UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
Miami Division
Sealed

FILED by _A5S_ D.C.

JUL 1 2 2013

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

UNITED STATES OF AMERICA
*ex rel.* JONATHAN LORD, M.D.,

        Plaintiff,

v.

UNIVERSITY OF MIAMI,

        Defendant.

_____/

Civil Action No.

# 13-22500

**Filed Under Seal
Pursuant To
31 U.S.C. § 3730(b)(2)** CIV-COOKE

MAGISTRATE JUDGE
TURNOFF

## FALSE CLAIMS ACT COMPLAINT

1.    JONATHAN LORD ("Relator") brings this action on behalf of the UNITED STATES OF AMERICA against the UNIVERSITY OF MIAMI ("UM") for treble damages and civil penalties arising from Defendant's conduct in violation of the Federal False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.* The violations arise out of requests for payment by Medicare, TRICARE, Medicaid, and other government agencies and programs based on false claims.

2.    This action is also brought on behalf of the STATE OF FLORIDA pursuant to the Florida False Claims Act, Fla. Stat. § 68.081 *et seq.* The violations arise out of requests for payment by Medicaid and other Florida agencies and programs based on false claims.

3.    Relator also brings actions for retaliation under the whistleblower retaliation provisions of the Federal FCA, 31 U.S.C. § 3730(h), and the protection for participating employees provisions of the Florida FCA, § 68.088, Fla. Stat.

## INTRODUCTION

4.     This case involves multiple schemes to defraud the Medicare, TRICARE, and Medicaid programs through various UM entities, including, but not limited to, UM's medical school, hospital, and health system. The source of this Complaint is Relator JONATHAN LORD, M.D. – UM Health System's former Chief Operating Officer and Chief Compliance Officer. These schemes involved billing for non-covered experimental surgical procedures, non-covered organ transplant laboratory tests and services, medically unnecessary organ transplant laboratory tests, and services furnished at non-enrolled locations. At all relevant times, these schemes were initiated and known throughout UM's highest corporate hierarchy, including its President, Board of Trustees, and chairs at its various health system's departments.

5.     The fraudulent schemes involved several departments within UM's Health System, including its Department of Medicine, Department of Surgery, and Department of Orthopaedics. The pervasive fraud and false claims described hereafter, occurred at the University of Miami Medical Center, Rosenstiel Medical Science Building, University of Miami Hospital, Marlins Park, and Jackson Memorial Hospital ("JMH"). By way of example:

a)     From 2007 to the present, UM through its agents and employees within its Organ Transplant Division in the Department of Surgery conspired and engaged in a scheme to defraud the United States and the State of Florida by submitting false claims to the Medicare and Medicaid programs. This scheme involved the Department of Surgery's Transplant Laboratories, which routinely and consistently submitted bills to the Medicare and Medicaid programs for (1) non-covered services, (2) services billed to and paid by another insurer, and (3) medically unnecessary clinical diagnostic tests and physician services.

b)     From May 1, 2012, to the present, UM through its agents and employees within its Cardiovascular Division in the Department of Medicine conspired and engaged in a scheme to defraud the United States and the State of Florida by submitting false claims to the Medicare, TRICARE, and Medicaid programs. This scheme involved the Cardiovascular Division routinely and consistently submitting bills to the Medicare, TRICARE, and Medicaid programs for non-covered services related to an experimental heart catheterization procedure that was never approved by the Centers for Medicare and Medicaid Services, as well as the Food and Drug Administration.

c)     From February 2012 to the present, UM through its agents and employees within its Division of Sports Medicine in the Department of Orthopaedics and Biomedical Engineering conspired and engaged in a scheme to defraud the United States and the State of Florida by submitting false claims to the Medicare and Medicaid programs. This scheme involved an off-campus physician facility located at Marlins Park that consistently and routinely submitted bills to Medicare and Medicaid without enrolling into either program.

6.     As required by the FCA, 31 U.S.C. § 3730(b)(2), the Relator has provided to the Attorney General of the United States and to the United States Attorney for the Southern District of Florida, simultaneous with and/or prior to the filing of this Complaint, a statement of all material evidence and information related to the Complaint. This disclosure statement is supported by material evidence known to Relator at the time of his filing, establishing the existence of the Defendant's legal responsibility for those false claims. Because the statement includes attorney-client communications and work product of Relator's attorneys, and is submitted to the Attorney General and to the United States Attorney in their capacity as potential co-counsel in the litigation, the Relator understands this disclosure to be confidential.

7.       Relator brings this action based on his direct knowledge and also on information and belief. None of the actionable allegations set forth in this Complaint are based on a public disclosure as set forth in 31 U.S.C. § 3730(e)(4). Notwithstanding same, Relator is an original source of the facts alleged in this Complaint.

8.       As required by the Florida FCA, § 68.083, Fla. Stat., the Relator has provided to the appropriate officials of Florida, simultaneous with and/or prior to the filing of this Complaint, as applicable. This disclosure statement is supported by material evidence known to the Relator at the time of the filing of this Complaint, establishing the existence of Defendant's false claims. Because this disclosure statement includes attorney-client communications and work product of Relator's attorneys, and is submitted to the state agencies in their capacity as potential co-counsel in the litigation, the Relator understands this disclosure to be confidential.

9.       Through his familiarity with UM's procedures at UM's locations, Relator believes that these same false and fraudulent practices may have occurred at other facilities which UM owns and operates.

## JURISDICTION AND VENUE

10.       The acts proscribed by 31 U.S.C. § 3729 *et seq.* and complained of herein occurred in part in the Southern District of Florida, and Defendant UM transacts business and is found in the Southern District of Florida. Therefore, this Court has jurisdiction over this case and Defendant UM pursuant to 31 U.S.C. § 3732(a), as well as 28 U.S.C. § 1345. This Court has pendent jurisdiction over this case for the claims brought on behalf of the State of Florida (referenced in paragraph 2) pursuant to 31 U.S.C. § 3732(b), inasmuch as recovery is sought on behalf of said state which arises from the same transactions and occurrences as the claim brought on behalf of the United States.

11.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), because the acts proscribed by 31 U.S.C. § 3729 *et seq.* and complained herein took place in this District and also proper pursuant to 28 U.S.C. § 1391(b) because the claims that this Complaint describe arose in this District. Moreover, Defendant UM resides in this District and conducts business in this District.

## PARTIES

12.     The UNITED STATES OF AMERICA ("United States") funds the provision of medical care for eligible citizens through Medicare, Medicaid, and other programs, acting through the Centers for Medicare and Medicaid Services within the United States Department of Health and Human Services, and other agencies.

13.     The STATE OF FLORIDA, acting through its Agency for Health Care Administration, jointly funds its Medicaid program along with the United States. Both the United States and the STATE OF FLORIDA will hereafter be referred collectively as "the Government".

14.     Relator, JONATHAN LORD, M.D., is a citizen of the United States and a resident of the State of Florida. Relator is a licensed medical doctor in the State of Florida. Between 1997 and 1999, Relator was the Chief Operating Officer of the American Hospital Association. In addition, Relator was Chief Innovation Officer and Senior Vice President of Humana from 2000 to 2009. On March 1, 2012, UM President Donna Shalala hired Relator as UM Health System's Chief Operating Officer, Chief Compliance Officer, Vice President of Medical Administration, and Professor of Pathology. UM later forced Relator to resign on January 31, 2013.

a)      Relator's duties included preparing UM Health System's annual budget, negotiating employment and collective bargaining contracts, negotiating the Annual Operating Agreement with Jackson Memorial Hospital, structuring the governance of the various departments within UM Health System, overseeing and implementing policies on compliance with various health laws including the Medicare and Medicaid programs, and developing revenue plans.

b)      Relator alleges that he directly, independently, and personally observed the activities undertaken by the Defendant and its agents and employees. Further, Relator alleges that he is an original source of the information provided to the Government.

15.      Defendant UM is a Florida nonprofit Corporation engaged in the business of owning and operating behavioral health facilities, acute care hospitals, ambulatory surgery and radiation centers, clinical diagnostic laboratories, outpatient clinics, and academic medical centers. It is incorporated in the State of Florida, its corporate headquarters are located in Coral Gables, Florida, and it conducts business throughout the United States.

16.      At all times relevant, Defendant UM acted through its officers, agents, and employees, and those acts were within the scope of their agency and employment. The policies and practices alleged in this Complaint were, on information and belief, set or ratified at the highest corporate levels of UM. An allegation against any entity herein is intended to include UM as a responsible party, inasmuch as UM is the parent company integrally involved in each of the Defendant entities' operations.

### *UM Entities, Officers, Agents, And Employees*

17.      The following entities are intended to include all subsidiaries of UM:

a)   University of Miami Miller School of Medicine;

b) University of Miami Health System;

c) University of Miami Medical Group;

d) University of Miami Hospitals and Clinics;

e) UHealth Clinical Practice;

f) The Miami Transplant Institute;

g) Life Alliance Organ Recovery Agency;

h) University of Miami Immuno-Monitoring Laboratory;

i) University of Miami Histo-Compatibility Laboratory;

j) University of Miami Miller School of Medicine DeWitt Daughtry Family Department of Surgery;

k) University of Miami Division of Cardiology;

l) University of Miami Department of Orthopaedics and Biomedical Engineering;

m) UHealth Physical Therapy Clinic; and

n) University of Miami Miller School of Medicine Department of Medicine.

18.      The term "UM" in this Complaint refers to, but is not limited to, the entities set forth in paragraph 17 of this Complaint.

19.      Donna E. Shalala, Ph.D., has been the President of UM since 2001 – its highest corporate officer – and a Professor of Political Science. From 1993 to 2001, she served as Secretary of Health and Human Services, which includes the Centers for Medicare and Medicaid Services. In that capacity, she promulgated a majority of the regulations and rules described herein.

20.     Alan S. Livingstone, M.D., is/was a Professor of Surgery, Chief Executive at UHealth Clinical Practice, Associate Vice President for Clinical Affairs, Chief of Surgical Services at Jackson Memorial Hospital, Chief of the Division of Surgery Oncology, Co-Medical Director of the University of Miami Medical Group, Chairman of the Life Alliance Organ Recovery Agency, Acting Clinical Director of the Miami Transplant Institute, and Chairman of the Lucille and DeWitt Daughtry Department of Surgery.

