Sealed

# EXHIBIT "1"

## F. Y.  2010-2011
## ANNUAL  OPERATING  AGREEMENT
## BETWEEN
## PUBLIC HEALTH TRUST
## AND
## UNIVERSITY OF MIAMI

This AGREEMENT, made and entered into this _2 4_
day of _November_ 2010, by and between the Public Health **TRUST** of
Miami - Dade County an agency and instrumentality of Miami - Dade County which
operates Jackson Health System (hereinafter referred to as the "**TRUST**"), and the
**UNIVERSITY** of Miami, a corporation not-for-profit organized and existing under
the laws of Florida which owns and operates the University of Miami Hospital, Anne
Bates Leach Eye Hospital and Bascom Palmer Eye Institute, and University of Miami
Hospitals and Clinics/Sylvester Comprehensive Cancer Center (hereinafter referred to
as the "**UNIVERSITY**").

**WHEREAS,** the **TRUST** and the **UNIVERSITY** have been affiliated since
1952; and

**WHEREAS,** the most recent Basic Affiliation Agreement between the parties
was entered into in 2004; and

**WHEREAS,** in the Basic Affiliation Agreement, the parties agree to enter into
an annual operational agreement setting forth the fiscal and administrative
provisions for carrying out said Basic Affiliation Agreement; and

**WHEREAS,** in the Basic Affiliation Agreement, the parties agree to specifically
address the following matters in the Annual Operating Agreement: (1) names of all
Chiefs of Service and other physicians that the University will permit to provide health
care as employees or agents of the **TRUST**; (2) other services that the **UNIVERSITY**
will deliver and the compensation to be provided by the **TRUST** for such services; (3)
identification of all **UNIVERSITY** resources to be utilized by the **TRUST** and the
compensation to be provided by the **TRUST** for such resources; and (4) identification of

1

all **TRUST** resources to be utilized by the **UNIVERSITY** and the compensation to be provided by the **UNIVERSITY** for such resources; and

**WHEREAS,** the parties intend for this Annual Operating Agreement to provide further clarification of and definition to the provisions of the Basic Affiliation Agreement; and

**WHEREAS,** the term "Hospital Patient" as used throughout this Annual Operating Agreement shall have the meaning set forth in the Basic Affiliation Agreement as otherwise clarified or further defined herein; and

**WHEREAS,** the **TRUST** and the **UNIVERSITY** have agreed to the Jackson Memorial Hospital Annual Operating Agreement (FY 2010-11) Methodology Model Spreadsheet v. 4 7.9.10, which shall hereinafter be referred to as "AOA Methodology Model Spreadsheet" (see Attachment VII) and further described in detail in the "AOA User's Guide v. 4 7.6.10" (Attachment VIII); and

**WHEREAS,** the **TRUST** and **UNIVERSITY** may from time to time enter into other agreements that will be maintained with this Agreement,

**NOW, THEREFORE,** in consideration of the premises and mutual covenants herein contained, the sufficiency of said consideration being hereby acknowledged, the parties hereto do agree as follows.

## A.    UNIVERSITY SERVICES AND RESOURCES

**UNIVERSITY** shall commit those resources and permit those services to be provided to the **TRUST** at Jackson Memorial Hospital, its clinics, its long-term care facilities and any other facilities that may from time to time be so designated under this Agreement.   The **UNIVERSITY** may also permit other services or commit other resources to the **TRUST** at other **TRUST** facilities, including but not limited to Jackson South Community Hospital and Jackson North Medical Center, and such arrangements shall be detailed in other contracts that are maintained with this Agreement.

The parties agree that they will abide by the terms and conditions of the Basic Affiliation Agreement as further clarified and defined as follows. First, UNIVERSITY shall permit its faculty to: act as agents, servants, or employees of the TRUST in the care

2

of Hospital Patients, regardless of how payment is made or received for the provision of that care; supervise and train resident physicians; and provide other administrative services. Second, Faculty shall act solely as agents, servants, or employees of the TRUST and not the UNIVERSITY when: providing care to Hospital Patients regardless of how payment is made or received for the provision of that care; supervising and training residents physicians; or providing other administrative services. Third, Faculty members and other UNIVERSITY employees who are on the TRUST's medical staff are acting solely as agents, servants or employees of the TRUST within the meaning of Section 768.28 of Florida Statutes while: providing care to Hospital Patients, regardless of how payment is made or received for the provision of that care; supervising and training resident physicians; and providing other administrative services.

This Annual Operating Agreement also is intended to provide further clarification of and definition to the following Basic Affiliation Agreement terms and conditions. To wit, care to "Hospital Patients", as that term is defined in the Basic Affiliation Agreement, is described in paragraph 1, "Direct Patient Care Services;" supervision and training of resident physicians is described in paragraph 2, "Educational Services Support," and administrative services is described in paragraph 3, "Hospital Administration Support," The parties further clarify and define that the Basic Affiliation Agreement terms and conditions regarding the TRUST's responsibility for billing and collecting for physician services for Hospital Patients is intended to be fulfilled by the UNIVERSITY billing and collecting for physician services for Hospital Patients.

The TRUST and the UNIVERSITY agree that when a faculty member is providing care to Hospital Patients (direct patient care services), regardless of how payment is made or received for the provision of that care; supervising and training residents (educational services); or providing administrative services (hospital administration support), the faculty member is under the exclusive and sole control of the TRUST subject to the Bylaws and Rules and Regulations of the Medical Staff of the Public Health Trust, TRUST policies and procedures as well as the direction of the TRUST's Chief Medical Officer and therefore is acting as an agent of the TRUST under Section 768.28 of Florida Statutes and is otherwise a borrowed servant or employee pursuant to the Borrowed Servant Doctrine.

3

1. **DIRECT PATIENT CARE SERVICES**

      a.     The **UNIVERSITY** shall permit its faculty members and other health care providers to provide direct patient care, regardless of how payment is made or received for the provision of that care, to Hospital Patients and pursuant to PHT policies and procedures. Such direct patient care shall be provided at Jackson Memorial Hospital, its clinics, its long-term care facilities and any other facilities that may from time to time be so designated.

      b.     The physicians and other health care providers providing services under this Agreement shall: be members of the PHT medical staff or health professional affiliate staff in good standing; provide such direct patient care according to the community standard of care; comply with the TRUST medical staff bylaws, TRUST medical staff rules and regulations, TRUST medical staff policies and procedures and the TRUST policies and procedures; and otherwise act under the direction and control of the TRUST in the performance of their duties as employees or agents of the TRUST.

      c.     Other terms and conditions regarding faculty members and other health care providers involved in direct patient care are detailed in Attachment I to this Agreement.

2. **EDUCATIONAL SERVICES SUPPORT**

     The term "resident" as it is used in this Section 2, "Educational Services Support" shall be inclusive to mean "interns, residents and fellows."

      a.     **Residency and Fellowship Program Administration.**

     The **UNIVERSITY** shall identify members of its faculty who will be permitted to act as agents, servants, or employees of the Trust in administering the **TRUST**'s graduate medical education and other graduate education programming as residency and fellowship program directors. The duties of these residency and fellowship program directors shall include: providing overall direction to the graduate medical education and other graduate education programs; submitting required reports to ACGME and other accreditation bodies; ensuring teaching quality; establishing rotation schedules; participating regularly in JHS GME activities (including attending at least 75% of meetings of the GMEC and GME Operations meetings); actively participating in

4

internal review activities; as well as other activities required to ensure a high quality educational program.

