# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
### Miami Division

## CASE NO.: 13-22500-CIV-ALTONAGA

**JONATHAN LORD, M.D.,**

        **Plaintiff,**

**v.**

**UNIVERSITY OF MIAMI,**

        **Defendant.**

_____/

## THIRD AMENDED COMPLAINT

Plaintiff, Jonathan Lord, by and through his attorneys of record, hereby amends and restates his Second Amended Complaint as follows:

## PARTIES AND RELEVANT NON-PARTIES

1.    Plaintiff, Jonathan Lord, M.D. ("Dr. Lord"), is a citizen of the United States and, at all times material to the Third Amended Complaint, was a resident of the State of Florida. Dr. Lord received both his undergraduate and medical school degrees from the University of Miami in 1973 and 1978, respectively. He is a licensed medical doctor in the State of Florida and board certified in pathology. Between 1997 and 1999, Dr. Lord was the Chief Operating Officer of the American Hospital Association. From 2000 to 2009, he was the Chief Innovation Officer and Senior Vice President of Humana, Inc. In that capacity, Dr. Lord helped create a joint research center between Humana and the University of Miami to study population health and pharmacovigilance. In 2010, he accepted a position to help develop the University of Miami Tissue Bank and subsequently became the University's Chief Innovation Officer and a professor in pathology. On March 1, 2012, Dr. Lord became the Chief Operating Officer ("COO") of the University of Miami Health System

("UHealth"), the operational name for the clinical delivery component of the Leonard M. Miller School of Medicine. On June 1, 2012, he became Chief Compliance Officer ("CCO") for the Medical Center and the University Vice President for Medical Administration. In Dr. Lord's capacities of COO, CCO, and Vice President for Medical Administration, his duties included:

     a.   preparing UHealth's annual budget;

     b.   negotiating employment and collective bargaining contracts;

     c.   negotiating the Annual Operating Agreement with Jackson Memorial Hospital;

     d.   structuring the governance of the various departments within UHealth;

     e.   overseeing and implementing policies on compliance with various health laws including the Medicare and Medicaid programs; and

     f.   developing revenue plans.

Upon becoming COO of UHealth, Dr. Lord required certain administrative and medical faculty leaders in his chain-of-command to prepare and circulate to each other summaries of their daily activities. These summaries became known as "daily updates" or "executive daily updates."

     2.    Defendant University of Miami ("UM") is a Florida nonprofit corporation engaged in the business of, *inter alia*, owning and operating behavioral health facilities, acute care hospitals, ambulatory surgery and radiation centers, clinical diagnostic laboratories, outpatient clinics, and academic medical centers. It is incorporated in the State of Florida, its corporate headquarters are in Coral Gables, Florida, and it conducts business throughout the United States. UM acted through, *inter alia*, the officers, agents, employees, and entities described herein.

     3.    At all times material to the Third Amended Complaint, the Leonard M. Miller School of Medicine ("MSOM") was a school within UM for undergraduate and post-graduate medical education, and included several hospitals, outpatient facilities, laboratories, research

facilities and medical school faculty. As more fully described below, Jackson Memorial Hospital ("JMH") was a teaching hospital for the MSOM which supplied the surgeons and medical expertise to JMH including the Miami Transplant Institute ("MTI"), one of the leading organ transplant centers in the United States.

4.      The surgeons referenced in paragraph 3 were a part of the Daughtry Family Department of Surgery ("Department of Surgery") within the MSOM. In 2007, non-party, Dr. Alan S. Livingstone, the chairperson of the Department of Surgery, moved pathology testing and testing oversight for organ transplant patients from JMH laboratories to the Immuno-Monitoring Laboratory ("IML") and the Histo-Compatibility Laboratory ("Histo Lab") (collectively "transplant laboratories") within the Department of Surgery.

5.      Non-party Donna E. Shalala, Ph.D., was the President of UM – its highest corporate officer – from 2001 through 2015 and a professor of political science. Prior to joining UM, from 1993 to 2001, President Shalala served as the United States Secretary of Health and Human Services, which includes the Centers for Medicare and Medicaid Services.

6.      Non-party Pascal J. Goldschmidt joined UM in April 2006 and served as the dean of the MSOM and the chief executive officer of UHealth until 2016. Between March 1, 2012, and January 31, 2013, Dr. Lord reported directly and exclusively to Dean Goldschmidt who reported directly to President Shalala. During that time, Dean Goldschmidt, having adopted the management communication protocol implemented by Dr. Lord, prepared and circulated daily updates to Dr. Lord and certain administrative and medical faculty leaders in Dr. Lord's chain-of-command.

7.      Non-party Alan S. Livingstone, M.D. has been affiliated with UM since the 1970s and was one of the most influential members of the medical school faculty. At all times material

to the Third Amended Complaint, he was professor and associate vice president and medical director of the University of Miami Medical Group and served as chairperson of the Department of Surgery, a position he held since 2001. He was also chief, Division of Surgery Oncology at the Sylvester Comprehensive Cancer Center, chief executive at UHealth Clinical Practice, co-medical director of the University of Miami Medical Group, and chairperson of the Life Alliance Organ Recovery Agency ("LAORA"). At JMH, he served as chief of surgical services and, until mid-2012, the clinical director of the MTI.

8.      At all times material to the Third Amended Complaint, non-party Rafic S. Warwar was vice chairperson of the LAORA and vice chairperson for administration of the Department of Surgery and reported directly to Dr. Livingstone.

9.      At all times material to the Third Amended Complaint, non-party Phillip Ruiz, Jr., M.D., Ph.D., was a professor of surgery, professor of pathology, director of the IML and the Histo Lab in the Department of Surgery, and director of the Division of Immunopathology. He also reported directly to Dr. Livingstone.

10.     At all times material to the Third Amended Complaint, non-party Jennifer McCafferty-Fernandez, Ph.D. was UM's Chief Medical Compliance Officer. Her responsibilities included oversight of medical compliance activities, compliance training and privacy related issues. Previously, Dr. McCafferty-Fernandez led efforts in research compliance for the MSOM. Dr. McCafferty-Fernandez was certified in healthcare compliance by the Health Care Compliance Association.

