# EXHIBIT 3

Memo to File
Miami Transplant Institute (MTI)/Jackson Memorial Hospital
November 19, 2012

I am currently a Senior Consultant with Transplant Management Group, LLC (TMG) and am assigned to an engagement with MTI. This engagement stemmed, among other things, from the medical schools concerns with regard to a "whistle blower" letter that had been sent to the OIG claiming fraudulent and medically unnecessary testing being completed at the HLA which currently falls under the department of surgery. The medical school contracted with TMG to perform a very comprehensive review of the transplant programs, including staffing, organizational design, billing processes, etc. A site visit for data gathering purposes was performed November $7^{th} - 9^{th}$, 2012. During this site visit a number of meetings took place with the medical school staff, leadership and physicians as well as hospital staff and leadership.

During these meetings it was apparent that there is a long-standing distrust between the school and the hospital, which seems to primarily stem from financial issues on both sides. Because of this rift, neither side was very forthcoming with information. The hospital side claimed that they were not agreeable to the visit by TMG, or that they did not get enough notice, or that they had not completely agreed to the scope of the visit, etc. It was very difficult to garner much, if any real usable information for the first day and a half of the site visit.

At 3:42pm CST today I received a call from Gaetano Ciancio, M.D., M.B.A. (professor of surgery, Director of the Miami Transplant Institute), who verbally seemed to be under duress. The call originated from phone number (305) 742-5741 to my cell phone (504) 616-1481. Dr. Ciancio requested that I not let anyone know that he was calling me for he feared he would lose his job. He made this statement no less than four times during the 7 minute and 19 second conversation.

Dr. Ciancio wanted to let me know that they had been instructed from the "highest levels" to be vague and standoffish with us, not share too much information about the leadership and financial issues within the transplant program. He would not tell me specifically who gave him this directive, but he was very upset and seemed afraid. Not physically afraid, but more afraid for his career.

He went on to tell me that it is very known internally that the lab has been performing tests without signed physician orders, performing known medically unnecessary testing and questionable billing practices. He stated that the department of surgery knows exactly how and why the lab revenue and profits have grown 10 fold over the past 6 years and that there are people "above his pay grade" that are determined to make sure the lab remains under the department of surgery and does not get taken and given to pathology to run as they will lose the significant revenue.

Again, he would not give me the specific names of whom he was talking about specifically. He made me promise that that we (TMG) would do a very thorough review of the business practices and ordering practices associated with the lab and expose it publically.

I told him that over the next few weeks the lab data is being reviewed and questions will be asked based on the data in order to determine what the recommendation regarding the structure and future of the lab and transplant programs should look like. I told him that if there are any irregularities found that they would be documented within the report.

The call was rather quick, but was obviously intended to draw my/our attention to the real issues associated with the alleged unethical practices of the lab, and possibly ordering physician(s). I ended the call by letting him know that he is more than welcome to call me any time and assuring him that the call would be confidential. He thanked me and stated that he truly hoped that I could be trusted to not let anyone know that he called.

Barry S. Marshall, MBA, FACHE
Senior Consultant