# EXHIBIT 4

## Possible IML Compliance Review Targets

1. **Direct Third Party Billing for Hospital Patients**

    **Background:** Prior to July 1, 2012, IML has been billing third parties (mostly Medicare) for JMH hospital patients for transplant/post-transplant biopsies and associated special testing on these tissues. IML did so under the "TC grandfather" provision under Medicare hospital patient billing exceptions. However, IML did not qualify for such provision. To qualify, IML must had the TC direct billing arrangement with JMH prior to July 23, 1999, which IML did not have, evidenced by that JMH was performing these services in its own Pathology laboratories until Dr. Ruiz made arrangement (around 2008/2009) to direct these specimens to bypass the JMH lab and sent to IML without the consent of JMH lab. This resulted in double billing and non-compliant billing to Medicare. (See Attachment A for more detailed explanations.) The estimated volumes _annual_ volumes for these services are listed below.

    **IML - JMH Hospital Patients**

    | TEST/CPT CODE | Current Annual Volume |
    |---|---|
    | Kidney/GI Biopsy 88305 | 500 |
    | Liver/Heart/Lung Biopsy 88307 | 300 |
    | Special Stain (I) 88312 | 120 |
    | Special Stain (II) 88313 | 600 |
    | Immunohistochemistry (I) 88342 | 3600 |
    | Immunohistochemistry (II) 88360 | 240 |
    | Immuno fluorescence 88346 | 180 |
    | Electron microscopy 88348 | 120 |
    | In situ hybridization (FISH or CISH) 88365 | 240 |

    Additional supporting evidence can be found by examining IML annual or monthly billing history from 2007 to present. Around the time Ruiz made the change in billing practice (2008-2009?), billing on the aforementioned CPT codes on JMH patients would have experienced the increase. This would also support that IML did not the the TC grandfather exemption for these services since 1999.

2. **Inappropriate, unnecessary and redundant testing via "protocols"**

    - "Protocols" not considered standard of practice or with no clinical or scientific justifications are used routinely. Examples are included in Attachment B.

    - When providers (e.g., Nephrology physicians who provide post-transplant care) did not agree with these order set protocols and refused to sign the orders, IML performed the tests in the absence of signed provider orders. The providers got together in 2011 and determined what would constitute appropriate lab testing order sets/protocols. For a brief period (around

May/June 2011,) these protocols replaced the inappropriate ones. However, upon seeing volume and revenue reduction, Drs. Livingstone and Ruiz ordered the previous inappropriate protocols to be restored in the electronic ordering system. The laboratory manager at the time (Ramiro Fernandez) voiced concerns about non-cooperation from providers and Medicare fraud/abuse but was over-ruled (Attachment C.) The laboratory manager soon after was dismissed under other reasons.

- IML/Surgery IT set up a "one-click" order approval at provider sign in when accessing TPIS. The "one-click" does not provide details of the unsigned orders. Upon clicking, all unsigned orders (sometimes hundreds of tests) will be "signed" electronically. This can likely be investigated/supported by looking at the time stamp of the electronic orders across multiple patients under a single physician in a given time frame.

- Attachment D - Example of IML billing to JMH on these unnecessary and redundant testing

- Additional "Lab-initiated" test orders on TB PCR, Quantiferon, CMV PCR with negative patient care impact (more details in Clinical Issues below.)

3. **Non-compliant telepathology practice on primary diagnosis (read) violating FDA, Medicare and CLIA rules**

    - Ruiz has been using telepathology – whole slide imaging technology to sign out cases when he is not on site. This is in violation of the following:

    - FDA has declared that this technology is a Class III medical device and has not cleared for use in making primary diagnosis
      http://www.fda.gov/downloads/AdvisoryCommittees/CommitteesMeetingMaterials/MedicalDevices/MedicalDevicesAdvisoryCommittee/HematologyandPathologyDevicesPanel/UCM187186.pdf (Attached)

    - CLIA requires that all slide reading/signout activities to be conducted physically within a facility that carries the appropriate CLIA licesnse. See attached email from Kimberly Cole, AHCA/CLIA Clinical Laboratory inspector

    - Medicare requires billing for Pathology professional services (in this case slide reading and signout) to accurately reflect the CLIA license, without which Medicare does not allow payments for these activities. http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/clm104c16.pdf

4. IML performs many "routine" laboratory tests on JMH patients when JMH's own lab offers identical services at a much lower cost. JMH pass-through bill to Medicare under the "cost reporting" mechanism. This can be construed as Medicare billing fraud as physician kick-back. (Attachment D – Example of IML billing)

5. From a prior employee at IML: IML splits tests between its "HLA lab" and "IML lab" to game the system, taking advantage of cost-based reporting billing for higher cost tests and use IML for direct Medicare billing on tests with higher reimbursement. (See attached bill examples from the two labs for similar tests.)

6. Clinical issues (more details later)

    - Unreliable results due to lack of QM programs in the lab with many examples of false results on CMV PCR, TB PCR, Quantiferon, etc. (See email attachments)

    - Lack of proper Clinical Pathology training and board certification of Dr. Ruiz

    - Electronic medical records non-compliance (TPIS HIPAA violations, missing patient records in Cerner, UChart and Meditech, lack of results tracking trails in home grown system, etc.)

