UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 13-22500-CIV-ALTONAGA/McAliley

JONATHAN LORD, M.D.,

     Plaintiff,

v.

UNIVERSITY OF MIAMI,

     Defendant.

_____/

**ORDER**

**THIS CAUSE** is before the Court on Defendant University of Miami's Motion to Dismiss Third Amended Complaint With Prejudice [ECF No. 114], filed on September 27, 2021. Plaintiff Jonathan Lord, M.D., filed a Response in Opposition [ECF No. 115], and Defendant filed a Reply [ECF No. 116]. The Court has carefully considered the Third Amended Complaint [ECF No. 101], the parties' written submissions, and applicable law. For the following reasons, the Motion is denied.

**INTRODUCTION**

Just one claim remains in this eight-year-old case. Plaintiff asserts that the University of Miami fired him from his position as a high-ranking operations and compliance officer because of his efforts to investigate billing practices that defrauded the federal government. He maintains that his termination violated the anti-retaliation provision of the False Claims Act. *See* 31 U.S.C. § 3730(h).

Defendant moves to dismiss Plaintiff's retaliation claim on three bases: first, that Plaintiff's alleged acts are not legally protected; second, that Plaintiff's employer did not know of his acts even if they are legally protected; and third, that Plaintiff's allegedly protected acts did not cause

his firing.  Each of these arguments emphasizes Plaintiff's role as a compliance employee. Defendant states that Plaintiff's behavior leading up to his firing was entirely consistent with his role as the University health system's lead compliance officer, so Defendant could not have had notice that Plaintiff was engaging in whistleblowing efforts rather than simply doing his job.

This suit raises important questions about how compliance officers may give their employers notice of whistleblowing activity before bringing a False Claims Act retaliation claim, particularly in light of congressional amendments to the anti-retaliation provision that broaden employer liability.  In resolving these questions, the Court keeps in mind that it must accept Plaintiff's factual allegations as true and resolve all reasonable doubts in Plaintiff's favor.

## BACKGROUND

### I.        Plaintiff's Early Tenure and Promotion at UHealth

The University of Miami operates a variety of well-known medical facilities and medical education institutions.  One such institution is the Leonard M. Miller School of Medicine ("Medical School").  (*See* Third Am. Compl. ¶ 3 (alterations added)).  The Medical School houses within it several clinical and teaching facilities, including Jackson Memorial Hospital ("Jackson"), a non-profit organization that serves the Medical School as a teaching hospital.  (*See id.* ¶¶ 3, 34). In turn, Jackson operates the Miami Transplant Institute, "one of the leading organ transplant centers in the United States."  (*Id.* ¶ 3).  The Medical School's Department of Surgery provides medical professionals and expertise to Jackson and the Miami Transplant Institute.  (*See id.* ¶ 4). The Medical School's "clinical delivery component" is sometimes broadly referred to as the University of Miami Health System, or "UHealth."  (*Id.* ¶ 1).

In February 2012, the Dean of the Medical School, Dr. Pascal Goldschmidt, offered Plaintiff a job as Chief Operations Officer ("CCO") of UHealth.  (*See id.* ¶ 43).  Plaintiff accepted,

bringing with him an "extensive background in compliance[.]"  (*Id.* ¶ 43–44 (alteration added)).

Within days of his hire, Plaintiff met with key leaders, including University of Miami President

Donna Shalala, to discuss financial issues facing the University.  (*See id.* ¶ 44).

Plaintiff's early tenure as COO was busy.  He soon hired Dr. Jennifer McCafferty-

Fernandez "to lead medical compliance activities for UHealth."  (*Id.* ¶ 48).  Plaintiff also

spearheaded several new financial initiatives "with the full support of President Shalala, Dean

Goldschmidt, and the [University] Board of Trustees" in the first three months of his employment.

(*Id.* ¶ 49 (alteration added)).  Throughout this period, Plaintiff had weekly meetings with Shalala,

Goldschmidt, and other University leaders about financial matters and other issues, including

collective bargaining negotiations with certain UHealth employees and the negotiation of an

annual operating agreement with Jackson.  (*See id.* ¶ 50).

These efforts earned Plaintiff praise and a promotion.  In July 2012, Goldschmidt, "with

the support of President Shalala and [the University]'s Board of Trustees," promoted Plaintiff to

Chief Compliance Officer of the Medical Center and University Vice President for Medical

Administration.  (*Id.* ¶ 51 (alteration added)).  Plaintiff's responsibilities in his new roles included,

among other tasks, "structuring the governance of the various departments within UHealth" and

"overseeing and implementing policies on compliance with various laws including the Medicare

and Medicaid programs[.]"  (*Id.* ¶ 1 (alteration added)).

## II.    Investigation of Billing Practices

In Plaintiff's telling, the events that led to his termination center around the conduct of

another prominent UHealth employee, Dr. Alan Livingstone.  Livingstone was an influential

member of the Medical School faculty, the chairperson of the Department of Surgery, chief of

surgical services at Jackson, and clinical director of the Miami Transplant Institute.  (*See id.* ¶ 7).

3

In 2007, Livingstone moved pathology testing and oversight for organ transplant patients from Jackson to facilities within the Department of Surgery, including the Immuno-Monitoring Laboratory ("IML").  (*See id.* ¶ 4).  Yet Livingstone also resisted efforts by University pathologists to transfer "transplant pathology testing and oversight" to the University's Pathology Department.  (*Id.* ¶ 55).  These decisions created tension between the Department of Surgery and Pathology Department.  (*See id.*).  In the midst of this interdepartmental struggle, some members of the University community suggested that the Department of Surgery was overbilling Medicare for medically unnecessary services.  (*See id.*).

By the spring of 2012, Goldschmidt had grown disappointed with the transplant facilities at Jackson.  (*See id.* ¶ 56).  He decided to pursue state approval of a new transplant facility at the University of Miami Hospital — the flagship hospital of UHealth, separate from Jackson's Miami Transplant Institute.  (*See id.* ¶¶ 41, 56).  This decision allegedly upset Livingstone because the "proposed . . . transplant facility would directly compete with and significantly impair" the Miami Transplant Institute where Livingstone served as director.   (*Id.* ¶ 56 (alteration added)).  Goldschmidt backed away from his initial plan after Jackson agreed to improve its transplant facilities.  (*See id.*).  But allegations of Medicare overbilling in the Department of Surgery continued to linger.  (*See id.*).

