UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 13-22500-CIV-ALTONAGA/McALILEY

JONATHAN LORD, M.D.,

    **Plaintiff,**

v.

UNIVERSITY OF MIAMI,

    **Defendant.**

_____/

### DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR FINAL SUMMARY JUDGMENT

Defendant, University of Miami, by and through undersigned counsel and pursuant to Fed. R. Civ. P. 56 and S.D. Fla. L. R. 56.1, hereby submits its Statement of Undisputed Material Facts in support of its Motion for Final Summary Judgment, filed contemporaneously herewith. Attached hereto are the following materials:

(A)    Transcript of the Deposition of Jonathan Lord, M.D. ("Lord Depo."), with referenced exhibits, attached hereto as Exhibit A;

(B)    Jonathan Lord's Responses to the University's First Request for Admissions ("First Admission No. ____"), attached hereto as Exhibit B;

(C)    Jonathan Lord's Responses to the University's Second Request for Admissions ("Second Admission No. ____"), attached hereto as Exhibit C;

(D)    Jonathan Lord's Second Amended Responses to the University's First Set of Interrogatories ("Interrog No. ____"), attached hereto as Exhibit D;

(E)    Two Affidavits of Jonathan Lord in his Divorce Case ("Dec. 28, 2015 Affs. of Jonathan Lord"), attached hereto as Exhibit E;

(F)    Apr. 6, 2016 Hearing Transcript in Jonathan Lord's Divorce Case ("Apr. 6, 2016 Hr'g Tr."), attached hereto as Exhibit F;

(G)    July 15, 2016 Final Judgment of Dissolution of Marriage in Jonathan Lord's Divorce Case ("July 15, 2016 Final Judgment"), attached hereto as Exhibit G;

(H) December 18, 2012, E-mail from Jonathan Lord, attached hereto as Exhibit H;

(I) December 19, 2012, E-mail from Jonathan Lord, attached hereto as Exhibit I;

(J) December 19, 2012 E-mail from Jonathan Lord, attached hereto as Exhibit J;

(K) Transcript of the Deposition of Donna Shalala ("Shalala Depo."), with referenced exhibits, attached hereto as Exhibit K;

(L) Transcript of the Deposition of Pascal Goldschmidt ("Goldschmidt Depo."), with referenced exhibits, attached hereto as Exhibit L;

(M) Transcript of the Deposition of Jennifer McCafferty-Fernandez ("McCafferty Depo."), with referenced exhibits, attached hereto as Exhibit M;

(N) Transcript of the Deposition of Alan Livingstone ("Livingstone Depo."), with referenced exhibits, attached hereto as Exhibit N; and

(O) Transcript of the Deposition of Joseph Natoli ("Natoli Depo."), with referenced exhibits, attached hereto as Exhibit O.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1. In July 2011, Jonathan Lord, M.D. ("Lord") accepted the position of Chief Innovation Officer for the University of Miami (the "University"). (Lord Depo. 25:2-25, Ex. 2.) Lord also received a faculty appointment in the Department of Pathology. (*Id*.)

2. The University publishes a Whistleblower Protection Policy and a Handbook of Business Conduct and Ethical Standards. (Lord Depo. 26:8-27:21, Exs. 3 and 4.) Employees must report suspected fraud and advise of the University's anti-retaliation policy for such employees. (*Id*., Ex. 3 at 1; Ex. 4 at 18.) "Every member of the University community, regardless of position, is expected to assist in preventing or identifying fraud." (*Id*., Ex. 4 at 12.)

3. Lord admits that "It's everybody's responsibility" - -- "All of the [University] employees" - - to report fraud. (Lord Depo. 27:22—28:21.) Lord "regularly communicated about the compliance program [and] people's obligations" to report fraud. (*Id*.)

4. Lord admits that his former job duties with the University included overseeing and implementing policies on compliance with various health laws including the Medicare and Medicaid programs. (First Admissions Nos. 2, 4, 7.)

5. In March 2012, Lord accepted the positions of Chief Operating Officer (COO) of the University's Health System ("UHealth") and University Vice President for Medical Administration. (Lord Depo. 29:17—30:17, Ex. 5.) Lord served at the pleasure of the Dean of the University's Miller School of Medicine and CEO (Dr. Pascal Goldschmidt). (*Id*.) His appointment as Chief Innovation Officer ended upon his acceptance; however, he maintained his faculty appointment in the Department of Pathology. (*Id*.) Lord understood that he did not have tenure and that he could be not reappointed/renewed to his faculty position. (*Id*. 97:11—98:7.) At this time, Lord also served as Chief Compliance Officer. (*Id*. 112:5-15.)

