*EXHIBIT "A"*

Jonathan Lord, M.D.

vs.

University of Miami

---

Deposition of:

Jonathan Lord

February 24, 2022

---

*Vol 01*

PHIPPS REPORTING

*Raising the Bar!*

Jonathan Lord
February 24, 2022

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:  13-22500-CIV-ALTONAGA/McALILEY

JONATHAN LORD, M.D.,

              Plaintiff,

vs.

UNIVERSITY OF MIAMI,

              Defendant.
_____/

WEB CONFERENCE VIDEOTAPE (VIA ZOOM) DEPOSITION OF

JONATHAN LORD, M.D.

Thursday, February 24, 2022
1:03 p.m. - 8:51 p.m.

LOCATION:  Via Web Conference

Stenographically Reported By:
CRAIG W. TAYLOR, STENOGRAPHER

Job No.:  234254

Jonathan Lord
February 24, 2022

Page 2

1    APPEARANCES:  (All Appearing By Web Conference:)

2

3    On behalf of the Plaintiff:

4        STUMPHAUZER FOSLID SLOMAN ROSS
         & KOLAYA, PLLC
5        Two South Biscayne Boulevard
         Suite 1600
6        Miami, FL 33131
         (305) 614-1400
7        BY:  Jeffrey H. Sloman, Esq.
         (jsloman@sfslaw.com)
8                 and
         Erica Perdomo, Esq.
9        (eperdomo@sfslaw.com)

10

11   On behalf of the Defendant:

12       ISICOFF RAGATZ
         601 Brickell Key Drive
13       Suite 750
         Miami, FL  33131
14       (305) 373-3232
         BY: Christopher M. Yannuzzi, Esq.
15       (yannuzzi@irlaw.com)

16

17

18   ALSO PRESENT:  Oliver Lee, Videographer

19

20

21

22

23

24

25

Jonathan Lord
February 24, 2022

Page 3

1

2                          I N D E X

3

4    WITNESS                                          PAGE

5
     TESTIMONY OF JONATHAN LORD, M.D.
6
          Direct Examination by Mr. Yannuzzi          8
7         Cross-Examination by Mr. Sloman            271

8

9    Certificate of Oath                             273

10   Certificate of Reporter                         274

11   Read & Sign Letter                              275

12   Errata Sheet                                    276

13

14

15                        EXHIBITS

16
     DEFENDANT'S            DESCRIPTION               PAGE
17

18   1   Jonathan Lord's Curriculum Vitae            20

19   2   7/1/11 Letter to Lord from UM               25

20   3   Whistleblower Protection Statement          27

21   4   Business Conduct & Ethical Standards        27

22   5   3/1/12 Offer Letter to Lord from UM         29

23   6   4/18/12 E-mails Between Lord and Natoli     39

24

25                   EXHIBITS (Continued)

Jonathan Lord
February 24, 2022

Page 4

| 1 | DEFENDANT'S | DESCRIPTION | PAGE |
|---|---|---|---|
| 2 | 7 | 4/24/12 E-mails Between Lord and Keitz | 44 |
| 3 | 8 | 5/4/12 E-mail from Natoli to Lord | 46 |
| 4 | 9 | 5/22/13 E-mails Between Lord and Ugalde | 49 |
| 5 | 10 | 7/19/12 E-mails Betw. Lord and Goldschmidt | 56 |
| 6 | 11 | 7/20/12 E-mails Between Goldschmidt, Keitz and Lord | 59 |
| 7 | 12 | 8/13/12 E-mails Betw. Lord and Goldschmidt | 69 |
| 8 | 13 | 8/15/12 E-mail from Goldschmidt to Others | 80 |
| 9 | 14 | 26-Page OIG Package | 87 |
| 10 | 15 | 10/19/12 E-mails Between Lord and McCafferty | 89 |
| 11 | 16 | 11/23/12 E-mails Between Lord and McCafferty | 92 |
| 12 | 17 | 11/28/12 Letter to Lord from UM | 95 |
| 13 | 18 | 12/1/12 E-mail to Lord from McCafferty | 100 |
| 14 | 19 | 12/1/12 E-mail from Lord to Keitz | 103 |
| 15 | 20 | 12/3/12 Memorandum of Lunch Between Lord and Bass | 113 |
| 16 | 21 | 12/6/12 E-mail from Goldschmidt to Shalala | 116 |
| 17 | 22 | 12/14/12 E-mail from Lord to Goldschmidt | 125 |
| 18 | 23 | 12/15/12 E-mail from Goldschmidt to LeBlanc | 127 |
| 19 | 24 | 12/16/12 E-mail from Goldschmidt to Lord | 130 |
| 20 | 25 | 12/19/12 E-mail from Goldschmidt to McCafferty | 136 |
| 21 | 26 | Possible IML Compliance Review Targets | 138 |
| 22 | 26-A | Third Amended Complaint | 140 |
| 23 | 27 | Memo to File by McCafferty | 144 |
| 24 | | | |
| 25 | | | |

Jonathan Lord
February 24, 2022

Page 5

1                     EXHIBITS (Continued)

2    DEFENDANT'S              DESCRIPTION              PAGE

3    28   12/28/12 Memo by Lord                       148

4    29   7/21/21 E-mail from Lord to Sloman          157

5    30   1/1/13 E-mail from Lord to Keitz            160

6    31   12/31/12 E-mail from Keitz to Sznurkowski   162

7    32   1/2/13 E-mail from Shalala to Others        165

8    33   1/18/13 E-mail from Lord to Board           175

9    34   1/18/13 E-mail from Barros to Others        177

10   35   1/20/13 E-mail from Lord to Newman          179

11   36   1/29/13 E-mail from Lord to Birnbach        181

12   37   1/30/13 Letter from UM to Lord              184

13   38   1/31/13 Letter from UM to Lord              186

14   39   1/30/13 Ltr from Goldschmidt to Colleagues  187

15   40   1/30/13 Senate Meeting Notes by Keitz       192

16   41   1/30&31/13 E-mails Between Lord and Keitz   194

17   42   2/18/15 Depo of Lord in Fayad Case          198

18   43   Financial Affidavit of Lord in Divorce Case  201

19   44   Lord's Answers to Interrogatories in Divorce
          Case                                        207
20
     45   Husband's Response to Wife's Urgent Motion
21        to Compel                                   214

22   46   Husband's Motion for Partial Summ. Judg.    219

23   47   Husband's Motion for Leave to Increase LOC  220

24   48   Deposition Excerpt of Lord in Divorce Case  223

25

Jonathan Lord
February 24, 2022

Page 6

1                        EXHIBITS (Continued)

2   DEFENDANT'S              DESCRIPTION              PAGE

3   49  Husband's Motion to Bifurcate              238

4   50  Lord's 2012 Tax Return                     246

5   51  Lord's 2013 Tax Return                     246

6   52  Lord's 2014 Tax Return                     247

7   53  Lord's 2015 Tax Return                     247

8   54  Lord's 2016 Tax Return                     248

9   55  Lord's 2017 Tax Return                     249

10  56  Lord's 2018 Tax Return                     249

11  57  Lord's 2019 Tax Return                     249

12  58  Lord's 2020 Tax Return                     250

13  59  Settlement Agreement from First Phase      251

14  60  Lord's Responses to UM's Interrogatories   254

15  61  Lord's Amended Responses to UM's Interrogs. 255

16  62  3/11/13 E-mail from Young to Lord          261

17  63  7/20/21 E-mail from Hagle-Caldwell to Lord 266

18  64  1/31/22 E-mail from Lord to Hagle          267

19

20

21

22

23

24

25

Jonathan Lord
February 24, 2022

Page 7

1    Proceedings began at 1:03 p.m.:

2            THE VIDEOGRAPHER:  We are on the record.

3        In the case styled Jonathan Lord, M.D. versus

4        University of Miami, Case Number

5        13-22500-CIV-ALTONAGA/McALILEY, this is the

6        videotaped deposition of Jonathan Lord, M.D.

7            This deposition is taking place via Zoom

8        on February 24th, 2022.  The time is now 1:03

9        p.m.  Our videographer is Oliver Lee.

10           Counsel will state their appearances for

11       the record, after which our court reporter,

12       Craig Taylor, will swear in the witness.

13           MR. SLOMAN:  Good afternoon, everybody.

14       Jeffrey Sloman and Erica Perdomo on behalf of

15       Jonathan Lord, M.D.

16           MR. YANNUZZI:  Christopher Yannuzzi of

17       Isicoff Ragatz on behalf of the defendant,

18       University of Miami.

19           THE STENOGRAPHER:  Please raise your right

20       hand.

21           Do you solemnly swear to tell the truth,

22       the whole truth, and nothing but the truth, so

23       help you God?

24           THE WITNESS:  I do.

25    Thereupon:

Jonathan Lord
February 24, 2022

Page 8

```
 1                    JONATHAN LORD, M.D.
 2   a witness named in the notice heretofore filed,
 3   being of lawful age and having been first duly
 4   sworn, testified under oath as follows:
 5                    DIRECT EXAMINATION
 6   BY MR. YANNUZZI:
 7        Q.   Dr. Lord, could you just state and spell
 8   your full name for the record, please?
 9        A.   Sure.  It's Jonathan T. Lord, L-O-R-D.
10        Q.   Have you ever gone by any other names?
11        A.   I am sometimes referred to as Jack Lord.
12        Q.   Is that what people call you, Jack, rather
13   than Jonathan?
14        A.   Yes.
15        Q.   Are you currently married?
16        A.   Yes.
17        Q.   What is your wife's name?
18        A.   Diane.
19        Q.   How long have you been married to Diane?
20        A.   Since September, 2016.
21        Q.   Were you previously married?
22        A.   Yes.
23        Q.   To whom?
24        A.   Alice Meagher.
25        Q.   Could you spell the last name?
```

Jonathan Lord
February 24, 2022

Page 9

```
 1        A.   M-E-A-G-H-E-R.

 2        Q.   How long were you married to Alice?

 3        A.   Approximately 12 years.

 4        Q.   When did you divorce?

 5        A.   I believe in 2016.

 6        Q.   Prior to Alice, were you married?

 7        A.   Yes, I was.

 8        Q.   To whom?

 9        A.   Pentha Jo Brouse, B-R-O-U-S-E.

10        Q.   Could you spell the first name, also,

11   please?

12        A.   P-E-N-T-H-A.

13        Q.   What is your home address?

14        A.   It's 51 Ironwood Lane, Lahaina,

15   L-A-H-A-I-N-A, Hawaii.

16        Q.   How long have you lived at that address?

17        A.   About 18 months.

18        Q.   Prior to that, where were you living?

19        A.   Amelia Island, Florida.

20        Q.   How long did you live in Amelia Island?

21        A.   Approximately five years.

22        Q.   Prior to living in Amelia Island, did you

23   live in Miami?

24        A.   I did.

25        Q.   You lived in Miami during and subsequent
```

Jonathan Lord
February 24, 2022

Page 10

1    to your appointment at the University of Miami?

2         A.    Yes.

3         Q.    You were deposed in 2015 in a lawsuit

4    brought against the university by Dr. Fayad.  Do you

5    recall that?

6         A.    Yes, I do.

7         Q.    You were also deposed in 2016 in your

8    divorce case with your former wife Alice, correct?

9         A.    That's correct.

10        Q.    You were deposed two times in that case?

11        A.    At the least.

12        Q.    Other than those three depositions, have

13   you ever been deposed before?

14        A.    I believe I have multiple times, starting

15   at the time I was in the Navy when I was a forensic

16   pathologist.  I was involved with cases in those

17   days.

18        Q.    Were you ever deposed in connection with

19   this lawsuit that we are here on today?

20        A.    Not that I am aware of.

21        Q.    Did you ever provide sworn testimony to

22   the government in connection with this case?

23        A.    I'm not sure what is sworn evidence, but I

24   did have meetings with the government.

25        Q.    Did you swear or affirm to tell the truth

Jonathan Lord
February 24, 2022

Page 11

1    when you participated in those meetings?

2         A.   I don't recall that.

3         Q.   Did you ever sign any affidavits or sworn

4    declarations?

5         A.   No.  I can't recall whether they were in

6    the form of affidavits or not.

7         Q.   I understand you have been deposed a few

8    times, but to make sure we are on the same page and

9    to sort of reaffirm the rules, especially since we

10   are here on Zoom today, I will go over a couple of

11   the ground rules.

12              You understand that you just took an oath

13   and you are testifying under the penalty of perjury.

14        A.   Yes.

15        Q.   Even though you are being video-recorded

16   today and we can all see you, it's important that

17   you give audible responses and don't shake your head

18   or give uh-uhh or um-hmm as an answer, okay?

19        A.   Yes.

20        Q.   If at any time you don't understand one of

21   my questions, let me know and I will be happy to

22   rephrase it or repeat it.  If you do give me an

23   answer to a question, though, I will assume that you

24   understood it.  Is that fair?

25        A.   Yes.

Jonathan Lord
February 24, 2022

```
 1        Q.   As far as breaks, this will probably last
 2   a couple of hours today.  I try to take a break
 3   about once an hour.  If you need to get off the call
 4   for anything before we take that hour break, just
 5   let me know.  I am happy to accommodate.  I would
 6   just ask that, if we are in the middle of a
 7   question, you answer the question and then we can
 8   take a break for as long as you need, okay?
 9        A.   Okay.
10        Q.   You were provided a Zoom link to access
11   your deposition today; is that correct?
12        A.   Yes, I was.
13        Q.   Are you accessing Zoom through a computer?
14        A.   Yes, I am.
15        Q.   Do you have any other programs open?
16        A.   No.
17        Q.   Where are you currently?
18        A.   I'm currently in Lahaina, Hawaii.
19        Q.   At your home?
20        A.   Yes.
21        Q.   Is there anybody in the room with you?
22        A.   No.
23        Q.   Are you taking any medication that would
24   affect your ability to understand and answer my
25   questions?
```

Jonathan Lord
February 24, 2022

Page 13

1      A.    No.

2      Q.    **What, if anything, did you do to prepare**
3   **for your deposition today?**

4      A.    I reviewed the materials that UM provided
5   in discovery, and I spent some time looking through
6   some of my own e-mails in the past.

7      Q.    **Other than reviewing those documents, did**
8   **you do anything else to prepare?**

9      A.    I spent some time with my attorneys.

10     Q.    **When you say your attorneys, whom are you**
11   **referring to?**

12     A.    Jeffrey Sloman and Erica Perdomo.

13     Q.    **How long did you meet with your attorneys?**

14     A.    I would say approximately six hours.

15     Q.    **Over what period of time?**

16     A.    About three days.

17     Q.    **Other than the three of you, did anybody**
18   **else participate in those meetings?**

19     A.    No, they did not.

20     Q.    **Were the meetings by Zoom?**

21     A.    Yes, they were or by phone.

22     Q.    **You mentioned that you reviewed some of**
23   **the documents that were produced by the university**
24   **and some of your e-mails.  Do you recall**
25   **specifically what documents you reviewed?**

Jonathan Lord
February 24, 2022

Page 14

 1      A.   Well, there was quite a bit in the

 2  materials provided in, I think, two or three

 3  different tranches as part of discovery for UM.  I

 4  had a chance to, I think, look at or least scan most

 5  of those.  I did have a chance to look at some of my

 6  own updates that I provided as well as were provided

 7  in some of the discovery.

 8      **Q.   Dr. Lord, what is your date of birth?**

 9      A.   September 26, 1954.

10      **Q.   Other than a driver's license, do you**

11  **currently hold any other licenses?**

12      A.   I do.

13      **Q.   What licenses?**

14      A.   I have a medical license in Florida,

15  Kentucky and Hawaii.

16      **Q.   Are all of those active and in good**

17  **standing?**

18      A.   Yes.

19      **Q.   When did you obtain your medical license**

20  **in Hawaii?**

21      A.   Sometime last year.  I think it was

22  January of 2021.

23      **Q.   Have you ever performed any medical**

24  **services in Hawaii since you obtained your medical**

25  **license?**

Jonathan Lord
February 24, 2022

Page 15

```
 1        A.   I have not.

 2        Q.   When did you obtain your medical license

 3   in Kentucky?

 4        A.   Approximately 2001.

 5        Q.   When did you obtain your medical license

 6   in Florida?

 7        A.   Well, actually it happened while I was in

 8   medical school back in 1980, and then I got my -- I

 9   went back and applied for license again in 2010.

10        Q.   I'm sorry.  I was a little bit confused by

11   that.

12        A.   Well, I was a medical student and

13   completed my studies in about 1978, 1979 when I got

14   my Florida license initially.  I was in the military

15   at that time.  After that I was living in states

16   other than Florida, and I let my license lapse, and

17   then I started it again in 2010.

18        Q.   Has your license ever been suspended in

19   any of these states?

20        A.   No, it has not.

21        Q.   You mentioned that you went to medical

22   school obviously.  Where did you go to medical

23   school?

24        A.   I went to medical school at the University

25   of Miami from 1974 to 1978.
```

Jonathan Lord
February 24, 2022

Page 16

1      Q.   After completing your medical degree in

2   1978, have you received any other degrees?

3      A.   No, I have not.  I have received

4   certifications in anatomic, clinical and forensic

5   pathology.

6      Q.   Dr. Lord, I know you started at the

7   University of Miami in terms of employment in 2011,

8   but prior to that what were you doing?

9      A.   Prior to that I was serving on a number of

10  public company boards and private company boards.

11  Prior to that is a long -- is a big question.  How

12  far prior to that are you referring to?

13     Q.   Well, in terms of immediate full-time

14  employment, were you working as a chief executive

15  officer for a company called Navigenics?

16     A.   I did through the end of 2009, beginning

17  of 2010.

18     Q.   You held that job for approximately seven

19  months?

20     A.   A little longer than that.

21     Q.   What were the circumstances surrounding

22  your departure?

23     A.   We couldn't fund the company.  It was a

24  startup in Silicon Valley.  2008 was the year of the

25  economic crisis, which dried up any sort of

Jonathan Lord
February 24, 2022

1  investment funds that were available for a venture

2  firm to put into that company.

3       Q.   After that company did not succeed, what

4  did you do for employment before starting at the

5  University of Miami?

6       A.   Well, as I said earlier, I spent a number

7  of years, beginning in about 2003, on public company

8  and private company boards.  Those board

9  responsibilities are work, although they are not an

10  employed relationship in most circumstances.

11       Q.   Were you looking for employment during

12  that period of time when you were working on those

13  boards?

14       A.   Well, you know, I have worked all of my

15  life since joining the Navy.  Throughout that period

16  I have always looked for new opportunities, network,

17  taking up new things to do.  In that period of time,

18  my primary focus was on boards.

19       Q.   Approximately how many hours a week were

20  you spending doing board activities?

21       A.   Well, it depended on the nature of the

22  company and the week and what was happening.  It

23  could be anywhere from four hours to twelve hours a

24  week.

25       Q.   Per company or in total?

Jonathan Lord
February 24, 2022

Page 18

1      A.    Per company, in some cases the total

2  probably gets close to that twelve hours per week on

3  a regular basis.

4      **Q.    Twelve hours per week across all of the**

5  **various boards that you were a member of?**

6      A.    At that point in time, yes.  The nature of

7  board work, because of the nature of the companies,

8  changes and the number of hours spent will change.

9  A great example is during COVID on our public

10  company board we were probably on board work 20

11  hours a week.  But it just depends on the time and

12  the nature of the work.

13      **Q.    How are you compensated for board work?**

14      A.    Boards are normally paid in equity.

15  Equity can take the form of stock options, stock

16  grants, restricted stock grants.  In some cases

17  there's a cash compensation.

18          By and large, the companies that I was

19  involved with, because I either was the chairman or

20  chaired the comp committees, my philosophy was that

21  board member compensation should be completely

22  aligned with shareholders, which meant that the form

23  of compensation should be in the form of equity.

24  So, if the company did well, the board members did

25  well.  Generally we were not in a position of taking

Jonathan Lord
February 24, 2022

Page 19

1    cash out of the companies.

2       Q.   **Would you receive both stocks and stock**

3    **options?**

4       A.   In each case it's slightly different in

5    terms of what the compensation was.  Sometimes the

6    compensation was all in options.  Sometimes it was a

7    combination of options and stock or RSUs.  It really

8    depended on the company, the availability of shares.

9    But by and large, it was, I would say, 90 percent

10   plus in the form of equity.

11      Q.   **And by equity, you mean actual stock?**

12      A.   Stock or options -- stock options.

13      Q.   **Do you typically exercise the options?**

14      A.   It really depends on when.  Those options

15   generally have a vesting period of anywhere from one

16   to three years.  Then they have a period of time

17   that they are valid, usually about ten years.  So,

18   it depends on, A, my circumstances, being whether

19   the company is selling.  Many of the companies that

20   I was involved with were very fortunately successful

21   and were acquired by others.  That creates a

22   liquidity event for those companies.  So, I think

23   it's a variety of factors that come into play there.

24          MR. YANNUZZI:  I am having some technical

25       difficulties pulling up my first exhibit.  So,

Jonathan Lord
February 24, 2022

Page 20

```
 1        why don't we go off the record and I will try
 2        to sort this out and hop back on in a couple of
 3        minutes.
 4               THE WITNESS:  So, we are going on a little
 5        break?
 6               MR. YANNUZZI:  Yes.
 7               THE WITNESS:  Okay.  I'm going on mute.
 8               THE VIDEOGRAPHER:  We are off the record
 9        at 1:21.
10               (Recess 1:21 p.m. until 1:48 p.m.)
11               THE VIDEOGRAPHER:  We are back on the
12        record.  The time is 1:48.
13        BY MR. YANNUZZI:
14           Q.  Dr. Lord, before the break we were going
15        through some of your employment history before you
16        started at the University of Miami.
17               I'm going to show you what we'll mark as
18        Exhibit 1, which is a copy of your CV at the time
19        you started at the University of Miami.
20               (The curriculum vitae referred to was
21        marked for identification as Defendant's
22        Composite Exhibit No. 1.)
23        BY MR. YANNUZZI:
24           Q.  Dr. Lord, are you able to see what's on my
25        screen?
```

Jonathan Lord
February 24, 2022

Page 21

```
 1        A.    I can.

 2        Q.    This is a 39-page document, and the first

 3   page is Bates stamped UM/Lord-0063.  I'm happy to

 4   scroll through all of this for you.  It's a little

 5   bit more complicated in the Zoom era to help

 6   identify documents.  But are you able to identify

 7   that as a copy of your CV?

 8        A.    Well, the first page is identifiable.  I

 9   don't know the date of this document.

10        Q.    Looking here at Employment Record, the

11   last position that is listed is the position with

12   Navigenics.

13        A.    Correct.

14        Q.    So, in terms of the time this document was

15   created, would it be fair to assume that it was

16   sometime after you left Navigenics but before you

17   started at the University of Miami?

18        A.    I would assume so, yes.

19        Q.    Just to help orient you on the document --

20   I realize I have been going quickly.  Feel free to

21   stop me.  I'm not going to ask you any questions

22   about the rest of this material.

23        A.    Okay.  What am I supposed to do at this

24   point?

25        Q.    Well, no.  I am just scrolling through it
```

Jonathan Lord
February 24, 2022

Page 22

1   now.  Now we are at the last page, Page 39.  It has

2   your activities up until 2010.  So, again, with sort

3   of that bit of information, can you confirm for me

4   or at least estimate for me the date of this CV of

5   yours?

6          A.    Well, it appears that it ends in 2010.

7          Q.    Now, how did you come to learn about a

8   position at the University of Miami?

9          A.    Well, I had a longstanding relationship

10  with the university.  I have a couple of alumni.  My

11  son was a graduate.  My mom worked for the

12  university.

13          In 2005 the university was in the process

14  of looking for a new company to provide health

15  benefits management.  United Healthcare had been the

16  previous provider.  In 2006 we successfully replaced

17  United Healthcare.

18          During that period of time, there were

19  conversations with many people, including Lanny

20  Gardner and Joe Natoli and Tom LeBlanc.  Part of

21  Humana's commitment to the university was to

22  establish a joint research center.  The university

23  provided some facilities and some staff.  We

24  provided data.  Humana ultimately gave the

25  university about $6 million to support that center,

Jonathan Lord
February 24, 2022

Page 23

1    for which I was recognized in 2007 by Dean Colson,

2    who was the chair at the time, and Donna Shalala.  I

3    maintained contact with those folks throughout the

4    period.  I would periodically be in Miami during the

5    period from 2007 to 2010, weekends, longer periods

6    of time during the year.

7              In 2010, after my time at Navigenics, I

8    was engaged socially with a number of folks from the

9    university, board members, Tom LeBlanc.

10   Conversations started early on that Tom LeBlanc and

11   Joe Natoli were working on a business plan for the

12   University of Miami Tissue Bank, which was also

13   going to be moving into the new Life Sciences Park.

14   They asked if I could provide some critique to that

15   business plan, which I did -- you know, this was not

16   any work or something I was getting paid for -- to

17   provide some advice that led to could I help them

18   with the Tissue Bank, which led to a conversation

19   then with Pascal Goldschmidt about the potential of

20   becoming the Chief Innovation Officer.  That was

21   somewhere through the period of time from January,

22   2011 through possibly the late summer, August, 2011.

23        Q.   At that time were you looking for

24   employment?

25        A.   I was not looking for employment, but I'm

Jonathan Lord
February 24, 2022

Page 24

1  always looking for opportunities.  So, during that

2  period of time, if either a new board, a new

3  investment or a new job opening came up and somebody

4  shared that with me and it was something I felt I

5  could make a difference in, then I would apply for

6  that position.

7       Q.   How often do you update your CV?

8       A.   Well, the CV is a complicated document

9  because of the number of pages compared to a bio.

10  The CV has different forms.  So, the University of

11  Miami has a required format in its presentation of

12  CVs.  So, you will see some CVs in a format that I

13  had for many years, similar to the one that you just

14  showed me.  There are others probably in the

15  University of Miami format which were necessary for

16  the purposes of applying for a faculty role.  It's

17  much easier to update the bio because the bio is a

18  narrative paragraph as opposed to 40-plus pages.

19       Q.   So, over the years you have updated your

20  CV as your employment history had changed?

21       A.   Well, I update, I would say, as necessary.

22  When I say as necessary, either because it was

23  related to someone looking for information about me

24  for one of those opportunities, board or search, or

25  in some cases, like the University of Miami, it was

Jonathan Lord
February 24, 2022

 1   about conforming to their format.

 2       Q.   You mentioned a few moments ago that you

 3   ultimately were offered the position of Chief

 4   Innovation Officer at the university; is that

 5   correct?

 6       A.   Correct.

 7       Q.   You received in time an offer letter?

 8       A.   Yes.  I would guess sometime in early to

 9   mid-December, 2011.

10       Q.   Let me show you what we will mark as

11   Exhibit 2, which is a copy of a letter to you dated

12   July 1, 2011.

13           (The letter referred to was marked for

14           identification as Defendant's Composite Exhibit

15           No. 2.)

16   BY MR. YANNUZZI:

17       Q.   Do you see that?

18       A.   Yes.

19       Q.   It's a five-page document.  It starts at

20   Bates stamp 0003.

21           Take a look at the last page of the

22   document.  Is that your signature?

23       A.   Yes, it is.

24       Q.   You signed it on or about July 26, 2011?

25       A.   It looks like it.

Jonathan Lord
February 24, 2022

Page 26

1      Q.   Did you start the position shortly after

2   you signed this letter?

3      A.   You know, I don't recall.  Somehow I

4   remember starting in the middle of September in

5   conjunction with the opening of the Life Sciences

6   Park.  But I don't have a specific recollection of

7   the start date.

8      Q.   Now, when you started at the University of

9   Miami, were you aware that the university had

10   certain policies regarding whistleblower protection

11   in business and ethical standards?

12      A.   Well, you know, I think you can probably

13   tell from my bio or CV, I have been involved in

14   compliance for many years, going back to my time at

15   the American Hospital Association and even before

16   that in the Navy.  I was the Chief Compliance

17   Officer for Humana for seven years and oversaw a CIA

18   that Humana was tied into.  So, if I don't recall a

19   specific document, I believe that a contemporaneous

20   practice would have been to have such a policy.

21      Q.   I'm going to show you a couple, and let's

22   see if you recognize them.  Let me show you what we

23   will mark as Exhibit 3, which is a document called

24   Whistleblower Protection Statement.

25           (The document referred to was marked for

Jonathan Lord
February 24, 2022

```
 1          identification as Defendant's Composite Exhibit

 2          No. 3.)

 3      BY MR. YANNUZZI:

 4          Q.    Dr. Lord, have you seen this policy before

 5      called Whistleblower Protection Statement?

 6          A.    You know, I probably have, but I don't

 7      remember the specific document that is in front of

 8      me.

 9          Q.    Let me show you what we'll mark as Exhibit

10      4.

11          (The documents referred to were marked for

12          identification as Defendant's Composite Exhibit

13          No. 4.)

14      BY MR. YANNUZZI:

15          Q.    This is a document called Business Conduct

16      & Ethical Standards for Faculty and Staff.

17          A.    Okay.

18          Q.    Have you seen this document before?

19          A.    You know, again, it's very possible that I

20      did.  These documents were updated.  So, I have no

21      idea of the vintage of this document.

22          Q.    Are you aware that the University of Miami

23      had a compliance hotline?

24          A.    Yes, I was.

25          Q.    Are you aware of generally the University
```

Jonathan Lord
February 24, 2022

1    of Miami's policy to encourage employees to report

2    incidents of fraud?

3         A.    I remember that, once I became the Chief

4    Operating Officer, we regularly communicated about

5    the compliance program, people's obligations.  We

6    also provided insights about the poor functioning of

7    the compliance program and the fact that many of our

8    clinicians had not actually attended the programs

9    they were supposed to attend.

10        Q.    When you say the people's obligations to

11   report fraud, which people are you referring to?

12        A.    All of the employees.  It's everybody's

13   responsibility.

14        Q.    When you say report fraud, report fraud to

15   whom?

16        A.    Well, it really depends, but principally

17   to their supervisor.  If their supervisor is unable

18   to handle it, then there are other functions, such

19   as the 'Cane Watch, which is the call line.  There's

20   the Human Resources function.  And if you are a

21   faculty member, there's a Faculty Affairs function.

22        Q.    Now, a few months after you worked as the

23   Chief Innovation Officer, you were offered the

24   position as Chief Operating Officer; is that

25   correct?

Jonathan Lord
February 24, 2022

1      A.   Well, on or about the 30th of January,

2    2012, Joe Natoli invited me to lunch with Stuart

3    Miller -- dinner with Stuart Miller.  That was

4    followed by a call from Goldschmidt and then

5    following that a call from the president, and I

6    believe by the 20th of February I had an offer

7    letter for the position of Chief Operating Officer

8    to start March the 1st, 2012.

9      **Q.   For the record, who is Joe Natoli?**

10     A.   Joe Natoli at the time was the Chief

11   Financial Officer for the University of Miami.

12     **Q.   You mentioned an offer letter.  Let me**

13   **show you what we'll mark as Exhibit 5.**

14          (The letter referred to was marked for

15          identification as Defendant's Exhibit No. 5.)

16   BY MR. YANNUZZI:

17     **Q.   Dr. Lord, what we have marked as Exhibit 5**

18   **to your deposition is a letter to you dated March 1,**

19   **2012.  Have you seen this letter before?**

20     A.   I believe so.

21     **Q.   Is that your signature on the second page?**

22     A.   Yes, it is.

23     **Q.   You signed it on or about March 5th, 2012?**

24     A.   Correct.

25     **Q.   In addition to being offered the position**

Jonathan Lord
February 24, 2022

```
 1   of Chief Operating Officer, you were also advised

 2   that you would hold the title of University Vice

 3   President for Medical Administration; is that

 4   correct?

 5        A.   Correct.

 6        Q.   You understood that all positions of this

 7   type that you were receiving serve at the pleasure

 8   of the Senior Vice President for Medical Affairs and

 9   dean and CEO at his sole discretion and in

10   compliance with other applicable university

11   policies?

12        A.   Can you show me that paragraph?

13        Q.   Absolutely.  It's the paragraph right

14   here.

15        A.   I see that, yes.

16        Q.   That was your understanding?

17        A.   Yes.

18        Q.   You were going to receive a salary of

19   $763,776 per year?

20        A.   That was the offer, correct.

21        Q.   And that was the offer you accepted?

22        A.   Correct.

23        Q.   Shortly after you started as COO -- well,

24   let me back up.

25             One of your job responsibilities as COO
```

Jonathan Lord
February 24, 2022

1    and as the University Vice President for Medical

2    Administration was ensuring the university's

3    compliance with various Medicare and Medicaid

4    bulletins; is that correct?

5        A.   Well, let me start out and be sure we are

6    clarified on something.  One, my role as Vice

7    President for Medical Affairs didn't start until

8    June 1st.  That was different than the Chief

9    Operating Officer role.

10            My predecessor, Bill Donelan, had been

11   working with outside consulting firms to come and

12   take a look at and review the compliance programs at

13   UM prior to my arrival.  Because of the cost of

14   those reviews, UM deferred those reviews.

15            When I became the Chief Operating Officer

16   on March the 1st, one of the areas I was concerned

17   about was the quality of the control environment at

18   UM.  I had had the opportunity as the Chief

19   Innovation Officer to attend the dean's leadership

20   meetings and listen to the issues around the

21   financial management and financial performance of

22   the university.  It was my experience in the past

23   that organizations that are poorly performing

24   financially generally have poor control

25   environments.

Jonathan Lord
February 24, 2022

Page 32

1           Within the first few days of my starting

2   that role, I hired Joe DiGenova and Victoria

3   Toensing and their son, Brady Toensing, to come

4   onboard and do a review of the compliance program.

5   That review was conducted around the 12th of March

6   of 2012.

7           The report showed a poorly performing

8   compliance program.  It showed no compliance plans

9   since 1996 and no oversight of the compliance

10  program prior to that time in the form of an

11  effective way.

12      Q.   **Did you ultimately hire Jennifer**

13  **McCafferty to take a compliance role below you?**

14      A.   Jennifer McCafferty had been in

15  conversations with Bill Donelan, my predecessor,

16  about taking that role.  I had a very congenial

17  relationship with Bill and thought he had a lot of

18  good insight about people, and I agreed that we

19  should proceed with hiring Jennifer.

20      Q.   **Do you recall how shortly after you**

21  **started as COO that Dr. McCafferty came on to lead**

22  **Medical Compliance?**

23      A.   You know, I think it was probably within

24  two weeks at the most.  Jennifer was part and parcel

25  of the review activity with DiGenova and Toensing.

Jonathan Lord
February 24, 2022

Page 33

 1      Q.    And she reported directly to you?

 2      A.    She did.

 3      Q.    And you reported directly to Pascal

 4   Goldschmidt at the medical school?

 5      A.    Yes.

 6      Q.    And he reported to the university

 7   president, Donna Shalala?

 8      A.    And probably the provost as well.

 9      Q.    And the provost at that time was Tom

10   Leblanc?

11      A.    Correct.

12      Q.    Shortly after starting in your role as

13   COO, one of the issues that you were tackling was

14   issues regarding budgets and deficits at the

15   university; is that correct?

16      A.    When I started on March the 1st, there

17   were three looming issues for the university.  The

18   most immediate was loss of money, financial

19   performance.  The second was negotiating the AOA

20   with Jackson Memorial.  The third was negotiating a

21   Collective Bargaining Agreement with the SEIU.  All

22   three of those activities had sort of a coterminous

23   date of the end of May, which was the end of UM's

24   fiscal year, as well as the time for the contract

25   renewal with Jackson as well as the contract renewal

Jonathan Lord
February 24, 2022

1    with the SEIU for the University of Miami Hospital.

2         Q.   **As part of that process, was one of the**

3    **activities you undertook an analysis of potential**

4    **layoffs of various staff at the university?**

5         A.   So, it's important to start out by saying

6    that Shalala, Goldschmidt and several board members,

7    Abess and Miller in particular, were all very

8    focused on what we needed to do.  Yes, one of the

9    first steps was to hire a consulting firm to do an

10   analysis of UM's position in comparison to other

11   academic institutions to identify opportunities

12   where we could become more efficient through

13   layoffs.

14            It's also important to note that the

15   university policies preclude layoffs of faculty.

16   The only people who would really be subject to a

17   layoff would be an employee or a temporary employee.

18   One of the ground rules that the leadership group

19   agreed to was that people who were involved with

20   patients would not be subject to the layoffs.  So,

21   the process for PwC was pretty much narrowed down to

22   employees not in direct patient care.

23        Q.   **When you say PwC, what do you mean by**

24   **that?**

25        A.   PwC is the name of an accounting firm,

Jonathan Lord
February 24, 2022

Page 35

1    consulting firm that did the analysis for the

2    university.

**3        Q.   Do you recall how many people ultimately**

**4    were laid off by the university?**

5        A.   Well, things happened in a couple of

6    tranches.  I don't know if I can give you the

7    specific numbers.  The first tranche that was laid

8    off were people who were in temporary roles.

9    Because of the undisciplined behaviors within the

10   university, beginning in about 2010, there had been

11   on again, off again hiring freezes for employees.

12   People worked their way around that by having

13   temporaries on board.  Some of the temporaries that

14   were laid off, and I believe it was the end of

15   April, were there for almost two years.  The second

16   tranche of layoffs occurred in the end of May, the

17   last two weeks of May.  The net effect of that was a

18   reduction in the annualized payroll of about $50

19   million for the university.

**20       Q.   Putting aside the amount of money that was**

**21   at issue, do you recall the number of folks who were**

**22   laid off?**

23       A.   It was somewhere in excess of a thousand.

24   I don't know the specific number.

**25       Q.   Do you recall having a conversation with**

Jonathan Lord
February 24, 2022

1    **the university president, Donna Shalala, concerned**

2    **about morale at the time these layoffs were going**

3    **into effect?**

4         A.   Well, we had regular conversations.  In

5    fact, we had weekly meetings with usually Leonard

6    Abess, Stuart Miller, Joe Natoli, Tom LeBlanc,

7    Shalala and Goldschmidt as well as several other

8    staff; and throughout that process we were both

9    concerned about financials and the way we were going

10   to be managing people during the layoff.  It's

11   probably important to say that we didn't have a

12   single complaint or EEOC issue when we were finished

13   with that process of doing the layoffs.

14         The issue around morale, morale was sort

15   of a bobbing cork at UM for many years because of

16   changes that were going on with the University of

17   Miami Hospital, changes that were going on with

18   Jackson, changes that were happening because of

19   national practice.  So, issues around morale would

20   come and go relative to layoffs.

21         The organization was subject to a number

22   of articles in the Miami Herald.  Both of those had

23   a negative slant to them, and that and many other

24   things contributed to the morale of the place.

25         Q.   **The weekly meetings that you were just**

Jonathan Lord
February 24, 2022

Page 37

1   describing with President Shalala, Pascal

2   Goldschmidt, Tom LeBlanc and some of the board

3   members, were issues other than the layoffs

4   discussed at those meetings?

5       A.   Well, we discussed a number of things,

6   including budget planning for 2013, the manner in

7   which we do layoffs.  There were other management

8   issues that related to the termination of two senior

9   team members on Goldschmidt's team as a part of the

10   layoffs.  So, there were a number of actions that

11   were discussed, updates on the AOA and the

12   relationship with JMH, updates on the Collective

13   Bargaining Agreement.

14       Q.   When you say the AOA, do you mean the

15   Annual Operating Agreement between Jackson Memorial

16   and the university?

17       A.   Yes, I do.

18       Q.   All right.

19           Were compliance issues ever discussed at

20   those weekly meetings?

21       A.   The compliance issues were addressed at

22   the UM board level.  I think around April 16th,

23   2012, I and Jennifer McCafferty did a full

24   presentation for the UM Board of Trustees Audit

25   Committee which summarized the findings of the

Jonathan Lord
February 24, 2022

Page 38

1  DiGenova and Toensing visit and identified an action

2  plan for going forward.

3      **Q.  And at that board meeting the Board of**

4  **Trustees members were present as well as Pascal**

5  **Goldschmidt?**

6      A.   I didn't hear the first part of that

7  question.

8      **Q.   At that board meeting the Board of**

9  **Trustees members were present, and my question was,**

10 **was Pascal Goldschmidt present?**

11     A.   It included the Audit Committee of the

12 board and, yes, he was, and I believe that Shalala

13 was as well.

14     **Q.   How often were those meetings held?**

15     A.   The Audit Committee, I believe, met on a

16 quarterly basis.  I think early on the information

17 was big news to the people who were on that

18 committee.  During the subsequent several months,

19 Dr. McCafferty and I petitioned both the secretary

20 of the board as well as Joe Natoli to be sure that

21 our agenda items were getting onto that committee's

22 meetings.  Sometimes they did not.

23     **Q.   Would you still participate in the meeting**

24 **even if such agenda items were not present?**

25     A.   It depended.  At the very least Pascal

Jonathan Lord
February 24, 2022

Page 39

 1   Goldschmidt was always there.

 **2**       Q.    **What about President Shalala?**

 3       A.    I would assume she was there as well.

 4             There were other issues going on that

 5   related to that Audit Committee.  Obviously some of

 6   them were financially related, like the rating

 7   activities.  Some of them related to the Athletic

 8   Department.

 **9**       Q.    **I'm going to show you what we'll mark as**

 **10**  **Exhibit Number 6 to your deposition, which is a**

 **11**  **series of e-mails between you and Joe Natoli.  They**

 **12**  **are Bates stamped 1128 and produced by you in this**

 **13**  **case.**

 14             (The documents referred to were marked for

 15             identification as Defendant's Composite Exhibit

 16             No. 6.)

 17   BY MR. YANNUZZI:

 **18**      Q.    **Dr. Lord, have you seen these e-mails**

 **19**  **before?**

 20       A.    I need to read it.

 **21**      Q.    **Can you see them okay?  Let me know if I**

 **22**  **need to blow them up.**

 23       A.    I can see it just fine.

 24             I can see it just fine.  Thank you.  Yes.

 **25**      Q.    **Did you send or receive these e-mails on**

Jonathan Lord
February 24, 2022

Page 40

```
 1   the dates indicated?
 2        A.   It appears that I did.
 3        Q.   Starting from the bottom, you wrote to Joe
 4   Natoli, and the subject line says, "Met briefly with
 5   DES."  Do you see that?
 6        A.   Yes, I do.
 7        Q.   That is a reference to Donna Shalala?
 8        A.   Yes.
 9        Q.   You write, "She seemed a bit nervous about
10   morale - don't know who may be whispering but let's
11   try to keep her fortified."  Do you see that?
12        A.   I do.
13        Q.   Do you know what you were referring to
14   here?
15        A.   Well, obviously it was a meeting that I
16   had with Donna Shalala.  She must have made a
17   comment about morale, and my response was that I
18   don't know who might be whispering in her ear.  I
19   think the "in her ear" is missing.
20             The University of Miami was a place where
21   everybody felt that they had, A, sort of a pocket
22   veto to almost anything and, B, could complain about
23   anything to anyone and routinely did.  So, I'm
24   thinking that that's what I would relate those
25   comments to.
```

Jonathan Lord
February 24, 2022

1     **Q.   Was the reference to morale related to the**
2  **layoffs that were being discussed and put into**
3  **effect around this time?**

4     A.   Well, it was clear.  Let me go back and
5  say that morale was a problem at the University of
6  Miami prior to me becoming COO and probably prior to
7  me becoming Chief Innovation Officer.

8          Part of what happened here is there were
9  times that the travel of individuals was cut off.
10  There were times in that period where people weren't
11  allowed to hire people or replace people.  There was
12  tension between Jackson and UM.  So, there were a
13  lot of things that were happening for which now a
14  reduction in force would be yet another thing that
15  would affect how people feel about their work.

16     **Q.   Well, Joe Natoli's response to you was,**
17  **"Did u talk about management rif?"  Do you see that?**

18     A.   I do.

19     **Q.   Rif stands for Reduction In Force, I'm**
20  **assuming.**

21     A.   Yes, it does.

22     **Q.   So, in context, the conversations that you**
23  **had with President Shalala on or about April 18,**
24  **2012, was that specifically about Reduction In Force**
25  **issues?**

Jonathan Lord
February 24, 2022

Page 42

1      A.   You know, I don't know.  I think my
2   interpretation of Joe's response to me was a much
3   more specific question, did I talk to her about the
4   two potential reductions of vice president level
5   positions that we were contemplating.
6      Q.   Did those discussions ever result in those
7   two folks being laid off?
8      A.   It did.
9      Q.   Who were those two people?
10     A.   It was Ted Shaw and Michelle Chulick.
11     Q.   Could you spell Michelle's last name?
12     A.   C-H-U-L-I-C-K.
13     Q.   Thank you.
14          Then in your response to Mr. Natoli you
15   wrote, "No - just hallway."  Do you see that?
16     A.   I do.
17     Q.   What did you mean by that?
18     A.   Well, what I think I meant is the fact
19   that I did not have a conversation because I was in
20   the hallway with her about those two specific
21   individuals.  The "No" means that I did not raise
22   that question or those issues with her.
23     Q.   So, "hallway" wasn't a reference to like a
24   class of people.  You just meant you had a
25   conversation in the hallway.

Jonathan Lord
February 24, 2022

Page 43

    1       A.   Correct, quite concrete and literal.

    2       Q.   Dr. Lord, one of the people that you

    3   worked with at the university was Dr. Sheri Keitz;

    4   is that correct?

    5       A.   Yes, it is.

    6       Q.   Do you recall what her position was at

    7   that time?

    8       A.   She had two roles.  One was the Senior

    9   Associate Dean for Faculty Affairs and the other was

   10   Vice President for Human Resources.

   11       Q.   She was involved with the discussions

   12   regarding layoffs?

   13       A.   Yes, she was because she had the lead

   14   responsibility in working through the actual

   15   selection of people within the individual department

   16   chairs.

   17       Q.   How, in terms of the organizational

   18   hierarchy at the university, were you Dr. Keitz's

   19   supervisor?  Did she report to you in any way?

   20       A.   She reported to me and she reported to the

   21   dean.  Really it depended on -- and she reported, I

   22   believe, to the provost or the vice provost.  It

   23   depends on which role we are talking about.

   24       Q.   In what role was she reporting to you?

   25       A.   Human Resources.

Jonathan Lord
February 24, 2022

Page 44

1        Q.    So, you had discussions with Dr. Keitz

2    about the layoffs that were being contemplated at

3    this time?

4        A.    Yes, and she was part of those group

5    meetings with Shalala, Goldschmidt, et al.

6        Q.    Let me show you what we'll mark as Exhibit

7    7., which is an e-mail chain that you produced to us

8    Bates stamped 1125.

9            (The documents referred to were marked for

10           identification as Defendant's Composite Exhibit

11           No. 7.)

12    BY MR. YANNUZZI:

13       Q.    Dr. Lord, there are two e-mails here, one

14    that you were not part of originally and then one

15    that got forwarded to you by Dr. Keitz.

16       A.    Okay.

17       Q.    Do you see that?

18       A.    I can see it.  I may need a few minutes to

19    read it.

20       Q.    That's fine.  Take your time and let me

21    know if you need me to scroll or when you are ready.

22       A.    Keep on scrolling a little bit.

23            Okay.

24       Q.    Dr. Lord, these e-mails that -- well, this

25    is an e-mail that was sent to you on or about

Jonathan Lord
February 24, 2022

Page 45

1    April 24th, 2012?

2        A.    Just the top part saying, "FYI...I am not

3    responding to this without your guidance."

4        Q.    But based on this part right here, this

5    forwarding --

6        A.    Yes.

7        Q.    -- Dr. Keitz forwarded this prior e-mail

8    between Nerissa Morris and Dr. Keitz to you?

9        A.    Yes, she did.

10       Q.    And she writes to you, Dr. Keitz, "I am

11   not responding to this without your guidance.

12   Please advise."  Do you see that?

13       A.    Yes, I do.

14       Q.    What guidance, if any, did you give Dr.

15   Keitz?

16       A.    I probably told her to work with Nerissa

17   and we could use as much help as possible.  That's

18   my recollection anyway.

19       Q.    Do you recall any follow-up conversations

20   about this particular item that is being discussed

21   between Ms. Morris and Dr. Keitz?

22       A.    I don't at this time, no.

23       Q.    At this point in time, had decisions

24   already been made about the identities of the people

25   who were going to be laid off?

Jonathan Lord
February 24, 2022

```
 1      A.   At this point in time, I believe we were

 2  finalizing a list of temporary employees because

 3  temporary employees had no sort of formal

 4  relationship with the university's HR function.  I

 5  don't believe we had the final list for the other

 6  layoffs until about the middle of May.

 7      Q.   Do you recall having discussions with Joe

 8  Natoli and perhaps others about how you would

 9  communicate the layoff messages to the employees who

10  were going to be affected?

11      A.   I'm sure those communications came up

12  between all of us because communications are

13  obviously critical when you are making changes of

14  this magnitude.

15      Q.   Let me show you what we'll mark as Exhibit

16  8, which is an e-mail to you.

17           (The document referred to was marked for

18           identification as Defendant's Exhibit No. 8.)

19  BY MR. YANNUZZI:

20      Q.   Well, actually let me back up.

21           Dr. Lord, do you recognize this e-mail?

22      A.   Not off the top of my head.

23      Q.   Let me show you down here at the bottom.

24  This is an e-mail that you produced to us Bates

25  stamped 1127.  Do you see that?
```

Jonathan Lord
February 24, 2022

Page 47

 1     A.    I do.

 2     Q.    This was an e-mail in your possession.

 3     A.    Okay.

 4     Q.    Do you recall whether you received this in

 5  the ordinary course in May of 2012?

 6     A.    I just said to you I have literally

 7  thousands and thousands of e-mails.  I can see what

 8  Natoli wrote.  I don't see any e-mail communication

 9  that it was to me or who else it was to.  But, you

10  know, I think it's very possible that this came to

11  me from Joe.

12     Q.    Assuming that it was sent to you on

13  May 4th, 2012, it reads, "DES asked me to remind

14  everyone (I'm sure this isn't needed) to be prepared

15  to explain individual circumstances and options

16  availability of retirement benefits," and a variety

17  of other points regarding layoffs; is that correct?

18     A.    Correct.

19     Q.    And DES again refers to President Shalala?

20     A.    Correct.

21     Q.    Was that an invention that people at the

22  university that you dealt with used DES to refer to

23  President Shalala?

24     A.    There were many different things, from the

25  president to Donna to DES.

Jonathan Lord
February 24, 2022

Page 48

1      Q.   If you didn't receive this e-mail in the
2   ordinary course, do you have any idea how you might
3   have come into possession of it?
4      A.   No.  I mean it's very possible I did.  It
5   seems like this was sent to the people who were
6   working on the layoffs.  I just would say, among the
7   thousands and thousands of e-mails, I don't remember
8   this one specifically.
9      Q.   A few minutes ago you mentioned that,
10   among the various people who participated in some of
11   these Audit Committee board meetings was the
12   secretary for the board.  Do you recall that?
13      A.   Yes, I do.
14      Q.   Who was the secretary at that time?
15      A.   You know, I can never remember her name.
16   I can see it.  It starts -- the last name starts
17   with an A, and I think it's hyphenated.  But I don't
18   remember the name.
19      Q.   Was Aileen Ugalde not the secretary at
20   that time?
21      A.   No.  It was someone else who worked in the
22   board office who was -- you know, I always referred
23   to as the secretary.  Maybe Aileen officially signed
24   off on minutes.  But this other person, and I think
25   the first name was Leslie something-something, was

Jonathan Lord
February 24, 2022

Page 49

1    the one who coordinated all of the agendas and

2    meeting notices.

3        Q.    Do you recall exchanging e-mails with

4    Aileen Ugalde regarding compliance?

5        A.    I'm sure many times.

6        Q.    Let me show you one of those e-mails.

7    This will be Exhibit 9.

8            (The documents referred to were marked for

9            identification as Defendant's Composite Exhibit

10           No. 9.)

11    BY MR. YANNUZZI:

12        Q.    Dr. Lord, what I marked as Exhibit 9 to

13    your deposition is a series of e-mails between you

14    and Aileen Ugalde.  It's a two-page document that

15    you produced in this case.

16        A.    Okay.  I just need you to go a little

17    slower.

18        Q.    I was going to scroll to the bottom and

19    then go to the top.

20        A.    That's fine.

21        Q.    Is that okay?

22        A.    Sure, whatever way you would like to do

23    it.

24        Q.    I will start here.

25        A.    Okay.

Jonathan Lord
February 24, 2022

Page 50

1     Q.   Are you done, Dr. Lord?

2     A.   I have these two -- I have this part, yes.

3          MR. SLOMAN:  Chris, can you give us the

4     Bates stamps?

5          MR. YANNUZZI:  Sure.  This is Lord 148 and

6     149.

7          MR. SLOMAN:  Thank you.

8          Is this Exhibit 9?

9          MR. YANNUZZI:  This is Exhibit 9.

10         MR. SLOMAN:  Thank you.

11         MR. YANNUZZI:  Yes.  After the deposition

12    is over, I will send an e-mail to everybody,

13    including the court reporter, with a Dropbox to

14    all the exhibits so everybody has a complete

15    set.

16         MR. SLOMAN:  All right.

17    A.   Okay.  I see this.

18    BY MR. YANNUZZI:

19    Q.   My first question to you is, Dr. Lord, do

20    you recognize these e-mails?

21    A.   I do.

22    Q.   They were sent and received by you on the

23    dates indicated?

24    A.   Yes.

25    Q.   Focusing on this e-mail in the middle of

Jonathan Lord
February 24, 2022

Page 51

1  the first page, you wrote on March 6th, "Many

2  thanks.  We had our first meeting with compliance

3  staff today.  The situation is serious and

4  significant."  Do you see that?

5      A.   Yes, I do.

6      Q.   Do you recall what in particular caused

7  you to feel that the situation was serious and

8  significant?

9      A.   I believe this was the first day that we

10 had the DiGenova and Toensing team on site.  I might

11 not have it calendared right, but I think that I

12 referred to the findings of the first day of that

13 on-site discussion.

14     Q.   Aileen responded, "Could not agree more.

15 You are unlikely to find folks more concerned about

16 compliance or more supportive of your efforts in

17 this area."  Do you see that?

18     A.   That's what that entry says, yes.

19     Q.   You mentioned that you had regular

20 communications with Aileen Ugalde about compliance

21 issues.  You understood that she was one of the

22 general counsel to the university at the time?

23     A.   I did.

24     Q.   I'm also scrolling to the second page

25 here.  It also notes that she was the secretary to

Jonathan Lord
February 24, 2022

Page 52

```
 1    the board.  That's why I was asking those questions
 2    before.
 3         A.    Yes.  I probably deemed that in just a
 4    slightly different way.  That was probably an
 5    official title for her for the purposes of minutes
 6    as opposed to the person who actually did the
 7    scheduling and agenda development for those
 8    different functions.
 9         Q.    Going back to the first page, these
10    e-mails were sent early on in your role as COO on
11    March 6th, 2012.  Do you see that?
12         A.    I do.
13         Q.    If we go to the very first e-mail in the
14    chain, it's an e-mail of you forwarding this e-mail
15    from your University of Miami e-mail to your Gmail
16    account in May of 2013.  Do you see that?
17         A.    I do.
18         Q.    Can you explain the circumstances
19    regarding why you were forwarding this to yourself
20    about 14 months after it was originally sent?
21         A.    Well, I was trying to make sure I would
22    have access to a variety of e-mails after my period
23    of appointment as a faculty member ended and I
24    returned my computer to the university.
25         Q.    Did you forward yourself many e-mails?
```

Jonathan Lord
February 24, 2022

Page 53

```
 1        A.    I don't know what the definition of "many"
 2   is, but I definitely forwarded e-mails to myself.
 3        Q.    Do you recall how many you forwarded to
 4   yourself?
 5        A.    I have no earthly idea.
 6        Q.    Was it five or closer to 500?
 7        A.    You know, it was not five, and I have no
 8   idea what the top number was.
 9        Q.    Did you forward every e-mail that you had
10   from you into your Gmail address?
11        A.    Not every e-mail because that would have
12   been a monster size file.
13        Q.    So, you sort of picked and chose the
14   e-mails you thought were worth saving?
15        A.    Correct.
16        Q.    Did you make a decision yourself as to
17   what e-mails you would be forwarding to yourself?
18        A.    I did.
19        Q.    Did you ever share your University of
20   Miami e-mail password to anybody so that he or she
21   could access your University of Miami e-mail
22   account?
23        A.    I did not.
24        Q.    During your employment at UM, did you ever
25   forward University of Miami e-mails to your Gmail
```

Jonathan Lord
February 24, 2022

Page 54

1   account?

2        A.   You know, again, I don't recall.  You

3   know, I think in certain devices you have e-mails

4   that can be mixed for multiple sources.  So, again,

5   I just don't recall having done that.  It's very

6   possible, but I don't have a specific recollection

7   of it.

8        **Q.   Now, in the July of 2012 time frame, did**

9   **you have a good working relationship with Joe**

10  **Natoli?**

11       A.   My working relationship with Joe changed

12  sort of during the summer of 2012.

13       **Q.   Why at least from your perspective did the**

14  **relationship change?**

15       A.   Well, Joe was a very important conduit for

16  relationships between the board and the management

17  team of the university, both in the main campus as

18  well as the medical school.  But he was also in many

19  cases hyperreactive to any request or conversation

20  that came from a board member to the point where his

21  behavior really sometimes got in the way of everyday

22  work.

23            In addition to that, I had, you know,

24  sometime in late June a rare visit from my youngest

25  son for a weekend, and it was about 6:00 at night on

Jonathan Lord
February 24, 2022

Page 55

1   a Friday.  Joe -- I was courteous enough.  I could

2   have just not answered the phone.  But I was

3   courteous to answer the phone.  And, you know, what

4   I got from Joe was a tirade of stuff that almost

5   made it sound like I reported to him.

6           I shared my concerns with both Goldschmidt

7   and Shalala about the behavior.  So, I think ever

8   since that conversation with Joe and the subsequent

9   conversations with Goldschmidt and Shalala, it would

10  be fair to say that we did not have the same

11  friendly relationship -- when I say friendly, I mean

12  getting together with wives and other stuff -- after

13  that.

14      **Q.   With Mr. Natoli being the CFO, was he at**

15  **an equivalent level on the corporate hierarchy as**

16  **you as COO?**

17      A.   Well, it's different.  I mean my direct

18  reporting relationship was to Goldschmidt.

19  Goldschmidt would have a rank that would probably be

20  equal to Natoli's role.  My role was principally

21  inside of the medical school.  As we talked about

22  before, not until June 1st, 2012, did I actually

23  have a university title in addition to a medical

24  school title.

25      **Q.   All right.  Let me show you what we will**

Jonathan Lord
February 24, 2022

Page 56

1    mark as Exhibit 10 to your deposition.

2              (The document referred to was marked for

3         identification as Defendant's Exhibit No. 10.)

4    BY MR. YANNUZZI:

5         Q.   Dr. Lord, do you recognize what we have

6    marked as Exhibit 10?

7         A.   Yes, I do.

8         Q.   Are these e-mails that were sent and

9    received by you on or about July 19th?

10        A.   Yes, they are.

11        Q.   Now, there's a reference in your e-mail to

12   Dean Goldschmidt that there was a list of items you

13   were thinking of covering.  Do you see that?

14        A.   I do.

15        Q.   There's a reference to an attachment here.

16        A.   I see that, yes.

17        Q.   Do you still have a copy of this e-mail

18   and that attachment?

19        A.   I do not.  I mean I think -- I don't know

20   that I have a copy of that.

21        Q.   Do you recall the items that were on that

22   list?

23        A.   Not specifically.  I had many meetings

24   with Shalala, and I had put together many lists for

25   Pascal.

Jonathan Lord
February 24, 2022

1      Q.    Based on the time frame of July of 2012,

2   do you have any recollection as to whether you were

3   discussing layoff items, compliance items or both?

4      A.    At that point in time we were probably

5   talking about Jackson more than almost anything

6   else.

7      Q.    When you say talking about Jackson, what

8   specifically with Jackson?

9      A.    The relationship between the Annual

10  Operating Agreement, which had been extended but not

11  finalized.

12     Q.    In response to your e-mail, Dean

13  Goldschmidt responds, "She had mentioned the fact

14  that she wants to help with your relationship with

15  Joe, but did not want to talk to me about it.  Let

16  me know."  Do you see that?

17     A.    I do.

18     Q.    Do you have any understanding of who he's

19  referring to with the pronoun "she"?

20     A.    Shalala.

21     Q.    Do you know what, if anything, President

22  Shalala did to help with your relationship with Joe

23  Natoli?

24     A.    No.  I just recall general conversations

25  about how important it is to have a good working

Jonathan Lord
February 24, 2022

Page 58

1  relationship with Joe because he has so much good

2  networking with the trustees.

3       Q.  Do you know when Mr. Natoli started at the

4  University of Miami?

5       A.  I have no idea.  I know he came from the

6  Miami Herald, and then he left a couple of years

7  like in 2015.

8       Q.  But he was there prior to your arrival; is

9  that correct?

10      A.  He was.  Again, I worked with Joe

11  starting, I think, back in 2006 when he was first

12  coming on when we were dealing with the health

13  insurance and health benefits for the university's

14  employees.

15      Q.  Then did you have any contact with him

16  between that period of time and the time you joined

17  the university as the Chief Innovation Officer?

18      A.  Definitely between that time.  As I said

19  earlier, those conversations around the UM Tissue

20  Bank took place between Natoli and Leblanc.  There's

21  a very good chance that at social settings from 2007

22  to 2010 I ran into Joe as well.

23      Q.  Now, in July of 2012 there were

24  discussions at the university about bringing on a

25  Dr. Ciancio.  Do you recall that?

Jonathan Lord
February 24, 2022

Page 59

1    A.   Well, I recall the conversations -- many

2    conversations about the Miami Transplant Institute

3    and leadership.  I believe Dr. Ciancio was already a

4    faculty member and part of the urology surgery

5    transplant team at the university.

6    **Q.   But discussions in July of 2012 would have**

7    **related to him being appointed as a director of the**

8    **Miami Transplant Institute?**

9    A.   The Medical Director for the Transplant

10   Institute, correct.

11   **Q.   Let me show you what we'll mark as Exhibit**

12   **11.**

13        (The documents referred to were marked for

14        identification as Defendant's Composite Exhibit

15        No. 11.)

16   BY MR. YANNUZZI:

17   **Q.   Dr. Lord, looking at what we marked as**

18   **Exhibit 11 to your deposition are a series of**

19   **e-mails between and among you, Dr. Keitz and Dean**

20   **Goldschmidt.**

21   A.   That's correct.

22   **Q.   It's a two-page document.  The Bates are**

23   **1146 and 1147.**

24        **Let me scroll to the bottom --**

25   A.   Correct.

Jonathan Lord
February 24, 2022

Page 60

```
 1        Q.   -- and give you a chance to take a look at

 2   these and see if you can identify them for me, okay?

 3        A.   Okay.

 4             Okay.

 5        Q.   Let me scroll down.

 6        A.   I see this.

 7        Q.   Take a look at the e-mail on the top.

 8        A.   Okay.

 9             I'm ready.

10        Q.   Dr. Lord, my first question to you is, do

11   you recognize these e-mails?

12        A.   I do.

13        Q.   Are they e-mails that you sent and

14   received on the dates indicated?

15        A.   I don't know whether I -- there's one in

16   this chain that I sent, which is the last one.  I

17   received them from other people, though.

18        Q.   Starting from here, this one was copied to

19   you?

20        A.   Copied, yes, it was.

21        Q.   And then it's unclear to whom Dr. Keitz

22   sent her e-mail, but you responded to her question;

23   is that correct.

24        A.   And included Goldschmidt as well in the

25   response.
```

Jonathan Lord
February 24, 2022

Page 61

```
 1        Q.   You mentioned Dean Goldschmidt, who was
 2   the sender of the original e-mail; is that correct?
 3        A.   Yes.
 4        Q.   Now, starting here at the first e-mail
 5   chronologically, Dr. or Dean Goldschmidt's e-mail
 6   that was copied to you notes that the director of
 7   the Miami Transplant Institute will have dual
 8   reporting lines to the dean and to the Chief
 9   Operating Officer; is that correct?
10        A.   I see that, yes, correct.
11        Q.   So, that would be reporting to Dean
12   Goldschmidt and to you?
13        A.   Correct.
14        Q.   The director of the Miami Transplant
15   Institute would have the director of the IML
16   reporting to him?
17        A.   I see that, yes.
18        Q.   Is that ultimately what happened in
19   practice?
20        A.   Well, there's a lot before and after this
21   note.  So, let me start with the before.
22             The Miami Transplant Institute was
23   essentially a virtual enterprise between the
24   University of Miami and Jackson Memorial.  It had
25   enjoyed a lot of success when Jackson Memorial had
```

Jonathan Lord
February 24, 2022

Page 62

1   the exclusive right to provide transplant services

2   in South Florida.  Beginning in the late 2000s,

3   multiple Certificates of Need came online for other

4   hospitals, and that meant that there was competition

5   for the first time in doing transplants.

6          During this period of time, there were

7   recruits that were being brought in by Goldschmidt

8   to help improve the quality of care at the

9   institution, and there are still people who remained

10  who were legacy faculty for UM who had a

11  longstanding working relationship with Jackson.

12  This took place in the Surgery Department, the

13  Urology Department, the Nephrology Department, the

14  Hepatology Department.  For many years there were

15  many different issues that were raised relative to

16  the quality of care at the institution.

17          Goldschmidt and Livingstone, who at least

18  for the last several years had been running the MTI

19  in addition to his role as chair of surgery, were at

20  loggerheads over many different issues but including

21  transplant.  Goldschmidt had a vision that was

22  supported by Shalala to get a Certificate of Need

23  for the University of Miami Hospital to start doing

24  transplants.  They applied several times for that

25  and withdrew the applications both times because of

Jonathan Lord
February 24, 2022

Page 63

1    anxiety and concern that came from Jackson Memorial.

2              So, by the time we were getting into the

3    summer of 2012, predating this memo, Dean

4    Goldschmidt had Michelle Chulick lead efforts to

5    build out a, quote, nephrology clinic at the

6    University of Miami Hospital, which would serve as a

7    pre-transplant clinic instead of sending those

8    patients to Jackson.  That created a set of tensions

9    between those legacy faculty members and the newly

10   recruited faculty members who were concerned both in

11   terms of quality of care as well as the quality of

12   the experience of patients going to Jackson's

13   facilities.

14             Ultimately that clinic was closed down,

15   never opened as a nephrology clinic because of

16   negotiations between Goldschmidt, Livingstone and

17   Migoya, and the Certificate of Need was pulled.  But

18   Goldschmidt was determined to replace Livingstone

19   with a different leader for transplant.  That was

20   the genesis of this memo.

21             The issues related to the IML and the need

22   for equal oversight and accreditation again were

23   longstanding.  Cote, who was the head of pathology,

24   and Livingstone, who was the head of surgery, had

25   been at loggerheads for many years about the

Jonathan Lord
February 24, 2022

Page 64

1    operation and the quality of the IML and the quality

2    of the leader at the IML.  The net result of that

3    again was a way for Goldschmidt to try to solve some

4    of those issues by inserting a new leader into the

5    Transplant Institute and be clear about what the

6    parameters were for the IML.

7              The transition post this document was very

8    messy.  When Ciancio actually took a role as the

9    leader, what his title was, whether it was UMTI or

10   Medical Director of UMTI, there were a lot of

11   iterations of what the structure was going to look

12   like.  And, you know, for all intents and purposes

13   behaviorally Livingstone really never gave up the

14   fact that he was behaving as the leader of MTI and

15   clearly was in a strong relationship with Migoya and

16   Steigman at Jackson.

17        Q.   Did you support the dean's vision that he

18   outlined in this e-mail that we looked at as Exhibit

19   11?

20        A.   Can you go back to it for me, please?

21        Q.   Sure.

22        A.   Can you repeat the question?

23        Q.   Sure.  Did you support the dean's vision

24   that he outlined in this e-mail that we marked as

25   Exhibit 11?

Jonathan Lord
February 24, 2022

Page 65

1      A.   Yes, and I guess one other thing.  Prior

2  to this, at this time and in the time after that,

3  given all the tumultuous activities round the MTI, I

4  had strongly advocated that we have an independent,

5  neutral, unbiased expert review of the transplant

6  activities at UM, as the only really fair way to get

7  above the fray of all these personalities who had

8  different feelings and perspectives about the MTI,

9  how it should be run and where the revenues went to.

10          I'm wondering if we are going to move off

11  of this.  When we get ready to move off of this

12  topic, can we have a break?  I'm just telegraphing

13  that to you.

14      **Q.   Yes, I hear you.  I have a couple more**

15  **questions, but I'm happy to break now.**

16      A.   No.  Go ahead and finish these couple.

17  You said you didn't want them in the middle of

18  things.  So, I'm just trying to accommodate you.

19      **Q.   No.  I know.  I appreciate that.  You are**

20  **the star.  So, we listen to you.**

21      A.   I doubt that, but that's very nice of you

22  to say.

23      **Q.   All right.**

24          **Doctor, you mentioned earlier, I believe,**

25  **that Dr. Ciancio was coming to the Department of**

Jonathan Lord
February 24, 2022

Page 66

1    Urology, correct?

2         A.    Yes.   I believe he was in the Department

3    of Urology.   He was a urologist for sure by

4    training.

5         Q.    Do you know, at the time he was being

6    considered for his director role, whether he was

7    aware of the tensions that existed between Surgery

8    and Pathology?

9         A.    Everybody was aware of the tensions that

10   existed.   I would say light and sound traveled

11   roughly at the same speed at the University of

12   Miami.

13        Q.    All right.   Why don't we go off the record

14   for a few minutes.

15        A.    Okay.   Can we take five minutes and maybe

16   come back at 10:00?

17        Q.    I'm sorry.   When you say 10:00 --

18        A.    I mean 10:00 is my time.

19        Q.    Sure.

20        A.    Great.   Thank you.

21             THE VIDEOGRAPHER:   We are going off the

22        record at 2:54.

23             (Recess 2:54 p.m. until 3:03 p.m.)

24             THE VIDEOGRAPHER:   We are back on the

25        record at 3:03 p.m.

Jonathan Lord
February 24, 2022

Page 67

1    BY MR. YANNUZZI:

2        Q.   Dr. Lord, before the break we were looking

3    at a series of e-mails between you and Pascal

4    Goldschmidt from July of 2012.  At that time how

5    would you characterize your relationship with Dean

6    Goldschmidt?

7        A.   Great.  We were joined at the hip.  I

8    never made a unilateral decision.  I think in

9    multiple, multiple communications, both in updates

10   as well as individual communications, we referred to

11   each other as partners all the way through the end

12   of 2012.

13       Q.   How would you characterize your

14   relationship with Alan Livingstone at that time?

15       A.   It was great.  I was a medical student

16   when Alan was just joining the faculty.  I had a lot

17   of respect for Alan's leadership and certainly

18   surgical skills.  It was very clear that he was

19   arguably the most influential person on the medical

20   campus.

21            In fact, later in the summer, towards the

22   end of the summer, the end of August, the beginning

23   of September, I actively encouraged Goldschmidt to

24   promote Livingstone to an executive role.

25   Goldschmidt hated the idea, but Shalala loved the

Jonathan Lord
February 24, 2022

Page 68

1    idea.  You know, I think I was able to persuade

2    Goldschmidt that having Livingstone inside of the

3    tent and trying to help us would be much better than

4    him being in a position of fighting or resisting

5    issues, particularly with Goldschmidt.

6         **Q.   Did Dean Goldschmidt ever express to you**

7    **why he was less than enthusiastic about Dr.**

8    **Livingstone than you were?**

9         A.   Many different times.  I think he saw a

10   struggle with Livingstone that extended back to

11   2005, 2006 when the university was considering

12   multiple strategic options; one, to integrate Mount

13   Sinai Medical Center into UM or to have a new

14   facility built on campus or to acquire the

15   University Miami Hospital at Cedars.  You know,

16   Livingstone managed to fight off any relationship

17   with Mount Sinai.  Livingstone had a very hostile

18   relationship with the Chief Executive Officer of

19   Mount Sinai.  Basically in Pascal Goldschmidt's mind

20   Livingstone stirred up the faculty for not wanting

21   to drive over the Julia Tuttle Causeway to see

22   patients at a second campus.

23            I think from then on the vision of the two

24   were very different.  Livingstone had a longstanding

25   allegiance to Jackson Memorial.  In the days when I

Jonathan Lord
February 24, 2022

Page 69

1   was a medical student in the days when he started,

2   the entire University of Miami health care system

3   was essentially integrated as one with Jackson.

4   When Shalala and Goldschmidt came, appropriately, I

5   believe, they recognized that the world had changed

6   and they needed to build a commercial enterprise for

7   UM's health care, and that clearly was an area of

8   disagreement between Goldschmidt and Livingstone.

9         **Q.   Do you recall exchanging a series of**

10   **e-mails with Dean Goldschmidt about trying to**

11   **improve the working relationship between the two of**

12   **them?**

13        A.   I do.  I tried many different ways.  You

14   know, my belief was to have transparent and

15   collaborative relationships across the university to

16   build a better university and to improve the quality

17   of our patient care, for which Livingstone was not

18   going away, and I believe he needed to be an

19   important part of that process.

20        **Q.   Let me show you what we'll mark as Exhibit**

21   **12.**

22        A.   Okay.

23             (The documents referred to were marked for

24             identification as Defendant's Composite Exhibit

25             No. 12.)

Jonathan Lord
February 24, 2022

Page 70

```
 1      BY MR. YANNUZZI:

 2          Q.   This is a series of e-mails that you

 3      produced to us Bates stamped 1152 and 1153.

 4          A.   Okay.

 5          Q.   Let me start at the first e-mail

 6      chronologically and work our way up.

 7          A.   Please take your time.  These are

 8      complicated.

 9               You can scroll down.

10               Okay.

11          Q.   I'll scroll up.

12          A.   Okay.  How can I answer questions?

13          Q.   My first question is, do you recognize the

14      e-mails that were sent and received by you on or

15      about August 13th, 2012?

16          A.   I do.

17          Q.   Going to the first e-mail chronologically

18      that starts at the bottom of the first page, you are

19      writing to Dean Goldschmidt about a meeting that you

20      had with Alan Livingstone that day?

21          A.   Probably.  I do things pretty

22      contemporaneous.

23          Q.   Other than what is listed here in your

24      e-mail, do you recall anything else about this

25      meeting?
```

Jonathan Lord
February 24, 2022

Page 71

1      A.   You know, Alan Livingstone is a complex

2  personality.  I think some of the conversations in

3  my notes with Pascal Goldschmidt, Paragraph 2 and

4  Paragraph 4, sort of summarize, you know, the -- I

5  don't know how I can describe it -- bivalent, sort

6  of multifaceted sort of persona that Livingstone

7  brought to any room.

8      Q.   I appreciate that.  My question was a

9  little bit different.  It was in terms of the

10  subject matter of that meeting.  Was there anything

11  covered that isn't outlined here?

12      A.   Generally I'm totally complete and don't

13  have any further recollection beyond that.

14      Q.   When you reference Alan here in the first

15  sentence of your e-mail, that is a reference to Dr.

16  Livingstone?

17      A.   That is correct.

18      Q.   Now, you mentioned here in Bullet Point 4

19  that Livingstone wants to do the right thing for the

20  university and recognizes that it won't happen with

21  the current leader.  Do you see that?

22      A.   I do.

23      Q.   Whom were you referring to with the

24  reference to the current leader?

25      A.   The current leader is David Lubarsky.

Jonathan Lord
February 24, 2022

Page 72

1  That's the DL a little bit further up in that same

2  e-mail.

3       Q.   Oh, DL here.

4       A.   Yes.

5       Q.   What was his role at the time?

6       A.   I believe he was the head of the medical

7  practice for UM, Executive Dean for Clinical

8  Affairs, some title like that.

9       Q.   If I scroll down into the second part of

10  your e-mail, you mentioned that you and Dean

11  Goldschmidt were going to work to expand your

12  partnership to include Dr. Livingstone as a partner

13  in working through and co-creating the future; is

14  that correct?

15       A.   That's correct.  That was the aspiration.

16       Q.   What steps were taken to realize that

17  aspiration?

18       A.   Regular meetings.  Early on when Dr.

19  Livingstone accepted this position, I took he and

20  his wife out to Il Gabbiano to celebrate on my

21  expense.  I had Dr. Livingstone at our home in early

22  September, along with all of the other leaders of

23  the team.  Dr. Livingstone was part of the daily

24  updates.  So, he had transparent access to

25  everything that was going on in the executive area,

Jonathan Lord
February 24, 2022

Page 73

 1   and Dean Goldschmidt included him and appointed him

 2   to some other things, too.

 3            There is something else I would like to

 4   see in that e-mail chain, if we can go back to it

 5   for a minute, though.

 6        Q.   Of course.

 7        A.   So, if you go to the top e-mail --

 8        Q.   Do you mean the top of the second page?

 9        A.   Yes.  Well, not going from the bottom but

10   on the first page.  I'm sorry about that.  I hate to

11   have you keep going up and down.

12            Scroll a little bit further, please.

13            Okay.  I just want to point out that it's

14   not clear in some or all of these messages but at

15   least two, these messages are going back and forth

16   to Goldschmidt's Gmail account from my Gmail

17   account.

18        Q.   Yes.  That was going to be one of my

19   questions to you.  So, you are clairvoyant.

20            Do you have any understanding as to why

21   these e-mails are being exchanged through your

22   Gmails rather than your University of Miami e-mail

23   accounts?

24        A.   Well, it's really -- you know, all of

25   leadership e-mail accounts were essentially emulated

Jonathan Lord
February 24, 2022

1  so that assistants and other handlers all had access
2  to e-mails.  So, I think you can understand when you
3  go down to the middle of that page where Goldschmidt
4  starts with, "We gave him the opportunity to build
5  the MTI and IML."  He basically said Livingstone has
6  done a crap job basically in that paragraph.  You
7  wouldn't want to see something like that necessarily
8  in non-confidential in boxes.
9       Q.   Shifting gears slightly, you understand
10  that in the course of this case the university
11  propounded discovery requests on you, including
12  requests for production, asking you to locate and
13  identify and produce certain documents to us?
14       A.   I know that was something that you did
15  with my attorney, and I believe all those documents
16  were provided, as far as I know.
17       Q.   Did you or someone on your behalf do a
18  search of your Gmail account for e-mails that you
19  sent to yourself from your University of Miami
20  e-mail account?
21       A.   You know, I don't recall ever doing
22  something like that.  I don't know if anybody else
23  did.
24       Q.   Did you ever give anybody else access to
25  your Gmail account?

Jonathan Lord
February 24, 2022

Page 75

1    A.   I have worked with my attorneys to be

2  supportive relative to anything that came through as

3  discovery requests.

4    **Q.   My question was a little bit different.**

5  **Did you, for example, give your user name and**

6  **password to anybody or no?**

7    A.   I recall giving access to my e-mail

8  account to Jeff, but I don't recall how I did it.

9    **Q.   You mentioned a couple of minutes ago that**

10  **you included Dr. Livingstone in your daily executive**

11  **updates.  Do you recall that?**

12    A.   I do.

13    **Q.   Who received those updates?**

14    A.   I can't give you the whole list.  You

15  might be able to see that from the captions.  But in

16  general it included Goldschmidt, all of his direct

17  reports and my direct reports.

18    **Q.   Was President Shalala ever copied on those**

19  **updates?**

20    A.   Sometimes she was, depending on the

21  topics, and I believe that from about October to

22  December of 2012 Natoli was routinely copied.

23    **Q.   What sort of topics would President**

24  **Shalala be copied on?**

25    A.   You know, they would be things that

Jonathan Lord
February 24, 2022

Page 76

1    related to an important area.  So, the combination

2    of the changes at the Hussman Institute for Human

3    Genetics, that was a very big dramatic change at the

4    university.  That would be something where she would

5    be involved.  Compliance-related issues that might

6    be related to the findings of TMG might be in that

7    category.  I think in general, if the topic was

8    important, and I believe, but I'm not sure -- I

9    think you would have to ask Goldschmidt this -- I

10   believe Goldschmidt sent all of his updates to

11   Shalala.

12        **Q.   And did you yourself decide which updates**

13   **would be sent to President Shalala?**

14        A.   It usually would be in concert with the

15   dean, with Goldschmidt.

16        **Q.   Now, earlier in your deposition you were**

17   **talking about an internal and then later an external**

18   **review of compliance activities at the hospital.  Do**

19   **you recall that?**

20        A.   Well, I want to be precise.  I had

21   DiGenova and Toensing come in and look at compliance

22   at UHealth as well as some of the research

23   compliance activities at the medical center.  That

24   was in March of 2012.

25        **Q.   Then at some point in the summer were**

Jonathan Lord
February 24, 2022

Page 77

```
1    discussions had to have a further compliance review
2    conducted?
3         A.    No.  There were conversations that began,
4    I think, in June about the need for an independent
5    external review of the MTI and activities related to
6    the MTI.  Those discussions continued.  Then in -- I
7    believe it was late August, 2012 -- a package
8    addressed to the OIG was inadvertently delivered to
9    McCafferty's office.  On opening that, it was a
10   fraud complaint against the IML.  We put the
11   materials back into the FedEx envelope it came in
12   and forwarded it on to general counsel to handle.
13   That activity stimulated and encouraged us to pick
14   up the pace of the external review of both the MTI
15   and the IML.
16        Q.    If I understand the timeline correctly,
17   prior to receipt of that OIG correspondence, there
18   were already discussions being had about adding an
19   external review conducted into IML issues?
20        A.    Into the MTI as well as the IML.  Those
21   were longstanding legacy issues.  My belief is we
22   had an obligation relative to making sure we were
23   delivering the right quality of care, and in that
24   case, if there were any other issues from a
25   regulatory or control environment perspective, we
```

Jonathan Lord
February 24, 2022

Page 78

 1   could tackle those through a review.

 2        **Q.   And who was having those discussions?**

 3        A.   Those discussions were led by Dean

 4   Goldschmidt with me, with Livingstone, with Ciancio,

 5   with Migoya, because there was just a -- again, as I

 6   said early on, context is everything in terms of UM.

 7   To understand the context of the strains and the

 8   tensions that went through multiple departments

 9   around the MTI, it was really important to

10   understand.  Everybody knew it.  This was not some

11   sort of stealth operation that was going on.  The

12   tensions and concerns were there for many years,

13   reported up chains of command for many years, and in

14   2012 it became one of those boiling points for the

15   staff, and ultimately Goldschmidt tried to resolve

16   it.

17        **Q.   You say these issues were raised up the**

18   **chains of command over the years.  Do you know**

19   **whether President Shalala was ever a part of any of**

20   **those conversations?**

21        A.   I can't imagine that she wasn't, just

22   because of the nature of how people like Goldschmidt

23   reported to Shalala, whether she was directly

24   involved or he reported to her.  Again, the faculty

25   all, you know, especially the faculty leadership,

Jonathan Lord
February 24, 2022

1  you know, basically tell Shalala things at social

2  events, football games, other stuff.  So, I can't

3  imagine she didn't, you know, have an idea about the

4  issues and the tensions there.

5      **Q.   Do you recall if you ever told President**

6  **Shalala about issues at the MTI or the IML?**

7      A.   Many times in terms of the external

8  review, the OIG letter that was misaddressed to the

9  university, the actual review process itself, the

10  collaborative engagement with Jackson about this.

11  And ultimately in the middle of December, and I

12  think it was December 14th, I had a one-on-one with

13  Shalala in which I went through the preliminary

14  findings of TMG Group as well as providing her

15  initial assessment that we had about a $10 million

16  potential exposure in terms of billing issues at the

17  IML.

18      **Q.   Before we get there, and we'll get there**

19  **later on in the deposition, but were you sharing**

20  **issues with President Shalala as early as the summer**

21  **of 2012?**

22      A.   You know, again, I don't think -- the

23  issues were the external review and the need for it.

24  The change in leadership, Shalala was clearly within

25  the know about that relative to anything that was

Jonathan Lord
February 24, 2022

Page 80

1    happening with Ciancio.  You know, again, the issues

2    around the IML and MTI are so longstanding, I can't

3    imagine that anyone didn't know about those issues.

4         **Q.   But in terms of what you told her, I**

5    **believe you testified earlier that you had discussed**

6    **with President Shalala about the need for an**

7    **external review, about engaging TMG, et cetera.**

8         A.   Yes.  Those are all different points in

9    time, yes, beginning probably in June and July of

10   2012 and extending all the way through the middle of

11   December.

12        **Q.   All right.**

13             **Let me show you what we'll mark as Exhibit**

14   **13, which is a two-page e-mail chain involving you.**

15        A.   Okay.

16             (The documents referred to were marked for

17             identification as Defendant's Composite Exhibit

18             No. 13.)

19   BY MR. YANNUZZI:

20        **Q.   This is Bates stamped 1156 and 1157.  I**

21   **will give you an opportunity to read sort of in**

22   **reverse chronological order.**

23        A.   Okay.

24        **Q.   I mean in chronological order.  I**

25   **apologize.**

Jonathan Lord
February 24, 2022

Page 81

```
 1      A.   No worries.
 2           Can you show me the signature line on this
 3  one?
 4           Okay.  So, I'm assuming, is that Phil Chen
 5  who wrote this?
 6      Q.   I believe, based on this e-mail heading
 7  here, that that's correct.
 8      A.   Okay.  Great.  Thank you.
 9      Q.   Sure.  Do you want me to scroll to the top
10  so you can see the rest of the chain?
11      A.   No.  I'll just read this one, and then we
12  can scroll up.
13           Okay.
14      Q.   Do you recognize the e-mails that we
15  marked as Exhibit 13?
16      A.   Yes.
17      Q.   Looking right now at the second e-mail in
18  this chain, the middle of the page, it's signed on
19  behalf of Dean Goldschmidt, yourself and Dr.
20  McCafferty; is that correct?
21      A.   Correct.
22      Q.   Do you recall giving Dean Goldschmidt
23  permission to add your name as part of the
24  signature?
25      A.   Well, I probably -- no, I don't.  I
```

Jonathan Lord
February 24, 2022

Page 82

1    probably never would feel like I had to give him

2    permission.  Again, if you look though all of our

3    correspondence, we refer to each other as partners

4    and trusted each other implicitly.

5        Q.    There's a reference in both Dean

6    Goldschmidt's e-mail that you signed off on and Dr.

7    Cote's e-mail to leaderships, especially UM

8    leadership and UHealth leadership.  Do you see that?

9        A.    I do.

10        Q.    Do you have any understanding as to whom

11    you and/or Dr. Cote considered part of the UM or

12    UHealth leadership?

13        A.    You are moving around a little bit.  So,

14    let me go back up and try to read that paragraph

15    again.

16        Q.    Sure.

17        A.    Well, it's a very long jumbled sentence,

18    but going to the end of it, I think what Cote was

19    referring to is that he had a role at Jackson as the

20    head of pathology, and he had a role at UM as the

21    head of pathology and that the issues around the MTI

22    and IML crossed over those boundaries multiple

23    different times and ways.  In order to have any, you

24    know, sort of resolution of this issue about who was

25    going to get the biopsies, it would require both

Jonathan Lord
February 24, 2022

Page 83

1   Pascal Goldschmidt, myself, as well as probably

2   Livingstone and Ciancio, to be involved in decisions

3   on the UM side.

4        **Q.   There's a reference here to the upcoming**

5   **review of the MTI and IML by the TMG Group.  Do you**

6   **see that?**

7        A.   I do.

8        **Q.   Do you know whether at this time, August**

9   **15th of 2012, that the TMG Group had, in fact, been**

10  **engaged to conduct this review?**

11       A.   I don't know what the exact date of the

12  engagement or selection was.  I was not involved in

13  the selection process.  The selection of TMG was

14  done by McCafferty and Steve Falcone, F-A-L-C-O-N-E,

15  from the UM side and Don Steigman and whoever was

16  head of compliance at Jackson.

17            The issue that I related to you before

18  relative to adding urgency to this is that they may

19  have had an agreement in August, but we weren't

20  getting scheduled until October.  With receipt of

21  that OIG misdirected letter alleging fraud, my sense

22  was we had to accelerate things to get them on the

23  schedule.  But I don't know -- the short answer is I

24  don't know when we contracted with TMG.

25       **Q.   You mentioned that you weren't involved in**

Jonathan Lord
February 24, 2022

Page 84

1    the selection of TMG Group and that was handled by

2    Mr. Falcone and Dr. McCafferty.  Were you

3    responsible for approving the decision that they

4    made?

5         A.   It's Dr. Falcone.

6              You know, I trusted Jennifer.  I worked

7    with Jennifer at that point for four or five months.

8    I had known Steve Falcone for a long time.  I felt

9    confident that, if they believed that the TMG Group

10   was right and the fact that the Jackson leadership

11   also agreed to the TMG Group, there was no review

12   necessary by me.  I just agreed with that decision.

13        Q.   Dr. Lord, did your approval have to be

14   made up the chain or was your approval the final

15   word?

16        A.   Well, again, there was nothing that I did

17   with Goldschmidt.  So, Goldschmidt was involved in

18   this as well.  I can't remember whether or not UM

19   general counsel was involved in the crafting of the

20   final document.  My guess is they did review the

21   potential contract with the TMG Group and approved

22   it because of the potentials relative to

23   communications between both organizations, Jackson

24   and UM, and not wanting to have something like this

25   not have some sort of veil of protection.

Jonathan Lord
February 24, 2022

Page 85

1      Q.    Dr. Lord, you had mentioned a few minutes
2  ago the letter that was mistakenly provided to the
3  university that was intended for the OIG.  Do you
4  recall that?
5      A.    I do.
6      Q.    Do you know who at the University of Miami
7  first became aware of the OIG letter?
8      A.    It was in Jennifer's hand and Jennifer's
9  office -- McCafferty's office.  We were on the same
10  floor.  She called me over to show me what she got.
11  I did not read through the package.  She told me
12  what was in the package.  I said to seal it up and
13  call Cindy Augustin and send it to the general
14  counsel's office.
15      Q.    You understand that ultimately the letter
16  or that package along with the transmittal letter
17  was sent to the OIG?
18      A.    I was aware.  I was not aware at the time
19  that it had taken that long.
20      Q.    When you say "that long," what two dates
21  are you referring to?
22      A.    I believe -- and, you know, I don't have
23  anything in specific dates for either receiving the
24  envelope or it being forwarded, but I believe it was
25  almost a month that was the time between those two

Jonathan Lord
February 24, 2022

1   events.

2      Q.   Do you know who prepared the letter to

3   OIG?

4      A.   I assume it was somebody in the general

5   counsel's office, most likely Cindy because that's

6   who we gave it to.

7      Q.   I'm sorry.  My question was a bad one.

8   Your answer was a fair answer.

9      A.   It was a great answer.

10     Q.   My question to you is, do you know who

11  authored the original letter to send the package to

12  the OIG?

13     A.   No.  I have no idea who authored that

14  letter.

15          I will say that Shalala received multiple

16  e-mails directly from either people who worked in

17  the IML, a related organization.  Some of those

18  e-mails are headed with a term of an address of Just

19  The Facts.  But Shalala responded to people who

20  worked in those areas, saying she was going to

21  investigate the issues that they were raising.

22     Q.   As you sit here today, you don't know who

23  put together the original package?

24     A.   I have no clue.

25     Q.   Do you have any guesses?

Jonathan Lord
February 24, 2022

Page 87

```
 1      A.   Well, it's someone who has some level of
 2  medical and laboratory knowledge and someone who
 3  does not have command of the English language.
 4           MR. SLOMAN:  Objection.  I was a little
 5      late on unmuting.  Objection.
 6           Don't guess, Dr. Lord.
 7           THE WITNESS:  I'm sorry.
 8      Q.   Doctor, let me mark the OIG package as
 9  Exhibit 14.
10      A.   Okay.
11           (The documents referred to were marked for
12      identification as Defendant's Composite Exhibit
13      No. 14.)
14  BY MR. YANNUZZI:
15      Q.   Dr. Lord, this is a 26-page document that
16  you produced to us in this case Bates stamped
17  starting at 1158.
18      A.   Okay.
19      Q.   Do you recognize this cover sheet?
20      A.   No.
21      Q.   What about this letter to the OIG?
22      A.   I'm going to read it now.
23           Okay.  I don't necessarily recall this
24  letter, but I see it.
25      Q.   This letter is something -- this affidavit
```

Jonathan Lord
February 24, 2022

Page 88

1   is something that at one point was in your

2   possession; is that correct?

3       A.   Correct.

4       Q.   You mentioned a few minutes ago that you

5   thought it took about a month for the university to

6   forward the letter on to OIG.  Do you recall that?

7       A.   I do, and I see that.  It was about two

8   weeks.

9       Q.   Actually that is what it's dated, right?

10      A.   Right.

11      Q.   Do you quibble with the amount of time

12  that it took for the University of Miami to forward

13  this on to OIG?

14      A.   I guess I wouldn't know why you wouldn't

15  just do it immediately.

16      Q.   Do you know if there was some event in

17  that ten-day span that -- some event that happened

18  because of the ten days that it took?

19      A.   I have no idea.

20      Q.   With her letter, Dr. McCafferty is

21  providing a copy of this package that was received

22  in the billing compliance office ten days prior; is

23  that right?

24      A.   Correct.

25      Q.   Do you recognize this as the package that

Jonathan Lord
February 24, 2022

Page 89

```
 1   was --

 2          A.    It looks like it.  It looks like it.

 3          Q.    Do you know what, if anything, OIG did in

 4   response to receiving this package from Dr.

 5   McCafferty?

 6          A.    I do not.

 7          Q.    There was never any follow-up from OIG?

 8          A.    I don't recall any.

 9          Q.    Do you know if anybody from the university

10   ever followed up with OIG, followed up on this

11   letter that Dr. McCafferty sent?

12          A.    I do not.

13          Q.    I take it from that answer that you never

14   did yourself.

15          A.    I did not.

16          Q.    Dr. Lord, earlier in your deposition you

17   mentioned that one of the reasons that the TMG

18   review got kicked into high gear was after receipt

19   of that package that was meant for the OIG.  Do you

20   recall that?

21          A.    I do.

22          Q.    Let me show you what we will mark as

23   Exhibit 15, which is a series of e-mails that you

24   were part of.

25                 (The document referred to was marked for
```

Jonathan Lord
February 24, 2022

```
 1          identification as Defendant's Exhibit No. 15.)
 2     BY MR. YANNUZZI:
 3          Q.   This is Bates stamped 1516.  It is a
 4     document you produced in this case.
 5          A.   Okay.
 6          Q.   Let me get you --
 7          A.   Do you want me to go to the bottom one
 8     where it says Jennifer?
 9          Q.   Yes.  I think I've got both centered on
10     the page so you will be able to read both.
11          A.   Okay.
12          Q.   Dr. Lord, do you recognize these e-mails?
13          A.   I do.
14          Q.   They were sent and received by you on or
15     about October 19th, 2012?
16          A.   Well, certainly the top one.  I don't know
17     about the bottom one, whether that was forwarded to
18     me or how it came to be attached to this.  But let's
19     just say that I definitely was involved with
20     responding on the top line.
21          Q.   I want to focus on your response.
22          A.   Okay.
23          Q.   You say in the last line or the last few
24     lines of your e-mail that, "No one from leadership
25     should be involved at this time."  Do you see that?
```

Jonathan Lord
February 24, 2022

Page 91

```
 1        A.   I do.
 2        Q.   Who from leadership were you referring to
 3   here?
 4        A.   I'm referring to Goldschmidt, me,
 5   Livingstone, anyone who has, you know, a leadership
 6   role.  We wanted this to be independent, not
 7   modified or not influenced by someone and having an
 8   outcome that was based on that influence.
 9        Q.   Dr. Lord, do you know who Charles Nemeroff
10   is?
11        A.   Yes, I do.
12        Q.   What was his role at the university at
13   that time?
14        A.   He was the chairman of the Department of
15   Psychiatry.
16        Q.   And how would you characterize your
17   working relationship with him?
18        A.   Very good.
19        Q.   Would you describe it as very good
20   throughout your entire time at the university, or
21   was there a period where it was not very good?
22        A.   No.  I think it was -- Nemeroff is a very
23   interesting and entertaining character.  There were
24   challenges in the Psychiatry Department for sure.  I
25   think he viewed himself as an important part or
```

Jonathan Lord
February 24, 2022

Page 92

1   tried to insert himself into many different

2   activities to be sure he was always relevant to

3   whatever was going on at the university.

4        **Q.   Do you recall ever calling him needy or a**

5   **sycophant?**

6        A.   I probably could have used those terms,

7   but I would like to see that in an e-mail.

8        **Q.   Let me show you what we will mark as**

9   **Exhibit 16.**

10            (The documents referred to were marked for

11            identification as Defendant's Composite Exhibit

12            No. 16.)

13   BY MR. YANNUZZI:

14        **Q.   Dr. Lord, what we have marked as Exhibit**

15   **16 are a series of e-mails between you and Dr. Keitz**

16   **on or about November 23rd, 2012.  Let me just scroll**

17   **down so I can get the Bates numbers.**

18            **It's a document that we produced that**

19   **starts at 39147.**

20            **Dr. Lord, I will start at the bottom of**

21   **this chain and give you a chance to review it and**

22   **work your way up, okay?**

23        A.   Great.

24            Stop there.

25            Okay.

Jonathan Lord
February 24, 2022

Page 93

1          Okay.

2          Okay.

3      Q.   Dr. Lord, do you recognize these e-mails?

4      A.   I do.

5      Q.   Are these e-mails, at least the ones

6   referred to you, between you and Dr. Keitz that you

7   sent or received?

8      A.   Correct.

9      Q.   I guess somewhere in the midst of her

10   conversations with Dr. Nemeroff she started a

11   separate chain with you; is that correct?

12      A.   Yes.

13      Q.   Do you know in this e-mail on Page 2 from

14   Dr. Keitz to Dr. Nemeroff what she's referring to

15   when she says the RAC?

16      A.   That was the Resource Allocation

17   Committee.

18      Q.   Do you have any understanding as to why

19   she communicated to you that she was sure that Dr.

20   Nemeroff will visit you with this issue?

21      A.   Because he always did.

22      Q.   Do you have any understanding as to what

23   Dr. Nemeroff was trying to accomplish here?  Was it

24   a matter of budgeting?

25      A.   It was a salary increase that was

Jonathan Lord
February 24, 2022

Page 94

1   unplanned.

2       Q.   **He made that kind of request to you**

3   **before?**

4       A.   He would be a regular in my office.  He

5   always had some kind of request or issue that needed

6   to be followed up on.

7       Q.   **Do you recall authorizing those additional**

8   **salary expenditures when the requests were made?**

9       A.   I don't remember this one specifically at

10  all.  Again, it went through that committee, which

11  included a couple of the hospital CEOs, a couple of

12  the department chairs and a few other

13  administrators.  They had a pot of money to work

14  with, and they would make the allocations.

15      Q.   **Do you recall calling him needy?**

16      A.   Oh, I probably did multiple times to his

17  face.  You know, you have to know Nemeroff, but he

18  is a personality.  And me telling him any time he

19  came in that he was acting needy would not be

20  unusual.

21      Q.   **What about sycophant?**

22      A.   Well, that was going back to Sheri when we

23  spoke about a DSM diagnosis, which is the

24  encyclopedia of behavioral health issues.

25      Q.   **So, that's a term that you just used with**

Jonathan Lord
February 24, 2022

Page 95

1    Dr. Keitz but not one that you used with Dr.

2    Nemeroff?

3        A.   Correct.

4        Q.   We already touched on this earlier in the

5    deposition, but at a certain point in time during

6    your tenure as COO, you also had an appointment to

7    the clinical track of the technology faculty; is

8    that correct?

9        A.   Correct.

10       Q.   I would like to show you what we'll mark

11   as Exhibit 17.

12            (The document referred to was marked for

13            identification as Defendant's Exhibit No. 17.)

14   BY MR. YANNUZZI:

15       Q.   Dr. Lord, what we marked as Exhibit 17 is

16   a letter to you dated November 28th, 2012.  Do you

17   see that?

18       A.   I do.

19       Q.   It's a letter that you received on or

20   about that date?

21       A.   It is.

22       Q.   The letter formally notified you of your

23   appointment to the rank of professor of clinical

24   pathology effective as of September 15th, 2011; is

25   that correct?

Jonathan Lord
February 24, 2022

Page 96

1      A.    Correct.

2      **Q.    Were you teaching any courses at the**

3  **university at that time?**

4      A.    I taught a number of courses.  One, I did

5  a special integrated program for the law school --

6  the medical school focused on the nature of

7  hospitals.  I taught several times with Shalala in

8  the course that she was teaching to the under-

9  graduates.  I did some special presentations on the

10  Coral Gables campus.  I particularly remember, you

11  know, standing in the same spot I had been in 40

12  years prior when I first came as a medical student.

13  I was an undergraduate student there.

14          I think the other courses that I was

15  involved in were probably more sort of small group

16  sessions with some of the pathology residents.  I

17  believe several times I presented to the Department

18  of Pathology in terms of doing a presentation for

19  one of their regular Pathology Department meetings.

20      **Q.    Were these projects that you were the**

21  **assigned professor for or was this more like a guest**

22  **lecturer or an occasional activity?**

23      A.    Well, it depended on the nature of it.

24  So, in the case of co-teaching with Shalala, that

25  was when she had her course, and I probably came in

Jonathan Lord
February 24, 2022

 1   for -- I don't know -- two to six classes of hers.

 2            In terms of the hospital course that I

 3   talked about, that was an annual course, a special

 4   weekend course for people needing to get credit for

 5   their Master's or higher level degree.

 6            Everything else in terms of pathology

 7   would be, you know, based on a request from Cote or

 8   there were four or five residents who were senior

 9   residents who all really wanted to learn about

10   entrepreneurship and health care.

**11       Q.   But you were more of the clinical track,**

**12   right, not the tenure track?**

13       A.   That is correct.

**14       Q.   And you understood, in terms of the**

**15   faculty manual, you would be subject to**

**16   reappointment in that position each year?**

17       A.   I was aware of the difference between

18   having tenure and not having tenure.  I was not

19   aware of an annual process, and I don't believe that

20   was a routine activity at the medical center.

**21       Q.   You said you don't believe.  Do you know**

**22   for sure one way or the other?**

23       A.   Well, I don't recall being at other

24   meetings for reappointments of other faculty

25   members.  I believe that the process for, quote,

Jonathan Lord
February 24, 2022

Page 98

1    reappointment was something that was almost

2    automatic or silent, but it was not part of what I

3    think most of the departments did routinely.

4         Q.   But you understood that at a point in time

5    you could be not appointed or not renewed to that

6    position?

7         A.   I did.

8         Q.   Dr. Lord, just to reorient you in time, a

9    few minutes ago we were looking at the e-mails

10   regarding the engagement of TMG after the OIG letter

11   emerged.  While all that process was underway and

12   TMG was conducting its review, did you have any

13   involvement with TMG at all?

14        A.   Not specifically.  I think I sat in --

15   attended the kickoff meeting with their team.  But

16   other than that, the relationship was managed by

17   McCafferty and Falcone.

18        Q.   Were you receiving updates as to what was

19   going on with the review during that time?

20        A.   Just like every other member of the

21   leadership team, McCafferty did an update and

22   Falcone did an update.  I think I noted it in my own

23   updates.  I frequently did a, quote, driveby to

24   Jennifer's office to touch base, not only on this

25   issue but many issues.

Jonathan Lord
February 24, 2022

1      Q.    Did you discuss the TMG audit with Dean

2   Goldschmidt at the time?

3      A.    Dean Goldschmidt and I talked every day.

4   Again, everyone had access to those updates.

5   Jennifer's went to Goldschmidt.  Mine went to

6   Goldschmidt.  Goldschmidt's went to me and to

7   McCafferty.  So, I would say our daily work was

8   pretty transparent.  Beyond that, we were all on the

9   same floor.  All of our offices were glass face.

10  So, everybody could see everybody across the room.

11     Q.    Do you know whether President Shalala was

12  part of any of those updates?

13     A.    Again, I think I stated before that I

14  believe that Goldschmidt's e-mail updates went to

15  her.  I know that the general counsel's office had

16  been briefed periodically by McCafferty.  That

17  information normally would go to her.  And as I

18  said, in mid-December I sat down one on one with her

19  to give her a summary of TMG's findings.

20     Q.    Do you recall in early December, December

21  1, 2012, Dr. McCafferty sharing with you a

22  PowerPoint presentation that she hoped to present to

23  the Audit Committee?

24     A.    You know, without seeing the specific

25  deck, I can't tell you specifically, but that would

Jonathan Lord
February 24, 2022

Page 100

1   be a normal practice for us to do.

2        Q.   Let me show you what we'll mark as Exhibit

3   18.

4        A.   Okay.

5             (The documents referred to were marked for

6        identification as Defendant's Composite Exhibit

7        No. 18.)

8     BY MR. YANNUZZI:

9        Q.   Dr. Lord, Exhibit 18 is an e-mail to you

10   and Dr. Goldschmidt or Dean Goldschmidt from Dr.

11   McCafferty.

12       A.   Okay.

13       Q.   Have you seen this e-mail before?

14       A.   I believe so.

15       Q.   Her e-mail references an attached draft

16   deck for the upcoming Audit and Compliance Committee

17   meeting.  Do you see that?

18       A.   I do.

19       Q.   Just so I understand the timing, there's a

20   reference to the MTI assessment as being in process.

21   Do you see that?

22       A.   I do.

23       Q.   Do you recall whether as of December 1,

24   2012, the TMG audit was still in process?

25       A.   I believe that it was in that we were

Jonathan Lord
February 24, 2022

1   getting -- we had both informal updates of what they

2   had found, and sometime over the next few days,

3   maybe between the 1st and the 10th, is when we

4   actually had a piece of paper that came from the TMG

5   Group.  Again, that's just my recollection of this

6   time.

7          Q.   As of December 1, 2012, had all of the

8   layoffs that had been contemplated and discussed in

9   the spring and summer of 2012, had all of those

10  layoffs gone into effect?

11         A.   Yes.

12         Q.   Were you aware, did you hear in your

13  reports about what morale was like among the

14  constituents at the university at that time

15  concerning the layoffs?

16         A.   Again, I think -- I started to say this

17  earlier.  Morale was an issue for a long time before

18  my time there.  It was up and down around many

19  different issues.  The layoffs, as I said, focused

20  in on one particular category of worker because it

21  was the only ones that we were allowed to engage in

22  terms of the reduction in force.  Most of those were

23  administrative positions.

24              The legacy of the University of Miami was

25  every clinical department had titles of positions

Jonathan Lord
February 24, 2022

1   that were the same as every other one.  So, it was

2   sort of Noah's Ark.  There are two of almost

3   everything in all 21 departments.  The consequence

4   of that is that that's where we could take the staff

5   from.  Those positions were built over time by

6   department chairs who wanted to be essentially semi-

7   independent.  There was no question that the changes

8   that the layoffs created significantly affected

9   their control of all of those positions.

10         **Q.   Were you aware as of December 1st, 2012,**

11   **that there was a collection of faculty members and**

12   **employees in the university who were circulating a**

13   **petition calling for your and Dean Goldschmidt's**

14   **removal?**

15         A.   So, let me go back.  On December 1st I

16   don't think I was aware of that.  But what you

17   should know is that the faculty senate had many

18   different issues with the medical center.  Some of

19   them were related to how they accessed care at UM.

20   Some of it related to morale that, again, goes back

21   to the tensions that I talked about that predated

22   me.  Some of the issues related to the fact that

23   there were layoffs and other restrictions in

24   spending or rehiring.

25               The only way you get $50 million out of an

Jonathan Lord
February 24, 2022

1   organization that quickly is to do things that are

2   going to be traumatic.  Especially for an

3   organization that wasn't used to it, it was very

4   traumatic.

5          So, that's what I knew around December the

6   1st.

7      Q.   Is it your testimony that as of that date

8   you were unaware of the existence of the petition?

9      A.   I believe I didn't learn about the

10   petition until somewhere between the 6th and the 9th

11   of December.

12      Q.   I'm going to show you what we'll mark as

13   Exhibit 19 to your deposition, which is a series of

14   e-mails that you referred to, for lack of a better

15   term, what you called Just The Facts.

16          (The documents referred to were marked for

17          identification as Defendant's Composite Exhibit

18          No. 19.)

19   BY MR. YANNUZZI:

20      Q.   This is a four-page document, a document

21   that you produced that starts at Bates Page 975.

22          Doctor, I am going to scroll to the bottom

23   of it to give you an opportunity to look at it.

24      A.   Okay.

25      Q.   It's rather lengthy.  I don't have a lot

Jonathan Lord
February 24, 2022

Page 104

1    of questions about this.  By all means, take your

2    time if you want, if you want to read through it.

3    My questions will be more focused on the front, but

4    I don't want you to be at a disadvantage.

5         A.   Okay.  Scroll up.

6              Okay.  Scroll up.

7              Okay.  Scroll up.

8              Okay.

9              MR. SLOMAN:  Chris, it's an hour from the

10        last break.  I think we wanted to try and take

11        a bathroom break around this point.  Since this

12        is such a long e-mail, I would appreciate the

13        opportunity if you could send it to us so we

14        can read it.  It's hard to get the entire gist

15        in reading.  I don't read as fast as Dr. Lord.

16             MR. YANNUZZI:  Sure.  That's not a

17        problem.  Do you want to take a break and go

18        off the record and I will send you this

19        exhibit?

20             MR. SLOMAN:  Yes.  That would be great.

21        Thank you.

22             MR. YANNUZZI:  Perfect.

23             THE VIDEOGRAPHER:  We are going off the

24        record at 4:03 p.m.

25             (Recess 4:03 p.m. until 4:16 p.m.)

Jonathan Lord
February 24, 2022

Page 105

```
 1              THE VIDEOGRAPHER:  We are back on the
 2         record at 4:16 p.m.
 3      BY MR. YANNUZZI:
 4         Q.   Dr. Lord, before the break we were taking
 5    a look at what we had marked as Exhibit 19.  Let me
 6    put that back up.
 7              Do you recall that?
 8         A.   Yes, I do.
 9         Q.   Dr. Lord, while we were on our break, did
10    you speak with anybody?
11         A.   I had a chance to --
12              MR. SLOMAN:  Objection, attorney/client
13         privilege.
14              MR. YANNUZZI:  You are saying he spoke
15         with you?
16              MR. SLOMAN:  Privileged.
17              MR. YANNUZZI:  Whether he spoke with you
18         is not privileged.
19              MR. SLOMAN:  He spoke to us.
20      BY MR. YANNUZZI:
21         Q.   How long did you speak with your lawyers?
22              MR. SLOMAN:  Objection.  I instruct the
23         witness not to answer.
24              MR. YANNUZZI:  On what basis?
25              MR. SLOMAN:  Privilege.
```

Jonathan Lord
February 24, 2022

1           MR. YANNUZZI:  How long he spoke with you

2      is privileged?

3           MR. SLOMAN:  Yes.

4      BY MR. YANNUZZI:

5      Q.   **Which of your lawyers did you speak to?**

6           MR. SLOMAN:  Objection, privileged.

7           MR. YANNUZZI:  Whom he spoke to is

8      privileged?

9           MR. SLOMAN:  He's not going to answer any

10     questions about who he spoke to and how long he

11     spoke.  We were on a break for 15 minutes.

12     BY MR. YANNUZZI:

13     Q.   **Other than your lawyers, did you speak**

14     **with anybody else?**

15     A.   No.

16     Q.   **Dr. Lord, I don't recall exactly where we**

17     **left off in your review of this e-mail.  Can you**

18     **tell me where you last read?**

19     A.   I think we can go towards the top.

20          Keep on going.

21          All right.  Keep on going.

22          Okay.

23     Q.   **Dr. Lord, do you recognize these e-mails?**

24     A.   I do.

25     Q.   **I understand that you were not part of the**

Jonathan Lord
February 24, 2022

```
 1    original chain but that you got looped in somewhere
 2    along the way; is that correct?
 3         A.    Correct.
 4         Q.    You referenced this Just The Facts group
 5    early on in your deposition.  Do you know anything
 6    about who was behind that entity, for lack of a
 7    better term?
 8         A.    I do not.
 9         Q.    Do you know who John Smith is?
10         A.    I do not.
11         Q.    Do you know whether there's a John Smith
12    or there was a John Smith employed at the University
13    of Miami at that time?
14         A.    I have no earthly idea.  It's a very
15    common name, though.
16         Q.    It's also possibly a pseudonym.
17               Dr. Lord, were you familiar with the
18    concerns that are being expressed to President
19    Shalala in some of these earlier e-mails in this
20    chain that we marked as Exhibit 19?
21         A.    I think I testified earlier to the fact
22    that different people, including this group, Just
23    The Facts, had written complaining about the work
24    environment to Shalala.  In general the way I would
25    get these would be when Shalala forwarded them on to
```

Jonathan Lord
February 24, 2022

1   either Goldschmidt; Goldschmidt and me; Goldschmidt,

2   me and Nerissa Morris and Ortiz.

3        Q.   There's a reference here from Dr. Keitz

4   that she was reviewing with Karen.  Do you know if

5   she's referring to Karen Stimmell?

6        A.   I believe she is.

7        Q.   Karen Stimmell was the Director of Human

8   Resources at that time?

9        A.   She reported to Keitz.

10       Q.   Dr. Keitz says, "We are looking in this

11   area, but this extends beyond our current review."

12   Do you see that?

13       A.   I do.

14       Q.   Do you know what current review was being

15   undertaken at that time that's being referenced

16   here?

17       A.   I believe that there were some

18   organizational climate studies going on.  Those are

19   the way that HR characterized their reviews.  And

20   they were related to specific complaints that came

21   to HR from individuals.  I don't know who, and I

22   don't know when.

23       Q.   Do you know the scope of the review?  Was

24   it medical school-wide?  Was it hospital-wide?  Was

25   it university-wide?

Jonathan Lord
February 24, 2022

Page 109

1      A.   I believe it's related only to the area of

2   IML and LAORA that are referenced in these notes.

3      Q.   Do you know whether or not the review was

4   thereafter extended, as Sheri Keitz sort of

5   references in her e-mail?

6      A.   I do not.

7      Q.   In your e-mail at the very top of the

8   chain, you asked that Jennifer be included on that.

9   Do you see that?

10      A.   I do.

11      Q.   Which Jennifer is that?

12      A.   That would be McCafferty.

13      Q.   Do you know whether, in fact, Jennifer was

14   included on this?

15      A.   I don't.

16      Q.   Did you have any more involvement with the

17   issues that are part of Exhibit 19 other than this

18   e-mail?

19      A.   Other than the fact that these things

20   generally related to the IML, and I was involved

21   with things related to the IML, but that would be

22   the extent of it, nothing specific.

23      Q.   Now, in December of 2012 Hilarie Bass was

24   a member of the Board of Trustees; is that correct?

25      A.   Yes.

Jonathan Lord
February 24, 2022

1      Q.    How often, if it all, did you interact

2   with Hilarie Bass?

3      A.    Either at social events or at Board of

4   Trustees meetings or at Audit Committee meetings.  I

5   know that on about December the 3rd I had a

6   one-on-one lunch with her.

7      Q.    Was that lunch the first time you had

8   interacted with her outside of the board setting

9   that you described a few moments ago?

10      A.    Well, I also said social settings.  This

11   was the first time I had lunch one on one with her.

12      Q.    Who scheduled that lunch?

13      A.    I requested it.

14      Q.    For what purpose?

15      A.    To provide and make sure that the

16   activities of the compliance program and areas of

17   risk to the university were reported to the chair of

18   the Audit Committee of the Board of Trustees.

19      Q.    Now, a few minutes ago before the break,

20   one of the exhibits we looked at was a deck that Dr.

21   McCafferty prepared to go over various issues,

22   including compliance issues, with the Audit

23   Committee.  Do you recall that?

24      A.    I do.

25      Q.    Do you know whether or not that

Jonathan Lord
February 24, 2022

1    presentation to the Audit Committee ever occurred?

2        A.   I'm not sure.  I did not attend that

3    meeting.  I believe Goldschmidt went to that

4    meeting.

5            Part of the reason I was reaching out to

6    Bass was for several months I was concerned that we

7    were unable to transparently report the findings of

8    compliance to the board.

9        Q.   Why do you say that you were unable to do

10   that?

11       A.   Well, because in different points in time

12   Jennifer would prepare a deck or have conversations

13   either with the general counsel's office or this

14   other person, not Aileen but the woman who I

15   referred to as the secretary, and I communicated

16   with both Goldschmidt and Natoli several times about

17   my concerns that these things need to get on the

18   agenda.

19       Q.   As of this time, December 3rd of 2012, had

20   the TMG Group published its preliminary findings?

21       A.   No.  As I said a few minutes ago, we were

22   getting informal results throughout the process.

23   Basically we were just waiting for their

24   consolidated report.  But, again, you know, there

25   was a lot of things going on in this time period.  I

Jonathan Lord
February 24, 2022

1  can't tell you the date that that report came in.

2  But the underpinning of what TMG was finding was

3  known to Jennifer, myself and at least Goldschmidt

4  and I also believe Shalala at that point in time.

5      Q.   At this point in time were you still the

6  Chief Compliance Officer?

7      A.   I was.

8      Q.   Were there talks about somebody else

9  stepping into that role?

10     A.   No, there wasn't.

11     Q.   Were you just a Chief Compliance Officer

12  over a particular department or was that for the

13  university hospital-wide?

14     A.   That was for the collection of activities

15  known as UHealth and the Miller School of medicine.

16          In and around that same period of time,

17  the university was contemplating hiring a

18  university-wide compliance officer.  They had other

19  people doing those functions, but compliance at the

20  Coral Gables campus not only included research

21  compliance, which in some ways would be similar to

22  what we did at the Miller School, but it also

23  included oversight of the Athletic Department.

24     Q.   After your lunch with Ms. Bass, did you

25  prepare a memorandum summarizing that meeting?

Jonathan Lord
February 24, 2022

 1        A.    I did.

 2        Q.    I will show you a copy of that memorandum

 3    meeting as Exhibit 20.

 4              (The document referred to was marked for

 5              identification as Defendant's Exhibit No. 20.)

 6    BY MR. YANNUZZI:

 7        Q.    Dr. Lord, do you recognize what we have

 8    marked as Exhibit 20?

 9        A.    Yes, I do.

10        Q.    This is a memorandum that you prepared

11    following your lunch with Hilarie Bass on

12    December 3rd, 2012?

13        A.    Correct.

14        Q.    Was there anything discussed at the

15    meeting that is not reflected in this memorandum?

16        A.    All the key topics are there.

17        Q.    At the very top you mentioned that you

18    prepared this memorandum for the record.  Do you see

19    that?

20        A.    I do.

21        Q.    Was this for your own record or had you

22    been asked to prepare this?

23        A.    It's for my own record.

24        Q.    Can you just describe for me so I

25    understand the circumstances when you would prepare

Jonathan Lord
February 24, 2022

1   a summary like this versus a circumstance when you

2   wouldn't after having any particular meeting?

3        A.   Well, I think, as you know, most of my

4   activities were summarized at some level in my daily

5   updates.  I believe even this meeting was referenced

6   in those daily updates.

7             For this purpose, it is reflective of my

8   concern that the information that was critical for

9   the Audit Committee to receive hadn't been getting

10  there.  I wanted to make sure that I was fulfilling

11  my role as compliance officer to share this

12  information with the person who was responsible at

13  the Board of Trustee level for compliance, risk and

14  audit.

15       Q.   What was Ms. Bass' response to the issues

16  that you discussed with her?

17       A.   I think she was listening, attentive,

18  engaged.  We both, you know, had a common assessment

19  of the need for more expert health care legal

20  support in-house for the complexity of the

21  organization that we were.  We didn't have the

22  horsepower to manage the range of health care

23  related issues that we were facing.

24       Q.   Did she indicate to you whether or not she

25  was aware of some of the issues at the IML prior to

Jonathan Lord
February 24, 2022

Page 115

1    your lunch?

2        A.    I don't recall her being -- having that

3    conversation.

4        Q.    **Other than the fact that she was the chair**

5    **of that particular community, is there any other**

6    **reason why you chose to have lunch with her and not**

7    **some other member of that committee?**

8        A.    No.  I think she was the most senior

9    person on the Board of Trustees who had direct

10   responsibility for compliance.  She also was a

11   lawyer and, I believe, quite knowledgeable in health

12   law.

13       Q.    **Dr. Lord, before the break we were**

14   **discussing the petition that had been circulated**

15   **that requested the removal of you and Dean**

16   **Goldschmidt.  Do you recall that?**

17       A.    I remember you asking me that.  I was

18   going to point out then and I didn't, but I will

19   now, that the petition was focused on Dean

20   Goldschmidt and me, not the other way around.

21       Q.    **I don't understand the point that you are**

22   **trying to make.**

23       A.    The point is the first name that appeared

24   in that petition was Dean Goldschmidt, not mine.

25       Q.    **And from that you are surmising that he**

Jonathan Lord
February 24, 2022

Page 116

1   was the focus and you were secondary?

2       A.   I would say, based on history at the UM as

3   well as that and activities that took place from

4   2013 through 2015, that is correct.  It was

5   primarily focused at him.

6       Q.   **He was your supervisor, though, at this**

7   **time, right?**

8       A.   He was, and I was totally loyal to him

9   right through the end of 2012.

10      Q.   **He was your partner, as you described it,**

11  **right?**

12      A.   We both described each other as our

13  partners.

14          MR. YANNUZZI:  Let me show you a petition.

15          This is actually a composite exhibit,

16      Jeff.  The first one is Bates stamped 41167,

17      and the next is duplicated, and I will explain

18      why I attached it.  There's 41168 and 41169.

19          MR. SLOMAN:  Okay.

20      BY MR. YANNUZZI:

21      Q.   **Dr. Lord, starting from the --**

22          MR. SLOMAN:  Is this marked?  This is

23      Exhibit 21?

24          MR. YANNUZZI:  Yes.

25          (The documents referred to were marked for

Jonathan Lord
February 24, 2022

```
 1        identification as Defendant's Composite Exhibit

 2        No. 21.)

 3    BY MR. YANNUZZI:

 4        Q.   Dr. Lord, starting at this e-mail here on

 5    Page 2 --

 6        A.   Okay.

 7        Q.   -- take a look at it and let me know if

 8    you have seen this e-mail before.

 9        A.   I have.

10        Q.   I'm not sure if your answer will be the

11    same as it was the last time, but did you authorize

12    your name to be added to the signature on this

13    e-mail?

14        A.   Again, probably not specifically, but I

15    had comfort in Goldschmidt's judgment in making that

16    communication.

17        Q.   Who is -- I apologize for the

18    pronunciation -- Magaly Robitaille?

19        A.   That is Goldschmidt's assistant.

20        Q.   All right.

21             Do you recall whether you or Dean

22    Goldschmidt instructed her to send this e-mail?

23        A.   It would be Dean Goldschmidt.  I didn't

24    instruct Maggie.

25        Q.   And you understand that, as it says here,
```

Jonathan Lord
February 24, 2022

1    a copy of the petition is attached, and that's Page

2    3 of the document, correct?

3         A.   I see that, yes.

4         Q.   Now, scrolling up now to the first page

5    that you haven't looked at, do you see how the text

6    of the e-mail here, the second e-mail, is the same

7    as the text of the e-mail that we just looked at on

8    the second page?

9         A.   Yes.

10        Q.   Could this suggest that it came from Dr.

11   Goldschmidt's e-mail address as opposed to from his

12   assistant, Maggie?  I'm just trying to understand

13   whether you recall if the e-mail was sent twice or

14   the circumstances surrounding that.

15        A.   I have no idea.

16        Q.   Focusing on the e-mail on the second page

17   that shows you getting a copy, it's dated

18   December 6th, 2012.

19        A.   I see that.

20        Q.   Do you recall receiving it on that date?

21        A.   Probably.  I'm very prompt on my e-mails.

22        Q.   Was this the first time you were aware of

23   the petition?

24        A.   It probably was around the time.  My gut

25   sense is that before Goldschmidt wrote this, he and

Jonathan Lord
February 24, 2022

Page 119

1  I talked about the petition.  It could have been the

2  same day, the same morning.  I have no idea.

3      Q.   Do you recall whether you first raised the

4  existence of the petition with him or he first

5  raised it with you?

6      A.   I don't remember that.

7      Q.   Do you recall how you came to learn of it?

8      A.   No.  Again, I'm not sure.  It could have

9  been through Pascal, but I'm not aware of any other

10 route.

11     Q.   Do you know at this time the number of

12 signatures that had been added to the petition?

13     A.   Clueless, no idea.

14     Q.   Now, focusing on this e-mail, the e-mail

15 was sent on behalf of both of you to Donna Shalala,

16 correct?

17     A.   Well, it's signed by both of us, but the

18 caption shows that Maggie sent it on behalf of

19 Pascal Goldschmidt.

20     Q.   Then scrolling up to the first page, the

21 response to this e-mail, it appears it went only to

22 Dean Goldschmidt, not to you, correct?

23     A.   Correct.

24     Q.   Have you seen these e-mails before, the

25 top two e-mails on Page 1 of Exhibit 21?

Jonathan Lord
February 24, 2022

Page 120

```
 1        A.   Yes, I have.
 2        Q.   When was the first time you saw them?
 3        A.   I don't recall.
 4        Q.   Did you see them around this time that
 5   they were being sent or was it, you know, years
 6   later?
 7        A.   Again, I'm sorry.  I don't recall.  I had
 8   so many e-mails in this time period that I just
 9   don't remember one specific one like this.
10        Q.   I'm sorry.  I didn't mean to cut you off.
11        A.   No.
12        Q.   I'm directing your attention to the first
13   line of President Shalala's response.  She says, "I
14   believe you need to talk to groups of faculty to
15   confront this and answer questions without Jack."
16   Do you see that?
17        A.   I do.
18        Q.   Do you recall having any discussions with
19   Dean Goldschmidt about this suggestion that he
20   received from President Shalala?
21        A.   I do not.
22        Q.   Did you ever have any discussions with
23   President Shalala about the petition?
24        A.   It's possible that I did at my December
25   14th meeting, but I don't recall the specifics.
```

Jonathan Lord
February 24, 2022

Page 121

1      Q.   What conversations did you have with Dean

2   Goldschmidt about this issue?

3      A.   You know, I think his e-mail, I think,

4   reflects the fact that he felt unappreciated for all

5   the things he felt he did for the university.  So, I

6   think it was a downer to have worked hard and worked

7   hard on behalf of people and trying to do the best

8   thing for people to have this kind of response.

9            Now, I have to contextualize some things

10   again.  Both the department chairs as well as the

11   dean are subject to a periodic vote about whether

12   they should remain in their roles.  Those votes are

13   advisory.  There were several cases like that

14   involving department chairs, and I believe that

15   somewhere in the mix of things Goldschmidt was

16   scheduled for a 2014 vote by that same process.

17      Q.   How did you feel about the petition when

18   you first read it?

19      A.   Again --

20      Q.   Did you share Dean Goldschmidt's

21   sentiment?

22      A.   Well, again, I worked tirelessly, and I

23   know that Goldschmidt worked tirelessly to try to

24   make the place better.  So, any time you have

25   something negative come up like this, you feel

Jonathan Lord
February 24, 2022

Page 122

 1   depressed about it.

 2        Q.   Now, you mentioned a few times in your

 3   deposition that on or about December 14th, 2012, you

 4   had a one-on-one meeting with President Shalala,

 5   correct?

 6        A.   That's correct.

 7        Q.   Do you recall the circumstances under

 8   which that meeting was scheduled?  Did you request

 9   it?  Did she request it?  How did that come about?

10        A.   I believe I requested it.  It was at a

11   time when we had a Board of Trustees meeting earlier

12   that day at the Coral Gables campus.  Shalala,

13   Goldschmidt, John Sory and I were meeting with the

14   CEO of Jupiter Medical Center in the afternoon.  So,

15   I was able to get some one-on-one time with Shalala

16   between the board meeting and the other meeting with

17   Jupiter Medical Center.

18        Q.   You are confident about this December 14th

19   date?

20        A.   You know, if it wasn't the 14th, it was

21   the 13th or 15th.  But I'm pretty confident about

22   the 14th.

23        Q.   I believe you testified earlier that you

24   discussed some of the preliminary findings from the

25   TMG report and you may have discussed the petition

Jonathan Lord
February 24, 2022

1   with her; is that correct?

2         A.   Well, what I said was I discussed a

3   variety of things with her, including the TMG report

4   and the potential exposure the university had

5   relative to the billing issues inside of that

6   report.  We talked about the marketing plan, which

7   was presented to the board earlier that day.  We

8   talked about the upcoming meeting with Jupiter

9   Medical Center.  We may have talked about the

10  petition.  That wasn't the central part of the

11  meeting.

12        Q.   Other than those topics, was there

13  anything else that you discussed?

14        A.   I don't recall.

15        Q.   Did you present a memorandum following

16  your meeting with President Shalala?

17        A.   You know, I don't think I did, but I tried

18  to document that meeting in the daily updates.

19        Q.   Is there a reason why you didn't prepare a

20  memorandum like the one you prepared following the

21  meeting with Hilarie Bass?

22        A.   Well, I viewed the meeting with Hilarie

23  Bass as exceptional.  I had meetings with Shalala in

24  a variety of settings, from social to group meetings

25  to one-on-ones on a pretty regular basis.

Jonathan Lord
February 24, 2022

1      Q.   You believe that the meeting that you had

2  with President Shalala was sometime in the late

3  morning on December 14th, assuming that's the right

4  date?

5      A.   I think it was early to mid-afternoon

6  because the board meeting was all morning.

7      Q.   Do you recall whether around that date of

8  your meeting that you had with President Shalala

9  there was another article in the Herald that was

10  critical of the university?

11      A.   I vaguely recall there was an article that

12  was related to the faculty senate and their

13  concerns, but I don't have any sharp detail on that

14  in my head.

15      Q.   Let me show you another e-mail that we'll

16  mark as Exhibit 22.

17          (The documents referred to were marked for

18          identification as Defendant's Composite Exhibit

19          No. 22.)

20  BY MR. YANNUZZI:

21      Q.   Dr. Lord, this is a three-page exhibit

22  that you sent to us.  The first page is Bates

23  stamped 1220.  I'll scroll to the bottom so you can

24  review it.

25      A.   I need to see more of the bottom, please.

Jonathan Lord
February 24, 2022

Page 125

```
 1              Okay.  I've seen the bottom.
 2      Q.   That was the end of that.  I'm sorry.
 3      A.   Yes.
 4      Q.   So, I'll scroll up.
 5      A.   Stop right there.  Okay.
 6           Okay.
 7           Are these connected somehow?
 8      Q.   Yes.
 9      A.   Okay.
10           Okay.
11      Q.   My first question to you is, Dr. Lord, do
12  you recognize these e-mails?
13      A.   I do.  I just didn't remember how they
14  were connected at all.
15      Q.   This is how they were produced by you, and
16  I was a little confused by them, also.  But based on
17  how Dean Goldschmidt's signature block is broken
18  across the two pages, they do seem to fit together.
19  Do you see that?
20      A.   Yes.  It's just kind of weird, but that's
21  fine.  Most of these e-mails come from his Gmail
22  account.
23      Q.   Yes.  I think it was forwarded to your
24  Gmail account here.
25      A.   They weren't forwarded.  He was writing to
```

Jonathan Lord
February 24, 2022

1    me, to my Gmail account.  We were going Gmail to

2    Gmail.

3         Q.   I want to focus right here on the first

4    e-mail that you wrote in this chain in response to

5    the FYI e-mail where, I guess, he shares with you

6    his e-mails with Carlos Migoya; and you respond,

7    "Thanks - I am finished.  Final blow was Leslie

8    telling me I cannot sit at the table."  Do you see

9    that?

10        A.   I do.

11        Q.   Who was it that you are referring to?

12        A.   Leslie is the woman who I misidentified as

13   the secretary of the board.

14        Q.   Can you describe what you are referencing

15   here when you say she told you that you could not

16   sit at the table?

17        A.   Well, normally when I went to board

18   meetings I was at the table alongside Goldschmidt.

19   In this meeting Leslie, who had been frustrating in

20   terms of trying to get material onto agendas, I

21   would say generally pissed me off because I was told

22   to sit on the sidelines.

23        Q.   Based on the time stamp of this e-mail at

24   10:35 in the morning, is this an e-mail that you

25   sent while you were sitting in the board meeting?

Jonathan Lord
February 24, 2022

Page 127

```
 1      A.    Probably.

 2      Q.    Now, Dr. Lord, going back to the petition

 3   that was directed towards Dean Goldschmidt and

 4   yourself, were you aware that at that time Dean

 5   Goldschmidt was communicating with the provost and

 6   President Shalala about how this petition might

 7   affect him?

 8      A.    There are a couple of things.  One, in

 9   general that would be very consistent with his

10   behavior.  Two, I don't know at what point in time I

11   had seen some of those e-mails.  But I am aware of

12   his concerns.

13      Q.    Let me show you what we'll mark as Exhibit

14   23.

15            (The documents referred to were marked for

16            identification as Defendant's Composite Exhibit

17            No. 23.)

18   BY MR. YANNUZZI:

19      Q.    Dr. Lord, this Exhibit 23 is a series of

20   e-mails that you were not copied on but which were

21   among Dean Goldschmidt, Tom LeBlanc, President

22   Shalala and Judd Goldberg.

23            My question to you is, notwithstanding

24   that you were not copied on them, have you ever seen

25   these e-mails before?
```

Jonathan Lord
February 24, 2022

Page 128

```
 1      A.    Can you scroll down and let me look
 2  through them?
 3      Q.    Sure.  Let me start at the very bottom.
 4      A.    Is this the very bottom, Chris?
 5      Q.    It goes a little bit farther.  Right there
 6  is the last one.
 7      A.    Yes.
 8            Okay.  You can scroll up now.
 9      Q.    Absolutely.
10      A.    Okay.
11      Q.    Dr. Lord, now that you have had a chance
12  to review what we marked as Exhibit 23, can you
13  confirm for me whether you have seen these e-mails
14  before?
15      A.    So, if you scroll down to the bottom one,
16  the one from Goldschmidt --
17      Q.    Yes.
18      A.    -- I believe I have seen that one.  I
19  don't believe I have seen the two above that.
20      Q.    The one that you believe you have seen
21  before, do you recall whether you saw it
22  contemporaneous to it being sent or was it down the
23  road?
24      A.    I'm guessing that it was something that --
25  I shouldn't say guessing.  I believe that this was
```

Jonathan Lord
February 24, 2022

1  something that Pascal Goldschmidt shared with me at

2  the time.  But, you know, again, there are so many

3  e-mails.

4      Q.  Now, at or around December 15th, 2012,

5  were you aware of the fact that the petition had

6  garnered as many as 485 signatures?

7      A.  You know, I can't tell you, Chris,

8  specifically that day or the following week or the

9  day before what the number was, but I knew that

10 there had been several hundred names on the

11 petition.

12     Q.  Now, at this moment in time, December

13 15th, 2012, did you have any concern about your

14 future employment at the university?

15     A.  No.

16     Q.  Had you discussed with Dean Goldschmidt a

17 potential succession plan for the two of you?

18     A.  I did.

19     Q.  Tell me about those conversations.

20     A.  Well, again, it was in the context of the

21 tumult of these petitions, behaviors and looking for

22 a way to have a good outcome, meaning that we could

23 get our plans to completely right the ship and start

24 growing the revenues of the organization and see if

25 we could come up with a model that might cause the

Jonathan Lord
February 24, 2022

Page 130

1    abatement of some of these tensions.

2        Q.   Did those conversations start sometime

3    after you both became aware of the petition?

4        A.   I believe so.

5        Q.   Let me show you what we'll mark as Exhibit

6    24.

7             (The documents referred to were marked for

8             identification as Defendant's Composite Exhibit

9             No. 24.)

10   BY MR. YANNUZZI:

11       Q.   Dr. Lord, this is a two-page exhibit that

12   you produced to us that is Bates stamped 1237 and

13   1238.

14       A.   Okay.

15       Q.   Let me start at the first e-mail, which

16   begins on Page 1 and continues to Page 2, and give

17   you a chance to take a look.

18       A.   Okay.

19       Q.   That's the first e-mail in the chain.

20       A.   Okay.

21       Q.   Dr. Lord, did you send or receive these

22   e-mails on or about the dates indicated?

23       A.   I did.

24       Q.   Directing your attention to the bottom of

25   the first e-mail here on Page 2 --

Jonathan Lord
February 24, 2022

```
 1      A.   Correct.
 2      Q.   -- you suggest a series of steps that you
 3   and Dean Goldschmidt should follow to work out a
 4   transition plan; is that correct?
 5      A.   Well, even as noted in Pascal
 6   Goldschmidt's response, this was the first sort of
 7   time of thinking about how we might go through a
 8   transition that would allow us to continue the
 9   course and again deal with some of the anxieties
10   that were in the group that were laying around the
11   petition.
12      Q.   Focusing here at the five bullet points at
13   the bottom of the e-mail, you referenced sharing
14   your plan with three to five of your top closest
15   supporters, in quotes, for feedback.  Do you see
16   that?
17      A.   I do.
18      Q.   Who at the time did you consider to be
19   your closest supporters?
20      A.   You know, it would probably range from
21   board members like Phil George to someone like Sheri
22   Keitz.
23      Q.   Then there's a reference here to Donna
24   Shalala "holds a meeting with LA, SM, MK, you and
25   me."  Do you see that?
```

Jonathan Lord
February 24, 2022

```
 1        A.    I do.
 2        Q.    Can you tell me whom these initials are
 3   referring to?
 4        A.    Well, I think the first is Leonard Abess.
 5   The second is Stuart Miller.  I don't know who the
 6   MK is.  I'm trying to think.  I can't remember who
 7   the MK is.
 8        Q.    The next line says all of these initials
 9   were to lay out a plan for CG leadership and BOT.  I
10   think BOT is the Board of Trustees.
11        A.    Correct.
12        Q.    Who is CG?
13        A.    Coral Gables.
14        Q.    I've got it.  Thank you.
15              Now, earlier in this e-mail there's a
16   reference here that you want to sort of restructure
17   your life and have more time for exercise and rest.
18   Do you see that?
19        A.    I do.
20        Q.    Then in Point 3 there's a reference about
21   being transitioned out of your formal administrative
22   role, remaining on as an adviser and then rotating
23   back to pathology or innovation as a transition out
24   the door.  Do you see that?
25        A.    Yes.
```

Jonathan Lord
February 24, 2022

 1       Q.   Now, when you say transition out the door,
 2  do you mean to no longer work for the university, at
 3  least as of fiscal year 2014/2015?
 4       A.   I think it relates to a potential
 5  endpoint.  But, again, as Goldschmidt points out,
 6  his recommendation was to take some of these dates
 7  out, but it would be at the end of fiscal year 2015.
 8       Q.   The reference here to changes of lifestyle
 9  and things of that nature, how old were you at this
10  time in December of 2012?
11       A.   Well, I was probably 58.
12       Q.   Had you considered retirement at that
13  time?
14       A.   No.  I've always been involved in a
15  variety of activities.  Those activities relate to
16  boards, new companies.  The issue around personal
17  need is I was working at this particular job 16
18  hours a day.
19       Q.   So, you were looking to sort of dial it
20  back at least somewhat?
21       A.   Yes.
22       Q.   During your time while you were employed
23  at the University of Miami, did you ever explore
24  other employment opportunities?
25       A.   I know that I was contacted for additional

Jonathan Lord
February 24, 2022

Page 134

1   board opportunities, and under the faculty manual in

2   my professor role I had time available to pursue

3   those activities as I deemed necessary and reported

4   to the dean.

5         Q.   Did you, in fact, pursue those

6   opportunities?

7         A.   I did.  I can't remember.  I don't have a

8   calendar in front of me, but we could take a break

9   and I can get you that and you can see what new

10  boards came into my life during that time.

11        Q.   Aside from board positions, were you

12  approached to explore more traditional full-time

13  employment?

14        A.   During this time I was focused on fixing

15  many simultaneous problems with some complex and

16  contentious people.  As I said, my role and focus

17  for May 31st, 2012, was to fix the financials and

18  set the budget, get the Collective Bargaining

19  Agreement accomplished and resolve issues with

20  Jackson around the Annual Operating Agreement.

21  Subsequent to that, my focus was on how we are going

22  to make things better for people both in terms of

23  their work life as well as increasing the clinical

24  revenues of the institution.

25        Q.   I understand those were your goals.  My

Jonathan Lord
February 24, 2022

Page 135

1    question was a little bit different.  I'm just

2    trying to understand whether at that time you were

3    looking for full-time employment elsewhere.  So, if

4    the answer is no because you were focused on the

5    stuff at the university, that's a fair answer.  I'm

6    just trying to --

7        A.   I'm just saying that's what I was doing.

8    I wasn't doing anything in terms of looking for

9    another job at that point in time.

10       Q.   Now, working our way back up the e-mail,

11   there is a paragraph at the bottom of the first

12   page.  Correct me if I am wrong, but it suggests

13   that the rationale for proposing this type of

14   transition plan was to take the vote off the table,

15   meaning any vote that would certify the petition; is

16   that correct?

17       A.   Correct.

18       Q.   Now, aside from that series of e-mails

19   that we are looking at as Exhibit 24, did you and

20   Dean Goldschmidt have any further discussions about

21   a succession plan for the two of you?

22       A.   I have no specific recollection.

23       Q.   Now, at this point in time, do you know

24   whether or not TMG had issued its preliminary

25   findings?

Jonathan Lord
February 24, 2022

Page 136

```
 1      A.    I believe that they had.

 2      Q.    Let me show you what we'll mark as Exhibit

 3   25.  It's a series of e-mails between Dr. McCafferty

 4   and Dean Goldschmidt, yourself and Cindy Augustin.

 5   They are Bates labeled 1235 and 1236.

 6      A.    I see that.

 7            (The documents referred to were marked for

 8            identification as Defendant's Composite Exhibit

 9            No. 25.)

10   BY MR. YANNUZZI:

11      Q.    Have you seen these e-mails before, Dr.

12   Lord?

13      A.    Let me look through them and confirm that

14   I have.

15            Okay.  You can scroll up.

16            You can scroll up.

17      Q.    This is the top of the chain.

18      A.    Okay.  I have seen them both.

19      Q.    You received them on or about December

20   18th, 2012?

21      A.    Correct.

22      Q.    Dr. Lord, in the very first e-mail dated

23   December 18th, 2012 at 5:43 p.m., Dr. McCafferty

24   writes to you and Dean Goldschmidt, "Please find the

25   memorandum describing the initial observations from
```

Jonathan Lord
February 24, 2022

Page 137

```
 1   the TMG assessment of the MTI attached."  Do you see

 2   that?

 3        A.   I do.

 4        Q.   She refers also to other attachments, and

 5   then she says the final report will be forthcoming

 6   in early 2013.  Do you see that?

 7        A.   I do.

 8        Q.   Now, based on this e-mail, can you confirm

 9   whether or not this is the first date you received a

10   copy of the initial TMG report?

11        A.   I think I stated earlier that we were

12   continuously updated by the TMG Group during the

13   review process.  Whether I saw a draft before this

14   or not, I have no specific recollection.

15        Q.   Do you recall receiving the final initial

16   report prior to the date and time stamp on this

17   e-mail, December 18th, 2012, at 5:43?

18        A.   In all likelihood I reviewed this document

19   with Dr. McCafferty prior to her sending this

20   e-mail, but I don't know exactly when.

21        Q.   Now, let me show you what we'll mark as

22   Exhibit 26.  This is a document that is attached to

23   the Complaint you filed in this case, the Third

24   Amended Complaint as Exhibit 4.  It's a 12-page

25   document, Dr. Lord.
```

Jonathan Lord
February 24, 2022

Page 138

1      A.    Okay.

2            (The documents referred to were marked for

3      identification as Defendant's Composite Exhibit

4      No. 26.)

5      Q.    Is this the preliminary TMG report?

6      A.    I need to review the whole thing.  I'm not

7   quite sure.

8      Q.    Sure.  I can let you read each page or I

9   can scroll to a particular section to kind of give

10  you a chance to figure it out.

11     A.    I have a suggestion that you send -- this

12  is an e-mail.  So, it's easier for us to sort of

13  read and review and then come back to answer

14  questions.  But whatever way you would like to do it

15  is fine with me.  It's 12 pages.

16     Q.    Yes.  I just wasn't sure if, based on the

17  scans here at the top, that it was filed with your

18  Complaint, whether you recognize this as the

19  preliminary TMG report.

20     A.    Well, that's why I need to see the entire

21  document to be able to answer that.

22           MR. YANNUZZI:  All right.  We have been

23           going for about an hour.  Jeff, I don't know if

24           you want to go off the record and I can send it

25           to you and you can send it to him.

Jonathan Lord
February 24, 2022

Page 139

1              MR. SLOMAN:  Yes.  Why don't we do that.

2              MR. YANNUZZI:  All right.

3              MR. SLOMAN:  Do you want to get back at

4       5:20?

5              MR. YANNUZZI:  Yes.  I was going to say

6       the same thing.  Perfect.

7              THE VIDEOGRAPHER:  We are off the record

8       at 5:08.

9              (Recess 5:08 p.m. until 5:23 p.m.)

10             THE VIDEOGRAPHER:  We are back on the

11      record at 5:23.

12      BY MR. YANNUZZI:

13      **Q.   Dr. Lord, before the break we were**

14      **discussing what we had marked and pulled up as**

15      **Exhibit 26.  We took the break because we had been**

16      **going for about an hour and because you requested an**

17      **opportunity to review it so that we could confirm**

18      **whether or not this is the preliminary TMG report.**

19      **Did you get a chance to review this document that we**

20      **marked as Exhibit 26 on the break?**

21      A.   I did.

22      **Q.   And can you confirm whether or not this is**

23      **the preliminary TMG report?**

24      A.   Well, while the issues that are identified

25      parallel many of the items that were in the TMG

Jonathan Lord
February 24, 2022

Page 140

```
 1   report, I believe that this was the document

 2   prepared by Cote and Chen and delivered to

 3   McCafferty.

 4        Q.   Do you know the timing of when this was

 5   prepared?

 6        A.   I believe that it would have been sometime

 7   in October of 2012.

 8        Q.   Dr. Lord, I'm going to mark -- so I don't

 9   mess up my numbering, I will mark as Exhibit 26-A a

10   copy of your Third Amended Complaint in this case.

11             (The documents referred to were marked for

12             identification as Defendant's Composite Exhibit

13             No. 26-A.)

14   BY MR. YANNUZZI:

15        Q.   Dr. Lord, what I marked as Exhibit 26-A is

16   a copy of your Third Amended Complaint.  Have you

17   seen this document before?

18        A.   I believe I have.  I see the first page of

19   it.  I believe it's a multipage document.

20        Q.   Yes.  It's 30 pages plus exhibits.  I'm

21   happy to represent to you that this is the Complaint

22   that was filed.  It has the court's stamp at the

23   top.  Do you see that?

24        A.   I do.

25        Q.   And it has your lawyer's signature block
```

Jonathan Lord
February 24, 2022

1   here, right?

2        A.   I do.

3        Q.   Now, one of the allegations that you made

4   in your Complaint -- and I'm looking now at

5   Paragraph 71.  I am going to give you a chance to

6   read that.  It says TMG issued a preliminary report

7   in December, 2012.

8        A.   I see that.

9        Q.   You see it describes the preliminary

10  findings in the TMG report, which is purportedly

11  attached as Exhibit 4.  Do you see that?

12       A.   I do.

13       Q.   What is attached as Exhibit 4 to your

14  Complaint is the document that we marked as Exhibit

15  26 to your deposition.  Do you see that?  It's the

16  same document.

17       A.   I do.

18       Q.   So, is this not, in fact, the TMG report?

19       A.   I said to you that the topics parallel the

20  TMG report.  However, I believe that this document

21  was prepared by Cote and Chen for Dr. McCafferty.

22       Q.   You think that was sometime in October of

23  2012?

24       A.   Sometime around that time, yes.

25       Q.   Do you know what, if anything, was done

Jonathan Lord
February 24, 2022

1   with this document that Dr. Cote prepared?

2        A.   You know, somewhere along the way I

3   thought I saw an e-mail from Jennifer to Goldschmidt

4   that referenced conversations she and Cote and Chen

5   had had.

6        Q.   So, if this were written in October of

7   2012, the report from TMG -- the preliminary report

8   from TMG would not have been yet prepared, right?

9        A.   That is correct.

10        Q.   Did you review the Third Amended Complaint

11   before it was filed?

12        A.   I did.

13        Q.   You would agree with me, notwithstanding

14   what is said in Paragraph 71, what is attached as

15   Exhibit 4 is not the TMG report, correct?

16        A.   I think what I said was the findings of

17   the TMG report paralleled the items that were in

18   that document.  However, I don't believe that was

19   the TMG report.

20        Q.   Do you have a copy of the preliminary TMG

21   report?

22        A.   In my possession, no, I do not.

23        Q.   Did you at one point in time have a copy

24   of the TMG report?

25        A.   I don't recall.

Jonathan Lord
February 24, 2022

Page 143

1        Q.    Let me just direct your attention to the
2   exhibit we were looking at a moment ago, Exhibit 25,
3   which is an e-mail from Dr. McCafferty to you and
4   Dean Goldschmidt dated December 18, 2012, where she
5   attaches a number of items, including what purports
6   to be the preliminary TMG report.  Do you recall
7   that?
8        A.    I do.
9        Q.    So, if you look at the bottom of the
10  e-mail message, which you produced to us, there is a
11  series of PDFs and other attachments that are
12  listed.  Do you see that?
13       A.    I do.
14       Q.    Do you know whether or not you still have
15  those attachments?
16       A.    I do not.
17       Q.    Do you know how you came to no longer have
18  them?
19       A.    I don't have my computer anymore.
20       Q.    Well, how do you have this e-mail which
21  you produced to us?
22       A.    I don't recall.
23       Q.    Do you recall whether this is an e-mail
24  that you sent from your University of Miami e-mail
25  to your Gmail?

Jonathan Lord
February 24, 2022

Page 144

1    A.    I believe this is -- I don't see any stamp

2    on here like that.

3    **Q.    Dr. Lord, one of the items you produced to**

4    **us is this memorandum, which we are going to mark as**

5    **Exhibit 27.**

6    A.    Okay.

7         (The document referred to was marked for

8         identification as Defendant's Exhibit No. 27.)

9    BY MR. YANNUZZI:

10   **Q.    I've got it all on the page.**

11   **Dr. Lord, do you recognize this Memo To**

12   **File?**

13   A.    Okay.  I remember this.

14   **Q.    Who authored this memo?**

15   A.    I believe this is Jennifer McCafferty.

16   **Q.    How did you come to be in possession of**

17   **this?**

18   A.    I'm sure she shared it with me.

19   **Q.    Do you recall whether she handed you a**

20   **digital copy or whether she sent it to you by e-mail**

21   **or both?**

22   A.    I would doubt that it was a physical copy.

23   I would anticipate it would have been electronic.

24   But it's possible.

25   **Q.    Are you certain that this is from a memo**

Jonathan Lord
February 24, 2022

1   that Dr. McCafferty prepared?

2        A.   Well, it's topics that were consistent

3   with what Jennifer related to me about Livingstone

4   and Warwar's behavior.

5        Q.   In Dr. McCafferty's memorandum, in the

6   middle of the large paragraph, she mentions that she

7   met with Cindy A.  Do you know if that's referring

8   to Cindy Augustin?

9        A.   I believe it is.  I think it says she

10  spoke with Cindy.

11       Q.   And she said here, "She and I," meaning

12  Cindy Augustin and her, "re-affirmed our opinion

13  that prior to any 'judgments' being made, that all

14  stakeholders would need to review the TMG report and

15  be given an opportunity to respond and comment.  As

16  there has been no report issued by TMG, it is

17  premature to provide opinions, judgments, et cetera.

18  The current plan is to expand an audit based on

19  TMG's initial observations and await their report

20  and the audit outcomes."  Do you see that?

21       A.   Yes, I do.

22       Q.   Did you ever discuss this particular topic

23  with Dr. McCafferty?

24       A.   Which particular topic?

25       Q.   The idea that the preliminary reports are

Jonathan Lord
February 24, 2022

1    **final and it would be premature to provide opinions,**

2    **et cetera, et cetera, until a more thorough review**

3    **is completed.**

4        A.    Well, there's two things.  One, in one or

5    two previous exhibits ago, there was a note from

6    Goldschmidt approving the expansion of the audit for

7    TMG.  I know that it was important at every level to

8    show that we were making good faith efforts to

9    entirely investigate the circumstances around the

10   IML, particularly as it -- let me go back.

11            You know, the key here is that the review

12   process was partially complete.  Goldschmidt had

13   approved an extension and expansion of that, and

14   that process was ongoing.  However, at the same

15   time, given the fact that we believed that the

16   report was delivered to the OIG the second time, we

17   believed that it was very important for us to show a

18   good faith effort and a very diligent effort at

19   trying to run the issues around the IML aground to

20   at least have an affirmative consent that we

21   reviewed this actively and here are our conclusions.

22        Q.    **When you say the report was delivered to**

23   **the OIG the second time around, do you mean that the**

24   **initial delivery mistakenly was sent to the**

25   **university and then we are the party that sent it on**

Jonathan Lord
February 24, 2022

Page 147

1  to the OIG?

2      A.   Correct.

3      Q.   **But do you agree with Dr. McCafferty's**

4  **statement here that, because there was no report**

5  **issued from TMG, that it's premature to provide**

6  **opinions, judgments, et cetera?**

7      A.   I think that what she's basically saying

8  is that it's premature to go to Livingstone with the

9  findings at this point.  That's not the same as

10  informing your chain of command, which included the

11  dean and Shalala, about what was being found.

12      Q.   **And you are gleaning that from this memo**

13  **or that's your own opinion?**

14      A.   I'm gleaning that from a combination of

15  this memo and my opinion.  This memo was really

16  written in the context of Livingstone's behaviors

17  and how to respond to them.  I believe this is Cindy

18  Augustin giving advice to McCafferty about how she

19  should answer when he asks for the results.

20      Q.   **Did you ever talk with Cindy Augustin**

21  **about the TMG findings?**

22      A.   I don't recall.  I know we talked about

23  the process along the way, and she was in all the

24  welcoming meetings and most of the meetings that

25  were going on with TMG.

Jonathan Lord
February 24, 2022

1      Q.   Do you have any understanding as to why

2  Jennifer McCafferty is saying in this e-mail that

3  there has been no report issued from TMG but two

4  days prior in the e-mail we looked at as Exhibit 25

5  she passed along a preliminary report?

6      A.   I believe that this is Cindy Augustin's

7  opinion, not Jennifer's opinion, and what Cindy

8  Augustin is advising Jennifer to say if and when

9  she's confronted by Livingstone or Warwar about what

10  are the findings.

11      Q.   And that's your interpretation, even

12  though that section begins with, "She and I,"

13  meaning Cindy and McCafferty?

14      A.   That's what I believe.

15      Q.   Now, Dr. Lord, there was another

16  memorandum in the document production that I would

17  like to ask you about.

18      A.   Okay.

19      Q.   We'll mark this memorandum as Exhibit 28.

20      A.   Okay.

21          (The documents referred to were marked for

22          identification as Defendant's Composite Exhibit

23          No. 28.)

24  BY MR. YANNUZZI:

25      Q.   Have you seen this document before?

Jonathan Lord
February 24, 2022

Page 149

```
 1       A.   I have.
 2       Q.   Did you write it?
 3       A.   I did.
 4       Q.   Can you explain why you wrote it?
 5       A.   Well, it was -- let me start to go through
 6   the process.
 7            Well, the reason I documented this was in
 8   particular the last sentence of the first paragraph.
 9       Q.   You are referring to the section here
10   where Don Steigman says that he heard about the
11   internal audit transition because he received an
12   e-mail from Alan, presumably Alan Livingstone?
13       A.   Correct.
14       Q.   So, why did that prompt you to prepare the
15   memo?
16       A.   Well, I would say because the pathway of
17   communicating to Steigman came through Livingstone,
18   who should not have even been a part of the process
19   of the change from compliance to internal audit.  I
20   believe it's reflective of the fact that he was
21   involved in those changes.
22       Q.   And what is that belief based on?
23       A.   That's based upon a statement that he's
24   the out-of-town caller to share with Steigman what
25   happened with the review process.
```

Jonathan Lord
February 24, 2022

1      Q.    Did they say anything else?

2      A.    Well, I believe, after reviewing a lot of

3  the discovery provided by the University of Miami,

4  there are many documents that would confirm that.

5      Q.    Can you identify any particular document

6  as we sit here today?

7      A.    I don't know Bates numbers by the back of

8  my hand, but there are several in discovery that

9  were provided, starting in mid-December all the way

10  through the middle of January.

11      Q.    Did you have regular conversations with

12  Don Steigman?

13      A.    Regular in terms of frequency?  We didn't

14  have too many standing meetings.  We always tried to

15  touch base one way or another once a week.

16  Occasionally I would round with he and Falcone in

17  the hospital.

18      Q.    Did you ever create memoranda for any of

19  those meetings, or is this the only one with Don

20  Steigman?

21      A.    This is the only one.

22      Q.    Now, after you met with Donna Shalala on

23  December 14th, 2012, did you have any additional

24  meetings or communications with her through the end

25  of the year?

Jonathan Lord
February 24, 2022

```
 1        A.    You know, there could have been e-mails.
 2   There could have been e-mails I was copied on, you
 3   know, but I did not have any one-on-one
 4   conversations.  I did not have a meeting with her.
 5   I did not have a phone call with her that I
 6   remember.
 7        Q.    Did you have any discussions with her
 8   regarding any of the issues that you had discussed
 9   in your December 14th meeting?
10        A.    Can you state that again?  That was
11   confusing.
12        Q.    Sure.  No problem.
13              If I understand, you didn't have any
14   one-on-one meetings or phone calls, but are you
15   aware of any communications that the two of you were
16   involved in, whether by virtue of being copied or
17   some sort of group e-mail, where the issues that you
18   discussed with her on December 14th were discussed?
19        A.    Well, there was a series of e-mails, and I
20   can't remember exactly how she became involved in
21   them, that related to changing the laboratory policy
22   across the medical center, and that would result in
23   the IML becoming part of the Department of
24   Pathology.  Those e-mails started around the 26th or
25   27th of December and went through about the 3rd or
```

Jonathan Lord
February 24, 2022

```
 1   4th of January.
 2        Q.   Other than the potential movement of the
 3   IML, were any of the issues that you raised in your
 4   meeting with Donna Shalala on December 14th
 5   discussed further with Donna Shalala?
 6        A.   Not by me directly.
 7        Q.   Were they discussed on your behalf by
 8   somebody else?
 9        A.   Well, they very well could have been.
10   Every day that Goldschmidt and I were in
11   conversation, MTI and the TMG review was a daily
12   part of that process.  The whole lab movement was at
13   Pascal's initiation.  So, I can't believe he wasn't
14   communicating with the president at that time.
15        Q.   But am I correct in saying that you didn't
16   have any direct conversations and you believe, but
17   don't know for sure, whether Dean Goldschmidt had
18   any such conversations?
19        A.   Well, let me try to say this.  Again, I
20   don't recall any other meetings with Shalala during
21   that period.
22             Number two, Goldschmidt had regular
23   contact with Shalala; and, again, in UM discovery
24   related to these topics, the two of them were in
25   dialogue, consistent with the same conversation I
```

Jonathan Lord
February 24, 2022

Page 153

1  had with Shalala on the 14th, relative to the TMG

2  report and MTI.

3      Q.   Would you agree with me that Dean

4  Goldschmidt communicated with Donna Shalala more

5  than you did?

6      A.   Dean Goldschmidt had a direct reporting

7  relationship with Shalala.  Shalala recruited

8  Goldschmidt to the university.  They had a very

9  active set of communications.

10     Q.   Do you know whether they also socialized

11  outside of work?

12     A.   Probably more in structural social

13  activities.  However, they were both involved in

14  outside board activities with MedMax and

15  relationships with Lennar.  So, they had a tiered

16  relationship.  They had the official relationship at

17  the university and they had a social relationship

18  that was demanded by those roles because of the need

19  to fund-raise.  And finally, they had a commercial

20  relationship.

21     Q.   Dr. Lord, you were advised on

22  December 31st, 2011, that you were going to be

23  removed from your -- excuse me.  Let me start over.

24          Dr. Lord, you were advised on

25  December 31st, 2012, that you were going to be

Jonathan Lord
February 24, 2022

Page 154

1    removed from your role as COO and the Vice President

2    of Medical Affairs; is that correct?

3        A.   Yes.

4        Q.   That was a conversation that you had with

5    Dean Goldschmidt?

6        A.   Yes.

7        Q.   What do you recall about that

8    conversation?

9        A.   Number one, it was a telephone call.

10       Number two, it was New Year's Eve day.  My

11   family had just left to go back to Massachusetts.

12   We had plans for that day.  You know, I think when I

13   had the call with Goldschmidt, you know, I was just

14   in disbelief because we had worked all this time

15   together.  We had related to each other as partners.

16   I had plenty of affirmative feedback from him and

17   from others in the leadership of the university.  We

18   had just created and accomplished a major turn-

19   around, probably at the top of the annals of

20   academic medicine.  So, it was a shock, and that

21   shock was made worse a couple of days later.

22       So, immediately after hearing from him, he

23   started to talk to me by e-mail and phone about a

24   continuing role as Chief Strategy Officer.  In fact,

25   in his first draft analysis of my transition, he

Jonathan Lord
February 24, 2022

Page 155

1   included in it that I was going to be the Chief

2   Strategy Officer.  Those lines were edited by

3   Shalala and edited out.  And once again, I was

4   gut-punched for the second time, clearly showing

5   that there was no intent to have me participate at

6   the university.

7        **Q.   When Dean Goldschmidt called you on New**

8   **Year's Eve, 2012, to advise you that you were being**

9   **removed from the two roles, did the topic of your**

10  **current professorship come up or no?**

11       A.   During that conversation, it basically

12  went like this.  "Donna wants you out.  She wants

13  you fired from the role of Chief Operating Officer."

14  We didn't even get into separating Vice President

15  for Medical Affairs.  They are kind of one and the

16  same in different ways.

17            The focus and the assumption from the

18  subsequent conversations with Goldschmidt were

19  clear.  He had wanted me to stay on, stay on in a

20  senior role and be a strategy and innovation adviser

21  for the leadership team.  He included that in his

22  draft.  That was taken out.

23            The issue of my appointment to the faculty

24  came up in different ways.  Number one, there was a

25  note from Cote to the Pathology Department welcoming

Jonathan Lord
February 24, 2022

                                          Page 156
1    me back to the department.  We know from UM's supply

2    of documents during discovery that that was not

3    Shalala's intent or LeBlanc's intent.  And there

4    were a host of communications that involved Cote and

5    Goldschmidt from Shalala directing them to terminate

6    my employment.

7        Q.   So, at that time the professor role was

8    not discussed on that initial call?

9        A.   Not on that initial call, no.

10       Q.   Did Dean Goldschmidt give you any

11   explanation as to why Donna Shalala had made the

12   decision to terminate you from those two roles?

13       A.   He did not, and I didn't ask.

14       Q.   How long was that conversation?

15       A.   Maybe 15 minutes at the most.  It was a

16   telephone conversation.  I was at home at the time.

17       Q.   The following day you and Dean Goldschmidt

18   exchanged a series of e-mails about the IML.  Do you

19   recall that?

20       A.   I know there were some things that related

21   to the movement of the laboratory and the fact that

22   Shalala had recalled some of the e-mails related to

23   that topic.

24       Q.   Let me show you what we'll mark as Exhibit

25   29.

Jonathan Lord
February 24, 2022

Page 157

 1      A.   All right.

 2           (The document referred to was marked for

 3      identification as Defendant's Exhibit No. 29.)

 4   BY MR. YANNUZZI:

 5      Q.   Is this what you were just referring to?

 6      A.   Okay.

 7           Okay.

 8      Q.   Dr. Lord, are these copies of the e-mails

 9   you sent and received on January 1st, 2013?

10      A.   Yes.

11      Q.   Now, at this particular time, even though

12   you had been removed from two of your roles, you

13   still had access to the University of Miami e-mail

14   account; is that right?

15      A.   That's correct.  Just to be technical, I

16   believe that I was in that role through the end of

17   January of 2013.

18      Q.   I understand.  You were advised you were

19   being removed on December 31st, but you remained in

20   that role until the end of January.

21      A.   So I could transition Natoli into the

22   role.

23      Q.   Taking a look at the first e-mail in this

24   chain, there's a message from Dean Goldschmidt to

25   you that says, "By the way, Donna requested to

Jonathan Lord
February 24, 2022

1    recall e-mails relative to IML, and no changes

2    should be considered or implemented until internal

3    and external investigations are completed."  Do you

4    see that?

5         A.   I do.

6         Q.   The reference to Donna here is to Donna

7    Shalala, you presume?

8         A.   Correct.

9         Q.   Scrolling up to this e-mail from Dean

10   Goldschmidt, he says, "She has a reasonable point.

11   We should not initiate changes that imply a concern

12   before the end of both investigations."  Do you see

13   that?

14        A.   Yes, I do.  I also see the fact that the

15   question was how did she get engaged with this.  Was

16   it Alan Livingstone?

17             I see that Goldschmidt said, of course,

18   Alan Livingstone.

19        Q.   The AL refers to Alan Livingstone?

20        A.   Correct.

21        Q.   There is this reference here that Donna

22   Shalala requested that e-mails related to IML be

23   recalled.  Do you know precisely what he means by

24   that?

25        A.   It relates to the movement of all

Jonathan Lord
February 24, 2022

1    laboratories.  That's the top line where it says,

2    "It was not IML specific - and as a policy going

3    forward, it would apply to all labs."  So, this was

4    related to the movement of the laboratories.

5         Q.   I see.

6              So, at least as far as you can understand

7    from what Dean Goldschmidt was communicating, it's

8    that the policy that originally was being

9    communicated in these e-mails was meant to be

10   expanded further to cover all labs?

11        A.   And it was.  There are four other

12   departments that would be affected by the change in

13   policy.

14        Q.   I've got you.

15             Do you know whether a corrected e-mail

16   went out that conveyed that original message that it

17   was not IML specific but it applied to all labs?

18        A.   I would say there were a flurry of e-mails

19   well documented in UM discovery.

20        Q.   Now, did you agree with Dean Goldschmidt

21   in his agreement with Donna Shalala that the

22   university should not initiate changes that imply a

23   concern before the end of both investigations?

24        A.   No, I didn't.

25        Q.   Did you ever communicate that to Dean

Jonathan Lord
February 24, 2022

    1    Goldschmidt?

    2         A.    Probably either in person or on the phone.

    3         Q.    Now, at the same time that you were

    4    relieved or advised that you were being relieved of

    5    your COO duties, Dr. Keitz was also transitioned out

    6    of her role; is that correct?

    7         A.    There was a change to her role as VP for

    8    HR.

    9         Q.    Do you know, did Dr. Keitz have any

   10    involvement at all with the TMG findings.

   11         A.    She was involved, if you recall, in the

   12    conversation we had about the work environment in

   13    the IML and LAORA.  So, she had some involvement,

   14    but not specifically to TMG activities.

   15         Q.    So, her involvement, and correct me if I

   16    am wrong, was on the personnel line of it and less

   17    on the underlying compliance issues that were being

   18    investigated?

   19         A.    Correct.

   20         Q.    Did you have any involvement along the

   21    decision to transition Dr. Keitz out of her role?

   22         A.    No, I did not.

   23         Q.    Let me show you what we'll mark as Exhibit

   24    30, which is a series of e-mails between you and she

   25    on January 1st, 2013.

Jonathan Lord
February 24, 2022

Page 161

```
 1     A.   Okay.

 2          (The document referred to was marked for

 3     identification as Defendant's Exhibit No. 30.)

 4     BY MR. YANNUZZI:

 5     Q.   Let's start at the bottom.

 6     A.   Can you scroll up now?

 7     Q.   Sure.

 8     A.   Thanks.  Okay.

 9     Q.   Dr. Lord, are these e-mails that you sent

10     and received on January 1st, 2013?

11     A.   I believe they are.

12     Q.   Based on the first e-mail in the chain

13     where Dr. Keitz is asking to speak with you, was

14     that the first time you learned that her role was

15     changing as well?

16     A.   You know, I'm not sure.  It's very

17     possible that Sheri and I communicated on the 31st,

18     but I don't recall specifically.  It would have been

19     probably by phone.

20     Q.   Do you know whether she was advised on

21     December 31st about the change in her position?

22     A.   I believe she was.

23     Q.   Do you know who communicated that message

24     to her?

25     A.   I believe it was Dr. Goldschmidt.
```

Jonathan Lord
February 24, 2022

1      Q.   Let me show you what we'll mark as Exhibit

2   31, which is a series of e-mails that you produced

3   to us in this case.  It's Bates stamped 1265 and

4   1266.

5      A.   Okay.

6           (The documents referred to were marked for

7           identification as Defendant's Composite Exhibit

8           No. 31.)

9   BY MR. YANNUZZI:

10     Q.   I will show you the beginning of this

11  e-mail just so you can see who sent it and when.

12     A.   Okay.

13          Can you scroll down now a little bit?

14     Q.   Sure.

15     A.   Thank you.

16          Can you scroll down a little bit more?

17          Okay.

18     Q.   Now I'm jumping to the first part of the

19  chain.

20     A.   Okay.

21     Q.   Dr. Lord, do you recognize these e-mails?

22     A.   I do.

23     Q.   It looks like, based on the subject of

24  this e-mail, that Dr. Keitz is forwarding a series

25  of e-mails that she had exchanged internally to you

Jonathan Lord
February 24, 2022

Page 163

```
 1    and Gilma Sznurkowski; is that correct?

 2         A.   That was her assistant.

 3         Q.   Who is Elaine Van Der Put?

 4         A.   Elaine was a member of the leadership

 5    team.  She had a role for about a year-and-a-half or

 6    two in strategy.  Subsequently she became the head

 7    of a project called CTSI.

 8         Q.   Did Dr. Keitz explain to you why she

 9    perceived Elaine Van Der Put's e-mail as evidencing

10    disingenuous behavior?

11         A.   Well, there had a long history between the

12    two of them relative to -- I would describe it as

13    petulant or needy kind of requests around Elaine's

14    compensation.  So, I don't believe that Sheri viewed

15    Elaine as meaning the paragraph that she wrote in

16    that e-mail to Sheri.

17         Q.   In Dr. Keitz's initial e-mail to the

18    executive daily update group --

19         A.   Right.

20         Q.   -- her first recitation is, "Monday:  New

21    Year's Eve:  Difficult meeting with Pascal regarding

22    decisions to make substantial change in the

23    leadership team, specifically my and Jack's roles."

24    Do you see that?

25         A.   I do.
```

Jonathan Lord
February 24, 2022

1     Q.   Jack here presumably is referencing you?

2     A.   Yes.

3     Q.   Was anybody else on the leadership team --

4 strike that.  Let me start over.

5          Did anybody else on the leadership team

6 have their roles changed at the end of 2012, the

7 beginning of 2013?

8     A.   Not at the end of 2012.

9     Q.   Based on that answer, does that mean that

10 at the beginning of 2013 some folks' roles changed?

11    A.   Well, there were changes during the month

12 of January that affected Lee Phillips.  There was a

13 change that, I think, permanently affected Nelson

14 Whitehold (phonetic).  So, there were at least those

15 two other changes.

16     Q.   Can you explain what changes befell those

17 two individuals?

18    A.   Phillips was terminated, and Whitehold

19 essentially was constructively demoted.

20     Q.   What were their roles prior to those

21 changes?

22    A.   Phillips was the Chief Marketing Officer,

23 and Whitehold was the Senior Business Adviser.  He

24 was sort of the CFO but did not want to have the

25 full responsibilities of a CFO.

Jonathan Lord
February 24, 2022

1          Q.    And the Chief Marketing Officer, that was

2     for the entirety of UM?

3          A.    For the Miller School of Medicine and

4     UHealth, yes.

5          Q.    And the non-CFO role that you were just

6     describing, was that also for --

7          A.    Miller School of Medicine and UHealth,

8     yes.

9          Q.    Okay.  Thank you.

10               Dr. Lord, you mentioned a few minutes ago

11    that Dean Goldschmidt had prepared a message and

12    then a portion of it was edited out by Donna

13    Shalala.  Do you recall that?

14         A.    I do.

15         Q.    Let me show what we'll mark as Exhibit 32,

16    which is a series of e-mails that I believe you were

17    referring to.

18               (The documents referred to were marked for

19               identification as Defendant's Composite Exhibit

20               No. 32.)

21    BY MR. YANNUZZI:

22         Q.    Let me start at the bottom and work our

23    way up.

24         A.    Okay.  You can scroll it up.

25               Okay.

Jonathan Lord
February 24, 2022

1     Q.   Dr. Lord, do you recognize the e-mails

2   that we marked as Exhibit 32?

3     A.   I do.

4     Q.   Now, I'm a little confused, and this could

5   be me because of fact that the documents were

6   produced by you.  So, I'm just trying to piece them

7   together based on the numbering.

8          This e-mail that is on Page 3 of this

9   exhibit, is this a copy of the e-mail that Dean

10  Goldschmidt actually sent out or is this --

11    A.   Yes.  This is the actual document that

12  went out as a blast from Communications.

13    Q.   So, where there's a reference to Paragraph

14  2 being out, you are talking about a paragraph that

15  previously fell between what are now the first and

16  second paragraphs?

17    A.   Correct.

18    Q.   Did you discuss the content of the message

19  with Dean Goldschmidt before he sent it out?

20    A.   Not in its revised form.

21    Q.   So, you would have seen the version with

22  the extra paragraph and received this version and

23  wondered what happened to the missing paragraph; is

24  that fair?

25    A.   Yes.  You know, there are a couple of

Jonathan Lord
February 24, 2022

Page 167

 1    things.  Can you scroll and just be sure we have the

 2    sequence here all correct?

 3             Okay.  So, just go back up.

 4             "I passed my comments on to Tom.

 5    Paragraph 2 is out."  That came from Shalala.

 6        Q.   Correct, and then you are asking, "What

 7    does that mean?"

 8        A.   Yes.  Basically what does that mean for me

 9    in my future role here?

10        Q.   And Dean Goldschmidt says, "Finding out

11    from Tom," which presumably is a reference to Tom

12    LeBlanc?

13        A.   Correct.

14        Q.   Did Dean Goldschmidt ever advise you what

15    he learned from Tom LeBlanc?

16        A.   I don't recall that he did.

17        Q.   Based on the timing, this e-mail was sent

18    at 2:58.  Then about three hours later is the final

19    message with Paragraph 2 edited out; is that

20    correct?

21        A.   Yes, with one time-related caution.

22    Sometimes these times slip.  In fact, in a lot of

23    discovery there are many things that were time

24    stamped 1200 for a date, and it was very hard to

25    track those.  So, we can say that this all happened

Jonathan Lord
February 24, 2022

1    on the same day.

2        Q.   All right.

3             Now, at this point in time, and now we are

4    looking at January 2nd, 2013, through, let's say,

5    the first half of January, had you had any

6    discussions with anyone at the university regarding

7    your staying on as a professor in pathology?

8        A.   Well, there was Cote's e-mail to the

9    Pathology Department.  There's a follow-up e-mail

10   from me to Cote thanking him for his support.  And I

11   guess there were other communications in the

12   UM-supplied discovery that showed Shalala and

13   Goldschmidt told Cote that I would not be staying.

14       Q.   And this is all in the early January time

15   frame?

16       A.   Correct.

17       Q.   Do you know whether, I guess, at that

18   point in time a decision had been made to not renew

19   or to not -- I guess potentially have a vote to not

20   renew your appointment in the Pathology Department?

21       A.   Well, I think it's important to step back

22   and have a sense of what the process is.  The

23   process of non-reappointment is ultimately a

24   judgment of either the provost or the president.

25   There is a process to get started with an advisory

Jonathan Lord
February 24, 2022

Page 169

1   vote from the department about whether that person

2   should be re-appointed or not.  That process again

3   is not something that is adhered to in terms of the

4   vote.  The vote is not a directive.  The vote is

5   merely advisory.

6          I have been in multiple settings in the

7   Pathology Department where I watched people get

8   voted for non-reappointment.  So, I was familiar

9   with the process.  For me it was the likely outcome.

10       **Q.   When you say for you it was the likely**

11  **outcome, you mean in your situation the vote would**

12  **have been more than likely unfavorable?**

13       A.   No.  As my 12-year-old used to say,

14  dis-irregardless of what the vote was, the decision

15  was already made by the provost and president that I

16  was not staying.  The vote was merely advisory, and

17  even it was positive, it would have no bearing on

18  the outcome.

19       **Q.   Do you have a sense of how a vote would go**

20  **if a vote had been taken?**

21       A.   I believe in the Pathology Department I

22  likely would have had a positive vote.  But given

23  all of the times that I was dragged in the media by

24  the university's leadership during this period, I

25  didn't need one more humiliation in terms of having

Jonathan Lord
February 24, 2022

Page 170

1    to go to a vote for non-reappointment.

2         Q.   Now, shortly after this set of discussions

3    regarding your continued role in the Pathology

4    Department, you sent a message to the members of the

5    Board of Trustees.  Do you recall that?

6         A.   I do.  Before we get to that one, do you

7    think we can go for a five to eight-minute break?

8         Q.   Of course, sure.  This is actually a very

9    good time to switch off.

10        A.   Okay.  Perfect.  Thank you.

11             THE VIDEOGRAPHER:  We are going off the

12        record at 6:12 p.m.

13             (Recess 6:12 p.m. until 6:20 p.m.)

14             THE VIDEOGRAPHER:  We are back on the

15        record at 6:20 p.m.

16    BY MR. YANNUZZI:

17        Q.   Dr. Lord, before the break we were talking

18    about your professor position, but I want to

19    transition to another topic.  There is one thing I

20    wanted to raise with you.  Did you resign from your

21    professor position?

22        A.   I did not.  I only signed a waiver of a

23    vote.  I had many communications -- again, this is

24    well documented inside of UM discovery -- with the

25    provost and others both about my desire to stay in

Jonathan Lord
February 24, 2022

Page 171

1  that role and, I believe, in our communications from

2  Jeff and Erica, my continued desire for restoration

3  to that role.

4      **Q.  Did you ever tell anybody that you retired**

5  **from that position or you resigned from that**

6  **position?**

7      A.   You know, words were really hard in those

8  days.  Socially I used the phrase retired because

9  quite frankly I was utterly embarrassed and

10  humiliated by what happened to me, especially since

11  I lived in Miami and I was a peer of many of the

12  trustees.  I was dragged through the media by the

13  university in a way that was grossly unfair and,

14  again, as supported by the documents that you

15  supplied in discovery.  So, there are times that I

16  used that word.  There are times saying to a normal

17  human being that you signed a waiver of a vote

18  doesn't sound like retirement, unemployment,

19  employment.  It's a weird kind of thing.  So, most

20  human beings wouldn't communicate that way.

21          I think you should recall that in other

22  settings related to depositions, this case was under

23  seal for eight years.  For eight years I was

24  essentially gagged from discussing things about it.

25  And despite all of the negative media, I never had

Jonathan Lord
February 24, 2022

1    an opportunity to defend myself in terms of any of

2    the actions that the university took.

3        **Q.    So, I appreciate that response.  I**

4    **actually discussed it with your lawyers before we**

5    **sat down here today.  My question was a little bit**

6    **more narrow, and that is --**

7            MR. SLOMAN:  Excuse me, Chris.  I'm sorry.

8        I was on mute.

9            I would object and move to strike the

10       comment about discussions with Dr. Lord's

11       lawyers and ask that we --

12           MR. YANNUZZI:  You can object to the form,

13       Jeff.

14           MR. SLOMAN:  No.  That's fine, but I just

15       wanted to make a strenuous objection.  Sorry.

16           MR. YANNUZZI:  All right.  You strenuously

17        object to the form.

18    BY MR. YANNUZZI:

19        **Q.   Dr. Lord, my question was a little bit**

20    **simpler than that.**

21            **Am I correct that you told people that you**

22    **either retired from your position or that you**

23    **resigned from your position?**

24        A.   Again, let me say to you what I said the

25    last time.  I used many terms to describe the

Jonathan Lord
February 24, 2022

Page 173

1   transition.  It was a humiliating transition.  So,

2   the answer is yes, I used multiple terms, including

3   retirement and resign.

4        **Q.   Did you ever swear under penalty of**

5   **perjury that you retired or resigned?**

6        A.   There are documents where I used those

7   phrases.  I'm not aware of any legal definition of

8   retired.  Again, in those depositions I was subject

9   to the seal in this case and used an abundance of

10  caution in responding to anything.

11       **Q.   We are going to get into that a little bit**

12  **later.  But you were represented by counsel in your**

13  **divorce proceedings, correct?**

14       A.   Yes.

15       **Q.   Your lawyers objected to various questions**

16  **on the basis of privilege in your deposition,**

17  **correct?**

18       A.   Yes.

19       **Q.   But they didn't object to the questions**

20  **about your leaving the University of Miami for the**

21  **professorship role at the University of Miami.  Do**

22  **you recall that?**

23            MR. SLOMAN:  Objection to the form.

24       A.   I don't recall parsing things out between

25  the role of professorship as well as COO.

Page 174

1      BY MR. YANNUZZI:

2           Q.   What about in your financial affidavit

3      that you and your lawyer prepared?  Do you recall

4      signing that financial affidavit in your divorce

5      proceeding?

6           A.   I do.

7           Q.   Do you recall swearing under penalty of

8      perjury in that document that you retired from your

9      position at the university as of July, 2013?

10          A.   I do.  Again, let me state for the record

11     that the document, the form has three options on it.

12     They are very limited between employed, unemployed

13     and retired.  We had a situation where we had a seal

14     in this case.  And retirement, as imprecise a term

15     as it is, is the one that we chose for that

16     document.

17          Q.   Did you ever discuss with your former

18     wife, Alice, whether you retired or resigned from

19     the university?

20          A.   My former wife knew every circumstance

21     that went on during that period of time.  She knows

22     that I was fired by the university.

23          Q.   Do you know whether in this divorce

24     proceedings she challenged your representation that

25     you retired or resigned from your last position at

Jonathan Lord
February 24, 2022

1    UM?

2         A.   I don't recall that.

3         **Q.   Dr. Lord, before the break we were talking**

4    **about a letter that you sent or a message you sent**

5    **to the Board of Trustees on January 18th, 2013.  Do**

6    **you recall that?**

7         A.   I do.

8              MR. YANNUZZI:  Let me mark that as Exhibit

9         33.

10             (The documents referred to were marked for

11        identification as Defendant's Composite Exhibit

12        No. 33.)

13    BY MR. YANNUZZI:

14        **Q.   Dr. Lord, what I marked as Exhibit 33 is a**

15    **letter or an e-mail from you to what I believe to be**

16    **the Board of Trustees at the university with an**

17    **attached letter; is that correct?**

18        A.   I believe that was principally the

19    Executive Committee, not the entire board.  The

20    entire board is about 77 people.

21        **Q.   So, this is the Executive Committee of the**

22    **board?**

23        A.   I believe so.

24        **Q.   Is this the letter that you attached to**

25    **your e-mail?**

Jonathan Lord
February 24, 2022

Page 176

```
 1        A.    Can you scroll through the entire
 2   document, please?
 3        Q.    Sure.  I will just go in order.  Let me
 4   know when you are ready.
 5        A.    You can continue.
 6        Q.    Okay.
 7        A.    Okay.  Continue, please.
 8              Continue, please.
 9              Continue, please.
10              Continue please.
11              Yes, this is my document.
12        Q.    Prior to this e-mail, had you ever sent an
13   e-mail to the entire Executive Committee before?
14        A.    No, I had not.
15        Q.    Prior to sending this e-mail, had you
16   discussed your departure from the university or at
17   least your departure from your COO and vice
18   president roles with any of the members of the
19   Executive Committee?
20        A.    I'm sure I did with Phil George.  I
21   attempted to with Stuart Miller.  And I may have had
22   a chance to talk with Jayne Malfitano and Chuck
23   Cobb, but I don't recall specifically.
24        Q.    And those conversations would have either
25   taken place or you would have attempted to have them
```

Jonathan Lord
February 24, 2022

Page 177

1    take place sometime between New Year's Eve, 2012 and

2    the date you sent this e-mail?

3        A.   Yes.

4        Q.   Let me show you what we'll mark as Exhibit

5    34, which is very similar to this e-mail that we

6    just looked at.

7        A.   Okay.

8            (The documents referred to were marked for

9            identification as Defendant's Composite Exhibit

10           No. 34.)

11   BY MR. YANNUZZI:

12       Q.   I believe this one was sent by your

13   assistant; is that correct?

14       A.   Correct.

15       Q.   Do you recall having the message sent

16   twice?

17       A.   I don't.

18       Q.   But you would agree with me that it's the

19   same message.  It's just this one appears not to

20   have an attachment, but it's embedded in the body of

21   the e-mail.  Do you see that?

22       A.   I do.

23       Q.   Do you have any recollection as to why

24   this document exists in duplicate?

25       A.   No, I do not.

Jonathan Lord
February 24, 2022

Page 178

1      Q.   Did you ever get any response to your

2   e-mail from any of the recipients?

3      A.   I did get several.  I can't remember

4   exactly which ones.  I did have the opportunity to

5   review in the UM-provided discovery that the

6   president responded to it by telling Goldschmidt to

7   give me my check and thank me for my efforts.

8      Q.   Are there any other responses you recall?

9      A.   There were some positive ones from people

10  like Phil Frost, Phil George, Aaron Podhurst.  I

11  think those are the ones I recall.

12     Q.   Did you receive any negative responses?

13     A.   No.

14     Q.   Are you familiar with any conversations

15  that were held among the board members regarding

16  your e-mail or your departure?

17     A.   I'm not aware of any specifics.

18     Q.   Who are Bob and Judi Newman?

19     A.   They are -- Judi Prokop Newman is a

20  trustee.  Bob and she gave the money for the Student

21  Center on the campus.  They are also members of the

22  Indian Creek Country Club where I was a member.

23     Q.   Do you recall forwarding your message to

24  them?

25     A.   I probably did because I probably

Jonathan Lord
February 24, 2022

Page 179

1    accidentally or I didn't include them.  They were

2    good friends.  We traveled with them quite

3    frequently, did social things with them and LeBlanc.

4    So, I think it's just my recognition that I didn't

5    include them in this distribution.

6         Q.    When you say you did things with them, you

7    mean you and your former wife, Alice?

8         A.    Correct.

9         Q.    Let me just show you what we will mark as

10   Exhibit 35, which is the e-mail we have been looking

11   at --

12        A.    Yes.

13        Q.    -- which is a forward from you to Judi and

14   Bob Newman.

15        A.    Right.

16             (The documents referred to were marked for

17             identification as Defendant's Composite Exhibit

18             No. 35.)

19   BY MR. YANNUZZI:

20        Q.    Is this an e-mail that you sent on that

21   date?

22        A.    I believe so.

23        Q.    Do you recall what you discussed with them

24   when you referenced your conversation that you had

25   with them this evening?

Jonathan Lord
February 24, 2022

```
 1        A.   Well, we all went out to dinner.  I think
 2   it was a conversation of them trying to understand
 3   what happened and why my job was gone.
 4        Q.   Now, at this time, and now we are looking
 5   at mid to late January, 2013, you are aware, because
 6   I believe you participated in them, of a series of
 7   communications regarding your no longer holding the
 8   professor role.  Do you recall that?
 9        A.   I do.
10        Q.   One of the folks that you communicated
11   with was David Birnbach.  Do you recall that?
12        A.   I do.
13        Q.   And David Birnbach was the vice provost;
14   is that correct?
15        A.   He worked for the provost, correct.
16        Q.   Prior to this, did you have any working
17   relationship with him?
18        A.   Yes, absolutely.  David was an
19   anesthesiologist who was no longer practicing.  He
20   was responsible for some of the safety initiatives
21   at the university for patients, and he had a vice
22   provost role relative to faculty affairs on all the
23   campuses.
24        Q.   Let me show you what we'll mark as Exhibit
25   36, which is a series of e-mails between you and Dr.
```

Jonathan Lord
February 24, 2022

1    Birnbach that loop in with some of the other

2    e-mails.

3        A.   Okay.

4            (The documents referred to were marked for

5        identification as Defendant's Composite Exhibit

6        No. 36.)

7    BY MR. YANNUZZI:

8        Q.   Would it be better for you if I go to the

9    bottom, and that way you can read this

10   chronologically?

11       A.   Yes.  That would be great.  Thank you.

12       Q.   No problem.

13           For the record, these are Bates numbered

14   44755 produced by us.

15       A.   Okay.

16           Okay.

17           Okay.

18       Q.   Dr. Lord, do you recall sending and

19   receiving these e-mails on or about January 29th,

20   2013?

21       A.   I do.

22       Q.   I just want to direct your attention to

23   this e-mail on the second page from Dr. Birnbach to

24   you --

25       A.   Okay.

Jonathan Lord
February 24, 2022

1      Q.   -- where he makes an indication that his

2   gut feeling is that going the route of a vote is not

3   a good choice.  Do you see that?

4      A.   I do.

5      Q.   Did you ever discuss what he meant by

6   that?

7      A.   You know, I know we talked about what my

8   options were.  You know, I think what is striking me

9   again is sort of the disingenuous behaviors that

10   were going on among the leadership at this time

11   because in the UM-supplied discovery there are

12   documents from Birnbach to Cote and to Pascal

13   detailing the process and the process -- how it

14   works relative to non-reappointment as well as the

15   vote, and it was clear that he was not being a good

16   adviser to me when I look back.  He was strictly

17   advising the university how they could get me non-

18   reappointed.

19      Q.   Did you reach out or did you ask Tom

20   LeBlanc to reach out to the general counsel's office

21   to discuss the terms of your compensation with

22   respect to the six-month billing period?

23      A.   I don't recall all the specifics.  I may

24   have asked for a continuation of my base

25   compensation of $763,000 as well as my

Jonathan Lord
February 24, 2022

Page 183

1    administrative overload of $150,000.

2        Q.   You were advised in this e-mail at the

3    bottom of the chain that your notice period would be

4    tied to your base salary, correct?

5        A.   Correct.

6        Q.   So, was the $150,000 administrative

7    supplement the additional amount that you were

8    compensated for the COO and Vice President of

9    Medical Affairs roles?

10       A.   That was a promotion that occurred in July

11   of 2012.  It was the advancement for the VP of

12   Medical Affairs role as well as formalizing the

13   Chief Compliance Officer title.

14       Q.   So, that's where the administrative

15   supplement came from, assuming those roles, for

16   $150,000?

17       A.   Yes.

18       Q.   Now, ultimately you received a letter

19   which you signed outlining the terms of you no

20   longer holding the position of clinical professor.

21   Do you recall that?

22       A.   I recall waiving my right to a vote.

23       Q.   Let me show you what we'll mark as Exhibit

24   37.

25       A.   Okay.

Jonathan Lord
February 24, 2022

1          (The document referred to was marked for

2     identification as Defendant's Exhibit No. 37.)

3    BY MR. YANNUZZI:

4       **Q.   Dr. Lord, this is a two-page letter.**

5       A.   I've got it.

6       **Q.   Have you seen this document before?**

7       A.   Yes, I have.

8       **Q.   Is that your signature on the bottom of**

9    **Page 1 and at the top of Page 2?**

10      A.   It is.

11          I said that I agree to waive my right to a

12   vote.

13      **Q.   By this statement were you suggesting that**

14   **you didn't agree with the rest of the content?  I**

15   **don't understand what you mean by this line here, "I**

16   **agree to waive my right to a vote."**

17      A.   I believe that's all I was agreeing to.

18      **Q.   Were there certain rights under the**

19   **faculty manual that you believe that you still had,**

20   **irrespective of the right to a vote?**

21      A.   During that period of time there were

22   certain things, but I don't recall all of the

23   specifics of the faculty manual.

24      **Q.   You understood that your time as a**

25   **clinical professor would end as of July 31st, that**

Jonathan Lord
February 24, 2022

1   you were going to be paid out through that period of

2   time calculated through the base salary of $753,776,

3   correct?

4        A.   Correct.

5        Q.   You mentioned that you had consulted with

6   Dr. Birnbach because you believed that he was,

7   again, a potential adviser to you with respect to

8   these matters; is that correct?

9        A.   Well, I thought he was a very decent

10  straight-up person.  That was my belief at the time,

11  and that he would provide me with the best possible

12  direction of anybody at that campus.

13       Q.   Did you consult with anybody else at the

14  university?

15       A.   I probably talked to Sheri along the way,

16  but that's about it.

17       Q.   Did you consult with anybody outside the

18  university?

19       A.   No, I did not.

20       Q.   At this particular time, had you consulted

21  with a lawyer regarding anything having to do with

22  the University of Miami?

23       A.   I don't recall.  I don't recall the exact

24  timing.

25       Q.   Do you have any recollection as to when

Jonathan Lord
February 24, 2022

1    you first spoke to a lawyer about anything dealing

2    with the University of Miami?

3         A.    I think I just answered that.  I thought I

4    did.  I just don't recall when it was.

5         Q.    I understand you don't recall the specific

6    time, but do you recall whether you were still

7    working for UM?

8         A.    I believe that I was still a faculty

9    member at that time.

10        Q.    Understood.

11              So, it was post-removal from the COO roles

12   but while you were still employed as a clinical

13   professor, correct?

14        A.    While I was still on the faculty, correct.

15        Q.    In addition to what we were just looking

16   at, I believe you received a letter from Dr.

17   Birnbach.  We'll mark that as Exhibit 38.

18              (The document referred to was marked for

19         identification as Defendant's Exhibit No. 38.)

20   BY MR. YANNUZZI:

21        Q.    Dr. Lord, have you seen this letter

22   before?

23        A.    I have.

24        Q.    You received this letter on or about

25   January 31st, 2013?

Jonathan Lord
February 24, 2022

Page 187

1     A.   I did.

2     Q.   With this letter Dr. Birnbach was advising

3   you that you were not going to -- he reiterated the

4   information that was provided in the letter that we

5   were just looking at, Exhibit 37, correct?

6     A.   Correct.

7     Q.   It says here at the bottom, "With this

8   letter the university discharges its notice

9   obligations to you under the Faculty Manual and all

10   prior offer letters."  Do you see that?

11     A.   I do.

12     Q.   Now, were you aware that at the end of

13   January Dean Goldschmidt sent a letter to the

14   medical school community sort of describing the

15   recent transition and its plans for the future?

16     A.   Absolutely.

17          MR. YANNUZZI:  Let me mark that as Exhibit

18     39.

19          (The document referred to was marked for

20     identification as Defendant's Exhibit No. 39.)

21   BY MR. YANNUZZI:

22     Q.   Dr. Lord, is this the e-mail that we were

23   just discussing?

24     A.   It is.

25     Q.   Did you receive this yourself on or about

Jonathan Lord
February 24, 2022

1    January 30th, 2013?

2         A.    I probably did.

3         Q.    At this point in time, were you still

4    referring to Dean Goldschmidt and was he still

5    referring to you as partners?

6         A.    Well, a few things.  Number one, President

7    Shalala made the decision to end all daily updates.

8    So, the type of communication that we would normally

9    be having ended.  And, no, I don't believe we called

10   each other partner on January 30th, 2013.

11              Go ahead, sir.

12         Q.    I apologize.  I didn't mean to cut you

13   off, Doctor.

14         A.    In the UM-supplied discovery, the initial

15   draft of this document, which was January 21st, is

16   radically different than the version that is here.

17   The version that is here is the result of directions

18   that Goldschmidt got from Shalala in terms of how to

19   edit this document.

20         Q.    At the time of the initial version, which

21   I believe you just said was January 21st; is that

22   correct?

23         A.    That was, I believe, in your supplied

24   discovery.  That was Pascal Goldschmidt's first

25   pass, first draft of the document.

Jonathan Lord
February 24, 2022

Page 189

1          Q.    I am willing to accept that for the
2     purposes of my question.
3          A.    Sure.
4          Q.    So, as of that date, were you and Dean
5     Goldschmidt still referring to each other as
6     partners?
7          A.    Probably not.
8          Q.    Was there a particular moment in time
9     where that stopped?
10         A.    You know, I'm guessing it was sometime
11    around January 8th to 10th.
12         Q.    Was that just as a result of your having
13    been removed from those two roles, or was there some
14    other event that caused that to happen?
15         A.    Well, it was clear that whatever was
16    happening at that point in time, Goldschmidt was
17    doing everything to save himself and creating a
18    complete false narrative about what transpired, A,
19    in the last nine months and, B, what was transpiring
20    in January.
21              Again, the false narratives that are seen
22    both in the drafts of documents he starts with and
23    the end product and the story line that was put out
24    in the Herald like the 31st of January all show
25    totally disingenuous, unreasonable behavior on the

Jonathan Lord
February 24, 2022

1    part of the leaders at the University of Miami.

2        Q.    Did you ever talk to Dean Goldschmidt and,

3    you know, call him out for what you perceive to be

4    untruthful statements?

5        A.    I believe we had a verbal confrontation in

6    my office sometime in that period of time that I

7    gave you.

8        Q.    The January 8th to 10th time frame?

9        A.    Something like that yes.

10       Q.    I'm directing your attention to what we

11   marked as Exhibit 39.  There's a reference here -- I

12   don't know why there's this Enter Search Item box.

13       A.    It's still there.

14       Q.    Yes.  I'm not sure what the issue is here.

15       A.    We can work around it.  It's over like the

16   key word of the thing.

17       Q.    Yes.  It seems to be over everything.  I

18   apologize for that.

19       A.    No worries.

20       Q.    Focusing back on Exhibit 39, there's a

21   reference here in this paragraph that starts with,

22   "Then at the end of December, when we realized that

23   our performance had indeed improved and stabilized,

24   it was time to re-focus.  I listened to the concerns

25   of faculty and staff via their Chairs, the Medical

Jonathan Lord
February 24, 2022

1    **Faculty Council representatives and their petition**

2    **and through direct, one-on-one conversations.  This**

3    **made me decide that a change in course and team was**

4    **warranted."  Do you see that?**

5         A.    I do.

6         **Q.    The reference to team here, do you have**

7    **any understanding as to whom it was referring to?**

8         A.    Well, let me just start with looking at

9    the facts.  At the end of December, Goldschmidt and

10   I did a video that was focused on 2013 strategies.

11   On December 27th, 28th and 29th, Goldschmidt and I

12   were going back and forth relative to changes in the

13   IML, not changes in any role or other activities.

14         So, I would view this entire paragraph as

15   made-up fluff because it's not accurate or true.

16   His only change came when it was clear again from

17   the UM-supplied discovery that Shalala told him what

18   to think and what to do.  He was not a free agent at

19   all, except maybe to save his own skin during this

20   process.

21        **Q.    Now, do you know whether Dean Goldschmidt**

22   **had any input into the transition of the three other**

23   **folks you were talking about earlier, Dr. Keitz, the**

24   **non-COO and CFO, and the other role?  I can't recall**

25   **right now.**

Jonathan Lord
February 24, 2022

1      A.    I do not.

2      **Q.    Do you know who made the decision with**

3  **respect to those three people?**

4      A.    Do I know?  I do not know who made them,

5  but I would believe they came from the same source,

6  which would be Shalala.

7      **Q.    Dr. Lord, are you aware of the fact that a**

8  **faculty senate meeting was held on January 30th,**

9  **2013?**

10     A.    I know that there were faculty meetings

11 with the president and Dean Goldschmidt.

12     **Q.    Have you seen the minutes from those**

13 **meetings?**

14     A.    I've seen them reported in the Miami

15 Herald.

16     **Q.    Let me show you what we'll mark as Exhibit**

17 **40.**

18           (The documents referred to were marked for

19           identification as Defendant's Composite Exhibit

20           No. 40.)

21   BY MR. YANNUZZI:

22     **Q.    Dr. Lord, this is a three-page document**

23 **Bates stamped 142 to 144 produced by you to us in**

24 **this case.**

25     A.    Okay.

Jonathan Lord
February 24, 2022

1      Q.    Let me scroll through it for you.

2      A.    Okay.

3            Okay.

4      Q.    Dr. Lord, my first question to you is,

5  have you seen this document before?

6      A.    Yes.  I believe that these are Dr. Keitz's

7  notes.

8      Q.    Do you know if she took notes because that

9  was her role at this particular meeting or she was

10  just taking notes for her own --

11      A.    These are her own informal notes.

12      Q.    Directing your attention to Page 2, in the

13  Dean's Report there's a reference to PJP.  I presume

14  that refers to Pascal Goldschmidt; is that correct?

15      A.    Correct.

16      Q.    There are bullet points here regarding a

17  change in course and change in leaders being needed.

18  Do you see that?

19      A.    I do.

20      Q.    Then there's a Faculty Comment that says,

21  "The person that created all that fear is no longer

22  here.  How are you going to assume there will be no

23  retribution?"  Do you see that?

24      A.    I do.

25      Q.    Then Dean Goldschmidt responds, "I do not

Jonathan Lord
February 24, 2022

 1    tolerate or condone retribution."

 2            My question is, did Dr. Keitz ever tell

 3    you whom they referenced here as the person who

 4    created all that fear?

 5        A.   She did not.

 6        Q.   Do you have any understanding as you sit

 7    here today who is being referred to here?

 8        A.   It could be Goldschmidt or it could be me.

 9        Q.   Well, being that Dean Goldschmidt is still

10    there --

11        A.   It's likely pointing the finger at me from

12    this unnamed faculty member.

13        Q.   I was just saying, you don't know who that

14    faculty member is.

15        A.   No.

16        Q.   Is that correct, Dr. Lord?

17        A.   Correct.  I'm sorry.

18        Q.   That's okay.  I thought for a second we

19    lost you on the video feed.

20            Let me show you what we'll mark as Exhibit

21    41.

22            (The documents referred to were marked for

23            identification as Defendant's Composite Exhibit

24            No. 41.)

25    BY MR. YANNUZZI:

Jonathan Lord
February 24, 2022

Page 195

 1        Q.   Dr. Lord, this is a series of e-mails

 2   between you and Dr. Keitz --

 3        A.   Yes.

 4        Q.   -- dated January 30 and 31 of 2013.

 5        A.   Okay.

 6        Q.   Let me go to the bottom one first.  I was

 7   doing it backwards.

 8        A.   Okay.

 9             Okay.

10             All right.

11        Q.   Dr. Lord, are these e-mails that you sent

12   and received on the dates indicated?

13        A.   Correct.

14        Q.   I believe you answered this before, but

15   the reason I marked this exhibit is because Dr.

16   Keitz references to sharing with you her notes from

17   the meeting, but I didn't see them actually ever

18   sent to you.  Is it your understanding that what we

19   looked at previously as Exhibit 40 were the notes

20   that are being referenced in what we are now looking

21   at as Exhibit 41?

22        A.   Yes.

23        Q.   Do you know how long after this e-mail she

24   provided those notes to you?

25        A.   I'm clueless.

Jonathan Lord
February 24, 2022

1      Q.   I am at a good stopping point.  I don't

2  have a whole lot more to go through.  There are the

3  tax returns we are going to have to go through very

4  quickly and a few other documents, but we are

5  nearing the end.  But we are at a good stopping

6  point.  So, why don't we take a break and come back

7  in five or ten minutes.

8      A.   What is your guess, Chris, as to life

9  planning of how much longer you think you will be?

10      Q.   Sure.  I think that we have got probably

11  about an hour.

12      A.   Okay.  That sounds good.  Thank you very

13  much.

14      Q.   No problem.  Don't hold me to it.

15      A.   We have five witnesses.  We are on the

16  record still.

17           THE VIDEOGRAPHER:  We are going off the

18      record at 6:56.

19           (Recess 6:56 p.m. until 7:07 p.m.)

20           THE VIDEOGRAPHER:  We are back on the

21      record at 7:07.

22  BY MR. YANNUZZI:

23      Q.   Dr. Lord, after you received those letters

24  at the end of January, 2013 advising you that you no

25  longer were going to be continuing as professor, did

Jonathan Lord
February 24, 2022

1    you perform any more duties for the university, or

2    was that it?

3        A.    I thereafter came to my office and I

4    believe I attended faculty meetings with the

5    Department of Pathology.

6        Q.    Other than that, nothing else?

7        A.    Maybe some mentoring of residents along

8    the way.

9        Q.    And your last day on campus was July 31st,

10    2013?

11        A.    Somewhere around that time.  I might have

12    moved out before then.

13        Q.    Do you recall mentioning earlier in your

14    deposition that you were deposed in the case against

15    the university brought by Fahed Fayad?

16        A.    I do.  I think your firm was representing

17    me there or doing something in that vein.

18        Q.    Yes.  My firm represented the university,

19    and I defended you in that deposition.

20             Do you recall being asked about your

21    departure from the university?

22        A.    There were a variety of questions.  It

23    would be great if you could just give me some

24    specifics.

25        Q.    Do you recall what you said when asked how

Jonathan Lord
February 24, 2022

 1    you came to leave the university?

 2         A.   Not off the top of my head.

 3         Q.   Let me show you what we will mark as

 4    Exhibit 42 to your deposition.

 5              (The deposition transcript referred to was

 6         marked for identification as Defendant's

 7         Composite Exhibit No. 42.)

 8    BY MR. YANNUZZI:

 9         Q.   Dr. Lord, do you recall when you sat for

10    this deposition you took an oath to tell the truth,

11    correct?

12         A.   I did.

13         Q.   Did you, in fact, do that?

14         A.   I believe I did.

15         Q.   Dr. Lord, I am directing your attention to

16    Page 64 of the transcript.

17         A.   Okay.

18         Q.   There are a series of questions starting

19    here on Line 15 about your departure from the

20    university.  Do you see that?

21         A.   I see that.  What was the -- okay.  Where

22    would you like me to start the focus on Page 64?

23         Q.   Line 15.

24         A.   Okay.  I've got it.

25         Q.   All right.  So, just read the first two

Jonathan Lord
February 24, 2022

Page 199

1    lines here.

2          A.   Okay.  I've got it.

3          Q.   Continuing on to the next page, the

4    question was asked, "Who terminated you?"

5               You said, "The dean," correct?

6          A.   Correct.  The dean was my direct report.

7    He was my principal supervisor.

8          Q.   When Dean Goldschmidt advised you that you

9    were being terminated from your position as COO, did

10   he tell you that Donna Shalala had made the decision

11   or did he tell you that he was the person making the

12   decision?

13         A.   He used a phrase something similar to,

14   "Donna doesn't want you to continue anymore."

15         Q.   Now, you were also asked about your role

16   as a faculty member.  Do you recall that?

17         A.    Not really, but maybe.  I'm confident you

18   will point it out to me.

19         Q.   Starting on Page 70, Line 3.

20         A.   Okay.

21         Q.   You said you were not re-appointed to the

22   faculty; is that correct?

23         A.   That's what it says, correct.

24         Q.   You said that the change was made per the

25   faculty manual, correct?

Jonathan Lord
February 24, 2022

Page 200

```
 1       A.   Correct.  I see that, yes.
 2       Q.   So, when you were deposed on
 3   February 18th, 2015, in the Fayad case, there was no
 4   equivocation about the circumstances surrounding
 5   your departure from the university; is that correct?
 6       A.   Well, there are two things that were
 7   fundamentally, you know, important at this point.  I
 8   was there on behalf of the University of Miami.  I
 9   had an attorney from the University of Miami or
10   hired by the University of Miami representing what I
11   could or couldn't say at that particular point in
12   time.
13       Q.   At this point in time you had filed your
14   qui tam, correct?
15       A.   The qui tam was filed, correct.
16       Q.   And you filed that in July of 2013; is
17   that right?
18       A.   That is correct.
19       Q.   At that point in time it was under seal;
20   is that right?
21       A.   Correct.
22       Q.   While the qui tam was under seal, did you
23   discuss it with anybody?
24       A.   No.
25       Q.   Prior to the qui tam being filed, did you
```

Jonathan Lord
February 24, 2022

Page 201

```
 1    discuss the fact that you were filing a qui tam with
 2    anybody, specifically excluding your lawyers?
 3        A.    Only my ex-wife.
 4        Q.    Your wife at the time was Alice, right?
 5        A.    Right.
 6        Q.    Dr. Lord, we touched on this earlier in
 7    your deposition, but in 2015 your former wife Alice
 8    filed a Petition for Divorce against you, correct?
 9        A.    Correct.
10        Q.    And that case was litigated for about a
11    year or a year-and-a-half?
12        A.    Somewhere in that time frame, about a
13    year.
14        Q.    You both had engaged lawyers, correct?
15        A.    Correct.
16        Q.    You are aware that in the course of those
17    proceedings you prepared a financial affidavit?
18        A.    Yes.
19        Q.    I will show you a copy of that.
20              (The documents referred to were marked for
21              identification as Defendant's Composite Exhibit
22              No. 43.)
23    BY MR. YANNUZZI:
24        Q.    Dr. Lord, what I marked as Exhibit 43 to
25    your deposition is a copy of the Family Law
```

Jonathan Lord
February 24, 2022

1    Financial Affidavit that you filed in your divorce

2    case.  Do you see that?

3          A.    Yes, I do.

4          Q.    Scrolling to the second-to-last page, is

5    that your signature?

6          A.    Yes, it is.

7          Q.    By signing this, you indicated that you

8    understood that you were swearing or affirming under

9    oath the truthfulness of the claims made in this

10    affidavit and that the punishment for knowingly

11    making a false statement includes fines and/or

12    prison, correct?

13          A.    Correct.

14          Q.    On Line 2 you wrote, "I retired in July,

15    2013," correct?

16          A.    That is typed in there.  That's correct.

17          Q.    That's information that you or your lawyer

18    typed?

19          A.    Somebody typed it.  I'm not sure who.

20          Q.    Was it you?

21          A.    I don't recall.

22          Q.    But you did sign it.

23          A.    I did.

24          Q.    Then in Box 3 you checked the box that you

25    are currently unemployed, correct?

Jonathan Lord
February 24, 2022

Page 203

```
1        A.    Correct.
2        Q.    And you or somebody on your behalf wrote,
3    "I am not currently seeking employment.  However, in
4    October, 2014 I was contacted by a national search
5    firm in regard to the chief executive office
6    position for the American Diabetes Association."  Is
7    that right?
8        A.    Correct.
9        Q.    Was that answer truthful?
10        A.    That answer is precise.
11        Q.    Is there any difference between precise
12    and truthful?
13        A.    The issue was around seeking employment
14    versus seeking other opportunities and work.
15    Beginning in January of 2013, I networked with
16    search firms.  I joined a variety of social sites
17    that assist with job searches.  I attended
18    conferences.  During the period of 2013 to October,
19    2014, I believe, I probably went on three or four
20    additional boards.
21            So, the issue was seeking employment for a
22    CEO role really is about networking.  These jobs are
23    done by search.  They are not an advertisement in
24    your local paper for a CEO role.  The principal way
25    that is done is done through search.  That's why I
```

Jonathan Lord
February 24, 2022

Page 204

1    tried to reach out to people.

2            In the time that this document was signed,

3    there were no active searches that I was a part of.

4    However, it says here that I did participate in a

5    search when the opportunity came, and I think we

6    noted in our interrogatories that there was a second

7    one like that in 2017.

8        **Q.   But in both cases those were situations**

9    **where somebody reached out to you or you initiated**

10   **the first contact?**

11       A.   I initiated the first contacts in January.

12   Those were general contacts to people that I was out

13   looking for opportunities either in board or

14   leadership roles.

15       **Q.   But the positions you were just**

16   **referencing, the one with the American Diabetes**

17   **Association in October, 2014 and the one three years**

18   **later, were those positions that came to you or**

19   **positions that you sought out yourself?**

20       A.   Again, the only way these things happen in

21   these type of roles is people come to you.  That's

22   how I was hired at the University of Miami twice.

23   The University of Miami, when they went to look for

24   my replacement, hired a search firm.  So, that's the

25   way search works.  People have a job.  They do

Jonathan Lord
February 24, 2022

1    research.  They find candidates they either know or

2    know of, and they provide a slate of candidates to

3    an organization.  It always requires something

4    coming from the search firm to initiate this.

5         **Q.   Have you ever worked in an employee**

6    **position?**

7         A.   I was in the Navy for 11 years.

8         **Q.   Aside from that, have you practiced as a**

9    **clinician?**

10        A.   I'm a forensic pathologist.  My focus is

11   sudden and unexpected death.  So, I did work after

12   the time I was in the Navy related to that, but it

13   was mostly in some expert witness type of capacity.

14        **Q.   When was the last time you served as an**

15   **expert witness?**

16        A.   Probably two decades ago.

17        **Q.   Is there a reason you haven't continued**

18   **with that type of work?**

19        A.   It wasn't the particular type of work that

20   I was looking for.  It was work that was either done

21   in conjunction with things that I was involved with

22   in the Navy or management of the organizations I was

23   part of at the time.

24        **Q.   Focusing back at your affidavit, moving**

25   **beyond 3a, in 3c you checked the box that you**

Jonathan Lord
February 24, 2022

Page 206

1   retired in July of 2013 from the University of

2   Miami.  Do you see that?

3        A.   I do.

4        Q.   There's also a section here for Last

5   Year's Gross Income.  You indicated that in 2014

6   your income was a little over $7.3 million; is that

7   right?

8        A.   Correct.

9        Q.   Was that your highest annual earnings ever

10  in your lifetime?

11       A.   I don't think so.  You know, I think what

12  you will see as you look at my taxes is my income

13  would be what I would describe as lump, and it was

14  the result of having been involved with companies

15  beginning in 2003 and sometimes having stock options

16  at the end of the exercise period and they have to

17  be exercised related to liquidity events, and some

18  of them are just related to premature sale of assets

19  in order to maintain my lifestyle.

20       Q.   Was this $7.3 million-plus more than you

21  ever earned at the University of Miami?

22       A.   Yes, it was.  If you go back and when you

23  look at tax returns, the fact that there was a

24  taxable event in a particular year has little

25  correlation to the time those moneys were actually

Jonathan Lord
February 24, 2022

Page 207

1    earned.

2        Q.   Do you recall, in addition to your

3    financial affidavit, you also answered

4    interrogatories in your divorce case?

5        A.   I did.

6        Q.   We will mark as Exhibit 44 your responses

7    to interrogatories in your divorce case.

8             (The documents referred to were marked for

9             identification as Defendant's Composite Exhibit

10            No. 44.)

11       Q.   This is a ten-page document, Dr. Lord,

12   that you produced to us in this case.  I'm just

13   scrolling to the back right now.

14            Is that your signature?

15       A.   Yes, it is.

16       Q.   Again, you understood that by signing you

17   were swearing or affirming under oath to the

18   truthfulness of these interrogatory responses --

19       A.   Yes.

20       Q.   -- and that the punishment for making a

21   false statement includes fines and/or imprisonment,

22   correct?

23       A.   Correct.

24       Q.   Focusing on your response to Question 3,

25   which has to do with employment, Subsection b asked

Jonathan Lord
February 24, 2022

Page 208

1    about your employment activities other than as an

2    employee.  Do you see that?

3        A.    Yes.

4        Q.    You identified a series of companies that

5    you worked for both before during and after your

6    employment with the university in board capacities;

7    is that correct?

8        A.    Correct.

9        Q.    In each of them you note, "I have not

10   received any cash compensation in the form of a

11   salary for such appointment."  Do you see that?

12       A.    I do.

13       Q.    The answer is repeated for many of these

14   companies on this page, right?

15       A.    Yes.

16       Q.    I understand you may not have received any

17   cash compensation, but did you receive any sort of

18   compensation for these companies?

19       A.    We'll have to go back to my earlier

20   responses and say that in the vast majority of board

21   work, public or private, the compensation was in the

22   form of equity, either stock options, stock grants

23   or restricted stock grants.  Each of these companies

24   are different, but public companies obviously

25   produce an equity that is traded on the market.  So,

Jonathan Lord
February 24, 2022

1   there's some intrinsic value to it at different

2   points in time.  I received equity in those firms.

3   I generally never sold stock in a company that I was

4   believing in, either as an employee or as a board

5   member, because it is a bad signal to send to the

6   public markets that a director is doing inside

7   sales, insider sales.

8          So, in general I held my stock and my

9   options for as long as I possibly could from the

10  time that I earned them.  Fortunately in many of

11  these cases these companies' value went up

12  substantially during this period of time.  And, oh,

13  by the way, as I pointed out, I had to do selling

14  of -- premature selling of some of my assets and

15  lost a lot of potential because of not being

16  employed by the university.

17      **Q.   Even though in this one year after you**

18  **were no longer working at the University of Miami**

19  **you had income of $7.3 million.**

20      A.   My income had throughout the period of

21  time that I believe you have tax returns for and

22  probably prior to that was quite variable.  The role

23  at the University of Miami, if you recall, was

24  something that the University of Miami came to me to

25  do, not something that I was searching for at the

Jonathan Lord
February 24, 2022

 1  time.

 2      Q.  Right.  You were not looking for

 3  employment at that time; is that right?

 4      A.  I was engaged with many things, boards,

 5  helping people, consulting, I believe, and really

 6  loved the University of Miami.  I wanted to do

 7  something that would be helpful wherever I could.

 8  Initially that was around intellectual property.

 9  Ultimately it was around managing the financial

10  losses of the institution and setting the boat

11  right.

12      Q.  My question was a little different.  When

13  you came to the University of Miami, you were not

14  actively looking for employment; is that right?

15      A.  I was not actively looking for employment.

16      Q.  Now, looking at some of these other

17  interrogatory responses, you were asked about assets

18  and other litigation, Interrogatories 6 and 7.  Do

19  you see that?

20      A.  Six and seven, I see the response.  I see

21  the response in six and seven, yes.

22      Q.  Question 6 asked you about litigation that

23  you were involved in, and Question 7 asked you

24  about, among other things, income, assets and

25  liabilities, correct?

Jonathan Lord
February 24, 2022

Page 211

```
 1        A.    Yes, I do.

 2        Q.    In response to these interrogatories, you

 3   objected to disclosing information because of a

 4   Complaint that was filed in camera and under seal

 5   pursuant to 31 USC Section 3730.  Do you see that?

 6        A.    I do.

 7        Q.    That, I assume, is a reference to the case

 8   we are here on today.

 9        A.    Yes.

10        Q.    So, when the information that was being

11   sought by your wife called for an answer protected

12   from disclosure by seal, your attorney and you

13   objected; is that right?

14        A.    I believe he objected.  I don't think I

15   had standing to object.

16        Q.    He objected on your behalf, though, right?

17        A.    Correct.

18        Q.    Now, focusing on Question 8, it says,

19   "State each and every attempt you have made to

20   become employed in the last 15 months preceding your

21   answer to this interrogatory."

22              You responded with, "Respondent has not

23   made any affirmative attempts to become employed in

24   the last 15 months.  Respondent, however, was

25   contacted by a national search firm in or around
```

Jonathan Lord
February 24, 2022

1    October, 2014 in regard to the chief executive

2    officer position for the American Diabetes

3    Association," correct?

4         A.   Correct.

5         Q.   That was an accurate answer?

6         A.   Well, the answer is precise.  As I said to

7    you, beginning in January of 2013, I did everything

8    that I could to find myself in a position to either

9    have a new job and/or find other new opportunities,

10   like board opportunities.  I networked with the

11   major search firms and the people I knew there.  I

12   used social media sites, and I went to conferences,

13   and I contacted many friends.  My friends are the

14   ones who principally got me the opportunity to serve

15   on the boards.

16              In terms of employment, they came through

17   the search firm.  This is a time when I had a gag

18   clause in place, a seal.  We had, you know, issues

19   relative to what I would get as a reference from the

20   University of Miami, not likely to be very good.

21   And in 2014, slash, 2015 when I didn't get the role

22   at the American Diabetes Association, I had heard

23   that it was because of references from the

24   University of Miami.  That was a very demoralizing

25   outcome.

Jonathan Lord
February 24, 2022

Page 213

1     Q.    Heard from whom?

2     A.    I can't remember whether it was the head-

3   hunter or it was another person who was familiar

4   with the search.  I can't remember that.

5     Q.    Did you hear it from somebody from the

6   ADA?

7     A.    Not directly for sure.  It may have come

8   from somebody who was on the board of the ADA to

9   somebody else who was involved in the search.

10    Q.    I've got it.  So, somebody told somebody

11  told somebody that it was because of a bad reference

12  from UM?

13    A.    Yes.

14    Q.    I've got it.

15          So, I understand that you signed off on

16  these interrogatories that we were just looking at,

17  Exhibit 44, which presumably means that you reviewed

18  them beforehand.  Is that fair?

19    A.    Correct.

20    Q.    Did you review any of the other filings

21  made by your lawyer in the divorce case before they

22  were filed?

23    A.    Generally, yes.  I don't know how many

24  there were.  I can't say every, but I would say that

25  would be my general response.

Jonathan Lord
February 24, 2022

Page 214

```
 1        Q.   Okay.  Let me show you what we'll mark as
 2   Exhibit 45.
 3             (The documents referred to were marked for
 4        identification as Defendant's Composite Exhibit
 5        No. 45.)
 6   BY MR. YANNUZZI:
 7        Q.   Dr. Lord, what I marked as Exhibit 45 to
 8   your deposition is a document that you filed in your
 9   divorce case called Husband's Response to Wife's
10   Urgent Motion to Compel Husband to Maintain Status
11   Quo and Fund Account for Household Expenses.  Do you
12   see that?
13        A.   I do.
14        Q.   And this was filed on November 15th, 2015.
15   Do you see that?
16        A.   I do.
17        Q.   It's a 21-page document with attachments.
18             Have you seen this document before?
19        A.   Maybe a long time ago, not any time
20   recently.
21        Q.   Let me direct your attention to Paragraph
22   3 -- excuse me -- Paragraph 5.
23             You are representing to the Court that you
24   retired in July, 2013 and prior to your retirement
25   you served as Chief Medical Officer of Humana, Chief
```

Jonathan Lord
February 24, 2022

1    Operations Officer of the Miller School and UHealth

2    at the University of Miami Health System, Chief

3    Innovation Officer at the University of Miami and

4    Professor of Pathology at the University of Miami's

5    Miller School of Medicine.  Do you see that?

6         A.   I do.

7         Q.   Then in Paragraph 6 you represented to the

8    Court, "Husband, who is retired, does not receive

9    any fixed, regular income.  Instead, husband

10   receives irregular distributions from several

11   sources."  Do you see that?

12        A.   I do.

13        Q.   You understand that you represented to the

14   Divorce Court that you retired in July, 2013, right?

15        A.   So, again, I'll go back to our

16   conversation that is fairly on today.  Number one,

17   the word retirement here in my mind was used as

18   loosely as possible.  It meant I was not employed in

19   a job.  However, for my entire career, beginning

20   with my time in the Navy, I have always looked to

21   seek and find other opportunities.  I have always

22   done a lot of different things.  I think, because I

23   did have a lot of time spent networking, that I

24   found those things.  But the question is how do you

25   characterize the work of somebody who is on a board,

Jonathan Lord
February 24, 2022

Page 216

1  who is not an employee of a company, who is doing

2  work?  What phrase do you use to accurately describe

3  that?  For the layperson I think this concept of I

4  was not in a job after July, 2013 and I was 60 years

5  old, people would conventionally accept that as a

6  time of, quote, retirement.  I never retired.

7      **Q.  Well, we are not talking about laypeople,**

8  **though, here, right?  This is a filing that you made**

9  **to the Divorce Court, right?**

10     A.  That's true.  Like I said early on, it's

11 finding the right words in a period of time that

12 was, A, influenced by caution relative to the seal

13 and a need to have some level of dealing with what

14 was an extraordinarily humiliating set of

15 circumstance and trying to find the right kind of

16 words to use to describe where I was.

17     **Q.  Well, couldn't you have said, "Husband**

18 **stopped working for the University of Miami in July,**

19 **2013"?**

20         MR. SLOMAN:  Objection to the form.

21    BY MR. YANNUZZI:

22     **Q.  You can answer.**

23     A.  I could have said 16 different things,

24 including that.

25     **Q.  Right.  Nothing in the seal would have**

Jonathan Lord
February 24, 2022

1  prevented you from saying that.  That would have

2  been an accurate statement, right?

3          MR. SLOMAN:  Objection.

4      A.   Yes, it would have been.  But, again,

5  there are other things that could have been said.

6      BY MR. YANNUZZI:

7      Q.   Right, and that's one of them, correct?

8      A.   That's one of them.

9      Q.   You have also said that you were

10  terminated from two positions and were not

11  re-appointed to your last position as of July, 2013,

12  right?

13          MR. SLOMAN:  Objection to the form.  At

14      the time it was under seal.  The age claim or

15      the termination claim was part of the seal.

16      A.   You know, again, I will just say that I

17  tried to deal with responding to questions the best

18  that I could under some very difficult circumstances

19  relative to the seal.

20      BY MR. YANNUZZI:

21      Q.   Well, you are not responding to questions

22  in this document, right, Dr. Lord?

23      A.   No, I'm not.  Correct.

24      Q.   And your lawyer, who was aware of the seal

25  because he previously objected on that basis,

Jonathan Lord
February 24, 2022

Page 218

```
 1   prepared this document on your behalf, right?

 2            MR. SLOMAN:  Objection to the form.

 3       A.   I guess I would like to be sure this came

 4   from Jose and not from Fogel.

 5   BY MR. YANNUZZI:

 6       Q.   No problem.  Let me scroll to the bottom.

 7            It was signed by Jose Becerra.  He was

 8   your divorce lawyer?

 9       A.   Yes.

10       Q.   And Fogel was one of the lawyers for your

11   former wife?

12       A.   Correct.

13       Q.   So, with that you understand this was a

14   statement that came from you and your lawyer, right?

15       A.   That is correct.

16            MR. SLOMAN:  I will just make a continuing

17       objection to questions with regard to this,

18       which we believe were previously under seal.  I

19       don't know how you guys got them, but I just

20       wanted to make that objection and also object

21       to the continuing argumentativeness of the

22       questions.

23   BY MR. YANNUZZI:

24       Q.   Dr. Lord, I am going to show you another

25   document that was filed in your divorce case.
```

Jonathan Lord
February 24, 2022

Page 219

```
1      A.   Okay.
2      Q.   We'll mark this as Exhibit 46.
3           (The documents referred to were marked for
4      identification as Defendant's Composite Exhibit
5      No. 46.)
6   BY MR. YANNUZZI:
7      Q.   Dr. Lord, this is a rather lengthy one.
8   It has a lot of attachments.  It's 136 pages.  Let
9   me just get to the end of the principal part of the
10  document so I can show you that it was filed on
11  January 4th, 2016, by your lawyer, Mr. Becerra.  Do
12  you see that?
13     A.   Yes.
14     Q.   This document is entitled Husband's Motion
15  for Partial Summary Judgment Regarding Unvested
16  Stock Options and Restricted Stock Units.  Do you
17  see that?
18     A.   I do.
19     Q.   Do you recall reviewing this document
20  before it was filed?
21     A.   You know, again, I said generally I did.
22  I don't remember this specific document.
23     Q.   And as before, looking at Paragraph 2,
24  there's a representation to the Court that you
25  retired in July, 2013.  Do you see that?
```

Jonathan Lord
February 24, 2022

Page 220

```
 1      A.    I do.

 2      Q.    Let me show you another document, which we

 3   will mark as Exhibit 47.

 4            (The documents referred to were marked for

 5            identification as Defendant's Composite Exhibit

 6            No. 47.)

 7   BY MR. YANNUZZI:

 8      Q.    Dr. Lord, what we have marked as Exhibit

 9   47 is another document that you filed in your

10   divorce case on January 4th, 2016, entitled

11   Husband's Motion for Leave to Increase Existing Line

12   of Credit and to Secure an Individual Line of

13   Credit.

14            I need to go to the last page.  It's the

15   principal part of the document that shows that this

16   was filed, again, by your lawyer on your behalf.  Do

17   you see that?

18      A.    I do.

19      Q.    Dr. Lord, have you seen this document

20   before?

21      A.    You know, again, I'll give you the same

22   response.  I probably did at one point.  I don't

23   recall it specifically.

24      Q.    I appreciate that.  I don't mean to keep

25   asking the question to be difficult.  It's possible
```

Jonathan Lord
February 24, 2022

Page 221

1    that, you know, one might be different.  For the
2    purposes of the record, I have got to ask each time.
3         A.    Not a problem.
4         Q.    I appreciate that.
5               Dr. Lord, directing your attention to
6    Paragraph 6, there is a representation that you made
7    to the Court that you are retired and do not receive
8    any fixed regular income.  Do you see that?
9         A.    I do.  Again, I'll state the same thing.
10   It's very difficult to conventionally describe
11   whether I was working or not working, retired or
12   not.  I did not have an employer at the time that
13   this was filed.
14        Q.    Do you recall giving testimony in your
15   divorce case?
16        A.    I remember giving a deposition.
17        Q.    Do you recall being asked whether or not
18   you were terminated by the University of Miami?
19             MR. SLOMAN:  Objection.  Please show him
20        the deposition and cite him to the page and the
21        line, please.
22             MR. YANNUZZI:  I don't have to do that
23        yet.  I am going to ask him the question first,
24        and then if I need to show him the document to
25        show him the testimony, then I will.

Jonathan Lord
February 24, 2022

Page 222

1     A.    Thank you.  Remember that.

2           Can I have the question again?

3    BY MR. YANNUZZI:

4     **Q.    Sure.  Dr. Lord, do you recall being asked**

5    **in your deposition in the divorce case whether or**

6    **not you were terminated by the University of Miami?**

7     A.    I remember being asked many questions

8    about my employment and the end of my employment at

9    UM.

10    **Q.    Do you recall testifying that you were not**

11   **terminated by the University of Miami?**

12    A.    I recall telling you a little bit ago that

13   I used an abundance caution in describing, because

14   of the seal, what my status was.  And I believe that

15   in that process or that time my attorney objected to

16   the question.

17          MR. SLOMAN:  I am going to object to the

18       form of the question.

19    BY MR. YANNUZZI:

20    **Q.    Dr. Lord, I am going to show you an**

21   **excerpt that you produced to us in this case from**

22   **the first day of your deposition taken in your**

23   **divorce case on January 18th, 2016.  Have you ever**

24   **reviewed your transcript before?**

25    A.    I'm sure I had to.  I signed it at some

Jonathan Lord
February 24, 2022

Page 223

1    point.

2              (The deposition transcript referred to was

3        marked for identification as Defendant's

4        Composite Exhibit No. 48.)

5    BY MR. YANNUZZI:

6        Q.    Was the last time you reviewed your

7    transcript back when your divorce was still pending?

8        A.    Probably.  I never sat down to read

9    transcripts volitionally.

10       Q.    Dr. Lord, turning your attention to Page

11   99, you were asked about your financial affidavit.

12   Do you see that?

13       A.    I do.

14       Q.    You were asked about Page 1 when you

15   indicated you retired in July, 2013, and you

16   responded, "Correct," right?

17       A.    Correct.

18       Q.    Then skipping down, you were asked, "Is

19   that the only position that you had at the

20   University of Miami at that time?"

21              Your Honor was, "Yes, it is."

22              Then you were asked, "In July, 2013 you

23   were, in fact, fired from the University of Miami?"

24              Your answer was, "No.  In July of 2013 my

25   faculty appointment expired."

Jonathan Lord
February 24, 2022

1           Do you see that?

2       A.   I do.

3       Q.   You were represented by counsel in this

4   deposition; is that right?

5       A.   I was.

6       Q.   Was that Mr. Becerra?

7       A.   It was.

8       Q.   We know in your interrogatory responses

9   Mr. Becerra was aware of your pending qui tam that

10  was under seal because he asserted an objection on

11  that basis in your interrogatory answers, right?

12          MR. SLOMAN:  Object to the form.

13  BY MR. YANNUZZI:

14      Q.   You can answer.

15      A.   Can you do that again because it was fast?

16      Q.   No problem.

17          We know from the objection in the

18  interrogatory answers that Mr. Becerra was aware of

19  your qui tam action and the fact that it was under

20  seal, right?

21      A.   Absolutely.

22      Q.   And he did not object to any of this line

23  of questioning at your deposition; is that correct?

24          MR. SLOMAN:  Objection to the form.

25      A.   You know, I do know that he objected.  I

Jonathan Lord
February 24, 2022

                                                    Page 225

1    don't know at which time or whether it was before or
2    after this.
3         Q.   But he certainly didn't object to this
4    question right here that asked whether you were, in
5    fact, fired and you said no, correct?
6              MR. SLOMAN:  Objection to the form.  The
7         document speaks for itself.
8         A.   So, all I can say is that in these Q and
9    A's there's no evidence that he said anything.
10   However, he may have made some general statements or
11   objections prior to this about this entire topic.  I
12   don't know what the resolution of that was.
13        Q.   So, putting aside the possible objection
14   that you are referencing, at least as far as you can
15   tell from this portion of the transcript, no
16   objection was asserted.  Is that fair?
17             MR. SLOMAN:  Objection to the form.
18        A.   From this page, Page 97, I would say that
19   is correct.
20        BY MR. YANNUZZI:
21        Q.   Did you ask any of the lawyers from your
22   qui tam case to represent you in connection with
23   your deposition in your divorce case?
24        A.   It is the same firm.  It's the Ferraro
25   firm.

Jonathan Lord
February 24, 2022

Page 226

 1      Q.    Is it the same lawyers or different
 2   lawyers from the firm?
 3      A.    Jim Ferraro has always been involved.
 4      Q.    Was Jim Ferraro involved in both this
 5   proceeding and your divorce proceeding?
 6      A.    Yes.
 7      Q.    I'm sorry.  I didn't understand your
 8   answer before.  Thank you for clarifying.
 9            Do you recall being asked about the press
10   coverage from the Miami Herald in your deposition in
11   your divorce case?
12      A.    Generally.
13      Q.    Do you recall testifying that the
14   University of Miami did not release information to
15   the Herald that they had fired you?
16      A.    I believe, not knowing what I said in the
17   deposition, but the actual article said that I was,
18   quote, stepping down.
19      Q.    Is there some other quote that you were
20   referring to when you mentioned earlier in your
21   deposition that the University of Miami has created
22   bad press for you?
23      A.    There's no question that it created bad
24   press for me because the stepping down was a
25   complete fabrication, as were many of the talk

Jonathan Lord
February 24, 2022

Page 227

1  tracks that Shalala ultimately edited out of

2  Goldschmidt's final e-mail to people on January 30th

3  as well as January 2nd.

4      Q.   Well, those e-mails were internal, right?

5  I'm talking about statements that were made to the

6  Herald and then statements that were published in

7  the Herald.

8      A.   I'm saying that the statements that were

9  made to the Herald both on January 2nd and

10  January 30th were incomplete and disingenuous.

11      Q.   And it's your position that the university

12  saying that you stepped down was more harmful to you

13  than the university saying they fired you?

14      A.   Well, it was harmful in the context of one

15  article comes out and says I'm stepping down.  The

16  next article comes along and says that I'm

17  continuing in pathology.  Then there were a series

18  of articles that came along after that that

19  basically have denials from the university about my

20  continued work at the university as a professor.

21  And, oh, by the way, again, in the UM-supplied

22  discovery there is lots of evidence from the

23  communications people that they were not telling the

24  truth to the newspapers.

25      Q.   My question is a little bit different.  Do

Jonathan Lord
February 24, 2022

Page 228

1    you think it would have been better for your

2    reputation if the university said, "We fired Dr.

3    Lord because there was a faculty petition signed by

4    over 500 people"?

5              MR. SLOMAN:  Objection to the form.

6        A.   I would say that, given all of the press

7    that we had about turning the place around, my

8    immediate supervisors multiple times in January

9    talking about how successful we were, that the way

10   it was communicated to the press was not correct.

11       BY MR. YANNUZZI:

12       Q.   And my question is very different.  Do you

13   think that your reputation would have been far less

14   if the university had told the Herald that they had

15   fired you because of a faculty petition calling for

16   your ouster that was signed by over 500 people?

17             MR. SLOMAN:  Objection to the form.

18       A.   I don't mean to be difficult, but I have

19   to parse some of that.  If the university would have

20   said that I had been fired or was stepping down with

21   absolutely no other explanation, something that was

22   sudden and it was clear that it was sudden, then the

23   reader could draw an inference whether I had some

24   issues around sexual harassment or other things that

25   went to cause that change to take pace suddenly.  If

Jonathan Lord
February 24, 2022

1    the conversation was, "Jack Lord is transitioning or

2    stepping down over the next three months," that

3    would have been very different than the way it was

4    handled by Shalala and UM Communications.

5         **Q.   I get that it could have been different in**

6    **a whole lot of different ways.  I'm just trying to**

7    **see it in a continuum.  Is it your sworn testimony**

8    **as you sit here today that a statement that you were**

9    **stepping down would be more harmful to you than a**

10   **statement that you were fired for misconduct or**

11   **performance?**

12             MR. SLOMAN:  Object to the form, asked and

13        answered.

14        A.   And beyond that, there was never anything

15   that had to do with my performance.  There was never

16   any communication relative to my conduct.  Again, I

17   don't mean to be difficult.  But the first issue is,

18   when you say somebody is stepping own suddenly or

19   that they are fired, it's kind of irrelevant.

20             The second part of your statement is

21   false, that the reason I was fired was because of a

22   petition that was aimed at my boss as well as

23   myself.  Again, there's a boatload of UM-supplied

24   discovery that says that that's a false narrative.

25        **Q.   Well, you testified earlier in your**

Jonathan Lord
February 24, 2022

Page 230

1   deposition that you don't know why you were fired,

2   right, because you were never told and you never

3   asked; is that correct?

4           MR. SLOMAN:  Objection to the form.

5       A.   I answered your question specifically who

6   told me and did I ask why.  I said Goldschmidt, and

7   I did not.

8           However, in the last week, since UM has

9   provided discovery, there have been many things that

10  I was completely unaware of that demonstrates

11  exactly what this process was, and it's consistent

12  with the filings that we made relative to the claims

13  in this case.

14      Q.   Putting aside what you think you learned

15  over the last week, at the time you were fired and

16  in the months thereafter, did you have any knowledge

17  as to the reasons why you were fired?

18      A.   Well, I had a belief that it was all

19  related to the IML because of the actions that took

20  place from December 18th, 19th or so when the review

21  was moved from compliance to McCafferty, to the

22  president instructing the changes in lab policies

23  which were directed by Goldschmidt, to the sudden

24  change.

25          You know, on December 1st I was a guest at

Jonathan Lord
February 24, 2022

Page 231

1   the president's house on a social activity.  On

2   December 2nd I sponsored a table at the Frost School

3   for $10,000 out of my own pocket.  The following

4   weeks I was actively engaged with Shalala and others

5   on other changes that were going on relative to

6   hospital governing structures, getting ready for

7   board meetings and executing things.

8           So, to me the sudden change and the sudden

9   change especially of the behavior of my partner, it

10  was clear that it was a specific event that caused

11  this to happen.  And the only one was related to the

12  IML and the activities related to Livingstone.

13  **Q.   Well, we know the petition was being**

14  **circulated in that time frame, also, correct?  We**

15  **looked at those e-mails a few minutes ago.**

16  A.   The petition was going on then, but the

17  petition was nothing.  We can go through some

18  history with the president and some of the e-mails

19  that you provided in your discovery.

20          She basically goes back and forth with

21  LeBlanc and says, "Well, do we have to accept that

22  petition or do we not have to accept it?"

23          LeBlanc gives her advice back.  That's

24  followed by a response from her, "Well, we can take

25  it, but we don't have to act on it."

Jonathan Lord
February 24, 2022

```
 1              So, Shalala in that instance and a year-
 2   and-a-half later when Pascal had a dean's vote, in
 3   both cases she didn't really care to listen to
 4   anybody who might be voting.
 5        Q.   And that's what you are surmising from
 6   your review of the documents, right?
 7        A.   That's my interpretation of what happened
 8   over that time.
 9        Q.   We got a little sidetracked, Dr. Lord.
10              Do you agree with me that the University
11   of Miami never told the Herald or the press that you
12   had been fired?
13        A.   The University of Miami used phrases like
14   "stepped down," or, "We don't have any comments
15   about Dr. Lord's future status at the university,"
16   and other comments that could be viewed as
17   extraordinarily negative when somebody like
18   Goldschmidt writes that beginning at the end of
19   December he started looking at people and he had
20   this epiphany, which again is totally belied by any
21   of the documents that you are in possession of.
22        Q.   Dr. Lord, my question was a little bit
23   different.  It's really a yes or no.  Did UM every
24   say, "We fired Dr. Lord"?
25        A.   Not in the newspaper.
```

Jonathan Lord
February 24, 2022

Page 233

1      Q.   Other than the newspaper, is there some
2  place where you believe that the University of Miami
3  said, "We fired Dr. Lord"?
4      A.   I believe that in the documents and
5  e-mails that went back and forth between a number of
6  leaders at UM after January 1st, it was clear that I
7  was fired.
8      Q.   Do you know whether outside of the
9  university the message was conveyed that you had
10 been fired?
11     A.   Well, again, there's no question that
12 anybody who has a Google search can pull up all of
13 those UM articles.  They go as far as July of 2013
14 that in a number of cases suggest that I was a
15 scapegoat for something.
16     Q.   My question is a little bit different.
17 Did you ever see any message from the University of
18 Miami to anybody or any organization outside of UM
19 that said you were fired?
20     A.   Again, not in the specific term of I'm
21 fired.
22     Q.   Were you ever asked to provide a comment
23 to the Miami Herald or any press in response to any
24 of the articles that were being written?
25     A.   Absolutely, and I always went through

Jonathan Lord
February 24, 2022

Page 234

1    corporate communications to rely on their guidance

2    as to whether to respond or not.

3        **Q.    What about after you were no longer**

4    **employed by the university?**

5        A.    I don't recall too many articles coming

6    out after 2013, and it would be irrelevant anyway

7    because the case was under seal by then.

8        **Q.    Well, your firing, you could have still**

9    **talked to the press and said you were not fired,**

10   **right?**

11           MR. SLOMAN:  Objection, foundation.

12       Objection to the form.  Objection, speculation.

13       A.    Let me try to be really clear.  Throughout

14   January my focus was on a better UM.  It was not on

15   having some sort of fight in the Miami Herald.  My

16   focus in terms of being loyal was every time a press

17   release -- a press question came in like from the

18   Herald, I would turn that over to corporate

19   communications and follow their guidance as to

20   whether or not to respond.  And that's the way I

21   operated my entire time there and quite frankly in

22   every organization.

23       **Q.    And now the case is no longer under seal.**

24   **Have you gone to the Herald to tell your side of the**

25   **story?**

Jonathan Lord
February 24, 2022

Page 235

1      A.   I have not, but I know there have been

2   Herald articles about this case and the settlement

3   in the first phase of the case.

4      **Q.   Have you provided any comments?**

5      A.   I have not.

6      **Q.   Has anything prevented you from providing**

7   **any comments?**

8      A.   The fact that we still have ongoing

9   litigation.

10     **Q.   Do you recall testifying in your divorce**

11  **case that your decision to leave your professor**

12  **position was voluntary on your part?**

13          MR. SLOMAN:  Objection.

14     A.   I don't recall.  I need to see that,

15  please.

16  BY MR. YANNUZZI:

17     **Q.   Do you not recall it or you don't recall**

18  **what your testimony was?**

19          MR. SLOMAN:  Object to the form.

20     A.   I would say both.

21  BY MR. YANNUZZI:

22     **Q.   Dr. Lord, we are looking at Page 105, Line**

23  **8.  You were asked, "Let's talk -- I know you said**

24  **your professorship ended in 2014, and that was when**

25  **you retired from that position, correct?"**

Jonathan Lord
February 24, 2022

Page 236

1              Answer:  "Correct."

2              Question:  "That was a voluntary act on

3      your part?"

4              Answer:  "Correct."

5              Do you see that?

6         A.   Yes.  I think the document that we looked

7      at from LeBlanc that I signed that said I waive my

8      right to a vote was a voluntary act on my part.

9         Q.   The prior question asked about retirement.

10     Then you were asked if that was a voluntary act, and

11     you said, "Correct."  Do you see that?

12        A.   I do see that.

13        Q.   Was there anything that prevented you back

14     in January of 2016 from explaining your answer a

15     little bit further and saying, "Oh, I agreed to an

16     actual vote, and that's what happened"?

17             MR. SLOMAN:  Objection.  Objection to the

18        form, speculation.

19        A.   I said on several occasions that when it

20     came to questions about the end of my work at the

21     University of Miami, we tried to use an abundance of

22     caution in our responses both in terms of extent and

23     the need to provide information above and beyond

24     what was asked in the question.

25        Q.   Let me direct your attention to this part

Jonathan Lord
February 24, 2022

Page 237

1    of the transcript, Page 106.

2        A.   Okay.

3        Q.   You were asked questions about the reason

4    you left the university.  Do you see that here?

5        A.   Yes.

6        Q.   Do you see how your lawyer over the next

7    several pages objected to those questions and

8    instructed you not to answer?

9        A.   I do.

10       Q.   He contends that the information is

11   privileged.  Do you see that?

12       A.   I do.

13       Q.   So, he did not assert those objections to

14   the questions that we were just looking at on Page

15   105 regarding your voluntary decision to resign your

16   professorship.  Do you see that?

17       A.   I see that he did not have any objection

18   related to that particular question.

19       Q.   You were also asked in your deposition

20   what you did in terms of employment after leaving

21   the University of Miami as a professor.  Do you see

22   that?

23       A.   Yes, I do.

24       Q.   You answered, "Nothing," right?

25       A.   I did.

Jonathan Lord
February 24, 2022

Page 238

1           I think I went on -- before you go away.
2    I'm sorry.
3        **Q.   Sure.**
4        A.   I think for completeness sake, the answer
5    beginning on Line 10 was consistent with everything
6    that I shared with you.  I have always looked for
7    new opportunities.  I have never stopped in 40-plus
8    years.
9        **Q.   And you also described your work with the**
10   **university as opportunistic, right?**
11       A.   Correct.
12       **Q.   And your lawyer didn't object to any**
13   **questions about your future employment plans there,**
14   **right?**
15           MR. SLOMAN:  Objection to the form.
16       A.   You know, again, I don't know whether
17   those objections carried forward or he had to object
18   every time.  But in that case there's no obvious
19   objection.
20       BY MR. YANNUZZI:
21       **Q.   I'm going to show you another document**
22   **from your divorce case that we will mark as Exhibit**
23   **49.**
24       A.   Okay.
25           (The documents referred to were marked for

Jonathan Lord
February 24, 2022

Page 239

```
 1        identification as Defendant's Composite Exhibit
 2        No. 49.)
 3        BY MR. YANNUZZI:
 4        Q.    This is a document entitled Husband's
 5   Motion to Bifurcate the Temporary Relief Proceeding.
 6   It's dated March 16, 2016.  Do you see that?
 7        A.    I do.
 8        Q.    Let me scroll to the end of the document
 9   and show you that this was filed on your behalf by
10   your lawyer from the Ferraro law firm --
11        A.    Right.
12        Q.    -- Jose Becerra.  Do you see that?
13        A.    Yes.
14        Q.    Do you recall reviewing this document
15   before it was filed?
16        A.    Again, I believe I reviewed documents, but
17   I can't recall specifically looking at this one.
18        Q.    Let me direct your attention to Paragraphs
19   3 and 4.
20              Dr. Lord, do you see how in Paragraph 3
21   you represented to the Divorce Court that you
22   resigned from your professor position at the
23   University of Miami in December, 2012 and officially
24   retired in July, 2013?
25        A.    I see that.
```

Jonathan Lord
February 24, 2022

1      Q.   Do you see in Paragraph 4 there's a

2  reference to your resignation from the University of

3  Miami?

4      A.   Yes.

5      Q.   Then in Paragraph 5 there's a reference to

6  the board work that you were doing at that time; is

7  that right?

8      A.   Correct.

9      Q.   Now, Dr. Lord, your divorce case

10  ultimately settled, correct?

11      A.   Yes.

12      Q.   And it was by a Settlement Agreement that

13  you and your former wife executed?

14      A.   Yes.

15      Q.   The Court signed off on the Settlement

16  Agreement.  Do you recall that?

17      A.   I believe they did.

18      Q.   Now, during your divorce proceedings --

19  well, let me back up.

20           Did your wife receive alimony from you as

21  part of your divorce?

22      A.   No, she did not.

23      Q.   She received an equitable distribution of

24  your current assets?

25      A.   Yes.

Jonathan Lord
February 24, 2022

Page 241

 1      Q.   Did she receive any portion of your
 2   recovery in the first phase of this case?
 3      A.   Yes, she did.
 4      Q.   Is she entitled to recover any portion of
 5   your recovery in this part of the case?
 6      A.   Yes, she is.
 7      Q.   What percentage is that?
 8      A.   50/50.
 9      Q.   And that's part of your divorce agreement?
10      A.   Yes.
11      Q.   Did your wife in the divorce case ever
12   challenge your representation that you retired or
13   resigned from the University of Miami?
14      A.   I don't recall.  Her attorney seemed to
15   object or fight about every single word.  So, it's
16   very possible.
17      Q.   But you testified earlier that you told
18   your ex-wife that you had been fired, correct?
19      A.   Yes.  She was there when it happened.  It
20   was a non-courteous, "Let me give Jack a call at
21   home," firing.
22      Q.   Are you aware of any filings that your
23   wife made in Divorce Court where she said, "Contrary
24   to what my husband said in his filings related to
25   his deposition testimony, he didn't retire or

Jonathan Lord
February 24, 2022

Page 242

```
 1   resign.  He was fired"?

 2            MR. SLOMAN:  Objection to the form.

 3       A.   I believe that there's something like that

 4   in there.  I don't know what the specifics are.

 5       Q.   Can you identify that document?

 6            MR. SLOMAN:  Objection to the form.  He

 7       may be referring to your deposition testimony

 8       at Page 105, Lines 16 through 22.

 9            THE WITNESS:  I don't have that.  I don't

10       see it.

11            MR. SLOMAN:  It's Exhibit 48.

12       A.   Is somebody getting that for me to look

13   at?  I'm sorry.

14       Q.   I will show it to you.

15            I will even allow the coaching.  That's

16   okay.

17            Is that what you are referring to here?

18       A.   I don't know.

19            MR. YANNUZZI:  Did you say Page 105?

20            MR. SLOMAN:  Right, 16 through 22.

21       BY MR. YANNUZZI:

22       Q.   Do you see that, Dr. Lord?  You testified

23   that she was --

24       A.   I see the objection.

25       Q.   And then you answered, "I was removed."
```

Jonathan Lord
February 24, 2022

Page 243

```
 1        A.    "I was removed."
 2        Q.    Because you had two other titles, right,
 3    other than being a professor?
 4        A.    I did.   That's true.   Correct.
 5        Q.    So, you testified that you were removed
 6    from those two positions, but you voluntarily
 7    retired from the professor position.   Do you see
 8    that all on this page?
 9        A.    Well, again, my recollection and testimony
10    and my testimony now is what I consider the word
11    "voluntary" was signing the note waiving my right to
12    a vote.
13        Q.    And what about the word "retired"?
14        A.    Well, we had this conversation before.
15    The situation was complicated by the fact that
16    things were under seal.   It's hard to characterize
17    the scope of my work in income generation.   And
18    "retired" was as good an option as there was at the
19    time.
20        Q.    Couldn't you have testified that you were
21    fired from all three positions?
22              MR. SLOMAN:   Object to the form,
23        speculation.
24        A.    Again, I think we were very clear about
25    our concerns relative to the seal and whether or not
```

Jonathan Lord
February 24, 2022

Page 244

1   that would have any sort of compromise on that

2   seal.

3       **Q.   Is it your position in this case that you**

4   **were fired from all three positions?**

5       A.   I was fired from all three positions.

6       **Q.   But you said in your divorce case you were**

7   **fired from two of them and retired voluntarily from**

8   **one, right?**

9       A.   Again, I want to go back to say that I

10  voluntarily signed a piece of paper that came from

11  the provost, and I specified that I waived my right

12  to a vote.  Now, if I hadn't done anything, then

13  there would have been a vote.  So, that's the sort

14  of bottom line on how to answer that question.

15      **Q.   I believe you testified earlier that the**

16  **vote would not be determinative, right, that it was**

17  **strictly advisory?**

18      A.   It was strictly advisory, correct.

19      **Q.   So, in essence, the vote would be**

20  **inconsequential.**

21      A.   Correct, and I think in your supplied

22  discovery one of the things that was very clear,

23  Birnbach provided guidance to everybody about that.

24           So, we are coming up on an hour.

25

Jonathan Lord
February 24, 2022

Page 245

```
 1        Q.   Yes.  I just want to go through the last
 2   few exhibits, but why don't we take a break now.
 3        A.   Okay.
 4        Q.   I have some simple stuff left.
 5        A.   You think we have maybe a ten-minute break
 6   and then a half hour max?
 7        Q.   Probably, yes.
 8        A.   Okay.  Great.  "Probably" is on the
 9   record.
10        Q.   I appreciate that, Doctor.
11             THE VIDEOGRAPHER:  We are going off the
12        record at 8:09.
13             (Recess 8:09 p.m. until 8:19 p.m.)
14             THE VIDEOGRAPHER:  We are back on the
15        record.  The time is 8:19.
16   BY MR. YANNUZZI:
17        Q.   Dr. Lord, before taking a break, we were
18   talking about your divorce settlement.  You
19   mentioned that you, as part of your divorce
20   settlement, you agreed to split the proceeds from
21   this case we are in now with your ex-wife 50/50; is
22   that right?
23        A.   Yes, I did.
24        Q.   Was that conditioned on her waiver of a
25   right to any other property?
```

Jonathan Lord
February 24, 2022

Page 246

1        A.    No.

2        Q.    It wasn't that she took a piece of this

3   and you got the house, right, or anything to that

4   effect?

5        A.    No.

6        Q.    She didn't waive her right to alimony to

7   get the proceeds from this case.

8        A.    No.

9        Q.    Now, I am going to walk you through very

10  quickly a series of exhibits, which are the tax

11  returns you produced in this case.  They are very

12  lengthy.  I'm happy to work with Jeff to expedite

13  this because they were already produced by you in

14  this case.  I just want to confirm that these are

15  your tax returns.

16       A.    This is my tax return.

17       Q.    Right.  This is for 2012?

18       A.    Yes.  That's what it says.

19             MR. YANNUZZI:  All right.  So, we will

20       mark that as Exhibit 50.

21             (The documents referred to were marked for

22       identification as Defendant's Composite Exhibit

23       No. 50.)

24   BY MR. YANNUZZI:

25       Q.    Dr. Lord, Exhibit 51 will be your tax

Jonathan Lord
February 24, 2022

1    return for 2013.

2            (The documents referred to were marked for

3        identification as Plaintiff's Composite Exhibit

4        No. 51.)

5    BY MR. YANNUZZI:

6        Q.   **Have you seen this document before?**

7        A.   I have.

8            MR. YANNUZZI:  We will mark as Exhibit 52

9        your tax return for 2014.

10           (The documents referred to were marked for

11       identification as Defendant's Composite Exhibit

12       No. 52.)

13   BY MR. YANNUZZI:

14       Q.   **Dr. Lord, this is a copy of the tax return**

15   **you filed in 2014?**

16       A.   Yes.

17       Q.   **Dr. Lord, what we will mark as Exhibit 55**

18   **to your deposition is your tax return for 2015.  Do**

19   **you recall seeing this document before?**

20           MR. SLOMAN:  Chris, I think that's Exhibit

21       53.

22           MR. YANNUZZI:  Excuse me.  Yes.  I

23       apologize.  Let me start over.

24           (The documents referred to were marked for

25       identification as Defendant's Composite Exhibit

Jonathan Lord
February 24, 2022

1        No. 53.)

2     BY MR. YANNUZZI:

3        Q.    What has been marked as Exhibit 53 to your

4     deposition is a copy of your tax return for 2015.

5     Do you see that?

6        A.    I do.

7        Q.    Is this the tax return that you filed?

8        A.    Yes.

9        Q.    At this point your wife had filed for

10    divorce but you still agreed to file jointly?

11       A.    Yes.

12       Q.    What I will mark as Exhibit 54 is your tax

13    return for 2016.  Do you see that?

14       A.    Yes, I do.

15             (The documents referred to were marked for

16             identification as Defendant's Composite Exhibit

17             No. 54.)

18    BY MR. YANNUZZI:

19       Q.    This is a copy of the tax return that you

20    filed that year?

21       A.    It is.

22       Q.    And this was also filed jointly by and on

23    behalf of you and your current wife, correct?

24       A.    Correct.

25       Q.    Does your wife work?

Jonathan Lord
February 24, 2022

Page 249

 1      A.   My wife worked for the Federal Government

 2  through 2015.

 3      Q.   Did she retire at that point?

 4      A.   She is still actively engaged in the

 5  compliance community.

 6      Q.   Is she approximately your age?

 7      A.   She is.

 8      Q.   Dr. Lord, what we will mark as Exhibit 55

 9  to your deposition is a copy of your tax return for

10  year 2017.

11      A.   Okay.  I see that.

12           (The documents referred to were marked for

13           identification as Defendant's Composite Exhibit

14           No. 55.)

15  BY MR. YANNUZZI:

16      Q.   Do you see that?

17      A.   Yes.

18      Q.   What we will mark as Exhibit 56 to your

19  deposition is a copy of your 2018 tax return.  Do

20  you see that?

21      A.   I do.

22           (The documents referred to were marked for

23           identification as Defendant's Composite Exhibit

24           No. 56.)

25      Q.   What I will mark as Exhibit 57 is a copy

Jonathan Lord
February 24, 2022

Page 250

1    of your 2019 tax return.

2           (The documents referred to were marked for

3       identification as Defendant's Composite Exhibit

4       No 57.)

5    BY MR. YANNUZZI:

6       Q.   Do you see that?

7       A.   I need to see the actual form.

8       Q.   No problem.  I'm sorry about that.  The

9    last few pages are from your accountant.

10      A.   Okay.

11      Q.   Do you agree that that is your tax return

12   for 2019?

13      A.   It is.

14      Q.   And last but not least what we will mark

15   as Exhibit 58 to your deposition is a copy of your

16   tax return for 2020.

17      A.   Okay.

18           (The documents referred to were marked for

19       identification as Defendant's Composite Exhibit

20       No. 58.)

21   BY MR. YANNUZZI:

22      Q.   Let me scroll through the first few pages

23   for you.  Do you see that?

24      A.   That's fine.

25      Q.   Dr. Lord, have you filed for 2021?

Jonathan Lord
February 24, 2022

Page 251

```
 1       A.   Not yet.
 2       Q.   Are you planning on filing on time or will
 3   you be getting an extension?
 4       A.   We'll be getting an extension.
 5       Q.   Dr. Lord, you alluded to this earlier in
 6   your deposition, but you are aware that a portion of
 7   this case related to the false narrative allegations
 8   was settled, correct?
 9       A.   Yes.
10       Q.   And the Settlement Agreement was entered
11   into last year?
12       A.   I can't recall whether it was 2021 or
13   2020.
14       Q.   Let me show you a copy of the Settlement
15   Agreement, which we'll mark as Exhibit 59.
16            (The documents referred to were marked for
17            identification as Defendant's Composite Exhibit
18            No. 59.)
19   BY MR. YANNUZZI:
20       Q.   It's a lengthy document, Dr. Lord.
21       A.   Yes.  I would like to see a date on it
22   somewhere.
23       Q.   It was filed on June 4th, 2021, but
24   perhaps if I can go to the signature page, it will
25   help.
```

Jonathan Lord
February 24, 2022

Page 252

```
 1     A.   There we go.  2021, yes, I've got it.

 2     Q.   I would like to find your signature for

 3   you.

 4          MR. SLOMAN:  You just passed it.

 5   BY MR. YANNUZZI:

 6     Q.   There you go.  Is that your signature,

 7   albeit somewhat faded?

 8     A.   Yes.

 9     Q.   Okay.  Perfect.

10          Dr. Lord, do you recall how much you

11   recovered as part of this settlement?

12     A.   I believe that it was somewhere in the

13   $3.9 to $4 million range.

14     Q.   Your attorneys received a portion of that?

15     A.   Yes, they did.

16     Q.   What percentage?

17     A.   There was a pre-agreement of a 40 percent

18   contingency fee.

19     Q.   Was that the ultimate final resolution?

20     A.   The ultimate resolution is we agreed on a

21   sum that would be equivalent to that.

22     Q.   40 percent?

23     A.   Correct.

24     Q.   And then you and your wife split the

25   remainder?
```

Jonathan Lord
February 24, 2022

Page 253

1     A.    The remainder was split.  There were

2  people like Chen and Yelen who were involved in this

3  as well.

4     Q.    **When you mentioned getting approximately**

5  **$4 million, that is across all the relaters or the**

6  **portion attributed to you?**

7     A.    The portion that was attributed to me.

8     Q.    **So, of that $4 million, approximately**

9  **40 percent went to your lawyers and then the**

10  **remainder of that went to you and your wife 50/50?**

11     A.    There was another individual involved in

12  the case who also received funds.

13     Q.    **Out of your $4 million?**

14     A.    Yes.

15     Q.    **Did Chen and Yelen receive funds -- a**

16  **portion of the $4 million that you received?**

17     A.    No.  That was separate from what I

18  received.

19     Q.    **How much did the other relater receive out**

20  **of your portion?**

21     A.    I don't remember the exact amount, but net

22  of taxes it was probably somewhere in the $100,000

23  range.

24     Q.    **And then after taking off his portion and**

25  **your attorney's portion, you and your ex-wife split**

Jonathan Lord
February 24, 2022

Page 254

1    the remainder 50/50?

2        A.    Correct.

3        Q.    Have you actually received those funds?

4        A.    Yes.

5        Q.    And has your ex-wife's portion been paid

6    to her?

7        A.    Yes, and the IRS and the State of Hawaii

8    as well.

9        Q.    Understood.

10            Dr. Lord, do you understand that in the

11   course of this case you also signed interrogatories

12   responsive to the interrogatories that we propounded

13   on you?  Do you recall that?

14       A.    I do.

15       Q.    Let me show you what we'll mark as Exhibit

16   60.

17            (The documents referred to were marked for

18       identification as Defendant's Composite Exhibit

19       No. 60.)

20   BY MR. YANNUZZI:

21       Q.    This is a copy of your interrogatory

22   responses signed on December 9th, 2021.  Is that

23   your signature?

24       A.    That is my signature.  We also, I believe,

25   provided an updated amended copy.

Jonathan Lord
February 24, 2022

Page 255

1      Q.    Yes.  We are going to get to those right

2   after this exhibit.  I appreciate you acknowledging

3   that.  I am not trying to trick you.  I promise.

4      A.    Hey, you are on the record.

5      Q.    Dr. Lord, Interrogatory Number 12 asked

6   about your efforts to find employment, and you

7   provided the response that is set out here.

8           I just wanted to ask about this line here

9   that, with respect to the ADA position, you

10  mentioned that, "In early 2015 the ADA informed Dr.

11  Lord that he was not selected for the position based

12  on references from the University of Miami."  Do you

13  see that?

14     A.    I do.

15     Q.    As I understand your testimony earlier,

16  whatever information you received came through a

17  series of folks --

18     A.    Correct.

19     Q.    -- from the University of Miami through

20  the ADA; is that right?

21     A.    Yes.

22     Q.    Let me show you what we'll mark as Exhibit

23  61, which are your amended interrogatory answers.

24           (The documents referred to were marked for

25           identification as Defendant's Composite Exhibit

Jonathan Lord
February 24, 2022

Page 256

```
 1        No. 61.)
 2        Q.   Dr. Lord, you signed this on February 15,
 3   2022.  Is that your signature?
 4        A.   Yes, it is.
 5        Q.   Let me direct your attention to the same
 6   interrogatory, which is Interrogatory Number 12,
 7   asking about your efforts to find employment.
 8        A.   Correct.
 9        Q.   When discussing the ADA position, your
10   answer now was that you understand that the ADA's
11   decision was based on Dr. Lord's termination from
12   the University of Miami, which the ADA learned about
13   through public information and confidential
14   conversations.  Do you see that?
15        A.   I do.
16        Q.   What confidential conversations are you
17   referring to?
18        A.   The conversations that you and I just
19   referenced from one person to another.  I can't
20   remember who provided me with that information,
21   whether it was the headhunter or someone from the
22   ADA to the University of Miami or some other
23   pathway.
24        Q.   Can you explain why you characterized this
25   conversation as confidential?
```

Jonathan Lord
February 24, 2022

Page 257

```
 1        A.    Well, I assumed that they took place
 2   between a source at the University of Miami who was
 3   not on a reference list.
 4        Q.    You also referred to a position that you
 5   heard about with the College of American
 6   Pathologists.  Do you see that?
 7        A.    Right.  I do.
 8        Q.    And you were informed that you were not
 9   selected for the role, as it says here.  Do you see
10   that?
11        A.    I do.
12        Q.    Were you offered any explanation as to
13   why?
14        A.    The only explanation I had was the skill
15   set of the person they had taken more closely
16   matched their requirements.
17        Q.    Understood.
18              So, this basis had nothing to do with the
19   University of Miami?
20        A.    Not that I am aware of.  But, again, what
21   I would say is that in anybody's diligence,
22   especially on the part of these headhunting firms,
23   they do a thorough search of social media, Google
24   and other things.  It's very clear from the articles
25   that appeared in the Miami Herald and in other
```

Jonathan Lord
February 24, 2022

Page 258

```
 1   publications that sort of dragged me through the mud

 2   that I believe those things influenced the search

 3   process.

 4        Q.   Without having to go through everything

 5   again, when you say you were dragged through the

 6   mud, are you referring to the Miami Herald articles

 7   that we talked about earlier where they suggested

 8   that you stepped down, et cetera, et cetera?

 9        A.   From January 1 through 31-plus, other

10   articles and publications, like Florida Trend

11   Magazine, there has certainly been more than enough

12   in the annals and the chronicles of higher

13   education, many places where my sudden termination

14   was covered juxtaposed with issues around the

15   University of Miami, its past issues in terms of

16   making decisions like buying Cedars and letters from

17   Norman Braman.  So, there was a lot always in those

18   articles or related to those articles.

19        Q.   Now, there was also significant press

20   coverage when the first part of your qui tam was

21   held, correct?

22        A.   Yes, there was.

23        Q.   So, in those articles would you say they

24   had a positive view or negative?

25        A.   I thought they were balanced.  I didn't
```

Jonathan Lord
February 24, 2022

Page 259

1    say fair and balanced.  I thought they were

2    balanced.

3        **Q.   But you would agree that those articles**

4    **reported the fact that you had recovered a**

5    **substantial settlement in your false claims action,**

6    **correct?**

7            MR. SLOMAN:  Objection to the form.

8        A.   Those were very long articles.  They were

9    always in reference to something that was happening

10   in the settlement.  And the settlement, I think, was

11   outlined in one or two of the headlines.  But beyond

12   that, I don't have the specifics at the tips of my

13   fingers.

14       **Q.   The case is no longer under seal, correct?**

15       A.   That's correct.

16       **Q.   And the settlement was not confidential,**

17   **correct?**

18       A.   No, it was not confidential.

19       **Q.   So, nothing prevents you from disclosing**

20   **the existence of the lawsuit or the settlement,**

21   **correct?**

22           MR. SLOMAN:  Object to the form of the

23           question.  There are local rules preventing

24           that.

25       A.   I would say that -- I answered this

Jonathan Lord
February 24, 2022

Page 260

1  earlier.  As long as we are under this litigation,

2  it's my intent not to be involved with the media.

3      Q.   The decision to not speak to the media

4  during the pendency of this case is a decision that

5  you have made for yourself, Dr. Lord; is that

6  correct?

7           MR. SLOMAN:  Objection.

8      A.   The answer is yes.

9  BY MR. YANNUZZI:

10     Q.   Dr. Lord, focusing back on your

11 interrogatory responses, at the end of your response

12 to Number 12, you note that you held various board

13 positions and consulting roles and that you

14 dedicated a significant amount of time to these

15 roles.  Do you see that?

16     A.   I do.

17     Q.   Can you quantify what you mean by

18 significant?

19     A.   I think we had conversations early on of

20 somewhere around four to twelve hours per board per

21 week.  It depends on the circumstances.  I pointed

22 out that like during the COVID year we were doing

23 more than 20 hours a week of board work.

24     Q.   Can you estimate for me over the course of

25 this past month how many hours you dedicated to

Jonathan Lord
February 24, 2022

Page 261

1    board work or consulting work?

2          MR. SLOMAN:  Objection to the form.

3      A.   So, I have to go back.  Are you talking

4    about the month of February?

5      Q.   Yes, sir.

6      A.   I would say 25 percent of my waking hours.

7      Q.   What about for the month of January, can

8    you estimate how much time you dedicated to board

9    positions or consulting roles?

10     A.   It was probably less because we didn't

11   have an active in-person board meeting that month.

12     Q.   The 25 percent of your waking hours would

13   be approximately six hours a day?

14     A.   That is correct.

15     Q.   Including weekends or not including

16   weekends?

17     A.   Not including weekends.

18     Q.   Dr. Lord, you produced a series of

19   communications to us regarding your job search.  I

20   just want to walk through them very quickly.

21     A.   Okay.

22     Q.   Here is an e-mail to you from Jeffrey

23   Young regarding the College of American

24   Pathologists.

25          (The documents referred to were marked for

Jonathan Lord
February 24, 2022

Page 262

```
 1          identification as Defendant's Composite Exhibit
 2          No. 62.)
 3     BY MR. YANNUZZI:
 4          Q.    Do you recognize these e-mails?
 5          A.    I do.
 6          Q.    They are e-mails that were sent and
 7     received by you on the dates indicated?
 8          A.    Yes.
 9          Q.    What is Korn Ferry?
10          A.    Korn Ferry is a national search firm, the
11     largest and also the search firm of record for the
12     university.
13          Q.    Do you pay a fee to be part of their
14     organization?
15          A.    I do not.  They are a hiring enterprise.
16     Let me clarify that.  The hiring enterprise or
17     business pays them a fee based on the percent of the
18     first year's salary of the person they recruit.
19          Q.    Understood.
20                Do you have like a file on file with Korn
21     Ferry that has your CV and related information?
22          A.    Yes.  So, again, most of the large search
23     firms, Heidrick & Struggles, Korn Ferry, they all
24     have a tendency to have large research departments.
25     They keep a file on most executives and where they
```

Jonathan Lord
February 24, 2022

                                                    Page 263

1   are and what they have done.  Then in general they

2   will work with you, or if you are trying to network,

3   you will send them an updated bio or CV.

4        Q.   Dr. Lord, aside from the board work and

5   the consulting work that you do, do you also do any

6   volunteer work?

7        A.   Right now my time has been focused on my

8   transition to Hawaii.  I'm in conversations to do

9   some work to help a local long-term care facility

10  here.

11            In the past, you know, I have worked for

12  nonprofit hospitals and boards or advisory boards.

13  Those were all nonpaid positions.

14       Q.   In one of your e-mails to Jeff Young of

15  Korn Ferry, you provide sort of an overview of your

16  work history; is that correct?

17       A.   Correct.

18       Q.   Then in the last paragraph at the top of

19  Page 2 of what we have marked as Exhibit 62, you

20  note, "I have been a pathologist first and foremost.

21  I was able to have a great career because I was a

22  pathologist.  And I would like to give back to the

23  community.  At this point in time, I don't need to

24  work, but want to work to make a difference."  Do

25  you see that?

Jonathan Lord
February 24, 2022

Page 264

1      A.   I do.

2      Q.   Was that your sentiment at the time?

3      A.   It was.

4      Q.   Is that still your sentiment today?

5      A.   Well, again, I think the issue is we have

6   to confine this -- these words all have sort of

7   nuance meanings.  When I said I don't need to work,

8   I meant I don't need employment.  I need work and I

9   have worked and I have never stopped working.

10     Q.   So, you are saying -- correct me if I am

11   wrong -- at this point in time you don't need

12   full-time employment, but you want to work in some

13   capacity to make a difference.

14     A.   Correct.

15     Q.   I know you said you recently got your

16   medical license in Hawaii.  Aside from this work

17   with the long-term care facility you just described,

18   have you sought any work in pathology in Hawaii?

19     A.   I have not.

20     Q.   Have you applied to any universities for

21   other professor roles?

22     A.   I have not.

23     Q.   At any point since the time you left the

24   university?

25     A.   I have not.

Jonathan Lord
February 24, 2022

Page 265

1      Q.    Are you conducting -- strike that.

2            Since the time you left the University of

3      Miami, have you conducted any research or published

4      any papers?

5      A.    I have not published any papers, and I

6      have not conducted any research.  Again, during this

7      period of time, the seal-off had a chilling effect

8      on anything that I might do publicly in terms of

9      writing articles or anything else.

10     Q.    Is that something that you decided on your

11     own or is that --

12     A.    Well, I think there is a lot of things

13     that I learned at the University of Miami that at

14     some point I would like to share with other people

15     so they can learn from that experience.  But I have

16     not been able to share that experience because of

17     the seal that was in place until last year and our

18     current ongoing litigation.

19           MR. SLOMAN:  Hey, Chris, I think we are

20           over seven hours.  So, I think we need to wrap

21           up.

22           MR. YANNUZZI:  We are at seven hours of

23           depo time, but we are not -- I have two more

24           exhibits.

25     BY MR. YANNUZZI:

Jonathan Lord
February 24, 2022

Page 266

1          Q.   Dr. Lord, let me show you what we'll mark
2     as Exhibit 63 to your deposition, which are a series
3     of e-mails between you and a representative of
4     Caldwell Partners.
5                (The document referred to was marked for
6           identification as Defendant's Exhibit No. 63.)
7      BY MR. YANNUZZI:
8          Q.   Do you see that?
9          A.   I do.
10         Q.   Are these e-mails you sent and received on
11    the dates indicated?
12         A.   Yes.
13         Q.   What is Caldwell Partners?
14         A.   They are a search firm based in
15    Switzerland and the U.K.
16         Q.   Is July 20th of 2021 the first time you
17    reached out to Caldwell Partners?
18         A.   It is.  Actually they reached out to me,
19    which then I followed up and responded to them.
20         Q.   And you asked them to let you know of any
21    opportunities?
22         A.   I did.
23         Q.   Have you heard anything?
24         A.   We had several conversations about
25    potential board roles, but nothing has panned out

Jonathan Lord
February 24, 2022

1    yet.

2         Q.    Dr. Lord, what I will mark as Exhibit 64

3    to your deposition is another series of he e-mails

4    with you and the representative from Caldwell.

5              (The document referred to was marked for

6         identification as Defendant's Exhibit No. 64.)

7    BY MR. YANNUZZI:

8         Q.    Have you seen these e-mails before?

9         A.    I have.

10        Q.    Again, you know, as of a couple of weeks

11   ago, you were touching base for board roles in 2022?

12        A.    Yes.

13        Q.    Are you only looking for board roles at

14   this time or are you --

15        A.    Again, I will say that I am opportunistic

16   in terms of what comes along.  My current focus is

17   board work because it's something I have been able

18   to get.  It has not been easy and it has not been

19   possible to find employed work as to the roles that

20   I had been in or commensurate with those roles.  But

21   if something came along, I certainly would be open

22   to exploring it, just like I'm committed to

23   returning to the University of Miami in my position

24   when it's restored at the end of this case.

25        Q.    Optimistic.

Jonathan Lord
February 24, 2022

Page 268

```
1              Dr. Lord, did you know about the False
2    Claims Act prior to your employment at the
3    University of Miami?
4         A.   Well, I think I shared with you in about
5    the middle of the deposition my experience with
6    compliance both in the government as a surveyor for
7    the Joint Commission.  I was Chief Operating Officer
8    of the American Hospital Association, and during
9    that time we interacted with the Department of
10   Justice relative to issues about bundle billing and
11   False Claims Act activities by hospitals.  And I
12   indicated that I was the Chief Compliance Officer
13   for seven-and-a-half years at Humana, including
14   oversight of the Corporate Integrity Agreement for
15   five years.  So, I'm very familiar with the False
16   Claims Act.
17        Q.   At what point in time did you decide to
18   file a False Claims Act lawsuit against the
19   university?
20        A.   You know, I can't give you a specific
21   date, but it was within the first few months of
22   2013.
23        Q.   Dr. Lord, do you know in this lawsuit you
24   produced a series of bios and CVs to us?  Are you
25   aware of that?
```

Jonathan Lord
February 24, 2022

Page 269

1      A.   I am.

2      Q.   The CVs that you produced have your Miami

3   address on them and your Fernandina address, but it

4   doesn't have your Hawaii address.  Are you aware of

5   that?

6      A.   I am.

7      Q.   Is there a reason why you haven't updated

8   your CV to reflect your current address?

9      A.   Well, CVs are really academic tools.  At

10   this point I'm not engaged in the search of an

11   academic institution.  I don't have any reason to

12   update it.  They are very long and complicated

13   documents as opposed to the bio, which is a

14   paragraph on a page, easily edited and transformed

15   and updated much more frequently than the CV is.

16      Q.   Then just in terms of wrap-up questions,

17   Dr. Lord, try not to be offended.

18      A.   No.  Go for it.

19      Q.   Have you ever been convicted of any crime

20   punishable by death or by imprisonment for more than

21   one year?

22      A.   No, I have not.

23      Q.   Have you ever been convicted of any crime

24   involving fraud?

25      A.   No.

Jonathan Lord
February 24, 2022

1       Q.    Have you ever been convicted of any crime

2   involving the commission of a felony by making a

3   false statement?

4       A.    No.

5             MR. YANNUZZI:  That is all I have.  Thank

6       you so much, Dr. Lord.  I really appreciate

7       your time today.  I appreciate your patience

8       and indulgence in getting started a little late

9       while I sorted out my emergency and my exhibit

10      issues.  So, I thank you very much.

11            THE WITNESS:  No problem.  Thank you.

12            MR. SLOMAN:  I will have one or two

13      redirect questions.

14            Chris, can you put back up Exhibit 48,

15      please --

16            MR. YANNUZZI:  Of course.

17            MR. SLOMAN:  -- the deposition, and go to

18      Page 109?

19            Can you make the screen go all the way to

20      the bottom of Page 109?

21            MR. YANNUZZI:  Is that better?

22            MR. SLOMAN:  Yes.  Actually can you put

23      109 and 110 together because it just leads into

24      110?

25            MR. YANNUZZI:  I see.  How is that?

Jonathan Lord
February 24, 2022

Page 271

```
 1              MR. SLOMAN:  Yes.  That's fine.
 2                   CROSS-EXAMINATION
 3    BY MR. SLOMAN:
 4        Q.   Dr. Lord, can you read the question at
 5    Lines 18 through 25 on Page 109 going into Page 110,
 6    Line 1?
 7        A.   It starts out with the question:  "Did you
 8    tell Mrs. Lord that you were not selected because
 9    you had failed to disclose you were fired from the
10    University of Miami?"
11             Answer:  "There was never any failure to
12    disclose anything."
13             Question:  "I understand, but did you tell
14    Mrs. Lord that --"
15             Answer:  "That in part it was because of
16    the University of Miami, yes.  And that is correct."
17        Q.   Now, can you explain further because it
18    looks like it, you know, you were answering part of
19    a question and didn't get to the rest.  But can you
20    explain that question and that answer?
21        A.   Well, it was really related to the fact
22    that the reason I didn't get the job was because of
23    my work at the University of Miami, not because I
24    failed to disclose that I was fired from the
25    University of Miami.
```

Jonathan Lord
February 24, 2022

Page 272

1          MR. SLOMAN:  I think that's all I have.

2   No further questions.

3          MR. YANNUZZI:  Okay.  I am done as well.

4          THE WITNESS:  That makes me done as well?

5          MR. YANNUZZI:  Yes, Doctor.

6          MR. SLOMAN:  We will read, Chris.

7          MR. YANNUZZI:  We will order it.  Regular

8   is fine.

9          I will have my assistant tomorrow Dropbox

10   everybody the exhibits.

11          THE VIDEOGRAPHER:  We are going off the

12   record at 8:51.

13          THE STENOGRAPHER:  Mr. Sloman, do you want

14   a copy of the deposition?

15          MR. SLOMAN:  Yes.

16          (The deposition was concluded at 8:51

17   p.m.)

18

19

20

21

22

23

24

25

Jonathan Lord
February 24, 2022

Page 273

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF MIAMI-DADE

I, the undersigned authority, certify that JONATHAN LORD, M.D. remotely appeared before me and was duly sworn on the 24th day of February, 2022.

Signed this 6th day of March, 2022.

*Craig W. Taylor*

CRAIG W. TAYLOR, STENOGRAPHER
Notary Public, State of Florida
My Commission No. HH 84400
Expires: 3/28/25

Jonathan Lord
February 24, 2022

CERTIFICATE OF REPORTER                    Page 274

STATE OF FLORIDA

COUNTY OF MIAMI-DADE


        I, CRAIG W. TAYLOR, Registered

Professional Reporter, do hereby certify that I

was authorized to and did stenographically report

the foregoing web conference deposition of

JONATHAN LORD, M.D., Pages 1 through 272; that a

review of the transcript was requested; and that

the transcript is a true record of my

stenographic notes.

        I FURTHER CERTIFY that I am not a

relative, employee, attorney, or counsel of any

of the parties, nor am I a relative or employee

of any of the parties' attorneys or counsel

connected with the action, nor am I financially

interested in the action.

        Dated this 6th day of March, 2022.

*Craig W. Taylor*
_____
CRAIG W. TAYLOR, STENOGRAPHER

Jonathan Lord
February 24, 2022

Page 275

March 6, 2022

JONATHAN LORD, M.D.
C/O Jeffrey H. Sloman, Esq.
(jsloman@sfslaw.com)

Re:  JONATHAN LORD, M.D. V. UNIVERSITY OF MIAMI
Case No.:  13-22500-CIV-ALTONAGA/MCALILEY

Enclosed please find your copy of the deposition of
JONATHAN LORD, M.D., which was taken in the
above-styled cause on February 24, 2022.  Please
have deponent execute the Errata Sheet, which can be
found at the back of the transcript, when reading
your copy, and have it returned to us for
distribution to all parties.

If deponent does not read and sign the deposition
within 30 days, the original, which has already been
forwarded to the ordering attorney, may be filed
with the Clerk of the Court.

If deponent wishes to now waive signature, please
have deponent sign his/her name in the blank at the
bottom of this letter and return to the address
listed below.

Very truly yours,

*Craig W. Taylor*

CRAIG W. TAYLOR, STENOGRAPHER
Phipps Reporting, Inc.
www.PhippsReporting.com

I do hereby waive my signature.

_____
JONATHAN LORD, M.D.

Jonathan Lord
February 24, 2022

Page 276

                    ERRATA SHEET

            DO NOT WRITE ON THE TRANSCRIPT
            ENTER CHANGES ON THIS SHEET

Re:  JONATHAN LORD, M.D. V. UNIVERSITY OF MIAMI
Case No.:  13-22500-CIV-ALTONAGA/MCALILEY
Deponent:  JONATHAN LORD, M.D.
Date of Deposition:  February 24, 2022

PAGE    LINE            REMARKS

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Under penalties of perjury, I declare that I have
read the foregoing document and that the facts
stated in it are true.

Signature of Witness _____

Dated this _____ day of _____, _____.

Job No. 234254

**UHealth**
UNIVERSITY OF MIAMI HEALTH SYSTEM

UNIVERSITY OF MIAMI
MILLER SCHOOL
of MEDICINE

Pascal J. Goldschmidt, M.D.
*Senior Vice President for Medical Affairs and Dean*
*Chief Executive Officer, University of Miami Health System*

PERSONAL AND CONFIDENTIAL

July 1, 2011

Jonathan T. Lord, M.D.
7181 Fisher Island Drive
Fischer Island, Florida 33109

Dear Jack,

On behalf of the University of Miami Miller School of Medicine, with this letter, we extend an offer for you to serve as the Chief Innovation Officer for the University of Miami. In this role, you will report directly to the Senior Vice President for Medical Affairs and Dean of the Miller School of Medicine and to the Executive Vice President and Provost of the University.

This position will also involve a faculty appointment. We, along with Richard Cote, M.D., Chair of the Department of Pathology, are pleased to offer you a full-time faculty appointment in the Department of Pathology. Your appointment is being preliminarily recommended as Professor on the Clinical Educator track at the, University of Miami Leonard M. Miller School of Medicine; this is a non-tenure earning appointment. There are formal University review processes involved with appointment to the professorial level. Please understand that the actual rank of this appointment is subject to the ultimate approval and recommendation of the Dean after review of the final materials submitted by the Department and consideration by the Miller School of Medicine Appointment, Promotion and Tenure Committee, and subsequent approvals by central University administration. Please be aware that you cannot use or refer to this rank prior to University approval.

In this faculty role, you will be expected to participate in the academic mission of the Department and School in a manner that is mutually negotiated between you and the departmental chair. This may include the provision of lectures to faculty and staff, participation in the residency training program including the residency management training sessions and participation in our grand rounds lecture series. This faculty appointment is being offered in conjunction with the offer to serve as Chief Innovation Officer and thus this faculty appointment is dependent upon acceptance and retention of the Chief Innovation Officer role. Funding for your full-time position, including both this faculty role and the Chief Innovation Officer role, is the full responsibility of the Miller School of Medicine through the administrative unit to be determined. Unless otherwise, mutually negotiated, funding of your compensation and associated expenses will not be the responsibility of the Department of Pathology at any point in time. You have additional rights and responsibilities, which are defined in the Faculty Manual; we encourage you to read this document carefully. (Follow the link from the Faculty Affairs home page: www.facultyaffairs.med.miami.edu).



JONATHAN LORD, M.D.
**February 24, 2022**
Defendant's
**Exhibit 2**

*Office of Senior Vice President for Medical Affairs and Dean*
*Executive Office, University of Miami Health System*
*1600 NW 10th Avenue, RMSB 1140 (R-699) I Miami, FL 33136*
*Ph: 305-243-6545 I Fax: 305-243-4888*

**UM/LORD - 0003**

This position will commence on September 1, 2011 or as soon as possible thereafter to complete all necessary administrative processing. This start date may be revised by mutual written agreement.

The role and responsibilities of the Chief Innovation Officer are those that we have discussed; some of the major components of which are reiterated below:

General:

In this role, you will be expected to perform your duties and responsibilities in a professional and collegial manner. This position will have the primary responsibility for catalyzing interdisciplinary innovation across the various schools, in areas where the University has a particular opportunity due to investments in genomics, stem cells, nanotechnology, innovation therapeutics, devices and other intellectual property outcomes with the potential for broad and far-reaching benefits.

Primary Responsibilities:

- Strategic, operational and management responsibility for the Office of UM Innovation, including all of its structures, programs and staff. While you will have an important advisory role to Technology Transfer, that office will continue to have a reporting relationship to the Provost.

- Operational responsibility for business development functions of the University of Miami Tissue Bank, including the commercialization of new products developed by UMTB and/or in partnership with third parties.

- Primary liaison with Wexford, Mamco and others for development, marketing and commercial investment of the Life Science and Technology Park.

- Active development of strategies to commercialize intellectual property outcomes in areas such as (but not limited to) nanotechnology, genetics/genomics, stem cells, and other biomedical innovations.

- Initial programs for development focus will include (but not be limited to): tissue bank, brain bank, AcGMP facility for cellular therapy, Interdisciplinary Stem Cell Institute, Hussman Institute for Human Genomics, etc.

- Consistent with your role and in partnership with University Development Offices, to assist in identification and development of potential donors and other fundraising initiatives.

2

UM/LORD - 0004

The following applies to this offer:

1. As compensation for your full-time effort, you will receive an annual base salary of $300,000 paid on a monthly basis, consistent with University pay dates and subject to deductions required by law. Contingent upon reappointment in subsequent fiscal years, your compensation and assigned effort will be determined by the University of Miami Miller School of Medicine's compensation plans and policies and annual performance evaluation.

2. There will be an additional incentive component to your compensation in the amount equal to a maximum of $50,000 for FY12. Please develop a set of performance measures, along with evaluation metrics, that can be used in determining the amount of the incentive payment to be determined at the FY12 annual performance review. With sufficient experience, we will revisit the possibilities of restructuring an alternative incentive plan.

3. As a full-time faculty member, you will be eligible for the fringe benefit package of the UMMG including but not limited to health and dental insurance coverage, vacation leave, sick leave, paid floating holidays, retirement plan and tuition remission. These plans will be available to you consistent with University policies. You can view these benefits in detail via the University's web site at www.miami.edu/benefits or contact the Office of Benefits Administration at 305-284-6830. Please note the UMMG benefits require continuation of your faculty appointment.

**University Administrative Requirements:**

Prior to accepting this new appointment, please provide a full, written disclosure of any and all business relationships or consulting agreements, either pending, presently active, or completed within the last 12 months, that you may have that could be considered conflicts of interest or conflicts of commitments.

Your anticipated start date is September 15, 2011 unless notified otherwise by the Office of the Senior Vice President for Medical Affairs and Dean. This offer and start date is contingent upon completing the mandatory University training requirements appropriate to your position. Your Department or the Office of Faculty Affairs will specify these requirements. If you are unable to complete these required trainings prior to your anticipated start date, your start date will be delayed and this offer could be rescinded, even if you have already met the deadline to accept the offer as set forth in the first paragraph. If at any time during your faculty appointment your compliance with these requirements lapses, your faculty appointment may be terminated.

3

Please be advised that the availability of this position being offered to you is contingent upon presentation by you of proof of work authorization and/or U.S. citizenship, and completing the Form I-9, as required by the Immigration Reform and Control Act of 1986. This federal law requires that the University verify, for citizens and non-citizens alike, the identity and authorization to work for all new employees.

The University of Miami currently participates in the E-Verify Program which allows an employer—using the information reported on the Form I-9—to confirm the eligibility of an employee to work in the **United States. The E-Verify system is operated by the U.S. Department of Homeland Security (DHS) in partnership with the Social Security Administration (SSA). Once you have formally accepted this offer, you will receive an email from our outside vendor, Hire Right,** with your personal log in and password and instructions that will enable you to complete Section 1 of the Form I-9 via their secure web based system. After you have completed Section 1 online, you will be required to present originals of acceptable I-9 documents in person to the Office of Medical Faculty Affairs *on or before your first day of employment*. The Office of Medical Faculty Affairs will complete section 2 of the I-9 form and submit this information to E-Verify for verification to determine your eligibility to work in the United States.

*Please note that you will not be able to start your employment with the University until such time as you have completed the Form I-9 online and presented acceptable documents in person to the Office of Faculty Affairs to establish your identity and work authorization.* Furthermore, please be advised that continued employment with the University is contingent upon the continuation of your authorization to work, as required by the Immigration Reform and Control Act of 1986. If you have any questions please call the Office of Faculty Affairs at 305-243-6551.

The availability of this position is contingent upon receipt by the University of proof of your terminal degree. Please request from your institution an official, original grade transcript showing award of your terminal degree be sent to the office of Sheri Keitz, M.D., Ph.D., Senior Associate Dean for Faculty Affairs, P.O. Box 019132 (D2-6) Miami, Florida 33101. The transcript must be received 30 days prior to your anticipated hire date. Please note that in order to be considered official, the transcript must be received in a sealed envelope mailed directly from the institution. In addition to requesting your official transcript, please complete the enclosed verification release form and return it with your signed offer letter.

You will be expected to abide by all University of Miami policies and procedures as well as those policies and procedures required of the University by agencies, vendors, or third parties. To review University policies, please visit our website www.med.miami.edu/hr.

Continuance of your employment during your first year and beyond is dependent upon the organizational structure of the School, business and operational needs, the availability of funding, and/or your performance. This letter is not and should not be construed as a contract nor as an offer for any definite term of employment. Your employment may be terminated by you or the University at any time.

4

We are excited about you becoming a part of our team.  Please confirm your acceptance of this offer by signing below and returning it to the Office of the Senior Vice President for Medical Affairs and Dean (attention: Dick Iacino).

The Miller School of Medicine is faced with many exciting challenges and is poised for continued success.  We anticipate you making significant contributions to support our continued mission and vision.

Sincerely,

Richard J. Cote, M.D., FRCPath, FCAP
Professor & Chair, Department of Pathology
Director, Biomedical Nanoscience Institute

Pascal J. Goldschmidt, M.D.
Senior Vice President for Medical Affairs and Dean
Chief Executive Officer, University of Miami Health System

Thomas J. LeBlanc, Ph.D.
Executive Vice President and Provost

Reviewed and accepted:

_____
Jonathan T. Lord, M.D.

_26 July 2011_
Date

h:\letters pjg\lord offer ltr. Final final

5

**Current Status:** *Old*



UNIVERSITY
OF MIAMI

**PolicyStat ID:** *5857185*

| | |
|---|---|
| **Origination:** | *01/2012* |
| **Effective:** | *01/2012* |
| **Last Approved:** | *01/2012* |
| **Last Revised:** | *01/2012* |
| **Next Review:** | *01/2014* |
| **Owner:** | *Mary Harper Hagan* |
| **Area:** | *Human Resources* |
| **References:** | |
| **Applicability:** | *University of Miami System-Wide* |

# Whistleblower Protection Statement

A whistleblower, as defined by this statement, is an employee of the University of Miami who discloses, or threatens to disclose, information to a governmental agency of University activity that is in violation of law, rule or regulation. Whistleblowers may also be employees who provided information to a governmental agency conducting an investigation, hearing or inquiry into alleged violations by the University of any law, rule or regulation, or employees who object to or refuse to participate in any activity, policy or practice of the University which is in violation of any law, rule or regulation. The whistleblower is not responsible for investigating the activity or for determining fault or corrective measures; appropriate University management officials are charged with these responsibilities. Insofar as possible, the confidentiality of the whistleblower will be maintained. The employee must exercise sound judgment to avoid baseless allegations.

If an employee has knowledge of information that is in violation of any law, rule or regulation as described above, the employee is encouraged to contact his/her immediate supervisor, visit the **'Cane Watch** website at www.canewatch.ethicspoint.com or call 877-415-4357, to provide information directly or on an anonymous basis to afford the University a reasonable opportunity to review and correct the activity.

Whistleblower protection prevents retaliatory actions against an employee who reports violations. This includes protection from retaliation in the form of an adverse employment action such as termination, suspension, or demotion. Any whistleblower who believes he/she is being retaliated against must contact the appropriate Human Resources Office, Faculty Affairs Office or the Office of Equality Administration immediately.

**Human Resources:**

| | |
|---|---|
| Gables/Marine School Campus | (305) 284-4083 |
| Medical School Campus | (305) 243-6501 |

**Faculty Affairs:**

| | |
|---|---|
| Gables/Marine School Campus | (305) 284-3386 |
| Medical School Campus | (305) 243-6551 |

**Equality Administration:**

Gables/Marine School Campus(305) 284-3064

## Attachments

No Attachments



JONATHAN LORD, M.D.
February 24, 2022
Defendant's
**Exhibit 3**

**UM/LORD - 0191**

## Applicability

University of Miami, University of Miami Ambulatory Care Surgery, University of Miami Hospital and Clinics, University of Miami Laboratories, University of Miami Medical Group

UM/LORD - 0192

# BUSINESS CONDUCT & ETHICAL STANDARDS

## FOR FACULTY AND STAFF



UNIVERSITY OF MIAMI

An Equal Opportunity/Affirmative Action Employer

UNIVERSITY COMMUNICATIONS 08-114

UNIVERSITY OF MIAMI

UM/LORD - 0173

JONATHAN LORD, M.D.
February 24, 2022
Defendant's
**Exhibit 4**

## TABLE OF CONTENTS

| | |
|---|---|
| Introduction | 2 |
| University of Miami Mission | 3 |
| Message From the Chair of the Audit and Compliance Committee | 4 |
| Message From the President | 5 |
| Standards for Professional and Personal Conduct | 6 |
| Conflict of Interest | 6 |
| Vendor Relations/Fair Trade | 8 |
| Gifts and Entertainment | 10 |
| Gifts from UM to Third Parties | 11 |
| Misuse of University Assets | 12 |
| Proper Accounting | 13 |
| Ownership of Intellectual Property | 16 |
| Billing Compliance Plan | 17 |
| False Claims Act and Whistleblower Protection | 18 |
| Information Technology Responsible Use Policy | 18 |
| World Wide Web Pages | 20 |
| Copyright Infringement | 23 |
| Faculty Consulting | 24 |
| Scientific Misconduct | 25 |
| Human Subjects Research | 26 |
| Confidentiality | 27 |
| Use of the University of Miami Name, Seal, and Logo | 29 |
| Working Together | 30 |
| Useful Addresses and Phone Numbers | 32 |



*Nothing in this booklet is meant to alter the existing rights and standards of conduct of faculty members, staff, or students.*

**UM/LORD - 0174** September 2007

## INTRODUCTION

The University of Miami is a large, diverse, and complex organization linking thousands of individuals and entities in missions of education, research, patient care, and community service. A paramount commitment to ethical standards of practice is essential to both the spirit of our institution and its practical operations.

Such a commitment serves a variety of useful functions. By articulating core values and policies that shape both daily and long-term operations, the University conveys what kind of employer, business affiliate, and neighbor it seeks to be.

This handbook outlines University guidelines on business conduct, provides questions and answers on each issue covered, and gives direction for handling situations in which policies are not being followed. The handbook also references relevant policies where applicable. However, please note that the guidelines in this booklet are not comprehensive, and the complete policies should be reviewed.

University policies are available online at www.miami.edu/policies_procedures covering the following areas:

• Business Services (including bookstores, duplicating services, environmental health and safety, food service, general business policies, mail systems, materials management, public safety, purchasing, risk management, and travel)

• Finance (including planning and budgeting, financial accounting and reporting, payroll, non-payroll expenditures, and treasury)

• Human Resources (including employment, affirmative action, wage and salary, pay, benefits, employee relations, and leaves of absence)



• Information Technology (including information systems, which addresses security, access and confidentiality, software copyright, Web policies and electronic mail, and telecommunications)

• Real Estate (including information on leases and sales of property)

• Sponsored Programs (including proposal development and negotiations, award management, cost principles, billing, and reporting)

The *Faculty Manual*, accessible online at www.miami.edu/facultysenate/FM, provides additional information on important faculty policies related to ethical matters and patent and copyright policy. The Office of Technology Transfer offers information for researchers regarding policies on intellectual property and conflict of interest on its Web site at www.miami.edu/techtransfer.

Policies are important both for what they say and for what they imply—in common occurrences and in situations not yet contemplated. A robust policy stimulates best practices in clear cases and provides guidance in complex and uncertain cases. The University expects proper business conduct whether a case is complex or easily resolved. The University makes policy changes periodically, and it is the responsibility of staff to review policies online regularly.

For questions regarding items not addressed in this guide, please contact the appropriate office using the phone numbers on pages 31 and 32.

## UNIVERSITY OF MIAMI MISSION

The University of Miami's mission is to educate and nurture students, to create knowledge, and to provide service to our community and beyond. Committed to excellence and proud of the diversity of our University family, we strive to develop future leaders of our nation and the world.

## CORE VALUES

We are absolutely committed to freedom of inquiry—the freedom to think, to question, to criticize, and to dissent. We will pursue the value of excellence in our research and educational missions with the single-mindedness that only great commitments deserve. We will provide our students with the standards of thought and communication. We also will prepare them for rewarding lifelong careers and will imbue in them a continued and permanent desire for the study of knowledge and the search for truth.

2

UM/LORD - 0175

3

## DEAR MEMBERS OF THE UNIVERSITY COMMUNITY:

As chair of the Board of Trustees' Audit and Compliance Committee, I want to encourage you to read and understand the matters detailed in this booklet as they are critical to the University maintaining the highest standards of ethics and compliance possible. My colleagues on the board are proud of your work and want to assist you in your endeavors. We hope you find this tool helpful.



If you have any questions or concerns, please feel free to call any of the numbers listed on the last two pages of this booklet or the University's Compliance Hotline (1-866-YOURCALL).

Sincerely,

Betty G. Amos
Chair, Audit and Compliance Committee
University of Miami Board of Trustees

## MESSAGE FROM THE PRESIDENT

The University of Miami works tirelessly to be among the best educational, research, and patient care institutions in the nation. We aim, too, to be a highly respected and trustworthy business partner in our community. We hold ourselves, as well as those with whom we do business, to the highest of business and ethical standards.



In all our endeavors, whether teaching our students, performing research studies, treating patients, transacting business with external entities, or accessing or managing confidential information, our principles should never be compromised.

These standards are achieved due to the best efforts, resolve, and integrity of each and every member of our University's faculty and staff.

To help provide guidance on these issues, the University has prepared a booklet of *Business Conduct and Ethical Standards for Faculty and Staff.* This guide, developed by a University-wide committee of colleagues, summarizes standards, provides answers to some of the ethical questions facing us in everyday work situations, references University policies and procedures, and provides a directory listing of the key departments to turn to for further assistance.

I hope you will find this booklet to be a helpful reference tool.

Sincerely,

Donna E. Shalala

## STANDARDS FOR PROFESSIONAL AND PERSONAL CONDUCT

The University of Miami is committed to the highest standards of ethics, honesty, and integrity in pursuit of its mission of education, research, patient care, and public service. These standards apply whether we are working with our students, patients, vendors, or fellow members of the faculty and staff. To this end, various statements in the University's policies and procedures address business ethics, professional and personal conduct, performance, and accountability. A summary of the various statements is reflected below.

All members of the University community are expected to adhere to the following basic values:

• Honesty and Integrity—Be truthful in both words and actions in your daily work.

• Excellence—We are committed to outstanding performance and service at all times, getting the job done right the first time, in as effective and efficient a manner as possible. We work collaboratively with others, promote personal responsibility and accountability, and aspire to do our jobs better in every dimension each day.

• Respect—Recognize each individual's right to quality service, confidentiality, and courtesy. Improve the service you offer by appreciating each person's opinions and ideas.

• Compassion—Acknowledge each individual's unique needs and how they may be affected by our decisions. Attempt to resolve problems and complaints in a timely manner.

• Professionalism—Perform all duties to the best of your abilities, experience, and training in a prompt and helpful manner that exemplifies teamwork. Assume responsibility for your work.

• Fairness—Be fair and objective in all your work.

• Compliance—Comply with all applicable laws, regulations, and policies by observing high standards in both personal and professional behavior.

In addition, faculty and staff should follow the rules of conduct in the *Faculty Manual* and the *Human Resources Policies and Procedures Manual*, respectively. Failure to do so may result in disciplinary action, up to and including dismissal.

## CONFLICT OF INTEREST

Conflicts of interest arise in situations in which University personnel might use their positions to obtain private gain for themselves or others, such as those with whom they have family, business, or other ties. Conflicts of interest occur in situations in which a financial or other relationship may compromise, or appear to compromise, an investigator's professional judgment in conducting or reporting research. Similarly, conflicts of interest arise when a financial or other relationship may compromise, or appear to compromise, a staff member's judgment in arriving at a University-related business decision. Conflicts of interest in business matters and outside consulting matters are covered in applicable policies contained in the *University of Miami Faculty Manual*, the Office of Technology Transfer policy, and the related policies in the *University of Miami Policies and Procedures Manual* (Business Services Policy BSJ025, Sponsored Programs Policy C8, and Human Resources policies on Conflict of Interest and Consulting Activities for employees). Situations that could be viewed as presenting a conflict of interest include the following:

• Significant ownership interests by a University employee in a company that has business relationships with the University

• Use of students or staff in external non-University activities

• Consulting, administrative, board membership, employment, or other financial relationship by the investigator with a company that is sponsoring that individual's research

• Improper transfer of University intellectual property rights

• Inappropriate use of University resources for the development of technologies for a third party

• Development of the same or similar technology for two different commercial entities

To determine whether a conflict actually exists, first ask yourself certain questions. Imagine how each party would react if they knew about a particular situation. Would they object? Would they have questions? Are contracts necessary? If situations like these arise, you should consult with the University Contract and Compliance Committee before becoming involved in a potential conflict. This group will help resolve outstanding issues. Meetings are scheduled every Friday morning at the office of the vice provost for research. (Call 305-243-6415 to place an item on the agenda.)

Principal investigators and other persons responsible for the design, conduct, or reporting of research funded by a governmental agency also are required by government regulations to disclose significant financial interests in entities conducting business with the University.

Investigators must disclose to the vice provost for research and their chairperson all significant financial and non-financial interests that would reasonably appear to affect, influence, or conflict with their research, and all such interests in entities whose financial interests would appear to affect, influence, or conflict with such research. A significant financial interest is anything of monetary value, including salary, consulting fees, tangible property, equity interests, and intellectual property rights. Salary or royalties from the University, income from seminars or from service on advisory committees for nonprofit or public entities, or financial interests in companies or salaries that do not exceed limits imposed by government agencies regarding the ownership in the company are not considered significant financial interests. A non-financial interest includes conflict of

commitment (see Sponsored Programs Policy C8) in which full-time members of the faculty are expected to devote their primary professional loyalty, time, and energy to their teaching, research, administrative responsibilities and, where applicable, to patient care through the University of Miami Medical Group. Outside financial interests and activities should not interfere with the primacy of these commitments.

The vice provost for research will review the disclosures to determine whether an actual or potential conflict of interest exists and what conditions or restrictions should be imposed to manage, reduce, or eliminate potential conflicts of interest.

Prior to expending any funds awarded through a government grant or contract, the University must report to the government agency that the conflict of interest has been managed, reduced, or eliminated.

For further information on this subject, please refer to the *University of Miami Faculty Manual*, the Office of Technology Transfer policy, and the related policies in the *University of Miami Policies and Procedures Manual* (Business Services Policy BSJ025, Sponsored Programs Policy C8, and Human Resources policies on Conflict of Interest and Consulting Activities for employees). See also Gifts and Entertainment, page 9.

*Questions and Answers*

**Q: If I teach and conduct research in organic synthetic chemistry, can I open and own a private business to synthesize new organic chemicals?**
A: No. Since the University could do this and organic chemistry is your field of expertise, this is a conflict.

**Q: If the University releases an invention, patent application, patent, or other form of intellectual property to me, can I work on it in my laboratory?**
A: No. The use of University resources in this case is a conflict.

## VENDOR RELATIONS/FAIR TRADE

The University of Miami Purchasing Department is authorized to act for the University in all procurement matters. Except where specifically authorized, faculty, staff, and students are prohibited from making commitments or negotiating on behalf of the University or acting as its agent in procurement or contract matters.

A "vendor" (supplier) is any firm, corporation, company, consultant, or individual with whom the University presently, formerly, or potentially conducts business. Faculty and staff are expected to observe the following rules with regard to vendor relations:

• Strive to obtain the maximum value for each dollar spent by the University.

• Demand honesty in sales representations and proposals, whether offered in verbal or written statements, advertisements, or product samples.

• Make reasonable efforts to arrive at an equitable agreement that is in the best interest of the University when settling a controversy with a supplier. Refer these matters, resolved and unresolved, to Purchasing.

• Avoid activities that would give the appearance of preferential treatment toward any vendor.

• Make all purchases through an approved procurement process, including purchase requisition, online purchasing, and procurement card.

• Ensure that all contracts have the review and signature of an authorized officer. Contact Purchasing for a list of these individuals.

• Make sure that all vendors have a Vendor Application on file with Purchasing. Vendor applications are available at www.miami.edu/purchasing .

The University of Miami Purchasing Department generally follows the National Association of Educational Procurement Code of Ethics in its relations with vendors. You can visit the association's Web site at www.naepnet.org.

Vendors are expected to observe the following in their relations with the University:

• Conduct business in an atmosphere of good faith.

• Be honest in representing the company's products.

• Report to the executive director of internal audit any solicitation or stipulation by a University employee seeking gifts, entertainment, favors, personal property, services, kickbacks, etc., for personal gain as a requirement for doing business with the University. Failure of a vendor to report the solicitation or stipulation may result in termination of current contracts and orders as well as jeopardize future business with the University.

*Questions and Answers*

**Q: Who is an approved vendor?**
A: An approved vendor is a company that has submitted a University of Miami Vendor Application and the required insurance documentation to the Purchasing Department. This information is verified and entered into the University's online vendor database, and the company is assigned a vendor number. The approval and assignment of a vendor number does not ensure that a purchase order will follow; rather, it implies that the vendor is eligible to do business with the University because it meets University requirements.

**Q: How do I find an approved vendor?**
A: Purchasing maintains a list of approved vendors online in the University's vendor database system. Contact Purchasing to check a vendor's status.

**Q: A family friend is involved in the sale of an item that the University frequently purchases from another vendor. Could I ask the Purchasing Department to consider switching vendors?**
A: Purchasing is always willing to consider adding vendors to its list. You may feel free to submit this vendor's name to the department for future consideration. (University employees are required to disclose vendors, who also are relatives, to Purchasing.)

**Q: What if a vendor is a member of my family?**

A: As a general rule, the University does not do business with companies owned by its faculty, staff, or employees. You can, however, contact Purchasing or Business Services for a review of the situation.

**Q: A vendor asks to know what another vendor has bid or the price of its product or service. Can I tell one vendor another vendor's bid or prices?**

A: No. Vendor information and pricing is confidential and should not be discussed. The University is not required to disclose this information. Requests of this nature should be referred to the director of purchasing.

**Q: A department needs equipment, supplies, or service. May I commit the University to purchasing the item or service from a certain company prior to obtaining the required bids?**

A: No. Only the Purchasing Department is authorized to commit the University in procurement matters. The University has set bid limits designed to keep the playing field fair. Purchasing is available to assist you with the bidding process.

**Q: My department has an immediate need for a piece of equipment that will enable research, classes, or business to continue. Should I place the order over the phone in order to expedite the delivery or service completion?**

A: No. The University of Miami purchase order contains many terms and conditions that protect the University in case a dispute arises between the requisitioner and vendor. Without a purchase order, the University has no commitment to pay the bill, leaving the requisitioner potentially responsible for payment. Contact Purchasing to protect both the University and yourself.

**Q: A vendor wants to drop off a piece of equipment for my department to evaluate. Can I accept and use it?**

A: Not without contacting Purchasing for instructions. A special document is needed to cover the equipment while it is on campus.

## GIFTS AND ENTERTAINMENT

Gifts made to University faculty, staff, and employees may be in the form of entertainment, social invitations, sporting events, favors, personal property, services, food, or discounts. Gifts from vendors, contractors, or anyone conducting business with the University of Miami are usually offered as a gesture of goodwill or appreciation, often during the holiday season. Faculty, staff, and employees should be aware that these gifts may be given with the intent to influence a business decision and may create a conflict of interest. The person responsible for any business relationship has the obligation to handle gifts properly and in compliance with University policy.

For further information on this subject, please refer to the *University of Miami Policies and Procedures Manual* (Business Services Policy B5J025 and Human Resources policies on Conflict of Interest and Consulting Activities for employees) and the *Faculty Manual*.

Faculty, staff, and employees (and family members) may not accept gifts of more than token or nominal value from any University supplier

or vendor under any circumstances. "Token or nominal value" has been defined by the University as gifts of less than $25. While at times it may be difficult to quantify the cost of a gift, it is always important to consider the appearance of impropriety and unfair business practice. During the bidding process it is unacceptable to receive any gifts even if they are of nominal value.

There are times when during the course of business it may be appropriate to conduct business during meals. In such instances, the meal should be for a specific business purpose. One should avoid frequent meals with the same supplier.

If you have any doubt or need help in determining if something is nominal or an appropriate business meal, please contact the director of Purchasing at 305-284-8233.

### *Questions and Answers*

**Q: A vendor providing products or service to my department treats me to sporting events three or four times a year. Is this appropriate?**

A: No. A one-time nominal or token gift of tickets is acceptable, but continued gifts would exceed prudent business practices. Since the value and repetitive nature of the gift is significant and could influence your business decisions, you should not accept future gifts/invitations.

**Q: While attending a vendor presentation, I was offered some promotional items. Is this acceptable?**

A: Yes. It is considered permissible to accept "giveaways" of promotional items such as pens, calendars, caps, and similar items that are offered by vendors at trade shows. In contrast, it should be an easy decision not to accept an item of substantial value such as a TV set, a $50 dollar gift certificate, or a trip to Bermuda.

**Q: A vendor working with the University has offered to let me stay at his vacation home (or company apartment) on Cape Cod for the weekend. Should I accept the invitation?**

A: No. This gift would not be considered a token or nominal one. Acceptance would give the appearance of impropriety, and it would be poor business practice for you to accept this type of invitation.

## GIFTS FROM UM TO THIRD PARTIES

The University, in fulfilling its mission of public and community service, donates time and talents to organizations affiliated with the University. While the practice is not encouraged, donation of cash and other tangible assets may be appropriate under certain circumstances. Any gifts or donations to third parties must be approved by a vice president of the University, regardless of the amount or value of the donation. In addition, the gift or donation must be charged to a University unrestricted account. See University Policy B022 in the Financial Accounting policies section.

**UM/LORD - 0179**

## MISUSE OF UNIVERSITY ASSETS

University assets, such as cash, receivables, equipment, and buildings, must be properly safeguarded from loss and misuse. This responsibility rests with every employee, at all levels and in every department. Because the overwhelming majority of University personnel have the utmost concern for these assets, fraudulent situations are often either not detected or viewed as "administrative errors," particularly when coworkers of long association are involved.

Fraud is defined as "an act of deceiving or misrepresenting in order to secure unfair or unlawful gain." Embezzlement or misappropriation is defined as "an act of appropriating dishonestly for one's own use property entrusted to one's care."

Fraud and embezzlement have many different manifestations. Practices that may constitute fraud or embezzlement include: untruthful financial reporting; expense report falsification by submitting receipts that could result in double reimbursements, receipts for personal expenses, or receipts for expenses that were not incurred; dishonest or false worker's compensation claims or insurance claims; kickbacks; bid rigging; misuse of University checks, credit cards, procurement cards (Pcards), or computers; misappropriation of cash; use of University equipment for personal purposes; and misuse of sponsored grant funds.

Fraud depletes the University and the department involved of vital resources. Every member of the University community, regardless of position, is expected to assist in preventing or identifying fraud.

If you are aware of or suspect fraud, theft, embezzlement, or misuse of University assets, you should immediately report the situation to your supervisor, chairperson, or dean, as well as to the executive director of Internal Audit (305-284-2605) or to the controller (305-284-4877). You may also call the Compliance Hotline at 866-YOURCALL. All calls will be treated confidentially.

Although University management prefers that sources identify themselves when reporting suspicion of fraud, anonymous fraud allegations will be considered when supported by reasonable facts and circumstances. Such allegations should be mailed to the executive director of Internal Audit, room 314, Max Orovitz Building, Coral Gables campus, locator code 1436. (Mark the envelope "confidential.")

### Questions and Answers

**Q: What should I do if I notice that a coworker is ordering goods for personal use and charging them to a departmental account?**
A: The misuse of University assets for personal gain is prohibited and constitutes fraud. You should report your suspicions to your supervisor, chairperson, or dean as well as to the Internal Audit department or the controller for investigation and follow-up.

**Q: I noticed a fellow employee submitting false receipts for business travel. What should I do?**
A: Report it to your supervisor, chairperson, or dean as well as to the Internal Audit department or to the controller for investigation and follow-up.

**Q: I have a strong suspicion that fraudulent activity is taking place in my department. I would like to see it stopped but don't want to get involved. How do I proceed?**
A: All honest allegations of fraud or embezzlement should be reported in order for University staff to investigate and correct the problem. The University encourages all faculty and staff to call Internal Audit when there is strong suspicion of wrongdoing; while the University prefers that complainants identify themselves, you may submit the information anonymously to the Internal Audit department (by telephone or mail) or call the Compliance Hotline at 866-YOURCALL.

## PROPER ACCOUNTING

University of Miami faculty and staff must assume responsibility for safeguarding and preserving University assets and resources. The following policy statements pertain to all University business activity and are applicable to all faculty and staff:

• All revenues generated by University activities and all expenditures for compensation, goods, and services must be recorded and the transactions accounted for in the University's Financial Record System (FRS).

• FRS consists of the general ledger and all subsidiary systems (manual and automated) that serve as a basis for input to FRS. Subsystems include payroll/human resources, accounts receivable, accounts payable, check requisitions, advancement (gifts), purchasing, budget, sponsored programs, telecommunications, work order system, computer billing, EDI (electronic payments), parking, and postage/duplicating, as well as online and paper transactions. All transactions, whether recorded directly into the general ledger or entered through a subsystem, should be recorded in a way that allows financial statements to be prepared in conformance with Generally Accepted Accounting Principles (GAAP).

The University's associate vice president and controller is the primary person responsible for the maintenance and integrity of the University's financial records and statements and should be consulted on any matters relating to accounting policies and procedures. The University's associate vice president for budget and planning is the primary person responsible for budget monitoring. Divisional chief financial officers must maintain a close business relationship with the associate VP and controller and the associate VP for budget and planning. This business relationship is further explained in Policy B001—Liaison Relationship, in the Finance section of the *University of Miami Policies and Procedures Manual.*

• All financial transactions must be timely and accurately recorded

and must clearly identify the business nature of the transaction. Specific guidance pertaining to the timely posting of transactions for month-end is published in the FRS online system. In addition, a fiscal year-end schedule is provided in a memorandum to all departments from the controller's office each spring.

• All transactions, whether recorded directly into the general ledger or indirectly from a subsystem, and any supporting documentation must be complete, accurate, and verifiable. Payments made on behalf of the University or reimbursements to faculty and staff must be made for the purpose described in the supporting documents.

• The use of University funds or assets for any unlawful or improper purpose is prohibited. For further guidance on the permissibility of particular expenses, please refer to the *Policies and Procedures Manual*, Finance section and Sponsored Programs section, available on the Internet at www.miami.edu/policies_procedures.

• Bank accounts are established when approved by the Board of Trustees. No unrecorded or undisclosed bank accounts can be established by individual schools, departments, units, or others acting on their behalf to fund, or to assist in funding, any University activity. See Policy E035 in the Finance section of the *Policies and Procedures Manual*.

• No checks payable to the University of Miami should be held in a faculty or staff member's desk, filing cabinet, or any other storage for any period of time. All checks must be transmitted promptly to the appropriate office on each campus responsible for depositing the checks. University policy requires the use of the sponsored lock box bank account for all sponsored checks. See Sponsored Programs Policy F14.

• Each account in FRS has been assigned to a responsible person. Every employee responsible for an account must:

a) ensure that monthly reports of account activity are reviewed to determine that all transactions are accurate and complete.

b) verify that all revenue entries are correct.

c) verify that all entries made to each account have been properly allocated, representing expenses for activities that pertain to the purpose of the account.

d) take appropriate and timely action to correct any improper charges to an account by generating correcting entries to the account and obtaining necessary approvals. The Office of the Controller, including General Accounting, Financial Reporting, Sponsored Programs, Property Accounting, and Cost Studies, can assist departmental personnel in correcting the errors.

e) ensure that all charges made to sponsored accounts are appropriate and allowable under the sponsor's regulations.

• Sponsored accounts are subject to rules and regulations that vary depending on the awarding agency. Each responsible person should be familiar with the agency guidelines and the Sponsored Programs section of the *Policies and Procedures Manual*. The Sponsored Programs office

has the expertise to help you process transactions for sponsored accounts and should be consulted when necessary.

• Contracts on behalf of the University must be signed by employees authorized to do so by the Board of Trustees. Those include the president, the executive vice president and provost, and the senior vice president for business and finance. Signatory authority has been delegated as follows:

a) Non-sponsored contracts must bear the signature of the vice president for business services or his or her designee.

b) Sponsored grants and contracts must bear the signature of the vice provost for research, the associate VP and controller, the directors of the Research Pre-Award offices, or the directors of the Sponsored Programs office.

Questions regarding contracts prior to signature should be forwarded to the General Counsel's office.

• Only authorized University officers may dispose of assets, as covered in the Office of Business Services Policy BSF-035 at www.miami.edu/policies_procedures/General-Business/PDF-Policies/BSF-035.pdf, Financial Policy B047—Sale and Disposition of Equipment. Faculty and staff lack authority to dispose of equipment. University equipment valued at $2,500 or higher and no longer needed must be transferred to the Surplus Property office for either redistribution to the University or sale. Please call Surplus Property at 305-243-9696 for proper procedures regarding disposal of all surplus property.

## Questions and Answers

**Q: I am responsible for an account; however, time constraints prevent me from reviewing account activity in detail and on a timely basis. May I assign this task to a staff member?**

A: Yes, it is acceptable to assign the task. You do, however, remain responsible for ensuring that the person is fully trained to perform the task, performs the task assigned on a timely basis, and informs you of errors or omissions so that you can take appropriate corrective action.

**Q: I need to process a transaction to a sponsored account after the end date of the award. Is this permissible?**

A: It is permissible as long as the date of service is before the end date of the award and the transaction is processed no later than 45 days (this could be earlier, depending on the award-specific terms) after the end of the award. The Sponsored Programs office must complete a financial report and submit it to the sponsoring agency, in most cases, no later than 90 days after the end of the award.

**Q: I have to correct an entry to a sponsored account. How much time do I have?**

A: Government regulations allow 90 days to correct a transaction from the day it is processed in FRS. Sponsored transactions that must be corrected after 90 days require a letter of justification. This letter should be addressed

UM/LORD - 0181

to the Sponsored Programs office, Expenditure Control section, and should state that the correction is required in order to correct the error. The letter also should provide a valid explanation as to why the correction is past the 90-day period and steps taken to ensure timely corrections going forward. Only valid justifications will be approved and processed by the Sponsored Programs office.

**Q: I received a sponsored program-related check in my office. What should I do?**

A: Take the check to the Sponsored Programs office on one of the three campuses for timely processing. Obtain the sponsored programs lock box address, and inform the sponsoring agency that future checks must be sent to the lock box.

## OWNERSHIP OF INTELLECTUAL PROPERTY

Intellectual property is a broad term that refers to creations of the mind: an invention, discovery, trade secret, know-how, design, process, method, scientific discovery, literary work, artistic work or performance, computer program, trademark, or commercial name.

This type of property includes property protected by patent, copyright, or trademark, including: inventions, trademarks, industrial designs, compositions of matter, devices, products, methods, constructs, processes and patentable computer programs (software or algorithms); and property protected by copyright, which includes: literary and artistic works such as novels, books, educational materials, software, poems, plays, films, musical works, drawings, paintings, photographs, sculptures, courseware, multi-media, rich media, and architectural designs.

The University is an institution dedicated to education, research, and patient care. As a result, the efforts of its employees and students generate many intellectual, literary, and artistic creations. Who owns the rights to these creations—the employee or student or the University?

Ownership of intellectual property developed by employees or students of the University usually resides with the University, unless otherwise specified. All University employees and students are obligated to assign ownership of all discoveries or inventions to the University, as stated in the *Faculty Manual, Student Handbook* (Undergraduate and Graduate Bulletins), and Sponsored Policy C7. In addition, new employees sign an agreement to this effect upon employment. Under certain limited conditions, as determined by the Patent and Copyright Committee, ownership rights of a discovery or invention may be transferred to the inventor or inventors. Ownership of intellectual property developed by faculty will be determined pursuant to the provisions of the Patent and Copyright Policy of the *Faculty Manual*.

Copyrightable materials (literary or artistic works) developed by faculty are the property of the author, unless they result from a project assigned by the University as part of his or her regular duties and a prior

written agreement exists. In the case of software, copyrights reside with the University if the software was developed by staff as part of their normal duties or if the University has committed substantial resources to the development of that software. Patentable software algorithms are owned by the University. In cases where ownership of copyrightable materials is questioned, the Patent and Copyright Committee will make a determination.

The complete policies governing disclosure and ownership rights of intellectual property can be found in the *Faculty Manual, Student Handbook*, and Sponsored Programs Policy C7.

### Questions and Answers

**Q: If I teach and conduct research in a well-defined field like chemistry and I invent a new chemical entity in my home laboratory, do I own it? What if I invent this in my car on the way home, while on vacation, during a sabbatical leave, during a scientific conference out of town, or during a consulting assignment?**

A: The University owns the intellectual property in each case. The Patent and Copyright Policy will explain the invention disclosure process, which is the next step.

**Q: Can I ever own software that I develop?**

A: Yes. Software developed by faculty or students is usually the property of the author, provided it is not patentable and does not fall under one of the exceptions noted in the *Faculty Manual*. In addition, in the case of an invention or discovery, the Patent and Copyright Committee may release the property to you if the University cannot commercialize it effectively or if the invention meets certain other requirements as outlined in the Patent and Copyright Policy.

**Q: Who gets the proceeds of my invention?**

A: Once University expenses have been recovered, the net proceeds are split three ways: one-third to the inventor(s), one-third to the Department, and one-third to the University.

## BILLING COMPLIANCE PLAN

The University intends that professional and hospital billing procedures comply with applicable federal and state laws and regulations. To this end, the University of Miami Miller School of Medicine has a Billing Compliance Plan. The director of Billing Compliance is responsible for training of physicians, administrators, and billing personnel and ongoing review of billing and documentation as well as the overall compliance effort. Employees can report any activity they believe to be in violation of University billing policies to the director of compliance by contacting the Billing Compliance Help Line at 305-243-HELP or toll-free at 877-415-HELP. Callers may remain anonymous.

16

17

UM/LORD - 0182

## FALSE CLAIMS ACT AND WHISTLEBLOWER PROTECTION

The False Claims Act (FCA) imposes liability on any person who knowingly presents a false or fraudulent claim for payment or approval, or who knowingly makes or uses a false record or statement to get a false or fraudulent claim approved or to avoid or decrease an obligation to pay or transmit money or property to the government. Penalties include a fine of up to $10,000 plus three times the amount of damages sustained by the government. In addition to its substantive provisions, the FCA provides that private parties may bring an action on behalf of the United States as a qui tam relator and may share in the proceeds of the settlement. The FCA provides protection to qui tam relators who are retaliated against for bringing an action under the Act. See the policy located at www.med.miami.edu/hr as well as the Whistleblower Protection Statement found at www.miami.edu/hr.

## INFORMATION TECHNOLOGY RESPONSIBLE USE POLICY

Access to the University's computing and network facilities and services is a privilege granted by the University to authorized users, including, but not limited to, faculty, scientific and technical staff, administrative staff, students, guest investigators, and visiting professors. Proper use of the University computing and network facilities and services involves only those activities performed in support of the University's contractual and/or operational requirements or related to its academic mission. Commercial use of those facilities and services, except for authorized University business, is prohibited. Reselling of network services using the University of Miami resources is not permitted. All users must comply with the following rules:

• The University of Miami computing and network facilities and services shall not be used

a) to violate the terms of federal, state, and private grants and contracts awarded to the University community

b) to access computer accounts and/or electronic identification addresses without authorization

c) to obtain passwords without the consent of owners or to divulge any confidential information or passwords to any third parties

d) to gain access to any computer, or information contained therein, without authorization

e) to intentionally perform acts that interfere with the normal operation of computers, terminals, peripherals, or networks

f) to knowingly install on any computer system or network, or to give to another user, a program designed to damage or render unusable (i.e., viruses) a computer system or network

g) to circumvent system security schemes without authorization

h) to knowingly violate terms of software licensing agreements or copyright laws

i) to breach another user's account and/or electronic identification address

j) to monitor or tamper with other users' communications, including reading, copying, changing, or deleting users' file software without explicit consent of the owner or authorized University personnel (i.e., system administrator/data custodian)

k) to transmit obscene data

l) to take or disclose data without authorization

m) to conduct any activity considered illegal under federal or state law or that violates University policy

n) to obtain illegal access to University computing or network facilities by engaging in activities such as wiretapping, packet snooping, or the unauthorized use of computer and network equipment, network connections, diskettes, or other computer media and data communications.

• The University electronic mail system shall not be used to send (upload) or store copyrighted materials, trade secrets, or proprietary financial information without authorization, unless the usage falls within the "fair use" provisions of the Copyright Act (see Copyright Infringement section of this handbook). In addition, it shall not be used for illegal purposes such as playing practical jokes; intentionally breaking security; sending chain letters, or abusive, harassing, or offensive material; or deliberately interfering with the work of others.

• Authorized system users and restricted access users

a) may not disclose their account access code (password) to anyone

b) must follow security guidelines relating to use of the system, including changing passwords on a regular basis

c) must make every reasonable effort to prevent the viewing of information by unauthorized parties

d) must be particularly aware of privacy issues when dealing with student information (Unauthorized disclosure may violate federal law, including Family Education Rights and Privacy Act, i.e.,"Buckley Amendment.")

e) must sign a Computer Access Authorization Form at the time of applying for an access code

f) are responsible for all utilization of any computer and network account including Internet address issued to him or her

g) may not share use of passwords, even with the University's Information Technology staff

h) must choose passwords that comply with guidelines for effective password protection.

For further guidance, please see Information Technology Policies A040—Software Copyright Protection, A045—Computer Access and Confidentiality, A046—Use of University Computing Facilities, A050-Systems Administrator Policy, A053—Policy Relating to Employee E-Mail, A055—Use of Electronic Communications, A060—Acceptable Use of Info Tech Resources by Students and A065 Peer-To-Peer Policy.

18

See also Policies B070 and B025—Professional Conduct and Performance in the Human Resources section of the *Policies and Procedures Manual.*

### Questions and Answers

**Q: Is it really a problem if I do not change my password?**

A: You should change your password frequently in order to reduce the potential of security problems. Outsiders could gain access to our systems if they determine an authorized user's password. It is generally recommended that passwords be changed each month.

**Q: I am going on vacation and have given my user ID and password to a coworker so that he/she will be able to review my e-mail messages and attend to urgent business. Is this acceptable?**

A: Giving another person your password constitutes a violation of University policy. The best solution in cases of absence is to ask your Local Area Network (LAN) administrator to forward your e-mail to someone else's mailbox for review.

## WORLD WIDE WEB PAGES

The University recognizes three categories of Web pages, each with its own set of policies: (1) official Web pages that provide information about an official unit of the University; (2) research and instructional Web pages; and (3) personal Web pages developed by students, faculty, and staff that contain nonofficial information about the authors, including their backgrounds, interests, and/or opinions.

Material contained on Web pages must not be for business purposes or for financial gain unrelated to academic and research activities traditionally associated with a university unless otherwise approved or permitted by the president's designee.

Copyright-protected material not belonging to the University of Miami or to a faculty member utilizing his/her own material may not be included on a Web page without the prior written permission of the copyright holder, unless the usage falls within the "fair use" exception of the Copyright Act. See the Ownership of Intellectual Property section of this handbook for further information relating to "fair use." Individuals with questions about the use of copyrighted material for official or research/instruction Web pages should contact the General Counsel's office.

Certain laws and University policies prohibit the publication of specific categories of material. The following must not be included in Web pages themselves or in Web pages accessed via direct links from official Web pages:

• Copyrightable or licensed materials for which the necessary permissions for use have not been obtained

• Material for commercial gain unrelated to the University

• Material that could lead to illegal activities

• Material or speech that is unlawful

• Material that is intended to damage, interfere with, or place an excessive load on a computer system or network

Any advertisements, sponsorship acknowledgments, or links to outside commercial sites appearing on University-related Web pages must be approved in advance by the vice provost for research or his/her designee. In addition, a written contract approved by Business Services and Information Technology must be in effect prior to posting on the Web site. Any revenue received from such activity must be reported to the controller's office for analysis in relation to Unrelated Business Income Tax or, if revenue is from sponsorship or other gift or grant, to University Advancement for recording in the University's gift system. The receiving department should acknowledge all gifts according to policy. Information links to outside sites that are established for the sole purpose of providing a service to audiences are not subject to these reporting requirements unless they are associated with revenue or other forms of compensation, they direct visitors to the site for commercial purposes, and/or they are intended for advertising purposes. Additional information on procedures related to advertising and sponsorship can be found in General Business Policy F055 in the Business Services section of the *Policies and Procedures Manual.*

Links to outside sites from University of Miami Web pages are allowed as long as there is no contract, revenue, or other remuneration to the University, and the purpose is to provide service to users. The following types of links are allowed:

• Links to other universities, other not-for-profits, or government sites

• Links to sites related to announcements about University of Miami events, grants, etc.

• Links to sites that provide the ability to download free Web software that is needed to access a University of Miami Web page (e.g., Acrobat Reader, RealPlayer)

• Links to hotel registration pages for conferences

• Links to technical support sites

• Links from faculty pages (only) to publishers of books or other publications of which they are authors

• Links to outside sites that provide services to users that are directly relevant to the University of Miami Web page from which they are linked

The following links or practices using University of Miami Web pages are not allowed:

• Banner ads on a University of Miami site that move and/or generate revenue based on numbers of hits

• Links from official University of Miami pages (including official faculty or personal pages) to outside contractors, consulting firms, or other commercial ventures in which University of Miami faculty or employees have a financial interest

• Revenue-generating links from any personal pages (other than student media)

UM/LORD - 0184

• Web-based acquisition of goods or services that have not been coordinated through University Purchasing

Neither the official nor personal pages of the University Web site may be used to generate personal income.

All Web pages must comply with the relevant sections of Information Technology Policy A047—University of Miami's World Wide Web Policies and other University policies relating to software copyright protection, computer access and confidentiality, and use of computer systems and networks (Information Technology Policies A040, A045, A046, A050, and A055), and any relevant department, school, or college policies).

The contents of all official Web pages are copyrighted by and are the property of the University of Miami. Each official Web page must include the following:

• Copyright xxxx (year), University of Miami. All Rights Reserved.

Each personal Web page must include the following language and a link to a disclaimer, as described in the University's World Wide Web policy:

*This personal Web page is not an official University of Miami Web page. See disclaimer.*

### Questions and Answers

**Q: Does the University of Miami have official policies for the World Wide Web site?**

A: Yes. The policies are included in the Information Technology section of the *University of Miami Policies and Procedures Manual* accessed at www.miami.edu/policies_procedures.

**Q: Who is responsible for developing and maintaining official Web pages?**

A: The academic departments and administrative offices are responsible for developing and maintaining official Web pages that contain information about their areas.

**Q: Are personal Web pages allowed on the University's Web pages?**

A: Although the University allows personal Web pages, they will not be considered official Web pages of the University. Each personal Web page should be accessed only through a directory containing a disclaimer and should contain an additional disclaimer if the page itself is to be stored on a University server and/or accessed via the University Web site. Authors of personal Web pages must verify that their personal Web pages comply with section four of the Information Technology Policy A047—University of Miami's World Wide Web Policies by signing the University's Terms and Conditions for Personal Home Pages before their pages can be linked to the University site.

**Q: I would like to follow the steps to publish a Web page. Where can I submit a request for a Web page?**

A: Authors of official Web pages can fill out and submit the required forms to set up a new Web page by going to the "Getting Started" section at www.miami.edu/web. This site also contains other helpful links to guide you in the development and promotion of your Web site.

## COPYRIGHT INFRINGEMENT

It is the University of Miami's policy to respect copyrights and to duplicate or reproduce copyrighted materials only as allowed by law or by special agreement. All members of the University community are expected to comply with the copyright law.

Copyright is a form of protection that the law provides to the creators of "original works of authorship... fixed in any tangible medium of expression," both published and unpublished.

The doctrine of "fair use" attempts to address the needs of scholars and students without infringing unduly on the rights of copyright holders. The fair use doctrine allows reproduction of a copyrighted article for the purpose of criticism, comment, scholarship, or research. Considerations for determining whether a use of a copyrighted work constitutes fair use include the following:

• Purpose and character of use (nonprofit as opposed to commercial)
• Nature of the work
• Amount and substantiality of the portion used
• Effect of the use on the value or commercial market of the work

The scope of the fair use doctrine is not always easy to ascertain. One should never assume that copyrighted permission is unnecessary.

The Office of Business Services assists members of the University community as they work with copyright issues in the use of existing copyrighted works for teaching, research, and service. The University is a complex organization with a multitude of programs for the creation and dissemination of new knowledge. In the pursuit of those programs, our activities may raise questions about the relationship of copyright to the University's research, teaching, and service mission. The objective is to facilitate a constructive relationship between our academic mission and our legal rights and responsibilities. For further information on this subject, please review Policy BSC010—Copyright Laws in the Business Services section of the *Policies and Procedures Manual* or call Business Services.

### Questions and Answers

**Q: Can I ever use a copyrighted work without permission of the copyright holder?**

A: There are indeed instances in which works may be used without the permission of a copyright holder, but each instance must be evaluated individually. Certain categories of photocopying are permitted under the fair use doctrine without permission. According to the Federal Copyright Act of 1976, copyright permission is not required for the following:

• Single or limited page copies for personal or scholarly use or for library reserve designation

• Materials not under copyright protection, e.g., most U.S. government documents and works whose copyright has expired

22

23

UM/LORD - 0185

• Multiple copies for classroom use, so far as they meet standards for brevity, spontaneity, and cumulative effect

**Q: I use a spreadsheet application in my work at the University. Would it be considered a violation of University policy if I copied the program disks for the spreadsheet software and gave them to a colleague to use in another University personal computer?**

A: Yes. Unless a special arrangement has been made between the University and the publisher (such as procurement of a multiuser license), one licensed copy of a software product must be obtained for every computer upon which it is run.

**Q: Do exceptions exist with regard to the copyright law for software?**

A: The only general exception concerns the user's right to make a backup copy for archival purposes.

## FACULTY CONSULTING

Many eligible faculty exercise their option to engage in consulting as outlined in their contracts and the *Faculty Manual*. Clinical faculty may engage in consulting activities only as described in the University of Miami Medical Group (UMMG) policies.

For faculty engaged in consulting, business conduct issues usually arise in three main areas: (1) financial gains from outside consulting on the subject matter that is the substance of a grant or contract sponsored through the University by a corporation or business entity; (2) ownership of intellectual property; and (3) conflict of interest.

In the first area, faculty should avoid the perception of scientific misconduct that may result when "good" outcomes produce monetary rewards. Outside observers would be suspicious of data that is connected to a financial incentive.

In the second area, the University's Employment Agreement provides for University ownership of certain intellectual property produced by its faculty and staff. See Ownership of Intellectual Property Policy in this handbook and the University Patent and Copyright Policy to determine whether a faculty member will own the relevant intellectual property and thus be able to transfer that ownership to an outside entity.

Issues regarding the third area are more fully discussed in the section on Conflict of Interest in this handbook. For more information on this subject, please refer to the *Faculty Manual*, the Office of Technology Transfer Conflict of Interest policy, and related policies in the *University of Miami Policies and Procedures Manual* (Business Services Policy J025, Sponsored Programs Policy C8, and Human Resources policies on Conflict of Interest and Consulting Activities for employees).

*Questions and Answers*

**Q: Can I consult with a pharmaceutical company that is sponsoring my University research on the same subject matter?**

A: No. As a general rule, this practice violates our Conflict of Interest policy related to financial rewards. The University recognizes a limited exception if the company seeks your advice on overall research direction or planning, or the company would like you to attend a scientific meeting and report on your findings. In such limited cases, the consulting agreement must be disclosed and approved by your chairperson and the Contract and Compliance Committee (see page 6). Certain restrictions or limitations may be imposed on the faculty member with respect to the agreement.

**Q: Can I sign a consulting agreement or contract that gives ownership of patentable property (inventions, discoveries, know-how, designs, patentable software, or processes) that is developed during the course of my consulting to the company hiring me?**

A: No. This is prohibited since it violates your employment agreement with the University. According to the *Faculty Manual* and the Patent and Copyright policy, the University automatically owns all patentable intellectual property that you develop during your employment in your particular field of research or teaching, regardless of where or when the property is created.

## SCIENTIFIC MISCONDUCT

The Committee to Investigate Misconduct in Research has the responsibility to investigate allegations of research misconduct. According to a widely accepted definition, research misconduct can include, but is not limited to "fabrication, falsification, or plagiarism in proposing, performing, or reviewing research, or in reporting research results, or other actions that seriously deviate from commonly accepted practices within the scientific or relevant academic community for proposing, conducting, or reporting research. It does not include honest error or honest differences in interpretations or judgments of data."

As a general rule, allegations of scientific misconduct should be reported to the vice provost for research or their designee to determine if an inquiry is warranted. Others who receive an allegation of misconduct should immediately forward it to the vice provost for research. University policy provides for an initial inquiry of the allegations by tenured faculty members, selected at large, to determine whether the allegations are substantiated. The faculty conducting the inquiry must either recommend a formal investigation or determine that an investigation is not warranted. In the latter situation, the faculty must document reasons in support of its determination.

Allegations of misconduct are generally kept confidential unless federal regulations require their disclosure because of immediate health hazards, an immediate need to protect the interests of persons making the allegations or the interests of the accused, or the likelihood that the

UM/LORD - 0186

alleged incident will be reported publicly.

The University, adopting generally accepted procedures, "will use diligent efforts to restore the reputations of persons alleged to have engaged in misconduct when allegations are not confirmed, as well as to protect the positions or reputations of those persons who make allegations in good faith."

Additional information and the complete policy can be found in the Academic Matters section of the *Faculty Manual*.

### *Questions and Answers*

**Q: I am a research technician, and I think the person I work for is falsifying data. What should I do?**
A: Discuss the matter with your chairperson. If you do not feel comfortable doing so, contact the vice provost for research.

**Q: I am a faculty member and have a dispute regarding authorship with another faculty member. Is this scientific misconduct?**
A: Whether or not an authorship dispute constitutes scientific misconduct depends on the facts. If you cannot resolve the matter with the other faculty member, the issue should be discussed with your chairperson or the vice provost for research.

## HUMAN SUBJECTS RESEARCH

The University of Miami is an international leader in health and medical research. Experiments in medicine, nursing, behavioral science, public health, and other disciplines generally require that people—often our patients—be asked to participate. Such research is a privilege, one that is justified when faculty, trainees, and students take care to ensure that the research follows applicable federal and state laws and, equally important, hew to an evolving ethical standard of care.

This means that research subjects must generally be fully informed about studies in which they are being asked to participate, that they are able to understand and appreciate that information, and that their agreement to participate is voluntary. Moreover, when subjects in research studies are exposed to risk, we must make sure the risk is reasonable; when data is collected about individuals it must be kept confidential; and when faculty and students analyze the data they must do so with integrity and without (unmanaged) conflicts of interest.

These requirements are the result of both an international history of past abuses and a growing recognition that investigators have a moral duty to ensure that volunteers are protected. At the University of Miami, as elsewhere, human subjects research is overseen by an official entity (at UM, the Human Subjects Research Office (HSRO); www.hsro.miami.edu) and a suite of institutional review boards (IRBs). The HSRO provides institutional and administrative oversight, and the IRBs—comprising faculty peers and community members—see to it

that research participants provide valid consent, that their personal information is protected, that the risks they face are acceptable, and so on.

IRBs must make a number of judgment calls regarding individual studies, and this requires that members of these boards receive adequate research ethics education.

*All* research involving humans must be approved by an IRB. Questions about what constitutes research and whether any special rules apply (as for children) must be addressed in advance by the HSRO and/or by an IRB.

### *Questions and Answers*

**Q: I only want to review records of past clinic visits. Do all the patients who visited the clinic need explicitly to consent to my review?**
A: No—some research may be conducted without individual consent, as long as certain conditions are met.

**Q: Do I need IRB approval for this?**
A: Yes. While IRBs may waive consent in certain cases, the research proposal itself must be submitted first to the IRB, and the waiver of consent must be justified.

**Q: I have residual blood samples in my lab. Surely I can analyze these samples without IRB review … right?**
A: No. All research, including research on banked or residual biological specimens, must be submitted for IRB review. This is especially true for genetics research, which can raise tricky questions regarding consent, the interests of family members, and questions related to future disclosure of research findings.

**Q: I've heard that certain populations are regarded as "vulnerable" and are entitled to additional institutional protection. Is this true?**
A: Yes. Children, some patients with behavioral maladies, and others are regarded as vulnerable. Study designs must take this into account, and IRBs must make sure that adequate precautions are taken to protect members of such populations.

## CONFIDENTIALITY

**Patient/Student/Systems/Business Data.** Many aspects of University activities involve confidential, private, and proprietary information related to the varied constituencies served, such as patients, students, vendors, colleagues, alumni, donors, and others. All should be afforded the highest levels of confidentiality.

Business data, such as financial, personnel, payroll, student records, etc., also are held to the same level of confidentiality. All data should be disclosed only as required by law and strictly on a need-to-know basis to carry out University or department missions.

Student information, such as grades, coursework, and disciplinary issues, are generally regarded as confidential pursuant to the Family

UM/LORD - 0187

Educational Rights and Privacy Act ("FERPA"), also known as the Buckley Amendment.

Campus and departmental information systems, related computer hardware/software, as well as University mainframe systems, are designed to be accessible and easy to use. However, use of computers/data, access to systems, and distribution of information must be restricted and safeguarded as confidential except as necessary to perform assigned tasks. Electronic networks must not be abused nor shared without written approval of supervisors. For more information, refer to the Information Technology section of this handbook.

Any questions regarding confidentiality should be brought to the attention of your supervisor, dean, vice president, the Human Resources department, or the General Counsel's office.

### Questions and Answers

**Q: I handle departmental budgets. Some employees have asked if I can let them know in advance what their merit increase will be. Can I do this?**
A: All budget and personnel data are to be disclosed to employees only by their authorized supervisors at the appropriate time, designated by department heads.

**Q: Can student grades or disciplinary issues be released to University personnel?**
A: Both the Buckley Amendment and University policy treat these types of information as confidential. Such information may not be released without following appropriate guidelines. FERPA provides that such information can be released to other school officials deemed to have a legitimate educational interest. Check with your department chairperson for instructions.

**Q: Can I share my e-mail access code with a friend?**
A: Access codes and data are confidential and must not be shared.

**Corporations/Research.** We receive an ever-increasing amount of financial support from corporations that are eager to collaborate with universities. Corporate representatives directly contact faculty members, research administrators, technology transfer officers, and others. When a corporation receives information from the University, it may have obtained knowledge of great value that it can use to its economic advantage.

Our knowledge is the University's greatest asset and most valuable exchange medium. In general, funding sources award funds in exchange for knowledge. Therefore, please consult with Technology Transfer, General Counsel, Research Administration, or Sponsored Programs offices before disclosing confidential information to corporate representatives. These University offices can help you determine whether information is confidential. When in doubt, the safe approach is to ask the appropriate corporate representative to sign our standard Confidentiality Agreement, which can be found in the *Technology Transfer Guide for Faculty* or on the Technology Transfer Web site at www.miami.edu/techtransfer.

### Questions and Answers

**Q: What is confidential information with respect to research data?**
A: In general, this is information or knowledge that can be used to enable a third party to reproduce proprietary (novel and unique) results. This does not apply to public knowledge that has already been disclosed in a patent, publication, or presentation.

**Q: Will my contacts be offended if I ask them to sign a Confidentiality Agreement? Will they think that I don't trust them?**
A: No. This is common and accepted practice that parties use to protect themselves.

**Patient's health records.** The privacy of a patient's health records is secured by Florida and federal laws, notably the Health Insurance Portability and Accountability Act (HIPAA). The University of Miami's Medical Privacy Office has the responsibility of assuring compliance with these laws and the associated regulations for all health information kept by UM hospitals and clinics. For information, please visit their Web site at www.miami.edu/privacy-office.

## USE OF THE UNIVERSITY OF MIAMI NAME, SEAL, AND LOGO

The University of Miami name, seal, and logo are registered marks owned by the University. These marks may not be used in any medium, other than approved University programs, without the approval of the vice president for business services, the assistant vice president for auxiliary services, or their designees. The use of our logo in conjunction with that of an outside vendor or firm must be reviewed by the aforementioned University officials. All requests for use of these marks must be submitted to the appropriate parties listed above.

Any questions regarding the use of the University name, seal, or logo should be referred to the vice president of business services or assistant vice president of auxiliary services.

For further information, please refer to the Business Services section of the *Policies and Procedures Manual* (Policy F050—Use of University of Miami Name).

### Questions and Answers

**Q: A local youth sports organization wants to use our logo on their uniforms. Is this permitted?**
A: No. The use of our name or logo is licensed to manufacturers. The licensing fees paid by the vendors give them rights to use the University name or logos, and the value of that right might be diminished if other groups are allowed to use the logo. Permission for uses like this may be granted only by the vice president for business services.

28

29

**UM/LORD - 0188**

**Q: Can we use University of Miami official stationery for private correspondence?**

A: No. Only official University of Miami business may be transacted using this stationery.

**Q: A local company wants to use the Ibis logo in an advertisement. Is this allowed?**

A: No. Endorsements by the use of our logos are not permitted.

**Q: Who can or should become licensed?**

A: All manufacturers who produce goods bearing any of the University's trademarks must either be licensed or have received special permission to produce such products without a formal license agreement. Manufacturers producing goods with the University's marks for sale to a University department or an officially recognized student group are not required to pay royalties on the goods sold to the University's department or student groups, but are required to be licensed. If the department or student group sells or distributes the goods with all proceeds used to benefit the University, no royalties are due. In order to do this, both the manufacturer and the University's department or student group must first obtain permission prior to the production of any product bearing the University's marks.

**Q: Is anyone exempt from royalties?**

A: Sales of items bearing the University's marks to University departments and authorized student groups are exempt from the royalty charge if all proceeds from the department or student group selling these insignia goods are used to benefit the University. In order for a department or student group to obtain royalty exemption, requests must be submitted for prior written approval from the University Department of Auxiliary Services and presented to the manufacturer prior to their production of the goods.

**Q: Why regulate the use of UM's marks?**

A: The licensing program strives to regulate, promote, and protect the commercial use of the University's name and identifying marks, both on and off campus. The University of Miami benefits from public recognition of our images, and when properly managed, these images provide the critical unifying look that establishes a strong visual presence. The look then becomes identified with the quality of UM's programs, products, and services and distinguishes our program from other universities. Royalties collected from licensed merchandise are returned to the University to help support University programs and services.

## WORKING TOGETHER

**Cultural Diversity.** In today's workplace, there is a constant need to align business objectives with the goal of retaining and developing a diverse workforce. Business leaders in today's culturally dynamic environment must harness the wealth of such human diversity. Workers from different racial and ethnic backgrounds make cultural diversity a critical issue and an undeniable resource for all enterprises. The University of Miami is no exception.

The road ahead is challenging and exciting as we come to understand the vast array of values and backgrounds in our workforce and maximize their potential. The University is committed to working with diverse cultures and accepting each as a vital link in the University's mission.

**Our Goal.** The University's goal is to provide equal opportunity through all of its educational programs and activities as well as through recruitment, employment, promotion, and retention of individuals at all levels within the University's employment structure without regard to race, color, religion, sex, sexual orientation, age, disability, national origin, veteran status, or marital status. This goal is affirmed in the Equal Opportunity/Affirmative Action policy of the University.

**Sexual Harassment Protection.** Sexual harassment in employment or educational programs and activities is not tolerated by the University. Sexual harassment includes, but is not limited to, physical or verbal abuse of a sexual nature, including graphic commentaries about an individual's body, sexually degrading remarks used to describe an individual, or unwelcome propositions and physical advances of a sexual nature. Sexual harassment also includes the threat or insinuation that the lack of sexual submission will be used as a basis for employment or educational decisions affecting or interfering with an individual's employment, academic standing, other conditions of employment, or academic or career development. The Sexual Harassment definition, policy, and grievance procedures are addressed in the Human Resources sections of the *Policies and Procedures Manual* and in the *Faculty Manual*.

**Consensual Relationships.** Consensual relationships within the workplace give the appearance of a compromising conflict of interest, favoritism, or bias. In order to ensure fairness and minimize conflicts of interest in the work environment, University policies provide guidelines for the reporting and management of relationships where one party has supervisory responsibility or authority over another. Please refer to the Human Resources section of the *Policies and Procedures Manual* and to the *Faculty Manual*.

**Drug-Free Workplace.** Consistent with the provisions of the Drug-Free Workplace Act, the unlawful manufacturing, distribution, dispensation, possession, or use of a controlled substance is prohibited in the University's workplace. Violations will subject the employee to disciplinary action. The University's commitment to a drug-free environment is embodied in its Human Resources policies on Drug-Free Workplace and Drug/Alcohol Policies.

**Information.** Employees who have questions or complaints relating to these policies are encouraged to discuss them with their immediate supervisor or contact the Equality Administration office on the Coral Gables or Miller School campus.

**UM/LORD - 0189**

## USEFUL ADDRESSES AND PHONE NUMBERS
*All University phone numbers have the 305 area code.*

### Internal Audit
Max Orovitz Building, Room 314
Coral Gables campus, locator code 1436 — 284-2605
*Report fraud, embezzlement, internal theft, and misappropriations*

### Office of the Controller
Max Orovitz Building, Room 212
Coral Gables campus, locator code 1422

| | |
|---|---|
| Controller | 284-4877 |
| General Accounting | 284-4244 |
| Financial Reporting | 284-4352 |
| Cost Studies | 284-5902 |
| Property Accounting | 284-4658 |
| Sponsored Programs | |
| Coral Gables campus | 284-2665 |
| Miller School campus | 243-4489 |
| Institute Building, 3rd Floor (R-45) | |
| Rosenstiel School | 361-4800 |

*Questions and information regarding accounting, correction of errors, misuse of University assets*

### Human Resources
Max Orovitz Building, Room 133
Coral Gables campus, locator code 1410

| | |
|---|---|
| Coral Gables campus/Rosenstiel School | 284-3798 |
| Miller School campus | 243-6106 |
| Park Plaza East, Suite L (D7-2) | |

### Equality Administration
Max Orovitz Building, Room 104
Coral Gables campus, locator code 1411

| | |
|---|---|
| Coral Gables campus/Rosenstiel School | 284-3064 |
| Miller School campus | 243-7203 |
| Park Plaza East, Suite D (M845) | |

*Questions and information about government regulations and compliance with human resources issues, i.e., sexual harassment*

### Billing Compliance Officer
Professional Arts Center, Suite 404
Miller School Campus (D-24) — 243-HELP
*Questions about patient billing and coding of services*

### Technology Transfer
Sewell Building, Suite 2012
Miller School Campus (M-811) — 243-5689
*Questions regarding patents, copyrights*

### Purchasing

| | |
|---|---|
| Coral Gables campus | 284-2833 |
| Max Orovitz Building, Room 344 | |
| Miller School campus | 243-3600 |
| Institute Building, Room 321 (R-31) | |

*Questions regarding vendor relations*

### Vice President, Business Services
Max Orovitz Building, Room 327 — 284-5550
Coral Gables campus, locator code 1432
*Questions and signature on all University non-sponsored contracts, licensing use of University name and logo*

### University of Miami Contract and Compliance Committee
Sewell Building, Suite 3011-A
Miller School campus (R-64) — 243-6415
*Questions regarding future or existing contracts*

### Vice Provost for Research
Sewell Building, Suite 3011-A
Miller School campus (R-64) — 243-6415
*Questions regarding conflicts of interest or scientific misconduct*

### University of Miami Ethics Programs
Mailman Center, Suite 2050, Miller School campus (M-825) 243-5723
321 Jenkins Building, Coral Gables campus,
   locator code 6532 — 284-5084
*Questions regarding research, clinical, business, and academic ethics*

### University Compliance Hotline — 866-YOURCALL
*All concerns regarding ethics, integrity, conflicts of interest, sexual harassment, scientific misconduct, fraud, embezzlement, misappropriations, violations of drug-free workplace, discrimination, and adherence to federal laws and regulations and University policies.*

*This booklet was originally developed in 1998 for the University of Miami community by a committee of faculty and staff. This 2007 revision was updated by the following: Cynthia L. Augostyn, Wilhemena Black, Dr. Richard J. Bookman, Gerry Dunn, Aida G. Diaz-Piedra, Alan J. Fish, Dr. Kenneth W. Goodman, Paul C. Hudgins, Dr. Gary S. Margules, Michael Moloney, Susan R. Montes, Gemma Ramillo, Timothy C. Ramsay, Humberto M. Speziani, William Tallman, Mel Tenen, Dr. Roosevelt Thomas, Jr., and Debbie J. Wedderburn.*

**UM/LORD - 0190**

**JJHealth**
UNIVERSITY OF MIAMI HEALTH SYSTEM

UNIVERSITY OF MIAMI
MILLER SCHOOL
of MEDICINE

CONFIDENTIAL
Letter of Offer: Jonathan (Jack) Lord

Pascal J. Goldschmidt, M.D.
*Senior Vice President for Medical Affairs and Dean*
*Chief Executive Officer, University of Miami Health System*

March 1, 2012

Jonathan (Jack) Lord, M.D.
1436 Clinical Research Bldg
University of Miami Miller School of Medicine
Miami, FL 33136

Dear Jack:

It is with a great deal of pleasure that I am writing to formally offer you the position as Chief Operating Officer of our Academic Medical Center: University of Miami Health System (UHealth) and Miller School of Medicine. Upon approval of the University of Miami Board of Trustees, you will also hold the title of University Vice President for Medical Administration, effective June 1, 2012. We feel certain that you have the leadership, experience, financial and business skills and the analytical abilities required for this position. In this role you will take the lead in providing direction for the major operational functions of the School and UHealth system. The responsibilities of these roles are those outlined in our discussions and the attached position description. Should you have any questions about the role please let me know prior to accepting this position.

The appointments are subject to annual performance review. All positions of this type serve at the pleasure of the Senior Vice President for Medical Affairs and Dean and CEO at his sole discretion and in compliance with other applicable University policies.

Your reporting relationship will be directly to me as the Senior Vice President for Medical Affairs, the Dean of the Miller School of Medicine, and the Chief Executive Officer, University of Miami Health System.

The expected start-date of your appointment as Chief Operating Officer is March 1, 2012, unless altered in writing to a mutually acceptable date.

You are currently a Professor of Clinical Pathology (rank pending) and this appointment does not alter your faculty status or the attendant rights and responsibilities as outlined in the faculty manual.

You are also currently appointed as Chief Innovation Officer and that appointment will terminate with the acceptance of this appointment as will your current reporting relationship with the Provost.

<u>Personal Package Commitments:</u>

The commitments of the University of Miami Miller School Of Medicine for your personal employment package are those outlined here.

Your personal base-salary will be as follows:

From the effective date of this appointment it will be at a rate of $763,776.00 per annum for the remainder of fiscal 2012 and for subsequent fiscal year, June 2012 through May 2013.

Future changes in base compensation will be based on merit as determined by the Senior Vice President for Medical Affairs and Dean and CEO.


JONATHAN LORD, M.D.
February 24, 2022
Defendant's
**Exhibit 5**

*Office of Senior Vice President for Medical Affairs and Dean*
*Executive Office, University of Miami Health System*
*1600 NW 10th Avenue, RMSB 1140 (R-699) I Miami, FL 33136*
*Ph: 305-243-6545 I Fax: 305-243-4888*

**UM/LORD - 0001**

CONFIDENTIAL
Letter of Offer: Jonathan (Jack) Lord

Your compensation will also contain an incentive component as follows:

You will be eligible for an incentive payment with a targeted payout of twenty-five percent (25%) of your base compensation, for attainment of certain goals, with additional bonus potential for extraordinary performance at the discretion of the President and the Board of Trustees. The metrics to be used for the calculation of this bonus have been developed and mutually agreed upon by the Senior Vice President for Medical Affairs and Dean and CEO of Miller School of Medicine and the Board of Trustees. The variable compensation components addressed by these metric are based on 12 goals that have been fully described in a document that has been provided to you.

If you are eligible to receive prorated incentive payment based on your role as Chief Innovation Officer, those will be honored for the FY12 year but will cease after this period.

Should you no longer serve in this role your duties and compensation will be reassessed in keeping with your change in responsibility. If the University chooses to end its employment relationship with you, a base salary of $300,000 will be used for purposes of calculating notice due under the Faculty Manual, if any, as a Clinical Educator in the Department of Pathology.

Jack, I am thrilled that you have agreed to join my leadership team and am particularly excited by your unique combination of innovative thinking and determined, disciplined leadership style. I am confident that your contributions will allow the Miller School of Medicine and UHealth system to continue to climb in the rankings and to honor our service to our patients, our trainees and our community.

We trust that you will find this appointment offer acceptable; however should you have any questions, please do not hesitate to call me to discuss any issue. If you find the terms of this offer to be acceptable, please express such by returning one signed copy of this letter directly to me.

With best personal regards,

Pascal J. Goldschmidt, M.D.
Senior Vice President for Medical Affairs and Dean
Chief Executive Officer, University of Miami Health System

Accepted?

Jonathan (Jack) Lord

5 Mm 12

Date

2

UM/LORD - 0002



Begin forwarded message:

**From:** "Keitz, Sheri" <SKeitz@med.miami.edu>
**Date:** April 24, 2012 2:57:13 PM EDT
**To:** "Lord, Jonathan" <JLord@med.miami.edu>
**Subject: FW: Preparation for DES Brieing**

FYI... I am not responding to this without your guidance. Please advise.
Sheri

**From:** Morris, Nerissa E. [mailto:nmorris@miami.edu]
**Sent:** Tuesday, April 24, 2012 11:31 AM
**To:** Keitz, Sheri
**Subject:** Preparation for DES Brieing
**Importance:** High

Sheri,

To prepare for the layoff briefing with President Shalala next week, we need to work together to prepare a summary document that can guide the discussion. This can serve as a discussion document, but also an official summary of the event for our internal records. The following topics are important to cover in the discussion and documentation, and you may have others based on your deeper knowledge of the overall planning:

· Decision process (how impacted staff are being identified, guidelines for layoff decisions, guidelines for reassignments)
· Staffing Impact (temporary, permanent, and reassignment)
· Benefits
· Outplacement and supportive services
· Communication
· Notification process and timing

Based on conversations I have had with President Shalala this week I believe she wants to fully understand the layoffs (process and magnitude), but also the process for laying off and rehiring in shared services. I think the latter part is the piece we need to bring the greatest clarity to. She will likely have some perspectives based on her own experience of significant reductions in force when she was with HHS. The ship has sailed on this, and we are committed to the course we're on, our goals at this stage must include helping the process to be as communicative, transparent, thoughtful, compassionate and organized as possible.

I have offered Karen assistance from the team here on documenting timelines, communications, etc. if that can be helpful to ease some of the administrative burden, so you all can focus on the critical discussions with departments and working through the mechanics of the various actions. I also spoke with Right Management last night, and they are prepared to provide a revised proposal as soon as we can give them somewhat more concrete numbers. We need to get them vendorized, which I will have Debbie start working on even in advance of the final proposal. We really need to get them officially on board to start getting hands on support to you and your team.

I am available all day, with the exception of 1:45-3:30. Let me know when you have time to strategize on the DES briefing and to finalize input to Right Management.

Nerissa E. Morris
Nerissa E. Morris
Vice President, Human Resources
University of Miami
nmorris@miami.edu
Ph: 305-284-4476
UNIVERSITY
OF MIAMI



This email and any files transmitted with it may contain PRIVILEGED or CONFIDENTIAL information and may be read or used only by the intended recipient. If you are not the intended recipient of the email or any of its attachments, please be advised that you have received

JONATHAN LORD, M.D.
February 24, 2022
Defendant's
**Exhibit 7**

this email in error and that any use, dissemination, distribution, forwarding, printing, or copying of the email or any attached files is strictly prohibited. If you have received this email in error, please immediately purge it and all attachments and notify the sender by reply email or contact the sender at the number listed.

LORD-001126



Sent from my iPhone

On Jul 19, 2012, at 9:42 PM, "Goldschmidt, Pascal (Dean - School of Medicine)" <PGoldschmidt@med.miami.edu> wrote:

> List looks great. The meeting will probably be dominated by the Jackson newest crisis.
> She had mentioned the fact that she wants to help with your relationship with Joe,
> but did not want to talk to me about it. Let me know...
>
> Pascal J. Goldschmidt, M.D.
> Senior Vice President for Medical Affairs and Dean
> University of Miami Miller School of Medicine
> Chief Executive Officer, University of Miami Health System (UHealth)
>
> On Jul 19, 2012, at 3:35 PM, "Jonathan Thomas Lord" <JLord@med.miami.edu> wrote:
>
>> Pascal - per earlier communications - DES asked for one on one time tomorrow.
>> Assuming that the conversation is "open" - the list below is what I am thinking of covering.
>> Looking for guidance or input
>> Cheers
>> J
>>
>>
>> Jack Lord, MD
>> Chief Operating Officer and VP for Medical Administration
>> University of Miami Health System
>> and University of Miami Miller School of Medicine
>>
>> Professor of Pathology
>> University of Miami Miller School of Medicine
>>
>> 1600 NW 10th Avenue
>> Miami, FL 33136RMSB 1122A
>>
>> jlord@med.miami.edu
>> 305.299.7741 (mobile)305.243.0145 (office)
>>
>>
>> <1207DES.docx>

JONATHAN LORD, M.D.
February 24, 2022
Defendant's
**Exhibit 10**



From: <Lord>, Jack lord <jlord@med.miami.edu<mailto:jlord@med.miami.edu>>
Date: Friday, July 20, 2012 8:32 PM
To: Sheri Keitz <SKeitz@med.miami.edu<mailto:SKeitz@med.miami.edu>>
Cc: Pascal Goldschmidt <PGoldschmidt@med.miami.edu<mailto:PGoldschmidt@med.miami.edu>>
Subject: Re: Gaetano Ciancio Offer

Correct

Sent from my iPhone

On Jul 20, 2012, at 8:32 PM, "Keitz, Sheri" <SKeitz@med.miami.edu<mailto:SKeitz@med.miami.edu>> wrote:

Just to be sure I am reading well, there is no reporting line to surgery?
Sheri

-----------------------------------------------------
Sheri Keitz, MD, PhD
Senior Associate Dean for Faculty Affairs
Associate Vice President for Human Resources
University of Miami Miller School of Medicine and UHealth System
Ph: 305-243-0332

The information contained in this transmission may contain privileged and confidential information, including information protected by federal and state privacy laws. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution, or duplication of this communication is strictly prohibited.

From: Goldschmidt, Pascal (Dean - School of Medicine)
Sent: Friday, July 20, 2012 6:40 PM
To: Keitz, Sheri
Cc: Lord, Jonathan; Robitaille, Magaly; Sznurkowski, Gilma
Subject: Gaetano Ciancio Offer



JONATHAN LORD, M.D.
February 24, 2022
Defendant's
**Exhibit 11**

Dear Sheri,

I want to provide some basic information relative to the appointment letter for Dr.Gaetano Ciancio, as the Director of the Miami Transplant Institute (MTI). As you know the Miami Transplant Institute is a Center of Excellence that has been endorsed by both the Jackson Health System and UHealth five years ago. The Director for the Institute is selected by the Dean of the Miller School, and suggested to the President and CEO of the Jackson Health System for appointment. I have recommended Dr. Gaetano Ciancio to become the Director of the MTI. Mr. Migoya is in support of my recommendation.

We have not yet established the University wide institute that represents the UM side of the MTI (UMTI). Dr. Gaetano Ciancio will also serve as the Director of the UMTI.Gaetano will have as part of his new responsibilities the establishment of the UMTI as a fully endorsed University Institute. Gaetano will work with Elaine Van der Put to establish a business plan for the UMTI and with Nelson Weichold to address the financial operations of the new Institute.

**In terms of report lines, the Director of the UMTI will have dual reporting lines to the Dean, and will also report to the Chief Operating Officer of the UM Medical Center, for operations.** Our faculty working as transplant physicians, no matter what their tenure initiating department might be, will report to the Director of the UMTI at UM. These physicians will also have a reporting line to their respective Chairs according to their tenure initiating department. **UM staff working for the UMTI will also report to the Director of the UMTI and that includes all the employees working in the Immunological Monitoring Laboratory (IML). The Director of the IML will report directly to the Director of the UMTI. However, the functioning of the IML needs to be compliant with good clinical laboratory practice and partner successfully with the Department of**

**Pathology to ensure standardization of testing and reporting, it is expected that the Director of the IML will maintain an important and collegial relationship with the Chair of the Department of Pathology at UM. In addition, the IML is expected to maintain all accreditations required for good clinical laboratory practice.**

Another important role for the Director will be to organize a regular review of the MTI by experts in transplant medicine. The review will performed by both a group of academicians with substantial credibility in the field of transplant and also by a group of administrators to ensure that compliance of the Institute is consistent with state-of-the-art practice.

In terms of important relationships, The Director will be expected to maintain excellent relationships with all of the stakeholders of the UMTI, Chairs, Institute Directors and other UM leaders. On the JTI side, your relationship with the President and CEO of the Jackson Health System, the Chief Operating Officer, the administrator delegated to the MTI and staff is expected to be outstanding. It is also expected that the Director advocates for reinvestment of all profits generated by the JTI technical fees into maintenance and expansion of the MTI facilities and personnel.

Compensation. Compensation for the MTI Director will reflect the high marketability of transplant program Directors. For Gaetano Ciancio, his current total compensation is $421,549.68. I suggest that we add a $100,000 administrative supplement, and another $75,000 as variable bonus (maximum opportunity).

Let me know if you have any question relative to the job offer, or this letter.

Thanks,

Pascal

LORD-001147



Begin forwarded message:

**From:** pascal goldschmidt <pgoldschmidt10@gmail.com>
**Date:** August 13, 2012, 10:11:13 PM EDT
**To:** Jack Lord <jlordmd@gmail.com>
**Subject: Re: Confidential - more insights on meeting with Alan this morning**

As you and I agree, better to keep Alan close to us, than distant and unpredictable. More on this very soon...
Thanks partner!

On Monday, August 13, 2012, Jack Lord wrote:
  I agree and understand
  I don't want to push you to a place that is uncomfortable
  We are all imperfect - my bias is he helps us change the game and we neutralize resistance

  Sent from my iPhone

  On Aug 13, 2012, at 10:00 PM, pascal goldschmidt pgoldschmidt10@gmail.com> wrote:

    We gave him the opportunity to build the MTI and IML, without these two programs, financial
    performance was so so for a DOS. In 55 years the DOS accumulated a $14m in plant account.
    Since MTI and IML, DOS accumulated in excess of an additional $24m in five years. He failed to
    reinvest in a great surgical programs to make the MS/UHealth successful.

    On Monday, August 13, 2012, Jack Lord wrote:
      Thanks - appreciate history.
      I think that the "great" related to performance - is about consistency - financials - perceptions of
      people like Sheri and Nelson around responsiveness - and would add "Rafic" to the mix along
      with telesurgery
      Appreciate the dialogue partner
      J
      On Aug 13, 2012, at 9:44 PM, pascal goldschmidt pgoldschmidt10@gmail.com> wrote:

        Interesting, actually, several on the board (including leaders like Frost and George)
        wanted for me to get rid of him right away, instead, I supported him. But I am not sure
        he understand "great performance". Exceptions are with individuals like Omaida,
        Williams, few others, they are encouraging. Will have many questions for our
        meeting. Thanks for the update!
        Pascal

        On Monday, August 13, 2012, Jack Lord wrote:
          Pascal - thought I would share more on Alan this am - his words and what I think
          may be a good way to approach with him
          1) He was surprised - about him not about DL
          2) Took me through history - of being a bit bewildered about why you didn't/don't
          like him; referenced your initial "kitchen" cabinet that didn't include him until the
          hospital was purchased and (his perception) that the board forced you to include
          him
          3) He recognizes that there is a lot of work to do with the medical group
          4) He wants to do the right thing for the University; and recognizes that it won't
          happen with current leader

          I think that the best strategy here has the following elements:
          1) authentic conversation about both your frustrations with and admiration of Alan
          2) recognition of what he has accomplished - career long here and consistency of
          performance since you have been here

JONATHAN LORD, M.D.
February 24, 2022
Defendant's
**Exhibit 12**

3) why it is important for him to lead now and step in – around change people can believe in – that it is about his blend of understanding great performance and the importance for people in the organization to trust and have confidence in leadership and changes

4) that you don't expect that you will always agree with each other – and that you actually want that kind of engagement to help drive the best change

5) that "we" - you and me - will expand our personal partnership to include him as a partner in working through and "co-creating" the future

6) that there are a couple of ways to approach – take as an interim and help us develop strategy and recruit talent to lead; or take it permanently and help drive a success plan for the department

Hope this is helpful partner. . good luck with meeting with him.  After your meeting, would like to have a 3 way

Cheers
J

LORD-001153



Sent from my iPhone

On Aug 16, 2012, at 10:45 AM, "Cote, Richard" <RCote@med.miami.edu> wrote:

Thank you Pascal. As you are aware, we are already working with Jennifer on the compliance issues.

It appears that MIT and JMH are having a conversation regarding the disposition of the transplant biopsies, and we are working with JMH on how they want to proceed. In addition to the financial and billing issues, there are serious governance, as well as hospital bylaw and accreditation issues involved in allowing tissue to be transferred to a non-pathology lab, and we will be discussing this, and the risks, with JMH and UM leadership.

For the time being, we will hold on sending this note until we receive further feedback from JMH (which we are actively pursuing). When we are ready to move, we will use the communication you have provided.

Thank you again.

**Richard J. Cote, M.D., FRCPath, FCAP**
**Professor and Joseph R. Coulter Jr. Chair, Department of Pathology**
**Chief of Pathology, Jackson Memorial Hospital**
**Director, Dr. John T. Macdonald Foundation Biomedical Nanotechnology Institute**
**University of Miami Miller School of Medicine**

*The information contained in this transmission may contain privileged and confidential information, including patient information protected by federal and state privacy laws. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution, or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.*

**From:** Goldschmidt, Pascal (Dean - School of Medicine)
**Sent:** Wednesday, August 15, 2012 8:00 PM
**To:** Chen, Philip; Cote, Richard
**Cc:** McCafferty-Cepero, Jennifer; Lord, Jonathan
**Subject:**

Dear Phil and Richard,

The upcoming review of the MTI and IML by TMG group will include an independent review of the allegations and concerns detailed below. The Compliance Office will be active partners in this review and assure (1) that UHealth leadership is briefed and (2) that any and all necessary refunds, adjustments, and other corrective actions take place in a timely fashion.

With this in mind, please find suggested revisions to your communication to Dr Ciancio. Given the sensitivity and charged nature of this situation and these relationships, We removed the allegations and attempted to focus on the facts and the quality improvement plans moving forward. Please let us know if we can be of any further assistance.

Best regards,
Pascal, Jack and Jennifer

JONATHAN LORD, M.D.
February 24, 2022
Defendant's
**Exhibit 13**

Dear Dr. Ciancio,

Thank you for your feedback. We will be moving forward with the transfer of the transplant biopsies back to JMH Histology and Pathology as ofAugust 16. The purpose of the meeting I called was to inform you of this, and to generate a discussion. Although we were unable to meet later this month, I would like to re-iterate the need to share with you the background and key issues regarding the return of this service to Pathology and the reasons for the immediate transfer. Hopefully, our schedules will accommodate an in person meeting in the next few weeks.

Here is the summary of our progress and next steps. Pathology has been working with Surgery and developed a plan to transfer transplant biopsies to Pathology in order to better serve our patients as well as meeting regulatory compliance and acceptable standards of practice. The plan calls for the technical components (TC) to be returned to JMH Histology Lab and professional components (PC) to UM Pathology Faculty. With the recent arrival of Drs. Thomas and Barisoni, both renowned renal and transplant pathologists, and the completion of operating procedures in the lab, the plan is ready to be implemented and we are on track for anAugust 16 transfer.

Should you need additional information, please feel free to call me at any time (6-2829). THANK YOU.

I look forward to working with you, Dr. Ruiz, and the rest of the MTI and IML team on quality and process improvement initiatives as well as specific "clean-up" actions. THANK YOU.

Respectfully,
Phil

Sent from my iPhone

LORD-001157



# OIG HOTLINE
# FACSIMILE SUBMISSION

### OFFICE OF INSPECTOR GENERAL
### OFFICE OF INVESTIGATIONS
### OIG HOTLINE OPERATIONS



| Number of Pages | 25 (including cover) |
|---|---|
| Your Fax # | 305 243 3424 |

### Complainant Information

| Your Name | Jennifer McCafferty |
|---|---|
| Telephone Number | 305 243 6129 |

### Subject/Provider Information

| Name (First/Last or Business) | University of Miami Transplant Lab |
|---|---|
| Type of Provider | |
| Address | 1600 NW 104th Ave |
| City, State, Zip Code | Miami, FL 33136 |
| Telephone # | |
| Email/Internet address | |

### Brief Description of Complaint
### (Please submit any additional information & documents)

Please see attached.

This Fax may contain confidential and/or privileged information. If you are not the intended recipient (or have received this Fax in error) please notify the sender immediately and destroy this Fax. Any unauthorized copying, disclosure or distribution of the material in this Fax is strictly forbidden.

OIG Hotline Facsimile Submission Form
Revised 04/05/2011



JONATHAN LORD, M.D.
February 24, 2022
Defendant's
**Exhibit 14**

LORD-001168

P. 1

☆ ☆ ☆ Personal Journal ( Oct. 2. 2012  3:50PM ) ☆ ☆ ☆

1)
2)

(Manual print)

| ( TX )<br>Date | Time | Destination | Mode | TXtime | Page | Result | User Name | File<br>No. |
|---|---|---|---|---|---|---|---|---|
| Oct. 2. | 3:44PM | 910002230164 | 03TES) | 3'00" | P. 25 | OK | | 1613 |

| ( RX )<br>Date | Time | Sender | Mode | RXtime | Page | Result | User Name | File<br>No. |
|---|---|---|---|---|---|---|---|---|

TX Count      001038                    RX Count      000965

| # : Batch | C : Confidential | ☆ : Transfer | P : SEP Code |
|---|---|---|---|
| M : Memory | L : Send later | @ : Forwarding | E : ECM |
| S : Standard | D : Detail | F : Fine | U : Super Fine |
| > : Reduction | H : Stored/D. Server | × : LAN-Fax | † : Delivery |
| Ω : RX Notice Req. | A : RX Notice | ✉ : Mail | <>: IP-FAX |
| ▱ : Folder | | | |

LORD-001169



UNIVERSITY OF MIAMI
MILLER SCHOOL
of MEDICINE

US Department of Health and Human Services
Office of Inspector General
ATTN: OIG HOTLINE OPERATIONS
PO Box 23489
Washington, DC 20026

October 2, 2012

To whom it may concern:

The attached packet was received in the Office of Billing Compliance at the University of Miami Miller School of Medicine late in the afternoon on Friday, September 21, 2012. As we could not confirm that the Office of the Inspector General received the communication, we are forwarding it independently.

The University and Miller School take any allegation of fraud, waste or abuse seriously. As a result of this letter, we have expanded an already ongoing investigation of the transplant laboratory.

We remain committed to being a good steward of federal healthcare dollars and we will take all appropriate and required actions should any of these allegations be substantiated.

Should you require additional information related to this matter, please contact me directly.

Sincerely,

Jennifer McCafferty, PhD, CHRC
Chief Medical Compliance Officer

LORD-001170





University of Miami
1600 NW 10th Ave
Miami, Fl 33136



LORD-001171



USPS.com® - Track & Confirm

Page 1 of 1

English     Customer Service     USPS Mobile

Register / Sign In

USPS

Search USPS.com or Track Packages

Check Tools     Ship a Package     Send Mail     Manage Your Mail     Shop     Business Solutions

# Track & Confirm

GET EMAIL UPDATES     PRINT DETAILS

| YOUR LABEL NUMBER | SERVICE | STATUS OF YOUR ITEM | DATE & TIME | LOCATION | FEATURES |
|---|---|---|---|---|---|
| 0311255060023756287 | Priority Mail | Return to Sender | August 29, 2012, 8:41 am | WASHINGTON, DC | Expected Delivery By: August 29, 2012 Delivery Confirmation™ |
| | | Arrival at Post Office | August 29, 2012, 8:37 am | WASHINGTON, DC 20026 | |
| | | Processed through USPS Sort Facility | August 29, 2012, 1:43 am | WASHINGTON, DC 20066 | |
| | | Depart USPS Sort Facility | August 28, 2012 | OPA LOCKA, FL 33054 | |
| | | Processed through USPS Sort Facility | August 28, 2012, 1:58 am | OPA LOCKA, FL 33054 | |
| | | Processed at USPS Origin Sort Facility | August 27, 2012, 11:15 pm | OPA LOCKA, FL 33054 | |
| | | Dispatched to Sort Facility | August 27, 2012, 5:22 pm | MIAMI, FL 33166 | |
| | | Acceptance | August 27, 2012, 10:01 am | MIAMI, FL 33166 | |

Check on Another Item

What's your label (or receipt) number?

Find

LEGAL
Privacy Policy ›
Terms of Use ›
FOIA ›
No FEAR Act EEO Data ›

ON USPS.COM
Government Services ›
Buy Stamps & Shop ›
Print a Label with Postage ›
Customer Service ›
Site Index ›

ON ABOUT.USPS.COM
About USPS Home ›
Newsroom ›
Mail Service Updates ›
Forms & Publications ›
Careers ›

OTHER USPS SITES
Business Customer Gateway ›
Postal Inspectors ›
Inspector General ›
Postal Explorer ›

Copyright© 2012 USPS. All Rights Reserved.

9/4/2012

LORD-001172



Please Recycle



PRIORITY MAIL
UNITED STATES POSTAL SERVICE

For Domestic and International Use

From University of Miami
1600 NW 10th Ave
Miami FL 33136

TO

U.S. Department of Health and
Human Services
Office of Inspector General P.O.Box
23489   Washington DC 20026

Label 228, January 2008

PRIORITY MAIL

ED STATES POSTAL SERVICE

Rate Mailing Envelope

s at usps.com



1130 5520 0000 325E 8247

DELIVERY CONFIRMATION™
United States Postal Service®



PS00001000014

LORD-001173

University of Miami, Miller School of Medicine

Transplant Laboratory

1600 NW 10 th Ave, RSMB

Miami, FL 33136

US Department of Health and Human Ser

Office of inspector General

ATTN: OIG HOTLINE OPERATIONS

PO Box 23489

Washington, DC 20026

LORD-001174

US Department of Health and Human Services

Office of Inspector General

ATTN: OIG HOTLINE OPERATIONS

PO Box 23489

Washington, DC 20026

This is to report a fraud, which is taking placed in the Transplant laboratory, Department of Surgery at the University of Miami, Miller school of Medicine; address 1600 NW 10th Ave Rosenthiel Medical Building, 8 floor, Miami, FL 33136.

The Medical Director Phillip Ruiz MD, PhD, Chief supervisor Alexandra Amador, Chair of the department of Surgery, Alan Livingston MD, Senior administrator Raffick Warwick, Former laboratory administrator Ramiro Fernandez,  current administrator Nicole Legeir.

This people are commitenting fraud to Medicare by billing laboratory test with no interpretation and not irrelevant for making decisions to transplant patient or treated for rejection. Medicare needs to review Cylex, Cytokines, MBL, T and B subsets.

This people have been reported to State but when the inspectors come to review the documentation the paper work

LORD-001175

have been altered and it seems that there is anything wrong, it needs experts in reviewing this billing issues and a forensic accountant to look for what is irregular. Medicare has been reported but they have not investigated these issues.

It seems that no one care because this people are doing the same and there continue whit the wrong doing. Phillip Ruiz the medical director are supported by the chair of the department of surgery Alan Livingston, they laid off individuals that do not follow their steps and because of treating and weak link we are scared to report the irregularities also the University is a private institution and one individual can't fight alone the university lawyers will "eat you alive". The keep everything very well secret so they do not be uncover.

Phillip Ruiz was fired from the department of Pathology were he work for the past 21 years, he was escorted by security for literally stealing biopsies from the department of Pathology and taking them to the department of Surgery to be process this happened on March approximately 2011, also he used founds from Histocompatibility laboratory to open a Histology laboratory when he did not suppose to, he both computers for his family, he hired family and friends to work at the transplant laboratory with salaries when there were not qualified to do the work ( Rene Martin and his son).

LORD-001176

Jennifer Macquie is a recent certified medical technologist that been since 2009 are billing Medicare for MBL test without a license   (she was recently certified in Dec, 2011), also there are technologist that do not have supervisors license (Alexandra Amador do not have a Histocompatibility license) (Rogelio Gonzalez have a license for serology and Microbiology and is performing HLA /DNA testing Histocompatibility for years) and they are being paid for those positions.

The State came to investigated a few weeks ( July,  2012) ago but did not find anything because Alexandra Amador spend and entire weekend sing  and changing the reports and fixed them process she did for the inspection that took pleased in March 2012 and for concerns if the inspectors would see (JM signature).

Ramiro Fernandez the former administrator of the laboratory was investigated for HIPPA complaint issues and in that investigation irregularities with fraud were found and he was force to leave the University; he was paid by the department of Surgery to leave and to not report Phillip Ruiz as well who was signing and allowed all this money issues to be performed. Around July, 2011 Phillip Ruiz  MD send an Email to Ramiro Fernandez were, he expressing the changes he made in the post-transplant protocol test  and  charges to Medicare without the authorization of the Clinical transplant director David Roth

LORD-001177

MD the been issues with the transplant  department and the transplant laboratory since Phillip Ruiz was placed as a director by Alan Livingston  and Andrea Tzaquis MD ( the University had to pay millions of dollars to the lawyers and UNOS because  A. Tzaquis  violated the UNOS laws and jump the transplant list favoring patients from outside the United States now he left the University and went to Cleveland Clinic after all the mess he created in the transplant laboratory supported by Phillip Ruiz.

Ramiro Fernandez has this Email in his personal files. It should not be any communicating with Phillip Ruiz.

Only the appropriate authorities can fight this big monster the University of Miami because they know what to look they have expert people that charge test by CPT codes and with test they are justified.

It is incredible that in one of the more powerful department of a Medical setting and an institution that is training future doctors these caned of activities are happening.  Believe or not is organized crime and it seems like a chapter of American Greed.

In the month of July 2012 a second article about the University of Miami, Miller Medical was reported in the Miami Gerald Mrs.  N. Braman was member of the University board and new the irregularities that the Dean and Shalala are allowing and

LORD-001178

again the Dean was excusing itself , this article followed one that was publish in May, 2012 ( Please see attachment).

The renal transplant graft survival have drop to 82% from 98% since Phillip Ruiz became the laboratory director. I can't understand why the University is supporting this type of behavior that have a negative impact in patient care and the rest of the physicians that are practicing in an honest way.

There are individuals like Ramiro Fernandez that know well and have documentation of how these frauds are performed to Medicare but he is not reporting this to Medicare (WHY?).

This letter has been sent to these appropriate authorities so the appropriate investigation will be done.

We hope that this letter will not be read and left on a desk or drawer.

Thank you

Please help

LORD-001179

<u>The Herald</u>

# UM med school's big ambitions led to big layoffs

UM's medical school has grown rapidly in recent years — too fast, say critics, who believe excessive ambitions led to its present financial troubles.



This is the UM Life Sciences Building, located at NW 7th Ave and 20th Street. This was shot, Saturday, July 13th, 2012.
PETER ANDREW BOSCH / MIAMI HERALD STAFF

Full-size Buy Photo

Previous | next

Image 1 of 2

UM MEDICAL SCHOOL
BY THE NUMBERS
Medical School Annual Revenue

$1.7 billion

LORD-001180

UM Total Annual Revenue

$2.3 billion

Layoffs
About 800

Full-time in June

About 190

Part-time in March

Theft
$14 million

Amount of drugs

Allegedly stolen by employee

Institute for Human Genomics
Special state funding

$80 million

Losses after 10 months

Fiscal 2012

$9.8 million

COMPENSATION
President Donna Shalala $1.16 million a year

Dean Pascal Goldschmidt

$1.1 million a year

Sources: UM medical school financial statements, audited report, court records,

IRS documents

BY JOHN DORSCHNER
JDORSCHNER@MIAMIHERALD.COM

Long before the University of Miami announced in May that its Miller School of Medicine had financial problems big enough to force layoffs of about 900 full-time and part-time workers, there were signs of serious trouble.

As far back as October, billionaire car dealer Norman Brahman wrote in a memo to fellow UM trustees that he and colleagues had been receiving anonymous letters for months "outlining a host of wrongdoings, mostly at the medical school." Brahman and others closely tied to the school warned UM officials the medical school was spending too much, too fast in the push to build a world-class medical center.

The expansion was occurring just as healthcare revenue — the foundation for much of the medical school's expansion — was starting to dry up, with lower rates of reimbursement from insurers and cuts in federal and state funding.

LORD-001181

The medical school also had major problems of its own. According to internal documents, the school suffered from bloated staffing, a faulty billing system and prices that sometimes ran much higher than at other South Florida hospitals. Internal controls apparently were weak at best: A whopping $14 million in expensive cancer drugs disappeared from a UM pharmacy over three years before an employee was charged with theft in June 2011.

The medical school's difficulties even began to impede its relationship with the ailing, taxpayer-financed Jackson Health System, endangering a decades-long partnership with the public hospital system.

By the time the layoffs were announced May 8, rumors had been swirling for weeks. UM President Donna Shalala insisted the medical school problems were caused by factors beyond her control. "We live in a world in healthcare in which our flows of funds are unpredictable," Shalala told the Herald in May, adding that she had responded as quickly as possible to the problems once they became apparent.

The medical school, she said, would emerge as a "much stronger healthcare system of a much higher quality."

In the past five years, Shalala has presided over major initiatives designed to reshape UM's medical school and propel it to the top tier. Hiring more than 100 high-profile researchers and creating a biotech research park boosted the school's national profile. Purchasing a hospital — the old Cedars Medical Center, now University of Miami Hospital — cemented the school's status as a leading healthcare provider. Reinventing the relationship between UM and Jackson allowed the medical school to launch new — potentially competing — roles.

Together, the ambitious moves vaulted UM's medical school to the national stage — but they may also have seriously damaged it. Layoffs weren't part of the plan, leaving critics and community leaders to wonder whether Shalala, who earns $1 million a year at UM and was for eight years the nation's No. 1 health official as secretary of the U.S. Department of Health and Human Services during the Clinton administration, simply failed to heed the warning signs in her quest to make UM a national powerhouse.

"Ultimately, Donna Shalala has to bear the responsibility for this failed strategy," says Stephen Greensick, a Miami-Dade physician-entrepreneur. He points out that during the 1990s, when she led HHS, she battled to keep down soaring healthcare costs. "Reducing the spending on Medicare that was her goal — first reducing payments to hospitals, then to doctors. And now she sits there and says, 'Gee, these are factors outside our control.' "

Shalala said in May she's done everything she can: "We're in a brave new world in healthcare, both in terms of how we're funded and in how fast we have to move."

In a statement to the Herald on Thursday, the medical school's dean, Pascal Goldschmidt, said, "Throughout my tenure at the Miller School we have focused on strategic initiatives to deliver the best possible care to our community, open new frontiers for research, and provide state-of-the-art training for our students and residents.

"We make decisions on the best information available and our assessment of where the field is moving. Not every decision is perfect, nor does the world around us function perfectly. ... What is important is that ... these programs are delivering life-changing discoveries, expanding our impact on the community, and building the reputation of UM as a great research institution."

EARLY WARNINGS
**OF TROUBLE . . . AND HOW THEY WERE DISMISSED**
Signs of problems with UM's finances go back to at least June 2011. That's when the Chronicle for Higher Education ran an article: Fast-Growing Strategy Has Its Costs at U. of Miami. The story noted that the "expansion is looking overambitious to some" and quoted several anonymous faculty members as saying UM "promised too much and is now hustling to cover costs, even if it means taking from the poverty-plagued population that it pledged to serve."

Shalala decried the article shortly after publication as "a shocking example of irresponsible and lazy reporting."

Behind the scenes, others were raising alarms. In October, Brahman, a longtime UM supporter, wrote a scathing letter to fellow UM trustees: "Poorly conceived decisions by the medical school administration have put the university at significant risk and, at the same time, injured Jackson Memorial Hospital."

Brahman said UM "looks nothing like the strong institution it was five years ago," and blamed "the poor performance of the medical school, a half-billion dollars of new debt and the depletion of almost all our cash reserves."

In his letter, Brahman was particularly irate about UM's purchase of Cedars, directly across the street from Jackson Memorial Hospital. UM leaders predicted the hospital would earn almost $90 million in its first six years, but Brahman had serious doubts: "We have missed our projections ... by hundreds of millions yet we continue to accept forecasts from the same people as if they are credible."

In February, Brahman resigned from the UM board, fed up with what he viewed as the bungled finances at the medical school.

Twice in the few months after Braman's letter, two former deans of the medical school met with Stuart Miller, the UM board member whose family donated $100 million to the medical school, to raise the alarm about the negative financial picture, according to UM insiders. Former deans Bernie Fogel and John Clarkson outlined a long list of major problems that needed to be addressed quickly, including the deteriorating relationship with Jackson.

Six months after the letter, UM leaders announced the layoffs, including the removal of several executives.

Shalala told The Herald in May that she reacted with reasonable speed to situations she couldn't control. "No one wants to lay anyone off. We waited as long as we could possibly wait to make some very tough decisions. In the process, we were doing some very careful planning. There is nothing we're doing that everybody else in healthcare is not doing."

LORD-001183

Braman doesn't buy that logic. Earlier this month, he told The Herald that the layoffs "were a real tragedy that never should have happened. ... The people at the top were very much more interested in flash than substance."

## JACKSON AND
## UM MED SCHOOL: INEXTRICABLY ENTWINED — AND NOW TROUBLED

UM and Jackson are among the region's biggest employers and most crucial institutions. But both are now troubled. Jackson has lost $419 million the past three years.

UM has placed tremendous emphasis on its medical school, which in fiscal 2011 had $1.7 billion in revenue, according to a medical school financial report. The whole university generated $2.3 billion in revenue, according to UM's audited statements.

Mark Rogers, a physician and former Duke University executive who has served on Jackson's board, says the situation "calls into question the whole economic future of the entire county. ... This applies not only to how residents get high quality healthcare, but also to the aspirations of Miami to become an economic center for the vibrant and growing biotechnology industry."

Braman put it this way: "This is really a double tragedy — UM and Jackson. And you can't disconnect the two." With UM's purchase of a hospital across the street of Jackson, "taking away paying patients, you can't underestimate the problems this has caused Jackson."

The partnership between the medical school and Jackson had generally worked well for years, despite occasional squabbles. For 25 years, the two previous medical school deans grew the institution slowly without layoffs. That changed in 2005, when Shalala announced she had hired Goldschmidt as the new dean, a renowned cardiologist and veteran Duke University administrator, for a $1-million-a-year compensation package.

Goldschmidt quickly began to push for UM to have its own hospital. "World-class doctors like to come to an environment where the university has its own hospital," he said. In 2007, UM purchased the 560-bed Cedars and renamed it.

Many were skeptical. Myra Hurt, a dean of Florida State University's medical school, said many universities found owning hospitals to be "financially tricky." Others criticized the purchase price: $275 million. Joshua Nemzoff, a specialist in buying and selling hospitals, was stunned by the amount. "They paid three times what I thought that hospital was worth," he said. UM used bonds to pay for the hospital plus $50 million in improvements.

Shalala remains a strong supporter of the purchase. In the midst of layoffs in May, she called the hospital "part of the solution," not the problem.

Last week, Goldschmidt said of the Cedars purchase: "Some things went according to, or better than, plan; some did not," but the UM hospital has shown improvements in performance metrics and provides "new life-saving care." Jackson officials had been worried all along. As far back as 2006, Larry Handfield, then chairman of Jackson's board, looked at UM's ambitious expansion plans and felt Jackson would be the loser: "My concern is ... if they have a hospital where they have to meet their bills, they are going to put a patient in that hospital first, and put one in Jackson second."

LORD-001184

Meanwhile, UM had been in expansion mode, attracting more than 100 high-priced star scientists from the nation's top schools, including 30 researchers who arrived with Marc Lippman, a University of Michigan breast cancer researcher. He and the team received a combined $52 million compensation package, according to Braman.

Goldschmidt said such packages tend to include not only the salaries of team members, but also laboratories, clinics and expensive equipment.

The biggest catches were more than 50 scientists from Duke's Center for Human Genetics, who became the bulwark of UM's Institute for Human Genomics. They were given housing assistance and other perks. UM subsidized the institute with $10 million. Two Florida legislators, Marco Rubio and David Rivera, shepherded a bill through the Legislature in 2007 to give the new UM Genomics Institute $80 million in state funding on the premise it would create 296 high-paying jobs within five years.

Shalala was enthusiastic: "We're trying to become one of the world's great research universities. And we're well on our way. We're building a scientific powerhouse."

Others were concerned about the money needed to create the powerhouse. Steve Green, former head of UM's faculty senate, told The Herald several weeks ago: "I don't know of anybody who disagrees with the vision that the dean has" to greatly increase research, but "the expectations of some of these high-priced people have not yet been realized."

Last week, Dean Goldschmidt said, "Recruitment of talented individuals is expensive — that is the norm for academic medicine," but the hiring was done carefully. "Some of these recruitments achieved their plans or better, while others did not."

A new Life Science Park was built by an independent developer, without any cost to the university, according to Shalala, but the medical school was pouring money into construction: a $100 million clinical research lab and another $80 million biomedical building, to be paid for by new revenue. Medical school executives told trustees that they expected the new UM Hospital (formerly Cedars) would increase net income by $88.9 million during its first six years, including $44 million in the fiscal year that ended May 31, according to an attachment that Braman sent board members. But in the first 10 months of that fiscal year, the hospital's income was just $4.8 million.

And the entire UM medical center — the clinical enterprise of doctors and the hospital, plus research and education — lost $17.9 million for the first 10 months, according to March UM financial reports. Such reports are private but The Herald obtained a copy of the March financial statement.

Making matters worse: UM's executives had budgeted the medical center to show a $25 million surplus for the year. Chief Operating Officer Jack Lord told The Herald last week that the medical school finished its fiscal year on May 31 $50 million below budget because of billing problems, "overly aggressive revenue targets" and a "need to more actively manage our expenses."

Joe Natoli, UM's chief financial officer, explained in May that UM needed surpluses from the medical school because "we have made significant and important investments in the medical school over the last decade and in particular over the last several years," with the expectation that the investments

LORD-001185

would yield cash to help the university's balance sheet, improve medical facilities and build up the underfunded pension plan.

One major problem for UM was revealed in a February report from PricewaterhouseCoopers, which said its survey showed patients think highly of the quality of care in academic medical centers, but they don't want to pay more for it — a huge challenge since academic centers are perceived, often correctly, as costing more. A July memo to employees from Goldschmidt and Lord reported faculty complaining that some tests that usually cost hundreds of dollars at other hospitals can cost "several thousands when performed at our hospital."

### WHERE THE MONEY WENT (INCLUDING THE MILLIONS IN MISSING MEDS)
When Shalala explained the medical school's problems in May, she listed factors that had either reduced revenue or driven up costs, some related to the national recession. Other reasons for UM's troubles may be its own inefficiencies, according to internal documents.

Among the factors listed by Shalala:

• Insurers are reducing payments to hospitals as the national push to reduce medical costs continues.

• State funding for UM was cut by $8 million in the most recent legislative session.

• Research money, mostly from the National Institutes of Health, has remained flat while the number of scientists competing for research dollars has gone up.

UM, like many other research centers, ramped up its programs because of stimulus funds. The medical school received $63 million in stimulus money to help fund research jobs. But even in August 2011, the former chief operating officer, William Donelan, warned that some of those positions could be lost when the money ran out.

Shalala didn't think so. "We were all warned about the stimulus money," she told The Herald, "but at the same time, everybody expected the federal budgets to start going up and for the economy to somewhat recover. We waited. It didn't happen."

The Hussman Institute for Human Genomics, which has received state and philanthropic funding for research, has remained among the school's biggest financial drains. In the first 10 months of the current fiscal year, it lost $9.8 million. UM leaders have supported the institute on the theory that genetic research offers the biggest chance for medical breakthroughs. "They're doing great," Shalala said of the institute in May, adding that some researchers had "moved on" because they didn't get NIH grants.

In its latest quarterly report to the state Department of Economic Opportunity, the institute said it had created 199.5 jobs by Feb. 29 and was projected to create 25 more jobs in June, on its way to the promised 296.

• Jackson's reduced payments to UM have hurt the medical school.

For years, UM has relied on a lump sum payment of about $130 million from taxpayer-supported Jackson to pay for UM doctors to treat Jackson patients and for other services. Last year, the

LORD-001186

struggling Jackson insisted on a $16 million cut. As UM's financial picture grew dimmer, medical school leaders — while pledging support for Jackson — emphasized that if a patient came to a UM doctor, the doctor could decide where to put the patient, and that was increasingly likely to be the UM Hospital.

Earlier this year, Jackson Chief Executive Carlos Migoya set out to rewrite the financial agreement to allow Jackson to "lease" or hire UM doctors at fair market value, with Jackson receiving the money from any insurance billings. The arrangement seems likely to reduce payments to UM. Shalala says UM wants to get an agreement done. "We've got to make this work."

With no new agreement in place, UM doctors are working under a temporary arrangement. At the moment, Jackson is paying far higher rates than last year.

UM is also struggling with internal inefficiencies.

Some are shared by many medical schools; a February report by a consultant on general problems at academic medical centers noted entrenched faculty and decentralized administration as frequent problems. One issue is specific to UM, though.

A pharmacy employee, Manuel Pacheco, 55, was arrested last year on charges of grand theft, dealing in stolen property and trafficking in prescription drugs. Court records say Pacheco was caught twice on video surveillance cameras removing expensive cancer drugs from a refrigerator.

Law enforcement investigators found seven cancer medications worth $734,000 in Pacheco's home, court records say. A filing by UM says that Pacheco confessed to taking drugs every other day from November 2010 to June 2011. A UM consultant found "the university's total loss as a result of Pacheco's thefts over a three year period was at least $14,358,637."

In a court filing, Pacheco's attorney, David S. Markus, said the evidence doesn't prove his client stole all the missing drugs. In an interview last week, he wondered about UM's control system: "After a million, you would think someone would notice."

That's precisely the point Braman made. In his October letter to fellow trustees, he complained that discovering the extent of the thefts took months "because of nonexistent inventory controls."

Shalala told The Herald in May: "Actually, it didn't take any time at all to unravel. ... Fraud is a problem in healthcare in South Florida. We are not exempt from that."

Natoli, UM's CFO, said he has been working to strengthen internal controls. He said he's convinced the problems have been fixed.

There's another internal problem: billing. After UM patients received letters explaining that new billing software was sending out statements for service more than a year old. UM leaders established a "War Room" to handle the problems.

TIGHTENING THE SCREWS — AND THE TEMPESTUOUS STAFF MEETINGS THAT FOLLOWED

Upper level shakeups at the medical school began in March, after the Braman letter and the former deans' meetings with Miller. Lord, a former Humana executive, was brought in as chief operating

officer to replace Donelan, a longtime colleague of Goldschmidt's from their Duke days. Since then, a half-dozen high-level Goldschmidt appointees have been fired or otherwise departed. The layoffs that followed were based on judgments made by PricewaterhouseCoopers, with input from school executives. Managers, administrators and researchers who were not getting grants were targeted. Shalala told The Herald that the cuts removed administrative duplication, taking out "a whole layer" of management.

In a series of tempestuous meetings with school leaders, faculty complained that they were not adequately consulted about the layoff decisions. Shalala said in May that faculty always complain about change.

Most of those laid off in early May were told to leave immediately. One of those was Michele Misurelli-Gillis, who supervised researchers. Though she was told she would be given preference for rehiring, she said in mid-July that she had applied for 63 UM openings and gotten nowhere.

Lord said Thursday 758 people were laid off, with 194 rehired in other positions, for an annual saving of $50 million.

UM is continuing to expand its reach as a way of increasing revenue, by opening new medical office buildings in Weston and Plantation and relying less on Jackson Memorial by planning to have its obstetricians also deliver babies at other hospitals.

In early July, Goldschmidt and Lord, responding to faculty questions about the potential for more layoffs, said there would be a consolidation of services in several departments "in the next few months," presumably leading to a reduction in workers.

On Thursday, Goldschmidt wrote to the Herald: "Our national ranking in National Institutes of Health funding (a key measure of academic success for a U.S. medical school) has increased from 51st to 39th in the past six years, a truly exceptional performance. ...

"Leadership is about making decisions, taking calculated risks, and constantly learning ways to be better. We have made decisions that we believe were in the interest of advancing UM ... and in the interest of bringing the best possible care to South Florida."

Read more here: http://www.miamiherald.com/2012/07/22/v-fullstory/2918375/um-med-schools-big-ambitions-led.html#storylink=cpy

LORD-001188

# The Miami Herald

Posted on Tue, Apr. 24, 2012

## 'Significant' UM medical school cutbacks coming in May

By John Dorschner
jdorschner@MiamiHerald.com



UM Pres. Donna Shalala

University of Miami President Donna Shalala announced Tuesday that the medical school will take "difficult and painful but necessary steps" next month to reduce costs, including staff cuts.In a letter to employees, she called the cuts "significant" but provided no details about how many employees might be laid off.

"The process will take place in stages, and affected employees will be notified during the month of May," Shalala wrote. "Reductions will not impact clinical care or our patients and will primarily focus on unfunded research and administrative areas."

Shalala said the cuts were necessary because of "unprecedented factors" including the global downturn of 2008, decreased funding for research and clinical care, plus cutbacks in payments from Jackson Health System. The Jackson reductions "have had a profound effect on our finances," she wrote.

UM is not alone. "Many medical schools are having to make difficult decisions," particularly because of the growing difficulties in getting research grants, said Ann Bonham, chief scientific officer of the Association of American Medical Colleges.

Sal Barbera, a former hospital executive now teaching at Florida International University, said UM created many of its own problems when it bought Cedars Medical Center in 2007 for $275 million. Paying off that debt is a "significant" financial responsibility, he said.

Jackson Health System, which has lost $419 million the past three years, cut its payments to UM by $16 million this year, and next fiscal year is working on a new operating agreement with UM that could mean far more drastic reductions.

In her letter, Shalala wrote that UM reaffirmed "our continued commitment to our partnership with Jackson."

LORD-001189

# The Miami Herald

Posted on Tue, May. 08, 2012

## UM medical school to lay off up to 800

By John Dorschner
jdorschner@MiamiHerald.com



University of Miami President Donna Shalala, third from left, talks to reporters and editors at The Miami Herald Tuesday, May 8, 2012.

Up to 800 people will lose their jobs under a major restructuring at the University of Miami medical school, President Donna Shalala said Tuesday.

State budget cuts, less research money, lower compensation from insurers and cutbacks in payments by Jackson Health System made the changes necessary, Shalala said during a meeting at the Miami Herald.

"It's not a great situation," Shalala said, "but at the end of the day, we'll be a much stronger healthcare system of a much higher quality because we will be able to reinvest in healthcare delivery. ... We've moved this institution to new heights. The world is changing beneath our feet."

Laid-off workers are being notified this month, Shalala said. A notice UM filed with the state Tuesday announced the university would cut 800 jobs by July 31, but Shalala said the final number is likely to be lower. The cutback is the largest by any employer in the state since the medical school's campus neighbor, Jackson, announced 920 layoffs in February.

The UM reduction amounts to 8 percent of the medical center's 10,000-person workforce. Shalala said no doctors or nurses who provide clinical care would be affected. The cuts announced Tuesday come after 182 temporary workers were laid off in late March.

Most of the UM layoffs are concentrated in research and administration as the university centralizes services to serve the entire enterprise. About 150 people who schedule appointments will lose their jobs in various departments as that service is centralized. About 150 in research administration and 110 researchers will also be let go, according to the letter UM filed with the state.

This year, the medical school lost about $8 million in state funding, a spokeswoman reported. It also lost $16 million in payments from Jackson.

Recently consultants from PricewaterhouseCoopers were brought in to study the medical school operation, finding duplication in administrative jobs. "We are going to actually take — from top to bottom — a whole layer out," Shalala said.

LORD-001190

# The Miami Herald

Posted on Mon, May. 28, 2012

## UM president's house sells for $9 million

By Michael Vasquez
mrvasquez@MiamiHerald.com



This bayside home on Old Cutler Road has served as the residence of University of Miami presidents for more than 40 years. It sold last month for $9 million.

The waterfront Coral Gables estate that has housed University of Miami presidents for more than a generation — hosting everyone from world leaders to bright-eyed college freshmen — has been sold.

The price: a cool $9 million. The buyer: New Yorker Maria Montalva, who listed a posh Upper East Side Fifth Avenue address on county sales records.

Montalva could not be reached for comment, while UM President Donna Shalala declined comment.

A local real estate blog written by Esslinger-Wooten-Maxwell Realtor Alexandra Restivo described the home, built in 1965, as boasting a "tropical ambiance," 4.6 acres of lush gardens, and a prestigious Gables Estates address.

"Here's a chance to own a rare piece of South Florida history," wrote Restivo, whose firm, EWM, represented both buyer and seller in the transaction.

Among the home's more-unique features is a guest room created specifically to host the Dalai Lama during His Holiness' visits to South Florida. University freshmen were also famously hosted by Shalala during a barbeque that welcomed them into the UM fold — a tradition expected to continue at Shalala's new digs.

UM has been designing and building a new presidential home in Pinecrest — the crown jewel of a 30-home gated community known as Smathers Four Fillies Farm.

The 32-acre Pinecrest development, built on land donated to the university by UM law grad-turned-philanthropist Frank Smathers Jr., exclusively houses UM faculty. Shalala will now join their ranks as both boss and neighbor.

Decades ago, the grounds were home to Smathers' Arabian horses and world-renowned mango collection. The UM-built homes are clustered in the center one-third of the acreage "to safeguard the botanical integrity of the estate," according to the university's website. The remaining land is dominated by lush plants and fruit groves, and is maintained by Fairchild Tropical Botanical Gardens.

LORD-001191

Unfunded research programs are also being slashed. Shalala said this is a national problem for all medical schools, because more researchers are applying for research grants, meaning fewer are funded.

"What we've chosen to protect is patient services," Shalala said. "Nothing that we're doing will affect the education of our students or the quality of the healthcare. In fact, what these moves will allow us to do is to improve the quality of healthcare at our hospitals, in our clinics and assure us that we can recruit and retain the finest healthcare professionals in the country."

Shalala acknowledged that UM leadership had heard intense objections from the faculty. The agenda for a faculty council meeting scheduled for Tuesday evening included two dozen topics including "explanation for such short notice for drastic changes" and "lack of faculty notification or involvement."

Steve Green, a biology professor and former head of the UM faculty senate, said that although the administration believed it had been transparent and forthcoming in deciding on cutbacks, his colleagues in the medical school told him they found the process "mysterious" and were angry that it was done by outsiders who weren't experts in research and looked only at numbers. "That's what's irritating people. That's the major cause for the morale crisis," he said.

Shalala, who has led institutions of higher education for a total of 24 years, said she's accustomed to dealing with complaining faculty when she tries to make changes. "There is nothing I haven't heard before."

Pascal Goldschmidt, dean of the medical school, said that all the decisions were based on national standards for most effective research standards. Jack Lord, the medical school's new chief operating officer, said the consultants made recommendations, but university leadership made the final decisions.

Some critics have long warned about looming disaster at the medical school. Last October, car dealer Norman Braman, a long-time UM trustee who has donated more than $5 million to the university, wrote a scathing letter to Leonard Abess, chairman of the board, complaining that "poorly conceived decisions by the medical school administration have put the university at significant risk. ... In the 'for profit' world, administrators would have already been fired for repeatedly failing to perform according to stated goals. Unfortunately, this is not the case at UM where people are instead given bonuses and raises as the university gets weaker and weaker."

Braman — who later resigned from the board — attached to his letter a list of projections that UM executives gave trustees before the university purchased the 560-bed Cedars Medical Center in 2007 that predicted the hospital would produce a net surplus of $44 million by 2011 and $58 million by 2012.

In fact, the medical school's monthly financial report, obtained by the Herald, showed that UMH, the former Cedars, showed a surplus of $4.8 million for the first 10 months of this fiscal year.

Shalala responded to Braman's criticisms Tuesday, saying that "everybody is entitled to their own opinion," but she noted that "UMH is solvent" and helping pay for educational and research losses at the medical school.

Overall, UHealth, the clinical enterprise, had a surplus of $61.8 million, while the Miller School of Medicine, including the teaching and research efforts, showed a loss of $79.8 million. The

LORD-001192

Once the home was placed on the selling block, UM welcomed any and all serious buyers, be they University of Miami Hurricanes, Florida Gators, Florida State Seminoles, or none of the above. The overarching principle: steering as much money as possible into university coffers.

"They're like any seller," said EWM Realtors President Ron Shuffield. "They just want the highest and best price."

© 2012 Miami Herald Media Company. All Rights Reserved.
http://www.miamiherald.com



Begin forwarded message:

**From:** "Lord, Jonathan" <JLord@med.miami.edu>
**Subject: Re: Transplant Review**
**Date:** October 19, 2012 8:31:24 AM EDT
**To:** "Livingstone, Alan" <ALivings@med.miami.edu>
**Cc:** "McCafferty-Cepero, Jennifer" <JMcCafferty@med.miami.edu>, "Goldschmidt, Pascal (Dean - School of Medicine)" <PGoldschmidt@med.miami.edu>

This is an external review generated by a complaint to the HHS OIG
There will be an an independent assessment of compliance related activities.  No one from leadership should be involved at this time

Sent from my iPhone

On Oct 19, 2012, at 8:27 AM, "Livingstone, Alan" <ALivings@med.miami.edu> wrote:

Jennifer,

I see from the Daily Updates that the plan to bring in outside consultants to review Transplant has almost been completed. I am concerned that this has been done without even a casual conversation with me or Rafic, the 2 individuals that know the most about the complexities of this program. As you know, even the labs were "born" in the Department of Surgery, and few people know more about the history and evolution of them than we do. I know you have gotten input from Dr. Ciancio who has been charged with developing and running an "independent MTI", but his 'band with' of knowledge and experience is insufficient to provide the requisite background that you need. Surgery has continued to provide all the infrastructure and financial backing/responsibility, and the ambiguity of the reporting relationships has already had a serious impact on the finances and operational efficiency of the Transplant program and Surgery.

I believe it would be productive for you to meet with me and Rafic to discuss 'issues' surrounding this hugely complex product line, and to get input prior to making the final decision concerning consultants. Documents alone will not provide a complete perspective. I look forward to meeting with you about this signature program that has to date been able to maintain Silver and Bronze medal status.

Alan



JONATHAN LORD, M.D.
February 24, 2022
Defendant's
**Exhibit 15**

LORD-001516

Message

| | |
|---|---|
| **From:** | Jonathan Thomas Lord [JLord@med.miami.edu] |
| **Sent:** | 11/23/2012 4:01:11 PM |
| **To:** | Keitz, Sheri [skeitz@med.miami.edu] |
| **Subject:** | Re: |

sycophant

Jack Lord, MD
Chief Operating Officer and VP for Medical Administration
University of Miami Health System and
University of Miami Miller School of Medicine

Professor or Pathology
University of Miami Miller School of Medicine

1120 NW 14th Street
3rd Floor-Executive Suite
Miami, FL. 33136

jlord@med.miami.edu
305.299.7741 (mobile)
305.243.0145 (office)

On Nov 23, 2012, at 3:59 PM, "Keitz, Sheri" <SKeitz@med.miami.edu> wrote:

"needy" doesn't really capture it... will need to find some synonyms or DSMIV diagnoses

Sheri

On Nov 23, 2012, at 3:51 PM, "Jonathan Thomas Lord" <JLord@med.miami.edu> wrote:

I don't think me calling him needy has taken hold yet.
At least he didn't cc or bcc me
J
Jack Lord, MD
Chief Operating Officer and VP for Medical Administration
University of Miami Health System and
University of Miami Miller School of Medicine

Professor or Pathology
University of Miami Miller School of Medicine

1120 NW 14th Street
3rd Floor-Executive Suite
Miami, FL. 33136

jlord@med.miami.edu



JONATHAN LORD, M.D.
February 24, 2022
Defendant's
**Exhibit 16**

UMLORD - 00039147

305.299.7741 (mobile)
305.243.0145 (office)

On Nov 23, 2012, at 3:48 PM, "Keitz, Sheri" <SKeitz@med.miami.edu> wrote:

I'm sure CN will visit you with this one...
Will review next week...

Sheri

----------------------------------------------

Sheri Keitz, MD, PhD
Senior Associate Dean for Faculty Affairs
Associate Vice President for Human Resources
University of Miami Miller School of Medicine and UHealth System
Ph: 305-243-0332

The information contained in this transmission may contain privileged and confidential information, including information protected by federal and state privacy laws. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution, or duplication of this communication is strictly prohibited.

**From:** Keitz, Sheri
**Sent:** Friday, November 23, 2012 3:48 PM
**To:** Nemeroff, Charles
**Subject:** RE:

Charlie,
Thanks for your note. First, very few salary actions go to the RAC, although that may change over time. The ones that are on this week pertain to Alan Pollack's retention package and special requests that were being considered in that setting.

I received the paperwork for this at 4:05 pm on 11/20. As you know as a member of the committee, the timeline for consideration was well past at that time.

Will look at this next week.

Hope you are enjoying the holiday weekend... I've been here with Pascal doing APT letters all day! Looking forward to being done with those...

Sheri

----------------------------------------------

Sheri Keitz, MD, PhD
Senior Associate Dean for Faculty Affairs
Associate Vice President for Human Resources
University of Miami Miller School of Medicine and UHealth System
Ph: 305-243-0332

UMLORD - 00039148

The information contained in this transmission may contain privileged and confidential information, including information protected by federal and state privacy laws. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution, or duplication of this communication is strictly prohibited.

**From:** Nemeroff, Charles
**Sent:** Friday, November 23, 2012 12:26 PM
**To:** Keitz, Sheri
**Subject:** FW:

Hi Sheri,
You have not responded to my email note below.

I hope you and your family had a good Thanksgiving holiday.

Charles B. Nemeroff, M.D., Ph.D.
Leonard M. Miller Professor and Chairman
Director, Center on Aging
Department of Psychiatry and Behavioral Sciences
Leonard M. Miller School of Medicine
University of Miami
1120 Northwest 14 Street, Suite 1455
Miami, Florida 33136
305.243.6400 (Office)
305.243.8532 (Facsimile)
<image001.jpg>

**From:** Nemeroff, Charles
**Sent:** Wednesday, November 21, 2012 11:08 AM
**To:** Keitz, Sheri
**Subject:**

Hi Sheri,
As you know I submitted a salary increase for Ushima Buford, MD to the RAC. He is our only
African-American faculty member and is chief of the inpatient child psychiatry unit at JMH. To say that
Such individuals are hard to find is a major understatement. He has another job offer and our request to
Increase his salary, commensurate with appropriate AAMC guidelines, would keep him with us. I would
Please ask you to have this added to the next RAV agenda. I am a bit puzzled why it hasn't landed there.
Thanks for your help with this time urgent request.

Charlie

Charles B. Nemeroff, M.D., Ph.D.
Leonard M. Miller Professor and Chairman
Director, Center on Aging
Department of Psychiatry and Behavioral Sciences
Leonard M. Miller School of Medicine
University of Miami
1120 Northwest 14 Street, Suite 1455

UMLORD - 00039149

Miami, Florida 33136
305.243.6400 (Office)
305.243.8532 (Facsimile)
<image001.jpg>

UMLORD - 00039150

Message

| | |
|---|---|
| **From:** | Jonathan Thomas Lord [JLord@med.miami.edu] |
| **Sent:** | 12/1/2012 8:59:14 AM |
| **To:** | Keitz, Sheri [skeitz@med.miami.edu] |
| **CC:** | Goldschmidt, Pascal (Dean - School of Medicine) [pgoldschmidt@med.miami.edu] |
| **Subject:** | Re: Just the Facts |

Please include Jennifer in this

J

Jack Lord, MD
Chief Operating Officer and VP for Medical Administration
University of Miami Health System and
University of Miami Miller School of Medicine

Professor of Pathology
University of Miami Miller School of Medicine

1120 NW 14th Street
3rd Floor-Executive Suite
Miami, FL. 33136

jlord@med.miami.edu
305.299.7741 (mobile)
305.243.0145 (office)

On Dec 1, 2012, at 8:44 AM, "Keitz, Sheri" <SKeitz@med.miami.edu> wrote:

Reviewing with Karen. We are looking in this area but this extends beyond our current review.

Will follow up after I get some feedback from Karen.

Sheri

On Dec 1, 2012, at 7:23 AM, "Goldschmidt, Pascal (Dean - School of Medicine)"
<PGoldschmidt@med.miami.edu> wrote:

Not sure if you had seen this....
Pascal

Pascal J. Goldschmidt, M.D.
Senior Vice President for Medical Affairs and Dean
University of Miami Miller School of Medicine
Chief Executive Officer, University of Miami Health System (UHealth)

Begin forwarded message:



JONATHAN LORD, M.D.
February 24, 2022
Defendant's
**Exhibit 19**

UMLORD - 00000975

**From:** John Smith <justthefacts12@hotmail.com>
**Date:** November 30, 2012 10:52:49 PM EST
**To:** "Goldschmidt, Pascal (Dean - School of Medicine)" <PGoldschmidt@med.miami.edu>
**Subject: Just the Facts**

We would like to think that this severe issue has already come before you. And we also trust that in your continued desire for excellence and commitment to make UM the best that it can be, your genuine interest and involvement is essential.

Thank you

From: justthefacts12@hotmail.com
To: dshalala@miami.edu
Subject: FW: Just the Facts
Date: Thu, 1 Nov 2012 13:43:00 -0400

Dear President Shalala,

The severity of the situation continues to grow. The validity of the information that was provided to you is not to be questioned. At the risk of continued employee resignations and continued employee morale deteriorating, we respectfully request that at the very least you confidentially interview the organization's key positions which would be the Executive Director and Medical Director, as we are certain that you would not support a working environment within the university that may be liable for being hostile, retaliatory, vindictive, and inappropriate; not to mention the problem with salary equalizations which exist University wide.

Please know that this persistency while knowing the many matters that you must attend to, is because we truly believe in you and only want to protect our organization from further deteriorating, as we are not even sure that the Chair of Surgery knows all that is happening below him with his trusted delegate.

Regards

From: justthefacts12@hotmail.com
To: dshalala@miami.edu
Subject: RE: Just the Facts
Date: Wed, 17 Oct 2012 16:01:18 -0400

Thank you for your reply indicating that our message has been received and is in the process of review. We had expected nothing less based on your dedication and commitment to the University of Miami.

There are additional incidents that have occurred during this period and we look forward to sharing them during the investigation process.

Regards

From: dshalala@miami.edu
To: justthefacts12@hotmail.com
Subject: Re: Just the Facts
Date: Sat, 6 Oct 2012 20:05:43 +0000

I received this message and will review

Sent from my iPhone

UMLORD - 00000976

On Oct 6, 2012, at 2:45 PM, "John Smith" <justthefacts12@hotmail.com> wrote:

Dear President Shalala:

It is with great respect that we send this communication. We feel that based on your dedication to make the University of Miami the best that it could be and to preserve its integrity and reputation on all levels, as well as your commitment to excellence, you would want to know the information below.

This comes to you in an anonymous fashion as previous investigations have not upheld confidentiality towards the staff that shared concerns and identified issues as per UM HR requests. The Vice Chair of the Department of Surgery shared comments that were made in confidentiality by employees to HR with the Director of the affected area; Life Alliance Organ Recovery Agency, Hospital Services/Development Department.

Below is a summary of some of the concerns which will be validated upon completion of your investigation.

1. An ineffective department that has been involved in many HR issues, high level of staff turn around/transfers within the organization (Glenda Alfaro, Rosemary Alexander, Martine Morency, Sandra Carrera, Yilian Fraga, Ana Flores, Devan Fager and Steven Rios. With the exception of Steven Rios, all have internally transferred as excellent performers) and has had on going conflict within itself and others. To help you better understand ineffective, this department has no real performance measures and although recommendations have been made by the Executive Director and the Medical Director, these have not been upheld by the Vice-Chair. The metrics that have been identified for this area do not have substantiating tangible documentation. Identified deficiencies within departmental leadership are often transferred and are now being completed by other organizational supervisors (i.e. death record review to QA, Hospital Issue follow up to QI) as opposed to holding Hospital Services leadership accountable to corrective action as other management is held. These and many other changes were a result of directives that were imposed by the Vice Chair and not necessarily the recommendations of the organization's leaders.

2. Departmental leadership provides inaccurate information to the staff which is used as an intimidation tool in order that they may achieve their agenda results. This was also brought to HR's attention in 2010 at the time that a formal investigation was conducted. Recommendations must have been made that would have held the Departmental leadership accountable to change, as it had been questioned on more than one instance; if the problem was all the hires or the leadership of the department by various HR members.

3. Departmental leadership promotes distrust and conflict within other departments of the organization. Other Directors are afraid to speak up and openly discuss their concerns as well as their own lack of trust, as this has been discussed for several years with the Vice Chair and there have not been any changes. On the contrary, he has at times divulged these comments to the actual person which has created even more internal struggles. There is a complete mistrust from the organization to the Vice Chair's office due to the preferential treatment and insubordinate environment that he has nurtured and supported by not holding all staff equally accountable and overstepping the Medical Director and Executive Director recommendations. This has been an ongoing concern by staff at all levels within the organization. Factual and substantiating documentation has been provided on many instances to justify VCA concerns, and these have gone without review or proper understanding.

4. There is an ongoing misrepresentation of the job descriptions, where staff is basically told by the department leader that any duty/tasks that is mandated falls under "other duties as assigned", this and many other misrepresentations by the department leader has created a hostile work environment with a lot of confusion, and where people have difficulty performing their daily tasks. They are also spoken to in a very punitive and

belittling manner. It has been implied to staff that any changes that are made are being done as to position them to be less likely involved in any future employee lay-offs. Staff does not have an opportunity to move up and better serve the organization as the only deciding factors for this area are the Director, Team Leader and the Vice Chair.

5. The Executive Director and other Administration staff have been made aware of these ongoing problems throughout the last several years, but once reported to the Vice Chair, there is no final resolution. Items are addressed, promises are made, leadership and team building exercises are executed, but the problem remains the same, even when the staffing changes (old teams, existing team, new staff etc...). The team leader that has been recommended for a promotion by the Director, was previously and continues to be identified by departmental staff as someone who does communicate respectfully or professionally, someone who does not provide consistent and clear guidance to staff nor is able to identify effective solutions to systemic issues that arise. This individual has been counseled on various occasions regarding ways in which to appropriately communicate with others. The staff is forced to be accountable to this person although not considered UM management by HR. This circumstance only continues to enforce the chaotic, non-trusting environment that exists within the department and yields ineffective overall performance.

6. Many of the decisions/directives given by the VCA have not been based on industry norms/best practices; from a logical premise based on factual information presented to him, which would be the most effective for the entire organization. We are a productive organization despite these circumstances due to the real dedication and commitment of most of the staff, but definitely not based on the VCA leadership influence. However, these ongoing issues affect employee morale, the quality of work life and limit us from achieving all that we are capable of achieving. The Hospital Services leadership is not considered credible by either internal or external stakeholders. UMTB has in the past had many concerns over the management of this area and has brought them to the VCA's attention, which were dismissed and turned back as an ineffective business practice of UMTB.

7. We do not believe that there exists equitable pay within the organization (we are aware that this problem exists throughout the university). The Director of Communications was promoted in 2011 to Director of Hospital Business Development in a year where the maximum increase was 3 percent. This is an area that should be fully investigated in order to ensure that all staff is fairly and equally compensated for their performance and contributions to the organization.

We implore that your office conducts an full investigation and interview all the staff at Life Alliance so that you have the information necessary in order to properly address this situation; as the purpose is not to harm anyone, but to protect those who have diligently performed to the University's standards and are/have been exposed to unnecessary hostile, retaliatory, coercive and unfair treatment.

We look forward to a reply acknowledging that these concerns will be thoroughly and fairly explored so that we can meet your level of "expected excellence".

| | |
|---|---|
| **Message** | |

| | |
|---|---|
| **From:** | Goldschmidt, Pascal (Dean - School of Medicine) [PGoldschmidt@med.miami.edu] |
| **Sent:** | 12/6/2012 7:02:49 PM |
| **To:** | Shalala, Donna E. [dshalala@miami.edu] |
| **Subject:** | RE: |

We told Carlos and Don that we would meet with the candidate and see if he is any good, interested, and bring him back for a second visit to meet with them. Not different from any prior joint recruitment.

-----Original Message-----
From: Shalala, Donna E. [mailto:dshalala@miami.edu]
Sent: Thursday, December 06, 2012 6:52 PM
To: Goldschmidt, Pascal (Dean - School of Medicine)
Subject: Re:

I believe you need to talk to groups of faculty to confront this and answer questions without Jack. I will spend some time in January reaching out to people  there is considerable confusion about the Jackson agreement. I have warned you before your communication is weak with the entire faculty not the chairs. The latest rumor is that Children's is hiring the nurses we said weren't trained. We don't need a no confidence vote just as things are turning around  Is it true we didn't invite  anyone at Jackson to meet with the candidate for bone marrow when he came?

Sent from my iPhone

On Dec 6, 2012, at 5:36 PM, "Goldschmidt, Pascal (Dean - School of Medicine)" <PGoldschmidt@med.miami.edu> wrote:

> Donna,
>
> We want to make you aware that the attached petition is being circulated by a someone at the Miller School of Medicine. Obviously, the issue relates to fear of changes in our relationship with Jackson. It is not the first time that similar documents have been circulated to hurt the Dean of the Miller School. You will remember the nasty anonymous letter that was circulated in 2009, just a few months before the 2010 official review of the Dean by faculty organized by the Faculty Senate came back with more than 70% support.
>
> In this case, what is upsetting is that the authors are threatening our chairs and faculty to sign the document, indicating that â€œwhen the change in leadership will have occurred, there will be consequences for those who did not support the petitionâ€. Obviously, this is all very disappointing, but the price to pay for trying to make the changes that are necessary for the success of UM, the Miller School and UHealth.
>
> Pascal and Jack
> <20121206173258025.pdf.pdf>

JONATHAN LORD, M.D.
February 24, 2022
Defendant's
**Exhibit 21**

UMLORD - 00041167

Message
| | |
|---|---|
| **From:** | Robitaille, Magaly [MRobitai@med.miami.edu] |
| **on behalf of** | Goldschmidt, Pascal (Dean – School of Medicine) [PGoldschmidt@med.miami.edu] |
| **Sent:** | 12/6/2012 5:36:15 PM |
| **To:** | Shalala, Donna E. [dshalala@miami.edu] |
| **CC:** | Lord, Jonathan [JLord@med.miami.edu]; Goldschmidt, Pascal (Dean - School of Medicine) [PGoldschmidt@med.miami.edu] |
| **Attachments:** | 20121206173258025.pdf.pdf |

Donna,

We want to make you aware that the attached petition is being circulated by a someone at the Miller School of Medicine. Obviously, the issue relates to fear of changes in our relationship with Jackson. It is not the first time that similar documents have been circulated to hurt the Dean of the Miller School. You will remember the nasty anonymous letter that was circulated in 2009, just a few months before the 2010 official review of the Dean by faculty organized by the Faculty Senate came back with more than 70% support.

In this case, what is upsetting is that the authors are threatening our chairs and faculty to sign the document, indicating that "when the change in leadership will have occurred, there will be consequences for those who did not support the petition". Obviously, this is all very disappointing, but the price to pay for trying to make the changes that are necessary for the success of UM, the Miller School and UHealth.

Pascal and Jack

UMLORD - 00041168

To the Chair of the Faculty Senate:

We the undersigned faculty of the University of Miami School of Medicine wish to express, in the strongest possible terms, the concern we feel for the future of our school of medicine. Under the current leadership there has been a major shift in the mission of the school that we feel jeopardizes our educational, clinical, and research enterprises. The deterioration of the relationship with Jackson Memorial Hospital fundamentally threatens both our graduate and undergraduate medical education programs without which the school of medicine cannot exist. Without these core components, this school of medicine will fail at its most critical mission of providing the best possible advanced clinical care to our community and as such, will quickly lose relevance on every level.

We believe that this shift is a direct result of the failed leadership of Pascal Goldschmidt and Jack Lord and we want to make clear that the faculty has lost confidence in the ability of these men to lead the school. We are concerned that this crisis comes during a particularly important fundraising campaign that is crucial to the success of the University as a whole, and want to be certain that there is as little impact as possible on this campaign.

We are steadfast in our commitment to our school, our university, and the welfare of our community and believe that this faculty, our students, and most importantly, our patients deserve a dean who shares this view.

Respectfully,

_____
PRINTED NAME

UMLORD - 00041169

Message

| From: | Goldschmidt, Pascal (Dean - School of Medicine) [PGoldschmidt@med.miami.edu] |
|---|---|
| Sent: | 12/15/2012 3:41:54 AM |
| To: | LeBlanc, Thomas J [leblanc@miami.edu] |
| CC: | Shalala, Donna E. [dshalala@miami.edu]; Goldberg, Judd J [jgoldberg@miami.edu] |
| Subject: | Re: Petition: Attorney Client Privileged |

Dear Tom,

Thank you for your response, I heard last night that the Faculty Council of the MSOM had organized a vote in the afternoon for its members. Apparently, including the members of the Council, there are 485 signatures to the circulating petition. I have obtained a copy of the petition and will send it to you next. It targets both Jack and I, and asks for our removal. The content is straightforward. It is addressed to the Chair of the Faculty Senate.

Regards,

Pascal

Pascal J. Goldschmidt, M.D.
Senior Vice President for Medical Affairs and Dean
University of Miami Miller School of Medicine
Chief Executive Officer, University of Miami Health System (UHealth)

On Dec 14, 2012, at 10:51 PM, "LeBlanc, Thomas J" <leblanc@miami.edu> wrote:

> Dear Pascal,
>
> As we discussed, I have heard rumors of signed petitions, but I haven't been presented with any real evidence that one exists.  The issue of a petition was raised by the Medical Affairs Committee of the Faculty Senate (since they had heard the same rumors), and I explained to them that I did not know if one exists, and if it exists, I do not know what the petition is seeking.  While the faculty might want to call for an early review of the dean by the Faculty Senate (and a petition is the mechanism for asking for an early review), the faculty cannot call for an early review of the dean if the next scheduled review is only a year away.  Since your upcoming review is next year, the faculty cannot request an early review.  I have confirmed this interpretation of the rules with the Faculty Senate office.
>
> The faculty could use a petition to the appointing authority (in this case, the President) to express displeasure with the dean or the administration, but then it would be up to the President to decide what action if any to take.  The same principle applies to the Faculty Council, where rumor has it a vote was held, but I don't know what the vote was about, and I don't know to whom the vote was reported.  (So far, it has not been reported to either the President or the Provost.)  There is no required action outlined in the Faculty Manual in either case.  The faculty could choose to make the existence of a petition public (rather than forward it to the President), and try to embarrass the administration into action, but again, there is nothing in the Faculty Manual that requires a response in that case.
>
> Rick Williamson has not informed me of any petition that he has received formally.  We have a good working relationship, and I presume he will call me if he receives such a petition, so I can only assume that the rumors that signed petitions were already delivered to Rick are false.
>
> There are so many rumors about so many things, I don't have anything brilliant to suggest to address them.  I have yet to meet individually with anyone who admits to either signing a petition or voting in the Faculty Council regarding some resolution.  Everyone is talking about "other people".  The President and I are meeting with the Medical Affairs Committee of the Faculty Senate next week.  Although they do not represent the Faculty Council of the MSOM, I presume they will know about any action taken by the Council.  Perhaps we can learn more at that point.
>
> I will continue to keep you updated on anything concrete that I learn, but so far, all I'm getting are rumors and innuendo.
>
> Regards,
> Tom
>
> -----Original Message-----
> From: Goldschmidt, Pascal (Dean - School of Medicine) [mailto:PGoldschmidt@med.miami.edu]
> Sent: Friday, December 14, 2012 3:01 PM
> To: LeBlanc, Thomas J
> Cc: Shalala, Donna E.; Goldberg, Judd J
> Subject: Petition: Attorney Client Privileged
>
> Dear Tom,
>
> I know that you are aware of the circulation of a petition at the Medical Campus that targets specifically Jack and I. We saw a copy of the petition and it makes several points that have to do with

JONATHAN LORD, M.D.
February 24, 2022
Defendant's
Exhibit 23

the direction of the Miller School, the claim that our relationship with Jackson is worse, and that we
are not providing support to our missions of patient care, education and research.
>
> These accusations are odd since when I took over the leadership of the Miller School, our entire
training program at Jackson was on terminal probation status by the ACGME, and several individual
programs were in jeopardy. Since then, the overall program and all individual programs have been
reaccredited, and the Miller School has also been reaccredited by the LCME.
>
> Our research enterprise that was dribbling down (51) in the ranks has been turned around and we are now
top 40 research medical school (38), with programs that are the envy of peer institutions.
>
> Our clinical enterprise is evolving rapidly, with many imperfections still, but a much more robust
structure and productivity than before 2006. Our medmal issue has been controlled and is now manageable.
>
> Financially, we are in the black and better than plan for this year. To get there, we had to make
significant changes in our organization, but that is the case for most academic medical centers.
>
> Our relationship with Jackson management: Migoya and Steigman, is strong, and our Jackson activities
are improving.
>
> Hence, while there is a morale issue on campus, issue that we are dealing with (and we should!) and the
changes that we had to go through over the past few months were incredibly challenging, it is unfair to
blame the administration for the challenges of Jackson, the economy, and the changing state of US
academic medical centers.
>
> We would like to understand better the meaning and possible consequences of this petition for us.
Specifically, could it trigger an early vote on the Miller School Dean, set up by the UM Senate? My next
vote is supposed to be in the following year (the last one after four years showed strong support for the
leadership). It seems fair for Jack and I to be kept updated on these issues.
>
> Best regards,
>
> Pascal
>
>
> Pascal J. Goldschmidt, M.D.
> Senior Vice President for Medical Affairs and Dean University of Miami Miller School of Medicine Chief
Executive Officer, University of Miami Health System (UHealth)

UMLORD - 00044731



Begin forwarded message:

**From:** Pascal Goldschmidt <pgoldschmidt10@gmail.com>
**Date:** December 16, 2012, 11:18:51 AM EST
**To:** Jack Lord <jlordmd@gmail.com>
**Subject:** Re: Concept

Jack,

We are thinking in the same direction. It will only work if we continue to be strong partners, where I help you differentiate the clinical enterprise with strong translational medicine, and you continue to provide strong financial support to the School.
I would not provide specific timelines for now. The vote will be the vote next year, no way we can change that. This place has been too hard to bring to this point, and we should be here to enjoy the easier ride for a little bit. My life has not been easy for nearly seven years.

Pascal

Pascal J. Goldschmidt, M.D.
Senior Vice President for Medical Affairs and Dean
University of Miami Miller School of Medicine
Chief Executive Officer, University of Miami Health System (UHealth)

On Dec 16, 2012, at 8:48 AM, Jack Lord <jlordmd@gmail.com> wrote:

Pascal - wanted to share some thoughts that I think can quiet things down, allow us to get work done that needs to happen, and make the work more feasible

The plan involves restructuring of UHealth and the Miller School; "remaking" calendars; planned succession with timelines; and explicit support from board and administration

And it causes all of us to change - some

1) Immediately announce that both of us intend to transition from roles between the end of FY2014 and FY2015 and that we would be setting up a search committee for a new Dean and that we would be working together on my succession planning.  I would look to potential internal candidates - new CFO, Dan or John Sory as first "panel" of candidates.

2) Split the Miller School and UHealth - with you taking the lead on education and research and me focusing on healthcare operations and commercial performance.  You focus on research infrastructure, changing the education paradigm, reshape the research portfolio, build things like rejuvenation, faculty affairs; I focus on on growing business while fixing infrastructure; finance, HR and marketing stay with me.

Rationale - intended to take the "vote" off the table, allow us to continue to work on fixes, while providing a "stable" platform for everything from talent recruitment (eg CFO), network

JONATHAN LORD, M.D.
February 24, 2022
Defendant's
**Exhibit 24**

development (eg MCH etc), stabilizing JMH relationship, fixing research infrastructure and building new service clusters like rejuvenation.

It provides platform to have consistent financial performance for the next team - as opposed to stepping into a crater which would be nearly impossible to do anything for the next 18 months and result in irreparable harm

Reflections of personal need

1) I need to change some of my lifestyle - I need time back for exercise and "rest". My sense is that I need to restructure 2 hours per day of my life

2) This provides a planned transition out of this that is "healthy" for relationships and community

3) I would like the faculty manual to govern my transition out of the formal admin role in that FY2014/FY2015 period; remain as an advisor if desired by successors or rotate back to pathology or innovation role as a transition out the door.

Implementation:

1) You and I flesh out plan

2) We share with 3 to 5 of our top, closest "supporters" for feedback

3) You share with DES

4) DES holds a meeting with LA, SM, MK you and me

5) After the new year - DES, LA, SM, MK lay out plan for CG leadership, BOT, and Faculty Senate

LORD-001238

## Possible IML Compliance Review Targets

1. **Direct Third Party Billing for Hospital Patients**

    **Background:** Prior to July 1, 2012, IML has been billing third parties (mostly Medicare) for JMH hospital patients for transplant/post-transplant biopsies and associated special testing on these tissues. IML did so under the "TC grandfather" provision under Medicare hospital patient billing exceptions. However, IML did not qualify for such provision. To qualify, IML must had the TC direct billing arrangement with JMH prior to July 23, 1999, which IML did not have , evidenced by that JMH was performing these services in its own Pathology laboratories until Dr. Ruiz made arrangement (around 2008/2009)  to direct these specimens to bypass the JMH lab and sent to IML without the consent of JMH lab. This resulted in double billing and non-compliant billing to Medicare. (See Attachment A for more detailed explanations.) The estimated volumes _annual_ volumes for these services are listed below.

    ### IML - JMH Hospital Patients

    | TEST/CPT CODE | Current Annual Volume |
    | --- | --- |
    | Kidney/GI Biopsy 88305 | 500 |
    | Liver/Heart/Lung Biopsy 88307 | 300 |
    | Special Stain (I) 88312 | 120 |
    | Special Stain (II) 88313 | 600 |
    | Immunohistochemistry (I) 88342 | 3600 |
    | Immunohistochemistry (II) 88360 | 240 |
    | Immuno fluorescence 88346 | 180 |
    | Electron microscopy 88348 | 120 |
    | In situ hybridization (FISH or CISH) 88365 | 240 |

    Additional supporting evidence can be found by examining IML annual or monthly billing history from 2007 to present. Around the time Ruiz made the change in billing practice (2008-2009?), billing on the aforementioned CPT codes on JMH patients would have experienced the increase. This would also support that IML did not the the TC grandfather exemption for these services since 1999.

2. **Inappropriate, unnecessary and redundant testing via "protocols"**

    o   "Protocols" not considered standard of practice or with no clinical or scientific justifications are used routinely. Examples are included in Attachment B.

    o   When providers (e.g., Nephrology physicians who provide post-transplant care) did not agree with these order set protocols and refused to sign the orders, IML performed the tests in the absence of signed provider orders. The providers got together in 2011 and determined what would constitute appropriate lab testing order sets/protocols. For a brief period (around

JONATHAN LORD, M.D.
February 24, 2022
Defendant's
**Exhibit 26**

May/June 2011,) these protocols replaced the inappropriate ones. However, upon seeing volume and revenue reduction, Drs. Livingstone and Ruiz ordered the previous inappropriate protocols to be restored in the electronic ordering system. The laboratory manager at the time (Ramiro Fernandez) voiced concerns about non-cooperation from providers and Medicare fraud/abuse but was over-ruled (<u>Attachment C.</u>) The laboratory manager soon after was dismissed under other reasons.

- IML/Surgery IT set up a "one-click" order approval at provider sign in when accessing TPIS. The "one-click" does not provide details of the unsigned orders. Upon clicking, all unsigned orders (sometimes hundreds of tests) will be "signed" electronically. <u>This can likely be investigated/supported by looking at the time stamp of the electronic orders across multiple patients under a single physician in a given time frame.</u>

- <u>Attachment D</u> - Example of IML billing to JMH on these unnecessary and redundant testing

- Additional "Lab-initiated" test orders on TB PCR, Quantiferon, CMV PCR with negative patient care impact (more details in Clinical Issues below.)

3. **Non-compliant telepathology practice on primary diagnosis (read) violating FDA, Medicare and CLIA rules**

- Ruiz has been using telepathology – whole slide imaging technology to sign out cases when he is not on site. This is in violation of the following:

- FDA has declared that this technology is a Class III medical device and has not cleared for use in making primary diagnosis
http://www.fda.gov/downloads/AdvisoryCommittees/CommitteesMeetingMaterials/MedicalDe vices/MedicalDevicesAdvisoryCommittee/HematologyandPathologyDevicesPanel/UCM187186. pdf (Attached)

- CLIA requires that all slide reading/signout activities to be conducted physically within a facility that carries the appropriate CLIA licesnse. See attached email from Kimberly Cole, AHCA/CLIA Clinical Laboratory Inspector

- Medicare requires billing for Pathology professional services (in this case slide reading and signout) to accurately reflect the CLIA license, without which Medicare does not allow payments for these activities. http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/clm104c16.pdf

4. **IML performs many "routine" laboratory tests on JMH patients when JMH's own lab offers identical services at a much lower cost. JMH pass-through bill to Medicare under the "cost reporting" mechanism. This can be construed as Medicare billing fraud as physician kick-back. (Attachment D – Example of IML billing)**

5. From a prior employee at IML: IML splits tests between its "HLA lab" and "IML lab" to game the system, taking advantage of cost-based reporting billing for higher cost tests and use IML for direct Medicare billing on tests with higher reimbursement. (See attached bill examples from the two labs for similar tests.)

6. Clinical issues (more details later)

   ○ Unreliable results due to lack of QM programs in the lab with many examples of false results on CMV PCR, TB PCR, Quantiferon, etc. (See email attachments)

   ○ Lack of proper Clinical Pathology training and board certification of Dr. Ruiz

   ○ Electronic medical records non-compliance (TPIS HIPAA violations, missing patient records in Cerner, UChart and Meditech, lack of results tracking trails in home grown system, etc.)

# Attachment A

### Key Concerns regarding IML related to TC Grandfather Expiration

**Background on CMS Anatomic Pathology TC Grandfather Provision:**

1. The IML issues surfaced with the recent expiration (6/30/2012) of Anatomic Pathology Services Technical Component (TC) Grandfather Provision authorized by Congress and CMS. Upon which Dr. Ruiz notified JMH that he has been providing the services and billing Medicare under this provision and now wishes to bill JMH for these services. The first invoice Dr. Ruiz sent to JMH was in excess of $33K for the month of July.

2. TC Grandfather Provision was established when Medicare changed reimbursement for anatomic pathology technical component services for hospital in and out patients effective July 23, 1999, not allowing independent laboratories, such as IML, to bill directly for such services. At that time, certain _existing_ independent laboratories providing these services were allowed to continue under the TC Grandfather Provision because the costs of these services were not included in the calculation of hospital patient reimbursement schemes (e.g., DRG's, etc.) For the most part, the Provision involved small rural and community hospitals that did not have their own histology laboratories or for reference laboratories performing high-end esoteric services.

3. The expiration of the TC Grandfather Provision enacted by Congress on June 30 was meant to shift the cost burden from CMS to the hospitals for inpatients and to offer better mechanisms to control the outpatient expansion of the costs associated with this Provision. Across the country the labs eligible for this provision have been negotiating with the hospitals to continue to provide the services that hospital labs are _unable_ to provide.

**Double billing to Medicare and other billing non-compliance by IML:**

4. Prior to the Provision, the transplant biopsies technical components for JMH patients were performed in house in JMH histology labs with professional components read by Department of Pathology faculty. This represented a typical arrangement across the country in institutions similar to JMH and UM and was never intended to be covered by the TC Grandfather Provision.

5. Dr. Ruiz arranged for the biopsies to be taken directly into IML a few years ago, which resulted in bypassing the JMH histology labs. This action resulted in double billing to Medicare (via DRG's coverage billed by JMH

and TC Grandfather billing on the same service by IML) for inpatients, and non-compliance for outpatient billing as they were supposed to be under the OPPS APC's mechanisms [under the SSA Section 1833(t) and Section 4533 of the Balanced Budget Act of 1997 implemented on August 1, 2000 by CMS].

**Further compliance concerns with Dr. Ruiz's proposal:**

6. Dr. Ruiz's request for JMH to pay for these services do not pass the musters of: a) the services were never supposed to be covered by TC Grandfather as outlined in #4 and 5 above and, b) JMH can indeed provide the 24/7 coverage required clinically, as it has been doing so currently for similar technical components and specifically for these services in the past prior to Dr. Ruiz taking them without JMH and Pathology agreement.

7. The cost for JMH to perform these services for both in and out patients are much lower than what IML billed in July due to the existing marginal capacities in the lab. JMH has no mechanisms for additional in-patient revenues associated with these services.

8. Should JMH agree to pay as Dr. Ruiz requested, since IML will be charging a rate higher than what JMH can provide itself, it will raise additional concerns for violating the federal anti-kickback statutes for JMH. UM Transplant physicians may also risk being accused of violating the Physician Self-Referral (Stark) law, given that IML is an entity under your leadership.

**Non-compliance with clinical documentations at IML and JMH:**

9. Clinically, when Dr. Ruiz assigned these tissues into IML, JMH lost accounting of these patient activities and no longer had these patient results entered in its CoPath and Cerner EHR systems, raising significant regulatory, accreditation and billing compliance issues. Since mid-July, Dr. Ruiz has been accessioning these cases into CoPath without proper vetting with JMH Lab and its medical director (me) regarding this transition, tempering multiple aspects of the established Quality Management programs, risking JMH hospital and lab's accreditations.

**Non-Compliance with appropriate Reference Laboratory governance at IML:**

10. Regarding the selection of technical testing reference laboratories for JMH patients, CLIA, Joint Commission and CAP put the responsibilities and authority on CLIA Laboratory Director (at JMH referred to as Laboratory

Medical Director, in this case Dr. Nadji), in consultation with the treating clinicians. The selections are governed by a set of well-established policies and Quality Assurance programs within JMH by the CLIA Laboratory Director and the Medical Executive Committee. The selection for each reference laboratory and the specific services must be documented in writing and a Quality Management program must be established to monitor the provision of services. QA Programs also must review for clinical, regulatory and billing compliance. The services in question currently provided by IML do not meet any of these criteria.

**Financial and clinical impacts to JMH and UM:**

11. Financially, should IML continue to provide the technical services for these biopsies, JMH will incur additional hundreds of thousand dollars of annual expenditure without adequate additional revenue to offset these costs. Since IML payment is paid out of AOA, it is likely that these additional payments will come out of other UM services at JMH.

12. For professional components of the services, there is no financial impact to either JMH or UM as they will continue to be provided by UM physicians including Drs. Ruiz, Thomas, Bejarano, Garcia and Barisoni.

# Attachment B

| DATE/TIME | TRANSCRIBED BY @ TIME | POST KIDNEY OR KIDNEY-PANCREAS TRANSPLANT |
|---|---|---|
| | | DO NOT USE: U, u, IU, MS, MSO₄, 1.0 (trailing zero), .5, QD, QOD, MgSO₄ |
| | | INSTEAD USE:  Unit, Morphine, 1, 0.5 (leading zero), Daily, Every other day, Magnesium |

LAB:
DAILY IN AM:
  a. CBC with differential
  b. Basic metabolic panel, magnesium , and phosphorous
  c. Serum amylase and lipase (if pancreas recipient)
  d. 12 hour urine collection (1800 – 0600, keep on ice) if pancreas recipient
  e. Random urine collection for protein and creatinine daily for 3 days
  f. Quantitative PCR for CMV, EBV, and BK virus daily for 3 days
  g. If patient receiving tacrolimus / cyclosporine / sirolimus / everolimus, trough level (1 purple top tube & 1 red top tube) at 0600 to IML lab.
EVERY MONDAY AND THURSDAY (in addition to daily labs):
  a. Comprehensive metabolic profile
  b. Cell Surface Enumeration Panel (2 lavender top tubes) to IML lab
  c. Cytokine level (1 tiger top tube) to IML lab

MEDICATIONS:
18. Intravenous fluids:_____@_____mL/hour
19. Tacrolimus _____mg by mouth at 1900 on (date) _____
    Tacrolimus _____mg by mouth at 0700 on (date) _____
20. Sirolimus _____mg by mouth daily at 0700
21. Mycophenolate Mofetil (CellCept) _____mg by mouth at 0700 and 1900 every day
22. Mycophenolate Sodium (Myfortic) _____mg by mouth at 0700 and 1900 every day
23. Everolimus _____mg by mouth daily at 0700
24. Methylprednisolone _____mg by mouth at 0700 daily
25. Sulfamethoxazole/trimephoprim one tablet by mouth every Monday, Wednesday, and Friday
26. Additional medications:

Physician Signature and ID #                                    Contact # / Date

University of Miami Hospital

1400 NW 12ᵗʰ Avenue,
Miami. FL 33136

Post Kidney and Kidney-Pancreas
Transplant / Admission to Floor         Revised 10/11                    Page 2 of 2

# Attachment C

Begin forwarded message:

**From:** Ramiro Fernandez <ramiroum@hotmail.com>
**Date:** August 31, 2011 6:57:24 AM EDT
**To:** Ramiro Fernandez <ramiroum@gmail.com>
**Subject: FW: Mexican standoff**

---

From: ramiroum@hotmail.com
To: warwarr@aol.com
Subject: RE: Mexican standoff
Date: Wed, 15 Jun 2011 09:30:08 -0400

ok

---

Subject: Re: Mexican standoff
To: ramiroum@hotmail.com
From: warwarr@aol.com
Date: Wed, 15 Jun 2011 13:27:35 +0000

Ramiro,

At the end of the day, Dr Livingstone is not only the Chairman but also MTI director. We all met with Dr Burke and he promised to get back to us after meeting with Roth....and he hasn't. Dr Livingstone sent him several emails and he has not responded (to my knowledge). Ruiz also sent him emails.

I suggest you personally try to find Burke so we can determine where we are. As a program, I think we put ourselves at risk by having multiple standards of care.

I am out of town but willing to have a teleconf with you, Nicole, and Phil.

---

**From:** Ramiro Fernandez <ramiroum@hotmail.com>
**Date:** Wed, 15 Jun 2011 09:21:59 -0400
**To:** <warwarr@aol.com>
**Subject:** Mexican standoff

Please take a look at Ruiz email to Alan yesterday regarding changing testing protocols.
I cannot go against a decision made by Alan nor legally prevent Phil from having the lab execute a order,
so here is my reasoning so you can evaluate pros & cons with Alan
I think this will generate another Mexican standoff,
where Roth & Kupin will not sign orders containing the immunology tests being questioned.
consequently we will not be able to bill for their patients,
That may ultimately result in not accepting their patients
what may end on either they sending their patients to other lab
or the Program director reassigning their patients to another physician
with the possible complain from them to medicine claiming the reason for their replacement are monetary and not clinical
with the consequent implication of medicare fraud by over testing
which could very well result in the transplant program being switched under Riser and the labs under Cote...
all scenarios are bad
I would rather recommend talk for an agreement
and in the event consensus cannot be obtained,

then just respect doctor specific orders

That way we could still criticize Roth & Kupin for not being proactive in testing the patients to detect impending rejection episodes early.

and ultimately, their statistics will be there to show their patient's graft survival rate being worst than those other physicians who actually actively look for rejection episodes and are able to stop the process before it has clinical manifestation / consequences.

Dead line to stop the changes made yesterday will be tomorrow at 7 a.m.

in addition there is the issue of notifying Roth that his orders that he placed in the patient orders system have been modified...

=

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
**Miami Division**

### CASE NO.: 13-22500-CIV-ALTONAGA

**JONATHAN LORD, M.D.,**

        **Plaintiff,**

**v.**

**UNIVERSITY OF MIAMI,**

        **Defendant.**

_____/

## THIRD AMENDED COMPLAINT

Plaintiff, Jonathan Lord, by and through his attorneys of record, hereby amends and restates

his Second Amended Complaint as follows:

### PARTIES AND RELEVANT NON-PARTIES

1.     Plaintiff, Jonathan Lord, M.D. ("Dr. Lord"), is a citizen of the United States and, at

all times material to the Third Amended Complaint, was a resident of the State of Florida. Dr. Lord

received both his undergraduate and medical school degrees from the University of Miami in 1973

and 1978, respectively. He is a licensed medical doctor in the State of Florida and board certified

in pathology. Between 1997 and 1999, Dr. Lord was the Chief Operating Officer of the American

Hospital Association. From 2000 to 2009, he was the Chief Innovation Officer and Senior Vice

President of Humana, Inc. In that capacity, Dr. Lord helped create a joint research center between

Humana and the University of Miami to study population health and pharmacovigilance. In 2010,

he accepted a position to help develop the University of Miami Tissue Bank and subsequently

became the University's Chief Innovation Officer and a professor in pathology. On March 1, 2012,

Dr. Lord became the Chief Operating Officer ("COO") of the University of Miami Health System



JONATHAN LORD, M.D.
February 24, 2022
Defendant's
**Exh. 26-A**

("UHealth"), the operational name for the clinical delivery component of the Leonard M. Miller School of Medicine. On June 1, 2012, he became Chief Compliance Officer ("CCO") for the Medical Center and the University Vice President for Medical Administration. In Dr. Lord's capacities of COO, CCO, and Vice President for Medical Administration, his duties included:

   a.   preparing UHealth's annual budget;

   b.   negotiating employment and collective bargaining contracts;

   c.   negotiating the Annual Operating Agreement with Jackson Memorial Hospital;

   d.   structuring the governance of the various departments within UHealth;

   e.   overseeing and implementing policies on compliance with various health laws including the Medicare and Medicaid programs; and

   f.   developing revenue plans.

Upon becoming COO of UHealth, Dr. Lord required certain administrative and medical faculty leaders in his chain-of-command to prepare and circulate to each other summaries of their daily activities. These summaries became known as "daily updates" or "executive daily updates."

   2.   Defendant University of Miami ("UM") is a Florida nonprofit corporation engaged in the business of, *inter alia*, owning and operating behavioral health facilities, acute care hospitals, ambulatory surgery and radiation centers, clinical diagnostic laboratories, outpatient clinics, and academic medical centers. It is incorporated in the State of Florida, its corporate headquarters are in Coral Gables, Florida, and it conducts business throughout the United States. UM acted through, *inter alia*, the officers, agents, employees, and entities described herein.

   3.   At all times material to the Third Amended Complaint, the Leonard M. Miller School of Medicine ("MSOM") was a school within UM for undergraduate and post-graduate medical education, and included several hospitals, outpatient facilities, laboratories, research

2

facilities and medical school faculty. As more fully described below, Jackson Memorial Hospital ("JMH") was a teaching hospital for the MSOM which supplied the surgeons and medical expertise to JMH including the Miami Transplant Institute ("MTI"), one of the leading organ transplant centers in the United States.

4.      The surgeons referenced in paragraph 3 were a part of the Daughtry Family Department of Surgery ("Department of Surgery") within the MSOM. In 2007, non-party, Dr. Alan S. Livingstone, the chairperson of the Department of Surgery, moved pathology testing and testing oversight for organ transplant patients from JMH laboratories to the Immuno-Monitoring Laboratory ("IML") and the Histo-Compatibility Laboratory ("Histo Lab") (collectively "transplant laboratories") within the Department of Surgery.

5.      Non-party Donna E. Shalala, Ph.D., was the President of UM – its highest corporate officer – from 2001 through 2015 and a professor of political science. Prior to joining UM, from 1993 to 2001, President Shalala served as the United States Secretary of Health and Human Services, which includes the Centers for Medicare and Medicaid Services.

6.      Non-party Pascal J. Goldschmidt joined UM in April 2006 and served as the dean of the MSOM and the chief executive officer of UHealth until 2016. Between March 1, 2012, and January 31, 2013, Dr. Lord reported directly and exclusively to Dean Goldschmidt who reported directly to President Shalala. During that time, Dean Goldschmidt, having adopted the management communication protocol implemented by Dr. Lord, prepared and circulated daily updates to Dr. Lord and certain administrative and medical faculty leaders in Dr. Lord's chain-of-command.

7.      Non-party Alan S. Livingstone, M.D. has been affiliated with UM since the 1970s and was one of the most influential members of the medical school faculty. At all times material

to the Third Amended Complaint, he was professor and associate vice president and medical director of the University of Miami Medical Group and served as chairperson of the Department of Surgery, a position he held since 2001. He was also chief, Division of Surgery Oncology at the Sylvester Comprehensive Cancer Center, chief executive at UHealth Clinical Practice, co-medical director of the University of Miami Medical Group, and chairperson of the Life Alliance Organ Recovery Agency ("LAORA"). At JMH, he served as chief of surgical services and, until mid-2012, the clinical director of the MTI.

8.     At all times material to the Third Amended Complaint, non-party Rafic S. Warwar was vice chairperson of the LAORA and vice chairperson for administration of the Department of Surgery and reported directly to Dr. Livingstone.

9.     At all times material to the Third Amended Complaint, non-party Phillip Ruiz, Jr., M.D., Ph.D., was a professor of surgery, professor of pathology, director of the IML and the Histo Lab in the Department of Surgery, and director of the Division of Immunopathology. He also reported directly to Dr. Livingstone.

10.     At all times material to the Third Amended Complaint, non-party Jennifer McCafferty-Fernandez, Ph.D. was UM's Chief Medical Compliance Officer. Her responsibilities included oversight of medical compliance activities, compliance training and privacy related issues. Previously, Dr. McCafferty-Fernandez led efforts in research compliance for the MSOM. Dr. McCafferty-Fernandez was certified in healthcare compliance by the Health Care Compliance Association.

## **INTRODUCTION**

11.     This action arises out of schemes by UM to generate illegal revenues by submitting or causing the submission of false claims to the Federal Medicare and the Florida Medicaid

programs for (a) medically unnecessary testing; (b) inflated claims for reimbursement for pre-transplant laboratory testing and (c) failing to satisfy the notification requirements outlined in 42 C.F.R. §413.65 and thereby seeking to be paid for services at hospital outpatient department rates rather than physician clinic rates.

12.     Throughout his tenure at UM, Dr. Lord engaged in efforts to stop these illegal and fraudulent schemes and reported them to UM officials, including President Shalala. Because of Dr. Lord's reports and efforts to thwart UM's fraudulent practices, UM retaliated against Dr. Lord as more fully described below.

## JURISDICTION AND VENUE

13.     This action arises under the laws of the United States of America to redress violations of the FCA, 31 U.S.C. § 3729 *et seq*., particularly 31 U.S.C. § 3730(h).

14.     The Court has subject matter jurisdiction under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331.

15.     UM regularly performs health care services and submits or causes the submission of thousands of claims for payment to federal and state healthcare programs, including, but not limited to Medicare and Medicaid, in addition to private healthcare insurers and patients who are self-payors. Accordingly, UM is subject to the jurisdiction of this Court.

16.     Venue lies under 28 U.S.C. § 1391(b), (c) and 31 U.S.C. § 3732(a) because the Southern District of Florida is a district in which UM is found and transacts business, and because an act proscribed by 31 U.S.C. § 3730 occurred within this district.

## PROCEDURAL HISTORY

17.     On July 12, 2013, Dr. Lord, as Relator in this action, filed a sealed *qui tam* Complaint alleging that UM submitted or caused the submission of false claims to federal and state

health insurance programs, in violation of the Federal False Claims Act, 31 U.S.C. § 3729 *et seq*. ("FCA") and its state equivalent ("Florida FCA") including a claim for the whistleblower protection provision of the FCA, 31 U.S.C. § 3730(h). Dr. Lord filed Amended and Second Amended Complaints, on December 3, 2013, and June 15, 2016, respectively, adding factual allegations and asserting additional causes of action against UM.

18.     Each of the above-mentioned complaints, including Dr. Lord's Second Amended Complaint, alleged, *inter alia*, a scheme by UM to defraud federal and state health insurance programs by submitting false claims for (a) medically unnecessary testing; (b) inflated claims for reimbursement for pre-transplant laboratory testing and (c) failing to satisfy the notification requirements outlined in 42 C.F.R. §413.65 and seeking to be paid for services at hospital outpatient department rates rather than physician clinic rates.

19.     On approximately May 7, 2021, the United States and the State of Florida ("the Government"), Dr. Lord, UM, and others entered into a Settlement Agreement with respect to the FCA claims of the Second Amended Complaint. The Settlement Agreement provided, *inter alia*, that upon payment of more than $22 million, UM would be released from any civil or administrative monetary claims raised by Dr. Lord under the FCA and Florida FCA *except* for (1) any claims arising under 31 U.S.C. § 3730(h) and (2) any liability to Dr. Lord for attorneys' fees and costs arising under 31 U.S.C. § 3730(d) and § 3730(h). *See* Settlement Agreement, ECF 95-1, p. 4-5, par. 5.

20.     Upon information and belief, on May 21, 2021, UM paid the Government in excess of $22 million to resolve the Government's FCA claims raised by Dr. Lord's allegations.

21.     On June 4, 2021, the Government advised the Court that the Government and Dr. Lord had reached a Settlement Agreement with UM and of the Government's decision to partially

intervene in Dr. Lord's case for the purpose of settlement as to certain civil claims for violations of the FCA, as defined by the "Covered Conduct in the Settlement Agreement." *See* Notice of Election to Partially Intervene for Purposes of Settlement, ECF 93, par. 1.

22. The "Covered Conduct in the Settlement Agreement" (also, "Covered Conduct") is defined as follows:

> (1) the University of Miami's transplant laboratories billed for medically unnecessary Cytokine testing, Flow Cytometry Testing, C-Reactive Protein Testing, Screen Luminex and Cylex testing, from January 1, 2008 through December 31, 2017; (2) between January 1, 2010 and December 31, 2017, the University of Miami caused Jackson Memorial Hospital to submit inflated claims for reimbursement for pre-transplant laboratory testing in violation of the Related Party Rule, 42 C.F.R. § 413.17, by controlling Jackson Memorial Hospital's decision to purchase pre-transplant laboratory tests from the University of Miami in exchange for the University of Miami's surgeons and Department of Surgery continuing to perform surgeries at Jackson Memorial Hospital; and (3) between October 1, 2009 and April 1, 2015, the University of Miami failed to satisfy the notification requirements outlined in 42 C.F.R. §413.65 and thereby sought to be paid for services at hospital outpatient department rates rather than physician clinic rates.

ECF 95-1, p. 2-3, par. D. The Covered Conduct constitutes the FCA claims raised by Dr. Lord in his original sealed *qui tam* Complaint filed on July 12, 2013 and included in the Amended and Second Amended Complaints.

23. On June 8, 2021, the Court, pursuant to the Settlement Agreement, dismissed the FCA claims raised by Dr. Lord and resolved in the Settlement Agreement, and retained jurisdiction over the parties to, *inter alia*, adjudicate Dr. Lord's non-dismissed claim arising from the whistleblower protection provision of the False Claims Act, 31 U.S.C. § 3730(h), which provides for damages to *qui tam* relators who have been retaliated against (hereinafter the "retaliation claim"). See ECF 97.

24.     This Third Amended Complaint eliminates the dismissed claims from the Second Amended Complaint which were resolved by the Settlement Agreement and sets forth the allegations relevant to Dr. Lord's retaliation claim.

## FACTS

### *Medicare and Medicaid Programs*

25.     In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare Program, to pay for the costs of certain healthcare services for eligible individuals. Eligibility to Medicare is based on age, disability, or affliction with certain diseases (these eligible individuals are hereafter referred as "Medicare Beneficiaries"). *See* 42 U.S.C. § 1395 *et seq.* There exist two general components to the Medicare Program: (a) Medicare Part A helps cover inpatient care in hospitals and hospital-related services; and (b) Medicare Part B helps cover doctors' professional services and outpatient care.

26.     At all times pertinent to this Third Amended Complaint, the Medicare program was administered by the various states through private insurance carriers. These carriers contracted with the U.S. Department of Health and Human Services and served as fiscal intermediaries to receive, adjudicate, and pay Medicare claims submitted to it by Medicare Beneficiaries, physicians, or providers of services.

27.     The Centers for Medicare and Medicaid Services ("CMS"), and its predecessor the Health Care Finance Administration, is an agency within the U.S. Department of Health and Human Services, and, at all times pertinent to this Third Amended Complaint, was responsible for the operation, administration, and supervision of the Medicare health insurance program.

28.     The Medicaid program, as enacted under Title XIX of the Social Security Act of 1965, 42 U.S.C. § 1396 *et seq.*, is a system of medical assistance for families with dependent

children and to aged, blind, and disabled individuals with insufficient income to pay the cost of such services. Though federally created, the Medicaid program is a joint federal-state program in which the United States provides a significant share of the funding.

29.    At all times pertinent to this Third Amended Complaint, federal regulations governing the Medicare program, regarding reimbursement for the provision of outpatient services, were applicable to the Medicaid program in the State of Florida, pursuant to 42 C.F.R. §§ 440.20(a)(4) and 440.220, and the State of Florida Title XIX Plan.

30.    At all times pertinent to this Third Amended Complaint, pursuant to Florida law and in accordance with the Medicaid portion of the Social Security Act, the Florida Agency for Health Care Administration, and its predecessor the Florida Department of Health and Rehabilitative Services, administered a statewide program whereby these agencies would reimburse medical doctors and other providers for providing medical care to Medicaid Recipients.

### *The False Claims Act*

31.    The FCA imposes civil liability on those who knowingly present false or fraudulent claims to the federal government for payment or approval, knowingly make a record or statement material to such a claim, or who otherwise conspire to present such claims. 31 U.S.C. § 3729(a)(1)(A), (B) and (C).

32.    Under the FCA, a "claim" is defined as:

> Any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property that is (1) presented to an officer, employee, or agent of the United States; or (2) made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest.

31 U.S.C. § 3729(c).

33.     The FCA contains a whistleblower protection provision which entitles an employee, contractor, or agent to all relief necessary to make that employee whole, if that employee is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee in furtherance of other efforts to stop one or more violations of the FCA. *See* 31 U.S.C. § 3730(h)(1). The above-mentioned whistleblower protection provision is the retaliation claim referenced in paragraph 23 above.

### *UM's Relationship with JMH*

34.     UM has a symbiotic relationship with JMH. JMH has always been a non-profit organization funded by Miami-Dade County residents through sales tax and bond revenues and operated by the Miami-Dade County Public Health Trust. JMH has always served as a teaching hospital for the MSOM. Since 1970, JMH has been home to the MTI, one of the leading transplant centers in the United States. Throughout the relationship between UM and JMH, UM, though the Department of Surgery, supplied the surgeons and medical expertise to the MTI resulting in an annual transfer of money from Miami-Dade County to UM. Until the mid-to-late 1990s, UM and JMH mutually benefitted from this arrangement because there was little dependence on commercial insurers for health care revenues and relatively no competition in south Florida for either organ transplant or trauma services.

35.     At all times material to the Third Amended Complaint, the financial and administrative relationship between UM and JMH was governed by an Annual Operating Agreement ("AOA").

36.     The AOA covered a variety of services furnished by UM faculty at JMH, whereby UM provided physicians to render services for JMH patients. Because of this, the AOA described a range of covered services, as well as the mechanism for reimbursing UM for these services.

37.     The AOA utilized a payment methodology to reimburse UM for the specified services. Under the AOA, JMH was required to pay no more than a set amount to UM for all the services described in the AOA and a portion of that amount was carved out to UM faculty and other health care providers for (1) direct patient care services, (2) educational services support, and (3) hospital administration support. The remainder of the set amount was to be paid to UM for all the other services described in the AOA, such as transplant services.

38.     Under the AOA, the parties set forth the terms and conditions regarding JMH's responsibility for billing and collecting for physician services for JMH patients. Generally, the AOA established that such services were "intended to be fulfilled by [UM] billing and collecting for physician services for [JMH] Hospital Patients." In addition to this general payment for direct patient care services, the AOA established a payment mechanism for specific services – such as transplant services – whereby UM billed JMH for those services.

39.     To obtain payment from JMH for the above specific services, UM was required to submit monthly invoices to JMH. Once JMH received those invoices, JMH was required to provide a remittance advice along with payment within 45 days of receipt of those invoices.

### *UM's History of Financial Problems*

40.     Around 2000, the healthcare world started to change. For example, Miami-Dade County reduced taxpayer funded resources for JMH which, in turn, limited its ability to pay UM for the services referenced in the AOA. Additionally, the State of Florida approved more transplant facilities, thus increasing competition for organ transplant and trauma services.

11

41.     By 2006, President Shalala and Dean Goldschmidt sought to attract better paying commercial patients and increase the rankings of the MSOM. Since rankings were heavily dependent on the dollar volume of grants from the National Institute of Health, UM overspent to attract medical and scientific talent and to buy facilities, especially Cedars of Lebanon Hospital which, at all times material to the Third Amended Complaint, was the University of Miami Hospital, the flagship of UHealth. This rapid expansion was reported to be a contributing factor to UM's financial troubles. *See* John Dorschner, "*UM med school's big ambitions led to big layoffs,*" The Miami Herald, July 22, 2012, updated July 28, 2012, https://www.miamiherald.com/latest-news/article1941579.html ("the Dorschner Article").

42.     As reported in the Dorschner Article, in October 2011, Norman Braman, a longtime UM Board of Trustees member "wrote a scathing letter to fellow UM trustees: '[p]oorly conceived decisions by the medical school administration have put the university at significant risk and, at the same time, injured Jackson Memorial Hospital.'" According to the Dorschner Article, Braman and others closely tied to the school warned UM officials the medical school was spending too much, too fast in the push to build a world-class medical center. By February 2012, Braman resigned from the UM board, fed up with what he viewed as bungled finances at the medical school.

43.     On February 14, 2012, Dean Goldschmidt met with Dr. Lord and offered him the position of COO of UHealth.  Dr. Lord accepted.

44.     Within days of meeting with Dean Goldschmidt, Dr. Lord determined, upon a review of relevant financials reports and meeting with key individuals including President Shalala, that UHealth had numerous and significant financial problems. Due to his extensive background in compliance prior to joining UM, Dr. Lord concluded that UHealth was suffering financially

because of a lack of business discipline and accountability that needed to be addressed immediately.

### *March 1, 2012 - Dr. Lord's Official Start Date*

45.    On March 1, 2012, Dr. Lord formally began his tenure as the COO of UHealth.

46.    On Saturday, March 3, 2012, Dr. Lord held a leadership retreat to plan for the last three months of the fiscal year. This meeting addressed layoffs, development of a shared services infrastructure and management of funds to deal with obligations to faculty members who had been recruited but were never given the funds per their contracts.

47.    The following week, Dr. Lord and his management team hired consultants to provide a comparative position analysis from other institutions and begin the review of compliance.

48.    Within days of his appointment as COO, Dr. Lord hired Jennifer McCafferty-Fernandez, Ph.D. to lead medical compliance activities for UHealth. Dr. McCafferty-Fernandez's first task was to work on an onsite review of the compliance program with external experts.

49.    Within three months of his appointment, Dr. Lord, with the full support of President Shalala, Dean Goldschmidt and the UM Board of Trustees changed the "run rate" of expenses by $90 million, prepared a $1.9 billion budget for the next fiscal year, negotiated a new collective bargaining agreement with the employees' union for the staff at the UM Hospital and negotiated an annual operating agreement with JMH.

50.    Every week throughout this period, Dr. Lord met to discuss these issues with President Shalala, key UM Board of Trustees Members, University Provost Thomas LeBlanc, University-wide CFO (Chief Financial Officer) Joseph Natoli and Dean Goldschmidt.

### *"A fiscal and cultural turn-around"*

51.     On July 3, 2012, in recognition of the fact that Dr. Lord drove "a fiscal and cultural turn-around and set the path for continued transformation of our medical school and health system," Dean Goldschmidt, with the support of President Shalala and UM's Board of Trustees, offered Dr. Lord a significant raise and a promotion to Chief Compliance Officer for the Medical Center and University Vice President for Medical Administration effective June 1, 2012. *See* Exhibit 1, July 3, 2012, letter, Pascal J. Goldschmidt, M.D., Senior Vice President for Medical Affairs and Dean to Jonathan T. Lord, Chief Operating Officer for Medical Center (hereinafter "July 3rd offer letter"). Dr. Lord accepted the July 3rd offer letter.

52.     In the July 3rd offer letter, Dean Goldschmidt stated:

> Jack, the past several months have been transformational for the School of Medicine and UHealth. Your tireless dedication to leading our school to greatness has made all the difference. I greatly look forward to continuing this journey with you as a partner.

53.     As set forth below, approximately six months later, Dr. Lord would be summarily terminated from all his positions at UM – without warning or notice of any performance, behavioral, competence or neglect of duty issues – after he personally briefed President Shalala, Dean Goldschmidt, the chair of the Audit and Compliance Committee of UM's Board of Trustees, and others regarding an ongoing Medicare fraud scheme being conducted by the Department of Surgery within UHealth including, but not limited to, causing the submission of inflated claims to Medicare for reimbursement for transplant laboratory testing and other schemes to generate illegal revenues from government payors.

14

### *The MTI and Transplant Labs Pathology Testing (IML & Histo Lab)*

54.     By June 2012, Dr. Lord learned of escalating disputes between UM and JMH over the MTI and UM's surgical and pathology departments regarding pathology testing for transplant patients.

55.     For years, UM's Department of Surgery supplied the surgeons to perform the organ transplants at the MTI. The MTI is a "virtual" entity composed of UM physicians, a laboratory based at UM, and physical facilities belonging to JMH. As a result, Dr. Alan Livingstone, the director of the MTI and chairperson of UM's Department of Surgery exerted tremendous influence over JMH's administrative operations. For example, in 2007, Dr. Livingstone moved pathology testing and testing oversight for organ transplant patients from JMH laboratories to UM's Department of Surgery on the MSOM campus. UM's pathologists unsuccessfully tried to move the transplant pathology testing and oversight to UM's Pathology Department, but Dr. Livingstone successfully resisted those efforts. As a result, tension grew between the Department of Surgery and the Pathology Department over transplant pathology testing and allegations of overbilling Medicare for unnecessary tests and other costly services.

56.     In the Spring of 2012, Dean Goldschmidt, upset with the condition of the transplant facilities at JMH, began efforts to obtain approval from the State of Florida to build a transplant facility at the University of Miami Hospital, separate and distinct from the MTI at JMH. Dean Goldschmidt's proposed UM transplant facility would directly compete with and significantly impair the MTI because UM's transplant surgeons would service the transplant facility at UHealth and not at JMH. JMH, supported by Dr. Livingstone, strongly objected to Dean Goldschmidt's attempt. In the end, Dean Goldschmidt withdrew UHealth's application for a "Certificate of Need" – the regulatory process to obtain state approval for a transplant facility – after JMH agreed to

15

make improvements to the transplant facilities at JMH. While this partially resolved the MTI issue, other significant issues remained including allegations of overbilling Medicare for unnecessary tests and other costly services at the Department of Surgery's IML and Histo Lab.

### *Investigating the IML Schemes to Generate Illegal Revenues*

57.     In July 2012, Dr. Lord and Dean Goldschmidt initiated a process to select a new director of the MTI to succeed Dr. Livingstone and an external reviewer to review the clinical operations and business practices of the transplant program including the IML and Histo Lab.

58.     In a July 20, 2012, email, Dean Goldschmidt recommended Gaetano Ciancio, M.D. for the role as the director of the MTI. Dr. Ciancio was an accomplished surgeon at UM who specialized in kidney transplants. Dean Goldschmidt envisioned, *inter alia*, that all employees working in the IML would report to the MTI director because "the functioning of the IML needs to be compliant with good clinical laboratory practice and partner successfully with the Department of Pathology to ensure standardization of testing and reporting."

59.     Dr. McCafferty-Fernandez and her counterpart at JMH were tasked with recommending a qualified firm to review the clinical operations and business practices of the transplant program including the IML. By August 2012, after interviewing, vetting, and ranking three firms, Dr. McCafferty-Fernandez and her JMH counterpart recommended to UHealth and JMH leadership that Transplant Management Group, LLC ("TMG") be engaged as an independent external consultant to review the clinical operations and business practices of the transplant program including the IML.

60.     Throughout the summer of 2012, Dean Goldschmidt and Dr. Lord worked together, constantly informing each other about compliance and billing issues associated with the Department of Surgery under the direction of Dr. Livingstone. Issues discussed included, *inter*

*alia*, the anticipated investigation by TMG of billing practices within the MTI and IML and complaints by leaders in the Department of Pathology regarding billing practices within the Department of Surgery.

61.     On September 21, 2012, UM received an anonymous letter "to report a fraud, which is taking placed [sic] in the Transplant laboratory, Department of Surgery at the University of Miami, Miller School of Medicine."   *See* Exhibit 2, undated letter addressed to the U.S. Department of Health and Human Services, Office of the Inspector General, Attn: OIG HOTLINE OPERATIONS, PO Box 23489, Washington, D.C. ("OIG Letter"). The OIG Letter detailed a scheme to defraud by overbilling Medicare for medically unnecessary transplant pathology testing, which the author likened to "organized crime" and a "chapter of American Greed." Soon after the OIG Letter was received, Dr. Lord, Dean Goldschmidt, and various administrators and leaders of UHealth and UM were made aware of the letter and its allegations.

62.     On October 2, 2012, after UHealth leadership had reviewed the OIG Letter and considered UM's reporting obligations, UM shared the OIG Letter with the U.S. Department of Health and Human Services, Office of the Inspector General in Washington, D.C.

63.     The receipt by UM of the OIG Letter, combined with numerous prior complaints from UHealth physicians and staff to UHealth administrators regarding the same or similar issues raised in the OIG Letter, created a sense of urgency to finalize the engagement agreement with TMG, so that it could begin and complete a comprehensive external review of the transplant programs, including a review of the allegations contained in the OIG Letter. Throughout this period, Dean Goldschmidt and Dr. Lord mutually agreed with the recommendation to select TMG as external investigator.

64.     In early October 2012, UM executed a contract with TMG to review the clinical operations and business practices of the transplant program, including allegations in the OIG Letter regarding a scheme to defraud Medicare based on billing for transplant pathology testing.

65.     On or about October 19, 2012, Dr. Livingstone complained to Dr. McCafferty-Fernandez about the external review process.

66.     Between November 7, 2012, and November 9, 2012, TMG conducted site visits of the MTI. During these site visits, TMG investigators met with and interviewed the medical school staff, leadership, and physicians to perform a "very comprehensive review of the transplant programs, including staffing, organizational design, billing processes, etc." *See* Exhibit 3, November 19, 2012, TMG Memo to File, Miami Transplant Institute (MTI)/Jackson Memorial Hospital.

67.     During the site visits by TMG, Dr. Ciancio telephoned a TMG Senior Consultant and reported that:

       a.     "[Dr. Ciancio and transplant staff] have been instructed from the 'highest levels' to be vague and standoffish with [TMG], [*sic*] not share too much information about the leadership and financial issues within the transplant program";

       b.     "it is very known internally that the lab has been performing tests without signed physician orders, performing known medically unnecessary testing and questionable billing practices"; and

       c.     "the department of surgery knows exactly how and why the lab revenue and profits have grown 10-fold over the past 6 years."

*See* Exhibit 3. Upon information and belief, "the highest levels" included Dr. Livingstone and his direct reports.

68.     In a November 10, 2012 email, Dean Goldschmidt commented to Dr. Lord that Dr. Livingstone was trying to destroy the career of Dr. Ciancio "for control and because of insecurity."

This same need for control and insecurity would lead Dr. Livingstone to lobby President Shalala to end the TMG investigation and advocate for the termination of Dr. Lord.

69.     On or about November 28, 2012, David J. Birnbach, M.D., MPH, Vice Provost of Faculty Affairs formally notified Dr. Lord via letter of his appointment to the rank of Professor of Clinical Pathology retroactively effective to September 15, 2011. In the letter, Dr. Birnbach, addressing Dr. Lord, wrote of the "high esteem in which you are held and our desire to have you join us and continue your productive academic career as a member of our faculty."

70.     On or about November 29, 2012, TMG completed the on-site portion of their assessment of the MTI, IML and LAORA, the organ procurement organization for the MTI.

71.     By early December 2012, TMG issued a preliminary report, finding that the IML: (1) participated in duplicative billing by directly billing the Medicare Program for non-covered services; (2) engaged in inappropriate, unnecessary, and redundant testing; (3) performed many "routine" laboratory tests on JMH patients when JMH offers identical services at a much lower cost; and (4) splits tests between itself and the Histo Lab in order to game the system by (a) direct-billing Medicare through the IML for tests that result in a higher reimbursement to the provider through direct billing as compared to cost-based billing, and (b) billing through the Histo Lab for tests that result in a higher reimbursement to the provider through cost-based billing as compared to billing Medicare directly (hereinafter referred to as "TMG findings"). *See* Exhibit 4 ("TMG Report").

72.     The TMG Report was provided to Dr. McCafferty-Fernandez, Dr. Lord, and Dean Goldschmidt, who discussed the TMG findings thoroughly and often and mutually agreed that the findings needed to be shared with UM leadership, as they raised serious concerns including

potential FCA violations. Based on the TMG findings coupled with the issues raised in the OIG Letter, they also agreed that TMG should be engaged to complete a full billing audit of the IML.

73.     On or about December 3, 2012, Dr. Lord met with the chairperson of the Audit and Compliance Committee of UM's Board of Trustees. At that meeting, Dr. Lord personally briefed the chairperson on major compliance issues identified in the TMG Report pertaining to the MTI and Department of Surgery and possible exposures.

74.     On or about December 14, 2012, Dr. Lord personally updated President Shalala concerning the TMG findings identified in the TMG Report.

75.     Throughout this time, Dr. McCafferty-Fernandez, at the direction of Dr. Lord, repeatedly informed UHealth leadership of the TMG findings identified in the TMG Report.

76.     On or about December 16, 2012, Dean Goldschmidt expressed his support for Dr. Lord and corresponded with Dr. Lord regarding their mutual plans for the new year.

77.     On or about December 18, 2012, Dr. McCafferty-Fernandez provided the TMG Report and other related materials to Dean Goldschmidt, Dr. Lord, and other members of UHealth leadership. As Dr. McCafferty-Fernandez was acting as the main point of contact with TMG and anticipated taking maternity leave in early 2013, she asked Dean Goldschmidt, Dr. Lord, and others to advise her if the decision had been made to engage TMG to undertake a more thorough review of billing practices identified in the TMG Report.

78.     On or about December 18, 2012, Dr. Lord and Dean Goldschmidt authorized UM to engage TMG in a more thorough review and audit of bills related to the IML as recommended in the TMG Report.

79.     On or about December 19, 2012, Dean Goldschmidt and Dr. Lord discussed the MTI and IML with IML Director, Dr. Phillip Ruiz. Specifically, they discussed, *inter alia*,

20

protocols, processes, best practices, organizational climate, relationships, staff anxieties, and regulatory environment.

80.     On December 20, 2012, Dean Goldschmidt and Dr. Lord recorded a video interview outlining plans for 2013. Writing about the video interview with Dr. Lord in an email that same day, Dean Goldschmidt referred to his "awesome partnership" with Dr. Lord and exclaimed that the interview was the "best interview, ever!"

81.     Around this time, upon information and belief, Dr. Livingstone grew concerned about TMG's independent investigation, particularly considering the TMG findings were consistent with the FCA violations alleged in the anonymous OIG Letter. Not only could the TMG Report expose Dr. Livingstone and UM to potential liabilities, but changes to the IML spurred by the TMG Report could affect Dr. Livingstone's position and power within UM. Upon information and belief, Dr. Livingstone tried to put a stop to any further investigation by TMG. On or about December 20, 2012, Dr. Livingstone falsely accused Dr. McCafferty-Fernandez of being the source for the concerns related to the IML, that she blocked him and/or refused to meet with him and Rafic Warwar or give them access to TMG. Dr. Livingstone then told Dr. McCafferty-Fernandez that he planned to discuss his concerns with President Shalala. It was Dr. McCafferty-Fernandez's impression at the time that Dr. Livingstone was trying to intimidate her and to influence the outcome of the TMG investigation.

82.     Upon information and belief, around December 20, 2012, Dr. Livingstone discussed his concerns with President Shalala and, as a result, on December 21, 2012, per an email sent to Dean Goldschmidt, Dr. Lord, Dr. McCafferty-Fernandez, and others, President Shalala directed that the TMG investigation of the IML, the MTI, and LAORA be led and managed by

"Internal Audit." President Shalala further directed that Dr. McCafferty-Fernandez transfer all data gathered relative to the TMG investigation to Internal Audit.

83.     On or about December 28, 2012, Don Steigman, the Chief Operating Officer of JMH, told Dr. Lord that he received an email from Dr. Livingstone that effective immediately the external review of the MTI and the Department of Surgery was to be coordinated by Mike Maloney of Internal Audit.

84.     On Friday, December 29, 2012, at 9:18 pm, Dean Goldschmidt emailed Dr. Lord and Dr. Richard Cote, the Chairman of the UM Pathology Department, noting that the "coming week will be busy with talks about the IML after the sharing of the document on UM laboratories, and the ongoing review of the IML by TMG." He asked Dr. Cote to prepare him "an elevator speech" on the key limitations of the IML as it is currently set up "such that the three of us can deliver a consistent message." Finally, he notified Drs. Lord and Cote that he was scheduled to meet with President Shalala that Monday, December 31, 2012, at 11:00 am to discuss these topics.

85.     At noon on December 31, 2012, immediately following the meeting between President Shalala and Dean Goldschmidt, without warning or notice of any issues related to Dr. Lord's performance, behavior, or competence, Dean Goldschmidt called Dr. Lord to notify him that President Shalala had terminated him as COO of UHealth.

86.     Despite Dr. Lord being terminated as COO by President Shalala, Dean Goldschmidt, who had a close working relationship with Dr. Lord, initially, and incorrectly, assumed that President Shalala and UM would want to keep Dr. Lord on staff to continue his work in the areas of strategy, restructuring, and financial reform. For example, on December 31, 2012, at 1:58 pm, Dean Goldschmidt's assistant emailed Drs. Cote and Lord seeking their review of a new policy consolidating the pathology labs.

87.    On January 1, 2013, communicating by email, Dean Goldschmidt asked Dr. Lord to stay on at UM as a leader for strategy and innovation. Dr. Lord responded that he would only stay if he could make a difference. In anticipation of Dr. Lord remaining in a leadership capacity, Dean Goldschmidt drafted or caused the drafting of a proposed announcement for review by President Shalala and other members of UHealth leadership. Paragraph 2 of the proposed announcement read in pertinent part:

> Jack will be returning to his role on the faculty of the Department of Pathology and as an innovator of 21st Century healthcare. I look forward to his continued outstanding impact as Senior Advisor to the Dean for Healthcare Innovation and Planning.

88.    On January 1, 2013, at 3:55 pm, Dean Goldschmidt emailed Dr. Lord from his private email and informed him that "Donna [Shalala] requested to recall emails relative to the IML, and no changes should be considered or implemented until internal and external investigations are completed." Within minutes, Dr. Lord responded by email to Dean Goldschmidt to ask, "how did she even know about those emails – AL?," the initials referring to Dr. Alan Livingstone. Dean Goldschmidt replied by email to Dr. Lord: "Of Course AL."

89.    On January 1, 2013, at 4:03 pm, using his UM email address, and pursuant to the direction of President Shalala, Dean Goldschmidt emailed Dr. Cote and copied Dr. Lord, recalling the December 31, 2012 email sent at 1:58 pm email from Dean Goldschmidt's assistant, *see* paragraph 86 above, further stating "[n]o change of plan. But we should not consider or implement changes until internal and external investigations of IML are completed."

90.    On January 2, 2013, at 4:59 am, Dr. Cote, Chairman of the Pathology Department, emailed colleagues that Dr. Lord would join the department. "We are very proud to have Jack as a member of our faculty and are fortunate that Jack will remain a vital member of our department to help move our efforts forward. His expertise in health care delivery and management will

23

continue to benefit the department and school." *See* John Dorschner, "*Jack Lord's future at UM unclear,*" The Miami Herald, January 9, 2013.

91.     On January 2, 2013, at 2:02 pm, Dean Goldschmidt's proposed announcement, *see* paragraph 87 above, was emailed to President Shalala, Thomas J. LeBlanc, Joe Natoli, Sergio Gonzalez, Jacqueline Menendez and Dr. Lord. Within an hour, at 2:53 pm, President Shalala ordered the deletion of paragraph 2 of the proposed announcement regarding Dr. Lord's future at UM.

92.     On January 2, 2013, at 6:06 pm, Dean Goldschmidt emailed the MSOM the revised announcement, eliminating the above-referenced paragraph 2, stating that Dr. Lord would be "stepping down" as COO but gave no indication what his future would be. While the email commended Dr. Lord for his leadership as COO, attributing to him a fiscal turnaround at UHealth, it did not indicate that Dr. Lord had been terminated as COO and that President Shalala ordered his termination.

93.     On January 3, 2013, President Shalala, in response to an inquiry from The Miami Herald, directed Dean Goldschmidt to make no mention of Dr. Lord's future at UM.

94.     On January 3, 2013, The Miami Herald reported UM's announcement that Dr. Lord was "stepping down," ostensibly over faculty dissatisfaction with the May 2012 budget cuts approved by Dean Goldschmidt, President Shalala, and the UM Board of Trustees. *See* John Dorschner, "*No. 2 executive at UM medical school stepping down*" The Miami Herald, January 3, 2013.

95.     Around this time, President Shalala instructed Dean Goldschmidt to stop all daily updates, the above-mentioned daily communication practice implemented by Dr. Lord and adopted by Dean Goldschmidt and his staff.

24

96.     On January 9, 2013, The Miami Herald reported that it had reached out to UM several times over the prior week for details regarding Dr. Lord's termination and future at UM. After initially offering no comment on Dr. Lord's future, UM confirmed to the Herald that Dean Goldschmidt's email about Dr. Lord moving to the Department of Pathology was "inaccurate." UM told the Herald, "We are working on a transition with Dr. Lord, and it will be resolved in the near future." *See* John Dorschner, "*Jack Lord's future at UM unclear,*" The Miami Herald, January 9, 2013.

97.     Throughout January 2013, after terminating Dr. Lord as COO, UM isolated Dr. Lord, cutting him off from communications and information.

98.     On January 18, 2013, Dr. Lord emailed each member of the UM Board of Trustees to thank them for the "unique opportunity to return to UM" and the "special opportunity to serve a place I have loved for more than 40 years." He also informed them about, *inter alia,* the compliance issues identified in the TMG Report, noting that it was "critical for the protection of the institution that this external review and audit are completed without interference from administration or others and reports shared with the board." Referring to potential civil and regulatory penalties that might arise from the TMG findings identified in the TMG Report, Dr. Lord stressed, "Appropriate corrective actions will help mitigate potential external mandated sanctions."

99.     On or about January 30, 2013, UM formally notified Dr. Lord that as of January 31, 2013, he would no longer hold the administrative posts of Vice President for Medical Administration and Chief Operating Officer at the MSOM and/or UHealth and effective July 31, 2013, he would not be reappointed as a Clinical Professor in the Department of Pathology, effectively terminating him from all positions at UM. *See* Exhibit 5, January 30, 2013 letter from

Thomas J. LeBlanc, Executive Vice President and Provost to Jack Lord, M.D., Clinical Professor of Pathology.

100.    On January 30, 2013, President Shalala and Dean Goldschmidt met with the medical school faculty. President Shalala told the gathering that tough decisions had been made to fix the school's finances and while she acknowledged that mistakes had been made, she did not offer specifics, deflecting responsibility for the unpopular budget cuts and associated layoffs at UHealth. Prior to or during that meeting, Dean Goldschmidt issued a formal letter to faculty which contained a false narrative explaining that he, not President Shalala, terminated Dr. Lord, and implying that Dr. Lord was responsible for the unpopular budget cuts imposed in May 2012. *See* John Dorschner, "*Goldschmidt confronts angry UM medical school faculty,*" The Miami Herald, January 31, 2013.

101.    Upon information and belief, President Shalala, upon the advice and urging of Dr. Livingstone, terminated Dr. Lord from all positions at UM to avoid the dissemination of the TMG findings identified in the TMG Report.

102.    On or about July 3, 2013, UM, under the guidance of UM's Internal Audit (as opposed to the original TMG investigation that was structured as an independent outside review), issued contrary findings to the TMG Report which falsely concluded that "virtually all of the allegations against the IML were unfounded." That finding was directly contradicted by the Settlement Agreement in this action. ECF 95-1, p. 2-3, par. D.

103.    On July 12, 2013, Dr. Lord, as Relator, filed a sealed *qui tam* complaint alleging that UM submitted or caused the submission of false claims to federal and state health insurance programs, in violation of the FCA. He also filed Amended and Second Amended Complaints, on

December 3, 2013, and June 16, 2016, respectively, adding factual allegations and asserting additional causes of action against UM.

104.    On or about May 21, 2021, UM paid the Government more than $22 million to resolve the Government's FCA claims raised by Dr. Lord's allegations, including the TMG findings identified in the TMG Report set forth above.

105.    Before he was formally terminated, UM harassed, isolated and publicly humiliated Dr. Lord by disseminating a false narrative implying that he was solely to blame for the May 2012 budget cuts and the resulting faculty unrest. This false narrative was published repeatedly by The Miami Herald and other news outlets. In truth and in fact, Dr. Lord was terminated solely on account of his investigation, discovery, and internal reporting of FCA violations, and not for any legitimate reason.

106.    Despite approving the May 2012 budget cuts and endorsing the TMG preliminary report, Dean Goldschmidt maintained his positions at UM earning more $1 million dollars per year until May 16, 2016, after executing President Shalala's order to terminate Dr. Lord on December 31, 2012.

107.    President Shalala maintained her position at UM through May 2015 and her multi-million per year compensation package following her decision to recall the TMG Report and terminate Dr. Lord. Before her resignation, UM renamed its $46.5 million Student Activities Center in President Shalala's honor. After resigning from UM, President Shalala served as President of the Clinton Foundation until 2017 and in 2018, she was elected to the United States House of Representatives. She was defeated in the 2020 general election just before the instant matter was unsealed by the Court. On March 1, 2021, UM announced she will be teaching an undergraduate class in the politics of health policy for the political science department.

27

108.     Following his termination, Dr. Lord applied to numerous executive positions that were equivalent to his position at UM, and which he was qualified to hold. He was not hired to any of these positions because of the false narrative generated by the leadership of UM and the publicity surrounding his termination from UM. Moreover, he was prevented from pursuing the instant claim for wrongful termination under the FCA for nearly eight years, until the Government filed its notice of election to intervene in this action.

109.     As a result of his investigation, discovery, and internal reporting of FCA violations at UM, including the publicity surrounding his termination based on the false narrative generated by the leadership of UM to cover up the FCA violations, Dr. Lord suffered (a) loss of salary and benefits; (b) loss of significant income potential from several boards of publicly traded companies and the CEO (Chief Executive Officer) position of a highly respected nationally recognized foundation; (c) reputational damage; and (d) emotional distress.

## FALSE CLAIMS ACT VIOLATION
### 31 U.S.C. § 3730(h)

110.     The allegations contained in paragraphs 1 through 109 are re-alleged as if fully set forth below.

111.     The whistleblower protection provision of the FCA, 31 U.S.C. § 3730(h), protects an employee from retaliation for lawful acts done by the employee in furtherance of an action under § 3730 or other efforts to stop one or more violations the FCA.

112.     As set forth above, Dr. Lord was an employee of UM who engaged in protected activity designed to stop one or more FCA violations.

113.     UM had actual and direct knowledge of Dr. Lord's protected activity as his complaints about UM's fraudulent and unlawful practices were made directly to President Shalala, the chair of the Audit and Compliance Committee of UM's Board of Trustees, Dean Goldschmidt,

28

and other members of UHealth leadership, both orally and in writing, using language sufficient to put UM on notice that he engaged in protected activities.

114.    UM retaliated against Dr. Lord as described above, by harassing, isolating, and terminating him from all positions at UM, but not before he was publicly humiliated in the media, solely on account of his protected activity and not for any legitimate reason.

115.    Pursuant to 31 U.S.C. § 3730(h)(1)&(2), Dr. Lord is entitled to "all relief necessary" to be made whole, including "reinstatement with the same seniority status that the employee … would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination including litigation costs and reasonable attorneys' fees."

## DEMAND FOR A JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands that all issues of fact be tried by a jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

1.    That judgment be entered in an amount to be determined by a jury for Plaintiff and against Defendant for violating 31 U.S.C. § 3730(h);

2.    That judgment be entered for Plaintiff and against Defendant for two times back pay and benefits from January 31, 2013, through the present, interest on the back pay and benefits and compensation for all special damages available by law, including damages for emotional distress and public humiliation, litigation costs, and reasonable attorneys' fees as authorized by 31 U.S.C. § 3730(h); and

3.      For all such further relief as the Court may deem just and proper.


Date: August 12, 2021           Respectfully submitted,


By:  _/s/ Erica L. Perdomo_____
      Jeffrey H. Sloman, Esq.
      Florida Bar No. 378879
      E-Mail: jsloman@sfslaw.com
      Erica Perdomo, Esq.
      Florida Bar No. 105466
      E-Mail: eperdomo@sfslaw.com
      STUMPHAUZER FOSLID SLOMAN ROSS &
      KOLAYA PLLC
      2 South Biscayne Blvd, Suite 1600
      Miami, FL 33131
      Tel.: (305) 614-1400
      Facsimile: (305) 614-1425
      _Attorneys for Plaintiff Jonathan Lord_

# EXHIBIT 1



UNIVERSITY OF MIAMI
MILLER SCHOOL
of MEDICINE

CONFIDENTIAL:
Jonathan T. Lord, M.D.

**PERSONAL AND CONFIDENTIAL**

July 3, 2012

Jonathan T. Lord, M.D.
Chief Operating Officer for Medical Center
Leonard M. Miller School of Medicine
University of Miami

Dear Jack:

Since taking on the role of Chief Operating Officer for the Medical Center in March of this year, you have driven both a fiscal and cultural turn-around and set the path for continued transformation of our medical school and health system. Consistent with the reorganization of our Medical Center and delayering of the organization, you also have taken on additional responsibilities in direct oversight of UHealth's Hospitals, the role of Chief Compliance Officer for the Medical Center, and oversight over new functions for Patient Experience, Marketing and Strategy.

In recognition of your direct management of these key responsibilities as well as the critical nature of your role, this letter redefines the conditions of your appointment.

You already hold the title of Chief Operating Officer for the Medical Center. This appointment was made at the sole discretion of the Senior Vice President for Medical Affairs and Dean of the Miller School of Medicine and may be rescinded at any time at his sole discretion. In addition, the University of Miami Board of Trustees approved your appointment as the University Vice President for Medical Administration, effective June 1, 2012.

You will continue to report directly to the Senior Vice President for Medical Affairs and Dean of the Miller School of Medicine. Your performance is subject to annual, documented performance review as well as policies and procedures that pertain to accountability of the medical school's leadership.

In these roles you will continue to lead the major operational functions of the School and UHealth system. The responsibilities of these roles are those outlined in our discussions and the attached updated position description.

Your appointment as Chief Operating Officer was made effective March 1, 2012. The additional conditions of this letter (including compensation) will be effective concurrent with your appointment as Vice President for Medical Administration retroactive to June 1, 2012.

*Office of the Senior Vice President for Medical Affairs and Dean*
*Executive Office, University of Miami Health System*
*1120 NW 14th Street (R-699) | Miami, FL 33136*
*Ph: 305-243-6545 | Fax: 305-243-4888*

CONFIDENTIAL:
Jonathan T. Lord, M.D.

You are currently a faculty member in the department of Pathology and this appointment does not alter your faculty status or the attendant rights and responsibilities as outlined in the faculty manual.

**Personal Package Commitments:**

Personal compensation package:

1. Your annualized compensation will be $913,776 made up of the following components:

   a. Your annual base salary for FY13 will be $763,776.

   b. For your increased responsibilities as Vice President for Medical Administration for the Medical Center, you will receive an administrative supplement of $150,000. This administrative supplement will continue until you no longer serve in the role of Vice President for Medical Administration. Should you no longer serve in this role, your compensation and support would be redefined based on your new role(s) and responsibilities.

   c. These components will be paid to you on a monthly basis, consistent with University pay dates and subject to deductions required by law.

   d. Your compensation in subsequent years will be determined by the University of Miami, Miller School of Medicine's compensation plans and policies and approved by the applicable committee of the University's board of trustees.

2. You will also be eligible for a performance based incentive payment with a targeted maximum payout of fifty percent - twenty-five percent (25%) of your annual compensation (including the administrative supplement) for attainment of certain goals and an additional 25% that the president may, at her discretion, recommend to recognize extraordinary performance, subject to approval of the board of trustees.

   a. The formula for calculating the targeted maximum payout was approved by the Board of Trustees at its April 19, 2012 meeting, along with preliminary goals for F2013. Final goals for F2013 will be recommended to the board in the fall.

The conditions of this letter replace the conditions of the letter dated March 1, 2012 including description of compensation (retroactive to June 1, 2012) and notice rights which henceforth shall be consistent with the faculty manual and based upon the revised base salary of $763,776.

2

CONFIDENTIAL:
Jonathan T. Lord, M.D.

Jack, the past several months have been transformational for the School of Medicine and for UHealth.  Your tireless dedication to leading our school to greatness has made all the difference.  I greatly look forward to continuing this journey with you as a partner.

We trust that you will find these conditions acceptable. If so, please express such by returning one signed copy of this letter directly to me.

With best personal regards,

Pascal J. Goldschmidt, M.D.
Senior Vice President for Medical Affairs and Dean

Accepted:

_____          _____

Jonathan T. Lord                          Date

3

# EXHIBIT 2

US Department of Health and Human Services

Office of Inspector General

ATTN: OIG HOTLINE OPERATIONS

PO Box 23489

Washington, DC 20026

This is to report a fraud, which is taking placed in the Transplant laboratory, Department of Surgery at the University of Miami, Miller school of Medicine; address 1600 NW 10th Ave Rosenthiel Medical Building, 8 floor, Miami, FL 33136.

The Medical Director Phillip Ruiz MD, PhD, Chief supervisor Alexandra Amador, Chair of the department of Surgery, Alan Livingston MD, Senior administrator Raffick Warwick, Former laboratory administrator Ramiro Fernandez, current administrator Nicole Legeir.

This people are commitenting fraud to Medicare by billing laboratory test with no interpretation and not irrelevant for making decisions to transplant patient or treated for rejection. Medicare needs to review Cylex, Cytokines, MBL, T and B subsets.

This people have been reported to State but when the inspectors come to review the documentation the paper work

have been altered and it seems that there is anything wrong, it needs experts in reviewing this billing issues and a forensic accountant to look for what is irregular. Medicare has been reported but they have not investigated these issues.

It seems that no one care because this people are doing the same and there continue whit the wrong doing.  Phillip Ruiz the medical director are supported by the chair of the department of surgery Alan Livingston, they laid off individuals that do not follow their steps and because of treating and weak link we are scared to report the irregularities also the University is a private institution and one individual can't fight alone the university lawyers will "eat you alive". The keep everything very well secret so they do not be uncover.

Phillip Ruiz was fired from the department of Pathology were he work for the past 21 years, he was escorted by security for literally stealing biopsies from the department of Pathology and taking them to the department of Surgery to be process this happened on March approximately 2011, also he used founds from Histocompatibility laboratory to open a Histology laboratory when he did not suppose to, he both computers for his family, he hired family and friends to work at the transplant laboratory with salaries when there were not qualified to do the work ( Rene Martin and his son).

Jennifer Macquie is a recent certified medical technologist that been since 2009 are billing Medicare for MBL test without a license  (she was recently certified in Dec, 2011), also there are technologist that do not have supervisors license (Alexandra Amador do not have a Histocompatibility license) (Rogelio Gonzalez have a license for serology and Microbiology and is performing HLA /DNA testing Histocompatibility for years) and they are being paid for those positions.

The State came to investigated a few weeks ( July,  2012) ago but did not find anything because Alexandra Amador spend and entire weekend sing  and changing the reports and fixed them process she did for the inspection that took pleased in March 2012 and for concerns if the inspectors would see (JM signature).

Ramiro Fernandez the former administrator of the laboratory was investigated for HIPPA complaint issues and in that investigation irregularities with fraud were found and he was force to leave the University; he was paid by the department of Surgery to leave and to not report Phillip Ruiz as well who was signing and allowed all this money issues to be performed. Around July, 2011 Phillip Ruiz  MD send an Email to Ramiro Fernandez were, he expressing the changes he made in the post-transplant protocol test  and  charges to Medicare without the authorization of the Clinical transplant director David Roth

MD the been issues with the transplant department and the transplant laboratory since Phillip Ruiz was placed as a director by Alan Livingston and Andrea Tzaquis MD ( the University had to pay millions of dollars to the lawyers and UNOS because A. Tzaquis violated the UNOS laws and jump the transplant list favoring patients from outside the United States now he left the University and went to Cleveland Clinic after all the mess he created in the transplant laboratory supported by Phillip Ruiz.

Ramiro Fernandez has this Email in his personal files. It should not be any communicating with Phillip Ruiz.

Only the appropriate authorities can fight this big monster the University of Miami because they know what to look they have expert people that charge test by CPT codes and with test they are justified.

It is incredible that in one of the more powerful department of a Medical setting and an institution that is training future doctors these caned of activities are happening. Believe or not is organized crime and it seems like a chapter of American Greed.

In the month of July 2012 a second article about the University of Miami, Miller Medical was reported in the Miami Gerald Mrs. N. Braman was member of the University board and new the irregularities that the Dean and Shalala are allowing and

again the Dean was excusing itself , this article followed one
that was publish in May, 2012 ( Please see attachment).

The renal transplant graft survival have drop to 82% from 98%
since Phillip Ruiz became the laboratory director. I can't
understand why the University is supporting this type of
behavior that have a negative impact in patient care and the
rest of the physicians that are practicing in an honest way.

There are individuals like Ramiro Fernandez that know well and
have documentation of how these frauds are performed to
Medicare but he is not reporting this to Medicare (WHY?).

This letter has been sent to these appropriate authorities so the
appropriate investigation will be done.

We hope that this letter will not be read and left on a desk or
drawer.

Thank you

Please help

## The Herald

# UM med school's big ambitions led to big layoffs

UM's medical school has grown rapidly in recent years — too fast, say critics, who believe excessive ambitions led to its present financial troubles.



This is the UM Life Sciences Building, located at NW 7th Ave and 20th Street. This was shot, Saturday, July 13th, 2012.
PETER ANDREW BOSCH / MIAMI HERALD STAFF

Full-size Buy Photo

Previous | next

Image 1 of 2

UM MEDICAL SCHOOL
BY THE NUMBERS
Medical School Annual Revenue

$1.7 billion

UM Total Annual Revenue

$2.3 billion

Layoffs
About 800

Full-time in June

About 190

Part-time in March

Theft
$14 million

Amount of drugs

Allegedly stolen by employee

Institute for Human Genomics
Special state funding

$80 million

Losses after 10 months

Fiscal 2012

$9.8 million

COMPENSATION
President Donna Shalala $1.16 million a year

Dean Pascal Goldschmidt

$1.1 million a year

Sources: UM medical school financial statements, audited report, court records,

IRS documents


BY JOHN DORSCHNER
JDORSCHNER@MIAMIHERALD.COM

Long before the University of Miami announced in May that its Miller School of Medicine had financial problems big enough to force layoffs of about 900 full-time and part-time workers, there were signs of serious trouble.

As far back as October, billionaire car dealer Norman Brahman wrote in a memo to fellow UM trustees that he and colleagues had been receiving anonymous letters for months "outlining a host of wrongdoings, mostly at the medical school." Brahman and others closely tied to the school warned UM officials the medical school was spending too much, too fast in the push to build a world-class medical center.

The expansion was occurring just as healthcare revenue — the foundation for much of the medical school's expansion — was starting to dry up, with lower rates of reimbursement from insurers and cuts in federal and state funding.

The medical school also had major problems of its own. According to internal documents, the school suffered from bloated staffing, a faulty billing system and prices that sometimes ran much higher than at other South Florida hospitals. Internal controls apparently were weak at best: A whopping $14 million in expensive cancer drugs disappeared from a UM pharmacy over three years before an employee was charged with theft in June 2011.

The medical school's difficulties even began to impede its relationship with the ailing, taxpayer-financed Jackson Health System, endangering a decades-long partnership with the public hospital system.

By the time the layoffs were announced May 8, rumors had been swirling for weeks. UM President Donna Shalala insisted the medical school problems were caused by factors beyond her control. "We live in a world in healthcare in which our flows of funds are unpredictable," Shalala told the Herald in May, adding that she had responded as quickly as possible to the problems once they became apparent.

The medical school, she said, would emerge as a "much stronger healthcare system of a much higher quality."

In the past five years, Shalala has presided over major initiatives designed to reshape UM's medical school and propel it to the top tier. Hiring more than 100 high-profile researchers and creating a biotech research park boosted the school's national profile. Purchasing a hospital — the old Cedars Medical Center, now University of Miami Hospital — cemented the school's status as a leading healthcare provider. Reinventing the relationship between UM and Jackson allowed the medical school to launch new — potentially competing — roles.

Together, the ambitious moves vaulted UM's medical school to the national stage — but they may also have seriously damaged it. Layoffs weren't part of the plan, leaving critics and community leaders to wonder whether Shalala, who earns $1 million a year at UM and was for eight years the nation's No. 1 health official as secretary of the U.S. Department of Health and Human Services during the Clinton administration, simply failed to heed the warning signs in her quest to make UM a national powerhouse.

"Ultimately, Donna Shalala has to bear the responsibility for this failed strategy," says Stephen Greensick, a Miami-Dade physician-entrepreneur. He points out that during the 1990s, when she led HHS, she battled to keep down soaring healthcare costs. "Reducing the spending on Medicare that was her goal — first reducing payments to hospitals, then to doctors. And now she sits there and says, 'Gee, these are factors outside our control.' "

Shalala said in May she's done everything she can: "We're in a brave new world in healthcare, both in terms of how we're funded and in how fast we have to move."

In a statement to the Herald on Thursday, the medical school's dean, Pascal Goldschmidt, said, "Throughout my tenure at the Miller School we have focused on strategic initiatives to deliver the best possible care to our community, open new frontiers for research, and provide state-of-the-art training for our students and residents.

"We make decisions on the best information available and our assessment of where the field is moving. Not every decision is perfect, nor does the world around us function perfectly. ... What is important is that ... these programs are delivering life-changing discoveries, expanding our impact on the community, and building the reputation of UM as a great research institution."

EARLY WARNINGS
OF TROUBLE . . . AND HOW THEY WERE DISMISSED

Signs of problems with UM's finances go back to at least June 2011. That's when the Chronicle for Higher Education ran an article: Fast-Growing Strategy Has Its Costs at U. of Miami. The story noted that the "expansion is looking overambitious to some" and quoted several anonymous faculty members as saying UM "promised too much and is now hustling to cover costs, even if it means taking from the poverty-plagued population that it pledged to serve."

Shalala decried the article shortly after publication as "a shocking example of irresponsible and lazy reporting."

Behind the scenes, others were raising alarms. In October, Brahman, a longtime UM supporter, wrote a scathing letter to fellow UM trustees: "Poorly conceived decisions by the medical school administration have put the university at significant risk and, at the same time, injured Jackson Memorial Hospital."

Brahman said UM "looks nothing like the strong institution it was five years ago," and blamed "the poor performance of the medical school, a half-billion dollars of new debt and the depletion of almost all our cash reserves."

In his letter, Brahman was particularly irate about UM's purchase of Cedars, directly across the street from Jackson Memorial Hospital. UM leaders predicted the hospital would earn almost $90 million in its first six years, but Brahman had serious doubts: "We have missed our projections ... by hundreds of millions yet we continue to accept forecasts from the same people as if they are credible."

In February, Brahman resigned from the UM board, fed up with what he viewed as the bungled finances at the medical school.

Twice in the few months after Braman's letter, two former deans of the medical school met with Stuart Miller, the UM board member whose family donated $100 million to the medical school, to raise the alarm about the negative financial picture, according to UM insiders. Former deans Bernie Fogel and John Clarkson outlined a long list of major problems that needed to be addressed quickly, including the deteriorating relationship with Jackson.

Six months after the letter, UM leaders announced the layoffs, including the removal of several executives.

Shalala told The Herald in May that she reacted with reasonable speed to situations she couldn't control. "No one wants to lay anyone off. We waited as long as we could possibly wait to make some very tough decisions. In the process, we were doing some very careful planning. There is nothing we're doing that everybody else in healthcare is not doing."

Braman doesn't buy that logic. Earlier this month, he told The Herald that the layoffs "were a real tragedy that never should have happened. ... The people at the top were very much more interested in flash than substance."

JACKSON AND
## UM MED SCHOOL: INEXTRICABLY ENTWINED — AND NOW TROUBLED

UM and Jackson are among the region's biggest employers and most crucial institutions. But both are now troubled. Jackson has lost $419 million the past three years.

UM has placed tremendous emphasis on its medical school, which in fiscal 2011 had $1.7 billion in revenue, according to a medical school financial report. The whole university generated $2.3 billion in revenue, according to UM's audited statements.

Mark Rogers, a physician and former Duke University executive who has served on Jackson's board, says the situation "calls into question the whole economic future of the entire county. ... This applies not only to how residents get high quality healthcare, but also to the aspirations of Miami to become an economic center for the vibrant and growing biotechnology industry."

Braman put it this way: "This is really a double tragedy — UM and Jackson. And you can't disconnect the two." With UM's purchase of a hospital across the street of Jackson, "taking away paying patients, you can't underestimate the problems this has caused Jackson."

The partnership between the medical school and Jackson had generally worked well for years, despite occasional squabbles. For 25 years, the two previous medical school deans grew the institution slowly without layoffs. That changed in 2005, when Shalala announced she had hired Goldschmidt as the new dean, a renowned cardiologist and veteran Duke University administrator, for a $1-million-a-year compensation package.

Goldschmidt quickly began to push for UM to have its own hospital. "World-class doctors like to come to an environment where the university has its own hospital," he said. In 2007, UM purchased the 560-bed Cedars and renamed it.

Many were skeptical. Myra Hurt, a dean of Florida State University's medical school, said many universities found owning hospitals to be "financially tricky." Others criticized the purchase price: $275 million. Joshua Nemzoff, a specialist in buying and selling hospitals, was stunned by the amount. "They paid three times what I thought that hospital was worth," he said. UM used bonds to pay for the hospital plus $50 million in improvements.

Shalala remains a strong supporter of the purchase. In the midst of layoffs in May, she called the hospital "part of the solution," not the problem.

Last week, Goldschmidt said of the Cedars purchase: "Some things went according to, or better than, plan; some did not," but the UM hospital has shown improvements in performance metrics and provides "new life-saving care." Jackson officials had been worried all along. As far back as 2006, Larry Handfield, then chairman of Jackson's board, looked at UM's ambitious expansion plans and felt Jackson would be the loser: "My concern is ... if they have a hospital where they have to meet their bills, they are going to put a patient in that hospital first, and put one in Jackson second."

Meanwhile, UM had been in expansion mode, attracting more than 100 high-priced star scientists from the nation's top schools, including 30 researchers who arrived with Marc Lippman, a University of Michigan breast cancer researcher. He and the team received a combined $52 million compensation package, according to Braman.

Goldschmidt said such packages tend to include not only the salaries of team members, but also laboratories, clinics and expensive equipment.

The biggest catches were more than 50 scientists from Duke's Center for Human Genetics, who became the bulwark of UM's Institute for Human Genomics. They were given housing assistance and other perks. UM subsidized the institute with $10 million. Two Florida legislators, Marco Rubio and David Rivera, shepherded a bill through the Legislature in 2007 to give the new UM Genomics Institute $80 million in state funding on the premise it would create 296 high-paying jobs within five years.

Shalala was enthusiastic: "We're trying to become one of the world's great research universities. And we're well on our way. We're building a scientific powerhouse."

Others were concerned about the money needed to create the powerhouse. Steve Green, former head of UM's faculty senate, told The Herald several weeks ago: "I don't know of anybody who disagrees with the vision that the dean has" to greatly increase research, but "the expectations of some of these high-priced people have not yet been realized."

Last week, Dean Goldschmidt said, "Recruitment of talented individuals is expensive — that is the norm for academic medicine," but the hiring was done carefully. "Some of these recruitments achieved their plans or better, while others did not."

A new Life Science Park was built by an independent developer, without any cost to the university, according to Shalala, but the medical school was pouring money into construction: a $100 million clinical research lab and another $80 million biomedical building, to be paid for by new revenue. Medical school executives told trustees that they expected the new UM Hospital (formerly Cedars) would increase net income by $88.9 million during its first six years, including $44 million in the fiscal year that ended May 31, according to an attachment that Braman sent board members. But in the first 10 months of that fiscal year, the hospital's income was just $4.8 million.

And the entire UM medical center — the clinical enterprise of doctors and the hospital, plus research and education — lost $17.9 million for the first 10 months, according to March UM financial reports. Such reports are private but The Herald obtained a copy of the March financial statement.

Making matters worse: UM's executives had budgeted the medical center to show a $25 million surplus for the year. Chief Operating Officer Jack Lord told The Herald last week that the medical school finished its fiscal year on May 31 $50 million below budget because of billing problems, "overly aggressive revenue targets" and a "need to more actively manage our expenses."

Joe Natoli, UM's chief financial officer, explained in May that UM needed surpluses from the medical school because "we have made significant and important investments in the medical school over the last decade and in particular over the last several years," with the expectation that the investments

would yield cash to help the university's balance sheet, improve medical facilities and build up the underfunded pension plan.

One major problem for UM was revealed in a February report from PricewaterhouseCoopers, which said its survey showed patients think highly of the quality of care in academic medical centers, but they don't want to pay more for it — a huge challenge since academic centers are perceived, often correctly, as costing more. A July memo to employees from Goldschmidt and Lord reported faculty complaining that some tests that usually cost hundreds of dollars at other hospitals can cost "several thousands when performed at our hospital."

### WHERE THE MONEY WENT (INCLUDING THE MILLIONS IN MISSING MEDS)

When Shalala explained the medical school's problems in May, she listed factors that had either reduced revenue or driven up costs, some related to the national recession. Other reasons for UM's troubles may be its own inefficiencies, according to internal documents.

Among the factors listed by Shalala:

• Insurers are reducing payments to hospitals as the national push to reduce medical costs continues.

• State funding for UM was cut by $8 million in the most recent legislative session.

• Research money, mostly from the National Institutes of Health, has remained flat while the number of scientists competing for research dollars has gone up.

UM, like many other research centers, ramped up its programs because of stimulus funds. The medical school received $63 million in stimulus money to help fund research jobs. But even in August 2011, the former chief operating officer, William Donelan, warned that some of those positions could be lost when the money ran out.

Shalala didn't think so. "We were all warned about the stimulus money," she told The Herald, "but at the same time, everybody expected the federal budgets to start going up and for the economy to somewhat recover. We waited. It didn't happen."

The Hussman Institute for Human Genomics, which has received state and philanthropic funding for research, has remained among the school's biggest financial drains. In the first 10 months of the current fiscal year, it lost $9.8 million. UM leaders have supported the institute on the theory that genetic research offers the biggest chance for medical breakthroughs. "They're doing great," Shalala said of the institute in May, adding that some researchers had "moved on" because they didn't get NIH grants.

In its latest quarterly report to the state Department of Economic Opportunity, the institute said it had created 199.5 jobs by Feb. 29 and was projected to create 25 more jobs in June, on its way to the promised 296.

• Jackson's reduced payments to UM have hurt the medical school.

For years, UM has relied on a lump sum payment of about $130 million from taxpayer-supported Jackson to pay for UM doctors to treat Jackson patients and for other services. Last year, the

struggling Jackson insisted on a $16 million cut. As UM's financial picture grew dimmer, medical school leaders — while pledging support for Jackson — emphasized that if a patient came to a UM doctor, the doctor could decide where to put the patient, and that was increasingly likely to be the UM Hospital.

Earlier this year, Jackson Chief Executive Carlos Migoya set out to rewrite the financial agreement to allow Jackson to "lease" or hire UM doctors at fair market value, with Jackson receiving the money from any insurance billings. The arrangement seems likely to reduce payments to UM. Shalala says UM wants to get an agreement done. "We've got to make this work."

With no new agreement in place, UM doctors are working under a temporary arrangement. At the moment, Jackson is paying far higher rates than last year.

UM is also struggling with internal inefficiencies.

Some are shared by many medical schools; a February report by a consultant on general problems at academic medical centers noted entrenched faculty and decentralized administration as frequent problems. One issue is specific to UM, though.

A pharmacy employee, Manuel Pacheco, 55, was arrested last year on charges of grand theft, dealing in stolen property and trafficking in prescription drugs. Court records say Pacheco was caught twice on video surveillance cameras removing expensive cancer drugs from a refrigerator.

Law enforcement investigators found seven cancer medications worth $734,000 in Pacheco's home, court records say. A filing by UM says that Pacheco confessed to taking drugs every other day from November 2010 to June 2011. A UM consultant found "the university's total loss as a result of Pacheco's thefts over a three year period was at least $14,358,637."

In a court filing, Pacheco's attorney, David S. Markus, said the evidence doesn't prove his client stole all the missing drugs. In an interview last week, he wondered about UM's control system: "After a million, you would think someone would notice."

That's precisely the point Braman made. In his October letter to fellow trustees, he complained that discovering the extent of the thefts took months "because of nonexistent inventory controls."

Shalala told The Herald in May: "Actually, it didn't take any time at all to unravel. ... Fraud is a problem in healthcare in South Florida. We are not exempt from that."

Natoli, UM's CFO, said he has been working to strengthen internal controls.He said he's convinced the problems have been fixed.

There's another internal problem: billing. After UM patients received letters explaining that new billing software was sending out statements for service more than a year old. UM leaders established a "War Room" to handle the problems.

TIGHTENING THE SCREWS — AND THE TEMPESTUOUS STAFF MEETINGS THAT FOLLOWED
Upper level shakeups at the medical school began in March, after the Braman letter and the former deans' meetings with Miller. Lord, a former Humana executive, was brought in as chief operating

officer to replace Donelan, a longtime colleague of Goldschmidt's from their Duke days. Since then, a half-dozen high-level Goldschmidt appointees have been fired or otherwise departed. The layoffs that followed were based on judgments made by PricewaterhouseCoopers, with input from school executives. Managers, administrators and researchers who were not getting grants were targeted. Shalala told The Herald that the cuts removed administrative duplication, taking out "a whole layer" of management.

In a series of tempestuous meetings with school leaders, faculty complained that they were not adequately consulted about the layoff decisions. Shalala said in May that faculty always complain about change.

Most of those laid off in early May were told to leave immediately. One of those was Michele Misurelli-Gillis, who supervised researchers. Though she was told she would be given preference for rehiring, she said in mid-July that she had applied for 63 UM openings and gotten nowhere.

Lord said Thursday 758 people were laid off, with 194 rehired in other positions, for an annual saving of $50 million.

UM is continuing to expand its reach as a way of increasing revenue, by opening new medical office buildings in Weston and Plantation and relying less on Jackson Memorial by planning to have its obstetricians also deliver babies at other hospitals.

In early July, Goldschmidt and Lord, responding to faculty questions about the potential for more layoffs, said there would be a consolidation of services in several departments "in the next few months," presumably leading to a reduction in workers.

On Thursday, Goldschmidt wrote to the Herald: "Our national ranking in National Institutes of Health funding (a key measure of academic success for a U.S. medical school) has increased from 51st to 39th in the past six years, a truly exceptional performance. ...

"Leadership is about making decisions, taking calculated risks, and constantly learning ways to be better. We have made decisions that we believe were in the interest of advancing UM ... and in the interest of bringing the best possible care to South Florida."

Read more here: http://www.miamiherald.com/2012/07/22/v-fullstory/2918375/um-med-schools-big-ambitions-led.html#storylink=cpy

# The Miami Herald ℮

Posted on Tue, Apr. 24, 2012

## 'Significant' UM medical school cutbacks coming in May

By John Dorschner
jdorschner@MiamiHerald.com



UM Pres. Donna Shalala

University of Miami President Donna Shalala announced Tuesday that the medical school will take "difficult and painful but necessary steps" next month to reduce costs, including staff cuts.In a letter to employees, she called the cuts "significant" but provided no details about how many employees might be laid off.

"The process will take place in stages, and affected employees will be notified during the month of May," Shalala wrote. "Reductions will not impact clinical care or our patients and will primarily focus on unfunded research and administrative areas."

Shalala said the cuts were necessary because of "unprecedented factors" including the global downturn of 2008, decreased funding for research and clinical care, plus cutbacks in payments from Jackson Health System. The Jackson reductions "have had a profound effect on our finances," she wrote.

UM is not alone. "Many medical schools are having to make difficult decisions," particularly because of the growing difficulties in getting research grants, said Ann Bonham, chief scientific officer of the Association of American Medical Colleges.

Sal Barbera, a former hospital executive now teaching at Florida International University, said UM created many of its own problems when it bought Cedars Medical Center in 2007 for $275 million. Paying off that debt is a "significant" financial responsibility, he said.

Jackson Health System, which has lost $419 million the past three years, cut its payments to UM by $16 million this year, and next fiscal year is working on a new operating agreement with UM that could mean far more drastic reductions.

In her letter, Shalala wrote that UM reaffirmed "our continued commitment to our partnership with Jackson."

# The Miami Herald

Posted on Tue, May. 08, 2012

## UM medical school to lay off up to 800

By John Dorschner
jdorschner@MiamiHerald.com



University of Miami President Donna Shalala, third from left, talks to reporters and editors at The Miami Herald Tuesday, May 8, 2012.

Up to 800 people will lose their jobs under a major restructuring at the University of Miami medical school, President Donna Shalala said Tuesday.

State budget cuts, less research money, lower compensation from insurers and cutbacks in payments by Jackson Health System made the changes necessary, Shalala said during a meeting at the Miami Herald.

"It's not a great situation," Shalala said, "but at the end of the day, we'll be a much stronger healthcare system of a much higher quality because we will be able to reinvest in healthcare delivery. ... We've moved this institution to new heights. The world is changing beneath our feet."

Laid-off workers are being notified this month, Shalala said. A notice UM filed with the state Tuesday announced the university would cut 800 jobs by July 31, but Shalala said the final number is likely to be lower. The cutback is the largest by any employer in the state since the medical school's campus neighbor, Jackson, announced 920 layoffs in February.

The UM reduction amounts to 8 percent of the medical center's 10,000-person workforce. Shalala said no doctors or nurses who provide clinical care would be affected. The cuts announced Tuesday come after 182 temporary workers were laid off in late March.

Most of the UM layoffs are concentrated in research and administration as the university centralizes services to serve the entire enterprise. About 150 people who schedule appointments will lose their jobs in various departments as that service is centralized. About 150 in research administration and 110 researchers will also be let go, according to the letter UM filed with the state.

This year, the medical school lost about $8 million in state funding, a spokeswoman reported. It also lost $16 million in payments from Jackson.

Recently consultants from PricewaterhouseCoopers were brought in to study the medical school operation, finding duplication in administrative jobs. "We are going to actually take — from top to bottom — a whole layer out," Shalala said.

# The Miami Herald

Posted on Mon, May. 28, 2012

## UM president's house sells for $9 million

By Michael Vasquez
mrvasquez@MiamiHerald.com



This bayside home on Old Cutler Road has served as the residence of University of Miami presidents for more than 40 years. It sold last month for $9 million.

The waterfront Coral Gables estate that has housed University of Miami presidents for more than a generation — hosting everyone from world leaders to bright-eyed college freshmen — has been sold.

The price: a cool $9 million. The buyer: New Yorker Maria Montalva, who listed a posh Upper East Side Fifth Avenue address on county sales records.

Montalva could not be reached for comment, while UM President Donna Shalala declined comment.

A local real estate blog written by Esslinger-Wooten-Maxwell Realtor Alexandra Restivo described the home, built in 1965, as boasting a "tropical ambiance," 4.6 acres of lush gardens, and a prestigious Gables Estates address.

"Here's a chance to own a rare piece of South Florida history," wrote Restivo, whose firm, EWM, represented both buyer and seller in the transaction.

Among the home's more-unique features is a guest room created specifically to host the Dalai Lama during His Holiness' visits to South Florida. University freshmen were also famously hosted by Shalala during a barbeque that welcomed them into the UM fold — a tradition expected to continue at Shalala's new digs.

UM has been designing and building a new presidential home in Pinecrest — the crown jewel of a 30-home gated community known as Smathers Four Fillies Farm.

The 32-acre Pinecrest development, built on land donated to the university by UM law grad-turned-philanthropist Frank Smathers Jr., exclusively houses UM faculty. Shalala will now join their ranks as both boss and neighbor.

Decades ago, the grounds were home to Smathers' Arabian horses and world-renowned mango collection. The UM-built homes are clustered in the center one-third of the acreage "to safeguard the botanical integrity of the estate," according to the university's website. The remaining land is dominated by lush plants and fruit groves, and is maintained by Fairchild Tropical Botanical Gardens.

Unfunded research programs are also being slashed. Shalala said this is a national problem for all medical schools, because more researchers are applying for research grants, meaning fewer are funded.

"What we've chosen to protect is patient services," Shalala said. "Nothing that we're doing will affect the education of our students or the quality of the healthcare. In fact, what these moves will allow us to do is to improve the quality of healthcare at our hospitals, in our clinics and assure us that we can recruit and retain the finest healthcare professionals in the country."

Shalala acknowledged that UM leadership had heard intense objections from the faculty. The agenda for a faculty council meeting scheduled for Tuesday evening included two dozen topics including "explanation for such short notice for drastic changes" and "lack of faculty notification or involvement."

Steve Green, a biology professor and former head of the UM faculty senate, said that although the administration believed it had been transparent and forthcoming in deciding on cutbacks, his colleagues in the medical school told him they found the process "mysterious" and were angry that it was done by outsiders who weren't experts in research and looked only at numbers. "That's what's irritating people. That's the major cause for the morale crisis," he said.

Shalala, who has led institutions of higher education for a total of 24 years, said she's accustomed to dealing with complaining faculty when she tries to make changes. "There is nothing I haven't heard before."

Pascal Goldschmidt, dean of the medical school, said that all the decisions were based on national standards for most effective research standards. Jack Lord, the medical school's new chief operating officer, said the consultants made recommendations, but university leadership made the final decisions.

Some critics have long warned about looming disaster at the medical school. Last October, car dealer Norman Braman, a long-time UM trustee who has donated more than $5 million to the university, wrote a scathing letter to Leonard Abess, chairman of the board, complaining that "poorly conceived decisions by the medical school administration have put the university at significant risk. ... In the 'for profit' world, administrators would have already been fired for repeatedly failing to perform according to stated goals. Unfortunately, this is not the case at UM where people are instead given bonuses and raises as the university gets weaker and weaker."

Braman — who later resigned from the board — attached to his letter a list of projections that UM executives gave trustees before the university purchased the 560-bed Cedars Medical Center in 2007 that predicted the hospital would produce a net surplus of $44 million by 2011 and $58 million by 2012.

In fact, the medical school's monthly financial report, obtained by the Herald, showed that UMH, the former Cedars, showed a surplus of $4.8 million for the first 10 months of this fiscal year.

Shalala responded to Braman's criticisms Tuesday, saying that "everybody is entitled to their own opinion," but she noted that "UMH is solvent" and helping pay for educational and research losses at the medical school.

Overall, UHealth, the clinical enterprise, had a surplus of $61.8 million, while the Miller School of Medicine, including the teaching and research efforts, showed a loss of $79.8 million. The

Once the home was placed on the selling block, UM welcomed any and all serious buyers, be they University of Miami Hurricanes, Florida Gators, Florida State Seminoles, or none of the above. The overarching principle: steering as much money as possible into university coffers.

"They're like any seller," said EWM Realtors President Ron Shuffield. "They just want the highest and best price."

© 2012 Miami Herald Media Company. All Rights Reserved.
http://www.miamiherald.com

# EXHIBIT 3

Memo to File
Miami Transplant Institute (MTI)/Jackson Memorial Hospital
November 19, 2012

I am currently a Senior Consultant with Transplant Management Group, LLC (TMG) and am assigned to an engagement with MTI. This engagement stemmed, among other things, from the medical schools concerns with regard to a "whistle blower" letter that had been sent to the OIG claiming fraudulent and medically unnecessary testing being completed at the HLA which currently falls under the department of surgery. The medical school contracted with TMG to perform a very comprehensive review of the transplant programs, including staffing, organizational design, billing processes, etc. A site visit for data gathering purposes was performed November 7th – 9th, 2012. During this site visit a number of meetings took place with the medical school staff, leadership and physicians as well as hospital staff and leadership.

During these meetings it was apparent that there is a long-standing distrust between the school and the hospital, which seems to primarily stem from financial issues on both sides. Because of this rift, neither side was very forthcoming with information. The hospital side claimed that they were not agreeable to the visit by TMG, or that they did not get enough notice, or that they had not completely agreed to the scope of the visit, etc. It was very difficult to garner much, if any real usable information for the first day and a half of the site visit.

At 3:42pm CST today I received a call from Gaetano Ciancio, M.D., M.B.A. (professor of surgery, Director of the Miami Transplant Institute), who verbally seemed to be under duress. The call originated from phone number (305) 742-5741 to my cell phone (504) 616-1481. Dr. Ciancio requested that I not let anyone know that he was calling me for he feared he would lose his job. He made this statement no less than four times during the 7 minute and 19 second conversation.

Dr. Ciancio wanted to let me know that they had been instructed from the "highest levels" to be vague and standoffish with us, not share too much information about the leadership and financial issues within the transplant program. He would not tell me specifically who gave him this directive, but he was very upset and seemed afraid. Not physically afraid, but more afraid for his career.

He went on to tell me that it is very known internally that the lab has been performing tests without signed physician orders, performing known medically unnecessary testing and questionable billing practices. He stated that the department of surgery knows exactly how and why the lab revenue and profits have grown 10 fold over the past 6 years and that there are people "above his pay grade" that are determined to make sure the lab remains under the department of surgery and does not get taken and given to pathology to run as they will lose the significant revenue.

Again, he would not give me the specific names of whom he was talking about specifically. He made me promise that that we (TMG) would do a very thorough review of the business practices and ordering practices associated with the lab and expose it publically.

I told him that over the next few weeks the lab data is being reviewed and questions will be asked based on the data in order to determine what the recommendation regarding the structure and future of the lab and transplant programs should look like. I told him that if there are any irregularities found that they would be documented within the report.

The call was rather quick, but was obviously intended to draw my/our attention to the real issues associated with the alleged unethical practices of the lab, and possibly ordering physician(s). I ended the call by letting him know that he is more than welcome to call me any time and assuring him that the call would be confidential. He thanked me and stated that he truly hoped that I could be trusted to not let anyone know that he called.

Barry S. Marshall, MBA, FACHE

Barry S. Marshall, MBA, FACHE
Senior Consultant

# EXHIBIT 4

## Possible IML Compliance Review Targets

1. **Direct Third Party Billing for Hospital Patients**

   **Background:** Prior to July 1, 2012, IML has been billing third parties (mostly Medicare) for JMH hospital patients for transplant/post-transplant biopsies and associated special testing on these tissues. IML did so under the "TC grandfather" provision under Medicare hospital patient billing exceptions. However, IML did not qualify for such provision. To qualify, IML must had the TC direct billing arrangement with JMH prior to July 23, 1999, which IML did not have , evidenced by that JMH was performing these services in its own Pathology laboratories until Dr. Ruiz made arrangement (around 2008/2009)  to direct these specimens to bypass the JMH lab and sent to IML without the consent of JMH lab. This resulted in double billing and non-compliant billing to Medicare. (See <u>Attachment A</u> for more detailed explanations.) The estimated volumes *annual* volumes for these services are listed below.

   **IML - JMH Hospital Patients**

   | TEST/CPT CODE | Current Annual Volume |
   | --- | --- |
   | Kidney/GI Biopsy 88305 | 500 |
   | Liver/Heart/Lung Biopsy 88307 | 300 |
   | Special Stain (I) 88312 | 120 |
   | Special Stain (II) 88313 | 600 |
   | Immunohistochemistry (I) 88342 | 3600 |
   | Immunohistochemistry (II) 88360 | 240 |
   | Immuno fluorescence 88346 | 180 |
   | Electron microscopy 88348 | 120 |
   | In situ hybridization (FISH or CISH) 88365 | 240 |

   <u>Additional supporting evidence can be found by examining IML annual or monthly billing history from 2007 to present. Around the time Ruiz made the change in billing practice (2008-2009?), billing on the aforementioned CPT codes on JMH patients would have experienced the increase. This would also support that IML did not the the TC grandfather exemption for these services since 1999.</u>

2. **Inappropriate, unnecessary and redundant testing via "protocols"**

   - "Protocols" not considered standard of practice or with no clinical or scientific justifications are used routinely. Examples are included in <u>Attachment B.</u>

   - When providers (e.g., Nephrology physicians who provide post-transplant care) did not agree with these order set protocols and refused to sign the orders, IML performed the tests in the absence of signed provider orders. The providers got together in 2011 and determined what would constitute appropriate lab testing order sets/protocols. For a brief period (around

May/June 2011,) these protocols replaced the inappropriate ones. However, upon seeing volume and revenue reduction, Drs. Livingstone and Ruiz ordered the previous inappropriate protocols to be restored in the electronic ordering system. The laboratory manager at the time (Ramiro Fernandez) voiced concerns about non-cooperation from providers and Medicare fraud/abuse but was over-ruled (<u>Attachment C.</u>) The laboratory manager soon after was dismissed under other reasons.

- IML/Surgery IT set up a "one-click" order approval at provider sign in when accessing TPIS. The "one-click" does not provide details of the unsigned orders. Upon clicking, all unsigned orders (sometimes hundreds of tests) will be "signed" electronically. <u>This can likely be investigated/supported by looking at the time stamp of the electronic orders across multiple patients under a single physician in a given time frame.</u>

- <u>Attachment D</u> - Example of IML billing to JMH on these unnecessary and redundant testing

- Additional "Lab-initiated" test orders on TB PCR, Quantiferon, CMV PCR with negative patient care impact (more details in Clinical Issues below.)

3. **Non-compliant telepathology practice on primary diagnosis (read) violating FDA, Medicare and CLIA rules**

- Ruiz has been using telepathology – whole slide imaging technology  to sign out cases when he is not on site. This is in violation of the following:

- FDA has declared that this technology is a Class III medical device and has not cleared for use in making primary diagnosis http://www.fda.gov/downloads/AdvisoryCommittees/CommitteesMeetingMaterials/MedicalDevices/MedicalDevicesAdvisoryCommittee/HematologyandPathologyDevicesPanel/UCM187186.pdf (Attached)

- CLIA requires that all slide reading/signout activities to be conducted physically within a facility that carries the appropriate CLIA licesnse. See attached email from Kimberly Cole, AHCA/CLIA Clinical Laboratory inspector

- Medicare requires billing for Pathology professional services (in this case slide reading and signout) to accurately reflect the CLIA license, without which Medicare does not allow payments for these activities.  http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/clm104c16.pdf

4. **IML performs many "routine" laboratory tests on JMH patients when JMH's own lab offers identical services at a much lower cost. JMH pass-through bill to Medicare under the "cost reporting" mechanism. This can be construed as Medicare billing fraud as physician kick-back. (Attachment D – Example of IML billing)**

5. From a prior employee at IML: IML splits tests between its "HLA lab" and "IML lab" to game the system, taking advantage of cost-based reporting billing for higher cost tests and use IML for direct Medicare billing on tests with higher reimbursement. (See attached bill examples from the two labs for similar tests.)

6. Clinical issues (more details later)

- Unreliable results due to lack of QM programs in the lab with many examples of false results on CMV PCR, TB PCR, Quantiferon, etc. (See email attachments)

- Lack of proper Clinical Pathology training and board certification of Dr. Ruiz

- Electronic medical records non-compliance (TPIS HIPAA violations, missing patient records in Cerner, UChart and Meditech, lack of results tracking trails in home grown system, etc.)

Attachment A

Key Concerns regarding IML related to TC Grandfather Expiration

**Background on CMS Anatomic Pathology TC Grandfather Provision:**

1. The IML issues surfaced with the recent expiration (6/30/2012) of Anatomic Pathology Services Technical Component (TC) Grandfather Provision authorized by Congress and CMS. Upon which Dr. Ruiz notified JMH that he has been providing the services and billing Medicare under this provision and now wishes to bill JMH for these services. The first invoice Dr. Ruiz sent to JMH was in excess of $33K for the month of July.

2. TC Grandfather Provision was established when Medicare changed reimbursement for anatomic pathology technical component services for hospital in and out patients effective July 23, 1999, not allowing independent laboratories, such as IML, to bill directly for such services. At that time, certain *existing* independent laboratories providing these services were allowed to continue under the TC Grandfather Provision because the costs of these services were not included in the calculation of hospital patient reimbursement schemes (e.g., DRG's, etc.) For the most part, the Provision involved small rural and community hospitals that did not have their own histology laboratories or for reference laboratories performing high-end esoteric services.

3. The expiration of the TC Grandfather Provision enacted by Congress on June 30 was meant to shift the cost burden from CMS to the hospitals for inpatients and to offer better mechanisms to control the outpatient expansion of the costs associated with this Provision. Across the country the labs eligible for this provision have been negotiating with the hospitals to continue to provide the services that hospital labs are *unable* to provide.

**Double billing to Medicare and other billing non-compliance by IML:**

4. Prior to the Provision, the transplant biopsies technical components for JMH patients were performed in house in JMH histology labs with professional components read by Department of Pathology faculty. This represented a typical arrangement across the country in institutions similar to JMH and UM and was never intended to be covered by the TC Grandfather Provision.

5. Dr. Ruiz arranged for the biopsies to be taken directly into IML a few years ago, which resulted in bypassing the JMH histology labs. This action resulted in double billing to Medicare (via DRG's coverage billed by JMH

and TC Grandfather billing on the same service by IML) for inpatients, and non-compliance for outpatient billing as they were supposed to be under the OPPS APC's mechanisms [under the SSA Section 1833(t) and Section 4533 of the Balanced Budget Act of 1997 implemented on August 1, 2000 by CMS].

**Further compliance concerns with Dr. Ruiz's proposal:**

6.  Dr. Ruiz's request for JMH to pay for these services do not pass the musters of: a) the services were never supposed to be covered by TC Grandfather as outlined in #4 and 5 above and, b) JMH can indeed provide the 24/7 coverage required clinically, as it has been doing so currently for similar technical components and specifically for these services in the past prior to Dr. Ruiz taking them without JMH and Pathology agreement.
7.  The cost for JMH to perform these services for both in and out patients are much lower than what IML billed in July due to the existing marginal capacities in the lab. JMH has no mechanisms for additional in-patient revenues associated with these services.
8.  Should JMH agree to pay as Dr. Ruiz requested, since IML will be charging a rate higher than what JMH can provide itself, it will raise additional concerns for violating the federal anti-kickback statutes for JMH. UM Transplant physicians may also risk being accused of violating the Physician Self-Referral (Stark) law, given that IML is an entity under your leadership.

**Non-compliance with clinical documentations at IML and JMH:**

9.  Clinically, when Dr. Ruiz assigned these tissues into IML, JMH lost accounting of these patient activities and no longer had these patient results entered in its CoPath and Cerner EHR systems, raising significant regulatory, accreditation and billing compliance issues. Since mid-July, Dr. Ruiz has been accessioning these cases into CoPath without proper vetting with JMH Lab and its medical director (me) regarding this transition, tempering multiple aspects of the established Quality Management programs, risking JMH hospital and lab's accreditations.

**Non-Compliance with appropriate Reference Laboratory governance at IML:**

10. Regarding the selection of technical testing reference laboratories for JMH patients, CLIA, Joint Commission and CAP put the responsibilities and authority on CLIA Laboratory Director (at JMH referred to as Laboratory

Medical Director, in this case Dr. Nadji), in consultation with the treating clinicians. The selections are governed by a set of well-established policies and Quality Assurance programs within JMH by the CLIA Laboratory Director and the Medical Executive Committee. The selection for each reference laboratory and the specific services must be documented in writing and a Quality Management program must be established to monitor the provision of services. QA Programs also must review for clinical, regulatory and billing compliance. The services in question currently provided by IML do not meet any of these criteria.

**Financial and clinical impacts to JMH and UM:**

11. Financially, should IML continue to provide the technical services for these biopsies, JMH will incur additional hundreds of thousand dollars of annual expenditure without adequate additional revenue to offset these costs. Since IML payment is paid out of AOA, it is likely that these additional payments will come out of other UM services at JMH.

12. For professional components of the services, there is no financial impact to either JMH or UM as they will continue to be provided by UM physicians including Drs. Ruiz, Thomas, Bejarano, Garcia and Barisoni.

# Attachment B

| DATE/TIME | TRANSCRIBED BY @ TIME | *POST KIDNEY OR KIDNEY-PANCREAS TRANSPLANT* |
|---|---|---|
| | | **DO NOT USE: U, u, IU, MS, MSO₄, 1.0 (trailing zero), .5, QD, QOD, MgSO₄**<br>**INSTEAD USE: Unit, Morphine, 1, 0.5 (leading zero), Daily, Every other day, Magnesium** |

**LAB:**
**DAILY IN AM:**
    a. CBC with differential
    b. Basic metabolic panel, magnesium , and phosphorous
    c. Serum amylase and lipase (if pancreas recipient)
    d. 12 hour urine collection (1800 – 0600, keep on ice) if pancreas recipient
    e. Random urine collection for protein and creatinine daily for 3 days
    f. Quantitative PCR for CMV, EBV, and BK virus daily for 3 days
    g. If patient receiving tacrolimus / cyclosporine / sirolimus / everolimus, trough level (1 purple top tube & 1 red top tube) at 0600 to IML lab.

**EVERY MONDAY AND THURSDAY (in addition to daily labs):**
    a. Comprehensive metabolic profile
    b. Cell Surface Enumeration Panel (2 lavender top tubes) to IML lab
    c. Cytokine level (1 tiger top tube) to IML lab

**MEDICATIONS:**
18. Intravenous fluids:_____@_____mL/hour
19. Tacrolimus _____mg by mouth at 1900 on (date) _____
    Tacrolimus _____mg by mouth at 0700 on (date) _____
20. Sirolimus _____mg by mouth daily at 0700
21. Mycophenolate Mofetil (CellCept) _____mg by mouth at 0700 and 1900 every day
22. Mycophenolate Sodium (Myfortic) _____mg by mouth at 0700 and 1900 every day
23. Everolimus _____mg by mouth daily at 0700
24. Methylprednisolone _____mg by mouth at 0700 daily
25. Sulfamethoxazole/trimephoprim one tablet by mouth every Monday, Wednesday, and Friday
26. Additional medications:

Physician Signature and ID #         Contact #  / Date

⊔ University of Miami Hospital

1400 NW 12th Avenue,
Miami. FL 33136

**Post Kidney and Kidney-Pancreas**
**Transplant / Admission to Floor**    Revised
10/11

# Attachment C

Begin forwarded message:

**From:** Ramiro Fernandez <ramiroum@hotmail.com>
**Date:** August 31, 2011 6:57:24 AM EDT
**To:** Ramiro Fernandez <ramiroum@gmail.com>
**Subject: FW: Mexican standoff**

---

From: ramiroum@hotmail.com
To: warwarr@aol.com
Subject: RE: Mexican standoff
Date: Wed, 15 Jun 2011 09:30:08 -0400

ok

---

Subject: Re: Mexican standoff
To: ramiroum@hotmail.com
From: warwarr@aol.com
Date: Wed, 15 Jun 2011 13:27:35 +0000

Ramiro,

At the end of the day, Dr Livingstone is not only the Chairman but also MTI director. We all met with Dr Burke and he promised to get back to us after meeting with Roth....and he hasn't. Dr Livingstone sent him several emails and he has not responded (to my knowledge). Ruiz also sent him emails.

I suggest you personally try to find Burke so we can determine where we are. As a program, I think we put ourselves at risk by having multiple standards of care.

I am out of town but willing to have a teleconf with you, Nicole, and Phil.

**From:** Ramiro Fernandez <ramiroum@hotmail.com>
**Date:** Wed, 15 Jun 2011 09:21:59 -0400
**To:** <warwarr@aol.com>
**Subject: Mexican standoff**

Please take a look at Ruiz email to Alan yesterday regarding changing testing protocols.
I cannot go against a decision made by Alan nor legally prevent Phil from having the lab execute a order,
so here is my reasoning so you can evaluate pros & cons with Alan
I think this will generate another Mexican standoff,
where Roth & Kupin will not sign orders containing the immunology tests being questioned.
consequently we will not be able to bill for their patients,
That may ultimately result in not accepting their patients
what may end on either they sending their patients to other lab
or the Program director reassigning their patients to another physician
with the possible complain from them to medicine claiming the reason for their replacement are monetary and not clinical
with the consequent implication of medicare fraud by over testing
which could very well result in the transplant program being switched under Riser and the labs under Cote...
all scenarios are bad
I would rather recommend talk for an agreement
and in the event consensus cannot be obtained,

then just respect doctor specific orders
That way we could still criticize Roth & Kupin for not being proactive in testing the patients to detect impending rejection episodes early.
and ultimately, their statistics will be there to show their patient's graft survival rate being worst than those other physicians who actually actively look for rejection episodes and are able to stop the process before it  has clinical manifestation / consequences.
Dead line to stop the changes made yesterday will be tomorrow at 7 a.m.
in addition there is the issue of notifying Roth that his orders that he placed in the patient orders system have been modified...

=

# EXHIBIT 5

January 30, 2013

Jack Lord, M.D.
Clinical Professor of Pathology

Dear Jack:

I write to confirm the terms of your faculty appointment as Clinical Professor of Pathology in light of the fact that, as of January 31, 2013, you will no longer hold the administrative posts of Vice President for Medical Administration and Chief Operating Officer at the Medical School.

In lieu of the University initiating the reappointment process based on a lack of funding (as described in Section C5.3 of the Faculty Manual), you agree to waive your right to a departmental vote as required by the Faculty Manual and therefore agree that this letter shall serve as your official notice of the non-reappointment as a Clinical Professor in the Department of Pathology effective July 31, 2013. Since you have agreed to waive the departmental vote and accept this notice of non-reappointment, this letter shall control over any conflicting terms in the Faculty Manual that address non-reappointment voting requirements and, to the extent necessary, you waive any such conflicting terms in the Faculty Manual.

Between February 1, 2013 and July 31, 2013, you will be provided with an office in the Department of Pathology and you will retain all your rights as a Professor on the Clinical-Educator Track. During this time period, will also retain the same benefits package you had as of January 31, 2013, including contributions to the applicable retirement plan and accumulation of vacation days as any other Clinical Professor.

As specified in your Offer Letter of July 3, 2012, during the six-month time period of February 1, 2013 to July 31, 2013, your monthly compensation will be calculated using the annual base rate of $763,776.00. As you will no longer hold any administrative posts, the monthly compensation based on the annual salary of $763,776.00 will be the only monies that you will receive during the six month time period.

The terms of this letter replace the terms and conditions of the Offer Letter of July 3, 2012.

Please sign on the next page confirming your agreement with all of the terms of this letter and return the signed letter directly to my attention.  Thank you.

Sincerely,


Thomas J. LeBlanc
Executive Vice President and Provost

Jack Lord, M.D.
January 30, 2013
Page 2


Agreed to and accepted: _I AGREE to WAIVE MY RIGHT TO A VOTE_

_____
Jonathan T. Lord, M.D.

_31 JAN 2013_
Date

**MEMO TO FILE**

December 20, 2012

Meeting with Jack – Alan L alleges that neither he nor Rafic have been engaged in the review of the MTI, IML, or OPO.

Alan alleges that I am the source for the IML concerns and that they are unfounded.

Alan L alleges that I have "blocked" him and/or refused to meet with him, Rafic or give him or Rafic access to TMG.

Alan L plans to discuss his concerns with the President.

At Jack's suggestion I am compiling all correspondence with Alan L and Rafic as it relates to the IML, OPO, and MTI assessment.

I spoke with Cindy A regarding these issues to solicit her advice and opinion as she has been intimately involved in the assessment. She agreed that Alan L and Rafic have been engaged at the same or higher levels that other stakeholders thus far (agenda planning with Rafic, etc). She and I re-affirmed our opinion that prior to any "judgments" being made that all stakeholders would need to review the TMG report and be given an opportunity to respond and comment. As there has been no report issued from TMG it is premature to provide opinions, judgments, etc. The current plan is to expand an audit based on TMG's initial observations and await their report and the audit outcomes.

It is my impression that this is a direct attempt on Alan's part to intimidate me and to influence the outcome of the MTI, IML, and OPO assessment.

JONATHAN LORD, M.D.
February 24, 2022
Defendant's
**Exhibit 27**

LORD-001243

**From:** Jack Lord <jlordmd@gmail.com>
**Sent:** Tuesday, January 01, 2013 10:48 AM EST
**To:** Sheri Keitz <sheri.keitz@gmail.com>
**Subject:** Re: Good morning.

Thanks - ready to move on
J
On Jan 1, 2013, at 10:44 AM, Sheri Keitz <sheri.keitz@gmail.com> wrote:

> Wow. That way fast!  Reviewing.
>
> Sheri
>
> On Jan 1, 2013, at 10:43 AM, Jack Lord <jlordmd@gmail.com> wrote:
>
>> See attached
>> Thanks
>> J
>> <Pascal.docx>
>>
>> On Jan 1, 2013, at 9:38 AM, Sheri Keitz <sheri.keitz@gmail.com> wrote:
>>
>>> Feel: hurt, sad, betrayed but also resolved and accepting, gratitude for lessons learned
>>>
>>> Think: prioritize stability for family, communication with the people I really care about at work.  I don't want them to hear this from someone else.
>>>
>>> Do: coordinate message and transition with jack.   Immediate action: no choices. Must go to faculty affairs. Longer term: search for Sheri 2.0
>>>
>>> And you?
>>>
>>> Sheri
>>>
>>> On Jan 1, 2013, at 8:48 AM, Jonathan Lord <jlordmd@gmail.com> wrote:
>>>
>>>> How r u?
>>>> What r u thinking?
>>>>
>>>> Sent from my iPad
>>>>
>>>> On Jan 1, 2013, at 8:40 AM, Sheri Keitz <sheri.keitz@gmail.com> wrote:
>>>>
>>>>> No worries.
>>>>>
>>>>> Sheri
>>>>>
>>>>> On Jan 1, 2013, at 8:28 AM, Jonathan Lord <jlordmd@gmail.com> wrote:
>>>>>
>>>>>> Thanks
>>>>>> Good evening with friends - will text in a bit
>>>>>>
>>>>>> Sent from my iPad
>>>>>>
>>>>>> On Jan 1, 2013, at 7:50 AM, Sheri Keitz <sheri.keitz@gmail.com> wrote:
>>>>>>
>>>>>>> Happy New Year!  Hope your night was good.
>>>>>>>
>>>>>>> Let me know when you want to speak today so we can plan for life in 2013.
>>>>>>>
>>>>>>> Sheri
>>

JONATHAN LORD, M.D.
February 24, 2022
Defendant's
**Exhibit 30**

LORD-001134



Begin forwarded message:

**From:** "Keitz, Sheri" <SKeitz@med.miami.edu>
**Subject: FW: Update 12-31, 2012 through 01-04-2013**
**Date:** January 15, 2013 at 6:24:45 PM EST
**To:** "Sznurkowski, Gilma" <GSznurko@med.miami.edu>, Jonathan Lord <jlordmd@gmail.com>

More disingenuous behavior, not helping my day
--------------------------------------------------------
Sheri Keitz, MD, PhD
Senior Associate Dean for Faculty Affairs
Professor of Medicine
University of Miami Miller School of Medicine and UHealth System
Ph: 305-243-0332

The information contained in this transmission may contain privileged and confidential information, including information protected by federal and state privacy laws.  It is intended only for the use of the person(s) named above.  If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution, or duplication of this communication is strictly prohibited.

**From:** Van Der Put, Elaine
**Sent:** Tuesday, January 15, 2013 6:22 PM
**To:** Keitz, Sheri
**Subject:** RE: Update 12-31, 2012 through 01-04-2013

Sheri, I stumbled with your email today, cleaning up my inbox after 2 very hard working weeks preparing for a NIH site visit for the CTSI

I just wanted you to know how much we all appreciated you taking on an impossible task last year.  I task that implied going against your nature and having to lead the implementation of very tough measures. I could not have done it and respect you a lot for having taken it on.
Having seen you in action many times, I always trusted your fairness and am sure you kept true to yourself all the way. Wishing you the best in this New Year.
Elaine

**From:** Keitz, Sheri
**Sent:** Saturday, January 05, 2013 7:07 AM
**To:** Executive Daily Update
**Cc:** Executive Daily UpdateCC; Morris, Christine; Sznurkowski, Gilma; Goldberg, Judd J
**Subject:** Update 12-31, 2012 through 01-04-2013

Difficult and emotion filled week, defies usual format.

Highlights of events:

Monday: New Year's Eve:  Difficult meeting with Pascal regarding decisions to make substantial change in the leadership team, specifically my and Jack's roles

Tuesday: New Year's Day: working with Pascal on logistics of my transition out of HR and clarifying my transition back to faculty affairs full time

Wednesday:
- series of meetings with my direct reports in HR to inform them of my transition
- Jack's announcement sent out to medical school
- discussions with Marcy Beckford and Nerissa about communication plan for rest of the HR team

Thursday:
- Emotional meeting with entire HR team to say goodbye; with Nerissa and Marcy
- My announcement sent out to the medical school
- Transition meeting with Marcy and Nerissa
- Posting of article by John Dorschner about faculty unrest, Jack stepping down and my change in role
- Day #1: moving out of CRB3 office and HR office and into faculty affairs
- Planned RAC is cancelled



JONATHAN LORD, M.D.
February 24, 2022
Defendant's
**Exhibit 31**

LORD-001265

Friday:
- Home for day with family and for some work from home on time sensitive issues
- Day #2: complete move for me and for Gilma (all credit to Gilma)

Every day:
- Ongoing sticky situation management (this never stops), approvals, faculty letters, support of the many people who run our HR/faculty affairs matters

Takeaways:

- In this space and with this executive team for the past 9 months and with Pascal for the past 10 years, I have always been honest whether that has been easy or hard. I have always given my all. I have always tried to lead with compassion, dignity and grace. I have served this school by the hour in ways that I believed to be right.

- In honesty, this has been the hardest year of my professional life and it ended on December 31 in a way that breaks my heart. The emotions I have expressed this week to many of you are real and will always be part of who I am. I mean it sincerely when I say I will miss you. Thank you for all who have supported me through that.

- But time only moves forward and every minute brings us closer to a better minute

- So I pledge to always be true to my values and my moral compass. Further, I ask those reading these words to carry forward the values and dreams that we have shared.

- As I move on, it is now up to you.

Appreciation
- My husband Paul and my family for their sacrifices for our school
- Mauro Moscucci, Michael Levy, Fred Telischi, Dan Snyder, Tony Etzel, Tony Artrip, Larry Young, Gordon Dickinson, Enery Samlet for expressing kindness during a hard week
- Chris Morris for many years of friendship and for sensitivity to the difficulty of press coverage
- Miriam: for always being there
- Irene: for letting me watch you grow—keep looking forward and keep true to who you are
- Omaida for friendship and many hugs
- Nelson: the best partner I could have hoped for. Thanks for countless times when you were there when I needed you
- Gina: for always caring whether or not I ate lunch (usually not)
- Karen, Alina, Danny, Kristina, Tianne, Irma for courage moving forward and countless gifts of their talents
- Marcy Beckford: for taking on a challenging interim task
- My HR team: for sharing their lives, their laughter as well as their tears; for showing and teaching me so much and giving their gifts to our school.
- My Faculty affairs team: for welcoming me and Gilma home
- Judd for countless things, countless times
- Pascal: for providing opportunities the past 10 years
- Gilma: you complete me; your strength carried me through these past few days and I look forward to my turn to pay you back with my support and love.
- Jack: I am who I am today because I have known you and I am blessed by the gift of our time together. I have been changed for the better and will give all I have to the world moving forward with you in my heart

Best wishes for a successful 2013 for us all

Sheri

---------------------------------------------------

Sheri Keitz, MD, PhD
Senior Associate Dean for Faculty Affairs
Professor of Medicine
University of Miami Miller School of Medicine and UHealth System
Ph: 305-243-0332

The information contained in this transmission may contain privileged and confidential information, including information protected by federal and state privacy laws. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution, or duplication of this communication is strictly prohibited.

LORD-001266

Message

| | |
|---|---|
| **From:** | Jonathan Thomas Lord [JLord@med.miami.edu] |
| **Sent:** | 1/29/2013 7:34:26 PM |
| **To:** | Birnbach, David [dbirnbach@med.miami.edu] |
| **Subject:** | Re: Further follow up on your transition |

Thanks David - I am back in the states - 2pm won't work for me. . tomorrow am up until around 11 or after 9 pm would work
I will be advising Tom that I continue to consider my options and that we (you and I) are planning on chatting tomorrow
J

Jack Lord, MD
Chief Operating Officer and VP for Medical Administration
University of Miami Health System and
University of Miami Miller School of Medicine

Professor of Pathology
University of Miami Miller School of Medicine

1120 NW 14th Street
3rd Floor-Executive Suite
Miami, FL.  33136

jlord@med.miami.edu
305.299.7741 (mobile)
305.243.0145 (office)

On Jan 29, 2013, at 7:21 PM, "Birnbach, David" <DBirnbach@med.miami.edu> wrote:

Do you have some time tomorrow evening  (your time) to talk?
I'm free at 2pm  Miami time, which I assume is 7 in London, (so depending on your dinner plans) will that work for  a few minutes?
You can reach me on my cell (305) 206-3290 or I can call you if that would be better.
Best,
David

David J. Birnbach, MD, MPH
Professor and Vice Provost
University of Miami
Senior Associate Dean for Quality, Safety and Risk
Director, UM-JMH Center for Patient Safety
Miller School of Medicine
Tel: (305) 284-2002
Fax: (305) 284-6758
dbirnbach@miami.edu



JONATHAN LORD, M.D.
February 24, 2022
Defendant's
**Exhibit 36**

**From:** Lord, Jonathan
**Sent:** Tuesday, January 29, 2013 3:47 PM
**To:** Birnbach, David
**Subject:** Re: Further follow up on your transition

Back Tuesday evening

Sent from my iPhone

On Jan 29, 2013, at 7:01 AM, "Birnbach, David" <DBirnbach@med.miami.edu> wrote:

I'm away at a Simulation meeting and get back home tonight. I need to speak with some Senate people to see if there are any better options for you, but my gut feeling is that going the route of a vote is not a good choice. When do you get back to the States? If not for a while, what's a good time to speak on Thursday or Friday?
David

Sent from my iPhone

On Jan 29, 2013, at 2:15 AM, "Lord, Jonathan" <JLord@med.miami.edu> wrote:

Second request for advice

Sent from my iPad

Begin forwarded message:

**From:** "LeBlanc, Thomas J" <leblanc@miami.edu>
**Date:** January 27, 2013, 7:36:09 PM GMT
**To:** "Lord, Jonathan Thomas" <j.lord@miami.edu>
**Cc:** "Birnbach, David" <DBirnbach@med.miami.edu>
**Subject: Further follow up on your transition**

Dear Jack,

I followed up with General Counsel regarding your request for compensation during your six-month notice period to be based on your administrative salary, rather than your base salary. I was reminded that your severance terms were revised at your request and approved by the appropriate subcommittee of the Board of Trustees on July 5 after extensive discussion. I cannot ignore the action taken by the Board in approving formally the terms of your severance, which were stated explicitly in your July 3 appointment letter:

"The conditions of this letter replace the conditions of the letter dated March 1, 2012 including description of compensation (retroactive to June 1, 2012) **and notice rights which henceforth shall be consistent with the faculty manual and based upon the revised base salary of $763,776.**"

I have no right to override the Board on this point, and I have no basis to petition the Board for reconsideration. And if I were to do so, I am confident that the Board would not approve of such a change in our contractual relationship.

At this point, I believe we have resolved all the other issues you raised. I have revised my earlier letter to be consistent with our follow up conversation and have attached it to this email. If you agree to forego the reappointment vote, please let me know and send me a signed copy of the letter. If not, I am required under the terms of the Faculty Manual to call for a vote of the faculty in Pathology and will do so as soon as possible.

Confidential Information

I hope you and Alice are enjoying the lights of London.

Regards,
Tom LeBlanc
Provost

&lt;TL to JL Jan 27.docx&gt;

UMLORD - 00044757

# UNIVERSITY
# OF MIAMI



David J. Birnbach, M.D., M.P.H.                    Office of the Provost
Vice Provost for Faculty Affairs

January 31, 2013

VIA EMAIL AND US MAIL

Jonathan T. Lord, M.D.
68 La Gorce Circle
Miami Beach, FL 33141

Dear Dr. Lord:

As you have agreed to waive your right to a departmental vote as required by the Faculty Manual, I am notifying you that your appointment as a Professor of Clinical Medicine in the Department of Pathology will end effective with the close of business on July 31, 2013.

Between February 1, 2013 and July 31, 2013, you will be provided with an office in the Department of Pathology and you will retain all your rights as a Professor on the Clinical-Educator Track. During this time period, you will also retain the same benefits package you had as of January 31, 2013, including contributions to the applicable retirement plan and accumulation of vacation days as any other Professor on the Clinical-Educator Track.

As specified in your Offer Letter of July 3, 2012, during the six-month time period of February 1, 2013 to July 31, 2013, your monthly compensation will be calculated using the annual base rate of $763,776.00. As you will no longer hold any administrative posts, the monthly compensation based on the annual salary of $763,776.00 will be the only monies that you will receive during this six month time period.

With this letter, the University discharges its notice obligations to you under the Faculty Manual and all prior offer letters.

Sincerely yours,

David J. Birnbach, MD, MPH
Vice Provost for Faculty Affairs

DJB:bt

cc:    Provost Thomas J. LeBlanc, Ph.D.
       Dean Pascal Goldschmidt, MD

JONATHAN LORD, M.D.
February 24, 2022
Defendant's
**Exhibit 38**

P.O. Box 248033
Coral Gables, Florida 33124-4628
Phone: 305-284-2002 • Fax: 305-284-6758
dbirnbach@miami.edu

UM/LORD - 0014

**Senate meeting 01-30-2013**

<u>Report of the President:</u>

<u>NCAA Update</u>: can't say much; very disappointed in the events surrounding the review; will cooperate fully and keep senate up to date on progress

<u>Recent Events at the SOM</u>

- I have listened closely chairs and faculty (new and longstanding faculty), as has the dean. We have made changes with more to come. There were serious issues of leadership, issues with transparency, faculty involvement and communication.

  So we made changes in leadership. The substitutes are very skilled people. We reached out to faculty in decision making.

- We are already changing the role if HR.

  We are taking steps to both centralize and decentralize. To make sure staff were being treated fairly, no matter where the person sits.

  There has been a stakeholders group. This group recommended changes. Nerissa Morris will have the Miller School report to her and others report to her. This comes from the Freeh report (Penn State). For the HR reorganization, there will be a search process and there will be medical staff representation on the search.

  VP HR will report to president.

- Compliance to report directly to pres.

- Tom and Bixby are dialing back to make sure research is responsive

- RAC: We have listened to a lot of what faculty and staff have said. We have listened and will continue to listen. We put some skilled people here.

- What we had to do (RIF) was not new. Other institutions have learned as well that there needs to be a dialing back—in places where we may have gone too far. But ours was made worse by people related decisions and decisions that were not right at the time. We have to get back on track. We need reserves. We also need to be sure people are comfortable with the direction.

Comments from the audience:

- Faculty comment: The problem: budget, inertia, specific administrators and style, centralization of services, shared governance. I hear that there is fear of talking about policy. Fear of retribution. I give a great deal of credence to these concerns.

- DES response: Retaliation is unacceptable. No one should fear. The only way you can address it is to be open to criticism and be willing to address this. I'm not saying this is over.

- Faculty comment: Never had more troubled communication. There is a genuine fear of making anything known. An example is the new committee on "faculty wellness." This is perceived as the health and well-being of faculty being blocked at as a good attempt to 'muzzle' the faculty.



JONATHAN LORD, M.D.
February 24, 2022
Defendant's
**Exhibit 40**

- DES:  Perception is reality.  We value different viewpoints.

- Faculty member:  We don't want to hear that things are great when we know they are not.

- DES: Let's be precise.  You have not heard that things are great from me.  Information is power. I will be candid about mistakes

- Faculty member:  What are the biggest mistakes you have made in the past five years?

- Leadership mistakes. Style is important. We have a culture that challenges hierarchy. To convince people who are from a different world of that is impossible. Outsiders don't understand our world.  I feel very strongly about process.

  If I make a mistake in a leader, I will respond by getting rid of them quickly or surrounding them with people who can balance their needs.  Holding people accountable was not happening here.

  Some of our partners were willing to make changes so fast (? I guess this is Jackson).  We were not anticipating some of these needs

Dean's Report: (PJG)

- We had a painful start to 2012, expenses were greater than revenues, the president, the trustees and I were concerned; but now in the start of 2013, the financials are now great, now sustainable.

- When we realized that that (financial stability) had been accomplished we realized that we needed to change.

- We had no time to do what needed to be done.  I was completely focused on fixing the financials to communicate properly.  I was working 17 or 18 hours a day, 7 days a week, to turn around the school.  For a year, I was doing another job that was not my regular job as the dean.

- Now I need to listen to all of you.  I listened.  I met with you one-on-one and in groups.  I met with chairs and with faculty members.

- When we realized in December that our performance had stabilized, I knew a change in course and a change in leaders was needed.  I took action and brought experienced leaders to the school.  DES was supportive of bringing Joe Natoli and Mark Diaz to our team.  They both have been here at the institution and understand our values.

- Faculty comment: The person who created all that fear is no longer here. How are you going to assure there will be no retribution?

- PJG: I do not tolerate or condone retribution.  Now, can I say that there is no retribution at a school of this size?  I can't say that there might not be retribution.  But I can say that I will never retaliate against anyone who has a different opinion and I have never retaliated against anyone for their opinions.

- You can call on me, your dean, any time of day or night and tell me if someone is retaliating against you and I promise you that person will see consequences.  But you have to tell me where this is happening for me to manage it.

LORD-000143

- The medical school hired consultants who didn't understand our environment.  They said we had too many people because at other places, the work being done was being done by computers.  But here, the work was being done by the people that they laid off.

- The SOM faculty members have voiced their opinions.  The fact that Dr. Lord is no longer here is the direct result of the petition.  There has been real damage to the teaching mission and the research mission of the school.

LORD-000144

FAHED FAYAD, M.D. vs. UNIVERSITY OF MIAMI
LORD, JONATHAN on 02/18/2015

```
 1    .
                    IN THE CIRCUIT COURT OF THE
 2                    11TH JUDICIAL CIRCUIT
              IN AND FOR MIAMI-DADE COUNTY, FLORIDA
 3

 4                   CASE NO. 13-04086 CA 31

 5

      FAHED FAYAD, M.D., an individual,
 6
              Plaintiff,
 7
      vs.
 8
      UNIVERSITY OF MIAMI d/b/a UNIVERSITY OF MIAMI
 9    HOSPITAL d/b/a SYLVESTER COMPREHENSIVE CANCER
      CENTER, a Florida corporation,
10
              Defendant.
11
      * * * * * * * * * * * * * * * * * * * * * * * * *
12

13

      DEPOSITION OF:        JONATHAN LORD
14
      DATE TAKEN:           Wednesday, February 18, 2015
15
      TIME:                 8:56 a.m. to 12:06 p.m.
16
      PLACE:                1550 Madruga Avenue
17                          Suite 504
                            Coral Gables, Florida
18
      TAKEN BEFORE:         LAURIE YANNACCONE, FPR
19                          and NOTARY PUBLIC

20    * * * * * * * * * * * * * * * * * * * * * * * * *

21

22

23

24

25
```

JONATHAN LORD, M.D.
February 24, 2022
Defendant's
**Exhibit 42**

FAHED FAYAD, M.D. vs. UNIVERSITY OF MIAMI
LORD, JONATHAN on 02/18/2015                                                              Pages 2..5

Page 2

```
 1  APPEARANCES:
 2
 3
    FELIX LOPEZ, ESQUIRE
 4  DiBello & Lopez, P.A.
    1550 Madruga Avenue
 5  Suite 504
    Coral Gables, Florida 33146
 6  Flopez@dlclegal.com
 7      APPEARING ON BEHALF OF THE PLAINTIFF
 8
 9
    TERESA RAGATZ, ESQUIRE
10  Iscoff, Ragatz & Koenigsberg
    1200 Brickell Avenue
11  Suite 1900
    Miami, Florida 33131
12  Ragatz@irlaw.com
13
    JUDD J. GOLDBERG, ESQUIRE
14  Office of Vice President, General Counsel and
    Secretary of the University
15  Gables One Tower
    1320 South Dixie Highway
16  Suite 1250
    Coral Gables, Florida 33146
17  Jgoldberg@miami.edu
18
        APPEARING ON BEHALF OF THE DEFENDANT
19
20
21  ALSO PRESENT:
22      Dr. Fahed Fayad
23
24
25
```

Page 3

```
 1              C O N T E N T S
 2  EXAMINATION OF JONATHAN LORD
 3          Examination by Mr. Lopez          4
 4  CERTIFICATE OF REPORTER                  154
 5  CERTIFICATE OF OATH                      155
 6  ERRATA SHEET                             156
 7  NOTIFICATION LETTER                      157
 8
 9              E X H I B I T S
10  Exhibit 64                               96
11  (E-mail dated November 1, 2012)
12  Exhibit 65                              113
13  (E-mail dated December 14, 2012)
14  Exhibit 66                              115
15  (E-mail dated December 18, 2012)
16  Exhibit 67                              123
17  (E-mail date December 19, 2012)
18  Exhibit 68                              126
19  (E-mail)
20  Exhibit 69                              133
21  (E-mail dated December 21st)
22
23
24
25
```

Page 4

```
 1        P R O C E E D I N G S
 2          JONATHAN LORD,
 3  having been first duly sworn to tell the truth,
    was examined and testified upon his oath as
 4              follows:
 5      THE WITNESS: I do.
 6          DIRECT EXAMINATION
 7  BY MR. LOPEZ:
 8      Q. Please state your full name for the
 9  record.
10      A. Jonathan Lord.
11      Q. And you're a medical doctor, are you not?
12      A. Yes, I am.
13      Q. Dr. Lord, my name is Felix Lopez and I
14  represent Dr. Fayad in this lawsuit against the
15  University of Miami. I'll be asking you questions
16  today during your deposition. If at any time you
17  don't understand my question, please let me know
18  and I'll try my best to rephrase it in such a way
19  that you do understand the question. If you
20  answer the question, I'll assume that you
21  understood it and that the answer that you are
22  giving is a full and complete response.
23      Is that fair?
24      A. Fair.
25      Q. Also, the court reporter needs to take
```

Page 5

```
 1  down your testimony, so you have to provide
 2  audible responses. She cannot take down head nods
 3  and that sort of thing, so you just need to keep
 4  in mind that you have to answer audibly.
 5      Okay?
 6      A. Okay.
 7      Q. If at any time during the deposition you
 8  need to take a break to take a telephone call or
 9  go to the restroom, stretch your legs, just let me
10  know and we'll do our best to accommodate you.
11      Okay?
12      A. Thank you.
13      Q. Who at the university asked you to appear
14  for the deposition today?
15      A. Judd Goldberg.
16      Q. And when was that done?
17      A. Oh, I think sometime in the fall, I don't
18  remember exactly when.
19      Q. And what did you do, if anything, to
20  prepare for your deposition today?
21      A. I met with Judd and counsel on -- two
22  days ago.
23      Q. Anything else?
24      A. That's it.
25      Q. Have you spoken to anybody at the
```

FAHED FAYAD, M.D. vs. UNIVERSITY OF MIAMI
LORD, JONATHAN on 02/18/2015                                    Pages 6..9

Page 6

1 university about your deposition?
2      A. No, I did not.
3      Q. When was the last time that you spoke
4 with anybody at the university?
5      A. In a formal world?
6      Q. In any way.
7      A. I would probably say six weeks ago.
8      Q. And who did you talk with at that point?
9      A. You know, I can't recall, but it was just
10 an informal conversation about social things, not
11 about work.
12      Q. And who was it that you had those
13 discussions with?
14      A. I can't remember exactly who that might
15 have been, but I just don't remember.
16      Q. Have you had any discussions with anybody
17 at the university about this lawsuit?
18      A. I have not.
19      Q. Where are you currently employed?
20      A. I'm not.
21      Q. Are you retired?
22      A. I'm not.
23      Q. Okay. What do you do for a living?
24      A. I am on the boards of a number of
25 companies, I share a public company board, I'm

Page 7

1 involved in a number of private companies, and so
2 my time is spent both in governance activities as
3 well -- and investments as well as playing golf.
4      Q. Are you compensated in any of your roles
5 as -- in what you just described?
6      A. I'm compensated in terms of the public
7 companies as filed in the proxy statements of
8 those companies.
9      Q. So you're paid a director's fee, is that
10 it?
11      A. I am paid director's fees.
12      Q. And so can you tell me the names of the
13 companies in which you serve on the boards?
14      A. Sure.
15          Dexcom, that's a publicly-traded company.
16 Biolase, that's a publicly-traded company.
17 Private companies include Digital Reasoning,
18 Velano Vascular, Parao.
19      Q. Any others?
20      A. That's it.
21      Q. And when did you first become a member of
22 the board of each of those entities?
23      A. Dexcom, 2008. I believe Biolase is 2013.
24 Velano Vascular, 2012. Digital Reasoning, 2013.
25 Parao, 2013.

Page 8

1      Q. What was the last job that you had?
2      A. I was the chief operating officer at the
3 University of Miami.
4      Q. Were you also a professor?
5      A. I was.
6      Q. And when did you cease becoming a
7 professor at the University of Miami?
8      A. July 31, 2013.
9      Q. And you were the COO you said?
10      A. Yes.
11      Q. And was that the COO of the University of
12 Miami Health System?
13      A. Yes, it was.
14      Q. Did you have any other positions with the
15 university?
16      A. I was the chief compliance officer.
17      Q. And was that also for the university
18 health system?
19      A. Yes, it was.
20      Q. Okay. Did you hold any other positions?
21      A. In terms of last position?
22      Q. Last position.
23      A. I was a professor of pathology in the
24 department.
25      Q. And you held that position until July 31,

Page 9

1 2013?
2      A. Correct.
3      Q. Any other positions, the last titles that
4 you had with the university?
5      A. Before I became the chief operating
6 officer I was a chief innovation officer for the
7 university.
8      Q. Any other titles or positions that you
9 held with the university?
10      A. No.
11      Q. What about vice president, did you hold
12 any vice president positions?
13      A. Oh, I did have a title of vice president
14 at -- and I can't remember. I think it was vice
15 president for administration or healthcare
16 administration.
17      Q. Was that for the university health
18 system?
19      A. Yes, it was.
20      Q. When did you first become employed by the
21 university?
22      A. September 2011.
23      Q. And was that when you became the chief
24 innovation officer?
25      A. Yes, it was.

Page 10

1    Q. Okay. And that was -- was that for the
2 Health System? Was it for the medical school?
3 Was it for both?
4    A. For both.
5    Q. And would you become a professor at that
6 time as well?
7    A. Yes, I did.
8    Q. What were your duties and
9 responsibilities as the chief innovation officer?
10   A. I was responsible for the intellectual
11 property portfolio of the university, helping to
12 promote the presence of the university in
13 development of new services and looking for ways
14 to help individual faculty members as well as
15 university monetize their discoveries.
16   Q. And that included specifically
17 responsibilities for the Life Science and
18 Technology Park, did it not?
19   A. Yes, it did.
20   Q. Okay. Any other responsibilities?
21   A. No.
22   Q. What was your task with regard to Life
23 Science and Technology Park?
24   A. The Life Science and Technology Park was
25 the showcase of the university around innovation.

Page 11

1 It was to attract new companies and help start new
2 companies using the discoveries that were made at
3 the University of Miami and bring them to some
4 form of market.
5    Q. And when was that established?
6    A. The Life Science Park was established
7 before I joined the university. I think it
8 started around 2008, it was officially opened in
9 2011.
10   Q. Was it opened before you become the chief
11 innovative officer?
12   A. Technically, I was there when we did the
13 ribbon cutting.
14   Q. Okay. Has the university agreed to pay
15 you for your time for this deposition today?
16   A. No.
17   Q. When was the last time you received any
18 compensation from the university?
19   A. July 31, 2013.
20   Q. And that was in connection with your role
21 as a professor?
22   A. Correct.
23   Q. Okay. As the chief innovative officer,
24 who did you report to?
25   A. The dean.

Page 12

1    Q. That's Dean Goldschmidt?
2    A. Correct.
3    Q. Did you report to anybody else?
4    A. The provost.
5    Q. And who was the provost at the time?
6    A. Tom LeBlanc.
7    Q. Did you report to anybody else?
8    A. No.
9    Q. Did you report to any board?
10   A. No.
11   Q. Your -- the university has a board of
12 trustees, does it not?
13   A. Yes, it does.
14   Q. Okay. Did you have any interaction with
15 that board as the chief innovation officer?
16   A. Not formal, no formal contacts.
17   Q. Okay. What about informal contacts?
18   A. Probably don't -- don't recall.
19   Q. Did you have any direct reports to you in
20 your role as chief innovation officer?
21   A. Yes, I did.
22   Q. Who reported to you?
23   A. It's hard for me to remember their names.
24 The person who is responsible for the group that
25 managed the IP portfolio and a small team of

Page 13

1 people who were responsible for the Life Science
2 Park.
3    Q. Do you remember any of their names?
4    A. I can't remember their names, sorry.
5    Q. Who hired you for the role as the chief
6 innovation officer at the university?
7    A. Dean Goldschmidt and the provost.
8    Q. And in your -- in your role as the chief
9 innovation officer at the university, did you have
10 any involvement with the University of Miami
11 Hospital?
12   A. No.
13   Q. Did you have any involvement with
14 Sylvester?
15   A. No.
16     Except -- I would say the only exception
17 to that would be if there was an individual
18 professor who had some intellectual property that
19 we were trying to promote or find a way to
20 commercialize, but nothing with the
21 administration.
22   Q. Did you know anything about the purchase
23 of Cedars Hospital by the university?
24   A. Just from what I read in the papers.
25   Q. You had no discussions with the dean

Page 14

1 about that?
2     A. Never.
3     Q. Did you have any discussions with anybody
4 else at the university about the purchase of
5 Cedars Hospital by the university?
6     A. No.
7     Q. How were you paid as the chief innovation
8 officer?
9     A. As a -- based on the employment agreement
10 as a professor.
11     Q. Did you have -- did you have a contract
12 with the university?
13     A. I don't think we had contracts, we had
14 at-will employment letters.
15     Q. Okay. Did you have two separate
16 employment letters, one for the chief innovation
17 officer and one as a professor?
18     A. No, it was one combined letter.
19     Q. And how was your compensation determined?
20     A. By the dean.
21     Q. And that was set forth in the letter?
22     A. Yes, it was.
23     Q. And were there any financial incentives
24 or bonuses provided for in the letter?
25     A. You know, I don't recall.

Page 15

1     Q. And did it break down your salary as far
2 as what you would earn as the chief innovation
3 officer and what you would earn as a professor?
4     A. No, it did not.
5     Q. Did you receive any bonuses?
6     A. No, I did not.
7     Q. Were you entitled to receive any bonuses?
8     A. In what role?
9     Q. In your role as chief innovation officer.
10     A. No. I mean, I was in that role for only
11 about six months or seven months.
12     Q. You don't recall whether your employment
13 letter provided for the payment of a bonus?
14     A. I don't.
15     Q. And you don't recall ever receiving a
16 bonus in your role as chief innovation officer?
17     A. I don't.
18     Q. Did you receive any bonuses as professor
19 of the university?
20     A. No, I did not.
21     Q. Were you entitled to receive any bonuses
22 as a professor?
23     A. No, I was not.
24     Q. When did you become the chief operating
25 officer for the university health system?

Page 16

1     A. March 1, 2012.
2     Q. Was that a promotion?
3     A. Yes.
4     Q. And who was it that promoted you to that
5 position?
6     A. Dean Goldschmidt.
7     Q. And why were you promoted to that
8 position?
9     A. There was a transition of the prior chief
10 operating officer and there was a time where the
11 university had significant financial stress at the
12 medical center and the dean asked me to fill in in
13 that role.
14     Q. And you were replacing Bill Donelan?
15     A. Correct.
16     Q. And when did he cease becoming the chief
17 operating officer?
18     A. I think, technically, March the 1st. I
19 think it was announced at the end of January,
20 beginning of February.
21     Q. So when you became the chief operating
22 officer for the university health system in March
23 of 2012, did he leave at that point, Mr. Donelan?
24     A. No. He had about three months of
25 overlap.

Page 17

1     Q. He stayed until about May of 2012,
2 correct?
3     A. Somewhere in that time zone.
4     Q. And what was his position during that
5 interim time period between March and May of 2012?
6     A. He continued to work with me on the key
7 issues of the university at the time.
8     Q. But was he still the chief operating
9 officer?
10     A. No, he was not.
11     Q. What was his title at that time?
12     A. I believe that his university vice
13 president title persisted until the end of May.
14     Q. And what was the reason for his departure
15 from the university?
16     A. I have no idea.
17     Q. You never talked to him about that?
18     A. No, I did not.
19     Q. Did he ever tell you why he was leaving?
20     A. I just know that he was asked to leave.
21     Q. He was fired?
22     A. That would be the common term for it.
23     Q. Okay. And how did you become aware of
24 the fact that he was asked to leave?
25     A. Just by virtue of the conversation I had

Page 18

1  with Dean Goldschmidt.
2      Q. So Dean Goldschmidt told you that?
3      A. Yes.
4      Q. Did he tell you why he was asked to
5  leave?
6      A. No, he did not.
7      Q. You didn't ask him?
8      A. It was clear that the -- that at that
9  point in time the university's finances, medical
10 center's finances were under stress.
11     Q. And they were, in fact, $28 million in
12 the red at that time, were they not?
13     A. I can't remember the exact number, but it
14 was very significant.
15     Q. And you were tasked with the job of
16 improving the bottom line for the university, were
17 you not?
18     A. That's correct.
19     Q. And that was your central task, was it
20 not?
21     A. That is correct.
22     Q. Were you given any goals to achieve as
23 the chief operating officer for the Health System?
24     A. No specific goals with the exception of
25 turning the financial situation around.

Page 19

1      Q. Did you have any understanding of why the
2  university was experiencing significant losses?
3      A. It was pretty clear to me as I assumed
4  the role that the expenses far exceeded the
5  revenues and that systems for accountability in
6  the organization needed improvement.
7      Q. And the university had overreached, would
8  you say?
9          MS. RAGATZ: Object to the form.
10         THE WITNESS: I can't comment on
11     overreached. It was very clear that they
12     spent more money than they were taking in.
13 BY MR. LOPEZ:
14     Q. And several people within the university
15 took the position that the university had
16 overreached and that is what caused the financial
17 losses, didn't they?
18         MS. RAGATZ: Object to the form.
19         THE WITNESS: There were many people with
20     many opinions at the university.
21 BY MR. LOPEZ:
22     Q. Do you disagree with those opinions?
23     A. There are so many I couldn't figure out
24 which one I would agree with. All I can say, very
25 clearly the university spent more money than it

Page 20

1  was taking in against its plan.
2      Q. Do you know who Mr. Braman is?
3      A. Yes, I do.
4      Q. Who is he?
5      A. He was a member of the board of trustees
6  and he is prominent social figure and
7  philanthropist in the community, and obviously has
8  a number of very large car dealerships.
9      Q. And he quit in protest at the beginning
10 of 2012 as a member of the university board of
11 trustees, did he not?
12     A. I understand that he left the university
13 board in 2012.
14     Q. And do you know why he left?
15     A. Only based on accounts in Miami Herald,
16 which I think picked up pieces of his comments in
17 a letter that he wrote to the rest of the board.
18     Q. And in that letter he took the position
19 that the university had overreached in its -- in
20 its strategy, did he not?
21         MS. RAGATZ: Object to the form.
22         THE WITNESS: If you have the letter --
23 BY MR. LOPEZ:
24     Q. You don't remember that?
25     A. I don't remember the word "overreached."

Page 21

1      Q. Okay. When you became the chief
2  operating officer in March of 2012, did you also
3  assume the title of the vice president?
4      A. No, I did not.
5      Q. When did you become vice president?
6      A. On I believe it was June the 1st.
7      Q. Was that vice president for medical
8  administration?
9      A. Correct.
10     Q. And why were you given that position in
11 June of 2012?
12     A. It was the way the role was structured,
13 and at that point in time Mr. Donelan left.
14     Q. Did -- was Mr. Donelan the vice
15 president?
16     A. He was.
17     Q. Okay. So when he left in May, then you
18 took over in June?
19     A. Correct.
20     Q. Any reason why you didn't take over that
21 role in March when you became the chief operating
22 officer?
23     A. I have no idea.
24     Q. Did you ever have any discussions with
25 the dean about that?

FAHED FAYAD, M.D. vs. UNIVERSITY OF MIAMI
LORD, JONATHAN on 02/18/2015

Pages 22..25

Page 22

1   A. Probably, but given the sort of tasks at
2 hand, that was the last thing on my mind -- things
3 to worry about.
4      Q. Did you have any discussions with
5 Mr. Donelan about the financial situation at the
6 university?
7   A. Yes, I did.
8      Q. And did he tell you why the university
9 was experiencing significant losses?
10   A. You know, I think, again, the why is
11 there was too much spending and not enough
12 revenue.  It was clear that the organization had
13 not focused on either generating sufficient
14 revenue to pay for what it was invested in or it
15 was overspending based on what was possible given
16 the structure of the entity.
17      Q. Did he have any discussions with you
18 about what efforts he had undertaken to increase
19 revenues for the university?
20   A. We talked through those strategies that
21 the university had been employing, but we spent
22 far more time on the ways to reduce expenses.  At
23 the point in time in March I took over, the most
24 important thing was the reduction of expenses,
25 because that would be the only way to achieve

Page 23

1 sustainable financial performance for the future.
2      Q. Well, wouldn't the increase of revenues
3 have done the same thing?
4   A. The increase in revenues could have never
5 happened quickly enough to deal with the situation
6 that was at hand.
7      Q. Would you consider it to have been a
8 desperate situation?
9      MS. RAGATZ:  Object to the form.
10      THE WITNESS:  I would describe the
11      situation as significant and needing
12      immediate attention.
13 BY MR. LOPEZ:
14      Q. Did Mr. Donelan tell you what efforts he
15 had undertaken to reduce the expenses?
16   A. Yes, he had.
17      Q. Okay.  And what did he do to attempt to
18 do that?
19   A. There are hiring freezes in place, there
20 were reductions in travel expenditures in place.
21      Q. Anything else?
22   A. That was about it.
23      Q. And those weren't sufficient, correct?
24   A. That those were sufficient to deal with
25 the situation at hand.

Page 24

1      Q. Did you discuss with Mr. Donelan any
2 strategies going forward to try to accomplish the
3 goals that you were tasked in achieving?
4   A. I discussed, you know, what I perceived
5 what were the challenges, what strategies I was
6 going to employ.  We discussed some of the likely
7 reactions within the university, but again in
8 March 2012 there was no -- it was very clear what
9 actions needed to be taken.
10      Q. Okay.  And you made those known to
11 Mr. Donelan during those discussions?
12   A. Yes.
13      Q. And what strategies did you feel needed
14 to be employed?
15   A. A significant reduction in force.
16      Q. Anything else?
17   A. Changes in the way we held leadership
18 accountable.
19      Q. Anything else?
20   A. Improvements to the control environment
21 and compliance programs within the institution.
22      Q. Anything else?
23   A. Those are the main ones.
24      Q. Okay.  Let's talk about the reduction in
25 force.

Page 25

1      What did that entail?  Was that
2 university employees?
3   A. That was university employees.  The
4 university has many classes of employees, has
5 administrative employees and it has faculty
6 members.  The rules that govern each of those are
7 different.
8      Q. And your strategy was to lay off
9 employees, correct?
10   A. Strategy was to deal with expenses as
11 quickly as we could and that included a reduction
12 of somewhere in the neighborhood of 800 temporary
13 employees and overtime somewhere in the ballpark
14 of 1,000 full-time employees.
15      Q. That was a mass layoff strategy, correct?
16   A. Correct.
17      Q. And that was across the board at the
18 university?
19   A. That was at the Medical Center only.
20      Q. Medical Center only.
21      Is there any particular reason why it was
22 only the Medical Center?
23   A. Because that's the only areas that I had
24 responsibility for.
25      Q. Did you feel that the university --

FAHED FAYAD, M.D. vs. UNIVERSITY OF MIAMI
LORD, JONATHAN on 02/18/2015
Pages 26..29

Page 26

1 strike that.
2        Did that include leadership members?
3        MS. RAGATZ:  Object to the form.
4        THE WITNESS:  We made changes in the
5 leadership level as well.
6 BY MR. LOPEZ:
7        Q.  And why were the changes made to the
8 leadership level?
9        A.  In part, one, I had a core belief that we
10 were not only going to reduce the structure in
11 force of the employees, staff employees, but that
12 in any responsible way had a show in good faith
13 they were also paying attention to the structure
14 of leadership.
15        Q.  So you believe that people in the
16 leadership roles were not doing their jobs?
17        A.  I believe that we had to reduce expenses
18 at all levels of the enterprise, and to be
19 truthful and be fair to the employees who were
20 there, we had to take action at leadership levels
21 as well.
22        Q.  Who in the leadership levels were -- were
23 targeted for being terminated?
24        A.  I would never use the word "targeted,"
25 but we did eliminate Michele Chulick's position

Page 27

1 which was overseeing the hospitals.  And we did
2 eliminate the role of chief financial officer of
3 the medical center at that time.  I can't -- Ted
4 Shaw.
5        Q.  And Michele Chulick, what was her
6 position with the university?
7        A.  I believe she was in an assistant vice
8 president and she had responsibility for the
9 hospitals.
10        Q.  And when you say "hospitals," what are
11 you referring to?
12        A.  The University of Miami Hospital, the
13 University of Miami Hospital and Clinics and --
14 Hospital.
15        Q.  When you are referring to the University
16 of Miami Hospital and Clinics, that is Sylvester?
17        A.  Sylvester is the institute that sort of
18 sits side-by-side with the --
19        Q.  So she was the vice president for
20 overseeing all the hospitals that you just named?
21        A.  I believe that's correct.
22        Q.  And then Ted Shaw was the CFO of the
23 Medical Center?
24        A.  Correct.
25        Q.  So he and Ms. Chulick were both fired,

Page 28

1 correct?
2        A.  They were terminated, yes.
3        Q.  Did you fire them?
4        A.  I did.
5        Q.  Why did you fire Ms. Chulick?
6        A.  Again, in the context of needing to make
7 changes and expenses, and to be fair and with all
8 employees my focus was what positions were
9 contributing the least in the case of that role, I
10 believe, that role was unnecessary and that the
11 CEOs of the individual hospitals had sufficient
12 skill sets to manage their own hospitals and would
13 be much better served managing as a self-manage
14 group.
15        Q.  Any other reason why you felt that she
16 needed to be terminated?
17        A.  No.
18        Q.  So is it -- there was no one who replaced
19 her?
20        A.  No one replaced her.
21        Q.  What was the reason why you terminated
22 Ted Shaw?
23        A.  We were in a very significant financial
24 situation which required prompt action and
25 immediacy of turnaround, and my belief was he was

Page 29

1 not fit for purpose of what he had to do.
2        Q.  And why did you feel that he was not fit
3 for that purpose?
4        A.  Because I don't think he had ever really
5 done something like we were doing and I did not
6 have confidence that he could continue that going
7 forward.
8        Q.  Did you replace him?
9        A.  We did not replace the CFO position, we
10 restructured the finance department.
11        Q.  How was the finance department
12 restructured?
13        A.  We created a role of chief business
14 development officer, I believe was the title.
15 Nelson Weichold, who was the -- in the finance
16 department at the university, assumed that role
17 and assumed the oversight for the people who were
18 responsible for financial services.
19        Q.  What was his name?
20        A.  Nelson Weichold, W-E-I-C-H-O-L-D.
21        Q.  And when was Michele -- Ms. Chulick
22 terminated?
23        A.  I believe it was the latter part of
24 April of 2012.
25        Q.  And how about Mr. Shaw, when was he

Page 30

1 terminated?
2    A. Same time.
3    Q. Did you have any discussions with the
4 dean about the termination of those two
5 individuals?
6    A. Of course.
7    Q. And he agreed with your decision?
8    A. Yes, he did.
9    Q. Did you need his approval in order to do
10 that?
11   A. Yes, I did.
12   Q. Did you need anybody else's approval in
13 order to do that?
14   A. In general, we always communicated with
15 leadership at Coral Gables so there were no
16 surprises.
17   Q. There were what?
18   A. So there would be no surprises.
19   Q. Okay. Now, you testified before that in
20 your role as chief innovation officer, you
21 reported not only to the dean, but to the Provost?
22   A. Correct.
23   Q. Did you also report to the Provost in
24 your capacity as the chief operating officer?
25   A. No, I did not.

Page 31

1    Q. So you just reported to the dean?
2    A. Correct.
3    Q. And in your role as chief operating
4 officer, did you ever report to any board?
5    A. I made multiple presentations to the
6 board and board committees.
7    Q. And which boards did you make
8 presentations to?
9    A. I made presentations to each of the
10 hospital boards, made presentations to the audit
11 committee of the university board of trustees, the
12 executive committee of the university board of
13 trustees, and the board of trustees in -- as an
14 entire group.
15   Q. Okay. And did you discuss with the board
16 the termination of these individuals?
17   A. No, I did not.
18   Q. Any reason why not?
19   A. That would not be pertinent or
20 appropriate given the structure --
21   Q. Given the structure --
22   A. Given the way the university is governed
23 and structured.
24   Q. Okay. So you don't believe that the
25 board of trustees should be interested in

Page 32

1 leadership being terminated?
2       MS. RAGATZ: Object to the form.
3       THE WITNESS: In terms of good
4    governance, the president of the university
5    and other leadership in Coral Gables relative
6    to somebody in an assistant vice president
7    role was sufficient in terms of communication
8    of decision making.
9 BY MR. LOPEZ:
10   Q. So my question was: You don't believe
11 the board of trustees was interested in leadership
12 being terminated?
13      MS. RAGATZ: Object to the form.
14      THE WITNESS: Again, I have no idea -- I
15   can't comment on whether they're interested
16   or not, but it is not appropriate.
17 BY MR. LOPEZ:
18   Q. You serve on boards, do you not?
19   A. I do.
20   Q. Do you find it to be interested in when
21 leadership is being terminated in the companies
22 that you serve on the boards?
23   A. It depends on the role.
24   Q. Do you ever feel that you're not
25 interested in when leadership is terminated in

Page 33

1 your capacity as a board member?
2    A. Again, I think the question is,
3 leadership at what level?
4    Q. At any level.
5    A. Well, I believe that good governance and
6 the role of CEO or, in this case, the president of
7 the university is the person who should be
8 understanding and making those decisions. If
9 there's somebody that is material or in the case
10 of a public company as a named officer, that would
11 be very different than it would at the university
12 setting where we are dealing with positions that
13 are probably four to five levels away from the
14 president.
15   Q. Did you have unfettered decision making
16 authority as the chief operating officer?
17   A. I never had unfettered decision making in
18 anything in my life.
19   Q. Were all of your decisions subject to
20 approval by the dean?
21   A. They were subject to review and
22 communication with many people including the dean.
23   Q. Did the dean ever disagree with any of
24 the decisions that you made as chief operating
25 officer?

FAHED FAYAD, M.D. vs. UNIVERSITY OF MIAMI
LORD, JONATHAN on 02/18/2015

Pages 34..37

**Page 34**

1     A. I'm sure that he did.

2     Q. And tell me what the decisions he

3 disagreed with.

4     A. I have no earthly idea, I don't recall.

5     Q. When you became the chief operating

6 officer for the Health System, did you obtain the

7 separate employment letter?

8     A. Yes, I did.

9     Q. And that letter set forth the manner in

10 which you would be compensated?

11     A. Yes, it did.

12     Q. Were you paid more as the chief operating

13 officer than you were as the chief technology

14 officer?

15     A. Yes, I was.

16     Q. Or I'm sorry, chief innovation.

17     How much more?

18     A. Somewhere in the magnitude of $400,000.

19     Q. $400,000 more than you had been making

20 before?

21     A. Correct.

22     Q. And what were you making before as the

23 chief innovation officer?

24     A. I believe it was either 300- or 350,000.

25     Q. So when you became the chief operating

**Page 35**

1 officer, you were making approximately $700,000 or

2 more?

3     A. In excess of that, yeah.

4     Q. How much was Mr. Donelan making, do you

5 know?

6     A. I don't know the exact number, because he

7 had been there for a while. So there's all sorts

8 of pay inside of the system.

9     Q. Was it more or less than what you were

10 making?

11     A. I believe the base pay was comparable to

12 what his pay was.

13     Q. And when you say "base pay," there's

14 something in additional to base pay?

15     A. There is obviously all of the fringe

16 benefits that come with being working in an

17 organization, plus a bonus opportunity.

18     Q. So what -- how was the bonus opportunity

19 determined?

20     A. By a number of metrics.

21     Q. What were those metrics?

22     A. They are based on -- generally, I think

23 on financial performance as well as reputation of

24 the institution.

25     Q. So if the university performed better

**Page 36**

1 financially, you'd be entitled to a bigger bonus?

2     A. That is the way most bonuses work.

3     Q. Did you ever receive a bonus --

4     A. No, I did not.

5     Q. -- as the chief operating officer?

6     A. No, I did not.

7     Q. Any reason why not?

8     A. Well, in 2012 the university's financial

9 performance, fiscal year 2013 financial

10 performance was insufficient for anybody to get a

11 bonus, and I was not present at the end of the

12 fiscal year 2014.

13     Q. The fiscal year runs from when to when?

14     A. It runs from June 1st to May 31st.

15     Q. Okay. So when you started in March of

16 2012, you were already towards the end of the

17 prior fiscal year, correct?

18     A. Correct.

19     Q. So you were tasked with improving the

20 performance for the following fiscal year,

21 correct?

22     A. In general, I think every management team

23 was tasked with improving performance year over

24 year.

25     Q. And that fiscal year would have -- would

**Page 37**

1 run from July of 2012 to June of 2013?

2     A. It would have gone from June of 2012 to

3 the end of May of 2013.

4     Q. Okay. And were you responsible for

5 preparing the budgets for the fiscal year for the

6 health system?

7     A. Yes, I was.

8     Q. And what was your -- your responsibility

9 in that regard?

10     A. I don't understand.

11     Q. Okay. What did you have to do in order

12 to prepare the budgets?

13     A. We had to lay out the strategy. We had

14 to work with each clinical department in terms of

15 their targets, each of the hospitals in terms of

16 their targets, and we had to put expense controls

17 in place so we wouldn't find ourselves in the same

18 situation as we did in 2012.

19     Q. So there were multiple budgets that you

20 had to prepare?

21     A. Multiples.

22     Q. Okay. And were those budgets subject to

23 being approved by the board?

24     A. In -- at a consolidated form, yes. The

25 medical center budgets were integrated with the

FAHED FAYAD, M.D. vs. UNIVERSITY OF MIAMI
LORD, JONATHAN on 02/18/2015                                               Pages 38..41

Page 38

1  university budgets and those were approved by the
2  board of trustees.
3      Q. Okay. But the -- the individual budgets
4  for all of the clinics and hospitals, were those
5  subject to being approved by any board?
6      A. The individual hospitals had to go
7  through their board structure and have their base
8  budgets approved. Those were then integrated into
9  the medical center's budget. The medical center's
10 was integrated into the university's budget.
11     Q. And then those would have been submitted
12 to the board of trustees for approval?
13     A. Correct.
14     Q. And did you do that?
15     A. Yes, we did.
16     Q. When did you do that?
17     A. I think it was probably were all -- the
18 fiscal year ended May 31st, probably sometime in
19 the end of April, beginning of May 2012.
20     Q. And who did you work with at the
21 University of Miami Hospital in preparing their
22 budget?
23     A. Well, again, I think it was the finance
24 staff who reported to me, who worked with the
25 individual organizations. Dan Snyder at that

Page 39

1  point was the CEO of University of Miami Hospital
2  and he would have worked with his financial team
3  to prepare a budget, then came to the medical
4  center.
5      Q. Would that have gone to you for approval
6  before it went to the University of Miami
7  Hospital's board for approval?
8      A. Absolutely.
9      Q. Do you recall them submitting their
10 budget to you for approval?
11     A. I recall reviewing their budgets and I
12 recall consolidating their budgets into the
13 medical center's budget, but I don't recall any
14 specifics.
15     Q. Did you disagree with any of the budgets
16 prepared by the University of Miami Hospital?
17     A. I don't recall.
18     Q. Did you have any discussions with
19 Ms. Chulick about University of Miami Hospital
20 before she was terminated?
21     A. I'm sure that I did.
22     Q. Did she -- were you aware of the
23 commitments that the university had made to the
24 private physicians at the University of Miami
25 Hospital when they acquired the hospital?

Page 40

1      A. I had no understanding of the prior
2  commitments. I understand that while I was there
3  there was some activity between the private
4  physicians and the dean and that the dean
5  recommitted to a set of principles.
6      Q. And what was your understanding of what
7  those principles were?
8      A. Again, I don't have a lot of specifics,
9  but they related to the continued presence of the
10 community physicians at UMH and how people could
11 become involved with the faculty and how marketing
12 efforts might be put in place.
13     Q. Okay. Well, it included, did it not,
14 equal access to resources at the hospital for the
15 private physicians?
16     A. I don't recall the specifics.
17     Q. You don't that.
18         How about the -- when you mentioned about
19 faculty, were you aware that the private
20 physicians were not required under the bylaws to
21 become a faculty member of the university?
22         MS. RAGATZ: Object to the form.
23         THE WITNESS: I knew that people did not
24 have to do anything, because you don't have
25 to do anything in life, but I think my

Page 41

1      perception was that there were more people
2      who wanted to have the ability to become
3      faculty as opposed to not.
4  BY MR. LOPEZ:
5      Q. Okay. Well, how did you develop that
6  perception?
7      A. I always perceived in my entire medical
8  career that there is something that was
9  advantageous in terms of being recognized as a
10 faculty member.
11     Q. Did you have any discussions with any of
12 the private physicians of UMH about becoming a
13 faculty member?
14     A. No, I did not.
15     Q. So you don't know if any of those private
16 physicians ever wanted to be a faculty member?
17     A. I have no clue.
18     Q. So your perception that -- wanted to
19 become faculty members had nothing to do with the
20 actual private physicians at UMH?
21     A. I would say it was a general impression
22 about people's attitude in the profession.
23     Q. Were you also aware that the bylaws
24 provided that private physicians would not be
25 disadvantaged if they chose not to become a

Page 42

1  faculty member?
2      A. I don't recall and I don't think I -- I
3  mean, if I read the bylaws -- again, my focus in
4  the beginning in March 2012 was to deal with a
5  financial turnaround at the university and that
6  was an all-consuming effort.
7      Q. The -- your understanding of the
8  principles that the dean had implemented at UMH
9  was -- was your understanding gained through
10 discussions with the dean?
11     A. Yes, it was.
12     Q. What did he tell you about those
13 principles?
14     A. Just that he was working with them, and I
15 think he was meeting with leadership periodically
16 to develop and finalize them, but again, that was
17 not in the area that I was particularly focused on
18 at the time.
19     Q. Did you have any discussions with anyone
20 other than the dean about those principles?
21     A. I may have had a discussion with Dan
22 Snyder, I don't recall.
23     Q. Did you have any discussions with any of
24 private physicians at UMH about those principles?
25     A. No, I did not.

Page 43

1      Q. Have you ever had any discussions with
2  any of the private physicians at UMH?
3      A. You know, I've probably met them in a
4  social setting around a medical staff meeting or
5  medical executive meeting. I know that I met with
6  Dr. Fayad once that about -- about it. And that
7  was again, in general, given what I was
8  responsible for and I believe that needed to be
9  done it was not an area of primary focus for me.
10     Q. When did you cease becoming the -- strike
11 that.
12        When you became the vice president for
13 the medical administration, did you receive
14 another employment letter for that position?
15     A. Yes, I did.
16     Q. Okay. So that had separate compensation?
17     A. It'd be hard to describe it as
18 "separate." It was updated based on the change in
19 title.
20     Q. So you were going to be making more
21 money?
22     A. Correct.
23     Q. So you were making an excess of $700,000
24 when you became the chief operating officer in
25 March of 2012, correct?

Page 44

1      A. Correct.
2      Q. And in June of 2012, when you became the
3  vice president of the medical administration, how
4  much more were you making?
5      A. Approximately $150,000 more.
6      Q. What additional duties and
7  responsibilities did you have as the vice
8  president for medical administration?
9      A. From the standpoint of technical, I had a
10 reporting relationship with the board and with the
11 leadership at that time.
12     Q. Any other differences?
13     A. No other differences.
14     Q. Any reason why you were paid $150,000 for
15 that limited role?
16        MS. RAGATZ: Object to the form.
17        THE WITNESS: I think because it was part
18     and parcel with the promotion to include the
19     vice president title.
20 BY MR. LOPEZ:
21     Q. Did you feel that that was appropriate
22 given the financial circumstances of the
23 university?
24     A. I think it was appropriate given the fact
25 that we had restructured, but at that point in

Page 45

1  time we had restructured the run rate of the
2  university and we were in a completely different
3  spot relative to looking through 2014 fiscal year
4  what the expense profile university would be, and
5  we had essentially at that point righted the ship.
6      Q. In June of 2012, you had righted the
7  ship?
8      A. By virtue of reducing the expenses, the
9  run rate of the expense side was now less than the
10 revenues coming into the institution.
11     Q. So is the answer, yes, you righted the
12 ship by June of 2012?
13     A. Correct.
14     Q. And so because you had righted the ship,
15 by then you felt it was appropriate to pay
16 yourself another $150,000?
17        MS. RAGATZ: Object to the form.
18        THE WITNESS: I didn't pay myself
19     anything.
20        And secondly, I think it was commensurate
21     with compensation was paid to others at the
22     university and it was in terms of comparison
23     to others -- others at the university. It
24     was still less than other leaders were paid.
25 BY MR. LOPEZ:

FAHED FAYAD, M.D. vs. UNIVERSITY OF MIAMI
LORD, JONATHAN on 02/18/2015                                                 Pages 46..49

Page 46

1    Q. Well, were you making more or less than
2  Mr. Donelan?
3      A. I have no idea.
4    Q. You don't know what Mr. Donelan was being
5  paid?
6      A. I told you I think -- I don't know all of
7  his compensation and compensation varies based on
8  tenure and fringes and other things at the
9  university.
10   Q. Who did you feel to be comparable in
11 leadership role with you at the university?
12     A. There were people who were at both the
13 university level who were responsible for parts of
14 the organization or all the organization. There's
15 the dean, there are people in the institution who
16 had administrative responsibilities as well as
17 clinical responsibilities.
18   Q. You testified before that you felt that
19 you were -- you were being paid less than some
20 other comparable leadership roles?
21     A. I believe that there were several other
22 people at the university who paid substantially
23 more than I was.
24   Q. And who were those people?
25     A. Again, the -- I believe there are

Page 47

1  department chairs, clinical departments, and I
2  believe that there were administrative roles,
3  including the dean that were paid more,
4  substantially more.
5    Q. And there were all in -- as part of the
6  university health system, correct?
7      A. That's correct.
8    Q. And you were responsible for cutting
9  expenses for the university health system,
10 correct?
11     A. That is correct.
12   Q. Did you ever consider cutting those
13 people's compensation?
14     A. As I said earlier, there are
15 substantially different rules for employees from
16 faculty members. Faculty members are subject to
17 and work under a faculty manual which has very
18 clear provisions for either a change in
19 compensation or termination of employment.
20   Q. So is it your testimony that you didn't
21 have the ability to change those people's
22 compensation?
23     A. That will be correct.
24   Q. That would be the board would have to do
25 that?

Page 48

1      A. I don't believe that the board could do
2  it without going through a very cumbersome...
3    Q. Who has the ultimate authority to change
4  compensation for those individuals?
5      A. Ultimately the board would, subject to
6  following the rules of the faculty manual.
7    Q. What about the people that you mentioned,
8  the clinical chairs and the people in the
9  administrative roles, they were all faculty
10 members?
11     A. The clinical chairs were and they may
12 have been one or two administrative people who
13 were not faculty, but it would be one or two, it
14 would not be the majority.
15   Q. You had the ability to change their
16 compensation, did you not?
17     A. I did.
18   Q. Did you, in fact, change their
19 compensation?
20     A. Some cases I did.
21   Q. Who -- tell me who you changed.
22     A. I don't recall.
23   Q. You lowered their salary?
24     A. I probably increased their salary.
25   Q. Any reason why you increased their

Page 49

1  salary?
2      A. For performance in a very difficult set
3  of circumstances.
4    Q. Other than Ms. Chulick, did you terminate
5  any other individuals affiliated with the
6  University of Miami Hospital?
7      A. As I said, the CFO of the health system,
8  Ted Shaw.
9    Q. Right.
10     Other than those two, anybody at
11 University of Miami Hospital that --
12     A. There was a change in CEO that took place
13 sometime around first week in March, second week
14 in March, I believe.
15   Q. And who was the CEO?
16     A. I believe his name was Tony Degina.
17   Q. And he was the CEO of?
18     A. University of Miami Hospital.
19   Q. And then he no longer was the CEO of in
20 the second week of March 2012?
21     A. Sometime in March. It was early.
22   Q. Was he fired?
23     A. I think he was offered another position
24 within the university.
25   Q. Was he fired?

FAHED FAYAD, M.D. vs. UNIVERSITY OF MIAMI
LORD, JONATHAN on 02/18/2015

Pages 50..53

Page 50

1        MS. RAGATZ: Object to the form.
2        He just answered the question.
3        THE WITNESS: I believe he was offered
4     another position in the university.  He was
5     asked to leave his role.
6  BY MR. LOPEZ:
7        Q.  Okay.  So he was fired?
8        MS. RAGATZ: Object to the form.
9        THE WITNESS: I said he was asked to
10     leave his role.
11  BY MR. LOPEZ:
12        Q.  Okay.  Is there some reason why you don't
13  want to use the word "fired"?
14        A.  Because I don't know if that was
15  appropriate or not.
16        Q.  Okay.  You think if someone is asked to
17  leave if they are not being fired?
18        A.  I think people can be asked to leave for
19  many reasons.
20        Q.  My question is:  If someone is asked to
21  leave, you don't consider that to be fired?
22        A.  No, I don't.
23        Q.  Who asked Mr. Degina to leave?
24        A.  I believe Ms. Chulick.
25        Q.  And why did she ask Mr. Degina to leave?

Page 51

1        A.  I believe it was around financial
2  performance of the University of Miami Hospital.
3        Q.  Did you tell her to ask him to leave?
4        A.  I did not tell her.  We discussed the
5  financial performance of the University of Miami
6  Hospital and it was clear that it was one of the
7  things that needed to be fixed in terms of the
8  overall improvement performance of the medical
9  center for the future.
10        Q.  And you had those discussions with
11  Ms. Chulick in the very first week of March?
12        A.  Probably.
13        Q.  Was that the first thing that you did as
14  the chief operating officer?
15        A.  No, it wasn't.
16        Q.  Okay.  When did you first have
17  discussions with Ms. Chulick about the financial
18  performance of the University of Miami Hospital?
19        A.  I would guess the week or two before the
20  first of March, before I took on the role.
21        Q.  Why were you talking to her about that
22  before you even took on the role?
23        A.  Because we had announced that I would be
24  taking on the role March 1st, and in preparation
25  for that, I was doing things that were baselined

Page 52

1  get me informed about the performance of different
2  parts of the University.
3        Q.  Did you tell her at that time that you
4  were going to be terminating her?
5        A.  No, I did not.
6        Q.  Why not?
7        A.  I had no idea what her role was.  I had
8  no idea about the situation of people who were
9  working for her.  For all intents and purposes,
10  that was when I first met her.
11        Q.  Okay.  When you first met her, you had no
12  idea what her role was?
13        A.  I knew what her title was, I didn't know
14  what she was responsible for day in and day out.
15        Q.  Did someone tell you to go and talk to
16  her?
17        A.  No one told me anything about meeting
18  with people.  I went ahead and I met with people
19  who were going to become my direct reports.
20        Q.  And she was going to be one of your
21  direct reports?
22        A.  Correct.
23        Q.  And who told you she was going to be one
24  of your direct reports?
25        A.  The dean, and that's the way the role was

Page 53

1  structured.
2        Q.  Okay.  And so you knew she was going to
3  be a direct report, but you had no idea other than
4  what her title was, what -- what her role was?
5        A.  In terms of what her day-to-day
6  activities were, that's correct.
7        Q.  Okay.  When you first met her, did you
8  talk about what her role was?
9        A.  Yes, we did.
10        Q.  Okay.  And you had an understanding after
11  that first meeting about what her role was?
12        A.  Yes, I did.
13        Q.  And did you think she was doing a good
14  job at that point?
15        A.  I had no idea.
16        Q.  Well, you discussed the performance of
17  the University of Miami Hospital, correct?
18        A.  Correct.
19        Q.  What exactly did you discuss with her
20  about Mr. Degina?
21        A.  I don't recall.
22        Q.  Whose decision was it to ask him to
23  leave?
24        MS. RAGATZ:  Object to the form.
25        THE WITNESS:  You know, again, I think it

FAHED FAYAD, M.D. vs. UNIVERSITY OF MIAMI
LORD, JONATHAN on 02/18/2015                                    Pages 54..57

Page 54

1     was based on my conversations with
2     Ms. Chulick and a sense of performance and
3     timing of the change in the -- the immediacy
4     of situation. There was probably
5     conversation between Michele and myself, and
6     perhaps including the dean, and we made that
7     decision collectively.
8  BY MR. LOPEZ:
9        Q. Do you recall meeting with the dean about
10 that?
11       A. I met with the dean hundreds of times a
12 week and I'm sure that we talked about that.
13       Q. And he approved of asking Mr. Degina to
14 leave?
15       A. Yes, he did.
16       Q. And Mr. Degina was asked to leave in the
17 second week of March?
18       A. It was sometime in March.
19       Q. Did you have any discussions with
20 Mr. Degina?
21       A. No, I did not.
22       Q. Any reason why you did not?
23       A. I had millions of things going on that
24 needed my attention relative to getting the
25 organization ready for a major event relative to

Page 55

1  the reduction.
2        Q. And who replaced Mr. Degina as the CEO of
3  the University of Miami Hospital?
4        A. I believe Dan Snyder.
5        Q. And who hired Mr. Snyder?
6        A. Ms. Chulick.
7        Q. Did you have any involvement in the
8  hiring process of Mr. Snyder?
9        A. Yes, I did.
10       Q. Did you recommend that he be hired?
11       A. Yes, I did.
12       Q. Okay. And why did you recommend that he
13 be hired?
14       A. Because I believe he was completely
15 competent in running hospitals, he ran hospitals
16 that were larger than the University of Miami
17 Hospital, including academic and medical centers.
18       Q. And how did you find him?
19       A. I've known him for 30-plus years.
20       Q. Okay. And how have you known him for
21 30-plus years?
22       A. We both served on active duty in the Navy
23 together.
24       Q. Okay. So he was one of your close
25 friends?

Page 56

1        MS. RAGATZ: Object to form.
2        THE WITNESS: We never said that he was a
3  close friend, but I knew him for 30 years.
4  BY MR. LOPEZ:
5        Q. Would you consider him a friend?
6        A. I would consider him an acquaintance.
7        Q. So you don't consider him to be a friend?
8        A. No, I do not.
9        Q. Never have?
10       A. No.
11       Q. And where was Mr. Snyder working at the
12 time?
13       A. Mr. Snyder was starting a role at the
14 University of Miami working at the U.M. tissue
15 bank.
16       Q. So you knew him when you were the chief
17 innovation officer, correct?
18       A. I've known him for 30 years.
19       Q. No, but I mean, as the chief innovation
20 officer, you had responsibilities for the tissue
21 bank; did you not?
22       A. I did.
23       Q. And Mr. Snyder was working for the tissue
24 bank?
25       A. He was just hired to start to become the

Page 57

1  CEO of tissue bank.
2        Q. When was that?
3        A. That was sometime in February of 2012.
4        Q. Did you hire him for that position?
5        A. Yes, I did.
6        Q. And where was he working before then?
7        A. He was working for the healthcare system
8  in Singapore.
9        Q. And did you recruit him for the position
10 for the CEO of the tissue bank?
11       A. Yes, I did.
12       Q. And how is it that you picked him?
13       A. We needed a strong administrative leader
14 in that position. We interviewed multiple people
15 and he was the best candidate.
16       Q. You did a search then for the position?
17       A. We did not use a search firm.
18       Q. So how did you determine who to interview
19 for the position?
20       A. There were several candidates locally
21 that we were recommended to interview as well as
22 Dan.
23       Q. Well, who recommended -- who recommended
24 him?
25       A. I did.

**Page 58**

1 Q. Okay. Why did you recommend him?
2 A. Because I believe he was competent to do
3 that job.
4 Q. Did you believe that there was no one
5 else competent to do the job?
6 A. I'm sure there were other competent
7 people, but among the candidates we had at the
8 time he was the most competent.
9 Q. And who approved his hiring for the
10 tissue bank?
11 A. The dean and Joe Natoli who's the CFO.
12 Q. And so when Mr. Degina was asked to
13 leave, you handpicked Mr. Snyder to take over as
14 the CEO of the hospital?
15 A. I recommended that as an interim Dan fill
16 that role because he was onsite and he's had a
17 history of managing hospitals and academic medical
18 centers.
19 Q. And when you say that you "recommended"
20 him, who did you recommend that to?
21 A. The dean.
22 Q. Okay. And you recommended that he act as
23 the interim CEO?
24 A. Correct.
25 Q. And the dean approved that?

**Page 59**

1 A. Correct.
2 Q. And did he ultimately become the CEO?
3 A. Yes, he did.
4 Q. How soon after becoming the interim CEO
5 did he become the CEO?
6 A. My recollection was about six to eight
7 weeks.
8 Q. Any reason why he wasn't appointed CEO
9 immediately?
10 A. In part because I think there's a process
11 that needed to be followed relative to
12 interactions with the community physicians,
13 medical staff, the board of UMH, and I think it
14 was getting a sense of is this a good match and
15 was there feedback that was positive about how his
16 performing during that interim role.
17 Q. Okay. Did you get positive feedback
18 about his performance as interim CEO?
19 A. We did.
20 Q. Was it positive?
21 A. Yes.
22 Q. Who gave you that feedback?
23 A. It's a combination of staff at UMH as
24 well as Michele.
25 Q. Okay. Who in the staff at UMH gave you

**Page 60**

1 positive feedback about Dan Snyder's performance?
2 A. During that time, David Zambrano, Kim
3 Manni. I can't recall others.
4 Q. What was Mr. Zambrano's position?
5 A. He was the chief nursing officer, maybe
6 interim chief operating officer at the time.
7 Q. And Kim Manni, what was her position?
8 A. She was head of the cardiovascular
9 service line.
10 Q. Did you talk to any private physicians
11 about Mr. Snyder's performance?
12 A. No, I did not.
13 Q. Any reason why not?
14 A. Didn't know them and, you know, again,
15 relied on Michele's comments to me about how Dan
16 was doing.
17 Q. And she told you that she was doing good?
18 A. Right.
19 Q. You had testified one of the -- one of
20 the things that you wanted to make sure before
21 making him CEO was that -- how he would interact
22 with the private physicians, correct?
23 A. Right.
24 Q. Did anybody tell you that he was
25 interacting well with the private physicians?

**Page 61**

1 A. Michele.
2 Q. Anybody else?
3 A. Maybe David or Kim, I'm not sure.
4 Q. When did you terminate Ms. Chulick?
5 A. I think towards the end of April.
6 Q. So she would have given you that feedback
7 in that first month?
8 A. Probably.
9 Q. Okay. Did you get any feedback from
10 anybody after she was terminated about
11 Mr. Snyder's performance?
12 A. I did.
13 Q. Anybody other than the people that you
14 just mentioned?
15 A. Some of the members of the board of
16 trustees of the hospital, I guess they are called
17 board of directors of the hospital.
18 Q. The board of governors?
19 A. Yeah.
20 Q. Who from the board?
21 A. Arthur Hertz and Phil George.
22 Q. And how would those individuals know how
23 Mr. Snyder was performing at the hospital?
24 MS. RAGATZ: Object to the form.
25 THE WITNESS: I would assume, as in any

FAHED FAYAD, M.D. vs. UNIVERSITY OF MIAMI
LORD, JONATHAN on 02/18/2015

Pages 62..65

Page 62

1 director's role, what they saw in terms of
2 presentations and interactions with him and
3 how he interacted with other people.
4 BY MR. LOPEZ:
5 **Q. Were these discussions you had with the**
6 **board, were they at board meetings?**
7 A. Principally.
8 **Q. So you attended board of governor**
9 **meetings at the university --**
10 A. I tried to, yes.
11 **Q. When you say you "tried to," what does**
12 **that mean?**
13 A. I tried to get to as many as I could. I
14 don't know if I was there for every one of them.
15 **Q. Okay. And those discussions with the**
16 **board happened after you terminated Ms. Chulick?**
17 A. Yes.
18 **Q. Did you -- and you told the board that**
19 **you had terminated Ms. Chulick?**
20 A. Yes, I did.
21 **Q. What was Mr. Snyder tasked to do as the**
22 **CEO of -- the new CEO of the hospital?**
23 A. He needed to work on the financial
24 performance, and another immediate activity that
25 we had to do deal was a contract with the 1199SEIU

Page 63

1 for staff. There is a Collective Bargaining
2 Agreement, it was due for renewal on May 31, 2012,
3 and occupied a significant amount of time because,
4 obviously, labor costs for a hospital are very
5 significant.
6 **Q. And was that accomplished?**
7 A. Yes, it was.
8 **Q. And when was that accomplished?**
9 A. It was accomplished about a week before
10 it was ready to be terminated. So about the third
11 week in May.
12 **Q. You testified that Mr. Degina was offered**
13 **another position at the university?**
14 A. I believe he was.
15 **Q. What position was that?**
16 A. I don't recall the specifics, but I think
17 it had something to do with working with community
18 physicians and community practices of the
19 university.
20 **Q. And he did accept that offer?**
21 A. I believe he stayed on for a while and
22 then went and sought employment someplace else.
23 **Q. Was that offer considered a demotion for**
24 **him?**
25 A. I think any time your role and title

Page 64

1 changes from CEO, it would be considered a
2 demotion.
3 **Q. And did you ever have any discussions**
4 **with him about his leaving the position of the**
5 **CEO?**
6 A. No, I did not.
7 **Q. Did you ever have any discussions with**
8 **him at all?**
9 A. I probably met with him informally in the
10 first couple of weeks in March, but no specifics
11 that I can recall.
12 **Q. Did you discuss the financial performance**
13 **of the hospital with him?**
14 A. I do not believe I did.
15 **Q. When did you cease becoming the COO for**
16 **the university health system?**
17 A. I think technically, I believe it was
18 January 31, 2013, but I transitioned beginning
19 January 1, 2013.
20 **Q. Okay. And was the transition as well**
21 **with regard to the position of vice president**
22 **medical administration?**
23 A. Yes, it was.
24 **Q. Were you fired?**
25 A. I was terminated.

Page 65

1 **Q. And who terminated you?**
2 A. The dean.
3 **Q. And why were you terminated?**
4 A. I would say you have to ask him.
5 **Q. He never told you why he was terminating**
6 **you?**
7 A. He told me that he felt that it was time
8 for me to no longer be in the role.
9 **Q. Okay. Did he give you any other reason?**
10 A. No, he did not.
11 **Q. Did you ask?**
12 A. No, I did not.
13 **Q. Okay. Why didn't you ask?**
14 A. Because it was a very clear message --
15 **Q. Well, what was the --**
16 A. -- made.
17 **Q. -- what was the clear message?**
18 A. The message was that I was no longer
19 needed or wanted there.
20 **Q. Okay. Why did you feel that you were no**
21 **longer needed or wanted there?**
22 A. Because I was terminated.
23 **Q. And -- but they had no specific reasons?**
24 A. No specific reasons.
25 **Q. And you weren't interested in knowing**

FAHED FAYAD, M.D. vs. UNIVERSITY OF MIAMI
LORD, JONATHAN on 02/18/2015                                                                 Pages 66..69

Page 66

1 what the -- why specifically you were being asked
2 to leave?
3        A. No.
4        Q. Did you have any discussions with anybody
5 else besides the dean about your termination?
6        A. The president stopped by my office to
7 thank me for my time at the university.
8        Q. That is President Shalala?
9        A. Correct.
10       Q. When was that?
11       A. Sometime in the first week in January.
12       Q. And did she tell you why you were being
13 asked to leave?
14       A. No.
15       Q. Did you ask her?
16       A. No.
17       Q. Did you have any discussions with anybody
18 else about your termination?
19       A. I went through the process of
20 transitioning with Joe Natoli, who is the CFO and
21 who became interim chief operating officer, not
22 specifically about my termination, but about the
23 priorities that needed to be addressed going
24 forward and the issues that were pending for the
25 remainder of the fiscal year.

Page 67

1        Q. He took over as the COO of the health
2 system?
3        A. Yes, he did.
4        Q. Did you feel that you had accomplished
5 the goals that you were tasked with achieving?
6        A. We had taken an organization that had
7 lost about $60 million in 2013 fiscal year and it
8 was on a run rate to make about $27- to
9 $30 million to the positive. That was a
10 $90 million improvement, and I was quite satisfied
11 with the fact that we had completely righted the
12 ship.
13       Q. So is it your testimony that you achieved
14 the goals that you were tasked to?
15       A. Yes.
16       Q. Were you surprised that you were
17 terminated?
18       A. Yes.
19       Q. It is because you had achieved the goals?
20       MS. RAGATZ: Object to the form.
21       THE WITNESS: I told you I don't
22       understand why.
23 BY MR. LOPEZ:
24       Q. Okay. That is why you were surprised?
25       A. Yes.

Page 68

1        Q. Any other reason?
2        A. No.
3        Q. And you never asked anybody?
4        A. No.
5        Q. Did people ever complain that you were a
6 bully?
7        A. I don't know what people complained
8 about.
9        Q. You never heard any complaints about you
10 being a bully?
11       A. I think there were certainly comments
12 about the fact that in order to achieve the
13 financial results, decisions were made in the
14 organization that had a hard time making decisions
15 relative to change and holding people accountable.
16       Q. Well, people from the university have
17 testified in this action that they complained that
18 you were a bully, would they be telling the truth?
19       MS. RAGATZ: Object to the form.
20       THE WITNESS: I have no idea what they
21       would testify. I have no idea what they
22       would be thinking.
23 BY MR. LOPEZ:
24       Q. Did you ever hear any complaints that you
25 were acting as a bully?

Page 69

1        A. No, I did not hear anybody use that
2 phrase.
3        Q. Did you hear any complaints about you?
4        A. I think there were complaints about
5 change, there was discomfort with change, there
6 was discomfort with people being held accountable
7 for their performance.
8        Q. Okay. And isn't it true that there was a
9 petition circulated among the university, a no
10 confidence vote in you?
11       A. There was a petition that included the
12 dean and myself.
13       Q. So the university -- there was a petition
14 circulating no confidence vote for both you and
15 the dean?
16       A. Correct.
17       Q. Did you have any discussions with anybody
18 about that?
19       A. Certainly with the dean.
20       Q. Okay. And what did you discuss with him?
21       A. Just the fact that this was a set of
22 circumstances caused by people who were
23 uncomfortable with the fact that life could not go
24 on the way it always had gone on.
25       Q. Were you offered any other positions at

Page 70

1 the university?
2      A. No, I was not.
3      Q. Did you continue as professor at the
4 university?
5      A. I did.
6      Q. Until how long?
7      A. Until July 31, 2013.
8      Q. And why did you leave?
9      A. I was not reappointed to the faculty.
10     Q. And why weren't you reappointed to the
11 faculty?
12        MS. RAGATZ: Object to the form.
13        THE WITNESS: I have no idea, but the
14     change was made per the faculty manual.
15 BY MR. LOPEZ:
16     Q. Who told you that you were no longer
17 appointed to the faculty?
18     A. The provost.
19     Q. And who was that?
20     A. Tom LeBlanc.
21     Q. What did -- why did he -- what did he
22 tell you about why you weren't being appointed --
23 reappointed?
24     A. Nothing more than that since I wasn't
25 continuing in my administrative role, I wouldn't

Page 71

1 be continuing as a faculty member.
2      Q. Are all faculty members at the university
3 in an administrative role?
4      A. No.
5      Q. Okay. Why is it then that he felt that
6 you could not be reappointed because you were no
7 longer --
8      A. Because my --
9        MS. RAGATZ: Object to the form.
10       THE WITNESS: -- because my principle
11     responsibility was administrative.
12 BY MR. LOPEZ:
13     Q. Was the University of Miami Hospital's
14 radiation oncology department considered part of
15 the hospital proper?
16     A. As far as I knew it was, yes.
17     Q. Now, you're familiar, are you not, with
18 the university's plans to align the radiation
19 oncology service line between UMH and Sylvester?
20     A. I became aware that there was a plan to
21 do that.
22     Q. Now, the university stated in this
23 lawsuit that at the leadership level you were the
24 one who initially came up with the idea; is that
25 true?

Page 72

1      A. That is not correct.
2      Q. Who initially came up with the idea?
3      A. I have no idea.
4      Q. Well, how did --
5      A. It was either someone in Sylvester's
6 leadership or within the dean's leadership, but it
7 was not me.
8      Q. Okay. How was it that you found out the
9 plan?
10     A. I believe the dean told me about the
11 plan.
12     Q. And when was the first time the dean told
13 you about the plan?
14     A. Again, in the macro of things, I really
15 don't recall. It was not a major issue for me in
16 terms of the things that I was trying to work on
17 or do.
18     Q. Why wasn't it a major issue for you?
19     A. Probably because the relevant size of the
20 revenue was not something that I was focused on.
21     Q. You don't recall when the dean first told
22 you about the plan?
23     A. I would guess it was sometime in the fall
24 of 2012, but it's simply a guess.
25     Q. Okay. What did he tell you about the

Page 73

1 plan?
2      A. Again, my recollection is that it was
3 something to do with Sylvester leadership had been
4 working on this, Dr. Pollack and his group had
5 been focused on this, and that this was something
6 that we needed to do to create additional patient
7 access for patients who were needing radiation
8 oncology at Sylvester.
9        I would say contextually there's always
10 been conversations about trying to make the
11 University of Miami healthcare system feel much
12 more like a system and provide an operation that
13 was both more efficient and more consistent.
14     Q. Who at the Sylvester leadership initially
15 came up with the plan?
16     A. Again, I don't know. It could have been
17 anybody on the administrative side, like Ballard,
18 it could have been Dr. Nimer, it could have been
19 Dr. Pollack, it could have been them collectively.
20     Q. What role, if any, did you have in the
21 plan?
22     A. Virtually none except, I think, the time
23 I met with Dr. Fayad.
24     Q. Okay. Now, you mentioned that the dean
25 had stated that -- that this had been in the works

Page 74

1  to create access for the patients at Sylvester?
2      A.  I think what I stated was the dean had
3  told me that there's -- had been some work to try
4  to create alignment between Sylvester and UMH
5  radiation oncology for a while.  I don't recall
6  specifics of some of the other things he might
7  have added to that conversation.
8      Q.  So that the patients at Sylvester could
9  seek treatment at those facilities, right?
10     A.  I think it was really about the fact that
11  we had an increasing amount of demand for
12  services, and given the fact that we had radiation
13  oncology equipment at UMH, and we had a hospital
14  that was branded UMH, that it would make sense for
15  patients to be able to be seen and use that
16  capacity as efficiently as possible.
17     Q.  Were you aware that the -- that there was
18  a -- that the inability to treat patients at
19  Sylvester was created because Dr. Pollack had
20  decommissioned one of the line acts at Sylvester?
21         MS. RAGATZ:  Object to the form.
22         THE WITNESS:  I'm not aware of that.
23  BY MR. LOPEZ:
24     Q.  You didn't know that?
25     A.  No.

Page 75

1      Q.  Were you aware that patients from
2  Sylvester could be treated at the facilities at
3  UMH?
4      A.  I was aware of that from the standpoint of
5  patients going to UMH, so it was complexity
6  relative to contracts with managed care and that
7  there may be payment level differences between
8  patients treated at Sylvester versus patients
9  being treated at UMH.
10     Q.  Because if they were treated at UMH, they
11  would have to be billed under UMH's rates,
12  correct?
13     A.  That's correct.
14     Q.  And UMH charged less than what Sylvester
15  charges for those services?
16     A.  I don't remember the specifics, but in
17  general, that would probably be true.
18     Q.  Dr. Lord, let me show you what was marked
19  as Exhibit 9, which is a letter from you and the
20  dean to Dr. Fayad, dated October 29, 2012.
21         Why don't you just read that to yourself
22  and then let me know when you are done.
23     A.  Sure.
24         There is the letter from the dean that I
25  cosigned.

Page 76

1      Q.  Okay.  And it's dated October 29, 2012,
2  correct?
3      A.  Correct.
4      Q.  And the first sentence says, "We enjoyed
5  meeting with you the past Friday."
6      A.  Correct.
7      Q.  So you had a meeting with Dr. Fayad the
8  Friday before this letter?
9      A.  Yes.
10     Q.  And that meeting was in the dean's
11  office?
12     A.  Yes, it was.
13     Q.  Okay.  And what was the purpose of the
14  meeting?
15     A.  The meeting, I believe, was organized by
16  the dean.  I generally attended many of the
17  meetings that the dean organized.  And I believe
18  it was to communicate with Dr. Fayad what plans
19  there were for the ways that Sylvester and UMH
20  would be working together in the future.
21     Q.  And how did you find out about those
22  plans?
23     A.  Again, we just been through this, from
24  the dean.
25     Q.  Okay.  So when did the dean -- how soon

Page 77

1  before this meeting did the dean tell you about
2  the plans?
3      A.  I would say it was sometime within two or
4  three weeks of that meeting.  That is why I said I
5  recall sometime in the fall.
6      Q.  Okay.  And had the plan already been
7  approved?
8      A.  You know, I think we're talking about the
9  plan as if there was some written document.  I
10  don't recall ever seeing a written document or
11  plan.  I think it was a -- probably as much a
12  concept in the way it was presented to me as a
13  plan.
14     Q.  Okay.  Because it says, "We shared our
15  plans."
16         Do you see that there?
17     A.  I do.
18     Q.  Okay.  So the university had plans to
19  create alignment between the radiation oncology
20  services of Sylvester and UMH?
21     A.  Correct.
22     Q.  Okay.  And the dean told you a few weeks
23  before this meeting with Dr. Fayad about those
24  plans?
25     A.  About the approach that would be taken.

FAHED FAYAD, M.D. vs. UNIVERSITY OF MIAMI
LORD, JONATHAN on 02/18/2015

Pages 78..81

Page 78

1    Q. When you had those discussions with the
2 dean, did the dean tell you that the plans had
3 already been approved?
4    A. I didn't know who they needed to be
5 approved by, but at the point -- and my belief is
6 inside of the way the enterprise worked, the dean
7 was relatively autonomous to do what he wanted to
8 do. So I assume that they were approved by him.
9    Q. Okay. Did he tell you that he approved
10 them?
11    A. No, he didn't tell me he approved them,
12 because he didn't have to tell me that he approved
13 them. He said, This is basically what we are
14 doing.
15    Q. Okay. And why was he telling you that?
16    A. I think because out of the courtesy to
17 let me know what was going on, and because I think
18 he wanted me to be involved in helping him oversee
19 this happen.
20    Q. So he wanted your involvement in these
21 plans?
22    A. I would assume so. I can't tell you what
23 he was thinking, but I would assume so.
24    Q. So he never told you, I want your
25 involvement in these plans?

Page 79

1    A. Not specifically.
2    Q. Okay. Well, how about indirectly?
3    A. I can't -- the indication was he asked me
4 to join this meeting with Dr. Fayad, it was his
5 meeting.
6    Q. Okay. Did he ever tell you that he
7 wanted you to oversee these plans to create
8 alignment?
9    A. No. But in the form of the way that we
10 worked together once he had this, you know, in
11 motion I would probably be the one to be
12 overseeing how it would be implemented.
13    Q. And why was -- would you be the one
14 overseeing how it would be implemented?
15    A. Because I think that is the way our
16 relationship worked. I think he was responsible
17 for strategy and direction and I was responsible
18 for overseeing the fact what he wanted to get done
19 was done.
20    Q. Okay. Were you not responsibile for
21 strategy and direction?
22    A. Not in the same formal way that he was.
23 I certainly participated in strategy when it came
24 to financial strategy and dealing with expense
25 management and other things, those areas that I

Page 80

1 was directly responsible for coming up with the
2 strategy and getting his approval. Nothing was
3 ever done at the medical center without the dean's
4 approval.
5    Q. And these plans were not something that
6 you had any involvement with the strategy and
7 direction?
8    A. That's correct.
9    Q. And you testified that you believed that
10 the people responsible for that strategy and
11 direction were leadership at Sylvester, correct?
12    A. Correct.
13    Q. Any reason why those people weren't
14 directed to oversee implementation of the plan?
15    A. They probably would be and we had
16 multiple levels of oversight.
17    Q. Okay. What was your responsibility for
18 oversight of the plans?
19    A. Again, I have no idea, I never saw -- my
20 involvement in this entire activity was sitting in
21 this meeting with the dean, cosigning this letter
22 and, you know, I understand from reviewing other
23 documents that Dr. Fayad sent via additional
24 e-mails, but that was really the -- all I had to
25 do with this activity.

Page 81

1    Q. So the dean wanted you to oversee
2 implementation of the plan?
3    A. I never said that.
4    Q. Okay.
5    A. I said the dean would normally expect
6 that I would oversee implementation of just about
7 everything that he approved.
8    Q. Okay. Was it your understanding that you
9 were to oversee implementation of this plan?
10    A. Let me try to back up.
11    There was no specific conversation about
12 that. This activity was relatively new, and I
13 don't mean to trivialize Dr. Fayad in this work,
14 very minor relative to the things that I needed to
15 manage at the university. If there was a plan and
16 if it was to be implemented and the people who
17 were listed here were responsible for working with
18 Dr. Fayad, then I would be periodically touching
19 base with them to see what the status of this
20 activity was.
21    Q. Okay. So is it your testimony that your
22 oversight of the plan was limited to discussing
23 with these individuals what the status was?
24    A. My testimony is that I had no oversight
25 of any specific plan, I had no involvement other

FAHED FAYAD, M.D. vs. UNIVERSITY OF MIAMI
LORD, JONATHAN on 02/18/2015

Pages 82..85

Page 82

1 than sitting in this meeting with the dean and
2 Dr. Fayad. And that sometime after this meeting,
3 Dr. Fayad sent several e-mails, which I was not
4 the direct recipient of it, I believe I was copied
5 on, but my involvement was superficial at best.
6     Q. So if someone from the university
7 testified that you were the person responsible for
8 spearheading these plans, would they be lying?
9         MS. RAGATZ: Object to the form.
10        Asked and answered.
11        THE WITNESS: All I can say is I told you
12     what my involvement was in this.
13 BY MR. LOPEZ:
14     Q. So you didn't spearhead these plans?
15     A. I was not responsible for coming up with
16 this plan or seeing the plan or driving this plan
17 or anything else.
18     Q. Okay. How long did the meeting last in
19 the dean's office with Dr. Fayad?
20     A. I would guess it was 45 minutes to an
21 hour, I'm not sure whether it was over lunch or
22 not, it might have been. I think it was a
23 conversational type of meeting and that's my
24 recollection.
25     Q. Did you say anything at the meeting?

Page 83

1     A. I probably talked and reiterated or
2 supported the dean.
3     Q. Well, what did you say about the plans?
4     A. You know, I don't recall.
5     Q. But you said something about the plans,
6 did you not?
7     A. I'm sure I said something at that
8 meeting, but again, in the macro of my life at the
9 University of Miami, this was not a priority. It
10 was secondary relative to me being called into
11 meet with -- to be present when the dean met with
12 Dr. Fayad and -- again, I have no specific
13 recollection of what I said.
14     Q. Okay. What exactly was going to be
15 aligned pursuant these plans?
16     A. My understanding was that the radiation
17 oncology services at Sylvester and the radiation
18 oncology services at UMH would become and operate
19 as one entity.
20     Q. Does that say that here in this letter?
21        MS. RAGATZ: Object to the form.
22        THE WITNESS: What I think this
23     letter says --
24 BY MR. LOPEZ:
25     Q. It's a yes or no answer, and then you can

Page 84

1 explain.
2        MS. RAGATZ: He can answer the question
3     yes or no.
4        Go ahead.
5        You're not required to, if you don't
6     understand.
7        THE WITNESS: Help me out and ask the
8     question again.
9 BY MR. LOPEZ:
10     Q. Does it say anywhere in this letter that
11 the plans were going to create -- make both of
12 those things one unit, like you just testified?
13        MS. RAGATZ: Object to the form.
14        Document speaks for itself.
15        THE WITNESS: There is nothing in here
16     that says it will become one unit.
17 BY MR. LOPEZ:
18     Q. Did you tell Dr. Fayad in the meeting
19 that that is what was going to happen?
20     A. I did not tell Dr. Fayad anything. The
21 dean led the conversation, and my interpretation
22 of the phrase "create alignment" based on this
23 letter and general recollection that that was the
24 sense of the meeting.
25     Q. Did the dean specifically tell Dr. Fayad

Page 85

1 during that meeting that that's what was going to
2 happen, that the units were going to become one?
3     A. I have no recollection.
4     Q. How was the alignment going to include
5 scheduling?
6     A. That there be -- my interpretation
7 looking back at this and not having a lot of
8 specific detail or memory about this was that
9 there be a single scheduling function, but there
10 was essential scheduling function for the
11 University of Miami healthcare system and that's
12 where the schedule would be integrated. Somehow
13 that would be aligned to the radiation oncology
14 department at Sylvester.
15     Q. Well, did you know how scheduling was
16 being done at the UMH radiation oncology
17 department?
18     A. I had no earthly idea.
19     Q. And the whole prioritization of services,
20 how was the alignment going to do that?
21     A. Again, my interpretation would be what
22 the caveat that I had -- this was not something
23 spent a lot of time on. It would be the types of
24 services that would be done at UMH versus the type
25 of services that would be done at Sylvester based

FAHED FAYAD, M.D. vs. UNIVERSITY OF MIAMI
LORD, JONATHAN on 02/18/2015

Pages 86..89

**Page 86**

1  on either technology or the talent and staff.
2  **Q. Did you feel that the technology was**
3  **different at the two facilities?**
4  A. I had no specific knowledge.
5  **Q. How about documentation and performance**
6  **improvement?**
7  A. I think there was a sense of making
8  medical records similar. They are operating
9  historically on two different platforms between
10  UMH and Sylvester, and I think it was trying to
11  integrate the idea of quality improvement and
12  oversight and be comparable at both locations.
13  **Q. Did you feel that the services being**
14  **provided in UMH radiation oncology department were**
15  **not sufficient?**
16  A. I had no earthly idea.
17  **Q. How about safety?**
18  A. That was a factor that is consistent, I
19  think, for the radiation oncology practices based
20  on the fact that they use a lot of technology that
21  the safety program should be the same.
22  **Q. Were you aware of any unsafe conditions**
23  **existing at UMH Radiation Oncology?**
24  A. Again, this is -- I have no specific
25  knowledge, recollection. This whole topic was a

**Page 87**

1  relatively informal moment in meeting the dean
2  with this meeting with Dr. Fayad.
3  **Q. Did you feel that patient quality of care**
4  **needed to better at the UMH radiation oncology**
5  **facilities?**
6  A. I had no opinion about the quality of
7  care anyplace.
8  **Q. So if the university has stated in this**
9  **lawsuit that at the leadership level you were the**
10  **one responsible for that decision, that would not**
11  **be accurate?**
12  MS. RAGATZ: Object to the form.
13  THE WITNESS: I have no idea what the
14  university stated, and all I can tell you,
15  and I'll say it again, is I had an informal
16  knowledge of any sense of plan before the
17  meeting with Dr. Fayad. I was asked to join
18  the dean. The dean talked to people at
19  university, whoever he talked to to do this,
20  and that's my level of involvement.
21  BY MR. LOPEZ:
22  **Q. And the dean asked you to sign this**
23  **letter?**
24  A. Yes, he did.
25  **Q. Did you review it before you signed it?**

**Page 88**

1  A. Yes, I did.
2  **Q. Did you disagree with anything in the**
3  **letter?**
4  A. No, I did not.
5  **Q. Okay. Did the dean routinely ask you to**
6  **sign letters about plans that you had no**
7  **involvement with?**
8  A. The dean routinely asked me to sign
9  letters when we met with people together.
10  **Q. Now, it indicates in this second**
11  **paragraph that you would like to continue to have**
12  **a dialogue with Dr. Fayad about ways his practice**
13  **could be more fully integrated into U.M.'s.**
14  **Do you see that there?**
15  **First sentence of the third paragraph.**
16  A. Yes.
17  **Q. Why did the university want Dr. Fayad's**
18  **practice to be fully integrated into U.M.'s?**
19  A. My impression was that the intent behind
20  this plan was not to create any tension or
21  controversy, and it was to try to make sure that
22  everyone was satisfied with whatever arrangement
23  played out in the future.
24  **Q. Do you know why the university wanted**
25  **Dr. Fayad's practice to be more fully integrated**

**Page 89**

1  into U.M.'s?
2  A. Again, only in the context of the first
3  phrase of the previous paragraph, which is around
4  alignment between the two facilities.
5  **Q. Other than that, you don't know why?**
6  A. No.
7  **Q. No other reason?**
8  A. No other reason.
9  **Q. Now, it says that "We recommend that you**
10  **meet with Hal Andrews who works with us as a**
11  **consultant."**
12  **Do you see that there?**
13  A. Okay. Yes, I do.
14  **Q. Who is Hal Andrews?**
15  A. Hal Andrews is someone who worked on a
16  variety of new business models and business
17  development with the medical center.
18  **Q. He was an outside consultant?**
19  A. Yes, we was.
20  **Q. What company did he work for?**
21  A. I believe it is called the Martin
22  Companies.
23  **Q. And the university hired him to do**
24  **business development models?**
25  A. Yes.

FAHED FAYAD, M.D. vs. UNIVERSITY OF MIAMI
LORD, JONATHAN on 02/18/2015                                                    Pages 90..93

Page 90

1      Q. What else was he and his company hired to
2  do for the university?
3      A. He was involved with creating business
4  partnerships for the tissue bank; he was involved
5  with work to potentially sell the University of
6  Miami behavioral health unit, which was a managed
7  care type of unit; and he was involved with the
8  recruitment of additional cardiovascular surgeons;
9  and he was involved with business relationships
10  with outside hospital companies.
11      Q. And anything else that he was hired to do
12  for the university?
13      A. I think that was about it.
14      Q. Was he asked to do anything with respect
15  to the plans to create alignment that is mentioned
16  here?
17      A. I have no earthly idea.
18      Q. Well, why is it that you were
19  recommending that Dr. Fayad meet with him?
20      A. Because Hal had insight in how private
21  practices and university practices and medical
22  economics of them, and again, I think to try to
23  find ways that Dr. Fayad and the university could
24  continue to work together in the context of this
25  new structure.

Page 91

1      Q. Okay. Who hired Hal Andrews?
2      A. I did.
3      Q. Okay. When did you hire him?
4      A. Probably 2011 for the first time.
5      Q. In your capacity as the --
6      A. Chief innovation officer.
7      Q. -- chief innovation officer?
8      A. Yes.
9      Q. How about was he hired -- did you hire
10  him to do anything in connection with your role as
11  a COO and vice president?
12      A. His role was expanded to include these
13  other projects as COO.
14      Q. Did he present any reports?
15      A. I'm sure he did.
16      Q. And you've seen those reports?
17      A. I'm sure I did.
18      Q. Okay. And what did you do with those
19  reports when you received them from him?
20      A. I probably read them. I don't keep paper
21  files and so my -- I would guess that they are
22  somewhere in electronic repository someplace.
23      Q. Now, when you hired Hal Andrews, was he
24  given any particular tasks with respect to the
25  plans to create alignment between the radiation

Page 92

1  oncology services of Sylvester and UMH?
2      A. I have no idea and I have no
3  recollection, and I don't believe that he had any
4  specific tasks.
5      Q. Who was it who was recommending that
6  Dr. Fayad meet with Hal Andrews? Was that you or
7  the dean or both?
8      A. Both.
9      Q. Okay.
10      A. And again, that was in the context that
11  that would be a pretty normal practice relative to
12  trying to figure out business relationships going
13  forward.
14      THE WITNESS: I'm going to have to take a
15  break just to do my parking.
16      MR. LOPEZ: Sure. Not a problem.
17      (There was a discussion off of the record.)
18  BY MR. LOPEZ:
19      Q. Dr. Lord, the plans to create alignment
20  that are discussed in this letter that is marked
21  as Exhibit 9, to your knowledge, was that ever
22  submitted to any board for approval?
23      A. I don't have any knowledge of any
24  submission.
25      Q. You testified before that you attended

Page 93

1  various board meetings.
2      Do you recall that?
3      A. I did.
4      Q. Were you ever at a board meeting where
5  these plans were discussed?
6      A. I have no recollection.
7      Q. Did you ever make any presentations to
8  the board about these plans?
9      A. No, I did not.
10      Q. Did you have any discussions with the
11  individuals mentioned in this letter about the
12  implementation of the plan?
13      A. Yeah. The only possible person I had any
14  conversation with was Dr. Pollack.
15      Q. Do you recall what you discussed with him
16  about the plan or implementation of the plan?
17      A. Just a recollection, I believe this is
18  something he wanted to have happen.
19      Q. Did he tell you why he wanted it to
20  happen?
21      A. Again, my recollection of the whole
22  activity is to both create additional access for
23  the demand that Sylvester is having for radiation
24  oncology services.
25      Q. Okay. Did you have -- how about Dan

FAHED FAYAD, M.D. vs. UNIVERSITY OF MIAMI
LORD, JONATHAN on 02/18/2015                                    Pages 94..97

Page 94

1 Snyder, did you have any discussions with him
2 about the plan?
3      A. It's, again, possible, but if it was it
4 was very peripheral, and it might have been just
5 to let him know that the dean and I met with
6 Dr. Fayad.
7      Q. Do you recall any discussions with
8 Mr. Snyder about the plans or implementation of
9 the plan?
10     A. No.
11     Q. To your knowledge, the decision to create
12 this alignment have anything to do with patient
13 quality care?
14     A. I have no specific recollection of
15 reasons. My sense is in general we were trying to
16 make improvements across the enterprise, but I
17 don't recall any conversations about specific
18 concerns about quality or issues surrounding the
19 improvement of quality.
20     Q. Were you aware what at this time the
21 university was representing to the public that
22 UMH's radiation oncology department had state of
23 the art of technology and was providing patients
24 with the highest quality of patient care?
25     A. Nothing specific, but that would not

Page 95

1 surprise me.
2      Q. Would you disagree with those
3 representations that were made to the public?
4      A. I have no reason to disagree.
5      Q. Did you believe that quality of patient
6 care needed to be improved at the facilities?
7      A. I believe the quality of patient care
8 across the board needs to be improved in every
9 hospital constantly.
10     Q. But you weren't aware of any deficiencies
11 at the time?
12     A. As I said, I was not aware of any
13 specific issues.
14     Q. Now, when you had the discussions with
15 Dr. Pollack that you just testified to about where
16 he said that this was something that he wanted to
17 have done, when did you have those discussions
18 with Dr. Pollack?
19        MS. RAGATZ: Object to the form.
20        THE WITNESS: Again, I think I testified
21     the fact that I may have talked to
22     Dr. Pollack, and again, my recollection was
23     that he had an interest in having the
24     alignment created between the two entities.
25 BY MR. LOPEZ:

Page 96

1      Q. Was it before or after the meeting with
2 Dr. Fayad at the dean's office?
3      A. I have no specific knowledge whether it
4 was before or after.
5      Q. And was that a -- was anybody else
6 present during that?
7      A. Not that I'm aware of.
8      Q. And where did that meeting take place?
9      A. It -- you know, again, I said I'm not
10 absolutely sure about the meeting. It was -- it
11 could have been an informal meeting. We could
12 have been -- we opened the dean offices up two
13 times a week for three hours in each afternoon for
14 anybody that stopped by and come by and talk to
15 anybody in leadership. It could have been during
16 one of those or it could have been -- I routinely
17 made rounds in all of the hospitals. I could have
18 stopped by and just bumped into him as I'm making
19 those rounds. So I have no specific knowledge.
20     Q. Exhibit 64.
21        Dr. Lord, I'm showing what we marked as
22 Exhibit 64, which is an e-mail from Dr. Fayad to
23 you and the dean dated November 1, 2012.
24        (Thereupon, E-mail dated November 1, 2012,
25        was marked as Exhibit Number 64 for

Page 97

1     identification.)
2        THE WITNESS: I see that.
3 BY MR. LOPEZ:
4      Q. Why don't you read that to yourself, and
5 then when you're done, let me know, and I'll ask
6 you some questions about it.
7        Are you done?
8      A. Uh-huh.
9      Q. Let me ask you before the -- the letter
10 dated October 29th that's Exhibit 9 --
11     A. Correct.
12     Q. -- the meeting that you had with
13 Dr. Fayad, was that the first time that the
14 university ever told Dr. Fayad about the plans to
15 create alignment?
16     A. I have no idea.
17     Q. Well, you certainly never talked to him
18 before then, right?
19     A. No.
20     Q. Well, when you had the meeting, was
21 Dr. Fayad aware of the plans when you told him
22 about it?
23     A. I can't remember.
24     Q. How soon before you had the meeting with
25 Dr. Fayad were the plans developed?

FAHED FAYAD, M.D. vs. UNIVERSITY OF MIAMI
LORD, JONATHAN on 02/18/2015

Pages 98..101

Page 98

1    A.  Again, I have no idea.
2        Q.  Were you aware that there were meetings
3  being held by leadership to discuss the plan?
4    A.  I wasn't specifically aware of any
5  meetings.  Again, I was informed by the dean about
6  this general direction and sense of activities
7  that had been going on and asked to meet when he
8  met with Dr. Fayad.
9        Q.  So you weren't aware that they were
10  having weekly meetings to discuss this plan?
11        MS. RAGATZ:  Object to the form.
12        THE WITNESS:  No, I wasn't.
13  BY MR. LOPEZ:
14        Q.  Okay.  Were you ever invited to attend
15  any meetings about the plan?
16    A.  Not to my recollection.
17        Q.  Okay.  When you had the discussions with
18  Dr. Pollack, did you agree with his opinion on the
19  plans?
20        MS. RAGATZ:  Object to the form.
21        THE WITNESS:  Let me state it again, I
22    may have had a meeting with Dr. Pollack.  It
23    was likely informal and, in all likelihood, I
24    would have supported Dr. Pollack as being the
25    university's expert in this area.

Page 99

1  BY MR. LOPEZ:
2        Q.  So whatever he wanted to do, you were
3  okay with it?
4        MS. RAGATZ:  Object to the form.
5        THE WITNESS:  I would never say whatever
6    anybody wanted to do I would be okay --
7  BY MR. LOPEZ:
8        Q.  Okay.
9    A.  -- but within the parameters of what
10  could have been discussed relative to creating
11  better ways to treat patients, I would agree with
12  that.
13        Q.  You're aware, are you not, that the
14  university prepared budgets to see if this plan
15  would create money for the university, are you
16  not?
17        MS. RAGATZ:  Object to the form.
18        THE WITNESS:  Again, I am not aware of
19    any specifics in this.
20        Let me try to restate.
21        I was told by the dean about this
22    direction.  I sat in the meeting with him
23    with Dr. Fayad.  And again, in the context of
24    all of the other stuff I had going on in the
25    world, this was not a priority area for me.

Page 100

1  BY MR. LOPEZ:
2        Q.  Did you think that these plans were going
3  to make more money for the university or have the
4  university lose money?
5        MS. RAGATZ:  Object to the form.
6        THE WITNESS:  Well, let me state that I
7    would not anticipate that the university
8    would undertake something that would
9    potentially lose money.
10  BY MR. LOPEZ:
11        Q.  And your task as the COO was to ensure
12  that you turned the boat around and got the
13  university back in the black, right?
14    A.  By this point, the university was in the
15  black.
16        And number two, my focus was to help
17  build the presence of the U Health medical system
18  and healthcare system in south Florida, and
19  increasing access for patients would be one of
20  these activities.
21        Again, this activity again, with all due
22  respect to Dr. Fayad, was not going to make or
23  break whatever plans we would have.
24        Q.  So is it your testimony that if this --
25  if this plan resulted in the university losing

Page 101

1  money, that -- that didn't matter to you as the
2  COO of health systems?
3        MS. RAGATZ:  Object to the form.
4        THE WITNESS:  I think what I said is:  I
5    don't think we would implement something that
6    would be planned to lose money.
7  BY MR. LOPEZ:
8        Q.  Okay.  Did anybody tell you that it was
9  going to make money?
10    A.  We had no conversation -- again, let me
11  restate it.
12        My recollection about my whole
13  involvement in this area was limited to a general
14  conversation with the dean in sitting in on this
15  meeting with Dr. Fayad and subsequent e-mails from
16  Dr. Fayad.
17        Q.  Okay.  So as the COO of the, health
18  system, you were not interested at all in whether
19  these plans were going to create more money for
20  the university or have the money -- or loss money
21  for the university?
22    A.  As a COO of the health system, this was
23  not a big deal.  We had much bigger opportunities
24  in much more places to -- for me to spend my time
25  than on this.  And if other people who had

FAHED FAYAD, M.D. vs. UNIVERSITY OF MIAMI
LORD, JONATHAN on 02/18/2015

Pages 102..105

Page 102

1  responsibilities in other units were taking this
2  on, that would be great, and it would be done in
3  the context of improving patient care, creating
4  more patient access or making care more efficient.
5      Q. And I just want to clarify, there was
6  nothing preventing Sylvester from sending their
7  patients to UMH for treatment, right?
8      A. I have no idea other than the differences
9  in --
10     Q. In the billing?
11     A. -- in the billing and manage care
12  contracts and other things.
13     Q. Right.
14        Now, if we go to what we marked as
15  Exhibit 64, this is an e-mail that Dr. Fayad sent
16  to you and dean on November 1, 2012, correct?
17        (Thereupon, E-mail dated November 1, 2012,
18        was marked as Exhibit Number 64 for
19        identification.)
20        THE WITNESS:  Correct.
21  BY MR. LOPEZ:
22     Q. And this would have been after you and
23  the dean sent Dr. Fayad the letter of October 29,
24  2012?
25     A. Correct.

Page 103

1      Q. Now, Dr. Fayad states in the first
2  paragraph that he looks forward to meeting with
3  Hal Andrews.
4        Do you see that there?
5      A. Yes, I do.
6      Q. And then at the end of the letter on the
7  second to the last paragraph --
8      A. Yes.
9      Q. -- Dr. Fayad says, "I look forward to
10  discussing these issues with Hal Andrews at his
11  earliest convenience.  Please have him contact me
12  to schedule a mutually convenient appointment."
13        Do you see that there?
14     A. Yes, I do.
15     Q. Okay.  Did Hal Andrews ever reach out to
16  Dr. Fayad?
17     A. I have no idea.
18     Q. Did you tell Dr. -- Hal Andrews to reach
19  out to Dr. Fayad?
20     A. I don't recall.
21     Q. Would there be any reason why you
22  wouldn't?
23     A. The principle reason was I believe that
24  this was the dean's deal and his responsibility,
25  and he was taking the lead on this, and I was

Page 104

1  purely secondary in this meeting with the dean.
2      Q. Okay.  Well, you hired Hal Andrews,
3  right?
4      A. I did.
5      Q. Okay.  And you told Dr. Pollack that you
6  recommend that he meet with Hal Andrews, right?
7      A. No.  I told Dr. Fayad.
8      Q. I mean, Dr. Fayad?
9         I apologize.
10     A. In this letter?
11     Q. Yes.
12     A. Yes.
13     Q. And then Dr. Fayad told you, Please have
14  him call me.
15     A. Right.  And I just assumed, because this
16  was not my thing or focus, that the dean was going
17  to do that follow-up.
18     Q. Okay.  So you didn't --
19     A. The dean met with Hal Andrews all the
20  time as well.
21     Q. Okay.  So you didn't contact Hal Andrews
22  and have him contact Dr. Fayad?
23     A. No, I did not.
24     Q. Now, in the second paragraph of this
25  e-mail, Dr. Fayad raises a number of concerns he

Page 105

1  has about the plans.
2         Do you see that there?
3      A. Yes, I do.
4      Q. Did you ever discuss with anybody the
5  concerns that Dr. Fayad had?
6      A. No.
7      Q. Did you have a response to this letter?
8      A. No, I did not.
9      Q. Why not?
10     A. Again, I thought the dean was taking care
11  of it.  I was like, and I said this multiple times
12  now, I was secondary to the dean in this whole
13  activity.
14     Q. Did you tell the dean, Hey, I got this
15  e-mail.  You're going to take care of it, right?
16     A. No, I don't recall.
17     Q. Did you ever talk to the dean about this
18  e-mail?
19     A. I don't recall.  It's possible, I just
20  don't recall.
21     Q. Okay.  Well, did the dean ever instruct
22  you not to respond to this e-mail?
23     A. No, he did not.
24     Q. So your failure to respond to this would
25  have been a result of your decision alone?

Page 106

1       MS. RAGATZ: Object to the form.
2       THE WITNESS: My decision about not to
3   respond is the fact that I believe that the
4   dean -- this was the dean's issue, his lead,
5   and he was going to follow up.
6   BY MR. LOPEZ:
7       Q. Okay. Did you have any discussions with
8   anyone else about Dr. Fayad's concerns that he
9   expressed in this e-mail?
10      A. I don't recall, and I would say probably
11  not.
12      Q. Now, in the first full paragraph on the
13  second page of the e-mail Dr. Fayad also expresses
14  his concerns about the alignment that you had
15  referred to in your prior meeting and that he
16  appreciate -- he would appreciate the opportunity
17  to review in advance of implementation and discuss
18  the appropriate hospital executive in any
19  alignment initiatives.
20      A. Correct.
21      Q. Okay. Do you know if anyone at the
22  university gave Dr. Fayad that opportunity?
23      A. I have no earthly idea.
24      Q. After your meeting with Dr. Fayad, did
25  the dean ever ask you to do anything else with

Page 107

1   respect to these plans?
2       A. I don't recall and I don't believe so.
3       Q. And despite the concerns that were raised
4   by Dr. Fayad in this e-mail, the university went
5   forward with its plans, did it not?
6       A. I have no idea when I was -- during the
7   time I was there, I don't believe there's any
8   change or implementation of anything.
9       Q. Okay. You don't know if the plan was
10  actually implemented?
11      A. I've only subsequently learned from
12  counsel that there was a change that was made,
13  but --
14      Q. That change wasn't made during your
15  tenure?
16      A. No, it was not.
17      Q. Did you have an understanding of when the
18  plans contemplated becoming effective?
19      A. No, I did not.
20      Q. You didn't know of a timetable?
21      A. No, I did not.
22      Q. Were you aware of any urgency in
23  implementing the plan?
24      A. Again, I've tried to describe my
25  involvement here as very superficial.

Page 108

1       Q. Were you aware that certain patients at
2   UMH were assigned UMMG ID numbers when they were
3   registered?
4       A. I have no idea.
5       Q. Do you know what a UMMG ID number is?
6       A. I know what UMMG stands for, but I don't
7   know what it means to have an identity number.
8       Q. Were you aware that Dr. Fayad's patients
9   were being assigned to UMMG ID numbers at UMH?
10      A. No idea.
11      Q. Did you have any discussions with anyone
12  at UMH about the assignment of UMMG ID numbers?
13      A. No, I do not.
14      Q. Let me show what we marked as Exhibit 17,
15  and this is another e-mail from Dr. Fayad to --
16  it's actually to you.
17      Do you see that there?
18      A. I see that.
19      Q. And he cc's the dean.
20      Why don't you read that to yourself and
21  let me know when you are done.
22      A. Okay.
23      Q. Okay. Do you recall receiving this
24  e-mail?
25      A. No, I don't.

Page 109

1       Q. You don't. Okay.
2       In this e-mail Dr. Fayad raises concerns
3   he had about the university taking over the
4   physics role at UMH.
5       A. I see that.
6       Q. Do you remember the UMH's decision to
7   take over physics?
8       A. No.
9       Q. Did you have any connection with that
10  decision?
11      A. Nope.
12      Q. Do you know anything about that decision?
13      A. It's possible that somebody told me about
14  it, but I was not involved with that decision.
15      Q. Did you respond to this e-mail?
16      A. I don't recall.
17      Q. Well, when you receive e-mails from
18  people, do you generally respond to them?
19      A. Generally I do.
20      Q. And any reason why you wouldn't have
21  responded to this?
22      A. I think I passed this over to the dean
23  and assumed that the dean was going to follow up
24  on it.
25      Q. Okay. But this e-mail was directed at

Page 110

1 you, right?
2    A. It was. It was.
3    Q. And you believe that you would have told
4 the dean to respond to it?
5    A. I believe I would have passed it on to
6 the dean and said, I assume you have the lead and
7 you're taking care of this.
8    Q. Did you, in fact, do that?
9    A. I don't know. It could have been done in
10 a conversation, I could have done it in an e-mail,
11 I could have done it in a text. I have no earthly
12 idea.
13    Q. Any reason you didn't tell Dr. Fayad that
14 you weren't involved in -- for him to stop sending
15 you e-mails?
16    A. There's no reason I can think that I
17 would tell him that, but --
18    Q. How would he know that you are not
19 involved if you don't tell him?
20    MS. RAGATZ: Object to the form.
21    THE WITNESS: I don't know, but again, I
22    assumed that the dean was communicating with
23    him.
24 BY MR. LOPEZ:
25    Q. Okay. Does he say in any of these

Page 111

1 e-mails that he sends to you that he's dealing
2 with the dean?
3    A. Well, the dean is either directly the
4 recipient or cc'd on all of this --
5    Q. Right.
6    A. -- so I have to assume that he is.
7    Q. Okay. So you assume that even though he
8 was directing this to you, that he was discussing
9 it directly with the dean?
10    A. I assumed that the dean followed up,
11 because again, I'm trying to be clear, I had many
12 other things going on at this time, and this was
13 not my priority or my issue or my deal.
14    Q. Okay. Did you feel bothered by receiving
15 these e-mails?
16    MS. RAGATZ: Object to the form.
17    What, plural, "e-mails" are you referring
18    to?
19 BY MR. LOPEZ:
20    Q. The e-mail marked as Exhibit 64 and the
21 e-mail marked as Exhibit 17.
22    A. It was not a priority for me and it was
23 not on the things that was more priorities for me.
24 And you know this is a particularly long e-mail,
25 I'm not even sure that I read all the way through

Page 112

1 it.
2    Q. Did you feel bothered by receiving these
3 e-mails?
4    A. "Bothered" would be a subjective term.
5 No, I just moved on to do other things.
6    Q. Did you feel that the courteous thing to
7 do would be to tell Dr. Fayad that you weren't
8 handling this and don't -- don't send you anymore
9 communications?
10    A. Again, I probably didn't pay a lot of
11 attention to the "To" and the "cc'd" line, and I
12 thought that the dean was driving this, and this
13 is what he was focused on, and the dean was
14 getting back to him.
15    Q. Did the dean ever tell you that he was
16 getting back to Dr. Fayad on these issues?
17    A. Again, let me try to put this in the
18 context, this was not something that is on my
19 radar screen of priority for me. So I probably
20 didn't pursue the dean relative to Sylvester
21 oncology and Dr. Fayad.
22    Q. Now, Dr. Lord, this is -- what we marked
23 as Exhibit 65, is an e-mail from Dr. Fayad to
24 Rafael Compo, and you are cc'd --
25    A. I see that.

Page 113

1    Q. -- as well as the dean, and it's dated
2 December 14, 2012.
3    (Thereupon, E-mail dated December 14, 2012,
4    was marked as Exhibit Number 65 for
5    identification.)
6    THE WITNESS: Correct.
7 BY MR. LOPEZ:
8    Q. Is it your testimony that you did the
9 same thing with this that you did with the other
10 e-mails that you received from Dr. Fayad?
11    A. Probably.
12    December -- I do recall December 14th was
13 exceptionally busy time. We had board meetings, I
14 had meetings with the president that day, and
15 again, since this wasn't my primary issue. I
16 probably didn't pay a lot of attention to it.
17    Q. When did the university ask you to step
18 down?
19    A. The December 31st.
20    Q. That was the first time that they asked
21 you to do that?
22    A. That was the only time they asked me to
23 do that.
24    Q. Okay. And then within a couple days the
25 university announced to everybody that you were

FAHED FAYAD, M.D. vs. UNIVERSITY OF MIAMI
LORD, JONATHAN on 02/18/2015                                             Pages 114..117

Page 114

1 leaving?
2     A. Yes.
3     Q. Do you know if in this e-mail Dr. Fayad
4 again asked for outline of the plans so that he
5 could review them and assess how it would affect
6 his patients and practice?
7        Do you know if the university ever
8 responded to his request?
9     A. I have no idea.
10    Q. You certainly didn't, right?
11    A. I did not.
12    Q. Did you also assume that the dean was
13 taking care of this?
14    A. I assume that the dean was involved in
15 this.
16    Q. Did you think anybody else was taking
17 care of this other than the dean?
18    A. Well, now it's -- direct -- obviously
19 there should have been responsibility for Rafael
20 Campo to be following up on something.
21    Q. Did you ever talk with Mr. Campo about
22 this e-mail?
23    A. No, I did not.
24    Q. Did you ever talk to any of these
25 individuals listed on this e-mail about Dr. Fayad?

Page 115

1     A. Potentially the only one, as I stated
2 before, besides the dean was Dan Snyder, but no
3 one else. I don't know who many of these people
4 are.
5     Q. Do you know that there was a meeting
6 scheduled between leadership at UMH and Dr. Fayad
7 in December of 2012?
8     A. I'm not aware of that.
9     Q. I'm going to show you what we marked as
10 Exhibit 66. This is another e-mail from Dr. Fayad
11 dated December 18, 2012 to Rafael Campo and Dan
12 Snyder and you're cc'd on this.
13       (Thereupon, E-mail dated December 18, 2012,
14       was marked as Exhibit Number 66 for
15       identification.)
16       THE WITNESS: Yes, I see that.
17 BY MR. LOPEZ:
18    Q. And this talks about a meeting scheduled
19 on December 20th.
20       Do you see that there?
21    A. Yes, I do.
22    Q. And you weren't aware that that meeting
23 was scheduled?
24    A. I don't recall any of this.
25    Q. Again, did you just assume that the dean

Page 116

1 and these other individuals were handling this?
2     A. Again, not a priority for me, and I
3 assumed that everybody was managing it.
4     Q. Did you have any involvement at all with
5 the matters that were going to be discussed at
6 this meeting?
7     A. Just to the extent that we've talked
8 about now, the conversation that I had with the
9 dean before we met with Dr. Fayad and Dr. Fayad
10 and the subsequent e-mails.
11    Q. And in this e-mail, Dr. Fayad is
12 requesting that the meeting be rescheduled --
13    A. I see that.
14    Q. -- to January.
15       Do you see that there?
16       Do you know if the university agreed to
17 reschedule a meeting?
18    A. I have no idea.
19    Q. Any reason why they wouldn't agree to
20 reschedule the meeting?
21       MS. RAGATZ: Object to the form.
22       THE WITNESS: I have no idea.
23 BY MR. LOPEZ:
24    Q. Did you ever tell anybody not to agree to
25 reschedule the meeting?

Page 117

1     A. No, I did not.
2     Q. Let me show you what was marked as
3 Exhibit 11.
4     A. Okay.
5     Q. And this is a letter from Dan Snyder to
6 Dr. Fayad.
7     A. Okay.
8     Q. And in the second full paragraph it says,
9 "As Dr. Campo explained, the university intends to
10 consolidate its oncology service line under
11 Sylvester."
12       Do you see that there?
13    A. Right.
14    Q. When did the plan change from alignment
15 to consolidation?
16       MS. RAGATZ: Object to the form.
17       THE WITNESS: I have no idea. I didn't
18       write this letter and I didn't choose that
19       word.
20 BY MR. LOPEZ:
21    Q. Did you ever hear of the plans being to
22 consolidate the oncology service line?
23    A. You know, I -- there are probably a
24 variety of words from "alignment" to "consolidate"
25 to "integrate." I have no sense of what words

**Page 118**

1 people would use to represent the same thing, but
2 to me alignment meant it's consistent with
3 consolidate, but that's -- that would just be my
4 interpretation of things.
5     Q. Well, when you met with Dr. Fayad, you
6 never said consolidation, did you?
7     A. I believe we used the word "alignment."
8     Q. Right. Okay.
9     And if alignment means the same thing as
10 consolidation, why then did it change -- did the
11 university change the terminology to
12 consolidation?
13     MS. RAGATZ: Object to the form.
14     THE WITNESS: I would just say it's a
15    different author.
16    I need to just take a minute break.
17     MR. LOPEZ: Sure.
18    (There was a discussion off of the record.)
19 BY MR. LOPEZ:
20     Q. Dr. Lord, the meeting that you had with
21 Dr. Fayad with the dean, did you or the dean ever
22 tell Dr. Fayad that the plans contemplated making
23 Sylvester one department?
24     A. I believe I said that the dean led the
25 conversation. I think you have to ask the dean

**Page 119**

1 what he said. I think that dean talked about the
2 things that were in the dean's letter relative to
3 alignment and having alignment around scheduling
4 some of the issues around quality and other
5 things. So I think -- my recollection is that the
6 dean's letter is very reflective of the
7 conversation that we had that day among the three
8 of us.
9     Q. Okay. And in the letter it doesn't say,
10 you testified before, it doesn't say that it's
11 going to be consolidated into one department,
12 right?
13     A. It does not use the word "consolidate,"
14 correct.
15     Q. And it doesn't say it's going to be all
16 one department?
17     A. No, it does not.
18     Q. And it doesn't say that Dr. Fayad is no
19 longer going to be able to treat patients at UMH
20 under the UMH bylaws, does it?
21     MS. RAGATZ: Object to the form.
22     THE WITNESS: I think the letter says
23    just the opposite, in trying to reach out and
24    find ways for Dr. Fayad to continue to work
25    as he was working.

**Page 120**

1 BY MR. LOPEZ:
2     Q. Right. Under the UMH bylaws?
3     A. I don't think it says "UMH bylaws," but I
4 think it basically says to continue.
5     Q. Well, it says that "it is going to be in
6 accordance with the UMH's bylaws and policy."
7     A. Okay. That's fine, yeah.
8     Sorry. I don't recall that was in the
9 letter.
10     Q. Okay. Do you know if the plans to
11 consolidate, if they were going to be done under
12 Sylvester's license?
13     A. I don't know, because I don't remember
14 seeing any specific plans or being -- or having
15 any role with specific plans.
16     Q. Did you ever have any discussions with
17 anybody about Sylvester's license to provide
18 radiation oncology services?
19     A. I don't think I ever had a conversation
20 about that in my life.
21     Q. Are you familiar with the term "Hospital
22 Within a Hospital"?
23     A. Generically, yes.
24     Q. What's your understanding of that term?
25     A. Is that there can be organizations within

**Page 121**

1 organizations, maybe separate licenses of those
2 enterprises.
3     Q. Isn't it true that that refers also to
4 the fact that a hospital, one hospital cannot
5 operate within another hospital?
6     A. I'm not specifically aware of that being
7 the case.
8     Q. You never heard of that?
9     A. No.
10     Q. Do you know if the "Hospital Within a
11 Hospital" issue arose with respect to the
12 university's plans to create alignment and then
13 consolidation?
14     MS. RAGATZ: Object to the form.
15     THE WITNESS: So let me state, I said
16    that I only generically know about the term
17    "Hospital Within a Hospital" and I have no
18    context of that phrase being used within this
19    case.
20 BY MR. LOPEZ:
21     Q. Did you have any involvement in analyzing
22 a "Hospital Within a Hospital" issue?
23     MS. RAGATZ: Object to the form.
24     THE WITNESS: I don't recall. I don't
25    believe so.

FAHED FAYAD, M.D. vs. UNIVERSITY OF MIAMI
LORD, JONATHAN on 02/18/2015                                          Pages 122..125

Page 122

1 BY MR. LOPEZ:
2     Q. Well, if Dr. Pollack has testified in
3 this case that you were the one who hired people
4 to look into that issue and you found a solution
5 to that problem, would he be lying?
6         MS. RAGATZ: Object to the form.
7         THE WITNESS: I have no idea what
8     Dr. Pollack said, but that was not my
9     involvement.
10 BY MR. LOPEZ:
11     Q. Okay. So you had absolutely no --
12 nothing to do with the "Hospital Within a
13 Hospital" issue?
14         MS. RAGATZ: Object to the form.
15         THE WITNESS: Again, I just -- I have no
16     recollection of anything to do with that
17     issue.
18 BY MR. LOPEZ:
19     Q. You don't have any recollection?
20     A. No.
21     Q. Did you ever assign the task of looking
22 into that issue to anybody?
23         MS. RAGATZ: Object to the form.
24         THE WITNESS: I don't recall.
25 BY MR. LOPEZ:

Page 123

1     Q. Did Hal Andrews look into that issue?
2         MS. RAGATZ: Object to the form.
3         THE WITNESS: Again, I don't recall and
4     it's certainly possible that the dean may
5     have had a conversation with Hal to do that,
6     no idea.
7 BY MR. LOPEZ:
8     Q. But you don't have any recollection of
9 having any discussions with anybody about
10 "Hospital Within a Hospital" issue?
11     A. No, I do not.
12     Q. Dr. Lord, let me show what we marked as
13 Exhibit 67, which is an e-mail from Dr. Fayad to
14 Mr. Snyder, to you, to the dean, dated
15 December 19, 2012.
16     (Thereupon, E-mail date December 19, 2012,
17     was marked as Exhibit Number 67 for
18     identification.)
19         THE WITNESS: Correct.
20 BY MR. LOPEZ:
21     Q. Now, he says that he is in receipt of the
22 letter dated December 19, 2012. That was the
23 one --
24     A. It's right here.
25     Q. -- that we had -- that was marked as

Page 124

1 Exhibit 11.
2     A. Correct.
3     Q. Okay. And Dr. Fayad says that in the
4 discussions he had with you and the dean, that
5 those discussions were about alignment and not
6 consolidation.
7     Do you see that there?
8     A. I do see that there.
9     Q. Did you disagree with that?
10     A. I don't think that I paid a lot of
11 attention to this e-mail.
12     Q. Did you ever respond to this e-mail?
13     A. I did not respond to this e-mail.
14     Q. Did you ever have any discussions with
15 anyone about this e-mail?
16     A. No, I did not.
17     Q. Any reason why not?
18     A. I had a lot of other things going on at
19 that time.
20     Q. And again, Dr. Fayad requests that the
21 meeting be rescheduled in January?
22     A. I see that.
23     Q. Do you know if the university ever agreed
24 to reschedule a meeting?
25     A. I have no earthly idea.

Page 125

1     Q. Is there any reason why you didn't give
2 Dr. Fayad an outline of the plans when you met
3 with him at the dean?
4     A. I didn't have any outline of any plans.
5 I don't know what the outline of the plans would
6 look like.
7     Q. Did the dean have an outline of the
8 plans?
9     A. I have no idea. You need to ask the
10 dean.
11     Q. You never asked the dean whether he had
12 an outline of plans?
13     A. No, I did not.
14     Q. Did you ever tell anybody at the
15 university, Hey, tell Dr. Fayad to stop e-mailing
16 me. I have nothing to do with this?
17     A. No, I did not.
18     Q. And you never told Dr. Fayad that either?
19     A. No, I did not.
20     Q. Dr. Lord, let me show what we marked as
21 Exhibit 68. This is an e-mail chain between
22 Dr. Fayad and various individually, including
23 yourself, and Dr. Fayad in these e-mails are
24 explaining that the private physical delegates
25 were not available for the meeting until January

Page 126

1 and again was asking that the meeting can be
2 rescheduled.
3     (Thereupon, E-mail, was marked as Exhibit
4     Number 68 for identification.)
5     THE WITNESS: Yes.
6 BY MR. LOPEZ:
7     Q. And you don't know whether the university
8 agreed to reschedule the meeting?
9     A. I have no idea.
10    Q. Did you ever have any discussions with
11 the -- any of the other private physicians or the
12 private physician delegates?
13    A. No, I did not.
14    Q. Did you have any interest in what was
15 going on at the University of Miami Hospital?
16        MS. RAGATZ: Object to the form.
17        THE WITNESS: I had a lot of interest of
18     what was going on at the University of Miami
19     Hospital; however, at this period of time, I
20     had many other things going on.
21 BY MR. LOPEZ:
22    Q. What was the single most important issue
23 at the University of Miami Hospital at this time?
24    A. Probably just general financial
25 performance.

Page 127

1     Q. And the plans to create this
2 consolidation, that would affect the financial
3 performance of the hospital, would it not?
4     A. At some level. I have no idea at what
5 level.
6     Q. Other than -- what exactly were you
7 focused on with the University of Miami Hospital
8 during this time?
9     A. During this time, I had other things that
10 I was doing outside the University of Miami
11 Hospital. In general, about the University of
12 Miami Hospital, the focus would have been on
13 financial performance.
14    Q. Did anyone at the University of Miami
15 Hospital discuss with you the financial
16 performance of the hospital?
17    A. I constantly received reports about
18 financial performance of the hospital.
19    Q. And isn't it true that the hospital
20 actually prepared budgets that would show the
21 impact financially on the hospital if these plans
22 were implemented?
23        MS. RAGATZ: Objection.
24        Asked and answered.
25        THE WITNESS: I have no idea, as I said

Page 128

1     before, I have not seen anything to that
2     effect.
3 BY MR. LOPEZ:
4     Q. You did testify that when the budgets
5 were prepared by the various hospitals, that those
6 would be sent to you for approval, correct?
7     A. That is correct, and that budget came in
8 May of 2013. The budget here is June 1st to
9 May 31st.
10    Q. Okay. So is it your testimony that no
11 budgets were prepared and submitted to you prior
12 to May of 2013?
13    A. Excuse me. 2012 is the correct answer.
14 I used the wrong year.
15        So May of 2012 and late April of 2012 we
16 would have been preparing budgets that would have
17 gone into effect June of 2012 through May of 2013.
18 That was the only time that we were budgeting.
19 There are financial reports that came out of the
20 system every month relative to the performance of
21 every unit of the University of Miami Healthcare
22 System, including UMH.
23    Q. And you don't recall ever seeing budgets
24 about the financial impact these plans would have
25 on the University of Miami Hospital?

Page 129

1     A. No, I do not.
2     Q. And you never received any -- you don't
3 recall ever receiving any budgets talking about
4 how this would impact Sylvester financially if
5 these plans were implemented?
6     A. No, I did not, because our budgeting
7 cycle would have been done at the -- just prior to
8 the start of the fiscal year, so budgeting in the
9 standpoint of practice would have taken place in
10 May of 2012 at the latest.
11    Q. Is it -- if that is the case, can the
12 University of Miami Hospital and Sylvester take
13 any action that affects the entities financially?
14    A. Yes, they can. They can make adjustments
15 to meet their financial targets.
16    Q. During the fiscal year?
17    A. Yeah.
18    Q. And they can implement plans that will
19 affect them financially during the year?
20    A. Yeah, they certainly could.
21    Q. Without submitting those budgets for
22 approval?
23    A. Without submitting budget approval,
24 depending on the nature of the action, they may
25 have to submit and request to make a change, or as

FAHED FAYAD, M.D. vs. UNIVERSITY OF MIAMI
LORD, JONATHAN on 02/18/2015

Pages 130..133

Page 130

1 courtesy they may have to let us know they are
2 making a change instead of termination of somebody
3 or consolidation of something in the entity, but
4 that would be done with conscious levels of
5 approval.
6     Q. Well, were you aware that the University
7 of Miami Hospital prepared budgets and submitted
8 them -- those budgets to their board for approval?
9     A. I'm not aware of that.
10    Q. Well, as the COO, wouldn't that be
11 something that you would be interested in knowing?
12    A. Let's go back and say this, I'm
13 completely aware of the budgets that were
14 submitted at the beginning of the year. I'm
15 completely aware throughout the year of the
16 financial statements that came from the
17 university. I have no knowledge of any specific
18 budget relative to or submission of budget
19 relative to the consolidation of this particular
20 issue.
21    Q. Do you know who Sylvain Foster is?
22    A. Yes, I do.
23    Q. Who is he?
24    A. He's the CFO for Sylvester and UMHC.
25    Q. Did you ever have any discussions with

Page 131

1 him about these plans to consolidate or align?
2     A. Don't recall any.
3     Q. If he testified that he had discussions
4 with you about the budgets, would that not be
5 accurate?
6        MS. RAGATZ: Object to the form.
7        THE WITNESS: I have no idea what he
8     testified to and I have no idea what he
9     recalled, but I don't recall having any
10    meetings with him.
11 BY MR. LOPEZ:
12    Q. How did you maintain your e-mails when
13 you were the COO?
14    A. What do you mean?
15    Q. When you received an e-mail, what did you
16 do with it? Did you print it and put it in a
17 file?
18    A. Never.
19    Q. Okay. What did you do with the
20 e-mails -- the e-mails were saved on your
21 computer?
22    A. Probably.
23    Q. Well, did you delete e-mails?
24    A. Not routinely.
25    Q. When you left in January of 2013, what

Page 132

1 happened to your computer?
2     A. My computer stayed with me until July of
3 2013, at which point it was returned to the
4 university.
5     Q. Did you leave everything on the computer
6 when you returned it?
7     A. I sent it back just as is.
8     Q. I'll show you what we marked as
9 Exhibit 40.
10    A. Okay.
11    Q. Let me know when you are done reading it.
12    A. Okay.
13    Q. This is a letter from the private
14 physician delegates at UMH to Mr. Snyder
15 expressing their concerns about the plan
16 consolidation.
17    A. Yup.
18    Q. You were aware of these concerns, were
19 you not?
20    A. I never saw this letter before in my
21 life.
22    Q. This is the first time that you ever saw
23 it?
24    A. Yup.
25    Q. Did you have any discussions with anybody

Page 133

1 about concerns that had been raised by the private
2 physician delegates?
3     A. None whatsoever.
4     Q. Okay. Dr. Lord, let me show you what we
5 marked as Exhibit 69. It's an e-mail from
6 Dr. Fayad to the dean and to you dated
7 December 21st.
8        (Thereupon, E-mail dated December 21st, was
9        marked as Exhibit Number 69 for
10       identification.)
11       THE WITNESS: Okay.
12 BY MR. LOPEZ:
13    Q. And he says, "Please find attached a
14 letter from the association of private physician
15 delegates that reflect my concerns as well
16 regarding the proposed consolidation."
17       Do you see that there?
18    A. Yes.
19    Q. So Dr. Fayad sent you the letter that the
20 delegates had sent to Mr. Snyder, right?
21    A. I see that he did there.
22    Q. Okay. So you did, in fact, receive that
23 letter?
24       MS. RAGATZ: Object to the form.
25 BY MR. LOPEZ:

Page 134

1   Q. Right?
2       A. I believe that I said that I never saw
3   this letter or read this letter before in my life.
4       Q. So when you got the e-mail from Dr.
5   Fayad, you didn't read the attached letter?
6       A. No, I did not.
7       Q. Again, did you tell anybody, Why am I
8   continuing to be sent e-mails regarding this issue
9   that I have no involvement with?
10      A. No.  I think -- again, my assumption was
11  that the dean was taking this and I was just
12  getting cc'd in terms of information.  And like I
13  said, I had much bigger issues to contend with at
14  this particular time.
15      Q. Did the dean ever tell you why he wanted
16  you at the meeting with Dr. Fayad?
17      A. The dean routinely had me attend meetings
18  with him.  And particularly when he was meeting
19  with other people, he always liked to have
20  somebody else participate in the meeting.
21      Q. And I understand that that's generally
22  what happened, but did he ever specifically tell
23  you why he wanted you in that meeting?
24      A. Nothing specific, nothing out of the
25  ordinary.

Page 135

1       Q. Isn't it true, Dr. Lord, that at the end
2   of the meeting with Dr. Fayad and the dean, you
3   told Dr. Fayad that you wanted this -- to see this
4   plan go forward and that you were going to make
5   sure that it get done?
6       A. If anything, I said that I wanted to be
7   sure that we -- whatever happens is something that
8   is consistent with what everybody needs in terms
9   of continuing to work together.  That probably
10  would have been the kind of statement that I made.
11      Q. Did you ever tell Dr. Fayad at the
12  meeting that you had no involvement with these
13  plans?
14      A. No, I did not.
15      Q. Why not?
16      A. Because I -- it wasn't appropriate to the
17  conversation.
18      Q. You wanted him to believe that you had
19  some involvement?
20          MS. RAGATZ:  Object to the form.
21          THE WITNESS:  I had no interest in having
22      Dr. Fayad believe anything.
23          The dean asked me to participate in the
24      meeting and I participated in the meeting.
25  BY MR. LOPEZ:

Page 136

1       Q. And the dean asked you to sign the letter
2   and you signed the letter?
3       A. That is correct.
4       Q. When you had the discussions with
5   Dr. Pollack, isn't it true that you told
6   Dr. Pollack that you wanted these plans to go
7   forward and that you were going to see to it that
8   the plans got done?
9           MS. RAGATZ:  Object to the form.
10          THE WITNESS:  Again, I told you I only
11      recall the potential of meeting with
12      Dr. Pollack and being supportive of what
13      Dr. Pollack wanted.
14  BY MR. LOPEZ:
15      Q. And if he had testified that you told him
16  that you wanted these plans to be done and that
17  you were going to see to it that it got done, that
18  would not be accurate?
19          MS. RAGATZ:  Object to the form.
20          THE WITNESS:  Again, I have no idea what
21      he testified to.  It's not my recollection.
22  BY MR. LOPEZ:
23      Q. Were you aware that under the
24  implementation of these plans, that Dr. Fayad
25  would only be able to continue to treat his

Page 137

1   patients if -- at facilities if he became
2   privileged at Sylvester?
3       A. I had no specific idea what the plan
4   looked like, what the plan implementation looked
5   like.  My assumption would be that, again, we had
6   this conversation about voluntary faculty
7   appointments, that there would likely have voluntary
8   faculty appointments, and that would be viewed as
9   a good thing by most physicians generically.
10      Q. Okay.  And, in fact, you talked about the
11  appointment of a -- a faculty to Dr. Fayad in the
12  meeting with the dean, right?
13      A. It's very possible.
14      Q. And were you aware that Dr. Fayad had
15  received privileges from Sylvester for CyberKnife
16  without having to be a faculty member?
17          MS. RAGATZ:  Object to the form.
18          THE WITNESS:  I had no idea.
19  BY MR. LOPEZ:
20      Q. And -- but you were aware that the bylaws
21  at UMH did not require any of the private
22  physicians to become faculty members, correct?
23      A. I did know that, yes.
24      Q. Was there any reason why the university
25  didn't offer Dr. Fayad privileges at Sylvester to

FAHED FAYAD, M.D. vs. UNIVERSITY OF MIAMI
LORD, JONATHAN on 02/18/2015

Pages 138..141

**Page 138**

1 continue treating his patients at the facilities
2 without having to obtain about -- faculty
3 appointment?
4     A. I have no idea.
5     Q. Who do you think spearheaded these plans?
6 Was it the dean?
7     A. My belief would be it would be some
8 combination of Sylvester leadership and the dean.
9     Q. Dr. Pollack as well?
10     A. Dr. Pollack I review as part of Sylvester
11 leadership.
12     Q. Okay. What was your understanding of how
13 the consolidation was going to work?
14     A. I had no idea again, I hadn't seen any
15 plan.
16     Q. Well, you testified that you thought that
17 it was all going to be one department, right?
18     A. I did say that potentially that's my
19 interpretation of what was going to happen, yes.
20     Q. And how -- and what was your
21 understanding of how Sylvester was going to
22 operate in those facilities?
23     A. Don't know.
24     Q. Did you know whether they were going to
25 lease space in the facilities?

**Page 139**

1     A. I have no idea. I did not see any
2 specific plans.
3     Q. Did you have any discussions with anyone
4 about how it was that Sylvester was going to
5 operate in the facility?
6     A. I don't recall. Is it possible that
7 somebody told me something, yes, but again, let me
8 be just absolutely clear, this was not a
9 fundamental, major issue taking any of my time in
10 terms what I was trying to do or what I needed to
11 do at the time.
12     MR. LOPEZ: Let's take a five-minute
13     break.
14     (There was a discussion off of the record.)
15 BY MR. LOPEZ:
16     Q. Dr. Lord, when you became the COO of the
17 health system, you met with leadership at both UMH
18 and Sylvester to discuss how they could improve
19 their bottom line, did you not?
20     A. I'm sure that I met with them to discuss
21 their financial performance and budgeting, yes.
22     Q. And isn't it true that Dr. Pollack told
23 you that one way to increase the financial
24 performance of Sylvester was to have them take
25 over the UMH radiation oncology department?

**Page 140**

1     A. If he did, I don't recall that.
2     Q. And if he said that he had those
3 discussions with you, you just would be mistaken
4 in your recollection or he wouldn't be telling the
5 truth?
6     MS. RAGATZ: Object to the form.
7     THE WITNESS: Well, I would never say
8     what somebody else is saying, but reality is
9     where I don't recall having that conversation
10     with him.
11 BY MR. LOPEZ:
12     Q. What was it that the leadership from both
13 of those institutions were telling you needed to
14 be done to improve their financial performance?
15     A. Well, number one, the situation of the
16 two places were very different. UMHC/Sylvester
17 was a very strong performer and positive
18 contributor to the university, and it provided a
19 lot of resources to the university, and it had its
20 own plans relative to new facilities, like opening
21 Plantation, which came online, I believe it was
22 April or May of 2012, as a way of expanding its
23 footprint. Those were major drivers of their
24 performance.
25     UMH, on the other hand, had a variety of

**Page 141**

1 issues that caused it to be compromised in how it
2 performed financially. Probably the number one
3 issue related to it was its management care
4 contracts and some of the legacy systems that were
5 left over from HCA that were -- the organization
6 was contractually responsible for, coupled with
7 the fact that it carries its debt on its books
8 relative to the acquisition that was made when it
9 was Cedars and HCA.
10     Very different situation between the two
11 places.
12     Q. Right. But both of the leaderships from
13 both of those places told you what they felt
14 needed to be done to improve their financial
15 performance?
16     A. They did.
17     Q. Right. And Sylvester not only opening up
18 the Plantation, one of the other things that they
19 had suggested doing to improve their financial
20 performance was taking over the UMH radiation
21 oncology facility; isn't that true?
22     A. I don't recall that specifically, even if
23 it was a conversation that would had -- be had,
24 the amount of money that would contribute relative
25 to the overall financial performance of a

FAHED FAYAD, M.D. vs. UNIVERSITY OF MIAMI
LORD, JONATHAN on 02/18/2015

Pages 142..145

Page 142

1  $2 billion business would be very small.
2      Q. Okay. What would you consider to be a
3  significant financial improvement?
4      A. In level of hospital performance?
5      Q. Yes.
6      A. From -- for University of Miami Hospital
7  to produce a $10- or $12 million bottom line
8  consistently.
9      Q. All right. What about for Sylvester?
10     A. Sylvester was producing a several -- $140
11  million bottom line that continued to grow, but
12  $10 million -- I would say, in my world, a
13  $10 million improvement in performance is the kind
14  of levels of improvement in performance I was
15  looking at as the net number, not as a top line
16  revenue number.
17     Q. Okay. Were you aware that the budgets
18  for the plan showed that Sylvester would make an
19  excess of $14 million by implementing this plan?
20     A. I told you that I have not seen any
21  budgets prepared on this topic.
22     Q. Well, that would be significant increase
23  in financial performance, would it not?
24     A. Again, as in any significant -- any
25  number north of $10 million of net revenue, not

Page 143

1  top line revenue, would be significant.
2      Q. Why is it that something like that
3  wouldn't have been something for you to oversee or
4  be involved with?
5      MS. RAGATZ: Object to the form.
6      THE WITNESS: Again, I have -- like I
7  said, I have many other things that I was
8  dealing with. This was not a priority for
9  me.
10 BY MR. LOPEZ:
11     Q. So if Sylvester wanted to increase its
12  bottom line by over $10 million, that -- you
13  weren't interested in that?
14     A. No. Sylvester had a plan to increase its
15  bottom line by more than $10 million, I'm sure I
16  would have been interested in that --
17     Q. Okay. And --
18     A. -- but I had not seen any document that
19  would suggest that this change would do that or
20  anything related to a budget or plan for this
21  particular change.
22     Q. What exactly did the leadership at
23  Sylvester tell you about ways to improve their
24  bottom line?
25     A. Expanding their footprint into Broward

Page 144

1  County was a clear strategy.
2      Q. And wasn't their strategy also expanding
3  their footprint by taking over UMH radiation
4  oncology facilities?
5      MS. RAGATZ: Object to the form.
6      THE WITNESS: Again, I think I've said to
7  you, no specific recollection of how
8  important this was to anybody in terms of
9  taking over UMH radiation oncology.
10 BY MR. LOPEZ:
11     Q. Well, if the leadership at the
12  institution told you ways that they thought they
13  could improve their financial performance, you
14  would have done something to help them achieve
15  those goals, right?
16     A. That's correct.
17     Q. Okay. So what did you do to help achieve
18  the goals of Sylvester to improve their financial
19  performance?
20     A. We helped open up the Plantation facility
21  which contributed a substantial amount of money,
22  but the Plantation facility which included many
23  services only contributed about $8 million
24  positive in its first year of operation.
25     Q. And -- so that -- you didn't consider

Page 145

1  that to be significant?
2      A. I consider it to be the first step of
3  something that was growing, but it was part of a
4  broader Broward strategy that Sylvester had.
5      Q. Right. Right.
6      And that was something that you had some
7  involvement with?
8      A. Absolutely.
9      Q. But something like taking over the UMH
10  radiation oncology facilities which would have
11  generated more revenue than that --
12     A. I have no --
13     MS. RAGATZ: Object to the form.
14     THE WITNESS: -- again, I have no idea
15  what it would have generated.
16 BY MR. LOPEZ:
17     Q. Well, if the --
18     A. I couldn't imagine that facility could
19  have generated that.
20     Q. Well, how do you know that?
21     A. Because it was not that large -- I don't
22  think it was that large of practice or larger
23  chain.
24     Q. Well, did you know how many patients were
25  being seen a day?

Page 146

1    A. No, I did not.
2    Q. Did you know what the billing rates were?
3    A. No, I did not.
4    Q. So then how did you know that you --
5    A. Gut sense.
6    Q. Okay. Now, what did the UMH leadership
7 tell you that they wanted to do to help increase
8 their bottom line?
9    A. Combination of engaging with manage care
10 relative to contracts, and on the revenue side,
11 and continuing to deal with expenses on the labor
12 side, increasing the number of patients that were
13 going to the operating room, improving -- in the
14 operating room and improving their facilities so
15 the facilities would be more attractive to
16 patients.
17    Q. Did you have any discussions with any
18 leadership about the radiation oncology
19 facilities?
20    A. As I said to you before, I may have had a
21 conversation with Dan Snyder, but I don't recall
22 the specifics.
23    Q. Well, if Dan Snyder talked with you about
24 it that is something that you have responded to,
25 would you not?

Page 147

1    A. Probably.
2    Q. But you don't have any recollection of
3 what you did?
4    A. No, I don't.
5    Q. Now, the meeting with Dr. Fayad with the
6 dean took an active role in that meeting, did
7 you not?
8    A. I was relatively passive. The dean led
9 the conversation and I supported what the dean was
10 trying to tell.
11    Q. You didn't say anything during the
12 meeting?
13    A. I didn't say that I didn't say anything.
14 I said I had a relatively passive role in that
15 meeting.
16    Q. Well, when you say "relatively passive,"
17 what do you mean?
18    A. I followed wherever the dean was going in
19 the conversation.
20    Q. Okay. You told Dr. Fayad, These are the
21 plans, this is what we want to do, did you not?
22    A. No, I didn't.
23    Q. You didn't.
24       You just sat there and said, I just agree
25 with --

Page 148

1    A. I think -- I participated in the meeting,
2 as a letter described, about the direction of
3 creating alignment between Sylvester and UMH --
4    Q. And you were --
5    A. -- and supporting the idea that we would
6 be using things like central scheduling in the
7 future.
8    Q. Right.
9       So you were familiar with the details of
10 the plan?
11    A. No, I was not familiar with the details
12 of the plan. The dean took the lead on every one
13 of those comments and I supported the dean.
14    Q. Do you recall having discussions with
15 Dr. Fayad about his desire to better the
16 department and his willingness to have patients
17 come over from Sylvester?
18    A. Yes, I do.
19    Q. And what was your response to that?
20    A. I said that was great.
21    Q. Okay. And did you ever follow up with
22 him on that?
23    A. No, I did not.
24    Q. Any reason why not?
25    A. Again, I thought this whole area was the

Page 149

1 dean's lead.
2       MR. LOPEZ: Just a minute.
3    (There was a discussion off of the record.)
4 BY MR. LOPEZ:
5    Q. Dr. Lord, part of your job as the COO was
6 to ensure that the various clinics and hospitals
7 increased their bottom line, right?
8    A. That is correct.
9    Q. Okay. Were you aware that UMH, that
10 65 percent of all patients' admissions came from
11 the private physicians?
12    A. Yes, I was.
13    Q. And were you aware that 70 or 80 percent
14 of the patients treated in the radiation oncology
15 facilities were Dr. Fayad's patients?
16    A. I knew he is the majority, I didn't know
17 the specific number.
18    Q. Okay. And Dr. Fayad told you that he had
19 no interest bringing his practice closer to U.M.
20 and becoming a faculty member, correct?
21    A. I certainly was clear and well in the
22 notes that he sent to us.
23    Q. Right.
24       And by going forward with the plans to
25 consolidate, that would have eliminated the

Page 150

1  substantial revenue from the UMH's bottom line
2  because of the patients that Dr. Fayad and the
3  other private physicians treat there, right?
4        MS. RAGATZ:  Object to the form.
5        THE WITNESS:  Again, I don't know the
6     specifics, but it would have meant obviously
7     some level of shift from one spot to another.
8  BY MR. LOPEZ:
9     Q.  Right.
10         It would have shifted the revenues from
11  UMH to Sylvester, right?
12    A.  Right.
13    Q.  Okay.  And weren't you concerned that the
14  negative effect on UMH bottom line by doing that?
15    A.  Ultimately, the bottom lines were all
16  consolidated.
17    Q.  Okay.  So as long as Sylvester was making
18  more money, then everything was okay?
19    A.  There was a trade off between the two
20  places.
21    Q.  Okay.
22        MR. LOPEZ:  Okay.  One more minute.
23    (There was a discussion off of the record.)
24  BY MR. LOPEZ:
25    Q.  Dr. Lord, the concerns that Dr. Fayad

Page 151

1  raised with you and the dean and the concerns that
2  the private physicians raised in their letter,
3  were you not at all interested in those concerns?
4        MS. RAGATZ:  Object to the form.
5        THE WITNESS:  I think I've said in the
6     past that I did not specifically read the
7     letter that came from the private physicians.
8     I probably glanced over Dr. Fayad's e-mail to
9     me and assumed that the dean was following
10    up.
11  BY MR. LOPEZ:
12    Q.  Well, he told -- Dr. Fayad told you at
13  the meeting about his concerns, did he not?
14    A.  Yes.
15    Q.  Okay.  And you didn't have any interest
16  in those concerns, right?
17        MS. RAGATZ:  Object to the form.
18        THE WITNESS:  I will say to you again,
19    it's not that I didn't have any interest,
20    it's that I believe the dean was following
21    up, and the focus was trying to figure out a
22    way for everybody to be able to work
23    together.
24  BY MR. LOPEZ:
25    Q.  And in what way was it to work -- to find

Page 152

1  a way for everybody to work together?
2     A.  Again, the assumption that -- and a
3  follow-up that Dr. Fayad and Hal would have based
4  on the ways that -- the work together was going to
5  be the pathway forward.
6     Q.  Isn't it true, Dr. Lord, that the letter
7  that the private physician delegates sent to
8  Mr. Snyder, that that was actually presented to
9  the board of trustees?
10    A.  I don't recall.
11    Q.  You don't know that?
12    A.  No.
13    Q.  You never had any discussions with the
14  board of trustees about the concerns that the
15  private physician delegates raised in their
16  letter?
17    A.  I believe that the letter came at the end
18  of December, and I have no idea when there would
19  have been a board of trustees meeting, but I was
20  out of my role beginning December 31st.
21    Q.  Right.
22        But the letter that the physicians sent
23  was before you left?
24    A.  It was 10 days before, and I don't know
25  when there was a board of trustees or anything

Page 153

1  else.
2     Q.  And someone from the board of trustees
3  were to testify that they discussed these concerns
4  with you, that wouldn't be accurate?
5        MS. RAGATZ:  Object to the form.
6        THE WITNESS:  I have no idea what they --
7     I don't recall having any conversation about
8     that.
9        MR. LOPEZ:  All right.  I don't have any
10    other questions.
11        MS. RAGATZ:  If it's ordered, we will
12    read.
13    (Thereupon, the deposition was concluded)
14
15
16
17
18
19
20
21
22
23
24
25

FAHED FAYAD, M.D. vs. UNIVERSITY OF MIAMI
LORD, JONATHAN on 02/18/2015

Pages 154..157

Page 154

CERTIFICATE OF REPORTER

THE STATE OF FLORIDA

COUNTY OF MIAMI-DADE

I, LAURIE M. YANNACCONE, FPR, do hereby
certify that I was authorized to and did
stenographically report the foregoing deposition
of JONATHAN LORD; that a review of the transcript
was requested; and that the foregoing transcript,
pages 1 through 153, is a true record of my
stenographic notes.

I FURTHER CERTIFY that I am not a relative,
employee, attorney or counsel of any of the
parties' attorneys or counsel connected with the
action, nor am I financially interested in the
action.

Dated this 18th day of February, 2015 at
Miami-Dade County, Florida.

Laurie M. Yannaccone, FPR

Page 155

CERTIFICATE OF OATH

STATE OF FLORIDA)
COUNTY OF MIAMI-DADE)

I, LAURIE YANNACCONE, FPR, Notary Public,
State of Florida, certify that the witness,
JONATHAN LORD, personally appeared before me on
the 18th day of February, 2015 and was duly sworn.

WITNESS my hand and official seal this 9th
day of October, 2015.

Laurie Yannaccone

Laurie M. Yannaccone
Notary Public - State of Florida
My Commission No. FF90655
Expires:  October 19, 2019

Page 156

E R R A T A   S H E E T
IN RE:  FAYAD vs. UNIVERSITY OF MIAMI, et al.
DEPOSITION OF:  JONATHAN LORD   TAKEN: 2/18/2015
DO NOT WRITE ON THE TRANSCRIPT, ENTER CHANGES HERE

Please sign, date, and return this sheet to our
office.  If additional lines are required for
corrections, attach additional sheets.

At the time of the reading and signing of the
deposition, the following changes were noted:
PAGE   LINE     CHANGE         REASON

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Under penalty of perjury, I declare that I have
read my deposition and that it is true and correct
subject to any changes in form or substance
entered here.

SIGNATURE OF DEPONENT:_____

DATE:_____

Page 157

Friday, October 9, 2015
TERESA RAGATZ, ESQUIRE
Iscoff, Ragatz & Koenigsberg
1200 Brickell Avenue
Suite 1900
Miami, Florida 33131
IN RE:  FAYAD v.  UNIVERSITY OF MIAMI, et al:
Dear Ms. Ragatz:

Enclosed please find the original errata page with
your copy of the transcript so JONATHAN LORD may
read and sign their transcript.  Please have him
make whatever changes are necessary on the errata
page and sign it.  Then place the original errata
page back into the original transcript.  Please
then forward a copy of the errata page back to our
office @ 1080 Woodcock Road, Suite 100, Orlando,
Florida 32803.

If the errata page is not signed by the witness
within 30 days after this letter has been
furnished, we will then process the transcript
without a signed errata page.  If your client
wishes to waive their right to read and sign the
transcript, please have him sign their name at the
bottom of this letter and return it to our office.

Your prompt attention to this matter is
appreciated.
Sincerely,

First Choice Network Reporting & Video.

I do hereby waive my right to read and sign.

JONATHAN LORD

cc:  Teresa Ragatz

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

IN RE: THE MARRIAGE OF:                    CASE NO.: 132015DR022706

ALICE LORD,                                DIVISION: FC 18

        Petitioner/Wife,

and

JONATHAN LORD,

        Respondent/Husband.

_____/

**FAMILY LAW FINANCIAL AFFIDAVIT**
($50,000 or more Individual Gross Annual Income)

I, **JONATHAN LORD**, being sworn, certify that the following information is true:

| SECTION I.  INCOME |
|---|

1. My age is: <u>61</u>
2. My occupation is: <u>I retired in July 2013</u>
3. I am currently

   *[Check **all** that apply]*

   a. ___✓___ Unemployed

   Describe your efforts to find employment, how soon you expect to be employed, and the pay you expect to receive: <u>I am not currently seeking employment. However, in October 2014, I was contacted by a national search firm in regard to the chief executive officer position for the American Diabetes Association.</u>

   b. _____ Employed by: _____

   Address: _____

   City, State, Zip code: _____ Telephone Number: _____

   Pay rate: $ _____ (   ) every week (   ) every other week (   ) twice a month

   (   ) monthly (   ) other: _____

   If you are expecting to become unemployed or change jobs soon, describe the change you expect and why and how it will affect your income: _____
   _____
   _____.

JONATHAN LORD, M.D.
February 24, 2022
Defendant's
**Exhibit 43**

JTL 00001

LORD-001025

_____ Check here if you currently have more than one job. List the information above for the second job(s) on a separate sheet and attach it to this affidavit.

c. _✓_ Retired. Date of retirement: July 2013.

Employer from whom retired: University of Miami.

Address: South Dixie Highway, Coral Gables, FL 33124.

Telephone Number: 305-284-2211.

| **LAST YEAR'S GROSS INCOME:** | Your Income | Other Party's Income *(if known)* |
|---|---|---|
| YEAR 2014 | $ 7,309,674.00 | $ _____ |

**PRESENT MONTHLY GROSS INCOME:**

**All amounts must be MONTHLY.** See the instructions with this form to figure out money amounts for anything that is NOT paid monthly. Attach more paper, if needed. Items included under "other" should be listed separately with separate dollar amounts.

1. *(see note 1)* Monthly gross salary or wages
2. _____ Monthly bonuses, commissions, allowances, overtime, tips, and similar payments
3. _____ Monthly business income from sources such as self-employment, partnerships, close corporations, and/or independent contracts (Gross receipts minus ordinary and necessary expenses required to produce income.)(Attach sheet itemizing such income and expenses.)
4. _____ Monthly disability benefits/SSI
5. _____ Monthly Workers' Compensation
6. _____ Monthly Unemployment Compensation
7. _____ Monthly pension, retirement, or annuity payments
8. _____ Monthly Social Security benefits
9. _____ Monthly alimony actually received (Add 9a and 9b)
    9a. From this case: $_____
    9b. From other case(s): _____
10. *(see note 1)* Monthly interest and dividends
11. _____ Monthly rental income (gross receipts minus ordinary and necessary expenses required to produce income) (Attach sheet itemizing such income and expense items.)
12. _____ Monthly income from royalties, trusts, or estates
13. _____ Monthly reimbursed expenses and in-kind payments to the extent that they reduce personal living expenses (Attach sheet itemizing each item and amount.)
14. _____ Monthly gains derived from dealing in property (not including nonrecurring gains) Any other income of a recurring nature (identify source)
15. _____
16. _____
17. *(see note 1)* **TOTAL PRESENT MONTHLY GROSS INCOME** (Add lines 1 through 16).

**PRESENT MONTHLY DEDUCTIONS:**

**All amounts must be MONTHLY.** See the instructions with this form to figure out money amounts for anything that is NOT paid monthly.

18. $_____ Monthly federal, state, and local income tax (corrected for filing status and allowable dependents and income tax liabilities)
    a. Filing Status _____
    b. Number of dependents claimed _____

JTL.00002

19. _____ Monthly FICA or self-employment taxes
20. _____ Monthly Medicare payments
21. _____ Monthly mandatory union dues
22. _____ Monthly mandatory retirement payments
23. 2,100 Monthly health insurance payments (including dental insurance), excluding portion paid for any minor children of this relationship
24. _____ Monthly court-ordered child support actually paid for children from another relationship
25. 10,000 Monthly court-ordered alimony actually paid (Add 25a and 25b)
       25a. from this case: $ _____
       25b. from other case(s): 10,000

26. **$12,100 TOTAL DEDUCTIONS ALLOWABLE UNDER SECTION 61.30, FLORIDA STATUTES**
     (Add lines 18 through 25).

27. **$ (12,100) PRESENT NET MONTHLY INCOME**
     (Subtract line 26 from line 17).

**SECTION II. AVERAGE MONTHLY EXPENSES**

**Proposed/Estimated Expenses.** If this is a dissolution of marriage case **and** your expenses as listed below do not reflect what you actually pay currently, you should write "estimate" next to each amount that is estimated.

**HOUSEHOLD:** (*see note 2*)

1. $3,400 Monthly mortgage or rent payments
2. 3,000 Monthly property taxes (if not included in mortgage)
3. 800 Monthly insurance on residence (if not included in mortgage)
4. 100 Monthly condominium maintenance fees and homeowner's association fees
5. 300 Monthly electricity
6. 300 Monthly water, garbage, and sewer
7. 300 Monthly telephone
8. 300 Monthly fuel oil or natural gas
9. 500 Monthly repairs and maintenance
10. 495 Monthly lawn care
11. 150 Monthly pool maintenance
12. 100 Monthly pest control
13. 500 Monthly misc. household
14. 1,000 Monthly food and home supplies
15. 1,000 Monthly meals outside home
16. 200 Monthly cable t.v.
17. 30 Monthly alarm service contract
18. _____ Monthly service contracts on appliances
19. 700 Monthly maid service
Other:
20. 500 misc. maintenance
21. _____
22. _____
23. _____
24. _____
25. **$13,675 SUBTOTAL** (add lines 1 through 24).

JTL 00003

 **LORD-001027**

**AUTOMOBILE:**

26. <u>100</u>____ Monthly gasoline and oil
27. <u>100</u>____ Monthly repairs
28. <u>5</u>_____ Monthly auto tags and emission testing
29. <u>200</u>____ Monthly insurance
30. <u>3,000</u>___ Monthly payments (lease or financing)
31. _____ Monthly rental/replacements
32. _____ Monthly alternative transportation (bus, rail, car pool, etc.)
33. _____ Monthly tolls and parking
34. _____ Other: _____
35. **$3,405** **SUBTOTAL** (add lines 26 through 34)

**MONTHLY EXPENSES FOR CHILDREN COMMON TO BOTH PARTIES:**

36. $_____ Monthly nursery, babysitting, or day care
37. _____ Monthly school tuition
38. _____ Monthly school supplies, books, and fees
39. _____ Monthly after school activities
40. _____ Monthly lunch money
41. _____ Monthly private lessons or tutoring
42. _____ Monthly allowances
43. _____ Monthly clothing and uniforms
44. _____ Monthly entertainment (movies, parties, etc.)
45. _____ Monthly health insurance
46. _____ Monthly medical, dental, prescriptions (nonreimbursed only)
47. _____ Monthly psychiatric/psychological/counselor
48. _____ Monthly orthodontic
49. _____ Monthly vitamins
50. _____ Monthly beauty parlor/barber shop
51. _____ Monthly nonprescription medication
52. _____ Monthly cosmetics, toiletries, and sundries
53. _____ Monthly gifts from child(ren) to others (other children, relatives, teachers, etc.)
54. _____ Monthly camp or summer activities
55. _____ Monthly clubs (Boy/Girl Scouts, etc.)
56. _____ Monthly time-sharing expenses
57. _____ Monthly miscellaneous
58. **$_____** **SUBTOTAL** (add lines 36 through 57)

**MONTHLY EXPENSES FOR CHILD(REN) FROM ANOTHER RELATIONSHIP**
(other than court-ordered child support)

59. $_____
60. _____
61. _____
62. _____
63. **$_____** **SUBTOTAL** (add lines 59 through 62)

JTL 00004

CONFIDENTIAL INFORMATION

LORD-001028

**MONTHLY INSURANCE:**

64. <u>$1,300</u> Health insurance (if not listed on lines 23 or 45) (estimate for 2016)

65. _____ Life insurance

66. _____ Dental insurance.

   Other:

67._____

68._____

69. <u>**$1,300**</u> **SUBTOTAL** (add lines 66 through 68, exclude lines 64 and 65)

**OTHER MONTHLY EXPENSES NOT LISTED ABOVE:**

70. $_____ Monthly dry cleaning and laundry

71. _____Monthly clothing

72. _____ Monthly medical, dental, and prescription (unreimbursed only)

73. _____ Monthly psychiatric, psychological, or counselor (unreimbursed only)

74. _____ Monthly non-prescription medications, cosmetics, toiletries, and sundries

75. _____ Monthly grooming

76._____ Monthly gifts

77._____ Monthly pet expenses

78._____ Monthly club dues and membership

79._____ Monthly sports and hobbies

80._____ Monthly entertainment

81._____ Monthly periodicals/books/tapes/CDs

82._____ Monthly vacations

83._____ Monthly religious organizations

84._____ Monthly bank charges/credit card fees

85._____ Monthly education expenses

86._____ Other: (include any usual and customary expenses not otherwise mentioned in the items
            listed above)_____

87._____

88._____

89._____

90. $_____ **SUBTOTAL** (add lines 70 through 89)

**MONTHLY PAYMENTS TO CREDITORS:** (only when payments are currently made by you on outstanding balances). List only last 4 digits of account numbers.

MONTHLY PAYMENT AND NAME OF CREDITOR(s):

91. $_____

92._____

93._____

94._____

95._____

96._____

97._____

98._____

99._____

100._____

101._____

102._____

JTL 00005

103._____

104. _____ **SUBTOTAL** (add lines 91 through 103)

105. **$18,380  TOTAL MONTHLY EXPENSES:**
(add lines 25, 35, 58, 63, 69, 90, and 104 of Section II,  Expenses)

**SUMMARY**
106. $(*see note 1*) **TOTAL PRESENT MONTHLY NET INCOME** (from line 27 of SECTION I.  INCOME)

107. **$18,380   TOTAL MONTHLY EXPENSES** (from line 105 above)

108. $_____ **SURPLUS** (If line 106 is more than line 107, subtract line 107 from line 106.  This is the amount of your surplus.  Enter that amount here.)

109. _____ **(DEFICIT)** (If line 107 is more than line 106, subtract line 106 from line 107.  This is the amount of your deficit.  Enter that amount here.)

JTL 00006

CONFIDENTIAL INFORMATION

LORD-001030

| SECTION III.  ASSETS AND LIABILITIES |
|---|

**A.  ASSETS  (This is where you list what you OWN.)**

**INSTRUCTIONS:**

**STEP 1:  In column A,** list a description of each separate item owned by you (and/or your spouse, if this is a petition for dissolution of marriage).  Blank spaces are provided if you need to list more than one of an item.

**STEP 2:** If this is a petition for dissolution of marriage, check the line **in Column A** next to any item that you are requesting the judge award to you.

**STEP 3:  In column B,** write what you believe to be the current fair market value of all items listed.

**STEP 4:  Use column C only if this is a petition for dissolution of marriage and you believe an item is "non-marital," meaning it belongs to only one of you and should not be divided.**  You should indicate to whom you believe the item belongs.  (Typically, you will only use Column C if property was owned by one spouse before the marriage.  See the **"General Information for Self-Represented Litigants"** found at the beginning of these forms and section 61.075(1), Florida Statutes, for definitions of "marital" and "non-marital" assets and liabilities.)

| A<br>ASSETS: DESCRIPTION OF ITEM(S)<br>LIST ONLY LAST FOUR DIGITS OF ACCOUNT NUMBERS.<br>Check the line next to any asset(s) which you are requesting the judge award to you. | B<br>Current Fair<br>Market Value | C<br>Non-marital<br>(✓correct<br>column) | |
|---|---|---|---|
| | | husband | wife |
| **Cash (in banks or credit unions)** | | | |
| ✓ UBS Joint Account # 27TU | $42,487.05 | | |
| ✓ UBS Personal Account # 89TU (*see note 3*) | $370,264.77 | ✓ | |
| ✓ Chase Checking Account # 8150 | $100 | | |
| ✓ UMB Healthcare Account Statement # 6628 | $16,259.52 | | |
| ✓ UBS Resource Management Account # 86TU (*see note 4*) | $892,504.84 | ✓ | |
| | | | |
| **Stocks/Bonds (UBS financial assets)** | | | |
| ✓ DexCom (127,107 shares; $82.74 per share ) (*see note 4*) | $10,516,833 | ✓ | |
| ✓ Hanson Medical (10,000 shares; $3.90 per share) | $39,000 | | |
| ✓ Biolase (Rest'd – private placement) (110,380 shares; $0.95 per share)(16,130 shares; $0.75 per share) (*see note 5*) | 116,958.50 | ✓ | |
| ✓ Veracyte (at UBS) (36,000 shares; $6.46 per share) | $232,560 | | |
| ✓ Municipal Bonds | $965,121 | | |
| ✓ Managed Futures | $301,751 | | |
| ✓ Hedge Fund | $359,112 | | |
| ✓ Diversified Equity/Fixed | $650,527 | | |
| ✓ Global Long/Short IRA | $447,302 | | |
| ✓ Corporate Bonds IRA | $156,718 | | |

JTL 00007

**CONFIDENTIAL INFORMATION**

| | | | |
|---|---|---|---|
| ✓ Apollo European Fund IRA | $183,066 | | |
| ✓ NFJ Intl | $92,082 | | |
| ✓ Meagher Diversified IRA | $41,402 | | |
| ✓ Alice IRA | $312 | | |
| **Stocks/Bonds (Private Investments & Veracyte; held at Broadridge)** | | | |
| ✓ Cruden Bay (*see note 6*) | $50,000 | | |
| ✓ Biolase (BIOL) RSU (*see note 5*) | $8,756 | ✓ | |
| ✓ Velano Vascular (formerly Creative Vascular) (*see note 7*) | $50,000 | ✓ | |
| ✓ Digital Reasoning (*see note 8*) | $500,000 | ✓ | |
| ✓ Lucas | - | | |
| ✓ Hubble Tele (Acquired) | - | | |
| ✓ Vigilant Biosciences | $30,000 | | |
| ✓ Par8o (*see note 9*) | $250,000 | ✓ | |
| **Stocks/Bonds (options & restricted stock)** | | | |
| ✓ Stericycle Options (38,852 shares; $150.91 per share) | $3,036,483 | | |
| ✓ DexCom RSU (4,475 shares; $82.74 per share) (*see note 4*) | $382,568 | ✓ | |
| | | | |
| **Notes (money owed to you in writing)** | - | | |
| **Money owed to you (not evidenced by a note)** | - | | |
| | | | |
| **Real estate: (Home)** | | | |
| ✓ 68 La Gorce Circle, Miami Beach, FL 33141 | $11,000,000 | | |
| ✓ 135 Long Point Drive, Fernandina Beach, FL 32034 (*see note 3*) | $2,000,000 | ✓ | |
| | | | |
| | | | |
| **Business interests** | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| **Automobiles** | | | |
| | | | |
| | | | |
| | | | |
| **Retirement plans (Profit Sharing, Pension, IRA, 401(k)s, etc.)** | | | |

JTL 00008

CONFIDENTIAL INFORMATION

LORD-001032

| | | | | |
|---|---|---|---|---|
| ✓ *See* above | – | | |
| | | | |
| **Other Personal Property** | | | |
| ✓ Furniture / Furnishings | TBD | | |
| ✓ Jewelry - Husband | TBD | | |
| ✓ Jewelry - Wife | TBD | | |
| ✓ Artwork | TBD | | |
| ✓ Wine Collection | TBD | | |
| | | | |
| **Life insurance (cash surrender value)** | | | |
| ✓ None | – | | |
| | | | |
| **Other assets:** | | | |
| ✓ Louisville Country Club Membership | TBD | | |
| ✓ Indian Creek Club Membership | TBD | | |
| ✓ Donor Advised Fund | $273,000 | | |
| ✓ American Airlines miles (approx. 405,000) | TBD | | |
| ✓ Southwest Airlines miles (approx. 73,000) | TBD | | |
| ✓ Fogel Rubin & Fogel IOTA Trust Account (*see note 1*) | $1,360,000 | | |
| ✓ Lease 2015 Mercedes Benz S65 | TBD | | |
| ✓ Lease 2015 Mercedes Benz ML 400 | TBD | | |
| | | | |
| | | | |
| | | | |
| **Total Assets** (add column B) (*excluding unknowns and TBD items*) | $34,365,167.68 | | |

B. **LIABILITIES/DEBTS (This is where you list what you OWE.)**

**INSTRUCTIONS:**

**STEP 1: In column A**, list a description of each separate debt owed by you (and/or your spouse, if this is a petition for dissolution of marriage). Blank spaces are provided if you need to list more than one of an item.

**STEP 2:** If this is a petition for dissolution of marriage, check the line **in Column A** next to any debt(s) for which you believe you should be responsible.

**STEP 3: In column B**, write what you believe to be the current amount owed for all items listed.

**STEP 4: Use column C only if this is a petition for dissolution of marriage and you believe an item is "non-marital,"** meaning the debt belongs to only one of you and should not be divided. You should indicate to whom you believe the debt belongs. (Typically, you will only use Column C if the debt was owed by one spouse before the marriage. See the **"General Information for Self-Represented Litigants"** found at the beginning of these forms and section 61.075(1), Florida Statutes, for definitions of "marital" and "non-marital" assets and liabilities.)

JTL 00009

LORD-001033

| A<br>LIABILITIES:  DESCRIPTION OF ITEM(S)<br><br>LIST ONLY LAST FOUR DIGITS OF ACCOUNT NUMBERS.<br>Check the line next to any debt(s) for which you believe you should be responsible. | B<br>Current<br>Amount<br>Owed | C<br>Non-marital<br>(Check correct column) | |
|---|---|---|---|
| | | husband | wife |
| **Mortgages on Real Estate** | | | |
| ✓ UBS Mortgage (68 La Gorce Circle) | $2,918,983 | | |
| ✓ UBS Line of Credit | $2,635,538 | | |
| ✓ Expected Capital Gain on sale of 68 La Gorce | $714,000 | | |
| ✓ Income taxes on deferred ordinary income | $1,770,255 | | |
| ✓ Balloon Mortgage Note (135 Long Point) | $893,337.50 | ✓ | |
| | | | |
| **Charge/credit card accounts** | | | |
| ✓ American Express # 6-71008 | Current | | |
| ✓ British Airways # 7324 | Current | | |
| ✓ UBS Visa Signature | Current | | |
| | | | |
| Auto loan | | | |
| Auto loan | | | |
| Bank/Credit Union loans | | | |
| | | | |
| | | | |
| | | | |
| Money you owe (not evidenced by a note) | | | |
| | | | |
| Judgments | | | |
| | | | |
| Other: | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| **Total Debts**  (add column B) | **$8,932,113.50** | | |

JTL 00010

LORD-001034

C.  NET WORTH  (excluding contingent assets and liabilities)

$ <u>34,365,167.68</u> Total Assets (enter total of Column B in Asset Table; Section A)
$ <u>8,932,113.50</u>  Total Liabilities (enter total of Column B in Liabilities Table; Section B)
$ <u>25,433,054.18</u> TOTAL NET WORTH (Total Assets minus Total Liabilities)
         (excluding contingent assets and liabilities)

D.  CONTINGENT ASSETS AND LIABILITIES
    INSTRUCTIONS:
    If you have any POSSIBLE assets (income potential, accrued vacation or sick leave, bonus, inheritance, etc.) or POSSIBLE liabilities (possible lawsuits, future unpaid taxes, contingent tax liabilities, debts assumed by another), you must list them here.

| A<br>Contingent Assets<br><br>Check the line next to any contingent asset(s) which you are requesting the judge award to you. | | B<br>Possible<br>Value | C<br>Nonmarital<br>(Check correct column) | |
|---|---|---|---|---|
| | | | husband | wife |
| | ✓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓ | TBD | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| Total Contingent Assets | | $TBD | | |

| A<br>Contingent Liabilities<br><br>Check the line next to any contingent debt(s) for which you believe you should be responsible. | | B<br>Possible<br>Amount<br>Owed | C<br>Nonmarital<br>(Check correct column) | |
|---|---|---|---|---|
| | | | husband | wife |
| | | $ | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| Total Contingent Liabilities | | $ | | |

JTL 00011

CONFIDENTIAL INFORMATION

**E.**  **CHILD SUPPORT GUIDELINES WORKSHEET.**  Florida Family Law Rules of Procedure Form 12.902(e), Child Support Guidelines Worksheet, MUST be filed with the court at or prior to a hearing to establish or modify child support. This requirement cannot be waived by the parties.

[Check **one** only]

_____**A Child Support Guidelines Worksheet IS or WILL BE filed in this case.** This case involves the establishment or modification of child support.

___✓_ **A Child Support Guidelines Worksheet IS NOT being filed in this case.** The establishment or modification of child support is not an issue in this case.

JTL 00012

CONFIDENTIAL INFORMATION

LORD-001036

## NOTES TO FINANCIAL AFFIDAVIT

### Note 1

Dr. Lord is retired and does not receive any fixed, regular income. Dr. Lord, however, does receive irregular distributions from a variety of sources, including but not limited to, consulting arrangements, income derived from the sale of stock, income derived from the exercise of stock options, interest, qualified dividends, and capital gains. The following schedule is an approximation of Dr. Lord's 2015 income to date:

Consulting/Board Income

| | |
|---|---|
| Third Rock Consulting: | $25,000 |
| DXCM Restricted Stock: | $624,587 |
| SRCL Option Exercise (3/20/15): | $777,762 |
| SRCL Option Exercise (9/8/15): | $993,000 |

Passive Income

| | |
|---|---|
| Interest: | $12,000 |
| Tax Exempt Interest: | $40,000 |
| Qualified Dividends: | $21,000 |
| NQ Dividends: | $8,000 |
| Capital Gains/Losses: | $595,000 |

### Note 2

Dr. Lord's household expenses as described in Section II of this Financial Affidavit represent a combination/approximation of Dr. Lord's current and future household expenses associated with his home at 135 Long Point Drive, Fernandina Beach, FL 32034. Dr. Lord is currently assuming and paying for various household expenses associated with 68 La Gorce Circle, Miami Beach, FL 33141, however for purposes of this Financial Affidavit, those expenses are not accounted for herein.

### Note 3

In July 2015, The Lords executed a Cancellation and Release of Agreement pertaining to Unit N-715 in the Surf Club Condominium. As a result thereof, the deposit associated therewith (totaling $2,720,000) was returned to the Lords. Pursuant to an Agreement between Dr. Lord and Alice Lord, the Lords agreed to equitably distribute 50% of the deposit evenly, with the remaining 50% remaining in the Fogel Rubin & Fogel IOTA Trust Account. As a result, Dr. Lord received a wire transfer in the amount of $680,000. A portion of those proceeds were used to purchase Dr. Lord's interest in 135 Long Point Drive, Fernandina Beach, FL 32034. As such, Dr. Lord's interest in 135 Long Point Drive, Fernandina Beach, FL 32034 is his separate, non-

JTL 00013

CONFIDENTIAL INFORMATION

marital property. Moreover, to the extent that any portion of those funds remain in Dr. Lord's account, those funds also constitute separate, non-marital property.

## Note 4

DexCom, Inc. – Dr. Lord claims that 55,000 shares in DexCom are separate, non-marital property, to the extent that such shares were acquired with his pre-marital assets.

On June 3, 2015, Dr. Lord was granted an award of 4,475 restricted stock units. Those stock units will vest in one annual installment on June 3, 2016. Dr. Lord claims that any and all unvested restricted stock unit awards that have not vested by the cutoff date for the determination of marital assets are separate, non-marital property to the extent that such unvested restricted stock unit awards were awarded as an incentive for continued and future services and/or as an incentive for future productivity (or to any other extent pursuant to Florida law).

On May 30, 2014, Dr. Lord was granted an award of 8,797 restricted stock units. Those stock units vested on May 30, 2015. Dr. Lord claims that, in the event the Court determines that the cutoff date for the determination of marital assets shall be the parties separation date in March 2015, these restricted stock units constitute separate, non-marital property to the extent that they were awarded as an incentive for continued and future services and/or as an incentive for future productivity (or to any other extent pursuant to Florida law).

## Note 5

Biolase, Inc. – On August 27, 2014, Dr. Lord was awarded a restricted stock unit award with respect to 9,217 shares in the company's common stock. Those stock units vested in one annual installment on August 27, 2015. Dr. Lord claims that any and all unvested restricted stock unit awards that did not vest by the cutoff date for the determination of marital assets are separate, non-marital property to the extent that such unvested restricted stock unit awards were awarded as an incentive for continued and future services and/or as an incentive for future productivity (or to any other extent pursuant to Florida law).

On August 27, 2014, Dr. Lord was granted an option to purchase 41,428 shares in the company's common stock at $2.27 per share. Commencing on May 27, 2015, the shares vest in monthly installments over a twelve month period. Dr. Lord claims that any and all unvested stock options that have not vested by the cutoff date for the determination of marital assets are separate, non-marital property to the extent that such unvested stock options were awarded as an incentive for continued and future services and/or as an incentive for future productivity (or to any other extent pursuant to Florida law).

On April 27, 2015, Dr. Lord was granted an option to purchase 132,159 shares in the company's common stock at $2.27 per share. Commencing on May 27, 2015, the shares vest in monthly installments over a twelve month period. Dr. Lord claims that any and all unvested stock options that have not vested by the cutoff date for the determination of marital assets are separate, non-marital property to the extent that such unvested stock options were awarded as an incentive for

JTL 00014

continued and future services and/or as an incentive for future productivity (or to any other extent pursuant to Florida law).

## Note 6

Cruden Bay – On a voting basis, Cruden Bay owns 1.09% of Shareable Ink on a fully diluted basis. In turn. Dr. Lord owns 9.3% of Cruden Bay, and as a result, Dr. Lord owns .10% of the voting interest in Shareable Ink.

## Note 7

Velano Vascular, Inc. (formerly Creative Vascular, Inc.) – On April 22, 2014, Dr. Lord was granted an option to purchase 10,062 shares in the company's common stock at $0.84 per share, as set forth in the 2011 Equity Incentive Plan. So long as Dr. Lord's continuous service status does not terminate, 1/24ths of the total number of shares began vesting on May 22, 2014, and are exercisable on each monthly anniversary of the vesting commencement date. Dr. Lord claims that any and all unvested stock options that have not vested by the cutoff date for the determination of marital assets are separate, non-marital property to the extent that such unvested stock options were awarded as an incentive for continued and future services and/or as an incentive for future productivity (or to any other extent pursuant to Florida law).

## Note 8

Digital Reasoning – On June 10, 2014, Dr. Lord was granted an option to purchase 210,000 shares in the company's common stock at $0.649 per share, as set forth in the 2011 Equity Incentive Plan. Twenty-one thousand (21,000) of those shares vested on December 10, 2014, with the balance vesting with respect to 1/60th of the shares each month thereafter (with vesting occurring on the first day of each month) over a 54 month period, subject to Dr. Lord's continuous service with the company through each such vesting date. Dr. Lord claims that any and all unvested stock options that have not vested by the cutoff date for the determination of marital assets are separate, non-marital property to the extent that such unvested stock options were awarded as an incentive for continued and future services and/or as an incentive for future productivity (or to any other extent pursuant to Florida law).

## Note 9

Par8o, Inc. – On January 27, 2015, Dr. Lord was granted an option to purchase 275,439 shares in the company's common stock at $0.14 per share. Commencing on January 2, 2014, 1/60th of the shares vest and become exercisable each month, provided Dr. Lord continues to have a service relationship with the company on each vesting date. Dr. Lord claims that any and all unvested stock options that have not vested by the cutoff date for the determination of marital assets are separate, non-marital property to the extent that such unvested stock options were awarded as an incentive for continued and future services and/or as an incentive for future productivity (or to any other extent pursuant to Florida law).

JTL 00015

On January 27, 2015, Dr. Lord was granted an option to purchase 27,548 shares in the company's common stock at \$0.14 per share. Commencing on November 6, 2014, 1/60th of the shares vest and become exercisable each month, provided Dr. Lord continues to have a service relationship with the company on each vesting date. Dr. Lord claims that any and all unvested stock options that have not vested by the cutoff date for the determination of marital assets are separate, non-marital property to the extent that such unvested stock options were awarded as an incentive for continued and future services and/or as an incentive for future productivity (or to any other extent pursuant to Florida law).

JTL 00016

CONFIDENTIAL INFORMATION

LORD-001040

I understand that I am swearing or affirming under oath to the truthfulness of the claims made in this affidavit and that the punishment for knowingly making a false statement includes fines and/or imprisonment.

Dated: 27 Oct 2015

JONATHAN LORD

STATE OF FLORIDA
COUNTY OF Nassau

Sworn to or affirmed and signed before me on 10-27-2015 by Jonathan Thomas Lord



NOTARY PUBLIC or DEPUTY CLERK

Deborah Ann St. Hart

*[Print, type, or stamp commissioned name of notary or deputy clerk]*

___ Personally known
✓ Produced identification
Type of identification produced Florida drivers license

DEBORAH ANN ST.HART
Notary Public- State of Florida
My Comm. Expires Jul 7, 2018
Commission # FF139371

JTL 00017

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was furnished by electronic mail on this 11<sup>th</sup> day of November, 2015, on Terry Fogel (tfogel@fogelrubinfogel.com) (frf@fogelrubinfogel.com) and Scott Rubin (srubin@fogelrubinfogel.com) FOGEL RUBIN FOGEL, 350 Courthouse Tower, 44 West Flagler Street, Miami, Florida 33130, pursuant to Florida Rule of Judicial Administration 2.516.

THE FERRARO LAW FIRM, P.A.
600 Brickell Avenue, Suite 3800
Miami, Florida 33131
(Phone) 305-375-0111
(Fax) 305-379-6222
*Attorneys for Respondent/Husband*

/s/ *Jose L. Becerra*
Jose Becerra Esq.
Florida Bar No. 104891
JLB@ferrarolaw.com

JTL 00018

**CONFIDENTIAL INFORMATION**                                    **LORD-001042**

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

IN RE: THE MARRIAGE OF:          CASE NO.: 132015DR022706

ALICE LORD,                         DIVISION: FC 18

          Petitioner/Wife,

and

JONATHAN LORD,

          Respondent/Husband.

_____/

## HUSBAND'S NOTICE OF SERVICE OF RESPONSES TO INTERROGATORIES

      Husband, JONATHAN LORD, through his undersigned counsel, gives notice to Wife,

ALICE LORD, that he has, on the date indicated herein, served his responses to Wife's Standard

Family Law Interrogatories for Original Enforcement Proceedings and to Wife's Additional

Interrogatories.

## CERTIFICATE OF SERVICE

      **I HEREBY CERTIFY** that a true and correct copy of the foregoing was furnished by
electronic mail on this 11th day of November, 2015, on Terry Fogel (tfogel@fogelrubinfogel.com)
(frf@fogelrubinfogel.com) and Scott Rubin (srubin@fogelrubinfogel.com) FOGEL RUBIN
FOGEL, 350 Courthouse Tower, 44 West Flagler Street, Miami, Florida 33130, pursuant to
Florida Rule of Judicial Administration 2.516.

                           THE FERRARO LAW FIRM, P.A.
                           600 Brickell Avenue, Suite 3800
                           Miami, Florida 33131
                           (Phone) 305-375-0111
                           (Fax) 305-379-6222
                           *Attorneys for Respondent/Husband*

                           */s/ Jose L. Becerra*
                           Jose Becerra Esq.
                           Florida Bar No. 104891
                           JLB@ferrarolaw.com

1

JONATHAN LORD, M.D.
February 24, 2022
Defendant's
**Exhibit 44**

CONFIDENTIAL INFORMATION          LORD-001519

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

IN RE: THE MARRIAGE OF:                    CASE NO.: 132015DR022706

ALICE LORD,                                DIVISION: FC 18

        Petitioner/Wife,

and

JONATHAN LORD,

        Respondent/Husband.

_____/

## HUSBAND'S RESPONSES TO INTERROGATORIES

    **COMES NOW**, Husband, by and through the undersigned counsel, and serves these responses Wife's Standard Family Law Interrogatories for Original Enforcement Proceedings and to Wife's Additional Interrogatories, stating:

    Information provided in these responses is based upon information that is presently reasonably available to Husband. Husband reserves the right, without imposing upon himself any duty not required by the Florida Rules of Civil Procedure to supplement these responses in the event that additional documentation comes to Husband's attention or into his possession.

    Objection is made to these interrogatories to the extent that they seek privileged information or information which has been gathered in the course of litigation or which is otherwise subject to the attorney-client privilege, attorney work product privilege, rules regarding materials prepared in anticipation of litigation, or any other privilege. Any responses contained herein are made subject to these objections and without waiver of same.

    Objection is also made to these interrogatories to the extent that they seek to impose on Plaintiff any obligation not otherwise required by the Florida Rules of Civil Procedure or the Family Rules of Civil Procedure.

2

1. **BACKGROUND INFORMATION**:

   a. State your full legal name and any other name by which you have been known.

      **Response: Jonathan Thomas Lord.**

   b. State your present residence and telephone numbers.

      **Response: 135 Long Point Drive, Fernandina Beach, Florida 32034.**

2. **EDUCATION**:

   a. List all business, commercial, and professional licenses that you have obtained.

      **Response: Medical license, M.D., Florida, Kentucky, and Maryland.**

   b. List all of your education including, but not limited to, vocational or specialized training, including the following:

      1) Name and address of each educational institution.

         **Response: University of Miami, South Dixie Highway, Coral Gables, Florida 33124.**

      2) Dates of attendance.

         **Response: University of Miami, September 1971 to December 1973, Bachelor of Science. University of Miami, September 1974 to June 1978, Medical Doctor.**

      3) Degrees or certificates obtained or anticipated dates of same.

         **Response: University of Miami, Bachelor of Science. University of Miami, Medical Doctor.**

3. **EMPLOYMENT**:

   a. For each place of your employment or self-employment during the last 3 years, state the following:

      1) Name, address, and telephone number of your employer.

3

LORD-001521

**Response**: **University of Miami, South Dixie Highway, Coral Gables, Florida 33124; (305)-284-2211.**

2) Dates of employment.

**Response**: **March 2012 – January 2013.**

3) Job title and brief description of job duties.

**Response**: **Chief Operating Officer and VP for Medical Administration; various duties.**

4) Starting and ending salaries.

**Response**: **Starting salary $736,000; ending salary $913,000.**

5) Name of your direct supervisor.

**Response**: **Pascal Goldschmidt.**

6) All benefits received, including, for example, health, life, and disability insurance; expense account; use of automobile or automobile expense reimbursement; reimbursement for travel, food, or lodging expenses; payment of dues in any clubs or associations; and pension or profit sharing plans.

**Response**: **Standard benefits for a Professor (clinical track).**

b. Other than as an employee, if you have been engaged in or associated with any business, commercial, or professional activity within the last 3 years that was not detailed above, state for each such activity the following:

**Response**: **Respondent objects to this Interrogatory and its subparts as overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Without waiving any objections and subject thereto, Respondent states as follows:**

**Since 2008 to present, I have served on the board of directors for DexCom; I have not received any cash compensation in the form of a salary for such appointment.**

**Since 2014 to present, I have served on the board of directors for Biolase, Inc.; I have not received any cash compensation in the form of a salary for such appointment.**

4

**LORD-001522**

From July 2013 to December 2013, I served on the board of directors for Mako Surgical Corp.; I did not receive any cash compensation in the form of a salary for such appointment. All of my stock options were exercised and converted to cash in December 2013.

From 2012 to 2014, I served on the board of directors for Vigilant Biosciences, Inc.; I did not receive any cash compensation in the form of a salary for such appointment. All of my stock options were exercised and converted to cash.

Since 2013 to present, I have served on the board of directors for Par8o, Inc.; I have not received any cash compensation in the form of a salary for such appointment.

Since 2014 to present, I have served on the board of directors for Digital Reasoning Systems, Inc.; I have not received any cash compensation in the form of a salary for such appointment.

Since 2014 to present, I have served on the board of directors for Velano Vascular, Inc.; I have not received any cash compensation in the form of a salary for such appointment.

I am also on the Commercial Advisory Board for Third Rock Ventures, where I served as a consultant between July 1, 2013, and July 1, 2015, and received an annual salary of $50,000.00.

Additional information pertaining to Respondent's consultation work can be found in the documents provided by Husband pursuant to Rule 12.285 and in response to Petitioner's Requests for Production.

1) Name, address, and telephone number of each activity.

**Response:** *see* **above.**

2) Dates you were connected with such activity.

**Response:** *see* **above.**

3) Position, title, and brief description of activities.

**Response:** *see* **above.**

4) Starting and ending salaries.

**Response:** *see* **above.**

5

CONFIDENTIAL INFORMATION

5) Name of all persons involved in the business, commercial, or professional activity with you.

**Response: Respondent objects to this Interrogatory as overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.**

6) All benefits received, including, for example, health, life, and disability insurance; expense account; use of automobile or automobile expense reimbursement; reimbursement for travel, food, or lodging expenses; payment of dues in any clubs or associations; and pension or profit sharing plans.

**Response:** *see* **above.**

c. If you have been unemployed at any time during the last 3 years, state the dates of unemployment. If you have not been employed at any time in the last 3 years, give the information requested above in question 3.a for your last period of employment.

**Response: I have been unemployed since January 2013.**

4. **ASSETS:**

a. **Real Estate.** State the street address, if any, and if not, the legal description of all real property that you own or owned during the last 3 years. For each property, state the following:

**Response: 68 La Gorce Circle, Miami Beach, FL 33141; 135 Long Point Drive, Fernandina Beach, Florida 32034.**

(1) the names and addresses of any other persons or entities holding any interest and their percentage of interest.

**Response: Respondent objects to this Interrogatory as not reasonably calculated to lead to the discovery of any admissible evidence. Without waiving any objections and subject thereto, Alice Lord, with an address of 68 La Gorce Circle, Miami Beach, FL 33141, has a 50% interest in 68 La Gorce Circle, Miami Beach, FL 33141; Diane Rogler, with an address of 135 Long Point Drive, Fernandina Beach, Florida 32034, has a 50% interest in 135 Long Point Drive, Fernandina Beach, Florida 32034.**

(2) the purchase price, the cost of any improvements made since it was purchased, and the amount of any depreciation taken.

6

PAGES REMOVED FOR PURPOSE OF PRODUCTION

IN CASE NO. 13-CV-22500

CONFIDENTIAL INFORMATION

LORD-001525

**admissible evidence.  Respondent further objects to this Interrogatory as nonsensical as phrased.**

6. Identify by court, case number and names of parties all litigation in which you have been involved as a party or a witness including marital litigation, from January 1, 2010 to the date you are answering this interrogatory.

    **Response: Respondent objects to this Interrogatory to the extent that it seeks information pertaining to a complaint filed in camera, which remains under seal pursuant to 31 U.S. Code § 3730, and which may contain information protected by the attorney-client privilege.**

7. With the exception of your attorneys, identify by name and address all persons with whom you have discussed the dissolution of your marriage, your employment circumstances, your income, your assets or your liabilities during the 15 months preceding your answer to this interrogatory.

    **Response: Respondent objects to this Interrogatory as vague, ambiguous, unduly burdensome, harassing, and as not reasonably calculated to lead to the discovery of admissible evidence.  Respondent further objects to this Interrogatory to the extent that it seeks information pertaining to a complaint filed in camera, which remains under seal pursuant to 31 U.S. Code § 3730, and which may contain information protected by the attorney-client privilege.**

8. State each and every attempt you have made to become employed in the 15 months preceding your answer to this interrogatory.

    **Response: Respondent has not made any affirmative attempts to become employed in the last 15 months. Respondent, however, was contacted by a national search firm in or around October 2014 in regard to the chief executive officer position for the American Diabetes Association.**

9. State the name and address of ever health care professional you have seen for diagnosis or treatment (including mental health professionals) during 2014 and 2015 to date, the date of visit(s) and the reason for the visit(s).

    **Response: Respondent objects to this Interrogatory as unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Without waiving any objections and subject thereto, Judy Woogler, M.D., University of Miami, for general physicals; and Beth G. Diamond, M.D., Annapolis Dermatology Center, Inc., for general body scans and removal of skin lesions. Otherwise, unknown.**

CONFIDENTIAL INFORMATION

10. List all addresses currently used by you for any purpose.

   **Response: PO Box 16346, Fernandina Beach, Florida 32035.**

22

**CONFIDENTIAL INFORMATION**

**LORD-001527**

I understand that I am swearing or affirming under oath to the truthfulness of these interrogatory responses and that the punishment for knowingly making a false statement includes fines and/or imprisonment.

Dated: 27 Oct 2015

_____
JONATHAN LORD

STATE OF FLORIDA

COUNTY OF Nassau

Sworn to or affirmed and signed before me on OCTOBER 27 2015 by Jonathan Thomas Lord

Deborah Ann St Hart

NOTARY PUBLIC or DEPUTY CLERK

Deborah Ann St Hart

*[Print, type, or stamp commissioned name of notary or deputy clerk]*

_____ Personally known

__V__ Produced identification

Type of identification produced Florida Drivers license



DEBORAH ANN ST.HART
Notary Public- State of Florida
My Comm. Expires Jul 7, 2018
Commission # FF139371

CONFIDENTIAL INFORMATION

Filing # 34460095 E-Filed 11/15/2015 11:58:04 AM

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

IN RE: THE MARRIAGE OF:                    CASE NO.: 132015DR022706

ALICE LORD,                                          DIVISION: FC 18

           Petitioner/Wife,

and

JONATHAN LORD,

           Respondent/Husband.

_____/

**HUSBAND'S RESPONSE TO WIFE'S URGENT MOTION TO COMPEL HUSBAND
TO MAINTAIN STATUS QUO AND FUND ACCOUNT FOR HOUSEHOLD EXPENSES**

      Husband, JONATHAN LORD, through his undersigned counsel, responds to the Petitioner

Wife's Urgent Motion to compel Husband to Maintain Status Quo and Fund Account for

Household Expenses, stating:

      1.     Petitioner, Alice Lord ("Wife") and Respondent, Jonathan Lord ("Husband")

married on April 17, 2002.

      2.     Wife currently lives in the parties' marital home at 68 La Gorce Circle, Miami

Beach, Florida 33140 (the "Marital Home").

      3.     Wife entered the marriage with a minimal net worth, but after the resolution of this

dissolution of marriage, will walk away as a multi-millionaire.

      4.     The Marital Home is currently listed for sale at $11,900,000. It is encumbered with

a mortgage totaling $2,918,983, and a home equity line of credit totaling $2,635,538. As such, the

Marital Home has approximately $6,345,479 in equity.

      5.     Husband retired in July 2013. Prior to his retirement, he served as Chief Medical

Officer of Humana, Chief Operations Officer of the Miller School and UHealth-University of

1



Miami Health System, Chief Innovation Officer for the University of Miami, and as Professor of Pathology at the University of Miami's Miller School of Medicine.

6. Husband, who is retired, does not receive any fixed, regular income. Instead, Husband receives irregular distributions from several sources. For example, it has been Husband's customary business practice to sell stock to generate cash. Recently, on September 9, 2015, Husband sold 10,000 shares of DexCom, Inc.

7. On September 10, 2015, Wife filed a petition for dissolution of marriage. On October 7, 2015, Husband filed an Answer, and Counter-Petition for Dissolution of Marriage.

8. In Husband's Counter-Petition, he does not dispute that the Marital Home is a marital asset. He does, however, state that the Court should award him his non-marital assets, including but not limited to, shares of stock and restricted stock units that were acquired with pre-marital assets (such as 55,000 shares of DexCom, Inc., among others). *See* Husband's Counter-Petition, attached as Exhibit A.

9. Prior to the commencement of this dissolution, and upon realization that the marriage was irretrievably broken, Husband recommended to Wife that they cancel their pending purchase of a condominium unit at the Surf Club in Miami Beach, Florida, in order to have their $2,720,000 deposit returned. Husband suggested that the parties evenly split the $2,720,000.00 deposit, but Wife refused.

10. Wife was only willing to cancel the Surf Club contract under her rules. Ultimately, the parties entered into an agreement (the "Agreement") whereby by the parties partially and equitably distributed 50% of the Surf Club deposit. As such, the Wife received $680,000 in unencumbered cash.

2

11.     The Agreement also stipulates that, during the pendency of the sale of the Marital Home, the Marital Home household expenses will be paid from the joint cash account and attributed jointly.

12.     Per the Agreement, the remaining 50% of the Surf Club deposit (totaling $1,360,000) is currently sitting in Wife's counsel's trust account, and is inaccessible absent "written agreement of the parties or a court order."

13.     On Thursday, November 5, 2015, Wife's counsel emailed Husband's counsel and noted that the parties' joint cash account was substantially depleted. *See* Email Chain, at p. 3, attached as Exhibit B. Wife's counsel demanded that such account be replenished with the proceeds from Husband's recent business decision to sell 10,000 shares of DexCom, Inc.

14.     On Monday, November 9, 2015, Husband's counsel responded to Wife's counsel and asked for an additional day or two to respond to Wife's request. *Id.* In addition, Husband's counsel asked Wife's counsel if he was available for a conference call in the afternoon of Tuesday, November 10, 2015. *Id.* In response, Wife's counsel stated that he had already filed an urgent motion, and that he "may" be able to call Husband's counsel on November 10, 2015. *Id.* at p. 2. To date, Wife's counsel has not called Husband's counsel to discuss this issue.

15.     On Tuesday, November 10, 2015, Husband's counsel sent Wife's counsel a correspondence, and offered two alternatives in order to replenish the joint cash account:

   a.  Transfer the $1,360,000 currently sitting in Wife's Counsel's trust account into the joint account; or

   b.  Draw down the parties' joint UBS home equity line of credit.

   *See* Nov. 10, 2015, Correspondence, attached as Exhibit C.

3

16.     On Wednesday, November 11, 2015, Wife's counsel responded, stating that neither proposal was acceptable. *See* Exhibit B, at p. 1.

17.     Husband is willing and able to replenish the parties' joint account so that the Marital Home expenses can be paid. Husband, however, wants to do so without jeopardizing or waiving his right to maintain his non-marital assets (assets which may include 55,000 shares in DexCom, Inc., and which may have been part of the recent sale on September 9, 2015).

18.     Discovery is necessary in order to prove Husband's good-faith claim that certain stock, such as 55,000 shares in DexCom, Inc., constitutes non-marital assets. Meaningful discovery in this case has yet to begin. Husband intends to pursue his claims to their fullest extent. Requiring Husband to replenish the parties' joint account with the proceeds from the recent sale of 10,000 DexCom, Inc. shares, however, may affect Husband's claims regarding his non-marital assets.

19.     Wife's unreasonable refusal to transfer the $1,360,000 currently sitting in escrow (or a portion thereof), combined with her insistence that the proceeds from the recent sale of 10,000 DexCom, Inc. shares, be transferred into the joint account instead, is an attempt to sabotage Husband's claims to his non-marital assets.

20.     Wife will argue that the $1,360,000 currently sitting in escrow should remain therein as "insurance" in the unlikely event that this Court orders an inequitable distribution. Wife's position, however, even if reasonable, is obviated by the fact that the Marital Home has roughly $6 million in equity, and the fact that substantial, additional marital assets exist—assets that can be used in the unlikely event that this Court orders an inequitable distribution.

4

21.    Husband has hired the undersigned counsel and has agreed to pay a reasonable fee for this response to protect his interest as well as paying all suit money and costs advanced on his behalf. The parties are in equal position to hire counsel. Moreover, Wife has unreasonably refused to accept Husband's proposal dated Tuesday, November 10, 2015, *see supra* at ¶¶ 15-16. As such, and further pursuant to Section 61.16, Florida Statutes (2015), as well as Rosen v. Rosen, 696 So. 2d 697 (1997), and Rosa v. Rosa, 723 So. 2d 312 (Fla. 4th DCA 1998), Wife should be required to pay some or all of the attorneys' fees, suit money and costs incurred in responding to Wife's motion.

**WHEREFORE,** Husband respectfully requests that this Honorable Court:

a)  Order that a portion of the $1,360,000 currently sitting in escrow be transferred into the parties' joint cash account so that Wife can satisfy the Marital Home obligations, only;

b)  Or, in the alternative, order that the parties' draw down the Marital Home equity line of credit, and transfer the proceeds into the parties' joint cash account so that Wife can satisfy the Marital Home obligations, only; and

c)  Award Husband his reasonable attorneys' fees and costs from Wife, and grant such other relief as is just and proper.

Dated: November 15, 2015

5

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was furnished by electronic mail on this 15th day of November, 2015, on Terry Fogel (tfogel@fogelrubinfogel.com) (frf@fogelrubinfogel.com) and Scott Rubin (srubin@fogelrubinfogel.com) FOGEL RUBIN FOGEL, 350 Courthouse Tower, 44 West Flagler Street, Miami, Florida 33130, pursuant to Florida Rule of Judicial Administration 2.516.

THE FERRARO LAW FIRM, P.A.
600 Brickell Avenue, Suite 3800
Miami, Florida 33131
(Phone) 305-375-0111
(Fax) 305-379-6222
*Attorneys for Respondent/Husband*

*/s/ Jose L. Becerra*
Jose Becerra Esq.
Florida Bar No. 104891
JLB@ferrarolaw.com

# EXHIBIT A

Filing # 32935783 E-Filed 10/07/2015 11:09:27 AM

## IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL
## CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

IN RE: THE MARRIAGE OF:                    CASE NO.: 132015DR022706

ALICE LORD,                                 DIVISION: FC 18

        Petitioner/Wife,

and

JONATHAN LORD,

        Respondent/Husband.

_____/

## HUSBAND'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTER-PETITION
## FOR DISSOLUTION OF MARRIAGE AND OTHER RELIEF

Petitioner/Husband, JONATHAN LORD, through his undersigned counsel, files his

Answer, Affirmative Defenses, and Counter-Petition for Dissolution of Marriage and Other Relief,

and states the following:

### ANSWER AND AFFIRMATIVE DEFENSES

1.    Admitted.

2.    Admitted.

3.    Admitted to the extent that the parties married on April 17, 2002, and did thereafter

cohabit as Husband and Wife until March 26, 2015. Denied as to the remaining allegations

contained in Paragraph 3 of Wife's Petition.

4.    Admitted to the extent that the marriage between the parties is irretrievably broken.

Denied as to the remaining allegations contained in Paragraph 4 of Wife's Petition.

5.    Admitted.

6.    Denied.

7.    Denied.

    8.    Denied.

    9.    Denied.

### HUSBAND'S COUNTER-PETITION FOR DISSOLUTION OF MARRIAGE AND OTHER RELIEF

The Counter-Petitioner/Husband, JONATHAN LORD, ("Husband") hereby files his Counter Petition for Dissolution of Marriage and Other Relief against the Counter-Respondent/Wife ALICE LORD ("Wife"), and states as follows:

### SECTION I – DISSOLUTION OF MARRIAGE

1.    This Court has jurisdiction of the subject matter and the parties.

2.    Both Husband and Wife have been Florida residents for at least six (6) months before the filing of the Petition for Dissolution of Marriage and Other Relief.

3.    Neither party is an active member of the military service.

4.    The parties married on April 17, 2002.

5.    The Wife currently lives in the marital home at 68 La Gorce Circle, Miami Beach, FL 33141-4520 (the "Marital Home").

6.    Husband vacated the Marital Home in March 2015. Wife currently lives in the Marital Home, and all of the household expenses are being paid from the parties' joint account.

7.    There are no children to this marriage.

8.    A completed Notice of Social Security Number in substantial conformity with Florida Supreme Court Approved Family Law Form 12.902(j) has been filed simultaneously herewith.

9.    Prior to the filing date of this petition, the parties entered into a voluntary agreement whereby Wife received a substantial amount of money through a "partial equitable distribution of marital assets."

10.   The marriage of the parties is irretrievably broken.

## SECTION II – MARITAL AND NON-MARITAL ASSETS AND LIABILITIES

11.   The parties have marital and non-marital assets and liabilities.

12.   All marital and non-marital assets and liabilities will be listed in the financial affidavits to be served in this case.

13.   The Court should set aside to each party his/her non-marital assets and liabilities.

14.   The Court should distribute to Husband his non-marital assets, including, but not limited to, the following:

   a.   Two-hundred thousand dollars ($200,000.00) used to purchase real property in Louisville, Kentucky, in August of 2002;

   b.   Any and all real property purchased with non-marital assets;

   c.   Fifty-five thousand (55,000) DexCom shares;

   d.   DexCom Restricted Stock Units;

   e.   Unvested stock options in Biolase, Inc.;

   f.   Unvested stock options in Digital Reasoning;

   g.   Unvested stock options in Creative Vascular/Velano;

   h.   Unvested stock options in Par8o, Inc.; and

   i.   Any and all future awards associated with any causes of action, whether in suit or not.

15.   The Court should equitably distribute the parties' marital assets and liabilities.

## SECTION III – SPOUSAL SUPPORT (ALIMONY)

16   During the marriage, the parties had a comfortable lifestyle.

17.   Wife is voluntarily unemployed, but is capable of supporting herself on a temporary and permanent basis.

18.   Wife currently receives Social Security income.

19.   Wife will not have a need for any spousal support (alimony) after the equitable distribution of the parties' marital assets and liabilities in order to continue to enjoy a lifestyle in the standard similar to which she enjoyed during the marriage.

## SECTION IV – ATTORNEYS' FEES, COSTS, AND SUIT MONEY

20.   The Husband has retained the undersigned counsel to represent him in this action and agreed to pay their reasonable attorneys' fees and costs, and suit money of this action.

21.   Prior to the filing date of this petition, the parties entered into an agreement whereby Wife received a substantial amount of money through a "partial equitable distribution of marital assets." As such, each party should be required to bear their own attorneys' fees, costs, and suit money of their own counsel, pursuant to Section 61.16, Florida Statutes (2015), on both a temporary and permanent basis, as neither has the need, or will have the need, for an award of attorneys' fees, costs, and suit money.

22.   In the alternative, if Husband advances temporary attorneys' fees, costs, and suit money to Wife, Husband should be reimbursed for same from Wife upon Financial Judgment for Dissolution of Marriage.

23.   Husband should be entitled to an award of attorneys' fees, costs, and suit money against Wife should she engage in unnecessary and vexatious litigation and/or as a punitive award for failure to comply with the Court's Orders.

**WHEREFORE,** Husband, JONATHAN LORD, respectfully requests that the Court:

4

a)  Assume jurisdiction of the parties and the subject matter;

b)  Upon Final Hearing, dissolve the marriage between the parties;

c)  Reserve to each party his/her non-marital assets and liabilities;

d)  Equitably distribute the marital assets and liabilities of the parties;

e)  Order that each party bear their own attorneys' fees, costs and suit money on both a temporary and permanent basis, or alternatively, if Husband advances temporary attorneys' fees, costs, and suit money to Wife, order Wife to reimburse him for same upon the Final Judgment for Dissolution of Marriage;

f)  Award to Husband his attorneys' fees, costs and suit money against Wife should she engage in unnecessary and vexatious litigation and/or as punitive award for failure to comply with this Court's Orders; and

g)  Award such further relief as is just and proper.

Dated: October 7, 2015

Respectfully submitted,

THE FERRARO LAW FIRM, P.A.
600 Brickell Avenue, Suite 3800
Miami, Florida 33131
(Phone) 305-375-0111
(Fax) 305-379-6222
*Attorneys for Respondent/Wife*

Jose Becerra Esq.
Florida Bar No. 104891
JLB@ferrarolaw.com
James L. Ferraro, Esq.
Florida Bar No. 381659
JLF@ferrarolaw.com

5

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was furnished by electronic mail on this 7th day of October, 2015, on Terry Fogel (tfogel@fogelrubinfogel.com) (frf@fogelrubinfogel.com) and Scott Rubin (srubin@fogelrubinfogel.com) FOGEL RUBIN FOGEL, 350 Courthouse Tower, 44 West Flagler Street, Miami, Florida 33130, pursuant to Florida Rule of Judicial Administration 2.516.

Respectfully submitted,

THE FERRARO LAW FIRM, P.A.
600 Brickell Avenue, Suite 3800
Miami, Florida 33131
(Phone) 305-375-0111
(Fax) 305-379-6222
*Attorneys for Respondent/Husband*

Jose Becerra Esq.
Florida Bar No. 104891
JLB@ferrarolaw.com
James L. Ferraro, Esq.
Florida Bar No. 381659
JLF@ferrarolaw.com

# EXHIBIT B

## Jose L. Becerra

| | |
|---|---|
| **From:** | Scott L. Rubin <srubin@fogelrubinfogel.com> |
| **Sent:** | Wednesday, November 11, 2015 11:25 AM |
| **To:** | Jose L. Becerra |
| **Cc:** | tfogel@fogelrubinfogel.com; 'Robert A. Stone' |
| **Subject:** | RE: URGENT re: Parties' Joint Cash Account |

Jose,

Neither of your proposals are acceptable. We shall be seeking a hearing from Judge Blake. On another note, are you prepared to exchange discovery today as agreed?



Scott L. Rubin

Florida Bar Board Certified in Marital and Family Law
Fogel Rubin & Fogel
350 Courthouse Tower
44 West Flagler Street
Miami Fl. 33130

Tel: (305)577-4905
Fax: (305)372-0936

The information contained in this transmission is **ATTORNEY PRIVILEGED, LAWYER WORK PRODUCT, OR CONFIDENTIAL INFORMATION** intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient or an employee or agent responsible for delivering this material to them, you are hereby notified that any dissemination, disclosure, distribution, copying or other use of this communication is strictly prohibited. If you have received this communication in error, please notify us by telephone immediately and delete the original message and any copies. Receipt by anyone other than the intended recipient listed above is not a waiver of any attorney-client, work-product or other applicable privilege. IF YOU EXPERIENCE ANY PROBLEMS WITH THIS TRANSMISSION, PLEASE CALL (305) 577-4905.

**From:** Jose L. Becerra [mailto:jlb@ferrarolaw.com]
**Sent:** Tuesday, November 10, 2015 7:07 PM
**To:** Scott L. Rubin <srubin@fogelrubinfogel.com>
**Cc:** tfogel@fogelrubinfogel.com; James L. Ferraro <JLF@ferrarolaw.com>
**Subject:** RE: URGENT re: Parties' Joint Cash Account

Scott:

As a follow up to the below and the urgent motion you filed, please find attached. I will be in the office tomorrow afternoon should you wish to chat, many thanks.

Jose L. Becerra, Esq.
Associate

1



**THE FERRARO LAW FIRM**

Brickell World Plaza
600 Brickell Ave
Suite 3800
Miami, FL 33131
Tel: (305) 375-0111
Fax: (305) 379-6222
Toll-Free: (800) 275-3332
www.ferrarolaw.com

Confidentiality Notice: The information contained in this transmittal, including any attachment, is privileged and confidential and is intended only for the person or entity to whom it is addressed. If you are neither the intended recipient nor the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any disclosure, copying or distribution or the taking of any action in reliance on the contents of this transmittal is strictly prohibited. If you have received this transmittal in error, please contact the sender immediately and delete this transmittal from any computer or other data bank.

---

**From:** Scott L. Rubin [mailto:srubin@fogelrubinfogel.com]
**Sent:** Monday, November 09, 2015 5:13 PM
**To:** Jose L. Becerra <jlb@ferrarolaw.com>
**Cc:** tfogel@fogelrubinfogel.com; 'Robert A. Stone' <RStone@KaufmanRossin.com>
**Subject:** RE: URGENT re: Parties' Joint Cash Account

Jose,

We have already filed an urgent motion, which you should receive shortly. Terry and I are in court in Key West tomorrow afternoon, but we will be receiving and periodically checking emails. We may be able to call after court, if we are not there too late. Please let us have your position by email tomorrow. We anticipate asking the Judge for a hearing if this matter is not resolved.



Scott L. Rubin

Florida Bar Board Certified in Marital and Family Law
Fogel Rubin & Fogel
350 Courthouse Tower
44 West Flagler Street
Miami FL 33130

Tel: (305)577-4905
Fax: (305)372-0936

The information contained in this transmission is **ATTORNEY PRIVILEGED, LAWYER WORK PRODUCT, OR CONFIDENTIAL INFORMATION** intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient or an employee or agent responsible for delivering this material to them, you are hereby notified that any dissemination, disclosure, distribution, copying or other use of this communication is strictly prohibited. If you have received this communication in error, please notify us by telephone immediately and delete the original message and any copies. Receipt by anyone other than the intended recipient listed above is not a waiver of any attorney-client, work-product or other applicable privilege. IF YOU EXPERIENCE ANY PROBLEMS WITH THIS TRANSMISSION, PLEASE CALL (305) 577-4905.

**From:** Jose L. Becerra [mailto:jlb@ferrarolaw.com]
**Sent:** Monday, November 09, 2015 4:30 PM
**To:** Scott L. Rubin <srubin@fogelrubinfogel.com>
**Cc:** tfogel@fogelrubinfogel.com; James L. Ferraro <JLf@ferrarolaw.com>
**Subject:** RE: URGENT re: Parties' Joint Cash Account

Scott:

I am in receipt of your below email, please give me an extra day or two to discuss your request with my client. Are you available for a call late tomorrow afternoon? Please let me know, thank you.

Jose L. Becerra, Esq.
Associate



Brickell World Plaza
600 Brickell Ave
Suite 3800
Miami, FL 33131
Tel: (305) 375-0111
Fax: (305) 379-6222
Toll-Free: (800) 275-3332
www.ferrarolaw.com

Confidentiality Notice: The information contained in this transmittal, including any attachment, is privileged and confidential and is intended only for the person or entity to whom it is addressed. If you are neither the intended recipient nor the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any disclosure, copying or distribution or the taking of any action in reliance on the contents of this transmittal is strictly prohibited. If you have received this transmittal in error, please contact the sender immediately and delete this transmittal from any computer or other data bank.

**From:** Scott L. Rubin [mailto:srubin@fogelrubinfogel.com]
**Sent:** Thursday, November 05, 2015 12:32 PM
**To:** Jose L. Becerra <jlb@ferrarolaw.com>
**Cc:** tfogel@fogelrubinfogel.com
**Subject:** URGENT re: Parties' Joint Cash Account
**Importance:** High

Jose,

As we assume you know, the parties' cash account from which the joint household expenses are being paid pursuant to their written agreement has been depleted to the point that the balance is little more than zero. It was the custom during the marriage to replenish the account with the proceeds from stock sales.

Unfortunately, shortly after our unsuccessful mediation at which we advised you we would be filing, your client sold a substantial amount of stock and, to this date, has failed to account for the proceeds. Clearly, they did not go into the joint cash account, as was the marital custom and status quo despite your knowledge that filing was imminent.

Both situations would be remedied if your client now places the proceeds from his unilateral sale of marital stock into the joint cash account to replenish it. Please advise by the close of business on Monday whether he will do so voluntarily or if we shall be required to seek emergency relief from Judge Blake.



Scott L Rubin

Florida Bar Board Certified in Marital and Family Law
Fogel Rubin & Fogel
350 Courthouse Tower
44 West Flagler Street
Miami FL 33130

Tel: (305)577-4905
Fax: (305)372-0936

The information contained in this transmission is **ATTORNEY PRIVILEGED, LAWYER WORK PRODUCT, OR CONFIDENTIAL INFORMATION** intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient or an employee or agent responsible for delivering this material to them, you are hereby notified that any dissemination, disclosure, distribution, copying or other use of this communication is strictly prohibited. If you have received this communication in error, please notify us by telephone immediately and delete the original message and any copies. Receipt by anyone other than the intended recipient listed above is not a waiver of any attorney-client, work-product or other applicable privilege. IF YOU EXPERIENCE ANY PROBLEMS WITH THIS TRANSMISSION, PLEASE CALL (305) 577-4905.

# EXHIBIT C

JAMES L. FERRARO*
DAVID A. JAGOLINZER**

SCOTT A. KNOTT***
GREGORY S. LYNAM+
JUAN P. BAUTA, II
ERICA L. BRADY+++
ALLAN B. KAISER****
MARC P. KUNEN
AMANDA A. KESSLER*****
JANPAUL PORTAL
STEPHEN U. MCCLOSKEY
JAMES L. FERRARO, JR.
JOSE L. BECERRA
ERIC M. TINSTMAN
GABRIEL S. SAADE
ANELY M. HERNANDEZ
MICHAEL D. DUNLAVY



MIAMI • WASHINGTON, D.C.

600 Brickell Avenue
38TH FLOOR
MIAMI, FLORIDA 33131
TELEPHONE (305) 375-0111
TELEFAX (305) 379-6222
TOLL FREE (800) 275-3332
www.ferrarolaw.com

*ALSO LICENSED IN MA, DC, NY, OH
**ALSO LICENSED IN MA, DC, NY
*** ALSO LICENSED IN DC
**** ALSO LICENSED IN MO
***** ALSO LICENSED IN OH, IL, MO
+ONLY LICENSED IN CA, IL
+++ ONLY LICENSED IN CA, NY, WDC

++ OF COUNSEL

November 10, 2015

**VIA EMAIL**
Scott L. Rubin, P.A.
Fogel Rubin & Fogel
Courthouse Tower, Suite 350
44 West Flagler Street
Miami, FL 33130
srubin@fogelrubinfogel.com

   ***Re:***  ***The Marriage of Alice Lord and Jonathan Lord, M.D.***

Dear Mr. Rubin:

   Please let this correspondence serve as our response to your email dated November 5, 2015, regarding the replenishment of the parties' joint account. Dr. Lord proposes the following two options with respect to replenishing the joint account:

- Transfer the $1,360,000 currently kept in the Fogel Rubin & Fogel IOTA Trust Account into the joint account; or
- Draw down on the parties' UBS line of credit.

   Please let us know which option Mrs. Lord prefers. Should you have any questions or concerns, please do not hesitate to contact me.

November 10, 2015
Page 2 of 2

Very truly yours,

THE FERRARO LAW FIRM, P.A.

/s/ *Jose L. Becerra*
JOSE L. BECERRA, ESQ.

Cc: *James L. Ferraro, Esq.; Terry Fogel, Esq.*

Filing # 36131856 E-Filed 01/04/2016 10:13:36 PM

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

IN RE: THE MARRIAGE OF:                    CASE NO.: 132015DR022706

ALICE LORD,                               DIVISION: FC 18

           Petitioner/Wife,

and

JONATHAN LORD,

           Respondent/Husband.

_____/

**HUSBAND'S MOTION FOR LEAVE TO INCREASE EXISTING LINE OF CREDIT
AND TO SECURE AN INDIVIDUAL LINE OF CREDIT**

      Husband, JONATHAN LORD, through his undersigned counsel, files this Motion for

Leave to Increase Existing Line of Credit and to Secure an Individual Line of Credit, stating:

      1.     Petitioner, Alice Lord ("Mrs. Lord") and Respondent, Jonathan Lord ("Dr. Lord")

were married on April 17, 2002.

      2.     Mrs. Lord currently lives in the parties' marital home at 68 La Gorce Circle, Miami

Beach, Florida 33140 (the "Marital Home").

      3.     In March 2015, Dr. Lord, upon realization that the marriage was irretrievably

broken, separated from Mrs. Lord.

      4.     On April 24, 2015, Mrs. Lord told Dr. Lord that he was forbidden from accessing

or entering the Marital Home.[1]

---

[1] Dr. Lord is in possession of text messages from Mrs. Lord forbidding him from accessing or entering the
Marital Home, but has not attached them hereto out of respect for Mrs. Lord's privacy. If necessary, Dr.
Lord will make those messages available for an *in camera* review.

1


JONATHAN LORD, M.D.
February 24, 2022
Defendant's
**Exhibit 47**

5.    On September 10, 2015, Mrs. Lord filed a petition for dissolution of marriage. On October 7, 2015, Dr. Lord filed an Answer, and Counter-Petition for Dissolution of Marriage.

6.    Dr. Lord is retired, and does not receive any fixed, regular income.

7.    During the marriage, Dr. Lord and Mrs. Lord sought to purchase a condominium in Miami Beach, Florida, at the "Surf Club." They executed a purchase agreement, and paid a deposit of $2,720,000.

8.    After the parties separated in March 2015, and prior to the commencement of this dissolution action, Dr. Lord recommended to Mrs. Lord that they cancel their pending purchase of the Surf Club condominium in order to have their $2,720,000 deposit returned. Dr. Lord suggested that the parties evenly split the $2,720,000.00 deposit, but Mrs. Lord refused.

9.    Mrs. Lord was only willing to cancel the Surf Club contract under her terms. Ultimately, the parties entered into an agreement (the "Agreement") whereby by the parties partially and equitably distributed 50% of the Surf Club deposit. As such, Dr. Lord and Mrs. Lord both received $680,000 in unencumbered cash.

10.    Per the Agreement, the remaining 50% of the Surf Club deposit (totaling $1,360,000) is currently sitting in Mrs. Lord's counsel's trust account, and is inaccessible absent "written agreement of the parties or a court order."

11.    In September 2015, Dr. Lord used $600,000 of his Surf Club proceeds as a deposit to purchase a home in Fernandina Beach, Florida ("Dr. Lord's Home"). He also executed a balloon mortgage in the amount of $890,000, at a 4% interest rate, due on September 15, 2016.

12.     The parties own 72,107 shares of DexCom, Inc.[2]  As of January 4, 2016, those shares were trading at $78.49, totaling an overall worth of $5,659,678.43.

13.     Apart from the DexCom, Inc. shares, the parties own additional financial assets, stocks, and bonds worth millions of dollars.[3]  *See* Husband's Financial Affidavit, attached as Exhibit A.

14.     The parties also jointly own the Marital Home, which is listed for sale at $11,900,000.  It is encumbered with a mortgage totaling $2,918,983, and a line of credit totaling $2,635,538.  The outstanding line of credit is secured by a combination of assets, including the Marital Home and DexCom, Inc. shares.  Some of those assets, such as the DexCom, Inc., shares, are held in Dr. Lord's individual name only.

15.     The interest charged on the line of credit is a function of the amount of assets pledged.  Specifically, the line of credit is based off the one month LIBOR (currently .276%), plus a spread. *See* Email from Financial Advisor Urowsky, attached as Exhibit B.  The parties are currently being charged 2.776% (one month LIBOR plus 2.5% spread), with a total line of credit approval of $3.6 million.  *Id.*

16.     The parties financial advisor, Todd J. Urowsky, Senior Vice President of Wealth Management at UBS, has recommended that, because of the significant increase in value in the existing underlying assets used as collateral against the line of credit, the parties increase the line of credit to $5 million, which would reduce the interest rate to 2.276% (one month LIBOR plus

---

[2] The parties own as marital property 72,107 shares of DexCom, Inc.  In addition, Dr. Lord claims that an additional 55,000 shares of DexCom, Inc. constitutes his separate, non-marital property. As discovery is on-going, Dr. Lord does not waive any of his rights and reserves the right to pursue any and all of his claims.

[3] Dr. Lord is in no way conceding that all of the financial assets, stocks, and bonds listed in his financial affidavit constitute marital property, nor is he waiving any claims against those assets.  As discovery is on-going, Dr. Lord reserves the right to pursue any and all of his claims.

2% spread), and save the parties roughly $14,000. *Id.* The interest rate savings (approximately $14,000) would be available even if the parties do not access the increased credit. Dr. Lord does not intend to access the increased credit, but merely hopes to increase the line of credit for cost-saving purposes attributable to both parties.

17.     Mrs. Lord's counsel has ignored Dr. Lord's requests to increase the joint line of credit.

18.     Dr. Lord desires to satisfy the $890,000 balloon mortgage as soon as possible. In order to do so with minimal financial consequences, Dr. Lord desires to secure an individual line of credit in the amount of $1 million. Mr. Urowsky has offered two alternatives: (a) cross-collateralize existing assets used for the parties' existing line of credit; or (b) move a portion of individually held assets for the existing line of credit—which are not required to collateralize the existing line of credit—to a separate, individual account held by Dr. Lord, to use as collateral against a new, individual line of credit.

19.     Due to the parties' tremendous financial net worth, Mrs. Lord will not be prejudiced should Dr. Lord secure an individual line of credit in the amount of $1 million. Dr. Lord will not dispute that such debt constitutes his own, non-marital debt.

**WHEREFORE,** Dr. Lord respectfully requests that this Honorable Court order that:

a) The parties increase their existing line of credit to $5 million; and

b) Mrs. Lord consent in Dr. Lord securing an individual line of credit either by cross-collateralizing existing assets used for the parties' existing line of credit, or by moving a portion of individually held assets for existing line of credit to a separate, individual account held by Dr. Lord, to use as collateral against a new, individual line of credit.

Dated: January 4, 2016

THE FERRARO LAW FIRM, P.A.
600 Brickell Avenue, Suite 3800
Miami, Florida 33131
(Phone) 305-375-0111
(Fax) 305-379-6222
*Attorneys for Respondent/Dr. Lord*

*/s/ Jose L. Becerra*
Jose Becerra Esq.
Florida Bar No. 104891
JLB@ferrarolaw.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was furnished by electronic mail on this 4th day of January, 2016, on Terry Fogel (tfogel@fogelrubinfogel.com) (frf@fogelrubinfogel.com) and Scott Rubin (srubin@fogelrubinfogel.com) FOGEL RUBIN FOGEL, 350 Courthouse Tower, 44 West Flagler Street, Miami, Florida 33130, pursuant to Florida Rule of Judicial Administration 2.516.

THE FERRARO LAW FIRM, P.A.
600 Brickell Avenue, Suite 3800
Miami, Florida 33131
(Phone) 305-375-0111
(Fax) 305-379-6222
*Attorneys for Respondent/Dr. Lord*

*/s/ Jose L. Becerra*
Jose Becerra Esq.
Florida Bar No. 104891
JLB@ferrarolaw.com

5

# EXHIBIT A

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

IN RE: THE MARRIAGE OF:                    CASE NO.: 132015DR022706

ALICE LORD,                               DIVISION: FC 18

        Petitioner/Wife,

and

JONATHAN LORD,

        Respondent/Husband.

_____/

**FAMILY LAW FINANCIAL AFFIDAVIT**
($50,000 or more Individual Gross Annual Income)

I, **JONATHAN LORD**, being sworn, certify that the following information is true:

**SECTION I. INCOME**

1. My age is: <u>61</u>

2. My occupation is: <u>I retired in July 2013</u>

3. I am currently

   *[Check all that apply]*

   a. ___✓___ Unemployed

   Describe your efforts to find employment, how soon you expect to be employed, and the pay you expect to receive: <u>I am not currently seeking employment. However, in October 2014, I was contacted by a national search firm in regard to the chief executive officer position for the American Diabetes Association.</u>

   b. ____ Employed by: _____

   Address: _____

   City, State, Zip code: _____   Telephone Number: _____

   Pay rate: $ _____ ( ) every week ( ) every other week ( ) twice a month

   ( ) monthly ( ) other: _____

   If you are expecting to become unemployed or change jobs soon, describe the change you expect and why and how it will affect your income: _____
   _____
   _____.

JTL 00001

_____ Check here if you currently have more than one job.  List the information above for the second job(s) on a separate sheet and attach it to this affidavit.

c.   ✓  Retired. Date of retirement: July 2013.

Employer from whom retired:  University of Miami.

Address: South Dixie Highway, Coral Gables, FL 33124.

Telephone Number: 305-284-2211.

| LAST YEAR'S GROSS INCOME: | Your Income | Other Party's Income *(if known)* |
|---|---|---|
| YEAR 2014 | $ 7,309,674.00 | $ _____ |

**PRESENT MONTHLY GROSS INCOME:**

**All amounts must be MONTHLY.**  See the instructions with this form to figure out money amounts for anything that is NOT paid monthly.  Attach more paper, if needed.  Items included under "other" should be listed separately with separate dollar amounts.

1.  *(see note 1)* Monthly gross salary or wages
2.  _____ Monthly bonuses, commissions, allowances, overtime, tips, and similar payments
3.  _____ Monthly business income from sources such as self-employment, partnerships, close corporations, and/or independent contracts (Gross receipts minus ordinary and necessary expenses required to produce income.)(Attach sheet itemizing such income and expenses.)
4.  _____ Monthly disability benefits/SSI
5.  _____ Monthly Workers' Compensation
6.  _____ Monthly Unemployment Compensation
7.  _____ Monthly pension, retirement, or annuity payments
8.  _____ Monthly Social Security benefits
9.  _____ Monthly alimony actually received (Add 9a and 9b)
       9a. From this case: $_____
       9b. From other case(s): _____
10. *(see note 1)* Monthly interest and dividends
11. _____ Monthly rental income (gross receipts minus ordinary and necessary expenses required to produce income) (Attach sheet itemizing such income and expense items.)
12. _____ Monthly income from royalties, trusts, or estates
13. _____ Monthly reimbursed expenses and in-kind payments to the extent that they reduce personal living expenses (Attach sheet itemizing each item and amount.)
14. _____ Monthly gains derived from dealing in property (not including nonrecurring gains)
       Any other income of a recurring nature (identify source)
15. _____
16. _____
17. *(see note 1)*  **TOTAL PRESENT MONTHLY GROSS INCOME** (Add lines 1 through 16).

**PRESENT MONTHLY DEDUCTIONS:**
**All amounts must be MONTHLY.**  See the instructions with this form to figure out money amounts for anything that is NOT paid monthly.
18. $_____ Monthly federal, state, and local income tax (corrected for filing status and allowable dependents and income tax liabilities)
       a. Filing Status _____
       b. Number of dependents claimed _____

JTL 00002

19. _____ Monthly FICA or self-employment taxes
20. _____ Monthly Medicare payments
21. _____ Monthly mandatory union dues
22. _____ Monthly mandatory retirement payments
23. 2,100 ___ Monthly health insurance payments (including dental insurance), excluding portion paid for
           any minor children of this relationship
24. _____ Monthly court-ordered child support actually paid for children from another relationship
25. 10,000 _ Monthly court-ordered alimony actually paid (Add 25a and 25b)
           25a. from this case: $ _____
           25b. from other case(s): 10,000

26. **$12,100** **TOTAL DEDUCTIONS ALLOWABLE UNDER SECTION 61.30, FLORIDA STATUTES**
           (Add lines 18 through 25).

27. **$ (12,100) PRESENT NET MONTHLY INCOME**
           (Subtract line 26 from line 17).

**SECTION II. AVERAGE MONTHLY EXPENSES**

**Proposed/Estimated Expenses.** If this is a dissolution of marriage case **and** your expenses as listed
below do not reflect what you actually pay currently, you should write "estimate" next to each amount
that is estimated.

**HOUSEHOLD:** (*see note 2*)
1. $3,400 __ Monthly mortgage or rent payments
2. 3,000 ___ Monthly property taxes (if not included in mortgage)
3. 800 _____ Monthly insurance on residence (if not included in mortgage)
4. 100 _____ Monthly condominium maintenance fees and homeowner's association fees
5. 300 _____ Monthly electricity
6. 300 _____ Monthly water, garbage, and sewer
7. 300 _____ Monthly telephone
8. 300 _____ Monthly fuel oil or natural gas
9. 500 _____ Monthly repairs and maintenance
10. 495 ____ Monthly lawn care
11. 150 ____ Monthly pool maintenance
12. 100 ____ Monthly pest control
13. 500 ____ Monthly misc. household
14. 1,000 __ Monthly food and home supplies
15. 1,000 __ Monthly meals outside home
16. 200 ____ Monthly cable t.v.
17. 30 _____ Monthly alarm service contract
18. _____ Monthly service contracts on appliances
19. 700 ____ Monthly maid service
Other:
20. 500 misc. maintenance
21. _____
22. _____
23. _____
24. _____
25. **$13,675** **SUBTOTAL** (add lines 1 through 24).

**AUTOMOBILE:**

26. <u>100</u>____ Monthly gasoline and oil
27. <u>100</u>____ Monthly repairs
28. <u>5</u>_____ Monthly auto tags and emission testing
29. <u>200</u>____ Monthly insurance
30. <u>3,000</u>___ Monthly payments (lease or financing)
31. _____ Monthly rental/replacements
32. _____ Monthly alternative transportation (bus, rail, car pool, etc.)
33. _____ Monthly tolls and parking
34. _____ Other: _____
35. **$3,405**  **SUBTOTAL** (add lines 26 through 34)

**MONTHLY EXPENSES FOR CHILDREN COMMON TO BOTH PARTIES:**

36. $_____ Monthly nursery, babysitting, or day care
37. _____ Monthly school tuition
38. _____ Monthly school supplies, books, and fees
39. _____ Monthly after school activities
40. _____ Monthly lunch money
41. _____ Monthly private lessons or tutoring
42. _____ Monthly allowances
43. _____ Monthly clothing and uniforms
44. _____ Monthly entertainment (movies, parties, etc.)
45. _____ Monthly health insurance
46. _____ Monthly medical, dental, prescriptions (nonreimbursed only)
47. _____ Monthly psychiatric/psychological/counselor
48. _____ Monthly orthodontic
49. _____ Monthly vitamins
50. _____ Monthly beauty parlor/barber shop
51. _____ Monthly nonprescription medication
52. _____ Monthly cosmetics, toiletries, and sundries
53. _____ Monthly gifts from child(ren) to others (other children, relatives, teachers, etc.)
54. _____ Monthly camp or summer activities
55. _____ Monthly clubs (Boy/Girl Scouts, etc.)
56. _____ Monthly time-sharing expenses
57. _____ Monthly miscellaneous
58. **$**_____ **SUBTOTAL** (add lines 36 through 57)

**MONTHLY EXPENSES FOR CHILD(REN) FROM ANOTHER RELATIONSHIP**
(other than court-ordered child support)

59. $_____
60. _____
61. _____
62. _____
63. **$**_____ **SUBTOTAL** (add lines 59 through 62)

**MONTHLY INSURANCE:**

64. $1,300   Health insurance (if not listed on lines 23 or 45) (estimate for 2016)
65. _____ Life insurance
66. _____ Dental insurance.
   Other:
67. _____
68. _____
69. $1,300   **SUBTOTAL** (add lines 66 through 68, exclude lines 64 and 65)

**OTHER MONTHLY EXPENSES NOT LISTED ABOVE:**

70. $_____ Monthly dry cleaning and laundry
71. _____ Monthly clothing
72. _____ Monthly medical, dental, and prescription (unreimbursed only)
73. _____ Monthly psychiatric, psychological, or counselor (unreimbursed only)
74. _____ Monthly non-prescription medications, cosmetics, toiletries, and sundries
75. _____ Monthly grooming
76. _____ Monthly gifts
77. _____ Monthly pet expenses
78. _____ Monthly club dues and membership
79. _____ Monthly sports and hobbies
80. _____ Monthly entertainment
81. _____ Monthly periodicals/books/tapes/CDs
82. _____ Monthly vacations
83. _____ Monthly religious organizations
84. _____ Monthly bank charges/credit card fees
85. _____ Monthly education expenses
86. _____ Other: (include any usual and customary expenses not otherwise mentioned in the items
              listed above)_____
87. _____
88. _____
89. _____
90. $_____   **SUBTOTAL** (add lines 70 through 89)

**MONTHLY PAYMENTS TO CREDITORS:** (only when payments are currently made by you on outstanding
balances). List only last 4 digits of account numbers.
MONTHLY PAYMENT AND NAME OF CREDITOR(s):

91. $_____
92. _____
93. _____
94. _____
95. _____
96. _____
97. _____
98. _____
99. _____
100._____
101._____
102._____

103. _____

104. _____ **SUBTOTAL** (add lines 91 through 103)

105. **$18,380**  **TOTAL MONTHLY EXPENSES:**
  (add lines 25, 35, 58, 63, 69, 90, and 104 of Section II,  Expenses)

**SUMMARY**

106. **$**(*see note 1*) **TOTAL PRESENT MONTHLY NET INCOME** (from line 27 of SECTION I.  INCOME)

107. **$18,380**  **TOTAL MONTHLY EXPENSES** (from line 105 above)

108. **$**_____ **SURPLUS** (If line 106 is more than line 107, subtract line 107 from line 106.  This is the
  amount of your surplus.  Enter that amount here.)

109. _____ **(DEFICIT)** (If line 107 is more than line 106, subtract line 106 from line 107.  This is
  the amount of your deficit.  Enter that amount here.)

JTL 00006

**SECTION III.  ASSETS AND LIABILITIES**

A. **ASSETS  (This is where you list what you OWN.)**
   **INSTRUCTIONS:**
   **STEP 1:  In column A,** list a description of each separate item owned by you (and/or your spouse, if this is a petition for dissolution of marriage).  Blank spaces are provided if you need to list more than one of an item.
   **STEP 2:** If this is a petition for dissolution of marriage, check the line **in Column A** next to any item that you are requesting the judge award to you.
   **STEP 3:  In column B,** write what you believe to be the current fair market value of all items listed.
   **STEP 4:  Use column C only if this is a petition for dissolution of marriage and you believe an item is "non-marital,"** meaning it belongs to only one of you and should not be divided.  You should indicate to whom you believe the item belongs.  (Typically, you will only use Column C if property was owned by one spouse before the marriage.  See the **"General Information for Self-Represented Litigants"** found at the beginning of these forms and section 61.075(1), Florida Statutes, for definitions of "marital" and "non-marital" assets and liabilities.)

| A<br>ASSETS:  DESCRIPTION OF ITEM(S)<br><br>LIST ONLY LAST FOUR DIGITS OF ACCOUNT NUMBERS.<br>Check the line next to any asset(s) which you are requesting the judge award to you. | | B<br>Current Fair<br>Market Value | C<br>Non-marital<br>(✓correct<br>column) | |
|---|---|---|---|---|
| | | | husband | wife |
| | **Cash (in banks or credit unions)** | | | |
| | ✓ UBS Joint Account # 27TU | $42,487.05 | | |
| | ✓ UBS Personal Account # 89TU (*see note 3*) | $370,264.77 | ✓ | |
| | ✓ Chase Checking Account # ▆▆▆ | $100 | | |
| | ✓ UMB Healthcare Account Statement # ▆▆▆ | $16,259.52 | | |
| | ✓ UBS Resource Management Account # 86TU (*see note 4*) | $892,504.84 | ✓ | |
| | | | | |
| | **Stocks/Bonds (UBS financial assets)** | | | |
| | ✓ DexCom (127,107 shares; $82.74 per share ) (*see note 4*) | $10,516,833 | ✓ | |
| | ✓ Hanson Medical (10,000 shares; $3.90 per share) | $39,000 | | |
| | ✓ Biolase (Rest'd – private placement) (110,380 shares; $0.95 per share)(16,130 shares; $0.75 per share) (*see note 5*) | 116,958.50 | ✓ | |
| | ✓ Veracyte (at UBS) (36,000 shares; $6.46 per share) | $232,560 | | |
| | ✓ Municipal Bonds | $965,121 | | |
| | ✓ Managed Futures | $301,751 | | |
| | ✓ Hedge Fund | $359,112 | | |
| | ✓ Diversified Equity/Fixed | $650,527 | | |
| | ✓ Global Long/Short IRA | $447,302 | | |
| | ✓ Corporate Bonds IRA | $156,718 | | |

JTL 00007

| | | | |
|---|---|---|---|
| ✓ Apollo European Fund IRA | $183,066 | | |
| ✓ NFJ Intl | $92,082 | | |
| ✓ Meagher Diversified IRA | $41,402 | | |
| ✓ Alice IRA | $312 | | |
| **Stocks/Bonds (Private Investments & Veracyte; held at Broadridge)** | | | |
| ✓ Cruden Bay (*see note 6*) | $50,000 | | |
| ✓ Biolase (BIOL) RSU (*see note 5*) | $8,756 | ✓ | |
| ✓ Velano Vascular (formerly Creative Vascular) (*see note 7*) | $50,000 | ✓ | |
| ✓ Digital Reasoning (*see note 8*) | $500,000 | ✓ | |
| ✓ Lucas | - | | |
| ✓ Hubble Tele (Acquired) | - | | |
| ✓ Vigilant Biosciences | $30,000 | | |
| ✓ Par8o (*see note 9*) | $250,000 | ✓ | |
| **Stocks/Bonds (options & restricted stock)** | | | |
| ✓ Stericycle Options (38,852 shares; $150.91 per share) | $3,036,483 | | |
| ✓ DexCom RSU (4,475 shares; $82.74 per share) (*see note 4*) | $382,568 | ✓ | |
| | | | |
| **Notes (money owed to you in writing)** | - | | |
| **Money owed to you (not evidenced by a note)** | - | | |
| | | | |
| **Real estate: (Home)** | | | |
| ✓ 68 La Gorce Circle, Miami Beach, FL 33141 | $11,000,000 | | |
| ✓ 135 Long Point Drive, Fernandina Beach, FL 32034 (*see note 3*) | $2,000,000 | ✓ | |
| | | | |
| | | | |
| **Business interests** | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| **Automobiles** | | | |
| | | | |
| | | | |
| | | | |
| **Retirement plans (Profit Sharing, Pension, IRA, 401(k)s, etc.)** | | | |

JTL 00008

| | | | |
|---|---|---|---|
| ✓ *See* above | - | | |
| | | | |
| **Other Personal Property** | | | |
| ✓ Furniture / Furnishings | TBD | | |
| ✓ Jewelry - Husband | TBD | | |
| ✓ Jewelry - Wife | TBD | | |
| ✓ Artwork | TBD | | |
| ✓ Wine Collection | TBD | | |
| | | | |
| **Life insurance (cash surrender value)** | | | |
| ✓ None | - | | |
| | | | |
| **Other assets:** | | | |
| ✓ Louisville Country Club Membership | TBD | | |
| ✓ Indian Creek Club Membership | TBD | | |
| ✓ Donor Advised Fund | $273,000 | | |
| ✓ American Airlines miles (approx. 405,000) | TBD | | |
| ✓ Southwest Airlines miles (approx. 73,000) | TBD | | |
| ✓ Fogel Rubin & Fogel IOTA Trust Account (*see note 1*) | $1,360,000 | | |
| ✓ Lease 2015 Mercedes Benz S65 | TBD | | |
| ✓ Lease 2015 Mercedes Benz ML 400 | TBD | | |
| | | | |
| | | | |
| | | | |
| **Total Assets**  (add column B) (*excluding unknowns and TBD items*) | **$34,365,167.68** | | |

B. **LIABILITIES/DEBTS (This is where you list what you OWE.)**
   **INSTRUCTIONS:**
   **STEP 1:**  **In column A**, list a description of each separate debt owed by you (and/or your spouse, if this is a petition for dissolution of marriage).  Blank spaces are provided if you need to list more than one of an item.
   **STEP 2:** If this is a petition for dissolution of marriage, check the line **in Column A** next to any debt(s) for which you believe you should be responsible.
   **STEP 3:** **In column B**, write what you believe to be the current amount owed for all items listed.
   **STEP 4:  Use column C only if this is a petition for dissolution of marriage and you believe an item is "non-marital,"** meaning the debt belongs to only one of you and should not be divided.  You should indicate to whom you believe the debt belongs. (Typically, you will only use Column C if the debt was owed by one spouse before the marriage.  See the **"General Information for Self-Represented Litigants"** found at the beginning of these forms and section 61.075(1), Florida Statutes, for definitions of "marital" and "non-marital" assets and liabilities.)

| A<br>LIABILITIES:  DESCRIPTION OF ITEM(S)<br><br>LIST ONLY LAST FOUR DIGITS OF ACCOUNT NUMBERS.<br>Check the line next to any debt(s) for which you believe you should be responsible. | B<br>Current<br>Amount<br>Owed | C<br>Non-marital<br>(Check correct column) | |
|---|---|---|---|
| | | husband | wife |
| **Mortgages on Real Estate** | | | |
| ✓ UBS Mortgage (68 La Gorce Circle) | $2,918,983 | | |
| ✓ UBS Line of Credit | $2,635,538 | | |
| ✓ Expected Capital Gain on sale of 68 La Gorce | $714,000 | | |
| ✓ Income taxes on deferred ordinary income | $1,770,255 | | |
| ✓ Balloon Mortgage Note (135 Long Point) | $893,337.50 | ✓ | |
| | | | |
| **Charge/credit card accounts** | | | |
| ✓ American Express # 6-71008 | Current | | |
| ✓ British Airways # ▮▮▮▮ | Current | | |
| ✓ UBS Visa Signature | Current | | |
| | | | |
| Auto loan | | | |
| Auto loan | | | |
| Bank/Credit Union loans | | | |
| | | | |
| | | | |
| | | | |
| Money you owe (not evidenced by a note) | | | |
| | | | |
| Judgments | | | |
| | | | |
| Other: | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| **Total Debts**  (add column B) | **$8,932,113.50** | | |

JTL 00010

**C. NET WORTH (excluding contingent assets and liabilities)**

$ <u>34,365,167.68</u> **Total Assets** (enter total of Column B in Asset Table; Section A)
$ <u>8,932,113.50</u>  **Total Liabilities** (enter total of Column B in Liabilities Table; Section B)
$ <u>25,433,054.18</u> **TOTAL NET WORTH (Total Assets minus Total Liabilities)**
          (excluding contingent assets and liabilities)

**D. CONTINGENT ASSETS AND LIABILITIES**
   **INSTRUCTIONS:**

   If you have any **POSSIBLE** **assets** (income potential, accrued vacation or sick leave, bonus, inheritance, etc.) or **POSSIBLE liabilities** (possible lawsuits, future unpaid taxes, contingent tax liabilities, debts assumed by another), you must list them here.

| A<br>Contingent Assets<br><br>Check the line next to any contingent asset(s) which you are requesting the judge award to you. | | B<br>Possible<br>Value | C<br>Nonmarital<br>(Check correct column) | |
|---|---|---|---|---|
| | | | husband | wife |
| | ✓ ██████████████████████ | TBD | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| **Total Contingent Assets** | | **$TBD** | | |

| A<br>Contingent Liabilities<br><br>Check the line next to any contingent debt(s) for which you believe you should be responsible. | | B<br>Possible<br>Amount<br>Owed | C<br>Nonmarital<br>(Check correct column) | |
|---|---|---|---|---|
| | | | husband | wife |
| | | $ | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| **Total Contingent Liabilities** | | **$** | | |

**E.** **CHILD SUPPORT GUIDELINES WORKSHEET.** Florida Family Law Rules of Procedure Form 12.902(e), Child Support Guidelines Worksheet, MUST be filed with the court at or prior to a hearing to establish or modify child support. This requirement cannot be waived by the parties.

[Check **one** only]

_____**A Child Support Guidelines Worksheet IS or WILL BE filed in this case.** This case involves the establishment or modification of child support.

✓ **A Child Support Guidelines Worksheet IS NOT being filed in this case.** The establishment or modification of child support is not an issue in this case.

## NOTES TO FINANCIAL AFFIDAVIT

### Note 1

Dr. Lord is retired and does not receive any fixed, regular income. Dr. Lord, however, does receive irregular distributions from a variety of sources, including but not limited to, consulting arrangements, income derived from the sale of stock, income derived from the exercise of stock options, interest, qualified dividends, and capital gains. The following schedule is an approximation of Dr. Lord's 2015 income to date:

Consulting/Board Income

| | |
|---|---|
| Third Rock Consulting: | $25,000 |
| DXCM Restricted Stock: | $624,587 |
| SRCL Option Exercise (3/20/15): | $777,762 |
| SRCL Option Exercise (9/8/15): | $993,000 |

Passive Income

| | |
|---|---|
| Interest: | $12,000 |
| Tax Exempt Interest: | $40,000 |
| Qualified Dividends: | $21,000 |
| NQ Dividends: | $8,000 |
| Capital Gains/Losses: | $595,000 |

### Note 2

Dr. Lord's household expenses as described in Section II of this Financial Affidavit represent a combination/approximation of Dr. Lord's current and future household expenses associated with his home at 135 Long Point Drive, Fernandina Beach, FL 32034. Dr. Lord is currently assuming and paying for various household expenses associated with 68 La Gorce Circle, Miami Beach, FL 33141, however for purposes of this Financial Affidavit, those expenses are not accounted for herein.

### Note 3

In July 2015, The Lords executed a Cancellation and Release of Agreement pertaining to Unit N-715 in the Surf Club Condominium. As a result thereof, the deposit associated therewith (totaling $2,720,000) was returned to the Lords. Pursuant to an Agreement between Dr. Lord and Alice Lord, the Lords agreed to equitably distribute 50% of the deposit evenly, with the remaining 50% remaining in the Fogel Rubin & Fogel IOTA Trust Account. As a result, Dr. Lord received a wire transfer in the amount of $680,000. A portion of those proceeds were used to purchase Dr. Lord's interest in 135 Long Point Drive, Fernandina Beach, FL 32034. As such, Dr. Lord's interest in 135 Long Point Drive, Fernandina Beach, FL 32034 is his separate, non-

marital property. Moreover, to the extent that any portion of those funds remain in Dr. Lord's account, those funds also constitute separate, non-marital property.

### Note 4

DexCom, Inc. – Dr. Lord claims that 55,000 shares in DexCom are separate, non-marital property, to the extent that such shares were acquired with his pre-marital assets.

On June 3, 2015, Dr. Lord was granted an award of 4,475 restricted stock units. Those stock units will vest in one annual installment on June 3, 2016. Dr. Lord claims that any and all unvested restricted stock unit awards that have not vested by the cutoff date for the determination of marital assets are separate, non-marital property to the extent that such unvested restricted stock unit awards were awarded as an incentive for continued and future services and/or as an incentive for future productivity (or to any other extent pursuant to Florida law).

On May 30, 2014, Dr. Lord was granted an award of 8,797 restricted stock units. Those stock units vested on May 30, 2015. Dr. Lord claims that, in the event the Court determines that the cutoff date for the determination of marital assets shall be the parties separation date in March 2015, these restricted stock units constitute separate, non-marital property to the extent that they were awarded as an incentive for continued and future services and/or as an incentive for future productivity (or to any other extent pursuant to Florida law).

### Note 5

Biolase, Inc. – On August 27, 2014, Dr. Lord was awarded a restricted stock unit award with respect to 9,217 shares in the company's common stock. Those stock units vested in one annual installment on August 27, 2015. Dr. Lord claims that any and all unvested restricted stock unit awards that did not vest by the cutoff date for the determination of marital assets are separate, non-marital property to the extent that such unvested restricted stock unit awards were awarded as an incentive for continued and future services and/or as an incentive for future productivity (or to any other extent pursuant to Florida law).

On August 27, 2014, Dr. Lord was granted an option to purchase 41,428 shares in the company's common stock at $2.27 per share. Commencing on May 27, 2015, the shares vest in monthly installments over a twelve month period. Dr. Lord claims that any and all unvested stock options that have not vested by the cutoff date for the determination of marital assets are separate, non-marital property to the extent that such unvested stock options were awarded as an incentive for continued and future services and/or as an incentive for future productivity (or to any other extent pursuant to Florida law).

On April 27, 2015, Dr. Lord was granted an option to purchase 132,159 shares in the company's common stock at $2.27 per share. Commencing on May 27, 2015, the shares vest in monthly installments over a twelve month period. Dr. Lord claims that any and all unvested stock options that have not vested by the cutoff date for the determination of marital assets are separate, non-marital property to the extent that such unvested stock options were awarded as an incentive for

continued and future services and/or as an incentive for future productivity (or to any other extent pursuant to Florida law).

## Note 6

Cruden Bay – On a voting basis, Cruden Bay owns 1.09% of Shareable Ink on a fully diluted basis. In turn, Dr. Lord owns 9.3% of Cruden Bay, and as a result, Dr. Lord owns .10% of the voting interest in Shareable Ink.

## Note 7

Velano Vascular, Inc. (formerly Creative Vascular, Inc.) – On April 22, 2014, Dr. Lord was granted an option to purchase 10,062 shares in the company's common stock at $0.84 per share, as set forth in the 2011 Equity Incentive Plan. So long as Dr. Lord's continuous service status does not terminate, 1/24ths of the total number of shares began vesting on May 22, 2014, and are exercisable on each monthly anniversary of the vesting commencement date. Dr. Lord claims that any and all unvested stock options that have not vested by the cutoff date for the determination of marital assets are separate, non-marital property to the extent that such unvested stock options were awarded as an incentive for continued and future services and/or as an incentive for future productivity (or to any other extent pursuant to Florida law).

## Note 8

Digital Reasoning – On June 10, 2014, Dr. Lord was granted an option to purchase 210,000 shares in the company's common stock at $0.649 per share, as set forth in the 2011 Equity Incentive Plan. Twenty-one thousand (21,000) of those shares vested on December 10, 2014, with the balance vesting with respect to 1/60th of the shares each month thereafter (with vesting occurring on the first day of each month) over a 54 month period, subject to Dr. Lord's continuous service with the company through each such vesting date. Dr. Lord claims that any and all unvested stock options that have not vested by the cutoff date for the determination of marital assets are separate, non-marital property to the extent that such unvested stock options were awarded as an incentive for continued and future services and/or as an incentive for future productivity (or to any other extent pursuant to Florida law).

## Note 9

Par8o, Inc. – On January 27, 2015, Dr. Lord was granted an option to purchase 275,439 shares in the company's common stock at $0.14 per share. Commencing on January 2, 2014, 1/60th of the shares vest and become exercisable each month, provided Dr. Lord continues to have a service relationship with the company on each vesting date. Dr. Lord claims that any and all unvested stock options that have not vested by the cutoff date for the determination of marital assets are separate, non-marital property to the extent that such unvested stock options were awarded as an incentive for continued and future services and/or as an incentive for future productivity (or to any other extent pursuant to Florida law).

On January 27, 2015, Dr. Lord was granted an option to purchase 27,548 shares in the company's common stock at $0.14 per share. Commencing on November 6, 2014, 1/60th of the shares vest and become exercisable each month, provided Dr. Lord continues to have a service relationship with the company on each vesting date. Dr. Lord claims that any and all unvested stock options that have not vested by the cutoff date for the determination of marital assets are separate, non-marital property to the extent that such unvested stock options were awarded as an incentive for continued and future services and/or as an incentive for future productivity (or to any other extent pursuant to Florida law).

JTL 00016

I understand that I am swearing or affirming under oath to the truthfulness of the claims made in this affidavit and that the punishment for knowingly making a false statement includes fines and/or imprisonment.

Dated: 27 OCT 2015

JONATHAN LORD

STATE OF FLORIDA
COUNTY OF Nassau

Sworn to or affirmed and signed before me on 10-27-2015 by JONathan Thomas Lord



NOTARY PUBLIC or DEPUTY CLERK

Deborah Ann St Hart

*[Print, type, or stamp commissioned name of notary or deputy clerk]*

_____ Personally known
___✓___ Produced identification
Type of identification produced Florida drivers license

DEBORAH ANN ST.HART
Notary Public- State of Florida
My Comm. Expires Jul 7, 2018
Commission # FF139371

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was furnished by electronic mail on this 11th day of November, 2015, on Terry Fogel (tfogel@fogelrubinfogel.com) (frf@fogelrubinfogel.com) and Scott Rubin (srubin@fogelrubinfogel.com) FOGEL RUBIN FOGEL, 350 Courthouse Tower, 44 West Flagler Street, Miami, Florida 33130, pursuant to Florida Rule of Judicial Administration 2.516.

THE FERRARO LAW FIRM, P.A.
600 Brickell Avenue, Suite 3800
Miami, Florida 33131
(Phone) 305-375-0111
(Fax) 305-379-6222
*Attorneys for Respondent/Husband*

/s/ *Jose L. Becerra*
Jose Becerra Esq.
Florida Bar No. 104891
JLB@ferrarolaw.com

JTL 00018

# EXHIBIT B

| | |
|---|---|
| **From:** | todd.urowsky@ubs.com |
| **To:** | srubin@fogelrubinfogel.com; tfogel@fogelrubinfogel.com |
| **Cc:** | Jose L. Becerra |
| **Subject:** | Jack & Alice Lord |
| **Date:** | Monday, December 07, 2015 9:12:52 AM |
| **Attachments:** | disclaim.txt |

Scott & Terry – I hope this message finds you doing well.  Per Jose Becerra's request, you'd like to understand our rational for recommending the sale of the Lord's Hansen Medical and an increase to their joint line of credit.

**Sale of Hansen Medical:**  the rational for this recommendation is purely based on the desire to tax loss harvest.  By realizing or harvesting the loss, the Lord's will be able to offset taxes on both gains and income.  The security can be repurchased 31 days after the sale.

**Increase line of credit:**  the interest charged on UBS lines of credit is a function of the amount of assets pledged.  That is, the line of credit interest rate is based off of the 1 month LIBOR (currently .276%) + a spread.  The Lords are currently being charged 2.776% ( 1 month LIBOR + 2.5% spread) with a total line of credit approval of $3.6 mm.  In light of the significant increase in value on the existing underlying assets used as collateral against the line of credit,  the Lords are eligible for a total line of credit approval of $ 5 mm which would reduce the interest rate to 2.276% (1 month LIBOR + 2% spread).   While the Lords could draw down additional debt from the line of credit with the additional capacity granted, this interest rate savings is available even in the Lord's do not pull another dollar from their line of credit.  Paperwork is required to convert the rates.

Best regards,

Todd J. Urowsky

Senior Vice President - Wealth Management

UBS Financial Services Inc.

600 Northpark Town Ctr.  1200 Abernathy Rd, Ste 1850

Atlanta GA 30328

678-441-1024, Fax 201-318-9457

Cell 678-772-6903

todd.urowsky@ubs.com

## Page 1

1   IN THE CIRCUIT COURT OF THE
2   ELEVENTH JUDICIAL CIRCUIT, IN AND FOR
    MIAMI-DADE COUNTY, FLORIDA
3
4   FAMILY DIVISION

5   CASE NO. 2015-022706 FC 18

6   IN RE: THE MARRIAGE OF
7
8   ALICE LORD,

9       Petitioner/Wife,

10  and

11  JONATHAN LORD, MD,

    Respondent/Husband
12
    - - - - - - - - - - - - - - x
13          44 West Flagler Street
14          Miami, Florida
            January 18, 2016
15          9:00 a.m. - 4:16 p.m.
16
17
18      DEPOSITION OF JONATHAN LORD
19
        VOLUME I
20
21  Taken Before ROBERT WOLINSKY, RMR, Registered
22  Professional Reporter and Notary Public for the
23  State of Florida at Large, pursuant to Notice of
24  Taking Deposition filed in the above cause.
25

## Page 2

1   APPEARANCES
2
3
4   Fogel, Rubin & Fogel
    44 West Flagler Street, Ste. 350
5   Miami, Florida 33130
    BY: TERRY L. FOGEL, ESQ.
6   BY: SCOTT RUBIN, ESQ.
    on behalf of the Petitioner
7   Tele: (305) 577-4905 Fax: 372-0936
8
9   The Ferraro Law Firm
    600 Brickell Avenue, Ste. 3800
10  Miami, Florida 33131
    BY: JOSE L. BECERRA, ESQ
11  on behalf of the Respondent
    Tele: 305.984.2031
12
13
14
15  Also Present: Robert Stone.  Mrs. Lord
16
17
18
19
20
21
22
23
24
25

## Page 3

1             I N D E X
2   Examinations              Page
    WITNESS:
3
4   DR. JONATHAN LORD

5   DIRECT EXAMINATION  BY MS. FOGEL:        5

6          E X H I B I T S
7   No.                              Page
    Petitioner's Exhibit 1 for Identification    6
    Petitioner's Exhibit 2 for Identification    10
8   Petitioner's Exhibit 3 for Identification    14
    Petitioner's Exhibit 4 for Identification    14
9   Petitioner's Exhibit 5 for Identification    39
    Petitioner's Exhibit 6 for Identification    74
10  Petitioner's Exhibit 7 for Identification    96
    Petitioner's Exhibit 8 for Identification    110
11  Petitioner's Exhibit 9 for Identification    112
    Petitioner's Exhibits 10 and 11 for          126
12  Identification
13
14     CERTIFIED QUESTIONS
15      Page   Line
16       93      5
        106     20
        108      4
17       119     20
        120      2
18       120      8
        120     13
19       121     15
        125     21
20
21
22  (Exhibits kept by Ms. Fogel)
23
24
25

## Page 4

1       THE VIDEOGRAPHER:  Okay.  This is the case
2   of Alice, this is in regards to the marriage
3   of Alice Lord, Petitioner/Wife, and Jonathan
4   Lord, M.D., Respondent/Husband.  This is in
5   the Circuit Court of the 11th Judicial Circuit
6   in and for Miami-Dade County, Florida, Case
7   Number 2015-022706 FC 18.  This is the
8   deposition of Dr. Jonathan Lord.
9       Today is January 18, the year 2016,
10  starting time 9:38 a.m.  Will the attorneys
11  please state their appearance.
12      MS. FOGEL:  Terry Fogel and Scott Rubin of
13  the law firm of Fogel, Rubin & Fogel on behalf
14  of the Petitioner/Wife, who is also present at
15  the deposition.  Also present is Mr. Robert
16  Stone.
17      MR. BECERRA:  Jose Becerra with the
18  Ferraro Law Firm on behalf of the Respondent,
19  Dr. Jonathan Lord.
20  Thereupon--
21      DR. JONATHAN LORD
22  was called as a witness by the Petitioner/Wife and,
23  having been first duly sworn, testified as follows:
24
25

JONATHAN LORD, M.D.
February 24, 2022
Defendant's
**Exhibit 48**

TRANSCRIPT PAGES 5 THROUGH 96

HAVE BEEN REMOVED FOR PURPOSES OF THIS PRODUCTION

CONFIDENTIAL INFORMATION

LORD-001019

Page 97

1     MS. FOGEL: Mr. Court Reporter, could you
2  mark this exhibit.
3     And that is an exact copy of what I've
4  given you, Mr. Becerra, as a courtesy.
5     MR. BECERRA: Thank you.
6  BY MS. FOGEL:
7     Q. Have you had an opportunity to review
8  what's been marked as Petitioner's Composite
9  Exhibit 7?
10    A. Not in any detail.
11    Q. Do you need some more time to do it?
12    A. Please. Can we go off the record?
13       MS. FOGEL: Yes. Just make a note of the
14  time going off the record and going back on.
15       THE VIDEOGRAPHER: We're off the camera.
16    (Discussion held off the record at 11:32)
17       THE WITNESS: Okay. We can go back on the
18  camera.
19       THE VIDEOGRAPHER: Okay. We are back on
20  the camera at 11:33.
21  BY MS. FOGEL:
22    Q. Dr. Lord, can you identify what has been
23  marked as Exhibit 7 to your deposition?
24    A. Yes, I can.
25    Q. What is that composite exhibit?

Page 98

1     A. They look like a series of financial
2  statements prepared by Todd at UBS.
3     Q. Did you receive these financial
4  statements?
5     A. Yes.
6     Q. When you received these financial
7  statements, did you ever advise Mr. -- I'm going to
8  massacre this name.
9     A. Mr. Urowsky's name is there.
10    Q. Mr. Urowsky; did you identify for him that
11  any of the information contained in these financial
12  statements was inaccurate?
13    A. I may have taken a quick look at these. I
14  principally looked at the larger numbers. As I
15  said, the investments in private companies were
16  generally estimates of what they were worth because
17  there's no way to actually value those. But in
18  general, I looked at the major elements of
19  liabilities as well as assets, yes.
20    Q. My question is, did you ever notify
21  Mr. Urowsky that any of this information needed to
22  be modified, corrected, revised?
23    A. I may have. I don't recall.
24    Q. If you had done so, would it be in
25  writing?

Page 99

1     A. No, it would not.
2     Q. Did he actually revise any of these
3  statements and send revised statements?
4     A. I don't recall.
5     Q. I want to go back to your financial
6  affidavit.
7        On Page 1 you indicate that you retired in
8  July of 2013.
9     A. Correct.
10    Q. That was the time you were working at the
11  University of Miami, correct?
12    A. That's correct.
13    Q. What was your position with the University
14  of Miami in July of 2013?
15    A. I was a professor of pathology.
16    Q. Is that the only position that you held
17  with the University of Miami at that time?
18    A. Yes, it is.
19    Q. In July 2013 you were, in fact, fired from
20  the University of Miami?
21    A. No.
22        In July of 2013 my faculty appointment
23  expired.
24    Q. What were you paid for faculty appointment
25  annually when you were with the University of

Page 100

1  Miami?
2     A. I believe it was, at that point in time it
3  was $736,000.
4     Q. Annual salary.
5     A. Correct.
6     Q. How long were you in that position with
7  the University of Miami?
8     A. My positions changed at the University of
9  Miami between 2011 and 2013.
10    Q. Let's start with 2011. That was the first
11  time that you were employed by the University of
12  Miami?
13    A. Correct.
14    Q. You attended undergrad and med school at
15  the University of Miami?
16    A. I did.
17    Q. Why is it that -- you were living in
18  Florida, or that was just the school you decided to
19  attend?
20    A. It was an opportunity for me to attend,
21  and once I was here I stayed here for medical
22  school.
23    Q. Where did you do your residency and your
24  internship?
25    A. In the Naval hospital in San Diego.

Page 101

1    Q.  What were you hired -- what was your
2    position when you were hired by the University of
3    Miami in 2011?
4        A.  I was appointed to the Department of
5    Pathology as a full professor, and I was appointed
6    as the Chief Innovation Officer at the University.
7        Q.  Do you recall your starting salary?
8        A.  I believe it was 300,000.
9        Q.  Who did you report to in 2011?
10       A.  I reported to the dean, for the purposes
11   of the innovation role, and the chairman of the
12   Department of Pathology for the pathology
13   department.
14       Q.  Would you identify those individuals,
15   please?
16       A.  Pascal Goldschmidt and Richard Cote.
17       Q.  In terms of timing, you were involved in
18   post-judgment litigation with your former wife in
19   2011, correct?
20       A.  I don't believe so.
21       Q.  You don't believe you were involved in
22   litigation with your former wife in 2011?
23           MR. BECERRA:  Objection to form; asked and
24   answered.
25           THE WITNESS:  I don't recall that at all.

Page 102

1    BY MS. FOGEL:
2        Q.  Did you ever seek to have your alimony
3    obligations of 10,000 a month to your former wife
4    reduced?
5            MR. BECERRA:  Objection; form, relevancy.
6            THE WITNESS:  I recall that, but I believe
7        that was prior to 2011.
8    BY MS. FOGEL:
9        Q.  And you had an attorney representing you
10   in those proceedings?
11       A.  Yes, I did.
12       Q.  Those proceedings were conducted, where?
13   What state?
14       A.  I believe they were in Maryland.
15       Q.  And the modification that you sought was
16   denied, correct?
17       A.  Correct.
18       Q.  That was done by an arbitrator?
19           MR. BECERRA:  Objection.
20           THE WITNESS:  Correct.
21   BY MS. FOGEL:
22       Q.  You provided financial disclosure in
23   connection with the post-judgment proceedings to
24   modify downward your alimony obligations?
25       A.  I would assume that we did.

Page 103

1    Q.  You don't recall?
2        A.  I don't recall the specifics.
3        Q.  Do you recall when those proceedings were
4    commenced?
5        A.  I believe they were commenced in 2010.
6        Q.  Do you recall when those proceedings
7    ended?
8        A.  No, I don't.
9        Q.  Do you know whether, in fact, in
10   connection with those proceedings, the issue of
11   your stock options and grants with varying entities
12   was the subject matter of those proceedings?
13       A.  I would assume that they were.
14       Q.  So as you sit here today, you don't
15   recall, in terms of those proceedings, when they
16   ended or where they are in terms of timing with
17   your commencement with your work at University of
18   Miami?
19       A.  No, I do not.
20       Q.  So how long were you in negotiations for
21   your position with University of Miami?
22       A.  My position at the University of Miami was
23   something that started out as a voluntary thing in
24   maybe late 2010 or early 2011.
25       Q.  What were you doing on a voluntary basis

Page 104

1    for the University of Miami?
2        A.  I was just helping them think through on
3    of their assets, the University of Miami tissue
4    bank.
5        Q.  Has that been something that you have done
6    in the past with other entities; that you have
7    volunteered your services in the medical field and
8    then eventually worked into either a consulting
9    position or something along those lines?
10       A.  Yes.
11       Q.  So let's talk about the University of
12   Miami.  After you initially started there, did you
13   change positions?
14       A.  Yes.
15       Q.  And what was your next position?
16       A.  My next position was chief operating
17   officer of the University Medical Center.
18       Q.  Did you receive a salary increase at that
19   time?
20       A.  I did.
21       Q.  When was the salary increase effective?
22       A.  That salary increase took place effective
23   March 1, 2012.
24       Q.  Was there another position that you held
25   after that position in 2012?

LORD-001021

Page 105

A. Well, the series of titles that came with that position became incremental, so in March of 2012 I was appointed as a chief operating officer. In July 1, 2012, I also was given the title of vice-president for medical administration, which is the university title. I also had the professor title, and I was also the chief compliance officer.

Q. Let's talk about, I know you said your professorship ended in 2014, and that was when you retired from that position, correct?

A. Correct.

Q. That was a voluntary act on your part?

A. Correct.

MR. BECERRA: Objection.

BY MS. FOGEL:

Q. Prior to retiring as a professor, the other titles that you held that you just described, from those -- from that position with those titles you were fired; is that correct?

MR. BECERRA: Objection.

THE WITNESS: I was removed from those roles, that's correct.

BY MS. FOGEL:

Q. There was some type of press coverage by the University of Miami at the time you left?

Page 106

A. Yes, there was.

Q. And they actually, did they indicate they had fired you?

A. No, they did not.

Q. What did you do in terms of employment after leaving the University of Miami in 2013 as a professor?

A. Nothing.

Q. You didn't look for work?

A. No. I think my work was opportunistic with the University, and I was certainly always open to another opportunity, but nothing else presented itself.

Q. And what was your ending salary package -- let me rephrase that. What was your ending salary with the University of Miami in the position where you described these varying titles that you had other than a professor?

A. I believe it was about 915,000.

Q. What was the reason that you left --

MR. BECERRA: I'm going to object to that question. Based on the same objection that we discussed before, I'm going to instruct him not to answer that question.

MS. FOGEL: I just want to be clear on the

Page 107

record. The circumstances surrounding Dr. Lord's ending his relationship with the University of Miami and the capacities that he's described earlier where he was paid about 900,000, it's your position that any line of questioning with respect to that you're going to object to until I obtain a court order?

MR. BECERRA: That is correct.

MS. FOGEL: And your basis for the objection, so I'm clear, because I understand you said I need a court order, but I would like to know what your objection is, your legal objection to me asking this line of questioning.

MR. BECERRA: It's privileged.

MS. FOGEL: Privilege. What type of privilege?

MR. BECERRA: That's all I'm going to say about it. It's my objection.

MS. FOGEL: You're saying on a record in which I'm taking a deposition that is costing these people a considerable amount of money, that the only thing you're going to assert is that it's privileged, and you're not going to tell me what the privilege is?

Page 108

MR. BECERRA: Yes. That's exactly right.

MS. FOGEL: Okay.

BY MS. FOGEL:

Q. Why did you retire from the University of Miami as a professor in 2013?

MR. BECERRA: Again, same objection. I'm going to instruct him not to answer.

MS. FOGEL: According to this, he says he retired in 2013. He's answered questions about that position as being different from the other position, that he left that and retired in 2013. He's put on his financial affidavit. He said, I retired. I don't know how you assert a privilege on something that your own client has indicated and I have -- you're telling me basically I have no opportunity to attack his veracity that he retired in July of 2013. I understand. I just want to be clear on the record.

MR. BECERRA: Yes.

MS. FOGEL: Then all of these questions, I want to have them marked where they have been asserted as privileged, this whole line.

BY MS. FOGEL:

Q. You were ultimately, apparently contacted

LORD-001022

Page 109

1 by a search firm in regard to chief executive
2 officer position of the American Diabetes
3 Association?
4    A. Correct.
5    Q. And you were close to getting that job at
6 some point in time?
7    A. I was one of two finalists.
8    Q. Is it an accurate statement that you were
9 told that the reason you didn't get the job was
10 because you were fired from the University of
11 Miami?
12       MR. BECERRA: Objection to form; assuming
13 facts into evidence.
14       THE WITNESS: I was told I was not
15 selected; that the other candidate was
16 selected.
17 BY MS. FOGEL:
18    Q. Did you tell Mrs. Lord that you were not
19 selected because you had failed to disclose you
20 were fired from the University of Miami?
21    A. There was never any failure to disclose
22 anything.
23    Q. I understand, but did you tell Mrs. Lord
24 that --
25    A. That in part it was because of the

Page 110

1 University of Miami, yes. And that is correct.
2    Q. So you chose, after the end of your
3 relationship with the University of Miami, not to
4 seek further employment, correct?
5       MR. BECERRA: Objection to form.
6       THE WITNESS: That's correct; and it needs
7 to be clear I was not seeking employment in
8 2011 when I went to work for the University.
9 BY MS. FOGEL:
10    Q. Why is that? Why weren't you seeking
11 employment?
12    A. Because at that point I really had no
13 particular interest in working.
14    Q. You and Mrs. Lord entered into several
15 agreements prior to the filing of this divorce case
16 by Mrs. Lord; is that correct?
17    A. Yes.
18       MS. FOGEL: Counsel, I'm going to hand you
19 what's going to be the next exhibit, which is
20 Exhibit 8, and after you are through with that
21 exhibit, if you would hand it to the court
22 reporter so he can mark it.
23       (Thereupon a document was marked
24 Petitioner's Exhibit 8 for Identification in
25 the proceeding).

Page 111

1       MR. BECERRA: Do you have an extra copy,
2 counsel?
3       THE WITNESS: Did you see this? Take a
4 look at it first.
5       MS. FOGEL: I thought you did see it.
6       MR. BECERRA: I did. I'm just curious, do
7 you have an extra copy that I can read along
8 with?
9       MS. FOGEL: Sure. Will you do the same
10 for me in Mrs. Lord's deposition?
11       MR. BECERRA: Of course.
12       MS. FOGEL: Good.
13       MR. BECERRA: Thank you.
14 BY MS. FOGEL:
15    Q. Let me ask you, Dr. Lord, if you can
16 identify what's marked as Exhibit 8 to your
17 deposition. Do you recognize this document?
18    A. Let me read it, please.
19       Yes.
20    Q. And you agreed -- that's your signature on
21 this document, on the last page?
22    A. Yes, it is.
23    Q. You agreed to be bound by the terms of
24 this agreement?
25    A. Yes, I was.

Page 112

1    Q. You had advice of counsel before entering
2 into the agreement?
3    A. Yes, I did.
4    Q. Thank you, sir. May I have that back.
5       Next one.
6       MS. FOGEL: Counsel, I'm going to hand you
7 two copies of the escrow agreement, assuming
8 you want one for yourself, and I would like
9 you to hand one to the court reporter when
10 you're done, which will become Exhibit 9.
11       (Thereupon a document was marked
12 Petitioner's Exhibit 9 for Identification in
13 the proceeding).
14 BY MS. FOGEL:
15    Q. And the court reporter is handing you
16 what's been marked as Exhibit 9. Please take a
17 moment to look at this document.
18    A. Thank you.
19       Yes.
20    Q. Did you execute what's been marked
21 Exhibit 9 to your deposition?
22    A. Yes, I did.
23    Q. And you had advice of counsel in entering
24 into this agreement?
25    A. Yes, I did.

TRANSCRIPT PAGES 113 THROUGH 294

HAVE BEEN REMOVED FOR PURPOSES OF THIS PRODUCTION

CONFIDENTIAL INFORMATION

LORD-001024

Filing # 39117224 E-Filed 03/16/2016 06:14:22 PM

<u>IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA</u>

IN RE: THE MARRIAGE OF:              CASE NO.: 132015DR022706

ALICE LORD,                        DIVISION: FC 18

         Petitioner/Wife,

and

JONATHAN LORD,

         Respondent/Husband.

_____/

### <u>HUSBAND'S MOTION TO BIFURCATE THE TEMPORARY RELIEF PROCEEDING</u>

      Respondent/Husband, JONATHAN LORD ("Dr. Lord"), through his undersigned counsel,
files this Motion to Bifurcate the Temporary Relief Proceeding, and states as follows:

### I.   <u>INTRODUCTION</u>

      In Florida, it is proper to spend marital funds during a dissolution of marriage for living
expenses and attorneys' fees. Up until now, the parties have done just that. Petitioner/Wife ALICE
LORD ("Mrs. Lord"), however, has now taken the position that, due to Dr. Lord's "continued
earnings," he should use his "own money" to fund Mrs. Lord's $1.4 million litigation budget. As the
evidence will show, the parties have a substantial net worth and Dr. Lord does not have the means by
which to pay for Mrs. Lord's temporary alimony and attorneys' fees absent the use of marital funds.
As such, this Court should first rule on "entitlement" to temporary support *i.e.*, whether Dr. Lord has
the "ability to pay" and, for that matter, whether Mrs. Lord has a "need," before hearing evidence on
the "reasonableness" of Mrs. Lord's $1.4 million litigation budget.

1



JONATHAN LORD, M.D.
February 24, 2022
Defendant's
**Exhibit 49**

## II.  FACTUAL BACKGROUND

### The Hearing on Wife's Motion for Temporary Support

1.      This Court has set aside two days—April 6, 2016, and April 13, 2016—for the hearing on Mrs. Lord's *Application for Temporary Support and Temporary Attorneys' Fees, Suit Monies and Costs* ("Motion for Temporary Support"). *See* Wife's Re-Notice of Hearing, attached as Exhibit A.

2.      At the hearing on Wife's Motion for Temporary Support, Mrs. Lord intends to introduce substantial testimony pertaining to the **reasonableness** of her $1.4 million litigation budget. Specifically, she intends to call four witnesses pertaining to this issue: Robert A. Stone, CPA, Gordon C. Brydger, Esq., Terry L. Fogel, Esq., and Scott Rubin, Esq. *See* Wife's Answers to Husband's Expert Witness Interrogatories, attached as Exhibit B.  In response, Husband intends to call one expert, Melissa Jacobs, Esq.

### Dr. Lord' Employment Status

3.      Dr. Lord's last formal employment was with the University of Miami's Miller School of Medicine as a Professor of Pathology.  He resigned from that position in December 2012, and officially retired in July 2013.

4.      Since his resignation from the University of Miami, Dr. Lord has not had any salary or wages other than those derived from his work as a consultant.  Currently, Dr. Lord is not performing any consultation work.

5.      Dr. Lord currently serves on the board of directors for the following companies: **DexCom, Inc., Biolase, Inc., Velano Vascular, Inc., Digital Reasoning, Inc., and Par8o, Inc.** Dr. Lord does not receive a salary from any of these companies.  Instead, he is compensated through grants of restricted stock units and stock options. The total value of such grants is between $198,744 and $228,401, approximately.  *Infra*, at ¶¶ 8-15.

2

6.      As Mrs. Lord confirmed at her deposition, since Dr. Lord's employment with the University of Miami, the parties have supported themselves by the sale of stock. *See* Excerpts from Dep. Tr. of Alice Lord March 11, 2016, at 42:15–21, attached as Exhibit C.

7.      Robert A. Stone, CPA, (Mrs. Lord's forensic accountant) was deposed on March 11, 2016. Notably, he has incurred $90,000 for his services to date, and projects to bill anywhere between $360,000 to $510,000 in additional services. *See* Excerpts from Dep. Tr. of Mr. Stone, at 19:20 – 20:22, attached as Exhibit D. Based on his work thus far, Mr. Stone not only confirmed that "Dr. Lord has no W-2 income," but he could not identify any new awards of restricted stock units or stock options given to Dr. Lord since the petition was filed. *Id.* at 165:23–166:6, 210:25 – 211:5.

**Dr. Lord's Compensation as a Director**

8.      Dr. Lord serves as a director for DexCom, Inc., Biolase, Inc., Velano Vascular, Inc., Digital Reasoning, Inc., and Par8o, Inc. He is compensated as follows

9.      **Dexcom.** Dr. Lord has continuously served on the board of directors for DexCom, Inc. ("DexCom") since May 20, 2008. On June 3, 2015, the company awarded Dr. Lord 4,475 restricted stock units in DexCom. *See* DexCom Stock Unit Award, June 3, 2015, attached as Exhibit E. Those stock units will vest in one annual installment on June 3, 2016. *Id.* The vesting of the restricted stock units is earned "only by continuing service as an Employee, Director, or Consultant of [DexCom]." *Id.* As of March 1, 2016, the value of these 4,475 restricted stock units was $172,717. *See* James Gilkeson's Valuation Report, attached as Exhibit F.

10.    **Biolase**. Dr. Lord has continuously served on the board of directors for Biolase, Inc. ("Biolase") since August 27, 2014. On April 27, 2015, Biolase granted Dr. Lord an option to purchase 132,159 shares of its common stock at $2.27 per share. *See* Biolase, Inc., Option Award Notice, April 27, 2015, attached as Exhibit G. Commencing on May 27, 2015, the shares began vesting in monthly installments over a 12-month period. *Id.* The vesting schedule is subject to the requirement that Dr. Lord continues to "serv[e] as a Non-Employee Director." *Id.* As of March 1, 2016, the value of these

3

stock options was $546. *See* James Gilkeson's Valuation Report, attached as <u>Exhibit F</u> (demonstrating that these stock options are currently underwater).

11.    **Velano Vascular.**  Dr. Lord has continuously served on the board of directors for Velano Vascular, Inc. ("Velano") since December 16, 2013.  On April 22, 2014, the company granted Dr. Lord an option to purchase 10,062 shares of Velano's common stock at $0.84 per share. *See* Velano Notice of Stock Option Grant, dated April 27, 2015, attached as <u>Exhibit H</u>.  The Stock Option Grant provides that "[s]o long as [Dr. Lord's] Continuous Service does not terminate, the Shares underlying this Option shall vest and become exercisable in accordance with the following schedule: $1/24^{th}$ of the Total Number of Shares shall vest and become exercisable on each monthly anniversary of the Vesting Commencement Date." *Id.* (emphasis added).  As of March 1, 2016, the value of these stock options was $7,477. *See* James Gilkeson's Valuation Report, attached as <u>Exhibit F</u>.

12.    **Digital Reasoning.**  Dr. Lord has continuously served on the board of directors for Digital Reasoning, Inc. ("Digital Reasoning") since June 10, 2014.  On June 10, 2014, Digital Reasoning granted Dr. Lord an option to purchase 210,000 shares in its common stock at $0.649 per share. *See* Digital Reasoning Notice of Stock Option Grant, dated June 10, 2014, attached as <u>Exhibit I</u>.  Twenty-one thousand (21,000) of those shares vested on December 10, 2014, with the balance vesting via the following schedule: $1/60^{th}$ of the shares each month thereafter (with vesting occurring on the first day of each month) over a 54-month period, "subject to the Option holder's Continuous Service with the Company through each such vesting date." *Id.* (emphasis added).  As of March 1, 2016, the value of these stock options was $6,515 at a $0.42 share valuation, and $36,173 at a $0.80 share valuation. *See* James Gilkeson's Valuation Report, attached as <u>Exhibit F</u>.

13.    **Par8o.**  Dr. Lord has continuously served on the board of directors for Par8o, Inc. ("Par8o") since December 2, 2013.  On January 27, 2015, Par8o granted Dr. Lord an option to purchase 275,439 shares in its common stock at $0.14 per share. *See* Par8o Stock Option Grant, dated Jan. 27, 2015, attached as <u>Exhibit J</u>.  Commencing on December 2, 2013, $1/60^{th}$ of the shares began vesting

4

and became exercisable each month thereafter, provided Dr. Lord "continues to have a Service Relationship with the Company on each vesting date." *Id.* As of March 1, 2016, the value of these stock options was $10,634. *See* James Gilkeson's Valuation Report, attached as Exhibit F.

14. **Par8o.** Also on January 27, 2015, Par8o granted Dr. Lord an option to purchase an additional 27,548 shares in its common stock at $0.14 per share. *See* Par8o Stock Option Grant, dated Jan. 27, 2015, attached as Exhibit K. Commencing on October 6, 2014, 1/60th of the shares began vesting and became exercisable each month thereafter, provided Dr. Lord "continues to have a Service Relationship with the Company on each vesting date." *Id.* As of March 1, 2016, the value of these stock options was $854. *See* James Gilkeson's Valuation Report, attached as Exhibit F.

15. The following chart summarizes Dr. Lord's compensation for his role as a director:

| Company | Date of Grant | Number of Shares | Vesting Schedule | Current Value[1] |
|---|---|---|---|---|
| Dexcom | June 3, 2015 | 4,475 restricted stock units | 4,475 restricted stock units will vest on June 3, 2016 | $172,717 |
| Biolase | April 27, 2015 | 132,159 shares | Commencing on May 27, 2015, the shares began vesting in monthly installments over a 12-month period | $546 |
| Velano Vascular | April 22, 2014 | 10,062 shares | Commencing on April 22, 2014, the shares began vesting in monthly installments over a 24 month period | $7,477 |
| Digital Reasoning | June 10, 2014 | 210,000 shares | Commencing on June 10, 2014, 1/60th of the shares began vesting in monthly installments over a 54 month period | $6,515 at a $0.42 share valuation $36,173 at a $0.80 share valuation |
| Par8o | October 6, 2014 | 275,439 shares | Commencing on December 2, 2013, | $10,634 |

---

[1] Values as of March 1, 2015.

| | | | | |
|---|---|---|---|---|
| | | | $1/60^{th}$ of the shares began vesting in monthly installments over a 60 month period | |
| Par8o | October 6, 2014 (27,548 shares) | 27,548 shares | Commencing on October 6, 2014, $1/60^{th}$ of the shares began vesting in monthly installments over a 60 month period | $854 |

**The Surf Club**

16.    During the marriage, Dr. Lord and Mrs. Lord sought to purchase a condominium in Miami Beach, Florida, at the "Surf Club." They executed a purchase agreement, and paid a deposit of $2,720,000.

17.    After the parties separated in March 2015, and prior to the commencement of this dissolution action, Dr. Lord recommended to Mrs. Lord that they cancel their pending purchase of the Surf Club condominium in order to have their $2,720,000 deposit returned. Dr. Lord suggested that the parties evenly split the $2,720,000.00 deposit, but Mrs. Lord refused.

18.    Mrs. Lord was only willing to cancel the Surf Club contract under her terms. Ultimately, the parties entered into an agreement (the "Surf Club Agreement") whereby by the parties partially and equitably distributed 50% of the Surf Club deposit. As such, Dr. Lord and Mrs. Lord both received $680,000 in unencumbered cash.

19.    The Surf Club Agreement stipulates that during the pendency of the sale of 68 La Gorce Circle, Miami Beach, Florida 33140 (the "Marital Home"), all of the household expenses, plus Mrs. Lord's health insurance, will be paid with joint funds and attributed jointly. Currently, Mrs. Lord enjoys exclusive use and possession of the Marital Home and has barred Dr. Lord from entering the house.

20.     Per the Surf Club Agreement, the remaining 50% of the Surf Club deposit (totaling $1,360,000) is currently held in Mrs. Lord's counsel's trust account, and is inaccessible absent "written agreement of the parties or a court order."

21.     In September 2015, Dr. Lord used $600,000 of his Surf Club proceeds as a deposit to purchase a home in Fernandina Beach, Florida. Since then, he has been using the remaining $80,000 from his Surf Club proceeds to satisfy his personal, daily living expenses.

**Mrs. Lord's Financial Affidavit**

22.     Per Mrs. Lord's financial affidavit, her monthly gross income is $4,409.09. *See* Wife's Financial Affidavit, attached as Exhibit L.

23.     She also notes that the parties' "total net worth" is $26,096,233.00. *Id.* at 11. The foregoing represents a combination of real and personal property. *Id.* She further claims that all of those assets are marital. *Id.* Assuming that is true, and absent any inequitable distribution, Mrs. Lord will receive approximately $13,048,116 in distribution.[2]

24.     Mrs. Lord's financial affidavit reflects the following information:

| Personal Financial Assets | | | Total |
|---|---|---|---|
| Unencumbered Cash UBS | | | 395,828 |
| Dexcom (DXCM) | 137,107 shs | $85.49 | 11,721,277 |
| Henson Medical | 100,000 shs | $0.49 | 49,000 |
| Biolase (Rest'd - private placement) | 101,163 shs | $1.46 | 147,698 |
| Veracyte (at UBS) | 36,000 shs | $8.41 | 302,760 |
| Muni bonds | | | 957,555 |
| Managed Futures | | | 308,667 |
| Hedge Fund | | | 359,317 |
| Diversified Equity/Fixed | | | 638,096 |
| Global Long/Short IRA | | | 459,001 |
| Stericycle Options: | 49,371 shs | $138.03 | 3,451,462 |
| Dexcom RSU | 4,475 shs | $85.49 | 382,568 |
| Corporate Bonds IRA | | | 140,785 |
| Apollo European Fund IRA | | | 201,923 |
| Meagher Diversified IRA | | | 41,402 |
| Wife's IRA | | | 312 |
| NFJ Intl | | | 91,402 |

[2] This information represents an estimation of Mrs. Lord's potential distribution according to her financial affidavit, is not updated to reflect market changes, and is in no way a representation or acknowledgement that Mrs. Lord is entitled to $13,048,116 in distribution. Dr. Lord is not waiving any of his claims regarding the classification of certain assets as non-marital, and further reserves his right to pursue any and all claims.

| UBS Financial Assets | 19,649,053 |
| :--- | ---: |
| Personal Residences | Total |
| LaGorce Island Miami Fl less commission | 12,000,000 |
| Surf Club - Four Seasons (funds held in escrow) | 2,720,000 |
| **Total Real Estate** | **14,720,000** |
| Total Assets | 34,369,053 |
| Current Liabilities | Total |
| UBS Mortgage (3.208%% 5/1 - 9/1/17 ARM reset) | 2,921,784 |
| UBS Line of Credit (2.926%) | 2,623,336 |
| Expected Capital Gain on sale of La Gorce (assumes 7.5 mm tax basis) | 952,000 |
| Income taxes on deferred ordinary income | 1,775,700 |
| Total Liabilities | |
| Net Worth | 26,096,743 |

## III.   ARGUMENT

The hearing on Mrs. Lord's Motion for Temporary Support should be bifurcated because doing so will serve judicial economy and dramatically limit the parties' litigation costs.

When a trial court evaluates whether an award of temporary alimony is proper, it must balance the **need of one spouse** as fixed by the parties' standard of living, on the one hand, **and ability to pay**, on the other. *Vickers v. Vickers*, 413 So. 2d 788, 789 (Fla. 3d DCA 1982). Moreover, temporary support is inappropriate when a wife has liquid assets with which to keep herself in reasonable comfort pending final hearing. *Grace v. Grace*, 162 So. 2d 314, 320 (Fla. 1st DCA 1964) (citing *Holly v. Holly*, 89 So. 132 (Fla. 1921)).

Section 61.16, Florida Statutes, sets forth the basis for awarding temporary attorneys' fees in a dissolution of marriage. The purpose of Section 61.16 "is to ensure that both parties will have a similar ability to obtain competent legal counsel." *Rosen v. Rosen*, 696 So. 2d 697, 699-700 (Fla. 1997). In making that determination, a trial court "must look to each spouse's need for suit money versus each spouse's respective ability to pay." *Id.* at 699 (citation omitted). Finally, the moving party has the burden of proving not only the necessity of the fees sought, **but also the "reasonableness" of the fees.** *Addie v. Coale*, 120 So. 3d 44, 48 (Fla. 4th DCA 2013) *reh'g denied* (Sept. 13, 2013); *Peacon v. Peacon*, 578 So. 2d 781, 783 (Fla. 3d DCA 1991).

8

Bifurcation is favored in Florida if it will serve judicial economy and dramatically limit the parties' litigation costs. *Smithers v. Smithers*, 743 So. 2d 605, 606 (Fla. 4th DCA 1999). In this case, bifurcation is appropriate because Dr. Lord does not have the "ability to pay." More specifically, he does not earn any wages or salary. *Supra*, at ¶¶ 3-15. Although Dr. Lord serves on the board of directors for five companies, his compensation for such work was "pre-paid" during the marriage in the form of a restricted stock unit award and stock options. *Id.* Thus, a presumption exists that his compensation for such work constitutes marital property.[3] *See* Fla. Stat. § 61.075(6)(a)1.(d). As a result, the only means by which Dr. Lord has to fund Mrs. Lord's living expenses and $1.4 million litigation budget is through the use of marital funds. *Supra*, at ¶¶ 3-15.

In Florida, it is proper to use marital funds for living expenses and attorneys' fees while divorce proceedings are pending. *Bateh v. Bateh*, 98 So. 750, 752 (Fla. 1st DCA 2012) (citations omitted); *see also* Status Quo Temporary Domestic Relations Order Without Minor Children, 11th Judicial Circuit, at ¶ 7 ("The use of funds or income after separation must be . . . justified and necessary for the necessities of the party . . . [a]ttorney's fees and costs are necessities and must be accounted for by each party."). As such, Dr. Lord previously suggested that the parties pay their respective attorneys with marital funds. Mrs. Lord unreasonably denied Dr. Lord's offer, taking the position that his "continued earnings give him superior ability to fund litigation." Interestingly, to date, Mrs. Lord's attorneys have failed to identify a single source of "continued earnings" that supports their position.

Even if this Court were to impute income to Dr. Lord, doing so would be futile because Dr. Lord would be required to use or liquidate marital funds to meet those obligations. In Florida, a spouse can use or liquidate marital property to pay for temporary support obligations without any prejudice. More specifically, if a marital asset is used or liquidated in good faith so that one spouse can pay his

---

[3] On January 4, 2016, Dr. Lord filed a motion for summary judgment pertaining to whether the unvested portions of these awards as of the petition filing date constitute non-marital property. Such motion has not been ruled on. By filing this motion, Dr. Lord does not waive, alter, or change his position in this regard, and reserves his right to pursue any and all of his claims.

9

or her temporary support obligations, no dissipation or misconduct occurs. For example, in *Cooper v. Cooper*, the trial court distributed three marital assets: the marital home (valued at $30,000); the husband's life insurance policies (valued at $8,000); and the husband's IRA (valued at $8,000). 639 So. 2d 153, 154-55 (Fla. 2d DCA 1994). The marital home was awarded to the wife. *Id.* The husband was awarded his insurance policies and his IRA. *Id.* The award to the wife totaled $30,000, and the award to the husband totaled $16,000. *Id.* The trial court's final judgement recited that the award to the husband was made "as an *offset* and as equal distribution" because he had liquidated and depleted the value of his IRA several months before the final hearing so he could pay his temporary support obligations (alimony and mortgage payments) and some of his living expenses. *Id.* The Second District reversed the trial court's award, noting that, because the final judgment did not find that the husband wrongfully depleted the IRA through any misconduct, or that the IRA was used for any purpose that would support crediting the value of the depleted asset to him, it was error to distribute the value of the depleted IRA as an asset. *Id.*; *see also Levy v. Levy*, 900 So. 2d 737, 746 (Fla. 2d DCA ███) (reversing award of dissipated asset because the wife's testimony that she used the asset for attorney's fees and living expenses during the dissolution proceedings was unrebutted and the trial court did not find the wife guilty of misconduct); *Bush v. Bush*, 824 So. 2d 298, 294 (Fla. 4th DCA 2002) (reversing award of dissipated asset when the evidence showed that the husband exercised his stock options to pay the parties' financial obligations during the dissolution proceedings); *Knecht v. Knecht*, 629 So. 2d 883,886 (Fla. 3d DCA 1993) (reversing award of dissipated asset when no evidence contradicted the wife's testimony that she expended the funds in her IRA for support during the dissolution proceedings); *Annas v. Annas*, 29 So.3d 1209 (Fla. 1st DCA 2010) (holding that nothing in the judgment suggested that the former wife used the money she withdrew from the parties' bank account for anything other than reasonable living expenses pending resolution of the case and the trial court erred when it assigned the money withdrawn as part of the scheme of equitable distribution).

In summary, the only means by which Dr. Lord has to fund Mrs. Lord's living expenses and $1.4 million litigation budget is through the use of marital funds. Because the parties own substantial marital assets, there is no reason why such assets cannot be used during the pendency of this dissolution of marriage. And finally, even if this Court were to impute income to Dr. Lord, doing so would be futile because Dr. Lord would be required to use or liquidate marital funds to meet those obligations.

## IV.   CONCLUSION

In light of the foregoing, this Court should bifurcate the hearing on Mrs. Lord's Motion for Temporary Support. Coincidentally, the Court has set aside two days for this hearing—April 6, 2016, and April 13, 2016. As such, the Court should first hear evidence on April 6, 2013, regarding Dr. Lord's "ability to pay" absent the use of marital funds. If Mrs. Lord can show that Dr. Lord has the ability to pay through his alleged "continued earnings," then, if necessary, the Court should hear evidence on April 13, 2016, pertaining to Mrs. Lord's "actual needs" and the "reasonableness" of her $1.4 million budget.

**WHEREFORE**, Respondent/Husband, JONATHAN LORD, respectfully requests that this Court bifurcate the hearing on *Wife's Application for Temporary Support and Temporary Attorneys' Fees, Suit Monies and Costs*, and award Dr. Lord his attorneys' fees and costs associated with brining this motion, and granting such other relief as this Court deems just and proper.

Dated: March 16, 2016

11

Respectfully,

THE FERRARO LAW FIRM, P.A.
600 Brickell Avenue, Suite 3800
Miami, Florida 33131
(Phone) 305-375-0111
(Fax) 305-379-6222
*Attorneys for Respondent/Husband*

/s/ *Jose L. Becerra*
Jose Becerra Esq.
Florida Bar No. 104891
JLB@ferrarolaw.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was furnished by electronic mail on this 16th day of March, 2016, on Terry Fogel (tfogel@fogelrubinfogel.com) (frf@fogelrubinfogel.com) and Scott Rubin (srubin@fogelrubinfogel.com) FOGEL RUBIN FOGEL, 350 Courthouse Tower, 44 West Flagler Street, Miami, Florida 33130, pursuant to Florida Rule of Judicial Administration 2.516.

THE FERRARO LAW FIRM, P.A.
600 Brickell Avenue, Suite 3800
Miami, Florida 33131
(Phone) 305-375-0111
(Fax) 305-379-6222
*Attorneys for Respondent/Husband*

/s/ *Jose L. Becerra*
Jose Becerra Esq.
Florida Bar No. 104891
JLB@ferrarolaw.com