*EXHIBIT "L"*

```
 1              IN THE UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF FLORIDA
 2
                CASE NO. 13-22500-CIV-Altonaga/McAliley
 3

 4   JONATHAN LORD, M.D.,

 5        Plaintiff,

 6      vs.

 7   UNIVERSITY OF MIAMI,

 8        Defendant.
     _____/
 9

10

11                      Via Zoom
                    Friday, April 1, 2022
12                  9:01 a.m. - 5:13 p.m.

13

                    VIDEOTAPED DEPOSITION
14                         OF
                 PASCAL GOLDSCHMIDT-CLERMONT
15

16

17        Taken before Mary Ann Collier, a Court Reporter

18   and Notary Public for the State of Florida at Large,

19   pursuant to Notice of Taking Videotaped Deposition

20   filed in the above cause.

21

22

23

24

25
```

```
 1   APPEARANCES:  (Via Zoom)

 2       JEFFREY H. SLOMAN, ESQ.
         JACQUELINE DER OVANESIAN, ESQ.
 3       Stumphauzer Foslid Sloman Ross & Kolaya
         Two South Biscayne Boulevard, Suite 1600
 4       Miami, FL 33131
         305-614-1400
 5       jsloman@sfslaw.com
         On behalf of the Plaintiff
 6
         ERIC D. ISICOFF, ESQ.
 7       CHRISTOPHER M. YANNUZZI, ESQ.
         Isicoff Ragatz
 8       601 Brickell Key Drive, Suite 750
         Miami, FL 33131
 9       305-373-3232
         isicoff@irlaw.com
10       On behalf of the Defendant and deponent

11   ALSO PRESENT:

12       JONATHAN LORD, M.D.
         THOMAS OLENDER, Videographer
13       AILEEN UGALDE, General Counsel, U of M

14                _____

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                     I N D E X

 2     WITNESS              EXAMINATION BY         PAGE

 3     PASCAL GOLDSCHMIDT    MR. SLOMAN            5

 4                   E X H I B I T S

 5     FOR PLAINTIFF                            FOR I.D.

 6      Exhibit 1                                  18
        Exhibit 2                                  57
 7      Exhibit 3                                  59
        Exhibit 4                                  59
 8      Exhibit 5                                  65
        Exhibit 6                                  66
 9      Exhibit 7                                  67
        Exhibit 8                                  68
10      Exhibit 9                                  68
        Exhibit 10                                 69
11      Exhibit 11                                 69
        Exhibit 12                                 72
12      Exhibit 13                                 78
        Exhibit 14                                 81
13      Exhibit 15                                 85
        Exhibit 16                                 90
14      Exhibit 17                                 91
        Exhibit 18                                 93
15      Exhibit 19                                100
        Exhibit 20                                102
16      Exhibit 21                                108
        Exhibit 22                                111
17      Exhibit 23                                116
        Exhibit 24                                116
18      Exhibit 25                                126
        Exhibit 26                                129
19      Exhibit 27                                130
        Exhibit 28                                135
20      Exhibit 29                                141
        Exhibit 30                                143
21      Exhibit 31                                148
        Exhibit 32                                149
22      Exhibit 33                                151
        Exhibit 34                                158
23      Exhibit 35                                162
        Exhibit 36                                165
24      Exhibit 37                                166
        Exhibit 38                                167
25      Exhibit 39                                168
        Exhibit 40                                168
```

```
 1        Exhibit 41                        169
          Exhibit 42                        172
 2        Exhibit 43                        177
          Exhibit 44                        179
 3        Exhibit 45                        181
          Exhibit 46                        181
 4        Exhibit 47                        182
          Exhibit 48                        183
 5        Exhibit 49                        185
          Exhibit 50                        187
 6        Exhibit 51                        187
          Exhibit 52                        190
 7        Exhibit 53                        192
          Exhibit 54                        192
 8        Exhibit 55 and 56                 193
          Exhibit 57                        194
 9        Exhibit 58                        194
          Exhibit 59                        195
10        Exhibit 60                        198
          Exhibit 61                        205
11        Exhibit 62                        211
          Exhibit 63                        211
12        Exhibit 64                        214
          Exhibit 65                        215
13        Exhibit 66                        221
          Exhibit 67                        222
14        Exhibit 68                        224
          Exhibit 69                        230
15        Exhibit 70                        232
          Exhibit 71A                       237
16        Exhibit 72                        238
          Exhibit 73                        238
17        Exhibit 74                        239
          Exhibit 75                        239
18

19

20

21

22

23

24

25
```

```
 1              THE VIDEOGRAPHER:  Good morning.  We're going

 2      on the record at approximately 9:01 a.m. on

 3      Friday, April 1st, 2022.  The audio and video

 4      recording will continue to take place unless all

 5      parties agree to go off the record.

 6          This is the video recorded deposition of

 7      Pascal Goldschmidt, M.D.  This deposition has

 8      been noticed by the law firm of Stumphauzer,

 9      Foslid, Sloman, Ross and Kolaya, counsel for the

10      plaintiff, in the matter of Jonathan Lord, M.D.,

11      versus University of Miami, case number

12      13-22500-Civ.  It's filed in the United States

13      District Court, Southern District of Florida.

14          This deposition is being taken by a remote

15      video conference.  My name is Thomas Olender.  I

16      am the certified legal video specialist.  The

17      court reporter is Mary Ann Collier from Mary Ann

18      Collier and Associates, Inc.

19          Counsel will now state their appearances and

20      affiliations for the record, beginning with the

21      noticing attorney, and then the court reporter

22      will swear the witness in.

23          MR. SLOMAN:  Good morning.  Jeffrey Sloman

24      and Jacqueline Der Ovanesian on behalf of the

25      plaintiff, Jonathan Lord, M.D.
```

```
 1            MR. ISICOFF:  Good morning.  Eric Isicoff and

 2       Chris Yannuzzi, on behalf of the witness and the

 3       defendant, University of Miami.  Also present is

 4       Aileen Ugalde, who is the general counsel of the

 5       University of Miami.

 6   Thereupon,

 7            PASCAL GOLDSCHMIDT-CLERMONT

 8   was called as a witness and, having been duly sworn,

 9   testified as follows:

10                 DIRECT EXAMINATION

11   BY MR. SLOMAN:

12       Q.   Good morning, Dr. Goldschmidt.  Would you

13   please state your full name for the record.

14       A.   Yes.  My name is Pascal Goldschmidt-Clermont.

15       Q.   And before we get started, Dr. Goldschmidt,

16   we're going to show you something called a

17   confidentiality order and refer you to paragraph five.

18   And I'll just read it for you.  It's not only for your

19   benefit, but for the benefit of the videographer and

20   court reporter.

21            It says "Documents designated as confidential

22   shall be shown only to the attorneys, the parties,

23   parties' experts, actual proposed witnesses, court

24   reporters, videographers and other persons whom the

25   attorneys reasonably deem necessary to review the
```

```
 1    documents for the prosecution or defense of this
 2    lawsuit.  Each person who is permitted to see
 3    confidential information shall first be shown a copy
 4    of this order and shall further be advised of the
 5    obligations under the confidentiality designation."
 6              I don't know whether you'll be shown
 7    confidential information, but I wanted to make you
 8    aware of that requirement.  Okay?  Do you understand
 9    that, sir?
10         A.   I do.
11         Q.   Dr. Goldschmidt, have you ever had your
12    deposition taken before?
13         A.   Yes, I did.
14         Q.   When you were affiliated with the University
15    of Miami?
16         A.   Correct.
17         Q.   All right.  So then you understand how these
18    depositions go.  You need to provide audible answers.
19    Head shakes don't get transcribed by the court
20    reporter.  And because it's by Zoom, it's even more
21    important that your answers be audible as opposed to
22    nodding or shaking your head.  You understand?
23         A.   I do.
24         Q.   You're using a laptop for this deposition
25    today?
```

```
1          A.    Yes, I do.

2          Q.    Whose laptop are you using?

3          A.    My own.

4          Q.    Are there any documents or programs or

5     applications open on the laptop, other than in the

6     Zoom application?

7          A.    Yeah.  But I can -- it was just to get on the

8     call.  I will take it off.

9          Q.    I don't want you to click off the Zoom

10    application.

11         A.    No, no.  I get it.  There's nothing else.

12         Q.    I just wanted to make sure there's no chat

13    windows, texting applications, email or other

14    communication programs open on the computer currently.

15    Is that correct?

16         A.    That's correct.

17         Q.    I know that there was somebody in the

18    background.  Who's the person that's in the

19    background?

20         A.    Yeah.  That's my wife.  She's on the Peloton.

21    Sorry.  She's done.

22         Q.    You blocked her sufficiently.  It will just

23    be better.  A moment of levity.

24               And right now, Dr. Goldschmidt, you cannot

25    see any chalkboards or easels, enlargements of printed
```

1    words or any signals of any kind.  Correct?

2         A.    No.

3         Q.    Sir, where do you currently reside?

4         A.    16800 Southwest 88 Court.

5         Q.    Is that Miami-Dade County, Florida?

6         A.    Yes, it is.  It's in Palmetto Bay.

7         Q.    Thank you, sir.

8         A.    33157.

9         Q.    And I know that you're a cardiologist and a

10   physician.  Are you currently employed by any

11   organization?

12        A.    I am.

13        Q.    And who are you employed by?

14        A.    Lennar Corporation.  I'm the chief medical

15   officer.  I have been employed by them for just about

16   two years.  I helped them navigate through the

17   COVID-19 pandemic.

18            To give you a little bit of a background,

19   Lennar Corporation is the largest home builder in the

20   United States.  On the 29th of February, Lennar had

21   one of the first six people who died of COVID-19 in

22   the U.S., and they asked me to help them with the

23   navigation of their company through the pandemic,

24   which we have done very successfully.

25        Q.    Aside from Lennar, are you employed

1    elsewhere?

2        A.   No.  I have a couple of contracts, but I'm

3    not employed anywhere else.

4        Q.   Earlier you mentioned before we went on the

5    record that you may be interrupted to attend to

6    patient calls.  Is that correct?

7        A.   Correct.  If there is somebody who is sick in

8    the company, they may call me because of medical

9    issues.

10       Q.   Do you anticipate that happening today, sir?

11       A.   I have asked for people to try to protect my

12   time, so I hope not.  But it may happen, so I just

13   wanted to let you know.

14       Q.   Okay.  Sir, what did you do in preparation

15   for today's deposition?

16       A.   First of all, I tried to think about the

17   period of time that, you know, Jack Lord was working

18   with us, with me, more specifically.

19            I don't remember exactly when he was

20   recruited at UM, but I think it was in 2011.  And in

21   2012 we worked together.  And the end of his

22   employment was early 2013.  And I was in a

23   conversation with my lawyers.

24       Q.   Is that Mr. Yannuzzi and Mr. Isicoff?

25       A.   Yes.

1        Q.   Did you review any materials, sir?

2        A.   I tried to find any material that I have,

3   like emails.  I couldn't find any.  And I found one

4   document that I kept, which was a short note of a

5   discussion that we had.  That's all.

6        Q.   And would you -- can you tell me what that

7   short note said, and if it was dated.

8        A.   Yes.  It was -- it was a note in October of

9   2012.  And it was a note that I received from Jack to

10  let me know that he was very upset at a time where

11  there had been a petition signed by faculty and he

12  just expressed his dismay and disappointment with the

13  reaction.

14          MR. SLOMAN:  Chris, could you provide us with

15      a copy of that, so that we may be able to ask Dr.

16      Goldschmidt a question or two about it?

17          MR. YANNUZZI:  I haven't -- I haven't seen

18      that note, so I have to see what it is first and

19      I guess determine if it's responsive to some

20      request or something.

21          But if the doctor would send it to me on a

22      break, I'm happy to take a look at it.

23          THE WITNESS:  I will.

24          MR. YANNUZZI:  I just don't know what he's

25      referring to in the abstract.

```
 1    BY MR. SLOMAN:
 2         Q.   So other than -- so as far as I understand
 3    it, it's a note that you wrote in your own handwriting
 4    or is it an email or how was it documented, Dr.
 5    Goldschmidt?
 6         A.   Just handwriting.
 7         Q.   Okay.  And do you recall why you kept it and
 8    where you stored it all this -- it's been
 9    approximately nine and a half years?
10         A.   Yes.
11         Q.   Where have you stored it, in your home?
12         A.   It was within my documents from UM.  I kept a
13    few documents.
14         Q.   Was there anything else that you reviewed in
15    anticipation of today's deposition?
16         A.   I have not seen any of the documents.  I have
17    not seen any document that is related to this
18    discussion.
19         Q.   Have you, other than the document that you
20    just referred to, have you reviewed any emails during
21    the time that Dr. Lord was employed at the University
22    of Miami?
23         A.   I have not seen a single email about that
24    time.
25         Q.   You said you have seen emails at that time?
```

```
 1        A.   I have not reviewed any emails from that

 2   time, no.

 3        Q.   Okay.  I'm sorry.

 4             And did you review any executive daily

 5   updates that were generated at that time?

 6        A.   None of them.

 7        Q.   Okay.  And when I say executive daily

 8   updates, do you understand what I'm talking about?

 9        A.   If you can be specific, it would help.

10        Q.   I'll show you a couple during your

11   examination and we can chat about them then.  Okay?

12   Is that fair?

13        A.   If they were the emails that we were

14   exchanging at the time, no, I have not reviewed any of

15   them.

16        Q.   Okay.  Have you reviewed the settlement

17   agreement that was entered into between the University

18   of Miami and the United States of America?

19        A.   I remember seeing articles in the press about

20   it, but that's it.

21        Q.   What do you remember about the articles that

22   you reviewed?

23        A.   There was a settlement, if I recall, for 20

24   plus million dollars between the university and the

25   government related to investigations that had been
```

1    going on relative to activities of our laboratory at

2    the University of Miami.

3         Q.    Specifically the IML?

4         A.    Specifically the IML, yeah.

5         Q.    Dr. Goldschmidt, why don't you tell me a

6    little bit about your educational background and we'll

7    get to know you a little bit during this process and

8    then I'll ask specific questions.

9         A.    Sure.  So I'm a native of Belgium.  I became

10   a citizen in 2002.  I went to the university, the Free

11   University of Brussels.  The free means non-Christian

12   university, because Jews were not allowed at the

13   University of Louvain, which was the other university

14   of the City of Brussels.  I finished medical school

15   first of my class.

16        After medical school, I did the residency in

17   medicine at the Academy Hospital of Brussels.  I was

18   very impressed with some patients that were coming

19   from Africa who had a very unusual deficiency of the

20   immune system.

21        My university suggested to me to go to the

22   United States to experience the prevalence and the

23   uniqueness of this disease, which was prevalent in

24   several cities of the United States.

25        I initially came to San Francisco and went to

1    the dermatology clinic, which is where patients with

2    AIDS were seen.  I remember the first time I went,

3    there was a line of 75 men, age 15 to 65, that were

4    waiting to be seen at the clinic.  All of this -- all

5    of the curves of the pandemic were going up

6    exponentially, including mortality and morbidity.  It

7    was a very challenging time.

8          Then my boss in the United States went to

9    become the chairman of immunology and microbiology in

10   South Carolina, so I went to South Carolina for two

11   years to do research exclusively.

12         I was quite successful, so I received an

13   offer from Dr. Thomas Pollard, who was the chair of

14   cell biology at Johns Hopkins University.  I went to

15   do a research fellowship with him and at the same time

16   I had to repeat two years of residency to be board

17   eligible in the United States in internal medicine.

18         Again, I was very successful and was offered

19   a fellowship in cardiology at Johns Hopkins, which I

20   took, because at the time we were starting to treat

21   patients with acute heart attack with thrombolytics,

22   which was a very exciting time, and decided that was

23   the thing I wanted to do.  I did three years of

24   fellowship.  Finished very successfully.

25         Went on to be on the faculty for six years,

1    and then I was recruited by somebody who had been at

2    the Johns Hopkins, Bernadine Healy.  You may know her.

3    She was the director of NIH at one point, the

4    president of the Red Cross.  Very unique individual.

5    She recruited me to build a heart and lung research

6    institute at the Ohio State University.

7            We did a lot of work.  I brought the first

8    DaVinci robot to the United States.  It is about

9    250,000 robotic surgeries that are being done every

10   year at this point.  It was zero before we brought the

11   first instrument.

12           We built a heart hospital for the Ohio State

13   University, which has been immensely successful, both

14   for the benefit of patients in that region, but also

15   financially for the university.

16           And then I was recruited by Duke University

17   to be chief of cardiology.  Oh, I had become chief of

18   cardiology in Ohio.  I was recruited by Johns Hopkins

19   to be the chief of cardiology at Duke University and

20   after three years, they were extremely pleased with my

21   service.  I became chairman of the department of

22   medicine, which is the largest and most successful

23   department of Duke University.

24       Q.   And was that the position you had before you

25   joined the University of Miami?

```
1        A.   Correct, correct.  I finished -- I finished
2    my tenure at Duke as chairman.  I received two things
3    that were very important to me.  First, a poster
4    signed by every faculty of the department of medicine
5    to thank me for extraordinary services.  And then also
6    I received a book at a luncheon, which was dedicated
7    by the women faculty of the department of medicine at
8    Duke to the chairman of the women of the department of
9    medicine at Duke.
10        That was very important to me, because Duke
11   had a bit of tendency to be a girl-boys club.  At the
12   time, women had a tough time to access leadership
13   positions, and I recruited a few women in critical
14   positions.  And so there was a lot of recognition for
15   that on the part of my faculty.
16        And then I was recruited by President Shalala
17   to come to the University of Miami to be dean of the
18   Miller School of Medicine.
19        Q.   So how did that recruitment take place?  How
20   were you recruited by President Shalala?  Did she just
21   call you up on the phone?  How did that work?
22        A.   If I recall, it was in 2005, I think in the
23   winter of 2005, they were looking for a new dean, and
24   somehow, you know, a friend of mine who had been at
25   Duke and was working at the University of Miami, David
```

```
 1    Lubarsky, told me about the job, asked me if I was
 2    interested.  I told him I was very happy with what I
 3    was doing.
 4            And then I think a month later I received an
 5    invitation to come for a visit.  I thought, you know,
 6    why not.  And I came for a visit.  And I liked what I
 7    saw.  I thought it was an opportunity.
 8        Q.   Were you -- had you placed your name with an
 9    executive recruiting firm at that time?
10        A.   No, nothing like that.
11        Q.   You've heard of executive recruiting firms
12    before.  Correct?
13        A.   Correct.
14            MR. SLOMAN:  In fact, let me just show you
15        Plaintiffs Exhibit Number 1.
16            (Thereupon, the document was marked as
17            Exhibit 1 for identification.)
18    BY MR. SLOMAN:
19        Q.   This is an email, Dr. Goldschmidt, from a
20    women named Beth Hicks at Korn Ferry to you on January
21    3, 2013.  Do you recognize or do you recall that
22    email?  Do you know who Beth Hicks is?
23        A.   I know who the person is, yes.
24        Q.   And what was Korn Ferry's relationship with
25    the University of Miami?
```

```
 1          A.    It was the organization I was using to help
 2    me with many of the top recruits.
 3          Q.    And is that after Dr. Lord was terminated,
 4    did you, in fact, use Korn Ferry to look for another
 5    candidate to replace Dr. Lord?
 6          A.    No.
 7          Q.    What did you use Korn Ferry for?
 8          A.    Oh, God.  I recruited I think 20 new chairs
 9    for the university and other leaders.  And I think
10    that Korn Ferry probably helped me for three quarters
11    of these recruitments.
12          Q.    When you were recruited by President Shalala,
13    did you bring along anyone from Duke University to
14    assist you at the University of Miami?
15          A.    Yes.
16          Q.    And who was that individual or individuals?
17          A.    I recruited probably about 70 people from
18    Duke.
19          Q.    Seven zero?
20          A.    Seven zero, yeah.
21          Q.    Was one of them William Donelan?
22          A.    Yes.  Bill Donelan was the first one I
23    recruited, I believe.
24          Q.    In fact, Dr. Lord succeeded Mr. Donelan.
25    Correct?
```

1    A.   Correct.  But Mr. Donelan is the person who

2    started the health system at Duke University.  An

3    extremely successful individual.  He was the chief

4    operating officer under Ralph Snyderman, who was the

5    chief executive officer at Duke.

6         And I felt very strongly that the University

7    of Miami needed help with their system and I felt he

8    would be the ideal person to be my chief operation

9    officer.  He came initially as a consultant and then

10   he switched to become the chief operating officer.

11   Q.   Before we start talking more about the

12   University of Miami, I just wanted to go back and talk

13   about your board affiliations while you were at the

14   University of Miami.

15        Can you tell me, sir, the names of the

16   publically-traded companies that you were on the board

17   of while you were the dean of the University of Miami

18   Medical School.

19   A.   Yes.  I was on the board of the company

20   Mednax.  Initially, it was named Pediatrix, and then

21   it became Mednax.

22   Q.   What was it originally called?

23   A.   Pediatrix, with an X at the end.

24   Q.   And when did you join that board?

25   A.   I think soon after I arrived, 2006 or 2007.

```
 1          Q.   And was there anyone on the board at the

 2     University of Miami who was affiliated with Pediatrix

 3     or Mednax?

 4          A.   Yes.  The chairman of the board.

 5          Q.   And what was his name?

 6          A.   Chief executive officer, Roger Medel.

 7          Q.   Was there anybody else associated with Mednax

 8     who was also on the board of the University of Miami?

 9          A.   Yes, yes.  There was one other individual,

10     Michael Fernandez.

11          Q.   What about Manny Kadre?

12          A.   He came later.

13          Q.   What was your compensation structure at

14     Mednax?  Was it a salary or did you receive stock or

15     was it a combination?

16          A.   Combination.  It was 15 -- about $15,000 per

17     quarter, and I think about that in shares as well.

18          Q.   Are you still affiliated with Mednax?

19          A.   No longer, no.

20          Q.   The shares of stock, were they options or

21     were they restricted in any way, or did you have

22     unrestricted stock, do you recall?

23          A.   Yeah, yeah.  They were -- they were options

24     to start with and then they became restricted shares.

25          Q.   And have you exercised the options on the
```

1    stock that you had?

2         A.   I did.

3         Q.   And approximately when was that?

4         A.   Over time.  You know, over the period of time

5    between 2006, 2007, whenever I started, and 2020, when

6    I left.

7         Q.   What about were there any other companies

8    that you were on the board of at that time?

9         A.   Yes.  I -- for two years I helped a friend of

10   mine named Bill Schoen, who had a company called HMA,

11   Health Management Associates, that he was intending to

12   sell and his chief medical officer -- well, no.  His

13   medical expert on the board had become unwell from

14   Mayo Clinic and he asked me to replace him for a

15   period of time.

16        Q.   And did you have a similar type of

17   compensation arrangement with HMA that you had with

18   Mednax?

19        A.   Correct.

20        Q.   You said correct?

21        A.   Yes.  And it was -- except it was not

22   options, it was restricted shares right away.

23        Q.   And have you since been able to exercise or I

24   guess sell those shares of stock?

25        A.   Yeah.  When the company was sold to the

1    buyer, I decided to sell my shares.

2         Q.   Do you recall approximately when that was?

3         A.   I think in 2013 or '14.

4         Q.   While you were still the dean of the

5    University of Miami School of Medicine?

6         A.   Yes.

7         Q.   How about any other --

8         A.   Yes.  I served on the board of the company

9    OPKO, which was a company started by Phil Frost, and

10   he wanted me to advise him on his board.

11        It was a new company, if I recall correctly,

12   it was a shell company that he purchased and he

13   started a new company called OPKO, which was

14   developing new products.

15        Q.   And was Mr. Frost a member of the board of

16   trustees at the University of Miami?

17        A.   Yes.  Yes, he was.

18        Q.   And did you have a similar compensation

19   schedule or arrangement with OPKO while you were dean

20   of the University of Miami School of Medicine?

21        A.   It was a small company, so there was some

22   compensation, but it was very limited.  I can't

23   remember exactly what it was.

24        Q.   Were there any other board memberships that

25   you had while you were dean of the University of Miami

24

1    School of Medicine?

2        A.   No.  That's it.

3        Q.   Now, currently you are working for Lennar as

4    the chief medical officer.  Is that correct?

5        A.   Correct.

6        Q.   And the CEO of Lennar is Stuart Miller.

7    Correct?

8        A.   No.

9        Q.   He's no longer CEO?

10       A.   The CEO of Lennar is an individual named

11   Beckwitt.

12       Q.   What's his name?  I'm sorry.

13       A.   Beckwitt, B-e-c-k-w-i-t-t, I believe,

14   Beckwitt.  And then the president is someone named Jon

15   Jaffe.  And Stuart Miller is executive chair of the

16   board.

17       Q.   Okay.  And who hired you at Lennar?

18       A.   It was the leadership of the company.  The

19   person I reported to is Rick Beckwitt, CEO.

20       Q.   Now, when you became the dean of the

21   University of Miami School of Medicine, that was in

22   approximately 2006.  Do I have that correct?

23       A.   Yes, it was on April 4, 2006.

24       Q.   And after you became dean of the University

25   of Miami School of Medicine, there was some -- there

1    was an acquisition of Cedars-Sinai Hospital.  Correct?

2        A.   It wasn't called Cedars-Sinai.  I think it

3    was Cedars Hospital.

4        Q.   I'm sorry.  For some reason I thought that

5    there was a Sinai in there at some point in time.

6        A.   That may have been.  It changed name a couple

7    of times.  So that may have been.  But when we bought

8    it, it was Cedars.

9        Q.   And approximately when was that?

10       A.   That was in 2007.

11       Q.   And what did that do for the University of

12   Miami School of Medicine, in your estimation?

13       A.   All right.  So do you mind if I give you a

14   bit of background?

15       Q.   Sure.

16       A.   Okay.  So when I came to UM, it was, you

17   know, a plan to develop the medical school

18   substantially.  In the prior year, the research

19   enterprise had been dwindling down in the rankings.

20   The school had been dwindling down in the rankings.

21   And the entire clinical enterprise, as you probably

22   know, academic medical centers usually have a research

23   component or an educational component and then a

24   clinical component.  And the clinical component was

25   made of two small specialty hospitals.  One was

```
 1    Bascomb Palmer Institute, which was quite successful,
 2    and the other one was Sylvester.
 3            Sylvester was a cancer hospital, which had
 4    lost its NCI designation, if I recall correctly, in
 5    1995, and it was not doing particularly well.  And
 6    then all of the urgent care hospital activities were
 7    performed at Jackson Memorial Hospital, which was
 8    adjacent to the medical school.
 9            At the time, the fraction of faculty and
10    staff who would use Jackson as their hospital was
11    about 17 percent, and there was a clear need for the
12    organization or the enterprise to both serve the
13    people of South Florida with top notch academic care
14    and to ensure that all students and residents had the
15    opportunity to get outstanding education in clinical
16    medicine.  It became very clear that we needed to have
17    our own urgent care hospital.
18            There was a plan to build a facility when I
19    came that was established by my predecessor to build a
20    million dollar facility in the middle of downtown, and
21    that plan was to open 100 hospital beds, and I didn't
22    think that it was a very smart investment.
23            There was a hospital that was called Cedars
24    on the campus, which at the time belonged to HCA, and
25    the largest for-profit hospital company in the
```

```
1    country.  They were advertising for physicians and

2    making, of course, all the money, because they were

3    getting the technical fees of their activities.

4         And so I strongly recommended to the

5    university to purchase Cedars instead of buying a --

6    building a hospital that would have cost us $5.6

7    million per bed, and, instead, buy a hospital that was

8    costing us about half a million a bed, which was a

9    very good price compared to the rest of hospitals

10   across the United States.

11        Q.   And that became what's known as UHealth, the

12   UHealth hospitals.  Do I have that right?

13        A.   Yeah.

14        Q.   Do you remember --

15        A.   Miami Hospital.

16        Q.   Do you remember an entity called the Miami

17   Transplant Institute?

18        A.   There was.  I started it.

19        Q.   And that was composed of UM physicians, but

20   the physical facilities were at Jackson.  Correct?

21        A.   Yes.  So here's the deal.  So when I came, I

22   was witness of a substantial fight between physicians

23   who were working at the Transplant Center, as it was

24   called at the time, and it is extremely important for

25   the performance of sophisticated procedures to make
```

```
 1    sure that there is a perfect partnership between

 2    hospital and physicians.

 3             And so in order to create the kind of

 4    structure that would be needed to have the

 5    partnership, I created the Miami Transplant Institute

 6    and it has been a great success.  I mean, the Miami

 7    Transplant Institute is now ranked number one in the

 8    U.S. by the organization that evaluates transplant

 9    hospitals.

10        Q.   And, Dr. Alan Livingstone was the director of

11    the Miami Transplant Institute and chairperson of the

12    department of surgery for -- I guess between 2007 and

13    the summer of --

14        A.   No.  So Alan Livingstone was the chairman of

15    surgery.  All the transplant surgeon had -- were

16    faculty of the department of surgery.  But Alan

17    Livingstone was not the head of the Transplant

18    Institute.  A doctor named Tzakis, T-z-a-k-i-s, was

19    the director of the Transplant Institute, Dr. Andy

20    Tzakis.

21        Q.   Were you aware that in 2007 pathology testing

22    moved from JMH laboratories to laboratories within the

23    department of surgery at the Miller School?

24        A.   I was aware that there was the small

25    laboratory in the department of surgery that was doing
```

```
1    specialized testing for transplant patient, yes.

2         Q.   And who was -- who initiated moving of it

3    from JMH into the department of surgery?

4         A.   I assume it was Dr. Livingstone.  I think it

5    preceded my time.  I think that the lab was already

6    established to some degree.

7              I remember one time, when I first came, a

8    patient was looking for that laboratory in the parking

9    lot and it was in a building of UM and I helped the

10   patient to get to the laboratory.

11        Q.   The laboratories within the department of

12   surgery were known as the immuno-monitoring laboratory

13   and the histocompatibility laboratory?

14        A.   Right.  My recollection is that they were

15   doing, you know, the tests to find out if there was

16   compatibility between the patient and the donor.

17        Q.   By moving organ transplant pathology testing

18   to the university, did that mean that the university

19   billed for those tests?

20        A.   Yeah.  I assume that these immune tests were

21   billed by the university, yes.  Again, that transfer

22   of the lab, if I recall correctly, preceded me,

23   because it was already there when I came.

24        Q.   Okay.  Were you aware that the department of

25   surgery was one of the most profitable in the medical
```

1   school while you were dean at the university?

2       A.   Yeah.  That doesn't have anything unusual.  I

3   mean, department of surgeries have always the

4   best-funded departments of any medical school.

5   Actually, they usually lead the medical school with

6   their revenues.

7       Q.   Was -- how would you characterize your

8   relationship with Dr. Livingstone?

9       A.   Okay.  When I interviewed for the job at UM,

10  I was interviewed by two trustees who had told me that

11  they were very unhappy with Dr. Livingstone, so it was

12  kind of an unusual way to start a relationship.

13          I met with Dr. Livingstone, found him to be

14  quite pleasant as an individual.  He was not an easy

15  person to work with as a dean of the medical school,

16  but he had quite a substantial following within the

17  faculty of the medical school.

18          In particular, you know, the University of

19  Miami was unusual in terms of the clinical enterprise,

20  because on one hand there was, you know, the faculty

21  of the university that was doing research, education

22  and clinical work, but a lot of the medical work was

23  being done at Jackson Memorial Hospital.  And so there

24  was a substantial fraction of the faculty that were

25  basically considering Jackson as their home, maybe

```
 1    more so than the university.
 2            And so it was a bit of a challenging
 3    environment compared to what I had seen at other
 4    university, like Johns Hopkins University, the Ohio
 5    State University, or Duke University where everybody
 6    was together.  The hospitals belonged to the
 7    university and there was no -- there was no division
 8    within the faculty in terms of their allegiance to one
 9    organization or the other.
10       Q.   And was Dr. Goldschmidt (sic) the chair of
11    the department of surgery before you got there and
12    while you were there for most of your tenure as dean
13    of the University of Miami School of Medicine?
14       A.   It was Livingstone, Alan Livingstone.
15            MR. ISICOFF:  You had said Goldschmidt Jeff,
16       just to make the record clear.  I know you meant
17       him, but he's just clarifying that you meant
18       Livingstone.
19            MR. SLOMAN:  That's right.  That's right.
20    BY MR. SLOMAN:
21       Q.   Dr. Livingstone was the chair of the
22    department of surgery before and during most of your
23    tenure as dean of the University of Miami School of
24    Medicine.  Correct?
25       A.   That is correct.
```

1        Q.   And in that position, would you say that Dr.

2   Livingstone was a very influential member of the

3   Miller School of Medicine?

4        A.   Dr. Livingstone was very influential person,

5   yes, particularly among the faculty that was working

6   as physicians at Jackson Memorial Hospital.

7        Q.   Dr. Goldschmidt, can you describe the

8   financial pressures that were prevalent in 2011,

9   turning into 2012, which preceded Dr. Lord's tenure as

10  COO of the Miller School of Medicine.

11       A.   Sure.  So let me go a little bit earlier, if

12  you don't mind.

13       Q.   Sure.

14       A.   So, as I mentioned, when I came in 2006,

15  there was a strong emphasis on evolving the medical

16  school to become a top medical school, a top 50

17  medical school in the U.S., which it was not when I

18  came, developing programs of first class, both

19  clinical and research programs.

20            One example, for example, is the Huntsman

21  Institute.  I don't know if you have heard of it.

22  It's The Institute of Human Genomics, which is now

23  ranked number two in terms of genetics, it's genetic

24  departments in the United States.

25            And I had recruited Peggy Vance, Peggy

1    Pericak-Vance, and her husband to lead it from Duke

2    University.  I had a unique opportunity to recruit

3    them with their team, which was about 65 people, and

4    it was a transaction that was facilitated by the fact

5    that I went to see Jeb Bush, who was the governor at

6    the time, Marco Rubio was the Speaker of the House,

7    and convinced them that it was -- they had started a

8    number of institutes, like Scripps in Florida,

9    institutes that actually have not been very

10   successful.

