*EXHIBIT "N"*

```
 1              IN THE UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF FLORIDA
 2
                 CASE NO. 13-22500-CIV-Altonaga/McAliley
 3

 4     JONATHAN LORD, M.D.,

 5          Plaintiff,

 6       vs.

 7     UNIVERSITY OF MIAMI,

 8          Defendant.
       _____/
 9

10

11                      Via Zoom
                       Wednesday, April 20, 2022
12                     9:32 a.m. - 4:27 p.m.

13
            VIDEOTAPED DEPOSITION OF ALAN LIVINGSTONE, M.D.
14

15

16       Taken before Mary Ann Collier, a Court Reporter

17     and Notary Public for the State of Florida at Large,

18     pursuant to Notice of Taking Deposition filed in the

19     above cause.

20

21

22

23

24

25
```

```
 1     APPEARANCES:   (Via Zoom)

 2         JEFFREY H. SLOMAN, ESQ.
           JORGE PEREZ SANTIAGO, ESQ.
 3         Stumphauzer Foslid Sloman Ross & Kolaya
           Two South Biscayne Boulevard, Suite 1600
 4         Miami, FL 33131
           305-614-1400
 5         jsloman@sfslaw.com
           On behalf of the Plaintiff
 6
           CHRISTOPHER M. YANNUZZI, ESQ.
 7         ERIC D. ISICOFF, ESQ.
           Isicoff Ragatz
 8         601 Brickell Key Drive, Suite 750
           Miami, FL 33131
 9         305-373-3232
           yannuzzi@irlaw.com
10         On behalf of the Defendant and deponent

11     ALSO PRESENT:

12         JONATHAN LORD, M.D.
           THOMAS OLENDER, Videographer
13         AILEEN UGALDE
           JUDD GOLDBERG
14
15         _____

16
17
18
19
20
21
22
23
24
25
```

3

```
 1                    I N D E X

 2    WITNESS              EXAMINATION BY         PAGE

 3    ALAN LIVINGSTONE   MR. SLOMAN                 5

 4                    E X H I B I T S

 5    FOR PLAINTIFF                              FOR I.D.

 6     Exhibit 1                                   64
       Exhibit 2                                   76
 7     Exhibit 3                                   81
       Exhibit 4                                   87
 8     Exhibit 5                                   89
       Exhibit 6                                   92
 9     Exhibit 7                                   98
       Exhibit 8                                  104
10     Exhibit 9                                  105
       Exhibit 10                                 110
11     Exhibit 11                                 111
       Exhibit 12                                 122
12     Exhibit 13                                 156
       Exhibit 14                                 162
13     Exhibit 15                                 168
       Exhibit 16                                 169
14     Exhibit 17                                 179
       Exhibit 18                                 187
15     Exhibit 19                                 189
       Exhibit 20                                 194
16     Exhibit 21                                 199
       Exhibit 22                                 200
17     Exhibit 23                                 208
       Exhibit 24                                 216
18

19

20

21

22

23

24

25
```

```
 1            THE VIDEOGRAPHER:  Good morning.  We're going
 2       on the record at approximately 9:32 a.m. on
 3       Wednesday, April 20th, 2022.  The audio and video
 4       recording will continue to take place unless all
 5       parties agree to go off the record.
 6            This is the video-recorded deposition of Alan
 7       Livingstone, M.D.  This video deposition has been
 8       noticed by the law firm of Stumphauzer, Foslid,
 9       Sloman, Ross and Kolaya, counsel for plaintiff.
10       It is in the matter of Jonathan Lord, M.D.,
11       versus University of Miami, case number
12       13-22500-Civ, filed in the United States District
13       Court, Southern District of Florida.  The
14       deposition is being taken by a remote video
15       conference.
16            My name is Thomas Olender.  I am the legal
17       video specialist from Valuable Video, Inc.  The
18       court reporter is Mary Ann Collier from Mary Ann
19       Collier and Associates.
20            Counsel will now state their appearances and
21       affiliations for the record, beginning with the
22       noticing attorney, and then the court reporter
23       will swear the witness in.
24            MR. SLOMAN:  Good morning.  Jeffrey Sloman
25       and Jorge Perez Santiago on behalf of the
```

1      plaintiff, Jonathan Lord, M.D.

2           MR. YANNUZZI:  Christopher Yannuzzi and Eric

3      Isicoff on behalf of the defendant and the

4      witness, Dr. Livingstone.

5           And also appearing with us are Judd Goldberg

6      and Aileen Ugalde, general counsel's office, also

7      appearing on behalf of the defendant and the

8      witness.  Thank you.

9  Thereupon,

10                    ALAN LIVINGSTONE, M.D.

11  was called as a witness and, having been duly sworn,

12  testified as follows:

13                    DIRECT EXAMINATION

14  BY MR. SLOMAN:

15      Q.   Good morning, doctor.  Again, my name is

16  Jeffrey Sloman and I represent Dr. Jonathan Lord.

17           Can you please state your name, date of birth

18  and address for the record, please.

19      A.   Alan Livingstone.  April 4, 1947.  I live at

20  3839 Wood Avenue, Miami, Florida.

21      Q.   Doctor, would you please give us a brief

22  description of your educational background, training

23  and work history.

24      A.   So I was born and raised in Montreal, Canada.

25  My education was at McGill University, both at the

```
1    undergraduate and graduate level.  I was in the

2    combined medical program.

3             Upon completion of my medical education, I

4    then went into a residency training program at

5    Montreal General Hospital.  I was the exchange, four

6    year residency, for one year from McGill University,

7    and then Montreal General Hospital to Miami, Florida,

8    here.  And then I went back to Montreal and Montreal

9    General Hospital to complete my training.

10            I was subsequently in my final year actually

11   recruited by the then chairman of the department of

12   surgery here at the University of Miami, Dr. Robert

13   Zeppa, and he talked me into leaving my position at

14   McGill and coming down to Miami.  And I'm pleased to

15   say that I've been here for my whole career.

16       Q.   Thank you, doctor.

17       A.   Do you want me to say anymore about what

18   happened once I got here, or you're going to ask me

19   specifically?

20       Q.   I'll ask you specifically.  But I think we

21   have some reverb.  I think somebody just muted their

22   sound, so I think we're okay.

23            Doctor, I'll get to your subsequent history

24   with the University of Miami in a moment.  I'd like to

25   ask you what you did in preparation for this morning's
```

1    deposition.

2        A.   I had a brief meeting yesterday or two days

3    ago with Judd and Eric Isicoff.  A couple of weeks ago

4    we had a brief meeting that included Aileen Ugalde, as

5    well as the aforenamed individuals.  I reviewed some

6    of my records this morning in anticipation of some

7    questions.

8        Q.   Okay.  Do you recall which records you

9    reviewed?

10        A.   I went over -- although I didn't realize it

11    was going to be germane -- I went over some of the

12    records that I had relating to the IML.

13        Q.   Were those emails or notes or memos or both?

14        A.   Yes, both.

15        Q.   Okay.  Doctor, can you -- you told us that

16    you have spent probably your entire -- after your

17    residency training in Canada, you came down to the

18    University of Miami and you've been here ever since.

19    So that was approximately when that you began at the

20    University of Miami?

21        A.   Do I have to reveal how long I've been here?

22        Q.   Well, it's on the Internet, so I don't think

23    it's a well-kept secret.

24        A.   No, it isn't.  I came July the 1st of 1976.

25    I was an assistant professor of surgery at that time,

1    and I worked both at the University of Miami Jackson

2    Memorial Hospital and the VA Hospital at that time.

3         And I was subsequently promoted to associate

4    professor.  And then professor of surgery with tenure

5    in the 1980s.  And subsequently had many roles in the

6    university, both from a clinical perspective, but also

7    from an administrative perspective.  And I suspect

8    you'll ask me about those.

9         Q.   Correct.  Can you tell us some of the titles

10   and roles that you've held over the years.

11        A.   I've done a lot of things, both for the

12   university and also for Jackson Memorial Hospital.  I

13   guess we can move forward to in 1993, when Dr. Zeppa

14   died prematurely and unfortunately, I was put in as

15   the acting chair of surgery for almost a year.

16        It was actually a search committee going on

17   and they selected Dr. Moglan to come in.  He started

18   in, I believe, April of 1993, and pursuant to that, he

19   named me as vice-chairman of the department of

20   surgery.

21        I already was the medical director of the

22   professional income plan, and then we changed the name

23   to the plan.  But, basically, the practice plan, I was

24   working administratively for that.

25        Over the next couple of years, from 1994 to

1    1997, I was the vice-chairman of surgery, I was the

2    chief of surgical oncology and had a number of other

3    responsibilities.  I was on the kitchen cabinet of the

4    dean of the medical school at that time.  That was Dr.

5    Bernie Fogel.

6            Subsequently, in 1997, when Dr. Moylan left

7    the medical center, I was put in as the interim chair

8    of the department of surgery.  I became the chair of

9    the department of surgery in 2000, and served as the

10   chair of the department of surgery through 2000 --

11   through September of 2015.

12           During that time I was also chief of surgery

13   at Jackson Memorial Hospital.  I had a number of other

14   administrative roles.  In 2012 I became the executive

15   dean of clinical affairs at the medical center.

16           I continued on as the chair of surgery, as I

17   said, until September of 2015.  Since that time I have

18   become the emeritus chair of surgery.  I am very busy

19   clinically.

20           I am in the division of surgical oncology.  I

21   operate three days a week.  I have clinics two days a

22   week.  I'm very involved with clinical research and

23   with the teaching and education of medical students,

24   residents and fellows in surgical oncology.

25       Q.  Do you have -- again, there is reverb, so

```
1    maybe everybody can mute their computer, if they

2    haven't already.  I think that's better.

3               Doctor, I also read that there is an endowed

4    chair in surgical oncology named in your name.  Is

5    that correct?

6         A.    That is correct.

7         Q.    And can you tell us when that was established

8    and what that actually means.

9         A.    So I operated on a woman who's actually not

10   only a survivor of cancer, but is still a friend, and

11   she's alive.  She and her husband, I operated on them

12   in the mid nineties.  And they came to me after she

13   was cured of her cancer and said that they wanted to

14   do something for the department of surgery.

15              At that time I was actively involved in

16   fundraising and we were trying to expand the

17   development aspects of the department of surgery, and

18   she and her husband offered to be instrumental in

19   funding a chair in surgical oncology.  I told them

20   that I would be ecstatic and that we would name it

21   after them.  It's Herb and Susan Grossman, who are the

22   benefactors.

23              They wanted none of that.  They didn't want

24   any public acclaim.  They insisted upon naming the

25   chair after me.  I don't hold the surgical oncology
```

1    chair.  We've used it for recruitment of stellar

2    individuals who -- the holder of the chair is actually

3    Nipun Merchant, who is the division leader and the

4    researcher.

5         We were able to raise enough money and I

6    think the chair now stands at over $6 million.  It's

7    one of the larger chairs.

8    Q.   In addition to the roles that you just

9    mentioned, did you ever serve as the interim director

10   of the Miami Transplant Institute?

11   A.   I did.

12   Q.   And approximately when was that?

13   A.   So it -- so the Miami Transplant Institute's

14   evolved over a period of years.  Initially, initially,

15   when it was evolving in the early 2003, 2004, Dr.

16   Tzakis was the director of the virtual institute.  I,

17   as the chairman of surgery, was intimately involved

18   with the transplant whole program.

19        Dr. Tzakis was relieved of some of his

20   positions by the dean and I was put in charge of the

21   role of the overseeing the Transplant Institute.  That

22   would have been somewhere around 2010, around that

23   time.

24        And then in July of 2012, the dean and Jack

25   Lord made a decision to put Gaetano Ciancio in as the

1    director of the Miami Transplant Institute, a role

2    that he served in from about July of 2012, as I

3    recall, to early in 2013, when Rodrigo Vianna became

4    the director of the Transplant Institute.

5         Q.   Can you tell us about what the Miami

6    Transplant Institute is.

7         A.   So, as you full well know, the transplant

8    program at the medical center is a superb program and,

9    in fact, at this particular time is the largest solid

10   organ transplant program in the country.

11        In the early 2000s, it became clear that this

12   was such a huge component of Jackson Memorial Hospital

13   as well as the university, that the multiple

14   components of the transplant program started to be

15   looked at to see if we could have increased

16   efficiencies.

17        The Transplant Institute includes not only

18   the department of surgery where all the surgeons

19   reside, but also the department of medicine,

20   everything from gastroenterology to infectious disease

21   to hepatology to renal transplant, all of the

22   nephrology pieces.  We do adult as well as pediatric

23   transplants.

24        And so you have pieces that are across

25   multiple departments, pediatrics, internal medicine,

 1    surgery and so on and so forth.  So we started looking

 2    at the best way of making this more efficient.

 3            Jackson initially hadn't been overly involved

 4    with it.  I mean, they were involved because of the

 5    financial aspect, but not involved with any of the

 6    administrative part.  That was basically handled out

 7    of the department of surgery, because, in fact,

 8    transplants started in the department of surgery under

 9    some of the individuals, such as Josh Miller, going

10    back to the 1970s.

11            So through the seventies and the eighties and

12    into the nineties, transplant was just basically

13    controlled by the department of surgery and the number

14    of our physician leaders.

15            So the Transplant Institute, we started

16    having discussions with Jackson as to how to optimize

17    the integration of these services across departments

18    in order to achieve the best possible outcomes for our

19    patients that we were serving.

20            And, of course, transplant was continuing to

21    grow.  During the nineties we went from doing just

22    kidney transplants to heart transplants to liver

23    transplants to other combination transplants, so it

24    became imperative to have a more unified structure.

25            We needed Jackson to participate in providing

```
1   us with support on the administrative level.  They

2   weren't doing the professional thing; they were

3   helping us across departmental lines.  They were going

4   to provide us with space for our physicians to be

5   together, rather than having one sitting in one

6   building, another sitting in another building and so

7   on and so forth.

8            So during the period of time, we started

9   having discussions 2004, 2006, 2008.  We tried to

10  figure out how best to integrate across departmental

11  lines.  And eventually by about 2000 -- I think -- I

12  think the -- I might be slightly off, but I think

13  about January 2014 we came up with a model where we

14  would integrate the various people across departmental

15  lines, the individuals all had their appointments in

16  their respective departments, because there's an

17  academic piece as well as a clinical piece, but

18  billing, collections, the issues surrounding

19  development, the issues surrounding advertising and

20  everything else would be assumed by Jackson Memorial

21  Hospital.

22           Part -- and it is in the basic affiliation

23  agreement -- part of it is in the AOA, and it was

24  formalized between Carlos Migoya, the chairman of the

25  Public Health Trust, and the university, including the
```

1    board of trustees.

2         And there was a signed agreement.  The date

3    is important.  I'm sure that it can be provided by

4    Aileen or Judd.  But I think somewhere in early 2014

5    it became fully formalized and included in the basic

6    affiliation agreement and the AOA.

7         The other components, and you'll be

8    discussing those as well, in addition to the clinical

9    component, which was in the Miami Transplant

10   Institute, there is the IML, the histocompatibility

11   labs and the organ procurement, which was separate, as

12   it has to be by federal regulations.

13   Q.   And can you tell us approximately -- it's my

14   understanding that the IML and the what would be

15   termed as pathology testing and testing oversight for

16   organ transplant patients moved from JMH labs to the

17   department of surgery sometime in approximately 2007.

18   Does that comport with your recollection?

19   A.   No, that's not correct.

20   Q.   Okay.  Would you please --

21   A.   The new monitoring lab developed in the late

22   seventies in the department of surgery.  And it was

23   actually set up under Dr. Joshua Miller, who was

24   really the first leader of transplant.  We actually

25   had done a couple of transplants before Josh came.

1       Ben Vanderwerf did one in the early 1970s.

2              The first transplant was done I think in 1970

3       by Dr. Ben Vanderwerf.  He did a kidney transplant.

4       Josh Miller was recruited by Dr. Zeppa around 1978,

5       and when he came, he recognized there was a challenge.

6       You cannot do transplants without having immuno

7       monitoring and histocompatibility.  So he started that

8       and he set it up.

9              And then also it was incredibly important to

10      have an organ procurement organization.  You probably

11      know historically that up until I believe it was 1984

12      when OPTN and UNOS came into existence, it was totally

13      unregulated and you had a situation where people were

14      retrieving organs.  There was no control at a national

15      level.

16             And I think -- I think in 1984, the

17      Department of Health and Human Services set up the

18      OPTN and OPTN then farmed it out to UNOS to regulate

19      the whole acquisition of organs, to make sure there

20      was a standard of care across North America, to make

21      sure that patients were being treated appropriately

22      and so on and so forth.

23             The IML never resided in Jackson.  I know

24      somebody asked that question once before.  It was

25      always in the department of surgery.  Dr. Josh Miller

```
 1    ran it.  He had a Ph.D.  Her name was Esquenazi,

 2    Esquenazi, and they ran the IML in the department of

 3    surgery, the histocompatibility lab as well, there are

 4    two components of the lab testing.  And they ran it up

 5    until about 2006.  And he set up all the protocols,

 6    along with all of the physicians and surgeons, as to

 7    how the IML would be run and so on and so forth.

 8            Dr. Miller left the medical center at the

 9    behest of Pascal Goldschmidt on May 31st of 2007.

10    Q.    Doctor, were there routine labs that were

11    being done at JMH during this time period and

12    subsequently moved over to on the IML in approximately

13    2007?

14    A.    No.  There's a misunderstanding about this.

15    And I've never been asked about it.  So the routine

16    lab testing that you're referring to only relates to

17    the inpatient transplant patients.

18            So as I think you know full well, all of the

19    testing for transplant falls into three buckets.  It's

20    the pre-transplant, the in-hospital transplant and the

21    post-discharge transplant testing.  And the

22    in-hospital testing that you're alluding to is only

23    done by the IML for those patients that are

24    transplanted.

25            So what was done in I think 2001 is what we
```

```
 1    did is we bundled all lab testing for in-hospital

 2    transplant patients.  And there was a bundle that was

 3    put together between the university and Jackson

 4    Memorial Hospital, and, basically, we gave them a

 5    bundled price for all testing that was done at the

 6    hospital for these patients.

 7            So we did the specialized testing and we did

 8    some of the other testing as well.  This case report,

 9    this case volume never changed.  We never increased it

10    from 2001.  So I don't remember exactly what the price

11    was.

12            Like for kidney transplant, if a patient was

13    in the hospital for two weeks, all testing could be

14    sent to the IML and it didn't matter if we did one

15    test or we did a thousand tests, the amount of money

16    that we charged Jackson was $1500.  That may not be

17    the exact number, but it's somewhere in that range.

18    And we never changed the individual bundled price.

19            I don't know if it's still the same at this

20    present time.  I don't have any knowledge about it.

21    But I can tell you that for the next decade, Jackson

22    benefitted tremendously from that, because they could

23    send all of the tests over.  We didn't care whether we

24    did it or not.  What we were interested in was

25    providing quality care to the patients.
```

1            One of the challenges, as you can undoubtedly

2    image, is that Jackson Memorial Hospital is a county

3    hospital.  It's a terrific county hospital, but it has

4    many of the limitations that come with being a county

5    hospital, including the difficulty of providing seven

6    by 24 hour testing.

7            And the beauty of the IML and the

8    histocompatibility lab and part of the reasons for its

9    continued viability was that we work on a 24 hour

10   basis.  And many of the problems, as you can imagine,

11   harvesting of organs happens in the middle of the

12   night.  You need to test the organs.  You need to find

13   out if they were going to be histocompatible with the

14   recipient, so you need to test the donor and the

15   recipient, and many of these tests are done in the

16   middle of the night, which could be done by IML and

17   the histo lab, but could not be done by Jackson.

18           So what ended up happening is we ended up for

19   patient safety and benefits reasons ended up doing a

20   lot of the routine testing, but only, only for the

21   transplant patients.

22   Q.   Doctor, did there come a time that the

23   University of Miami pathology department tried to move

24   the transplant pathology testing and oversight to its

25   own pathology department?

```
 1        A.    Yes.

 2        Q.    Approximately when was that, if you recall?

 3        A.    I recall.  Richard Cote was recruited.  I

 4   think his recruitment was like at the beginning of

 5   2009.  So when he was being interviewed, I was on the

 6   search committee, and I explicitly remember the

 7   discussions with him, and he talked about the whole

 8   issue of unifying labs across the whole campus.

 9            And one of the discussions that we had,

10   probably 2008, was the whole issue of the IML and the

11   histocompatibility lab.  And we discussed it and I

12   told him how important this was for our transplant

13   program.

14            And he at that time, of course, he was a

15   recruit, he was interviewing, he said, yes, yes, no, I

16   understand that.  I won't touch the transplant lab.

17            When he came in 2009, and I have no knowledge

18   about his recruitment package or anything else, but it

19   became clear in 2009 that his interests extended to

20   unifying all labs across the campus.

21            And this created a huge -- but not just in

22   the department of surgery.  So he wanted to take over

23   the eye lab, the Bascom Palmer Eye Institute, the

24   leading Eye Institute in the world, at a lab that took

25   care of the pathology of eyes, dermatopathology in the
```

1     department of dermatology.

2              Their book of business at that time, as I

3     recall, because the chairman of dermatology discussed

4     it with me very clearly, the book of business for

5     dermatopathology was over $3 million a year.  And

6     Richard Cote wanted to take over that.

7              The department of medicine had a number of

8     labs.  They had a thyroid lab, they had a -- Fletcher

9     had a lab.  They had a hepatology lab.  And the

10    department of medicine just lost money on all of these

11    labs, so they were willing to let Cote take over the

12    labs.

13             Dermatopathology, surgery and ophthalmology

14    were extremely resistant.  This prompted, as you are

15    well aware, a number of discussions.  In fact, I met

16    with Richard Cote on a bi-weekly monthly basis over

17    the period of the next several years discussing how we

18    could work together with the labs.

19    Q.   And during that period -- again, it seems to

20    pop up every time I start to talk.

21             What are your recollections, doctor, about

22    government reviews of the IML in 2010 and 2011, if you

23    recall?

24    A.   I do.  The reviews at that time, we passed

25    all of the reviews with absolutely no significant

1   problems.  In 2010, 2011, we were reviewed by AHCA, by

2   CMS, internal audit at the university, and all of the

3   protocols and everything else, including a compliance

4   department, said that everything was functioning just

5   fine.

6        Q.   Can you tell us what the connection between

7   the revenue generated in the IML and the overall

8   performance of the department of surgery was.

9             MR. YANNUZZI:  Object to the form.

10       A.   Can you ask a specific question?

11       Q.   Can you tell us in general what the

12  connection between the revenue generated by the IML in

13  those years, 2010, 2011, 2012, and the overall

14  performance of the department of surgery was.

15            MR. YANNUZZI:  Object to the form.  You can

16       answer.  Go ahead and answer, doctor, if you can.

17       A.   So, I guess you're referring to what was the

18  book of business for these different components?

19       Q.   Yes.  That's a good way of putting it.

20       A.   All right.  So this is over a decade ago.

21  I'm going strictly off my memory.  The department of

22  surgery's budget in 2011, 2012, was about $120

23  million.

24            Out of that, we were taxed by the dean and we

25  were -- the IDX and a bunch of different things.  Out

1    of that 120 million, IML and histo were probably about

2    $20 million.  I may be slightly off on the numbers,

3    but I think that's the ballpark.

4         Organ procurement, which we also ran, organ

5    procurement, we basically served as a management

6    function for the OPO.  I don't think we need to get

7    into all the details unless you specifically ask me.

8         The department of surgery never taxed the

9    OPO, because that was not an acceptable thing.

10   Although the medical school taxed it, and I have to

11   pay -- it's another issue -- I have to pay it out of

12   other revenue sources.  But the OPO was not really --

13   did not enter into our budget, other than the fact

14   that it was a cost center for me, rather than a

15   revenue center.

16        Q.   Out of the revenues that were generated in

17   the department of surgery, were you able to pay

18   bonuses to the surgeons and to staff in the department

19   of surgery?

20        A.   So the department of surgery was in surplus

21   every year while I was chair.  Even in the year of

22   2012.  So the department of surgery, the business

23   model that we had was that we would tax the revenue in

24   the different divisions and those dollars flowed into

25   the operation of the department of surgery and allowed

```
 1    us to invest in research, in the residents going into

 2    the lab for a couple of years.  That cost us almost a

 3    million dollars a year.

 4              We were able to use the money for

 5    recruitment, and we were able in some years when the

 6    school wasn't deficit, we were allowed to distribute

 7    incentive pay to the faculty, and I always distributed

 8    it to the support people as well.

 9              I was one of the few departments, we took our

10    surplus that we were allowed to distribute and

11    distributed it to the secretaries and the other

12    support people, as well as to the faculty.

13         Q.   Now, we took president -- ex-president

14    Shalala's deposition, and she said that the department

15    of surgery was one of the most profitable departments

16    in the medical school behind the Sylvester Cancer

17    Center.  Does that comport with your recollection?

18         A.   Yes.

19         Q.   Was there -- other than the Sylvester Cancer

20    Center, was there a more profitable department than

21    the department of surgery as far as you remember at

22    that time?

23         A.   Most departments ran a deficit.

24         Q.   Can you tell us a little bit about your

25    relationship with President Shalala.  I'll just ask
```

1    you that generally, and then ask you specific

2    questions.

3        A.    President Shalala was the president of the

4    university.  She was a dynamic individual.  She was

5    recruited after Tad Foote and led the university.

6    It's hard to believe that somebody her size could be

7    so dynamic and so forceful.

8            My relationship with President Shalala was

9    like any other chair.  If she needed something, she

10   would call us.  If she wanted information, she would

11   call us, and we would give her whatever she asked for.

12           I didn't have a personal relationship with

13   her or anything like that.  I never cared for her.

14   She wasn't one of my patients or anything like that,

15   nor did I take care of anybody in her family.

16       Q.    Did you have any major disagreements with

17   President Shalala?

18       A.    If I did, I wouldn't be here.

19       Q.    Would you say that she was generally

20   supportive of your chairmanship and your mission as

21   chair of the department of surgery?

22       A.    I think so.  She was driven by results.  And

23   as the department of surgery was climbing academic

24   roles, we were always in a balanced budget, and many

25   of the individuals in the department of surgery

1    assumed important leadership roles in the medical

2    center.

3          We produced the executive dean of research;

4    the executive dean of clinical affairs.  We had

5    leaders in Jackson Memorial Hospital.  We were the

6    biggest supporter of the acquisition of University of

7    Miami Hospital.  University of Miami Hospital would

8    have been challenged financially if the department of

9    surgery hadn't committed to doing a bunch of surgery

10   at that hospital.

11         So she never told me.  She didn't evaluate

12   me.  The dean was the one that always did the

13   evaluations.  But it was my impression that she was

14   satisfied with my role.

15         I know that when Pascal Goldschmidt took over

16   the leadership at the university in 2006, he made some

17   very fundamental changes in departmental leadership.

18   And I have been told, I don't know if it's true, that,

19   whereas, he removed the chair of medicine and other

20   departments, he had considered removing the chair of

21   surgery, and it was suggested that I was more valuable

22   as a chair, rather than being removed.

23         But I don't -- she never -- President Shalala

24   is not the type of person that goes out of her way to

25   speak to chairs.  She requests information, she

1    processes it and she makes decisions.  She's a very

2    strong individual.

3        Q.   Would you say that you had an open door

4    policy with her where you could communicate without

5    the formality of going through layers of

6    administrators?

7        A.   If I needed to -- I can't imagine where it

8    would be.  So the reporting relationships for a chair

9    are through the dean.  And so I would not go to the

10   president of the university without first consulting

11   the dean, whether it was Dean Clarkson or Dean

12   Goldschmidt.

13           I mean, over a period of years, I had a

14   handful of meetings with President Shalala.  She would

15   come to the medical center.  She would have days where

16   people could ask questions and everything else.  But

17   that was not a one-on-one.

18           I believe that if I had a problem and I

19   called her, that she would take my call.  But I would

20   always have gone through the hierarchy, including, if

21   I had a particular issue, if it was in the legal

22   department, I would work through Ms. Ugalde or Judd.

23   I wouldn't go directly to the president.

24       Q.   Would you say that you never went directly to

25   the president and jumped the chain of command?  Strike

```
 1    that.  Let me ask you a better question.
 2            Did you ever bypass Pascal Goldschmidt and go
 3    directly to President Shalala with a problem or a
 4    concern?
 5        A.   The only time that I can remember doing that,
 6    and let me see if I can remember the date.  So, as you
 7    know, issues on the campus were becoming extremely
 8    complex by December of 2012.  On a Sunday morning of
 9    2012, I think it was December 9th, I had an issue.  I
10    was contacted by another chairman and was threatened.
11    And I specifically -- I didn't go to President
12    Shalala, but I specifically responded to that threat
13    by contacting the chairman of the board of trustees
14    and the two former deans, Clarkson and Fogel.  I also
15    verbally communicated with Judd.
16            And I don't know the exact way that it worked
17    out, but within a few hours the message had gotten to
18    President Shalala.  That was on a Sunday afternoon.  I
19    know, because I even got a phone call from the
20    president of the senate, Rick Williamson at that time,
21    saying that he had heard about what had transpired.
22    So that was on December 9th, I think, Sunday, December
23    9th.
24            The president set up an emergency meeting on
25    the Tuesday morning, which would make it two days
```

```
 1    later, probably December 11th, with the surgical

 2    chairs -- not the surgical chairs -- with all of the

 3    chairs.  I was extremely concerned about -- I had no

 4    idea what she was going to do -- I was extremely

 5    concerned about the whole situation.  I knew that it

 6    was explosive on the campus with the threat that I had

 7    received.

 8           At that time I was the executive dean of

 9    clinical affairs and also was the chair of the

10    department.  And I explicitly remember sending her a

11    text message at quarter to -- the meeting was going to

12    start at seven o'clock in the morning -- and at

13    quarter to seven in the morning, I sent her a text

14    message and I said something to the effect "Madam

15    President, I am requesting that I return to the

16    department of surgery and that I resign from the

17    position of being executive dean of clinical affairs

18    at the university."

19           She never responded to it, other than to say

20    "Please don't do anything until I see what's

21    happening."  That I believe is the only time that I

22    ever violated the chain of command.

23      Q.   Doctor, can you, and we'll talk more about

24    that email that you generated on Sunday morning,

25    December 9th, but I'm going to ask you a lot of other
```

1    questions before we get there, so thank you for

2    previewing that.

3           Let me ask you about your relationship with

4    Pascal Goldschmidt.  Can you describe your

5    professional relationship with Pascal Goldschmidt and

6    whether it evolved from, you know, over time.

7           So I know that's a broad question, but I

8    think instead of me asking you, you know, specific

9    little questions, let's see where this takes us.

10   Okay?

11       A.   All right.  So Pascal was recruited in April

12   of 2006.  He came with Bill Donelan.  At that time I

13   was the leader of the practice plan.  He rapidly

14   recruited Bill O'Neill and Bill O'Neill was a

15   cardiologist who knew nothing about the University of

16   Miami.  And Bill O'Neill came in.  He was going to

17   leave the whole practice plan and everything else.

18          He had been an extremely successful

19   cardiologist in Michigan and he was hoping to do the

20   exact same thing in Miami.  He was prescient enough to

21   ask for assistance.  And he made me -- I forget the

22   exact title -- but it amounted to co-medical director

23   or something or other, although he was clearly the

24   leader of the practice plan, the whole enterprise.

25          From April of 2006 through the following

1    year, sometime during the negotiations to acquire the

2    University of Miami Hospital, what was former --

3    formerly Cedars.  So we acquired that hospital

4    December 1, 2007.  But in order to get it through the

5    board of trustees, Pascal needed to get support from

6    all the chairs.