21.     Rafic S. Warwar is/was a Vice Chairman of the Life Alliance Organ Recovery Agency and Vice Chairman for Administration of the Lucille and DeWitt Daughtry Department of Surgery.

22.     Phillip Ruiz, Jr., M.D., Ph.D., is/was a Professor of Surgery, Professor of Pathology, Director of the University of Miami Immuno Monitoring Laboratory in the Lucille and DeWitt Daughtry Department of Surgery, Director of the University of Miami Histo-Compatibility Laboratory in the Lucille and DeWitt Daughtry Department of Surgery, and Director of the Division of Immunopathology.

23.     William W. O'Neill, M.D., is/was a Professor of Medicine at UM, Executive Dean for Clinical Affairs at UM, Chief Medical Officer at UM, Chief Executive Officer for Research at UM, Chairman of the Department of Cardiology at UM, and Medical Director of the Center for Structural Heart Disease at Henry Ford Hospital in Detroit, Michigan.

24.     Lee D. Kaplan, M.D., is/was a Professor of Orthopaedics at UM, Chief of UM's Division of Sports Medicine, Medical Director of UM's Athletics, and Miami Marlins Medical Director and Team Physician.

## THE THREE MAJOR FEDERAL HEALTHCARE PROGRAMS

### A.      The Medicare Program.

25.      In 1965, Congress enacted Title XVIII of the Social Security Act ("SSA"), known as the Medicare Program, to pay for the costs of certain healthcare services for eligible individuals. Eligibility to Medicare is based on age, disability, or affliction with certain diseases (these eligible individuals are hereafter referred as "Medicare beneficiaries"). *See* 42 U.S.C. § 1395 *et seq.* There exist two general components to the Medicare program:

a)      Part A, which provides insurance for inpatient hospital and hospital-related services for Medicare beneficiaries; and

b)      Part B, which provides insurance for outpatient hospital services, and other medical services provided by physicians and other providers to non-hospitalized Medicare beneficiaries.

26.      At all times pertinent to this Complaint, the Medicare program was administered by the various states through private insurance carriers. These carriers contracted with the Department of Health and Human Services and served as fiscal intermediaries ("FI") to receive, adjudicate, and pay Medicare claims submitted to it by Medicare beneficiaries, physicians, or providers of services.

27.      The Centers for Medicare and Medicaid Services ("CMS"), and its predecessor the Health Care Finance Administration, is an agency within the Department of Health and Human Services, and, at all times pertinent to this Complaint, was responsible for the operation, administration, and supervision of the Medicare health insurance program.

### B.     The Medicaid Program.

28.     The Medicaid program, as enacted under Title XIX of the Social Security Act of 1965, 42 U.S.C. § 1396 *et seq.*, is a system of medical assistance for families with dependent children and to aged, blind, and disabled individuals (collectively "Medicaid recipients") with insufficient income to pay the cost of such services. Though federally created, the Medicaid program is a joint federal-state program in which the United States provides a significant share of the funding.

29.     At all times pertinent to this Complaint, federal regulations governing the Medicare program, regarding reimbursement for the provision of outpatient services, were applicable to the Medicaid program in the State of Florida, pursuant to 42 C.F.R. §§ 440.20(a)(4) and 440.220(1)(4), and the State of Florida Title XIX Plan.

30.     At all times pertinent to this Complaint, pursuant to Florida law and in accordance with the Medicaid portion of the Social Security Act, the Florida Agency for Health Care Administration, and its predecessor the Florida Department of Health and Rehabilitative Services, administered a statewide program whereby these agencies would reimburse medical doctors and other providers for providing medical care to Medicaid recipients.

### C.     The TRICARE Program

31.     TRICARE Management Activity, formerly known as CHAMPUS, is a program of the Department of Defense that helps pay for covered civilian health care obtained by military beneficiaries, including retirees, their dependents, and dependents of active-duty personnel. 10 U.S.C. §§ 1079 & 1086; 32 C.F.R. Part 199. TRICARE contracts with fiscal intermediaries and managed care contractors to review and pay claims, including claims submitted by UM.

## FALSE CLAIMS ACT

32.     The False Claims Act provides, in pertinent part that:

(a)(1) any person who (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; (C) conspires to commit a violation of [(A) or (B)];

* * *

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person ...

(b) For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729.

33.     Under the False Claims Act, a "claim" is defined as:

Any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property that is (1) presented to an officer, employee, or agent of the United States; or (2) made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest.

31 U.S.C. § 3729(c).

34.     The FCA is the government's primary tool to recover losses due to fraud and abuse by those seeking payment from the United States. *See* S. Rep. No. 345, 99 Cong. 2d Sess. At 2 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266.

## ALLEGATIONS

35.     UM has routinely submitted false and fraudulent claims to the Medicare and Medicaid programs, and it has done so "knowingly", as provided in the Act. UM has been repeatedly advised by a number of sources that the claims it has submitted do not comply with

11

Medicare, TRICARE, and Medicaid regulations and are false and fraudulent. Nevertheless, UM has failed to take steps to ensure that claims and billings are accurate and comply with the applicable regulations, and has instead continued to submit claims with reckless disregard of their truth and accuracy, and/or actual knowledge that they are false and fraudulent.

36.     In the course of performing his duties, Relator learned that false and fraudulent claims and billings to the Medicare, TRICARE, and Medicaid programs were widespread throughout UM. From interviews of program directors and his own review of related records and billing histories, Relator identified numerous routine billing practices that produced claims to Medicare, TRICARE, and Medicaid that not only failed to comply with program requirements, but were also false and fraudulent.

37.     As he dug deeper, and as he attempted to have UM correct these problems and prevent future false and fraudulent claims from being submitted, Relator learned that the illegal practices were not only well known to UM at the highest corporate level, but were encouraged.

38.     The fraudulent practices of which Relator learned and in which UM continues to routinely engage include the following:

### *Relationship Between UM And JMH*

39.     UM through its various healthcare entities, including but not limited to those described in paragraph 17, generates approximately $1.7 billion of system-wide yearly revenue. A portion of this revenue is derived from its affiliation with JMH. This affiliation is derived from a Basic Affiliation Agreement that was initially entered in 1952 and was last updated in 2004. Under the Basic Affiliation Agreement, UM and JMH agreed to enter into Annual Operating Agreements ("AOA") that set forth the fiscal and administrative provisions for carrying out the

Basic Affiliation Agreement. A true and correct copy of the AOA for Fiscal Year 2010-2011 is attached hereto as Exhibit "1".

40.     The AOA covers a variety of services furnished by UM faculty at JMH hospitals, whereby UM provides physicians to render services for JMH patients. Because of this, the AOA describes a range of covered services, as well as the mechanism for reimbursing UM for these services.

41.     The AOA utilizes a payment methodology to reimburse UM for the specified services. Under the AOA, JMH will pay no more than a set amount to UM for all the services described in the AOA. By way of example, JMH paid UM $130,092,000.00 for FY 2010-2011 for such services. A portion of that amount is carved out to UM faculty and other health care providers for (1) direct patient care services, (2) educational services support, and (3) hospital administration support. *Id.* at 11. The remainder of the set amount is to be paid to UM for all the other services described in the AOA, such as transplant services. *Id.*

42.     Under the AOA, the parties set forth the terms and conditions regarding JMH's responsibility for billing and collecting for physician services for JMH patients. Generally, the AOA states that such services are "intended to be fulfilled by [UM] billing and collecting for physician services for [JMH] Hospital Patients". *Id.* at 3. In addition to this general payment for direct patient care services, the AOA describes a payment mechanism for specific services – such as transplant services – whereby UM bills JMH for those services.

43.     In order to obtain payment from JMH for the above specific services, UM must submit monthly invoices to JMH. Once JMH receives those invoices, JMH must provide a remittance advice along with payment within 45 days of receipt of those invoices.

### *UM's Transplant Laboratories Fraudulently Billing Non-Covered and Medically Unnecessary Tests and Services*

44.    UM has two transplant laboratories: the Immuno-monitoring laboratory ("IML") and the histocompatibility laboratory ("Histo Lab"). Although the IML and the Histo Lab bill as separate entities, both utilize the same staff, the same physician, and the same physical structure within UM's Rosenstiel Medical Science Building. Indeed, there exists no visible or physical distinction between the two. At all relevant times, every false bill originated from this facility.

45.    These transplant laboratories are supervised and organized under UM's Department of Surgery, which is chaired and exclusively run by Dr. Alan S. Livingstone. Since 2007, Dr. Livingstone orchestrated several schemes to increase the revenue of the Department of Surgery by defrauding the government's healthcare programs.

46.    The first scheme involves the transplant laboratories billing and receiving payment for non-covered laboratory tests. Hospitals furnishing transplant services are the only lawful provider allowed to submit any and all transplant related bills to CMS. Because of this, any non-transplant hospital laboratory is prohibited to submit any bills to CMS for transplant laboratory services. These laboratories must only seek payment from the transplant hospital that hired the laboratory's services.

a)    In addition to this prohibition, these non-transplant laboratories furnishing tests and services to transplant hospital patients are further prohibited from submitting to CMS a global bill that includes the technical component and professional component of laboratory tests and services. These laboratories may only submit bills for the professional component of their services. An exception existed from 2000 to 2010 that allowed certain laboratories that had a pre-existing arrangement with a hospital that allowed the laboratory to submit to CMS a global bill.

14

This exception was further limited to only the services and tests the laboratory furnished to hospital patients prior to July 22, 1999.

b)      Here, JMH – the transplant hospital – contracted with UM – the non-transplant facility – to have UM's transplant laboratories furnish tests and services to JMH patients. UM's transplant laboratories, however, submitted bills to and received payments from the govnerment for laboratory tests and services it furnished to JMH transplant inpatients. Such billing was and is prohibited.

c)      Further, UM submitted global bills to CMS for laboratory tests and services, despite never having a pre-existing arrangement with JMH to globally bill for those tests and services. Prior to 2007, JMH itself furnished and billed for the tests and services that UM has sought payment from 2007 to the present. UM was and is prohibited from submitting such global bills.