**b.**   **Residents and Fellows Clinical Instruction**

The **UNIVERSITY** shall further permit its physicians and other health care providers to act as agents, servants, or employees of the Trust in teaching and supervising **TRUST** residents. This teaching and supervision shall include: time spent in **TRUST** outpatient clinics and inpatient settings with **TRUST** residents; preparing for and delivering lectures and other didactic education to **TRUST** residents; appropriate supervision of **TRUST** residents pursuant to applicable laws, rules, regulations, accreditation standards and **TRUST** policies and procedures, including physical presence if appropriate; documentation of such supervision; and such other activities recognized as reasonable and necessary to a high quality educational program as determined by the TRUST. The TRUST shall not provide compensation, either directly or through the UNIVERSITY for undergraduate medical teaching and supervision.

**c.**   **Residents and Fellows Direct Expense Stipend**

The **TRUST** shall make available to **UNIVERSITY** a direct expense stipend for each resident supervised and trained by **UNIVERSITY** faculty pursuant to this Agreement. This stipend is to be used for expenses related to operating the teaching programs such as resident travel, in-service training and other examinations required within the training programs, entertainment, supplies, other activities that support the program's educational goals or any other expense or activity that the **TRUST** may specifically identify from time to time. This stipend is in addition to the stipend paid directly to **TRUST** residents and fellows pursuant to the collective bargaining agreement between the **TRUST** and the Committee of Interns and Residents.

**d.**   **Resident and Fellowship Program Coordinators and Administrative Support.**

The **UNIVERSITY** shall, through designated program coordinators and administrative staff support the **TRUST**'s graduate medical education and other post-graduation education programs. The duties and responsibilities of these program coordinators and administrative staff shall include scheduling rotations, tracking time and expenses, submitting required program documentation, submitting accurate time card

data for residents and fellows on a timely basis as well as other administrative duties to support the program efficient operations.

    **e.**   **Graduate Medical Education Administrative Office.**

       The **UNIVERSITY** shall identify individuals that it permits to act as agents, servants, or employees of the Trust in administering the graduate medical education administrative office, which shall provide overall direction to the graduate medical education and other graduate education programs; submit required reports to the ACGME and other accreditation bodies; and ensure teaching quality.

    **f.**   The supporting documentation for these services is in AOA Methodology Model Spreadsheet, Section II(2) "education support", Section III "Residents and Fellow Data" and Section III "Roster of Residency Program Coordinators."

**3.**   **HOSPITAL ADMINISTRATION SUPPORT**

       The **UNIVERSITY** shall permit selected faculty, acting as agents, servants, or employees of the Trust to serve in the hospital administration leadership roles detailed in AOA Methodology Model Spreadsheet, Section II(3).

**4.**   **DEPARTMENTAL SERVICES SUPPORT**

    **a.**   **Recruiting Support**

       **i.**   The **UNIVERSITY** may recruit faculty to support the **TRUST**'s program growth objectives and community needs.  The **TRUST** shall only provide recruitment support for  programs that the **UNIVERSITY** and the **TRUST** both agree are critical to further the two institution's collective strategic plans, and for faculty positions within those identified programs where the recruited faculty member shall practice primarily within a **TRUST** facility and provide services pursuant to this Agreement.

       **ii.**   Once the recruited faculty member begins working in an identified **TRUST** program, the **TRUST** shall provide start up funding, as agreed between the UNIVERSITY and the TRUST, to the **UNIVERSITY** while the faculty member develops a self-sustaining practice.  However, this start-up funding shall decline incrementally over a three (3) year period unless otherwise agreed to by the **TRUST** and **UNIVERSITY** after the recruited faculty member begins working in the identified **TRUST** program.  Start up funding will be proportionately decreased if over ten percent

(10%) of the recruited faculty member's RVUs are billed outside of a **TRUST** facility unless otherwise agreed to by the TRUST and the UNIVERSITY.

 **b.** **Department Services**.

 The Departments listed in AOA Methodology Model Spreadsheet, Section II(4) shall make their various specialties and services available at Jackson Memorial Hospital, its clinics, its long-term care facilities and any other facilities that may be so designated from time to time.   In return, the **TRUST** shall provide compensation for those services through the **UNIVERSITY** in the following ways.

 i. Additional Support.  In accordance with a legally compliant formula that is mutually acceptable to the parties, the **TRUST** may provide additional support payments to the **UNIVERSITY** to help partially offset any increased cost to the UNIVERSITY arising out of any direct or vicarious liability it experiences as a result of those services permitted or resources utilized by the TRUST.  See AOA Methodology Model Spreadsheet, Section III for details about additional support.

 ii. Programmatic Support.  The **TRUST** shall provide programmatic funding support to departments, divisions, or programs that are important to the **TRUST**'s operations or strategy but would otherwise operate at a loss based solely on their activities at **TRUST** facilities.

 iii. Centers for Excellence Support.  The **UNIVERSITY** will continue to participate in the development of six (6) centers of excellence – cardiovascular, neuroscience, orthopedics, trauma, transplant and women's/children's hospital.   The **TRUST** shall provide funding to the **UNIVERSITY** for its continued participation in the development of these Centers for Excellence.   The parties agree that the priority for FY 2010-11 will be the development of the service line administration structure of the women's/children's hospital and transplant program.

 The supporting documentation for these services is the AOA Methodology Model Spreadsheet, Section II(4).

5.    **PURCHASED SERVICES.**

   a.    **Transplant Services**

   The **TRUST** may purchase a variety of transplant related services from the **UNIVERSITY** including: (i) physician services related to pre-transplant workups; (ii) physicians' services related to organ procurement; (iii) histology laboratory services; (iv) immuno-monitoring laboratory services; (v) organ procurement; and (vi) staff support for the **TRUST** transplant center.  A more detailed description of these services is attached hereto and incorporated as Attachment II.

   b.    **Anne Bates Leach Eye Hospital Purchased Services**

   The Trust shall pay the **UNIVERSITY** to provide ophthalmologic services through its Ann Bates Leach Eye Hospital (d/b/a Bascom Palmer) to HOSPITAL patients.   These Ophthalmologic services to be paid for by the **TRUST** shall include Direct Patient care services, Educational Services, and Hospital Administrative Support, and shall include optical shop, outpatient visits, emergency department visits, outpatient surgeries, and inpatient stays.  A more detailed description of these services is attached hereto and incorporated as Attachment III.

   c.    **Other Purchased or Programmatic Services**

   The **UNIVERSITY** shall provide the following services to the **TRUST**: reference laboratories, specialty laboratories, radiation safety services, MOHS services and other services. A more detailed description of these services is attached hereto and incorporated as Attachment IV.

   d.    The supporting documentation for these services is in AOA Methodology Model Spreadsheet, Section II(5).

6.    **GRANTS AND PASS-THROUGHS**

   The **TRUST** subcontracts with the **UNIVERSITY** to provide services in relation to several grants and other agreements.  A list of such agreements is in AOA Methodology Model Spreadsheet, Section II (6). These services are provided to the **TRUST** by the **UNIVERSITY** through subcontracts between the two parties.

7.    **DEAN'S OFFICE SUPPORT**

   THE **UNIVERSITY'S** medical school Dean, the medical   school's chief operating officer and the executive dean for clinical affairs shall be available to consult

with **TRUST** leadership and otherwise offer administrative support and advice to the **TRUST** in relation to its clinical operations in terms of clinical instruction, hospital and clinical administration and residency program administration. The **UNIVERSITY** shall also make available access to the services of its Calder Library to the **TRUST** as well as other services agreed to by the TRUST and UNIVERSITY.   See Methodology Model Spreadsheet, Section II (7).

**8.**     **INSTITUTIONAL REVIEW BOARD**

The **UNIVERSITY** agrees to serve as the designated Institutional Review Board for the **TRUST**.

**B.**     **TRUST SERVICES AND RESOURCES**

**1.**     **NON-CASH SUBSIDIES**

a.     The **TRUST** may provide the following professional staff to support **UNIVERSITY** faculty providing services outlined in Section A.1 of this Agreement: Advance Registered Nurse Practitioners; Registered Nurses; Physician's Assistants; Certified Registered Nurse Anesthetists.   See Methodology Model Spreadsheet, Section III. In addition, the **TRUST** shall provide the following administrative support staff: secretarial support. See Methodology Model Spreadsheet, Section III

b.     The **TRUST** may provide space to support **TRUST** functions performed at PHT facilities as outlined in Section A.  See Methodology Model Spreadsheet, Section III.