## INTRODUCTION

11.     This action arises out of schemes by UM to generate illegal revenues by submitting or causing the submission of false claims to the Federal Medicare and the Florida Medicaid

programs for (a) medically unnecessary testing; (b) inflated claims for reimbursement for pre-transplant laboratory testing and (c) failing to satisfy the notification requirements outlined in 42 C.F.R. §413.65 and thereby seeking to be paid for services at hospital outpatient department rates rather than physician clinic rates.

12.     Throughout his tenure at UM, Dr. Lord engaged in efforts to stop these illegal and fraudulent schemes and reported them to UM officials, including President Shalala. Because of Dr. Lord's reports and efforts to thwart UM's fraudulent practices, UM retaliated against Dr. Lord as more fully described below.

## JURISDICTION AND VENUE

13.     This action arises under the laws of the United States of America to redress violations of the FCA, 31 U.S.C. § 3729 *et seq*., particularly 31 U.S.C. § 3730(h).

14.     The Court has subject matter jurisdiction under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331.

15.     UM regularly performs health care services and submits or causes the submission of thousands of claims for payment to federal and state healthcare programs, including, but not limited to Medicare and Medicaid, in addition to private healthcare insurers and patients who are self-payors. Accordingly, UM is subject to the jurisdiction of this Court.

16.     Venue lies under 28 U.S.C. § 1391(b), (c) and 31 U.S.C. § 3732(a) because the Southern District of Florida is a district in which UM is found and transacts business, and because an act proscribed by 31 U.S.C. § 3730 occurred within this district.

## PROCEDURAL HISTORY

17.     On July 12, 2013, Dr. Lord, as Relator in this action, filed a sealed *qui tam* Complaint alleging that UM submitted or caused the submission of false claims to federal and state

health insurance programs, in violation of the Federal False Claims Act, 31 U.S.C. § 3729 *et seq*. ("FCA") and its state equivalent ("Florida FCA") including a claim for the whistleblower protection provision of the FCA, 31 U.S.C. § 3730(h). Dr. Lord filed Amended and Second Amended Complaints, on December 3, 2013, and June 15, 2016, respectively, adding factual allegations and asserting additional causes of action against UM.

18.     Each of the above-mentioned complaints, including Dr. Lord's Second Amended Complaint, alleged, *inter alia*, a scheme by UM to defraud federal and state health insurance programs by submitting false claims for (a) medically unnecessary testing; (b) inflated claims for reimbursement for pre-transplant laboratory testing and (c) failing to satisfy the notification requirements outlined in 42 C.F.R. §413.65 and seeking to be paid for services at hospital outpatient department rates rather than physician clinic rates.

19.     On approximately May 7, 2021, the United States and the State of Florida ("the Government"), Dr. Lord, UM, and others entered into a Settlement Agreement with respect to the FCA claims of the Second Amended Complaint. The Settlement Agreement provided, *inter alia*, that upon payment of more than $22 million, UM would be released from any civil or administrative monetary claims raised by Dr. Lord under the FCA and Florida FCA *except* for (1) any claims arising under 31 U.S.C. § 3730(h) and (2) any liability to Dr. Lord for attorneys' fees and costs arising under 31 U.S.C. § 3730(d) and § 3730(h). *See* Settlement Agreement, ECF 95-1, p. 4-5, par. 5.

20.     Upon information and belief, on May 21, 2021, UM paid the Government in excess of $22 million to resolve the Government's FCA claims raised by Dr. Lord's allegations.

21.     On June 4, 2021, the Government advised the Court that the Government and Dr. Lord had reached a Settlement Agreement with UM and of the Government's decision to partially

intervene in Dr. Lord's case for the purpose of settlement as to certain civil claims for violations of the FCA, as defined by the "Covered Conduct in the Settlement Agreement." *See* Notice of Election to Partially Intervene for Purposes of Settlement, ECF 93, par. 1.

22.    The "Covered Conduct in the Settlement Agreement" (also, "Covered Conduct") is defined as follows:

> (1) the University of Miami's transplant laboratories billed for medically unnecessary Cytokine testing, Flow Cytometry Testing, C-Reactive Protein Testing, Screen Luminex and Cylex testing, from January 1, 2008 through December 31, 2017; (2) between January 1, 2010 and December 31, 2017, the University of Miami caused Jackson Memorial Hospital to submit inflated claims for reimbursement for pre-transplant laboratory testing in violation of the Related Party Rule, 42 C.F.R. § 413.17, by controlling Jackson Memorial Hospital's decision to purchase pre-transplant laboratory tests from the University of Miami in exchange for the University of Miami's surgeons and Department of Surgery continuing to perform surgeries at Jackson Memorial Hospital; and (3) between October 1, 2009 and April 1, 2015, the University of Miami failed to satisfy the notification requirements outlined in 42 C.F.R. §413.65 and thereby sought to be paid for services at hospital outpatient department rates rather than physician clinic rates.

ECF 95-1, p. 2-3, par. D. The Covered Conduct constitutes the FCA claims raised by Dr. Lord in his original sealed *qui tam* Complaint filed on July 12, 2013 and included in the Amended and Second Amended Complaints.

23.    On June 8, 2021, the Court, pursuant to the Settlement Agreement, dismissed the FCA claims raised by Dr. Lord and resolved in the Settlement Agreement, and retained jurisdiction over the parties to, *inter alia*, adjudicate Dr. Lord's non-dismissed claim arising from the whistleblower protection provision of the False Claims Act, 31 U.S.C. § 3730(h), which provides for damages to *qui tam* relators who have been retaliated against (hereinafter the "retaliation claim"). See ECF 97.

24.     This Third Amended Complaint eliminates the dismissed claims from the Second Amended Complaint which were resolved by the Settlement Agreement and sets forth the allegations relevant to Dr. Lord's retaliation claim.