# Attachment A

Key Concerns regarding IML related to TC Grandfather Expiration

Background on CMS Anatomic Pathology TC Grandfather Provision:
1. The IML issues surfaced with the recent expiration (6/30/2012) of Anatomic Pathology Services Technical Component (TC) Grandfather Provision authorized by Congress and CMS. Upon which Dr. Ruiz notified JMH that he has been providing the services and billing Medicare under this provision and now wishes to bill JMH for these services. The first invoice Dr. Ruiz sent to JMH was in excess of $33K for the month of July.
2. TC Grandfather Provision was established when Medicare changed reimbursement for anatomic pathology technical component services for hospital in and out patients effective July 23, 1999, not allowing independent laboratories, such as IML, to bill directly for such services. At that time, certain _existing_ independent laboratories providing these services were allowed to continue under the TC Grandfather Provision because the costs of these services were not included in the calculation of hospital patient reimbursement schemes (e.g., DRG's, etc.) For the most part, the Provision involved small rural and community hospitals that did not have their own histology laboratories or for reference laboratories performing high-end esoteric services.
3. The expiration of the TC Grandfather Provision enacted by Congress on June 30 was meant to shift the cost burden from CMS to the hospitals for inpatients and to offer better mechanisms to control the outpatient expansion of the costs associated with this Provision. Across the country the labs eligible for this provision have been negotiating with the hospitals to continue to provide the services that hospital labs are _unable_ to provide.

Double billing to Medicare and other billing non-compliance by IML:
4. Prior to the Provision, the transplant biopsies technical components for JMH patients were performed in house in JMH histology labs with professional components read by Department of Pathology faculty. This represented a typical arrangement across the country in institutions similar to JMH and UM and was never intended to be covered by the TC Grandfather Provision.
5. Dr. Ruiz arranged for the biopsies to be taken directly into IML a few years ago, which resulted in bypassing the JMH histology labs. This action resulted in double billing to Medicare (via DRG's coverage billed by JMH

and TC Grandfather billing on the same service by IML) for inpatients, and non-compliance for outpatient billing as they were supposed to be under the OPPS APC's mechanisms [under the SSA Section 1833(t) and Section 4533 of the Balanced Budget Act of 1997 implemented on August 1, 2000 by CMS].

**Further compliance concerns with Dr. Ruiz's proposal:**

6. Dr. Ruiz's request for JMH to pay for these services do not pass the musters of: a) the services were never supposed to be covered by TC Grandfather as outlined in #4 and 5 above and, b) JMH can indeed provide the 24/7 coverage required clinically, as it has been doing so currently for similar technical components and specifically for these services in the past prior to Dr. Ruiz taking them without JMH and Pathology agreement.
7. The cost for JMH to perform these services for both in and out patients are much lower than what IML billed in July due to the existing marginal capacities in the lab. JMH has no mechanisms for additional in-patient revenues associated with these services.
8. Should JMH agree to pay as Dr. Ruiz requested, since IML will be charging a rate higher than what JMH can provide itself, it will raise additional concerns for violating the federal anti-kickback statutes for JMH. UM Transplant physicians may also risk being accused of violating the Physician Self-Referral (Stark) law, given that IML is an entity under your leadership.

**Non-compliance with clinical documentations at IML and JMH:**

9. Clinically, when Dr. Ruiz assigned these tissues into IML, JMH lost accounting of these patient activities and no longer had these patient results entered in its CoPath and Cerner EHR systems, raising significant regulatory, accreditation and billing compliance issues. Since mid-July, Dr. Ruiz has been accessioning these cases into CoPath without proper vetting with JMH Lab and its medical director (me) regarding this transition, tempering multiple aspects of the established Quality Management programs, risking JMH hospital and lab's accreditations.

**Non-Compliance with appropriate Reference Laboratory governance at IML:**

10. Regarding the selection of technical testing reference laboratories for JMH patients, CLIA, Joint Commission and CAP put the responsibilities and authority on CLIA Laboratory Director (at JMH referred to as Laboratory

Medical Director, in this case Dr. Nadji), in consultation with the treating clinicians. The selections are governed by a set of well-established policies and Quality Assurance programs within JMH by the CLIA Laboratory Director and the Medical Executive Committee. The selection for each reference laboratory and the specific services must be documented in writing and a Quality Management program must be established to monitor the provision of services. QA Programs also must review for clinical, regulatory and billing compliance. The services in question currently provided by IML do not meet any of these criteria.

**Financial and clinical impacts to JMH and UM:**
11. Financially, should IML continue to provide the technical services for these biopsies, JMH will incur additional hundreds of thousand dollars of annual expenditure without adequate additional revenue to offset these costs. Since IML payment is paid out of AOA, it is likely that these additional payments will come out of other UM services at JMH.
12. For professional components of the services, there is no financial impact to either JMH or UM as they will continue to be provided by UM physicians including Drs. Ruiz, Thomas, Bejarano, Garcia and Barisoni.