Not much later, Goldschmidt recommended that Dr. Gaetano Ciancio replace Livingstone as director of the Miami Transplant Institute.  (*See id.* ¶¶ 57–58).  Goldschmidt planned for IML employees to report to Ciancio because, as he put it, "the functioning of the IML needs to be compliant with good clinical laboratory practice and partner successfully with the Department of Pathology to ensure standardization of testing and reporting."  (*Id.* ¶ 58 (quotation marks omitted)).  Around the same time, Plaintiff and Goldschmidt assigned McCafferty-Fernandez and a colleague

the task of recommending a firm to review and investigate the practices of the transplant program, including those of the IML. (*See id.* ¶ 59). McCafferty-Fernandez and her counterpart ultimately recommended that Transplant Management Group, LLC ("TMG") do the job. (*See id.*). After that recommendation, Plaintiff and Goldschmidt continued to "work[] together" and "constantly inform[] each other about compliance and billing issues associated with the Department of Surgery under the direction of Dr. Livingstone." (*Id.* ¶ 60 (alterations added)).

On September 21, 2012, the University received an anonymous letter that "report[ed] a fraud, which is taking placed [sic] in the Transplant laboratory, Department of Surgery[.]" (*Id.*, Ex. 2, Anonymous Letter [ECF No. 101-2] 2 (alterations added)).[1]  The letter "detailed a scheme to defraud by overbilling Medicare for medically unnecessary transplant pathology testing" and accused the Department of Surgery of "commitenting [sic] fraud to Medicare[.]" (Third Am. Compl. ¶ 61; Anonymous Letter 2 (alterations added)).  Plaintiff, Goldschmidt, and various other University leaders were soon made aware of the letter. (*See* Third Am. Compl. ¶ 61).  Less than two weeks later, the University shared the letter with the Office of the Inspector General at the U.S. Department of Health and Human Services in Washington, D.C.  (*See id.* ¶ 62).

Plaintiff and Goldschmidt agreed to press forward with the plan to have TMG externally review the transplant program. (*See id.* ¶ 63).  In October 2012, the University formally engaged TMG to conduct an audit of the IML. (*See id.* ¶ 64).  TMG's review included several physical visits to the Miami Transplant Institute and IML. (*See id.* ¶¶ 66, 70).

According to Plaintiff, Livingstone criticized and impeded TMG's investigation.  On October 29, 2012, "Livingstone complained to . . . McCafferty-Fernandez about the external review process." (*Id.* ¶ 65 (alteration added)).  A TMG consultant also reported:

---

[1] The Court uses the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings.

> today I received a call from Gaetano Ciancio . . ., who verbally seemed to be under duress. . . .  Dr. Ciancio requested that I not let anyone know that he was calling me for he feared he would lose his job.  He made this statement no less than four times during the 7 minute and 19 second conversation.
>
> Dr. Ciancio wanted to let me know that they had been instructed from the "highest levels" to be vague and standoffish with us, not share too much information about the leadership and financial issues within the transplant program.  He would not tell me specifically who gave him this directive, but he was very upset and seemed afraid.  Not physically afraid, but more afraid for his career.
>
> He went on to tell me that it is very known internally that the lab has been performing tests without signed physician orders, performing known medically unnecessary testing and questionable billing practices.   He stated that the department of surgery knows exactly how and why the lab revenue and profits have grown 10 fold over the past 6 years and that there are people "above his pay grade" that are determined to make sure the lab remains under the department of surgery and does not get taken and given to pathology to run as they will lose the significant revenue.

(*Id.*, Ex. 3, Memo to File [ECF No. 101-3] 2 (alterations added)).  Plaintiff alleges "[u]pon information and belief" that "'the highest levels' included Dr. Livingstone and his direct reports." (Third Am. Compl. ¶ 67 (alteration added)).

In December 2012, TMG issued a preliminary report ("TMG Report").  (*See id.* ¶ 71).  The findings were troubling.  TMG concluded that the IML "participated in duplicative billing by directly billing the Medicare Program for non-covered services;" "engaged in inappropriate, unnecessary, and redundant testing;" and "performed many 'routine' laboratory tests on [Jackson] patients when [Jackson] offers identical services at a much lower cost[.]"  (*Id.* (alterations added)).  The Report also found that the IML's billing practices could "be construed as Medicare billing fraud[.]"  (*Id.*, Ex. 4, TMG Report [ECF No. 101-4] 3 (alteration added)).

Plaintiff, Goldschmidt, and McCafferty-Fernandez reviewed the TMG Report and mutually agreed that its findings should be shared with University leadership.  (*See* Third Am.

Compl. ¶ 72).  "[T]hey also agreed that TMG should be engaged to complete a full billing audit of the IML."  (*Id.* (alteration added)).

### III.    Plaintiff's Termination

On December 3, 2012, Plaintiff briefed the chairperson of the University Board of Trustees' Audit and Compliance Committee on the TMG Report's findings "and possible exposures."  (*Id.* ¶ 73).  Plaintiff briefed Shalala on the Report's findings less than two weeks later.  (*Id.* ¶ 74).  The Third Amended Complaint does not elaborate on the content of Plaintiff's conversation with Shalala.  (*See id.*).

Four days after Plaintiff's meeting with Shalala, Plaintiff and Goldschmidt authorized the University "to engage TMG in a more thorough review and audit of bills related to IML as recommended in the TMG Report."  (*Id.* ¶ 78).  Plaintiff alleges "upon information and belief" that Livingstone "grew concerned about TMG's independent investigation" and "tried to put a stop to any further investigation by TMG."  (*Id.* ¶ 81).  Livingstone accused McCafferty-Fernandez of manufacturing the allegations of fraud against the IML and advised McCafferty-Fernandez that he would bring his concerns to President Shalala.  (*See id.*).  McCafferty-Fernandez thought that Livingstone "was trying to intimidate her and to influence the outcome of the TMG investigation."  (*Id.*).  Plaintiff alleges — again on "information and belief" — that Livingstone "discussed his concerns with" Shalala around the same time.  (*Id.* ¶ 82).

The day after Livingstone's alleged talk with Shalala, Shalala emailed Goldschmidt, Plaintiff, McCafferty-Fernandez, and others to direct that the investigation of the transplant program be conducted by "Internal Audit" rather than TMG.  (*Id.* (quotation marks omitted)).  She also instructed McCafferty-Fernandez to "transfer all data gathered relative to the TMG investigation to Internal Audit."  (*Id.*).

About a week passed.  Goldschmidt then told Plaintiff and the chair of the University's Pathology Department that "the coming week will be busy with talks about the IML after the sharing of the document on UM laboratories, and the ongoing review of the IML by TMG" and that he wanted the three of them to "deliver a consistent message" about "the key limitations of the IML as it is currently set up[.]"  (*Id.* ¶ 84 (alteration added; quotation marks omitted)). Goldschmidt related that he was scheduled to meet with Shalala in two days "to discuss these topics."  (*Id.*).  Goldschmidt and Shalala met as planned on December 31, 2012.  (*See id.* ¶ 85). Immediately following that meeting, Goldschmidt informed Plaintiff that Shalala had terminated him as COO of UHealth.  (*See id.*).