6. One of Lord's first tasks was to review the University's compliance program. (Lord Depo. 30:25—32:11.) He hired Dr. Jennifer McCafferty to lead the University's Compliance Department. (*Id*. 32:12-25.) She reported directly to Lord. (Lord Depo. 33:1-2.)

7. Lord reported directly to Dean Goldschmidt. (Lord Depo. 33:1-11.) Lord also had reporting requirements to University President Donna Shalala and the Board of Trustees. (Goldschmidt Depo. 192:15—193:8, Ex. 54.)

8. Dean Goldschmidt reported directly to President Shalala and Provost Thomas LeBlanc. (Lord Depo. 33:6-11.)

9. Another of Lord's "immediate' tasks as COO related to the University's financial performance. (Lord Depo. 33: 12—35:24.) The University hired an outside consulting firm to analyze potential layoffs of employees to reduce costs. (*Id*.) Ultimately, "in excess of a thousand" employees were laid off, with the last wave of layoffs occurring in May 2012. (*Id*.)

10. Lord had "regular conversations" and "weekly meetings" with President Shalala and others about the layoffs, which included discussions about low morale among employees. (Lord Depo. 35:20—36:24.)

11. Lord acknowledges that layoffs of that magnitude would be "very traumatic" to an organization. (Lord Depo. 102:10—103:6.)

12. As COO, Lord worked with Dr. Sheri Keitz (Senior Associate Dean for Faculty Affairs and Vice President for Human Resources) regarding the layoffs. (Lord Depo. 43:2—44:5.) She reported to him. (*Id*.) In April 2012, while discussing how to brief President Shalala about the layoffs, Dr. Keitz and Lord discussed the need for the layoff process to be "as communicative, transparent, thoughtful, compassionate and organized as possible." (*Id*. 44:6—45:18, Ex. 7.) Such communications to affected employees are "obviously critical" when "making changes of this magnitude." (*Id*. 46:7-14.)

13. Lord also participated in quarterly meetings with the Audit Committee of the University's Board of Trustees to discuss compliance issues. (Lord Depo. 37:19-39:8.) Dean Goldschmidt and President Shalala attended those meetings. (*Id*.)

14. Although Lord originally had a good working relationship with Joseph Natoli (the University's Chief Financial Officer), their relationship changed during the Summer of 2012 following a dispute over Mr. Natoli's "hyperactive" responses to Board of Trustee concerns and a spat over their reporting relationship. (Lord Depo. 29:9-11, 54:8—55:13.) Mr. Natoli also noted a change in their relationship, including that Lord was less frequent and less forthcoming with his communications. (Natoli Depo. 21:7—23:5, 29:2-21, 58:10—59:22, Ex. 3.)

15. Lord acknowledges that, in terms of corporate hierarchy, Dean Goldschmidt (Lord's supervisor) "had a rank that would probably be equal to Natoli's role." (Lord Depo. 55:14-24.) President Shalala wanted to help improve Lord's relationship with Mr. Natoli because Mr. Natoli had a good networking relationship with Trustees. (Lord Depo. 56:5—58:22, Ex. 10.) President Shalala believed that, for the University "to be able" to handle budgetary and academic affairs, the COO (Lord) needed to have a good working relationship with the CFO (Natoli) and Provost

(LeBlanc). (Shalala Depo. 47:20—48:8.) Dean Goldschmidt counseled Lord about the need to communicate effectively. (Goldschmidt Depo. 98:25—99:22, 107:13—108:10.)

16. In July 2012, the University appointed Dr. Gaetano Ciancio to serve as the Director of the Miami Transplant Institute ("MTI"), a joint program between Jackson Memorial Hospital and the University. (Lord Depo. 58:23—61:17, Ex. 11.) The Director of the Immunological Monitoring Laboratory ("IML"), a University laboratory, would report to Dr. Ciancio as the Director of the MTI. (*Id*.) Dr. Ciancio, in turn, would report to Dr. Lord and Dean Goldschmidt. (*Id*.)