11         This one is a formidable success.  We are

12   leading genetics in pretty much all neurodegenerative

13   disorders, Alzheimer's and everything else.  Peggy

14   Vance was the discoverer of the most important gene in

15   Alzheimer's disease.  And she's one example of the

16   type of people that I was able to recruit to UM.  And

17   by the way, the grant from the government was $80

18   million, from the government of Florida.

19         In 2008, as you recall, Miami and South

20   Florida were very affected by the real estate bubble

21   and the consequence of the economic crisis of 2008.

22   We had to change plans substantially to limit the

23   impact on our organization.

24         We had purchased a hospital, thank God, just

25   before the crisis happened.  We had to purchase a

 1    novel electronic medical records system that we

 2    purchased in the form of Epic system.  These were

 3    absolutely essential measures to provide patients with

 4    21st century level of care.  Didn't exist at Jackson

 5    Memorial Hospital and didn't exist in many of the

 6    hospitals in South Florida.

 7            And our strategy to improve medicine in South

 8    Florida was, you know, with the tide, all ships rise,

 9    and as a consequence of our progress, we were able to

10    substantially change the shape of medicine in South

11    Florida.

12            Having said that, it was a very difficult

13    time for both Jackson Memorial Hospital and the

14    University of Miami.  There was a debt of $70 million

15    that Jackson had contracted with us.  In 2010, I

16    believe, it was discovered in the account receivable

17    of Jackson -- of Jackson Health System a 250 million

18    bad debt that almost took Jackson to collapse.

19            There were interesting interactions at the

20    time.  Eneida Roldan was the president and the CEO of

21    Jackson at the time.  She asked me to take over the

22    transplant program, because they couldn't afford it,

23    according to her.

24            We had to create application for certificate

25    of needs, which we filed.  And two days before the

1    deadline, Eneida told me that she realized that the

2    transplant program was actually profitable to their

3    organization and she asked me to please withdraw

4    application for certificate of needs, which I did,

5    because all along in my career I tried to be

6    supportive of the safety net hospital of South

7    Florida, Jackson Memorial Hospital, and adjacent

8    hospitals.

9        Q.   Sorry for interrupting.  Was Dr. Livingstone

10   supportive of your efforts for the certificate of need

11   application?

12       A.   Yes, he was, because it was a request from

13   Eneida Roldan.  I think that -- I think that he was

14   involved in the efforts to show that the programs were

15   actually profitable to Jackson, and that is the extent

16   of his participation.  But, initially, he was

17   supportive, yes.

18       Q.   One other question, and I will let you

19   continue.  Was Dr. Livingstone supportive of your

20   purchasing of Cedars?

21       A.   I think so.  I mean, he didn't oppose to it.

22       Q.   I know that you're leading up to telling me

23   about the financial pressures that the University of

24   Miami School of Medicine were under in late 2011 and

25   beginning of 2012.

```
 1        A.   Right.  So that issue with the account

 2   receivable created a substantial disarray, you know,

 3   which was very public at the Jackson Memorial.  There

 4   was a lot of -- a lot of press about it.  And it

 5   was -- it was very -- it was very challenging for

 6   those who were working at the Jackson Memorial

 7   Hospital among the faculty of UM.

 8             UM provided about 95 percent of the care at

 9   the time.  And the leadership that I experienced,

10   before I came, Ira Clark was the head of the Jackson

11   Health System.  Then came Marvin O'Quinn.  Marvin

12   O'Quinn was more politician than anything else.  My

13   first interaction with him was a bit odd, because he

14   told me -- I'm a cardiologist, and he said I had been

15   chief of cardiology in two excellent university, the

16   Ohio State University and Duke University, and he

17   tells me that he was replacing the cardiac team with a

18   private practice cardiac team of Miami.  And so our

19   relationship didn't start on the best foot, I would

20   say.

21             Then came Eneida Roldan, with whom I had a

22   very good relationship.  But Eneida was a person who

23   went through all of these substantial hiccups that she

24   didn't really cause.  They came -- they happened

25   before her.
```

```
 1              And then there was a search for a new -- a
 2     new president and CEO of the Jackson Health System,
 3     Carlos Migoya, who was the person that I thought was
 4     the most competent for a variety of reason to take on
 5     that job and he did.  He came and quit the job in
 6     2012.
 7         Q.   So if you could just tell us --
 8         A.   I'm almost done.  So after Carlos became the
 9     CEO and president of the Jackson Health System, the
10     first thing that he did was to reduce the annual
11     operating agreement, which was the yearly agreement
12     between the Jackson Health System and the University
13     of Miami.
14              There was an evergreen agreement that, you
15     know, define the relationship between the two
16     organization.  But the annual operating agreement was
17     the yearly agreement that we negotiate and that define
18     what would be the payment of Jackson to the university
19     to support the academic work that was going on in
20     Jackson in terms of education and some research, but
21     also the compensation for physicians that were working
22     at Jackson for patients who did not have an insurance.
23     That was the result of the half penny sales tax.  I
24     don't know if you're familiar with that.
25         Q.   Yes.
```

1          A.    So the half penny sales tax was a piece of

2     legislation that was basically to help physicians and

3     other care providers of Jackson Health System at the

4     University of Miami, mostly in terms of physicians to

5     provide care to individuals that did not have any

6     insurance.

7          And being a safety net hospital for South

8     Florida, there were quite a number of patients who

9     were in that category.  If I recall, about 25 percent

10    of the patients were in that category.

11         MR. SLOMAN:  Excuse me one second.  Eric, do

12        you have to take a call now?

13         MR. ISICOFF:  Yes.  I was just going to

14        interrupt.  If I could, I will keep the call to

15        ten minutes, no more than 15.  If we could just

16        take that break now and we'll pick right back up

17        where we were.  I appreciate it.

18         I was going to jump in, but I didn't want to

19        interrupt, just like you.  Thank you for that.  I

20        will get right to that call, and you'll see me

21        reappear, so you'll know I'm back.

22         MR. SLOMAN:  We'll go off the record.

23         THE VIDEOGRAPHER:  This marks the end of

24        video file number one.  The time is ten a.m.,

25        and we're going off the record.

```
 1              (Thereupon, a brief recess was taken, after
 2         which the following proceedings were had:)
 3              THE VIDEOGRAPHER:  We're back on the video
 4         record.  This is the start of video file number
 5         two in the deposition of Dr. Pascal Goldschmidt.
 6         The time is 10:12 a.m.
 7    BY MR. SLOMAN:
 8         Q.   Dr. Goldschmidt, I believe you were giving us
 9    the background to the financial pressures that the
10    University of Miami School of Medicine were facing in
11    the 2011, leading into the 2012 -- am I on it?
12         A.   Yes, I can hear you very well.
13         Q.   My question is, sir, I know you were giving
14    us the background to the financial pressures the
15    University of Miami School of Medicine was under in
16    the 2011-2012 time period.  So I'd like to kind of
17    focus on the extent of the financial problems the
18    University of Miami School of Medicine was having in
19    2011, going into 2012.
20         A.   Sure.  So the last thing I was telling you
21    was that after Carlos Migoya was recruited to be the
22    presidency of the Jackson Health System, one of his
23    first moves was to reduce the annual operating
24    agreement, or AOA, from roughly $150 million to, if I
25    recall correctly, about $95 million.  So that was a
```

1    hole of $55 million that we had to fill.

2       Q.   So as you went into the beginning of 2012,

3    would it be fair to say that your expenses were

4    exceeding your revenues at the Miller School of

5    Medicine?

6       A.   Yeah, by a fraction of 55 million.

7       Q.   And at that time, the president and the board

8    of trustees were becoming concerned, and, as a result,

9    you brought on Dr. Lord to replace William Donelan.

10   Is that correct?

11      A.   Actually, Joe Natoli is the one who

12   recommended Jack Lord.  I didn't know Jack.  I think I

13   had one meeting with Jack Lord before.  Joe Natoli was

14   the chief financial officer of the university.

15      Q.   Okay.  But would it be fair to say that these

16   financial concerns triggered replacing Mr. Donelan

17   with Dr. Lord.  Is that a fair statement?

18      A.   Yes, it's a fair statement.

19      Q.   And can you tell us a little bit about how

20   Dr. Lord was hired.  You mentioned Joe Natoli knew

21   him.  But can you discuss that a little more.

22      A.   I think that Jack was recruited at UM as

23   chief strategy officer or something like that.  I'm

24   not totally sure, because I was not involved in his

25   initial recruitment.  And he had an appointment, I

1   believe, in the department of pathology at the Miller

2   School.

3        And then he came to work with me at the

4   medical school, functioning as the chief operating

5   officer.  And I think that the job was fully

6   implemented in the summer of 2012, if I recall

7   correctly.

8   Q.   And do you recall that he actually started as

9   chief operating officer on March 1, 2012?

10  A.   I recall that -- I can't remember if it was

11  in February or March, but it was around that time.  It

12  was during, you know, the first quarter of the year.

13  And if I recall correctly, he was -- he was initially

14  interim or something, until the summer.  I don't

15  remember exactly that transition.

16       Again, Jack Lord is not a person that I had

17  recruited to the university, so it's a little bit

18  difficult to remember exactly how that happened.  But

19  functionally, yes, he was the chief operating officer

20  between February or March of 2012.

21  Q.   And you mentioned that Joe Natoli brought him

22  to your attention.  Is that correct?

23  A.   That's correct.

24  Q.   And that would have been in the early part of

25  2012?

1        A.    It would have been.

2        Q.    And did you meet with Dr. Lord before you

3   hired him as the chief operating officer?

4        A.    Yeah.  I had one meeting with him before, I

5   believe, because Jack had been, you know, an important

6   individual at the insurance company, Humana, and his

7   work at Humana was of interest to me and I think that

8   we met before.

9        Q.    And would it be fair to say that when you

10  hired Dr. Lord as chief operating officer, one of the

11  primary reasons that you hired him was to address the

12  financial issues that the University of Miami School

13  of Medicine was facing in the spring of 2012?

14       A.    I think it's fair to say that, yes.

15       Q.    And did that, in fact, lead to a number of

16  layoffs in May of 2012?

17       A.    There was a layoff of about five percent of

18  the workforce, which was -- which stretched from, if I

19  recall correctly, April to June of the year.

20       Q.    Okay.

21       A.    Many individuals who were in that

22  administration and the research organization.  Very,

23  very few, if any, in the clinical area.

24       Q.    And did you support those layoffs?

25       A.    I did.

```
1          Q.   Did the president of the university support

2     those layoffs?

3          A.   Yes.

4          Q.   And did the board of trustees support those

5     layoffs?

6          A.   Yeah, I believe so.

7          Q.   Were you Dr. Lord's direct supervisor?

8          A.   My relationship with Jack was a combination

9     of supervising and partnership.

10         Q.   But his, according -- and we'll go through

11    some of the documents --

12         A.   Yeah.  He was -- he was directly reporting to

13    me, that's correct.

14         Q.   Were you aware of whether he had any

15    obligations to report to anybody else?

16         A.   I think that he had a side reporting with Joe

17    Natoli.

18         Q.   And is that documented anywhere, do you know?

19         A.   I can't remember.  Sorry.

20         Q.   Do you remember terminating Dr. Lord?

21         A.   I do.

22         Q.   And was it your decision to terminate Dr.

23    Lord?

24         A.   I think it's fair to say that it was the

25    decision of President Shalala.  I did not oppose it
```

1    for a variety of reasons.

2        Q.   When you say you didn't oppose it for a

3    variety of reasons, what were the reasons that you did

4    not oppose it?

5        A.   I didn't think that Jack was really very much

6    engaged into what we were doing at that point.

7        Q.   What do you mean?

8        A.   Okay, so Jack was very engaged and very

9    enthusiastic about what he was doing I would say until

10   October of 2012.

11       Q.   And what does that mean?

12       A.   That means that we found out in October of

13   2012 that there was a vote, a petition of the faculty,

14   to advise the no confidence in the leadership from the

15   faculty of medicine -- of the School of Medicine and

16   it had a huge impact on Jack.

17            And he told me at the time, "Look, you know,

18   I love to work hard.  I love to do difficult things.

19   But if I'm not working in a place that I like and that

20   I appreciate, you know, I'm at a stage of my life when

21   I don't want to do this anymore."

22       Q.   And is that one of the primary reasons you

23   didn't oppose President Shalala's decision to

24   terminate him?

25       A.   Well, he -- look, there are a lot of things

1    that I like about Jack.  We were good friends.  We

2    would see each other outside of work.  I think two or

3    three times we had dinner together with our families.

4    We had a very -- a very cordial relationship, and I

5    felt that Jack was no longer happy at UM.

6          I knew that he was kind of distancing him a

7    little bit from other people at the university and at

8    Jackson, and so I didn't -- I didn't feel that, you

9    know, he was -- he was happy with what he was doing.

10          And that was very different from before the

11    petition, where, you know, Jack was a force to be

12    reckoned with.  He was really totally engaged.  He was

13    working very hard.  He was enthusiastic about what he

14    was doing.

15          We would have, you know, we would have very

16    wonderful conversations.  But when that petition came,

17    there was a huge change in his attitude.

18    Q.    Is it fair to say that, according to you,

19    that the petition caused him to become more distant

20    and less engaged?  Is that what you mean?

21    A.    He was profoundly upset.  He felt -- he felt

22    that it was, you know, a parody of academic medicine

23    and he was extremely disappointed.  This was something

24    that hurt my feelings very strongly, too.  We were

25    both named in that petition side by side.

1          You know, my review by the faculty the year

2   before was 75 percent approval, which is very high for

3   an academic organization.  As I had told you, when I

4   left Duke, I had a poster signed by every single

5   faculty of the department to tell me how great a chair

6   I was.  So this was -- this was a big shock for both

7   of us.  Very difficult.

8       Q.   We'll get to that, Dr. Goldschmidt, and I

9   appreciate that.  I really want to try and nail down

10   the reasons why you didn't oppose President Shalala's

11   decision.  And I believe you said that the petition

12   changed his attitude and he became unhappy.

13          Was there anything else about the petition

14   that affected Jack's, or Dr. Lord's, job performance?

15       A.   Well, Jack thought that it was over; that we

16   were done, basically, after receiving the news of the

17   petition.  Note that we had not seen the petition.  We

18   were just told that there was a petition against us.

19   I can't remember who leaked it to us.

20          But I do remember one meeting where Jack was

21   not where I was.  It was a regular meeting of the

22   faculty with President Shalala and I and President

23   Shalala made a presentation, answered a couple of

24   questions and then left.

25          And when I was alone with the faculty, of the

1    faculty senate for the medical school, a former dean,

2    Bernie Fogel, stood up and basically told me that I

3    should -- that I should step down.

4          I shared that information with Jack.  He

5    asked me whether President Shalala was in agreement

6    with Dr. Fogel and I knew that she was not and I told

7    him.

8          Understand, look, Jack was a friend.  Okay?

9    So not only I get a petition to tell us that we're

10   doing a terrible job, but I was also going to lose my

11   friend, because he was -- he didn't want to work at UM

12   anymore.

13         There is not a small issue, I can guarantee

14   you, particularly when you have a career of 30 plus

15   years in academia that was brilliant and incredibly

16   supported by the faculty.  And what's crazy is the

17   reason why this petition came up.  Okay?  Do you mind

18   if I explain to you?

19     Q.   Dr. Goldschmidt, I really need to get to the

20   answer.  I guarantee you, you're going to have the

21   opportunity to talk about this.  I've got a lot of

22   exhibits to show you and I think a lot of that will,

23   you know, we'll get to.  But I need to find out from

24   you whether Dr. Lord's job performance was affected by

25   the petition.

1      A.   Dr. Lord's job performance was affected by

2   the petition.  No question about it.

3      Q.   Okay.  And did you -- did you tell him about

4   that?

5      A.   I had conversation with him.  I was as

6   encouraging to Jack as possible.  I was telling him,

7   look, we can -- we can manage this.  We can -- we can

8   survive.  We can continue what we are doing.  We have

9   a job to do.  We're not done with it and we need to

10   continue to do our job.

11      Q.   Did you -- so my question is did his job

12   performance suffer?

13      A.   There were complaints about Jack that were

14   coming to me and he was not -- he was not the person

15   that he was before we got the petition result.

16            I'm sure I was not, either, by the way, but

17   certainly Jack had been extremely affected and job

18   performance was impacted by it.  We thought we were

19   done.

20      Q.   I understand.  Did you document his decline

21   in his job performance?

22      A.   No.

23      Q.   Did President Shalala tell you why she was

24   terminating Dr. Lord?

25      A.   Well --

1      Q.   If you can tell me yes or no and then

2   explain, that would help.

3      A.   Yes.  I think I can explain.

4      Q.   Did she tell you why?

5      A.   Yes.

6      Q.   And what was the reason why?

7      A.   Okay.  So one aspect of Jack's personality is

8   that he is a very aggressive individual.  For example,

9   you know, for the layoff, instead of, you know, trying

10   to identify the individuals that were underperforming

11   in their role at the university, he thought we didn't

12   have enough information on performance, and so he

13   required that we would lay off everybody and then

14   reappoint the individuals that we wanted to reappoint.

15       That created a substantial amount of

16   challenge.  Jack was very much, you know, there is a

17   war before us and the rest of the world.  He was at

18   times very dismissive of faculty and sometimes

19   disrespectful even.

20       I remember a meeting with the faculty of a

21   basic science department, I think it could have been

22   cell biology, and he came out of the meeting and he

23   made a sign like this (gesturing) to say losers.

24       And that was the aspect of his character that

25   I had a problem with, because -- and we talked about

1   that -- because I, you know, it's not because people

2   don't make a lot of money that they don't do work for

3   the university that is extremely valuable in the area

4   of research and education.  And that was not -- that

5   was not part of Jack's interest.

6       Q.   So, Dr. Goldschmidt, did you ever document

7   any of this behavior by Dr. Lord and did you counsel

8   him about it?

9       A.   I had conversation about it with him, yes.

10      Q.   But you never -- you never documented it.

11  Correct?

12      A.   Not that I remember.

13      Q.   Dr. Goldschmidt --

14      A.   But I did talk to my supervisor, President

15  Shalala, about it.

16      Q.   Now, with regard to those layoffs, you

17  supported those layoffs.  Correct?

18      A.   Totally.  I didn't -- I didn't necessarily

19  like the way we went about them, but I certainly

20  recognized that it was a must for the university.

21      Q.   And you had mentioned something about, and

22  I'm still trying to figure out, did President Shalala

23  tell you why that she was terminating Dr. Lord?

24      A.   I think that, okay, the reason that I recall

25  is that she was very upset with his refusal to

1    interact with the people that she had asked him to

2    interact with, including Joe Natoli, if I recall

3    correctly, the chair of the board, who at the time was

4    Leonard Abess, and with Carlos Migoya.

5        Q.   And did you counsel Dr. Lord about that prior

6    to terminating him?

7        A.   Okay.  So the decision to terminate Jack, if

8    I recall, happened in 2013, very early days of 2013,

9    like January.  I had been on the family vacation for

10   ten days, if I recall, and it happened when I returned

11   beginning of January.  And I was asked to attend a

12   meeting at the house of President Shalala.

13            If I recall, it was in the presence of the

14   provost and Thomas LeBlanc, and that is when President

15   Shalala shared with me that she wanted to terminate

16   Dr. Lord.

17       Q.   And did she tell you why?

18       A.   Yes.  She said that he's creating a huge

19   issue with the faculty and he's not communicating with

20   the people of her team anymore.

21       Q.   And prior to that, had she ever told you why

22   or did she ever tell you that she had those concerns?

23       A.   She had mentioned them a couple of times.

24       Q.   And did you counsel Dr. Lord about them?

25       A.   I talked to Dr. Lord about it, yes.

1        Q.   And are they reflected in any documents of

2   any type that you counseled Dr. Lord about President

3   Shalala's preference that he speak to Mr. Natoli or

4   Mr. LeBlanc?

5        A.   It is possible that we exchanged some emails,

6   but I don't recall.  And I've not reviewed any email

7   of that time, so I couldn't tell you.

8        Q.   And you included no -- did you ever have a

9   performance work plan with the person that you

10   directly supervised, Dr. Lord?

11        A.   Well, usually we had a performance review

12   once a year of my 42 reports, including Dr. Lord, yes.

13   I don't think that -- I don't think that -- there was

14   one, I believe, I did in the summer of 2012, but then

15   the next one would have been in 2013 never happened.

16        Q.   So would it be fair to say there's no

17   documentation that you counseled Dr. Lord about the

18   concerns that President Shalala had conveyed to you?

19   Is that correct?

20        A.   I don't know.  Again, it could have been

21   email exchange.  We had quite a bit of email exchanges

22   with Jack.  I don't remember.  I can't tell you yes or

23   no.  I just don't know.

24        Q.   Let's switch gears a little bit and talk

25   about the first time that you learned that there was

```
 1    concerns about the IML inside the department of

 2    surgery.  Do you recall when that was?

 3        A.   I think that the person who was the first to

 4    communicate with me concerns about the IML was the

 5    chair of pathology, Dr. Richard Cote.

 6        Q.   And approximately when was that?

 7        A.   I would say probably -- probably around the

 8    summer of 2012.

 9        Q.   That's the first time that you learned of any

10    problems about pathologists reporting their concerns

11    to you and/or Dr. Cote about the behaviors of -- I'm

12    sorry.  Strike that.

13         That was the first time that you learned that

14    there was concerns from the pathologists about the

15    transplant labs inside the department of surgery?

16        A.   Okay, so there were complaints from the

17    department of pathology that there would be a lab

18    outside of pathology, which I had shared with Dr.

19    Livingstone probably as early as the end of 2011.

20         By the way, there was a major -- at the time,

21    at that time, Andy Tzakis had left the university and

22    Livingstone was serving as the interim director of the

23    Miami Transplant Institute.  And there were huge

24    issues with that.  There was fights among physicians

25    and surgeons.  It was -- it was a very difficult time.
```

```
 1    And so sometimes around the middle of 2012 I ask Dr.

 2    Gaetano Ciancio to take on the leadership of the MTI.

 3        Q.   And that would have been in the summer of

 4    2012?

 5        A.   Correct.  Probably August of 2012, if I

 6    recall.

 7        Q.   And do you remember that there was an effort

 8    to vet external firms to investigate the transplant

 9    labs within the department of surgery?

10        A.   I requested for an outside third party to

11    come and investigate the complaints of the department

12    of pathology, yes.

13        Q.   And did you assign Dr. Jennifer McCafferty

14    Fernandez to head up the vetting of potential external

15    review teams?

16        A.   My recollection is that I asked Jack to take

17    care of it.

18        Q.   Okay.  And do you know whether Jennifer

19    McCafferty and her counterpart at Jackson ended up

20    reviewing potential external review teams?

21        A.   Definitely.

22        Q.   And do you recall that there was a time in

23    which the recommendation was to hire Transplant

24    Management Group, or TMG, sometime in late summer of

25    2012?
```

1     A.   Yes, I do recall that.

2     Q.   And do you recall agreeing to, along with Dr.

3  Lord and Jennifer McCafferty, to try to hire TMG

4  through the university, along with approval from

5  Jackson?

6     A.   Yes, I do recall that.

7     Q.   Do you recall around that time promoting Dr.

8  Livingstone to a role in -- I believe an executive

9  dean position?

10     A.   Yeah.  Jack was very supportive of doing

11  that, because he saw Dr. Livingstone as someone that,

12  you know, we should -- we should have a close

13  relationship with, rather than a distant relationship.

14  And, therefore, by having him, you know, in a

15  leadership team, we were hoping that we could -- we

16  could bring him to be more supportive of what we were

17  trying to do for UM and building the health system.

18     Q.   Did that work out?

19     A.   Not really.

20     Q.   What do you mean?

21     A.   I think that -- I think that Alan Livingstone

22  was a very ambitious person and I think that he really

23  wanted to be the dean of the Miller School of Medicine

24  in my stead, and so I don't think that he really saw

25  his participation into out group as, you know, a

1    commitment to help us be successful.

2        Q.   Do you recall in September of 2012 a letter

3    being received by the university's Medical Compliance

4    Unit detailing allegations of fraud inside the IML?

5        A.   I do remember vaguely, yeah, that there was a

6    communication that, you know, is even further reason

7    why I wanted to have a full-scale review of the

8    activity of the IML.

9        Q.   And were you aware at that time of the

10   financial contributions of the IML to the department

11   of surgery's net income?

12       A.   I'm sure I was.  I can't remember what it

13   was.  It was somewhere around -- no, I don't remember.

14   I don't remember.  I don't remember the specific level

15   of that contribution, but I remember that it was not

16   negligible.

17            We were at the time about a 1.8 to two

18   billion dollar organization, so I think it would have

19   been in the range of one to two percent maybe.

20       Q.   And you said that it was not negligible or,

21   put another way, it was relatively significant?

22       A.   Yeah.  I mean, it was one to two percent of

23   our revenues, something like that, yeah.

24       Q.   Do you remember whether any of the University

25   of Miami pathologists were refusing to sign standing

```
1    orders for tests that were generated by the IML?
2         A.   I do not remember that the pathologists
3    would, because they would not be the caretakers for
4    the transplant patient.  But I do remember that
5    faculty who were the internists involved in the care
6    of transplant patient refused to sign, yes.  At least
7    five of them.
8         Q.   Did you consider Dr. Livingstone to be
9    manipulative?
10        A.   I do have some serious issues with Dr.
11   Livingstone.  I think that he's an individual with
12   some character flaws, yes.
13        Q.   I'm sorry.  He's a person with what?
14        A.   Character flaws.
15        Q.   Character flaws.
16             (Thereupon, the document was marked as
17             Exhibit 2 for identification.)
18   BY MR. SLOMAN:
19        Q.   I want to show you -- let me show you Exhibit
20   2, which is an email, dated July 2, 2012, from you to
21   President Shalala and then an email from you to Nelson
22   Weichold.  So let's start at the bottom.
23        A.   Okay.  Let me look at it.
24        Q.   Sure.
25        A.   Okay.
```

1          Q.   Do you remember what this email was about?

2          A.   No, I'm not sure.

3          Q.   Do you remember that shortly thereafter, you

4     sent a letter to Dr. Lord documenting a salary

5     increase and expansion of his duties?

6          A.   That's the time where the role of Jack became

7     officialized, yes, as the chief operating officer.

8          Q.   Go up a little bit.  And you see the email

9     that you sent to Nelson Weichold:  "Nelson, I heard

10    from Donna, she supports, please process the change in

11    compensation according to the letter, retroactive June

12    1, 2012."

13         A.   Yeah, that sounds -- I do remember that

14    period of time, yes.

15         Q.   Okay.  And do you remember that this came

16    after the layoffs for the -- that occurred in May

17    2012?

18         A.   April, May, June, yes, absolutely.

19         Q.   And would you say at this time that Dr. Lord

20    was exceeding your expectations as the COO of the

21    Miller School of Medicine?

22         A.   Definitely.

23         Q.   And, in fact, President Shalala supported

24    this change in compensation and the board of

25    directors, or the board of trustees supported this

```
 1    change in compensation.  Correct?
 2        A.   Correct.
 3             (Thereupon, the document was marked as
 4             Exhibit 3 for identification.)
 5    BY MR. SLOMAN:
 6        Q.   Let's go to Exhibit 3.
 7        A.   I think there was -- there was some -- there
 8    was some changes that Donna wanted me to execute to
 9    the process.  I can't remember what they were, but
10    they were reasonable modifications.
11             MR. SLOMAN:  Okay.  So I'm going to show you
12             the final document for printing that -- so this
13             is the cover email, which is Exhibit 3.  And
14             let's go to Exhibit 4.
15             (Thereupon, the document was marked as
16             Exhibit 4 for identification.)
17    BY MR. SLOMAN:
18        Q.   Why don't you take a moment.  We'll try to --
19    why don't you take a moment and read those first three
20    paragraphs, Dr. Goldschmidt.
21        A.   Yeah, I remember all that.
22        Q.   Let's go down further.  You see that you will
23    continue to report directly to the senior
24    vice-president for medical affairs and dean of the
25    Miller School?
```

```
 1        A.    Yeah.
 2        Q.    And can you go down a little further, Jackie.
 3              And do you see the increase in his annualized
 4   compensation?
 5        A.    Yeah.
 6        Q.    And if you could go to the bottom, next to
 7   the last --
 8        A.    By the way, all the salaries at the
 9   university were -- were assessed by a company that was
10   doing comparison with similar job at other
11   universities, medical center, and this was totally
12   consistent with the average of these salaries.
13        Q.    Okay.  So I want to just to go through some
14   of the excerpts of this letter.
15              MR. SLOMAN:  Can you go to the top, Jackie.
16        Q.    It says "Dear Jack, Since taking on the role
17   of chief operating officer of the medical center in
18   March of this year..." that's 2012.  Correct?
19        A.    Uh-huh.  It was.
20        Q.    "...you have driven both a physical and
21   cultural turnaround and set the path for continued
22   transformation of our medical school and health
23   system."
24              Did I read that correctly?
25        A.    Yes, correctly.
```

```
 1        Q.   And that was a true statement.  Correct?

 2        A.   Correct.

 3        Q.   And you wrote that on behalf of the

 4   university.  Correct?

 5        A.   Yes.

 6        Q.   And that was with the support of President

 7   Shalala and the board of trustees.  Correct?

 8        A.   Maybe not every trustees on the board, but

 9   certainly on the executive committee, yes.

10        Q.   Certainly President Shalala.  Correct?

11        A.   Correct.

12        Q.   And when you go down a little further --

13   well, we'll leave it right there.  "You already hold

14   the title of chief operating officer.  The appointment

15   was made at the sole discretion of the senior

16   vice-president for medical affairs and the dean of the

17   Miller School of Medicine."  That's you.  Correct?

18        A.   Correct.

19        Q.   And it says, "In addition, the university of

20   Miami board of trustees approved your appointment as

21   the university vice-president for medical

22   administration, effective June 1, 2027."  Correct?

23        A.   Uh-huh.

24        Q.   And, again, Dr. Lord reported to you.

25   Correct?  There is no reference of him reporting to
```

```
1    anybody else.  Is that right?
2         A.   Yeah.  Again, I think that there was -- there
3    was a side relationship with Joe Natoli.  I don't know
4    if it was formalized or informal.  But, clearly, there
5    was.
6         Q.   But it's not in that letter.  Correct?
7         A.   I don't see it there, no.
8         Q.   And you haven't reviewed or seen of a
9    document that would support your contention that there
10   was a -- a side reporting requirement.  Correct?
11             MR. ISICOFF:  Objection to form.
12        A.   Again, I want to remind you, I have not
13   reviewed any of the document of that time, so you
14   would know better than me.
15        Q.   So, essentially, his annual base salary of
16   $763,776 was increased to $913,776, $150,000 amount
17   for the increased responsibilities that Dr. Lord was
18   taking on.  Correct?
19        A.   Correct.
20        Q.   And let's go to the bottom, Jackie.
21             And you ended -- you ended the letter by
22   saying "Jack, the past several months have been
23   transformational for the School of Medicine and for
24   UHealth.  Your tireless dedication to lead our school
25   to greatness has made all the difference.  I greatly
```

```
 1    look forward to continuing this journey with you as a

 2    partner."

 3              Did I read that correctly?

 4        A.    Absolutely.

 5        Q.    And you felt that was a true statement.

 6    Correct?

 7        A.    Absolutely.  That was exactly the way I felt.

 8        Q.    And at this point in time, there was no

 9    concern with Dr. Lord's performance of his job or the

10    way he was carrying it out.  Correct?

11        A.    No.  There was some -- there was some issues

12    that we discussed with Jack, which I mentioned to you,

13    which was, you know, respect for faculty, the fact

14    that sometimes he had a little bit of anger management

15    issue, and the fact that he was -- he was always

16    talking about, you know, wars and war rooms and going

17    to war with the team, et cetera.

18              My vision was a little bit more specific than

19    that and we had discussions about it.  But these were

20    just personality issues; that his work was of great

21    quality and I was very grateful and I expressed it in

22    that letter.

23        Q.    These other concerns that you just mentioned,

24    do you recall ever documenting them in an email or in

25    any form of document that would be contained in his
```

1    personnel file?

2        A.   Again, I've not reviewed any email relative

3    or documents relative to that period of time.  I don't

4    have them, and, therefore, it's just my recollection.

5    But, you know, there were witnesses.

6            One of the event was with an individual named

7    Don Steigman where Jack hit the desk of Don Steigman

8    to the point that things fell off the desk.  And we

9    had a conversation about it and I told him that this

10   was not behavior that would be helpful to us.

11           But, look, nobody's perfect.  Okay?  Jack was

12   doing overall the job that I describe in this letter

13   and I was truly hopeful that over time I would be able

14   to address some of the personality glitches that he

15   had.

16       Q.   But you don't recall -- let me ask it this

17   way.  You don't remember whether you ever documented

18   any anger management issues with Dr. Lord.  Correct?

19       A.   No.  I don't think that they were frequent at

20   all.  There were maybe one or two circumstances that,

21   you know, were a bit problematic.  But most of the

22   time he was able to control.  So I didn't see it as a

23   problem that needed to have coaching or anything like

24   that.