7            So between his recruitment in 2006 to the

8    middle of 2007, basically, my major contact with him

9    was at the clinical chairs' meeting.  We didn't have

10   much involvement.  Periodically he would call about an

11   issue or whatever, but we didn't have much of a

12   relationship.

13           His relationships actually were with Bill

14   O'Neill, Bill Donelan -- Bill Donelan and with David

15   Lubarsky.  David Lubarsky's wife and his wife had been

16   friends up at Duke and he trusted Lubarsky and

17   Lubarsky was intimately involved with a whole bunch of

18   things that were happening at the medical center.

19           However, by the middle of 2007, Pascal called

20   and asked me to come to his office.  It was a very

21   interesting meeting.  He said, "Alan, you know, I came

22   to the medical center.  I didn't know people.  I knew

23   Lubarsky, because he had been up at Duke and he was

24   working well and so on and so forth.  So I relied on

25   people that I knew.  And now over the last year, I

1    come to realize that there are other people that I

2    should have included.  I want you to become more

3    active in some of the affairs at the medical center."

4            He said "I've looked at your CV.  I see that

5    you and I have a lot of common."  I grew up in French

6    Quebec and he, of course, was Belgian, so he spoke

7    French.  He said, "You know, Alan, I was valedictorian

8    of my medical school class.  I see that you were

9    valedictorian of your medical school class."  I said

10   "Yes."  He said "So why did you go into surgery?"

11   I'll never forget this.  I said "Yes, yes, Pascal, I

12   understand.  Surgeons are only technical, they're not

13   supposed to be using their brains too much."  In any

14   event, that's just a sidebar that you asked me and it

15   reminds me.

16           What he wanted was endorsement of the

17   application for acquisition of Cedars.  So we went

18   through a whole review.  He actually got I think maybe

19   all of the chairs to sign a letter of support

20   explaining why it was necessary to buy Cedars

21   Hospital.

22           And, if I recall correctly, it was submitted

23   to the board of trustees in September of 2007, and

24   with the support of the chairs, it was accepted, and

25   the purchase of the hospital went through.  I believe

1    we acquired it December 1, 2007.

2              Pursuant to that, because I had been

3    supportive and everything else, we spent more time

4    together.  With the acquisition of the hospital, part

5    of the issue was that he and Bill Donelan and Bill

6    O'Neill knew that in order for the hospital to be

7    successful, it was, essentially, build a private

8    practice at University of Miami Hospital.

9              So my meetings with Paz often included Bill

10   Donelan and Michele Chulick, who I will never forget,

11   and Bill O'Neill.  And what they wanted was for the

12   department of surgery to transfer all of its private

13   patients from Jackson Memorial Hospital to the

14   University of Miami Hospital.

15             So this is where we got into disagreements.

16   And I said Pascal, for a whole bunch of different

17   reasons, we're very supportive of University of Miami

18   Hospital, but we can't transfer all of our cases over

19   there.  They don't have the infrastructure, they don't

20   have all of the assets that Jackson Memorial Hospital

21   has and so on and so forth.  I don't want to go into

22   the details.

23             This was a tedious issue that was constantly

24   raised.  The department of surgery, indeed, built

25   divisions over at UMH, colorectal surgery, thoracic

1   surgery, cardiac surgery.  I specifically recruited

2   people to go to the cardiac surgical program, which

3   pleased Bill O'Neill, because Bill O'Neill was a

4   cardiologist and he want to build the cardiac surgical

5   program, which we did.

6         He wanted me to transfer, for example, at a

7   period of time we discussed transferring transplant,

8   and this was a huge issue.  And without belaboring the

9   point, it never happened.

10         But just to go ahead, this would have been a

11   drop-dead issue for Jackson.  I actually was the

12   intermediary sometimes between Jackson and the dean's

13   office about why we couldn't transfer transplant over

14   to UMH.

15         He wanted me to transfer my surgical oncology

16   practice over to UMH and they frankly didn't have the

17   infrastructure to support the complex surgical

18   oncology cases that I did over there.  So this was an

19   area where Pascal was displeased.

20         It didn't -- it didn't stop us from working

21   together.  Our relationship was always a business

22   relationship; it was never a personal relationship.

23   We're different people.  He used to try to invite my

24   wife and myself out with his wife and we didn't

25   socialize.  And, in fact, I told him it was a business

```
 1     relationship, it wasn't a personal relationship.
 2            And then what happened, by 2012, a number of
 3     things were happening at the medical center.  As you
 4     well know, the medical school was facing a deficit of
 5     I believe $64 million.  This was a huge problem on the
 6     Coral Gables campus at the board of trustees level.
 7     That's when Jack Lord was brought in.
 8            And then during -- so Jack was brought in,
 9     first I knew of him was somewhere around April of
10     2012.  At that time, the executive dean of clinical
11     affairs was Lubarsky.  And then in July of 2012, the
12     dean and Jack Lord put Gaetano Ciancio in as the chief
13     of the Transplant Institute without any discussion
14     with the department of surgery at all.
15            And then in August I get a phone call from
16     Jack Lord wanting to meet with me.  And what
17     transpired as a result of that is that we had a
18     meeting and he asked me to be the executive dean of
19     clinical affairs replacing Lubarsky.
20            And at that time, I specifically had a
21     discussion about the fact that it wouldn't work, the
22     triumvirate of me, Dean Goldschmidt and him.  We were
23     different people and that Goldschmidt and I had
24     disagreements.  Jack Lord assured me that this
25     wouldn't be a problem.  And, in fact, he even spoke to
```

1    President Shalala and President Shalala asked me to

2    assume the role.

3            So starting in September of 2012, I started

4    meeting with Dr. Goldschmidt and Jack Lord on a

5    regular basis, because I assumed the role of executive

6    dean of clinical affairs and had obviously a lot of

7    responsibilities with dealing with the other chairs,

8    working out the budgets for the coming year and so on

9    and so forth.  And that relationship was challenging,

10   as you'll ask me about.

11           And then by December of 2012 was the whole

12   thing about the petition, the recall petition, the

13   president coming on campus, assuming responsibility

14   for a lot of the areas where there was discord to use

15   a euphemism.

16           And then when Jack Lord left the medical

17   center in January of 2013, it was just me and Pascal

18   and I was the executive dean of clinical affairs and I

19   was meeting with him constantly about how to continue

20   to move forward.

21   Q.   Thank you for your recollection and being so

22   comprehensive.

23           A couple of things I want to ask you about,

24   and that is, when Dr. Ciancio was selected to replace

25   you as the interim director of the Miami Transplant

1    Institute, were you in favor or not in favor of that

2    selection?

3         A.   I wasn't asked about it.  I was not in favor

4    of it.  In fact, at that time we had a national search

5    going on.  I had a search firm that we had been having

6    a national search looking for a director of the

7    Transplant Institute.  And as of June of 2012, of

8    course, Andy Tzakis left the university at that time,

9    as of June of 2012, I think it was Korn Ferry that was

10   our search firm.

11        He had spent hundreds of thousands of dollars

12   doing a search, it was a joint search with Jackson.

13   And I had made a verbal offer to Alan Hemming, who was

14   a nationally-respected transplant surgeon who was at

15   U.C. San Diego, I had made a verbal offer to him and

16   he had already announced that he was leaving U.S. San

17   Diego.  And I was sitting in a meeting in July and the

18   dean made the announcement that he was putting Ciancio

19   in as the director of the Transplant Institute.

20        This has nothing to do with my feelings about

21   Gaetano.  Gaetano is a wonderful surgeon, tremendous

22   surgeon, he's a great researcher, he's a great teacher

23   and administration is not his skill set.

24        Q.   Can you tell us a little bit about your

25   relationship with David Lubarsky.

```
 1        A.   My relationship with David was interesting.
 2   He -- I forget exactly when he became chair of
 3   anesthesia.  Early in 2000 -- maybe around 2003 or
 4   something or other.  David -- David's very smart.  He
 5   is extremely parochial in his approach to things.  I
 6   met with him on a regular basis.  Obviously, the
 7   department of surgery and the department of anesthesia
 8   have to work closely together.
 9        The president had been set with the previous
10   chair, Dr. Craythorne, who I had a -- Dr. Craythorne I
11   had a personal relationship with, as well as a working
12   relationship.
13        David's relationship and I was cordial.  We
14   met on a regular basis.  It wasn't particularly
15   social, although he used to have holiday parties.  I
16   always went to them.
17        When his mother died, I went to the Shiva.
18   It was a cordial relationship.  We didn't -- our
19   management styles were different.  I think I can,
20   unless you have a specific question, can leave it at
21   that.
22        Q.   You replaced Dr. Lubarsky.  Correct?
23        A.   I did.  That had nothing to do with me,
24   though.  The decision had already been made by Jack
25   Lord to replace him.
```

```
 1        Q.   Okay.  And the selection of Dr. Ciancio, did
 2   you know who was responsible for that selection?
 3        A.   It was -- I presume it had to be the dean and
 4   Jack Lord.  I mean, there was nobody else to make that
 5   decision.
 6        Q.   All right.  Do you know whether or not it was
 7   both or just Dean Goldschmidt?
 8        A.   Well, you're asking me to speculate.  Having
 9   worked with Pascal for six years, although I didn't
10   always agree with his goals or the way he did things,
11   I always found Pascal to be collegial.
12             And my personal feeling about it is, if I had
13   to speculate, which is what you're asking me to do, is
14   that I don't think Pascal would have put Ciancio in as
15   the director of the Transplant Institute without
16   speaking to me and without discussing it with me
17   without Jack Lord pushing him.
18             The dean's MO was usually to try to work out
19   a compromise.  And so I could envisage him sitting
20   down with me and saying, "Alan, I need your help here.
21   Ciancio is an important person.  We just put Dipen
22   Parekh in as the chair of urology.  I know that
23   Ciancio wanted to be chair of urology.  I'm sort of
24   giving him a consolation prize.  Can we work together
25   and do this?"
```

1            I think on his own Pascal would have talked

2      to me about there.  I don't think he would have just

3      imposed it on me.  That wasn't the way he behaved.

4      And I have multiple other examples previously, even

5      the recruitment of Vivere Decaniere (phonetic),

6      although Pascal wanted to recruit that cardiac surgeon

7      from Belgium, he went out of his way to co-op with me

8      over a period of two years in order to accomplish his

9      goal.  That's my feeling.

10          Q.   Okay.  But you're just speculating; you don't

11     know.  Correct?

12          A.   That's correct.

13          Q.   What other major disagreements did you have

14     with Dean Goldschmidt besides the disagreements

15     concerning the request to bring I guess higher paying

16     patients into the University of Miami health system?

17          A.   So when Richard Cote was recruited,

18     regardless what was he had said in the recruitment

19     phase, it became clear after he arrived that he wanted

20     to consolidate all of the labs across the medical

21     campus.  And it also became clear with my

22     conversations with Pascal that he was supportive of

23     going ahead and doing this.

24          And this actually gets back to the question

25     you just asked me about Gaetano.  The dean had the

1    prerogative and he was in control, he could have told

2    me to just give the IML labs to pathology.  But that's

3    not the way Pascal worked.

4         What he did is, over a period of a couple of

5    years, he said, "Look, I want you to meet with Richard

6    Cote, work out a deal, work out an arrangement."  He

7    never -- he never said "You have to do this."  He said

8    "I would sort of like you to consolidate all of the

9    labs," but he didn't force me to do it.  And, of

10   course, he had the prerogative to do it.

11        I served at the pleasure of the dean.  He

12   could relieve me any time that he wanted.  Chair

13   positions are strictly up to the dean, as you know.

14        So, I think that was an area, and we talked

15   about it a lot.  He took the time to understand just

16   exactly what the labs were.  The labs were very

17   complicated, and many people, even Jackson didn't have

18   a full understanding.

19        I know Gaetano didn't have a full

20   understanding, because when he was appointed as the

21   director of the Transplant Institute, he thought that

22   that meant that he was also in control of the IML and

23   the OPO and everything else.

24        It wasn't until we had discussions pointing

25   out to him that that was a conflict of interest, it

```
 1    would be self-dealing, and you couldn't have the OPO
 2    in the Transplant Institute and you couldn't have the
 3    IML and the lab testing in the Transplant Institute,
 4    that there has to be an arms-length relationship.  So
 5    all of these issues we talked about over an extended
 6    period of time.
 7            And then, of course, when Jack assumed the
 8    COO position, things became much more directed and
 9    accelerated.  And you'll be asking me about that.
10    Q.   So I'm asking you about your relationships
11    with various individuals.  Can you tell me about your
12    relationship with Dr. Lord.
13    A.   So it was interesting.  When he started,
14    along with Sheri Keitz, in April of 2012 and they did
15    the reduction in force, and you can ask me whatever
16    you want about that, I didn't have much contact with
17    him.  I would see him.  We would get the directives.
18    He would attend the chair meetings.
19            We were told to reduce -- it was just a top
20    down, you're going to cut this, this, this, this, this
21    and this, and we would work through it and we did.
22            I met him at a couple of the chair meetings
23    and didn't have personal stuff with it.  I remember a
24    distinct meeting where Lubarsky, I think it was early
25    in August, and I suspect it may have been the meeting
```

```
 1    that resulted in Jack deciding that Lubarsky could not

 2    lead the practice plan, there was a meeting, and

 3    Lubarsky came out and made some pronouncements and he

 4    was dogmatic and emphatic and you're going to do what

 5    I tell you and everything.  He's talking to the

 6    chairs.

 7            And I sat up and I said, "You know, David,

 8    you're not going to accomplish anything if you behave

 9    like this.  You really need to be more collegial."

10    That's a paraphrase of what it was.

11            Shortly thereafter was when I had my first

12    personal interaction with him.  And I remember it,

13    because I was at the Olympics in London, so it was the

14    first week in August.  And I received a phone call and

15    it was an urgent phone call, and it was -- I don't

16    remember the date.  The Olympics was the first week in

17    August and I was getting ready to come home on the

18    weekend.

19            So I received a phone call and the message

20    from my office stating that Jack Lord was insistent

21    upon meeting with me immediately.  So, quite frankly,

22    I thought the meeting was going to be that he was

23    going to tell me that he was recommending that I not

24    be chair of surgery anymore.

25            So I called Jack and got hold of him and he
```

1    said "I want to meet with you tomorrow."  And I said

2    "Unless you come to London, you're not meeting with me

3    tomorrow."  He said "Well, when are you coming back?

4    I still want to meet with you."  I said "I'm coming

5    back on Sunday."  He said "I want to meet at seven

6    o'clock on Monday morning."

7              I still thought that what was happening is I

8    was going to be relieved of my position.  But then he

9    said "I'll come to your office."  And as soon as he

10   told me that he was going to come to the office, I

11   presumed he wasn't going to fire me in my office, he

12   would have called me to his office.

13             So we did meet on that Monday morning and at

14   that time he told me that he was recommending that I

15   become the executive dean of clinical affairs and

16   replace Lubarsky.

17             And over the next couple of weeks we had

18   quite a number of discussions about this.  I already

19   said to you, I told you that I told him that I didn't

20   think it would work, because Pascal and I had

21   different management styles and stuff.

22             He assured me that Pascal was on board for

23   this and everything was going to be all right.  And,

24   finally, after much discussion and actually getting

25   Judd to help me compose a letter of acceptance, I took

```
 1    the position and assumed the position of executive
 2    dean of clinical affairs in September.
 3              From that time forward I met with Jack on a
 4    regular basis.  It was very interesting.  He's a very
 5    intelligent individual.  He is cold.  He's almost
 6    emotionless.  I would talk to him about different
 7    issues and he would say, "Well, you know, this is a
 8    business thing and I have to do it."  I said, "Doesn't
 9    it bother you that 800 people are going, being let go
10    and everything else?"  He said, "No.  It's a business
11    decision, it has to be done," and so on and so forth.
12              So we actually had a working relationship
13    over the next couple of months that was very civil.
14    But what became apparent is that -- and this is my
15    evaluation, you're asking me what I think -- what
16    became apparent is that he was using me to do the
17    things with the chairs and the faculty that he
18    couldn't do himself.  So I was set up to meet with the
19    chairs to discuss budgets and how they were going to
20    expand their revenue and cut their costs and so on and
21    so forth.
22              So in September and October I was meeting on
23    a regular basis.  There was no exchange of information
24    from him coming to me.  It was always a one-way
25    street, going from me to him.  And I found out, for
```

1    example, that he was working on a relationship with

2    Miami Children's Hospital and Mount Sinai.  And I had

3    been deeply involved with these relationships going

4    back to Dean Clarkson.  And I knew the people.  I knew

5    Sonenreich over at the hospital, I knew the CEOs at

6    Miami Children's Hospital.

7           So I found out about this, and this was a

8    critical thing.  And I said, "Jack, why wouldn't you

9    talk to me about this or ask for my input?  I'm

10    running, nominally running the clinical practice plan

11    here, of course, reporting to you and to Pascal, but

12    you didn't even discuss it.  Wouldn't you like to know

13    some of the historical context or what?"  He said "No,

14    this is -- this is -- this doesn't have anything to do

15    with you," you know.

16           So it became clear that, really, what he was

17    looking for was somebody to implement his policies; he

18    wasn't interested in me helping him develop them or

19    whatever.

20           I set up a meeting with the clinical chairs

21    and the VCAs one afternoon in early October.  I don't

22    remember the exact date, but I could easily get it for

23    you if you wanted it.  And I set up a meeting, I think

24    it was like a Thursday.  And the meeting basically was

25    we've gone through a difficult period of time.

1          The medical school was facing a huge

2     budgetary deficit.  There were absolute requirements

3     to reduce expenses.  You didn't agree necessarily with

4     how this was done, but it was critical for the

5     survival of the medical school and, in fact, it would

6     impact the university as well.

7          I said let's get over it.  Let's work

8     together.  My goal, as it had been forever, because

9     even in that year, in 2012, the department of surgery

10    was in surplus, because we had made some stringent

11    cuts.  I said let's work together.  I will do whatever

12    I can to serve as intermediary between Jack Lord and

13    Pascal Goldschmidt and let's see what we can do to

14    make the environment here at the medical center, once

15    again, collegial and not one where we're worried, a

16    reign of terror or whatever.  So that was on a

17    Thursday.  I think, a Thursday.  Maybe a Wednesday.

18         I get a phone call at 9:30 on Friday evening

19    and, simultaneously, my VCA, Rafic Warwar, received a

20    phone call from Maggy Dickens as well, the assistant

21    to Dean Goldschmidt.  We were being summoned to a

22    meeting Saturday morning on the campus and we were

23    expected to show up at nine o'clock.  So I have no

24    idea what it was.  I thought there must have been a

25    disaster or something or other.

1          So both of us show up and it's Jack Lord and

2     the dean.  And, basically, to summarize what happened

3     is Jack said "What are you doing having meetings with

4     the chairs and the VCAs without my permission?  You

5     are never to have a meeting without me going over the

6     agenda, without me telling you what is allowed to be

7     discussed," et cetera.  I said "Jack, what are you

8     talking about?  This is -- you want me to try to make

9     the whole practice plan happier, to make things run

10    better, to expand our practice and so on."  He was

11    emphatic that I was never to meet alone with them

12    without his permission again.

13         And then at the end of this one hour he turns

14    to Rafic Warwar and he says, "So, Rafic, we've offered

15    you this position to come into the C-Suite and to

16    administer a bunch of different things and so on and

17    so forth and leave the department of surgery."

18         And Rafic, I don't know if you've ever talked

19    to him, Rafic said, "After what I just saw and went

20    through, I would never accept that position.  And I

21    will stay with the department of surgery."  And that

22    was -- so that was somewhere around the middle of

23    October.

24         And it showed me that, really, I was a tool

25    for what he wanted to try to accomplish.  I met with

```
 1    him on a regular basis after that as well.  There was

 2    a committee called the RAC which reviewed every

 3    request for raising salaries, hiring new people, et

 4    cetera, et cetera, and Jack ran that meeting and I

 5    was, of course, one of the principals in it.  It was

 6    obviously designed to control expenses.

 7              And then, as things evolved with the petition

 8    and what was happening, a petition that I had no role

 9    in starting, by the way, I'll just preempt your

10    question.

11              And then with the meeting on December 9th,

12    the meeting, the telephone call with Nemeroff, I don't

13    think I had any further meetings with Jack Lord after

14    that.  It's possible I may have had one or something

15    or other, but I don't recall any subsequent meetings

16    after that.

17        Q.   Going back to the spring of 2012, you're

18    pretty close, Dr. Lord actually started on March 1st,

19    2012, and do you know why he was brought in to replace

20    Bill Donelan?

21        A.   The medical school -- well, you know, I

22    hear -- I hear things and everything else.  There are

23    a number of -- there are two separate questions.  I

24    mean, why was Bill Donelan removed and why was Jack

25    Lord put in?
```

1          And some of the reasons overlapped, but the

2    board of trustees became dissatisfied with Donelan for

3    a number of different reasons.  I have no direct

4    knowledge.  I heard a bunch of different things.

5          But more pressing was the issue that the

6    medical school was facing a budget deficit was

7    projected to be somewhere around 60 to $65 million.

8    Our fiscal year ends May 31st.  It was already -- you

9    said March -- I thought it was April.  It was always

10   April.

11         So the only way that you could even come

12   close to trying to balance the budget when you

13   consider that the medical school's about two-thirds or

14   70 percent of the expenses are related to salaries,

15   the only way of doing that was by cutting people.  And

16   Jack was brought in to do that and he did that.

17   Q.   And did you take issue with the way that the

18   layoffs were implemented?

19   A.   I understood the goals.  I did take issue

20   with the way that it was done.  I thought that it was

21   unnecessarily cruel and didn't take into account that

22   this wasn't a strict business, this was an academic

23   medical center and some of the people that were

24   brutally cut were done so without regard to the

25   consequences.

1        I mean, we had -- in the department of

2   surgery we had single mothers who had been working

3   with us for 20 years, and the reason that they were

4   working there at a low salary level was because they

5   wanted tuition remission, and there was no way that

6   this could be maintained.

7        They were fired, terminated, and even at a

8   senior level.  So people like Dennis Harris, who was

9   the VCA for pediatrics.  He was called in on a Friday

10  afternoon.  He was one of the most respected VCAs and

11  he was terminated.  He tried to say I've been here for

12  15 years and ten months or something.  Let me stay two

13  more months so I can get my benefits.  Let me run this

14  program out using my vacation time.  Absolutely not.

15       On a Friday afternoon, being called in at

16  whatever time it was, three o'clock, he was terminated

17  and he was escorted to his office and he was told to

18  pick up his stuff.  He couldn't even say good-bye to

19  his people that he had worked with for almost 16 years

20  and he was escorted off the campus.  This was

21  unnecessary.

22       I understand the imperative of reducing

23  expenses.  I think that I disagreed with the brutal

24  nature with which it was accomplished.  It literally

25  set up a reign of terror on the campus.

1      Q.   Of the people that were laid off, were any

2  rehired?

3      A.   I know that some were rehired into other

4  roles.  I don't know the details about that.  I would

5  be purely speculating.

6      Q.   Were you aware of the time constraints to

7  implement those changes?

8      A.   Well, I mean, it was April and the fiscal

9  year ended May 31st.  And the way the budgets and

10  everything else are generated, we were already into

11  the end of the budget-generating sessions, so all of

12  this had to happen very quickly.  There was no

13  question about that.  I did understand that.

14      Q.   Okay.  Did you know that those layoffs were

15  implemented with the imprimatur of the dean, the

16  president of the university and the board of trustees?

17          MR. YANNUZZI:  Object to form.

18      A.   I don't have specific information.  But it is

19  in my opinion unlikely that it could have happened

20  without endorsement at a senior level.

21      Q.   Now, you used the word reign of terror.

22      A.   Yes.

23      Q.   Why did you use that phrase?

24      A.   People were horrified of what was going on.

25  One of the things that, very special, one of the

1    things -- so, as you asked earlier, I trained in

2    Canada and it's -- although we're similar in many

3    ways, the Canadian system is much more collegial or

4    easygoing than in many academic medical centers in the

5    United States.  If you're working some places in New

6    York or Boston or whatever, it's literally dog eat

7    dog.

8           When I came down and interviewed at the

9    University of Miami, I was impressed with the

10   collegiality, with the civility of it.  I had lived

11   through Dean Fogel, who was just a wonderful, warm

12   individual.  Dean Clarkson who was the dean from '96

13   to 2006.  I went through all of that.  The campus was

14   a place where people enjoyed going to work.

15          When things started happening and when people

16   started being terminated, not just with the abruptness

17   that might have been necessary to achieve the goals,

18   but with the MO of how to do it, it was unnecessary.

19          I mean, people -- I could give you a couple

20   of examples.  So Lipshultz, Dr. Lipshultz, who was the

21   chair of the department of pediatrics, was literally

22   called in on a Friday afternoon in May and told that

23   he was relieved.  Here is a nationally-respected,

24   funded researcher.

25          I have no idea, other than the fact that they

1    were trying to set an example, and he was -- he wasn't

2    terminated, he was relieved of being the dean, which,

3    as we already said, is the prerogative of the dean of

4    the school, but, I mean, for no apparent reason.  And,

5    of course, that created all sorts of things.  And,

6    simultaneously, Dennis Harris was fired.

7            Mark Harman, who was the VCA for the

8    department of medicine, was visiting his 94 year old

9    aunt or somebody or other up in Washington, and on a

10   Friday afternoon, while he was out of the state

11   visiting somebody that was dying, he gets a phone call

12   telling him he doesn't need to come back; that he's

13   been fired.

14           Mark Harman and Dennis Harris, along with

15   Warwar were the three best VCAs in the medical school.

16   I have no idea why this happened.  Removing Dennis

17   Harris, for example, here is a guy that has been

18   working for 16 years or something at the university

19   and they just took him out and they told him that Ruth

20   was going to -- who -- she was the VCA in OB/GYN, that

21   Ruth was going to take over the two departments.

22           Ruth couldn't even control her own

23   department.  And she was markedly inferior, not only

24   in terms of tenure, but also of the ability, to Dennis

25   Harris.  And yet there was no discussion about this.

```
 1     No input from the chair.  No input from any of the
 2     other people that worked with people like Dennis
 3     Harris.
 4            So what ended up happening is the faculty got
 5     very, very nervous.  We started losing people.  They
 6     weren't happy about what was going on on the campus.
 7     A whole bunch of the support services were eliminated.
 8     It became very, very difficult to work in June and
 9     July and August of 20012.  People were terrified as to
10     what was going on.
11            MR. YANNUZZI:  Sorry to interrupt.  When
12         we're getting to a breaking point, can we take a
13         break?  I don't want to interrupt your flow.  I
14         wanted to put it out there.
15            MR. SLOMAN:  Thank you, Chris.  I know we've
16         been going for almost an hour and a half.
17     BY MR. SLOMAN:
18         Q.   Doctor, did you see the logic in these
19     layoffs, indiscriminate as they may have seemed, due
20     to the time constraints and due to the $65 million
21     deficit that you had mentioned earlier in your
22     testimony?
23         A.   As I said, I saw the logic of the cuts.  They
24     had to be done.  What I disagreed with was the manner
25     in which it was ruthlessly carried out.  I didn't
```

1       think that part was necessary.

2              Most of the people who work at the medical

3       center do it because they genuinely love the medical

4       center.  As you know, the faculty get paid less than

5       people at Baptist Hospital and in the community

6       programs.  They are working at the medical center,

7       because they love to work at the medical center and

8       are genuinely interested in academics, education,

9       clinical research, basic science research and so on.

10      These are not people that are going to create havoc.

11             And so I think that the necessity of using

12      collegiality and treating people with respect, that's

13      what academic medical centers have been about for a

14      thousand years.  The reason that academic medical

15      centers have been able to survive is because of the

16      collegiality and the investment of fine individuals in

17      the center.  So that was the part that I disagreed

18      with.

19          Q.  But you would also agree, would you not, that

20      at some time, when deficits run as high as they did

21      here, hard decisions had to be made, and the manner in

22      which those decisions were implemented may not have

23      comported with, you know, the Geneva Convention in

24      terms of the way that they are implemented?

25             MR. YANNUZZI:  Object to the form.  Asked and

1          answered.  Go ahead, doctor.

2          A.    I've answered it twice and you've asked me

3     the same question.  I will accede to the fact that

4     there was an absolute need to cut the budget.

5     Absolute need to cut it.  It's the manner.  It could

6     have been done in a much more collegial manner that

7     would have resulted in there being less discord.

8               You know, we even suggested that make the

9     cuts, but, simultaneously, instead of making -- I'm

10    going to choose a number, I don't remember exactly how

11    the conversation went, because I talked with Nelson

12    Weichold and some other people at the same time, I

13    said "Listen, we're developing the budgets, make a ten

14    percent cut, that's what your goal is, and allow us to

15    actually cut 11 percent, but allow us to give a reward

16    to the remaining people so that they recognize that

17    they are not going to be on the block next and that

18    you give them a slight raise and you reinforce the

19    issue of they're wanted, needed and everything else."

20              That was the part that was missing.  The way

21    of handling it in a gracious manner.  The whole

22    concept of noblesse oblige is something that -- and I

23    told Jack that.  I said "You know, Jack, you don't do

24    that."

25              One of the things he told me, he said "I

1    never regretted firing someone too soon."  I said,

2    "You know, Jack, that works well in business.  I don't

3    think it works very well in an academic medical

4    center."  And that was the biggest -- the biggest

5    challenge.  It was the manner of implementing things.

6              MR. SLOMAN:  Is everybody okay with a ten

7         minute bathroom break?

8              THE WITNESS:  I went yesterday.

9              MR. YANNUZZI:  That would be great, Jeff.

10        Thank you.

11             THE VIDEOGRAPHER:  We're going off the

12        record.  This marks the end of video file number

13        one.  The time is 10:58 a.m. and we're going off

14        the record.

15             (Thereupon, a brief recess was taken, after

16        which the following proceedings were had:)

17             THE VIDEOGRAPHER:  We're back on the video

18        record.  This is the start of video file number

19        two in the deposition of Dr. Alan Livingstone.

20        The time is 11:12 a.m.

21   BY MR. SLOMAN:

22        Q.   Doctor, a question I forgot to ask you at the

23   beginning is, I just want to make sure that you have

24   no open applications on your computer at this time.  I

25   assume that you're using your own computer in which to

```
 1    Zoom into this video deposition.  Is that correct?
 2         A.   Correct.  There's nobody else on my line.
 3         Q.   Okay.  And you have no open applications, you
 4    know, to be able to refer to any information.
 5    Correct?
 6         A.   Not at the moment.
 7         Q.   Okay.  Thank you, sir.
 8              Doctor, tell me about your relationship with
 9    Jennifer McCafferty-Fernandez.
10         A.   I didn't really have much of a relationship
11    with Jennifer.  She was put into the position as
12    compliance officer by Jack Lord.
13              When I became the executive dean of clinical
14    affairs, she and I would meet occasionally about
15    issues if she had a problem.  But, for example, when
16    they brought in TMG and everything else to do an
17    audit, she never even notified me.
18              So even though I was not only the chair of
19    surgery, but was also the executive dean of clinical
20    affairs, I had no knowledge or forewarning or anything
21    else from her.
22         Q.   Okay.  Did you respect her in her position as
23    the chief medical compliance officer?
24         A.   I really didn't have much of an opinion about
25    her abilities or anything else.  I never had a
```

1    conflict with her.  I didn't run in with her.  I

2    really don't know her as a person, so I don't really

3    have much of an opinion.

4         Q.   So when I asked you did you respect her in

5    her position, you did or did not?