47.      The second scheme involves UM's transplant laboratories for furnishing and submitting bills for unsigned and unrequested laboratory tests. Under the Medicare program, unsigned and unrequested laboratory tests are considered medically unnecessary for the treatment and evaluation of patients. Despite this, UM's transplant laboratories furnished these tests and services, and then submitted and received payment for these tests and services from Medicare and Medicaid. As a result, the transplant laboratories submitted and received payment for medically unnecessary laboratory tests and services.

### 1.  *Relationship Between JMH And UM's Transplant Laboratories*

48.      The AOA contains a provision that allows JMH to purchase a variety of transplant services from UM including, but not limited to, (1) physician services related to pre-transplant workups; (2) physician services related to organ procurement; (3) histology laboratory services;

(4) immune-monitoring laboratory services; (5) organ procurement; and (6) staff support for JMH transplant centers.

49. The AOA specifies the rights and responsibilities of UM and JMH in rendering transplant services to JMH patients. Specifically, the AOA states:

> [UM] shall have the right to bill patients for services performed by physicians on a direct basis or to third-party reimbursers, within the limitations of the federal regulations for the End-Stage Renal Disease Program, other transplant programs and other applicable laws. [UM] agrees to establish and/or maintain billing practices which are consistent with regulations of all third-party payers as they affect [JMH] and will not jeopardize the relationship of [JMH] with such third-party payers.

Exhibit 1 at 21.

50. In performing such services, the AOA states that JMH desires to utilize UM's Histo Lab for the purpose of tissue matching organs for potential transplant candidates. *Id.* The Histo Lab is enrolled to receive Medicare and Medicaid reimbursements.

51. At all relevant times, transplant surgeries on JMH patients occur at JMH, and the tissue matching occurs at UM's Rosenstiel Medical Science Building.

52. Since June 1, 1983, UM has also operated the previously described IML. The IML performs pre- and post-transplant clinical diagnostic tests. Pre-transplant diagnostic tests evaluate the transplant candidate and donor, in order to aid the physician during the transplantation. Post-transplant clinical diagnostic tests evaluate the immunosuppression, tolerance, side effects, infection, and any early graft rejection of the transplant patient. At all relevant times, both the Histo Lab and the IML are certified under the Clinical Laboratory Improvement Amendments ("CLIA"), 42 U.S.C. § 263a.

53. Under the AOA, JMH may utilize UM's IML for JMH patients. When this occurs, UM must only bill JMH for these services on a negotiated case rate basis. Further, UM must bill JMH for routine pre-transplant laboratory services at the current Medicare rate. Under the

Medicare program, all inpatient services are billed using the site-of-service code "21" which denotes that the service was furnished to a hospital inpatient. Further, all pre-transplant laboratory services are furnished on JMH inpatients and occur at UM's Rosenstiel Medical Science Building.

54.     Once the patient has accepted the transplanted organ, JMH will discharge the patient from its inpatient services. Upon which, the patient is transferred for follow-up appointments with UM physicians from the Department of Medicine. This outpatient care is done at JMH affiliated facilities. These physicians will monitor the patient to ensure that the patient does not suffer complications from the transplant.

55.     Under the Medicare program, outpatient care may be done at one of two types of facilities: a physician office or an outpatient hospital facility. *See Medicare Claims Processing Manual* Ch. 26 § 10.5. The reimbursement amount is different depending on where the service was furnished. Importantly, hospitals directly receive reimbursement from the government when billing as a hospital outpatient facility. UM transplant laboratories – non-hospital based facilities – frequently submitted bills to the Medicare program as an outpatient hospital facility in violation of the Act.

56.     UM's transplant laboratories generate yearly revenue of approximately $25.5 million for UM's Department of Surgery. A substantial portion of these revenues come from the Medicare and Medicaid programs.

### 2.  *IML Falsely Presented A Bill To Medicare And Medicaid For Uncovered Services*

57.     In and around 2007, Dr. Ruiz was dismissed from UM's Department of Pathology for performance related issues. Shortly thereafter, Dr. Livingstone appointed Dr. Ruiz on April 24, 2007, to lead the IML and the Histo Lab. Despite Dr. Ruiz never being credentialed to run

these transplant laboratories, as well as being the only pathologist within the Department of Surgery, Dr. Ruiz was hired to run these transplant laboratories and only answered to Dr. Livingstone.

58.     Upon assuming his new position, Dr. Ruiz caused certain non-hospital based transplant laboratory tests, such as biopsies, to be billed to the government on behalf of UM's transplant laboratories. These tests had previously been billed to the government on behalf of JMH's histo lab, which is a hospital based facility. He also caused UM to seek payment from the Medicare program for both the technical and professional component for these tests, instead of only the technical component as required under federal law. In addition to redirecting reimbursements from the government for certain transplant laboratory tests from JMH to UM, UM's transplant laboratories continued to submit invoices to JMH for these same services as required by the AOA. This scheme greatly increased the revenue of the transplant laboratories, as well as UM's Department of Surgery.

59.     The revenues generated by the transplant laboratories have consistently and continuously increased despite the number of transplants declining from 547 to 308 over the past six years. This largely occurred because Drs. Livingstone and Ruiz through the transplant laboratories began (1) to bill Medicare and Medicaid for procedures that do not qualify for reimbursement; and (2) continuing to bill JMH for the same services as required by the AOA.

60.     Medicare reimburses only the hospital for a diagnostic laboratory service furnished to an inpatient at the hospital, regardless of whether the service was furnished by the hospital or an independent laboratory. 42 C.F.R. § 409.16. This rule also exists for organ transplants.

61.     For organ transplants, Medicare reimburses only the transplant hospital for services related to (1) the evaluation or preparation of a potential or actual donor, (2) the donation of the organ, or (3) postoperative recovery services directly related to the organ donation. 42 C.F.R. § 409.18(b). Included within these services are laboratory procedures such as tissue typing and pre-transplant diagnostic evaluations. *Medicare Claims Processing Manual,* Ch. 3 § 90. As a result, an independent laboratory, such as UM's transplant laboratires, furnishing transplant related services may only bill the transplant hospital that hired it. *Id.* Medicare, then, reimburses the transplant hospital for all transplant related services. 42 C.F.R. §§ 413.1(d) & 413.172. As a result, only the transplant hospital can bill Medicare for inpatient hospital laboratory tests and services, and not the independent laboratory contracted by the transplant hospital.

62.     Like hospital inpatients, only the hospital may bill for the technical component of laboratory tests rendered to hospital outpatients. 42 U.S.C. § 1395*l*(h)(5)(A)(iii). Stated differently, "[w]hen the hospital obtains laboratory tests for outpatients under arrangements with clinical laboratories or other hospital laboratories, only the hospital can bill for the arranged services." *Medicare Claims Processing Manual,* Ch. 16 § 40.3.

63.     Congress later allowed certain contracted or independent laboratories of "covered hospitals" to directly bill Medicare for the technical and professional components of pathology services. Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000 ("BIPA"), Pub. L. 106-554 § 542(a). In order to qualify as a "covered hospital", the hospital must meet all of the following: (1) an arrangement with an independent laboratory that was in effect as of July 22, 1999; (2) the arrangement states that the independent laboratory was to furnish the technical component of a laboratory service to hospital inpatients or outpatients; and

(3) the independent laboratory – not the hospital – submitted claims for payment to Medicare prior to July 22, 1999. Pub. L. 106-554 § 542(a)(1).

64.     BIPA further is limited to only those services that the independent laboratory provided under the qualified arrangement prior to July 22, 1999. *See Medicare Claims Processing Manual,* Ch. 16 § 80.2.1 ("If the arrangement between the independent laboratory and the covered hospital limited the provision of [technical component] physician pathology services to certain situations or at particular times, then the independent laboratory can bill [Medicare] only for those limited services.").

65.     The BIPA grandfather provision was in effect from January 1, 2001, until December 31, 2010, when Congress allowed it to expire. Since this expiration, "[a]n independent laboratory that furnishes the technical component of physician pathology services to inpatients or outpatients of a hospital that is not a covered hospital *may not bill the carrier* for the technical component of physician pathology services." *Medicare Claims Processing Manual,* Ch. 12 § 60 A (emphasis added).

66.     In order to comply with the above rules, independent laboratories must use modifiers on their bills to denote whether the services rendered were a technical component or professional component. For example, the "26" modifier notes that the services within the bill are only for the professional component of laboratory services. All bills that do not contain the "26" modifier are requesting reimbursement for the technical component, along with the professional component of the service.

67.     In addition, independent laboratories billing tests furnished to hospital patients must state on the bill that the site-of-service occurred at the hospital. *Medicare Claims Processing Manual* Ch. 26 § 10.6. Specifically, the independent laboratory must use the site-of-

service codes "21" or "22" to signify that the service was furnished to a hospital inpatient or outpatient, respectively.

68.     By way of example, the IML through Dr. Ruiz submitted global bills and received payment for the following JMH transplant inpatients to Medicare and Medicaid:

| Patient (initials) | Claim Date (Month/Day/Year) | Insurer | Site-of-Service |
|---|---|---|---|
| K.I. | 10/31/2012 | Medicare | 21-Hospital Inpatient |
| M.B. | 11/13/2012 | Medicare | 21-Hospital Inpatient |
| C.O. | 9/26/2012 | Medicare | 21-Hospital Inpatient |
| F.D. | 9/26/2012 | Medicare | 21-Hospital Inpatient |
| E.L. | 11/13/2012 | Medicare | 21-Hospital Inpatient |
| V.S. | 8/15/2012 | Medicare | 21-Hospital Inpatient |
| H.D. | 2/25/2013 | Medicare | 21-Hospital Inpatient |

*See* Remittance Letters from CMS to the IML, attached hereto as Exhibit "2".

69.     As shown, these are all JMH hospital inpatients that the IML received payment from CMS in violation of BIPA and 42 C.F.R. §§ 409.18, 413.1 & 413.172. The IML has continuously and consistently sought payment for similar bills since Dr. Ruiz's 2007 appointment.