**2.**     **RESIDENT AFFILIATION AGREEMENT**

The **UNIVERSITY** and **TRUST** acknowledge that they have entered into resident affiliation agreements for **TRUST** residents and fellows to receive training at Anne Bates Leach Eye Hospital, the University of Miami Hospital, and the Sylvester Comprehensive Cancer Center/University of Miami Hospital and Clinics. The terms and conditions are detailed in separate resident affiliation agreements that are maintained with this Agreement. The **UNIVERSITY** and **TRUST** acknowledge that the parties may enter into other resident affiliation agreements for additional **TRUST** residents to receive training at other **UNIVERSITY** facilities upon mutual agreement of both parties.   In

9

addition, the **TRUST** on behalf of Jackson Memorial Hospital and the **UNIVERSITY** on behalf of University of Miami Hospital have entered into a Medicare Graduate Medical Education Agreement as of July 2010. See Attachment IX.

3.  **PARKING**

The **TRUST** agrees to provide parking cards to the **UNIVERSITY** for parking in PHT parking garages and surface lots.   The **UNIVERSITY** agrees to pay $63.25 for a garage space, $51.75 for a surface lot space and $10 for each lost parking card.   Payment shall be made in twelve (12) equal monthly installments.  Currently, the **UNIVERSITY** purchases 995 spaces per month (958 garage spaces and 37 surface lot spaces) but the number of spaces purchased by the UNIVERSITY is subject to change from month to month.  The TRUST shall provide the University notice on or before April 1 of each year of any proposed change in the fees for Parking space.

4.  **PRIVATE  OFFICE SPACE AND OTHER PROPERTY**

a.     The  **UNIVERSITY**  and **TRUST** acknowledge that they have entered into lease agreements for the **UNIVERSITY** to rent space in **TRUST** facilities as well as certain land.  The terms and conditions are detailed in separate lease agreements which are maintained with this Agreement.  The **UNIVERSITY** and **TRUST** acknowledge that the parties may enter into other lease agreements from time to time. The TRUST shall provide the University notice on or before April 1 of each year of any proposed change in the fees for office space and other property

b.     The **UNIVERSITY** shall   pay the **TRUST**  for **TRUST**   space occupied by  **UNIVERSITY** departments   for treating **UNIVERSITY**  private outpatients and performing other **UNIVERSITY** services.  The TRUST shall provide the University notice on or before April 1 of each year of any proposed change in the fees for space occupied for treating private outpatients.

5.  **PATHOLOGY SERVICES.**

The **UNIVERSITY** shall pay the **TRUST** at charges listed in the most recent **TRUST** Rates and Charges Manual for reference lab services provided by the **TRUST** to the **UNIVERSITY**. The TRUST shall provide the University notice on or before April 1 of each year of any proposed change in the fees for Pathology Services

6.    **CHILLED WATER.** The **TRUST** and the **UNIVERSITY** acknowledge that the parties have entered into a separate agreement for the provision of chilled water from the **TRUST** to the **UNIVERSITY**.  All amounts owed for Phase I under the Agreement for Sale and Purchase of Chilled Water System and Services have been paid pursuant to the Agreement between Miami-Dade County and Public Health Trust of Miami-Dade County and University of Miami executed on our about July 2010.  See Attachment VI.

## C. PAYMENT

1.    The **TRUST** shall pay no more than $130,092,000.00 under this Agreement based on the payment methodology developed in the AOA Methodology Model Spreadsheet: $60,112,125 shall be paid to faculty and other health care providers for the services detailed in Sections A.1, A.2. and A.3 through the **UNIVERSITY;** and the remainder shall be paid to the UNIVERSITY for all other services and resources described in Article A of this Agreement.  The **UNIVERSITY** shall distribute this payment to departments exactly as it has been designated in the AOA Methodology Model Spreadsheet and shall not transfer payment amounts between payment categories, or departments, without prior written approval of the PHT;   such modification shall be reduced to writing and made an amendment to this Agreement.

2.    The **UNIVERSITY** shall pay no more than $19,964,137.72 to the **TRUST** for all the services and support described in Article B of this Agreement.  See Attachment V, "Payment from University to Trust."

3.    The **UNIVERSITY** shall present monthly invoices to the **TRUST** for payment for those services that the **UNIVERSITY** permits to be provided or delivers and those **UNIVERSITY** resources utilized by the **TRUST**.  The **TRUST** shall present monthly invoices to the **UNIVERSITY** for payment for the services and resources provided by the **TRUST**.  Each party shall pay such invoices within 45 days of receipt, and shall provide a remittance advice along with payment. Each party shall engage in periodic reconciliation of the invoiced amounts and the services and resources provided and shall make adjustments from time to time as appropriate.

4.      The Parties acknowledge that they have entered into an Agreement with Miami-Dade County on or about July 2010 entitled "Agreement Between Miami-Dade County and Public Health Trust and University of Miami" (Tri-Party Agreement") for prepayment of certain obligations.  Notwithstanding anything to the contrary in this Annual Operating Agreement, certain payments under this Annual Operating Agreement are governed by the terms and conditions of the Tri-Party Agreement. See Attachment VI.

## D.   ACCESS TO BOOKS AND RECORDS

Pursuant  to  Section  952  of   Public Law  96-499,  as  a  condition for reimbursement  for  costs  incurred  under  agreement  having  a cost or value of $10,000.00   or  more  over  a   twelve  month   period, the **TRUST**  and   the **UNIVERSITY**  are   required  to  obtain  each  other's agreement,  and   the **UNIVERSITY** and **TRUST** hereby agree, that they will  retain,  and  make  available upon  request of the  Secretary  of  the  Department of  Health  and  Human  Services or  to  the  Comptroller General  of  the  United  States  or any of their  duly authorized representatives,  a  copy  of  the Agreement  and  all books,  documents and  records necessary  to verify  the  nature  and  extent  of  the  costs of   the  services  provided under  this  contract,  and  that  such  records will  be  retained  and  held  available  by the  parties  for  such inspection  until  the  expiration  of  four  years  after  the  services are  finished under this contract.

If,  pursuant  to  this Agreement,  any   of  the  parties' duties and obligations are  to  be  carried  out  by  an  individual  or   entity sub-contracting  with  the parties  and  that  subcontractor  is,   to a significant extent,  associated  or  affiliated with,  owns,  or  is owned  by  or  has  control  of  or  is  controlled  by  the  parties, each  such  sub- contractor  shall  itself  be  subject  to  the  access requirement;  and  the parties   hereby  agree  to  require  such  sub-contractors  to  meet   the  access requirements.

The **UNIVERSITY** and the **TRUST** understand that request for access must be in writing and contain reasonable identification of the documents, along with a statement as to the reason that the appropriateness of the costs or value of the services in question cannot be adequately or efficiently determined without access to such books and records. The **UNIVERSITY** and the **TRUST** agree that they will notify each other in writing within 10 days upon receipt of a request for access.

### E. BASIC AFFILIATION AGREEMENT

The parties intend that the provisions in this Agreement provide further clarification of and definition to the Basic Affiliation Agreement between the **UNIVERSITY** and the **TRUST** dated February 19, 1985, and updated May 24, 2004 and that the parties intend that these two Agreements shall be interpreted as consistent with one another.

### F. TERM OF AGREEMENT

The term of this Agreement shall commence on October 1, 2010 and shall continue through September 30, 2011. The terms and conditions of this Agreement shall remain in full force and effect until such time as the parties enter into another annual operating agreement.