## FACTS

### *Medicare and Medicaid Programs*

25.     In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare Program, to pay for the costs of certain healthcare services for eligible individuals. Eligibility to Medicare is based on age, disability, or affliction with certain diseases (these eligible individuals are hereafter referred as "Medicare Beneficiaries"). *See* 42 U.S.C. § 1395 *et seq.* There exist two general components to the Medicare Program: (a) Medicare Part A helps cover inpatient care in hospitals and hospital-related services; and (b) Medicare Part B helps cover doctors' professional services and outpatient care.

26.     At all times pertinent to this Third Amended Complaint, the Medicare program was administered by the various states through private insurance carriers. These carriers contracted with the U.S. Department of Health and Human Services and served as fiscal intermediaries to receive, adjudicate, and pay Medicare claims submitted to it by Medicare Beneficiaries, physicians, or providers of services.

27.     The Centers for Medicare and Medicaid Services ("CMS"), and its predecessor the Health Care Finance Administration, is an agency within the U.S. Department of Health and Human Services, and, at all times pertinent to this Third Amended Complaint, was responsible for the operation, administration, and supervision of the Medicare health insurance program.

28.     The Medicaid program, as enacted under Title XIX of the Social Security Act of 1965, 42 U.S.C. § 1396 *et seq.*, is a system of medical assistance for families with dependent

children and to aged, blind, and disabled individuals with insufficient income to pay the cost of such services. Though federally created, the Medicaid program is a joint federal-state program in which the United States provides a significant share of the funding.

29.    At all times pertinent to this Third Amended Complaint, federal regulations governing the Medicare program, regarding reimbursement for the provision of outpatient services, were applicable to the Medicaid program in the State of Florida, pursuant to 42 C.F.R. §§ 440.20(a)(4) and 440.220, and the State of Florida Title XIX Plan.

30.    At all times pertinent to this Third Amended Complaint, pursuant to Florida law and in accordance with the Medicaid portion of the Social Security Act, the Florida Agency for Health Care Administration, and its predecessor the Florida Department of Health and Rehabilitative Services, administered a statewide program whereby these agencies would reimburse medical doctors and other providers for providing medical care to Medicaid Recipients.

### ***The False Claims Act***

31.    The FCA imposes civil liability on those who knowingly present false or fraudulent claims to the federal government for payment or approval, knowingly make a record or statement material to such a claim, or who otherwise conspire to present such claims. 31 U.S.C. § 3729(a)(1)(A), (B) and (C).

32.    Under the FCA, a "claim" is defined as:

> Any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property that is (1) presented to an officer, employee, or agent of the United States; or (2) made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest.

31 U.S.C. § 3729(c).

9

33.    The FCA contains a whistleblower protection provision which entitles an employee, contractor, or agent to all relief necessary to make that employee whole, if that employee is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee in furtherance of other efforts to stop one or more violations of the FCA. *See* 31 U.S.C. § 3730(h)(1). The above-mentioned whistleblower protection provision is the retaliation claim referenced in paragraph 23 above.

### *UM's Relationship with JMH*

34.    UM has a symbiotic relationship with JMH. JMH has always been a non-profit organization funded by Miami-Dade County residents through sales tax and bond revenues and operated by the Miami-Dade County Public Health Trust. JMH has always served as a teaching hospital for the MSOM. Since 1970, JMH has been home to the MTI, one of the leading transplant centers in the United States. Throughout the relationship between UM and JMH, UM, though the Department of Surgery, supplied the surgeons and medical expertise to the MTI resulting in an annual transfer of money from Miami-Dade County to UM. Until the mid-to-late 1990s, UM and JMH mutually benefitted from this arrangement because there was little dependence on commercial insurers for health care revenues and relatively no competition in south Florida for either organ transplant or trauma services.

35.    At all times material to the Third Amended Complaint, the financial and administrative relationship between UM and JMH was governed by an Annual Operating Agreement ("AOA").

36.     The AOA covered a variety of services furnished by UM faculty at JMH , whereby UM provided physicians to render services for JMH patients. Because of this, the AOA described a range of covered services, as well as the mechanism for reimbursing UM for these services.

37.     The AOA utilized a payment methodology to reimburse UM for the specified services. Under the AOA, JMH was required to pay no more than a set amount to UM for all the services described in the AOA and a portion of that amount was carved out to UM faculty and other health care providers for (1) direct patient care services, (2) educational services support, and (3) hospital administration support. The remainder of the set amount was to be paid to UM for all the other services described in the AOA, such as transplant services.

38.     Under the AOA, the parties set forth the terms and conditions regarding JMH's responsibility for billing and collecting for physician services for JMH patients. Generally, the AOA established that such services were "intended to be fulfilled by [UM] billing and collecting for physician services for [JMH] Hospital Patients." In addition to this general payment for direct patient care services, the AOA established a payment mechanism for specific services – such as transplant services – whereby UM billed JMH for those services.

39.     To obtain payment from JMH for the above specific services, UM was required to submit monthly invoices to JMH. Once JMH received those invoices, JMH was required to provide a remittance advice along with payment within 45 days of receipt of those invoices.

### *UM's History of Financial Problems*

40.     Around 2000, the healthcare world started to change. For example, Miami-Dade County reduced taxpayer funded resources for JMH which, in turn, limited its ability to pay UM for the services referenced in the AOA. Additionally, the State of Florida approved more transplant facilities, thus increasing competition for organ transplant and trauma services.

11

41.     By 2006, President Shalala and Dean Goldschmidt sought to attract better paying commercial patients and increase the rankings of the MSOM. Since rankings were heavily dependent on the dollar volume of grants from the National Institute of Health, UM overspent to attract medical and scientific talent and to buy facilities, especially Cedars of Lebanon Hospital which, at all times material to the Third Amended Complaint, was the University of Miami Hospital, the flagship of UHealth. This rapid expansion was reported to be a contributing factor to UM's financial troubles. *See* John Dorschner, "*UM med school's big ambitions led to big layoffs,*" The Miami Herald, July 22, 2012, updated July 28, 2012, https://www.miamiherald.com/latest-news/article1941579.html ("the Dorschner Article").