# Attachment B

| DATE/TIME | TRANSCRIBED BY @ TIME | POST KIDNEY OR KIDNEY-PANCREAS TRANSPLANT |
|---|---|---|
| | | DO NOT USE: U, u, IU, MS, MSO$_4$, 1.0 (trailing zero), .5, QD, QOD, MgSO$_4$<br>INSTEAD USE: Unit, Morphine, 1, 0.5 (leading zero), Daily, Every other day, Magnesium<br>**LAB:**<br>**DAILY IN AM:**<br>   a. CBC with differential<br>   b. Basic metabolic panel, magnesium, and phosphorous<br>   c. Serum amylase and lipase (if pancreas recipient)<br>   d. 12 hour urine collection (1800 – 0600, keep on ice) if pancreas recipient<br>   e. Random urine collection for protein and creatinine daily for 3 days<br>   f. ==Quantitative PCR for CMV, EBV, and BK virus daily for 3 days==<br>   g. If patient receiving tacrolimus / cyclosporine / sirolimus / everolimus, trough level (1 purple top tube & 1 red top tube) at 0600 to IML lab.<br>**EVERY MONDAY AND THURSDAY (in addition to daily labs):**<br>   a. Comprehensive metabolic profile<br>   b. Cell Surface Enumeration Panel (2 lavender top tubes) to IML lab<br>   c. Cytokine level (1 tiger top tube) to IML lab<br>**MEDICATIONS:**<br>18. Intravenous fluids:_____@_____mL/hour<br>19. Tacrolimus _____mg by mouth at 1900 on (date) _____<br>    Tacrolimus _____mg by mouth at 0700 on (date) _____<br>20. Sirolimus _____mg by mouth daily at 0700<br>21. Mycophenolate Mofetil (CellCept) _____mg by mouth at 0700 and 1900 every day<br>22. Mycophenolate Sodium (Myfortic) _____mg by mouth at 0700 and 1900 every day<br>23. Everolimus _____mg by mouth daily at 0700<br>24. Methylprednisolone _____mg by mouth at 0700 daily<br>25. Sulfamethoxazole/trimephoprim one tablet by mouth every Monday, Wednesday, and Friday<br>26. Additional medications: |
| | | Physician Signature and ID #                       Contact # / Date |

University of Miami Hospital
1400 NW 12th Avenue,
Miami, FL 33136

Post Kidney and Kidney-Pancreas Transplant / Admission to Floor

Revised 10/11

Page 2 of 2

# Attachment C

Begin forwarded message:

From: Ramiro Fernandez <ramiroum@hotmail.com>
Date: August 31, 2011 6:57:24 AM EDT
To: Ramiro Fernandez <ramiroum@gmail.com>
Subject: FW: Mexican standoff

---

From: ramiroum@hotmail.com
To: warwarr@aol.com
Subject: RE: Mexican standoff
Date: Wed, 15 Jun 2011 09:30:08 -0400

ok

---

Subject: Re: Mexican standoff
To: ramiroum@hotmail.com
From: warwarr@aol.com
Date: Wed, 15 Jun 2011 13:27:35 +0000

Ramiro,

At the end of the day, Dr Livingstone is not only the Chairman but also MTI director. We all met with Dr Burke and he promised to get back to us after meeting with Roth....and he hasn't. Dr Livingstone sent him several emails and he has not responded (to my knowledge). Ruiz also sent him emails.

I suggest you personally try to find Burke so we can determine where we are. As a program, I think we put ourselves at risk by having multiple standards of care.

I am out of town but willing to have a teleconf with you, Nicole, and Phil.

---

From: Ramiro Fernandez <ramiroum@hotmail.com>
Date: Wed, 15 Jun 2011 09:21:59 -0400
To: <warwarr@aol.com>
Subject: Mexican standoff

Please take a look at Ruiz email to Alan yesterday regarding changing testing protocols.
I cannot go against a decision made by Alan nor legally prevent Phil from having the lab execute a order,
so here is my reasoning so you can evaluate pros & cons with Alan
I think this will generate another Mexican standoff,
where Roth & Kupin will not sign orders containing the immunology tests being questioned.
consequently we will not be able to bill for their patients,
That may ultimately result in not accepting their patients
what may end on either they sending their patients to other lab
or the Program director reassigning their patients to another physician
with the possible complain from them to medicine claiming the reason for their replacement are monetary and not clinical
with the consequent implication of medicare fraud by over testing
which could very well result in the transplant program being switched under Riser and the labs under Cote...
all scenarios are bad
I would rather recommend talk for an agreement
and in the event consensus cannot be obtained,

then just respect doctor specific orders
That way we could still criticize Roth & Kupin for not being proactive in testing the patients to detect impending rejection episodes early.
and ultimately, their statistics will be there to show their patient's graft survival rate being worst than those other physicians who actually actively look for rejection episodes and are able to stop the process before it has clinical manifestation / consequences.
Dead line to stop the changes made yesterday will be tomorrow at 7 a.m.
in addition there is the issue of notifying Roth that his orders that he placed in the patient orders system have been modified...

=