Just one day later, Goldschmidt emailed Plaintiff from a private email address to inform Plaintiff that Shalala had asked "to recall emails relative to the IML" and directed that "no changes should be considered or implemented until internal and external investigations are completed." (*Id.* ¶ 88 (quotation marks omitted)).  Goldschmidt suggested that Livingstone had informed Shalala about the existence of these emails.  (*See id.*).

Plaintiff received conflicting signals about his employment status after being fired as COO. Initially, Goldschmidt's behavior suggested that Plaintiff would continue to play an important role at the University.  Goldschmidt's assistant emailed Plaintiff two hours after his termination as COO to solicit his review of a new policy that pertained to pathology laboratories.  (*See id.* ¶ 86). Goldschmidt then asked Plaintiff to remain at the University "as a leader for strategy and innovation[.]"  (*Id.* ¶ 87 (alteration added)).  Goldschmidt drafted a proposed announcement of Plaintiff's new position for review by Shalala and other University leaders.  (*See id.*).  The chair of the Pathology Department likewise announced in an email that Plaintiff would join the Department.  (*See id.* ¶ 90).

Shalala's actions pointed in the opposite direction. She allegedly ordered deletion of the paragraph that Goldschmidt had drafted to announce Plaintiff's new position. (*See id.* ¶ 91). Soon Goldschmidt circulated a revised announcement that stated that Plaintiff "would be stepping down as COO[.]" (*Id.* ¶ 92 (alteration added; quotation marks omitted)). The next day, Shalala ordered Goldschmidt to avoid mentioning Plaintiff's future at the University in response to an inquiry from *The Miami Herald*. (*See id.* ¶ 93). The University told *The Miami Herald* that Plaintiff would not be joining the Pathology Department but that it was working on a "transition" with Plaintiff. (*Id.* ¶ 96 (quotation marks omitted)). The *Herald* reported the University's statement in an article entitled "Jack Lord's future at UM unclear[.]" (*Id.* (alteration added; italics omitted)).

A few days after publication of the *Herald* article, Plaintiff emailed the members of the University's Board of Trustees to inform them about the TMG Report's findings. (*See id.* ¶ 98). He stressed "that it was 'critical for the protection of the institution that this external review and audit are completed without interference from administration or others and reports shared with the board.'" (*Id.*). He also told the Board: "Appropriate corrective actions will help mitigate potential external [sic] mandated sanctions." (*Id.* (alteration added; quotation marks omitted)).

Twelve days after Plaintiff's email to the Board, the University notified Plaintiff that he would be terminated from his positions at the University effective July 31, 2013. (*See id.* ¶ 99; *id.*, Ex. 5, Jan. 2013 Letter [ECF No. 101-5] 2). Plaintiff alleges "[u]pon information and belief" that Shalala terminated Plaintiff's employment "to avoid dissemination of the . . . TMG Report" and that she did so "upon the advice and urging of Dr. Livingstone[.]" (Third Am. Compl. ¶ 101 (alterations added); *see also id.* ¶ 105).

## IV.     Procedural History

On July 12, 2013, Plaintiff brought a *qui tam* action against Defendant, alleging federal and state False Claims Act violations.  (*See* False Claims Act Compl. [ECF No. 1]).  The federal government and Florida eventually intervened and settled most of the claims.  (*See* United States of America's Notice of Election to Partially Intervene for Purposes of Settlement [ECF No. 93]).  In the partial settlement, Defendant agreed to pay the United States and Florida more than $21 million in exchange for a release from the claims asserted by Plaintiff, with two exceptions: Plaintiff expressly reserved rights to pursue a claim under the False Claims Act's anti-retaliation provision and claims for attorney's fees.  (*See* Settlement Agreement [ECF No. 95-1] 4–6).

After the settlement, the Court granted Plaintiff's Unopposed Motion for Leave to File Third Amended Complaint [ECF No. 99].  (*See* Aug. 12, 2021 Order [ECF No. 100]).  The Third Amended Complaint asserts one cause of action under 31 U.S.C. section 3730(h).  (*See* Third Am. Compl. ¶¶ 110–15).  Defendant now moves to dismiss the claim.

## LEGAL STANDARD

Courts evaluating motions to dismiss under Rule 12(b)(6) must construe the complaint in the light most favorable to the plaintiff and take its factual allegations as true.  *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (citing *SEC v. ESM Grp., Inc.*, 835 F.2d 270, 272 (11th Cir. 1988)).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A complaint is plausible on its face when it contains sufficient facts to support a reasonable inference that the defendant is liable for the misconduct alleged."  *Gates v. Khokhar*, 884 F.3d 1290, 1296 (11th Cir. 2018) (citing *Iqbal*, 556 U.S. at 678).

CASE NO. 13-22500-CIV-ALTONAGA/McAliley

Although this pleading standard "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (alteration added; quoting *Twombly*, 550 U.S. at 555). Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Twombly*, 550 U.S. at 555 (alteration added; citation omitted). A pleader may allege facts "on information and belief," but such allegations are entitled to a presumption of truth only if they concern matters outside the knowledge of the pleader and are not conclusory. *See Magnum Constr. Mgmt., LLC v. WSP USA Sols., Inc.*, 522 F. Supp. 3d 1202, 1209 (S.D. Fla. 2021) (citations omitted); *Dairyland Animal Clinic, S.C. v. Amatheon, Inc.*, No. 16-21820-Civ, 2016 WL 11129919, at *2 (S.D. Fla. Sept. 30, 2016) (citation omitted).

A party who alleges fraud "must state with particularity the circumstances constituting fraud[.]" Fed. R. Civ. P. 9(b) (alteration added). Retaliation claims brought under the False Claims Act "d[o] not depend on allegations of fraud," *United States ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1304 (11th Cir. 2010) (alteration added); and thus, a complaint that alleges a retaliation claim need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief[,]" Fed. R. Civ. P. 8(a) (alteration added).

## DISCUSSION

The False Claims Act is aptly named: it forbids making false claims for payment to the United States. *See* 31 U.S.C. § 3729(a). Congress enacted the False Claims Act more than 150 years ago "to 'stop the massive frauds perpetrated by large contractors during the Civil War.'" *United States ex rel. Hunt v. Cochise Consultancy, Inc.*, 887 F.3d 1081, 1085 (11th Cir. 2018) (alteration adopted; quoting *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016)). Fraud on the government was so serious and widespread that Congress

elected to enlist the help of private citizens in preventing it: the Act permits anyone with knowledge of violations to file suits on the government's behalf, or *qui tam* suits. *See Hickman v. Spirit of Athens, Ala., Inc.*, 985 F.3d 1287–88 (11th Cir. 2021) (citations omitted). Congress amended the Act in 1986 to include the provision that is relevant today: section 3730(h), or the anti-retaliation provision. *See id.* at 1288 (citation omitted).