17. Prior to, during and after the time Dr. Ciancio was appointed as Director of the MTI, Lord "strongly advocated" for "an independent, neutral, unbiased expert review of the transplant activities at" the University. (Lord Depo. 64:23—65:9.) Issues surrounding the MTI and IML were "longstanding legacy issues" that had existed "for many years" and that had been "reported up chains of command for many years." (Lord Depo. 77:16—78:16.) Lord advised President Shalala of those issues "many times," beginning as early as June/July of 2012. (Lord Depo. 79:5—80:11.)

18. On August 13, 2012, Lord met with Dr. Alan Livingstone, the Chair of the Department of Surgery and the former head of the MTI, to discuss operations. (Lord Depo. 62:17-21, 69:9—73:2, Ex. 12.) Dr. Livingstone expressed that he wanted "to do the right thing for the University." (*Id*.) Lord e-mailed Dean Goldschmidt after the meeting and, although Dean Goldschmidt and Dr. Livingstone did not have a great working relationship, Lord and Dean Goldschmidt believed that it was "better to keep Alan [Livingstone] close to us" to "neutralize resistance." (*Id*.)

19. In August 2012, TMG Group was selected to conduct a review of the IML and the MTI. (Lord Depo. 81:14—84:25, Ex. 13.) Although Dr. McCafferty and Steven Falcone of the University originally made the selection, Lord and Dean Goldschmidt approved it. (*Id*.)

20. On September 21, 2012, the University received an anonymous letter that was directed to the US Department of Health and Human Services, Office of Inspector General ("OIG"). (Lord Depo. 85:6—89:15, Ex. 14.) The letter alleged that Medicare fraud was occurring in the University's Transplant laboratory. (*Id*.) Dr. McCafferty forwarded that letter to OIG. (*Id*.) In her transmittal, Dr. McCafferty wrote that the University takes "any allegation of fraud, waste or abuse seriously. As a result of this letter, we have expanded an already ongoing investigation of the transplant laboratory." (*Id*.) Lord does not know whether anyone at the University ever followed up with OIG about the letter, and Lord did not do so himself. (*Id*.)

21. The receipt of the OIG letter caused the TMG review to be "kicked into high gear." (Lord

Depo. 89:16—91:8, Ex. 15.) In an e-mail dated October 19, 2012, Lord stated that this "will be an independent assessment of compliance related activities" and that "[n]o one from leadership should be involved at this time." (*Id*.) Lord wanted to exclude leadership (meaning himself, Dean Goldschmidt and Dr. Livingstone) from the review process so that it would be "independent" and "not modified or not influenced by someone" from leadership. (*Id*.)

22. Following TMG's engagement, Lord's only involvement with TMG was "attend[ing] the kickoff meeting with their team. But other than that, the relationship was managed by McCafferty and Falcone." (Lord Depo. 98:8-17.)

23. In October and November 2012, a group called Just the Facts began writing to President Shalala to voice concerns about the poor morale and work environment at UHealth. (Lord Depo. 103:12-24, 107:17—109:2, Ex. 19.) At that time, Dr. Keitz and Karen Stimmel (Director of Human Resources, who reported to Dr. Keitz) were conducting "organizational climate studies" in response to complaints that had come to Human Resources about the IML. (*Id*.)

24. Dr. Livingstone described Lord's tenure as a "Reign of Terror" and provided several examples of Lord's hostile/domineering management style. (Livingstone Depo. 50:17—58:5.)

25. On December 6, 2012, Lord and Dean Goldschmidt e-mailed President Shalala about a Petition that was being circulated among University Medical School Faculty, which called for the removal of Lord and Dean Goldschmidt because of their "failed leadership." (Lord Depo. 116:25—119:23, Ex. 21; Goldschmidt Depo. 93:93:21—98:24, Ex. 18.) President Shalala responded only to Dean Goldschmidt to advise him to talk to faculty "to confront this and answer questions without Jack [Lord]." (*Id*.)

26. Dr. Livingstone did not create the Petition; a non-tenured member of the Department of Otolaryngology did. (Livingstone Depo. 111:25—120:14, Ex. 11.). (*Id*.) The Petition began as early as September 2012. (*Id*.)