25       Q.   So the answer is no, you didn't document them

```
 1    in any --
 2         A.   We shared a lot of things by email, so maybe
 3    I did mention it to him.  I don't want to say no,
 4    because it is possible.  But I don't recall a
 5    particular document that I prepared along that line.
 6              (Thereupon, the document was marked as
 7              Exhibit 5 for identification.)
 8    BY MR. SLOMAN:
 9         Q.   Let's move now to Exhibit 5.  I draw your
10    attention, Dr. Goldschmidt, to what's been marked as
11    Exhibit 5, and the first part of this email is dated
12    August 14, 2012, from Jennifer McCafferty Cepero.  Who
13    is Jennifer McCafferty Cepero?
14         A.   Jennifer was the person that was charged
15    with -- by Jack.  She was really in his team, making
16    sure that we didn't have compliance issues within the
17    organization.
18         Q.   And did she also go by the name of Jennifer
19    McCafferty Fernandez, do you know?
20         A.   She a got married to Mr. Fernandez, yes.
21         Q.   Okay.  And can you just take a moment and
22    read this.
23         A.   Sure.  Okay.
24         Q.   Do you recall the serious issues that would
25    require careful and thorough investigation and
```

```
 1    resolution emanating from the MTI and the IML?
 2         A.   Not specifically, but in substance, yes.
 3         Q.   And, in substance, we're talking about what?
 4         A.   I think that they were concerned that there
 5    was overbilling of -- for the IML activities.
 6         Q.   And the person who was -- the IML was within
 7    the department of surgery.  Is that correct?
 8         A.   That's correct.
 9         Q.   And the chair of the department of surgery
10    was who?
11         A.   Alan Livingstone.
12              MR. SLOMAN:  Let's just go up a little bit,
13         Jackie.  Okay.
14              (Thereupon, the document was marked as
15              Exhibit 6 for identification.)
16    BY MR. SLOMAN:
17         Q.   Let's go now to Exhibit 6.  Dr. Goldschmidt,
18    I'm showing you what's been marked as Exhibit 6, which
19    is an August 15 email from you, Jack and Jennifer.  If
20    you could just take a moment and read it, it's to Dr.
21    Cote and Dr. Chen.
22         A.   Okay.
23         Q.   Do you recall that this was the beginning of
24    the process of bringing on the TMG group to perform an
25    independent review of the allegations and concerns
```

```
 1    that were eminating by -- through the department of
 2    pathology and their concerns about the IML?
 3         A.   Yeah.  Again, I was the one who had requested
 4    to have a third party review of the allegations.
 5         Q.   Okay.
 6              (Thereupon, the document was marked as
 7              Exhibit 7 for identification.)
 8    BY MR. SLOMAN:
 9         Q.   Let's go to Exhibit 7.  Let's go down.  Let's
10    go down further.  Keep going.  That's fine.  Okay.
11              Dr. Goldschmidt -- let's just go up a little
12    bit, Jackie -- do you remember the university
13    receiving this letter that was addressed to the Office
14    of Inspector General in Washington?
15         A.   Vaguely, yeah.
16         Q.   And what do you remember about it?
17         A.   My recollection is that it was addressing
18    that Dr. Phillip Ruiz was running the IML lab for Dr.
19    Livingstone, was doing what it said.  It's to report a
20    fraud.
21         Q.   And what was your reaction to that at that
22    time, do you recall?
23         A.   Yeah.  As I mentioned, I was pushing for a
24    review of these allegations of this and the other
25    allegations that we have talked about by a third
```

```
 1      party.
 2          Q.   And you were supportive of the engagement of
 3      TMG.  Correct?
 4          A.   TMG seemed to be a reasonable company to do
 5      it, yes.
 6               MR. SLOMAN:  Let's go to Exhibit 8.
 7               (Thereupon, the document was marked as
 8               Exhibit 8 for identification.)
 9      BY MR. SLOMAN:
10          Q.   I'm just going to show you a couple of
11      emails.  This one from Dr. Lord, copying to Jennifer
12      McCafferty Cepero and to you, asking for status as to
13      the engagement of TMG.
14               Do you remember if there was -- do you
15      remember if there was any type of a lull between the
16      receipt of the OIG letter, which was Exhibit 7, and
17      the engagement of TMG?
18          A.   I mean, I don't think they were available
19      right away.  I mean, they were busy with other
20      projects and we got them to come ASAP.
21               (Thereupon, the document was marked as
22               Exhibit 9 for identification.)
23      BY MR. SLOMAN:
24          Q.   Let me show you Exhibit 9.  This is another
25      email from Dr. Lord to Jennifer McCafferty Cepero
```

1    asking, you know, what's the timeline here, trying to

2    push it along.

3         A.   That was probably --

4         Q.   And you agreed with that.  Correct?

5         A.   Yeah.  I was probably pushing Jack to

6    accelerate the process.  And because I was getting a

7    lot of feedback from Richard Cote of the department of

8    pathology and, you know, I wanted to have this done as

9    quickly as possible.

10             (Thereupon, the document was marked as

11             Exhibit 10 for identification.)

12   BY MR. SLOMAN:

13        Q.   And let's show you Exhibit 10.  This is

14   October 10, 2012, another email.  And you were

15   supportive of pushing along the engagement of TMG.

16   Correct?

17        A.   Yeah.

18             (Thereupon, the document was marked as

19             Exhibit 11 for identification.)

20   BY MR. SLOMAN:

21        Q.   Okay.  I'd like to now turn your direction to

22   Exhibit 11.  Dr. Goldschmidt, this is an email from

23   you to Dr. Lord, dated October 26, 2012.  The subject

24   may or may not be relevant, but I just wanted you to

25   read your email to Dr. Lord.

1        A.   Yeah.  Again, as I mentioned --

2        Q.   Let me ask you a question.  I'm sorry for

3   interrupting.  It says "Jack, I just want to push the

4   pause button for a second, hug you and tell you that

5   you've done a heck of a job, a grand job for UM.  I

6   never say thank you enough.  But right here and now,

7   thank you, Jack, and thank you partner.  Pascal."

8        A.   Correct.

9        Q.   Did I read that correctly?

10       A.   Yes.  As I mentioned to you, Jack and I were

11  friends.  I think that a little bit before this time

12  we had received the news that there was a petition to

13  get rid of us, and I was very concerned about, you

14  know, his way of taking it, and so I wanted to

15  encourage him to get over his concerns and remain

16  engaged and continue to work with me.

17            I must tell you that I was also very

18  concerned.  I brought a remarkable administrator to UM

19  in the person of Bill Donelan, an absolutely superb

20  administrator, with a phenomenal track record in

21  academic medicine, who had built one of the best

22  health system in the United States, academic health

23  system, and I had lost Bill Donelan as a partner.

24            Jack was a very different person from Bill

25  Donelan.  He didn't have the experience with faculty,

```
1    he didn't have the immense know-how of, you know, how

2    to interact with faculty and staff in this type of

3    enterprise.  But he had remarkable qualities.

4         And at the time he was extremely down and

5    self-isolating, if I can tell, and I was very

6    concerned that would affect his performance in the way

7    that would be potentially causing his loss, and that's

8    the last thing I wanted to happen.

9         Q.  Are you sure that you had seen the petition

10   at this point?

11        A.  I'm pretty sure I had heard of the petition.

12   I had not seen it.  Again, I didn't see it before I

13   think end of November, beginning of December.

14             MR. ISICOFF:  Is now a good time to take a

15        five minute break?

16             MR. SLOMAN:  Sure.

17             THE VIDEOGRAPHER:  Okay.  We're going off.

18        This marks the end of video file number two.  The

19        time is 11:12 a.m. and we're going off the

20        record.

21             (Thereupon, a brief recess was taken, after

22        which the following proceedings were had:)

23             THE VIDEOGRAPHER:  We're back on the video

24        record.  This is the start of video file number

25        three in the deposition of Dr. Pascal
```

```
1          Goldschmidt.  The time is 11:27 a.m.
2               (Thereupon, the document was marked as
3               Exhibit 12 for identification.)
4    BY MR. SLOMAN:
5        Q.   Dr. Goldschmidt, we finished talking about
6    Exhibit 11.  Now I'm showing you what's been marked as
7    Exhibit 12, and this is an update.
8               Can you tell me what the significance of
9    these updates was back at the time that Dr. Lord was
10   reporting directly to you.
11       A.   Yeah.  Again, Jack was a friend, and I would
12   say a dear friend, as well as a colleague, and I was
13   very concerned with his mood.
14       Q.   Doctor, I'm asking a slightly different
15   question.  I'm asking you about what did these
16   updates -- see it says subject re update?  There's
17   executive updates and then this went to I believe you
18   originally.  Let's go down.
19       A.   No.  I hear you.  We were just -- we were
20   just, you know, both very shaken by the news of the
21   petition and we were engaging in conversations that
22   were in raising the other one's morale.
23       Q.   Why don't you take a moment and read this,
24   because this has nothing to do with the petition.
25   This was --
```

```
 1        A.   Okay.
 2             MR. SLOMAN:  Go down further, Jackie.  Okay.
 3        Go down.  All the way down.  Okay.  Now go up.
 4        Okay.  Stop right there.
 5   BY MR. SLOMAN:
 6        Q.   So these updates or executive daily
 7   updates --
 8        A.   Oh, okay.  That was totally different.  I was
 9   talking about the notes that we were sending to each
10   other to help each other.
11        Q.   Right.  I have a slightly different question.
12        A.   Okay.
13        Q.   So what were these executive daily updates or
14   these updates between you and him, between a whole
15   team of people?  What did those --
16        A.   Okay, so this was an idea of Jack.  All of us
17   were very busy people.  We were having meetings all
18   day long with all the kind of people.  And for things
19   that were really important, Jack wanted for us to
20   write a quick note at the end of the day to update the
21   others of the progress of what we were doing.
22        Q.   Okay.  And there's nothing magical about this
23   one, per se.  But as we go up in this email -- go up a
24   little bit, Jackie.  Okay, stop right there.
25             This was a response by Alan Livingstone, and
```

1    it says, "Jack, what was the proposal to MSMC?  As you

2    know, I had no input into developing any of it and I

3    probably know more about Mount Sinai and cancer care

4    than most other faculty."

5            Do you see that?

6       A.   Yeah.

7       Q.   Then -- can you go up a little bit more --

8    and Dr. Lord's response went to you.  You can go up a

9    little bit further.  Right there.  And he writes to

10   you Monday, a.m., "We need to tell them to stop

11   whining about not being consulted.  He can move up to

12   CRB-3 and be in as many meetings as he would like to

13   be in.  He has been resistant to that, away, and

14   behind on emails.  Too bad."

15           And then -- go up a little bit more -- and

16   you write "Let's talk about that on Monday at our

17   morning meeting with Alan.  My concern is that he is

18   so negative about MSH."  Is that Mount Sinai Hospital?

19      A.   Correct.

20      Q.   "And he would probably kill the opportunity."

21      A.   Yeah.

22      Q.   All right.  And so this has nothing to do

23   with the petition.  Correct?

24      A.   Nothing.

25           MR. ISICOFF:  I'm going to object to the

```
 1            form.  If there's a question about this document,

 2            go ahead and ask it.  But the question you just

 3            asked, I object as to form.

 4     BY MR. SLOMAN:

 5            Q.   But this was dealing with Mount Sinai

 6     Hospital; correct, Dr. Goldschmidt?

 7            A.   Yes, it's Mount Sinai Hospital.  But this is

 8     not a new issue.  So when I first came to UM, there

 9     was a pair of trustees that asked me to reconsider the

10     possibility of getting together between Mount Sinai

11     and University of Miami.

12            Q.   And would it be fair to say that Dr.

13     Livingstone was not in favor of that?

14            A.   Dr. Livingstone and Steve Sonenreich, who was

15     the CEO of Mount Sinai, were enemies.

16            Q.   Okay.  So the answer to my question is yes,

17     Dr. Livingstone was not in favor of any relationship

18     with Mount Sinai Hospital.  Correct?

19            A.   That is an understatement.

20            Q.   Now let's go up a little bit further.  And

21     Dr. Lord writes to you "How are you feeling, partner?

22     Where were you?  Saw you come by Sylvester this

23     morning."  And you respond, going up a little bit

24     more, "I missed you.  Where were you, partner?  I

25     looked for you," and it goes on.
```

```
 1              And was this indicative of the relationship

 2    that you and Dr. Lord had during this time period,

 3    that you referred to each other as partner and were

 4    really working collaboratively?

 5        A.   It was really in a very purposeful effort to

 6    get Jack back on track and have him, you know, become

 7    the person I had known during the first six months of

 8    our relationship.

 9        Q.   Are you sure that you had seen the petition

10    at this point?

11        A.   I am sure that I had heard of it.

12        Q.   And so what did you hear before you saw it?

13        A.   That there was a petition signed by 700

14    faculty and that was to get rid of -- a petition of no

15    confidence.

16        Q.   And who was it directed towards?

17        A.   Sorry?

18        Q.   Did you know at that point?

19        A.   Did I know what?

20        Q.   Before you saw the petition, did you know who

21    the petition was focused on?

22        A.   No, I didn't -- I absolutely did not know

23    about that petition.  It was completely secret.  I

24    have no idea.  I mean, you know, usually, when there

25    is a petition, people talk early on about it and I
```

1    didn't have any knowledge of it at all.

2        Q.   So is it your testimony that before you saw

3    it that this affected Dr. Lord's job performance?

4        A.   That it affected both Dr. Lord and my

5    performance.  My performance, the guy who, you know,

6    was the hero of the department of medicine at Duke,

7    who had a 75 percent in his last review a year before.

8    Okay?  So, yes, it was a shock.

9        Q.   But you seem to be implying that you're

10   trying to build Dr. Lord's spirits up at this point.

11       A.   I was.

12       Q.   And I understand you haven't seen it and he

13   hasn't seen it.

14       A.   Jeff, we knew it was going on.  Okay?  And it

15   was very difficult to not have seen it, because we

16   couldn't even tell exactly what it was.  We just heard

17   that there was a petition against us.

18            I think that maybe Jack got wind of it before

19   I did.  I think he may be the one who told me.  I

20   remember I was in my office.  I can see -- I can see

21   the particular scene when we found out about it.  And

22   I remember I closed my door and I went to sit down at

23   my desk, you know, completely baffled by it.

24       Q.   Okay.  So at this point, on November 3rd,

25   2012, my question is you refer to him as partner, he

```
 1    refers to you as partner, and it appeared from the --
 2    I'm not cherry picking, it appeared that this was
 3    indicative of the way the two of you interacted with
 4    one another and it appeared that both of you valued
 5    each other.
 6        A.    Of course I valued Jack.  Jack had tremendous
 7    quality as an individual, I mean, and he was a good
 8    friend.
 9            (Thereupon, the document was marked as
10            Exhibit 13 for identification.)
11    BY MR. SLOMAN:
12        Q.    Let's go now to Exhibit 13.  I'm showing you
13    what's been marked as Exhibit 13.  We just want to go
14    down to show him that it's been marked as Exhibit 13.
15    Okay.
16            And this purports to be one of your activity
17    summaries for April -- if you go up a little further,
18    Jackie -- activity summary, November 7, 2012.
19    Correct?
20        A.    Okay.
21        Q.    And this went out from you to the executive
22    daily update email chain.  Correct?
23        A.    Okay.
24        Q.    And the sixth asterisk down --
25        A.    Yeah.
```

```
 1          Q.   Do you see where it says, Jack, Jennifer MC,
 2     TMG Consultants?
 3          A.   Yes.
 4          Q.   It says Jack, Jennifer MC.  I assume that
 5     meant Jennifer McCafferty.  Is that correct?
 6          A.   Yeah.
 7          Q.   TMG Consultants.
 8          A.   Yeah.
 9          Q.   Tracy Giacoma, Barry Marshall, Christine
10     Marshall.
11          A.   Okay.
12          Q.   "Good conversation about Miami Transplant
13     Institute and the need to make sure compliance and
14     systems are optimized.  The complexity of having two
15     collaborating institutions, UM and J" I take it that
16     means Jackson?
17          A.   Yeah.
18          Q.   "...that collectively deliver solid organ
19     transplant care requires particular attention."
20               Did I read that correctly?
21          A.   Totally.
22          Q.   And if we go down to takeaways -- and, by the
23     way, a lot of these executive daily updates had a
24     section for appreciation, takeaways and I think
25     progress.  Is that how these were generally formatted?
```

```
 1        A.   Yep.
 2        Q.   And so under takeaways, the second asterisk
 3   says "TMG Consultants, good team.  Will provide
 4   reports on key aspects of MTI.  Will need to round in
 5   the HP building again next week with Jack."
 6             What's that refer to?
 7        A.   Wait, wait, wait.  Where do you see that?
 8        Q.   Do you see under takeaways?
 9        A.   Yes.
10        Q.   The second asterisk.  Do you see where it
11   says --
12        A.   I was below.  Okay.  "Good team, will provide
13   reports on key aspect of MTI.  Will need to round in
14   the HP building again next week with Jack."
15        Q.   If you recall.
16        A.   I'm sorry.
17        Q.   If you don't remember, Dr. Goldschmidt,
18   that's fine.
19        A.   I'm sorry.  HP building, it may have been a
20   project to move the lab or something like that.  But,
21   I'm sorry, I don't remember the initial HP.
22        Q.   Okay.  But at this point --
23        A.   I don't think it happened, anyways, because I
24   would remember if it did.
25        Q.   Okay.  So at this point, on November 7, 2012,
```

1    at least, based on your activity summary, it appears

2    as though you felt comfortable with TMG and you felt

3    that they were the right fit to investigate the key

4    aspects of the Miami Transplant Institute, which also

5    involved the IML and the department of surgery.  Is

6    that correct?

7        A.   Correct.

8        Q.   And under appreciation, in fact, one, two,

9    three, four, fifth asterisk down, it says "Jennifer,

10   Jack and TMG Consultants for audit and helping us fix

11   compliance issues with MTI."  So that is under

12   appreciation.  Correct?

13       A.   Correct.

14            (Thereupon, the document was marked as

15            Exhibit 14 for identification.)

16   BY MR. SLOMAN:

17       Q.   I want to show you Exhibit 14 and ask you if

18   you've ever seen this document before.  Dr.

19   Goldschmidt, this appears -- this purports to be a

20   memo to file, Miami Transplant Institute/Jackson

21   Memorial Hospital, November 19, 2012.  Can you go up

22   just a little further, Jackie.  No.  The other way.

23   Okay.  Stop right there.

24       A.   Where did that come from?

25       Q.   Go up a little bit.  My question is have you

```
 1    ever seen this document before?  Take a moment and
 2    read it.
 3         A.   Okay.  The whistleblower was the OIG thing?
 4         Q.   Correct.  Let me know when you've gotten to
 5    the bottom, Dr. Goldschmidt.
 6         A.   The hospital side claimed that they were not
 7    agreeable to visit by TMG.  Is that the Jackson
 8    Hospital?
 9         Q.   I'm not going to weigh in.  I'm just asking
10    you if this document -- have you seen this document
11    before?  We can go up a little further.
12         A.   I really don't.  It doesn't ring any bell.
13         Q.   Do you see where it says at 3:42 p.m.?
14         A.   Yeah.
15         Q.   Do you recall anything about this call
16    allegedly from Dr. Ciancio to the Barry Marshall at
17    TMG?
18         A.   You know, I do remember that there was an
19    issue related from Dr. Gaetano Ciancio.  I don't know
20    if I know about it from this document or direct phone
21    call that I receive from Dr. Ciancio, which would
22    happen very frequently.
23         Q.   Well, do you remember whether anyone reported
24    to you about this -- about Dr. Ciancio --
25         A.   Dr. Ciancio, himself.
```

1      Q.   Excuse me?

2      A.   I remember Dr. Ciancio calling, telling me.

3      Q.   You remember him telling you that what?

4      A.   That he had received a phone call from

5 someone and that there was some issues with somebody

6 losing job.  I can't remember the details.  But, yes,

7 it rings a bell.

8      Q.   Okay.  And do you recall ever speaking to Dr.

9 Ciancio about feeling intimidated about cooperating

10 with the TMG investigators?

11      A.   Yes, I do remember that there was something

12 like that that happened, yes.

13      Q.   And did he ever let you know who -- do you

14 see the paragraph that says "Dr. Ciancio wanted to let

15 me know that they had been instructed from the,

16 quote/unquote, highest levels to be vague and

17 standoffish with us?"  Do you see that?

18      A.   Okay.  Yeah, I see it.  I do remember having

19 a conversation with Dr. Ciancio about this and I told

20 him that he did not need to have any fear, that he

21 should tell people exactly what he knows and that I

22 would protect him if there was any attempt to take

23 step against him if he was -- if he was telling

24 something that people didn't like.  I don't know who

25 is that, 504-616-1481, by the way.

84

```
 1          Q.   Go to the bottom, Jackie.

 2          A.   I'm sorry?

 3          Q.   I'm just going to show you who that person

 4    is.  So you see there was written by Barry S.

 5    Marshall.  He was one of the consultants for TMG.

 6          A.   Okay, yeah.

 7          Q.   All right.  And did you ever ask Dr. Ciancio

 8    who was telling him to be uncooperative with the TMG

 9    folks?

10          A.   I'm sure I asked him.

11          Q.   And do you recall who he told you that person

12    was?

13               MR. ISICOFF:  Object as to form.

14          A.   I'm sorry, I don't recall if he answer my

15    question or not.

16          Q.   Was it Alan Livingstone?

17          A.   It's possible.  I just don't -- I really

18    don't know.  I do remember the part where I told him

19    no matter who tries to influence your interaction with

20    TMG, let me know, because you will be protected by me

21    and I will not let that happen.

22          Q.   Okay.

23          A.   But I'm sorry, you know, there is ten years

24    ago.  It is possible that it was Livingstone.  You

25    know, Alan was a very -- is a person that is not in my
```

1  heart.  He was not somebody I liked.  And he was

2  usually threatening people in his department, anyways.

3  So this could be him.

4         But I don't remember the details of my

5  conversation with Dr. Ciancio.  I don't want to accuse

6  if I'm not absolutely sure.  I just don't know.

7         (Thereupon, the document was marked as

8         Exhibit 15 for identification.)

9  BY MR. SLOMAN:

10    Q.   Let's go to Exhibit 15.  Again, this is

11 another executive daily update you sent out on

12 November 21st.  The activity summary is dated November

13 20th, 2012.  And I'd like to go to the bottom that

14 says appreciation.

15    A.   Which one?

16    Q.   You see the last asterisk under appreciation?

17    A.   Yeah.

18    Q.   And it says "Jack, for awesome partnership

19 with tough negotiations."

20    A.   Uh-huh.

21    Q.   Did I read that correctly?

22    A.   Yeah.

23    Q.   And do you recall what those negotiations

24 were at the time?

25    A.   Well, look, we were dealing with two

```
1    departments that were fighting, the department of
2    pathology, the department of surgery.  We had I think
3    this is at the time of -- sorry, I didn't catch the
4    date -- but I assume this is at the time of the review
5    by TMG, so I guess that was what it was referring to.
6         Q.   We can -- we can go up.
7         A.   Okay.
8         Q.   Right there.  See?
9         A.   Yeah, I think that that was during the TMG
10   visit.  No?
11        Q.   So TMG was on campus, yes, around that time
12   period, that's correct.
13        A.   Okay.
14        Q.   I think my question is a little bit
15   different, dealing with your appreciation for Jack for
16   tough negotiations.
17             So is there anything in that activity report
18   that triggers your recollection as to Jack for awesome
19   partnership with tough negotiations?
20        A.   I don't.  Sorry.  I see that we had -- I was
21   reporting on a meeting with trustees, Leonard Abess,
22   Stuart Miller, Lenny Kadre, Jack and President
23   Shalala.  Long meeting on Jackson and exclusivity.
24   Yeah, I think that's what it's referring to.
25        Q.   And did you have any concerns with Dr. Lord's
```

1    job performance at this time?

2         A.   You mean in that particular situation?

3         Q.   Yeah.  I'm trying to figure out when you had

4    mentioned that there was this petition and that you

5    were flattering Jack at times to keep his spirits up.

6    But I'm trying to figure out whether or not Dr. Lord's

7    job performance was impaired in any way.

8              MR. ISICOFF:  Object as to form.

9         A.   This was not the TMG issue that I was

10   referring to.  I was referring to a completely

11   unrelated conversation that we had, which was also

12   very difficult.  Do you want to know?

13        Q.   Sure.  My question is whether or not at this

14   time, November 20, 2012, whether you had concerns

15   about Dr. Lord's job performance.

16             MR. ISICOFF:  Object as to form.  Go ahead

17        and answer.

18        A.   Yes, I was.

19        Q.   And why was that?

20        A.   Because, as I mentioned to you, Jack was not

21   the person I had known before we received the petition

22   and he was much more detached and less constructive in

23   his interaction with others, and he was not

24   functioning the way he functioned before the news of

25   the petition.

1          This is my observation.  I'm not going to

2     change it.  I was always trying to identify points

3     where he did a good job, because I was trying to make

4     him feel the best I could, making sure that he would

5     not quit on me.  But, yes, there were issues.

6          Let me explain to you what this was in

7     reference to, because this is another issue that was

8     really really challenging.  Okay?

9          So in our relationship with the Jackson

10    Health System, we didn't do transplants, except for

11    bone marrow transplant at Sylvester.  We didn't do any

12    pediatrics, we didn't do any OB/GYN.  And most of the

13    orthopedic surgeries were being done at Jackson

14    Memorial Hospital.  Most of the cardiovascular

15    activities were also done at Jackson Memorial.

16          If you look at the key service line in an

17    organization, I mentioned, except for cancer, cancer

18    was the only one that we had that the University of

19    Miami fully developed, but there was an issue.  The

20    head of the pediatric oncology group came to see me,

21    and I think Jack was there as well, and reported that

22    as a consequence of the financial difficulty of

23    Jackson, the bone marrow transplant unit at Jackson

24    was no longer suitable to do bone marrow transplant on

25    children.  That is not a small issue.  It was an

1    absolutely fundamentally critical issue.

2         So I asked what can we do.  And he said,

3    well, maybe what we could do, because we had kids with

4    cancer who were coming to Jackson, Julio Barredo, who

5    was the individual who was in charge of that program,

6    told me, well, maybe we can ask Miami Children, it was

7    not Nicholas at the time, it was Miami Children

8    Hospital, could help us and allow us to do a bone

9    marrow transplant at Miami Children until the unit at

10   Jackson is fixed.

11        There are extremely specific criteria for a

12   bone marrow transplant unit to be accredited, and at

13   the time, the concern of Julio Barredo is that the

14   Jackson unit was not fulfilling this criteria.

15        So that conversation that I referred to was

16   about the issue between Jackson, who was furious that

17   we were considering doing bone marrow transplant at

18   the Miami Children Hospital, and started to upset the

19   faculty by telling them that we had decided to go to

20   Miami Children with our bone marrow transplant

21   program.

22        That was not the case.  We just wanted to

23   deal with the serious challenge on the suitability of

24   the facilities that were at Jackson to do bone marrow

25   transplant.  If we were to lose one kid because of

```
 1    infection in a facility that was no longer functional,

 2    it would have been a catastrophe.  Okay?  Talk about

 3    lawsuit.  That would be one for sure.  And so it

 4    was -- it was a difficult situation.

 5           I thought that Jack did a very good job at

 6    presenting the situation and I wanted to thank him for

 7    having helped with that issue, which, by the way,

 8    resulted in a very, very upset faculty of the people

 9    who were working at Jackson from UM, because they felt

10    that we were trying to move, you know, an important

11    program of Jackson to a competing hospital.

12           Q.   And at the end of this particular activity

13    summary you wrote "Jack, for awesome partnership with

14    tough negotiations."  Correct?  You have to say yes or

15    no.

16           A.   Yes, I do.

17                (Thereupon, the document was marked as

18                Exhibit 16 for identification.)

19    BY MR. SLOMAN:

20           Q.   Let's go to Exhibit 16.  Exhibit 16 is dated

21    November 22nd regarding Happy Thanksgiving, partner.

22    And Dr. Lord sends you at the bottom an email.

23    "Pascal, this is our first Thanksgiving together and

24    didn't want to miss the opportunity to say thanks for

25    being a great partner in many dimensions, from sharing
```

1   leadership to a bunch of times with near

2   uncontrollable laughter, to really brutal moments.  I

3   want to be sure I say thank you for the opportunity to

4   contribute and make a difference."

5        And then you responded, let's go up a little

6   bit, and you wrote "And right back at you, partner.  I

7   thank you for an awesome ride, but, above all, for

8   your friendship.  My love to Alice," et cetera.  Did I

9   read that correctly?

10       A.   Yes.

11       Q.   And, again, this was indicative of the

12  exchanges that you had with Dr. Lord, if not daily,

13  certainly weekly.  Correct?

14       A.   Totally.

15            (Thereupon, the document was marked as

16            Exhibit 17 for identification.)

17  BY MR. SLOMAN:

18       Q.   Let's go to Exhibit 17.  Go down, please.

19  Dr. Goldschmidt, I'm showing you what's been marked as

20  Exhibit 17, which is a November 26, 2012, email that

21  you sent to Thomas LeBlanc, who was the provost,

22  copying David Birnbach, Donna Shalala, Jonathan Lord,

23  Sheri Keitz, subject, Senate on MC.  What's MC?

24       A.   Medical Center.

25       Q.   I'm going to read it and I'm going to ask you

1    if I read it correctly.  "Dear Tom, At our last

2    one-on-one meeting with the president, I learned that

3    a scolding report, in quotes, is being prepared by the

4    senate committee charged to review UHealth for UM

5    employees.  An interim report with a much larger

6    umbrella than UHealth for UM employees has already

7    been published and we have responded to it as

8    constructively as possible.

9         "We have not seen a draft of the final report

10   on the medical center and there is no evidence that

11   the committee sought access to the official/serious

12   databases."  And then, in parenthesis, surveys and

13   other official existing databases.  "They did meet

14   with members of the core team for the medical center

15   at our request.  The outcome of these meetings was

16   highly variable, according to our team.

17        "Considering the potential damage that a,

18   quote/unquote, scolding report based on rumors,

19   innuendos and pseudo surveys, personal feeling and/or

20   experience could create a seriously negative impact on

21   our health system and, consequently, on our

22   institution, we are wondering if we could have a high

23   level conversation about this issue."

24        There's a PS there, and then attached -- I

25   don't believe there's an attachment to this.  So did I

1    read that correctly?

2         A.    Correct.

3         Q.    All right.  Again, so the scolding report, is

4    that the petition that you were referring to?

5         A.    Not at all.

6         Q.    What was the scolding report?

7         A.    It was a despicable activity of the faculty

8    center.

9         Q.    The petition was something else.  Correct?

10        A.    Completely separate.

11              (Thereupon, the document was marked as

12              Exhibit 18 for identification.)

13   BY MR. SLOMAN:

14        Q.    Let me show you Exhibit 18.  We can go to the

15   bottom, Jackie.  Okay.

16              So this is Exhibit 18.  This is dated

17   December 6 --

18              MR. ISICOFF:  17 or 18?

19              MR. SLOMAN:  This is 18.

20   BY MR. SLOMAN:

21        Q.    This is dated December 6, 2012.  This is an

22   email from you.  It came from your email address, but

23   the signature is Pascal and Jack.  And there's a pdf

24   attached, and we will get to that in a second.  Do you

25   want to take a moment and read this, Dr. Goldschmidt.

```
 1        A.    Uh-huh.   Yep.

 2        Q.    So my question is does this refresh your

 3   recollection as to the timeline about seeing the

 4   petition, which is attached to this email?

 5        A.    Yeah, I believe that's when we finally

 6   received the document.

 7        Q.    As a matter of fact, let's go to exhibit --

 8   before we do, I wanted to ask you -- can you go up a

 9   little bit, Jackie -- do you see President Shalala's

10   response to you?

11        A.    Where is it?

12        Q.    It's at 6:52 p.m.

13        A.    Oh, by the way, this is not about -- it is

14   propaganda, yeah.

15        Q.    No.   That's your response, see at 6:52 p.m.

16   Donna Shalala wrote "I believe you need --

17        A.    "I believe you need to talk to group of

18   faculty to confront them and answer question about

19   Jack.   Spend some time in January reaching out to

20   people.   There is considerable confusion about the

21   Jackson agreements.   I have warned you before your

22   communication is weak with the entire faculty, not the

23   chairs.   The latest rumor is that Children is..."

24   Yeah, yeah, that's what I'm talking about.

25        Q.    So this is dated December 6th.
```

1      A.    Yeah.

2      Q.    Earlier you were telling us that you had

3   known about this petition.

4      A.    Wait, wait, wait, wait.  There are several

5   things.  So, yes, we heard about the petition in

6   October.  This is the issue I just told you about

7   involving Jackson and the request from the head of

8   pediatric oncology, Julio Barredo, to no longer do

9   bone marrow transplant in an inappropriate facility at

10  Jackson.  Move it to Children Hospital until Jackson

11  attempt to fix their facility.  This is what Donna

12  Shalala is referring to.

13     Q.    Okay.  Let's go to the bottom.

14     A.    She mentioned Jackson.  She mentioned I

15  think -- she thought that we had not made at all the

16  appropriate case to the faculty relative to the bone

17  marrow issue for Children.

18     Q.    I want to direct your attention to your email

19  to her at 5:36 p.m.  It says "We want to make you

20  aware that the attached petition is being circulated

21  by someone at the Miller School of Medicine."

22          Do you see that?

23     A.    Yes.

24     Q.    And who are you referring to by a someone?

25     A.    I think it was Alan Livingstone.  There were

```
 1     two people that were driving the process, according to
 2     what I heard.  According to what I heard.  I cannot
 3     guarantee you that it's the truth.  But there were two
 4     people who were driving this petition.  One was Alan
 5     Livingstone and the other one was Lanny Gardner.  Two
 6     individual who, by the way, before I got the job at UM
 7     and I interviewed with trustees, two trustees told me
 8     there are two people you need to fire, Alan
 9     Livingstone and Lanny Gardner.
10          Q.   And Lanny Gardner succeeded you as the dean
11     of the Miller School of Medicine?
12          A.   No, no.
13          Q.   No?
14          A.   I retired in June of 2016 after ten years,
15     which is a pretty long time to be a dean at any
16     medical school in the United States.
17          Q.   Okay.  The next sentence says "Obviously, the
18     issue relates to fear of changes in our relationship
19     with Jackson."
20               Did I read that correctly?
21          A.   Right.
22          Q.   "And it is not the first time that similar
23     documents have been circulated to hurt the dean of the
24     Miller School."  Correct?
25          A.   Correct.
```

1    Q.   "You will remember the nasty anonymous letter

2    that was circulated in 2009, just a few months before

3    the 2010 official review of the dean by faculty,

4    organized by the faculty senate, came back with more

5    than 70 percent support," which you told us about

6    earlier.  Correct?

7    A.   Yeah.

8    Q.   All right.  So you think that perhaps the

9    someone was Dr. Livingstone and maybe Lanny Gardner as

10   well.  Correct?

11   A.   Yes.  But I understand your confusion.  Okay?

12   There were several things going on at the same time.

13   Okay?  One is we finally got the official document

14   from the faculty senate on the petition.  Okay?

15   Second, which I believe I mentioned, and sharing with

16   Donna Shalala.

17        Second, we had this acute issue that took an

18   unreal dimension of simply trying to save the life of

19   children who needed bone marrow transplant.