6         A.   I would say I was sort of neutral.  I, quite

7    frankly, if you were to ask me what her background

8    was, whether she was even suited to be the compliance

9    officer, I couldn't answer that question.  I don't

10   know very much about Jennifer McCafferty.

11        Q.   Okay.  What were -- you just mentioned TMG.

12   What was TMG?

13        A.   TMG was a group of people that were brought

14   in, without any discussion with the department of

15   surgery, they were brought in in the fall of 2012.

16   And my understanding was they were to -- were

17   initially brought in as sort of a business issue to

18   oversee, overlook or make recommendations about the

19   transplant program.

20            And then eventually, and I don't really know

21   the details about this, I know they got involved with

22   looking at the IML and the OPO.  All that I can tell

23   you is that, in spite of the fact when we found out,

24   when my VCA, Rafic Warwar, found out that they were

25   there doing this, we asked to meet with them, and they

1    never met with either one of us.  And we were the ones

2    that knew more about the whole transplant setup than

3    anybody else in the medical center.

4         Q.   Would you say that you were taken by surprise

5    that the TMG group was hired?

6         A.   Yes.

7         Q.   And by this time, you were the executive dean

8    of clinical affairs.  Correct?

9         A.   That's correct.

10        Q.   And as the executive dean of clinical

11   affairs, were you receiving executive daily updates?

12        A.   Not about that.  I was never consulted.

13        Q.   You mean in terms of their actual retention.

14   Correct?

15        A.   That's correct.

16        Q.   But once the university, through the general

17   counsel's office, engaged TMG, you were aware through

18   the executive daily updates whenever there was a note

19   between either Jennifer McCafferty, Pascal

20   Goldschmidt, Dr. Lord, et cetera.  Correct?

21             MR. YANNUZZI:  Object to the form.

22        A.   No, I don't think that's correct.  I don't

23   think I got any daily updates.  I may be mistaken.

24   But to the best of my recollection, I knew nothing

25   about what was happening, other than that they were

```
1    there and they were talking to different people.
2           I do know that on one occasion, when they
3    called the head of the OPO, our director of the OPO,
4    Leslie Cortina, she called, of course, Rafic Warwar,
5    because she reported directly to him.
6           So Rafic went over to meet with Leslie
7    Cortina and TMG.  And Rafic received a phone call from
8    Jack Lord telling him to get back to the medical
9    campus, that this was none of his business.  So Rafic
10   also, who knows more about the management of the
11   transplant stuff than even I do, because he took care
12   of a lot of the details, even he was totally excluded,
13   could not give any input to TMG.
14      Q.   Did you ever become aware of the
15   qualifications of the individuals who were working for
16   TMG?
17      A.   No.  And when we looked it up on the Internet
18   to try to find out where they were based, we found
19   they were based out of a Post Office box.
20      Q.   Would it be fair to say that you were not a
21   fan of TMG?  Correct?
22      A.   How could I be a fan of them?  I never met
23   them.  I never saw anything in writing.  There was
24   never a final report from them.
25           So other than the fact that they were there
```

1    and didn't even have the courtesy or the foresight to

2    speak with the people that were instrumental in

3    running a lot of the transplant issues, I thought that

4    they were clearly not as prescient as they might be in

5    doing their report and investigation.

6        Q.   Do you recall in September of 2012 a letter

7    that was -- I think went through or originally was --

8    strike that.

9             Were you aware of a letter that was addressed

10   to HHS, Health and Human Services Office of Inspector

11   General reporting an alleged fraud in the IML?

12       A.   I am aware of that.

13       Q.   Tell me with what -- tell me from the

14   beginning how you became aware of it and what you

15   understood was contained or the allegations contained

16   in that letter.

17       A.   So however it happened, I was called by Rafic

18   Warwar one day to say that they had received a letter.

19   It actually and incredibly it was directed to HHS or

20   something or other, but it ended up being delivered to

21   the transplant center and we got the letter.

22            And I told Rafic that this letter was to go

23   to Jennifer McCafferty, so that she could look into

24   it.  And we handed the letter -- we didn't dispose of

25   the letter.  I never saw the letter personally, I

1    don't think.  But I told him it had to be handled by

2    our compliance officer and it was delivered to

3    Jennifer McCafferty.

4        Q.   Did you ever read the contents of the letter?

5        A.   I don't think I read the contents.  I think I

6    was told that there were some issues.  And, frankly, I

7    don't remember just exactly what it was.  But we

8    turned it over immediately to Jennifer McCafferty.

9        Q.   Dr. Livingstone, I'd like to go through --

10       A.   I apologize.  That is my front door.

11            MR. SLOMAN:  Yeah.  Why don't we go off the

12       record very briefly.

13            THE WITNESS:  Just one second.  I'll be right

14       back.

15            THE VIDEOGRAPHER:  We're going off the

16       record.  The time is 11:21 a.m.

17                 (Brief pause.)

18            THE VIDEOGRAPHER:  We're back on the video

19       record.  The time is 11:21 a.m.

20            (Thereupon, the document was marked as

21            Exhibit 1 for identification.)

22   BY MR. SLOMAN:

23       Q.   Dr. Livingstone, I'd like to show you what's

24   been marked as Exhibit 1.  We'll put it up on the

25   screen and have you take a look at it and ask you some

1      questions about it.

2          A.   I can't see it.

3          Q.   We're bringing it up.  It's on our end.

4      Okay?  Bear with us.

5               Dr. Livingstone, I'm showing you what's been

6      marked as Exhibit 1, which is an email chain, and it

7      starts -- if you could go up just a little bit,

8      Jorge -- starts as an email from you to Richard Cote,

9      dated November 11, 2012.

10               Why don't you just take a moment to read it

11      and I'd like to ask you some questions about it.  Let

12      me know when you've finished reading it.

13          A.   I've read what you have up.

14          Q.   Why don't we go down just a little bit more.

15          A.   Okay.

16          Q.   Do you remember generating this email back in

17      January of 2012?

18          A.   I do.

19          Q.   And beginning -- go up just a little bit,

20      Jorge -- the first paragraph sets the stage of what

21      this meeting was about and what it evolved into.  Can

22      you tell us in your own words about that meeting.

23          A.   Yeah.  We had a meeting over at Jackson in

24      the afternoon, as it is outlined here.  We go into the

25      meeting, I have no idea, there is no forewarning about

```
 1    what it is, and Phil Chen -- and Phil Chen is there
 2    with Alex Contreras and they are talking about what
 3    they think that they might be able to do that would
 4    save Jackson money about the transplant labs.
 5            They have no historical context.  They know
 6    nothing about what has been going on.  Both of them
 7    are relatively new.  Know nothing about what has gone
 8    on for years and years, 20 years.  This was in 2012,
 9    so it had been going on for 30 years.
10            And Phil Chen, who never let it go, he kept
11    going on afterwards, but he is trying to make some
12    fundamental changes without even discussing what the
13    implications are.
14       Q.   And who is Phil Chen?
15       A.   Phil Chen was one of the vice chairs of
16    pathology.
17       Q.   And he was a pathologist.  Correct?
18       A.   Yes.
19       Q.   And he worked for the University of Miami,
20    but he had some type of dual role with Jackson?
21       A.   That's my understanding.
22       Q.   Okay.  And, as you mentioned, and let me just
23    read the last sentence of the first paragraph, it says
24    Alex, meaning Alex Contreras.  Who is Alex Contreras?
25       A.   He was the chief administrative officer at
```

1    JMH.

2        Q.   And the last sentence states, and this is

3    your words, "Alex opened the meeting by essentially

4    stating, quote, Dr. Livingstone, we believe we have an

5    opportunity to recapture about 80 percent of the

6    pre-transplant labs performed in the UM IML and I have

7    invited Phil Chen to validate what I'm saying."

8            Did I read that correctly?

9        A.   Yes.

10       Q.   So you're writing this email to Richard Cote.

11   Correct?

12       A.   Correct.

13       Q.   And Dr. Cote was the chairman of the

14   pathology department at the University of Miami Miller

15   School of Medicine?

16       A.   That is correct.

17       Q.   And so you wrote this email to Dr. Cote and

18   you, in the third paragraph, you write "Phil Chen goes

19   on to explain his laboratory leadership role at JMH."

20   That's Jackson.  Correct?

21       A.   Correct.

22       Q.   "And that he is paid by Jackson as the lab

23   director and that he believes he, in parentheses, JMH,

24   has the capacity and the capability to provide 80

25   percent of what is done in UM pre-transplant labs."

```
 1                    Did I read that correctly?

 2         A.    Yes.

 3         Q.    And then you then go on and say "I am puzzled

 4   why a UM faculty member would propose to take 2.5M" --

 5   I guess that's million.  Correct?

 6         A.    Yes.

 7         Q.    "...in revenues from UM, without

 8   understanding the ramifications or even the financial

 9   implications this could have on Jackson's Medicare

10   cost report."

11                    Did I read that correctly?

12         A.    That is correct.

13         Q.    And then in the next paragraph you write "Is

14   Dr. Chen unaware of our current financial crisis and

15   the dean's desire to improve revenues and margin?"

16                    Did I read that correctly?

17         A.    Yes, you did.

18         Q.    Now, earlier I believe that you told us that

19   at that time UM was experiencing a financial crisis.

20   Correct?

21         A.    That's correct.

22         Q.    And did Dean Goldschmidt express to you a

23   desire to improve revenues and margins?

24         A.    Well, the whole goal of the medical school

25   was to try to figure out how to cut the huge projected
```

1    loss.  This letter I think is in January of 2012, and

2    we already knew by midyear that we were facing a

3    potential 60 to 64 million dollar deficit.

4           We were in the process of doing our budgets

5    for the current -- for the coming here, 2013 fiscal

6    year, and so, absolutely, the dean was very concerned

7    about -- he knew that we couldn't continue with the

8    deficits.

9           And, in fact, Nelson Weichold had already

10   handed down guidelines about what had to happen, the

11   departments had to cut expenses and improve revenues.

12   But the answer is yes.

13   Q.    And then you go on to write "JMH's desire to

14   grow their margin is understandable to me, but I have

15   additional responsibilities to protect/defend/grow our

16   university's revenues, along with our premier centers

17   of excellence."

18          Did I read that correctly?

19   A.    Yes.

20   Q.    In January of 2012, did you believe it was

21   within the scope of your employment at the university

22   to protect, defend, grow the university's revenues?

23   A.    That was my responsibility as the chairman of

24   the department of surgery to do whatever I could to

25   make sure that we were fiscally responsible and that

```
 1    we were doing the right thing.  That doesn't mean that
 2    we were supposed to be generating revenues that were
 3    inappropriate.
 4          And, of course, when we get down to analyzing
 5    the rest of this outline here, you will find out
 6    exactly what I'm talking about.  I would never do
 7    anything to increase revenues that wasn't appropriate.
 8          And, in fact, this whole thing, as you will
 9    find out when we discuss, you probably already know,
10    not only was this proposal wrong, it showed that Phil
11    Chen -- Alex Contreras knew nothing about the
12    transplant.  This was not only going to be to the
13    detriment of the department of surgery, but also to
14    Jackson.  It would cost Jackson money.  This wouldn't
15    make money for it.  And Phil Chen didn't understand
16    that either, and I'll be happy to explain.
17       Q.   There was about -- this was about
18    pre-transplant labs.  Correct?
19       A.   That's correct.  That's exactly correct,
20    which is important to understand the distinction.
21       Q.   Didn't you say earlier that the IML only
22    dealt with inpatient routine labs?
23       A.   No.
24       Q.   Okay.  Maybe I have that wrong.
25       A.   Yeah, you do.
```

```
1          Q.   It goes on, you go on and say and you said
2     "What is disconcerting from my perspective is that one
3     of our own faculty is either proposing or advocating
4     the elimination of approximately $2.5 million from the
5     university's revenue stream without even having the
6     courtesy of talking to me."
7          Did I read that correctly?
8          A.   Correct.
9          Q.   How important was the revenue generated by
10    the IML to the university's revenue stream?
11         A.   It is, like everything else, it's -- it would
12    be the same thing as cutting the AOA two and a half
13    million dollars or having the department of medicine
14    and cardiology all of a sudden going on strike and not
15    doing cardiac catheterizations and doing surgery.
16         I mean, revenue is revenue.  It's fungible.
17    And the reality is that here we are in the middle of
18    the fiscal year and somebody's making a proposal that
19    might have the impact of reducing the revenue to the
20    department of surgery and the university.
21         But, equally important, and I didn't have
22    time in this letter, I don't even know what time of
23    the night I sent it, but, equally important, is it was
24    clear that Phil Chen and Alex Contreras had no idea
25    how pre-transplant stuff was set up.  They didn't
```

1    understand the Medicare cost report, they didn't

2    understand the strategic acquisition charges for

3    getting transplant organs and everything else.

4           If this -- this never went anywhere, as you

5    well know, because when we explained to them the

6    consequences of doing something like this, it became

7    clear it didn't make any sense, and it never made any

8    sense.

9           The issue of doing this, and the outside

10   consultants looked at this, as you are well aware, and

11   what we did on the pre-transplant side is we charged

12   at the Medicare fee level, the appropriate Medicare

13   fee level, and sent it to Jackson for the expenses of

14   doing these tests, and they could then put it on their

15   Medicare cost report and they got reimbursed at that

16   rate.

17          If Jackson had gone ahead and done the

18   testing themselves, they would have been reimbursed at

19   only 12 cents on the dollar, because of the discount

20   that they had for lab services.  I forget the name of

21   it, the terminology.

22          But -- so the benefit, as soon as this

23   became -- that everybody on the financial side of

24   Jackson and everything else understood what the

25   implications of this were, they immediately said that

1    doesn't even make sense.

2         So we charge for the pre-transplant testing

3    that was done and there are a whole bunch of things

4    that go into this, as you probably know.  If patient

5    comes in, you're trying to figure out whether or not

6    they are a transplant candidate and then it goes on to

7    the histocompatibility lab.  A whole series of tests

8    are done.  We charge only at the Medicare rate.  Not a

9    cent more.  We were completely in compliance.

10        This charge was sent to Jackson, Jackson took

11   it and put it into a Medicare cost report.  They

12   didn't lose a cent from this thing.  It actually

13   worked out beneficially for them as well.

14        Many places in the country, when the labs do

15   these pre-testing, they actually charge more than the

16   Medicare-allowable fee.  We never did.  We were very,

17   very careful.

18        Q.   Did the department of surgery and the IML

19   bill the government directly as well?

20        A.   Not for this.

21        Q.   What did they bill -- what did the department

22   of surgery and the IML bill the government for?

23        A.   Only in the post-transplant area.  So

24   pre-transplant all went through the Medicare cost

25   report.  In-hospital was a bundled price.

 1    Post-transplant was direct billing to either the

 2    government or to the appropriate insurer, just like

 3    any other fee for service afterwards.

 4        Q.   I want to skip to the last sentence on our

 5    screen right now, if we could just move up a little

 6    bit.  It says "I know that Dr. Chen is fairly new and

 7    that he may just be naive and not have the big picture

 8    concerning our campus."

 9             Did I read that correctly?

10        A.   You did.

11        Q.   What did you mean "he did not have the big

12    picture concerning our campus?"

13        A.   Phil Chen had no knowledge about the

14    background of the transplant program.  He didn't know

15    about the IML.  He didn't know about OPO.  He didn't

16    know about -- I don't think he even -- at the time, I

17    don't think he had any expertise with transplant.

18             It's an extremely complex product line.  It

19    took me about 15 years to learn about a lot of this

20    stuff.  And I'm a surgical oncologist, but I obviously

21    had to become deeply involved with understanding many

22    of the pieces of this.

23             Phil Chen never did.  All he was interested

24    in doing and he actually told -- he was part of the

25    reason that Cote was so excited about maybe taking

1    over the transplant labs.  He thought he was going to

2    make a whole bunch of money on it and everything else.

3    And it wouldn't have done anything.  It was a right

4    pocket, left pocket issue.

5          Phil Chen knew nothing about pre-transplant,

6    about the implications.  So as I have said twice I

7    think, this would have negatively impacted the medical

8    center and Jackson.  So it never went anywhere when

9    people found out exactly what the implications were.

10   I was much more concerned about -- much more

11   concerned -- I was equally concerned about the fact

12   here we had a faculty member, a vice chair of the

13   department, he didn't even reach out to me or Rafic or

14   somebody else to even say, "Listen, what do you think

15   about this?  Does this make sense?  Is this going to

16   improve the quality of care?  Is this going to save

17   money?  Is this more efficient?"  No, he didn't.

18         And his subsequent behavior repeatedly, until

19   he left the medical school on his motorcycle, never

20   changed.  He was always combative; he was never

21   collegial.

22   Q.   How long did the IML continue to operate

23   under the department of surgery?  Until what time

24   period?

25   A.   It continued to operate under surgery as long

1    as I was chair.  I don't know what has happened

2    subsequently.  I'm not involved with the finances of

3    the department.

4              (Thereupon, the document was marked as

5              Exhibit 2 for identification.)

6    BY MR. SLOMAN:

7         Q.   Let me show you now what's been marked as

8    Exhibit 2.  Doctor, I'm showing you what's been marked

9    as Exhibit 2, which is the letter, and we can go down,

10   this is a fax cover sheet, the letter that was

11   purportedly received by someone in the transplant

12   laboratory who then forwarded it on to medical

13   compliance.

14             Other than seeing it right here, does this --

15   does anything in this letter refresh your recollection

16   about seeing it back in September of 2012?

17        A.   I know about the episode and I know we

18   immediately turned the -- we didn't try to discard the

19   letter, we didn't try to hide it.  This was a letter

20   we received.  We had no idea.

21             I'm sort of surprised it came to us, because

22   it was supposedly sent to the Department of Health and

23   Human Services.  It came to the transplant center and

24   when we received it we turned it over to Jennifer

25   McCafferty.

1          Q.   Seeing this letter, and by this time in

2     September of 2012, it seems as though there had been

3     an ongoing dispute between the department of pathology

4     and the department of surgery concerning the

5     transplant laboratory pathology testing.  Do I have

6     that correct?

7          A.   I'm not sure how you arrived at that

8     conclusion.  This doesn't say anything about coming

9     from pathology.

10          Q.   No, I understand that.  But before this

11     letter was received by whoever it was in the IML,

12     there had been, according to what you've testified, it

13     seems as though there was a tug of war, if you will,

14     between the department of pathology and the department

15     of surgery over transplant pathology testing.  Do I

16     have that right?

17               MR. YANNUZZI:  Object to the form.

18          A.   That is correct.  Transplant -- the pathology

19     department was interested in trying to centralize all

20     of the labs, including the IML.

21          Q.   And, in fact, I believe you testified earlier

22     that had Pascal Goldschmidt just made a decision and

23     moved pathology transplant testing to pathology, a lot

24     of this probably would not have culminated with an

25     investigation or a review by the TMG group.  Is that

```
 1    correct?

 2         MR. YANNUZZI:  Object to the form.

 3         A.   I think it's true.  True and unrelated.

 4    You're implying that if we had transferred everything

 5    to pathology that everything would have been fine.

 6    There is no difference in what happened.

 7            What the difference is, and this letter had

 8    nothing to do with pathology as best as I can tell,

 9    it's written by somebody that, obviously, English

10    isn't their native language and we have an idea who

11    may have sent it, but it's irrelevant.  It doesn't

12    matter.

13            Anybody is allowed to file a complaint, and

14    it's our responsibility, as appropriate leaders, to

15    have it investigated, and that's exactly what we did.

16            If Dr. Goldschmidt had chosen to transfer the

17    IML to pathology, there would have been a whole bunch

18    of other issues.  But I don't think it would have had

19    any impact on this.

20            This is an allegation that there is fraud and

21    it didn't work out to show the other things.  I'm

22    reading what it says.  No interpretation, irrelevant

23    making decisions, which is all not accurate, as you

24    know, because it's been investigated.

25            But people are allowed to do that.  That's
```

```
1    our system in the United States, that people can

2    accuse you of anything that they want.

3        Q.   Why don't we go down a little further and see

4    what the other allegations were.  The paragraph I

5    think you were referring to, it says "This people,"

6    who, as you indicated, and it appears as though the

7    person that wrote this, English is not their first

8    language, but it says "This people are" -- I think

9    they mean "committing fraud to Medicare by billing

10   laboratory tests with no interpretation and not

11   irrelevant for making decisions to transplant patient

12   or treated for rejection."

13            Did I read that correctly?

14       A.   You read what is there.

15       Q.   Right.  And there are other allegations

16   concerned, and it's personalized with, as you go down

17   further, to Philip Ruiz.  Who was Phillip Ruiz?

18       A.   He was the director of the IML.

19       Q.   And it says "Phillip Ruiz, the medical

20   director, are supported by the chair of the department

21   of surgery, Alan Livingstone" -- I assume that's

22   you -- "and they laid off individuals that do not

23   follow their steps and because of treating and weak

24   link we are scared to report the irregularities.  Also

25   the university is a private institution and one
```

```
 1    individual can't fight alone.  The university lawyers
 2    will, quote/unquote, eat you alive."
 3           So needless to say, somebody wrote this
 4    letter.  It was supposed to go to Health and Human
 5    Services, Office of Inspector General.  Somehow it
 6    ended up in the lap of the transplant laboratory and,
 7    according to you, it was then turned over to medical
 8    compliance.  And as we see by the cover sheet, it was
 9    forwarded on to the HHS OIG.
10           Did you ever find out who generated this
11    letter?
12       A.   Not with certainty.  We believe it was one of
13    the employees that was terminated.  But I have no
14    specific knowledge.
15       Q.   Was it a doctor or --
16       A.   No.
17       Q.   -- or lab assistant?
18       A.   It was a lab assistant, we believe.  I mean,
19    I don't know.  But we didn't terminate any doctor, so
20    it wouldn't be a doctor.
21       Q.   Now, at this point in time, in September, do
22    you understand with the backdrop of the dispute
23    between pathology and surgery, this letter, did you at
24    least understand why the university hired an external
25    group to review such allegations?
```

```
 1              MR. YANNUZZI:  Object to the form.
 2       A.    The -- I don't have any question about
 3    whether or not it should be investigated and looked
 4    at.  The question is is who you would bring in and how
 5    would you address it.  Who would you involve with the
 6    evaluation process.
 7              (Thereupon, the document was marked as
 8              Exhibit 3 for identification.)
 9    BY MR. SLOMAN:
10       Q.    Okay.  Let me show you what's been marked as
11    Exhibit 3.  This is an email that purports to be dated
12    October 19, 2012, from you to Jennifer McCafferty.  If
13    you would please take a moment and read it and then I
14    have some questions.
15       A.    Yes.
16       Q.    The first sentence -- so this email was
17    generated from you to Jennifer McCafferty at 8:27
18    a.m., and the first sentence and the first few words
19    from you to Dr. McCafferty-Fernandez is, "I see from
20    the daily updates that the plan to bring in outside
21    consultants to review transplant has almost been
22    completed."
23              Did I read that correctly?
24       A.    Yes, you did.
25       Q.    Okay.  And so you were receiving the daily
```

1    updates.  Correct?

2         A.   Yes.

3         Q.   And you knew from those daily updates that

4    there was this plan to bring in outside consultants to

5    review the transplant lab.  Correct?

6         A.   All that this says is that on October 19th of

7    2012 there was a daily update that said that the

8    process had almost been completed.  I don't recall

9    being involved with the process or having any

10   discussion with it.

11        And the next paragraph goes on to say that we

12   would like to discuss this.  And they had gone ahead

13   and done all of this without consulting or even

14   discussing it with Rafic or myself, the people that

15   knew the most about things.

16        They even had time to discuss it with Gaetano

17   Ciancio, who knew nothing about the history or the

18   management of IML or OPO.

19        Q.   Was your objection to the process or to which

20   group was actually hired or both?

21        A.   Well, I didn't know who was hired, because we

22   had no involvement with that.  I was concerned about

23   the process.  I thought that it was important.  We

24   wouldn't have turned over the letter if we didn't

25   think it was important.

1          We can't hide those things.  People find out

2    you hide it, it's basically an admission of guilt.  We

3    have no objection to evaluating the whole thing.  I

4    had hoped, as I said with Jennifer, she also had no

5    background about acknowledging this.

6          As I said repeatedly, that the -- there are

7    few areas in the medical center that are more complex

8    than transplant.  There are no areas that are more

9    regulated in medicine than transplant.

10         Most people have no idea of the relationship

11   between UNOS, OPTN, SRTR, how do you the

12   pre-transplant.  Even you, and I know you did a lot of

13   this before, you didn't understand the difference

14   between pre-transplant billing or post-transplant

15   billing or in-hospital billing and there is a distinct

16   difference with it.

17         All I am trying to get through in this

18   missive is the idea that please, let's discuss this,

19   so you know that what's happening.  They never asked

20   us whether to hire TMG.  And TMG is a -- is not a

21   forensic investigator, anyway, as we eventually found

22   out, which is what they needed.

23   Q.   Dr. Livingstone -- again, if somebody can

24   turn off their sound.  Okay, thank you.

25         Dr. Livingstone, as we saw from Exhibit 2,

1   which was the letter, misdirected, addressed to HHS

2   OIG --

3       A.   Yeah.

4       Q.   -- and the subject of those allegations not

5   only included you, but also included Phil Ruiz and

6   others.  Did it make sense to exclude you from this

7   review by an external group?

8           MR. YANNUZZI:  Object to the form.

9       A.   We weren't concerned about whether or not we

10  or anybody else would be evaluated.  What we wanted to

11  do was to provide context so they would have an

12  understanding of what was even being looked into and

13  to give some input on on how to proceed with the

14  audit.

15          You know, subsequently, when internal audit

16  was involved, the first thing that they did is they

17  hired outside consultants, they hired a legal firm to

18  oversee the outside consultants and they talked to us

19  to get additional information.

20          When people come in from the outside and have

21  no idea who is involved with it and what's happened

22  over a period of 30 years, you know, over a period of

23  a week, they're never going to find out what is going

24  on.

25          MR. SLOMAN:  Can we go up just a little bit,

1      Jorge.

2      Q.   Okay.  I believe that the Exhibit 3 has an

3   email from Dr. Lord to you a few opinions later.  So

4   I'm guessing that Dr. McCafferty-Fernandez sent your

5   email to Dr. Lord and Dr. Lord responded to you.  Do

6   you see that?

7      A.   Yes.  He responded to me and Goldschmidt and

8   Ms. McCafferty.

9      Q.   He wrote "This is an external review

10   generated by a complaint to the HHS OIG.  There will

11   be an independent assessment of compliance-related

12   activities.  No one from leadership should be involved

13   at this time."

14          Did I read that correctly?

15      A.   Yes.

16      Q.   Do you understand why you were not included

17   in being able to give the history of the MTI and the

18   IML because of the complaint generated to HHS OIG?

19          MR. YANNUZZI:  Object to the form.

20      A.   The issue is not whether or not we would be

21   involved with the audit or the complaint or whatever

22   is is that we could provide background information

23   about even the structure.

24          And without that, it becomes almost

25   impossible for somebody to come into a complex medical

```
1    center and know what's going on and figure out what's

2    happening.

3         Q.   Dr. Livingstone, are you saying that you

4    never were able to meet with anyone from TMG?

5         A.   That is correct.  Never.  Nor Rafic.

6         Q.   And if there are agendas from TMG showing

7    that you and Rafic Warwar attended meetings, would

8    they be mistaken?

9         A.   They would be mistaken.  I never attended a

10   meeting with TMG.

11        Q.   Do you recall whether you were -- whether

12   there was ever any attempts to set up meetings between

13   you and members of TMG?

14        A.   We tried to set up meetings and they were

15   denied.

16        Q.   And who denied them?

17        A.   I don't know.  All I know is that we didn't

18   meet with them.  We asked to set it up and they

19   wouldn't -- they wouldn't meet with us.

20             And, in fact, I told you the example that

21   when -- and I have no idea why they were even looking

22   at OPO, this has nothing to do with OPO, but they set

23   up a meeting to meet with Leslie Cortina, who is the

24   director of the OPO, she called Rafic.  Rafic went

25   over, because the OPO at that time was over in the
```

1    Science Park, and he was specifically told by Jack

2    Lord to go back to his office and that he wasn't to be

3    there when TMG met with Leslie Cortina.

4        Q.   Going back to the email and Dr. Lord's email

5    to you at 8:31 a.m. on the same day, do you remember

6    what your reaction to Dr. Lord's response to you was?

7        A.   I really don't.  Did I respond to him?

8        Q.   I don't know.  This is all I have at this

9    point.

10       A.   Yeah.  No, I don't know.  You know, he sent

11   an email.  He was the COO.  He copied the dean.  These

12   are my two supervisors.  And I suspect that I just

13   said, okay, but I don't specifically recall.

14            (Thereupon, the document was marked as

15            Exhibit 4 for identification.)

16   BY MR. SLOMAN:

17       Q.   Okay.  Let's move on to Exhibit 4.  I'm

18   showing you what's been marked as Exhibit 4, which is

19   dated October 29th, 2012, which is a invitation to you

20   from Dr. Lord for some event.

21            Do you recall whether you had opportunities

22   to meet with Dr. Lord, both socially and

23   professionally?

24       A.   Do i recall if I met with him socially?

25       Q.   Yes.

1      A.   The answer is is, except for a Labor Day

2   party in early September of 2012, when he was

3   attempting to get me to become the executive dean of

4   clinical affairs, he invited us to a Labor Day party

5   at his home and I went to that, I don't recall ever

6   accepting an invitation to anything else social with

7   Jack Lord.

8      Q.   Okay.  So this invitation, you didn't take

9   Dr. Lord up on it, I take it?

10      A.   I seriously doubt it.

11      Q.   And at this point your feelings towards Dr.

12   Lord it sounds like were strained?  How would you

13   characterize them?

14      A.   You know, that's not entirely true.  I

15   actually respected him for some of the things that he

16   did, and I said that earlier.

17           You know, you have to give the devil his due.

18   He was smart.  He was willing to go ahead and do

19   things.  He was ruthless in the undertaking.  He was

20   indiscriminate in the way he cut people and everything

21   else.  His manor was unacceptable to me, but I

22   understood it.

23           I didn't have a problem with parts of those

24   things, because it was not my responsibility.  I

25   didn't hire him.  The board of trustees and whoever

1    the leadership on Coral Gables campus, ultimately

2    Shalala, were the ones that hired him.  So I wasn't

3    the one that was supposed to be making a judgment

4    about his -- the way he handled things.

5           But if you were to say did you dislike him?

6    The answer is I didn't dislike him as a person.  I

7    didn't like the way he carried things out.  I found

8    him a very interesting individual.

9       Q.   Do you remember a dinner with him and your

10   wives to Il Gabbiano?

11      A.   I don't specifically remember.  At that time

12   I was going out for everything.  Was there a reception

13   or something or did he invite us out for something?  I

14   don't specifically remember.

15      Q.   Okay.  So the answer is you don't remember.

16      A.   No, I don't.

17           (Thereupon, the document was marked as

18           Exhibit 5 for identification.)

19   BY MR. SLOMAN:

20      Q.   Let me show you what's been marked as Exhibit

21   5.  Let's go down.  Okay.  So, Dr. Livingstone, I'm

22   showing you Exhibit 5, which is, subject, update,

23   October 30.  It says to executive daily update.  Do

24   you see that?