70.     Prior to the 2007 appointment of Dr. Ruiz, UM's transplant laboratories did not bill Medicare and Medicaid for certain physician pathology services. Further, these laboratories never claimed to qualify under BIPA. At that time, JMH utilized its own pathology laboratory to furnish the technical component of certain procedures, such as biopsies. Because of this, JMH

21

did not have an agreement with any independent laboratory, including UM's transplant laboratories, to furnish such services.

71.     By way of example, prior to Dr. Ruiz's 2007 appointment, he billed for transplant laboratory procedures as taking place at JMH's pathology anatomic services laboratory. None of these inpatient transplant laboratory services occurred at UM's transplant laboratories.

72.     Once appointed to lead UM's transplant laboratories in 2007, Dr. Ruiz began rendering and billing for the same services and tests he previously billed and furnished at JMH. Since Dr. Ruiz's 2007 appointment, the IML rendered and billed Medicare and Medicaid for the following services previously billed by the JMH pathology laboratory:

**Test/CPT Billing Code**

Kidney/GI Biopsy 88305
Liver/Heart/Lung Biopsy 88307
Special Stain (I) 88312
Special Stain (II) 88313
Immunohistochemistry (I) 88342
Immunohistochemistry (II) 88360
Immuno fluorescence 88346
Electron microscopy 88348
*In situ* hybridization (FISH or CISH) 88365

73.     At all relevant times since Dr. Ruiz's appointment, JMH has simultaneously billed Medicare and Medicaid for the technical component of these services as part of its bill for transplant treatment. *See* Exhibit "2". As stated above, only JMH – the transplant hospital – was lawfully allowed to bill for the above services.

### 3.  *UM's Transplant Laboratories Performed Medically Unnecessary Services*

74.     Under the Act, "no payment may be made for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A); *see*

22

*also* 42 C.F.R. § 411.15(k)(1). Pertinent here, diagnostic tests, including laboratory tests, "must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." 42 C.F.R. § 410.32(a).

75.     Laboratories wishing to conduct a diagnostic test on any material derived from a human body must be certified by the Secretary under CLIA. Public Health Service Act § 353, 42 U.S.C. § 263a. When a certified CLIA laboratory wishes to process, perform, and report a histopathology diagnostic test, then the processing, performance, and reporting of such test must be rendered by a licensed and board certified doctor of medicine, such as a pathologist. *See* 42 C.F.R. §§ 493.1449, 493.1489, & 493.1495. Thus, a CLIA certified laboratory not meeting the supervision and testing requirements of the CLIA is not performing a "medically necessary and reasonable" test.

76.     In addition to the requirements for laboratory tests, laboratory services furnished to hospital patients carry additional requirements to be "medically necessary and reasonable" and must: (1) be personally furnished for an individual beneficiary by a physician; (2) directly contribute to the diagnosis or treatment of an individual beneficiary; and (3) ordinarily require performance by a physician. 42 C.F.R. § 415.102(a). Additionally, the regulations only provide reimbursement to pathologists providing the following services: (1) surgical pathology services; (2) specific cytopathology, hematology, and blood banking services that have been identified to require performance by a physician; (3) a requested clinical consultation service by an attending physician that relate to an abnormal test result and require the exercise of medical judgment by the consultant physician; or (4) a requested clinical laboratory interpretative service by an

23

attending physician that require the exercise of medical judgment by the consultant physician. 42 C.F.R. § 415.130.

77.     The above pathology services must produce a written narrative report and include it in the beneficiary's medical record. Further, this consultation pathology service must (1) be requested by the beneficiary's attending physician; (2) be related to a test result that lies outside the clinically significant normal or expected range in view of the condition of the beneficiary; and (3) require the exercise of medical judgment by the consultant physician. 60 Fed. Reg. 63124.

78.     Medical providers who seek reimbursement for medical services from CMS are required to complete prescribed claim forms from CMS. 42 C.F.R. § 424.32(b). By way of example, when submitting claim Form CMS 1500, physicians and/or providers make the following certification:

> I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction.

> NOTICE: this is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or state laws.

79.     At all relevant times, UM utilizes the Transplant Program Information System ("TPIS") for the ordering of clinical diagnostic laboratory tests for its transplant laboratories. TPIS is a computer program that allows physicians to electronically order laboratory tests from any physical location. Additionally, TPIS allows for laboratory test protocols to be pre-loaded into it. These protocols contain a series of tests that are specific to a certain diagnosis. By having protocols pre-loaded into TPIS, a treating physician may select and/or request only the protocol and not individual tests for a laboratory to furnish. Indeed, protocols do not have to be signed by

24

the treating physician before any laboratory, such as the IML, views and receives them. As a result, TPIS facilitates the submission of an unsigned order for a series of diagnostic tests to the transplant laboratories.

80.     The IML routinely furnishes laboratory tests on unsigned orders pursuant to the IML's preloaded protocols on TPIS. These orders are unsigned because the treating physician believes that these laboratory tests are medically unnecessary. Despite this, UM's transplant laboratories perform and bill the laboratory tests regardless of whether the order was signed by a physician. Moreover, Dr. Ruiz does not have to be physically present at the transplant laboratories to sign for laboratory results.

81.     By way of example, UM has specific protocols for each laboratory test, such as for post-kidney transplant tests. Protocols such as this contain tests and procedures that physicians and other providers felt were medically unnecessary. Because of this, treating physicians refused to sign any requisitions, charts, or orders for these tests. Indeed, internal e-mails from within IML voiced these concerns to the Department of Surgery. *See* E-Mails from IML Laboratory Manager, attached hereto as Exhibit "3". Despite these concerns, the IML performed these tests solely because of the protocol and not because a physician requested the test. The IML then billed Medicare and Medicaid for these tests. This was done for multiple patients at a time.

82.     By way of example, the following physicians had 23,570 unsigned laboratory test orders by January 2012:

| Physician | Last Signed Order | First Unsigned Order | Last Unsigned Order | Tests Unsigned |
|---|---|---|---|---|
| MATTIAZZI | 11/30/2011 | 11/28/2011 | 12/2/2011 | 176 |
| TEKIN | 11/22/2011 | 11/22/2011 | 12/5/2011 | 360 |

| | | | | |
|---|---|---|---|---|
| TZAKIS | 11/23/2011 | 11/28/2011 | 11/28/2011 | 6 |
| DURO | | 10/27/2010 | 02/02/2011 | 3 |
| FERTEL | 11/15/2011 | 11/16/2011 | 12/5/2011 | 178 |
| LEVI | 10/20/2011 | 11/14/2011 | 11/16/2011 | 2 |
| ROTH | 5/9/2011 | 4/27/2011 | 12/2/2011 | 17258 |
| BURKE | 12/1/2011 | 11/29/2011 | 12/2/2011 | 35 |
| CIANCIO | 11/14/2011 | 11/7/2011 | 12/2/2011 | 1024 |
| GUERRA | 11/7/2011 | 11/2/2011 | 12/2/2011 | 753 |
| KLEINER | | 12/1/2009 | 7/29/2011 | 41 |
| BAUERLEIN | 11/17/2011 | 11/21/2011 | 12/1/2011 | 51 |
| CHANDAR | | 4/6/2010 | 10/24/2011 | 74 |
| GARCIA | | 1/25/2011 | 9/2/2011 | 3 |
| SAGESHIMA | 11/14/2011 | 8/2/2010 | 11/30/2011 | 772 |
| CHEN | 11/7/2011 | 11/2/2011 | 12/2/2011 | 623 |
| RODRIGUEZ | | 1/19/2010 | 9/14/2011 | 301 |
| ABBAS | | 1/5/2010 | 12/2/2011 | 497 |
| BURGOS-TIBURCIO | | 11/30/2009 | 6/18/2010 | 447 |
| SAAVEDRA | | 3/29/2010 | 11/21/2011 | 381 |
| HERSHBERGER | | 11/5/2010 | 11/30/2011 | 191 |
| JIMENEZCARCAMO | | 12/7/2009 | 11/10/2011 | 141 |
| ANDREANSKY | | 12/15/2009 | 11/30/2011 | 137 |
| KUMAR | | 1/5/2010 | 4/6/2011 | 135 |
| MARTINEZ | | 6/11/2010 | 10/17/2011 | 135 |
| R PEREIRA | | 8/15/2011 | 10/24/2011 | 116 |
| KALMAN | | 2/8/2011 | 11/29/2011 | 113 |
| HALPERT | | 3/11/2010 | 11/17/2011 | 111 |
| ALEJANDRO | | 12/29/2009 | 8/29/2011 | 106 |
| UPDIKE | | 7/26/2010 | 8/31/2011 | 89 |
| NAMIAS | | 6/1/2010 | 10/26/2011 | 77 |
| H FERNANDEZ | | 12/1/2009 | 6/17/2011 | 61 |
| IFTIKHAR | | 6/28/2010 | 11/14/2011 | 59 |
| TALMACIU | | 3/17/2011 | 7/20/2011 | 58 |
| GAIER | | 5/10/2010 | 8/24/2011 | 56 |
| KAPLAN | | 12/17/2009 | 6/21/2011 | 52 |
| SACKEL | | 3/17/2010 | 10/6/2011 | 52 |
| AHN | | 6/9/2010 | 9/7/2011 | 49 |
| KALIDINDI | | 5/27/2010 | 10/13/2011 | 49 |
| KABIR | | 10/5/2010 | 7/6/2011 | 47 |
| PAREDES | | 3/3/2011 | 8/24/2011 | 39 |