### G.   AMENDMENTS & CHANGES

Any changes to the amounts to be expended by the **TRUST** or the **UNIVERSITY** or any changes to the amount or types of services permitted to be provided or delivered by the **TRUST** or the **UNIVERSITY** must be approved by the Chief Executive Officer of Jackson Health System or his/her designee and the Chief Operating Officer of the **UNIVERSITY**'s Miller School of Medicine. Any such changes made during the course of this Annual Operating Agreement shall be documented in writing, with an agreement, and shall be retained along with this Annual Operating Agreement. Such change(s) will then be incorporated into the next Annual Operating

Agreement between the **UNIVERSITY** and the **TRUST**. The parties, however, may also amend this Annual Operating Agreement or any of its attachments and such amendment shall be reduced to writing and signed by both parties.

## H.   COUNTY CONTRACTING REQUIREMENTS

**1.   CONFLICT OF INTEREST**. The **UNIVERSITY** shall be familiar and comply with all conflict of interest legal requirements, to the extent they apply to the **UNIVERSITY**, including the Miami-Dade County Conflict of Interest and Code of Ethics ordinance, Section 2-11.1, Code of Miami-Dade County, as made applicable to the **TRUST** by Section 25A-3(c), Code of Miami-Dade County, and Florida's Code of Ethics for Public Officers, Chapter 112, Part III, Florida Statutes. The **TRUST** will not contract or transact business with the **UNIVERSITY**, and any contract with the UNIVERSITY shall be void, if a conflict of interest under State or local laws occurs and neither an exemption nor opportunity to waive the conflict exists, or an opportunity to waive the conflict exists but the **TRUST** does not waive it. If a conflict of interest is waivable, the **TRUST**'s Board of Trustees shall have the sole authority to waive the conflict. Copies of the Ordinance are available on line or may be furnished to the **UNIVERSITY** upon request.

**2.**   Independent Private Inspector General Review. Pursuant to Resolution R-515-96, and Miami-Dade County Administrative Order 3-20, and in connection with this Agreement, the **TRUST** has the right to retain the services of an Independent Private Sector Inspector General ("IPSIG") whenever the **TRUST** or County deems it appropriate to do so. Upon written notice from the **TRUST**, the **UNIVERSITY** shall make available, to the IPSIG retained by the **TRUST**, all requested records and documents. The IPSIG shall have the right to inspect and copy all documents and records in the **UNIVERSITY**'s possession, custody or control which in the IPSIG's sole judgment, pertain to performance of the Agreement. The TRUST will be responsible for the payment of these IPSIG services, and under no circumstance shall the **UNIVERSITY**'s fees for its performance under this Agreement be inclusive of any charges relating to these IPSIG services. Nothing contained in this provision shall impair

14

any independent right of the **TRUST** to conduct, audit, or investigate the operations, activities and performance of the UNIVERSITY in connection with this Agreement.

3.      Miami-Dade County Inspector General Review.  According to Section 2-1076 of the Code of Miami-Dade County, Miami-Dade County has established the Office of the Inspector General (IG) which may, on a random basis, perform audits, inspections, and reviews of all County and Trust contracts.  This random audit is separate and distinct from any other audit by the County or Trust.

a.    The Miami-Dade Office of Inspector General is authorized to investigate County and the **TRUST** affairs and empowered to review past, present and proposed County and Public Health **TRUST** programs, accounts, records, contracts and transactions.  In addition, the Inspector General has the power to subpoena witnesses, administer oaths, require the production of witnesses and monitor existing projects and programs.  Monitoring of an existing project or program may include a report concerning whether the project is on time, within budget and in conformance with plans, specifications and applicable law.  The Inspector General shall have the power to audit, investigate, monitor, oversee, inspect and review operations, activities, performance and procurement process including but not limited to project design, proposal specifications, proposal submittals, activities of the **UNIVERSITY**, its officers, agents and employees, lobbyists, County and Public Health **TRUST** staff and elected officials to ensure compliance with contract specifications and to detect fraud and corruption.

b.    Upon ten (10) days written notice to the **UNIVERSITY**, the **UNIVERSITY** shall make all requested records and documents available to the Inspector General for inspection and copying.  The Inspector General shall have the right to inspect and copy all documents and records in the **UNIVERSITY**'s possession, custody or control which in the Inspector General's sole judgment, pertain to performance of the Agreement.  The **UNIVERSITY** shall make available at its office at all reasonable times the records, materials, and other evidence regarding the performance of this Agreement, for examination, audit, or reproduction, until three (3) years after final payment under this

15

Agreement or for any longer period required by statute or by other clauses of this Agreement.

      c.  In addition:

      i.  If this Agreement is completely or partially terminated, the **UNIVERSITY** shall make available records relating to the work terminated until three (3) years after any resulting final termination settlement; and

      ii.  The **UNIVERSITY** and **TRUST** shall make available records relating to appeals or to litigation or the settlement of claims arising under or relating to this Agreement when such appeals, litigation or claims are finally resolved. This provision is not intended to include or otherwise relate to any claims or litigation files, materials, or information, in whatever form, that arise out of appeals, litigation, or claims involving charges of professional or medical malpractice.

      d.  The provisions in this section shall apply to the **UNIVERSITY**, its officers, agents, employees, subcontractors and suppliers. The **UNIVERSITY** shall incorporate the provisions in this section in all subcontracts and all other agreements executed by the **UNIVERSITY** in connection with the performance of this Agreement.

      e.  Nothing in this section shall impair any independent right to the County to conduct audits or investigative activities nor shall any audit rights provided elsewhere in this Agreement limit the audit rights set forth in this section. The provisions of this section are neither intended nor shall they be construed to impose any liability on the County by the **UNIVERSITY** or third parties

## I.    <u>OTHER REPRESENTATIONS</u>

1.    The parties agree that this agreement or any of its terms were not entered into as an inducement or payment for referral of patients by either party to the other. **UNIVERSITY** may refer patients to other healthcare facilities, including, but not limited to (1) referrals when the patient expresses a preference for a different health care provider, (2) referrals when the patient's insurer determines the provider, or (3) referrals when **UNIVERSITY** decides the referral to another health care provider is in the patient's best medical interest. The University has no obligation to refer patients to the **TRUST**.

2.      The **TRUST** shall be solely and exclusively responsible for the administration and operation of the Jackson Health System. In that capacity, the **TRUST** is authorized to enter into contractual agreements with providers and vendors in order to obtain those services required to perform these essential public functions and to direct and control the performance of those service by those contractual agents in the course and scope of that contractual undertaking. The **TRUST** hereby acknowledges and agrees that the **UNIVERSITY**'s ability to perform fully its duties and obligations hereunder is dependent in part on the **TRUST**'s provision of an environment that is reasonably conducive to the performance of such obligations, and to the training of the **TRUST'S** Post-Graduate Trainees. In this regard, the **TRUST** agrees, subject to the terms and conditions of this Agreement, to provide such services, facilities, materials, supplies and equipment as shall be reasonably necessary to support the Contract Services listed in Article A of this Agreement to the extent available financial resources permit, and to maintain the Jackson Health System in accordance with applicable JCAHO, ACGME, and other required accreditation and legal standards. The **TRUST** will use its best efforts to ensure that such support will be, at a minimum, equal to the level of support provided by the **TRUST** at the time of execution of this Agreement unless a subsequent change in the workload existing at the time of execution of this Agreement makes such a level of support inappropriate.  In the event of such a change in workload, the level of support provided by the **TRUST** will be changed commensurately and implemented in the subsequent year's AOA after at least thirty (30) days prior written notice to and discussions in good faith with, if requested by, the **UNIVERSITY.** In addition, the level of support may decrease in the subsequent year's AOA in the event enhancements at the Facility made by the **TRUST** during the term of this Agreement make such a level of support unnecessary.  In the event the **UNIVERSITY** is able to demonstrate that any decrease in the level of support provided hereunder has adversely affected its ability to achieve productivity under this Agreement, the parties will, within thirty (30) days after receipt of the **UNIVERSITY**'s written request, negotiate in good faith any changes to the then current level of support.