42.     As reported in the Dorschner Article, in October 2011, Norman Braman, a longtime UM Board of Trustees member "wrote a scathing letter to fellow UM trustees: '[p]oorly conceived decisions by the medical school administration have put the university at significant risk and, at the same time, injured Jackson Memorial Hospital.'" According to the Dorschner Article, Braman and others closely tied to the school warned UM officials the medical school was spending too much, too fast in the push to build a world-class medical center. By February 2012, Braman resigned from the UM board, fed up with what he viewed as bungled finances at the medical school.

43.     On February 14, 2012, Dean Goldschmidt met with Dr. Lord and offered him the position of COO of UHealth.  Dr. Lord accepted.

44.     Within days of meeting with Dean Goldschmidt, Dr. Lord determined, upon a review of relevant financials reports and meeting with key individuals including President Shalala, that UHealth had numerous and significant financial problems. Due to his extensive background in compliance prior to joining UM, Dr. Lord concluded that UHealth was suffering financially

because of a lack of business discipline and accountability that needed to be addressed immediately.

### *March 1, 2012 - Dr. Lord's Official Start Date*

45.     On March 1, 2012, Dr. Lord formally began his tenure as the COO of UHealth.

46.     On Saturday, March 3, 2012, Dr. Lord held a leadership retreat to plan for the last three months of the fiscal year. This meeting addressed layoffs, development of a shared services infrastructure and management of funds to deal with obligations to faculty members who had been recruited but were never given the funds per their contracts.

47.     The following week, Dr. Lord and his management team hired consultants to provide a comparative position analysis from other institutions and begin the review of compliance.

48.     Within days of his appointment as COO, Dr. Lord hired Jennifer McCafferty-Fernandez, Ph.D. to lead medical compliance activities for UHealth. Dr. McCafferty-Fernandez's first task was to work on an onsite review of the compliance program with external experts.

49.     Within three months of his appointment, Dr. Lord, with the full support of President Shalala, Dean Goldschmidt and the UM Board of Trustees changed the "run rate" of expenses by $90 million, prepared a $1.9 billion budget for the next fiscal year, negotiated a new collective bargaining agreement with the employees' union for the staff at the UM Hospital and negotiated an annual operating agreement with JMH.

50.     Every week throughout this period, Dr. Lord met to discuss these issues with President Shalala, key UM Board of Trustees Members, University Provost Thomas LeBlanc, University-wide CFO (Chief Financial Officer) Joseph Natoli and Dean Goldschmidt.

13

### *"A fiscal and cultural turn-around"*

51.     On July 3, 2012, in recognition of the fact that Dr. Lord drove "a fiscal and cultural turn-around and set the path for continued transformation of our medical school and health system," Dean Goldschmidt, with the support of President Shalala and UM's Board of Trustees, offered Dr. Lord a significant raise and a promotion to Chief Compliance Officer for the Medical Center and University Vice President for Medical Administration effective June 1, 2012. *See* Exhibit 1, July 3, 2012, letter, Pascal J. Goldschmidt, M.D., Senior Vice President for Medical Affairs and Dean to Jonathan T. Lord, Chief Operating Officer for Medical Center (hereinafter "July 3rd offer letter"). Dr. Lord accepted the July 3rd offer letter.

52.     In the July 3rd offer letter, Dean Goldschmidt stated:

> Jack, the past several months have been transformational for the School of Medicine and UHealth. Your tireless dedication to leading our school to greatness has made all the difference. I greatly look forward to continuing this journey with you as a partner.

53.     As set forth below, approximately six months later, Dr. Lord would be summarily terminated from all his positions at UM – without warning or notice of any performance, behavioral, competence or neglect of duty issues – after he personally briefed President Shalala, Dean Goldschmidt, the chair of the Audit and Compliance Committee of UM's Board of Trustees, and others regarding an ongoing Medicare fraud scheme being conducted by the Department of Surgery within UHealth including, but not limited to, causing the submission of inflated claims to Medicare for reimbursement for transplant laboratory testing and other schemes to generate illegal revenues from government payors.

### *The MTI and Transplant Labs Pathology Testing (IML & Histo Lab)*

54.     By June 2012, Dr. Lord learned of escalating disputes between UM and JMH over the MTI and UM's surgical and pathology departments regarding pathology testing for transplant patients.

55.     For years, UM's Department of Surgery supplied the surgeons to perform the organ transplants at the MTI. The MTI is a "virtual" entity composed of UM physicians, a laboratory based at UM, and physical facilities belonging to JMH. As a result, Dr. Alan Livingstone, the director of the MTI and chairperson of UM's Department of Surgery exerted tremendous influence over JMH's administrative operations. For example, in 2007, Dr. Livingstone moved pathology testing and testing oversight for organ transplant patients from JMH laboratories to UM's Department of Surgery on the MSOM campus. UM's pathologists unsuccessfully tried to move the transplant pathology testing and oversight to UM's Pathology Department, but Dr. Livingstone successfully resisted those efforts. As a result, tension grew between the Department of Surgery and the Pathology Department over transplant pathology testing and allegations of overbilling Medicare for unnecessary tests and other costly services.

56.     In the Spring of 2012, Dean Goldschmidt, upset with the condition of the transplant facilities at JMH, began efforts to obtain approval from the State of Florida to build a transplant facility at the University of Miami Hospital, separate and distinct from the MTI at JMH. Dean Goldschmidt's proposed UM transplant facility would directly compete with and significantly impair the MTI because UM's transplant surgeons would service the transplant facility at UHealth and not at JMH. JMH, supported by Dr. Livingstone, strongly objected to Dean Goldschmidt's attempt. In the end, Dean Goldschmidt withdrew UHealth's application for a "Certificate of Need" – the regulatory process to obtain state approval for a transplant facility – after JMH agreed to

make improvements to the transplant facilities at JMH. While this partially resolved the MTI issue, other significant issues remained including allegations of overbilling Medicare for unnecessary tests and other costly services at the Department of Surgery's IML and Histo Lab.