The parties agree on the basic elements of False Claims Act retaliation claims. A plaintiff who sues under section 3730(h) must show that he "engaged in protected conduct and that [his employer] retaliated against him because of that protected conduct." *Mack v. Augusta-Richmond Cnty.*, 148 F. App'x 894, 896–97 (11th Cir. 2005) (alteration added; citation omitted). Some courts read this standard as involving three elements: (1) that the plaintiff engaged in protected conduct, (2) that the employer knew of plaintiff's protected conduct, and (3) that the employer took adverse action against the plaintiff because of the protected conduct. *See, e.g.*, *Farnsworth v. HCA, Inc.*, No. 8:15-cv-65, 2015 WL 5234640, at *3 (M.D. Fla. Sept. 8, 2015) (citations omitted).

Defendant asserts that Plaintiff has failed to plead any of these elements. (*See* Mot. 7–8; Reply 2 n.1).[2] Unsurprisingly, Plaintiff disagrees. (*See* Resp. 3–4).

## I. Protected Activity

*Amendments to Section 3730(h).* Initially, section 3730(h) prohibited employers from retaliating against their employees for actions that they took "in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or

---

[2] According to Plaintiff, Defendant has conceded the retaliation claim satisfies the notice element. (*See* Resp. 2). Defendant's Motion to Dismiss certainly conflates the protected activity and notice elements with each other at times. (*See id.* 8–11). But fairly read, the Motion to Dismiss argues that Plaintiff's claim fails to allege Defendant's notice of protected activity. So, the Court will address all three elements. *See United States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1260 (D.C. Cir. 2004) (observing that relator's brief conflated protected activity and notice elements but nonetheless addressing the notice element).

to be filed under this section[.]"  31 U.S.C. § 3730(h) (1986) (alteration added), *amended by* 31 U.S.C. § 3730(h)(1) (2010).  The Eleventh Circuit interpreted this version of the anti-retaliation provision as protecting employees when a False Claims Act lawsuit "was 'a distinct possibility' at the time the assistance was rendered."  *Childree v. UAP/GA AG CHEM, Inc.*, 92 F.3d 1140, 1146 (11th Cir. 1996).

In 2009 and then again in 2010, Congress amended the anti-retaliation provision.  *See* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, § 1079 A(c), 124 Stat. 1376, 2079 (2010); Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, § 4(d), 123 Stat. 1617, 1624 (2009).  The ultimate effect of these amendments was to add a second category of protected activity.  Post-amendments, the statute reads:

> Any employee . . . shall be entitled to all relief necessary to make that employee . . . whole, if that employee . . . is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee . . . in furtherance of an action under this section *or other efforts to stop 1 or more violations of this subchapter*.

31 U.S.C. § 3730(h)(1) (alterations and emphasis added).

The Eleventh Circuit has not yet addressed the precise impact of the 2009 and 2010 amendments.  *See Hickman*, 985 F.3d at 1288.  But it has noted that "the new language is broader than the old" and "the amendments expanded retaliation coverage to at least some set of people who make 'efforts to stop' False Claims Act violations — even if those efforts do not lead to the 'distinct possibility' of a lawsuit."  *Id.* (citation omitted).  At minimum, plaintiffs who bring retaliation claims in this Circuit must "show that the activity had *something* to do with the False Claims Act — or that a reasonable person might have thought so."  *Id.* at 1289 (emphasis in original).

Several federal appellate courts have considered the amendments' effect. And they largely agree: each court has concluded that the "distinct possibility" test does not apply to the second — or "other efforts" — prong of the anti-retaliation provision. *See Singletary v. Howard Univ.*, 939 F.3d 287, 295–96 (D.C. Cir. 2019); *United States ex rel. Reed v. KeyPoint Gov't Sols.*, 923 F.3d 729, 765–67 (10th Cir. 2019); *United States ex rel. Grant v. United Airlines, Inc.*, 912 F.3d 190, 201 (4th Cir. 2018); *United States ex rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d 71, 96–98 (2d Cir. 2017). These courts have instead applied some version of an "objective reasonableness" test that asks whether the plaintiff's allegedly protected activity was motivated by an objectively reasonable belief that his employer is violating or will violate the False Claims Act. *See, e.g.*, *Grant*, 912 F.3d at 201–02.

No matter, says Defendant. Despite the amendments to section 3730(h) and case law uniformly recognizing expansion of the statute's coverage, Defendant contends that the Third Amended Complaint must satisfy the distinct possibility standard. (*See* Mot. 9 n.4; Reply 6). Defendant even implies that the Eleventh Circuit's decision in *Hickman*, 985 F.3d 1284, *requires* plaintiffs who plead retaliation claims to allege that a False Claims Act suit was a distinct possibility at the time of their allegedly protected conduct. (*See* Mot. 9 n.4; Reply 6). For three reasons, Defendant is wrong.

First, the Eleventh Circuit in *Hickman* expressly announced that it was not interpreting the language added by the amendments. *See* 985 F.3d at 1285 ("The meaning of that statutory amendment is important to consider, but we decline to do so here[.]" (alteration added)). The court held that the plaintiffs' retaliation claim failed under any conceivable standard — including the distinct possibility and objective reasonableness tests — because the plaintiffs lacked "any reason to believe that their employer had filed a false claim against the government[.]" *Id.* (alteration

added). And because the plaintiffs' claim did not satisfy even this basic requirement, the court had no occasion to, and did not, interpret the new statutory language.

Second, the text of section 3730(h) forecloses Defendant's reading. The statute describes two kinds of protected activity: "lawful acts . . . in furtherance of an action under this section *or other* efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h)(1) (alteration and emphasis added). The statute's use of the phrase "or other" to separate the two categories makes plain that the second category encompasses at least some acts beyond those described by the first. *See Carlson v. DynCorp Int'l LLC*, 657 F. App'x 168, 171 (4th Cir. 2016); *see also United States v. Woods*, 571 U.S. 31, 45–46 (2013) ("While [the word 'or'] can sometimes introduce an appositive . . . its ordinary use is almost always disjunctive, that is, the words it connects are to 'be given separate meanings.'" (alterations added; citation omitted)).