27. Lord had a "very good" relationship with Dr. Charles Nemeroff, the Chair of the Department of Psychology. (Lord Depo. 91:9-18.) On or about December 9, 2012, Dr. Livingstone reported that he had received a threat from Dr. Nemeroff, in which he advised that, if Dr. Livingstone put a stop to the Petition, Dean Goldschmidt and Dr. Lord would put an end to the TMG audit. (Shalala Depo. 62:24—67:1, Ex. 6; Livingstone Depo. 122:19—156:3, Ex. 12.) President Shalala asked Provost LeBlanc to investigate. (Shalala Depo. at 67:12-16.) Provost LeBlanc concluded that the conversation likely occurred but may have been the result of poor word

choice. (Livingstone Depo. 189:7—190:23, Ex. 19.) Dr. Livingstone did not want the matter to be investigated any further, in the interest of avoiding more problems for the medical school. (*Id.*)

28.     Because the TMG audit appeared to be tainted (insofar as an allegation had been raised about its use to threaten Dr. Livingstone by people like Dean Goldschmidt and Lord who were supervising the audit), on December 21, 2012, President Shalala made the decision to transfer the next stage of the review to the University's Internal Audit Department. (Shalala Depo. 98:18---104:22, Exs. 15-16; Goldschmidt Depo. 172:8—175:21, 178:2-20, Exs. 42-43; Natoli Depo. 79:6—82:9, Ex. 26.) It was "typical" for compliance investigations to be managed by Internal Audit. (Goldschmidt Depo. 149:24—150:19, 160:4-10, Ex. 32.)

29.     Internal Audit engaged independent outside counsel (Hogan Lovells) and an independent, third-party auditor (Compliance Concepts) to conduct the review. (Goldschmidt Depo. 239:23—240:9, Ex. 75; McCafferty Depo. 132:12—133:23.) That review concluded that "virtually all" of the allegations were unfounded but, in an abundance of caution, a refund of approximately $400,000.00 was paid to the government. (Natoli Depo. 102:4—103:18, 106:16—107:1, Exs. 30 and 31; Livingstone Depo. 176:10—178:15.) That compliance finding was consistent with 15 years of prior reviews by AHCA, CMS and others. (Livingstone Depo. 210:14-23, Ex. 23.)

30.     On December 14, 2012, Dean Goldschmidt e-mailed Provost LeBlanc to inquire about the potential consequences from the Petition. (Lord Depo. 127:13—129:11, Ex. 23; Shalala Depo. 78:18—84:16, Ex. 10.) Provost LeBlanc advised that, because the Dean's regularly-scheduled review was less than a year away, the Faculty could not call for his early review. (*Id.*) With respect to Lord, the President could use to Petition "to decide what action if any to take." (*Id.*)

31.     On December 14, 2012, Lord met with President Shalala following a regular Board of Trustees meeting. (Lord Depo. 122:2—123:25.) They discussed "the TMG Report" and the "potential exposure the University had relative to the billing issues inside that report,"; a marketing plan; an upcoming meeting with Jupiter Medical Center; and possibly the Petition. (Lord Depo. 122:23—123:11.) Lord did not prepare a memorandum summarizing this meeting (as he had for other meetings) because it was not "exceptional"; Lord had "many meetings with [President] Shalala" during his tenure "on a pretty regular basis." (Lord Depo. 56:21-25, 123:15-25.)

32.     In Lord's sworn interrogatory responses, which asked him to identify all alleged instances of statutorily-protected activity, the only alleged instance involving President Shalala was his December 14 meeting with her. (Interrog. No. 5.)

7

33.     During his tenure, Lord instituted a practice of exchanging Daily Executive Updates, by which Dean Goldschmidt, Lord and their direct reports sent e-mails summarizing their daily activities. (Lord Depo. 75:9—76:15.) President Shalala was copied on Updates that "related to an important area," such as "compliance-related issues." (*Id*.)

34.     As of December 15, 2012, there were 485 signatures on the Petition. (Lord Depo. 127:13—129:11, Ex. 23.) Lord testified that, as of that date, he did not have concerns about his future employment with the University. (Lord Depo. 129:12-15.) Notwithstanding, Lord and Dean Goldschmidt exchanged a series of e-mails to discuss their succession plan out of the University. (Lord Depo. 129:16—131:11, Ex. 24.) Lord admitted that these discussions started sometime both learned of the Petition. (*Id*.) Lord admitted that the rationale for the plan was to "take the vote off the table, meaning any vote that would certify the Petition." (Lord Depo. 135:12-17, Ex. 24.)