20        And the Jackson -- the Jackson leadership,

21   together with, I believe, Lanny Gardner and Alan

22   Livingstone, took again this opportunity to go after

23   me when I was just doing my job, which is to make sure

24   that kids in South Florida and Peru, because we were

25   also doing bone marrow transplant to children coming

```
 1    from Peru, could have this bone marrow transplant done
 2    in conditions that were consistent with the
 3    requirement of the accreditation organization.
 4           So there were several issues at the same time
 5    and I totally understand there is a little bit of
 6    confusion about it.
 7       Q.   And in the middle, President Shalala's
 8    response to you, if you go up just a little bit, she
 9    says "I believe you need to talk to groups of faculty
10    to confront this and answer questions without Jack."
11           Did I read that right?
12       A.   Yeah.
13       Q.   And she was telling you to talk to groups of
14    faculty and to confront this and answer questions
15    without Jack.  Correct?
16       A.   Let me see exactly what she's saying.
17       Q.   Did I read that correctly?
18       A.   Yeah, yeah.
19       Q.   And so she was telling you to go out and talk
20    to the groups and confront and answer questions
21    regarding this?
22       A.   Correct, yes, because Donna was concerned
23    that, again, when it came to interaction with faculty,
24    Jack was dismissive, disrespectful and disparaging.
25       Q.   And so did you, in fact, talk to Jack about
```

1    that at this time?

2        A.    I don't think that I talked to him about that

3    at that time.  But, as I mentioned, we had a frank

4    explanation after he came out of a meeting with

5    faculty and did the L sign on his head.  That was very

6    childish, inappropriate and uncalled for.

7        Q.    But it was never documented.  Correct?

8        A.    I don't know.  It is very possibly

9    documented.  I don't have my emails with him, so I

10   can't tell you.  I just don't remember exactly what I

11   put on paper.  But I probably sent him an email about

12   it.  It was probably mentioned in an email to him.

13       Q.    So it would be in the University of Miami

14   system.  Correct?

15            MR. ISICOFF:  Object as to form.

16       A.    If I wrote an email to him about it, yes.

17   But Jack and I were mostly discussing issues verbally,

18   because we were talking to each other every day.

19       Q.    And, by the way, at this time, did you ever

20   counsel Dr. Lord about failing to respond to Joe

21   Natoli or Tom LeBlanc as well?

22       A.    I definitely did mention to him, yes.

23       Q.    And did you document that?

24       A.    I don't remember.  I can't tell you yes or

25   no.  I just don't remember.  It's ten years ago.  You

 1    know, it's a miracle that I remember these issues the

 2    way I do.  I just can't remember everything I put on

 3    paper or told him orally.

 4         Q.   Going up to the top, at 8:54, your response

 5    to President Shalala, it says "BTW."  I guess that

 6    means by the way.

 7         A.   Correct.

 8         Q.   "This is not a vote.  It is propaganda of the

 9    worst type.  Unacceptable.  I will have my second

10    official dean review during 2014.  Faculty can vote

11    then."

12              Did I read that correctly?

13         A.   Correct.

14              (Thereupon, the document was marked as

15              Exhibit 19 for identification.)

16    BY MR. SLOMAN:

17         Q.   And, in fact, let me show you Exhibit 19.  Do

18    you remember President Shalala, after your review,

19    sending this to the faculty?

20         A.   Yes.

21         Q.   And, in fact, at that time, this was in the

22    summer of 2014, that the faculty still believed that

23    you should be fired as dean.  Correct?

24         A.   Okay, so let me ask you a question.  Do you

25    think that is completely random, that after we worked

```
 1    with Dr. Lord, for someone that received a poster sign
 2    by every single faculty of Duke saying amazing job I
 3    had done, somebody who has been recognized as the
 4    chair of the women of the department of medicine at
 5    Duke, somebody who was beloved and received a letter
 6    from the president of the Ohio State University
 7    begging him not to leave the university, who received
 8    a 70 percent review in 2010, becomes all of a sudden,
 9    out of the blue, somebody that is rejected by the
10    faculty?
11         Do you think there is maybe a slight
12    relationship between that and Dr. Lord?  How about me
13    suing Dr. Lord, because of his behavior?  He destroyed
14    a huge part of my career.
15         Q.   Dr. Lord did?
16         A.   Obviously.  How is it that I have all of
17    these positive recognition, and then after working
18    with him, I become a pariah?
19         Q.   A pariah?  Is that what you said?
20         A.   Yes.
21         Q.   Did it have anything to do with the petition?
22              MR. ISICOFF:  Object as to form.  I'm not
23         sure what you mean.
24         A.   Why do you think the petition occurred?
25              (Thereupon, the document was marked as
```

```
 1                    Exhibit 20 for identification.)
 2      BY MR. SLOMAN:
 3           Q.   Let's go to Exhibit 20.
 4                MR. ISICOFF:  Jeff, when you get to a good
 5           breaking spot, let's take a break for lunch,
 6           because I have a feeling you're not going to be
 7           done soon enough so we can skip lunch.
 8                MR. SLOMAN:  Yeah, okay.  I'll just go to the
 9           petition, Eric, and then I'll ask him questions
10           and then we can break.
11                MR. ISICOFF:  Okay.  That's fine.
12                THE WITNESS:  You did not respond to my
13           question, though.
14      BY MR. SLOMAN:
15           Q.   Dr. Goldschmidt, I'm asking you questions;
16      you're not asking me questions.  That's the way
17      depositions go.  Do you understand?
18           A.   I do.
19           Q.   I'm showing you the attachment to Exhibit 18,
20      which is Exhibit 20.  Is this the petition that you
21      were referring to?
22           A.   I believe so.
23                MR. SLOMAN:  Can you go down further, Jackie.
24           Q.   The last paragraph says "We are steadfast in
25      our commitment to our school, our university and the
```

1     welfare of our community and believe that this

2     faculty, our students and, most importantly, our

3     patients deserve a dean who shares this view."

4             Did I read that correctly?

5     A.    Correct.

6     Q.    From a timing perspective, would you agree

7     that the appearance of this petition coincided with

8     the pending issuance of the preliminary assessment of

9     the IML?

10    A.    No, this has nothing to do with the IML.

11    Q.    I believe that earlier you said that the

12    person or persons behind the petition was Alan

13    Livingstone and Lanny Gardner.

14    A.    Yes, that's correct.

15    Q.    The focus of the investigation of the IML

16    concerned Dr. Livingstone, did it not?

17    A.    Yes, that's correct.

18    Q.    So my question is from a timing perspective,

19    on December 6, 2012, from a timing perspective, would

20    you agree that the appearance of this petition

21    coincided with the pending issuance of the preliminary

22    assessment of the IML from TMG?

23    A.    The petition was started I think in the

24    summer.  I don't -- I don't think -- no, no.  We heard

25    about it in October.  But my understanding is that it

```
 1      started in August.
 2              It has nothing to do with TMG.  It had to do
 3      with the feeling that, you know, look, this is a major
 4      issue at the University of Miami.  I have explained to
 5      you that it's very unusual that the faculty is divided
 6      into those who feel that you are part of the
 7      University of --
 8          Q.   I understand.  You've explained this.  My
 9      question is simple.
10          A.   -- Jackson.  It is not a simple answer.
11          Q.   My question is a simple one and you are
12      telling me about something else.
13          A.   I'm saying this petition was started way
14      before the TMG report.  It has nothing to do with it.
15          Q.   How do you know, Dr. Goldschmidt?  How do you
16      know that it was started before?  What evidence do you
17      have that the petition was started way before what you
18      previously testified to was in October?
19              MR. ISICOFF:  Object as to form.
20              Mischaracterization of prior testimony and
21              argumentative.  Hold on, Dr. Goldschmidt.
22          A.   I have said to you from the beginning that I
23      heard about the petition in October.  But my
24      understanding for the people who were informing him of
25      what was going on, because they had been approached by
```

```
 1    people to sign the petition, told me that it was going
 2    on for a while, and I think that it started in August.
 3         Q.   What is that based on?  Do you have a
 4    document, an email, anything to substantiate that?
 5              MR. ISICOFF:  Object to the form.
 6         A.   Nobody wrote anything.  Nobody wrote anything
 7    about it.  They told me.
 8              MR. SLOMAN:  All right, Eric, now is a good
 9         time.  We can come back -- how is, let's see,
10         it's 12:21 now.  You want to come back -- what do
11         you want to do?  Half an hour?  Is that good?
12              MR. ISICOFF:  Why don't we come back at one,
13         just to get a little extra breathing room.
14              MR. SLOMAN:  That's fine.
15              THE VIDEOGRAPHER:  This marks the end of
16         video file number three.  The time is 12:21 p.m.
17         and we're going off the record.
18              (Thereupon, a lunch recess was taken, after
19         which the following proceedings were had:)
20              THE VIDEOGRAPHER:  We're back on the video
21         record.  This is the start of video file number
22         four in the deposition of Dr. Pascal Goldschmidt.
23         The time is 1:04 p.m.
24    BY MR. SLOMAN:
25         Q.   Dr. Goldschmidt, before the break, you
```

1    indicated that you may have emailed Dr. Lord regarding

2    counseling him regarding his behaviors or poor

3    performance or workplace misconduct.  Do you remember

4    testifying to that?

5        A.   I said it is possible.  There was ten years

6    ago.  I don't know what we discussed in person or what

7    I emailed to him.

8        Q.   Okay.  The university has produced all of Dr.

9    Lord's emails and I can represent to you that I've

10   seen none from you counseling him about his poor

11   performance or behaviors or anything in that regard.

12          Is it possible that you could have deleted

13   emails to that effect?

14       A.   No, it's not.

15       Q.   So whatever has been produced and is in the

16   University of Miami records is -- you would stand by

17   that.  Correct?

18       A.   Correct.  The only possibility is, I mean,

19   the reviews would happen once a year.  Jack and I were

20   talking every day and I think that it was the topic --

21   a topic that we had discussed one on one.  I don't

22   think that necessarily it was part of an email.

23       Q.   Okay.  With regard to the one-on-one

24   conversations, where would those conversations have

25   taken place?

1      A.    Typically, we were meeting in a meeting room

2      in between our offices.

3      Q.    And do you recall approximately when you

4      would have had those conversations?

5      A.    No.

6      Q.    Do you remember whether it was -- do you

7      remember whether they were morning conversations or

8      afternoon conversations?

9      A.    Again, we were talking about, you know,

10     probably two to five times per day.  So this happened

11     ten years ago.  There is no way I can tell you with

12     precision when it happened.

13     Q.    So is it fair to say that you can't point me

14     to a date, a time or any particular event that would

15     have generated that type of a conversation between you

16     and him?  Correct?

17     A.    Except that it would probably happen between

18     October and December.

19     Q.    And, okay, so let's narrow that down.

20     Between October and December.  Is it your testimony

21     that you counseled Dr. Lord on his behaviors and poor

22     performance during that time period?

23     A.    I don't think I would have meant -- I would

24     have said low performance.  But, yes, there are issues

25     that we had discussed relative to his interaction with

1   faculty and certain relationship also with the

2   leadership of Jackson and a time of members of the

3   administration at the time in the team of Donna

4   Shalala.

5        Q.   Between October and December, how many times

6   did you have conversations to that effect?

7        A.   I don't have the slightest remembrance of the

8   number of time we discussed it.

9        Q.   Was it more than five times?

10       A.   I couldn't tell you.

11            (Thereupon, the document was marked as

12            Exhibit 21 for identification.)

13   BY MR. SLOMAN:

14       Q.   I need to show you now Plaintiff's Exhibit

15   21.  Let me just go to the bottom, Jackie, to show him

16   Exhibit 21.  All right.

17            Dr. Goldschmidt, I'm showing you Plaintiff's

18   Exhibit 21, which is an email originally from Donna

19   Shalala to you at 11:41 a.m. on December 9th, 2012.

20   The subject is "How is it going?"  Do you see that?

21       A.   Yep.

22       Q.   And your response is "Very challenging, very

23   busy, challenging w-e."  I guess week?

24       A.   The weekend, most likely.

25       Q.   "Thanks for last night at the gala.  You were

```
 1    great.  All information we are gathering indicate that

 2    the individual behind the petition is Livingstone.  He

 3    is also calling chair colleagues to push and even

 4    threatened them to sign.  Barth Green may be

 5    supporting also.  Very disappointing.  Most chairs

 6    refuse to participate or to have their faculty

 7    participate.  I am meeting all chairs in small groups

 8    next week.  Meanwhile, trying to get business going

 9    uninterrupted.  We may lose many great faculty due to

10    the disruption created by the petition.  Not easy,

11    Pascal."

12           Did I read that correctly?

13      A.   Yes.

14      Q.   Now, this email, do you recognize the email

15    address umfourfillies?

16      A.   Yes.

17      Q.   And did you often communicate with President

18    Shalala on her personal email address?

19      A.   Variably, I think.

20      Q.   And did you discuss with her on the

21    umfourfillies@aol.com email address anything

22    pertaining to Jack Lord?

23      A.   Not that I remember.

24      Q.   Do you know why she would have emailed you

25    from her personal email address?
```

1      A.   I'm sure that as the president, the

2   president's email is paid for, and, as a consequence,

3   when she wants a more direct interaction, she will

4   probably use her personal email.

5      Q.   Did you use your personal email address, too?

6           MR. ISICOFF:  Object to the form.

7      A.   I didn't have a personal -- I didn't have a

8   non-UM email at the time.

9      Q.   When did you first acquire a non-UM email

10  address?

11     A.   I think probably in 2015 or '16.

12     Q.   Are you sure about that?  Are you sure about

13  that?

14     A.   I'm pretty sure, yes.

15     Q.   Okay.

16     A.   All other emails were UM emails.

17     Q.   All right.  Let me -- what did you base your

18  claim on that all information we are gathering

19  indicates that the individual behind the petition is

20  Livingstone?

21     A.   People talked to me about it.  I mean, there

22  were also -- there was also Lanny Gardner.  I don't

23  know why I didn't mention in this email, but he was

24  probably also an instigator.

25     Q.   And was Barth Green also an instigator?

```
1          A.    That's what I was told.

2          Q.    And the petition, as we read before the

3     break, indicated that in the last paragraph "We are

4     steadfast in our commitment to our school, our

5     university and the welfare of our community and

6     believe that this faculty, our students and, most

7     importantly, our patients deserve a dean who shares

8     this view."

9               Why was Dr. Livingstone circulating or behind

10    this petition targeting you and Dr. Lord?

11              MR. ISICOFF:   Object as to form.

12         A.    I believe this is -- I believe he wanted my

13    job.

14         Q.    Dr. Livingstone wanted your job.  Is that

15    right?

16         A.    Yep.

17              (Thereupon, the document was marked as

18              Exhibit 22 for identification.)

19    BY MR. SLOMAN:

20         Q.    Let me show you Exhibit 22.  Let's go up a

21    little bit.  Have you ever seen this email?  This is

22    an email from Alan Livingstone to Leonard Abess,

23    copying John Clarkson and Bernard Fogel, subject

24    line -- actually, let's go down further.  I'm sorry.

25              Okay.  Let's go up.  Okay.  This is an email
```

```
 1    from Alan Livingstone to Laurence Gardner, Rafic

 2    Warwar.  Who is Rafic Warwar?

 3         A.   He was the manager of the department of

 4    surgery.

 5         Q.   Okay.  And did he have anything to do with

 6    the IML?

 7         A.   Well, the IML would be administratively

 8    within his department, yes.

 9         Q.   Okay.  And I'm going to read the first -- do

10    you want to take a moment and read this email and see

11    if you've ever seen it before.

12         A.   I read the first paragraph.  It's a lie.

13         Q.   Have you ever seen this before?

14         A.   I don't think so.

15         Q.   Did you use Charlie Nemeroff to deliver an

16    ultimatum to Dr. Livingstone?

17         A.   Absolutely not.

18         Q.   Did you try to use the TMG Consultants to

19    take away the transplant lab from the department of

20    surgery to weaken surgery and, in particular, control

21    Dr. Livingstone?

22         A.   Absolutely not.

23         Q.   Where is Dr. Livingstone getting this from?

24              MR. ISICOFF:  Object as to form.  If you

25         know.  Same objection.
```

```
 1        A.   I think -- I believe he made up that story.

 2        Q.   Why do you believe that?

 3        A.   Because it wouldn't be surprising.  He's very

 4   manipulative.

 5        Q.   I'm sorry.  What did you say?

 6             (Reporter clarification.)

 7        A.   Because it wouldn't be surprising.  He's very

 8   manipulative.

 9        Q.   In I believe where it says "Charlie has

10   delivered the dean's ultimatum to me, which Charlie

11   says he doesn't believe in and that he is only serving

12   as an intermediary, that basically states that if I

13   agree to cease and desist and stop the recall

14   petition, that I will be held harmless and allowed to

15   continue in my current position, or if I desire, go

16   back and be chairman of surgery, as was promised in my

17   letter of offer.  If I do not stop the recall

18   petition, they intend to use the recent transplants

19   review, specifically the IML audit, to impugn my

20   integrity and to punish me."

21             Did I read that correctly?

22        A.   Yeah.  That's a lie.  I heard from people

23   around me that Dr. Livingstone had made that point.  I

24   confronted Charlie Nemeroff to find out if it is true

25   that he talked to Dr. Livingstone in these terms and
```

1    Charlie swore to me that it never happened.

2        Q.   Now, if we go up a little further, you see

3    that he -- that Dr. Livingstone sent this email to

4    Leonard Abess.  Do you see that?

5        A.   Uh-huh.

6        Q.   On December 9, 2012.

7        A.   Uh-huh.

8        Q.   Do you know whether or not TMG was about to

9    issue their preliminary assessment?

10        MR. ISICOFF:  Object as to form.

11        A.   I'm sorry.  Let me read the letter.

12        Q.   Okay.

13        A.   I've never seen this before.  What is this?

14    This is for a -- first of all --

15        MR. ISICOFF:  Hold on, Dr. Goldschmidt.  Let

16        him ask any questions.  Hang on one second.

17        Jeff, if you've got any questions about this,

18        please.

19        MR. SLOMAN:  Sure.

20    BY MR. SLOMAN:

21        Q.   Is there any truth behind his allegations

22    contained in either email, which is reflected in

23    Exhibit 22?

24        A.   Absolutely not.

25        Q.   Is there any -- is there any truth behind

1    either you orchestrating the use of the TMG audit or

2    Dr. Lord using the TMG audit to extract some -- to

3    extract from Dr. Livingstone the withdrawal of the

4    petition?

5         MR. ISICOFF:  Object as to form.

6    Q.  Is there any truth --

7    A.  As far as I'm concerned, I never did

8    something like that.  I doubt very strongly that Jack

9    would do something like that.  Of course, you can ask

10   him directly.  But I think that this was completely

11   fabricated.

12   Q.  Is there any truth behind Jennifer

13   McCafferty's use of compliance as a blunt instrument

14   to manipulate people?

15        MR. ISICOFF:  Object as to form.  You can

16        answer.

17   A.  No.  Jennifer was probably simply sharing

18   with TMG the concerns expressed by the department of

19   pathology.  And that was very much what she should

20   have done.

21   Q.  So from a timing perspective, would you agree

22   that the appearance of this petition coincided with

23   the pending issuance of the preliminary assessment of

24   the IML?

25        MR. ISICOFF:  Object as to form.

1      A.   Absolutely not.  The petition, as I told you,

2   was started in, I believe, the end of the summer of

3   2012.  And we heard about him -- we heard about the

4   petition in October.  It has nothing to do in terms of

5   timing with the TMG report.

6             (Thereupon, the document was marked as

7             Exhibit 23 for identification.)

8   BY MR. SLOMAN:

9      Q.   I'm going to show you now Exhibit 23.  Take a

10   moment and read that email, dated December 11, 2012,

11   at 6:52 a.m. from Alan Livingstone to President

12   Shalala.

13             Do you remember reading this email back in

14   December of -- back on December 11 or 12, 2012?

15      A.   I don't think I was copied on that email.

16             (Thereupon, the document was marked as

17             Exhibit 24 for identification.)

18   BY MR. SLOMAN:

19      Q.   Let me show you Exhibit 24.

20      A.   But I don't think that Alan Livingstone

21   resigned.

22      Q.   I'm showing you Exhibit 24, which is the

23   email chain that contains the email from Alan

24   Livingstone to Donna Shalala.  Do you see that, Dr.

25   Goldschmidt?  The same one that you just read,

```
 1   correct, in 23?

 2        A.   Yes.

 3             MR. SLOMAN:  Go up, please, Jackie.

 4        Q.   President Shalala emailed you and said I -- I

 5   think the second word is would -- "I would talk him

 6   out of it."

 7             Did I read that correctly?

 8        A.   Yep.

 9        Q.   And you responded by saying what?

10        A.   "We had a good chat.  Back on track.  When

11   you talk to him, please tell him to fix the petition

12   issue.  Thanks, Pascal."

13        Q.   So did you, in fact, take President Shalala's

14   instruction to talk Dr. Livingstone out of resigning

15   from that position?

16        A.   No, not at all.

17        Q.   So were you -- why did you tell President

18   Shalala "We had a good chat.  Back on track?"

19        A.   I guess that she probably asked me to ask him

20   not to resign.

21        Q.   Correct.  And you got back to her and she

22   asked you not to talk to him 8:04 a.m.  Correct?

23        A.   I'm sorry?

24        Q.   Do you see her email to you on December 11 at

25   8:04 a.m.  Correct?  It says "I would talk him out of
```

1    it."  Correct?

2        A.   Yeah.

3        Q.   And you responded to Donna Shalala "We had a

4    good chat."  "We had a good chat."  Who are you

5    talking about?

6        A.   I'm not sure.  I'm sorry.  It could be

7    Livingstone, but I can't be sure just from this email.

8        Q.   So you don't recall whether you talked Alan

9    Livingstone out of resigning from that position?

10       A.   No.  The talk with Livingstone about

11   resigning from his position, if I recall correctly,

12   was way later.

13       Q.   Let's go to the bottom of the email again.

14   Follow the email chain.  Dr. Livingstone emails

15   President Shalala at 6:52 a.m., correct, indicating "I

16   think I can best serve you in the medical school by

17   resigning as being the executive dean of clinical

18   affairs."  I think he means effective immediately.  Do

19   you see that?

20       A.   Yeah.

21       Q.   And then, go up please, Jackie, at 8:04 a.m.

22   President Shalala emails you and says "I would talk

23   him out of it."  Correct?

24       A.   Yeah.

25       Q.   And you respond later in the day, at 1:15,

1    close to 1:16 p.m. on December 11th, "We had a good

2    chat.  Back on track.  When you talk to him, please

3    tell him to fix the petition issue.  Thanks.  Pascal."

4           Did I read that correctly?

5        A.   Well, it is possible that Donna Shalala

6    mentioned to me something about the rumor that, you

7    know, this issue with Charlie Nemeroff and that we

8    talked about it with Alan and that's the reason why I

9    wrote what I wrote.

10       Q.   And you talked him out of resigning.

11   Correct?

12       A.   I can't tell you from this email.  But it's

13   most likely related to it, yes.

14       Q.   And you asked President Shalala when you

15   talked to her "Please tell him to fix the petition

16   issue."  Did you not write those words?

17       A.   Yeah.  I think that it is the issue -- I

18   probably had a conversation with him relative to what

19   he pretended was an attempt for me to exchange a

20   petition for a report of TMG, which never happened and

21   was a lie, and we may have talked about it at that

22   time.

23       Q.   All right.  But you were asking President

24   Shalala to tell him, meaning Alan Livingstone, to fix

25   the petition issue.  Correct?

1    A.   No.  What I -- what I said is that this issue

2    of exchanging a petition for a -- for a report was

3    completely false and I thought we wanted for Donna to

4    talk to him about it.

5    Q.   But you weren't on the email chain between

6    Alan Livingstone and Leonard Abess or Alan Livingstone

7    and Laurence Gardner and Rafic Warwar, were you?  You

8    never saw that email at that time.  Correct?

9    A.   No.  But there were rumors about the fact

10   that I was supposed to have asked Charlie Nemeroff to

11   talk to Alan Livingstone and tell him that if he was

12   no longer promoting the petition, which was months

13   before this, this was way after the petition was out

14   and everything was done.  There was absolutely no

15   chance that this was -- Alan had no control at that

16   time of the petition.

17        The petition had been submitted to the

18   faculty senate and was out and about.  So the only

19   thing that I could have been mentioning is to make

20   sure that Donna told him that it never happened that I

21   asked Charlie Nemeroff to try to put pressure on Alan

22   Livingstone to stop the petition in such a way that

23   the report would not come out.

24   Q.   Why would you even give it any -- lend it any

25   credence, Dr. Goldschmidt?

```
 1        A.   Because it was reported to me.  I would never

 2   behave that way.  It is completely in contradiction

 3   with my most basic principles.  Okay?  I just wanted

 4   this thing to be absolutely clear that it never

 5   happened and that Livingstone would stop spreading the

 6   rumor.

 7             That's what I was talking about by fixing

 8   this issue of petition.  He was spreading rumors that

 9   were destroying my reputation and that were completely

10   false.

11        Q.   Dr. Livingstone was spreading rumors.

12   Correct?

13        A.   That's what I'm saying.  He was spreading

14   rumors and Donna had to fix it, because it was

15   disgusting.  I never did that.  This was way after the

16   petition became public.

17             It's interesting, by the way, that he copied

18   my two predecessors who were deans of the medical

19   school.

20        Q.   And what's the significance of that?

21        A.   I think that they -- they were pretty upset

22   with the success that we were able to achieve at the

23   medical school and the health system and everything

24   around them, and they were -- they were extremely

25   strong supporter of the relationship between UM and
```

1   Jackson, never willing to evolve it and keep it the

2   way it was in the middle of the century when UM

3   medical school was created.

4        I think there was a lot of jealousy on their

5   part and I think that they played a very negative and

6   destructive role.

7        I know for a fact that one of the two was

8   actively involved in trying to get fired a remarkable

9   faculty and leader at the University of Miami, Bill

10  O'Neall, and their role was just completely outrageous

11  in trying to sabotage what we were creating.

12  Q.   Do you know, did President Shalala ever talk

13  to Alan Livingstone about fixing the petition issue?

14  A.   Well, I mean, she knew that I was very

15  annoyed with the rumors that were circulating that I

16  would put pressure on Livingstone as an exchange for

17  the review of the IML.  The review of the IML had

18  nothing to do with it.

19        It had to do with the fact that we had very

20  reasonable individuals in the part of Dr. Richard Cote

21  and Phil Chen, I believe, in pathology, who were

22  telling us that they were -- a lot of things that were

23  very reprehensible that were happening and we simply

24  had to clarify what was going on.  It had absolutely

25  nothing to do with the petition.  It had absolutely

1    nothing to do with trying to gets rid of Alan

2    Livingstone.

3            Actually, as you see, Alan Livingstone

4    apparently was volunteering to step down.  I never

5    asked him to step down, until he did something that

6    was very apprehensible that I could not let go.  It

7    was the third time it happened and it could no longer

8    be condoned.

9        Q.   Do you think that the investigation, the TMG

10   investigation, was causing concern to Alan

11   Livingstone?

12           MR. ISICOFF:  Object as to form.

13       A.   I'm not in the head of Alan Livingstone.

14   But, yeah, I'm sure that he was -- he was probably

15   feeling targeted.

16       Q.   And what do you base that on?

17       A.   His reaction.

18       Q.   His reaction --

19       A.   The letter that he wrote to the chairman of

20   the board of trustees at UM, probably two prior -- two

21   prior deans of the medical school that were probably

22   on his side.

23       Q.   So do you think that the TMG investigation,

24   because of the TMG investigation, Alan Livingstone was

25   trying to deflect that issue by raising this issue

1    against you, Dr. Lord and Jennifer McCafferty?

2            MR. ISICOFF:  Object as to form.

3        A.   I think that -- I think that it is very clear

4    that Alan Livingstone made up this story for a reason,

5    and I think that he may have been concerned with the

6    consequences of a report on him.

7        Q.   And the consequences would have been what, in

8    your opinion?

9        A.   Well, it depends on what was in the report.

10   As you know, we had a preliminary report received from

11   the TMG.  I don't know exactly when we got it.  I

12   think it was a little bit later.  But then the 11th.

13   But I'm sure he was a little bit uncomfortable about

14   it.

15       Q.   More than a little uncomfortable, wouldn't

16   you say?

17           MR. ISICOFF:  Object as to form.

18       Q.   Dr. Goldschmidt, would you agree with me that

19   Dr. Livingstone's behaviors were indicating that he

20   was more than a little bit uncomfortable?  Correct?

21           MR. ISICOFF:  Object as to form.

22       A.   Most likely.  I'm not in his head, thank God.

23       Q.   But you saw his email.  Correct?  You saw his

24   email to President Shalala offering to resign from his

25   executive position.  Correct?

```
1        A.    Yep.

2        Q.    Do you think that came out of thin air or do

3   you think that the TMG investigation had something to

4   do with it?

5              MR. ISICOFF:  Object as to form.

6        A.    That I'm not sure, actually.

7        Q.    Well, with regard to the email that he

8   generated to Rafic and --

9        A.    I know.  I know.  But I think that what may

10  have gone in his head, and, again, this is totally

11  speculative on my part --

12       Q.    I don't want you to speculate.  I don't want

13  you to speculate.

14       A.    Again, I'm not in his head, so if you want my

15  opinion on it --

16       Q.    Okay.

17       A.    Do you?

18       Q.    Yes.

19       A.    Okay.  I think that he may have played that

20  card.  Because if he was resigning, it would look as

21  if, indeed, the TMG report was to get rid of him.

22             And that's the reason why he was -- he was

23  pushing for it in such a way that he could go to his

24  friend, you know, Dean Fogel and Clarkson, and have

25  them connect with the rest of the faculty to say I
```

1    told you they want to get rid of me.

2              (Thereupon, the document was marked as

3              Exhibit 25 for identification.)

4    BY MR. SLOMAN:

5        Q.    I want to show you now what's been marked as

6    Exhibit 25, which is an email dated December 14th,

7    2012.  This is from you to Don Shalala regarding Tom's

8    presentation.

9        A.    Uh-huh.

10       Q.    Do you recall what this was in reference to?

11       A.    Yes.

12       Q.    What?

13       A.    Well, I'm sure that it was in reference to a

14   presentation that Tom LeBlanc made where he recognized

15   Mark for the great work that he was doing for the

16   medical school; where, actually, Mark was like an

17   individual who was taking advantage of a very complex

18   situation for his own support, for his own success.

19   And I wanted for Jack and Nelson, Jack as COO and

20   Nelson as CFO, to be recognized for the work that was

21   presented by them.

22       Q.    Would it be fair to say that Dr. Lord and

23   Nelson Weichold were responsible for that

24   presentation?

25       A.    I'm not saying that they were responsible for

```
 1    the presentation.  What I'm saying is that Jack had

 2    done a terrific job in turning the financial situation

 3    of the medical enterprise around by organizing a RIF

 4    that was successful financially.

 5         Q.   Did you ever reprimand Alan Livingstone?

 6         A.   Yes.

 7         Q.   For what?

 8         A.   A number of things.

 9         Q.   Can you tell me what you reprimanded him for.

10         A.   I'm going to have to divulge confidential

11    information.  Am I allowed to?

12         Q.   Are you referring to the incident with a

13    female resident?

14         A.   That's one of them.

15         Q.   Okay.  Tell us about that.

16         A.   Okay.  So the daughter of a very good friend

17    of mine, Duke Cameron, who is a great cardiac surgeon,

18    he was one of my favorite cardiac surgeons at Johns

19    Hopkins University, his daughter came to medical

20    school and she wrote to me a letter that was -- that

21    was very upsetting where she described a situation

22    where she was interviewing I think for residency in

23    surgery with Dr. Livingstone and he asked her to step

24    up on a chair and he said "You don't look like

25    somebody who practices some form of yoga."
```

1    Q.   Dr. Goldschmidt, not to interrupt you.

2    Didn't it have something to do with her comments that

3    she was a runner and Dr. Livingstone responded to

4    stand up and said something to the effect "It doesn't

5    look like you run very much" or something like that?

6    A.   No.  It has to do with yoga, if I recall

7    correctly.  It was a form of yoga that is more

8    intensive, like an intensive yoga or something like

9    that.  And the comment was "You don't look like

10   somebody who performs intensive yoga."

11        Needless to say, my friend Duke, who was

12   extremely upset, she was extremely upset, she told

13   me -- she wrote to me when Alan was selected as the --

14   as a member of my team in his administrative function,

15   beyond being the chair of the department of surgery,

16   which he was before I came.

17        And then there were two more events.  One

18   event were in front of somebody who was being

19   interviewed.  The leading administrator for the

20   department of medicine was told by Alan Livingstone

21   that he needed a testicle transplant.  Again, the

22   character of Alan Livingstone is not my favorite.  I

23   prefer stopping here.  You get the idea.

24        The third time that -- I think this was

25   actually the third time, he had violated a code of

1    conduct as a faculty at University of Miami and we had

2    a meeting with the senior leadership of the

3    university, which Aileen attended, and a decision was

4    made collectively that Alan Livingstone had to resign

5    from his position as chair as well.

6         Q.   Thank you.

7              (Thereupon, the document was marked as

8              Exhibit 26 for identification.)

9    BY MR. SLOMAN:

10        Q.   I would like to show you now what's been

11   marked as Exhibit 26.  Dr. Goldschmidt, I'm showing

12   you an updated December 14th, sent December 16th, from

13   Dr. Lord to executive daily update, which included you

14   and a number of other individuals on that email chain.

15             I'd like to draw your attention, sir, to --

16   do you see right above takeaways, it says one on one

17   with the president.  Compliance update, affiliates,

18   discussion and Miller School climate.  Do you see

19   that, sir?  Do you see that, Dr. Goldschmidt?

20        A.   Yeah.  I'm reading it.  When is this from?

21        Q.   This is dated -- if you go to the top,

22   please, Jackie -- it was sent December 16th, but it

23   was an update, dated December 14th.