25      A.   Yes.

```
 1        Q.   And the executive daily updates you received.
 2   Correct?
 3        A.   I received a whole bunch of them, yes.
 4        Q.   Right.  Because at this point you were the --
 5   I know the executive dean of clinical --
 6        A.   Clinical affairs, yes.
 7        Q.   And as executive dean of clinical affairs,
 8   you were obligated to write your own executive daily
 9   updates.  Correct?
10        A.   I was mandated.
11        Q.   Okay.  And you were mandated and so was
12   everybody else who was in this executive daily update
13   category.  Correct?
14        A.   Yes.
15             MR. SLOMAN:  Can you go up a little bit, I
16        believe.  Go to 226.  Go down.  All right.  Just
17        go up a little bit.  There, I believe.  Let's go
18        down a little.  Keep on going.  Keep going.  Keep
19        going.  Okay.  Let's go up a page.  I think I'm
20        just on the wrong page.  Okay.  Right there.  I
21        found it.
22   BY MR. SLOMAN:
23        Q.   Dr. Livingstone, the one, two, three, four, I
24   think the fifth bullet point down is this was Dr.
25   Lord's executive daily update for October 30th, and
```

1    the fifth bullet point down says "One-on-one with Alan

2    Livingstone.  Bonus time," bonus, in quotes, "time to

3    discuss upcoming compliance visit for transplant/IML.

4    Research priorities, transition issues."

5              Do you recall whether you ever spoke to Dr.

6    Lord about the upcoming compliance visit for

7    transplant/IML?

8         A.   By this time it was the end of the month.

9    Jennifer McCafferty had already told us that there was

10   going to be an upcoming visit.

11             I don't remember exactly what happened with

12   the discussion of this.  I don't know if she told me

13   TMG was coming.  The decision had already been made.

14   This was a fait accompli.

15             This wasn't a discussion about whether or not

16   we thought TMG it was appropriate people or whatever.

17   I suspect he just informed me, which is what he

18   usually did when we were discussing issues.

19        Q.   So is it your testimony that you didn't have

20   a discussion where there was give and take, this was

21   just him giving you information?  Is that what you're

22   saying?

23        A.   For sure there wasn't a discussion about

24   whether it was going to happen.  Whether I asked for

25   additional information, I don't specifically recall

```
 1    this meeting.  It was ten years ago.

 2              But he wasn't having the meeting to ask me if

 3    I thought there should be an upcoming compliance visit

 4    by somebody.  He was informing me that this was

 5    happening.

 6              (Thereupon, the document was marked as

 7              Exhibit 6 for identification.)

 8    BY MR. SLOMAN:

 9         Q.   Let's go to Exhibit 6.  Dr. Goldschmidt, I'm

10    showing you Exhibit 6.

11         A.   I'm not Dr. Goldschmidt.

12         Q.   I'm sorry.  I'm sorry.  Dr. Livingstone, I'm

13    showing you what's been marked as Exhibit 6, which is

14    an activity summary from Pascal Goldschmidt to the

15    executive daily update group, dated activity summary,

16    November 7, 2012.  Did I read that correctly?

17         A.   Yes.

18         Q.   And, again, these executive daily updates are

19    disseminated to a group of I guess chairs and other

20    people who are in the C-Suite of the Miller School of

21    Medicine.  Is that a fair description?

22              MR. YANNUZZI:  Object to the form.

23         A.   Yes.

24         Q.   And you were a member of that executive daily

25    update group.  Correct?
```

1      A.   Correct.

2      Q.   And this is a summary, this is an example of

3  a summary written by Dr. Goldschmidt.  Is that a fair

4  characterization?

5      A.   Yes.

6      Q.   All right.  I'd like you to read what it says

7  on the one, two, three, four, five, the sixth asterisk

8  down.

9      A.   Okay.

10      Q.   And is this an example of the updates

11  concerning -- this is dated November 7th, and Dr.

12  Goldschmidt's disclosure to the group that Jack,

13  Jennifer McCafferty, TMG Consultants.  Then he lists

14  three names, presumably people from TMG Consultants.

15  "Good conversation about Miami Transplant Institute

16  and the need to make sure compliance and systems are

17  optimized.  The complexity of having two collaborating

18  institutions, UM and J" -- presumably Jackson -- "that

19  collectively deliver solid organ transplant care

20  requires particular attention."

21           Did I read that correctly?

22      A.   Yes.

23      Q.   Okay.  So when you received these executive

24  daily updates and you read that TMG was there or about

25  to begin their review, did you try to insert yourself

1    and, you know, to be able to give the history of the

2    IML and the transplant labs?

3            MR. YANNUZZI:  Object to the form.

4        A.   I've already answered the question.  And I

5    don't know exactly when it was.  I don't know exactly

6    when they came.  This was November 7th.  This was a

7    month after the initial thing from Jennifer

8    McCafferty.

9            So I don't know if the TMG were already on

10   campus or not.  I already told you that we were hoping

11   to meet with them so that we could give some of the

12   information about the transplant and the complexities

13   of it.

14           You can see that even here in this summary, I

15   mean, there's nothing in this, except other than a few

16   superficial comments, but they even recognized that

17   there was complexity of having institutions working

18   together to deliver solid organ transplant and they

19   want to pay particular attention.

20           We agreed with them.  We want to pay

21   particular attention to it as well, and we absolutely

22   wanted to make sure that compliance and all the

23   systems were optimized, which is something that we had

24   done year after year after year.

25           And the record reflects that in 2008, 2009,

```
1    2010, the transplant program, the IML gets

2    investigated, reviewed -- not investigated -- they get

3    reviewed every year by AHCA, they get reviewed by CMS,

4    they get reviewed by internal audit and every single

5    year we didn't have a problem with it.

6            So this was another basic continuation of

7    this, and I don't have anything else to comment about

8    this, because there's just no information here.

9        Q.   Now, earlier you mentioned that Dr. Ciancio

10   had replaced you as interim director of the Miami

11   Transplant Institute.  Correct?

12       A.   That's correct, yes.

13       Q.   So at this time, in November of 2012, Dr.

14   Ciancio was the interim director of the Miami

15   Transplant Institute?

16       A.   I think he still was.

17       Q.   Dr. Vianna -- did I pronounce that

18   correctly -- Vianna?

19       A.   Yeah.

20       Q.   He did not replaced Dr. Ciancio as director

21   of the Miami Transplant Institute yet, correct?

22       A.   I think that he became the official -- I

23   think the transfer of responsibilities came in January

24   of 2013.  But I might be slightly off on the dates.

25            (Reporter clarification.)
```

1      Q.   Thank you, doctor.

2           Doctor, what was your relationship like with

3    Dr. Ciancio in the fall of 2012?

4      A.   You know, Gaetano was trying to go ahead and

5    do -- manage the Transplant Institute.  It was clear

6    that he needed support and we were providing him with

7    some administrative support.  He was learning about

8    the complexity of things.

9           As I said earlier, he initially thought that

10   the IML fell under his purview and that the OPO fell

11   under his purview.  That didn't.  It was never a part

12   of the Transplant Institute, and, in fact, it was

13   contradictory to rules and regulations about having an

14   IML and an OPO inside the Transplant Institute and so

15   they weren't.

16          But there was a conflation of activities at

17   this time.  And it's my understanding, although

18   there's never been a formal report as best as I can

19   tell from TMG, it was my understanding that they were

20   looking at not only whether or not there was a

21   functioning Transplant Institute, but they were also,

22   for reasons which are unclear to me, looking at the

23   OPO and also at the IML.

24          Perhaps their direction, I never saw what

25   their -- what their orders -- matching orders were.

1    Perhaps their whole direction was how do you maximize

2    the efficiency of a transplant program that would

3    include a transplant institute, an OPO and

4    histocompatibility and also IML labs.  Maybe that's

5    what they were trying to do.

6         Q.   Dr. Livingstone, at this point in time, did

7    you respect Dr. Ciancio and what he was trying to do?

8         A.   I still respect Dr. Ciancio.  I think Dr.

9    Ciancio is a terrific, a terrific doctor.  He's an

10   excellent surgeon.  He is absolutely committed.  He's

11   passionate to what he does.  He's a good researcher

12   and everything else.

13          It was clear to me that there were some gaps

14   in his ability to administratively lead the transplant

15   program.

16        Q.   And did those gaps result in you and Dr.

17   Ciancio attending meetings with Dr. Goldschmidt to

18   discuss those gaps?

19        A.   It wouldn't surprise me.  I don't

20   specifically remember, but it wouldn't surprise me if

21   we had meetings about that.

22        Q.   Did you become verbally abusive to Dr.

23   Ciancio in those meetings?

24        A.   I am never verbally abusive to anybody.  I

25   believe in the concept of noblesse oblige.  I think

1    it's counterproductive.  I don't even discipline

2    faculty members in public, I always do it in private.

3    So I would never do something like that in front of

4    Goldschmidt.

5         Q.   So if Dr. Ciancio testified that you called

6    him stupid or words to that effect, you would

7    categorically deny them?

8         A.   I'd take a lie detector test on it.  He is

9    not stupid.  I would never say that about Gaetano.

10             (Thereupon, the document was marked as

11             Exhibit 7 for identification.)

12   BY MR. SLOMAN:

13        Q.   Dr. Livingstone, let me show you what's been

14   marked as Exhibit 7.  Dr. Livingstone, I'm showing you

15   what's been marked as Exhibit 7, which is a memo to

16   file.  This was generated back in November of 2012.

17             Have you ever seen this document before?

18        A.   I don't think so.  This is pursuant to that

19   letter that was sent to the OIG that eventually got

20   transferred, I guess.

21        Q.   No.  This appears to be something different.

22   This is a memo to file from a senior consultant with

23   the Transplant Management Group.

24        A.   I didn't get communications from them, so --

25   let me read it and see.

```
 1        Q.   Yeah.  I'd like to direct your attention to

 2   paragraph three.

 3        A.   Let me read paragraph one, because it

 4   outlines what they were told to do.

 5        Q.   Yeah.  Let me know when you're ready.

 6        A.   Apparently, the medical school contracted

 7   with TMG to perform a very comprehensive review of the

 8   transplant programs, including staffing,

 9   organizational design, billing processes, et cetera.

10   I have no knowledge of this.

11             A site visit for data gathering purposes was

12   performed in two days, between November the 7th and

13   November the 9th.  Okay?  So two days.

14             Well, I guess the hospital was never informed

15   that TMG was coming in, either.  And this was supposed

16   to be a program jointly operated by the two sides.

17             So, I mean, that's -- that is a procedural

18   tactical error.  They should have contacted either

19   Contreras or Carlos Boyer, Don Steigman or something.

20   They have not given any notice.  Okay.

21             So do you want me to read the next one at

22   3:42 p.m.?

23        Q.   Yes.

24        A.   Okay.  Go ahead.

25        Q.   Keep going.
```

1          A.   So there is an uncorroborated statement from

2     whoever this person is in TMG.  And did you speak to

3     Dr. Ciancio directly about this?

4               First of all, Gaetano is a tenured faculty

5     member.  He can't be fired and he's not going to lose

6     his job.  It doesn't even make sense.  Even when

7     Lipshultz was taken out as being chair of the

8     department of pediatrics, he wasn't fired, because he

9     has tenure and he's protected.

10              Anyway, I don't know about from the highest

11     levels to be vague and standoffish with us -- okay.

12     And the revenue hasn't grown tenfold over the past six

13     years.

14              I mean, he has -- this -- Gaetano, wonderful

15     person that he is, was not involved with the business

16     of transplant and knew nothing about it.  More

17     importantly, and it's very important to understand

18     this, so I'm going to say this over and over again,

19     because I suspect you're going to ask me, medically

20     unnecessary testing.  He was instrumental in setting

21     up the protocols that were done through the IML.  This

22     was never set up by anybody else except the transplant

23     doctors.

24              And this is critical to be understood by

25     everybody.  And it's not without signed physician

1    orders.  That is nonsense.  All of these things, just

2    like at other transplant centers, because of the

3    complexity of transplant, these -- there are standard

4    protocols.

5         We function as a group.  The transplant

6    program is so big and they see -- so they screen 4,000

7    patients a year, they transplant, you know, like 600

8    of them, but now it's 700.  And in order to go over

9    all of these things, in order to get a level of care

10   that is not just good, but superior, because our

11   programs have been named silver medallion and gold

12   medallion programs and everything else, in order to

13   get a standard of care appropriate for optimizing the

14   outcomes of transplant, there are standing protocols.

15   And this is something that is perfectly legitimate and

16   everything else.

17        And, as I said, he, George Burke and David

18   Roth, were instrumental in setting up these testing

19   protocols.  Nobody else.  It wasn't set up by the IML;

20   it wasn't set up by me.  I don't even know what these

21   tests are.  It was set up by the transplant doctors,

22   and the testimony in the past has corroborated that

23   information.

24        Q.  Dr. Livingstone, my only question was had you

25   seen this and do you take -- first of all, do you know

1    what -- do you have any idea as to whether anyone from

2    the department of surgery ever instructed anyone to be

3    standoffish and vague with the TMG investigators?

4        A.   I doubt that anybody said to be standoffish

5    and vague.  Whether Rafic or anybody else had a

6    conversation about being appropriate and going over

7    some of the issues objectively, I don't know if that

8    occurred.  But nobody would say to be standoffish or

9    anything else.

10           These people were being brought in for two

11    days, can you imagine, to try to investigate the

12    complexity of this program in two days, with a couple

13    of people?  It doesn't make sense.

14           But nobody would say to avoid it.  We always

15    have gone ahead and been very careful about

16    compliance.  As I said repeatedly, the transplant

17    programs are the most heavily-scrutinized programs in

18    medicine across North America.  No other program is

19    scrutinized as intensively as these programs and we

20    always, always did well with it.

21        Q.   Okay.  And this is just the last page of that

22    exhibit.

23           Going back to your relationship with Dr.

24    Ciancio, is it your testimony that you never insulted

25    Dr. Ciancio?

```
 1        A.   Well, you know, insulting is in the eyes of
 2   the beholder.  Whether I said something to him that he
 3   found to be not to his liking, I don't know.  But I
 4   never called him stupid.  I would never do that.  And
 5   I don't know exactly what it is, so it's hard for me
 6   to comment.
 7        Maybe, maybe I said something to the effect
 8   that I thought that he needed additional help and he
 9   took that as an insult.  I don't know.  I'd be happy
10   to look at anything that he specifically says and
11   comment about it, if you provide it for me to peruse.
12        Q.   Let me go to the next exhibit, which is
13   Exhibit 8.
14        MR. YANNUZZI:  Before we flip to the next
15        exhibit, we've been going about an hour and it's
16        sort of lunchtime.  So I just don't want -- it
17        looks like whatever we were just looking at, we
18        can forward.  But we're sort of shifting.  Now
19        might be a good time to take a break.
20        MR. SLOMAN:  Why don't we take -- do you want
21        to take -- doctor, would you like to take a lunch
22        break?
23        THE WITNESS:  Whatever it is.  I'd like to
24        get through this.  I know you have an agenda and
25        you have things that you need to get through.
```

1           I'd like to get through, so that I can get to the

2           hospital later this afternoon.

3                 MR. SLOMAN:  All right.  Why don't we keep

4           going and we'll break in about ten minutes and

5           then take a 15, 20 minute break for lunch to get

6           something to eat and reconvene and try to plow

7           through this.  Okay, does that make sense?

8                 THE WITNESS:  Okay.

9                 (Thereupon, the document was marked as

10          Exhibit 8 for identification.)

11    BY MR. SLOMAN:

12          Q.   I'm showing you what's been marked as Exhibit

13    8, Dr. Livingstone, which purports to be an update

14    from Jennifer McCafferty Cepero.  Do you see that?

15          A.   Yes.

16          Q.   And this refers to compliance, November 27 to

17    28, and it says, the second sentence states:  MTI

18    consultants on site for day two of IML and day one of

19    OPO assessment.  Multiple meetings, phone calls and

20    follow-ups.

21                Did I read that correctly?

22          A.   Yes, you did.

23          Q.   Okay.  So at least, according to this, this

24    was part of the TMG group on site, at least on

25    November 27 and 28.  Does that comport with your

1    recollection, or you --

2        A.   I don't know about the dates.  But that's

3    what the email says, they were here on November 27 and

4    28.

5        Q.   I know earlier you said they were only there

6    for a couple days in beginning of the November.  But,

7    in actuality, it was more than that.  But that is a

8    side note.

9            What I'm more interested in, Dr. Livingstone,

10   is -- if you go up a little bit, Jorge -- is Rafic

11   Warwar's email to you on the same day, at 10:29 p.m.,

12   reading "Calls and emails with counsel, re updates on

13   MTI, UMTB, privacy matters and covered entity

14   assessment planning.  What in the world is going on?"

15           Do you know what Dr. Warwar was referring to

16   there?

17       A.   He wondered, I presume, if I knew anything

18   more than he did.  But we were out in the dark and

19   knew nothing about what was going on.

20           (Thereupon, the document was marked as

21           Exhibit 9 for identification.)

22   BY MR. SLOMAN:

23       Q.   Let me show you what's been marked as Exhibit

24   9, which is another executive daily update.  This one

25   from Dr. Lord, dated November 28th, 2012, at 10:01

1   p.m.  Let's see.  Go down a bit to where it says

2   compliance on page 217.

3          Do you see the sixth bullet points or hyphens

4   down, it says "Compliance, update with Jennifer on MTI

5   review and next steps.  Looks like a, quote, second

6   stage, unquote, audit will be necessary."

7          Did I read that correctly?

8   A.   You did.

9   Q.   And, again, you're receiving -- you received

10  this executive daily update.  Correct?

11  A.   Yes.

12  Q.   And did you have any understanding as to TMG

13  continuing with their review in a second stage?

14  A.   I had no idea.  I never saw the first stage.

15  Q.   Were you, again, resistant to the TMG group,

16  because you didn't understand their background or what

17  was your specific objection at this point?

18          MR. YANNUZZI:  Object to the form.

19  A.   First of all, I'm not saying that I'm

20  objecting to it at all.  I know nothing about TMG at

21  this stage, other than the fact that they had been

22  brought in to do this audit.

23          My understanding was that initially it was a

24  business thing and then all of a sudden it transformed

25  into a forensic investigation.  I have no idea what

 1     their qualifications are or were.

 2            When we looked them up on the Internet, we

 3     couldn't figure out who they were.  They seemed to be

 4     a group of loosely-associated people who had worked in

 5     transplant.

 6            I don't know anything about them.  I have no

 7     idea at this stage whether or not they are qualified

 8     to do even a first stage audit and there was no work

 9     product associated with this.

10     Q.   Dr. Livingstone, did you have any window or

11     insight into the vetting process as to how TMG was

12     selected?

13     A.   No, I have no idea.

14     Q.   If I told you that it was a collaborative

15     effort with people from Jackson, would you know one

16     way or the other?

17     A.   Well, the email that you showed me before

18     stated that Jackson was unaware about the audit, so I

19     don't have any idea who they might have spoken to at

20     Jackson.

21            But Jackson was pushing back on the whole

22     thing.  They weren't happy about it.  Do you have a

23     specific name and I could respond to that?

24     Q.   I don't have it offhand, but -- I can't cite

25     you chapter and verse right now -- but at this point,

1    I don't -- I'm just asking you whether you were aware

2    of the vetting process and how TMG was actually

3    selected.

4         A.   No.  I have no knowledge.

5         Q.   Thank you.

6              Can you go up little bit, Jorge.

7              I believe you exchanged emails with Dr. Lord.

8    If you go up a little further.  Go up a little

9    further.  Okay.

10        A.   This is one of the -- it's amusing.  This is

11   part of our occasional interaction.  One of the things

12   about Jack is he was compulsive about his emails.  He

13   cleared his emails every single day.

14             And, of course, I was -- I was in the

15   operating room and doing all sorts of other things.

16   You will see that most of my emails, responses, come

17   at 12 o'clock at night and one o'clock.  My daily

18   updates I usually did at 1:30 in the morning and

19   everything else.

20             So you keep telling me about these clinical

21   updates.  I'm sure I read many of them, or I scanned

22   them.  I, at this time, I was receiving almost a

23   thousand emails a day.  It was impossible.

24             And so you'll see Jack was talking about,

25   when you go, if you move the page down, or whichever

```
 1    direction it is, about the emails, I was saying it was
 2    impossible.  I couldn't keep up on doing my emails.
 3    It was -- I would have hundreds and hundreds and
 4    hundreds of these emails.
 5            And, of course, everybody thinks that their
 6    email is important.  I did try to read the daily
 7    updates and I'm sure I scanned them.  Many of them are
 8    just, as you can see, I didn't care if he had
 9    breakfast with Pascal and Phil George and focused on
10    elevator speech.
11            You know, these things, they, themselves,
12    they talk about short term.  There's no information.
13    All it is is a way of making sure that people are
14    working their eight or ten hour shifts.
15            I can tell you, without patting my own back,
16    I was working 18 hours a day, seven days a week.  And
17    you can ask my wife about that if you want.  She was
18    livid.
19            So these things about looking at some of
20    these daily updates, they came in every day, and other
21    people responded to them as well, and it just added to
22    my inbox.
23            Anyway, most of them don't have any
24    information, as you can see from this.  It looks like
25    a second stage audit will be necessary.  Okay.  What
```

1    did the first stage show and who is going to do the

2    second stage and so on and so forth?

3                (Thereupon, the document was marked as

4                Exhibit 10 for identification.)

5    BY MR. SLOMAN:

6        Q.   Let me show you Exhibit 10 and then why don't

7    we take a 20 minute break.  Okay?

8                I'm showing you what's been marked as Exhibit

9    10.  This is another executive daily update, re:

10   Compliance, December 5, from Jennifer McCafferty

11   Cepero.  Do you see that?

12       A.   Yes.

13       Q.   And do you see where it says about halfway

14   down "Debrief with TMG re: On site-follow up with GC

15   and drive by with Jack?"

16               Did I read that correctly?

17       A.   Right.

18       Q.   So I understand that you got a lot of emails,

19   but the updates on, if not a daily basis, almost on a

20   daily basis, recounted everyone's daily input, at

21   least that's what I understood the purpose of it was,

22   or their daily activities.

23               Is that your understanding as well?

24       A.   Yes.

25       Q.   And in this case, Dr. McCafferty-Fernandez, I

1    refer to her as Dr. McCafferty-Fernandez, by her

2    married name now, indicated that she had a debrief

3    with TMG re: On-site days, follow-up with GC and drive

4    by with Jack, meaning Jack Lord.  Correct?

5              MR. YANNUZZI:  Object to the form.

6        A.    Correct.

7        Q.    Okay.

8              MR. SLOMAN:  Why don't we take a 20 minute

9         break, get some food or whatever, and reconvene

10        at -- why don't we reconvene at about 12:50, or

11        12:55.

12             (Discussion held off the record.)

13             THE VIDEOGRAPHER:  This marks the end of

14        video file number two.  The time is 12:33 p.m.

15        and we're going off the record.

16             (Thereupon, a lunch recess was taken, after

17        which the following proceedings were had:)

18             THE VIDEOGRAPHER:  We're back on the video

19        record.  This is the start of video file number

20        three in the deposition of Dr. Alan Livingstone.

21        The time is 1:23 p.m.

22             (Thereupon, the document was marked as

23             Exhibit 11 for identification.)

24    BY MR. SLOMAN:

25        Q.   Dr. Livingstone, I'm going to show you what's

1    been marked as Exhibit 11 as soon as it comes up,

2    which purports to be -- it was referenced in a

3    December 6th, 2012, email, as the petition.

4         Is this the petition that you were referring

5    to earlier?

6    A.   Yes.  This is not me, though.  This is not me

7    writing this, it's somebody else.

8    Q.   I understand.  We'll go to the bottom, and I

9    think there's a place for those who wanted to sign

10   on -- keep going, please -- for -- there is a space to

11   print your name or sign it and I understand that a

12   number of the faculty signed this petition.  Is that

13   your understanding?

14   A.   Yes.  Over 800.

15   Q.   And, doctor, I'd like to go to the top.  If

16   you could just read along with me, it says "To the

17   chair of the faculty senate."  Who was the chair of

18   the faculty senate?

19   A.   Rick Williamson.

20   Q.   And he was a -- was he in the medical school?

21   A.   No, he is -- he was the dean of law, I

22   believe.  It's Dr. Williamson.

23   Q.   By the way, do you know who drafted this

24   document?

25   A.   Yes.

```
 1          Q.    Who?

 2          A.    Am I supposed to say or it doesn't matter?

 3          Q.    You have to answer.

 4                MR. YANNUZZI:   That's fair.  Go ahead,

 5          doctor.

 6          A.    Dave Arnold.

 7          Q.    And who is Dave Arnold?

 8          A.    He is a faculty member in the department of

 9          otolaryngology.

10          Q.    Okay.  And it's written "We, the undersigned

11          faculty of the University of Miami School of Medicine,

12          wish to express in the strongest possible terms the

13          concern we feel for the future of our School of

14          Medicine."

15                Did I read that correctly?

16          A.    You did.

17          Q.    "Under the current leadership, there has been

18          a major shift in the mission of the school that we

19          feel jeopardizes our educational, clinical and

20          research enterprises.  The deterioration of the

21          relationship with Jackson Memorial Hospital

22          fundamentally threatens both our graduate and

23          undergraduate medical education programs without which

24          the School of Medicine cannot exist.  Without these

25          core components, this School of Medicine will fail at
```

1    its most critical mission of providing the best

2    possible advanced clinical care to our community, and,

3    as such, will quickly lose relevance on every level."

4         Did I read that paragraph correctly?

5    A.   You did.

6    Q.   So at least in the first paragraph, the

7    petition identifies a major shift in the mission of

8    the school.  What did you understand that to mean?

9    A.   That the emphasis on the medical campus had

10   now switched away from what we considered to be the --

11   what we, as academic faculty, considered to be the

12   core mission of the medical school.  A medical school,

13   so in terms of even the title, a medical school means

14   education, research, clinical research, basic science

15   research.  And then down below, that is the clinical

16   mission, which, of course, under opinions, the ability

17   to do the education and the research.

18        But the thing, as I said earlier, that

19   attracts such qualified people as we have at the

20   medical center to the medical center to work for

21   lesser compensation and everything else is the fact

22   that they are fully invested in the goals of educating

23   the next generation of doctors and doing clinical,

24   cutting edge research and advancing the field of

25   medicine.

```
 1              Of course, we provide care for the privileged

 2    and the underprivileged and the underserved

 3    population, and that is financially very important.

 4    But that's what this is alluding to.

 5         Q.   And what was the major shift?

 6         A.   The concentration was strictly on finances.

 7    Everything was -- had been shifted, as we discussed

 8    earlier, to finances.  So when we were -- when we were

 9    cutting people, not only were we reducing expenses,

10    but sometimes there was a lack of selectivity, and

11    this was done across the board, without paying

12    attention to the fact that in order to do clinical

13    research, you have to have some support people.  In

14    order to see patients, you have to have medical

15    assistants.  In order to schedule patients for clinics

16    and for operations, we need to have support staff.

17              And with the indiscriminate cutting,

18    sometimes indiscriminate cutting of people just so you

19    can get down to a certain level of FTEs, what ended up

20    happening is you were actually causing degradation in

21    the clinical mission.

22         Q.   When you say that, you're talking about

23    full-time employees?

24         A.   Yes.

25         Q.   And, doctor, you would agree with me, would
```

1    you not, that the financial problems that faced the

2    university in the spring of 2012 were an accumulation

3    of decisions -- resulted from decisions that had been

4    made years earlier.  Is that a fair assessment?

5        A.   In part.  The reality is that there were

6    external pressures and circumstances that were going

7    on at a national level as well.

8             I mean, this was a difficult time, 2012, as

9    you well know.  And all of these issues sort of came

10   together and piled on top of each other, presenting

11   with -- we weren't the only medical center that was

12   having financial issues.

13            And, in fact, across North America I suspect

14   that there were 80 percent of the academic medical

15   centers that were having problems in 2012, but not all

16   of them handled them in the exact same manner.

17       Q.   So there were -- it was an accumulation of

18   external factors and decisions that had been made.

19   There was a purchase of the Cedars complexes.  There

20   was a whole host of issues that resulted in a $65

21   million deficit in the spring of 2012.  Correct?

22       A.   That is correct.

23       Q.   The next paragraph says "We believe that this

24   shift is a direct result of the failed leadership of

25   Pascal Goldschmidt and Jack Lord and we want to make

1    clear that the faculty has lost confidence in the

2    ability of these men to lead the school."

3              Did I read that correctly?

4        A.   Yes, you did.

5        Q.   And it goes on.  And in the last paragraph it

6    says, "We are steadfast in our commitment to our

7    school, our university and the welfare of our

8    community and believe that this faculty, our students,

9    and, most importantly, our patients, deserve a dean

10   who shares this view."

11             Did I read that correctly?

12       A.   You did.

13       Q.   Now, in this petition, Dr. Livingstone,

14   there's no mention of layoffs.  Correct?

15       A.   No.

16       Q.   There's no mention of retribution.  Correct?

17       A.   Yes.

18       Q.   There's no mention of a reign of terror.

19   Correct?

20       A.   Well, no, there's no mention, other than the

21   fact that they're saying that the atmosphere has

22   totally changed at the medical center and that it

23   fundamentally threatens the core mission of the

24   school.  So all of those pieces that you're alluding

25   to enter into the background for why this missive is

1    being constructed.

2         I mean, it didn't just happen because

3    somebody sat down and had nothing better to do on a

4    Sunday afternoon.  The faculty member that wrote this

5    was not a tenured faculty member.  He wasn't even a

6    professor.  He just was, and he still is, he's at the

7    medical school, he is a hard-working, committed

8    individual, and he had seen some things happen that

9    just were anathema to him.

10         So he sat down.  Nothing to do with -- I

11   didn't even see this thing for months.  And he did

12   this I think in September of that year and wrote this,

13   because he felt from his heart that the school was not

14   the school that he had joined, it was not going to be

15   the school that he could continue to stay in, unless

16   something fundamentally changed, which is why he wrote

17   this.

18   Q.   Okay.  Thank you for that.  But my question

19   was there's no mention of a reign of terror.  Correct?

20   A.   Correct.

21        MR. YANNUZZI:  Object to the form.  Asked and

22        answered.

23        MR. SLOMAN:  It wasn't answered.

24        MR. YANNUZZI:  He gave you a two-minute long

25        answer.  It was definitely answered.

```
 1              MR. SLOMAN:  No, it wasn't.  He didn't answer
 2         my specific question, but, regardless.
 3    BY MR. SLOMAN:
 4         Q.   And there's no mention of a lack of civility.
 5    Correct?
 6         A.   Well, it's alluded to in the paragraph above.
 7    I mean, you're asking me the same question and you're
 8    parsing words.
 9              I mean, the atmosphere at the medical school
10    had changed.  The mission was threatened.  I mean, all
11    of these things enter into the reason for writing the
12    letter.
13              He didn't put down all of the other issues.
14    He doesn't mention finances at all.  But, clearly,
15    these were all integral to the construct of the
16    letter; stating that he didn't think that the medical
17    school could continue along the path that it was
18    pursuing.
19         Q.   And that's your subjective interpretation.
20    Correct?
21              MR. YANNUZZI:  Object to the form.
22         A.   I think an objective look at the letter would
23    result in that conclusion.
24         Q.   Okay.  And there's no mention of lack of
25    collegiality.  Correct?
```

1      A.   Correct.

2      Q.   Now, sir, you mentioned that you didn't see

3  this until approximately December of 2012.

4      A.   I'm not -- I'm not sure exactly when I saw

5  it.  It was probably late November.  But I certainly

6  didn't see it during the first couple of months.

7      Q.   But you had no participation in drafting it.

8  Correct?

9      A.   Absolutely not.

10      Q.   Did you participate in encouraging others to

11  support the petition?

12      A.   Only at the end.

13      Q.   When was that?

14      A.   In probably in the latter part of November.

15  A lot of this had been going on for a considerable

16  period of time and I was very concerned about -- when

17  I eventually -- I didn't know about it for quite some

18  time.  And then when I eventually found out about it,

19  because the pressures became too great to ignore it, I

20  had a very fundamental decision to make, was whether

21  or not I was in conflict because of my roles and

22  everything else at the medical center, and I had to

23  decide, along with the executive dean of education and

24  the executive dean of research, whether or not we

25  thought that, indeed, the core missions of the medical

1    school were being threatened.