| | | | | |
|---|---|---|---|---|
| NEVILLE | | 5/13/2011 | 10/13/2011 | 37 |
| JIMENEZ | | 1/26/2010 | 11/17/2011 | 33 |
| INVEROUDI | | 5/27/2010 | 4/20/2011 | 32 |
| MAYOR | | 12/15/2009 | 10/21/2011 | 32 |
| ABITOL | | 11/16/2009 | 7/29/2011 | 30 |
| GOLDSTEIN | | 12/7/2009 | 5/31/2011 | 29 |
| CHAO | | 12/10/2009 | 11/2/2010 | 28 |
| NEUHAUS | | 3/22/2010 | 8/9/2010 | 27 |
| GORDON | | 9/15/2010 | 11/9/2011 | 26 |
| PFEIFFER | | 8/29/2011 | 9/1/2011 | 26 |
| SEQUEIRA | | 2/10/2010 | 9/29/2011 | 24 |
| CALVO | | 3/23/2011 | 7/18/2011 | 23 |
| MUSHTAQ | | 12/9/2010 | 11/7/2011 | 23 |
| CHEDIAK | | 2/9/2010 | 3/29/2010 | 21 |
| ESCALON | | 4/8/2010 | 12/29/2010 | 21 |
| FERNANDES | | 4/16/2010 | 4/6/2011 | 20 |
| FERRADA | | 4/27/2011 | 8/29/2011 | 19 |
| ABBASSI | | 3/16/2011 | 12/1/2011 | 18 |
| AGATSTON | | 7/28/2010 | 10/22/2010 | 18 |
| CESPEDES | | 2/18/2010 | 11/2/2011 | 18 |
| SELVAGGI | | 3/9/2010 | 9/14/2011 | 18 |
| ZILLERUELO | | 1/5/2010 | 11/9/2011 | 18 |
| LOSSOS | | 2/25/2010 | 10/7/2011 | 16 |
| GOLDBERG | | 12/2/2009 | 9/30/2010 | 15 |
| GOODMAN | | 12/9/2009 | 4/27/2011 | 15 |
| SEEHERUNVONG | | 7/6/2010 | 8/9/2011 | 15 |
| ANAPOL | | 4/5/2011 | 4/5/2011 | 14 |
| PAGELOW | | 10/25/2010 | 8/16/2011 | 14 |
| BREBENE | | 5/4/2011 | 5/4/2011 | 12 |
| EASTES | | 4/19/2011 | 4/19/2011 | 12 |
| PEREIRA | | 2/18/2010 | 9/29/2011 | 12 |
| VILVAR | | 3/4/2010 | 3/4/2010 | 11 |
| BARREDO | | 7/13/2010 | 11/7/2011 | 10 |
| EARLY | | 4/14/2011 | 6/3/2011 | 10 |
| MALLON | | 9/8/2010 | 9/8/2010 | 10 |
| SLINGERLAND | | 12/27/2010 | 12/27/2010 | 10 |
| STEFANOVIC | | 3/29/2010 | 10/29/2010 | 10 |
| THOMAS | | 2/9/2011 | 3/31/2011 | 10 |
| CALDERA-NIEVES | | 1/25/2011 | 6/27/2011 | 9 |

| | | | | |
|---|---|---|---|---|
| RIVERA-HERNANDE | | 2/14/2011 | 2/14/2011 | 9 |
| COLIN | | 2/17/2010 | 7/18/2011 | 8 |
| RATZAN | | 11/10/2010 | 2/15/2011 | 8 |
| SNYDER | | 4/20/2011 | 4/20/2011 | 8 |
| BLAUSTEIN | | 12/17/2009 | 6/22/2010 | 7 |
| BOLOOKI | | 10/26/2010 | 8/22/2011 | 7 |
| FERCHAK, PA | | 7/28/2010 | 08/20/2010 | 7 |
| HENDEL | | 2/9/2011 | 2/9/2011 | 7 |
| KOMANDURI | | 6/8/2010 | 8/30/2011 | 7 |
| OTHER | | 2/24/2010 | 5/26/2011 | 7 |
| FEUN | | 7/1/2010 | 9/13/2011 | 6 |
| O'BRIEN | | 10/5/2010 | 10/5/2010 | 6 |
| R SCHIFF | | 7/15/2010 | 07/15/2010 | 6 |
| SYMES | | 10/7/2011 | 11/29/2011 | 6 |
| ABU | | 9/9/2010 | 9/9/2010 | 5 |
| DAVIS | | 1/20/2010 | 6/9/2010 | 5 |
| HERNANDEZ | | 5/21/2010 | 10/19/2011 | 5 |
| KOUTOUBY | | 12/12/2010 | 3/12/2011 | 5 |
| SELVAGY | | 12/31/2009 | 11/3/2010 | 5 |
| SMOLLER | | 10/20/2010 | 10/20/2010 | 5 |
| TALEBI | | 6/8/2011 | 6/8/2011 | 5 |
| BAIER | | 11/2/2011 | 11/2/2011 | 4 |
| BOULANGER | | 10/13/2010 | 4/4/2011 | 4 |
| COHEN | | 3/15/2010 | 11/15/2011 | 4 |
| DE LA CRUZ | | 05/05/2010 | 7/8/2010 | 4 |
| BYRNES | | 7/25/2011 | 9/2/2011 | 3 |
| KHURANA | | 12/22/2010 | 12/22/2010 | 3 |
| LEVEILLEE | | 3/28/2011 | 3/28/2011 | 3 |
| SMITH | | 6/1/2010 | 6/7/2010 | 3 |
| ABREU | | 9/7/2011 | 9/7/2011 | 2 |
| AUNG | | 9/21/2010 | 9/21/2010 | 2 |
| DIAZ WONG | | 7/15/2011 | 07/15/2011 | 2 |
| LENZ | | 3/30/2010 | 5/23/2011 | 2 |
| MODIR | | 11/17/2011 | 11/17/2011 | 2 |
| RINDE-HOFFMAN | | 7/19/2011 | 7/19/2011 | 2 |
| SANDHU | | 3/29/2011 | 5/29/2011 | 2 |
| STUDY | | 8/20/2010 | 8/26/2010 | 2 |
| VALLE | | 3/21/2011 | 3/21/2011 | 2 |
| WATERMAN | | 12/8/2010 | 12/8/2010 | 2 |

| | | | | |
|---|---|---|---|---|
| YASIN | | 11/17/2010 | 9/8/2011 | 2 |
| ANDRADE-BUCK | | 3/1/2011 | 3/1/2011 | 1 |
| AVISAR | | 7/22/2011 | 7/22/2011 | 1 |
| CONTRERAS | | 3/26/2010 | 3/26/2010 | 1 |
| DESHPANDE | | 7/1/2010 | 7/1/2010 | 1 |
| DIAZ | | 2/9/2010 | 2/9/2010 | 1 |
| HARRINGTON | | 11/15/2011 | 11/15/2011 | 1 |
| LAZAR | | 11/15/2010 | 11/15/2010 | 1 |
| LENNOX | | 11/2/2010 | 11/2/2010 | 1 |
| LEVY | | 10/29/2010 | 10/29/2010 | 1 |
| LOKSHWAR | | 3/25/2010 | 3/25/2010 | 1 |
| NORRIS | | 8/19/2010 | 8/19/2010 | 1 |
| OBRIEN | | 9/27/2011 | 9/27/2011 | 1 |
| PALA | | 10/11/2011 | 10/11/2011 | 1 |
| SCHIFF | | 7/15/2010 | 7/15/2010 | 1 |
| SHAPIRO | | 6/6/2011 | 6/6/2011 | 1 |
| SOLOWAY | | 9/30/2010 | 9/30/2010 | 1 |
| WOLFF | | 7/21/2011 | 7/21/2011 | 1 |
| WRIGHT | | 3/7/2011 | 3/7/2011 | 1 |
| RUSCONI | 11/14/2011 | 11/16/2011 | 12/1/2011 | 93 |
| NISHIDA | 11/22/2011 | 11/17/2011 | 12/5/2011 | 16407 |
| PHAM | 11/14/4201 | 11/28/2011 | 12/5/2011 | 124 |
| BUENO | | 2/8/2011 | 2/8/2011 | 19 |
| KUPIN | 11/21/2011 | 11/16/2011 | 12/2/2011 | 961 |

*See* List of Unsigned Laboratory Orders for the IML by January 2012, attached hereto as Exhibit "4".

83.     Despite these unsigned orders, the IML, by and through Dr. Ruiz, furnished laboratory tests on these orders according to the uploaded protocol on TPIS. Thereafter, the IML submitted a form for payment on all of these tests to Medicare or Medicaid for reimbursement. Indeed, Dr. Ciancio, the former director of UM's and JMH's Miami Transplant Institute, stated "that it is very known internally that the lab has been performing tests without signed physician

orders, performing known medically unnecessary testing and questionable billing practices." *See* TMG Memorandum regarding phone call from Dr. Ciancio, attached hereto as Exhibit "5".

84.    Dr. Ruiz and the transplant laboratories billed for physician services that did not result in the production of a written narrative. By not fulfilling these obligations and not following the required regulations with regard to the furnishing and rendering of physician services, these tests are not considered medically necessary. By certifying that these tests were medically necessary on the Form CMS 1500, the IML requested and received reimbursement for falsely certified bills.

85.    The transplant laboratories' unlawful billing has occurred on a consistent basis since the 2007 appointment of Dr. Ruiz. Even more troubling, Relator reported this conduct to UM's General Counsel and Medical School Dean. As of the filing of this Complaint, UM has taken no action to remedy these violations.

### 4. *Relator, As UM's Chief Compliance Officer, Retained External Auditors To Audit The Transplant Laboratories*

86.    Throughout the fall of 2012, UM at Relator's behest hired an independent consultant – Transplant Management Group ("TMG") – to audit, *inter alia*, UM's transplant laboratories. The TMG investigation revealed several fraudulent practices: (1) that the IML participated in duplicative billing by directly billing the Medicare Program for non-covered services; (2) that the IML engaged in inappropriate, unnecessary, and redundant testing; (3) that the IML performed many "routine" laboratory tests on JMH patients when JMH offers identical services at a much lower cost; and (4) that the IML splits tests between itself and the Histo Lab in order to game the system by taking advantage of cost-based reporting for higher cost tests and use the IML for direct Medicare billing on tests with higher reimbursement.

87.     In addition to the December 2012 TMG report, Relator met with UM Board Member Hilarie Bass, who chaired UM's audit and compliance committee for UM's Board of Trustees. At that meeting, Relator personally briefed Ms. Bass concerning all the above violations relating to the transplant laboratories. Moreover, Relator expressed his fear that Dr. Livingstone and Mr. Warwar personally interfered with the TMG audit by personally intimidating employees to not talk or provide TMG with any information.