Subject to the terms and conditions of this Agreement, the **TRUST** shall plan, coordinate and ensure the quality of all services provided hereunder.  The President, on

behalf of the Governing Body, shall ensure the maintenance throughout the Jackson Health System of health care that complies with accepted community standards.

## J.    **RESEARCH**

The parties acknowledge that they may enter into other agreements for the purpose of **UNIVERSITY** faculty and staff conducting research at **TRUST** facilities.    These Agreements shall be retained at the **TRUST'S** Clinical Research Office.

## K.    **INDEMNIFICATION**

The parties intend that all activities delineated in this Agreement shall operate under the terms and conditions of Article VI, "Sovereign Immunity" of the Basic Affiliation Agreement, except where specifically indicated otherwise in this Agreement through an indemnification clause or specifically indicated otherwise in other agreements through an indemnification clause.  To wit, the Parties intend that this Agreement be consistent with the Basic Affiliation Agreement, which states that the parties intend that faculty members and other **UNIVERSITY** employees who are on the **TRUST**'s medical staff are agents, servants, or employees of the **TRUST** within the meaning of Florida Statutes, Section 768.28, while acting within the scope of the Basic Affiliation Agreement as well as this Agreement and performing the following responsibilities:  (a) the provision of health care services (Direct Patient Care Support) provided to Hospital Patients as that term is defined in the Basic Affiliation Agreement, regardless of how payment is made or received for the provision of that care, and the PHT Policies and Procedures; (b) supervision and training residents (Residents and Fellows Clinical Instruction); and (c) providing administrative services (Residency & Fellowship Program Directors; Hospital Administration Leadership Roles).    Article VI "Sovereign Immunity" of the Basic Affiliation Agreement further states that the parties intend that all actions taken or permitted by the **UNIVERSITY** in fulfillment of the Basic Affiliation Agreement are pursuant to the **UNIVERSITY** acting as an agent of the **TRUST**.

L. **TOTALITY OF AGREEMENT/SEVERABILITY OF PROVISIONS**

This Agreement with it recitals on the first page and second page of the agreement and with its attachments as referenced below contain all the terms and conditions agreed upon by the parties:

| | |
|---|---|
| ATTACHMENT I | Faculty Members and Other Health Care Providers Providing Direct Patient Care--Additional Terms and Conditions |
| ATTACHMENT II | Transplant Services |
| ATTACHMENT III | Anne Bates Leach Hospital Services |
| ATTACHMENT IV | Other Purchased or Programmatic Services |
| ATTACHMENT V | Payment from University to Trust |
| ATTACHMENT VI | Tri-Party Agreement (Trust, County & University) |
| ATTACHMENT VII | AOA Methodology Model Spreadsheet v 4 7.9.10 |
| ATTACHMENT VIII | AOA User's Guide v 4 7.6.10 |
| ATTACHMENT IX | Affiliated Group Agreement for GME |

If any provision of this Agreement is held invalid or void, the remainder of this Agreement shall not be affected thereby if such remainder would then continue to conform to the terms and requirements of applicable law.

**IN WITNESS WHEREOF,** the parties have caused this Agreement to be executed by their officials thereunto duly authorized.

ATTEST:

FOR UNIVERSITY OF MIAMI

By: _____
Joe Natoli,
Senior Vice President for
Business and Finance

ATTEST:

FOR THE PUBLIC HEALTH TRUST OF
MIAMI-DADE COUNTY, FLORIDA

Secretary of the Public Health Trust

By: _____
Eneida Roldan, M.D.
President/Chief Executive Officer
Public Health Trust

Approved for legal sufficiency
and form by the Miami-Dade County
Attorney's Office.

_____   _____
Signature            Date

Approved for sufficiency as to insurance
and liability by the Administrator, Risk
Management Jackson Health System

_____   _____
Signature            Date

## ATTACHMENT I
## PHYSICIANS PROVIDING DIRECT PATIENT CARE

The **UNIVERSITY** shall permit its faculty members and other providers, acting solely in their capacity as agents, servants, or employees of the **TRUST** to provide direct patient care at **TRUST** facilities. These responsibilities will be discharged by physicians licensed by the State of Florida. Each physician so assigned shall be responsible for delivery of direct patient assigned to him / her by the Chief of Service in accordance with standards of accountability agreed upon by the Chief Executive Officer of the **TRUST** and the Chief of Service and as may be contracted for with the **TRUST.**

The **UNIVERSITY** agrees to provide and make available on an annual basis the Relative Value Units (RVUs) provided to PHT under this agreement by department, division and individual practitioner, clinical revenue (both historical and concurrent) by department, individual indigent patient billing information by billing code, Medicaid collection rates and other information as required to update the Model.   The **UNIVERSITY** will produce information to the TRUST on a quarterly basis during the course of the term of this contract.

The University shall identify the names of all Chiefs of Service and other physicians that the UNIVERSITY permits to provide health care as agents, servants, or employees of the TRUST, which list be retained by the TRUST's AOA Administration Office and updated as necessary from time to time.

## ATTACHMENT II
## TRANSPLANT SERVICES

A.     The **UNIVERSITY** shall be responsible (through the School of Medicine, Department of Surgery, Division of Transplantation) for the delivery of administrative technical, and professional services and supervision to the **TRUST**'s Transplant Program, of the kind and at the level provided for in paragraph B of this Attachment. Professional and clerical staff shall be duly qualified, and where required, licensed by the State of Florida to serve in the capacity for which they are compensated. The **UNIVERSITY** shall be responsible for insuring that said staff are qualified, and if required, licensed.

      1.     The **UNIVERSITY** agrees to provide to the **TRUST**, upon request, the names and salaries of all personnel assigned the supervision described in paragraph B through on-site examination of UNIVERSITY records. In the event of a vacancy in any position, the replacement of such vacancy shall be made upon the mutual agreement of the **UNIVERSITY** and the **TRUST**.

      2.     The **UNIVERSITY** shall have the right to bill patients for services performed by physicians on a direct basis or to third-party reimbursers, within the limitations of the federal regulations for the End-Stage Renal Disease Program, other transplant programs and other applicable laws. The **UNIVERSITY** agrees to establish and / or maintain billing practices which are consistent with regulations of all third –party payers as they affect the **TRUST** and will not jeopardize the relationship of the **TRUST** with such third- party payers.

B.     The Program Director, named by the **TRUST** CEO after consideration of the recommendation of the **UNIVERSITY**, shall be responsible for planning, organizing, conducting and directing the Transplant Program. He/She shall devote sufficient time to carry out these responsibilities, which include, but are not limited to the following:

      1.  Participating in the selection of a suitable treatment modality for each patient.
      2.  Assuring adequate training of nurses in the care of transplant patients.
      3.  Assuring that tissue typing and organ procurement services are available either directly or under arrangement.

Transplant Services under this agreement shall include but not limited to:
    1.     Pre-entitlement services to recipients of cadaver donor and living - related donor transplants.
      2.     Living - related donor evaluations.

21

    3.      Consultations to determine the acceptability of
cadaver donors referred to the Renal Transplant Program.

C.    **ORGAN PROCUREMENT AGENCY**

    1.      The **UNIVERSITY** has established and has been approved as an independent Organ Procurement Agency under Section 226 and Section 1881 of the Social Security Act. The **TRUST** desires to utilize the services of the **UNIVERSITY** to meet the Organ Procurement requirements of Section 2291 of the Social Security Amendments of 1972 (405.2171e) (CFR 41 /108). In the event the **UNIVERSITY** has an organ that matches a recipient at the **TRUST**, and it is accepted for transplant , the **TRUST** shall pay to the **UNIVERSITY**, the **UNIVERSITY'** s Standard Acquisition Charge (SAC) billed monthly at the current Medicare Intermediary approved rates. The **UNIVERSITY** will provide the **TRUST** thirty (30) days written notice in advance of the date of the change in the SAC.