### *Investigating the IML Schemes to Generate Illegal Revenues*

57.     In July 2012, Dr. Lord and Dean Goldschmidt initiated a process to select a new director of the MTI to succeed Dr. Livingstone and an external reviewer to review the clinical operations and business practices of the transplant program including the IML and Histo Lab.

58.     In a July 20, 2012, email, Dean Goldschmidt recommended Gaetano Ciancio, M.D. for the role as the director of the MTI. Dr. Ciancio was an accomplished surgeon at UM who specialized in kidney transplants. Dean Goldschmidt envisioned, *inter alia*, that all employees working in the IML would report to the MTI director because "the functioning of the IML needs to be compliant with good clinical laboratory practice and partner successfully with the Department of Pathology to ensure standardization of testing and reporting."

59.     Dr. McCafferty-Fernandez and her counterpart at JMH were tasked with recommending a qualified firm to review the clinical operations and business practices of the transplant program including the IML. By August 2012, after interviewing, vetting, and ranking three firms, Dr. McCafferty-Fernandez and her JMH counterpart recommended to UHealth and JMH leadership that Transplant Management Group, LLC ("TMG") be engaged as an independent external consultant to review the clinical operations and business practices of the transplant program including the IML.

60.     Throughout the summer of 2012, Dean Goldschmidt and Dr. Lord worked together, constantly informing each other about compliance and billing issues associated with the Department of Surgery under the direction of Dr. Livingstone. Issues discussed included, *inter*

16

*alia*, the anticipated investigation by TMG of billing practices within the MTI and IML and complaints by leaders in the Department of Pathology regarding billing practices within the Department of Surgery.

61.     On September 21, 2012, UM received an anonymous letter "to report a fraud, which is taking placed [sic] in the Transplant laboratory, Department of Surgery at the University of Miami, Miller School of Medicine."   *See* Exhibit 2, undated letter addressed to the U.S. Department of Health and Human Services, Office of the Inspector General, Attn: OIG HOTLINE OPERATIONS, PO Box 23489, Washington, D.C. ("OIG Letter"). The OIG Letter detailed a scheme to defraud by overbilling Medicare for medically unnecessary transplant pathology testing, which the author likened to "organized crime" and a "chapter of American Greed." Soon after the OIG Letter was received, Dr. Lord, Dean Goldschmidt, and various administrators and leaders of UHealth and UM were made aware of the letter and its allegations.

62.     On October 2, 2012, after UHealth leadership had reviewed the OIG Letter and considered UM's reporting obligations, UM shared the OIG Letter with the U.S. Department of Health and Human Services, Office of the Inspector General in Washington, D.C.

63.     The receipt by UM of the OIG Letter, combined with numerous prior complaints from UHealth physicians and staff to UHealth administrators regarding the same or similar issues raised in the OIG Letter, created a sense of urgency to finalize the engagement agreement with TMG, so that it could begin and complete a comprehensive external review of the transplant programs, including a review of the allegations contained in the OIG Letter. Throughout this period, Dean Goldschmidt and Dr. Lord mutually agreed with the recommendation to select TMG as external investigator.

64.    In early October 2012, UM executed a contract with TMG to review the clinical operations and business practices of the transplant program, including allegations in the OIG Letter regarding a scheme to defraud Medicare based on billing for transplant pathology testing.

65.    On or about October 19, 2012, Dr. Livingstone complained to Dr. McCafferty-Fernandez about the external review process.

66.    Between November 7, 2012, and November 9, 2012, TMG conducted site visits of the MTI. During these site visits, TMG investigators met with and interviewed the medical school staff, leadership, and physicians to perform a "very comprehensive review of the transplant programs, including staffing, organizational design, billing processes, etc." *See* Exhibit 3, November 19, 2012, TMG Memo to File, Miami Transplant Institute (MTI)/Jackson Memorial Hospital.

67.    During the site visits by TMG, Dr. Ciancio telephoned a TMG Senior Consultant and reported that:

   a.    "[Dr. Ciancio and transplant staff] have been instructed from the 'highest levels' to be vague and standoffish with [TMG], [*sic*] not share too much information about the leadership and financial issues within the transplant program";

   b.    "it is very known internally that the lab has been performing tests without signed physician orders, performing known medically unnecessary testing and questionable billing practices"; and

   c.    "the department of surgery knows exactly how and why the lab revenue and profits have grown 10-fold over the past 6 years."

*See* Exhibit 3.  Upon information and belief, "the highest levels" included Dr. Livingstone and his direct reports.

68.    In a November 10, 2012 email, Dean Goldschmidt commented to Dr. Lord that Dr. Livingstone was trying to destroy the career of Dr. Ciancio "for control and because of insecurity."

This same need for control and insecurity would lead Dr. Livingstone to lobby President Shalala to end the TMG investigation and advocate for the termination of Dr. Lord.

69.     On or about November 28, 2012, David J. Birnbach, M.D., MPH, Vice Provost of Faculty Affairs formally notified Dr. Lord via letter of his appointment to the rank of Professor of Clinical Pathology retroactively effective to September 15, 2011. In the letter, Dr. Birnbach, addressing Dr. Lord, wrote of the "high esteem in which you are held and our desire to have you join us and continue your productive academic career as a member of our faculty."

70.     On or about November 29, 2012, TMG completed the on-site portion of their assessment of the MTI, IML and LAORA, the organ procurement organization for the MTI.