Third, Defendant's reading fails to give effect to each word in the statute. The amendments to section 3730(h) left the statute's previously existing verbiage basically untouched: they simply added the phrase "or other efforts to stop 1 or more violations of this subchapter."[3] 31 U.S.C. § 3730(h)(1). Yet Defendant would have the Court read section 3730(h) in exactly the same way that governing law required before the amendments became effective. That reading would violate the canon against surplusage. *See Reed*, 923 F.3d at 765–66; *Carlson*, 657 F. App'x at 171; *see also United States v. Garcon*, 997 F.3d 1301, 1305 (11th Cir. 2021) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." (citation and

---

[3] The pre-2009 version of section 3730(h) differs from the current version in several other ways, but none of them is material here. For example, the pre-2009 version of the statute provided a non-exhaustive list of protected actions that an employee might take, including "investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section[.]" 31 U.S.C. § 3730(h) (1994) (alteration added), *amended by* 31 U.S.C. § 3730(h)(1) (2010). The amended statute does not specifically list these protected actions.

quotation marks omitted)); Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* § 26 (2012) ("If possible, every word and every provision is to be given effect . . . ." (alterations added)).

Under the current version of section 3730(h), the relevant question for determining whether Plaintiff has alleged protected conduct is whether his allegations raise at least a reasonable inference that Plaintiff (1) engaged in lawful acts in furtherance of a False Claims Act suit when such a suit was a distinct possibility or (2) attempted to stop a violation of the Act based on an objectively reasonable belief that violations had occurred.  *See Grant*, 912 F.3d at 201–02.

**Alleged "efforts to stop 1 or more violations" of the False Claims Act.**  Although Defendant argues that Plaintiff does not allege protected activity, nearly all the cases Defendant cites to support that argument pertain only to whether an employer had *notice* of protected activity. (*See* Mot. 8–11 (citations omitted)).  The protected activity and notice elements are related, but they are distinct: one asks what a plaintiff did and believed, while the other asks what the plaintiff's employer knew.  *See Reed*, 923 F.3d at 766.  Because Defendant at least references the protected activity element, the Court will address it.

A plaintiff makes "efforts to stop 1 or more violations of" the False Claims Act if he is "motivated by an objectively reasonable belief that the employer is violating, or will soon violate, the [False Claims Act]."  *Grant*, 912 F.3d at 201 (alteration added).  A plaintiff's belief that his employer is violating the Act "is objectively reasonable when the plaintiff alleges facts sufficient to show that he believed his employer was violating the [Act], that his belief was reasonable, that he took action based on that belief, and that his actions were designed to stop one or more violations of the [Act]."  *Id.* at 201–02 (alterations added); *see also Chorches*, 865 F.3d at 96.

The Third Amended Complaint easily meets this standard.  Plaintiff had ample reason to believe that the University had defrauded the government.  His suspicions were initially stoked by the anonymous letter that detailed ongoing "fraud to Medicare[.]"  (Anonymous Letter 2 (alteration added); *see id.* ¶¶ 61–62).  These suspicions received confirmation — or at least strong support — from the TMG Report, which found that the IML's billing practices "can be construed as Medicare billing fraud[.]"  (TMG Report 3 (alteration added); *see also* Third Am. Compl. ¶ 71).  A conclusion reached by an external auditor that Medicare fraud had occurred furnished Plaintiff with more than a reasonable belief that Defendant had violated the False Claims Act.

It is also clear that Plaintiff acted based on his objectively reasonable belief.  After reviewing the anonymous letter, Plaintiff became an advocate for conducting an external review of the IML.  (*See id.* ¶¶ 63–64, 72).  When TMG issued its Report, Plaintiff shared the Report's findings — which expressly noted potential liability for Medicare fraud (*see* Report 3) — with Shalala and the University's Board of Trustees.  (*See id.* ¶¶ 73–74, 98).  He then authorized an expanded investigation of the potential fraud.  (*See id.* ¶ 78).  These are precisely the sorts of "efforts" that section 3730(h) protects.

Defendant's assertions to the contrary are unmoving.  Defendant suggests that Plaintiff fails to allege protected activity because Plaintiff raised only "general procedural concerns" in his meeting with Shalala following issuance of the TMG Report.  (Mot. 11 (quotation marks omitted; quoting *United States ex rel. Howard v. USA Env't, Inc.*, No. 8:06-cv-27, 2009 WL 113444, at *6 (M.D. Fla. Jan. 19, 2009))).  For support, Defendant emphasizes Plaintiff's allegations that the TMG Report was "preliminary" and "identified 'Possible IML Compliance Review Targets.'"  (*Id.* (quotation marks omitted)).  But this argument is little more than a request to ignore the bevy of other allegations that Plaintiff took protected actions and the portions of the TMG Report that are

less favorable to Defendant — such as the Report's finding that Defendant's billing practices could make it liable for Medicare fraud.  (*See, e.g.*, Third Am. Compl. ¶¶ 63–64, 72–74, 78, 98; TMG Report 3).

All told, Plaintiff adequately alleges that he made efforts to stop False Claims Act violations and based those efforts on his reasonable belief that violations had occurred.  That is enough to allege protected activity.

***Alleged acts "in furtherance of" an action under the False Claims Act.***  A plaintiff may also state a viable retaliation claim by alleging that he acted "in furtherance of" a False Claims Act suit when such a suit was a distinct possibility.  *See Hickman*, 985 F.3d at 1288–90; *Childree*, 92 F.3d at 1146.  Plaintiff has done so here.  Even if Defendant is correct that Plaintiff's claim must meet the distinct possibility standard, Plaintiff's allegations pass the test.

Section 3730(h) protects any "lawful acts done by the employee . . . in furtherance of an action under this section[.]"  31 U.S.C. § 3730(h) (alteration added).  This protection applies "not only where a false claims action is actually filed, but also where the filing of such an action, by either the employee or the government, was a 'distinct possibility' at the time the assistance was rendered."  *Childree*, 92 F.3d at 1146.  "To show protected activity, [a plaintiff] need not allege filing his . . . suit before retaliation or referencing the [False Claims Act] in his communications to his employer."  *United States ex rel. Gallo v. Thor Guard, Inc.*, No. 3:18-cv-811, 2020 WL 1248975, at *8 (M.D. Fla. Mar. 16, 2020) (alterations added; citing *United States v. Miami Cancer Inst.*, No. 17-24051-Civ, 2019 WL 1993513, at *5 (S.D. Fla. May 6, 2019)).  Allegations are sufficient if they "support a reasonable conclusion that the employer could have feared being reported to the government for fraud or sued in a *qui tam* action by the employee[.]"  *Sanchez*, 596 F.3d at 1304 (alteration added; citation omitted).

18

Here, litigation became a distinct possibility no later than when the University received the anonymous letter that reported Medicare billing fraud in the Department of Surgery.  (*See* Third Am. Compl. ¶ 61; Anonymous Letter 2).  Plaintiff alleges that numerous University leaders were promptly made aware of the letter.  (*See* Third Am. Compl. ¶ 61).  The University shared the letter with the federal government roughly two weeks after receiving it.  (*See id.* ¶ 62).  By this time at least, there was a distinct possibility that either the government or a private citizen — perhaps the author of the anonymous letter — would sue the University for False Claims Act violations.  *See Childree*, 92 F.3d at 1146.  The prospect of litigation became all the more palpable when TMG concluded the University had committed acts that could "be construed as Medicare billing fraud" and when Plaintiff reported this finding to Shalala.  (TMG Report 3; *see* Third Am. Compl. ¶ 74).