35.     On December 18, 2012 (four days *after* Lord's meeting with President Shalala), Dr. McCafferty e-mailed Lord and Dean Goldschmidt with a memorandum she prepared "describing the initial observations from the TMG assessment." (Lord Depo. 136:2—137:14, Ex. 26.) Her e-mail also noted that "a final report will be forthcoming in early 2013." (*Id*.) Dean Goldschmidt responded, "There are many unanswered questions and we do need follow up TMG engagement to get them answered." (*Id*.) Lord responded that he had completed "a first pass review" and authorized her to engage TMG in a further review "as recommended in the report." (Ex. G.)

36.     Dr. McCafferty acknowledges that TMG's initial findings were not "definitive" but rather were "preliminary information"; this was the "first step" in the assessment. (McCafferty Depo. 80:1-16, 84:4—89:2, 135:2-10, 136:5-13, 149:15—150:1, Ex. 8 and A.) Further review was needed. (*Id*.) In fact, TMG never issued an actual report. (*Id*. 142:9-11.)

37.     On December 18, 2012, Dean Goldschmidt and Lord exchanged e-mails discussing sharing Dr. McCafferty's memorandum with President Shalala. (Ex. H.) Dean Goldschmidt noted, "Many questions but not enough answers, we need the report from TMG." (*Id*.)

38.     On December 19, 2012, Lord prepared a draft transmittal to President Shalala, in which he shared "the first phase of deliverables from TMG"; noting that the report was framed to "provide perspective and raise key questions—the group was reluctant to put specific, 'judgmental' comments in this first report." (Ex. I.) Lord noted that the next phase would be a detailed audit. (*Id*.) Later that day, that transmittal was adopted by Dean Goldschmidt and shared with President Shalala. (Shalala Depo. 85:4—88:6, 94:13—95:23, Exs. 11 and 13) This was when President

Shalala first learned of TMG's preliminary findings. (*Id.*)

39.     In Lord's operative Third Amended Complaint, Lord alleged that "in early December 2012, TMG issued a preliminary report," which Lord termed the "TMG Report" and which Lord purported to attach as Exhibit 4. (D.E. 101 ¶ 71; D.E. 101-4.) The Third Amended Complaint contains multiple allegations about the TMG Report. (D.E. 101 ¶¶ 71-75, 77, 78, 81, 98, 101-104, 107.) In his deposition, however, Lord admitted that the allegations regarding the TMG Report were inaccurate, as that document was not the TMG Report; in fact, Lord could not recall whether he ever had a copy of the TMG Report. (Lord Depo. 137:21—142:25, Exs. 26 and 26-A.) As noted in Paragraph 36, *supra*, TMG never issued any report.

40.     On December 20, 2012, Dr. McCafferty wrote a Memo, in which she summarized a conversation with Cindy Augustyn (University Associate General Counsel). (Lord Depo. 144:3—145:21, Ex. 27; McCafferty Depo. 108:18—109:12, 142:14—143:6, Ex. 9.) Both agreed that, because "no report issued from TMG it is premature to provide opinions, judgments, etc." (*Id.*)

41.     Lord concedes that Dean Goldschmidt and President Shalala communicated more than Lord and President Shalala did: President Shalala recruited Dean Goldschmidt to the University, and Dean Goldschmidt reported directly to her. (Lord Depo. 153:3-20.) Dean Goldschmidt and President Shalala also had a social/personal relationship. (*Id.*; Shalala Depo. 14:13-23.)

42.     In December 2012, President Shalala made the decision to terminate Lord. (Shalala Depo. 26:11—27:22, 28:20—35:7, 37:8—38:3, 40:15—43:12, 81:21—82:5.) The decision was "cumulative" and based on the Petition, Lord's "destructive" leadership style (which "destroyed morale" and caused faculty and staff to be "upset and fearful") and his refusal/inability to communicate with key leadership officials, department chairs and vice chairs. (*Id.*) The receipt of the TMG assessment had "absolutely nothing" to do with her decision. (*Id.* 110:17—111:3.)

43.     Dean Goldschmidt supported President Shalala's decision because, after he and Lord first learned of the Petition in October 2012; he noticed that Lord became less interested in his roles, less engaged and more aggressive, (Goldschmidt Depo. 44:2—51:23, 87:13—88:8, 153:19—154:3.) Because Dean Goldschmidt was well-regarded at his prior institution and by University staff/faculty prior to Lord's hiring, Dean Goldschmidt attributed the negative reaction from faculty to Lord. (*Id.* 100:24—101:20.)

44.     Mr. Natoli supported President Shalala's decision because Lord's management style and lack of communication did not work in the university/hospital environment. (Natoli Depo. 83:15—

85:7, 88:5—89:17.) The ongoing audit "was not a factor in any way." (*Id*.)