24        A.   Yeah.

25        Q.   By the way, Dr. Goldschmidt, did you and

```
 1   other members in the executive daily update chain

 2   often send their update on, let's say, December 14th

 3   and then send it, too, December 16th?  Was that

 4   common?

 5        A.   We used to send regular updates, yes.

 6        Q.   Okay.  And with regard to this particular one

 7   from Dr. Lord, if you can go down just a little

 8   Jackie, where it says one on one with the president,

 9   compliance update, affiliates discussion and Miller

10   School climate, do you recall Dr. Lord telling you

11   about his one on one with the president concerning

12   those topics?

13        A.   I don't remember this one in particular.

14   Yeah, I'm sure that he had mentioned before having

15   conversation with the president on these issues.

16        Q.   And it was common to document meeting like

17   that in these updates.  Correct?

18        A.   Yeah.  I think -- I believe so, yes.

19        Q.   All right.

20             (Thereupon, the document was marked as

21             Exhibit 27 for identification.)

22   BY MR. SLOMAN:

23        Q.   Let me show you now what's been marked as

24   Exhibit 27.  I would like you to go -- Dr.

25   Goldschmidt, this is --
```

1          A.   2010, yeah.

2          Q.   Who is Dr. Chen?

3          A.   Philip Chen was a major administrator in the

4    department of pathology.

5          Q.   Okay.  And he's writing to Norman Altman and

6    Timothy Cleary.  Do you know who those individuals

7    were?

8          A.   Yeah.

9          Q.   Who were they?

10         A.   Altman was the ombudsman for the School of

11   Medicine.

12         Q.   Did you say ombudsman?

13         A.   Ombudsman, yeah.

14         Q.   And Timothy Cleary, who is he?

15         A.   Not sure.  He was not -- I don't think he was

16   at the medical school.  He may have been ombudsman for

17   the university.  I'm just guessing.  I don't know.

18         Q.   Okay.  He writes "Dear Norman and Tim, As a

19   faculty member of University of Miami Miller School of

20   Medicine, I'm writing to, one, express my concerns

21   about the secretive nature surrounding the recent

22   medical faculty council vote to support, quote, change

23   of leadership, and, two, to request transparency of

24   the voting records from the council members."

25              He goes on and he writes "Both of you have

1    been extraordinary in representing our faculty on the
2    council and senate.  Personally, I am deeply
3    appreciative of the longstanding, timely and open
4    communications you have conducted with our faculty.
5    It is with this background that I am surprised to
6    learn about the vote today through rumor mills.  I
7    received no prior communications that there was an
8    active consideration for a formal motion within the
9    faculty council or senate.  There was no discussions
10   with you, my representatives, about the issue, nor
11   have I heard from you about the results after the vote
12   and how I and my colleagues were represented.  This is
13   a drastic deviation from how historically you have
14   been representing us on these two important bodies."
15          Then he goes on to request immediately to
16   provide additional information on this important
17   issue.  Do you see that?
18        A.   Yeah.
19        Q.   Have you ever seen that email before?
20        A.   Not that I remember, no.
21        Q.   Can you go up a little bit.
22          Now, you somehow got -- I didn't mean to
23   trick you or anything, but somehow you got this email.
24   Do you see you forwarded this email on to President
25   Shalala?

1      A.    Yeah.  I didn't remember it, but there were

2  many emails, so, you know, I just may not remember.

3      Q.    Right.  So now does this refresh your

4  recollection after seeing you're forwarding the email

5  and your comment to President Shalala?

6      A.    Oh, yeah.  Yeah, I had to.

7      Q.    Okay.  And so what do you remember about this

8  email, your reaction and you're forwarding the email

9  on to President Shalala?

10      A.    I'm sorry.  What's your question?

11      Q.    I want to know what caused you to write this

12  to President Shalala.  "This is beyond belief.  My

13  nine year old son Dylan has asked me if I have been

14  fired.  This is all coming from a rather limited group

15  of naysayers, but the damage is huge."

16      A.    Yeah, I think that, you know, according to

17  the -- okay, so according to the faculty bylaws, the

18  review of deans at the University of Miami happens

19  every four years, and I got the results of my last one

20  I think in 2011, which, again, was very good.

21          I think that there was a group of members of

22  the faculty senate that were trying to move the date

23  of my next review, which should have been -- which

24  result should have come in 2013, at some point in

25  2013, and they were trying to accelerate it.  I think

1    that's what it is, but I'm not even sure.

2            But whatever it was, one day my son came, my

3    nine year old son, who was at Beth Am, came to me and

4    said, "Hey, dad, I heard that you were fired."

5        Q.  And so did you attribute this to the limited

6    group of naysayers?

7        A.  The push was from a small group of people,

8    yes.

9        Q.  And who was that small group of people that

10   you were referring to?

11       A.  I think that they were members of the faculty

12   senate.

13       Q.  And was Dr. Livingstone behind this?

14       A.  God only knows.  God only knows.  I presume

15   he did, but I can't -- I can't confirm it.  There

16   was -- in the review of the medical center, that thing

17   we mentioned earlier, I know that a lot of the people

18   who went to testify were selected by Livingstone.

19       Q.  Do you see in the middle where it says from

20   Philip Chen, December 14, 5:18:38 p.m. to David Seo

21   and a list of others?  Do you see that?  It says "FYI

22   on what Mad Dog has done."  Do you see that?

23       A.  Yeah, I see that.

24       Q.  Who do you understand Mad Dog to be?

25            MR. ISICOFF:  Object as to form.

```
 1          A.   I don't know.  I really don't know.  I'm
 2     sorry.  I'm not aware of who Mad Dog was.  I knew the
 3     football player Mad Dog was a wonderful guy, and
 4     thanks to him we raised $50 million for the Sylvester
 5     Cancer Center.  But I have no idea who Mad Dog is in
 6     the case of this email.
 7               (Thereupon, the document was marked as
 8               Exhibit 28 for identification.)
 9     BY MR. SLOMAN:
10          Q.   Now let me show you what we marked as Exhibit
11     28.  This is an email from you to Tom LeBlanc, copying
12     Donna Shalala and Judd Goldberg, do you see that, re
13     petition?
14          A.   Uh-huh.
15          Q.   Let's go down, if you will, please.  Okay.
16     On December 14th at 3:01 p.m. you wrote an email to
17     Tom LeBlanc, copying President Shalala and Judd
18     Goldberg.  Do you see that?
19          A.   Yeah.
20          Q.   It reads, "Dear Tom, I know that you are
21     aware of the circulation of a petition at the medical
22     campus that targets specifically Jack and I.  We saw a
23     copy of the petition and it makes several points that
24     have to do with the direction of the Miller School, a
25     claim that our relationship with Jackson is worse and
```

```
 1   that we are not providing support to our missions of

 2   patient care, education and research.

 3           "These accusations are odd, since when I took

 4   over the leadership of the Miller School, our entire

 5   training program at Jackson was on terminal probation

 6   status by the ACGME and several individual programs

 7   were in jeopardy.  Since then, the overall program and

 8   all individual programs have been reaccredited and the

 9   Miller School was also been reaccredited by the LCME."

10           Do you see that?

11   A.    Yeah, yeah.

12   Q.    Is that a true statement?

13   A.    It is.

14   Q.    It goes on.  "Our research enterprise that

15   was dribbling down to 51 in the ranks has been turned

16   around and we are now top 40 research medical school,

17   38 with programs that are the envy of peer

18   institutions."

19           Is that a correct statement?

20   A.    Correct.

21   Q.    "Our clinical enterprise is evolving rapidly,

22   with many imperfections still, but a much more robust

23   structure in productivity than before 2006.  Our med

24   mal issue has been controlled and is now manageable."

25           Was that true?
```

1          A.    Totally true.

2          Q.    Going on.  "Financially, we are in the black

3    and better than planned for this year.  To get there,

4    we had to make significant changes in our

5    organization, but that is the case for most academic

6    medical centers."

7                Is that also true?

8          A.    Yes.

9          Q.    Continuing.  "Our relationship with Jackson

10   management, Magoya and Steigman, is strong and our

11   Jackson activities are improving."

12               Was that a true statement?

13         A.    Yeah.  Remember, I voted for Mayoya to

14   become -- actually, Magoya, with an event for the

15   opening of the Christine Lynn Rehab Hospital, which I

16   was instrumental in helping Carlos to get the funds

17   for, and he publicly thanked me for my contribution.

18   Actually, I was the second person that he mentioned.

19         Q.    Continuing, it says, "Hence, while there is a

20   morale issue on campus, issues that we are dealing

21   with and we should, and the changes that we had to go

22   through over the last few years (sic) were incredibly

23   challenging, it is unfair to blame the administration

24   for the challenges of Jackson, the economy and the

25   changing state of U.S. academic medical centers."

1          Was that a true statement?

2     A.   You meant the past few months, not few years.

3     Q.   Oh, I'm sorry.  I apologize.

4     A.   Yeah.  I misunderstood you.  Yeah, that's

5 correct.

6     Q.   And then, finally, where it says "We should

7 like to understand better the meaning and possible

8 consequences of this petition for us," you were

9 referring to you and Jack.  Correct?

10    A.   I assume so.

11    Q.   "Specifically, could it trigger an early vote

12 on the Miller School dean set up by the UM senate?  My

13 next vote is supposed to be in the following year.

14 The last one after four years showed strong support

15 for the leadership.  It seems fair for Jack and I to

16 be kept updated on these issues."

17         Did I read that correctly?

18    A.   Yes.

19    Q.   And you believed that.  Correct?

20    A.   Yes, totally.

21    Q.   If you go up, please, Jackie.  Now Tom

22 LeBlanc responded and referenced that he had heard

23 rumors of signed petitions, but I haven't been

24 presented with any real evidence that one exists.  Do

25 you see that?

1          A.    Uh-huh.

2          Q.    Did you have more information about the

3     petitions than Tom LeBlanc did on December 14th, 2012?

4               MR. ISICOFF:  Object to the form.

5          A.    Yeah.  I believe I was provided with a copy

6     of it.

7          Q.    Right.  And you, in fact, got a copy of the

8     petition a few days earlier.  Correct?

9          A.    I thought that you showed me an email where I

10    copied the petition to Donna Shalala?

11         Q.    That's correct.  That was -- you attached the

12    petition to a -- on Exhibit 18.  On Exhibit 18 you

13    attached that exhibit.  That email was December 6.

14    Correct?  You had a copy of the petition.

15         A.    Okay.  All right.  So, yes.  Tom LeBlanc does

16    not seem to be in a position where he had seen it.

17         Q.    Well, I think it says there "As we discussed,

18    I heard rumors of signed petitions."

19               The petition that you sent was not signed.

20    Correct?

21         A.    Signed by whom?

22         Q.    Well, let's go back to Exhibit 20.  I'm going

23    to show you again Exhibit 20, which is an unsigned

24    version.  Do you see that?

25         A.    Yeah.  But, I mean, the petition was a series

```
1    of signatures.

2         Q.   Right.

3         A.   I don't think I saw -- I definitely did not

4    see the signature of the individuals that signed the

5    petition.  I only saw a summary of the petition.

6         Q.   Excuse me.  You saw Exhibit 20.  Correct?

7         A.   Yeah, I definitely saw that.

8         Q.   And this is attached to the email that you

9    sent on December 6th, 2011, and which was attached to

10   Exhibit 18, dated December 6th, 2012, an email that

11   you sent to President Shalala and to Jack.  Correct?

12        A.   Correct.

13        Q.   So now on December 14th, in reference to

14   Exhibit 28, let's go to Exhibit 28, you see Mr.

15   LeBlanc at 10:51 p.m. writes to you on December 14,

16   "Dear Pascal, As we've discussed, I've heard rumors of

17   signed petitions, but I haven't been presented with

18   any real evidence that one exists."

19        A.   Okay.

20        Q.   So at this point in time, on December 14th,

21   you hadn't seen a signed petition either.  Correct?

22             MR. ISICOFF:  Object as to form.

23        A.   I mean, this was provided me, if I recall

24   correctly, by the -- by the president of the faculty

25   senate.
```

1    Q.   My question is a little bit different.  You

2    hadn't seen any signatures and you didn't know the

3    count of how many faculty members had signed the

4    petition.  Correct?

5         MR. ISICOFF:  Object as to form.

6    A.   I'm not sure.  My recollection is that I knew

7    that there was about 750 faculty that had signed, and

8    I think I learned that from the president of the

9    faculty senate.

10   Q.   You respond to Mr. LeBlanc on December 15 at

11   3:41 a.m. "Thank you for your response.  I heard last

12   night that the faculty council of the Miller School of

13   Medicine had organized a vote in the afternoon.

14   Apparently, including the members of the council,

15   there are 485 signatures to the circulating petition.

16   I have obtained a copy of the petition and will

17   forward -- and will send it to you next.  It targets

18   both Jack and I and asks for our removal."

19        Does that refresh your recollection?

20   A.   Yeah.  I thought it was more than that, but

21   it's possible.

22        (Thereupon, the document was marked as

23        Exhibit 29 for identification.)

24   BY MR. SLOMAN:

25   Q.   Let's go to Exhibit 29.  Down to the bottom,

```
 1    please.  Dr. Goldschmidt, I'm showing you an email

 2    from Jennifer McCafferty, dated December 18, at 5:43

 3    p.m., and it reads, "Dear Pascal and Jack, Please find

 4    the memorandum describing the initial observations

 5    from the TMG assessment of the MTI attached.  I also

 6    attached the agendas for each of the site visits, the

 7    biographies of the TMG Consultants and the initial

 8    analysis comparing transplant volumes, from UNOS

 9    website with net revenue, from the IML from medical

10    finance department of surgery, from CY2005 to present.

11          "We expect a final report will be forthcoming

12    in early 2013.  Please advise on the next steps and

13    recommendations.  If you are in agreement with the

14    follow-up TMG engagement, please let me know, as I

15    would like to move forward prior to my going on

16    maternity unit leave.

17          "I recognize this is a lengthy memo.  Please

18    let me know if you prefer face-to-face meetings to

19    review takeaways."

20          Do you remember receiving that from Jennifer

21    McCafferty?

22      A.   Yep.

23      Q.   And you responded "Thank you, Jennifer, for a

24    thorough update.  There are many unanswered questions

25    and we do need full TMG engagement to get them
```

1    answered."

2           Did I read that correctly?

3      A.    Correct.

4      Q.    And you authorized Jennifer to go forward.

5    Correct?

6      A.    Yeah.  I mean, Jennifer was not reporting to

7    me directly, but I'm sure that I encouraged her to go

8    forward.  Although, if I recall, there was an issue of

9    maternity for her.

10     Q.    Right.  She was pregnant at the time.  But

11   you, in fact, said, "We do need follow-up TMG

12   engagement to get them answered."  Correct?

13     A.    Correct.

14           (Thereupon, the document was marked as

15           Exhibit 30 for identification.)

16   BY MR. SLOMAN:

17     Q.    Let's go now to Exhibit 30.  And this is an

18   email from -- who is Magaly Robitaille?

19     A.    My assistant.

20     Q.    And so she sent an email, dated December 19

21   at 9:07 a.m. on behalf of you.  Correct?

22     A.    Yes.

23     Q.    And it reads "Donna, Below are the first

24   phase of deliverables from TMG, the group that

25   reviewed the MTI, IML and OPO as summarized by

1    Jennifer.  These reports are framed in a way to

2    provide perspective and raise key questions -- the

3    group was reluctant to put specific, quote, unquote,

4    judgmental comments in this first report."

5           Did I read that correctly?

6       A.   Yes.

7       Q.   What did you mean when you wrote "The group

8    was reluctant to put specific judgmental comments in

9    the first report?"

10      A.   Whether they thought that it was a good

11   organization, an organization that could be trusted on

12   up.  But I guess prior to MTI, IML and now in the OPO.

13      Q.   "As a summary of the key takeaways," it goes

14   on, "the management of the MTI has been a problem."

15          Do you see that?

16      A.   Yes.

17      Q.   I read that correctly.  Correct?

18      A.   Yes.

19      Q.   "There are many financial/conduct of business

20   questions raised about IML practices, both in service

21   to patients and to the OPO."

22          Did I read that correctly?  You have to say

23   yes or no.

24      A.   Yes.

25      Q.   "And the business practices of the IML and

1  the OPO have resulted in extraordinary revenue growth

2  benefitting the department of surgery."

3        Did I read that correctly?

4  A.   Yes.

5  Q.   And you then said "The next phase will be a

6  detailed audit of bills, charges and payments for

7  services that flow through the IML."  Correct?

8  A.   Correct.

9  Q.   And these financial or conduct of business

10  questions raised about the IML practices, this was due

11  to many of the problems identified by Phil Chen and

12  others in the department of pathology.  Correct?

13        MR. ISICOFF:  Object as to form.

14  A.   That was the concern, yes.

15  Q.   In fact, there was concern about

16  inappropriate and unnecessary and redundant testing

17  via protocols.  Correct?

18  A.   Yes.

19  Q.   There was concern about the IML surgery.  IT

20  set up a one click order approval and provider sign-in

21  when accessing the TPIS system.  Correct?

22  A.   I haven't used it, but I heard about it.

23  Q.   That also the IML -- there were also concerns

24  about the IML performing many routine lab tests on

25  Jackson patients when Jackson's own lab offered

1    identical services at much lower cost.  Correct?

2        A.   That one I'm less familiar with, but I trust

3    what you -- I guess you have information on that.

4        Q.   And there was also concern that the IML split

5    the test between the HLA lab and the IML lab to game

6    the system, which took advantage of cost-based

7    reporting going from higher cost tests and use of IML

8    for direct Medicare billing on tests with higher

9    reimbursements.  Correct?

10           MR. ISICOFF:  Object to the form.

11       A.   These were the concerns.  What is not part of

12   this enunciation of issues is what typically

13   Transplant Institute do across the country.

14           I don't know if this was an unusual behavior

15   or a standard behavior on the part of departments of

16   Transplant Institute or transplant departments.  And

17   that's the reason why we needed to have additional

18   review by people who do that professionally.

19       Q.   Well, did you have -- was there a transplant

20   division at Duke University?

21       A.   There was a very strong transplant center at

22   Duke University, yes.

23       Q.   Was there a transplant pathology testing in

24   the department of surgery at Duke University?

25       A.   I don't know.

1     Q.   Had you ever heard of transplant testing

2   being in the department of surgery at any other

3   university?

4     A.   I never checked.  In general, look, the

5   correct thing to do is always to have testing done by

6   the department of pathology.  The department of

7   pathology is fundamentally responsible for the

8   provision of testing, and that includes anything from

9   glucose, your glucose level, to very sophisticated

10   biopsy results.

11         These departments are the centerpiece of

12   laboratory testing in any medical center.  And any

13   time you detach the pathology responsibility to a

14   non-pathology service, you encounter difficulties.

15         And so Jack and I very strongly felt that the

16   IML should be in the department of pathology.  We were

17   pretty open about that with Dr. Livingstone, and Dr.

18   Livingstone very strongly opposed to it.

19         You know, it's an issue of compliance.  It's

20   just much more difficult to make sure that you have

21   compliant practices whenever a laboratory is outside

22   the department of pathology.

23         In the case of the IML, that structure

24   existed in the department of surgery when I came.  It

25   was a mom and pop organization.  There were some

1    research studies that were done, together with the

2    clinical studies.  It needed to be - to be revised

3    substantially.

4           I think that -- I think that the department

5    of surgery cleaned that quite a bit, but never agreed

6    to move it to the department of pathology.

7       Q.   Dr. Goldschmidt, the other -- in your letter

8    or in your email to President Shalala, it references

9    "And the business practices of the IML and OPO have

10   resulted in extraordinary revenue growth benefitting

11   the department of surgery."

12          And, again, just so the record is clear, who

13   was running the department of surgery?

14      A.   Who was leading the department of surgery?

15      Q.   Yes.

16      A.   Dr. Livingstone.

17          (Thereupon, the document was marked as

18          Exhibit 31 for identification.)

19   BY MR. SLOMAN:

20      Q.   Now I'd like to turn your attention to

21   Exhibit 31.  Dr. Goldschmidt, this is an email from

22   you to President Shalala responding to her email to

23   you at 12:14 p.m.  Do you see that?

24      A.   Yeah.

25      Q.   This is the day after sending the assessment

```
 1   update that we just went over in Exhibit 30.  This is

 2   President Shalala emailing you the very next day.  Can

 3   you read what she wrote.

 4       A.   "You need to come alone tomorrow."

 5       Q.   And responded?

 6       A.   "Okay.  Will do."

 7       Q.   And did you speak to her about what she

 8   wanted to see you about?

 9       A.   No.

10       Q.   And did you, in fact, go to see her the next

11   day, on December 21st?

12       A.   I presume I did, because, otherwise, I would

13   have said so.

14       Q.   Okay.  Do you remember what your meeting was

15   about?

16       A.   No.

17       Q.   Do you remember whether President Shalala at

18   that meeting told you to terminate Dr. Lord?

19       A.   I don't think so.  My recollection is that it

20   happened early in January.

21       Q.   So what do you recall about this meeting, if

22   it wasn't about that?

23       A.   I don't remember that meeting.  I'm sorry.

24            (Thereupon, the document was marked as

25            Exhibit 32 for identification.)
```

```
1     BY MR. SLOMAN:

2        Q.   Okay.  Let me show you what's been marked as

3     Exhibit 32.  I'm showing you, Dr. Goldschmidt, Exhibit

4     Number 32.  Do you see that?  It's a December 21st,

5     2012, email.

6        A.   Yeah.

7        Q.   It says "The president has directed that,

8     effective immediately, the investigation of the IML be

9     led and managed by internal audit."

10            Do you see that?

11       A.   Yes.

12       Q.   Did you know that email was coming out?

13       A.   No.

14       Q.   Did that take you by surprise?

15       A.   Not totally, no.

16       Q.   Why?

17       A.   Because, typically, when things escalate in

18    issues that have to do with compliance, then the audit

19    department takes care of them.

20       Q.   And sitting here today, do you remember

21    whether your meeting the day before had anything to?

22    do -- or, I'm sorry, strike that.

23            According to Exhibit 31, you told President

24    Shalala that you would come and see her the following

25    day, which would have been December 21st.  Correct?
```

 1      A.   Correct.

 2      Q.   And on that very same day -- Exhibit 32 was

 3  emailed at 4:40 p.m.  Does that refresh your

 4  recollection as to what you spoke to President Shalala

 5  about?

 6      A.   Not really.

 7           MR. SLOMAN:  Why don't we take a break.

 8           THE VIDEOGRAPHER:  This marks the end of

 9      video file number four.  The time is 2:20 p.m.

10      We're going off the record.

11           (Thereupon, a brief recess was taken, after

12      which the following proceedings were had:)

13           THE VIDEOGRAPHER:  We're back on the video

14      record.  This is the start of video file number

15      five of the deposition of Dr. Pascal Goldschmidt.

16      The time is 2:31 p.m.

17           (Thereupon, the document was marked as

18           Exhibit 33 for identification.)

19  BY MR. SLOMAN:

20      Q.   Dr. Goldschmidt, I'm showing you what's been

21  marked as Exhibit 33.  And before we get to that, Dr.

22  Goldschmidt, was the IML still in the department of

23  surgery when you left as dean?

24      A.   I believe so.

25      Q.   You believe it remained in the department of

1    surgery throughout your tenure as dean of the Miller

2    School of Medicine?

3        A.   I think so, yeah.

4        Q.   I'm showing you Exhibit 33, which is an email

5    from Thomas LeBlanc to Donna Shalala, dated December

6    22, 2012.  Do you see that?

7        A.   Yep.

8        Q.   And, actually, let me go to the 9:45 a.m.

9    email from Donna Shalala to Thomas LeBlanc.  Do you

10   see that?  It says "Pascal intends to have a final

11   conversation with Jack on the 31st.  Nothing must

12   leak.  Jack may want to talk to me on the 2nd."

13            Do you see that?

14       A.   Okay.

15       Q.   So does it refresh your recollection, Dr.

16   Goldschmidt, whether you had met the president the day

17   before, on the 21st, and she instructed you to

18   terminate Dr. Lord on the 31st?

19       A.   My recollection is that we had a phone call.

20   But I do not remember that it was a one-on-one

21   conversation.

22       Q.   Okay.  But you see what she wrote to Mr.

23   LeBlanc.  You don't deny that timeline, do you?

24            MR. ISICOFF:  Object as to form.  Could you

25       clarify what you mean by that.

 1           MR. SLOMAN:  Sure.  Dr. Goldschmidt testified

 2      that he didn't remember when he met with the

 3      president on December 21st about.  I'm asking him

 4      whether the December 22, 2012, email from Donna

 5      Shalala to Tom LeBlanc indicating that Pascal

 6      intends to have a final conversation with Jack on

 7      the 31st, nothing must leak, whether that

 8      refreshed his recollection as to what he met with

 9      Donna Shalala about on the 21st.

10           THE WITNESS:  Okay.  So around that time I

11      remembered that I was taking a family vacation.

12      And it is possible that Donna had mentioned

13      something to me at that meeting.

14           My recollection is that I received a phone

15      call when I was -- when I was on family vacation

16      from Donna and that's when she indicated to me

17      that she had decided to separate from Dr. Lord.

18 BY MR. SLOMAN:

19      Q.   Okay.  And whether it was a meeting or

20 whether it was a phone call, what do you remember her

21 telling you was the reason why she was -- instructed

22 you to terminate Dr. Lord?

23      A.   Yeah.  Because she said that it had become

24 impossible to deal with him; that he was not -- he was

25 not working with joint authority and the chairman of

1    the board, and that she had complaints from Carlos

2    Migoya, from the faculty, and that there was no way we

3    could continue to work with him.

4        Q.   And it was all during the telephone call or

5    was that the meeting?

6        A.   Again, it may be at the meeting.  But there

7    was also a phone call about timing.  Because I

8    remember I was asked to go to her house when I was

9    returning from the vacation.  And I met with Jack

10   after that meeting.

11       Q.   So did you go to President Shalala's house on

12   the 21st?

13       A.   I thought it was when I returned from

14   vacation.

15       Q.   Okay.  But you saw the email traffic

16   referencing -- let's go back to Exhibit 31.  Do you

17   see on December 20 at 12:14 p.m. Donna Shalala writes

18   "You need to come alone tomorrow."  And you responded

19   "Okay.  Will do?"

20       A.   Yes.

21       Q.   Okay.  Now, seeing Exhibit 31 and now that

22   I've shown you Exhibit 33, does it refresh your

23   recollection as to whether you met with Donna Shalala

24   concerning Jack's termination or whether you spoke to

25   her on the phone?

1    A.   Okay.  So, again, what I recall is that there

2    was a meeting with Donna and Tom LeBlanc, and I

3    thought that meeting was after the family vacation, to

4    discuss next steps.  And that there was a phone call

5    with Donna where we discuss the separation from Dr.

6    Lord.

7         I don't know if the phone call was on the

8    21st or 22nd.  But I know that there was -- there was

9    a period of one week between -- between the 21st and

10   the date of the meeting with Tom LeBlanc and Donna

11   Shalala, during which I was on family vacation.

12   Q.   So do you remember the sequence, whether you

13   met with her on the 21st?  Do you remember meeting

14   with her on the 21st, in light of Exhibits 31 and 33?

15   A.   I do remember -- I don't remember meeting

16   with her on the 21st.

17   Q.   Okay.

18   A.   I remember meeting with her and Tom LeBlanc

19   on my return from vacation.

20        And I also remember that before that meeting

21   with Tom LeBlanc and President Shalala, Donna had

22   shared with me her decision to separate with Dr. Lord.

23   Q.   Okay.

24   A.   I can't be more specific about my

25   recollection of the succession of events.  I agree

1    with the succession of events; the specific dates at

2    which they occurred is a little bit blurred, I must

3    say.

4        Q.   So when you said in Exhibit 31 -- actually,

5    strike that.

6            In Exhibit 31, when she said "You need to

7    come alone tomorrow" and you said, responded, "Okay.

8    Will do," that doesn't trigger a recollection that

9    you, in fact, went to her home on December 21st.

10       A.   It could have been to her office.

11       Q.   Okay.

12       A.   It was not -- I don't think it was the

13   meeting with Tom LeBlanc at that time.

14       Q.   Okay.  So you don't think that she told you

15   to terminate Dr. Lord on the 21st.  Is that fair?

16       A.   No, I didn't say that.  What I'm saying is

17   that I am not sure that the actual meeting with Donna

18   was on the 21st or whether it was a phone call and

19   then we met with Tom LeBlanc when I returned from

20   family vacation.

21       Q.   Whether it was a phone call or a meeting, did

22   you receive an instruction from the president to

23   terminate Dr. Lord?

24       A.   Yes.

25       Q.   And that was on December 21st.  Correct?

1     A.   I assume it was, based on these emails, yes.

2     Q.   And your instruction was to terminate him

3  from his COO position or all positions?

4     A.   My recollection it was to terminate him as a

5  COO, not as a faculty.

6     Q.   Okay.  And why did you -- why were you

7  waiting until the 31st to have that conversation, the

8  final conversation, with Jack?

9     A.   I believe I was on family vacation.

10    Q.   Okay.  And where did you go to?

11    A.   I didn't want to have that conversation on

12  the phone with him.  Needless to say, I was very upset

13  with it.

14    Q.   You were upset about President Shalala's

15  decision to terminate Dr. Lord?

16    A.   I was upset.  I was upset about losing Jack,

17  yes.

18    Q.   Back to Exhibit 33 for just a moment.  Why do

19  you think President Shalala told Mr. LeBlanc that

20  nothing must leak?

21         MR. ISICOFF:  Object as to form.

22    A.   That always what Donna does when there's

23  something important.

24    Q.   Do you know why you were instructed to

25  terminate Dr. Lord from his COO position?

```
 1              MR. ISICOFF:  Object as to form.
 2      A.   Because he was my direct -- my direct report.
 3      Q.   Okay.
 4      A.   Remember that Jack and I were friends.  This
 5  was not anywhere easy for me.
 6      Q.   And it was not easy for you, because you
 7  valued him.  Correct?
 8              MR. ISICOFF:  Object as to form.
 9      A.   He was a friend and I valued him, yes.  Jack
10  has wonderful qualities.
11              (Thereupon, the document was marked as
12              Exhibit 34 for identification.)
13  BY MR. SLOMAN:
14      Q.   I'm showing you what's been marked as Exhibit
15  34.  This is an email from Tom LeBlanc to Donna
16  Shalala.
17      A.   It's from Shalala to LeBlanc.  I'm sorry.
18      Q.   The first email is at 4:51.  Do you see that?
19      A.   Yeah.  Okay, okay.
20      Q.   Can you read that for us.
21      A.   "I just spoke with Alan.  He was qualified to
22  hear that oversight of the IML investigation was moved
23  to GC/internal audit and that he would have given a
24  chance to explain his position on the matter.  He
25  would prefer that we not initiate any other
```

```
 1   investigation regarding threats, real or implied, as
 2   there is every possibility that this whole episode was
 3   good intentions poorly delivered, and further
 4   investigation would only cause more problems for the
 5   Miller School of Medicine.  He is looking forward to
 6   meeting with the investigators and explaining his
 7   position."
 8        Q.   And do you see what President Shalala's
 9   response was?  "Correct?"
10        A.   Best --
11        Q.   "Correct.  Best conclusion."
12             Did you ever see this email before?
13        A.   No.
14        Q.   Did you know that Alan Livingstone was given
15   these promises?
16             MR. ISICOFF:  Object as to form.
17        A.   No, I didn't.  By the way, this is not the
18   way it's supposed to go.  I was the direct -- I was
19   the direct supervisor of both Dr. Lord and Dr.
20   Livingstone and, as a consequence, I should have --
21   this kind of communication should have come to me from
22   Mr. LeBlanc.  Composed, LeBlanc.
23        Q.   Well, sitting here today and reading this,
24   you don't feel that this was properly done.  Correct?
25        A.   In terms of my involvement, no.  In terms of
```

1    the fact that he went to internal audit, that is

2    completely expectable for something that escalate to

3    the level of seriousness, as this deal did.

4         Q.   Well, the effect of that, Dr. Goldschmidt,

5    was that TMG would no longer be involved in the

6    investigation.  Is that correct?

7              MR. ISICOFF:  Object as to form.

8         A.   I assume that internal audit would chose

9    whatever company they thought would be the most

10   appropriate, yes.

11        Q.   So the answer to my question is TMG would no

12   longer be involved.  Correct?

13        A.   Not necessarily.

14        Q.   Was TMG involved after this point?

15        A.   I'm sorry?

16        Q.   Was TMG involved after this point?

17        A.   Not that I know of.

18        Q.   They were not reengaged.  Correct?

19        A.   Not that I know of.  But there was another

20   organization that was involved.

21        Q.   Right.  We'll get to that.

22        A.   Okay.

23        Q.   And, again, just so the record is clear,

24   there was no merit behind Dr. Livingstone's

25   contention you or Dr. Lord had threatened him in any

```
 1    way.  Correct?
 2              MR. ISICOFF:  Object as to form.  Repetitive.
 3         Asked and answered.
 4         A.   I'm sorry.  What is your question?
 5         Q.   Let me ask a different question.
 6              You see where Mr. LeBlanc says he would
 7    prefer that we not initiate any other investigation
 8    regarding threats, real or implied.  Do you see that?
 9         A.   Uh-huh.
10         Q.   And, again, that refers to Dr. Livingstone's
11    contention that there was this implied or real threat
12    delivered to him through Charlie Nemeroff.  Correct?
13              MR. ISICOFF:  Object as to form.
14         A.   That's a speculation.
15         Q.   Well, do you know what Mr. LeBlanc is
16    referring to, that he would prefer that we not
17    initiate any other investigation regarding threats to
18    Dr. Livingstone's contention that you and Dr. Lord
19    threatened him?  Right?
20              MR. ISICOFF:  Object as to form.
21         A.   My understanding from that is that
22    Livingstone didn't want any further investigation,
23    meaning by a third party.
24         Q.   Okay.
25         A.   It has nothing to do with Charlie Nemeroff.
```

```
1                    (Thereupon, the document was marked as

2                    Exhibit 35 for identification.)

3        BY MR. SLOMAN:

4             Q.   Let me show you what's been marked as Exhibit

5        35.

6             A.   Okay.

7             Q.   Let's go to the 13th asterisk down.

8             A.   Can you help me count.

9             Q.   I'll get there.  We'll find it.  It's under

10       progress, I think.

11            A.   What dates's on it?

12            Q.   This is dated December 22nd.

13            A.   Okay.

14            Q.   Do you see that?  Can you read?  This is

15       your -- this is your activity summary for December

16       20th.

17            A.   Yeah.

18            Q.   And it's dated December 22nd.

19            A.   Yeah.

20            Q.   And do you recall a video interview with

21       Jack?

22            A.   No, I don't.  But it doesn't matter.

23            Q.   Those are your words.  Correct?  Video

24       interview with Jack regarding what is ahead in 2013,

25       awesome partnership?
```

1        A.   Yes.

2        Q.   So on December 22nd, 2012, when you wrote

3   that at 7:41 p.m., you knew that you were going to

4   fire Jack from his position as COO.  Correct?