2           And after an analysis of the situation, we

3    all arrived at the conclusion that, yes, in fact, the

4    core missions of the school were being threatened.

5    Q.   So can you tell us, earlier I believe that

6    you said that you became aware of this in late

7    November, early December, 2012.  Is that fair?

8    A.   I think late November probably, yes.

9    Q.   And would it be fair to say at that time you

10   encouraged others to support the petition?

11   A.   I wasn't -- I wasn't going out and beating

12   the bushes or something or other, or I didn't do that,

13   like some of the others.  There were plenty of other

14   people that were enthusiastic about going ahead and

15   gathering signatures.  But nor did I stop it.

16          I didn't have the wherewithal to stop it,

17   anyway.  Even if I had wanted to, I couldn't.  I

18   didn't have the bandwidth or the wherewithal.

19          All I can say is that as things evolved on

20   the campus, I was in agreement with the thrust of this

21   petition.

22   Q.   And when Jack Lord was relieved of his

23   duties, were you gratified that he -- that the

24   president of the university had terminated him?

25          MR. YANNUZZI:  Object to the form.

1        A.   That's the wrong way of phrasing it.  If you

2    knew me, you'd realize I'm never gratified by

3    punishing somebody or relieving somebody or whatever.

4    I thought that it was the right thing to do and it is

5    what it is.

6            A decision had been made by the president of

7    the university, after she had reflected upon it and

8    thought about it.  And I didn't disagree with her

9    decision, but I didn't -- I didn't revel in it.  I

10   guess that's all I can say.  I didn't take pleasure in

11   the fact that another person had been terminated.

12       Q.   The dean was not terminated.  Correct?

13       A.   That's correct.

14       Q.   And the last sentence of the petition states

15   that "Our patients deserve a dean who shares this

16   view."  Correct?

17       A.   That is correct.

18            (Thereupon, the document was marked as

19            Exhibit 12 for identification.)

20   BY MR. SLOMAN:

21       Q.   Let me show you what's been marked as Exhibit

22   12, which is the email that you generated and

23   referenced before.  Let's go down to the bottom.

24            This is the December 9th Sunday morning email

25   that you wrote to Laurence Gardner and Rafic Warwar.

1    Is that what you were referring to earlier, Dr.

2    Livingstone?

3        A.   This was the thing that I -- this is what I'm

4    referring to.  My initial email was to Leonard Abess,

5    who was the chairman of the board of trustees, and to

6    the two former deans, Dean Fogel and Dean Clarkson.

7            And then, after that, I felt it was important

8    to discuss with my other executive dean, who was Lenny

9    Gardner, he was the executive dean of education, and

10   to Rafic Warwar, who was my right-hand man for ten

11   years and my VCA of surgery.  I knew that there was

12   going to be fallout and I wanted them to be prepared.

13       Q.   Dr. Livingstone, do you see, this is an email

14   chain where I believe that you mentioned that you

15   first emailed Leonard Abess.  Is that your testimony?

16       A.   That's what I thought it was, yes.

17       Q.   Do you see the time stamp on the earlier

18   email to Lenny Gardner?

19       A.   So it's five minutes apart, or 15 minutes

20   apart.

21       Q.   Right.  So the point being that you first

22   emailed Lenny Gardner and Rafic Warwar.  Correct?

23       A.   I guess, yes.

24       Q.   Okay.  So let's start with the email from you

25   to Lenny Gardner and Rafic Warwar.  Can you just

 1    refresh our recollection as to who Lanny Gardner is.

 2         A.   He was the former chair of the department of

 3    medicine.  And when he was relieved as being the chair

 4    of medicine, he was made the executive dean of

 5    clinical -- of education at the medical school.

 6         Q.   So this is on Sunday morning, at 10:21 a.m.,

 7    and you write "Talked to Nemeroff."  You wrote "Lenny,

 8    Rafic, Charlie Nemeroff just called and we talked for

 9    more than a half hour."

10              Do you see that?

11         A.   Yes, I do.

12         Q.   And did he call you that morning and then you

13    generated this email?

14         A.   Correct.

15         Q.   And how soon after your call with Charlie

16    Nemeroff did you generate this email?

17         A.   Immediately.

18         Q.   And can you tell us who Charlie Nemeroff was

19    at the university at the time.

20         A.   He was the chairman of the department of

21    psychiatry.

22         Q.   And the call that you had with Charlie

23    Nemeroff, did you take notes from that call or was the

24    conversation fresh in your mind that you were able to

25    generate this email?

```
 1        A.   It was fresh in my mind.

 2        Q.   And so why did you generate this email and

 3   send it to Lenny Gardner and Rafic Warwar?

 4        A.   Lenny Gardner and I had been colleagues at

 5   that time for 20 years.  He was the executive dean of

 6   education.  Rafic Warwar was my right-hand person.

 7             Frankly, when I got off the phone with

 8   Charlie, I was in a quandary.  I wasn't quite sure

 9   what was going to happen.  I was very concerned.  I

10   had seen what had happened to other individuals.

11             The threat was explicit and I wanted to make

12   sure that I documented what was transpiring.  And so I

13   sat down and I wrote it.  And if you know the way I

14   type, it took me a long time, because I type with one

15   finger.  But this is what happened.

16             I sent it, and then initially I wasn't quite

17   certain how high I should elevate it to.  And, in

18   fact, I don't know if I called Judd at ten o'clock in

19   the morning or whether I called him after I sent the

20   letter to Leonard Abess, but once I started on this

21   path, I knew that I had to document it and, hence, the

22   letters to these five individuals and the conversation

23   with Judd that morning.

24        Q.   So the very next sentence states "He" I guess

25   you mean Charlie Nemeroff.  Correct?
```

1       A.   Which sentence are you on?

2       Q.   The second sentence, "He states..."

3       A.   Yes.

4       Q.   "So Charlie Nemeroff states that he has been

5   talking with Dean Goldschmidt and Phil George and they

6   categorically assert that I am the ringleader for the

7   recall petition."

8            Did I read that correctly?

9       A.   You did.

10      Q.   And when you spoke to Dr. Nemeroff, did he

11  indicate that he had one conversation or multiple

12  conversations with Dean Goldschmidt and Phil George?

13      A.   I don't think he explicitly said.

14      Q.   And Phil George was a member of the board of

15  trustees.  Do I have that correct?

16      A.   Yes, you do.

17      Q.   The next sentence states that "Charlie"

18  meaning Charlie Nemeroff, "has delivered the dean's

19  ultimate TMG to me - which Charlie says he doesn't

20  believe in and that he is only serving as an

21  intermediary - that basically states that if I agree

22  to cease and desist and stop the recall petition, that

23  I will be held harmless and allowed to continue in my

24  current position, or, if I desire, I can go back and

25  be chairman of surgery, as was promised in my letter

1    of offer."

2              Did I read that correctly?

3         A.    You did.

4         Q.    Were those Dr. Nemeroff's words, the dean's

5    ultimatum?

6         A.    I'm sorry?

7         Q.    I said was the phrase the dean's ultimatum,

8    is that your interpretation of what Dr. Nemeroff told

9    you or is that what Dr. Nemeroff told you, that he

10   delivered the dean's ultimatum?

11        A.    It was no question that this was coming from

12   the dean's office.

13        Q.    Now, before you describe what the dean's

14   ultimatum was, you qualify the sentence with "Charlie

15   doesn't believe in and he is only serving as an

16   intermediary."  Correct?

17        A.    That is correct.

18        Q.    Why didn't you just write what Dr. Nemeroff

19   told you?  Why did you qualify that by saying that Dr.

20   Nemeroff didn't believe in this dean's ultimatum?

21        A.    No, I didn't say he didn't believe in the

22   dean's ultimatum.  He didn't believe in the rest of

23   the -- the thrust of it, that I would be penalized

24   with the transplant issue.

25              Charlie is a psychiatrist, and whenever you

1    talk to him -- he's a very interesting individual --

2    whenever you talk to a psychiatrist, you know they

3    often couch things, this is not me saying this, I am

4    merely conveying a message.  I am serving as an

5    intermediary.  I am -- I'm -- I don't take any

6    position on this.  I'm just delivering a message.  And

7    that's why I put that in.

8             What I was trying to do in this letter and,

9    obviously, I was under stress, I was trying to

10   memorialize basically what had transpired during the

11   half hour conversation with Charlie Nemeroff.

12        Q.   And is it your testimony, Dr. Livingstone,

13   that Charlie Nemeroff was conveying a threat from Dean

14   Goldschmidt and Phil George to you to either stop the

15   petition and continue on in your role as chair of

16   surgery or not stop the petition and suffer the

17   consequences?

18        A.   The message -- yes, you're summarizing it.  I

19   took it as meaning that the decision had been made

20   that if I didn't go ahead and try to stop the

21   petition, that they would go ahead and try to take me

22   out of my role, not only as the executive dean of

23   clinical affairs, but as the chairman of surgery.

24        Q.   But this was coming -- but just so that we're

25   clear, the way you understood it is that this threat

1    was coming from the dean and Phil George.  Is that

2    correct?

3         A.   No, that's not the way I interpreted it.  And

4    as I told you earlier on, Dr. Goldschmidt, regardless

5    of what he thinks about the way he handled things or

6    his ability to handle finances or whatever, is not a

7    person that likes to engage in confrontation.

8              How I interpreted this is that the -- that

9    Jack Lord had persuaded the dean that this was the way

10   to go, to play hardball, and to get me to stop the

11   petition, the recall petition.

12             I don't think that Dr. Goldschmidt would have

13   done this on his own.  I think he might have called me

14   in and begged or asked for my help.  This isn't the

15   usual modus operandi of Pascal, and I have known him

16   for over six years.  He had never threatened me in

17   that way.  He's more a person to try to persuade you

18   to do his bidding.

19             In any event, that's how I interpreted it.

20   Regardless, I put this down as contemporaneously as I

21   could remember.

22        Q.   And nowhere in this first email, Dr.

23   Livingstone, did you mention Dr. Lord.  Correct?

24             MR. YANNUZZI:  Object to the form.

25        A.   The second paragraph goes on to Jack Lord.

```
 1    But the -- my understanding of it and the reason that
 2    it really got to me is that, because I had seen the
 3    way Jack had handled other people that stood in the
 4    way of what he wanted to do, and, whereas, I didn't
 5    think the dean, himself, would have behaved quite like
 6    this, I had little reason to doubt that, with the
 7    backing and the support of Jack Lord, that he would
 8    have gone ahead and done this.
 9         Q.   Dr. Livingstone, did Charlie Nemeroff mention
10    Jack Lord to you in reference to the dean's ultimatum?
11         A.   I don't recall, honestly.
12         Q.   Well, first of all, you generated this email
13    within minutes or within an hour of this conversation
14    with Charlie Nemeroff.  Correct?
15         A.   Correct.
16         Q.   And in the first paragraph there's no mention
17    of Dr. Lord.  The mention is "Charlie states he has
18    been talking with Dean Goldschmidt and Phil George."
19              Do I have that right?
20         A.   You do.
21         Q.   "And they, Dean Goldschmidt and Phil George,
22    categorically assert I'm the ring leader for the
23    recall petition."
24              Correct?
25         A.   Correct.
```

1      Q.   "Charlie has delivered the dean's ultimatum

2   to me, which Charlie says he doesn't believe in and

3   that he is only serving as an intermediary that

4   basically states that if I agree to cease and desist

5   and stop the recall petition, that I will be held

6   harmless and allowed to continue in my current

7   position, or if I desire, go back and be chairman of

8   surgery, as was promised in my letter of offer.  If I

9   don't stop the recall petition, they -- Dean

10  Goldschmidt and Phil George -- they intend to use the

11  recent transplant review..."  We're talking about the

12  TMG review.  Correct?

13     A.   I hadn't seen any review.  But the transplant

14  review that we knew was ongoing, yes.

15     Q.   "Specifically, the IML audit, to impugn my

16  integrity and to punish me.  They, meaning Phil George

17  and Dean Goldschmidt."

18          Correct?

19     A.   That's not the way I interpreted it.  I

20  used --

21     Q.   I'm just asking you what's in --

22          MR. YANNUZZI:  Let him finish his answer.

23          THE WITNESS:  Will you let me answer the

24  question?

25     Q.   Yes, you can explain anything.  But will you

```
1    agree with me, sir, that there's nothing mentioned
2    about Dr. Lord at that point?
3         A.   That's -- that is -- I don't agree with you.
4    What -- the reason --
5         Q.   Where does it say Dr. Lord?
6              MR. YANNUZZI:  Would you let him finish his
7         answer.  Jeff, he's trying to explain.
8              MR. SLOMAN:  But he needs to answer the
9         question first, and then he can explain.
10             THE WITNESS:  So Jack Lord's name --
11             MR. YANNUZZI:  You don't like his answer.
12             MR. SLOMAN:  No.
13        Q.   It's obvious there's no mention of Dr. Lord
14   in the first paragraph.
15        A.   No.
16        Q.   Dr. Livingstone, do you agree with that or
17   not?
18        A.   I agree that there is no explicit listing of
19   Jack Lord.  However, the construct of the letter is
20   such that I take it as being the dean's office with
21   Goldschmidt and the trustees represented by Phil
22   George.  Phil George was a close associate and
23   supporter of Dean Goldschmidt.  I suspect he was
24   acting alone.
25             I don't know if he had talked to anybody else
```

```
 1    on the board of trustees.  But what I was doing in the

 2    first sentence is pointing out the level that this was

 3    coming from.

 4         I have no doubt that this was -- something

 5    changed here -- I had no doubt that this was coming

 6    from the C-Suite with the imprimatur and support of

 7    Jack and the dean on one side and Phil George as a

 8    representative of the trustees on the other side.

 9         Q.   Dr. Livingstone, how long did you speak to

10    Charlie Nemeroff for on that Sunday morning on

11    December 9th?

12         A.   Half an hour.

13         Q.   So you gathered that all from that half hour

14    conversation with Charlie Nemeroff as to Dr. Lord's

15    involvement.  Correct?

16         A.   Correct.

17         Q.   By the way, Dr. Lord is the person that hired

18    you as the executive director of clinical affairs.

19    Correct?

20         A.   Hired?  I guess he appointed me, along with

21    the dean.  It was the two of them that did it, yes.

22         Q.   But you told us in explicit detail how he,

23    Dr. Lord, called you into his office on your return

24    trip from the Olympics.  Correct?

25         A.   No.  He came to my office.  But, yes, it was
```

1    Jack Lord that initiated this and made sure that the

2    dean would sign onto it.

3        Q.   Now, the rest of this email, after we get

4    past the first paragraph ending with "Charlie knows

5    that the petition did not originate with me and that I

6    have no ability to stop it even if I wanted to," the

7    next sentence, I think that's an independent thought

8    and it would constitute another paragraph.  Do you

9    agree with that where it says "I reviewed with

10   Charlie?"

11       A.   Yes.

12       Q.   And would you agree with me that most of the

13   rest of this email dealt with an explanation of how

14   the IML and the standing protocols and the ordering of

15   lab testing were made and the history of what you've

16   testified about this morning.  Correct?

17            MR. YANNUZZI:  Object to the form.

18       A.   Yes.

19       Q.   You would agree with that.  Correct?

20       A.   I would agree with that.

21       Q.   So why did you include the self-serving

22   exculpatory statements about the running of the IML in

23   this email, when you're notifying Lenny Gardner and

24   Rafic Warwar about an extortionate threat that you

25   received through Charlie Nemeroff?

```
 1              MR. YANNUZZI:  Object to the form.

 2              THE WITNESS:  I can answer?

 3              MR. YANNUZZI:  Go ahead.

 4    BY MR. SLOMAN:

 5         Q.   Yes.

 6         A.   So, I knew Charlie quite well.  Charlie was

 7    one of the people that actually the dean listened to.

 8    He -- Charlie is very, very smooth, very

 9    knowledgeable.  Charlie got hired by the dean over the

10    objection of a state senator, a U.S. senator, and was

11    brought to our medical center.  So he was very

12    beholding to the dean and the dean's office.

13         Q.   Hired by State Senator Grassley.  Correct?

14         A.   That's correct.  So what I was doing in my

15    conversation, initially, I was just in shock.  And

16    then what I was trying to do with Charlie, he was one

17    of the few people that I thought might be able to

18    convey a message to the dean.

19              I had been unsuccessful getting through to

20    either the dean or Jack Lord, and what I was trying to

21    do with the time I was talking -- I mean, this was a

22    Sunday morning, early on a Sunday morning, I was

23    taking time, hoping that Charlie might take some of

24    this back, that he might diffuse the situation.

25              Because, clearly, I couldn't stop the
```

```
 1    petition.  And my feeling was is if I didn't get this
 2    message back to the dean and to Jack Lord, that they
 3    would carry through with their threat.
 4           And so what I was doing was talking to
 5    Charlie about all of this stuff, hoping that he could
 6    work out a compromise.  I mean, if I had gotten a
 7    phone call two hours later from the dean and Jack Lord
 8    saying come on in and talk about this, I would have
 9    been willing to do that.
10           (Technical difficulties.)
11           (The partial answer referred to was read by
12            the reporter as above recorded.)
13    A.    Willing to do that.  I was hoping to diffuse
14    the situation as best as possible.  Obviously, this
15    was a very significant thing.  Clearly, the dean and
16    Jack Lord had gotten hold of a petition.  Somebody
17    brought them a petition.  They saw what it was.  They
18    knew that there were a bunch of people that had signed
19    it and they were trying to stop it.
20           So the -- my hope -- I knew that they were in
21    a struggle with this.  And if they were going to focus
22    on me as being the ringleader of the whole thing, I
23    had little doubt in my mind that it would have
24    resulted in significant -- a significant impact on my
25    career.
```

1     Q.   Dr. Livingstone, this email was not directed

2   to either Charlie Nemeroff.  Correct?

3     A.   Correct.

4     Q.   It was not generated and directed to Dean

5   Goldschmidt.  Correct?

6     A.   Correct.

7     Q.   And it certainly wasn't generated and

8   directed to Dr. Lord.  Correct?

9     A.   That is correct.

10     Q.   And did you or anybody as far as you know

11   ever talk to Jack Lord about this ultimatum?

12     A.   Well, things accelerated so quickly, that

13   there was little opportunity to do that.  I have no

14   doubt in my mind that when Charlie got off the phone,

15   he called, spoke to the dean and/or Jack to tell them

16   what my response was.

17     Q.   But you don't know that.  Right?

18     A.   No.  But I have little doubt, because things

19   accelerated very quickly after that.

20     Q.   Dr. Livingstone, you know of no one that

21   communicated this ultimatum, for lack of a better

22   word, from Jack Lord.  Correct?

23     A.   No.

24     Q.   I'd like to now go to the portion of the

25   email in Exhibit 12 that you then sent on to Leonard

1    Abess, cc'ing John Clarkson and Bernard Fogel at

2    10:36 a.m.  And Leonard Abess was the chair of the

3    board of trustees at that time?

4         A.   He was.

5         Q.   You begin, and, again, this is at 10:36 a.m.,

6    and the prior email that you generated to Lenny

7    Gardner and Rafic Warwar was at 10:21 a.m.  Correct?

8         A.   Yes.

9         Q.   Now, the email to Leonard Abess begins, "I

10   have predicted for months that Jack and the dean would

11   try to use the consultants to take away the transplant

12   labs from the department of surgery to weaken surgery,

13   and in particular, control me."

14            Did I read that correctly?

15        A.   You did.

16        Q.   Dr. Livingstone, why was it so important to

17   keep the transplant lab in the department of surgery?

18        A.   There are a bunch of reasons to do that,

19   including quality of care.  Without the transplant

20   labs in the department of surgery, there was no other

21   lab on the campus that was qualified or had the

22   capability to provide the service that was requisite

23   for running a transplant program.

24            We ran a lab that was seven by 24 hours a

25   day.  We had all of the people in position that knew

1    how to do the histocompatibility work.  There was no

2    other lab, including the department of pathology, that

3    could do this.  We had all of the equipment.  We had

4    been running it for 30 years without any problems.

5            And I think I mentioned earlier, you know,

6    the department of pathology runs basically from eight

7    to four.  It does some emergency stuff.  But when I'm

8    in the operating room at five o'clock in the afternoon

9    and I need to get a frozen section, there's nobody

10   there.  We have to bring in somebody from the outside.

11           So the only way that you could really run a

12   transplant program efficiently and properly was by

13   having the type of control and setup that we had in

14   the department of surgery.

15           Histocompatibility is often times done at

16   night.  All of the transplant workup and everything

17   else is done by physicians around the clock.  So it

18   was very important from that perspective alone.

19           The transplant labs, there is no question

20   that with a transplant lab there is a financial issue

21   with it.  We had invested a tremendous amount of money

22   in it and we were getting some return on our

23   investment, but no more than any other lab or any

24   other product line that we ran.

25           And we had 18 different divisions in the

1    department of surgery, and this was another division.

2    This -- the whole setup of the transplant labs was

3    established back in the seventies by Josh Miller.  He

4    set it up.  He expanded it over the years.  He

5    developed the OPO.  He really set up a tremendous

6    system, which we continued to build on.

7         Nobody else had invested in it.  All of the

8    labs, including the equipment, we had five mass

9    spectrometers, for example.  In the rest of the

10   medical school, there wasn't a single mass

11   spectrometer.

12        We have invested millions of dollars in the

13   equipment for a whole bunch of reasons.  But, really,

14   from a quality of care issue, that was my greatest

15   concern, about maintaining of the labs in the

16   department of surgery.

17        Q.   And the pathologists disagreed with you.

18   Correct?

19        A.   The pathologists disagreed.

20        Q.   And you believe that it was only financial,

21   the reason -- that the reason they disagreed with you

22   is because it involved money, not because of the

23   quality of care?

24        A.   I don't think that it's fair to say that.  I

25   think that Richard Cote believed and had been told by

1     Phil Chen that they could make it better.

2            The department of pathology had financial

3     issues.  There's no question that he wanted to expand

4     the revenue stream for the department of pathology.

5     But I think it would be unfair to say that that was

6     the only reason that he did it.

7            He had a vision of expanding the department

8     of pathology.  He wanted to -- he, for example, wanted

9     to build relationships with outside centers.  And, in

10    fact, he brought people in to expand testing in the

11    community and other places, and he was rebuffed by

12    that.  The dean didn't allow him to do it.

13           I don't think it was strictly a financial

14    issue with Dr. Cote.  I think it was a control issue,

15    it fit in with what he wanted to do in his vision for

16    making the department of pathology more expansive.

17       Q.   Going back to what is reflected in Exhibit 11

18    and your statement "I have predicted for months" your

19    prediction, who did you make that prediction to, if

20    anyone, that you predicted for months that Jack and

21    the dean would try to use the consultants to take away

22    the transplant lab from the department of surgery?

23       A.   So this was going on for months.  It wouldn't

24    even be fair to say that it started in July of 2012

25    when the dean and Jack put in Gaetano Ciancio as the

```
 1    director of the transplant thing.

 2            It had gone back -- Richard Cote and I had

 3    been discussing things.  We had had meetings with the

 4    dean, multiple meetings back in 2011, about working

 5    together and seeing about doing a joint venture on the

 6    whole transplant lab situation.

 7            So we had -- I talked about it with Dr. Cote

 8    forever.  I had been over this issue, obviously, with

 9    Rafic Warwar and we discussed this frequently.  Phil

10    Ruiz was very aware of what was going on with the

11    transplant labs.

12            We haven't even gotten into Phil Ruiz.  But

13    the fact of the matter is, Phil -- Phil is a

14    pathologist and a tremendous individual and a

15    researcher and has all the qualifications, and when we

16    appointed him as the director of the Transplant

17    Institute -- not the transplant, the IML and the

18    histo, he at that time was actually a pathologist.

19            And the chairman of pathology at that time

20    was Azorides Morales who was a good friend of the

21    department of surgery.  We had worked closely

22    together.

23            And before doing it, of course, I went to him

24    and I got permission to hire him as the director of

25    the Transplant Institute.  It wasn't until Cote came
```

1    in.  And then when Cote came in and also Chen became

2    the vice chair, and a few others, Soderman and others,

3    what happened is the relationship soured tremendously.

4         And Richard Cote actually couldn't tolerate

5    the fact that Ruiz was working with the department of

6    surgery.  And one day Phil Ruiz, a tenured faculty

7    member, came back and found that the lock to his

8    office had been changed.  And that was when he

9    transferred from the department of pathology to the

10   department of surgery.

11        So this had been really going on for a very

12   long period of time.  It culminated in the fall.

13   Q.   You believe that the use of the TMG

14   Consultants was an attempt to take away the transplant

15   labs from the department of surgery and to control you

16   and to weaken surgery.  Correct?

17   A.   I think that is a component of it.  I think

18   that when we found out that they were going to look at

19   the OPO and other things, that this fit in with the

20   direction that was becoming clear from the dean and

21   Jack Lord.

22   Q.   And your next sentence -- by the way, the

23   inclusion of Jack in this email, when you didn't

24   include him in the prior email to Lenny Gardner and to

25   Rafic Warwar, this was part of your subjective belief

```
 1   that Jack had convinced the dean to issue this
 2   ultimatum to you.  Correct?
 3       A.   That is correct.  I don't think the dean
 4   would do this on his own.
 5       Q.   All right.  But you've never spoken to Dr.
 6   Lord, you never received any -- you never had a
 7   conversation with anybody where Dr. Lord issued the
 8   dean's ultimatum to you.  Correct?
 9       A.   Well, no, I didn't.  But I had worked with
10   Jack for six months.  I knew exactly how he worked.
11       Q.   I understand what -- I understand what you're
12   saying.  But you never had a conversation with anybody
13   suggesting that Dr. Lord had issued this dean's
14   ultimatum.  Correct?
15       A.   Well, I didn't have a conversation with the
16   dean, either, to verify that he had issued this
17   ultimatum either.  But the answer is is that I did not
18   speak to Jack Lord about it and, indeed, I didn't
19   speak to the dean or Jack Lord for quite some time
20   after this.
21       Q.   All you had was a conversation with Charlie
22   Nemeroff where he said he had a conversation with the
23   dean and Phil George.  Correct?
24       A.   That is correct.
25       Q.   And, again, you wrote in your email to
```

```
 1    Leonard Abess "Surgery has done nothing wrong."
 2    Correct?
 3         A.   Correct.
 4         Q.   And you were, frankly, angered by how the
 5    outside consultants were directed to try to find a
 6    compliance issue with the IML.
 7              What basis did you have to make that
 8    sentence, that the outside consultants were directed
 9    to try to find a compliance issue with the IML?
10         A.   I was told that that was the situation.
11         Q.   By who?
12         A.   Initially, initially, the engagement was to
13    sort of look at the business and how we would lump
14    things together, could we make it better.  But then as
15    things evolved, I was told that TMG was explicitly
16    told to look and find some compliance issue with the
17    IML.
18         Q.   By who?  Who told you that?
19         A.   There were a number of people that told me
20    that.  And how they got the information, I don't know.
21    But it went back to the fact that the next sentence
22    says it, that Jennifer McCafferty had told them.
23    that --
24         Q.   We'll get to the next sentence.  We'll get to
25    the next sentence.
```

1      A.    Okay.

2      Q.    You said a number of people.  Name one.

3      A.    Rafic Warwar.

4      Q.    Okay.  Who else?

5      A.    You know, I don't specifically remember.  But

6  the discussion was the engagement had evolved; that it

7  was no longer just looking at the business issues, but

8  it was looking at figuring out compliance as well.

9      Q.    So the only person that you remember telling

10  you that the consultants were directed to try to find

11  a compliance issue with the IML was Rafic Warwar.

12  Correct?

13          MR. YANNUZZI:  Object to the form.

14     A.    Jennifer and Jack did not tell me that.

15     Q.    And Rafic Warwar worked for you in the

16  administration of the transplant labs within the

17  department of surgery.  Correct?

18     A.    He was the vice-chairman of surgery.

19     Q.    And he worked for you.  Correct?

20     A.    Correct.

21     Q.    Now the next sentence says, "Jennifer

22  McCafferty explicitly told them there were problems

23  and she wanted them found, and she also refused to

24  meet with Rafic and myself to get any background

25  information on the IML."

1          Before we get to that second part, let's

2     focus on the first, Jennifer McCafferty explicitly

3     told them.  Who told you that Jennifer McCafferty

4     explicitly told them there were problems and she

5     wanted them found?

6          A.   I don't specifically remember the whole

7     context of it.  This, as the process was evolving,

8     this is what I was told and that the whole function

9     now and the focus had been narrowed down to find out

10    if there were problems with the IML and to root them

11    out.

12         And when you showed that subsequent thing

13    from Jennifer McCafferty, the email where it talked

14    about there needs to be a second audit, referring with

15    Jack and Jennifer, that reinforces what I was told

16    about this.

17         Q.   Dr. Livingstone, you're making a very

18    explosive allegation against the chief of the medical

19    compliance office at the University of Miami, that she

20    explicitly told the TMG Consultants that there were

21    problems and she wanted them found.  Who told you

22    that?  That's a very important fact.

23         A.   The -- I don't know exactly how that

24    information was exposed or how it developed.  But that

25    is exactly the information that I was explicitly told.

1    Q.   So you don't know who told you that?

2    A.   Well, I know that Rafic and I discussed it

3    and he told me.  I don't know how he found out from

4    it.  But there's no question that that is what I

5    understood was happening.

6    Q.   So other than Rafic Warwar, there's nobody on

7    this planet earth that you can name that told you that

8    Jennifer McCafferty explicitly told them, TMG, there

9    were problems and she wanted them found out.  Correct?

10           MR. YANNUZZI:  Object to the form.

11    A.   Apart from the hyperbole, no, I didn't speak

12    to everyone on the planet.  But Rafic was my second in

13    command.  We are facing this together.  Things were

14    evolving rapidly.

15           We are talking about something here that is

16    at the beginning of December.  The campus was

17    explosive, and also some other issues were going on,

18    and here we were, we had tried even to meet with the

19    TMG people.  We tried to get information from the TMG

20    people.  They were explicitly told not to meet with

21    us.