88.     By way of example, Dr. Ciancio telephoned TMG and stated that he and transplant staff have "been instructed from the 'highest levels' to be vague and standoffish with [TMG], [sic] not share too much information about the leadership and financial issues with the transplant program." *See* Exhibit 5. Further, he stated "that the department of surgery knows exactly how and why the lab revenue and profits have grown 10 fold over the past 6 years." *Id.*

89.     Relator also explained these violations to UM's General Counsel and various other members on UM's Board of Trustees. In those discussions, Relator advocated to hire expert healthcare legal support. Furthermore, Relator met with UM's President Donna E. Shalala to personally update her concerning the above violations and report TMG's findings. On December 19, 2012, President Shalala responded to these concerns by ending the investigation into the transplant laboratories. *See* E-Mail from General Counsel to Compliance, attached hereto as Exhibit "6".

90.     After Relator reported TMG's findings, UM through a direct order by President Shalala transferred the investigation from Relator to Internal Audit. This transfer effectively ended TMG's investigation.

91.     UM then proceeded to isolate and subsequently dismiss Relator. On January 1, 2013, President Shalala forced Relator to resign and requested to recall all e-mails relative to

IML and recommended that no changes should be considered or implement until internal and external investigations are completed.

### *UM Fraudulently Billing An Experimental Catheterization Procedure*

92.     Due to the breadth of the Medicare program, Congress opted against drafting a comprehensive list of specific items or services eligible for coverage. Instead, it sketched Medicare benefits in a broad stroke with several bars to payment, most notably a bar on payment for services that "are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member."   42 U.S.C. § 1395y(a)(1)(A).

93.     Within this "reasonable and necessary" criteria, Congress delegated to the Secretary of Health and Human Services the authority to make initial determinations about which specific items or services will be covered under Medicare. 42 U.S.C. § 1395ff(a). The Secretary makes these initial determinations in one of two ways: a National Coverage Determination ("NCD") and a Local Coverage Determination ("LCD"). 42 U.S.C. § 1395ff(f). A NCD is "a determination by the Secretary with respect to whether or not a particular item or service is covered nationally." 42 U.S.C. § 1395ff(f)(1)(B). On the other hand, a LCD is a determination by a Medicare contractor, who is a private insurance company that processes local Medicare claims, with respect to whether or not a particular item or service is covered within the contractor's locality. 42 U.S.C. § 1395ff(f)(2)(B). Further, a NCD is binding on all Medicare contractors. 42 C.F.R. § 405.1060(a)(4).

94.     For the NCD process, CMS adopts the Food and Drug Administration ("FDA") determinations of safety and effectiveness. 68 Fed. Reg. 55636. As a result, an FDA-approved product is a precondition for Medicare coverage for certain products. *Id.*

32

95.     On November 1, 2010, Edwards Lifesciences ("Edwards") filed a Pre-Market Approval[1] application with the FDA for its new heart valve device: the Edwards SAPIEN Transcatheter Heart Valve ("THV"). This device is placed in patients whose aortic heart valve is damaged and/or diseased due to calcium build up, which restricts blood flow by narrowing the valve. This narrowing is known as senile aortic valve stenosis. Over half of the patients diagnosed with aortic valve stenosis die within two years of diagnosis.

96.     Two treatment regimes exist for aortic valve stenosis: (1) open heart surgery to replace the damaged and/or diseased valve; and (2) transfemoral delivery of a catheter[2] to the damaged and/or diseased valve. The latter procedure is prohibited unless a cardiac surgeon determines that the patient is too sick for the former. The procedure inserting these devices is known as Transcatheter Aortic Valve Replacement ("TAVR"). Because of TAVR's novelty, it is currently undergoing clinical trials in order to evaluate its safety and effectiveness. *See id.* at 7; *see also* STS/ACC TVT Registry (hereafter "Registry"), available at https://www.ncdr.com/TVT/Home/Default.aspx (last visited July 11, 2013) (a national registry that serves as a benchmarking tool developed to track patient safety and real-world outcomes related to TAVR).

97.     On November 2, 2011, the FDA granted Edwards's Pre-Market Approval application and label. As such, the FDA allowed Edwards to commercially distribute its THV for TAVR, as long as Edwards continues its premarket study.

---

[1] The FDA undergoes a process of scientific and regulatory review to evaluate the safety and effectiveness of devices that (1) support or sustain human life, (2) are of substantial importance in preventing impairment of human health, or (3) which present a potential, unreasonable risk of illness or injury. The Food, Drug, and Cosmetic Act § 515, 21 U.S.C. § 360e. A Pre-Market Approval applicant must receive FDA approval prior to marketing the device. As such, an approval is a private license granting the applicant permission to market the device. *Id.*

[2] One device used in the transfemoral delivery is the THV.

98.     At all relevant times, Edwards sponsored and continues to sponsor a prospective, randomized-controlled, multi-center pivotal trial to evaluate the safety and effectiveness of THV. This trial is known as the Placement of Aortic Transcatheter Valves Trial ("PARTNER"). Since September 14, 2007, the PARTNER Trial has been a registered clinical trial with the United States National Institutes of Health.[3]

99.     Based in part on the success of the PARTNER trial, as well as the Pre-Market Approval of THV, the Society of Thoracic Surgeons and the American College of Cardiology jointly submitted on September 22, 2011, a formal request to CMS for a NCD of THV and TAVR. On May 1, 2012, CMS issued its NCD approving Medicare coverage for TAVR but only under specified conditions.

100.    Since May 1, 2012, Medicare covers TAVR when furnished under either an FDA approved or FDA unapproved use. When TAVR is furnished under an FDA-approved indication, then the hospital and its heart team must participate "in a prospective, national, audited registry". *Medicare National Coverage Determinations Manual* at § 20.32(B)(A)(5). Importantly, the only FDA approved TAVR procedure is the transfemoral insertion. *Medicare National Coverage Determinations Manual* at § 20.32(B)(A).

101.    TAVR is also covered for uses that are not expressly listed as an FDA-approved indication. One non-FDA approved use is the transaortic insertion of the THV. Medicare covers such non-FDA approved uses only in the furtherance of a clinical study. *Id.* at § 20.32(B)(B). This clinical study must be registered with the government prior to the enrollment of the first study subject, and must comply with all applicable Federal regulations concerning the protection

---

[3] In and around March 7, 2011, the PARTNER Trial has evolved into a second trial known as PARTNER II, which is also registered with the NIH.

of human subjects found at 45 C.F.R. Part 46. *Id.* at § 20.32(B)(B)(3)(f) & § 20.32(B)(B)(3)(j).[4] For all non-FDA approved clinical trials, Medicare does not provide coverage.

102.    At all relevant times, UM participated in the FDA approved PARTNER and PARTNER II trials. Moreover, UM was considered a main site for both trials. In accordance with the TAVR NCD, CMS provided reimbursement to UM for these patients. Despite being part of both clinical trials, UM furnished TAVR to patients not enrolled in these or any other FDA approved trials.

103.    From May through July 2012, UM furnished TAVR to seventeen patients, who were never enrolled in any FDA-approved trial. For these patients, UM inserted THV using the transaortic technique, a technique that CMS never approved for reimbursement. William O'Neill, who led UM's TAVR program at all relevant times to this complaint, ordered and directed that UM bill Medicare for furnished services to these patients.

104.    The following list contains the seventeen (17) patients who were never enrolled in any FDA-approved clinical trial or registry that UM billed to Medicare for TAVR using the transaortic technique:

| Patient (initials) | Date of Service (Month/Day/year) | Treating Physician | Insurer | Approximate Amount Charged |
|---|---|---|---|---|
| M.B. | 5/1/2012 | William O'Neill | Medicare | $334,540 |
| A.B. | 5/1/2012 | Deepak Mummidavarapu | Medicare | $174,784 |
| F.S. | 5/7/2012 | Alberto Burgos-Tiburcio | Medicare | $429,777 |
| A.D. | 5/7/2012 | Syeda Abbas | Tricare | $201,157 |
| D.S. | 5/9/2012 | Syeda Abbas | Medicare | $424,435 |

---

[4] The PARTNER and PARTNER II trials were complicit trials under this regulation.

| S.K. | 5/14/2012 | Tony Abbassi | Medicare | $380,790 |
|------|-----------|--------------|----------|----------|
| L.F. | 5/15/2012 | Win Aung | Medicare | $267,276 |
| P.G. | 5/22/2012 | Deepak Mummidavarapu | Medicare | $253,732 |
| M.S. | 5/23/2012 | Suparna Dutta | Medicare | $253,490 |
| A.T. | 5/28/2012 | Deepak Mummidavarapu | Medicare | $257,338 |
| H.R. | 6/4/2012 | Ayesha Salahuddin | Medicare | $209,963 |
| A.F. | 6/5/2012 | Alan Heldman | Medicare | $693,120.14 |
| S.M. | 6/6/2012 | Canseco Pavon | Medicare | $259,338 |
| T.M. | 6/11/2012 | Efren Manjarrez | Medicare | $449,261.26 |
| J.S. | 6/12/2012 | Efren Manjarrez | Medicare | $210,063.26 |
| Z.C. | 6/13/2012 | Canseco Pavon | Medicare | $210,063 |
| R.M. | 7/31/2012 | Muzammil Mushtaq | Tricare | $273,586 |

105.    The total amount UM billed for the above seventeen patients is $5,282,713.66.

106.    At all relevant times, UM billed Medicare for the above named patients, knowing that none of the patients were enrolled in any FDA approved trial or registry. This was known at the highest corporate levels within UM. By way of example, UM's General Counsel stated that "[b]ased on my initial review, [] it appears that the coverage determination is tied directly to the FDA approved indications only. This does not include the transaortic insertion method." *See* E-Mail from Steven Stark to Dr. O'Neill, attached hereto as Exhibit "7" (emphasis added). On September 23, 2012, a physician involved in the scheme declared that he "updated Pres. Shalala on the issue of CMS (*sic*) (non)-reimbursement for non-transfemoral TAVI a couple weeks ago

36

... She and I discussed the political approach to influencing CMS." *See* September 23, 2012, E-Mail from Dr. Heldman, attached hereto as Exhibit "8".