    2.      The **UNIVERSITY** shall maintain and provide a registry for cadaver donor recipients to be transplanted at Jackson Memorial Hospital.

    3.      From time to time, the **UNIVERSITY** may purchase from the **TRUST** certain clinical laboratory tests, pharmaceutical items, and central supply items, related to the evaluations of the suitability of organs for transplant. The **TRUST** will bill the **UNIVERSITY** for laboratory tests at the current Medicare rates and charges established by the date of service; the **TRUST**'s charges to the **UNIVERSITY** for pharmaceutical and central supply items will be based on **TRUST** cost plus 25%.

D.    **<u>HISTOCOMPATIBILITY LABORATORY</u>**

The **UNIVERSITY** has established and has been approved as an Independent Histocompatibility Laboratory. The **TRUST** desires to utilize the services of the **UNIVERSITY** Histocompatilitiy Laboratory for the purpose of the tissue matching organs to potential transplant candidates. The **UNIVERSITY** will bill the **TRUST** for the tissue typing under the Organ Acquisition Program. These services are to be billed monthly at the current Medicare Intermediary approved rates

E.    **IMMUNO-MONITORING LABORATORY**

The **UNIVERSITY** has established and has been approved as an independent Immuno-Monitoring Laboratory effective June 1, 1983. The **TRUST** desires to utilize the services of the **UNIVERSITY** to meet its immuno-monitoring requirements. The **UNIVERSITY** will bill the **TRUST** for these services at negotiated case rate basis (The base rate was set at FY00 charges per case). The **UNIVERSITY** shall bill the **TRUST** for routine pre-transplant laboratory services at the current Medicare rate by date of service. In recognition of costs for operating the Immuo-Lab, the **TRUST** shall provide additional support compensative to the FY02 level.

The **UNIVERSITY** shall have the right to bill patients for services performed by the Immuno-Monitoring Laboratory according to the guidelines of this Agreement.

## ATTACHMENT III
## ANNE BATES LEACH HOSPITAL SERVICES

A.     The **UNIVERSITY** agrees:

1.     To provide the full scope of outpatient and inpatient ophthalmological facility services and treatment twenty-four hours per day, seven days per week, to patients determined by the **TRUST** to meet eligibility requirements of those whom the **TRUST** is required to serve.

2.     To provide emergency ophthalmological services to patients determined by the **TRUST** to meet eligibility requirements of those whom the **TRUST** is required to serve.

3.     To provide to the **TRUST** through its Department of Ophthalmology, ophthalmological consultative services when requested by the **TRUST** for HOSPITAL PATIENTS at Jackson Memorial Hospital and/or other **TRUST** facilities.

4.     That the Anne Bates Leach Eye Hospital (hereinafter referred to as the "Hospital") shall make available various other medical services to the **TRUST** for patients at Jackson Memorial Hospital and/or other TRUST facilities.  The provision of such other medical services must be pre-approved by the **TRUST**'s Utilization Management Office, and may be made on an individual case by case basis or on a medical service or programmatic basis. Payment shall be made at the prevailing Florida Medicaid out-patient reimbursement rate..

5.     To provide to the **TRUST**'s Utilization Review committee, upon reasonable notice and as requested, all necessary records and information pertaining to patients determined by the **TRUST** to meet eligibility requirements of those whom the **TRUST** is required to serve receiving ophthalmological services, and to comply with reasonable recommendation of said committee.

6.     To provide to the **TRUST** monthly, necessary data pertaining to patients determined by the **TRUST** to meet eligibility requirements of those whom the **TRUST** is required to serve, as reasonably determined by the **TRUST**, for the purpose of review of volume and type of services. Such data for each respective patient classified as eligible for these clinic classifications shall be limited to patient identification information (including SSN and DOB) and

detailed bills for services rendered and pertinent supporting documents.

7.    To provide and maintain at the Hospital an internal, appointment scheduling system for all patients identified and certified as eligible for ophthalmological services.

8.    To comply with **TRUST** patient transfer policies.

9.    To provide a detailed cost report to the **TRUST** of the facilities utilized for providing services to patients determined by the **TRUST** to meet eligibility requirements of those whom the **TRUST** is required to serve.

B.    The **TRUST** agrees:

1.    To make available to the Hospital various medical services at charges listed in the most recent **TRUST** Rates and Charges Manual. To make available to the Hospital other non-medical services not covered in the **TRUST** Rates and Charges Manual at charges based upon reasonable costs. The **TRUST** shall not charge for services when provided to patients determined by the **TRUST** to meet eligibility requirements of those whom the **TRUST** is required to serve.

2.    To make available to the Hospital at no charge; medical records and other information as requested; provided requests from the Hospital are given to the TRUST at least twenty-four (24) hours in advance except in the case of emergencies. To make available to the Hospital; upon reasonable advance notice, special studies. The TRUST shall not charge for services when provided to patients determined by the TRUST to meet eligibility requirements of those whom the TRUST is required to serve.

3.    To maintain TRUST ophthalmology residents who will train at the HOSPITAL through a residency affiliation agreement.

4.    To accept transfer admissions of the following categories of patients on an as available and as eligible basis as determined by the TRUST in agreement with TRUST transfer policies and Inter-Institutional UM-JMH Transfer Agreement (to be renegotiated annually):

a.    Patients who require isolation for contagious diseases.

b.     Patients who, due to the severity of their medical conditions, require admission to an intensive care or coronary are unit.

c.     Patients who are under two (2) years of age.

d.     Patients who are in need of confinement in the prison medical service.

5.    To make available morgue facilities and autopsy services for all patients who expire at the Hospital.

C.                            Both parties agree:

1.    That identification and certification of patients eligible for ophthalmological services at the Hospital shall be the responsibility of and within the sole authority of the **TRUST**. Anne Bates Leach Eye Hospital, through a system established by the **TRUST,** shall determine the classification of patients with regard to eligibility requirements of those whom the **TRUST** is required to serve in accordance with the **TRUST's** Financial Rating Schedule guidelines. The **UNIVERSITY** shall have the right to require from all other patients such financial assurance of payment for health care services as it may reasonably determine.

That the Hospital shall be reimbursed by the **TRUST** for hospital services only for those patients determined by the **TRUST** to meet eligibility requirements of those whom the **TRUST** is required to serve.

2.    That the **TRUST** shall have reserved to it the right to bill and collect payment from all patients determined by the **TRUST** to meet eligibility requirements of those whom the **TRUST** is required to serve for both inpatient and outpatient services received at either Jackson Health System and / or related facilities under the jurisdiction of the **TRUST** or at the Hospital. The Hospital shall have the responsibility for billing all other patients without recourse to the **TRUST** or Miami-Dade County for reimbursement.

3.    That when providing or permitting any services pursuant to this Attachment, including but not limited to direct patient care; supervision of residents or fellows; or provision of administrative services to eligible patients, the University shall act as an agent of the Trust and its faculty shall act as agents, servants, or employees of the Trust to the same extent as other "Hospital Patients'.