71.     By early December 2012, TMG issued a preliminary report, finding that the IML: (1) participated in duplicative billing by directly billing the Medicare Program for non-covered services; (2) engaged in inappropriate, unnecessary, and redundant testing; (3) performed many "routine" laboratory tests on JMH patients when JMH offers identical services at a much lower cost; and (4) splits tests between itself and the Histo Lab in order to game the system by (a) direct-billing Medicare through the IML for tests that result in a higher reimbursement to the provider through direct billing as compared to cost-based billing, and (b) billing through the Histo Lab for tests that result in a higher reimbursement to the provider through cost-based billing as compared to billing Medicare directly (hereinafter referred to as "TMG findings"). *See* Exhibit 4 ("TMG Report").

72.     The TMG Report was provided to Dr. McCafferty-Fernandez, Dr. Lord, and Dean Goldschmidt, who discussed the TMG findings thoroughly and often and mutually agreed that the findings needed to be shared with UM leadership, as they raised serious concerns including

potential FCA violations. Based on the TMG findings coupled with the issues raised in the OIG Letter, they also agreed that TMG should be engaged to complete a full billing audit of the IML.

73.     On or about December 3, 2012, Dr. Lord met with the chairperson of the Audit and Compliance Committee of UM's Board of Trustees. At that meeting, Dr. Lord personally briefed the chairperson on major compliance issues identified in the TMG Report pertaining to the MTI and Department of Surgery and possible exposures.

74.     On or about December 14, 2012, Dr. Lord personally updated President Shalala concerning the TMG findings identified in the TMG Report.

75.     Throughout this time, Dr. McCafferty-Fernandez, at the direction of Dr. Lord, repeatedly informed UHealth leadership of the TMG findings identified in the TMG Report.

76.     On or about December 16, 2012, Dean Goldschmidt expressed his support for Dr. Lord and corresponded with Dr. Lord regarding their mutual plans for the new year.

77.     On or about December 18, 2012, Dr. McCafferty-Fernandez provided the TMG Report and other related materials to Dean Goldschmidt, Dr. Lord, and other members of UHealth leadership. As Dr. McCafferty-Fernandez was acting as the main point of contact with TMG and anticipated taking maternity leave in early 2013, she asked Dean Goldschmidt, Dr. Lord, and others to advise her if the decision had been made to engage TMG to undertake a more thorough review of billing practices identified in the TMG Report.

78.     On or about December 18, 2012, Dr. Lord and Dean Goldschmidt authorized UM to engage TMG in a more thorough review and audit of bills related to the IML as recommended in the TMG Report.

79.     On or about December 19, 2012, Dean Goldschmidt and Dr. Lord discussed the MTI and IML with IML Director, Dr. Phillip Ruiz. Specifically, they discussed, *inter alia*,

protocols, processes, best practices, organizational climate, relationships, staff anxieties, and regulatory environment.

80.     On December 20, 2012, Dean Goldschmidt and Dr. Lord recorded a video interview outlining plans for 2013. Writing about the video interview with Dr. Lord in an email that same day, Dean Goldschmidt referred to his "awesome partnership" with Dr. Lord and exclaimed that the interview was the "best interview, ever!"

81.     Around this time, upon information and belief, Dr. Livingstone grew concerned about TMG's independent investigation, particularly considering the TMG findings were consistent with the FCA violations alleged in the anonymous OIG Letter. Not only could the TMG Report expose Dr. Livingstone and UM to potential liabilities, but changes to the IML spurred by the TMG Report could affect Dr. Livingstone's position and power within UM. Upon information and belief, Dr. Livingstone tried to put a stop to any further investigation by TMG. On or about December 20, 2012, Dr. Livingstone falsely accused Dr. McCafferty-Fernandez of being the source for the concerns related to the IML, that she blocked him and/or refused to meet with him and Rafic Warwar or give them access to TMG. Dr. Livingstone then told Dr. McCafferty-Fernandez that he planned to discuss his concerns with President Shalala. It was Dr. McCafferty-Fernandez's impression at the time that Dr. Livingstone was trying to intimidate her and to influence the outcome of the TMG investigation.

82.     Upon information and belief, around December 20, 2012, Dr. Livingstone discussed his concerns with President Shalala and, as a result, on December 21, 2012, per an email sent to Dean Goldschmidt, Dr. Lord, Dr. McCafferty-Fernandez, and others, President Shalala directed that the TMG investigation of the IML, the MTI, and LAORA be led and managed by

"Internal Audit." President Shalala further directed that Dr. McCafferty-Fernandez transfer all data gathered relative to the TMG investigation to Internal Audit.

83.    On or about December 28, 2012, Don Steigman, the Chief Operating Officer of JMH, told Dr. Lord that he received an email from Dr. Livingstone that effective immediately the external review of the MTI and the Department of Surgery was to be coordinated by Mike Maloney of Internal Audit.

84.    On Friday, December 29, 2012, at 9:18 pm, Dean Goldschmidt emailed Dr. Lord and Dr. Richard Cote, the Chairman of the UM Pathology Department, noting that the "coming week will be busy with talks about the IML after the sharing of the document on UM laboratories, and the ongoing review of the IML by TMG." He asked Dr. Cote to prepare him "an elevator speech" on the key limitations of the IML as it is currently set up "such that the three of us can deliver a consistent message." Finally, he notified Drs. Lord and Cote that he was scheduled to meet with President Shalala that Monday, December 31, 2012, at 11:00 am to discuss these topics.

85.    At noon on December 31, 2012, immediately following the meeting between President Shalala and Dean Goldschmidt, without warning or notice of any issues related to Dr. Lord's performance, behavior, or competence, Dean Goldschmidt called Dr. Lord to notify him that President Shalala had terminated him as COO of UHealth.

86.    Despite Dr. Lord being terminated as COO by President Shalala, Dean Goldschmidt, who had a close working relationship with Dr. Lord, initially, and incorrectly, assumed that President Shalala and UM would want to keep Dr. Lord on staff to continue his work in the areas of strategy, restructuring, and financial reform. For example, on December 31, 2012, at 1:58 pm, Dean Goldschmidt's assistant emailed Drs. Cote and Lord seeking their review of a new policy consolidating the pathology labs.