Defendant disagrees.  It contends that Plaintiff does not allege a distinct possibility of litigation because "an employee only engages in protected activity when *his conduct creates* the 'distinct possibility' of a False Claims Act lawsuit."  (Mot. 9 n.4 (emphasis added)).  This argument both misstates and misapplies the law.

It misstates the law because an employee need not create the distinct possibility of litigation to earn protection under section 3730(h).  At bottom, Defendant's suggestion that an employee's conduct must create the possibility of litigation mistakes what is *sufficient* to allege protected activity for what is *necessary* to do so.  The Eleventh Circuit has repeatedly articulated the distinct possibility standard in the passive voice, explaining that a plaintiff need only show that litigation "*was* a 'distinct possibility' *at the time* the assistance was rendered."  *E.g.*, *Childree*, 92 F.3d at 1146 (emphases added); *see also Sanchez*, 596 F.3d 1303–04.  It has also made clear that an employee alleges protected activity by showing that a lawsuit brought by an employee *or* the government was a distinct possibility at the time of the employee's acts.  *See Sanchez*, 596 F.3d

1303–04; *Childree*, 92 F.3d at 1146; *see also United States ex rel. Paredes v. Res-Care, Inc.*, No. 02-23460-Civ, 2006 WL 8432596, at *8 (S.D. Fla. Feb. 9, 2006).  And here, False Claims Act litigation brought by the government or by a private party became a real possibility at least by the time University leaders became aware of the anonymous letter and shared it with the government. (*See* Third Am. Compl. ¶¶ 61–62).

Defendant's argument that Plaintiff did not create the possibility of litigation also misapplies the law.  Defendant admits that Plaintiff's allegations establish protected activity if they show that Plaintiff created the distinct possibility of litigation at the time of the alleged retaliatory action.  (*See* Mot. 9 n.4).  Well, Plaintiff's allegations do just that.  Plaintiff personally reported the TMG Report's findings of possible fraud to Shalala (*see* Third Am. Compl. ¶ 74), authorized a thorough investigation of the IML in response to TMG's preliminary findings of fraud (*see id.* ¶ 78), and informed the University's Board of Trustees of the TMG Report's conclusions while warning of potential sanctions before he was terminated from all of his positions (*see id.* ¶¶ 73, 98).

## II.    Defendant's Notice of Plaintiff's Protected Activity

***How compliance employees may plead notice.***   Section 3730(h)(1) protects "[a]ny employee" whose employer retaliates against him "because of" protected conduct.  31 U.S.C. § 3730(h)(1) (alteration added).  The Eleventh Circuit has held that the statute requires plaintiffs to show but-for causation to succeed on a retaliation claim.  *See Nesbitt v. Candler Cnty.*, 945 F.3d 1355, 1359 (11th Cir. 2020).

The Eleventh Circuit has also read section 3730(h) to require that an employer have had notice of the plaintiff's protected conduct.  *See Mack*, 148 F. App'x at 897.  The notice element stems from the statute's but-for causation requirement.  *See Singletary*, 939 F.3d at 300; *Mack*,

148 F. App'x at 897; *cf. Melvin v. Fed. Express Corp.*, 814 F. App'x 506, 519 (11th Cir. 2020) ("To succeed on a retaliation claim, the plaintiff must prove a causal connection between the protected activity and the alleged retaliatory conduct. This generally requires showing 'that [the] decision maker was aware of the protected conduct at the time of the adverse employment action.'" (alteration added; citations omitted)).

Normally, alleging that the employee investigated or reported potential fraud would suffice to show notice at the pleading stage. *See Maturi v. McLaughlin Rsch. Corp.*, 413 F.3d 166, 173 (1st Cir. 2005). But courts generally require a more demanding showing, even in a motion-to-dismiss posture, when the employee, like Plaintiff here, is a compliance professional.[4] *See, e.g.*, *id.* at 172–73; *Reed*, 923 F.3d at 767; *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 567 (6th Cir. 2003); *United States v. KForce Gov't Sols., Inc.*, No. 8:13-cv-1517, 2014 WL 5823460, at *10–11 (M.D. Fla. Nov. 10, 2014). Even though section 3730(h) protects "[a]ny employee" from unlawful retaliation, 31 U.S.C. § 3730(h)(1) (alteration added), the heightened requirement for compliance professionals derives from the statute's causation element and the "core insight" that "an employer is unlikely to be on notice when an employee does not raise concerns about fraud or simply does [his] job," *Singletary*, 939 F.3d at 305–06 (Katsas, J., dissenting) (alteration added; citation omitted); *see also Reed*, 923 F.3d at 767. In an unpublished case, the Eleventh Circuit lent some support to the principle that compliance employees must do more than others to establish employer notice. *See Mack*, 148 F. App'x at 897 (citing *Maturi*, 413 F.3d at 173).

The 2009 and 2010 amendments to section 3730(h) left intact this higher hurdle for compliance workers. *See Reed*, 923 F.3d at 767. Still, the amendments affect *how* a compliance employee — or any employee — may prove notice. That is because "[o]nce Congress expanded

---

[4] The parties do not dispute that Plaintiff was a compliance employee at the time his employment was terminated. (*See* Third Am. Compl. ¶¶ 1, 44, 51).

the scope of protected activity, the universe of conduct that a plaintiff could allege to show notice also necessarily expanded." *Reed*, 923 F.3d at 766 (alteration added; citation omitted); *see also United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 742 (D.C. Cir. 1998) ("[T]he kind of knowledge the defendant must have mirrors the kind of activity in which the plaintiff must be engaged." (alteration added)).  Thus, an employee may establish notice at the pleading stage by alleging that his employer was aware of either his "lawful acts. . . in furtherance of" a False Claims Act suit or his "other efforts to stop 1 or more violations of" the Act.  31 U.S.C. § 3730(h)(1) (alteration added).

So, what exactly must compliance employees allege to establish notice?  Broadly speaking, "notice can be accomplished . . . by any action [that] a factfinder reasonably could conclude would put the employer on notice that litigation is a reasonable possibility[,]" *Eberhardt v. Integrated Design & Constr., Inc.*, 167 F.3d 861, 868 (4th Cir. 1999) (alterations added); or, post-amendments, by any action that would make an employer aware of the plaintiff's efforts to stop violations of the False Claims Act, *see* 31 U.S.C. § 3730(h)(1).