45.    Dr. Livingstone did not ask President Shalala to shut down the TMG investigation or to terminate Lord. (Livingstone Depo. 187:2-11, 197:5—198:2.)

46.    Dr. McCafferty is aware of complaints about Lord's ability to work with others. (McCafferty Depo. 125:19—126:12, 127:6-15. 137:9—139:6.)

47.    On December 31, 2012, Dean Goldschmidt advised Lord that President Shalala had made the decision to remove Lord from his positions as COO and Vice President of Medical Affairs. (Lord Depo. 153:24—154:6, 155:7-17.) Lord remained in those positions until the end of January 2013 to transition Mr. Natoli into that role. (Lord Depo. 157:11-22.)

48.    On December 31, 2012, Dr. Keitz was advised by Dean Goldschmidt that she was being transitioned out of her role as Vice President for Human Resources. (Lord Depo. 160:3—163:25, Exs. 30 and 31.) Dr. Keitz had no involvement with any compliance issues that were being investigated. (*Id*.), She had been involved with the work environment and personnel issues at the Medical School. (*Id*.) President Shalala made that decision. (Lord Depo. 191:21—192:6.)

49.    At the beginning of 2013, Lee Phillips (Chief Marketing Office for UHealth and the Medical School) was terminated and Nelson Weichold (Senior Business Advisor for UHealth and the Medical School) was demoted. (Lord Depo. 164:5—165:8.) President Shalala made those decisions. (Lord Depo. 191:21—192:6.)

50.    On January 16-17 2013, Dr. Livingstone and Mr. Natoli exchanged a series of e-mails, in which they discussed the need "to bring faculty leadership together" and end the "infighting" and "negativity." (Livingstone Depo. 200:6—201:16, Ex. 22.)

51.    In January 2013, Lord discussed his faculty appointment with various officials at the University. (Lord Depo. 168:3—170:1, 180:4—187:11, Exs. 36 to 38.) Lord decided to waive his right to a faculty vote and agreed not to be appointed. (*Id*.) By letter dated January 30, 2013, Lord was advised of the termination of his faculty appointment, effective July 31, 2013. (*Id*.)

52.    On January 30, 2013, a Faculty Senate meeting was held. (Lord Depo. 192:7—194:12, Ex. 40.) President Shalala noted that, because there were "serious issues in leadership" and "issues with transparency, faculty involvement and communication," the University "made changes in leadership." (*Id*.) One faculty member commented that the "person who created all that fear is no longer here," which Lord conceded is a reference to him. (*Id*.)

53.    Lord filed this *qui tam* lawsuit in July 2013 under seal. (Lord Depo. 200:13-21; D.E. 1.)

While it remained under seal, Lord did not discuss his *qui tam* with anyone other than his lawyers and his then-wife Alice. (Lord Depo. 200:22—201:5.)

54. Lord admits that he has advised people that he "retired" and/or "resigned" from his professor position. (Lord Depo. 170:17—171:20.)

55. Lord admits that he has sworn under penalty of perjury that he retired or resigned but claims that he "was subject to the seal in this case and used an abundance of caution in responding to anything." (Lord Depo. 173:4-10, 174:2-16.)

56. Lord was represented by counsel in his divorce proceedings, and his lawyers objected to various items on the basis of privilege but not to these questions. (Lord Depo. 173:12-25.) The same law firm and the same lawyer (Jim Ferraro) represented Lord in the *qui tam* and in his divorce proceedings. (Lord Depo. 225:21—226:6.)

57. In February 2015, Lord was deposed in a lawsuit styled *Fayad v. University of Miami*. (Lord Depo. 197:13—200:12, Ex. 42.) In that deposition, Lord testified that he was terminated as COO and Vice President of Medical Administration by Dean Goldschmidt; that President Shalala stopped by his office to thank him for his time at the University; and that he was not reappointed to his faculty position in accordance with the faculty manual. (*Id*.) Lord also admitted that he was aware of complaints about him - - specifically about people's discomfort with change and being held accountable for their performance - - and the Petition of no confidence that had been circulated about him and Dean Goldschmidt. (*Id*.)

58. Lord formerly was married to Alice Meagher f/k/a Alice Lord, beginning on April 17, 2002. (Second Admissions Nos. 1 and 2.)