5             MR. ISICOFF:  Object as to form.  No

6        foundation.  Inconsistent with prior testimony.

7        Q.   Let's go to the top, please.

8        A.   Based on the email that you showed me, it is

9   possible, yes.

10       Q.   All right.  So do you see at the top it says

11   activity summary, December 20.

12       A.   Okay.  So that was -- that was two days

13   before.

14       Q.   But you sent this email on December 22nd, do

15   you see that, at 7:41 p.m.?

16       A.   Yes.

17       Q.   So when you sent that email -- go down,

18   please -- you wrote video interview with Jack re what

19   is ahead in 2013.

20       A.   Yes.

21       Q.   "Awesome partnership!"  Correct?

22       A.   Yes.

23       Q.   So when you sent that email, you knew that

24   you were going to terminate Dr. Lord from his position

25   as COO on December 31st.  Correct?

```
1              MR. ISICOFF:  Object as to form.
2       A.   That email was written on the 20th.  Because
3    it relays events of the 20th, I would probably not
4    wait two days, definitely not wait two days to speak
5    to him.  And, yes, you're correct I didn't change the
6    email that I wrote on the 20th.
7       Q.   Right.  So you sent it out on the 22nd.
8    Correct?
9       A.   I agree.  I did not change it, that's
10   correct.
11      Q.   And, as a matter of fact, can you go down to
12   the bottom, under appreciation, can you see the third
13   asterisk from the bottom?
14      A.   Oh, yes.
15      Q.   And what does it say?
16      A.   Jack for best interview ever.
17      Q.   That is appreciation.  Correct?
18      A.   Definitely.
19      Q.   And, again, when you wrote that email, were
20   there any performance issues or workplace issues with
21   Dr. Lord?
22              MR. ISICOFF:  Object as to form.
23      A.   I told you about the issues with Jack.  Okay?
24   It doesn't -- it doesn't mean at all that there was
25   not great qualities about Jack, which I very much
```

1    appreciated.

2            Jack was a friend.  Okay?  I knew I was going

3    to lose a friend.  I knew I was going to lose the

4    person who I was working with every day.  Do you think

5    that that would be an appropriate thing to do for me

6    to not be grateful for what he had done, even if there

7    were significant limitation to, you know, his work

8    since October of 2012?  He was my friend and he had

9    done a lot of really good work.

10            (Thereupon, the document was marked as

11            Exhibit 36 for identification.)

12   BY MR. SLOMAN:

13       Q.   Okay.  Let me show you now what's been marked

14   as Exhibit 36.  I'm showing you, Dr. Goldschmidt, an

15   email from Dr. Lord, dated December 26, the day after

16   Christmas, at nine o'clock a.m. to you, and it reads

17   "Pascal, Per our conversation, please review the

18   attached."

19       A.   Okay.

20       Q.   And you can see the subject is "Please review

21   clinical laboratory policy."  Do you see that?

22       A.   Yes.

23       Q.   Do you remember the clinical laboratory

24   policy that you and Dr. Lord and Dr. Cote, with help

25   from I believe Dr. Chen, had prepared?

1      A.    Yeah, vaguely.

2            (Thereupon, the document was marked as

3            Exhibit 37 for identification.)

4   BY MR. SLOMAN:

5      Q.    Let me show you Exhibit 37 and see if that

6   refreshes your recollection.  Do you remember this

7   clinical lab policy that you and Dr. Lord and Dr. Cote

8   intended to put into effect in 2013?

9      A.    Yes, I do remember it vaguely.

10     Q.    Okay.  Can you just go to the bottom, Jackie.

11  Go up a little bit.  There you go.

12           And do you recall that the intent was to

13  transfer laboratories in various departments

14  throughout the School of Medicine to the pathology

15  department?

16     A.    Yes.

17     Q.    And it was to be done in I guess gradual

18  increments where the money would be kept in certain

19  departments, gradually going eventually all to the

20  department of pathology, is the best way I could

21  decipher it.  Is that how you remember it?

22     A.    Very much so.  It was a long negotiation.

23     Q.    Okay.  And, in fact, it wasn't limited to the

24  IML.  Correct?

25     A.    No.  There were other smaller entities.

```
 1              (Thereupon, the document was marked as
 2              Exhibit 38 for identification.)
 3   BY MR. SLOMAN:
 4       Q.   Let me show you Exhibit 38, which is an
 5   email -- let's go down -- the email on December 30 at
 6   3:17 a.m.  The times may be screwed up, because I
 7   think Dr. Cote was in Europe at the time, but you
 8   wrote to Dr. Lord and to Dr. Cote "I anticipate that
 9   coming week will be busy with talks about the IML
10   after the sharing of the document on UM laboratories
11   and the ongoing review of the IML by TMG.  It would be
12   great if Richard could prepare an elevator speech on
13   the key limitations of the IML as it is currently set
14   up, should limit to the top five, although I can think
15   of many more, such that the three of us can deliver a
16   consistent message.  The first meeting will be on
17   Monday with the president.  It would be great if we
18   could have the message ready by then.  Cheers,
19   Pascal."
20              Did I read that correctly?
21       A.   Correct.
22       Q.   And, again, this was December 30.  You and
23   Dr. Cote and Dr. Lord intended to put into effect this
24   new clinical labs policy.  Correct?
25       A.   Yes.
```

```
 1                (Thereupon, the document was marked as
 2                Exhibit 39 for identification.)
 3      BY MR. SLOMAN:
 4          Q.   I would like to show you Exhibit 39.  This is
 5      an email from Christine Morris to you regarding that
 6      video and she said "I want to make sure it is okay
 7      with you if we lead the newsletter this Wednesday with
 8      a great video interview with you and Jack."
 9                Do you see that?
10          A.   Yes.
11          Q.   And do you see your response?  Just go up a
12      little, Jackie.  "Okay.  Great."
13          A.   Okay.
14          Q.   You responded to her on December 31st at 7:04
15      p.m.  Do you see that?
16          A.   Yeah.
17          Q.   Had you, in fact, had a conversation with
18      Jack by then that the president wanted to terminate
19      him from his position as COO?
20          A.   I do not know the specific day that we
21      talked.  I thought it was right around that time.
22      Maybe December 31st or the 1st of January.
23                (Thereupon, the document was marked as
24                Exhibit 40 for identification.)
25      BY MR. SLOMAN:
```

```
 1        Q.   Okay.  Well, let me show you what's been

 2   marked as Exhibit 40.  If we can go down.  This is an

 3   email from Joe Natoli to Shalala at 4:10 p.m.  Where

 4   is 4:10?  Just go up a little bit.

 5             You see Joe Natoli's email to President

 6   Shalala at 4:10 p.m.

 7        A.   Okay.

 8        Q.   I direct your attention to the sentence "Once

 9   Pascal has spoken with Jack and timing and next steps

10   are clear, I would like to grab you one more time."

11             Do you see that?

12        A.   Yeah.

13             (Thereupon, the document was marked as

14             Exhibit 41 for identification.)

15   BY MR. SLOMAN:

16        Q.   Now let me show you Exhibit 41.

17        A.   I'm sorry.  I need to close my shutter,

18   because there's too much light coming in my eyes.

19   Hold on just one second.

20        Q.   Okay.

21        A.   Back with you.

22        Q.   Thank you, Dr. Goldschmidt.

23             I'm showing you Exhibit 41, which is an email

24   from you to President Shalala at 6:03 p.m.  Do you see

25   that?
```

1          A.    Okay.

2          Q.    It says "Great.   I talked to Jack and then

3     also with Sheri.   Conversations were difficult, but

4     very civilized."

5          A.    Yes.

6          Q.    "I also followed up with Joe and Nerissa."

7               Do you see that?

8          A.    Yes.

9          Q.    So by 6:03 p.m. you had had the conversation

10    with Jack.   Correct?

11         A.    Yeah.   Correct.

12         Q.    And, in fact, you had actually spoken to him

13    earlier in the day.   Would you agree with that?

14         A.    Definitely.

15         Q.    Do you recall approximately what time you

16    spoke to him?

17         A.    No.

18         Q.    Would it have been closer to noon on that

19    day?

20         A.    Oh, my God, I really don't remember the time

21    of the day.   I remember it was extremely difficult.

22         Q.    And so at the time that you spoke or were in

23    email correspondence with Christine Morris with regard

24    to the video, you had or were about to fire Jack from

25    his position as COO.   Correct?

```
 1        A.   Yes.  Remember that I was not supposed to
 2   talk about it to anyone.
 3        Q.   I understand.  But you still authorized
 4   Christine to put out the video.  Correct?
 5        A.   Yes.  I agree with that.
 6        Q.   Dr. Goldschmidt, you also had a conversation
 7   with Sheri Keitz.  Correct?
 8        A.   Yes.
 9        Q.   And did President Shalala also instruct you
10   to terminate Sheri Keitz?
11        A.   I think that -- let me think for a second.  I
12   think that Nerissa Morris is the one who talked to me
13   about Sheri, because she was in human resources and
14   Nerissa was in charge of human resources.  So I think
15   that relative to Sheri's termination, the conversation
16   was with Nerissa Morris.
17        Q.   But you informed President Shalala that you
18   talked to Jack and then also with Sheri.
19        A.   Correct.
20        Q.   Why did you tell President Shalala that you
21   had also spoken to Sheri, presumably regarding her
22   termination?
23        A.   Because -- because, obviously, Donna Shalala
24   was aware of it.
25        Q.   Now, at this point in time, on December 31st,
```

1   New Year's Eve, 2012, you expected Dr. Lord would

2   remain in some capacity.  Correct?

3       A.   I was hoping so, yes.

4       Q.   And -- well, we'll get to that.

5            (Thereupon, the document was marked as

6            Exhibit 42 for identification.)

7   BY MR. SLOMAN:

8       Q.   Let me go to Exhibit 42 and ask you if you've

9   ever seen this email from Alan Livingstone to Donna

10  Shalala and Tom LeBlanc.

11      A.   I don't think that I was copied on any of the

12  email of Livingstone to Tom LeBlanc or Donna Shalala,

13  which was, by the way, strictly inappropriate in terms

14  of reporting organization.

15      Q.   Do you know why President Shalala gave Alan

16  Livingstone the ability to contact her directly with

17  regard to subjects like the one you'll see when you

18  read this email?

19           MR. ISICOFF:  Object as to form.

20      A.   No, I don't.

21      Q.   Is that because he was a very influential

22  member of the faculty?

23           MR. ISICOFF:  Object as to form.

24      A.   That's probably one of the factors, yes.

25      Q.   Now, Dr. Goldschmidt, showing you this email

1  that you are not copied on, written to President

2  Shalala and Provost LeBlanc, I'm just going to read

3  sections and ask you questions.  "I'm reaching out to

4  you for guidance and support.  I am more than a little

5  surprised with the attached document."

6       And I'll represent to you, Dr. Goldschmidt,

7  that the attached document is the clinical lab's

8  policy and the route by which it was delivered.

9       "I was personally on the medical campus

10  yesterday until almost six p.m. holding a clinic at

11  SCC..." which is Sylvester Cancer Center?

12       A.   Right.

13       Q.   "...and having meetings, and neither the dean

14  nor Jack extended the courtesy of discussing this

15  issue with me.  I even had a meeting on CRB-3 with

16  Sheri Keitz at 1:00 p.m.  Instead, they called my

17  assistant, Roberto Estrada, to come and pick up the

18  attached document.  They clearly must have discussed

19  it with the chair of pathology, Dr. Cote, and it would

20  seem only reasonable they could have asked for my

21  input.

22       "As you know, on December 9th, Charlie

23  Nemeroff delivered an explicit threat to me about how

24  the IML would be used to take me out if I did not

25  endorse the dean" and he rehashes that.

1          Did you know, Dr. Goldschmidt, that Dr.

2     Livingstone had contacted President Shalala about the

3     clinical labs policy that you, Dr. Lord and Dr. Cote

4     had proposed to go into effect in the beginning of

5     January?

6          A.    No.   But I'm surprised that he said that he

7     was surprised, because we had multiple discussions

8     about it.   This was a -- there was a form of a, you

9     know, the result of a prolonged negotiation and

10    Livingstone was involved with it.

11         Q.    Directing your attention to paragraph three

12    where it says "Donna, after my meeting with you

13    December 21st and, Tom, after my discussion with you

14    December 22nd, I was relieved to know how strongly you

15    felt that this form of intimidation was unacceptable

16    and that the transplant lab review would be put

17    directly under Mike Moloney and Aileen Ugalde.   Even

18    though they have styled this is a policy changed, I'm

19    deeply troubled a see a desire to implement it without

20    discussion within several days over the New Year's

21    holiday.   Moreover, it is explicitly being applied

22    only to surgery and not to the analogous clinical

23    laboratories in dermatology and opthalmology."

24         It goes on and ends with "I perceive this to

25    be a continuation of the threat expressed by Dr.

1   Nemeroff on December 9th and I would request your

2   intercession."

3          Were you ever aware that he had made these

4   allegations to President Shalala?

5   A.    No.

6   Q.    Sitting here today, what's your --

7   A.    Let me say this.  Donna had mentioned to me

8   that Alan Livingstone was complaining of the fact that

9   I was using the review of the IML as a way to obtain

10  from him that he would support me after the petition

11  that he had organized.

12         Since Livingstone made that allegation, it

13  was creating a conflict of interest, obviously, for me

14  to be directly involved with it, which I was told by

15  Donna Shalala.

16         And, you know, I told her that it was pure

17  invention and lies from Livingstone and I believe that

18  she believed me.  But it didn't stop the fact that,

19  obviously, he, having documented an obvious conflict

20  of interest, if he was right, was creating a problem

21  for the president.

22  Q.    The next to the last paragraph:  "The timing

23  of this encyclical is frankly surprising to me,

24  because with everything that had already been going

25  on, I would have anticipated the dean perhaps reaching

 1    out in a conciliatory manner in an attempt to

 2    compromise a reconciliation.  Unfortunately, this is

 3    representative of much of what has been going on

 4    across our campus for too long a period of time.

 5    Arbitrary decisions are made in a dictatorial manner

 6    with no discussion with the involved faculty and the

 7    contrary perspectives are crushed ruthlessly.

 8    Transparency, stability, collegiality and

 9    inclusiveness are no longer present and faculty are

10    suppressed with intimidations.

11         "I have not responded to the dean or Jack

12    Lord and await your guidance and support."

13    A.    I am not surprised by the likes of

14    Livingstone.  And it is obvious that Livingstone does

15    not have what I have, which is a deep concern for the

16    safety and the wellness of our customers, which are

17    our patients.  And everything that I've done to

18    reorganize the labs was in the effort of maximizing

19    the safety and the quality of care of our patients,

20    period.  If he didn't understand that, it's

21    unfortunate.

22    Q.    Because the change in the policy, the

23    clinical labs' policy that you, Dr. Lord and Dr. Cote

24    had envisioned, was not just a revenue situation, it

25    involved the safety and quality of care of patients.

 1    Correct?

 2         A.   Correct.

 3         Q.   And do you see what the president's response

 4    to Alan Livingstone was on January 1 at 3:50 p.m.?

 5         A.   Sit tight.

 6         Q.   Did that surprise you?

 7         A.   No, no.  Because it would be a way to prevent

 8    from Livingstone to continue his bullshit and to, you

 9    know, have more time to prepare the next steps.

10              Remember that Donna was dealing with a

11    conflict of interest on my part raised by Livingstone.

12    She was dealing with an unhappy faculty.  She was

13    dealing with two former dean, trying to knock me off

14    my seat.

15              She needed me in my position and needed me to

16    be strong in my position.  And she was trying to save

17    some time to be able to react to it more effectively.

18         Q.   Would you agree, Dr. Goldschmidt, that she

19    was also giving a voice to the person who was at the

20    focus and the focal point of the TMG investigation?

21              MR. ISICOFF:  Object as to form.

22         A.   Yeah, you can look at it that way.  I think

23    it's much more complex than that.

24              (Thereupon, the document was marked as

25              Exhibit 43 for identification.)

1    BY MR. SLOMAN:

2        Q.   I want to show you Exhibit 43.  This is an

3    email from President Shalala to you at 3:51 p.m. at

4    the bottom.  Do you see she wrote you at 3:51 on

5    January 1?

6        A.   "Wait for the audit to finish.  Withdraw the

7    memo."

8        Q.   And the subject line is re lab.  Correct?

9        A.   Let me see.

10       Q.   Do you see where it says --

11       A.   Yeah, yeah, yeah.

12       Q.   So, in effect, she was telling you to

13   withdraw the clinical labs policy memo and to wait for

14   the audit to finish.  Correct?

15       A.   As I told you, Donna Shalala needed me and

16   she was concerned that with the conflict of interest

17   raised by Alan Livingstone, it would be better to wait

18   for the review of the audit committee and the company

19   that told they would select to be done with the review

20   of the IML to make further decisions.

21       Q.   Dr. Goldschmidt, my question's a little

22   different.  I just wanted to know whether Donna

23   Shalala was instructing you to withdraw the clinical

24   labs memo that was supposed to have gone into effect

25   in January.

```
 1          A.    I assume so.

 2                (Thereupon, the document was marked as

 3          Exhibit 44 for identification.)

 4   BY MR. SLOMAN:

 5          Q.    Let's me show you now what's been marked as

 6   Exhibit 44.  This is an email from -- let me go to the

 7   first one at 3:55 p.m.  This is an email at 3:55 p.m.

 8   on January 1st, 2013, to Dr. Lord.

 9                Before I ask you a question about that, Dr.

10   Goldschmidt, do you see the email address?

11          A.    Yeah.

12          Q.    Is that your personal email address?

13          A.    Yeah, that is my personal email address.

14          Q.    Remember earlier in the deposition when you

15   told me that you didn't use your personal email

16   address for university business communications?

17                MR. ISICOFF:  Object as to form.  It's

18          inconsistent with his prior testimony.

19          A.    Yeah, I do remember.  I thought that I didn't

20   have my email, my personal email, before 2015.

21          Q.    And you see that this was actually on January

22   1, 2013, a full two years before.  Correct?

23          A.    Totally.  And I was wrong.

24          Q.    In that email at 3:55 p.m. you wrote to Dr.

25   Lord, "BTW" -- I believe that's by the way -- "Donna
```

```
 1    requested to recall emails relative to IML and no
 2    changes should be considered or implemented until
 3    internal and external investigations are completed."
 4             Did I read that correctly?
 5       A.   Correct.
 6       Q.   And Dr. Lord responded "How did she even know
 7    about those emails?  AL?  Are you sure that you want
 8    to stay in this environment?  Are you worried about
 9    the integrity of the review?"
10             And you responded "Of course AL.  But she has
11    a reasonable point.  We should not initiate changes
12    that imply a concern before the end of both
13    investigations."
14             And Dr. Lord responded at 4:29 p.m. "It was
15    not IML-specific, and as a policy going forward, it
16    would apply to all labs."
17             Did I read that correctly?
18       A.   You do read that correctly.
19       Q.   Okay.  With regard to that recall of the
20    emails relative to the IML, and no changes should be
21    considered or implemented, the conversation that
22    you're having with Dr. Lord is actually concerning the
23    intended policy changes for all of the labs to be
24    brought under the pathology department.  Correct?
25       A.   Correct.  That was our goal.
```

1      Q.   Dr. Goldschmidt, do you recall approximately

2   around the same time that President Shalala also

3   ordered you to stop the executive daily updates?

4      A.   Yeah, I do recall that it was around that

5   time.

6           (Thereupon, the document was marked as

7           Exhibit 45 for identification.)

8   BY MR. SLOMAN:

9      Q.   I show you what's been marked as Exhibit 45,

10   which is a January 1 email on behalf of you to Dr.

11   Cote.  And actually the first one is the December

12   31st, 2012 email that attached the confidential draft

13   to clinical labs.  Do you see that?

14      A.   Yes.

15      Q.   And then, if you go up, on January 1 at 4:03

16   p.m., after you received instruction from President

17   Shalala, you inform Dr. Cote that you needed to recall

18   this email.  You further stated "No change of plan,

19   but we should not consider or implement changes until

20   internal and external investigations of IML are

21   completed."

22           Did I read that correctly?

23      A.   You do.

24           (Thereupon, the document was marked as

25           Exhibit 46 for identification.)

```
1    BY MR. SLOMAN:

2         Q.   Now I'm showing you what's been marked as

3    Exhibit 46.  Its start out, Dr. Goldschmidt, with an

4    email from Christine Morris.  Do you remember who

5    Christine Morris was?

6         A.   Yes.  She was in charge of communications.

7         Q.   Right.  And so she writes "Here is the

8    announcement, including dean's input.  Our plan is to

9    send out tonight.  Please let me know if you have any

10   feedback."  The dean is you.  Correct?

11        A.   It is me.

12             (Thereupon, the document was marked as

13             Exhibit 47 for identification.)

14   BY MR. SLOMAN:

15        Q.   Let's go to Exhibit 47, which is the

16   attachment.  Do you remember, Dr. Goldschmidt, I'm

17   directing your attention to the statement that you

18   attached and sent to Christine Morris.  Do you

19   remember this statement coming from you?

20        A.   Which one in particular?

21        Q.   Well, specifically, I'm referencing paragraph

22   two.

23        A.   Yes.

24        Q.   So even after you were instructed by the

25   president to terminate Dr. Lord as COO, you believed,
```

```
1    at least as of the date of this email, that Dr. Lord
2    was going to remain on in some capacity possibly as a
3    senior adviser to you for health care innovation and
4    planning.  Correct?
5         A.   Correct.
6         Q.   And that was -- that was overruled by
7    President Shalala.  Correct?
8         A.   I don't remember exactly how it happened.
9         Q.   I'll show you an email to refresh your
10   recollection.
11        A.   Okay.
12             (Thereupon, the document was marked as
13             Exhibit 48 for identification.)
14   BY MR. SLOMAN:
15        Q.   Let's go to 47.  I'm sorry.  Let's go to 48.
16   So you see the original email from Christine Morris
17   that attached the previous document, which was 47, and
18   the statement.  And if you can go up, Jackie.  Do you
19   see President Shalala's response at 2:53 p.m.?
20        A.   Yeah.
21        Q.   It reads -- she said "I passed my comments on
22   to Tom paragraph two is out."
23             Do you see that?
24        A.   Okay.
25        Q.   Do you remember her informing the people in
```

1    that email that paragraph two of Exhibit 47 was out?

2        A.   I'm sorry.  What with regards to paragraph

3    two?

4        Q.   Sure.  Let's go back to Exhibit 47.

5    Paragraph two reads "After helping us accomplishing

6    all this, Jack will be returning to his role on the

7    faculty of the department..."

8        A.   Okay.  Go ahead now.

9        Q.   Let's go to 48.  And you see that President

10   Shalala at 2:53 said "I passed my comments on to Tom.

11   Paragraph two is out."

12       A.   Okay.

13       Q.   So do you remember President Shalala

14   informing the people on that email that paragraph two

15   of your statement was coming out?

16       A.   No.  I probably blocked that in my memory.

17       Q.   But you don't deny that that happened?

18       A.   I don't deny it happened.

19       Q.   And you see that Dr. Lord responded at 2:54:

20   "What does that mean?"  Do you see that?

21       A.   Yes.

22       Q.   Go to the top, please.  And you responded to

23   Dr. Lord "Finding out from Tom."  Do you see that?

24       A.   Okay.

25       Q.   And he responded "We need some transition

```
1    statement."  And you wrote "Definitely!"
2            Did I read that correctly?
3       A.   You do.
4            (Thereupon, the document was marked as
5            Exhibit 49 for identification.)
6   BY MR. SLOMAN:
7       Q.   Now let's go to Exhibit 49.  It's the same
8   email chain.  Going up, please.
9       A.   Okay.
10      Q.   Continue up.  Can you read your response
11  to the --
12      A.   "Can we at least say that he's going back to
13  his prior role?  Do not want for people to think he
14  was fired."
15      Q.   Right.  So at this point, on January 2, 2013,
16  at 2:56 p.m., you wrote to Tom LeBlanc and asked him
17  "Can we at least say that he's going back to his prior
18  role?  Do not want for people to think he was fired."
19  Correct?
20      A.   Yeah.
21      Q.   And, as it turned out, Dr. Lord was fired
22  from all of his positions.  Correct?
23           MR. ISICOFF:  Object as to form.
24      A.   I remember that he was fired from his roles
25  in leadership.  I do not know for sure that he was
```

1    also fired from his faculty position.

2        Q.   You would not contest President Shalala's

3    testimony on the subject, would you?

4            MR. ISICOFF:  Object as to form.

5        A.   No.  But that was not part of my conversation

6    with Dr. Lord.

7        Q.   I understand.  At this point, Dr.

8    Goldschmidt, you were concerned about the perception

9    that people would think that Dr. Lord was fired.

10   Correct?

11       A.   Yes, definitely.

12       Q.   And why was that?

13       A.   Look, I think that I've been explicit with

14   that.  While there were issues that existed in the

15   leadership style and some of the character issues that

16   I mentioned earlier with Dr. Lord, I think that Dr.

17   Lord came to provide a support to the medical school

18   at a very difficult time.

19            I think that some of his work has been

20   invaluable.  And Dr. Lord was a friend.  I was deeply

21   sad, saddened by the events.  And what else can I say?

22       Q.   And, in fact, you wanted him to stay on in

23   the capacity as senior adviser to you for health care

24   innovation and planning.  Correct?

25       A.   Correct.  Jack has a very well known

```
 1    reputation of being an innovator, so it made a lot of

 2    sense.

 3              (Thereupon, the document was marked as

 4              Exhibit 50 for identification.)

 5    BY MR. SLOMAN:

 6        Q.   Let me now turn to Exhibit 50.  And this

 7    Exhibit 50 is from you, message from the dean.  This

 8    went out from you to the Miller School of Medicine.

 9    And you can see that it's almost the same statement,

10    except paragraph two was taken out.  Correct?

11        A.   Correct.  Note that paragraph two in this

12    email was very respectful to Jack Lord.

13              (Thereupon, the document was marked as

14              Exhibit 51 for identification.)

15    BY MR. SLOMAN:

16        Q.   I'm showing you what's been marked as Exhibit

17    51.  Dr. Goldschmidt, I'm showing you Exhibit 51.

18    It's an email chain, but the first email on the chain

19    is dated January 3, 2013, at 4:59 a.m. from Dr. Cote

20    writing to his colleagues.  I don't know whether this

21    went to the Miller School or just to the pathology

22    department, but do you remember this email?

23        A.   I do.

24        Q.   And do you remember the reaction that it got

25    from President Shalala?
```

1    A.   I think -- I believe that she thought it

2    was --

3    Q.   Well, I'll show you, and maybe it will

4    refresh your recollection.

5    A.   I believe she thought it was not his role to

6    send that email.

7    Q.   Do you see her response on January 3rd at

8    1:21 p.m.?

9    A.   Which one?

10   Q.   At 1:21 p.m.

11   A.   Yeah.  Uh-huh.

12   Q.   Do you see that?  There you go.  Do you know

13   what she meant when she said "You need -- this was to

14   Dr. Cote, of course, from President Shalala -- she

15   wrote "You need to fully understand our obligations

16   under Jack's contract.  He has no backup appointment

17   and we owe him only six months salary.  If we pay him

18   beyond the end of August, we trigger another payment.

19   We need to be careful here, very careful."

20        Do you see that?

21   A.   Yeah, I see that.

22   Q.   Is it around this time that you realized that

23   Dr. Lord was, in fact, going to be fired from all of

24   his positions?

25        MR. ISICOFF:  Object as to form.

1      A.   Was I copied on that email?

2      Q.   I can't -- I don't know.

3      A.   Okay.

4      Q.   I assume that you were, but I can't -- you

5   know, it's hard to tell from these emails, doctor.  It

6   looks like you were, because from the top it went from

7   you -- it goes to -- I'm sorry.  Can you go up a

8   little further, Jackie.  It goes from Dr. Cote to

9   President Shalala and copying you.  So I believe that

10  you did receive this entire chain.

11     A.   Yeah, okay.  Got it.

12     Q.   So does it refresh your recollection at all

13  whether it was around this time that you found out

14  that Dr. Lord was, in fact, fired and not coming back

15  at all?

16          MR. ISICOFF:  Object as to form.

17     A.   Well, yes, from this email, definitely.  But

18  I don't know if the final -- what was the final

19  arrangement of with Dr. Lord's position with the

20  department of pathology.  I don't think I was privy of

21  the correspondence between Dr. Cote and Dr. Lord.

22  Maybe I was and I blocked it, but I just don't

23  remember it.

24     Q.   Well, you can see from this email that he was

25  only getting a six month payment.  Do you understand

```
 1    that?
 2            MR. ISICOFF:  Object to the form.
 3        A.    From this email I do.
 4        Q.    Thank you.
 5            (Thereupon, the document was marked as
 6            Exhibit 52 for identification.)
 7    BY MR. SLOMAN:
 8        Q.    Now I'm showing you Exhibit 52.  This was a
 9    January 3rd article entitled Number 2 executive at UM
10    medical school stepping down, written by John
11    Dorschner on January 3rd.
12            Do you remember a series of article in
13    January of 2013 recounting not only Dr. Lord's
14    departure, but also the faculty petition?
15        A.    I did do.
16        Q.    And the first sentence of the story says
17    "Amid roiling faculty anger over drastic budget cuts,
18    the University of Miami announced that the number two
19    executive at the Miller School of Medicine, Jack Lord,
20    is stepping down."
21            Did I read that correctly?  And it goes on.
22    "The change announced by Dean Pascal Goldschmidt comes
23    as a petition circulates among tenured faculty,
24    medical school faculty, expressing no confidence in
25    both Goldschmidt and Lord."
```

1          Did I read that correctly?

2     A.    Yes, you do.

3     Q.    And the tenor of the article was that Dr.

4    Lord was stepping down ostensibly over faculty

5    dissatisfaction with the May 2012 budget cuts.

6    Correct?

7          MR. ISICOFF:  Object as to form.

8     A.    Yes.  I do have some concern relative to

9    Mr. Dorschner.

10    Q.    I understand.  I want to get through --

11   that's fair, Dr. Goldschmidt, but let me try to answer

12   my questions and I will give you a chance to air your

13   grievances about Mr. Dorschner later.  But I want to

14   ask you some specific questions about this article.

15    A.    Sure.

16    Q.    The budget cuts that are referenced here in

17   this article, those were the same budget cuts that we

18   talked about earlier that were approved not only by

19   you, but by the president and by the board of

20   trustees.  Correct?

21    A.    Correct.  The numbers are fake.  It was not

22   900 full-time and part time -- well, okay.

23    Q.    I understand.  Correct.  With that caveat, I

24   understand that there's errors in this article, but I

25   need to ask certain questions about that, so I hope

1    that you understand.

2         A.    Most of the faculty that was unhappy was the

3    faculty that had more allegiance for the Jackson

4    Health System than the University of Miami.

5              (Thereupon, the document was marked as

6              Exhibit 53 for identification.)

7    BY MR. SLOMAN:

8         Q.    I'm showing you Exhibit 53.  This was an

9    email from Irene.  Do you remember who Irene Hung was?

10        A.    Yeah.

11        Q.    And she is providing you with the updated

12   version of the organizational chart for the executive

13   team?

14        A.    Yep.

15             (Thereupon, the document was marked as

16             Exhibit 54 for identification.)

17   BY MR. SLOMAN:

18        Q.    Now, let me show you -- she actually

19   attached -- well, let me show you the next exhibit,

20   which is 54.  Now, this was the, correct me if I'm

21   wrong, but this was the organizational chart before

22   Dr. Lord was terminated from his position as chief

23   operating officer?

24        A.    Yep.

25        Q.    And other than -- strike that.

1          Was this an accurate organizational chart

2     before Dr. Lord was terminated?

3          A.   It looks like it, yeah.

4          Q.   Do you see anywhere on this organizational

5     chart of any requirements or any suggestion that Dr.

6     Lord had reporting requirements to anybody but you

7     and/or President Shalala and/or the board of trustees?

8          A.   Nope.

9               (Thereupon, the documents were marked as

10              Exhibit 55 and 56 for identification.)

11    BY MR. SLOMAN:

12         Q.   I'm showing you what is marked as Exhibit 55.

13    Exhibit 55 attaches, it's a little confusing, but the

14    Bates stamps actually go in sequence of this email,

15    which, if you go to the bottom, Jackie, please, is

16    Bates stamp number, do you see, UM-Lord 00042851.

17              If we go to Exhibit 56 and we go to the

18    bottom, it's 00042852.  So this is the next one, and,

19    presumably, what was attached to Exhibit 55.  This is

20    the -- I will represent to you, Dr. Goldschmidt, this

21    is the revised organizational chart in Exhibit 56.

22              Let's go to 56.  And this shows the

23    replacement of Joe Natoli in the interim chief

24    operating officer position.  Do you see that?