22           Rafic Warwar couldn't go over and be present

23    when Leslie Cortina, the director of the OPO, was

24    being talked to by them and so on and so forth.  It

25    wasn't exactly an area where I could go to Jack or to

```
 1    the dean and say did you tell Jennifer McCafferty to
 2    find something wrong?
 3              They were acting on issues.  Jennifer
 4    genuinely believed that there could be audit problems
 5    or other issues with the IML.  She had received the
 6    OIG letter that we sent to her and she had initiated
 7    some review.  She told them, as best as I knew, that
 8    there were some problems, and if there were problems,
 9    and if there were problems, she wanted them found.
10         Q.   That's not what you wrote here.  You wrote
11    Jennifer McCafferty explicitly told them, TMG, there
12    were problems and she wanted them found.  Is that what
13    you wrote?
14         A.   Correct.
15         Q.   That's right?
16         A.   Yes.
17         Q.   Now, and other than Rafic Warwar, there's
18    nobody else that you can name as the source of that
19    statement.  Correct?
20         A.   It's ten years ago.  I don't remember exactly
21    the complete context with it.  But that was basically
22    the information that I had.
23         Q.   Dr. Livingstone, you seem to have a
24    remarkable capacity to remember things, and it would
25    strike me as odd that you don't remember who told you
```

```
 1    that, other than Rafic Warwar.

 2            MR. YANNUZZI:  That's not a question, Dr.

 3        Livingstone, so there's nothing to respond to.

 4        It's just a gratuitous comment.  Let's just ask a

 5        question and keep moving.

 6    BY MR. SLOMAN:

 7        Q.   Now, going on, it says in the next paragraph,

 8    "Hopefully, the dean and his backers will not persuade

 9    President Shalala to cancel her meeting with me and

10    Lenny tomorrow at five p.m."

11            Did you have a meeting scheduled with

12    President Shalala the next day at five p.m.?

13        A.   Yes.  When things were exploding on the

14    campus, we felt that it was important to meet with

15    her.  So it was sort of coincidental, but it showed

16    how the crescendo was building.

17            So Lanny Gardner and I wanted to meet with

18    her.  We asked to meet with her, so that we could go

19    over some of the concerns and about some of the things

20    that were happening on the campus.

21            And she had agreed to meet with us at five

22    o'clock on the Monday.  It was just a coincidence that

23    I received the phone call from Nemeroff on the Sunday.

24    We had set up the meeting earlier.

25        Q.   And, again, you were receiving the daily
```

```
 1    updates showing the progress of or lack of progress or
 2    the updates concerning the TMG Consultants, concerning
 3    what was next, you had been receiving all of those
 4    emails from Dr. Lord, Dr. Goldschmidt, Jennifer
 5    McCafferty, and you, generating your own emails as
 6    well concerning your day-to-day comings and goings.
 7    Correct?
 8              MR. YANNUZZI:  Object to the form.
 9         A.   I'm sorry.  Is there a question there?
10         Q.   Yes.  At this time, on December 9th, 2012,
11    you had been privy to all of the executive daily
12    updates from Dr. Lord, Dr. Goldschmidt, Jennifer
13    McCafferty and others.  Correct?
14         A.   I did.  And there was no substance to them,
15    as you saw.  All they were were a couple of statements
16    that we're going through a review, we're doing this
17    and that.  But there was not a single allegation.
18    There wasn't a single report.  There was nothing.  The
19    two things were not related.
20         Q.   The next paragraph in Exhibit 12 states:
21    "This is but a further example of the toxic
22    environment on our medical school campus.  Even Mike
23    Moloney and Aileen Ugalde are dismayed by Jennifer
24    McCafferty's use of compliance as a blunt instrument
25    to manipulate people."
```

1    Did I read that correctly?

2    A.    You did.

3    Q.    And your statement that Jennifer McCafferty's

4    use of compliance as a blunt instrument to manipulate

5    people, where does that come from?

6    A.    She was aggressively threatening and using

7    audits to get people to do different things.  There

8    was no collegiality associated with the approach on

9    this.

10    Compliance at the -- at academic medical

11    centers and everything else is something that the

12    majority of people embrace.  They realize how

13    essential it is and everything else.

14    So Mike Moloney, for example, had been in

15    charge of internal audit for, I don't know, 30 years

16    maybe, at the medical school.  When there was a

17    problem, he would engage the chairs or the people to

18    find out if they could resolve it, find out if it was

19    a specific problem or whatever they could do to make

20    it better.

21    That was not Jennifer's approach.  She didn't

22    even seek out information or an explanation or

23    anything else.  Even though we delivered the letter to

24    her and stuff, there was no discussion about was there

25    a problem?

```
 1              Dr. Livingstone, do you think that there's
 2      some basis in reality?  We're obviously going to
 3      investigate this, but do you have any idea how this
 4      might have happened?
 5              I mean, we could have destroyed that letter
 6      and, I don't know, maybe the person would have written
 7      another one, but, obviously, we didn't.  We went
 8      forward, trying to get everything done.  Jennifer just
 9      wouldn't engage.
10              And, as you saw, and we've gone over this
11      repeatedly, the hiring of TMG was done without -- we
12      had no understanding that this was happening.  No
13      input to it whatsoever.  Not that we wanted to
14      influence what was going to happen, but to provide
15      help in, you know, getting it done.
16              The same thing, Jackson Memorial Hospital
17      didn't have any input into it as best as we can tell.
18      Although you said somebody maybe at a low level did
19      something.  But you saw in the email that they pushed
20      back on it also and they weren't happy about the TMG
21      audit.
22              She shared no information.  She functioned
23      just the way Jack did.  It was a one-way street and
24      she didn't share information that could have been
25      constructive or helpful.
```

1      Q.   Dr. Livingstone, can you fathom why you were

2   not consulted in at least this initial review by TMG,

3   since there was a September 21st, 2012, letter

4   accusing you, Rafic Warwar and Phil Ruiz of committing

5   Medicare fraud?

6           Is it possible that maybe that was the reason

7   why you weren't included in this part, to get your

8   views as to how the IML was being utilized and how it

9   billed and how it reviewed pathology testing?

10          MR. YANNUZZI:  Objection to form.

11     A.   We've gone over this question several times.

12  I am not trying -- I never had any intent of trying to

13  influence what was happening.  I was interested in

14  trying to get information so that they could conduct

15  an appropriate in detail audit and find out what was

16  happening.

17          They came in for two days to do the IML

18  thing.  And, obviously, there was no work product or

19  whatever.  As best as I can tell, I don't think there

20  was any final report, because it's impossible to do

21  that in two days on something as complex as what was

22  happening.

23          My concern was an OIG letter had been

24  generated.  In fact, I guess, I don't even know if OIG

25  used it or whatever.  But the fact is that what we

1    wanted to do was to clear the department of surgery.

2    We wanted to do everything that we possibly could to

3    help them go through the process and to clear up any

4    misunderstandings that might have existed.

5        Q.   Dr. Livingstone, you mentioned that Jennifer

6    McCafferty used use of compliance as a blunt

7    instrument to manipulate people.

8             Did you have any one-on-one conversations

9    with Jennifer McCafferty where she tried to manipulate

10   you?

11       A.   My conversations with Jennifer were brief

12   and, frankly, they weren't -- I'm just trying to

13   remember a particular subject that we even discussed.

14   She was supposed to be bringing some of these issues

15   of compliance to me and, obviously, there are always

16   issues that were -- that can be potential compliance

17   issues at a medical center and they have to be

18   investigated.  I suspect she brought some information

19   to me at some time.  I don't remember a specific

20   example of a major conversation about any compliance

21   issue.

22            I do remember trying to, and Rafic did, too,

23   trying to meet with her to discuss the IML, at least

24   the background on it.  But I honestly don't remember

25   other discussions.

1              We didn't work together very long.  You know,

2      it was from September into November.  And during that

3      time, there were a lot of other things going on.

4              (Thereupon, the document was marked as

5              Exhibit 13 for identification.)

6      BY MR. SLOMAN:

7          Q.   Let me show you what has been marked as

8      Exhibit 13, which is one of your daily updates, dated

9      December 10th to 11th.  Actually, this is Exhibit 13.

10     Do you see where it says December 13 at 12:48 a.m.?

11             And you wrote, if you go up just a little bit

12     further, okay, I believe this is in connection with an

13     update for December 10th through 11th.  And you

14     emailed this on December 13th.  Does that sound about

15     right, Dr. Livingstone?

16         A.   I'm just trying to read it.

17         Q.   Sure.

18         A.   So this is basically at one o'clock in the

19     morning, me telling them what I was doing that day.

20     It doesn't really say terribly much in the ones that I

21     looked at at the top.  I didn't see the bottom of it.

22         Q.   Yeah.  I want to first try and orient the

23     date.  So this is 12:48 a.m., so it's --

24         A.   One o'clock in the morning.

25         Q.   -- one o'clock in the morning.  But the

1  subject line updates December 10 to 11.  Would it be

2  fair to say that this is a recount of your activities

3  on December 10 to 11 or on the day of December 12?

4      A.   It says updates on December 10 and 11, so

5  these represent the things that I was willing to share

6  with Pascal Goldschmidt.

7      Q.   All right.  Let's go down to the seventh

8  bullet point.  Do you see where the arrow is now?

9  This is your writing.  I'll read it and tell me if I

10  read it correctly.  "Meeting with Jennifer McCafferty

11  for an update on compliance issues."

12      A.   Oh, yes.

13      Q.   "Much on her plate, including avoiding issues

14  of kickback while providing CME to community primary

15  care physicians, modest issues at Bascom Palmer,

16  ongoing TAVI audit at UMH and preliminary report of

17  review of MTI structure."

18          Did I read that correctly?

19      A.   You did.

20      Q.   And so how would you describe what that entry

21  means?

22      A.   So I must have met with her on the 10th or

23  the 11th.  And at that time, I do remember, we were

24  going through an issue with the whole thing about the

25  transaortic insertion of aortic grafts.

1      Q.   That should have been TABR, right?

2      A.   Yeah, TABR.  And there was also some issues

3   at Bascom Palmer with one of the faculty members

4   accusing another faculty member of stuff.  So she -- I

5   guess she did update me on this and I remember that

6   now.

7           I don't remember what the issue with the

8   community primary care physician was.  Kickback while

9   providing CME to community primary care physician.  I

10  have no recollection of that whatsoever.

11     Q.   Let's focus on the part where it says

12  "Meeting with Jennifer McCafferty for an update on

13  compliance issues."

14          What do you recall about that?

15     A.   I must have had a meeting with her on either

16  the 10th or the 11th, and she gave me some information

17  on these things, saying that she was working on issues

18  at Bascom Palmer, was working on the TABR audit at

19  UMH.  And I can tell you that she didn't give me --

20  she was talking about the MTI structure, but nothing

21  about the MTI audit.  We were at that time still

22  negotiating how we were going to structure the MTI.

23     Q.   So your statement, your wording, preliminary

24  report of MTI structure, were you aware that at or

25  about this time she was receiving and preparing a

1    report, a preliminary report, from the TMG

2    Consultants?

3            MR. YANNUZZI:  Object to the form.

4        A.   I wasn't -- I wasn't privileged to that.  I

5    didn't know exactly what it was.  I specifically put

6    down MTI structure.  That is not the IML.  I didn't

7    put down a review of the IML thing.  But we were --

8    apparently, we talked about the MTI structure and how

9    that would be set up.

10           At that time we were setting up a contract,

11   which we finally finalized in 2013, about how Jackson

12   and the university would pay for an integrated program

13   and we transferred over a lot of things, and it was

14   settled subsequently.  She was involved with looking

15   at some of the compliance issues with that.  This

16   doesn't say anything about the IML.

17       Q.   Let's go down a little further where it says

18   one-on-one with Pascal.  Do you see that?  "One-on-one

19   with Pascal.  Very open, frank and constructive hour

20   long discussion."

21           Now, this is a day or two after you generated

22   the email to Lenny Gardner and Rafic Warwar and to

23   Leonard Abess.  Did you discuss anything about your

24   email to those gentlemen in your one-on-one hour long

25   conversation with Pascal Goldschmidt?

1      A.    Almost certainly not.  The meeting, I don't

2  remember exactly -- what day is this?  This is the

3  12th I'm writing?

4      Q.    This is -- I believe that you testified that

5  this occurred on December 10th or 11th.

6      A.    This is an update of 10 and 11.  So nine is

7  the Sunday.

8      Q.    Right.

9      A.    Tuesday is the 11th.  And I'm writing this on

10  the late night of the 12th or the 13th.  So this is --

11  I'm writing it on the Wednesday.

12          Obviously, as I said, there was a surprise

13  guest meeting by Donna Shalala.  She told us that she

14  was looking into all of the issues at the medical

15  center; that she was personally going to be involved.

16  She realized there was a lot of unrest at the campus,

17  so on and so forth.  And that over the next two weeks

18  she was going to meet with all of the chairs and so on

19  and so forth.

20      Q.    I'm asking you --

21      A.    I'm going --

22      Q.    -- one-on-one with Pascal, very open, frank

23  and constructive hour long discussion.  Are you

24  telling me that you didn't discuss anything about the

25  email that you generated either the day or two before?

```
 1        A.   I am -- when I'm writing this email, I am

 2   sending this to Pascal and I am certainly not going to

 3   put into this thing the whole issues of what was

 4   happening, when the president had already told me that

 5   she was going to look into it and she was taking this

 6   under her personal responsibility in her office.

 7             And I don't think that Pascal or I had any

 8   discussion about the -- I doubt we even had a

 9   discussion about the petition.  I don't specifically

10   remember.  But we probably were just talking about

11   what was happening on the campus.  Many of the

12   discussions that I would have with Pascal were

13   superficial.

14        Q.   But you wrote "very open, frank."

15        A.   Yeah.

16        Q.   What does frank mean?

17        A.   Well, it depends who you're talking to.

18        Q.   Okay.

19        A.   A frank discussion with the dean, after what

20   had transpired two days earlier, if he wasn't bringing

21   it up and saying, you know, I never spoke to Charlie,

22   I wasn't about to raise the issue of, well, Charlie

23   Nemeroff called me two days ago and said that you were

24   threatening me.  Obviously, that wouldn't happen.  I

25   didn't do that.
```

```
 1        Q.    Why?

 2        A.    Why?

 3        Q.    Yeah.

 4        A.    Because the president -- President Shalala

 5   explicitly told us that she was taking over this and

 6   was going to look into it and she was personally going

 7   to solve the issues.  And, in fact, later on she did.

 8             And we were -- we met with her ten days later

 9   to go over all -- less than ten days later, seven

10   days -- six days later, because she had done a review.

11             I met with her and Lanny Gardner met with her

12   prior to my meeting with her.  She went over the whole

13   thing that she had been looking into the issue about

14   what had happened on the Sunday morning.

15             And then on the Saturday, so I met with her

16   on a Friday, on Saturday, the 23rd or whatever date

17   that was, I was called by Tom LeBlanc, who also was

18   apprised of the whole situation and we had a long

19   conversation and you have the email, so you've seen

20   what it says.

21             (Thereupon, the document was marked as

22             Exhibit 14 for identification.)

23   BY MR. SLOMAN:

24        Q.    Let me show you what's been marked as Exhibit

25   14.  This is December 11, 2012, at 6:52 a.m. from you
```

1    to President Shalala.  Correct?

2         A.   That's correct.

3         Q.   And there was either before or after -- I

4    can't tell -- you having a very open, frank and

5    instructive hour-long discussion with Pascal

6    Goldschmidt.

7         A.   Yes.

8         Q.   And two days after you had the -- you wrote

9    the email to Lanny Gardner, Rafic Warwar and

10   subsequent email to Leonard Abess, and you wrote at

11   6:52 a.m.  "Dear Donna, I had hoped to be able to

12   speak to you in person yesterday, but events have

13   overcome circumstances."

14        So did you meet with Donna Shalala on the day

15   that you thought that you had met her?

16        A.   No.  So Sunday morning was December 9th.

17        Q.   Right.

18        A.   That was when the episode occurred.

19        Monday was the 10th and she cancelled the

20   meeting with Lanny Gardner and myself and came to the

21   campus to meet with the clinical chairs at seven a.m.

22   on December 11th.  So that was Tuesday morning.

23        And my -- as I told you earlier, I was

24   literally -- I didn't know what was going to happen.

25   And it was quite clear that it was hard to predict

1    what was going to happen.

2            My personal belief was that the dean and Jack

3    Lord had told me what they were going to do; that if I

4    didn't pull back on the petition, that I was going to

5    lose my job, and I wanted to preempt that.

6            I had no idea what the president was going to

7    say on Tuesday morning.  So I remember sitting in my

8    car, getting ready to go into the meeting, which was

9    at seven a.m., and I sent her this thing, because I

10   wanted to return to the department of surgery.

11           She had promised me that I could do that.

12   And, in fact, the letter that was written, the letter

13   of offer that was written to me guaranteed that I

14   could go back to the department of surgery where I

15   felt that I would be safer.

16      Q.   So you asked to be allowed to resign.

17   Correct?

18      A.   That is correct, from being executive dean of

19   clinical affairs.

20      Q.   Right.  And did it have anything to do with

21   the TMG assessment?

22      A.   It had nothing to do with it whatsoever,

23   because I had no knowledge about the TMG assessment.

24   This all related to the issue that I had received the

25   threat on Sunday morning and that, obviously, this --

```
 1    the president is a very strong person.  She doesn't

 2    usually all of a sudden just come down to the medical

 3    campus.  She's highly intelligent, she's very

 4    knowledgeable about stuff.  I had no idea what this

 5    meeting was going to be.

 6          I didn't want to be all of a sudden find out

 7    that there was going to be a massacre or something or

 8    other, so I tried to preempt it and I tried to protect

 9    myself by saying I want to go back to the department

10    of surgery.  I'll step away from being executive dean

11    of clinical affairs.

12          Jack Lord and the dean can do whatever they

13    want with that.  They can put in somebody else, just

14    like they had put me in over Lubarsky.  And then I

15    finally, I said I pledge to you that I will do

16    everything possible to continue to support the

17    academic mission of education, research, clinical

18    activity and community affairs.  And that's what I

19    sent to her.

20          And she actually responded in the middle of

21    the meeting, and you can see her response, because the

22    meeting went on past 8:00 a.m.  She wanted me to stay.

23          Q.   And, again, Dr. Lord never said anything to

24    you about an ultimatum.  Correct?

25          A.   Neither did Pascal directly.
```

```
 1        Q.   All right.  And, according to you, Dr. Lord
 2   never said anything to Dr. Nemeroff about an
 3   ultimatum.  Correct?
 4        A.   I didn't say that.  I have no knowledge of
 5   that piece.
 6        Q.   So if you don't have knowledge of that, as
 7   far as you know, Dr. Lord never said anything about an
 8   ultimatum to Dr. Nemeroff.  Correct?
 9        A.   No, I have no knowledge of whether he said
10   something or didn't say something.  I'm neutral on it.
11   I'm unable to comment.
12        Q.   As far as you know, he never said anything to
13   Dr. Nemeroff about an ultimatum.  Correct?
14        A.   I don't know.  I have no knowledge about it.
15        MR. SLOMAN:  All right.  Let's take a break.
16   Let's come back at 2:55.
17        THE VIDEOGRAPHER:  This marks the end of
18   video file number three.  The time is 2:41 p.m.
19   and we're going off the record.
20        (Thereupon, a brief recess was taken, after
21   which the following proceedings were had:)
22        THE VIDEOGRAPHER:  We're back on the video
23   record.  This is the start of video file number
24   four and the deposition of Dr. Alan Livingstone.
25   The time is 2:56 p.m.
```

```
 1    BY MR. SLOMAN:
 2         Q.   Dr. Livingstone, I believe that we were still
 3    talking about Exhibit 14, which is this email from --
 4    it starts off with from you to Donna Shalala at 6:52
 5    a.m.  her response to you:  "Alan, stay.  We need
 6    voices that are experienced."  And then your response
 7    to her:  "Donna I will give you a call later today.
 8    Thank you for coming this morning.  Your vision and
 9    leadership are critical during these difficult times.
10    I am deeply appreciative of your support."
11              Did I read that correctly?
12         A.   You did.
13         Q.   And what were you referring to that you were
14    deeply appreciative of her support?  Support for what?
15         A.   I had proffered my resignation for the
16    executive dean of clinical affairs and she asked me
17    not to do that.  I took that as an endorsement of my
18    position and the fact that she would support me.
19         Q.   Did you take that as an endorsement of your
20    running of the transplant labs in the department of
21    surgery?
22         A.   That is too expansive of a role.  We were
23    responding specifically to the email below, which is I
24    had offered my resignation as executive dean of
25    clinical affairs and she asked me not to do that.
```

1      Q.   Okay.

2           (Thereupon, the document was marked as

3           Exhibit 15 for identification.)

4           MR. SLOMAN:  Let's go to Exhibit 15, if you

5      would, please, Jorge.

6   BY MR. SLOMAN:

7      Q.   Exhibit 15, I'm showing you, is an email --

8   if you can go to the bottom -- this is your email, and

9   continue up, please, and President Shalala's email to

10  Pascal Goldschmidt.  "I would talk him out of it."  Do

11  you see that sentence, Dr. Livingstone?

12     A.   I do.  I don't think I've seen this email

13  before, though.  That's interesting.

14     Q.   Right.  The response from Dr. Goldschmidt is

15  to Donna Shalala:  "We had a good chat."  I'm guessing

16  he means he had a good chat with you.

17          Do you recall having a chat with Dr.

18  Goldschmidt at that point in time?

19     A.   It must have been -- he must have called me

20  over to his office after Donna Shalala left and I

21  suspect it relates to previous series of things in

22  that daily brief where I responded that we had met.

23          "I think it's interesting that we're back on

24  track, and when you talk to him, please tell him to

25  fix the petition issue."

```
 1              I can assure you we did not have a discussion
 2   about the petition issue.  I guess -- I don't
 3   specifically remember the meeting.  Pascal -- Pascal
 4   is, as I told you, he's not -- he's a warm sort of
 5   person.  He's -- I probably went into the meeting and
 6   he said, "Boy, there are a lot of problems on the
 7   campus, Alan.  Let's work together.  You're the
 8   executive dean of clinical.  I know there's a question
 9   of whether or not you might leave.  But please stay,
10   we can work together and things will be all right."
11          But he never asked me to fix the petition
12   issue.
13      Q.   Okay.  And did you discuss any of the issues
14   that were raised in the December 9th email that you
15   generated to Lanny Gardner, Rafic Warwar and a
16   subsequent email to Leonard Abess?
17      A.   I seriously doubt it.  I'm sure it didn't
18   come up.  I'm sure the conversation was that the
19   president came down to our campus.  She's aware that
20   there are issues on the campus, that there's a lot of
21   unrest and we need to make it better.  Let's work
22   together, because that's exactly how Pascal would have
23   behaved.
24              (Thereupon, the document was marked as
25              Exhibit 16 for identification.)
```

1    BY MR. SLOMAN:

2        Q.   Let's go to Exhibit 16, and let's go to the

3    top so we can orient ourselves.  And, Dr. Livingstone,

4    I believe Exhibit 16 purports to be an email generated

5    by you, another executive daily update for an update

6    December 12th to 13th.  Do I have that correct?

7        A.   It looks like that's what it is.

8        Q.   Right.  And this is an email that you

9    generated as part of your executive daily update

10   duties.  Correct?

11       A.   Correct.  I see by this time that I was doing

12   updates for two days rather than doing them every day.

13       Q.   Okay.  And if we go down to the seventh

14   bullet point, you see where it says meeting with Jack.

15   Is that Dr. Lord?

16       A.   Yes.

17       Q.   And it says "Open, direct and constructive.

18   Areas of divergence were explicitly discussed."

19            Did I read that correctly?

20       A.   You did.

21       Q.   And then you put four asterisks and the word

22   takeaways.  If we go down to takeaways, fourth

23   asterisk is "Overdue discussion, and will follow up in

24   the near future."

25            Reading this email, and also right above it

1    you had discussed the department of surgery providing

2    an MSO-type function for the MTI analogous to what we

3    had performed in the past.  I guess that has nothing

4    to do with it.

5            But focusing on where it says, four

6    asterisks, which I believe references the conversation

7    that you had with Dr. Lord, it says "Overdue

8    discussion and will follow up in the near future."

9            Do you recall what you spoke about with Dr.

10   Lord in your meeting where you described it as open,

11   direct and constructive?

12       A.   I don't.  These meetings were directed by

13   Jack.  He would bring up something.  I guarantee you,

14   he didn't bring up the petition issue and he didn't

15   bring up the Nemeroff issue.  He probably talked about

16   that there was unrest on the campus; what can we do to

17   make it better.  I don't have any specific

18   recollection.

19       Q.   Okay.  Let's go back up to that seventh

20   bullet point.

21       A.   The one about organizing MTI?  Is that seven?

22       Q.   No.  The seventh one is "Meeting with Jack.

23   Open, direct and constructive."

24            Do you see that?

25       A.   Right, yeah.

1    Q.   Right above it it says, which would be the

2    sixth bullet point, "Meeting with Gaetano Ciancio..."

3    A.   Right.

4    Q.   "...and Rafic to discuss how to better

5    organize and structurally support the MTI.  They have

6    no infrastructure.  Very amicable and productive."

7    A.   Correct.

8    Q.   And do you remember that conversation?

9    A.   So, this was an evolving situation with the

10   MTI.  So it was absolutely clear that the MTI and

11   Jackson Memorial Hospital were going to be integrated.

12   And the question became, number one, how to structure

13   it, and how to manage it.

14        As I said, Gaetano is a superb clinician, a

15   wonderful human being and just a great person, no

16   organizational experience, and he didn't know how to

17   organize or even run the MTI.

18        So here is an individual that, you know, had

19   never even run a division, and now, all of a sudden,

20   was being put in charge of a couple hundred million

21   dollar business.

22        So the -- in the MTI, we had been meeting,

23   and there are a whole series of meetings going back to

24   2006, 2007, and 2008 with Jackson, and what we elected

25   to do eventually, and I think it came to fruition in

1    2013, so the following year, is that we were going to

2    put everything together, the billing.

3            And I think I said this earlier.  The

4    billing, the collections, all of the processing of the

5    intake and everything else would be supervised by

6    Jackson.  But there had to be infrastructure; there

7    had to be administrative support for this and

8    everything else.

9            So the department of surgery would act

10   basically as an MSO for this and take care of all of

11   the things, just like we had always done with

12   transplant before.

13           We didn't discuss it, but from 2000 --

14   2000 -- from 1978 until 2005, 2006, even though we had

15   members from every department in the transplant

16   structure, really, transplant was run out of the

17   department of surgery.  It was our people that ran all

18   of the organizational aspects of it.

19           And now what was going to happen was we were

20   going to set this up and Jackson and the university

21   were going to have a formalized structure, and

22   eventually it was signed by Carlos Migoya and by I

23   think the executive committee of the trustees, in any

24   event, down in Coral Gables, that they were going to

25   integrate things.  And we developed a specific

1    structure.  And it was covered by the basic

2    affiliation agreement and also by the AOA.

3           And, parenthetically, ironically, what ended

4    up happening is, this ended up being horrific for the

5    department of surgery, because we were sponsoring so

6    many activities, and not to get into the weeds about

7    the finances of transplant, on the clinical side, the

8    surgeons, the specialists in medicine and everything

9    else, command high salaries and the revenues never

10   cover it.

11          So in every academic medical center, or even

12   private medical centers, when they have a transplant

13   service, it is the hospital, the technical component,

14   that makes all the money.

15          So when we put this together, I actually was

16   relieved, because it actually gave a boost to the

17   bottom line in the department of surgery.  By having

18   the MTI incorporated into this integrated manner

19   across departments, in the hospital, we eliminated the

20   bottom line deficit that we had previously been

21   carrying.

22          So it actually turned out to be good.  And

23   when we did this, when we set up the organization, by

24   this time, Gaetano, this is now December 13th or

25   whatever the day is in December, he came to realize

1    that the IML and the OPO weren't part of the MTI and

2    couldn't be for the reasons we've already discussed

3    previously.

4         Q.   Did Dr. Ciancio ever voice to you his

5    concerns that there was overbilling going on in the

6    IML?

7         A.   No.   So Dr. Ciancio and the person that we

8    had the biggest challenges with, and they weren't

9    awful or whatever, it was a difference of opinion, so

10   Dr. Ciancio and Dr. Burke were two -- obviously, two

11   transplant surgeons, and the counterpart was David

12   Roth.

13        David Roth was the individual who stated I

14   don't need all of these tests.   And, in fact, he

15   didn't need two tests.   The -- Gaetano and George

16   Burke in particular wanted all these tests.

17        So as you probably know, the reality is is

18   that transplants, whether it's kidney, pancreas,

19   liver, intestine, heart or lung, they have many common

20   issues with regard to how the organs are matched, how

21   they're worked up through the histocompatibility and

22   everything else.

23        Also, the number of patients and the

24   complexity of the patients demand that you have a very

25   organized structure for going over the -- taking care

1    of these patients, bringing them into the transplant

2    program and everything else, which is the reason that

3    you set up protocols.

4          And this is standard across the whole

5    transplant network.  They set up protocols.  And the

6    protocols -- I'm going to emphasize it again -- are

7    not written by the immuno-monitoring lab.  They are

8    not written by the department of surgery.  They are

9    written by the clinicians.

10   Q.   Excuse me for one second.  Sorry for

11   interrupting, Dr. Livingstone.  I'm not talking about

12   the protocols; I'm talking about the number of times

13   the tests were given to patients.  Did Dr. Ciancio

14   ever voice his concerns that there was an overbilling

15   in the number of tests being given to transplant

16   patients?

17   A.   The only one that I remember voicing a

18   concern about it, and that's why I put Gaetano in

19   charge of it, was David Roth who said that there are

20   some tests that I don't need.

21         And the reality is that the person that was

22   in charge of kidney transplant was actually George

23   Burke, and George Burke had a genuine difference of

24   opinion.  He thought these tests were necessary, but

25   that David Roth was against it.

```
 1            And, eventually, we took those two tests that

 2   he deemed -- that he didn't use, even though other

 3   people and other people who saw the same patients that

 4   he did wanted them, and that was one of the things

 5   that we eventually refunded.

 6            And as I recall, over a period of five years,

 7   because when CCI did the audit on this thing, they

 8   looked at it, and over a period of five years, from

 9   2008 to 2013, we had to refund something like

10   $225,000.  This represented less than one percent of

11   all of the billings and everything else.

12            And we did it out of an abundance -- we

13   literally went through everything that David Roth said

14   he didn't like or didn't need and we refunded the

15   money.  We deducted it.

16   Q.    When you refer to CCI, you're referring to

17   Compliance Concepts.  Correct?

18   A.    That's correct.

19   Q.    That was an external consulting firm or audit

20   firm that was utilized after TMG in November or

21   December 2012.  Correct?

22   A.    I think -- the president, when she changed

23   things and brought it into internal audit and Blanca

24   Malagon and Mike Moloney were involved with it, they

25   got the outside legal firm -- I forget the name of the
```

1    legal firm, Hogan and Lovells or something.

2           Anyway, they got a legal firm with experience

3    in auditing to oversee and to bring in CCI.  I think

4    that was probably in January of 2013, but I don't

5    remember the exact date of the engagement.

6      Q.   And you were involved in that audit.

7    Correct?

8      A.   No.  Oh, I was involved in the audit.  No, I

9    had nothing to do with the hiring of it or anything

10   else.  But we were asked questions about the structure

11   of the MTI and we filled in some information for them.

12          There is a tremendous amount of information,

13   as you well know, and it took them a long time to do

14   the -- I think it took six months to do the audit or

15   something.

16     Q.   And just so the record is clear, it's your

17   testimony that you never insulted Gaetano Ciancio in

18   any of these meetings whenever he talked about his

19   view of the testing that went on in the IML.  Correct?