107.   In addition, UM's own compliance office recommended that UM return all monies received from the above seventeen patients. By way of example, Jennifer McCafferty-Cepero, who is UM's Chief Medical Compliance Officer, wrote a memorandum on March 29, 2013, reiterating that the transaortic insertion technique was not covered. *See* March 29, 2013 Memorandum, attached hereto as Exhibit "9". In that memo, Ms. McCafferty-Cepero recommended to return all monies received for the above seventeen (17) patients. *Id.* To date, UM has not returned any monies related to this program.

108.   Instead of returning the monies received for these patients, UM decided to engage in a political effort with the aim to legalize these charges. *See* Exhibit 8. This strategy originated from UM's President Donna Shalala. As such UM knowingly and repeatedly engaged in unlawful billing of TAVR patients and has steadfastly refused to repay any amount.

### *UM Billing Off-Campus Outpatient Clinics As Hospital Clinics Without Enrolling Them Into Medicare*

109.   In order for an entity to submit payments to Medicare, that entity must first enroll into the program. 42 U.S.C. § 1395cc; *see* 42 U.S.C. § 1395f(a) ("Except as provided in subsections (d) and (g) and in section 1876, payment for services furnished an individual may be made only to providers of services which are eligible therefor under section 1866."); 42 C.F.R. § 424.505 ("To receive payment for covered Medicare items or services from either Medicare (in the case of an assigned claim) or a Medicare beneficiary (in the case of an unassigned claim), a provider or supplier must be enrolled in the Medicare program. Once enrolled, the provider or supplier receives billing privileges and is issued a valid billing number effective for the date a claim was submitted for an item that was furnished or a service that was rendered."). When

enrolling into Medicare, the applicant must identify all locations and addresses of where the applicant will furnish services. 42 C.F.R. § 424.510(d)(2)(ii).

110.    Once an entity is enrolled in Medicare, the entity must report any changes to its enrollment application within 90 days of the effective date of change. 42 C.F.R. § 424.516(e)(2). This is especially true when an enrolled provider seeks to add a new service location and have that new service location bill as the enrolled provider. These changes must be reported by submitting a CMS Form 855 every time an enrolled provider adds a new location.

111.    Before the enrolled provider may bill for services of the new facility as the enrolled provider, or before it includes the costs of those services on its cost report, the new facility must meet the criteria listed in 42 C.F.R. § 413.65. These facilities may either be "on-campus" or "off-campus" to the enrolled provider's main buildings. "On-campus" is defined as "the physical area immediately adjacent to the provider's main buildings, other areas and structures that are not strictly contiguous to the main buildings but are located within 250 yards of the main buildings, and any other areas determined on an individual case basis, by the CMS regional office, to be part of the provider's campus." 42 C.F.R. § 413.65(a)(2). In contrast, "off-campus" additions may be billed as provider-based if the addition is within a 35 mile radius of the campus of the enrolled provider. 42 C.F.R. § 413.65(e)(3)(ii).

112.    For "off-campus" additions that are performing services of a kind ordinarily furnished in physician offices that seek provider-based status, the regulations presume such an addition is a "free-standing facility" and not an extension of the enrolled provider. 42 C.F.R. § 413.65(b)(4).

113.    If the enrolled provider seeks to have a new off-campus facility bill as the provider, then the enrolled provider "would be required to submit an attestation stating that the

facility meets the criteria in paragraphs (d) and (e)" of 42 C.F.R. § 413.65. 42 C.F.R. § 413.65(b)(3)(ii). These potential provider-based facilities must meet all of the following requirements in order to bill as the provider: (1) the provider and the applicant operate under the same license; (2) the clinical services of the entity seeking provider-based status and the main provider are integrated; (3) the entity seeking provider-based status and the main provider are fully integrated within the financial system of the main provider, as evident by the main provider readily identifying the new entity in its trial balance on the main provider's cost report; (4) the entity seeking provider-based status holds itself out to the public and other payers as part of the main provider; (5) operate under the ownership or control of the main provider; (6) the organization seeking provider-based status and the enrolled provider must have the same frequency, intensity, and level of accountability that exists in the relationship between the main enrolled provider and one of its existing departments; and (7) the entity seeking provider-based status must comply with all the terms of the main provider's provider agreement. 42 C.F.R. §§ 413.65(d) & (e).

114.    In addition, if the new facility seeking provider-based status is a hospital outpatient department or hospital-based entity, then certain additional requirements apply. First, physician services furnished in these facilities must be billed with the correct site-of-service code so that appropriate physician and practitioner payment amounts can be determined. 42 C.F.R. § 413.65(g)(2). In addition, these facilities "must treat all Medicare patients, for billing purposes, as hospital outpatients" and not treat some Medicare patients as hospital outpatients and others as physician office patients. 42 C.F.R. § 413.65(g)(5). Further, these new facilities must provide written notice to the beneficiary prior to the delivery of service stating: (1) the amount of the beneficiary's potential financial liability or (2) an explanation that the beneficiary will incur a

coinsurance liability to the hospital that the beneficiary would not incur if the facility were not provider-based, an estimate of the charge, and a statement that the patient's actual liability will depend upon the actual services furnished by the hospital. 42 C.F.R. § 413.65(i). If a new facility is billing as a provider-based entity and does not comply with any of the above requirements, then the facility is not a provider-based entity and has overbilled Medicare.

115.    Medicare reimburses provider-based entities at a higher rate than if the service was furnished at a physician's office. Stated differently, provider-based outpatient facilities generally bill at a higher rate than a physician office for the same rendered service.

116.    On February 28, 2012, the University of Miami entered into a contract with Marlins Stadium Operator, LLC – the entity that owns and operates Marlins Park in Miami, Florida – to use a portion of Marlins Park for private patient consultations and treatment in connection with UM's physical therapy practice ("Marlins Clinic"). UM operates Marlins Clinic from Monday through Saturday with varying hours based on whether or not an event or baseball game is scheduled for Marlins Park.

117.    On the promenade Level at Marlins Park, UM operates this physical therapy clinic under the name "UHealth Physical Therapy Clinic". At all relevant times, Marlins Clinic billed as the University of Miami Hospitals and Clinics ("UMHC") without ever submitting Form CMS 855 to report the Marlins Clinic location as a new location for UMHC.

118.    At all relevant times, Marlins Clinic is located at 501 NW 16th Avenue, Miami, Florida 33125. UMH is located at 1475 NW 12th Avenue, Miami, FL 33136. Approximately1.1 miles separate these two locations. Because this distance is greater than 250 yards, Marlins Clinic is an off-campus facility.

119.    Lee D. Kaplan is the UM physician in charge of Marlins Clinic. At all relevant times, Marlins Clinic generates revenue in part from Medicare beneficiaries. These patients are furnished outpatient physical therapy services – a service ordinarily furnished at a physician's office. As an off-campus facility, Marlins Clinic is presumed to be a free standing physician's office.

120.    As stated above, the enrolled provider must list and account each and every off-campus facility that bills as a provider. Under the regulations, each off-campus facility billing as the enrolled provider must be accounted in the trial balance of the enrolled provider's cost report. UMHC, however, omits Marlins Clinic from its cost report.

121.    By way of example, UMHC lists all its off-campus provider-based facilities on its trial balance attached to its cost report. *See* UMH FY2012 Cost Report at 17, attached hereto as Exhibit "10". Absent from this list is Marlins Clinic. *Id.* By not listing Marlins Clinic, UMHC failed to financially integrate Marlins Clinic into UMHC.

122.    At all relevant times, Marlins Clinic has not sought a determination of its provider status. Despite this, Marlins Clinic billed and is still billing as a hospital-based facility – UMHC. Marlins Clinic billed as a provider-based facility despite never submitting a Form CMS 855 or complying with the provider-based billing requirements in 42 C.F.R. § 413.65. Moreover, Marlins Clinic – like all other UMHC outpatient provider-based facilities – never provided written notice to its Medicare beneficiaries prior to treatment.

123.    Prior to furnishing and billing a Medicare beneficiary as a provider-based facility, Marlins Clinic was required to inform each and every beneficiary that the beneficiary will incur a coinsurance liability to UMHC that the beneficiary would not incur if the facility was not provider-based. Every UMHC outpatient facility, including Marlins Clinic, failed to provide any

notice of the fee or amount of the coinsurance liability to incoming beneficiaries. *See* Hospital Outpatients Facility Fees E-Mail, attached hereto as Exhibit "11". Moreover, these facilities failed to mention any relationship between the fee and the site-of-service billing.

124.     Marlins Clinic failed to comply with several conditions for billing as a provider-based facility. Despite this, Marlins Clinic continuously and consistently submitted bills to Medicare as a provider-based facility. By submitting these bills as a provider-based facility, Marlins Clinic overbilled the Medicare program by billing for both physician services and hospital facility fees.

## COUNT I

### FALSE CLAIMS ACT VIOLATIONS
### 31 U.S.C. § 3729(a)(1)(A)

125.     The allegations contained in paragraphs 1 through 91 are re-alleged as if fully set forth below.

126.     Defendant, by and through its officers, agents, supervisors, and employees, knowingly presented or caused to be presented to the United States Government, false or fraudulent claims for payment by the Medicare and TRICARE programs, in violation of 31 U.S.C. § 3729(a)(1)(A).

127.     The United States paid such false or fraudulent claims because of the acts of Defendant.

128.     By reason of the acts and conduct of Defendant in violation of 31 U.S.C. § 3729(a)(1)(A), the United States has suffered actual damages, including the total amounts paid in response to all such false or fraudulent claims for payment. In addition, the United States is entitled to recover civil money penalties, and other monetary relief as deemed appropriate.

129.    As set forth in the proceeding paragraphs, Defendant have knowingly violated 31 U.S.C. § 3729(a)(1)(A) and have thereby damaged the United States by its actions in an amount to be determined at trial.

## COUNT II

### FALSE CLAIMS ACT VIOLATIONS
### 31 U.S.C. § 3729(a)(1)(A)

130.    The allegations contained in paragraphs 1 through 43 and 92 through 108 are re-alleged as if fully set forth below.

131.    Defendant, by and through its officers, agents, supervisors, and employees, knowingly presented or caused to be presented to the United States Government, false or fraudulent claims for payment by the Medicare program, in violation of 31 U.S.C. § 3729(a)(1)(A).