D.              Compensation:

1.      Both parties mutually recognize and agree that the price of health care services rendered by the Hospital shall be based on reasonable costs of providing those services, and that the price shall not exceed the audited actual costs of providing those services. Due to the methods of funding of the **TRUST**, the maximum reimbursement allowable to the Hospital for fiscal year 2010-2011, commencing on October 1, 2010, will be **$4,310,000.**–During this twelve month period from October 1, 2010 to September 30, 2011, the Hospital shall be responsible for providing ophthalmological services to all indigent and medically indigent patients who are determined by the **TRUST** to meet the eligibility requirements of those whom the **TRUST** is required to serve and eligible for ophthalmological services. The Hospital shall bill the **TRUST** by submitting an itemized invoice for each patient for whom reimbursement is sought. Reimbursement by the **TRUST** shall be based upon a unit payment basis, with maximum payment as indicated below:

a.      The **TRUST** agrees to reimburse the Hospital for services rendered to outpatients determined by the **TRUST** to meet eligibility requirements of those whom the **TRUST** is required to serve. Reimbursement pursuant hereto shall be at the prevailing Medicaid rates.

b.      The **TRUST** agrees to reimburse the Hospital for services rendered to inpatient determined by the **TRUST** to meet eligibility requirements of those whom the **TRUST** is required to serve. Reimbursement pursuant hereto shall be at the prevailing Medicaid rates.

c.      The **TRUST** agrees to reimburse the Hospital for outpatient surgery rendered to patients determined by the **TRUST** to meet eligibility requirements of those whom the **TRUST** is required to serve. Reimbursement pursuant hereto shall be at the prevailing Medicaid rates.

d.      The **TRUST** agrees to pay the Optical Shop directly for therapeutic contact lens and prosthetic services to patients determined by the **TRUST** to meet eligibility requirements of those whom the **TRUST** is required to serve. Reimbursement pursuant hereto shall be at the prevailing Medicaid rates. Efforts will be made to screen all patients requiring glasses as well as pre-payment plans investigated. Expenditure overages will be reimbursed within reasonable

27

limits and depending on the availability of funding remaining for the fiscal year.

e.  The total reimbursement of items a - d above may not exceed $4,310,000.

f.  If a patient determined by the TRUST to meet eligibility requirements of those whom the TRUST is required to serve receiving services identified in paragraph a, b, and c, above, subsequently becomes ineligible for this classification i., e., becomes a funded patient, the TRUST agrees to notify and provide supporting documentation to the Hospital of such change in classification. If, as a result of such classification change, the Hospital has the right to retroactively bill and collect for these services, and the TRUST has previously reimbursed the Hospital under paragraph a, b, and c, the TRUST shall deduct the amount previously paid for these services from the next payment due to Hospital. In doing so the TRUST forfeits all rights to bill for such services. If the Hospital is subsequently denied payment due to a lack of coverage or ineligibility for the dates of service, the Hospital will provide documentation to the TRUST and may re-bill the TRUST for these services.

g.  The Hospital agrees to reimburse the TRUST for ophthalmological postgraduate year house staff on the TRUST payroll at actual costs of salaries and fringe benefits as well as full educational costs on a monthly basis. This reimbursement shall be made as a deduction from billings to the TRUST.

2.  Any patients requiring transportation from Jackson Health System and/or other **TRUST** facilities to and from the Hospital for services at the Hospital shall be the responsibility of the **TRUST**. Any patients requiring transportation from the Hospital to and from Jackson Health System and/or other related facilities under the jurisdiction of the **TRUST** for services at Jackson Memorial Hospital shall be the responsibility of the Hospital.

## ATTACHMENT IV
## OTHER PURCHASED SERVICES/PROGRAMMATIC SUPPORT

A.   **RADIATION SAFETY SERVICES**

The following services will be provided to the **TRUST** by Personnel of the **UNIVERSITY'S** Radiation Control Center during the Term of this Annual Operating Agreement

1.   Inspect weekly all areas in which authorized users work, to include radiation surveys and/or wipe tests as appropriate.
2.   Conduct semi-annual, complete, internal evaluations of the Nuclear Medicine and Radiation Therapy facilities as described in the Radiation Control Plan.
3.   Provide personal dosimetry monitoring devices to individuals as required by License 1319-1 and State of Florida Regulations.
4.   Maintain a list of all occupationally exposed faculty, employees and students. Issue personnel dosimeters to all such individuals (except when using only Hydrogen 3 or Carbon 14) and maintain exposure records.
5.   Provide thyroid bioassays to personnel potentially exposed to radioiodine.
6.   Ensure calibration of all survey meters at regulatory required intervals.
7.   Provide consultation services regarding the use of radioactive materials to appropriate personnel.
8.   Inventory and/or leak test all sealed sources every six months.
9.   Ensure proper waste disposal of radioactive materials.
10.  Perform required periodic quality assurance testing of dose calibrators and xenon trap efficiency tests.
11.  Maintain records for the following: Wipe tests; Leak tests; Waste disposal; Personnel exposure; Overexposure calibrations; Dose calibrator quality assurance; Xenon trap efficiency; and other tests required by the State of Florida Radioactive Materials License Number 1319-1
12.  Respond to and provide expertise and coordination services in the event of a radiation accident or emergency.
13.  Maintain liaison with nursing supervisors with respect to Inpatients treated with radionuclides for therapy purposes.
14.  Provide periodic radiation safety in-service programs for all personnel assigned to units where therapy patients are assigned.
15.  Perform State of Florida compliance testing on new equipment at the request of the Director of the Division of Diagnostic Radiology.
16.  Provide annual equipment performance testing on all diagnostic x-ray equipment.
17.  Provide consultation and testing on existing radiographic equipment when performance is in question.

18.   Provide consultation on shielding and ventilation requirements pertaining to the use of radioisotopes or radiation producing equipment in new construction and renovations.

19.   Develop, implement and monitor a formal ALARA program for the facility.

20.   Provide a qualified individual to serve as a member of the Medical Human Use Sub-Committee on Radiation and the Medical Center Safety Committee.

21.   Conduct instruction programs for students enrolled in the School of Technological Radiology (Radiology, Nuclear Medicine and Radiation Oncology).

22.   Provide annual in-service programs to Technologists and other personnel occupationally exposed to radiation.

23.   Assist in the development and implementation of a plan for the handling of incoming patients potentially contaminated with radioactive material for the Trauma Center.

24.   Provide qualified personnel to assist the Trauma Center in the handling of radioactively contaminated patients.

25.   Carry out the duties described for the Radiation Control Center in Policy 600.1, Insertion or Implant of Encapsulated Sources, of the Department of Radiation Oncology.

26.   Develop and review on an annual basis the JCAHO required Radiation Safety Program for the **TRUST**.

27.   Administer and maintain all portions of State of Florida Radioactive Materials License Number 1319-1 in a current Status.

28.   Develop, implement, and carry out a Diagnostic Quality Assurance Program as specified by JCAHO.

THE TRUST agrees to adhere to the maintenance, replacement and operational requirements and instructions of UM with respect to the above Radiation Safety Services as determined by the Plant Operations maintenance program. Notwithstanding the above, if the Plant Operations maintenance program determines that it cannot adhere to the instructions and requirements of UM with respect to the Radiation Safety Services, the Trust will advise the UM Vice President for Medical Administration. In such event, the University may discontinue providing the above described radiation safety services upon ninety (90) days advanced written notice to the TRUST. During the ninety (90) day notice period, the TRUST shall comply with the applicable instructions and requirements of UM with respect to the Radiation Safety Services.

B.   **MOHS/UMHC CHEMO-SURGICAL SERVICES AND LASER TREATMENT**

1.   The **UNIVERSITY** agrees:

a.   To provide the full scope of outpatient and inpatient chemo-surgical services and laser treatment to all indigent and medically

indigent patients, as defined in credit policies and procedures of the **TRUST**.

b.      To provide to the **TRUST** through its Department of Dermatology, dermatological consultative services when requested by the **TRUST** for **TRUST** patients at Jackson Health System and/or other related facilities under the jurisdiction of the **TRUST**.

c.      To provide to the **TRUST**'s Utilization Review committee, upon reasonable notice and as requested, all necessary records and information pertaining to indigent and medically indigent patients identified and certified as eligible for chemo-surgical services in accordance with paragraph C-1 of this Attachment, and to comply with reasonable recommendation of said committee.

d.      To provide to the **TRUST** weekly, necessary data pertaining to patients determined by the **TRUST** to meet eligibility requirements of those whom the **TRUST** is required to serve, as reasonably determined by the **TRUST**, for the purpose of review of volume and type of services. Such data for each respective patient classified as eligible for these clinic classifications shall be limited to patient identification information (including SSN and DOB) and detailed bills for services rendered and pertinent supporting documents.

e.      To provide and maintain at the Hospital an internal, appointment scheduling system for all patients identified and certified as eligible for chemo-surgical services in accordance with paragraph C-1 for this Attachment.

f.      To comply with the **TRUST** patient transfer policies.