87.     On January 1, 2013, communicating by email, Dean Goldschmidt asked Dr. Lord to stay on at UM as a leader for strategy and innovation. Dr. Lord responded that he would only stay if he could make a difference. In anticipation of Dr. Lord remaining in a leadership capacity, Dean Goldschmidt drafted or caused the drafting of a proposed announcement for review by President Shalala and other members of UHealth leadership. Paragraph 2 of the proposed announcement read in pertinent part:

> Jack will be returning to his role on the faculty of the Department of Pathology and as an innovator of 21st Century healthcare. I look forward to his continued outstanding impact as Senior Advisor to the Dean for Healthcare Innovation and Planning.

88.     On January 1, 2013, at 3:55 pm, Dean Goldschmidt emailed Dr. Lord from his private email and informed him that "Donna [Shalala] requested to recall emails relative to the IML, and no changes should be considered or implemented until internal and external investigations are completed." Within minutes, Dr. Lord responded by email to Dean Goldschmidt to ask, "how did she even know about those emails – AL?," the initials referring to Dr. Alan Livingstone. Dean Goldschmidt replied by email to Dr. Lord: "Of Course AL."

89.     On January 1, 2013, at 4:03 pm, using his UM email address, and pursuant to the direction of President Shalala, Dean Goldschmidt emailed Dr. Cote and copied Dr. Lord, recalling the December 31, 2012 email sent at 1:58 pm email from Dean Goldschmidt's assistant, *see* paragraph 86 above, further stating "[n]o change of plan. But we should not consider or implement changes until internal and external investigations of IML are completed."

90.     On January 2, 2013, at 4:59 am, Dr. Cote, Chairman of the Pathology Department, emailed colleagues that Dr. Lord would join the department. "We are very proud to have Jack as a member of our faculty and are fortunate that Jack will remain a vital member of our department to help move our efforts forward. His expertise in health care delivery and management will

continue to benefit the department and school." *See* John Dorschner, "*Jack Lord's future at UM unclear,*" The Miami Herald, January 9, 2013.

91.     On January 2, 2013, at 2:02 pm, Dean Goldschmidt's proposed announcement, *see* paragraph 87 above, was emailed to President Shalala, Thomas J. LeBlanc, Joe Natoli, Sergio Gonzalez, Jacqueline Menendez and Dr. Lord. Within an hour, at 2:53 pm, President Shalala ordered the deletion of paragraph 2 of the proposed announcement regarding Dr. Lord's future at UM.

92.     On January 2, 2013, at 6:06 pm, Dean Goldschmidt emailed the MSOM the revised announcement, eliminating the above-referenced paragraph 2, stating that Dr. Lord would be "stepping down" as COO but gave no indication what his future would be. While the email commended Dr. Lord for his leadership as COO, attributing to him a fiscal turnaround at UHealth, it did not indicate that Dr. Lord had been terminated as COO and that President Shalala ordered his termination.

93.     On January 3, 2013, President Shalala, in response to an inquiry from The Miami Herald, directed Dean Goldschmidt to make no mention of Dr. Lord's future at UM.

94.     On January 3, 2013, The Miami Herald reported UM's announcement that Dr. Lord was "stepping down," ostensibly over faculty dissatisfaction with the May 2012 budget cuts approved by Dean Goldschmidt, President Shalala, and the UM Board of Trustees. *See* John Dorschner, "*No. 2 executive at UM medical school stepping down*" The Miami Herald, January 3, 2013.

95.     Around this time, President Shalala instructed Dean Goldschmidt to stop all daily updates, the above-mentioned daily communication practice implemented by Dr. Lord and adopted by Dean Goldschmidt and his staff.

24

96.     On January 9, 2013, The Miami Herald reported that it had reached out to UM several times over the prior week for details regarding Dr. Lord's termination and future at UM. After initially offering no comment on Dr. Lord's future, UM confirmed to the Herald that Dean Goldschmidt's email about Dr. Lord moving to the Department of Pathology was "inaccurate." UM told the Herald, "We are working on a transition with Dr. Lord, and it will be resolved in the near future." *See* John Dorschner, "*Jack Lord's future at UM unclear,*" The Miami Herald, January 9, 2013.

97.     Throughout January 2013, after terminating Dr. Lord as COO, UM isolated Dr. Lord, cutting him off from communications and information.

98.     On January 18, 2013, Dr. Lord emailed each member of the UM Board of Trustees to thank them for the "unique opportunity to return to UM" and the "special opportunity to serve a place I have loved for more than 40 years." He also informed them about, *inter alia,* the compliance issues identified in the TMG Report, noting that it was "critical for the protection of the institution that this external review and audit are completed without interference from administration or others and reports shared with the board." Referring to potential civil and regulatory penalties that might arise from the TMG findings identified in the TMG Report, Dr. Lord stressed, "Appropriate corrective actions will help mitigate potential external mandated sanctions."

99.     On or about January 30, 2013, UM formally notified Dr. Lord that as of January 31, 2013, he would no longer hold the administrative posts of Vice President for Medical Administration and Chief Operating Officer at the MSOM and/or UHealth and effective July 31, 2013, he would not be reappointed as a Clinical Professor in the Department of Pathology, effectively terminating him from all positions at UM. *See* Exhibit 5, January 30, 2013 letter from

Thomas J. LeBlanc, Executive Vice President and Provost to Jack Lord, M.D., Clinical Professor of Pathology.

100.    On January 30, 2013, President Shalala and Dean Goldschmidt met with the medical school faculty. President Shalala told the gathering that tough decisions had been made to fix the school's finances and while she acknowledged that mistakes had been made, she did not offer specifics, deflecting responsibility for the unpopular budget cuts and associated layoffs at UHealth. Prior to or during that meeting, Dean Goldschmidt issued a formal letter to faculty which contained a false narrative explaining that he, not President Shalala, terminated Dr. Lord, and implying that Dr. Lord was responsible for the unpopular budget cuts imposed in May 2012. *See* John Dorschner, "*Goldschmidt confronts angry UM medical school faculty*," The Miami Herald, January 31, 2013.