More concretely, a compliance professional might establish notice "by expressly stating an intention to bring a *qui tam* suit," *Eberhardt*, 167 F.3d at 868; "characterizing the employer's conduct as illegal or fraudulent[,]" *id.* (alteration added); "recommending that legal counsel become involved[,]" *id.* (alteration added); "act[ing] outside his normal job responsibilities[,]" *Williams*, 389 F.3d at 1261 (alterations added; citation omitted); or "alert[ing] a party outside the usual chain of command[,] *id.* (alterations added; citation omitted).  A compliance employee need not "incant talismanic words to satisfy the notice element," *id.* (citations omitted), but if the employee is the source of the employer's notice, he must do more than "[m]erely grumbl[e] . . . about job dissatisfaction or regulatory violations" or report mischarging the government to a

supervisor, *Yesudian*, 153 F.3d at 744 (alterations added); *see Eberhardt*, 167 F.3d at 868 (citations omitted).

It also matters *who* within the employer had notice of a plaintiff's allegedly protected conduct. "To establish causation under [section] 3730(h)(1), the plaintiff must show that the final decision-maker who approves or implements the adverse employment action knew about the plaintiff's protected conduct." *Kalch v. Raytheon Tech. Servs. Co., LLC*, No. 6:16-cv-1529, 2017 WL 3394240, at *3 (M.D. Fla. Aug. 8, 2017) (alteration added; citing *Reynolds v. Winn-Dixie Raleigh, Inc.*, 620 F. App'x 785, 792 (11th Cir. 2015)); *see also Mack*, 148 F. App'x at 897 (citations omitted).

Deciding whether a compliance employee has stated a valid retaliation claim requires striking a delicate balance. Courts must determine whether the plaintiff has plausibly alleged employer awareness beyond its knowledge that the plaintiff fulfilled his ordinary job responsibilities, but they must also avoid imposing a more demanding burden on the plaintiff than federal pleading standards require. *See Singletary*, 939 F.3d at 302; *see also Guerrero v. Total Renal Care, Inc.*, No. EP-11-cv-449, 2012 WL 899228, at *8 (W.D. Tex. Mar. 12, 2012) (citations omitted). On a motion to dismiss, the question is whether the plaintiff "allege[s] facts that, viewed in her favor, make clear that her employer had been put on notice that she was trying to stop it from violating the False Claims Act and not merely doing her job." *Reed*, 923 F.3d at 767 (alteration added).

***Plaintiff's allegations of employer notice.*** Plaintiff alleges that Shalala made the ultimate decision to fire him, first from his role as COO of UHealth and later from all of his positions at the University. (Third Am. Compl. ¶¶ 85, 100–01, 106). The relevant question is whether Plaintiff adequately alleges that Shalala was aware of his protected conduct when she fired him. *See Kalch*,

2017 WL 33394240, at *3.  Three sequences of events alleged by Plaintiff persuade the Court that the answer is "yes."

First, Plaintiff alleges that he personally briefed Shalala on the TMG Report's findings four weeks before Shalala fired him as COO.  (*See* Third Am. Compl. ¶ 74).  The TMG Report expressly concluded that the University had committed acts that could "be construed as Medicare billing fraud[.]"  (TMG Report 3 (alteration added)).  Thus, Plaintiff's allegation that he briefed Shalala on the TMG Report's findings, when viewed in his favor, supports a reasonable inference that Plaintiff expressed concern to Shalala about potential fraud on the government.  That is enough to establish notice, even for a compliance employee.  *See Eberhardt*, 167 F.3d at 868 ("[N]otice can be accomplished by . . . . characterizing the employer's conduct as illegal or fraudulent[.]" (alterations added)).

Defendant resists this result by arguing that Plaintiff "had routine meetings with President Shalala and University leadership throughout his tenure."  (Reply 3 (citing Third Am. Compl. ¶¶ 44, 49, 50)).  Although Plaintiff alleges he had previous meetings with Shalala, those meetings pertained to financial issues and corporate governance negotiations rather than compliance.  (*See* Third Am. Compl. ¶¶ 44, 49, 50).  Nowhere does the Third Amended Complaint allege or indicate that Plaintiff regularly met with Shalala to discuss compliance.

Far less does it suggest that Plaintiff frequently briefed Shalala on external investigations into allegations of fraud.  Defendant might believe — and may ultimately be proven correct — that Plaintiff's meeting with Shalala about the TMG Report was a routine occurrence.  But, as Defendant well knows, on a motion to dismiss, the Court must view the allegations in the light most beneficial to Plaintiff and draw all reasonable inferences in his favor.  *See Gates*, 884 F.3d at 1296 (citation omitted).  Applying that standard to Plaintiff's allegations compels the conclusion

that Plaintiff's briefing Shalala on the TMG Report was beyond the ambit of his usual responsibilities. *See Williams*, 389 F.3d at 1261–62 (citations omitted).

Second, Plaintiff alleges that he and Goldschmidt discussed a strategy to "deliver a consistent message" about "the key limitations of the IML as it is currently set up[.]" (Third Am. Compl. ¶ 84 (alteration added; quotation marks omitted)). Goldschmidt also told Plaintiff that he would meet with Shalala two days later "to discuss these topics." (*Id.*). Shalala fired Plaintiff during or right after that meeting. (*See id.* ¶ 85).

Given Goldschmidt's pre-meeting statement to Plaintiff, it is more than reasonable to assume that Shalala and Goldschmidt discussed the TMG investigation during the meeting. And given that Shalala fired Plaintiff while or immediately after discussing the TMG investigation with Goldschmidt, it is also reasonable to assume that Goldschmidt and Shalala discussed Plaintiff's investigation-related activities. Taken together, Plaintiff's allegations support an inference that Goldschmidt made Shalala aware of Plaintiff's protected actions. *See Yesudian*, 153 F.3d at 743 (reversing grant of summary judgment on retaliation claim because a juror could reasonably conclude that employees other than plaintiff made retaliator aware of plaintiff's protected conduct).

Third, Plaintiff alleges that he informed the University's Board of Trustees of the TMG Report's findings and in doing so alluded to potential sanctions the University could face. (*See* Third Am. Compl. ¶ 98). Plaintiff's message to the Board came amid widespread uncertainty about his current and future employment status as well as significant local media coverage of his firing as COO. (*See id.* ¶¶ 87–96). Twelve days later, the University informed Plaintiff that he would be terminated from his positions within a few months. (*See id.* ¶ 99); *see also Williams*,

389 F.3d at 1261 (holding that an employee may give his employer notice of protected activity when he "alerts a party outside the usual chain of command").

Defendant asserts that these allegations at most establish the Board's — not Shalala's — knowledge of Plaintiff's protected conduct.  (*See* Reply 5).  On Defendant's view, Plaintiff emailed the entire University Board of Trustees to alert them about the University's potential liability for fraud during a high-profile dispute between Plaintiff and the University, yet Shalala — the University's "highest corporate officer" — did not learn about Plaintiff's email at any time within the next 12 days.  (Third Am. Compl. ¶ 5).