59. On September 10, 2015, Alice Meagher f/k/a Alice Lord filed a Verified Petition for Dissolution of Marriage and Other Relief, in which she sought *inter alia* alimony because Mrs. Lord "gave up her successful career when the parties commenced their relationship" and "has no ability to earn income at this time." (Second Admissions Nos. 3 to 5.)

60. Generally, Lord reviewed all of the filings made on his behalf in his divorce case. (Lord Depo. 213:20-25.)

61. In his divorce case, Lord filed a Financial Affidavit, in which he swore that he "retired" from the University in July 2013 and was "not currently seeking employment." (Lord Depo. 201:16—203:8, 205:24—206:3, Ex. 43.)

62. In his divorce case, Lord served interrogatory responses, in which he swore that he had

11

"been unemployed since January 2013" and had "not made any affirmative attempts to become employed in the last 15 months." (Lord Depo. 207:2-23, 212:4, Ex. 44.) Lord also objected to providing certain information as protected from disclosure pursuant to 31 U.S.C. § 3730. (*Id*.)

63.     In his divorce case, Lord filed several pleadings in which he represented that he "retired in July 2013" from the University. (Lord Depo. 214:7—221:13, Exs. 45 to 47.)

64.     In his divorce case, Lord filed pleadings in which he represented that he "resigned" from the University in December 2012 and "officially retired in July 2013." (Lord Depo. 238:21—240:8, Ex. 49.)

65.     In his divorce case, Lord filed two affidavits in connection with his motions for partial summary judgment. (Dec. 28, 2015 Affs. of Jonathan Lord.) In each, Lord swore under penalty of perjury that he was "currently retired." (*Id*.)

66.     In his divorce case, Lord was deposed; during his deposition, Lord testified that, in July 2013, he was not fired from his faculty position but, rather, his "faculty appointment expired" and he "retired". (Lord Depo. 222:20—224:2, 235:22—236:12, Ex. 48.) Lord further testified that that "was a voluntary act on [his] part." (*Id*.) In response to other questions about Lord's employment, his lawyer objected and instructed Lord not to answer. (Lord Depo. 237:3-18, Ex. 48.)

67.     Lord's divorce case was settled and approved by the Court. (Lord Depo. 240:9-17; July 15, 2016 Final Judgment.) During the settlement colloquy with the Court, Lord's wife testified that she is "basing the entry into this agreement on the financial disclosure that has been made in this case by Dr. Jonathan Lord, including his financial affidavit." (Apr. 6, 2016 Hr'g Tr. 38:2-6.)

68.     "Point 1" of the settlement was that "there will be no temporary or permanent alimony." (Apr. 6, 2016 Hr'g Tr. 4:8-9.) Lord's wife did not receive alimony and did not waive her right to alimony in order to get part of the proceeds from this lawsuit. (Lord Depo. 240:20-22, 246:6-8.)

69.     In this case, Lord has taken the position that he was fired from all of his positions at the University, that he never retired and that he has continuously sought comparable employment after leaving the University. (Lord Depo. 243:20—244:14; University's *Daubert* Motion, D.E. 141.)

70.     Dr. McCafferty remained employed at the University through May/June 2014. (McCafferty Depo. 124:21-24, 140:20—141:5.) She was not terminated; she chose a new position at Nicklaus Children's Hospital. (*Id*.)

Respectfully submitted,

**ISICOFF RAGATZ**
601 Brickell Key Drive, Suite 750
Miami, Florida 33131
Tel: (305) 373-3232
Fax: (305) 373-3233

By: /s/ Christopher M. Yannuzzi
    Eric D. Isicoff
    Florida Bar No. 372201
    Isicoff@irlaw.com
    Teresa Ragatz
    Florida Bar No. 545170
    Ragatz@irlaw.com
    Christopher M. Yannuzzi
    Florida Bar No. 92166
    Yannuzzi@irlaw.com

### CERTIFICATE OF SERVICE

I **HEREBY CERTIFY** that a true and correct copy of the foregoing has been served via

CM/ECF this 31st day of May, 2022, upon the following:

Jeffrey H. Sloman
Stumphauzer Foslid Sloman Ross & Kolaya, PLLC
Two South Biscayne Boulevard, Suite 1600
Miami, Florida 33131
Telephone: (305) 614-1400
Facsimile: (305) 614-1425
E-mail: jsloman@sfslaw.com

By: /s/ Christopher M. Yannuzzi
    Christopher M. Yannuzzi