25         A.   Very well.

```
1                    (Thereupon, the document was marked as

2                    Exhibit 57 for identification.)

3       BY MR. SLOMAN:

4           Q.   Now I'd like to show you Exhibit 57.   And

5       this is your email to Irene Hung on January 6th at

6       5:17 p.m.  "Irene, It's important to have Joe in the

7       interim COO role on the chart right away."  Go on up.

8       And she responds "Hi, Dr. Goldschmidt.  Here is a

9       revised org chart as per instruction below.  Used the

10      same setup as during the Dr. Lord/Donelan transition.

11      Thanks.  Irene.  "

12                   And you responded, "Irene, Orders from the

13      president are very clear.  Please remove Dr. Lord from

14      the org chart for now.  We will revisit at the end of

15      January."

16                   So did I read that correctly?

17          A.   Yeah.

18                   (Thereupon, the document was marked as

19                   Exhibit 58 for identification.)

20      BY MR. SLOMAN:

21          Q.   Let's go to 58.  Dr. Goldschmidt, I'm showing

22      you an email to Magaly Robitaille, your secretary or

23      assistant, indicating "Maggie, Please disinvite Jack

24      from all official meetings, that includes Core and all

25      other C-suite meetings and replace him with Joe N."
```

1          Did I read that correctly?

2     A.   Correctly.

3          (Thereupon, the document was marked as

4          Exhibit 59 for identification.)

5     BY MR. SLOMAN:

6     Q.   Now I'd like to show you Exhibit 59.  I will

7     show Dr. Goldschmidt the exhibit number.

8          Dr. Goldschmidt, I'm showing you Exhibit 59,

9     which purports to be a Wednesday, January 9th, 2013,

10    Miami Herald article, again written by John Dorschner.

11    This one entitled Jack Lord's future at UM unclear.

12         If you just go to the top.  Did I read that

13    correctly?

14    A.   Yes.

15    Q.   And, again, another article begins "Jack Lord

16    stepped down last week as the number two executive at

17    the University of Miami Miller School of Medicine, but

18    is he really leaving UM?  That's unclear a week after

19    the announcement."

20         And then it recounts, "On the evening of

21    January 2nd, Dean Pascal Goldschmidt wrote a letter to

22    faculty that Lord would be no longer -- would no

23    longer be chief operating officer, but gave no

24    indication of what Lord's future would be," and then

25    references the 4:59 a.m. email from Dr. Cote

1   indicating "We are very proud to have Jack as a member

2   of our faculty and are fortunate that Jack will remain

3   a vital member of our department to help move our

4   efforts forward.  His expertise in health care

5   delivery and management will continue to benefit the

6   department and school."

7           Did I read that correctly?

8       A.   Yeah.

9       Q.   The article goes on and says the following

10   day, January 4th, "The Herald asked Lord and UM public

11   affairs department whether he was going to pathology.

12   Spokeswoman Christine Morris emailed, quote,

13   responding on behalf of the institution and Dr. Lord,

14   We have nothing to say, unquote.

15           Again, did I read that correctly?

16       A.   Yes.

17       Q.   And then, if you go down to the paragraph

18   that begins with "Meanwhile, a petition continues to

19   circulate among faculty that decries, quote, the

20   failed leadership of Pascal Goldschmidt and Jack Lord.

21   We want to make clear that the faculty has lost

22   confidence in the ability of these men to lead the

23   school."

24           Did I read that correctly?

25       A.   Yes.

1     Q.  Now, again, this is the second article, the

2  first being January 3rd, this is January 9th, and,

3  again, referencing this petition continues to

4  circulate.

5     At that time had the petition -- it seems as

6  though the petition was continuing to circulate.  At

7  what point did you learn about any action or

8  resolution with that petition?

9     MR. ISICOFF:  Object as to form.

10    A.  When was the article published?

11    Q.  January 9th.

12    A.  I mean, the informants of Mr. Dorschner

13  didn't know what they were talking about.

14    Q.  How is that?

15    A.  They just didn't know, because they had no

16  idea that the petition had been submitted months

17  before to the faculty senate and was history.  There

18  was no petition going on at the time.

19    Q.  And, again, it references "Many faculty are

20  angry about the medical school laying off 900 full and

21  part-time employees, cuts that were devised shortly

22  after Lord took over as COO in the spring of 2027."

23     Did I read that correctly?

24    A.  Yeah.  So what?

25    Q.  My question is what was your reaction to

1    having your name circulated in this article, again,

2    referencing the failed leadership of you and Dr. Lord?

3        A.   Again, I have very strong concern relative to

4    the conflict of interest of Mr. Dorschner.

5        Q.   Okay.  But were you -- obviously, this is the

6    second article that references your failed leadership

7    as well as Dr. Lord's failed leadership.  Correct?

8        A.   The damage is done.  What difference does it

9    make at that point?

10            (Thereupon, the document was marked as

11            Exhibit 60 for identification.)

12   BY MR. SLOMAN:

13       Q.   Let me show you Exhibit Number 60.  Let's go

14   to the bottom.  Dr. Goldschmidt, I'll represent to you

15   that imbedded in this email is a January 14th article,

16   January 14, 2013, article entitled "Large number sign

17   UM Med School petition," by John Dorschner.

18            Do you see that?

19       A.   Yeah.

20       Q.   And, again, this is another article about,

21   and I'll read the first sentence, "A large number, in

22   quotes, of faculty at the University of Miami School

23   of Medicine signed a petition complaining about the

24   school's leadership, the head of the faculty senate

25   said in an email Monday.  Richard Williamson, a law

```
1    professor who's chair of the senate sent the email to

2    faculty assuring them anonymity if they signed and

3    saying that the deadline for submitting copies of the

4    petition is Friday, quote, in order to make a final

5    report in a timely manner, unquote.

6              Do you see that?

7    A.   Uh-huh.

8    Q.   Now, do you still believe that the issue

9    concerning the petition had been consummated before

10   this period of time?

11   A.   I do believe that the damage was done, yes.

12   Q.   Well --

13   A.   Look, look, look.  If you follow what was

14   going on in 2013 around the United States, the

15   president of NYU was under -- and the president of

16   Emory were in about the same situation as I was.

17             There was an increasing tendency for these

18   petitions to happen in universities, mostly because of

19   the fact that there had been, you know, the leadership

20   had been in the middle of the complexities and

21   challenge of the economic downturn of 2008.

22             And what the press will tell you as well is

23   that, while these petitions number were increasing,

24   the impact of these petitions was going to be -- was

25   clearly becoming less and less impactful in such a way
```

1    that, you know, faculty were upset, because, you know,

2    what they want to see is a head fall down, and when

3    they don't see it, they continue to revolt.

4            Unless there's been an issue with you

5    stealing or with you creating a substantial disorder

6    in the organization, the faculty does not have the

7    means of removing you from your post; the board of

8    trustee does.

9        Q.   Can we go up to a little bit further.  Before

10   we go up any further, there is an email from Christine

11   Morris to you at 5:22, "FYI, I'm going to tell him we

12   have no comment.  Please let me know if you would like

13   to discuss."

14           And you then forwarded this email at 5:32

15   p.m. to President Shalala.  It reads "Donna, This is

16   the third article on the same topic.  My wife and kids

17   are becoming very worried or upset.  I thought that

18   Tom was working with Rick."

19           And President Shalala communicated to you

20   later that evening, "You need to communicate with your

21   faculty on your priorities."  And you had asked "What

22   forum?  Town hall meeting?  One department at a time?"

23           Do you see that?

24       A.   Yep.

25       Q.   In fact, you responded to her at 5:01 a.m. on

1    January 15th.  Correct?

2        A.   Yeah.

3        Q.   And she responded to you at 6:40 a.m. "You

4    have visited only with Jack.  Go see every department

5    by yourself.  Meet with your faculty council and take

6    Altman to lunch.  Focus on the departments that are

7    big, medicine, surgery.  They need to know your

8    strategy.  I met with each department chair for an

9    hour and I learned a lot.  Get out of your office and

10   listen to your faculty.  You need immediately to

11   communicate with them in writing."

12            And you responded to her "Good advice.  Will

13   do," at 11:00 a.m.  And she, at 8:27, said "Get going

14   quickly."  Correct?

15       A.   Correct.

16       Q.   Now, correct me if I am wrong, but it seems

17   like this was really bothering you.

18            MR. ISICOFF:  Object as to form.

19       A.   Well, look, whenever you transform an

20   organization, you take a substantial risk.  The risk

21   was, you know, the medical school a dribbling down,

22   the education of all residents is on final steps

23   before being closed down.  The clinical enterprise was

24   not making money as it needs to happen in order to

25   finance the research and the education, which lose

1    money.

2         And we needed to become a better research

3    place to find out new treatments and solutions for

4    patients with complex illnesses.  So my choice was am

5    I going to be just a, you know, carrier dean that is

6    kicking the can down the road or am I going to make

7    some significant changes?

8         I decided to make significant changes.  I

9    create 15 institutes.  I purchase a hospital.  I made

10   Sylvester again an NCI-designated comprehensive cancer

11   center.  I have turn around the research enterprise of

12   the medical school.

13        I've increased the faculty with about 255

14   faculty that were at a very different level than the

15   prior faculty.  And if you think that that can be done

16   without experiencing some challenge along the way, you

17   are dreaming.

18   Q.   I'm not --

19   A.   This is an extremely difficult transition to

20   operate.  Okay?  But it was for the benefit of so many

21   people in South Florida and beyond, that it was worth

22   the challenge, the difficulties.

23        I mean, you read it as I did.  The men in the

24   arena.  I mean, tell me one individual that has made

25   significant and useful changes that is not being

1    trashed at one point of their existence.

2           And if you ask the trustees today, ask the

3    executive committee were the choices that Pascal

4    Goldschmidt made for the medical school and the

5    organization good?  Were the changes that Donna

6    Shalala made for the university smart?  They will tell

7    you yes.

8    Q.   Dr. Goldschmidt, I'm not quibbling with you

9    about that at all.  It appears to me is that you were

10   being undermined by a person who is the focus of the

11   TMG investigation, Alan Livingstone.  Do you agree or

12   disagree?

13          MR. ISICOFF:  Object as to form.

14   A.   He was the director for a crazy revolt, yes.

15          MR. ISICOFF:  Jeff, we have been going a

16          really long time and it's getting late, so maybe

17          we should take a short break.

18          MR. SLOMAN:  Absolutely.  And, Eric, I'm

19          going to try to wrap this up by five.  I've going

20          to do my best.  Okay?

21          MR. ISICOFF:  We're going to hold you to

22          seven hours.  Again, you run your own show and

23          I'm not quarreling with you, but there's no

24          reason on God's green earth for this depo to go a

25          minute beyond the allocated time.  I know you'll

```
1        do your best.  But I'm going to give you a hard
2        time if you want to go beyond the seven hour,
3        because this depo does not warrant it.
4             MR. SLOMAN:  Well, you know the seven hours
5        includes running time.  Correct?
6             MR. ISICOFF:  I understand that.  But, again,
7        we try to be reasonable with each other here and
8        I don't want to waste time discussing what I
9        would do or wouldn't do.
10            I'm just simply saying this depo does not
11       warrant anything more than the maximum permitted
12       by the rules.
13            MR. SLOMAN:  You and I both agree.
14            MR. ISICOFF:  Okay, good.
15            MR. SLOMAN:  I'm looking towards that.
16            MR. ISICOFF:  Thank you.
17            THE VIDEOGRAPHER:  We'll go off the record.
18       This marks the end of video file number five.
19       The time is 3:55 p.m. and we're going off the
20       record.
21            (Thereupon, a brief recess was taken, after
22       which the following proceedings were had:)
23            THE VIDEOGRAPHER:  We're back on the video
24       record.  This is the start of video file number
25       six in the deposition of Dr. Pascal Goldschmidt.
```

```
 1          The time is 4:03 p.m.

 2              (Thereupon, the document was marked as

 3              Exhibit 61 for identification.)

 4  BY MR. SLOMAN:

 5      Q.   Dr. Goldschmidt, I'm showing you what's been

 6  marked as Exhibit 61, which purports to be an email

 7  chain from January 16th through January 17th.  The

 8  first email in the chain is from Joe Natoli to Alan

 9  Livingstone, if you can just take a moment and read

10  that.

11      A.   Yeah.

12      Q.   Okay.  Do you see that?  Now, do you recall

13  that Mr. Natoli forwarded you his email exchange with

14  Alan Livingstone from the 16th on the morning of

15  January 17th?  Do you see that?

16      A.   Yep.

17      Q.   And if you can just go up a little more,

18  Jackie.  And you responded to Mr. Natoli at 6:19 a.m.,

19  "Joe, you and I should talk about this.  Thanks,

20  Pascal."

21              Do you see that?

22      A.   Yeah.

23      Q.   And if you go up a little further, you

24  forwarded the email chain to President Shalala at 6:32

25  a.m.  Do you see that?
```

```
 1          A.   Yes.
 2          Q.   The email to President Shalala states:
 3     "Donna, We should talk about this.  Alan is
 4     campaigning against me and yesterday at a meeting with
 5     Nimer, Lubarsky and Cote was opposed to our efforts to
 6     work with Steve Sonenreich to bring Sylvester at
 7     MSMC," Mount Sinai Medical Center.
 8          A.   Yes.
 9          Q.   "Support from the president and trustees is
10     needed.  Pascal."
11               Did I read that correctly?
12          A.   Yes.
13          Q.   What was Alan Livingstone -- let me ask.
14     Sorry.  Alan is Alan Livingstone.  Correct?
15          A.   Yes, it is.
16          Q.   And what was he campaigning against you?
17          A.   So, we were asked by Mount Sinai, and my
18     recollection is that Aaron Podhurst was always trying
19     to have us develop a relationship with Mount Sinai.
20     And in this case they wanted to become expansion of
21     the Sylvester Comprehensive Cancer Center.  And so
22     Alan opposed it.
23               You know, one thing very interesting about
24     Alan is that the whole mess that he created for the
25     university was related to one to two percent of our
```

```
1    total revenues.  He could never see the big picture.

2    He could never see beyond his little department.  It

3    was always, you know, the village that was the most

4    important compared to the country.

5           And that was very unfortunate, because we

6    wasted so much time, so much energy.  And this was

7    another evidence of it.

8        Q.   And President Shalala responded to you at

9    9:07 a.m.  She said "I talked with Joe.  He talked

10   with Alan.  Alan has always hated Sinai based on his

11   previous experience with them.  We know that and he

12   says the same thing whenever the name is mentioned.

13   Don't trust Steve S.  Nothing new in his position."

14   Did I read that correctly?

15       A.   Yeah.  He's like that with everybody.  Steve

16   Sonenreich has done so much better than Alan

17   Livingstone.

18       Q.   Okay.  And then the email from President

19   Shalala concludes "  Alan has big job to get

20   productivity up."

21           Do you see that?

22       A.   Yeah.

23       Q.   What did you understand that to mean?

24       A.   Well, I think that Donna realized that Alan

25   was fighting for, you know, a couple of crumbles when
```

1    there was really important things to get done.

2           Look, we were trying to reinstitute an NCI

3    designation as comprehensive cancer center, and

4    extending to Mount Sinai would have been a huge help

5    in that process, not to mention the fact that we would

6    have improved the cancer care of patients going to

7    Mount Sinai and that may have saved a lot of lives,

8    not to mention that the research that we're doing in

9    the context of the Sylvester Comprehensive Cancer

10   Center could have happened at Mount Sinai as well and

11   benefit patients with new treatment.  That was not

12   visible to Alan.

13        Q.   So did you disagree with President Shalala

14   when she says "He has a big job to get productivity

15   up" in the sense that she was placing more importance

16   on Dr. Livingstone's productivity than she was in the

17   big picture with regard to getting Mount Sinai Medical

18   Center as a partner with UM?

19        A.   No.  I think that she meant that Alan needs

20   to do a better job.

21        Q.   And she used the words "get productivity up."

22   Correct?

23        A.   Yep.

24        Q.   And you understood that to mean generating

25   money through the department of surgery.  Correct?

```
 1         A.   No.  Just develop the department in a way

 2    that would be helpful to the university and to South

 3    Florida.

 4         Q.   Well, productivity also implies, would you

 5    agree, that it involves money.  Correct?

 6         A.   Yeah, of course.

 7         Q.   Let's go up a little bit more.  And your

 8    response to President Shalala is "Alan is a

 9    destructive individual who has raised my faculty

10    against me.  Did I read that correctly?

11         A.   Yes.

12         Q.   And do you feel that that was true at the

13    time?

14         A.   And it's still true now.

15         Q.   And you go on and say "Plenty of witnesses to

16    testify to this.  Is ruining my reputation."

17              Was that true at the time and is it true

18    today?

19         A.   It's still's true today.

20         Q.   You wrote "I have parents of medical student,

21    applicants who are calling me to find out if I'm going

22    to be kicked out of UM.  Dipen Parekh does -- refuses

23    to meet in the presence of Alan, because Alan is so

24    negative about what Dipen does and puts his work down

25    in front of everybody.  Ask Nimer about it."
```

```
1        A.    Dipen Parekh is a formidable individual which
2    I had recruited as the head of urology, and he's now
3    the chief executive officer for UHealth, the
4    University of Miami Health System.
5        Q.    And you go on and say "Alan is destroying
6    everything I have built at UM.  There is a decision to
7    be made."
8              Again, was it true that Alan was destroying
9    everything you felt you had built at UM?
10       A.    He was certainly trying.
11       Q.    And when you said "There's a decision to be
12   made," what did you mean?
13       A.    I think that I realized that there was a
14   communication, direct communication, going between Tom
15   LeBlanc, Alan, and Donna Shalala and Alan, and I think
16   that decision should have been made to stop it.
17       Q.    And do you think that he was given too much
18   encouragement by President Shalala?
19       A.    I think he was being given way too much
20   attention, yes.
21       Q.    President Shalala responded "You appointed
22   him.  Contain him.  He has to lead more productivity."
23             How did you interpret that?
24       A.    Well, I certainly didn't appoint him as chair
25   of the department of surgery.
```

1      Q.   Right.  And her directive "to contain him, he

2   has to lead more productivity," how did you interpret

3   that?

4      A.   Not sure.  She thought I should control him

5   more.  I mean, you have to understand, Alan is someone

6   who was threatening his faculty.  His faculty was

7   constantly feeling insecure and intimidated.

8           Finally I got Alan out of his position of

9   chair of surgery and replaced him by one individual

10  named Omaida Velazquez and the department is

11  completely different from the day it was under Alan.

12          (Thereupon, the document was marked as

13          Exhibit 62 for identification.)

14  BY MR. SLOMAN:

15     Q.   Let me show you now what's been marked as

16  Exhibit 62.  This is an email from Dr. Lord to certain

17  individuals on the UM board of trustees, dated January

18  18, 2013.  I'd like to go to Exhibit 63 before we get

19  to this top of this email.

20          (Thereupon, the document was marked as

21          Exhibit 63 for identification.)

22  BY MR. SLOMAN:

23     Q.   Exhibit 63 is the attachment to that email

24  sent by Dr. Lord.  Do you remember the email and the

25  attachment, Dr. Goldschmidt?

1    A.   Yes, very well.

2    Q.   And what do you remember about it?

3    A.   Well, it was -- it was a bit surprising, but

4    not entirely unexpected.

5    Q.   Why do you think it was surprising?

6    A.   Surprising, because -- surprising, because

7    Jack was a friend.  I expected that, because Jack has

8    a tendency to fight.

9    Q.   Well, so let's break that down.  Let me

10   direct your attention -- go down a little bit,

11   Jackie -- do you see the sentence "I would not be

12   fulfilling my duties as chief compliance officer for

13   the medical center if I didn't highlight key

14   compliance issues that are pending completion."

15   A.   Yes.

16   Q.   And were you surprised that he wrote this to

17   the board of trustees or to certain members of the

18   board of trustees?

19   A.   Okay, I was surprised, but it was not

20   unexpected.

21   Q.   Did you feel that there was anything

22   untruthful about what he included in this particular

23   bullet point?

24   A.   No.  That particular bullet point didn't

25   bother me at all.

```
 1        Q.   Okay.  Let me ask it this way.  What about

 2   this email and the attachment bothered you, if

 3   anything?

 4        A.   I think it was very --

 5             MR. ISICOFF:  Object as to form.  You can

 6        answer.

 7        A.   I thought it was very derogatory.

 8        Q.   To who?

 9        A.   To me.

10        Q.   To you?

11        A.   Yes.

12        Q.   What about it?

13        A.   It presented me and my administration as

14   being very much kind of not knowing what they were

15   doing.

16        Q.   Well, can you point to an example?

17        A.   Look, I don't have the entire letter in my

18   mind.  I'm just telling you how I reacted to it.

19        Q.   Do you want to take a moment and read it and

20   tell me what particular aspects of it bothered you?

21   Do you want to start at the top, Jackie.

22        A.   Keep going.  For example, indirect,

23   incomplete or inaccurate communications of business

24   plans, investments and strategic operational --

25        Q.   Can I just stop you for one second.  Can you
```

1    point to what you're referencing.

2        A.   Accountability and compliance, second point.

3        Q.   Okay.

4        A.   Keep going.

5        Q.   Go down.

6        A.   Keep going.  It doesn't mention any of the

7    things that are being achieved, such as there was no

8    mention of the fact that we took the extraordinary

9    risks and effort to reengineer entirely electronic

10   platform for medical record and everything attached to

11   that, which was a substantial effort.

12            There was no mention of the fact that we had

13   been able to create a complete health system with an

14   urgent care hospital within the system, and,

15   therefore, without a major leak of patients out of the

16   system.

17            There was really nothing positive about it at

18   all.  I think it could have been at least objectively

19   balanced.

20       Q.   Anything else that you can think of?

21       A.   No.  This was the key issues.

22            (Thereupon, the document was marked as

23            Exhibit 64 for identification.)

24   BY MR. SLOMAN:

25       Q.   Let me go to Exhibit 64.  If you go to the

1    top of Exhibit 64, and if you go down a little bit, a

2    little further, do you see President Shalala's

3    response?

4         A.   Yeah.

5         Q.   "Give him his check and thank him for his

6    hard work on our behalf."

7         A.   Yeah.

8         Q.   How did you interpret that?

9         A.   Well, I guess she was not very happy either.

10        Q.   Are you saying that there is some sarcasm in

11   that statement?

12             MR. ISICOFF:  Object as to form.

13        A.   Yeah.  I mean, yes.

14             (Thereupon, the document was marked as

15             Exhibit 65 for identification.)

16   BY MR. SLOMAN:

17        Q.   Let me show you what's been marked as Exhibit

18   65.  Aside from -- I apologize for the highlights

19   here.  Somehow we added them.  But, in any event, go

20   down a little bit, Jackie, and I just want to -- go

21   down further, further, further.  Okay.  Let's go to

22   the Bates stamp.  This is Bates stamp UM-Lord 00044671

23   and I believe it's 672.

24        A.   I hope you don't expect me to capture

25   everything that you just passed.

1          Q.   No, no, no.  I want to start at the top.  Dr.

2     Goldschmidt, do you remember drafting several

3     statements that eventually went out to the Miller

4     School of Medicine on or about January 30, 2013?

5          A.   Yeah.

6          Q.   And I'll represent to you that this was one

7     of the first drafts of your statement that eventually

8     was edited and went out something different.  Okay?

9     But I'd like to focus on this draft, if you would

10    permit me.  Okay?

11          Do you remember drafting several drafts of a

12    statement that would go out to the medical school

13    community that led up to a meeting with the faculty on

14    or about January 30th?

15          A.   Vaguely.

16          Q.   Okay.  I want to go through a couple of these

17    paragraphs.  And the first paragraph says "I have been

18    reflecting on this past year.  A year ago in January

19    our expenses were exceeding our revenues.  The UM

20    president and trustees became concerned.  The team I

21    had brought to start the UM Health System was not

22    prepared to help us make a major turnaround."

23          Did I read that correctly?

24          A.   Yes.

25          Q.   And was that essentially a true statement

1    that you wrote back then?

2        A.    I think that it was correct that the UM

3    president and the trustees became concerned.

4        Q.    And, as a result, you referenced "The team

5    that I brought to start the UM Health System was not

6    prepared to help us make a major turnaround."

7        A.    I thought that what I meant is that the

8    trustee became very concerned and what their concern

9    was that the team I had brought to start the UM Health

10   System was not prepared to help us make a major

11   turnaround.

12       Q.    Okay.  And then it goes on, and you said

13   "Today we have accomplished one of the most impressive

14   turnarounds in the history of modern academic

15   medicine."

16       A.    Yeah.

17       Q.    Did you believe that to be a truthful

18   statement?

19       A.    Yeah, I believe it.

20       Q.    Going on it says "Seven months in the year we

21   are eight million in the black, nine million ahead of

22   plan, 36 million favorable to prior year, well on our

23   way to surpass our commitment of delivering 27 million

24   to the UM balance sheet and still have unused

25   contingency line, and this is after paying our two

1    percent contribution to the university and after

2    reserving for payment of all bonuses and clinical

3    incentives that we have pledged to our hard-working

4    faculty.

5              "We also intend to implement a three percent

6    merit increase for our faculty and staff on June 1st

7    of the new academic year."

8              Is that essentially correct?

9         A.   That was correct at the time, yes.

10        Q.   And then you go on and say "The best way I

11   can characterize the past nine months is with an

12   analogy to a crucible event, one that changes the

13   nature of something."

14             In the drafts that I've seen, one of the

15   drafts that you had referred to war and wartime

16   events, and this was I think one of your analogies to

17   a crucible event.

18             But, in any event, it goes on "With a rapid

19   growth of the past six years, we've accumulated a

20   workforce with many redundancies and duplicative

21   layers, unfunded programs, and we simply could no

22   longer afford them."

23             Was that correct at the time?

24        A.   Yeah, I think that was correct.  There was

25   never a recalibration of the organization until that

```
 1    point.

 2         Q.   Okay.  And you went on and said "There is

 3    limited preparedness on part of my departments -- of

 4    many departments."  I'm sorry.  I will reread that.

 5              "There was limited preparedness on the part

 6    of many departments and institutes to make tough

 7    decisions we were confronted with the need of rapid

 8    action.  We needed to create our own crucible event."

 9              Without referencing the need for a crucible

10    event there, you would agree that many of the

11    departments in the institute were subject to tough

12    decisions and the need for rapid action to address

13    them.  Correct?

14         A.   Yeah.

15         Q.   And then the next paragraph says "A few

16    months before, we had recruited Dr. Jack Lord as our

17    chief innovation officer.  Jack had experience from

18    prior roles in restructuration and in successfully

19    turning around medical centers that were experiencing

20    a financial crisis."

21              Did I read that correctly?

22         A.   Yeah.

23         Q.   "He was willing to help us, took the position

24    of chief operating officer, and led the operation of

25    saving financially our medical school and health
```

1    system."

2           Did I read that correctly?

3       A.   Yeah.

4       Q.   "We also reduced our leadership team with

5    departure of many leaders who had been instrumental in

6    launching our health system and many others."

7           Is that a correct statement or statements in

8    that paragraph?

9       A.   Yes.

10      Q.   If we can go down, Jackie.  I'm going to skip

11   down further in the document on Bates stamp ending in

12   72.  Where it says then.  I'm going to skip down to

13   the paragraph beginning with then at end of December.

14          It says "Then at the end of December, when we

15   realized that our performance had, indeed, improved

16   and was stabilized, it was time to revert to a

17   creation-driven and peaceful mode.  The plan that was

18   carefully presented to the entire leadership team of

19   our Miller School and health system at the beginning

20   of March 2012 had been executed fully.  The crucible

21   event created to save us financially could no longer

22   be prolonged and all of us were fed up with the status

23   quo.  Frustrations of the faculty manifested with

24   petitions, revolts against the going modus operandi,

25   against decisions that, even if they were the right

1    decisions, failed to be communicated with the expected

2    concerns for clarity and appropriate links to our

3    principles."

4              Did I read that correctly?

5         A.   Yes.

6         Q.   And did you believe that to be true?

7         A.   Yes, I do.  I think there is one area where

8    we misperformed.  It was in the area of communication.

9              (Thereupon, the document was marked as

10             Exhibit 66 for identification.)

11   BY MR. SLOMAN:

12        Q.   Let's go to Exhibit 66.  And, as you can see,

13   Dr. Goldschmidt, I guess there were various people who

14   were helping you wordsmith this and one of them was

15   the president.  Do you see that?

16        A.   Yeah.

17        Q.   And as I represented to you before, I

18   believe, that in one of these drafts there was a war

19   analogy and apparently President Shalala didn't like

20   war analogy.

21             But what I'm interested in is her statement

22   to you, "You also overdo the thanks to Jack and Sheri.

23   You don't need to do it in public talk about making

24   tough decisions to achieve a turnaround.  Take credit

25   for bringing in a new transition team.  Go through

```
 1    another draft."

 2              Do you see that?

 3    A.   I do.

 4    Q.   And I think you agreed.  "Okay.  I will

 5    change the analogy.  Reduce the role of JTL."

 6              That's Jack Lord.  Correct?

 7    A.   Yep.

 8    Q.   "And pass it to Joe when done."

 9              Did I read that correctly?

10    A.   Yes.

11    Q.   Okay.

12              (Thereupon, the document was marked as

13              Exhibit 67 for identification.)

14    BY MR. SLOMAN:

15    Q.   Let me show you 67.  67 is a January 21st

16    string of emails, with a revised version at 4:55, at

17    5:27 Natoli wrote "In Pascal's note, I'd be careful

18    about saying today we accomplished one of the most

19    impressive turnarounds in the history of modern

20    academic medicine.  Better to be understated

21    throughout the note."

22              And then, apparently, you redrafted it again

23    and took out the statement about it being one of the

24    most impressive turnarounds in the history of modern

25    academic medicine.  Do you agree with that?
```

1      A.   Yeah.

2      Q.   But you felt it was an impressive turnaround.

3  Now whether it was the most impressive turnaround in

4  the history of modern academic medicine, you still

5  believed it was an impressive turnaround.  Correct?

6      A.   No.  In ten years we triple the revenues of

7  the medical center.  And, again, the IML was between

8  one and two percent of that.  So we did things that

9  were absolutely instrumental in developing the health

10  system to make it a health system of value that people

11  were seeking and that was serving the people of South

12  Florida in a major way.

13        And that further also impacted on other

14  organization, like Jackson, like Baptist and like

15  Mount Sinai in the way that they had to upgrade their

16  game to continue to compete with us.

17        And what had happened is that in the events

18  that followed 2008, the in and outs were misaligned,

19  and we needed to make a recalibration of the

20  organization, which we did, and Jack had played a

21  critical role in that.

22      Q.   And whether it was in the final draft or not,

23  it was certainly a very impressive turnaround in the

24  history of modern academic medicine.  Correct?

25        MR. ISICOFF:  Object as to form.

```
 1          Q.   Would you agree with that?

 2          A.   Yes, I do.

 3               (Thereupon, the document was marked as

 4               Exhibit 68 for identification.)

 5     BY MR. SLOMAN:

 6          Q.   Let me show you now Exhibit 68.  Dr.

 7     Goldschmidt, instead of me reading this one, I'd like

 8     you to read it, and when you finish reading it, I then

 9     have a series of questions for you.

10               (Reporter clarification.)

11          Q.   You can read it to yourself, Dean

12     Goldschmidt.

13          A.   Okay.  I think we missed a little piece.

14     Yep.

15          Q.   Dr. Goldschmidt, you would agree with me that

16     Dr. Lord has been excised from this statement.

17     Correct?

18          A.   Yes.

19          Q.   And regarding the financial results, they've

20     been tempered to reflect that -- sorry.  Let me strike

21     that.

22               The reference to it being one of the most

23     impressive turnarounds in the history of academic

24     medicine, that has been taken out as well.  Correct?

25          A.   Correct.
```

1    Q.   I'd like to, if you can go up a little bit,

2    Jackie, up there, do you see the paragraph that says

3    "Then at the end of December?"

4    A.   Yes.

5    Q.   "Then, at the end of December, when we

6    realized that our performance had indeed improved and

7    stabilized, it was time to refocus."

8    A.   Yep.

9    Q.   "I listened to the concerns of faculty and

10   staff via their chairs.  The medical faculty council

11   representatives and their petition and through direct

12   one-on-one conversations."

13        And then the last sentence.  "This made me

14   decide that a change in course and team was

15   warranted."

16        Did I read that correctly?

17   A.   Yes.

18   Q.   Now correct me if I'm wrong, Dr. Goldschmidt,

19   but it wasn't you that made the decision to change the

20   team at that time.  Correct?

21        MR. ISICOFF:  Object as to form.

22   A.   No, it wasn't.  But, you know, the problem

23   with big organizations is that when you in charge of

24   them, you supposed to take responsibility, and I

25   didn't want to not take my responsibility.

1        Q.   I understand that.  But the statement that

2   "This made me decide that a change in course and team

3   was warranted," that was not true.  Correct?

4        A.   Look --

5             MR. ISICOFF:  Object as to form.

6        A.   There were many unique contributors to the

7   success that we had.  Bill Donelan had been a

8   formidable leader initially.  Jack was a formidable

9   leader at a critical time of the organization, and

10  Donna Shalala played a very important role.  Stuart

11  Miller had been instrumental in helping us being more

12  successful.  There were several chairs that were

13  instrumental in our success as well.

14           I mean, you know, it's never about just one

15  person; it's about -- it's about the organization.

16  And there were -- I can see the point of Donna, you

17  know, if we thank one person, we really need to

18  recognize the other people that were unique.

19           To get Cedars the way we got it, I mean, I

20  had phone calls the day before to tell me that the

21  university was never able to buy either south hospital

22  or doctors, it would never happen, because the

23  university was not capable of doing so.

24           We had a huge issue at the level of the

25  trustees, with trustees, that it always voted

1    unanimously on things, who were very divided about

2    this.  This was very challenging, and many, many

3    people were instrumental in making -- in allowing the

4    turnaround.

5          With all due respect, while I totally

6    recognize that the contribution of Jack Lord was an

7    essential one at a very critical time, there were many

8    people that contributed to the success of the

9    organization, and that made it now a very successful

10   medical school, not only in terms of education,

11   research and clinical care, but also financial.

12        Q.   Dr. Goldschmidt, my question was a little

13   different.

14        A.   Okay.

15        Q.   My question is with regard to the last

16   sentence of the paragraph beginning "Then, at the end

17   of December," you stated "This made me decide that a

18   change in course and team was warranted."

19        A.   Yes.

20        Q.   That is not a true statement.  Correct?

21             MR. ISICOFF:  Object as to form.

22        A.   Well, at the end of the day, I could have

23   refused.