20     A.   What I explicitly said is, I never called him

21   stupid and I never intentionally insulted him, if I

22   did it inadvertently in his eyes, that's a separate

23   issue.  But I respect him deeply.  I think he's a

24   wonderful individual and a tremendous surgeon and

25   clinician.

```
1          Q.   Let's show you exhibit so -- we're on Exhibit

2     16, and I think we've gone through all of this.

3     Right?  Okay.

4               (Thereupon, the document was marked as

5               Exhibit 17 for identification.)

6     BY MR. SLOMAN:

7          Q.   Let's go to Exhibit 17.  Dr. Goldschmidt --

8          A.   I'm Dr. Livingstone.

9          Q.   I'm sorry.  I apologize profusely.

10              Dr. Livingstone, I'm showing you a memo that

11    was generated by Dr. Jennifer McCafferty to Dr.

12    Goldschmidt and to Dr. Lord.

13              Have you ever seen this memo?

14         A.   No.

15         Q.   Did you ever hear about this memo being

16    generated?

17         A.   Could you roll it up so that I could see

18    what's in it.

19         Q.   Sure.  Yep.

20              MR. YANNUZZI:  Maybe show him the

21         introduction and that might orient him.

22              MR. SLOMAN:  Be glad to.

23              THE WITNESS:  The background there.  All

24         right.  Move down a little bit, please.  Okay.

25         Okay.  Go ahead.  Down a little bit, please.
```

```
 1        I've never seen this.
 2   BY MR. SLOMAN:
 3        Q.   Okay.  Would you like to keep reviewing
 4   further to see whether it refreshes your recollection?
 5        A.   My recollection is good.  The question is
 6   what questions are you going to ask me?
 7        Q.   First of all, have you seen or heard anything
 8   about this memo that Jennifer McCafferty generated and
 9   submitted to Dr. Lord and Dr. Goldschmidt on or about
10   December 19, 2012?
11        A.   I don't think so.  I don't think I've ever
12   seen this, and I was never debriefed on it, either, is
13   the best of my recollection.  Continue down.  Okay.
14        Q.   Does it refresh your recollection at all?
15        A.   My recollection is unchanged.  I've never
16   seen this.
17        Q.   All right.  Then we can move on.  Doctor --
18   can you take that off the screen -- doctor, we've
19   deposed Jennifer McCafferty.  She testified that on or
20   about December 20th she had a meeting with you where
21   you alleged and communicated to her that neither you
22   nor Rafic had been engaged in the review of the MTI,
23   IML or OPO.
24             It sounds like that -- it sounds like that
25   would have been consistent with something that you
```

1    would have said to her.  Would you agree with that?

2         A.   And that's what I said earlier.

3         Q.   Right.  Right.

4              She further testified that you alleged to her

5    that she was the source of the IML concerns and that

6    the concerns about the IML were unfounded.

7              Does that sound consistent with what you

8    would have said to her?

9         A.   Well, you have two statements there, and I

10   don't necessarily agree with both of them.

11        Q.   Okay.  Let's break it up.

12        A.   Break it up into two parts, please.

13        Q.   She claims that you told her that she,

14   Jennifer, was the source for the IML concerns.

15        A.   I'm not sure I would phrase it quite like

16   that.  I don't specifically recall what happened on

17   that date or even if December the 20th I was in town.

18   December 20th?  I'd have to check my calendar.

19             But in my conversations with her that it

20   would be entirely possible that I might have said that

21   she initiated the audit, but I would not have looked

22   upon that as condemning her or accusing her or

23   anything else.

24             She had received that letter that had been

25   sent by whoever, nominally to the OIG and to the

1   Department of Health and Human Services and it had

2   come to the department of surgery, and then we had

3   delivered it to her.  She was fulfilling her role

4   following up on that.  So I wouldn't have had -- I

5   might have said that as a statement, but not as a

6   condemnation.

7       Q.   On December 9th you put in an email to

8   Leonard Abess that Jennifer McCafferty explicitly told

9   them, meaning TMG, that there were problems and she

10  wanted them found.

11      A.   That's a separate piece to this.  Setting up

12  the IML audit is, I think, perfectly reasonable.  I

13  mean, she was fulfilling her responsibility.  The

14  tenor of it would be a different issue, and we've

15  already been over it.

16          I didn't have an explicit conversation with

17  her.  I wasn't present.  She didn't tell me.  I had

18  heard that she had told and explicitly stated that

19  there was a problem with the IML and that she wanted

20  the problem found, if there was a problem.  So that is

21  a separate piece to it.

22      Q.   So if she testified that you told her that

23  she, Jennifer, was the source for the IML concerns,

24  that would be incorrect?

25      A.   I'm not -- you're parsing words here.  She

1    was responsible in part for generating the audit,

2    which I think is perfectly correct.  It was the

3    responsible thing to do.

4            You couldn't ignore it.  You wouldn't be a

5    compliance officer.  The nuance about she was twisting

6    it or whatever, I heard that.  I don't know if that is

7    absolutely true.  That is what I was told.

8            But the whole issue -- if I was having a

9    meeting with her and we were having the discussion on

10   December 20th, like you said, I might very well have

11   acknowledged that she was the person that had set up

12   the audit being done.

13       Q.  She also claimed that on or about that date

14   that you accused her of blocking you in refusing to

15   meet with you, Rafic or give you and Rafic access to

16   TMG.  Do you recall telling her that?

17       A.  I don't recall telling her that.  But it

18   would have been -- if the issue came up, I might very

19   well have said we would have liked to have the

20   opportunity to talk to them so that they could find

21   out additional information and find out what the rest

22   of the story was.

23       Q.  And she also claimed that on or about that

24   date that you told her that you planned to discuss

25   your concerns with the president.

1      A.   Nonsense.

2      Q.   What's that?

3      A.   Nonsense.

4      Q.   You're saying that Jennifer McCafferty's

5    testimony under oath saying that you told her on or

6    about December 20th that you planned to discuss your

7    concerns with the president was nonsense?

8      A.   No.  You changed the question a little bit.

9      Q.   Okay.

10     A.   I did not tell her that I was going to

11   complain about her or anything else to the president.

12          First of all, I wasn't planning to meet with

13   the president to discuss her or anything else.  I met

14   with the president only at the president's discretion

15   and when she wanted to meet with us.

16          I never ever had anything -- my relationships

17   with Jennifer were peripheral and very modest.  And I

18   absolutely did not -- the implication is that I

19   threatened her or something or other.  Number one,

20   that's not the way I act.  And, number two, it's not

21   accurate.

22     Q.   So if she testified that you tried to

23   intimidate her to influence the outcome of the MTI,

24   IML and OPO assessment, that would be false.  Correct?

25     A.   Correct.

1       Q.   By the way, you remember meeting with

2   President Shalala on the very next day, December 21st.

3   Correct?

4       A.   Absolutely.

5       Q.   And what did you discuss in your meeting with

6   President Shalala on the 21st?

7       A.   Everything that she wanted to talk about.

8   She came in.  She said -- we were supposed to -- Lanny

9   Gardner and I were supposed to meet with her

10  simultaneously in his office.  She came in a half hour

11  early.  She met with Lanny Gardner and then called me

12  to come over to meet with her, so we met with her

13  separately.

14          And the meeting basically went over what was

15  happening on the campus; that she wanted to make

16  things better.  She realized that there was a lot of

17  discord.  She had gone through a meeting with the

18  chairs and she was taking things under her wing and

19  things were going to get better.

20          She -- towards the end of the discussion, she

21  said that she had heard that there had been a threat

22  to me; was this a low level person?  And I said no.  I

23  told her that it was Dr. Nemeroff.

24          And she said, "Well, you don't think that

25  Pascal or Jack Lord knew about this?"  And I said, "I

1    am absolutely certain that they knew about this,

2    because in my conversation with Nemeroff, he had

3    explicit information about the fact that the IML and

4    the audit and everything that was going on and there

5    was no way in the world that Nemeroff would know

6    anything about an audit with the IML.  He has just no

7    relationship with any pieces of that.  So he had to

8    know about that and he had to be fed specific

9    information."

10        Q.   So you told President Shalala about the

11   contents of your email from December 9th, 2012.

12   Correct?

13        MR. YANNUZZI:  Object to the form.

14        A.   I told -- I didn't read -- I didn't send the

15   email to her.  I don't know if she's ever even seen

16   it.  We didn't go into details about the IML or any of

17   the other things, other than me stating that we -- the

18   department of surgery firmly believed that we had

19   adhered to appropriate protocols and didn't do

20   anything that was wrong or would put the university at

21   risk, and that the issue with Nemeroff was as I had

22   outlined it.

23        And I know that she said she was going to

24   look into it.  That that was going to be in her office

25   and she would look into it.  And the next day was when

1    I got a phone call from LeBlanc about the same thing.

2        Q.   At that meeting, did you urge President

3    Shalala to shut down the TMG investigation?

4        A.   Absolutely not.

5        Q.   During that meeting, did you urge President

6    Shalala to terminate Dean Goldschmidt?

7        A.   No.

8        Q.   During that meeting, did you urge President

9    Shalala to terminate Dr. Lord?

10       A.   I did not.  It's not my job to do those

11   things.

12            (Thereupon, the document was marked as

13            Exhibit 18 for identification.)

14   BY MR. SLOMAN:

15       Q.   On the very same day there was an email

16   generated from Aileen Ugalde to a number of people

17   regarding the investigation of the IML be led and

18   managed by internal audit.

19            Did you become aware of that on December

20   21st, 2012?

21       A.   I don't think I was copied on that email.

22       Q.   Were you made aware of it?

23       A.   I don't -- I don't think so.  I don't think

24   it was discussed with me.  I knew -- I knew, and I

25   don't know exactly how I knew, I knew that perhaps

1    President Shalala said that she was going to make sure

2    that internal audit took over this.  She was getting

3    Mike Moloney and Blanca involved with this and that

4    there would be an intense review of the whole

5    situation.

6        Q.   Let's move up, please.  Did you ever become

7    aware of this email from Ms. Ugalde to Jennifer

8    McCafferty Cepero?

9        A.   I didn't -- I never saw this email.  But,

10   obviously, I became aware of things, because Mike

11   Moloney became involved and they then initiated hiring

12   outside counsel and getting CCI involved.

13       Q.   There is the very same day that you met with

14   President Shalala.  Correct?

15       A.   Friday -- yes.

16       Q.   And do you remember whether you became aware

17   of this email on the day that you met with President

18   Shalala?

19           MR. YANNUZZI:  Object to the form.

20       A.   I have no recollection about it, when I

21   became aware of the fact that Mike Moloney was going

22   to be involved with the audit.

23       Q.   What time of day did you meet with President

24   Shalala on December 21st, if you recall?

25       A.   About nine o'clock in the morning.

1      Q.   Okay.  And this email is generated at 4:37

2  p.m.  Correct?

3      A.   That's what it says, yes.

4           (Thereupon, the document was marked as

5           Exhibit 19 for identification.)

6  BY MR. SLOMAN:

7      Q.   Let's go to 19.  Dr. Livingstone, I'm showing

8  you an email from Thomas LeBlanc to President Shalala,

9  indicating "I just spoke with Alan."  Presumably

10  that's you.  "He was gratified to hear that oversight

11  of the IML investigation has moved to GC internal

12  audit and that he will be given a chance to explain

13  his position on the matter."

14           Did I read that correctly?

15      A.   You did.

16      Q.   Does that refresh your recollection of

17  approximately when you heard about the email that we

18  just discussed in Exhibit 18?

19           MR. YANNUZZI:  Object to the form.

20      A.   Perhaps.  This -- I remember the conversation

21  or the time explicitly with Mr. LeBlanc.  I was

22  actually out in Vale, Colorado, and he called me in

23  the afternoon to ask me specifically about what had

24  transpired with Dr. Nemeroff.

25      Q.   And I presume that you told him that all of

1    your knowledge about the dean's ultimatum was through

2    Dr. Nemeroff, that you had never spoken to either Dr.

3    Goldschmidt or Phil George.  Correct?

4        A.   We didn't go over those points.  We went over

5    the issue of the threat.  And then he asked me if I

6    wanted to pursue it.  This was not consistent with

7    academic principles and I -- it's interesting he says

8    there is every possibility this whole episode was with

9    good intentions, poorly delivered.

10           That wouldn't be the way that I would phrase

11   it.  What I said was I did not think that this was

12   coming from Dr. Nemeroff explicitly; that it was -- he

13   was merely being a messenger conveying the message to

14   me.  I said I did not want them to go after Dr.

15   Nemeroff.  I didn't think that that was going to be

16   productive.  Charlie -- Charlie is Charlie.  I didn't

17   see any benefit in punishing him.

18           I did -- I was glad that LeBlanc knew about

19   this, and, obviously, the president knew about this,

20   because I felt that that allowed some control of the

21   situation.  And he did tell me about the internal

22   audit transfer.  That's probably when I found out

23   about it.

24       Q.   You believe that that's when you found out?

25   You didn't hear about it before December 22nd, late in

1    the afternoon?

2        A.   I'm sorry, I really don't -- I don't recall.

3    I don't have anything documented about it in my

4    records.  I found out sometime within that 24 hour

5    period of time.  Does it make a difference?

6        Q.   I'm just trying to figure out when you heard,

7    coincidentally, with the delivery of the email on

8    December 21st, late in the afternoon from Aileen

9    Ugalde, or whether you heard it sometime between then

10   and the time you spoke to Tom LeBlanc.

11       A.   No.  I believe -- because I flew out to Vale

12   in the morning, so I left at seven o'clock Saturday

13   morning.  I may have even taken a night flight out.

14            So I left Miami either late Friday or early

15   Saturday, because he called me in the afternoon on

16   Saturday and I see that the time that he wrote this

17   email was 4:51 p.m.  So I believe that that's when I

18   found out about it.

19       Q.   Now, my other question is did you make clear

20   to Mr. LeBlanc that --

21       A.   Dr. LeBlanc.

22       Q.   Okay.  I've never seen him refer to himself

23   as doctor, but, okay, Dr. LeBlanc.  Did you make clear

24   to Dr. LeBlanc that the dean's ultimatum communicated

25   to you by Charlie Nemeroff that you never spoke to the

1   dean or Phil George or Jack Lord or anybody about that

2   ultimatum, other than Charlie Nemeroff?

3        A.   We didn't discuss whether I talked to the

4   dean or to Jack Lord or anybody else.  He asked about

5   what had happened and I went over it with him and he

6   never asked if I spoke to the dean or Jack Lord.

7        Q.   So is Dr. LeBlanc's statement that you were

8   gratified to hear that oversight of the IML

9   investigation is moved to GC internal audit, is that a

10  correct statement?

11       A.   You know, gratified?  All I was gratified

12  about was the fact that I thought that there was

13  control of the situation.

14            My academic career the week before had been

15  threatened, in my opinion, explicitly threatened, and

16  I was gratified that the president was deeply involved

17  with this and that the provost of the medical school

18  from an academic side knew what had transpired, at

19  least according to what I was conveying to him.

20            And that I knew that, once this had happened,

21  that I was protected and that I wasn't going to be

22  arbitrarily eliminated by Jack Lord or the dean.

23       Q.   You were a tenured professor at the

24  University of Miami School of Medicine for nearly 30

25  or almost 40 years at that point.  Correct?

1          A.    Correct.

2          Q.    How would your career have been affected by

3    Dr. Goldschmidt or Dr. Lord?

4          A.    So, the position as being executive dean of

5    clinical affairs, we serve at the pleasure of the

6    leadership of the medical school.  I've already said

7    that for being the chairman of the department,

8    regardless of surgery or any other department, we also

9    serve at the pleasure of the dean.

10         So he couldn't fire me unless he proved that

11   I did something, lack of collegiality or, you know,

12   some misdeed or something or other, there's a very

13   high bar for firing a tenured faculty member.  He

14   wouldn't fire me, but he would do exactly what

15   happened to Lipshultz.  Get called in on a Friday

16   afternoon and all of a sudden you're no longer the

17   chairman of the department and I would be no longer

18   the executive dean of clinical affairs.

19         Q.    Did you, on or about, if you recall, generate

20   an email to Don Steigman informing him that the

21   external review of the MTI and the department of

22   surgery was going to be coordinated by Mike Moloney of

23   internal audit?

24         A.    If you're asking the question, I must have

25   sent an email.  I don't remember it specifically, but

```
 1    it would be absolutely consonant with what was

 2    happening.

 3            Remember, that -- so Don Steigman was the

 4    executive vice-president, I forget his title at that

 5    time, he's now the senior vice-president of Jackson.

 6    So he was very involved.  I had a long relationship

 7    with him.  We had been working on the transplant

 8    integration forever.

 9            This is an extraordinary important product

10    line for him, so he would be concerned.  And it's very

11    likely that when I found out about this that I did

12    communicate with him.  I suspect you have an email

13    that supports that.

14            (Thereupon, the document was marked as

15            Exhibit 20 for identification.)

16    BY MR. SLOMAN:

17       Q.   Let me show you Exhibit 20.  Dr. Livingstone,

18    I'm showing you an email generated by you on January

19    1, New Year's day, at 3:39 p.m., to President Shalala

20    and Dr. LeBlanc.

21            Do you remember generating this email

22    about -- if you can go up to the top, Jorge -- it says

23    the draft policy for clinical and anatomic laboratory

24    test, confidential.  Do you remember generating this

25    email to President Shalala and Mr. LeBlanc?
```

1      A.   Let me read it, please.

2      Q.   Sure.

3      A.   Move down, please.  Okay.  You obviously had

4  the letter.  This was notifying me that they were

5  going to try to take the transplant -- the IML out of

6  surgery?  I don't remember.

7      Q.   Yeah.  Just to give you some background, Dr.

8  Cote, Dr. Livingstone and Dr. Lord circulated a

9  draft --

10     A.   No, no.  I'm here.  I didn't circulate the

11  draft.

12     Q.   Sorry.  Dr. Goldschmidt, Dr. Cote and Dr.

13  Lord circulated a draft policy concerning clinical

14  labs that were apparently delivered to your assistant,

15  Mr. Estrada.  You took issue with them, with the draft

16  policy, and generated this email.  Does that refresh

17  your recollection?

18     A.   No.  I read the email and I don't -- I was

19  constantly getting little missives from Cote.  Can you

20  show me the letter?

21     Q.   The draft policy?

22     A.   Yeah.

23     Q.   I don't have it handy.  But I'm more

24  interested in the statements that you made in this

25  email to President Shalala and Dr. LeBlanc.

```
 1        A.    Okay.  Which one?

 2        Q.    Specifically, where it says, "Donna, after my

 3   meeting with you December 21st and Tom, after my

 4   discussion with you December 22, I was relieved to

 5   know how strongly you felt that this form of

 6   intimation was unacceptable and that the transplant

 7   lab review would be put directly under Mike Moloney

 8   and Aileen Ugalde."

 9              Do you see that?

10        A.    I do.

11        Q.    My question, Dr. Livingstone -- sorry -- my

12   question, Dr. Livingstone, is in your meeting with

13   President Shalala on the 21st, did she tell you that

14   the transplant lab review would be put under Mike

15   Moloney and Aileen Ugalde before the email went out to

16   the rest of the people on that email from Aileen

17   Ugalde at four p.m. or so on December 21st?

18              MR. YANNUZZI:  Objection to form.

19        A.    I already responded.  I don't remember the

20   exact time.  Even in the first sentence it says "After

21   my meeting with you on December 21st and with Tom,

22   after my discussion on December 22nd, I was relieved

23   to know how strongly you felt that this form of

24   intimidation was unacceptable and that everything

25   would be put under internal audit."
```

```
1            I've already acceded to the fact that I don't

2     remember exactly the time of day during that 24 hour

3     period when that happened.  I truly do not know when

4     it happened.

5        Q.   My question is more specific.  It's whether

6     the president -- whether President Shalala committed

7     to you in your meeting on December 22nd that the

8     transplant lab review would be put under Mike Moloney

9     and Aileen Ugalde?

10       A.   She doesn't usually share things like that.

11    She made a decision.  I don't know exactly when she

12    made the decision during that 24 hour period of time

13    or whether it was earlier in the week, but she didn't

14    discuss that with me.  She didn't discuss what I felt

15    about Jack Lord.  She didn't discuss with me what I

16    felt about the dean.

17            She was concerned about the campus.  And it

18    was perfectly clear to me that this woman, who has

19    tremendous energy and enthusiasm and intelligence, was

20    trying to gather as much information, so that she

21    could formulate a decision as to how she wanted to

22    handle things.  She was trying to calm down the campus

23    and trying to settle things down, and she knew

24    everything about the mission that was going on.

25            So I don't -- I don't remember exactly during
```

1    that 24 hour period of time when I found out that Mike

2    Moloney and Blanca were going to be involved.

3         Q.   But it's your testimony that President

4    Shalala didn't tell you in your meeting on December

5    21st that the transplant lab review would be put under

6    Mike Moloney and Aileen Ugalde.  Correct?

7         A.   I don't specifically remember that piece.  I

8    really don't.

9         Q.   So it's possible, it's possible that she did

10   tell you in your meeting of December 21st?

11              MR. YANNUZZI:  Object to the form.

12        A.   I don't know, and I won't accede to the fact

13   that she might have told me that or not.  I may have

14   an email or a memo somewhere, I may have spoken to

15   Rafic Warwar.  This is important to you, we can get

16   back to you and tell you the answer to that if I can

17   get additional information.

18        Q.   Let's go to the top, Jorge.  Okay.  In

19   response to your email that you generated at 3:39

20   p.m., at 3:50 p.m. she wrote back to you, copying Dr.

21   LeBlanc, "Sit tight."  Correct?

22        A.   Yes.

23        Q.   And, again, this was regarding the draft

24   policy for clinical and anatomic laboratory test

25   policy.  Correct?

```
 1          A.    Yes.

 2                (Thereupon, the document was marked as

 3                Exhibit 21 for identification.)

 4    BY MR. SLOMAN:

 5          Q.    Now, subsequent to that, let's go to Exhibit

 6    21, President Shalala directed Dean Goldschmidt at

 7    3:51, which was a minute after she told you to sit

 8    tight, she directed Dean Goldschmidt "Wait for the

 9    audit to finish.  Withdraw the memo," meaning the memo

10    about the clinical labs policy.  Correct?

11                MR. YANNUZZI:  Object to the form.

12          A.    I'm reading what you're seeing.  I did not

13    see this and I didn't know that she did this.

14          Q.    Right.  But you see at the top it says

15    subject re: lab?

16          A.    Yes.

17          Q.    Okay.  So, you would agree with me that the

18    minute after she wrote to you to sit tight, she

19    directed Dean Goldschmidt to withdraw the memo

20    referencing the clinical lab policy.  Correct?

21                MR. YANNUZZI:  Object to the form.

22          A.    Yes.  Although I still don't have the letter

23    to review.  But, yes.

24          Q.    And Dean Goldschmidt eventually wrote back to

25    her and said fine.
```

```
 1          A.    She's the president.

 2          Q.    Right.

 3                (Thereupon, the document was marked as

 4                Exhibit 22 for identification.)

 5    BY MR. SLOMAN:

 6          Q.    Let's go to Exhibit 22.  And this is an email

 7    chain, if we go to the bottom, these things are always

 8    confusing, because they start at the bottom and then

 9    you have to work your way up.

10                This is an email from Joe Natoli to you.  Who

11    is Joe Natoli at this point?

12          A.    He was the -- because Jack came in.  He was

13    one of the chief -- I forget his exact title at this

14    particular time.  He was the chief financial officer

15    for the university at this time.  Judd and Aileen will

16    know exactly what it is.

17          Q.    It is a bit unfair, but at this point, Dr.

18    Livingstone, this is on January 16th, and at this

19    point in time he had replaced Dr. Lord as the COO.

20          A.    Okay, yeah.

21          Q.    Does that make sense?

22          A.    Yes, that makes sense.

23          Q.    Okay.  So he, Joe Natoli writes to you,

24    subject, one more thing.  "One more thing.  We have to

25    bring faculty leadership together.  There's so much
```

```
 1   infighting, reporting of negative comments, this
 2   person is out to get that person, et cetera.  So much
 3   wasted productivity.  We need to set the tone that
 4   that won't be tolerated.  It's been a painful time, it
 5   still is, but it's time to get back to work and use
 6   water fountain conversation and other ways to improve
 7   what we do.  Let's grab a few minutes to talk about
 8   that in the days to come."
 9           Did I read that correctly?
10   A.   Yes, you did.
11   Q.   Okay.  And then as we go up, you'll see that
12   in this email chain that this email is then -- you
13   responded, "Joe, I agree.  This is very important.
14   Way too much energy is being expended on negativity."
15           Correct?
16   A.   Correct.
17   Q.   All right.  And then from there it somehow
18   gets directed at 6:05 a.m. on January 17th, Joe Natoli
19   apparently forwards it on to Pascal Goldschmidt.
20           And we go up a little bit further and we see
21   from Pascal Goldschmidt to Joe Natoli, "Joe, you and I
22   should talk about this.  Thanks.  Pascal."
23           Do you see that?
24   A.   Yes.
25   Q.   And I take it, and it doesn't appear as
```

```
1   though that you're privy to this part of the email

2   chain.  Would you agree with me there?

3        A.   I certainly would agree with you.

4        Q.   Okay.  And from that email from Pascal

5   Goldschmidt to Joe Natoli, we then see an email from

6   Pascal Goldschmidt to Donna Shalala and Dean

7   Goldschmidt writes "Donna, we should talk about this.

8   Alan is campaigning against me and yesterday at a

9   meeting with Nimer, Lubarsky and Cote was opposing our

10  efforts to work with Steve Sonenreich to bring

11  Sylvester at -- I believe that's Mount Sinai Medical

12  Center.  Support from the president and trustees is

13  needed.  Pascal."

14        Do you see that?

15        A.   I do.  Interesting.

16        Q.   Do you know what this was about?  Does this

17  ring any bells to you?

18        A.   Yes.  Over a period of years, it had actually

19  started with Jack Lord, but I think we had an earlier

20  conversation that Jack Lord had been dealing with

21  Mount Sinai and also with Miami Children's Hospital,

22  trying to integrate and do some issues with them.

23        The whole issue -- so, here I am, once again,

24  so this is January 17th.  Jack Lord is no longer the

25  COO.  I am being called into Pascal's office every
```

1    day.  He wants to establish a personal relationship as

2    well as a professional relationship.  He's asking me

3    to get my wife and his wife to go out to dinner so

4    that we can work together as an integrated team.

5            Alan, it's just the two of us and we are

6    going to work together to make this medical school

7    better than ever.  So here they are working behind the

8    backs to go ahead and bring Sylvester over to Mount

9    Sinai Medical Center.

10           Now, this is a long discussion.  I have known

11   Steve Sonenreich since 1990.  I knew him when he was

12   at Cedars Hospital.  I've worked with him.  We also,

13   when -- and part of the reason that I was resistant to

14   this, he is a totally dishonest individual.

15           When there was a problem over at Mount Sinai

16   Medical Center around about 2008, it may have been

17   2007, he was desperate for coverage of the intensive

18   care facility, the SIC over at Mount Sinai.  He and I,

19   because we had had a strong and long relationship,

20   made an agreement.  My faculty from the department of

21   trauma, they are all critical care surgeons, all

22   critical care trained and they all are board

23   certified, we agreed to cover their intensive care

24   unit for seven by 24, so that they could continue to

25   do their surgery and all the other things.

1          We went ahead.  I did this on a handshake, a

2    mistake, with Steve Sonenreich.  I did it on a

3    handshake.  After the first couple of months, I think

4    it started something like September, by November, he

5    hadn't paid me a cent.  And this was about $100,000 a

6    month or $125,000 a month that he owed the department

7    of surgery.  I was paying the faculty to go over to

8    cover their intensive care unit.

9          Come November I said, "Steve, I need the

10   money.  We have to go ahead.  We're building our

11   budget.  I need to know what's going on and everything

12   else."  And he said "Please wait until January the

13   1st," because we're -- Mount Sinai was having

14   financial problems at that time.

15         The long and the short of it is, come

16   beginning of January, whatever date it was, 2008 or

17   so, I went over to Mount Sinai Hospital to collect the

18   money and Steve Sonenreich said "I'm not going to pay

19   you a cent."

20         He owed the department of surgery $825,000

21   and I never -- the board of trustees, of course, some

22   of the board members are on both hospitals, so we

23   ended up -- I was told that just suck it up and they

24   paid $25,000 and he still owes me $805,000, plus

25   interest.

1          So when it came to going ahead and putting

2    the Sylvester Comprehensive Cancer Center over at

3    Mount Sinai, this was a desperation move.  To this day

4    I can tell you, because this is what I do for a

5    living, is cancer surgery, Mount Sinai Medical Center

6    has a crappy surgical oncology program and they

7    desperately wanted to have the imprimatur and the

8    advantage of having surgeons over who could actually

9    do the major operations they wanted done.  So I did

10   resist having this relationship with Mount Sinai

11   Medical Center and we never did it.

12        Q.   Okay.  So let's move up a little bit at 9:07

13   a.m., President Shalala responded to Dean Goldschmidt:

14   "I talked with Joe.  Talked with Alan.  Alan has

15   always hated Sinai based on his previous experience

16   with him.  We know that, and he says the same thing

17   whenever the name is mentioned.  Don't trust Steve S.

18   Nothing new in his position.  Alan has a big job to

19   get productivity up."

20          Did I read that correctly?

21        A.   You did.  It's interesting she knew about it.

22   Obviously, she knew about it.  She knows everything.

23        Q.   Okay.  Let's go up to Dean Goldschmidt's

24   response.  "Alan is a destructive individual who has

25   raised my faculty against me.  Plenty of witnesses to

1    testify to this."

2        Is that a true statement?

3    A.  No, I can't take credit for what he has

4    personally done.  He did it himself.  What do you

5    think?  One person is going to go ahead and cause

6    people to write a petition, 800 out of a thousand

7    people to write a petition for a recall?  This is

8    nonsense.

9        And the beauty about this is at the same

10    time, as he's meeting with me on a daily basis, asking

11    me to go out to dinner with him.

12    Q.  He goes so, he says "He's ruining my

13    reputation.  I have parents and medical school

14    applicants who are calling to find out if I am going

15    to be kicked out of UM.  Dipen Parekh refuses to meet

16    in the presence of Alan, because Alan is so negative

17    about what Dipen does and puts his effort down in

18    front of everybody.  Ask Nimer about it.  Alan is

19    destroying everything I've built at UM.  There's a

20    decision to be made.  Pascal."

21        Did you know that Dr. Goldschmidt felt this

22    way about you?

23    A.  I wouldn't have been terribly surprised about

24    his duplicity in terms of the way he acted.  He took

25    all of these things personally.  When he found out

```
 1    that I supported the petition, it was, you know, I
 2    wouldn't have denied it.
 3              This issue about Dipen Parekh, why don't you
 4    call Dipen Parekh and ask what he thinks about me in
 5    our relationship.  This is ridiculous.  I have no idea
 6    about parents of medical student applicants who are
 7    calling me.  I have no idea about that, either.  And I
 8    didn't ruin his reputation; he did it all by himself.
 9        Q.    Let's go up and see President Shalala's
10    response.  She responded "You appointed him.  Contain
11    him.  He has to lead more productivity."
12              Do you see that?
13        A.    I do.
14        Q.    And productivity meaning financial
15    productivity.  Correct?
16              MR. YANNUZZI:  Object to the form.
17        A.    It means productivity in general.  Remember,
18    this is now after the previous eight months, from
19    April, May of 2012, up to December, the whole campus
20    was in turmoil.  We had been in financial deficit of
21    60 plus million dollars.  We had all of the reduction
22    in force.  We had the RAC committee, the committee
23    that was dealing with accommodations and hiring of
24    people.  We had all of the restrictions in positions.
25              And the president knew that it would require
```

1    leadership from the senior faculty to increase

2    productivity and to calm things down.  We had to do

3    better on a clinical basis.  We had to do better on a

4    research basis.  We had to make sure that the morale

5    of the faculty was improving.  We were losing faculty.

6    It was a very difficult time.

7            It would have been very easy for the

8    president to say, listen, this is a medical school

9    issue.  You appointed him.  He didn't appoint me.

10   Actually, I was appointed by John Clarkson, but he had

11   the absolute prerogative of taking me out if he wanted

12   to and he didn't.

13           And, in fact, he didn't even remove me from

14   being executive dean of clinical affairs and I served

15   as the executive dean of clinical affairs until

16   September of 2013.

17       Q.   And Dr. Lord appointed you, or at least

18   announced to you, that you were being appointed the

19   executive dean of clinical affairs.  Correct?