132.    The United States paid such false or fraudulent claims because of the acts of Defendant.

133.    By reason of the acts and conduct of Defendant in violation of 31 U.S.C. § 3729(a)(1)(A), the United States has suffered actual damages, including the total amounts paid in response to all such false or fraudulent claims for payment. In addition, the United States is entitled to recover civil money penalties, and other monetary relief as deemed appropriate.

134.    As set forth in the proceeding paragraphs, Defendant have knowingly violated 31 U.S.C. § 3729(a)(1)(A) and have thereby damaged the United States by its actions in an amount to be determined at trial.

## COUNT III

### FALSE CLAIMS ACT VIOLATIONS
### 31 U.S.C. § 3729(a)(1)(B)

135.    The allegations contained in paragraphs 1 through 91 are re-alleged as if fully set forth below.

136.    Defendant, by and through its officers, agents, supervisors, and employees, knowingly made, used, or caused to be made or used, false records or statements to get false fraudulent claims paid by the United States Government under the Medicare and Medicaid programs in violation of 31 U.S.C. § 3729(a)(1)(B).

137.    The United States paid such false or fraudulent claims because of the acts of Defendant.

138.    By virtue of the false records or statements Defendant made or used, the United States has suffered actual damages, including the total amounts paid in response to all such false or fraudulent claims for payment. In addition, the United States is entitled to recover civil money penalties, and other monetary relief as deemed appropriate.

139.    As set forth in the proceeding paragraphs, Defendant have knowingly violated 31 U.S.C. § 3729(a)(1)(B) and have thereby damaged the United States by its actions in an amount to be determined at trial.

## COUNT IV

### FALSE CLAIMS ACT VIOLATIONS
### 31 U.S.C. § 3729(a)(1)(A)

140.    The allegations contained in paragraphs 1 through 43 and 109 through 124 are re-alleged as if fully set forth below.

141.    Defendant, by and through its officers, agents, supervisors, and employees, knowingly presented or caused to be presented to the United States Government, false or fraudulent claims for payment by the Medicare program, in violation of 31 U.S.C. § 3729(a)(1)(A).

142.    The United States paid such false or fraudulent claims because of the acts of Defendant.

143.    By reason of the acts and conduct of Defendant in violation of 31 U.S.C. § 3729(a)(1)(A), the United States has suffered actual damages, including the total amounts paid in response to all such false or fraudulent claims for payment. In addition, the United States is entitled to recover civil money penalties, and other monetary relief as deemed appropriate.

144.    As set forth in the proceeding paragraphs, Defendant have knowingly violated 31 U.S.C. § 3729(a)(1)(A) and have thereby damaged the United States by its actions in an amount to be determined at trial.

## COUNT V

### FLORIDA FALSE CLAIMS ACT
### § 68.081 *et seq.*, Fla. Stat.

145.    The allegations contained in paragraphs 1 through 124 are re-alleged as if fully set forth below.

146.    The allegations and claims against Defendant in this Complaint also state claims for which relief may be granted pursuant to the Florida False Claims Act, §§ 68.081 – 68.09, Fla. Stat.

147.    31 U.S.C. § 3732(b) provides that the Court has jurisdiction over claims under state law that arise from the same transactions or occurrences at issue in Counts I through IV in this False Claims Act action.

148.    Accordingly, the claims alleged in Counts I through IV also encompass the state of Florida's shares of the Medicaid funds at issue, together with such additional damages, penalties and other relief as may be available under applicable law.

## COUNT VI

### FALSE CLAIMS ACT VIOLATIONS
### 31 U.S.C. § 3730(h)

149.    The allegations contained in paragraphs 1 through 124 are re-alleged as if fully set forth below.

150.    As set forth above, in connection with the foregoing scheme, Defendant conspired to get false or fraudulent claims paid or approved by the United States, in violation of the False Claims Act.

151.    As set forth above, Relator JONATHAN LORD was threatened, harassed, and discriminated against by Defendant as a result of his performing lawful acts in furtherance of this action, including his investigating and refusing to participate in Defendant's wrongful acts and conduct in violation of the False Claims Act.

152.    In order to redress the harms he has suffered as a result of the acts and conduct of Defendant in violation of 31 U.S.C. § 3730(h), JONATHAN LORD is entitled to damages including two times the amount of back pay, interest on back pay, and compensation for any

special damage, including emotional distress, and any other damages available by law including litigation costs and reasonable attorneys' fees.

## COUNT VII

### FLORIDA FALSE CLAIMS ACT
### § 68.088, Fla. Stat.

153.    The allegations contained in paragraphs 1 through 124 are re-alleged as if fully set forth below.

154.    As set forth above, in connection with the foregoing scheme, Defendant conspired to get false or fraudulent claims paid or approved by the State of Florida, in violation of the Florida False Claims Act.

155.    31 U.S.C. § 3732(b) provides that the Court has jurisdiction over claims under state law that arise from the same transactions or occurrences at issue in Counts I through IV in this False Claims Act action.

156.    As set forth above, Relator JONATHAN LORD was threatened, harassed, and discriminated against by Defendant as a result of his performing lawful acts in furtherance of this action, including his investigating and refusing to participate in Defendant's wrongful acts and conduct in violation of the Florida False Claims Act.

157.    In order to redress the harms he has suffered as a result of the acts and conduct of Defendant in violation of § 68.088, Fla. Stat., JONATHAN LORD is entitled to damages including back pay, interest on back pay, compensation, and any other damages available by law including litigation costs and reasonable attorneys' fees.

## COUNT VIII

### COMMON LAW FRAUD

158.     The allegations contained in paragraphs 1 through 124 are re-alleged as if fully set forth below.

159.     As set forth above, in connection with the foregoing scheme, Defendant falsely represented the nature of their claims to the United States for reimbursement by the Medicare and TRICARE programs and to the State of Florida for reimbursement by the Medicaid program. Defendant knew that their express and implied representations that these claims for payment were for medically necessary and appropriate medical services were false.

160.     These misrepresentations were material. Defendant's false representations that the medical services were medically necessary and appropriate were prerequisites for reimbursement by Medicare, TRICARE, and Medicaid.

161.     Defendant knew that the United States and the State of Florida would rely, and intend the United States and the state of Florida to rely, on these false representations.

162.     The United States and the State of Florida justifiably relied upon false representations submitted or caused to be submitted by Defendant.

163.     By reason of Defendant's fraud, the United States and the State of Florida suffered damages in an amount to be determined at trial.

## COUNT IX

### UNJUST ENRICHMENT

164.    The allegations contained in paragraphs 1 through 124 are re-alleged as if fully set forth below.

165.    As set forth above, in connection with the foregoing scheme, Defendant received from the United States and the State of Florida funds to which they were not entitled, including all amounts paid in response to false or fraudulent claims for reimbursement by Medicare, TRICARE, and Medicaid.

166.    Defendant benefited from those funds. Had the misconduct of Defendant described herein been known to the officers, employees, or agents of the United States responsible for adjudicated and paying Medicare and TRICARE claims, these claims presented and/or caused to be presented by Defendant would not have been paid.

167.    Had the misconduct of Defendant described herein been known to the officers, employees, or agents of the State of Florida responsible for adjudicated and paying Medicaid claims, these claims presented and/or caused to be presented by Defendant would not have been paid.

168.    Consequently, Defendant received money, directly and indirectly, to which they were not entitled. Defendant have therefore been unjustly enriched and the attendant circumstances dictate that, in equity and good conscience, the money should be returned to the United States and the state of Florida.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand and pray that judgment be entered in their favor and against Defendant as follows:

169.    For money damages in the amount of the United States' damages, payments, other losses, and civil penalties, as are allowable under the False Claims Act, for each false or fraudulent claim, including an award to Relator as the *qui tam* Plaintiff under 31 U.S.C. § 3730, and all costs of this civil action;

170.    For money damages in the amount of the State of Florida's damages, payments, other losses, and civil penalties, as are allowable under the Florida False Claims Act, for each false or fraudulent claim, including an award to Relator as the *qui tam* Plaintiff under § 68.085, Fla. Stat., and all costs of this civil action;

171.    For money damages to redress the harms personally suffered by Relator, including two times the amount of back pay, interest on back pay, front pay, and compensation for all special damages available by law, including emotional distress, litigation costs, and reasonable attorneys' fees;

172.    For money damages in the amount which Defendant obtained from the United States by fraud;

173.    For money damages in the amount which Defendant obtained from the State of Florida by fraud;

174.    For money damages in the amount by which Defendant were unjustly enriched at the expense of the United States;

175.    For money damages in the amount by which Defendant were unjustly enriched at the expense of the state of Florida;

176.    For interest, costs, reasonable attorneys' fees, and other expenses; and

177.    For all such further relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand

trial by jury.

Respectfully submitted this 12th day of July, 2013.

The Ferraro Law Firm, P.A.
4000 Ponce de Leon Blvd., Suite 700
Miami, FL 33146
Tel: (305) 375-0111
Fax: (305) 379-6222

By: _____

Jeffrey H. Sloman, Esq.
Florida Bar No. 378879
E-Mail: jhs@ferrarolaw.com
Christopher E. Gottfried, Esq.
Florida Bar No. 99780
E-Mail: ceg@ferrarolaw.com
Attorneys for Relator

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 12th day of July, 2013, I caused an original and a copy of this Complaint to be filed under seal for sixty (60) days and not to be served on the Defendant named herein or until further order of this Honorable Court.

I HEREBY CERTIFY that a copy of the foregoing Complaint was sent via Certified Mail, Return Receipt Requested, this 12th day of July, 2013, to:

By: _____

Jeffrey H. Sloman, Esq.
Florida Bar No. 378879


Wifredo A. Ferrer, Esq.
U.S. Attorney for the Southern District of Florida
99 N.E. 4th Street
Miami, FL 33132

Eric Holder, Esq.
Attorney General for the United States
United States Department of Justice
National Place Building
Room 950 North
1331 Pennsylvania Avenue
Washington, DC 20004

Pam Bondi, Esq.
Attorney General
State of Florida
The Capital PL-01
Tallahassee, FL 32399-1050