2.   The **TRUST** agrees:

a.      To make available to the Hospital various medical services at charges listed in the most recent **TRUST** Rates and Charges Manual. To make available to the Hospital other non-medical services not covered in the **TRUST** Rates and Charges Manual at charges based upon reasonable costs. The **TRUST** shall not charge for services when provided to patients determined by the **TRUST** to meet eligibility requirements of those whom the **TRUST** is required to serve.

b.      To make available, when requested, medical and surgical consultative services at the **TRUST** for patients identified and

31

certified by the **TRUST** as eligible for MOHS Surgical services in accordance with paragraph C-1 of this Attachment subject to approval of the appropriate Chief of Service of the **TRUST.**

c.  To make available to the Hospital at no charge; medical records and other information as requested; provided requested from the Hospital are given to the **TRUST** at least twenty-four (24) hours in advance, except in cases of emergency. To make available to the Hospital; upon reasonable advance notice, special studies. The **TRUST** shall not charge for services when provided to patients determined by the **TRUST** to meet eligibility requirements of those whom the **TRUST** is required to serve.

d.  To accept transfer admissions of the following categories of patients on an as available and as eligible basis as determined by the **TRUST** in agreement with **TRUST** transfer policies and Inter-Institutional UM-JMH Transfer Agreement  (to be re-negotiated annually):

     i.  Patients who require isolation for contagious diseases.

     ii.  Patients who, due to the severity of their medical conditions, require admission to an intensive care or coronary are unit.

     iii.  Patients who are under two (2) years of age.

     iv.  Patients who are in need of confinement in the prison medical service.

e.  To make available morgue facilities and autopsy services for all patients who expire at the Hospital.

3.  Both parties agree:

a.  That identification and certification of patients eligible for MOHS chemo-surgical services at the Hospital shall be the responsibility of and within the sole authority of the **TRUST.** MOHS/UMHC, through a system established by the **TRUST,** shall determine the classification of patients with regard to eligibility requirements of those whom the **TRUST** is required to serve in accordance with the **TRUST**'s Financial Rating Schedule guidelines. The **UNIVERSITY** shall have the right to require from all other patients such financial assurance of payment for health care services as it may reasonably determine.

b.  That the Hospital shall be reimbursed by the **TRUST** for hospital services only for those patients determined by the **TRUST** to meet

eligibility requirements of those whom the **TRUST** is required to serve.

c.     That the **TRUST** shall have reserved to it the right to bill and collect payment from all patients eligible determined by the **TRUST** to meet eligibility requirements of those whom the **TRUST** is required to serve for both inpatient and outpatient services received at either Jackson Health System and / or related facilities under the jurisdiction of the **TRUST** or at the Hospital. The Hospital shall have the responsibility for billing all other patients without recourse to the **TRUST** or Miami-Dade County for reimbursement.

4.     Compensation:

a.     Both parties mutually recognize and agree that the price of health care services rendered by the Hospital shall be based on reasonable costs of providing those services, and that the price shall not exceed the audited actual costs of providing those services. Due to the methods of funding of the **TRUST**, the maximum reimbursement allowable to the Hospital for fiscal year 2010-11, commencing on October 1, 2010, will be $75,000. During this twelve month period from October 1, 2010 to September 30, 2011, the Hospital shall be responsible for providing chemo-surgical services to all indigent and medically indigent patients who are determined by the **TRUST** to meet eligibility requirements of those whom the **TRUST** is required to serve and eligible for MOHS chemo-surgical services. The Hospital shall bill the **TRUST** by submitting an itemized invoice for each patient for whom reimbursement is sought. Reimbursement by the **TRUST** shall be based upon a unit payment basis, with maximum payment as indicated below:

i.     The **TRUST** agrees to reimburse the Hospital for outpatient surgery rendered to patients determined by the **TRUST** to meet eligibility requirements of those whom the **TRUST** is required to serve. Reimbursement to the Hospital for the estimated 100 cases will be at $250 per case. The total for this service not to exceed $25,000.

ii.    If a patient determined by the **TRUST** to meet eligibility requirements of those whom the **TRUST** is required to serve, receiving services identified in paragraph a, b, and c, above, subsequently becomes ineligible for this classifications -- *i.e.,* becomes a

33

funded patient -- the **TRUST** agrees to notify and provide supporting documentation to the Hospital of such change in classification. If, as a result of such classification change, the Hospital has the right to retroactively bill and collect for these services, and the **TRUST** has previously reimbursed the Hospital under paragraph a, b, and c, the **TRUST** shall deduct the amount previously paid for these services from the next payment due to Hospital. In doing so the **TRUST** forfeits all rights to bill for such services.  If the Hospital is subsequently denied payment due to a lack of coverage or ineligibility for the dates of service, the Hospital will provide documentation to the **TRUST** and may re-bill the **TRUST** for these services.

b.      Any patients requiring transportation from Jackson Health System and/or other related facilities under the jurisdiction of the **TRUST** to and from the Hospital for services at the Hospital shall be the responsibility of the **TRUST**. Any patients requiring transportation from the Hospital to and from Jackson Health System and/or other related facilities under the jurisdiction of the **TRUST** for services at Jackson Health System shall be the responsibility of the Hospital.

**ATTACHMENT V**
**PAYMENT FROM UNIVERSITY TO TRUST**

### PAYMENTS FROM UM
#### FY 2011

| SERVICES | AMOUNT |
|---|---|
| ABLEH/Bascom Palmer Housestaff | $ 1,667,712.89 |
| UMHC Housestaff | $ 2,375,850.02 |
| UMH - Housestaff | $ 5,713,700.88 |
| UM Departments - House Staff | $ 2,485,516.93 |
| Rent | $ 5,271,525.00 |
| Parking | $ 750,099.00 |
| JMH Staff Reimbursement | $ 225,800.00 |
| Poison Control Grant | $ 1,473,933.00 |
| **TOTAL** | **$ 19,964,137.72** |

## ATTACHMENT VI
## AGREEMENT BETWEEN MIAMI-DADE COUNTY AND PUBLIC HEALTH
## TRUST OF MIAMI-DADE COUNTY AND UNIVERSITY OF MIAMI
## (JULY 2010)

A copy of the Agreement between Miami-Dade County and Public Health Trust of
Miami-Dade County and University of Miami (July 2010) is retained at the TRUST'S
AOA Administration Office

**ATTACHMENT VII**
**JACKSON MEMORIAL HOSPITAL ANNUAL OPERATING AGREEMENT**
**METHODOLOGY MODEL (FY 2010-11) SPREADSHEET**
JMH Proposed FY10-11 AOA model v. 4 7.9.10


    The Jackson Memorial Hospital Annual Operating Agreement Methodology Model (FY 2010-11) Spreadsheet  v. 4   7.9.10 is retained at the TRUST'S AOA Administration Office.

**ATTACHMENT VIII**
**AOA USER'S GUIDE V4 7.6.10**

The AOA USER'S Guide V.4 7.6.10 is retained at the TRUST'S AOA Administration Office.

**ATTACHMENT IX**
**AFFILIATED GROUP AGREEMENT FOR GRADUATE MEDICAL EDUCATION**

The Affiliated Group Agreement for Graduate Medical Education is retained at the TRUST'S AOA Administration Office.

Rev. 9/28/10