101.    Upon information and belief, President Shalala, upon the advice and urging of Dr. Livingstone, terminated Dr. Lord from all positions at UM to avoid the dissemination of the TMG findings identified in the TMG Report.

102.    On or about July 3, 2013, UM, under the guidance of UM's Internal Audit (as opposed to the original TMG investigation that was structured as an independent outside review), issued contrary findings to the TMG Report which falsely concluded that "virtually all of the allegations against the IML were unfounded." That finding was directly contradicted by the Settlement Agreement in this action. ECF 95-1, p. 2-3, par. D.

103.    On July 12, 2013, Dr. Lord, as Relator, filed a sealed *qui tam* complaint alleging that UM submitted or caused the submission of false claims to federal and state health insurance programs, in violation of the FCA. He also filed Amended and Second Amended Complaints, on

December 3, 2013, and June 16, 2016, respectively, adding factual allegations and asserting additional causes of action against UM.

104.    On or about May 21, 2021, UM paid the Government more than $22 million to resolve the Government's FCA claims raised by Dr. Lord's allegations, including the TMG findings identified in the TMG Report set forth above.

105.    Before he was formally terminated, UM harassed, isolated and publicly humiliated Dr. Lord by disseminating a false narrative implying that he was solely to blame for the May 2012 budget cuts and the resulting faculty unrest. This false narrative was published repeatedly by The Miami Herald and other news outlets. In truth and in fact, Dr. Lord was terminated solely on account of his investigation, discovery, and internal reporting of FCA violations, and not for any legitimate reason.

106.    Despite approving the May 2012 budget cuts and endorsing the TMG preliminary report, Dean Goldschmidt maintained his positions at UM earning more $1 million dollars per year until May 16, 2016, after executing President Shalala's order to terminate Dr. Lord on December 31, 2012.

107.    President Shalala maintained her position at UM through May 2015 and her multi-million per year compensation package following her decision to recall the TMG Report and terminate Dr. Lord. Before her resignation, UM renamed its $46.5 million Student Activities Center in President Shalala's honor. After resigning from UM, President Shalala served as President of the Clinton Foundation until 2017 and in 2018, she was elected to the United States House of Representatives. She was defeated in the 2020 general election just before the instant matter was unsealed by the Court. On March 1, 2021, UM announced she will be teaching an undergraduate class in the politics of health policy for the political science department.

108.     Following his termination, Dr. Lord applied to numerous executive positions that were equivalent to his position at UM, and which he was qualified to hold. He was not hired to any of these positions because of the false narrative generated by the leadership of UM and the publicity surrounding his termination from UM. Moreover, he was prevented from pursuing the instant claim for wrongful termination under the FCA for nearly eight years, until the Government filed its notice of election to intervene in this action.

109.     As a result of his investigation, discovery, and internal reporting of FCA violations at UM, including the publicity surrounding his termination based on the false narrative generated by the leadership of UM to cover up the FCA violations, Dr. Lord suffered (a) loss of salary and benefits; (b) loss of significant income potential from several boards of publicly traded companies and the CEO (Chief Executive Officer) position of a highly respected nationally recognized foundation; (c) reputational damage; and (d) emotional distress.

## FALSE CLAIMS ACT VIOLATION
### 31 U.S.C. § 3730(h)

110.     The allegations contained in paragraphs 1 through 109 are re-alleged as if fully set forth below.

111.     The whistleblower protection provision of the FCA, 31 U.S.C. § 3730(h), protects an employee from retaliation for lawful acts done by the employee in furtherance of an action under § 3730 or other efforts to stop one or more violations the FCA.

112.     As set forth above, Dr. Lord was an employee of UM who engaged in protected activity designed to stop one or more FCA violations.

113.     UM had actual and direct knowledge of Dr. Lord's protected activity as his complaints about UM's fraudulent and unlawful practices  were made directly to President Shalala, the chair of the Audit and Compliance Committee of UM's Board of Trustees, Dean Goldschmidt,

and other members of UHealth leadership, both orally and in writing, using language sufficient to put UM on notice that he engaged in protected activities.

114.    UM retaliated against Dr. Lord as described above, by harassing, isolating, and terminating him from all positions at UM, but not before he was publicly humiliated in the media, solely on account of his protected activity and not for any legitimate reason.

115.    Pursuant to 31 U.S.C. § 3730(h)(1)&(2), Dr. Lord is entitled to "all relief necessary" to be made whole, including "reinstatement with the same seniority status that the employee … would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination including litigation costs and reasonable attorneys' fees."

**DEMAND FOR A JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands that all issues of fact be tried by a jury.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

1.    That judgment be entered in an amount to be determined by a jury for Plaintiff and against Defendant for violating 31 U.S.C. § 3730(h);

2.    That judgment be entered for Plaintiff and against Defendant for two times back pay and benefits from January 31, 2013, through the present, interest on the back pay and benefits and compensation for all special damages available by law, including damages for emotional distress and public humiliation, litigation costs, and reasonable attorneys' fees as authorized by 31 U.S.C. § 3730(h); and

3.      For all such further relief as the Court may deem just and proper.


Date: August 12, 2021                    Respectfully submitted,


                                         By: /s/ Erica L. Perdomo
                                             Jeffrey H. Sloman, Esq.
                                             Florida Bar No. 378879
                                             E-Mail: jsloman@sfslaw.com
                                             Erica Perdomo, Esq.
                                             Florida Bar No. 105466
                                             E-Mail: eperdomo@sfslaw.com
                                             STUMPHAUZER FOSLID SLOMAN ROSS &
                                             KOLAYA PLLC
                                             2 South Biscayne Blvd, Suite 1600
                                             Miami, FL 33131
                                             Tel.: (305) 614-1400
                                             Facsimile: (305) 614-1425
                                             *Attorneys for Plaintiff Jonathan Lord*