Perhaps Defendant's version of the story is true.  "But the question at the pleading stage is not whether the facts could be read differently than the plaintiff does [sic].  Instead, [the Court] must take all reasonable inferences in favor of [Plaintiff]."  *Singletary*, 939 F.3d at 302 (alterations added; citation omitted).  Plaintiff's allegations support an inference that Shalala learned of Plaintiff's email to the Board in the 12 days between the email and Plaintiff's firing.  For that reason, dismissal based on Shalala's purported lack of notice would be error.  *See Yesudian*, 153 F.3d at 743.

### III.    Causation

As a final basis for dismissal, Defendant argues that Plaintiff's alleged conduct did not cause his termination.  (*See* Mot. 12–14).  Defendant premises this argument on the contention that the Third Amended Complaint contains only one causation-focused allegation: Plaintiff's "upon information and belief" allegation that Shalala fired him to avoid dissemination of the TMG Report.  (*Id.* 13–14 (quotation marks omitted; citing Third Am. Compl. ¶ 101)).  According to Defendant, that sole allegation is a legal conclusion not entitled to any presumption of truth.  (*See id.* 14 (quoting *United States v. HPC Healthcare, Inc.*, 723 F. App'x 783, 792 (11th Cir. 2018))).

If Plaintiff's "upon information and belief" allegation was indeed the only one relevant to causation, Defendant might be correct that dismissal is warranted.[5]  Courts may credit allegations made "on information and belief" as true only when specific facts support those allegations.  *See Mann v. Palmer*, 713 F.3d 1306, 1315 (11th Cir. 2013) (citation omitted); *Magnum Constr. Mgmt.*, 522 F. Supp. 3d at 1209 (citation omitted).  And when considered alone, Plaintiff's "upon information and belief" allegation that Shalala fired him to suppress the TMG Report is conclusory.  (*See* Third Am. Compl. ¶ 101).

The problem for Defendant is that many other allegations plausibly suggest a causal link between Plaintiff's protected actions and his firing.  For one thing, Shalala fired Plaintiff as COO only shortly after Plaintiff briefed her on the TMG Report's findings and authorized a larger investigation.  (*See id.* ¶¶ 74, 78, 85).  Not only that: Plaintiff's initial demotion came immediately after a meeting between Goldschmidt and Shalala about the problems with the IML.  (*See id.* ¶¶ 84–85).  Shalala's knowledge of the ongoing investigation and the timing of Plaintiff's abrupt firing plausibly suggest that Plaintiff's remedial efforts caused his termination.

Plaintiff's allegations about Livingstone's role in his termination also buttress the conclusion that Plaintiff's firing was retaliatory.  As the leader of the Department of Surgery, Livingstone was personally implicated — potentially criminally — by the allegations of Medicare fraud.  (*See id.* ¶¶ 4, 7, 55, 60–67, 71, 81; TMG Report 3).  Livingstone was also a longtime, influential member of the Medical School faculty.  (*See* Third Am. Compl. ¶ 7).  McCafferty-

---

[5] According to Defendant, Plaintiff waived opposition to Defendant's supposed "argument[] that allegations made 'upon information and belief' are not entitled to the presumption of truth[.]"  (Reply 2 (alterations added)).  Plaintiff did not waive opposition to this argument because Defendant never made it.  In its Motion to Dismiss, Defendant argued only that *one* "upon information and belief" allegation should not be credited.  (*See* Mot. 13 (citing Third Am. Compl. ¶ 101)).  And as explained, Plaintiff has adequately alleged causation regardless of whether that single allegation is insufficient.

Fernandez understood after a conversation with Livingstone that Livingstone was attempting to influence the outcome of TMG's investigation.  (*See id.* ¶ 81).

Ciancio, Livingstone's replacement as director of the Miami Transplant Institute, told a TMG investigator that he had been directed by the "highest levels" — which Plaintiff alleges included Livingstone (*id.* ¶ 101 (quotation marks omitted) — to be uncooperative with TMG.  (*See id.* ¶ 67; Memo to File at 2).  Ciancio even feared losing his job for talking to the investigator. (Memo to File at 2).  Livingstone said that he would complain about TMG's investigation to Shalala shortly before Shalala fired Plaintiff.  (*See* Third Am. Compl. ¶¶ 81, 85).  Shortly after Livingstone made that intention clear, Shalala turned the external investigation internal and allegedly ordered recall of investigation-related emails that might damage the University.  (*See id.* ¶¶ 82–83, 88).  Plaintiff alleges that Shalala knew about these emails only because Livingstone told her they existed.  (*See id.* ¶ 88).

Taken together, Plaintiff's allegations plausibly tell the story that Livingstone possessed both the ability and the incentive to influence the TMG investigation, he in fact exerted this influence by attempting to persuade Shalala to scuttle the investigation, Shalala agreed with Livingstone that the TMG investigation could harm the University, and Shalala fired Plaintiff to avoid the fallout.[6]  Whether this story is an accurate account of events is a question for resolution

---

[6] Defendant intimates that Livingstone's conduct is irrelevant because the Eleventh Circuit has interpreted section 3730(h) to require but-for causation rather than cat's paw causation.  (*See* Reply 6 n.4 (citations omitted)); *see also Nesbitt*, 945 F.3d at 1359 (requiring but-for causation); *Sims v. MVM, Inc.*, 704 F.3d 1327, 1334–35 & n.6 (11th Cir. 2013) (declining to apply cat's paw causation when statute requires but-for causation and defining cat's paw causation).  Defendant's argument ignores the alleged *effect* of Livingstone's conduct on Shalala's state of mind as well as Plaintiff's allegations that Shalala knew of Plaintiff's protected actions.  If Shalala fired Plaintiff to minimize the damage that the TMG Report might inflict on the University, Shalala may have possessed the retaliatory intent necessary to establish but-for causation regardless of any lobbying by Livingstone.  *See Sims*, 704 F.3d at 1335–36 (holding that but-for causation is established if the employer's forbidden discriminatory intent "ha[d] a determinative influence on the employer's adverse decision" (alteration added; citation omitted)).

CASE NO. 13-22500-CIV-ALTONAGA/McAliley

at trial.  For now, however, the many facts alleged by Plaintiff plausibly suggest that Plaintiff's firing was retaliatory.  The law requires nothing more at this phase.

Accordingly, it is

**ORDERED AND ADJUDGED** that Defendant University of Miami's Motion to Dismiss Third Amended Complaint With Prejudice **[ECF No. 114]** is **DENIED**.

**DONE AND ORDERED** in Miami, Florida, this 16th day of November, 2021.

**CECILIA M. ALTONAGA**
**CHIEF UNITED STATES DISTRICT JUDGE**

cc:      counsel of record