24        Q.   Did you decide to change the team at the end

25   of December?  Was it your decision?

```
 1        A.   I agreed to change the team.  But since I was

 2   in charge of the change, I take full responsibility

 3   for it.

 4        Q.   Dr. Goldschmidt, you did not make that

 5   decision.  Correct?  You've testified here all day --

 6             MR. ISICOFF:  Object to the form.

 7        A.   I'm not disputing that point.  Okay?  It was

 8   not my decision to remove Jack Lord.  I'm not

 9   disputing that.

10             But when it comes to talking to the faculty,

11   I have to stand for what happened and take full

12   responsibility for it.  Maybe I didn't express that

13   correctly, but that was the intent.  Is that -- can

14   you understand that?

15        Q.   Again, Dr. Goldschmidt, I'm asking the

16   questions.  You have to answer them.  I don't answer

17   questions.

18        A.   Let me understand specifically what you want

19   me to answer.

20        Q.   I want you to acknowledge that the last

21   sentence of that paragraph, beginning with -- that

22   starts with "Then, at the end of December."  Do you

23   see that paragraph?

24        A.   Yes.

25        Q.   The last sentence:  "This made me decide that
```

1  a change in course and team was warranted."

2     A.   Okay.

3     Q.   That is not a true statement.  Correct?

4          MR. ISICOFF:  Object as to form.

5     A.   No.  I think that it's -- it's an adequate

6  way to explain a series of events that had occurred

7  within my team.

8          At the end of the day, I do believe that it

9  was my choice to refuse to go along with the decision

10  of Donna Shalala and the board and to be fired.  I was

11  not done with my -- for some reason the screen

12  disappear here.

13     Q.   We see you.

14     A.   Okay.  Got it.

15          Look, I was not done with what I came to

16  accomplish at UM.  And the team was changed.  And at

17  the end of the day, whether you like it or not, while

18  it was not my responsibility or decision to separate

19  from Jack, who was my friend and was my partner at

20  work, it was -- it, nevertheless, falls on me the

21  responsibility that the team has changed.

22     Q.   But you did not make that decision.  Correct?

23  That was Donna Shalala's decision.  Correct?

24          MR. ISICOFF:  Object as to form.

25     A.   You're upset about the term decide.  And I

1    agree with you, it was not the correct time.  I should

2    have said I was responsible for that change in course.

3         Q.   Dr. Goldschmidt, who suggested that sentence,

4    do you recall?

5         A.   I don't.  It may have been Joe Natoli.  I

6    just -- I just don't -- I just don't remember who made

7    the change in it.

8         Q.   Do you know why it was so important to

9    include in your statement to the faculty?

10             MR. ISICOFF:  Object as to form.

11        A.   What I was concerned is that I wanted to make

12   sure that I was very clear that anything that happened

13   in the medical center was my responsibility, yes.

14             You're correct that I should have said -- I

15   was responsible for the change, of course, and team

16   that was -- that took place.

17        Q.   You were responsible, but you did not make

18   the decision.  Correct?

19             MR. ISICOFF:  Object as to form.

20        A.   That is correct.

21             (Thereupon, the document was marked as

22             Exhibit 69 for identification.)

23   BY MR. SLOMAN:

24        Q.   Let me show you now what we've marked as

25   Exhibit 69.  If we can go to the bottom, please.  This

```
 1    is an email from John Dorschner to Christine Morris.

 2    "I now have multiple sources saying she -- referring

 3    to President Shalala -- spoke to the senate for about

 4    30 minutes, including taking of questions.  She said

 5    that tough decisions had to be made to fix the

 6    school's finances.  She says the stakes had been made,

 7    quote/unquote, but when asked, wouldn't name

 8    specifics.  She said retaliation had, quote/unquote,

 9    absolutely no place in an academic setting and she

10    would not tolerate it."

11            He goes on.  "I'll wait a few minutes before

12    adding to this to the online story if you want to

13    comment."  Go up, Jackie.  And President Shalala

14    indicated "To let it go.  Pascal's letter speaks for

15    itself."

16            Dr. Goldschmidt, my question is, you were at

17    that meeting with President Shalala.  Correct?

18    A.    No, I don't think I was at the meeting.

19    Q.    Well, this was the -- so your statement --

20    A.    It was between Shalala and the faculty?

21    Q.    Yes.  Were you there?

22    A.    I was not there.

23    Q.    I'm sorry.  I thought you were.

24    A.    No.

25    Q.    Okay.  I was going to ask you whether she
```

1    made any reference to retaliation and who she was

2    referring to or who the group was referring to in

3    terms of retaliation.

4         A.   I was not at the meeting.

5              MR. ISICOFF:  Object as to form.

6         Q.   Sitting here today, do you know who the

7    reference to retaliation was aimed towards?

8         A.   No idea.

9              (Thereupon, the document was marked as

10             Exhibit 70 for identification.)

11   BY MR. SLOMAN:

12        Q.   Let me show you Exhibit 70.  Dr. Goldschmidt,

13   I'll represent to you that Exhibit 70 has got John

14   Dorschner's January 31st, 2013, article where it says

15   "Goldschmidt confronts angry UM Medical School

16   faculty."  And imbedded in the email is the version of

17   that article.

18             The article quoted President Shalala as

19   referencing this -- let me find it -- in the article

20   it says -- let me see if I can find it -- go up a

21   little bit, Jackie.  Down.  I'm sorry.

22             At the bottom it says that you told the

23   gathering that you had never punished anyone who's

24   spoken out against him or his actions.

25             Do you see that?

```
 1        A.   That meeting I was part of.  I was talking
 2   about a different meeting.
 3        Q.   Okay.  So am I correct in assuming that you
 4   and President Shalala addressed the faculty?
 5        A.   Okay, that's the meeting I mentioned where
 6   Donna Shalala addressed the faculty, talked to them,
 7   and then, when I was alone, Fogel get up on his feet
 8   and start attacking me.
 9        Q.   You said Fogel.  Bernard Fogel?
10        A.   Yeah.
11        Q.   He's the dean?
12        A.   Two deans before.
13        Q.   Two deans before you.
14        A.   Yeah.
15        Q.   And were you accused at that meeting of
16   punishing critics?
17        A.   Not that I remember.  That was not the key
18   topic.
19        Q.   Okay.  But at the bottom there it says
20   "Goldschmidt told the gathering that he has never
21   punished anyone who has spoken out against him or his
22   actions."
23             Do you see that?
24        A.   Yeah, that's correct.
25        Q.   Do you recall that coming up at the meeting
```

```
1    with the faculty?

2         A.   It's one of the things that came up at the

3    faculty meeting.  It was a horrible meeting.

4         Q.   And President Shalala was quoted during that

5    meeting as saying that retaliation against the

6    faculty, quote, had absolutely no place in an academic

7    setting, unquote.

8              Do you remember her saying that at the

9    faculty meeting?

10        A.   Vaguely, yes.

11        Q.   And do you know who they were referring to

12   about retaliation against the faculty?

13             MR. ISICOFF:  Object as to form.

14        A.   No.  But I assume that it was -- it was

15   something related to Livingstone.

16        Q.   Right.  In fact, this was all carried over

17   from Livingstone's accusations against you and Dr.

18   Lord.  Correct?

19             MR. ISICOFF:  Object as to form.

20        A.   It may be, yes.

21        Q.   Can you go down further, Jackie.  I'm sorry.

22   Go up.  Go down.

23             Okay.  Go up just a tiny bit.  Okay.

24             And it says -- I'm sorry.  Go down a tiny

25   bit.  I'm getting punch drunk.  Okay.  Right there.
```

1          Near the bottom, Dr. Goldschmidt, you're

2     quoted as saying "At the end of December, when we

3     realized that our performance had indeed improved and

4     stabilized, it was time to refocus, I listened to the

5     concerns of faculty and staff via their chairs, the

6     medical faculty council representatives and their

7     petition, and through direct one-on-one conversations.

8     This made me decide that a change in course and team

9     was warranted."

10          So this was the statement that you had

11    earlier approved and now have made it into John

12    Dorschner's article, dated January 31st, 2013.

13    Correct?

14     A.   Yes.  You know, it's very interesting.  The

15    two individuals who were recruited to replace me

16    lasted about 18 months.  Miami is a very challenging

17    environment.  I think way more difficult than even New

18    York when it comes to leading a big academic

19    enterprise.  And people like John Dorschner are

20    particularly able to create such a disfigured image of

21    what is actually happening in the university.

22          I mean, if you look at the changes that were

23    operated, we were doing extremely well.  But he was

24    listening only to Alan Livingstone, his clique and a

25    couple of people who had nothing to do really with the

1    medical school, but had very specific agenda.  That's

2    the reason why it's so difficult to lead a big

3    enterprise in Miami.

4         Q.   Dr. Goldschmidt, earlier in the deposition I

5    believe you -- and it's been hours, so correct me if

6    I'm wrong -- but I believe that you attributed some of

7    your problems to Dr. Lord.  Can you explain that to me

8    once more.

9         A.   Yeah.

10        MR. ISICOFF:  Object as to form.

11        A.   So I mentioned many times, you have seen it

12   in the documents that you have reviewed, my admiration

13   for critical qualities of Jack Lord.  There are some

14   issues that Jack has in terms of communication, in

15   terms of lack of respect for groups of individuals

16   that he sees as not doing something important, and

17   that created some significant problems in the

18   organization.

19        And so, you know, I have to be frank.  It had

20   a lot to do with the revolt that ensued.  It was

21   not -- it was not Alan Livingstone alone.  Alan

22   Livingstone took advantage of a milieu where actually

23   he had a chance to turn people against us.

24        And I think the fact that there was, you

25   know, quite a bit of attitude that people perceived as

1   disparaging and demeaning and disrespectful had a lot

2   to do with the challenges that we encountered later.

3        Q.   But you have no recollection of any email

4   where you documented those very concerns.  Correct?

5             MR. ISICOFF:  Object as to form.

6        A.   As I said, I prefer not to put things in

7   writing; I prefer to express them face-to-face.  And

8   there is once a year a review of the individual where,

9   if there are issues that need work, they end up in the

10   record.

11             THE VIDEOGRAPHER:  Mr. Sloman, 30 minutes.

12             MR. SLOMAN:  I'm almost done.

13             (Thereupon, the document was marked as

14             Exhibit 71A for identification.)

15   BY MR. SLOMAN:

16        Q.   Let me show you what has been marked as

17   Exhibit 71A.  Dr. Goldschmidt, go to page 16.  I just

18   want to go over some of the financials to verify your

19   income during 2012, 2013, 2014 and 2015.

20             Go to page 16.  There it is.  Okay.  There it

21   is.  All right.

22             Dr. Goldschmidt, I'm showing you what's known

23   as a Form 990.  It's a reporting IRS form that the

24   university makes.  Are you familiar with this?

25        A.   Very.

1    Q.   Okay.  It indicates here that for the

2   reporting period of 2012, which I believe actually

3   ends in 2013, that you reported W-2 income of

4   $1,199,905, and there was approximately an estimated

5   amount of other compensation of $45,635.  Is that

6   correct?

7    A.   That sounds right.  So you now know if you

8   compare my salary with other leaders of similar health

9   system, I was underpaid.

10          (Thereupon, the document was marked as

11          Exhibit 72 for identification.)

12   BY MR. SLOMAN:

13    Q.   I'm showing you what's been marked as Exhibit

14   72, which is the UM Form 990 for 2013.  Go to page 16

15   again.  And I believe this is for the year ending in

16   2014.  It reported a W-2 income that will you received

17   of $1,299,866, and an estimated amount of other

18   compensation of $46,994.  Is that correct?

19    A.   That's correct.

20          (Thereupon, the document was marked as

21          Exhibit 73 for identification.)

22   BY MR. SLOMAN:

23    Q.   I'm showing you what's been marked as 73,

24   which is the UM Form 990, 2014, which I believe ends

25   in 2015.  If we go to page 16 again, I believe you

1   made slightly less that year, two million -- I'm

2   sorry -- W-2 income of $1,277,879, but made $76,969 in

3   estimated amount of other compensation.  Is that

4   accurate?

5        A.   Yeah.

6             (Thereupon, the document was marked as

7             Exhibit 74 for identification.)

8   BY MR. SLOMAN:

9        Q.   And showing you Exhibit 74, which is the 990

10  for 2015, and I believe this ends in 2016, which would

11  have been your last year at the university, W-2

12  income, reported W-2 income of $1,558,915 and

13  estimated amount of other compensation of $94,273.  Is

14  that accurate?

15       A.   That seems to be a little bit high.  But,

16  whatever.

17       Q.   Which part was a little bit high?

18       A.   The 1.58.  I thought it was closer to 1.2

19  that year.

20       Q.   But this is what the university reported.

21       A.   Okay.

22             (Thereupon, the document was marked as

23             Exhibit 75 for identification.)

24  BY MR. SLOMAN:

25       Q.   Now I'd like to go to Exhibit 75.  Dr.

 1    Goldschmidt, this is an email -- let me just go to the

 2    Bates stamp.  This was Bates stamped Lord-001298.

 3    Just go to the top.  This is an email dated July 3rd,

 4    2013, written to you, Pascal, Joe and Tom.  And it

 5    says "Compliance Concepts, the outside independent

 6    auditing company, tasked with reviewing certain

 7    allegations of inappropriate billing at the IML has

 8    completed its report.  Virtually all of the

 9    allegations against the IML are unfounded."

10           Do you see that?

11    A.    Yeah.

12    Q.    What was your reaction when you saw that?

13    A.    It was done by a third party that's supposed

14    to be, you know, a group that is very competent in

15    making their assumptions.  So what do you want me to

16    tell you?

17    Q.    Were you surprised knowing --

18           MR. ISICOFF:  Object to the form.

19    A.    Surprised?  You know, I was surprised,

20    because I thought that the evaluation that I had seen

21    coming from Dr. Cote were accurate and I was a little

22    bit disappointed by the result.

23    Q.    And you were disappointed in the results

24    because why?

25    A.    Because they were different.  I would have

1    assumed that Dr. Cote was providing accurate

2    information and, obviously, the evaluation was that

3    the problems were relatively limited.

4           If I recall, it was -- we had to reimburse

5    something like $200,000 to Medicare, which is

6    regrettable, but was not a huge deal.

7        Q.   Did you find out from anybody that Jennifer

8    McCafferty Fernandez was asked to sign something

9    validating that audit?

10       A.   No.  I was -- you know, it had been moved to

11   the audit group, which was not reporting to me.  If I

12   recall correctly, it was Michael Moloney who was in

13   charge of the audit.

14          MR. SLOMAN:  Eric, give me five minutes and I

15       think I'm done.  I just want to make sure that

16       I'm done.  Okay?

17          MR. ISICOFF:  Standing by.

18          THE VIDEOGRAPHER:  We're going off the

19       record.  The time is 5:06 p.m.

20          (Thereupon, a brief recess was taken, after

21       which the following proceedings were had:)

22          THE VIDEOGRAPHER:  We're back on the video

23       record.  The time is 5:13 p.m.

24          MR. SLOMAN:  Plaintiff Dr. Jack Lord doesn't

25       have anymore questions.

```
 1            MR. ISICOFF:  Thank you.  I don't have any
 2       questions at this time.  We are going to take a
 3       copy of whatever is ordered, including the video,
 4       if ordered.  And we will read and sign.
 5            MR. SLOMAN:  I'm ordering the deposition and
 6       the video.
 7            (Discussion held off the record.)
 8            THE VIDEOGRAPHER:  This concludes today's
 9       video deposition of Dr. Pascal Goldschmidt.  This
10       consists of six video disks.  The time is 5:13
11       p.m. and we're going off the record.
12            (Reading and signing not waived.)
13            (Deposition concluded at 5:13 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    CERTIFICATE OF OATH

 2

 3    STATE OF FLORIDA

 4    COUNTY OF BROWARD

 5

 6         I, the undersigned authority, certify that

 7    PASCAL GOLDSCHMIDT appeared before me via Zoom on

 8    April 1, 2022, and was duly sworn.

 9         WITNESS my hand and official seal this

10    11th day of April 2022.

11

12

13

14                    Mary Ann Collier
                      _____
15                    Mary Ann Collier
                      Commission #HH 078151
16                    Expires 2/21/25

17

18    Witness I.D.:  Florida drivers license

19

20

21

22

23

24

25
```

1      <u>REPORTER'S DEPOSITION CERTIFICATE</u>

2

3          I, MARY ANN COLLIER, Court Reporter, certify

4      that I was authorized to and did stenographically

5      report the deposition of PASCAL GOLDSCHMIDT, that a

6      review of the transcript was requested, and that the

7      foregoing transcript, pages 1 through 242, is a true

8      and complete record of my stenographic notes.

9

10         I further certify that I am not a relative,

11     employee, attorney or counsel of any of the parties,

12     nor am I a relative or employee of any of the parties'

13     attorney or counsel connected with the action, nor am

14     I financially interested in the action.

15

16         Dated April 11, 2022.

17

18

19

20

21         *Mary Ann Collier*
           MARY ANN COLLIER

22

23

24

25

```
 1                        ERRATA SHEET

 2   DO NOT WRITE ON TRANSCRIPT.  ENTER CHANGES HERE.

 3   NAME:  PASCAL GOLDSCHMIDT
     RE:  Lord v. University of Miami
 4   DATE OF DEPOSITION:  4/1/22
     Page/Line  Change                      Reason
 5   _____

 6   _____

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22
     Under penalty of perjury, I declare that I have read
23   my deposition and that it is true and correct,
     subject to any changes in form or substance entered
24   above.
                                      _____
25   _____
     Deponent's signature      Date      (Print Name)
```

```
 1              Mary Ann Collier & Associates, Inc.
                        2423 SE 10th Court
 2                   Pompano Beach, FL  33062
                        305-371-2443
 3

 4                                  April 11, 2022

 5    Eric Isicoff
      Isicoff & Ragatz
 6    isicoff@irlaw.com

 7                 Re:  Lord v. University of Miami

 8    Dear Mr. Isicoff:

 9    With reference to the deposition of Pascal Goldschmidt
      taken in connection with the above-captioned case,
10    please be advised the transcript is prepared and
      awaiting signature.
11
      Please have the witness read the transcript, denoting
12    any corrections by page and line number on the
      enclosed errata sheet.  This errata sheet must be
13    signed by you and a copy forwarded to Jeffrey Sloman,
      attorney for the plaintiff.
14
      If this has not been taken care of within 30 days of
15    this date or by the time of trial, it shall then be
      concluded that the reading and signing has been
16    waived.

17                        Yours very truly,

18

19                        Mary Ann Collier & Associates

20    cc:  Jeffrey Sloman, Esq.

21

22

23

24

25
```

Message

| | |
|---|---|
| **From:** | Goldschmidt, Pascal J. [/O=UNIVERSITY OF MIAMI/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=PGOLDSCHMIDT] |
| **Sent:** | 12/6/2012 8:54:47 PM |
| **To:** | Shalala, Donna E. [dshalala@miami.edu] |
| **BCC:** | Goldschmidt, Pascal J. [pgoldschmidt@med.miami.edu] |
| **Subject:** | Re: Re: |

BTW, this is not a vote, it is propaganda of the worse type. Unacceptable. I will have my second official Dean review during FY14, faculty can vote then...

Sent from my iPhone

On Dec 6, 2012, at 6:52 PM, "Shalala, Donna E." <dshalala@miami.edu> wrote:

> I believe you need to talk to groups of faculty to confront this and answer questions without Jack.  I will spend some time in January reaching out to people  there is considerable confusion about the Jackson agreement.  I have warned you before your communication is weak with the entire faculty not the chairs. The latest rumor is that Children's is hiring the nurses we said weren't trained.  We don't need a no confidence vote just as things are turning around   Is it true we didn't invite  anyone at Jackson to meet with the candidate for bone marrow when he came?
>
> Sent from my iPhone
>
>
> On Dec 6, 2012, at 5:36 PM, "Goldschmidt, Pascal (Dean - School of Medicine)" <PGoldschmidt@med.miami.edu> wrote:
>
>> Donna,
>>
>> We want to make you aware that the attached petition is being circulated by a someone at the Miller School of Medicine. Obviously, the issue relates to fear of changes in our relationship with Jackson. It is not the first time that similar documents have been circulated to hurt the Dean of the Miller School. You will remember the nasty anonymous letter that was circulated in 2009, just a few months before the 2010 official review of the Dean by faculty organized by the Faculty Senate came back with more than 70% support.
>>
>> In this case, what is upsetting is that the authors are threatening our chairs and faculty to sign the document, indicating that "when the change in leadership will have occurred, there will be consequences for those who did not support the petition". Obviously, this is all very disappointing, but the price to pay for trying to make the changes that are necessary for the success of UM, the Miller School and UHealth.
>>
>> Pascal and Jack
>> <20121206173258025.pdf.pdf>

**EXHIBIT**

**18**

UMLORD - 00042419

Message

| | |
|---|---|
| **From:** | Robitaille, Magaly [MRobitai@med.miami.edu] |
| on behalf of | Goldschmidt, Pascal (Dean - School of Medicine) [PGoldschmidt@med.miami.edu] |
| **Sent:** | 12/19/2012 9:07:05 AM |
| **To:** | Shalala, Donna E. [dshalala@miami.edu] |
| **CC:** | Goldschmidt, Pascal J. [pgoldschmidt@miami.edu] |
| **Subject:** | Assessment Update |
| **Attachments:** | MTI Assessment Update - 12-18-2012.docx.docx; TMG Agenda - OPO Assessment 11-28.29-2012.pdf.pdf; TMG Agenda - MTI Assessment 11-7.9-2012.pdf.pdf; University of Miami - TMG Project Staff.pdf.pdf; TMG Agenda - IML Assessment 11-26.27-2012.pdf.pdf; IML revenue and transplant volume.xlsx.xlsx |

Donna

Below are the first phase of deliverables from TMG, the group that reviewed the MTI, IML and OPO, as summarized by Jennifer. These reports are framed in a way to provide perspective and raise key questions – the group was reluctant to put specific, "judgmental" comments in this first report.

As a summary of key takeaways, the management of the MTI has been a problem; there are many financial/conduct of business questions raised about IML practices-both in service to patients and to the OPO; and the business practices of the IML and OPO have resulted in extraordinary revenue growth benefiting the department of surgery. The next phase will be a detailed audit of bills, charges and payments for services that flowed through the IML.

Pascal

**EXHIBIT**

**30**

UMLORD - 00041246

**From:** McCafferty-Cepero, Jennifer <JMcCafferty@med.miami.edu>
**Sent:** Friday, December 21, 2012 4:40 PM EST
**To:** Ugalde, Aileen M <augalde@miami.edu>
**CC:** Shalala, Donna E. <dshalala@miami.edu>; LeBlanc, Thomas J <leblanc@miami.edu>; Natoli, Joe <jnatoli@miami.edu>; Goldschmidt, Pascal J. <pgoldschmidt@miami.edu>; Lord, Jonathan <JLord@med.miami.edu>; Moloney, Michael J. <mmoloney@miami.edu>
**Subject:** RE: IML investigation

Thanks, Aileen.

Can you please clarify whether this relates to the IML only or to the larger assessment that includes the MTI and the OPO as well?

Best-
Jennifer


Jennifer McCafferty, PhD, CHC, CHPC, CHRC
Chief Medical Compliance Officer

305.243.6129 Office
305.439.9250 Cellular
jmccafferty@med.miami.edu



*The information contained in this transmission may contain privileged and confidential information, including patient information protected by federal and state privacy laws.  It is intended only for the use of the person(s) named above.  If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited.  If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.*

**From:** Ugalde, Aileen M [mailto:augalde@miami.edu]
**Sent:** Friday, December 21, 2012 4:37 PM
**To:** McCafferty-Cepero, Jennifer
**Cc:** Shalala, Donna E.; LeBlanc, Thomas J; Natoli, Joe; Goldschmidt, Pascal J.; Lord, Jonathan; Moloney, Michael J.
**Subject:** IML investigation

The President has directed that, effectively immediately, the investigation of the IML be led and managed by Internal Audit.  Internal Audit will be contacting you to coordinate the transfer of all data gathered relative to the investigation, as well as oversight of the retained outside consultant.

*Aileen M. Ugalde*
Vice President, General Counsel
  and Secretary to the Board
University of Miami
1320 South Dixie Highway
Penthouse Suite 1250
Coral Gables, Florida 33146
305-284-2700

EXHIBIT

32

LORD-001244

**Message**

| | |
|---|---|
| **From:** | dshalala@miami.edu [dshalala@miami.edu] |
| **Sent:** | 1/1/2013 3:50:40 PM |
| **To:** | Livingstone, Alan S. [alivings@med.miami.edu] |
| **CC:** | LeBlanc, Thomas J [leblanc@miami.edu] |
| **Subject:** | Re: Request from Dean - Draft Policy for Clinical and Anatomic Laboratory Test - Confidential |

Sit tight

Sent from my iPhone

On Jan 1, 2013, at 3:39 PM, "Livingstone, Alan" <ALivings@med.miami.edu> wrote:

> Dear President Shalala and Provost LeBlanc,
>
> I am reaching out to you for guidance and support.
>
> I am more than a little surprised with the attached document, and the route by which it was delivered. I was personally on the medical campus yesterday until almost 6 PM holding a clinic at SCCC and having meetings, and neither the Dean nor Jack extended the courtesy of discussing this issue with me. I even had a meeting on CRB 3 with Sheri Keitz at 1 PM. Instead, they called my assistant, Roberto Estrada, to come and pick up the attached document. They clearly must have discussed it with the Chair of Pathology, Dr. Côte, and it would seem only reasonable they could have asked for my input.
>
> As you know, on Sunday December 9th, Charlie Nemeroff delivered an explicit threat to me about how the IML would be used to "take me out" if I did not endorse the Dean. I am including a contemporaneous documentation of that conversation-I also apprised Judd Goldberg of what transpired shortly after I received the call.
> [cid:image003.png@01CDE836.09D03350]
>
> Donna, after my meeting with you December 21, and Tom after my discussion with you December 22, I was relieved to know how strongly you felt that this form of intimidation was unacceptable, and that the transplant lab review would be put directly under Mike Moloney and Aileen Ugalde. Even though they have styled this as a policy change, I am deeply troubled by the timing and sense of urgency (a desire to implement it without discussion within several days over the New Year's holiday). Moreover, it is explicitly being applied only to Surgery and not to the analogous clinical laboratories in Dermatology and Ophthalmology-I have verified with doctors Schachner and Alfonso that they have not received a similar letter. I perceive this to be a continuation of the threat expressed by Dr. Nemeroff on December 9, and I would request your intercession.
>
> The timing of this encyclical is frankly surprising to me because with everything that has already been going on, I would have anticipated the Dean perhaps reaching out in a conciliatory manner with an attempt at compromise and reconciliation. Unfortunately, this is representative of much of what has been going on across our campus for too long a period of time. Arbitrary decisions are made in a dictatorial manner with no discussion with the involved faculty, and any contrary perspectives are crushed ruthlessly. Transparency, civility, collegiality, and inclusiveness are no longer present, and faculty are suppressed with intimidations.
>
> I have not responded to the Dean or Jack Lord, and await your guidance and support.
>
> With respect and deepest concern.
>
> Alan Livingstone
>
>
>
> From: Estrada, Roberto J
> Sent: Monday, December 31, 2012 2:34 PM
> To: Livingstone, Alan
> Cc: Warwar, Rafic; Namias, Nicholas
> Subject: Request from Dean - Draft Policy for Clinical and Anatomic Laboratory Test - Confidential
> Importance: High
>
> Dear Sir:
>
> Good day.
>

**EXHIBIT**

**42**

UMLORD - 00041622

> I just got a call from the dean's office to pick up the attached document.  There is a specific deadline to reply to this request:  01/04/2013
>
> I am copying Mr. Warwar and Dr. Namias for their information.
>
>
> I remain respectfully at your service,
>
>
>
> Roberto J. Estrada
> DeWitt Daughtry Family Department of Surgery
> Leonard M. Miller School of Medicine
> University of Miami
> Office:  305.243.5837
> Facsimile:  305.243.5863
> To learn more about the Department of Surgery please visit: http://surgery.med.miami.edu<http://surgery.med.miami.edu/>
>
> [Description: Description: Description: Surgery - logo - UHealth-Miller_The DeWitt Daughtry Family_Text_Jetg]
>
> The information contained in this transmission may contain privileged and confidential information, including patient information protected by federal and state privacy laws. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution, or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.
>
> [Description: everitas_07-09-07_green]
>
>
>
> <image005.jpg>
> <image006.jpg>
> <oledata.mso>
> <image003.png>
> <20121231142350426.pdf>

UMLORD - 00041623

Message

| | |
|---|---|
| **From**: | Shalala, Donna E. [/O=UNIVERSITY OF MIAMI/OU=GABLES CENTRAL EMAIL/CN=RECIPIENTS/CN=STAFFFACULTY/CN=DSHALALA] |
| **Sent**: | 1/1/2013 4:19:24 PM |
| **To**: | Goldschmidt, Pascal (Dean - School of Medicine) [PGoldschmidt@med.miami.edu] |
| **BCC**: | LeBlanc, Thomas J [leblanc@miami.edu] |
| **Subject**: | Re: Lab |

Fine

Sent from my iPhone


On Jan 1, 2013, at 4:08 PM, "Goldschmidt, Pascal (Dean - School of Medicine)" <PGoldschmidt@med.miami.edu> wrote:

> Just asked Maggie to recall the six emails. Pascal
>
> Pascal J. Goldschmidt, M.D.
> Senior Vice President for Medical Affairs and Dean
> University of Miami Miller School of Medicine
> Chief Executive Officer, University of Miami Health System (UHealth)
>
> On Jan 1, 2013, at 3:51 PM, "Shalala, Donna E." <dshalala@miami.edu> wrote:
>
>> Wait for the audit to finish withdraw the memo
>>
>> Sent from my iPhone
>>

EXHIBIT
43

UMLORD - 00041734

# Administrative / Academic

Organizational Chart
January 6, 2013



**Board of Trustees**

**University President**
(Donna E. Shalala, Ph.D.)

**Senior Vice President for Medical Affairs and Dean Chief Executive Officer, University of Miami Health System**
(Pascal J. Goldschmidt, M.D.)

**Chief Operating Officer, Medical Center Vice President for Medical Administration**
(Jonathan T. Lord, M.D.)

**Principal Business Officer**
(Nelson Weichold)

**Chief Medical Compliance Officer, UHealth**
(Jennifer McCafferty, Ph.D.)

**Chief Marketing Officer**
(Lee Phillips)

**Chief Strategy Officer, Medical Center**
(Elaine Van der Put, Ph.D.)

**Chief Executive, UHealth Regional Alliance**
(John Sory)

**Interim Associate Vice President for Human Resources**
(Marcia Beckford)

**Hospital Chief Executive Officers**
**UMH:** (Daniel Snyder)
**UMHC/SCCC:** (Richard Ballard)
**ABLEH/BPEI:** (Michael Gittelman)

**Executive Dean / Chief Executive Officer for Clinical Affairs and the UHealth Clinical Practice**
(Alan Livingstone, M.D.)

**Chief Executive, UM@Jackson**
(Steve Falcone, M.D.)

**Clinical Service Chiefs**

**Vice Chairs for Administration (UMMG Only)**

**Interim Executive Dean for Research and Research Training**
(Omaida C. Velazquez, M.D.)

**2- Senior Associate Deans**
**1- Associate Dean**

**Executive Dean/ Chief Officer Education and Policy**
(Laurence B. Gardner, M.D.)

**3 - Senior Associate Deans**
**6 – Associate Deans**
**6 - Assistant Deans**
**1 - Regional Dean**
**4 – Assistant Regional Deans**

**1- Senior Associate Dean**
**6- Associate Dean**
**2- Assistant Dean**

**Clinical Chairs**
**Basic Science Chairs**
**Center/ Institute Directors**

**Chief Innovation Officer Vice Provost for Innovation**
(Norma Sue Kenyon, Ph.D.)

**Chief Medical Informatics Officer**
(David M. Seo, M.D.)

**Senior Associate Dean for Faculty Affairs**
(Sheri A. Keitz, M.D., Ph.D.)

**2- Assistant Deans**
**1- Faculty Ombudsman**

EXHIBIT
**54**

UMLORD - 00042850

Begin forwarded message:

From: "Augustyn, Cynthia Lou" <caugusty@miami.edu<mailto:caugusty@miami.edu>>
Date: July 3, 2013, 5:50:59 PM EDT
To: "Goldschmidt, Pascal (Dean - School of Medicine)" <PGoldschmidt@med.miami.edu<
mailto:PGoldschmidt@med.miami.edu>>, "Natoli, Joe" <jnatoli@miami.edu<mailto:jnat
oli@miami.edu>>, "LeBlanc, Thomas J" <leblanc@miami.edu<mailto:leblanc@miami.edu>>
Cc: "Ugalde, Aileen M" <augalde@miami.edu<mailto:augalde@miami.edu>>, "Livingstone, Alan"
<ALivings@med.miami.edu<mailto:ALivings@med.miami.edu>>, "McCafferty-Cepero, Jennifer"
<JMcCafferty@med.miami.edu<mailto:JMcCafferty@med.miami.edu>>, "Green, Rudolph H."
<r.green3@miami.edu<mailto:r.green3@miami.edu>>, "Moloney, Michael J."
<mmoloney@miami.edu<mailto:mmoloney@miami.edu>>, "Malagon, Blanca Aurora"
<bmalagon@miami.edu<mailto:bmalagon@miami.edu>>
Subject: IML report

Pascal, Joe and Tom, Compliance Concepts, the outside independent auditing company tasked with
reviewing certain allegations of inappropriate billing at the IML, has completed its report.  Virtually all
of the allegations against the IML are unfounded.  The independent auditor found no support for any
of the allegations, with the exception of non-compliance with the extremely technical requirements of
the "grandfather clause", and the dissatisfaction of one nephrologist with two of the multiple tests on
the standard treatment protocols.  As Internal Audit had found the other non-billing allegations to be
unfounded as well, this completes the review of the allegations raised about the IML.

To cover the period from 2008 through May 2013, the lab will be asked to refund $136K for the
billings that did not meet the technical grandfather clause requirements, and $227K for the two tests
that the one nephrologist claimed he did not use in treatment of his patients.

Please let me know if there are any questions.

EXHIBIT
75

LORD-001298