20       A.   That is correct.

21           (Thereupon, the document was marked as

22           Exhibit 23 for identification.)

23   BY MR. SLOMAN:

24       Q.   Let's go to Exhibit 23.  I believe you

25   received this email, correct?  I see your name on it.

```
 1        A.   Yeah.  I'm just looking at it.  I remember
 2   this, yes.
 3        Q.   Okay.  And tell us about your involvement
 4   with the review that was conducted by Compliance
 5   Concepts.
 6        A.   Compliance Concepts did all the review
 7   independently.  When they asked for information, like
 8   a billing or whatever, Rafic Warwar contacted the
 9   people in the IML, Maggy Dickens and the other people,
10   people at the hospital, provided them with all the
11   information that they needed.  I had very little to do
12   with it.  Frankly, the details of all of this are --
13   it's not my strong suit, so...
14             But we provided Compliance Concepts with the
15   information that they needed to do the investigations,
16   as did Jackson.  It took six months.
17        Q.   Do you know Jennifer McCafferty was not --
18   did not participate in the review conducted by
19   Compliance Concepts?
20        A.   I don't.  I see she's copied on this email.
21        Q.   Right.  Do you know that she was -- she
22   refused to sign off on the remittance to CMS?
23        A.   She thought it was too much?
24        Q.   She was not included in the review.
25        A.   Oh.  I don't know those details.
```

1      Q.   Okay.  Did you talk to Mike Moloney about

2  this audit?

3      A.   He may have updated me that it was ongoing or

4  whatever.  I did not provide -- Mike wasn't the one

5  that was doing the detailed work on this thing, nor

6  was -- Blanca was involved somewhat.  I never met with

7  her.

8           But this was done by a nationally-respected

9  firm that did forensics and are used to doing audits

10  of -- I think the senior auditor was actually, if I'm

11  not mistaken, the senior guy from Compliance Concepts

12  had worked for the OIG or 20 years or something.  I

13  mean, they are a very respected firm.

14      Q.   Dr. Livingstone, did you ever suggest to

15  anyone that the review go or be overseen by Mike

16  Moloney?

17      A.   No.

18      Q.   Were you surprised by the outcome of the

19  audit conducted by Compliance Concepts?

20      A.   No.  It's consistent with what had happened

21  over the previous 15 years.  Every time we were

22  reviewed by AHCA, CMS, any of these organizations, we

23  were found to have been in compliance.

24           So I was relieved and I felt that we had been

25  exonerated.  I mean, these things, you see there's

```
 1    136,227, this represents over a period of -- from 2008

 2    through 2013, there was probably $100 million worth of

 3    billing, and this was a rounding error.

 4          And this was done, not because we had done

 5    anything wrong, but because we thought it was the

 6    right thing to do.  This whole thing about the

 7    grandfather clause, for example, they couldn't find --

 8    this dates back, if I remember correctly, dates back

 9    to 1999.

10          And, apparently, in the AOA it was accepted

11    that the technical components of the histology could

12    be done through the MTI, but they couldn't find the

13    papers or the, whatever it was, the agreement that

14    allowed them to do it.  So because they didn't have

15    this endorsement or proof that we were grandfathered,

16    we ended up paying back $136,000.

17          The $227,000 was explicitly related to David

18    Roth.  He thought that he did not need cytokines and

19    one other test -- oh, C reactive protein or something.

20    These were two tests that his compatriots, his

21    colleagues, thought that they needed.

22          They went through I forget how many -- they

23    went through a period of five years, they took out

24    every single test that amounted to $227,000 that he

25    said that maybe he didn't need.
```

1          He admitted that he thought that there was --
2     it was all done in good faith the way things were
3     structured.  The ultimate irony is that David,
4     himself, was involved in setting up the protocols and
5     he could have, if he wished to, he could have changed
6     them or whatever, but didn't.  Anyway, I was relieved
7     when this summary came out.
8          Q.   So I take it that you are in disagreement
9     with the settlement that the university entered into
10    with the department of justice.  Correct?
11         MR. YANNUZZI:  Object to the form.
12         A.   It's not my prerogative to really even
13    comment on it.  This was a business decision, the
14    medical school, the university made a decision.  And
15    they are the professionals.  I am merely a peg in the
16    whole overall process here.
17         Q.   Dr. Livingstone, were you ever disciplined or
18    the subject of any disciplinary actions at the
19    University of Miami?
20         A.   One time, one -- somebody said that I made
21    some comments in the operating room or something or
22    other about -- that was unacceptable to them and they
23    filed a complaint.  And, frankly, I don't even
24    remember the issue about it, but I did meet with the
25    leadership and discussed it.

1    Q.   Did you ever impugn the masculinity of a male

2    member of the financial division of the University of

3    Miami School of Medicine?

4         MR. YANNUZZI:  Object to form.

5    A.   So the impugn is an interesting situation,

6    and I know exactly what it is.  When we were

7    interviewing and trying to recruit an excellent

8    recruit for the department of medicine and we had gone

9    through an extended period of time trying to recruit

10   him, and with the VCA, in front of the candidate and

11   everything else, I told him that he could be

12   tremendously helpful and to go over the various issues

13   that were facing the department of medicine.

14        I strongly encouraged him to support the

15   recruitment and everything else.  And I said something

16   to the effect that I hope you have the balls to do

17   this and to tell him all of the issues that are going

18   on, so that we can recruit him.

19   Q.   What was the name of the member of the

20   University of Miami financial staff who you made the

21   comment to?

22   A.   I don't remember.  I should remember.  I

23   don't remember at the present time.

24   Q.   Was it Michael Levi?

25   A.   I don't remember.

```
 1        Q.   When you testified earlier that you stopped

 2   being the chairman of the department of surgery

 3   sometime in 2015 -- is that correct?

 4        A.   Correct.

 5        Q.   -- did that incident have anything to do with

 6   your no longer being the chairman of the department of

 7   surgery?

 8        A.   I'm sorry.  Repeat the question.

 9             MR. YANNUZZI:  I think you made a mistake

10        there, Jeff.

11             MR. SLOMAN:  I'm sorry.

12   BY MR. SLOMAN:

13        Q.   You were no longer the chair of the

14   department of surgery sometime in 2015.  Correct?

15        A.   September, yeah.

16        Q.   Why were you no longer -- were you forced out

17   or did you resign voluntarily?

18             MR. YANNUZZI:  Object to the form.

19        A.   Well, I resigned, but I was forced out.

20   Pascal met with me in 2014 and he told me that he

21   wanted me to step down effective immediately.  And I

22   said if you will allow me to continue so that I can

23   ease the transition and help in the recruitment of the

24   next chair, I will voluntarily step down as soon as

25   you can arrange that.  And it took a year.
```

1      Q.   Did it have anything to do with your comments

2   to I believe it was the vice-chairman or the VCA of

3   medicine who you made that comment to?

4      A.   No.  That was a couple of years earlier.

5      Q.   Did you ever have any -- do you recall an

6   incident involving a woman by the name of Danielle

7   Cameron?

8      A.   I do not.

9      Q.   Do you remember who Danielle Cameron was?

10      A.   I do not.

11      Q.   Dean Goldschmidt -- Dr. Goldschmidt testified

12   about an incident in which you were interviewing a

13   potential residency candidate by the name of Danielle

14   Cameron, whose father was, I believe, the chair of --

15   the chief of cardiac surgery at Johns Hopkins.  Does

16   that refresh your recollection?

17      A.   No.

18      Q.   Do you recall commenting to her in an

19   interview that something to the effect that you

20   noticed on her CV that she had taught power yoga and

21   commented "Power yoga?  Really?  You look big for

22   that."

23      A.   It's possible.  I am imperfect and I have

24   learned to not be critical.

25      Q.   Well, it's more than possible, is it not,

1    doctor?  In fact, she complained to Dr. Goldschmidt,

2    which he testified to us about.

3           Do you remember commenting to this candidate

4    for a residency position, a residency in the

5    department of surgery, that she didn't -- she looked

6    big for teaching power yoga?

7           MR. YANNUZZI:  Object to the form.

8        A.   I don't recall that comment.  I may have said

9    something about yoga and whatever.  And, as we well

10   know, it's impossible to make any comments and it's

11   wrong to make any comment and I don't.

12          I am sure that, and I don't remember the

13   individual, I'm sure that I apologized for it.

14          MR. SLOMAN:  Well, let me show you Exhibit 24

15      and see if this refreshes your recollection.

16          (Thereupon, the document was marked as

17          Exhibit 24 for identification.)

18          MR. YANNUZZI:  Does this have a Bates, Jeff?

19          MR. SLOMAN:  No.

20          MR. YANNUZZI:  So it wasn't produced?

21          MR. SLOMAN:  No.

22          THE WITNESS:  I see the letter.  I don't

23      remember the explicit things.  At that time I

24      might have said something about power yoga and

25      something about exercising.

```
 1              I would not have said -- I had no idea chief

 2         of cardiac surgery, I would not have made

 3         comments about that, nor would I have said

 4         something about the father creating connections.

 5         That I wouldn't have done.  I might very well

 6         have said something about power yoga and running

 7         a marathon.

 8    BY MR. SLOMAN:

 9         Q.   Dr. Livingstone, Dr. Goldschmidt brought this

10    up voluntarily in his deposition.

11         A.   I'm sure.

12         Q.   Do you believe that this was some type of

13    creation on his part or a creation on the part of

14    Ms. Cameron, who is now apparently a successful

15    surgeon in the Boston area?

16              MR. YANNUZZI:  Object to the form.

17         A.   I don't think that he manufactured it.  I

18    mean, why would he do that?

19         Q.   But you don't recall making these comments

20    to --

21         A.   This was ten years ago.  I interview hundreds

22    of applicants every single year, and that if I said

23    something like this, that I'm sure I apologized.

24              It was not done with any malice of

25    forethought; it was just wrong for me to say it.  And
```

1    I make sure that I don't say anything about anybody's

2    appearance these days.

3        Q.    Okay.  Did you make comments to employees of

4    the University of Miami or students at the University

5    of Miami in the past that you regret, looking back on

6    it?

7        A.    Standards have changed over the years.  And I

8    think that if you look at the last decade that you

9    will find that if you look at the awards that I've

10   received from the residents and from the students and

11   everything else in terms of mentorship and treating

12   them well, promoting -- I'm constantly asked to write

13   letters of reference for all of the medical students,

14   I have a whole series of these, and what I did in the

15   past, it was a mistake if I did it and I acknowledge

16   it.

17       Q.    But you don't remember saying it.  Correct?

18       A.    Listen, I've answered the question as best as

19   I can recollect.  I may have said the thing about the

20   yoga, power yoga and everything else.  I don't

21   specifically recall.  I wouldn't have talked about her

22   father.  And I certainly wouldn't have talked about

23   creating job creations, connections for her, even if

24   that was the situation.

25       Q.    And it's your testimony that you never said

```
 1   anything insulting to Dr. Ciancio?

 2            MR. YANNUZZI:  Jeff, we've gone over this so

 3       many times now.  Let's move on.  You asked this

 4       question and it's been answered so many times.

 5       It's after four o'clock.

 6            MR. SLOMAN:  He just testified that there are

 7       things that he said in the past that he regrets

 8       today.

 9            MR. YANNUZZI:  And yet he didn't mention Dr.

10       Ciancio.  So we've already gone over Dr. Ciancio

11       a thousand times.  I can't believe we're going

12       over this again.

13            MR. SLOMAN:  I have the right to ask him.

14   BY MR. SLOMAN:

15       Q.  Dr. Livingstone, does this refresh your

16   recollection as to whether you said anything insulting

17   to Dr. Ciancio?

18            MR. YANNUZZI:  Object to the form.  Asked and

19       answered literally a dozen times by now.  But go

20       ahead and say the same thing again, Dr.

21       Livingstone.

22       A.  I never called Dr. Ciancio stupid.  I would

23   never do that.  I respect him.  There's a lot of

24   difference between some of the other what used to be

25   considered maybe an acceptable parley between people.
```

1    It's no longer considered acceptable.  The

2    relationship with Dr. Ciancio is totally different

3    than what you are putting up on the board at the

4    present time.

5            I acknowledge that I shouldn't have said

6    anything to this young woman and I don't recall the

7    thing.  We literally interview hundreds of people a

8    year.  If she wrote it, this is her interpretation of

9    it, and I am sorry that I did it.

10            I don't do that anymore.  I mean, the whole

11   approach to these things has changed.  As we know, you

12   have to be extraordinarily careful as to what you say

13   to other people, because it's in the eyes of the

14   beholder.  It's the person who takes these things

15   personally and you have to be very careful.

16            I did not call Dr. Ciancio stupid, because

17   that is not accurate.  It is not representative of

18   him.  I have the greatest respect for him from a

19   clinical, from a educational and from a research

20   perspective.

21            And the only thing that I would have ever

22   have said about it is what I said before, that from an

23   administrative perspective, he needed additional help.

24   Q.   And do you remember the incident with Michael

25   Levi, who was the VCA of medicine?

1          A.    Yes.   I already said that I didn't remember

2     it was Michael Levi.  I forgot that it was Michael

3     Levi.  It was -- once again, I said it, not from my

4     perspective, and, obviously, I was wrong, he took it

5     personally.  I was not being critical or whatever.

6     What I was saying literally, and I had already had a

7     meeting with the candidate, because I thought that he

8     had a strong candidate who could help him in his new

9     role if he assumed the position at the medical center.

10          And all I was doing, trying to be jocular or

11    whatever, obviously, it was a mistake in judgment of

12    mine, I said to Michael something about being stronger

13    and I already told you what I said.

14          MR. SLOMAN:  Let's take about five minutes.

15          I think I'm practically done.  Let's take a five

16          minute break and we'll come back and, hopefully,

17          I will have collected my thoughts and may be

18          done.  Okay?

19          THE VIDEOGRAPHER:  This marks the end of

20          video file number four.  The time is 4:20 p.m.

21          and we're going off the record.

22          (Thereupon, a brief recess was taken, after

23          which the following proceedings were had:)

24          THE VIDEOGRAPHER:  We're back on the video

25          record.  This is the start of video file number

1    five of the deposition of Dr. Alan Livingstone.

2    The time is 4:12 p.m.

3         MR. SLOMAN:  Doctor, thank you very much.  I

4    don't have any further questions.

5         MR. YANNUZZI:  We have no questions.  Thank

6    you, Dr. Livingstone.

7         THE WITNESS:  Good afternoon.

8         THE VIDEOGRAPHER:  This concludes the video

9    deposition of Dr. Alan Livingstone consisting of

10   five video media disks.  The time is 4:27 p.m.

11   and we're going off the record.

12        MR. ISICOFF:  If ordered, we will read and

13   sign.

14        MR. SLOMAN:  I'm ordering.

15        MR. ISICOFF:  And we'll take whatever normal

16   copies we take of whatever's ordered.

17        (Reading and signing not waived.)

18        (Deposition concluded at 4:27 p.m.)

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF OATH

 2

 3      STATE OF FLORIDA

 4      COUNTY OF BROWARD

 5

 6           I, the undersigned authority, certify that Alan

 7      Livingstone, M.D., appeared before me via Zoom on

 8      April 20, 2022, and was duly sworn.

 9           WITNESS my hand and official seal this

10      28th day of April 2022.

11

12

13

14                    _Mary Ann Collier_____

15                    Mary Ann Collier
                      Commission #HH 078151
16                    Expires 2/21/25

17

18      Witness I.D.:  Florida drivers license

19

20

21

22

23

24

25
```

Mary Ann Collier & Associates, Inc.
Broward: 954-782-4300   Dade: 305-371-2443

1        <u>REPORTER'S DEPOSITION CERTIFICATE</u>

2

3            I, MARY ANN COLLIER, Court Reporter, certify

4    that I was authorized to and did stenographically

5    report the deposition of Alan Livingstone, M.D., that

6    a review of the transcript was requested, and that the

7    foregoing transcript, pages 1 through 222, is a true

8    and complete record of my stenographic notes.

9

10           I further certify that I am not a relative,

11   employee, attorney or counsel of any of the parties,

12   nor am I a relative or employee of any of the parties'

13   attorney or counsel connected with the action, nor am

14   I financially interested in the action.

15

16           Dated April 28, 2022.

17

18

19

20

21           *Mary Ann Collier*
             MARY ANN COLLIER

22

23

24

25

```
 1              ERRATA SHEET

 2    DO NOT WRITE ON TRANSCRIPT.  ENTER CHANGES HERE.

 3    NAME:  Alan Livingstone, M.D.
      RE:  Lord vs. University of Miami
 4    DATE OF DEPOSITION:  4/20/22
      Page/Line  Change                      Reason
 5    _____

 6    _____

 7    _____

 8    _____

 9    _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    _____

22
      Under penalty of perjury, I declare that I have read
23    my deposition and that it is true and correct,
      subject to any changes in form or substance entered
24    above.
      _____
25    Deponent's signature      Date      (Print Name)
```

Mary Ann Collier & Associates, Inc.
Broward: 954-782-4300  Dade: 305-371-2443

1    Mary Ann Collier & Associates, Inc.
       2423 SE 10th Court
2     Pompano Beach, FL  33062
       305-371-2443
3

4         April 28, 2022

5 Christopher M. Yannuzzi, Esq.
 Isicoff Ragatz
6 yannuzzi@irlaw.com

7      Re:  Lord vs. University of Miami

8 Dear Mr. Yannuzzi:

9 With reference to the deposition of Alan Livingstone
 taken in connection with the above-captioned case,
10 please be advised the transcript is prepared and
 awaiting signature.
11
 Please have the deponent read the transcript, denoting
12 any corrections by page and line number on the
 enclosed errata sheet.  This errata sheet must be
13 signed by you and a copy forwarded to Jeffrey Sloman,
 attorney for the plaintiff.
14
 If this has not been taken care of within 30 days of
15 this date or by the time of trial, it shall then be
 concluded that the reading and signing has been
16 waived.

17      Yours very truly,

18      *Mary Ann Collier*

19      Mary Ann Collier & Associates

20 cc:  Jeffrey Sloman, Esq.

21

22

23

24

25

**To the Chair of the Faculty Senate:**

We the undersigned faculty of the University of Miami School of Medicine wish to express, in the strongest possible terms, the concern we feel for the future of our school of medicine. Under the current leadership there has been a major shift in the mission of the school that we feel jeopardizes our educational, clinical, and research enterprises. The deterioration of the relationship with Jackson Memorial Hospital fundamentally threatens both our graduate and undergraduate medical education programs without which the school of medicine cannot exist. Without these core components, this school of medicine will fail at its most critical mission of providing the best possible advanced clinical care to our community and as such, will quickly lose relevance on every level.

We believe that this shift is a direct result of the failed leadership of Pascal Goldschmidt and Jack Lord and we want to make clear that the faculty has lost confidence in the ability of these men to lead the school. We are concerned that this crisis comes during a particularly important fundraising campaign that is crucial to the success of the University as a whole, and want to be certain that there is as little impact as possible on this campaign.

We are steadfast in our commitment to our school, our university, and the welfare of our community and believe that this faculty, our students, and most importantly, our patients deserve a dean who shares this view.

Respectfully,

_____
PRINTED NAME

EXHIBIT

11

UMLORD - 00043511

Message

| | |
|---|---|
| **From:** | Clarkson, John [JClarkson@med.miami.edu] |
| **Sent:** | 12/9/2012 4:36:13 PM |
| **To:** | Alan LIVINGSTONE MD [alivingstone@miami.edu] |
| **Subject:** | Fwd: For the record Moloney |


FYI

Sent from my iPhone

Begin forwarded message:

From: "Moloney, Michael J." <mmoloney@miami.edu<mailto:mmoloney@miami.edu>>
Date: December 9, 2012, 4:26:27 PM EST
To: "Clarkson, John" <JClarkson@med.miami.edu<mailto:JClarkson@med.miami.edu>>
Subject: RE: For the record

The Provost with assistance from a number of people including Joe N assigned the reviews to a number
number of people. Jennifer and I (my staff) are looking at some of the billing issues.

Lots of problems, lots of issues, all unnecessary.

_____
From: Clarkson, John [JClarkson@med.miami.edu<mailto:JClarkson@med.miami.edu>]
Sent: Sunday, December 09, 2012 3:57 PM
To: Moloney, Michael J.
Subject: FW: For the record

Mike,
    This appears to be a complete fabrication/witch hunt.

    Did you follow up on O'Neill's clinical studies at UH and the concerns uncovered by Newcomber?

John
_____
From: Livingstone, Alan
Sent: Sunday, December 09, 2012 10:36 AM
To: Leonard Abess
Cc: Clarkson, John; Fogel, Bernard
Subject: FW: For the record

Leonard,

I have predicted for months that Jack and the Dean would try to use the consultants to take away the
transplant labs from the Department of Surgery, to weaken Surgery and in particular control me. I am not
in the least surprised that the Dean-orchestrated by Jack Lord-is using Charlie Nemeroff to deliver an
ultimatum to me. Surgery has done nothing wrong, and we were frankly angered by how the outside
consultants were directed to try to find a compliance issue with the IML. Jennifer McCafferty explicitly
told them there were problems and she wanted them found-and she also refused to meet with Rafic and
myself to get any background information on the IML.

Hopefully the Dean and his backers will not persuade president Shalala to cancel her meeting with me and
Lanny tomorrow at 5 PM.

This is but a further example of the toxic environment on our medical school campus. Even Mike Maloney
and Aileen Ugalde are dismayed by Jennifer McCafferty's use of compliance as a blunt instrument to
manipulate people. The status quo is unacceptable-is it any wonder chairs and faculty are so intimidated?
Considering circumstances, it is astonishing that anyone has been willing to sign a petition even though
they have been told the Senate will sequester all the names.

Alan

From: Livingstone, Alan
Sent: Sunday, December 09, 2012 10:21 AM
To: Gardner, Laurence B; Warwar, Rafic
Cc: Livingstone, Alan
Subject: For the record

Lanny/Rafic,

**EXHIBIT**

**12**

UMLORD - 00040951

Charlie Nemeroff just called and we talked for more than half an hour. He states that he has been talking with Dean Goldschmidt and Phil George and they categorically assert that I am the ringleader for the recall petition. Charlie has delivered the Deans ultimatum to me-which Charlie says he doesn't believe in and that he is only serving as an intermediary-that basically states that if I agree to cease and desist and stop the recall petition that I will be held harmless" and allowed to continue in my current position, or if I desire, go back and be Chairman of Surgery as was promised in my letter of offer. If I do not stop the recall petition, they intend to use the recent Transplant review-specifically the IML audit-to impugn my integrity and to punish me. Charlie knows that the petition did not originate with me, and that I have no ability to stop it even if I wanted to.

I reviewed with Charlie in detail some of the background information about the IML; the fact that Jennifer McCafferty, Jack Lord, and the Dean refused to meet with me or Rafic about the IML so that they could understand some of the key issues; and the fact that we have gone through repeated audits from national and state agencies and there were no significant problems found with the IML. I briefly explained that we have had standing protocols for decades (set up originally by Josh Miller) to standardize ordering of lab testing for our transplant patients in order to ensure uniformity and quality of care (our outcomes are the best in the nation), and that these were generated by the doctors and not the IML lab. I emphasized that the lab never ordered tests, they always did what was protocol driven. Gemma Romillo (Compliance) had reviewed these standing orders in the past and opined that they were sufficient to justify doing the lab tests. I told Charlie that I suspected any complaints that were heard about testing originated from David Roth, who frequently got far behind in signing thousands of orders, and that I had met with him on a number of occasions to encourage him to sign them so there would be absolutely no question about us having documentation of the testing being ordered by the doctors (even though we did have the standing protocols). We even pointed out to Dr. Roth that if there were some orders that he didn't feel that he needed, to let us know and we would remove them from his list, and also reminded him that in spite of the fact that he wasn't signing the orders, he was using the information to manage his patients. Eventually we were always able to get David to sign the orders, and I finally set up a team-Giselle Guerra and Gaetano Ciancio-to review all of the standing protocols and to get buy-in from everyone so that we wouldn't have to have this discussion about signing off on the orders. This was accomplished earlier this year. The ultimate irony is that the major beneficiary of any revenues generated by the labs has been the Dean as he not only taxes them, but sweeps all profits at the end of the year.

I did not discuss the issue of the OPO and the fact that the Dean taxes this even though he and his team have been repeatedly told that we cannot run these expenses through the Medicare cost reporting.

I told Charlie that I would categorically not capitulate to an ultimatum or threat of retaliation, that I will stand by how the labs have been administered, and have no intention of continuing to do anything less than I possibly can to preserve the medical school that I have worked so hard for over the last 35 years. This is but a further example of why everyone is terrified and intimidated at the medical center, and is afraid of retaliation. The concept of academic freedom no longer is tolerated. We are clearly at or over the tipping point.

Alan

PS. Charlie says he also has been talking to Leonard Abess-I will reach out to him.

UMLORD - 00040952

Message

| | |
|---|---|
| **From**: | Shalala, Donna E. [dshalala@miami.edu] |
| **Sent**: | 12/22/2012 4:58:28 PM |
| **To**: | LeBlanc, Thomas J [leblanc@miami.edu] |
| **Subject**: | Re: Alan Livingstone |

Best conclusion

Sent from my iPhone


On Dec 22, 2012, at 4:51 PM, "LeBlanc, Thomas J" <leblanc@miami.edu> wrote:

I just spoke with Alan.  He was gratified to hear that oversight of the IML investigation has moved to GC/Internal Audit and that he will be given a chance to explain his position on the matter.  He would prefer that we not initiate any other investigation regarding threats (real or implied), as there is every possibility that this whole episode was good intentions poorly delivered, and further investigation would only cause more problems for the MSOM.  He is looking forward to meeting with the investigators and explaining his position.


Tom LeBlanc
Executive Vice President and Provost
University of Miami

EXHIBIT

**19**

UMLORD - 00041456

Message
_____

**From:**      Shalala, Donna E. [dshalala@miami.edu]
**Sent:**      1/17/2013 12:48:46 PM
**To:**        Goldschmidt, Pascal (Dean - School of Medicine) [PGoldschmidt@med.miami.edu]
**Subject:**   Re: one more thing


You appointed him contain him he has to lead more productivity

Sent from my iPhone


On Jan 17, 2013, at 12:31 PM, "Goldschmidt, Pascal (Dean - School of Medicine)"
<PGoldschmidt@med.miami.edu> wrote:

> Alan is a destructive individual who has raised my faculty against me. Plenty of witnesses to testify
> to this. He is ruining my reputation. I have parents of medical student applicants who are calling me to
> find out if I am going to be kicked out of UM. Dipen Parekh does refuses to meet in the presence of Alan
> because Alan is so negative about what Dipen does, and puts his work down in front of everybody, ask
> Nimer about it... Alan is destroying everything I have built at UM.  There is a decision to be made.
> Pascal
>
> -----Original Message-----
> From: Shalala, Donna E. [mailto:dshalala@miami.edu]
> Sent: Thursday, January 17, 2013 9:07 AM
> To: Goldschmidt, Pascal (Dean - School of Medicine)
> Subject: RE: one more thing
>
> I talked with Joe--he talked with Alan--Alan has always hated Sinai based on his previous experience
> with them--we know that and he says the same thing whenever the name is mentioned--Don't Trust Steve S.
> Nothing new in his position.  Alan has a big job to get productivity up--
>
> -----Original Message-----
> From: Goldschmidt, Pascal (Dean - School of Medicine) [mailto:PGoldschmidt@med.miami.edu]
> Sent: Thursday, January 17, 2013 6:32 AM
> To: Shalala, Donna E.
> Subject: Fwd: one more thing
>
> Donna, we should talk about this. Alan is campaigning against me and yesterday at a meeting with Nimer,
> Lubarsky and Cote, was opposing our efforts to work with Steve Sonenreich to bring Sylvester at MSMC.
> Support from the President and Trustees is needed. Pascal
>
> Pascal J. Goldschmidt, M.D.
> Senior Vice President for Medical Affairs and Dean University of Miami Miller School of Medicine Chief
> Executive Officer, University of Miami Health System (UHealth)
>
> Begin forwarded message:
>
> From: "Goldschmidt, Pascal (Dean - School of Medicine)"
> <PGoldschmidt@med.miami.edu<mailto:PGoldschmidt@med.miami.edu>>
> Date: January 17, 2013, 6:19:25 AM EST
> To: "Natoli, Joe" <jnatoli@miami.edu<mailto:jnatoli@miami.edu>>
> Subject: Re: one more thing
>
> Joe,
> You and I should talk about this.
> Thanks,
> Pascal
>
> Pascal J. Goldschmidt, M.D.
> Senior Vice President for Medical Affairs and Dean University of Miami Miller School of Medicine Chief
> Executive Officer, University of Miami Health System (UHealth)
>
> On Jan 17, 2013, at 6:05 AM, "Natoli, Joe" <jnatoli@miami.edu<mailto:jnatoli@miami.edu>> wrote:
>
> Fyi.
>
> From: Livingstone, Alan [mailto:ALivings@med.miami.edu]
> Sent: Wednesday, January 16, 2013 8:57 PM
> To: Natoli, Joe
> Subject: RE: one more thing
>
> Joe,
>
> I agree. This is very important- way too much energy is being expended on negativity.

EXHIBIT
**22**

> 
> Alan
> 
> From: Natoli, Joe [mailto:jnatoli@miami.edu]
> Sent: Wednesday, January 16, 2013 6:04 AM
> To: Livingstone, Alan
> Subject: one more thing
> 
> One more thing, we have to bring faculty leadership together.  There's so much infighting, reporting of negative comments, this person is out to get that person, etc.  So much wasted productivity…  We need to set the tone that that won't be tolerated.  It's been a painful time, still is, but it's time to get back to work and use water fountain conversation to talk about patient care and other ways to improve what we do.
> 
> Let's grab a few minutes to talk about that in the days to come.

UMLORD - 00041349

Begin forwarded message:

From: "Augustyn, Cynthia Lou" <caugusty@miami.edu<mailto:caugusty@miami.edu>>
Date: July 3, 2013, 5:50:59 PM EDT
To: "Goldschmidt, Pascal (Dean - School of Medicine)" <PGoldschmidt@med.miami.edu<
mailto:PGoldschmidt@med.miami.edu>>, "Natoli, Joe" <jnatoli@miami.edu<mailto:jnat
oli@miami.edu>>, "LeBlanc, Thomas J" <leblanc@miami.edu<mailto:leblanc@miami.edu>>
Cc: "Ugalde, Aileen M" <augalde@miami.edu<mailto:augalde@miami.edu>>, "Livingstone, Alan"
<ALivings@med.miami.edu<mailto:ALivings@med.miami.edu>>, "McCafferty-Cepero, Jennifer"
<JMcCafferty@med.miami.edu<mailto:JMcCafferty@med.miami.edu>>, "Green, Rudolph H."
<r.green3@miami.edu<mailto:r.green3@miami.edu>>, "Moloney, Michael J."
<mmoloney@miami.edu<mailto:mmoloney@miami.edu>>, "Malagon, Blanca Aurora"
<bmalagon@miami.edu<mailto:bmalagon@miami.edu>>
Subject: IML report

Pascal, Joe and Tom, Compliance Concepts, the outside independent auditing company tasked with
reviewing certain allegations of inappropriate billing at the IML, has completed its report.  Virtually all
of the allegations against the IML are unfounded.  The independent auditor found no support for any
of the allegations, with the exception of non-compliance with the extremely technical requirements of
the "grandfather clause", and the dissatisfaction of one nephrologist with two of the multiple tests on
the standard treatment protocols.   As Internal Audit had found the other non-billing allegations to be
unfounded as well, this completes the review of the allegations raised about the IML.

To cover the period from 2008 through May 2013, the lab will be asked to refund $136K for the
billings that did not meet the technical grandfather clause requirements, and $227K for the two tests
that the one nephrologist claimed he did not use in treatment of his patients.

Please let me know if there are any questions.

EXHIBIT

23

LORD-001298