*EXHIBIT "O"*

```
1                IN THE UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
2
                    CASE NO. 13-22500-CIV-Altonaga/McAliley
3

4       JONATHAN LORD, M.D.,

5            Plaintiff,

6         vs.

7       UNIVERSITY OF MIAMI,

8            Defendant.
        _____/
9

10

11                           Via Zoom
                             Friday, May 6, 2022
12                           10:00 a.m. - 1:31 p.m.

13
                  VIDEOTAPED DEPOSITION OF JOSEPH NATOLI
14

15

16          Taken before Mary Ann Collier, a Court Reporter

17      and Notary Public for the State of Florida at Large,

18      pursuant to Notice of Taking Deposition filed in the

19      above cause.

20

21

22

23

24

25
```

```
1    APPEARANCES:   (Via Zoom)

2         JEFFREY H. SLOMAN, ESQ.
          JORGE A. PEREZ SANTIAGO, ESQ.
3         Stumphauzer Foslid Sloman Ross & Kolaya
          Two South Biscayne Boulevard, Suite 1600
4         Miami, FL 33131
          305-614-1400
5         jsloman@sfslaw.com
          On behalf of the Plaintiff
6
          ERIC D. ISICOFF, ESQ.
7         CHRISTOPHER M. YANNUZZI, ESQ.
          Isicoff Ragatz
8         601 Brickell Key Drive, Suite 750
          Miami, FL 33131
9         305-373-3232
          isicoff@irlaw.com
10        On behalf of the Defendant and deponent

11   ALSO PRESENT:

12        JONATHAN LORD, M.D.
          THOMAS OLENDER, Videographer
13        AILEEN UGALDE, Esq.
          JUDD GOLDBERG, Esq.

14
                     _____
15

16

17

18

19

20

21

22

23

24

25
```

1                                I N D E X

2      WITNESS                 EXAMINATION BY          PAGE

3      JOSEPH NATOLI     MR. SLOMAN                     5

4
                             E X H I B I T S
5
       FOR PLAINTIFF                              FOR I.D.
6
        Exhibit 1                                    23
7       Exhibit 2                                    26
        Exhibit 3                                    28
8       Exhibit 4                                    30
        Exhibit 33                                   32
9       Exhibit 5                                    35
        Exhibit 6                                    37
10      Exhibit 7                                    38
        Exhibit 8                                    39
11      Exhibit 9                                    40
        Exhibit 10                                   42
12      Exhibit 11                                   47
        Exhibit 37                                   48
13      Exhibit 12                                   49
        Exhibit 13                                   51
14      Exhibit 14                                   52
        Exhibit 15                                   53
15      Exhibit 16                                   55
        Exhibit 17                                   57
16      Exhibit 18                                   60
        Exhibit 19                                   62
17      Exhibit 20                                   64
        Exhibit 21                                   65
18      Exhibit 22                                   68
        Exhibit 25                                   71
19      Exhibit 38                                   76
        Exhibit 34                                   78
20      Exhibit 26                                   79
        Exhibit 35                                   82
21      Exhibit 27                                   91
        Exhibit 28                                   92
22      Exhibit 29                                   95
        Exhibit 36                                   96
23      Exhibit 30                                  102
        Exhibit 31                                  103
24      Exhibit 32                                  108

25

1          THE VIDEOGRAPHER:  Good morning.  We're going

2     on the record at approximately ten o'clock a.m.

3     on Friday, May 6th, 2022.  The audio and video

4     recording will continue to take place unless the

5     parties agree to go off the record.

6          This is the video-recorded deposition of Joe

7     Natoli.  This video deposition has been noticed

8     by the law firm of Stumphauzer, Foslid, Sloman,

9     Ross and Kolaya, counsel for plaintiff, in the

10     matter of Jonathan Lord, M.D., versus University

11     of Miami, case number 13-22500-CIV, filed in the

12     United States District Court, Southern District

13     of Florida.

14          This deposition is being taken via remote

15     video conference.  My name is Thomas Olender.  I

16     am the certified legal video specialist from

17     Valuable Video, Inc.  The court reporter is Mary

18     Ann Collier from Mary Ann Collier and Associates,

19     Inc.

20          Counsel will now state their appearances and

21     affiliations for the record, beginning with the

22     noticing attorney, and then the court reporter

23     will swear the witness in.

24          MR. SLOMAN:  Good morning.  My name is

25     Jeffrey Sloman and my colleague, Jorge Perez

```
 1          Santiago is with me, on behalf of the law firm of

 2          Stumphauzer, Foslid, Sloman, Ross and Kolaya on

 3          behalf of the plaintiff, Jonathan Lord, M.D.

 4             MR. ISICOFF:  Eric Isicoff and Christopher

 5          Yannuzzi of Isicoff Ragatz in Miami on behalf of

 6          the witness and the defendant, University of

 7          Miami.

 8             Also present is Judd Goldberg, deputy general

 9          counsel at University of Miami.

10             MS. UGALDE:  And Aileen Ugalde, general

11          counsel.

12             (Discussion held off the record.)

13   Thereupon,

14                       JOSEPH NATOLI

15   was called as a witness and, having been duly sworn,

16   testified as follows:

17                      DIRECT EXAMINATION

18   BY MR. SLOMAN:

19      Q.   Sir, would you please state your full name

20   for the record.

21      A.   Joseph Natoli.

22      Q.   And, Mr. Natoli, can you tell us a little bit

23   about your background, starting with where you

24   currently live.

25      A.   Sure.  Sure.  I live in Coral Gables,
```

1   Florida.  I grew up in New York.  Moved to South

2   Florida when I was in high school.  Spent most of my

3   working life in South Florida, with about five and a

4   half years in San Jose, California and Philadelphia,

5   before returning to Miami in 2006.

6       Q.   Would you please give us the benefit of your

7   educational background.

8       A.   I have a bachelor's degree in accounting from

9   the University of South Florida and an MBA from Nova,

10  what's Nova University now, Nova Southeastern

11  University, and I used to be a CPA.

12      Q.   Have you ever had your deposition taken

13  before?

14      A.   You know, I believe so, but don't ask me what

15  it was, because I don't remember.  But I think so.

16      Q.   Okay.  The primary purpose of my question is

17  not to probe your prior depositions and things like

18  that, but just to go over a few ground rules.

19           First of all, we're on -- this is the Zoom

20  deposition age, so the court reporter can see you, we

21  can all see you, but she needs to record audible

22  answers.  So head shakes, those types of things,

23  aren't going to do it.  So if you could please answer

24  audibly.

25           Second of all, do you have any -- I note that

1    earlier that you said you were on your personal

2    computer.  Do I have that right?

3         A.   No.  I'm on a university computer.

4         Q.   Oh, okay.  So do you have any other

5    applications open on the computer, other than --

6         A.   No.

7         Q.   So there's no notes, there's nothing --

8    there's no AIDS of any type that would help you answer

9    questions.  That's what I'm getting at.

10        A.   I have some personal notes with dates to

11   myself.

12        Q.   Okay.

13        A.   Beside the computer.

14        Q.   Did you create those in anticipation of this

15   deposition?

16        A.   Yes.

17        Q.   They weren't created at the time that you

18   worked for the University of Miami?

19        A.   No.

20        Q.   And just so I have it correct, you currently

21   work for Baptist Hospital, or whatever the

22   conglomerate name of it is?

23        A.   I work for Baptist Health South Florida, the

24   corporate headquarters.

25        Q.   Okay.  Let's start with what you did in

```
1    preparing for today's deposition.  Can you run down

2    who you met with and let's start with that.

3         A.   Okay.  I zoomed with basically the group

4    that's on this call right now.  With Eric, Judd, Chris

5    and Aileen.

6         Q.   And would you consider them your lawyers for

7    this deposition?

8         A.   You know, Eric said they were.  I assumed

9    they were the University of Miami's lawyers, so I

10   really didn't assume they are my lawyer, but they

11   were, so maybe they are.

12        Q.   The reason that I'm asking is because if they

13   were your lawyers or, you know, you work for Baptist,

14   I, you know, I've been respectful with other

15   witnesses, but I'd really like to find out, what was

16   the nature of your conversations with them?

17             MR. ISICOFF:  So I'm going to object to any

18        discussion about what was said, because I think

19        what Joe just testified to was he wasn't

20        expecting that we would be his lawyers, but we

21        indicated we were serving as his lawyers.  And I

22        think if he does not reject that representation,

23        I think it's relatively clear that we are

24        representing him and the university in this

25        deposition.
```

```
 1              And you can get any clarification with him on

 2         that, but that's how I understood his testimony.

 3         But ask away to get comfortable, if that's the

 4         case.

 5              MR. SLOMAN:  Okay.

 6    BY MR. SLOMAN:

 7         Q.  So, is that a correct representation,

 8    Mr. Natoli?

 9         A.  Yes.

10         Q.  All right.  So without divulging what you and

11    the others on this -- who have noted appearances here,

12    can you tell me what you did to prepare, without

13    divulging the nature of the conversations.

14         A.  I had a Zoom with them, actually two Zooms

15    with them, one brief, one a little bit longer, where

16    we mostly talked about the nature of the deposition

17    and how it would work, how much of my calendar I need

18    to block, et cetera.

19         Q.  Okay.  And what was the other component of

20    your preparation?

21         A.  I spent a little bit of time just thinking

22    about the questions you were likely to ask me and

23    trying to refresh my memory on what occurred ten years

24    ago.

25         Q.  Okay.  Did you review any emails from that
```

```
 1    time period?

 2         A.    No.

 3         Q.    Okay.  Let me -- let's go through your

 4    professional background.  I know that you're working

 5    for Baptist now.  Why don't we go in reverse order.

 6    Is that more helpful?  Whatever's more comfortable for

 7    you.

 8         A.    It might be easier for me to start at the

 9    beginning.

10         Q.    Fine.  I'll take that.

11         A.    Okay.  My first 30 years were spent in the

12    newspaper business for Knight Ridder, almost entirely

13    for Knight Ridder.

14         Q.    And what was the nature of that employment?

15         A.    I started as a staff accountant right out of

16    college, doing the accounting for four little

17    bi-weekly newspapers in South Florida that were owned

18    by Knight Ridder.  I then became a traveling internal

19    auditor to the corporate staff.

20              Then moved to the Miami Herald in the

21    manufacturing division to gain operational experience.

22    Became the Herald's controller.  Went back and became

23    the vice-president of operations, then the general

24    manager and then the president.

25              So I was the president of the Herald for my
```

1    last seven years there, ending in 2001, when I moved

2    to San Jose, California, to be the publisher of the

3    San Jose Mercury News, and then about three years

4    later moved to Philadelphia as publisher of the

5    Philadelphia Inquirer and the Philadelphia Daily News.

6            And then in 2006, following the sale of

7    Knight Ridder to McClatchy and the subsequent sale of

8    the Philly papers to local Philly owners, I returned

9    to Miami and joined the University of Miami as senior

10   vice-president for business and finance and CFO.  And

11   I was at UM through the end of 2016.

12           I consulted for the next six months for St.

13   George's University, which is the medical school in

14   Grenada, who I almost joined in a full-time role, but

15   didn't.

16           And then I joined Baptist Health in July of

17   2017 as executive vice-president and chief

18   administrative officer.

19       Q.   And you've been in that capacity ever since

20   July of 2017?

21       A.   Yes.

22       Q.   Okay.  Did you ever in your years, obviously,

23   not with the newspapers and not with I guess -- well,

24   it seems like there's been two segments of your

25   career, right, with publishing newspapers, for lack of

1    a better term, and then working for University of

2    Miami, Baptist, and for a short stint of consulting

3    with St. George's Medical School.  Correct?

4         A.   Yes.

5         Q.   When you worked for the University of Miami

6    and working for Baptist, did you ever undergo any

7    health care training of any type, either compliance or

8    was it necessary for your role as chief -- your CFO

9    positions?

10             MR. ISICOFF:  Object as to form.  You can

11        answer to the extent you're able.

12        A.   I spent four weeks in a Harvard exec ed

13   program on I think it was called managing health care

14   delivery systems, something like that.

15        Q.   Okay.  Other than that, did you have any

16   training in health care compliance?

17        A.   Not that I recall.

18        Q.   Did you have, when you worked for the

19   university or you worked in your capacity at Baptist,

20   did you have any other compliance training, other than

21   what you just mentioned?

22        A.   I think there is some minimal mandatory

23   compliance training, I believe, at the U and at

24   Baptist that I would have participated in.

25        Q.   That was in-house?

```
1        A.   I don't remember if the presenters were
2   employed or not.
3        Q.   All right.  You don't have any certifications
4   in health care compliance.  Correct?
5        A.   I do not.
6        Q.   Have you ever served on outside boards while
7   you were at the University of Miami?
8        A.   Yes.
9        Q.   Can you list those for us.
10        A.   I was on the board of Perry Ellis for about
11   six years.  I was on the board of Coral Gables Trust
12   Company for a brief time.  And I have been on many
13   non-profit boards over the years.
14        Q.   Still on the board of Perry Ellis?
15        A.   No.
16        Q.   When were you on the board of Perry Ellis?
17        A.   It was during my time at the university.  I
18   don't remember the exact years.
19        Q.   Okay.  And was Perry Ellis owned by
20   Mr. Feldenkreis at the time?  Was he the CEO of Perry
21   Ellis?
22        A.   It was a public company and he was the CEO.
23        Q.   And was he also on the board of the
24   University of Miami board of trustees?
25        A.   Yes.
```

```
1          Q.   I want to take you back to the 2011 time
2     period, late 2011, early 2012.  Was the University of
3     Miami board of trustees focused and concerned about
4     the finances at the University of Miami School of
5     Medicine?
6          A.   Yes.
7          Q.   Do you recall what the financial condition of
8     the University of Miami School of Medicine was at that
9     time?
10         A.   The -- at that time they were operating at a
11    deficit.
12         Q.   Okay.  You don't -- I'll show you some
13    documents and maybe they will refresh your
14    recollection.  But beyond they were operating at a
15    deficit, can you -- do you remember anything other
16    than that?
17         A.   No.
18         Q.   Were you at that time in late 2011, do you
19    recall whether you were in favor of having to lay off
20    a considerable number of employees?
21         A.   Yes.
22         Q.   And do you recall approximately how many
23    employees you believed at that time were necessary to
24    begin the process of bringing -- balancing the books
25    at the University of Miami School of Medicine?
```

```
1        A.   I believe it was about 500, plus some
2   temporary employees.  Something in that ballpark.
3        Q.   Leading into 2012 and after -- and let me
4   just back up a second.  Do you recall when Jack Lord
5   was hired as the chief operating officer of the
6   University of Miami School of Medicine?
7        A.   Yes.
8        Q.   When was that?
9        A.   Early in 2012.
10       Q.   If I told you it was March 1, 2012, does that
11  comport with your recollection?
12       A.   I don't have a recollection of the specific.
13       Q.   Okay.  That's fine.
14            Do you recall whether you advocated for Dr.
15  Lord's employment as the chief operating officer at
16  that time?
17       A.   I did.
18       Q.   And did you communicate that to the dean of
19  the medical school, Pascal Goldschmidt?
20       A.   Yes.
21       Q.   Did you also communicate that to the
22  president of the university, Donna Shalala?
23       A.   Yes.
24       Q.   Assuming that Dr. Lord was hired -- or,
25  strike that.
```

```
 1              Assuming that Dr. Lord's first day as the

 2   chief operating officer at the University of Miami

 3   School of Medicine was March 1, 2012, do you recall

 4   how soon after that date you and others began meeting

 5   to implement layoffs and structural changes at the

 6   School of Medicine to balance the books?

 7        A.   My recollection of the process is that it

 8   involved bringing in some consultants who surveyed

 9   employees on their -- how they spend their time,

10   basically, and that input was then used to decide

11   where the reductions would occur.  That was the

12   process for a relatively short period of time.

13        Q.   Was that Price Waterhouse, if you recall?

14        A.   I don't recall.

15        Q.   When you say -- if I told you that the

16   layoffs began sometime in April and then there were

17   more in May and more after that, does that sound

18   approximate?

19        A.   It does.

20        Q.   Okay.  And in implementing those, did you

21   participate in planning -- did you participate in

22   planning sessions with board members, such as Stuart

23   Miller and Leonard Abess?

24        A.   I don't recall participating in sessions with

25   them.
```

```
 1        Q.    Okay.  Do you recall participating in

 2   sessions with the president?

 3        A.    I don't recall participating in sessions with

 4   her.

 5        Q.    Did you -- do you recall organizing a meeting

 6   with the editorial board at the Miami Herald?

 7        A.    I recall participating in a meeting with the

 8   Miami Herald.

 9        Q.    And do you recall whether it was the --

10   whether -- I actually have a picture of the Miami

11   Herald article, dated May 8, 2012, and there's a

12   picture of you, the president, Dr. Lord and others

13   sitting at a conference table on Tuesday, May 8, 2012.

14   Does that -- would you take issue with that?

15        A.    I would not.

16        Q.    Okay.  And, in fact, whether the article was

17   correct or not, the headline to it says UM Medical

18   School to lay off up to 800.  Do you remember that

19   article being published in the Miami Herald?

20        A.    Yes.

21        Q.    What was the financial impact of those

22   layoffs and restructurings?

23        A.    It improved the financial performance of the

24   medical school.

25        Q.    What did it do for the bond ratings, if you
```

```
 1   recall?

 2              MR. ISICOFF:  Object as to form.

 3        A.    I don't recall.

 4        Q.    Okay.  When did you first meet Dr. Lord?

 5        A.    I think I met him first in his role at

 6   Humana, which was the manager of our employee health

 7   care.  They were the administrator of our employee

 8   health care.  I think I had interactions with him at

 9   that point.  I don't really remember that for sure,

10   but I think we had some contact.

11              I remember being introduced to him in

12   probably 2011 one day when he was meeting with the

13   provost and I was introduced to him then.  I think I

14   probably had met him previously, but this was a more

15   formal introduction.

16        Q.    Do you recall how he came to be employed by

17   the university?

18        A.    So the provost at that introduction said

19   Jack, you know, was a double UM alum, and I may have

20   met him at some alumni gatherings and things like

21   that, and that he had retired from Humana and was

22   looking to get involved at the university and so,

23   therefore, he was introducing him to me in case I had

24   thoughts in that regard.

25        Q.    Do you remember him in his role as chief
```

1    innovation officer of the university?

2         A.   Yes.

3         Q.   And I don't expect you to remember, but his

4    employment file indicates that he began in that

5    position on September 1, 2011.  Does that sound about

6    right to you?

7         A.   Yes.

8         Q.   And did you have contact with him before he

9    actually came on in his role as chief innovation

10   officer?

11        A.   My initial dealings with Jack on work, you

12   know, his doing work at the university, involved the

13   University of Miami tissue bank.

14        Q.   Can you explain what the University of Miami

15   tissue bank is.

16        A.   Yes.  So it's an operation that harvests

17   tissue from donors and processes in ways that the

18   tissue is then subsequently used in a clinical

19   environment.  And it is a department that had kind of

20   grown up within the department of orthopedics.  And I

21   was interested in the possibility of growing that

22   business.

23        Q.   And did you consult, when I say consult, did

24   you exchange ideas with Dr. Lord before, during and

25   after his coming on board as chief innovation officer?

1          A.   Yes.

2          Q.   In fact, without showing you them, you

3    wouldn't take issue with you had multiple email

4    exchanges with him concerning ideas, concerning the

5    tissue bank that predated his employment and postdated

6    his employment with the University of Miami.  Correct?

7          A.   Yes.

8          Q.   Why were you an advocate for Dr. Lord to

9    become the chief operating officer?

10         A.   When I was dealing with Jack in the early --

11   in the early days when he was getting involved with

12   the tissue bank and then innovation and we would talk

13   about opportunities to improve the performance of the

14   medical school, I generally agreed with his

15   perspective.

16         Q.   And did you, in addition to the tissue bank,

17   did you exchange ideas about the financial condition

18   of the University of Miami School of Medicine?

19         A.   Yes.

20         Q.   And did you value his input with regard to

21   ideas about how to, for lack of a better term, balance

22   the books at the University of Miami School of

23   Medicine?

24         A.   Yes.

25         Q.   After the -- assuming that Dr. Lord started

1   on March 1, 2012, assuming that layoffs were announced

2   beginning of May, my understanding is there were

3   layoffs that preceded the meeting with the editorial

4   board of the Miami Herald and layoffs that went into

5   effect after the meeting with the editorial board at

6   the Miami Herald.

7           Did there come a time where you had

8   communication issues with Dr. Lord?

9       A.   Yes.

10      Q.   Can you describe them.

11      A.   When Dr. Lord -- prior to him becoming the

12  chief operating officer at the medical school and in

13  the early months of his tenure there, we had a lot of

14  correspondence, a lot of communication.  That then

15  slowed and there were at least a couple of incidences

16  that I recall that weakened our relationship.

17      Q.   Can you describe when that occurred and what

18  happened.

19      A.   You know, I don't remember the specific

20  months.  It would have been after the layoffs.  In one

21  case I got a call from one of the attorneys in the

22  general counsel's office who said that they had had a

23  meeting with Dr. Lord involving an initiative and that

24  they were specifically told not to tell me about the

25  subject of the meeting and they didn't understand why

1    that would be the case.

2           And there was another instance where the

3    medical school and Jack were recruiting a finance

4    resource, a senior finance executive, from a health

5    system in New York for the University of Miami

6    Hospital and had committed to two years severance in

7    the event that it didn't work out, and I had

8    previously said that we would not be offering

9    severances that were that lucrative, and then they did

10   it anyway.

11          And I called Jack and said, basically, I told

12   you not to do this and you did it.  And he responded a

13   little later that evening with an email that said

14   something like you're not my boss.  I haven't had a

15   boss in a very long time, and if you ever talk to me

16   like that again, you'll be looking for another chief

17   operating officer.

18      Q.   Other than those two incidences, did you have

19   any other communication issues with Dr. Lord that you

20   recall?

21          MR. ISICOFF:  Object as to form.

22      A.   Just the communication went from a lot of

23   communication, I mean, sending me PowerPoints before

24   he's making presentations.  We had a lot of

25   communication in the early months.  And then it

```
1    dropped off dramatically and I felt like I was really

2    no longer in the know, and I was concerned with

3    whether I was getting all of the information that I

4    needed to properly discharge my responsibilities, deal

5    with rating agencies and so forth.

6              (Thereupon, the document was marked as

7              Exhibit 1 for identification.)

8    BY MR. SLOMAN:

9        Q.   Let me show you what I've marked as Exhibit

10   1, if we can put that up on the screen.  Mr. Natoli,

11   I'm showing you what's been marked as Exhibit 1 and I

12   think the way these things go is you have to start at

13   the bottom and then go up.  So this is -- is this the

14   only part of one?  All right, so that was the bottom.

15   Okay.

16             Let's start at the bottom.  I know this is

17   unfair, but if you like, let me tell you what it is

18   and then you're free to read it and then we can ask

19   questions.

20             This is an email from -- do you remember who

21   Nelson Weichold was or is?

22       A.   Yes.

23       Q.   This is dated October 17th, 2011, with regard

24   to the fiscal year 2012 forecast of the University of

25   Miami School of Medicine.  I don't intend to test you
```

```
 1    on this, because -- and I'll give you a preview of
 2    where I'm going with it.  This is an email, obviously,
 3    from Nelson to you, and then there will be an email,
 4    if you go up, from you to the president and to Tom
 5    LeBlanc.  And then that's followed by an email from
 6    you to Dr. Lord.  Again, this is before he was in his
 7    capacity as chief operating officer, so this is
 8    November, December, January, three months before he
 9    took over the role as chief operating officer.
10           And if you go down to the middle where it
11    says "This will give you a sense of the frustration I
12    live with," you wrote to Dr. Lord, basically, showing
13    him what the financial situation was and then getting
14    his assessment of your thoughts about how to tackle
15    the issue.
16           And, again, I would be glad to have you read
17    it, because I want to ask you some questions about it.
18           MR. ISICOFF:  Jeff, was this produced,
19        because I can't see the bottom?
20           MR. SLOMAN:  It was not.
21           MR. ISICOFF:  Okay.
22           THE WITNESS:  Okay.  Do you want to tell me
23        where you're going and I will decide whether I
24        need to read the whole thing.
25    BY MR. SLOMAN:
```

1    Q.   Right.  Right.  That's fair.  If you could go

2    all the way to the top.  So this is an example of the

3    exchange -- exchanges that you had with Dr. Lord

4    preceding his role as chief operating officer and his

5    thoughts about what needed to be done.  And I just

6    wanted to have you read Dr. Lord's response to you and

7    see if you recall this.

8    A.   Okay.

9    Q.   Would it be fair to say that back in October,

10   beginning of November 2011, that you were sharing

11   information with Dr. Lord and seeking his advice or

12   opinions about your thoughts on the -- what needed to

13   be done vis-a-vis the financial situation at the

14   Miller School of Medicine?

15   A.   Yes.

16   Q.   And, in fact, when you look at the beginning,

17   Dr. Lord says to you "Your analysis is spot on.  The

18   plans are optimistic and don't go far enough."

19        Did I read that correctly?  The second line,

20   do you see that?

21   A.   Yep.  Yep.  Yes.

22   Q.   And I believe he offers his thoughts as to

23   what needed to be done going beyond your

24   recommendations about the 400 FTE number, which if you

25   look at the I guess last sentence after -- yeah, "And

```
1    I don't think I would accept the 400 FTE number, but
2    that is my two cents."
3            So would it be fair to say that at this time
4    you're exchanging ideas about what needs to be done to
5    bring the financial condition of the University of
6    Miami School of Medicine to a balanced, if not
7    balanced, but a more manageable financial situation?
8        A.   Yes.
9            (Thereupon, the document was marked as
10           Exhibit 2 for identification.)
11   BY MR. SLOMAN:
12       Q.   Let me show you now what's been marked as
13   Exhibit 2.  Again, this has not been produced.  It's
14   not subject to any request for production.
15           MR. ISICOFF:  So, Jeff, we may take issue
16           with you on this.  I'm not going to take the time
17           right now to pull out the multiple requests that
18           have been served in this case.  I couldn't tell
19           you sitting here with certainty that it's
20           covered.  I would imagine these are.
21           But I'm certainly not waiving any rights that
22           we may have in connection with these items that
23           you're using in this deposition which have not
24           previously been produced.
25           But, again, I'm not going to waste the time
```

1          to pull out all the requests now.  We'll deal

2          with it at a later time.

3                 MR. SLOMAN:  Okay.

4                 THE WITNESS:  What's the distinction of

5          produced versus not produced?

6                 MR. ISICOFF:  So, Joe, to keep the

7          conversation as limited as possible, we have

8          discovery in these cases.  We send requests for

9          information to them, they send requests for

10         information to us.  There have been a bunch of

11         them in this case.  There has been a tremendous

12         amount of discovery exchanged.

13                And I'm raising the question of why these

14         items that obviously they have, because they are

15         using them with you in this deposition, have not

16         been produced to us previously.  That's the

17         question I'm raising, because I believe they

18         should have been.

19                But, again, in deference to you and not to

20         keep you here any longer here than you need to

21         be, let's keep moving on.

22                THE WITNESS:  Okay.

23     BY MR. SLOMAN:

24         Q.  Mr. Natoli, showing you what's been marked as

25     Exhibit 2.  This is an email from Dr. Lord to you,

1   dated May 1, 2012, from his gmail to your University

2   of Miami School of Medicine email address.  He says

3   "My take is..."  the subject is DES.  Is that Donna

4   Shalala?

5        A.   Yes.

6        Q.   The email is "My take is that it was a great

7   meeting and ditto for the second meeting.  Many, many

8   thanks for your efforts.  No, nothing happens by

9   accident.  This afternoon I will be doing the Stuart

10  meeting deck and finalizing the finance committee

11  meeting deck, so I do need to talk to you about

12  Nelson, but we can do that on one of our cheating

13  calls."

14           Did I read that correctly?

15       A.   Yes.

16       Q.   And you responded, "I agree.  Good meetings.

17  Lots of progress.  Holler any time."

18           Again, this is around the time that layoffs

19  are being announced.  Correct?

20       A.   Yes.

21       Q.   Do you recall what this meeting was about?

22       A.   I don't recall the meeting.

23       Q.   Okay.

24           (Thereupon, the document was marked as

25           Exhibit 3 for identification.)

```
 1    BY MR. SLOMAN:
 2         Q.   Let me show you what is marked as Exhibit 3.
 3    I want to show you -- if you could go down, Jorge --
 4    if you could just take a moment and read this.
 5         A.   Yes.
 6         Q.   Is this what you were referring to earlier
 7    concerning the communication issue that you had with
 8    Dr. Lord?
 9         A.   Yes.
10         Q.   And if you could go up, do you see your
11    response?
12         A.   Yes.
13         Q.   And if you could go up further.
14         A.   Yes.
15         Q.   Is that as far as it goes?
16         A.   Yes.
17         Q.   So this is dated June 8, 2012.  Is it your
18    testimony that after this date that your
19    communications with Dr. Lord dropped off
20    significantly?
21         A.   It dropped off over time.  I don't recall --
22    I don't recall specifically if that started right
23    after this note.
24         Q.   Okay.  And I believe that you also reference
25    some other situation that caused your communication
```

```
 1   issues to deteriorate.
 2       A.   Yes.
 3       Q.   Did it have anything to do with this?
 4       A.   No.
 5            MR. ISICOFF:  Object as to form.
 6       Q.   When I say this, I'm referring to the June
 7   8th conversation reflected in Exhibit 3.
 8       A.   The two instances were not connected to my
 9   knowledge.
10       Q.   Do you recall when the other incident
11   happened?
12       A.   I don't.
13            (Thereupon, the document was marked as
14            Exhibit 4 for identification.)
15   BY MR. SLOMAN:
16       Q.   Let me show you what's been marked as Exhibit
17   4.  Mr. Natoli, I'm showing you what's been marked as
18   Exhibit 4, which is an email from Dr. Lord to you,
19   dated June 12, 2012.  Do you see that?
20       A.   Yes.
21       Q.   This is following that Exhibit 3, dated June
22   8, 2012.  Correct?
23       A.   Yes.
24       Q.   And Dr. Lord is providing you, "Just want to
25   give you a heads up of our plan for tomorrow" and
```

```
 1    itemizes a couple bullet points with regard to a

 2    meeting, I believe, with Leonard.  Leonard is Leonard

 3    Abess.  Correct?

 4        A.  Yes.

 5        Q.  "...and additional time with Stuart."  Stuart

 6    Miller, is that who is referred to as Stuart?

 7        A.  Yes.

 8        Q.  And this involved financial information that

 9    apparently one or both were interested in receiving.

10    Correct?

11        A.  Yes.

12        Q.  And at the end, Dr. Lord says, "Given one

13    hour and complexity of a full deep dive on the AOA."

14    The AOA was what?

15        A.  The annual operating agreement with the

16    Jackson Health System.

17        Q.  Okay.  And he suggests that that will need to

18    be handled at another meeting.  Correct?

19        A.  Yes.

20        Q.  Do you remember having that meeting with Dr.

21    Lord the next day with Mr. Abess and Mr. Miller?

22        A.  No, I don't remember the specific meeting.

23        Q.  But you wouldn't take issue that it took

24    place.  Correct?

25        A.  Right.
```

```
1          Q.   And you wouldn't take issue with the fact

2     that it was you and Dr. Lord who attended that meeting

3     with Mr. Abess and Mr. Miller.  Correct?

4          A.   You know, as I said, I don't recall the

5     specific meeting.  But if the calendars say I was

6     there, I am sure I was there.

7               (Thereupon, the document was marked as

8               Exhibit 33 for identification.)

9     BY MR. SLOMAN:

10         Q.   Let me show you now, going a little bit out

11    of order, showing you what's been marked as Exhibit

12    33.  Mr. Natoli, I'm showing you what's been marked as

13    Exhibit 33.  This is a letter to Dr. Lord from Pascal

14    Goldschmidt concerning Dr. Lord's increase in duties

15    and responsibilities and an increase in his pay level.

16              Were you aware that he received a promotion

17    on July 3, 2012?

18         A.   Yes.

19         Q.   Did you have anything to do with it?

20         A.   I don't remember specifically.

21         Q.   But you in your role as chief financial

22    officer at the university you would have been aware of

23    it at the time.  Correct?

24              MR. ISICOFF:  Object as to form.

25         A.   Yes.
```

1       Q.   It says, I'm referring to I think it's the

2    third paragraph down, it says "You already hold the

3    title chief operating officer for the medical center."

4            Do you see that?

5       A.   Yes.

6       Q.   "This appointment was made at the sole

7    discretion of the senior vice-president for medical

8    affairs and the dean of the Miller School of Medicine

9    and may be rescinded at any time at his sole

10   discretion.  In addition, the University of Miami

11   board of trustees approved your appointment as the

12   university vice-president for medical administration

13   effective June 1, 2012."

14           Did I read that correctly?

15      A.   Yes.

16      Q.   And would this type of letter, would you, in

17   your role as chief operating officer, would this have

18   been something that you would have discussed with the

19   president of the university?

20           MR. ISICOFF:  Object as to form.

21      A.   I was the chief financial officer, and so,

22   no, not necessarily.  She could, you know, a change

23   that Pascal was making at the medical school with

24   President Shalala's approval, I may be aware of it,

25   but, you know, I'm not approving.  That was not my

```
 1    role.

 2              MR. SLOMAN:  Can you go up further, Jorge.

 3         I'm sorry.  The other way.

 4    BY MR. SLOMAN:

 5         Q.   Can you read the first paragraph.

 6         A.   "Since taking on the role of chief operating

 7    officer for the medical center in March of this year,

 8    you have driven both a fiscal and cultural turnaround

 9    and set the path for continued transformation of our

10    medical school and health system.  Consistent with the

11    organization of our medical center and delaying of the

12    organization, you also have taken on additional

13    responsibilities and director oversight of UHealth's

14    hospitals, the role of the chief compliance officer

15    for the medical center and oversight for patient

16    experience, marketing and strategy."

17         Q.   Does that -- first of all, do you agree with

18    that particular paragraph as written by Dr.

19    Goldschmidt?

20         A.   Yes.

21         Q.   Go down further, Jorge.  Okay, you see before

22    the break on page 1 "You will continue to report

23    directly to the senior vice-president for medical

24    affairs and dean of the Miller School of Medicine."

25              Did I read that correctly?
```

```
 1          A.   Yes.
 2          Q.   As far as you know, are you aware of any
 3     documentation that required Dr. Lord to report to you
 4     directly?
 5          A.   No.
 6          Q.   If you can go to the second page.
 7               And do you see in the personal package
 8     commitments that his annualized compensation was
 9     raised from $763,776 to $913,776?  Do you see that?
10          A.   Yes.
11          Q.   If you could go to the bottom, page 3.  And
12     near the bottom, Dr. Goldschmidt wrote, "Jack, the
13     past several months have been transformational for the
14     School of Medicine and for UHealth.  Your tireless
15     dedication to leading our school to greatness has made
16     all the difference.  I greatly look forward to
17     continuing this journey with you as a partner."
18               Did I read that correctly?
19          A.   Yes.
20               (Thereupon, the document was marked as
21               Exhibit 5 for identification.)
22     BY MR. SLOMAN:
23          Q.   Let's go to Exhibit 5.  Exhibit 5.
24     Mr. Natoli, I'm showing you what's been marked as
25     Exhibit 5.  And without -- I don't expect you to
```

1    remember this, but the subject line, it's from Dr.

2    Lord to his -- Miriam Barros was Dr. Lord's secretary,

3    if I'm not mistaken.  Do you recall?

4         A.   Yes.

5         Q.   And do you see that apparently as of July 25,

6    2012, you had made a request to meet with Dr. Lord and

7    to shadow him?  Do I have that correct?

8         A.   That's -- yes, that's what the emails say.

9         Q.   Okay.  Do you remember that incident at all?

10        A.   I don't.

11        Q.   All right.  Do you remember -- do you know

12   why you would have been shadowing Dr. Lord?

13        A.    In general, I was trying to build my

14   understanding of the medical operation.  So I did a

15   number of different things over the years to try to

16   build my understanding of it.

17        Q.   And you see Dr. Lord's response, "Great."

18   And do you recall specifically or in general whether,

19   in fact, you met with Dr. Lord and, you know, shadowed

20   him, for lack of a better term?

21        A.   I don't recall specifically.

22        Q.   Do you recall ever doing that with Dr. Lord?

23        A.   You know, I recall it in the -- I don't know,

24   several weeks when Jack was departing and we had a

25   carryover period and I worked mostly out of the

1    conference room next to his office.  I remember that.

2         I don't remember specifically, you know,

3    other meetings.  I don't remember specifically

4    shadowing him.  But, you know, I tried to continue to

5    build my understanding of the medical operation,

6    because this was -- this was something where I had a

7    lot to learn.

8         (Thereupon, the document was marked as

9         Exhibit 6 for identification.)

10   BY MR. SLOMAN:

11        Q.  Let me show you Exhibit 6.  Mr. Natoli, I'm

12   showing you Exhibit 6, which purports to be an email

13   from Dr. Lord to the president and to you, dated

14   August 6, 2012, subject "Comments on meeting with John

15   Sory."  Do you see that?

16        A.  Yes.

17        Q.  And do you remember, I guess this was in

18   relation to hiring John Sory.  Is that correct?

19        A.  Yes.

20        Q.  And did you meet with Dr. Lord and John Sory

21   and the president and eventually hire John Sory?

22        A.  You know, again, I don't remember the

23   specific meetings, but I know John Sory.  I met with

24   him many times and we did hire John Sory.

25        (Thereupon, the document was marked as

```
 1              Exhibit 7 for identification.)

 2    BY MR. SLOMAN:

 3         Q.   Okay.  Let me move on to Exhibit 7.  I'm

 4    showing you what's been marked as Exhibit 7, which is

 5    an August 13, 2012, email, re package retrospective

 6    analysis, from Dr. Lord to you.  "Joe, know that you

 7    asked for the documents for tomorrow in advance.  The

 8    package analysis is very sensitive.  I have discussed

 9    with Pascal and given him a variety of confidential

10    information that has, quote/unquote, escaped our

11    control.  I've recommended that we hand out the

12    information and not distribute it electronically."  It

13    goes on, "I will be glad to spend time on deep dive

14    after we have presented tomorrow."

15              Do you see that?

16         A.   Yes.

17         Q.   Do you recall this type of information being

18    communicated from Dr. Lord to you?

19         A.   Yes.

20         Q.   This, obviously, reading the emails thus far,

21    through the summer of 2012, are there any

22    communication issues that you're having with Dr. Lord

23    at this period of time following the June 8, 2012,

24    incident that we referred to in Exhibit 3?

25         A.   You know, as I said, the communication slowed
```

```
 1    over time.  I don't recall the specific dates that

 2    that occurred.

 3         Q.   Do you recall Dr. Lord ever ignoring an email

 4    from you?

 5         A.   I don't recall that specifically.

 6              (Thereupon, the document was marked as

 7              Exhibit 8 for identification.)

 8    BY MR. SLOMAN:

 9         Q.   Let me show you what's been marked as Exhibit

10    8.  Mr. Natoli, I'm showing you what's been marked as

11    Exhibit 8.  This is an email dated August 16, 2012.

12    First at the bottom it's from Pascal Goldschmidt to

13    the president, cc'ing you, Dr. Lord and Steven

14    Falcone.  Do you see that?

15         A.   Yes.

16         Q.   And the subject is AOA approved.

17         A.   Yes.

18         Q.   And do you recall what that was referring to?

19         A.   I assume this was Jackson approving the

20    annual operating agreement.

21         Q.   And on August 16th at 9:31 p.m. you wrote,

22    "Pascal, Congrats to you and your team.  Great job."

23              Did I read that correctly?

24         A.   Yes.

25         Q.   And Dr. Lord responded to you specifically at
```

```
 1    10:04 p.m., "Thanks, Joe.  A lot of credit goes to

 2    Steve for steadfastness.  It is great to have him

 3    completely focused on making this relationship work."

 4           Did I read that correctly?

 5    A.   Yes.

 6    Q.   Again, this is not an example of having

 7    communication issues with Dr. Lord, is it?

 8           MR. ISICOFF:  Object as to form.

 9    A.   This email says what it says.  I don't know.

10    I don't know what else I can tell you.

11           (Thereupon, the document was marked as

12           Exhibit 9 for identification.)

13    BY MR. SLOMAN:

14    Q.   Let me show you now what's been marked as

15    Exhibit 9.  Exhibit 9 is dated September 9, 2012.

16    This is from Dr. Lord to you, copying Pascal

17    Goldschmidt, Nelson Weichold and Jennifer

18    McCafferty-Cepero, subject "Getting ready for

19    September 25th."

20           Do you see that?

21    A.   Yes.

22    Q.   Was September 25th a board meeting of some

23    sort do you recall?

24    A.   I don't recall.  But that's what this email

25    would suggest.
```

```
 1        Q.   And do you recall who Jennifer
 2   McCafferty-Cepero is or was at the time?
 3        A.   Yes.
 4        Q.   Was she the chief medical compliance officer
 5   at the university?
 6        A.   I think that was her role at that time.
 7        Q.   Okay.  And do you also know her as Jennifer
 8   McCafferty-Fernandez?
 9        A.   Yes.
10        Q.   Subsequent to this or around this time, I
11   don't know when she got married, but she got married
12   to Rudy Fernandez.  Correct?
13        A.   Yes.
14        Q.   Okay.  Again, the email from Dr. Lord to you
15   reads:  "Hi, Joe.  Looking for some insights.  Sure
16   that Pascal, Nelson, Jen and I will be on agendas for
17   upcoming board meetings.  Describing, one, audit and
18   compliance, two, finance executive."
19             He concludes "Planning on working framework
20   for these beginning this week and want to be sure that
21   we meet everyone's needs.  Look forward to your
22   thoughts."
23             Did I read that correctly?
24        A.   Yes.
25             (Thereupon, the document was marked as
```

```
 1            Exhibit 10 for identification.)

 2    BY MR. SLOMAN:

 3        Q.   Let's go now to Exhibit 10.  I'm showing you

 4    what's been marked as Exhibit 10, which is an email

 5    dated five days later from Dr. Lord to you.  I don't

 6    know why this -- I guess this wasn't produced to us by

 7    the university, because it's on Dr. Lord's gmail

 8    address, but there is no Bates number.

 9            The subject, "A number of issues to catch up

10    on."  Do you see at the bottom it says, "Problem at TB

11    of and general discussion about August narrative.  Any

12    time tomorrow."

13            Do you see that?

14        A.   Yes.

15        Q.   TB would have been the tissue bank?

16        A.   Yes.

17        Q.   And, again, as we discussed earlier, you and

18    Dr. Lord had consulted before his employment, during

19    his employment as COO about issues regarding the

20    tissue bank.  Correct?

21        A.   Yes.

22        Q.   And you responded at 8:22 p.m., "Oh, no.  I

23    just brought Leonard up to speed on current results.

24    Bankers, HCA."  You ask "How bad a problem?"  And Dr.

25    Lord responded to you.  Apparently, this was going
```

```
 1    into a I think a game day for the University of Miami
 2    football team.  Does that sound correct?
 3         A.   Yes.  First game.  First home game it looks
 4    like.
 5         Q.   Right.  It would have been September 15,
 6    2012.  I don't know who they played at that time.
 7              And, apparently, you both scheduled an 8:30
 8    a.m. call.  Does that sound right?
 9         A.   Yes.
10         Q.   For Saturday, the 15th.  Correct?
11         A.   Yes.
12         Q.   If you go up further, you responded at 8:33
13    p.m., "Ugh is right.  Talk tomorrow.  I'll call your
14    cell at 8:30."  And then you describe I guess
15    conversations with Leonard and Manny.  Leonard being
16    Leonard Abess.  Correct?
17         A.   Yes.
18         Q.   And Manny being Manny Kadre.  Correct?
19         A.   Yes.
20         Q.   And you indicated "It was good that I could
21    give him positive August results."
22              Did I read that correctly?
23         A.   Yes.
24         Q.   And does that -- is that reference meaning
25    positive August financial results?
```

```
 1            A.    Yes.

 2            Q.    And the positive August financial results

 3     were, at least in part, the result of the layoffs and

 4     the restructuring that occurred in the spring of 2012.

 5     Correct?

 6            A.    Yes.

 7            Q.    And Dr. Lord at the top, which would have

 8     been at 8:48 p.m., responded to you, "We need to stay

 9     aligned.  I'm thinking about taking two million from

10     contingency to work on rev cycle and billing."

11            Did I read that correctly?

12            A.    Yes.

13            Q.    Do you know what that was in reference to?

14            A.    Yes.  There was the thought that we could

15     have a return on investment from a consulting project

16     focused on rev cycle and billing.

17            Q.    Again, you and Dr. Lord are in what seemed to

18     be constant communication, at least as of September

19     14th, 2012.  Correct?

20            MR. ISICOFF:  Object as to form.

21            A.    I'm just reading these specific emails, so

22     these specific emails that you're showing me, yes,

23     indicate we were communicating.

24            Q.    Well, let me ask you, at this point, that

25     September, middle of September 2012, and, again, I'm
```

```
 1   showing you representative samples of emails, I would
 2   be curious as to whether or not you had ever
 3   complained in an email to Dr. Lord that he was either
 4   being unresponsive or noncommunicative, if you recall?
 5       A.   I don't recall.
 6       Q.   Or that you complained to him about cutting
 7   off any relationship with you.  Do you recall anything
 8   like that?
 9       A.   I don't.
10            MR. ISICOFF:  Jeff, if we're in a good spot,
11       we're a few minutes past 11, if we can take a
12       short break.  I was anticipating for you to take
13       a pause.
14            MR. SLOMAN:  You picked a good time.
15            THE VIDEOGRAPHER:  This marks the end of
16       video file number one.  The time is 11:06 a.m.
17       and we're going off the record.
18            (Thereupon, a brief recess was taken, after
19       which the following proceedings were had:)
20            THE VIDEOGRAPHER:  We're back on the video
21       record.  This is the start of video file number
22       two of the deposition of Joe Natoli.  The time is
23       11:18 a.m.
24   BY MR. SLOMAN:
25       Q.   Mr. Natoli, I'd like to just go back very
```

```
 1    briefly to Exhibit 10, and where the cursor is right
 2    now, at 8:33 p.m. on September 14th you wrote to Dr.
 3    Lord, "All in all, an uneventful meeting."  I guess,
 4    and correct me if I'm wrong, you're referring to the
 5    meeting with Mr. Abess and Mr. Kadre.  Correct?
 6         A.   Yes.
 7         Q.   You wrote "Prepared them for downgrade."
 8              What did you mean by that?
 9         A.   A rating agency.  Ratings of the university.
10         Q.   Right.  It goes on, "Some of our ratios are
11    abysmal due to weak reserves and unfunded pension
12    liability."
13              Did I read that correctly?
14         A.   Yes.
15         Q.   "Losing A rating, if it happens, will get
16    attention of others on board, even though borrowing
17    costs will still be very attractive."
18              Did I read that correctly?
19         A.   Yes.
20         Q.   And did you, in fact, prepare Mr. Kadre and
21    Mr. Abess that at least as of September 14, 2012,
22    there is a possibility that, due to these financial
23    conditions, the university might lose it's A rating,
24    which, theoretically, could affect borrowing costs,
25    even though rates were attractive at that time?
```

```
1    Correct?
2         A.   Yes.
3         Q.   All right.  Thank you.
4              (Thereupon, the document was marked as
5              Exhibit 11 for identification.)
6    BY MR. SLOMAN:
7         Q.   Now moving on to Exhibit 11, I'm showing you
8    what's been marked as Exhibit 11, from Dr. Lord to
9    you, which is I guess game day, Saturday, September
10   15th, 2012, subject line "Good win."
11             Do you see that?
12        A.   Yes.
13        Q.   And Dr. Lord says to you "Hope you are dry."
14             Did I read that correctly?
15        A.   Yes.
16        Q.   Do you recall whether it was a rainy game
17   that day?
18        A.   I don't recall that day.
19        Q.   It all fits together.  Right?
20        A.   No.  There was a game where it poured like
21   crazy.  I couldn't tell if you that was September 15th
22   of 2012 or not.
23        Q.   Yeah.  I think I was there.
24             All right.  Let's move on.
25             (Thereupon, the document was marked as
```

```
 1            Exhibit 37 for identification.)

 2    BY MR. SLOMAN:

 3        Q.   Showing you now, going a little bit out of

 4    order, Exhibit 37.  I'm showing you what's been marked

 5    as Exhibit 37, which is an email from you at 10:07

 6    a.m. on September 25th, 2012 where you wrote at the

 7    bottom, "A video for finance/exec.  Please watch time

 8    and mood in the room.  Could be good or feel out of

 9    place.  Need an audible at the line of scrimmage."

10            Do you recall where you were and what you're

11    talking about at this time?

12        A.   I don't recall this.  It sounds like there

13    was the thought of presenting a video and the question

14    was whether there would be time for it or not.

15        Q.   And this was at the September 25th board --

16    was it a board meeting or audit meeting?

17        A.   Yeah.  You know, I don't recall, but it looks

18    like finance -- it's probably a combined finance and

19    executive committee meeting.

20        Q.   Okay.  And would it be fair to say that you

21    emailed Dr. Lord from the meeting?

22        A.   I don't know that.  I can't tell from this

23    email whether that's the case or not.

24        Q.   Okay.  Were these meetings accessible online?

25        A.   Back then I think it was just people could
```

1    call in.  This was pre-Zoom.  Right?  So I assume this

2    is talking about a video that was going to be shown,

3    not a, hey, you're going to be calling in via Zoom or

4    something like that.

5        Q.   Yeah.  The reference from you to Dr. Lord is

6    "Please watch time and mood in the room."

7             You don't know what you were referring to.

8    Correct?

9        A.   Well, no.  I'm referring to at that meeting,

10   right, the combined finance/exec meeting, watch the

11   time and the mood in the room to determine whether

12   there's -- does the video fit in or not.  I don't know

13   that I'm in the meeting when I'm sending him this.

14       Q.   Okay.  And Dr. Lord -- it appears that Dr.

15   Lord responded two minutes later, "Yep.  Left you a V

16   mail.  What is moot?"

17            Did I read that correctly?

18       A.   Yes.

19       Q.   All right.

20            (Thereupon, the document was marked as

21            Exhibit 12 for identification.)

22   BY MR. SLOMAN:

23       Q.   Let me show you now what's been marked as

24   Exhibit 12.  I'm showing you what's been marked as

25   Exhibit 12, which is an email from you to Magaly

1    Robitaille and Pascal Goldschmidt.  Do you recall who

2    Magaly Robitaille was at that time?

3         A.   Yes.

4         Q.   Was she Dr. Goldschmidt's secretary or

5    assistant?

6         A.   Yeah.  Yes.

7         Q.   Okay.  And you wrote to her "Thanks for

8    returning my call.  I understand Pascal is doing a

9    procedure.  Leonard Abess emailed asking about the

10   status of several things, including the med school

11   CFO.  I spoke with Jack and summarized his and my

12   thoughts.  With Pascal's concurrence, I will send the

13   note below to Leonard."  And then there's a proposed

14   email to Mr. Abess.  Correct?

15        A.   Yes.

16        Q.   And this is something that you and Dr. Lord

17   worked on together?

18        A.   Can you go up to the top of that?  Or is that

19   the top?

20        Q.   Yeah, that is.

21        A.   I assume that's true.

22        Q.   Right.  You wrote to Maggie "I spoke with

23   Jack..."

24        A.   Spoke with Jack, yes.

25        Q.   "...and summarized his and my thoughts

```
 1    below."  Right?

 2         A.   Yes.  Yes.

 3         Q.   And then you forward that email with regard

 4    to what you were going to write to Mr. Abess to

 5    President Shalala.  Correct?

 6         A.   Yes.

 7         Q.   All right.

 8              (Thereupon, the document was marked as

 9              Exhibit 13 for identification.)

10    BY MR. SLOMAN:

11         Q.   Let's go to Exhibit 13.  Go to the bottom.

12    Exhibit 13 starts with an email from you to Leonard

13    Abess.  Correct?

14         A.   Yes.

15         Q.   Again, this is the email that you and Jack

16    worked on together.  You then forwarded it on to

17    Mr. Abess on October 3, 2012, at 3:36 p.m.  Correct?

18         A.   Yes.

19         Q.   And then as we go up, Mr. Abess responded,

20    "It sounds good."  You then forwarded it on to Dr.

21    Lord, and Dr. Lord responded, "Thanks.  Reasonably

22    positive."

23              Did I read that correctly?

24         A.   Yes.

25              (Thereupon, the document was marked as
```

```
 1              Exhibit 14 for identification.)
 2    BY MR. SLOMAN:
 3         Q.   Let's go to Exhibit 14, which is an email,
 4    dated October 4, 2012, the subject line McKinsey.  Do
 5    you see that?
 6         A.   Yes.
 7         Q.   And first of all, do you recall what McKinsey
 8    was?
 9         A.   Yes.
10         Q.   What was McKinsey?
11         A.   A consulting company.
12         Q.   What type of consulting did they do, do you
13    remember?
14         A.   They do all sorts of stuff.  At UM, in this
15    reference I believe it was rev cycle.
16         Q.   Revenue cycle.  Correct?
17         A.   Yes.
18         Q.   All right.  And at 4:44 p.m. you wrote to Dr.
19    Lord, "I mentioned the McKinsey Consulting engagement
20    to Leonard our intention to have them present at an
21    upcoming board meeting and offered him the opportunity
22    to speak with them.  He'd like to do that.  Want to
23    connect him with Paul Mango."  I don't know if you
24    pronounce it Mango or whatever.  "It would be good for
25    him to have ownership of their assessment."
```

```
 1                    Did I read that correctly?

 2        A.    Yes.

 3        Q.    And Dr. Lord responded to you approximately

 4   14 minutes later, "Of course - I will coordinate with

 5   Nelson.  I think either you or I should be on the

 6   phone with Paul and Leonard.  It would be great to

 7   have insights about Leonard's interest in advance.

 8   Many thanks."

 9                    Did I read that correctly?

10        A.    Yes.

11        Q.    That is as of October 4th, 2012.

12                    (Thereupon, the document was marked as

13                    Exhibit 15 for identification.)

14   BY MR. SLOMAN:

15        Q.    Let's go on to Exhibit 15.  I'm showing you

16   what's been marked as Exhibit 15.  This is regarding

17   Deloitte proposal for readiness assessment.  And if

18   you go down to the bottom, it starts with an email

19   from Betty Fleurimond.  I don't know if you remember

20   who Betty Fleurimond was.

21                    And it was an email to Jack George, not Jack

22   Lord, but to Jack George and a number of others,

23   including Mr. Shipley.  And I believe Mr. Jack George

24   then forwards it -- if you go up a little bit,

25   Jorge -- then forwards it to you.
```

```
 1              Do you recall what this email referenced or
 2   involved?
 3        A.   It says ERP readiness assessment.
 4        Q.   Right.  If you could go up a little bit more.
 5   Okay.  In the email -- if you can go up further --
 6   okay -- so at 8:00 p.m. you wrote to -- I'm sorry.
 7   I'm a little confused here.  Right, at 8:00 p.m. you
 8   wrote to Dr. Lord, "I wanted to stop by when done, but
 9   I guess would be up running late or something like
10   that.  We have S and P tomorrow, then Mark discussion
11   later in day."
12              Do you know what you were referring to, "We
13   have S and p tomorrow?"
14        A.   It would have been Standard and Poors, a
15   rating agency.
16        Q.   And what was the significance of that?
17        A.   The rating agency reviews ultimately led to,
18   you know, the consideration of the rating.
19        Q.   Okay.  And a negative, if you drop below an A
20   rating, then that would affect your ability to borrow
21   money on the open market.  Is that correct?
22        A.   It's -- yes, it has an effect.
23        Q.   And you were communicating to Dr. Lord in the
24   second paragraph.  "I'm asking the controller's office
25   to focus on the period 2005 to 2012 and trying to get
```

 1    financial information."  Correct?

 2         A.   Yes.

 3         Q.   All right.  And if you go to the top, Dr.

 4    Lord responded to you approximately nine minutes

 5    later.  It says, "Got it.  Will work with Pascal to

 6    unstick as much as I can."  And, basically, is telling

 7    you that he's going to try and get you the financial

 8    information that you need.  Is that right?

 9         A.   Yes.

10              MR. ISICOFF:  Object as to form.

11         Q.   Your answer is yes?

12         A.   Yes.

13              (Thereupon, the document was marked as

14              Exhibit 16 for identification.)

15    BY MR. SLOMAN:

16         Q.   Let's now go to Exhibit 16, this is the next

17    day, dated October 6th.  I'm sorry.  I actually have

18    it out of order.  But, in any event, I'm showing you

19    what's been marked as Exhibit 16.  Actually, this came

20    before, but, irregardless, this is an email dated

21    October 6th from you to Dr. Lord where you wrote "I

22    ran into (not literally -- but almost) Stuart Miller

23    while cycling this morning.  He was chipper and very

24    positive about the trajectory of the university and

25    medical school.  It was nice to hear and I figured you

```
 1    would want to hear as well.  Donna said Bill Morrison
 2    and others in Chicago were positive, too.  Now all we
 3    need is a W tonight."
 4              Did I read that correctly?
 5         A.   Yes.
 6         Q.   Do you recall talking to Stuart Miller about
 7    the finances at the university and the medical school?
 8              MR. ISICOFF:  Object as to form.
 9         A.   Yes.  I don't recall this specific cycling
10    interaction.  But, yes, I had interactions with Stuart
11    Miller often.  Often, I don't know.
12         Q.   Right.  But would it be fair to say that this
13    was that you and others at the university who were
14    dealing with board members were constantly in
15    communication with them regarding the school's
16    finances, especially coming off the layoffs in May of
17    2012?  Correct?
18              MR. ISICOFF:  Object as to form.
19         A.   I would say everyone was pleased that the
20    finances at the medical school had improved.
21         Q.   Okay.  And this was an example of that?
22              MR. ISICOFF:  Object as to form.
23         A.   Yes.
24         Q.   And you see Dr. Lord responded "Great to
25    hear!"  Correct?
```

```
 1         A.   Yes.

 2              (Thereupon, the document was marked as

 3              Exhibit 17 for identification.)

 4   BY MR. SLOMAN:

 5         Q.   Let's go to Exhibit 17.  This is an email

 6   from Dr. Lord to you, dated November 5, 2012.

 7   Actually, this is from you to Dr. Lord, dated November

 8   5, 2012 -- I'm sorry.  Strike that.

 9              You see at the bottom, Mr. Natoli, 10:32

10   a.m.?

11         A.   Yes.

12         Q.   It says, subject, "How are you feeling?"

13         A.   Yes.

14         Q.   All right.  This is from Dr. Lord to you on

15   Monday, November 5, 2012, at 10:32 a.m., asking how

16   you were feeling and you responded.  Correct?

17         A.   Yes.

18         Q.   Do you recall what generated this

19   conversation?

20         A.   I believe this -- let me read this a little

21   more -- this was the date of the Dolphin's cycling

22   challenge where folks, myself included, jump on

23   bicycles.  It's a fundraiser for Sylvester.

24         Q.   This is associated with Jim Mandich's

25   foundation or his son's foundation?
```

```
 1        A.   Not exactly.  But Jim Mandich was an

 2    inspiration for it and his son wound up running the

 3    operation that put the event on for a number of years.

 4        Q.   Okay.  In addition to asking you how you were

 5    feeling and you're responding, you also responded

 6    that, in the second paragraph on another subject, "I

 7    spent time with Al Matthews this morning catching up

 8    on the TB..."  Is that the tissue bank?

 9        A.   Yes.

10        Q.   "...and so many issues.  The tissue bank

11    desperately needs strong management.  Have any

12    candidates in mind?"

13             And Jack responded approximately 13 minutes

14    later, "Sorry.  How about setting a time to meet on UM

15    TB?"

16             That's the University of Miami tissue bank.

17    Correct?

18        A.   Yes.  You know, just to be clear, there

19    continued to be communication between Jack and me.

20    Right?  Had to be.  We were both in very senior roles.

21    But there was not the forthcoming communication that

22    existed early in our relationship.

23             You know, I would go to board meetings and

24    learn things in board meetings.  So, you know, we, you

25    know, we continued to have a relationship and to
```

```
 1    communicate with one another and, you're, obviously,

 2    you're showing me many examples of that.

 3        Q.   Right.  And I'm not cherry picking them, by

 4    the way.  There's many, many, many more.  I'm looking

 5    for evidence that there was a drop-off or that he

 6    refused to communicate with you.

 7        A.   He was -- I mean, he was running a very large

 8    percentage of the university and I was the CFO, so,

 9    you know, there had to continue to be communication.

10    It's the drop-off was in proactive consultation from

11    what it was in the early days.

12        Q.   Okay.  So did you ever complain to him about

13    that?

14        A.   Not that I recall specifically.

15        Q.   Okay.  How about generally?

16        A.   No.  I tried to avoid conflict with Dr. Lord.

17    You know, in his note to me, he basically threatened

18    to resign, and he didn't work for me, and so I did not

19    want to be the cause of him resigning through our

20    interactions.  That was for his bosses to decide.  So

21    I tried my best to continue to have an amicable

22    relationship.

23        Q.   Right.  And I respect that and we reviewed

24    that June 8th email.  But my question is that is there

25    any evidence in emails, in memos, anything that you
```

```
 1    can think of that reflected that he had either cut off

 2    relationships with you or that he was unresponsive to

 3    you and/or other members in leadership at the

 4    university?

 5            MR. ISICOFF:  Object as to form.

 6        A.   I don't know of emails that say that.

 7        Q.   And you didn't document it in any memo of any

 8    type.  Correct?

 9            MR. ISICOFF:  Object as to form.

10        A.   Not that I recall.

11            (Thereupon, the document was marked as

12            Exhibit 18 for identification.)

13    BY MR. SLOMAN:

14        Q.   Let me show you now what's been marked as

15    Exhibit 18.  I'm showing you what's been marked as

16    Exhibit 18, which is an email, dated November 6, 2012,

17    regarding draft report for UM series 2012 AB.  Do you

18    see that?

19        A.   Yes.

20        Q.   What was draft report for UM series 2012 AB?

21        A.   The S and P report.

22        Q.   And working up, this is an email from an

23    individual named Charlene Butterfield with Standard

24    and Poor's.  Correct?

25        A.   Yes.
```

1      Q.   And announcing that they are going to release

2   the rating for the university and to expect it to be

3   published tomorrow, which would have been November

4   7th, or Thursday morning.  I assume it's either the

5   next day or the day after.  Is that correct?

6      A.   Yes.

7      Q.   And as we move up in the middle, at 6:32

8   p.m., you send an email out to a number of

9   individuals, including Dr. Lord and, actually, it's

10  from -- it's from -- I assume you sent it to Dr. Lord

11  and others.  You wrote "It's official.  We maintained

12  an A minus rating with S and P."

13          Did I read that correctly?

14     A.   Yes.

15     Q.   And you wrote congratulations to us all and

16  thanks for all your help.  Correct?

17     A.   Yes.

18     Q.   And you recall earlier you had prepared

19  Mr. Miller and Mr. Abess for a downgrade and the

20  university maintained it's A minus rating, which, I

21  suppose, was not a downgrade.  Is that right?

22     A.   Yes.

23     Q.   So, all in all, this was good financial news,

24  based on, in part, if not in whole, on the measures

25  that were taken in the spring of 2012.  Correct?

```
 1        A.   Yes.

 2             (Thereupon, the document was marked as

 3             Exhibit 19 for identification.)

 4   BY MR. SLOMAN:

 5        Q.   Let me show you now what's been marked as

 6   Exhibit 19.  I'm showing you what's been marked as

 7   Exhibit 19.  If you go to the top, this is a November

 8   12, 2012, at 9:01 p.m., Jonathan Thomas Lord wrote,

 9   and this is an update.

10             Did you remember back in the 2012 time period

11   when Dr. Lord was the chief operating officer that he

12   circulated executive daily updates?

13        A.   I don't remember daily updates.  It's quite

14   possible, but I don't recall that.

15        Q.   Do you recall ever receiving emails like this

16   that contained a subject line for progress, takeaways

17   and appreciation?  Do you remember, does this refresh

18   your recollection as to whether or not, if you didn't

19   receive them every day or every other day or

20   infrequently, did you remember receiving emails like

21   this where members of the executive C-Suite level of

22   university leaders at the University of Miami School

23   of Medicine circulated these daily updates?

24        A.   I don't recall daily updates.

25        Q.   Do you remember ever receiving anything like
```

```
1     this email?
2          A.   Yes, I recall receiving some emails like
3     this.  I couldn't tell you the frequency.
4          Q.   And I don't expect you to be able to recall.
5     But if you look at this date, November 12, 2012, under
6     the heading progress, one, two, three, four hyphens
7     down, it says "One on one with Joe Natoli.  Catch" --
8     I think that means "catch up on AOA and rev cycle.
9     Discussion about upcoming BOT."  I assume that's board
10    of trustee meetings.  "November 27 AOA and JMH
11    principals, and December 14 rev cycle and MCK, budget
12    parameters."
13              Do you see that?
14         A.   Yes.
15         Q.   And then if you go down to the bottom, it
16    says "Appreciation, Joe N."  Do you see that?
17         A.   Yes.
18         Q.   Do you remember receiving -- well, first of
19    all, I don't expect you to remember this one in
20    particular, but do you remember having meetings with
21    Dr. Lord regarding those types of issues in the fall
22    of 2012?
23         A.   Yes.  I was still, you know, the medical
24    operation was still a huge part of my
25    responsibilities, and so, you know, I did the best I
```

```
 1    could to stay involved and to continue communicating

 2    with Dr. Lord and the rest of the team there.

 3              (Thereupon, the document was marked as

 4              Exhibit 20 for identification.)

 5    BY MR. SLOMAN:

 6        Q.   Let me go on now to Exhibit 20.  I'm showing

 7    you what's been marked as Exhibit 20, which is an

 8    email from the president to you, re finance and exec

 9    meeting on September 14th.  And you wrote -- actually,

10    you began the email chain from her -- from you to her

11    where you wrote, "Jack asked for a 30 minute agenda

12    item on UHealth strategy be added to the December 14

13    finance/exec meeting in exec session."

14              Did I read that correctly?

15        A.   Yes.

16        Q.   And the president responded, "Great idea."

17    Do you see that?

18        A.   Yes.

19        Q.   Do you remember what this involved and

20    whether that was added to the agenda on December 14th?

21        A.   I don't remember that specifically.  But this

22    would have been in my role as the CFO setting the

23    agenda, gathering the materials for board meetings,

24    which was a, you know, that was a basic requirement of

25    my role at the university.
```

```
1          Q.    Okay.
2                (Thereupon, the document was marked as
3                Exhibit 21 for identification.)
4    BY MR. SLOMAN:
5          Q.    Going now to Exhibit 21, I would like to go
6    down, if you could, to -- this starts with -- go to
7    the bottom, please -- an email from Nelson Weichold to
8    Pascal, Jack and Joe.  For some reason this part of
9    this email chain was not provided to us, but, in any
10   event, it outlines from Nelson Weichold that spending
11   controls across the medical center and continued
12   strong performance at UMHC resulted in a $3.8 million
13   surplus for the month of November versus the $1.6
14   million plan.
15               Did I read that correctly?
16         A.    Yes.
17         Q.    And, going on, it says, "That places the med
18   center at a $9 million surplus on a year-to-date
19   basis, eight million ahead of plan and 33 million
20   ahead of prior year."
21               Did I read that correctly?
22         A.    Yes.
23         Q.    Was that a significant result as of the end
24   of November 2012, if you recall?
25         A.    Was it -- I'm not sure -- was it a
```

1    significant result?

2        Q.   Well, was it better than expected?

3        A.   It's eight million ahead of plan.

4        Q.   Okay.  And it was better than expected.

5    Correct?

6        A.   Well, you create the budget.  Right?  That's

7    the plan.

8        Q.   Right.

9        A.   And it was eight million ahead of the budget,

10   so that's better than the budget.

11       Q.   That's right.  And Nelson -- let's see -- it

12   says "Two attachments are included in this email.

13   Normal preliminary packet and the proposed PowerPoint

14   for tomorrow's board of trustee's meeting.  Joe,

15   please let us know if okay to send the PowerPoint only

16   to the board of trustee office for distribution

17   tomorrow."

18           Do you see that?

19       A.   Yes.

20       Q.   And at the bottom, Nelson states right before

21   he signs off, "Overall an impressive performance by

22   UMHC and the School of Medicine in November."

23           Did I read that correctly?

24       A.   Yes.

25       Q.   "Joe, let us know on distribution of

1    PowerPoint to board of trustee office.  Nelson."

2         If you go up, please, Jorge.  You wrote back

3    at 6:03 p.m.:  "Jack" -- this is to -- I'm sorry.  Go

4    in the middle at five p.m.  You wrote "I'm out of

5    office, so can't see, but don't believe a PowerPoint

6    is needed for November results.  Do brief comments."

7         Do you recall writing that back in December

8    of 2012?

9         A.   No.

10        Q.   Dr. Lord responded at 5:11:  "I disagree.  We

11   should I believe share this information after months

12   of horrible performance.  This information should be

13   made available to the finance and exec committees when

14   we are meeting with them face to face."

15        Do you see that?

16        A.   Yes.

17        Q.   And then, if you go to the top, you wrote at

18   6:03 p.m.:  "I just conferred with the board office.

19   The operations report was intentionally placed in the

20   consent agenda that was approved by the chairs of the

21   exec and finance committees.  The agenda does not

22   include a presentation of November results.  I agree

23   that November financial results are important and

24   should be shared at the meeting, but reiterate

25   guidance to do so with brief comments.  If you and

```
 1    Pascal still disagree, please speak with the president
 2    who must approve materials distributed at the meeting
 3    or agenda items that are late adds."
 4             Well, what's going on here?
 5        A.   That's, you know, managing the agenda.  What
 6    do we -- we got limited time.  How should we spend the
 7    time at the board meeting.
 8        Q.   And was there -- it seems, leading up to
 9    this, that financial results, especially good
10    financial results, would be something that you would
11    want to present at the board meeting.  Am I wrong
12    about that?
13        A.   It's really how best to use the time at the
14    board meeting.  There are a number of ways to
15    communicate financial results.  They, you know, it
16    really was just managing how the time could best be
17    spent at the board meeting.
18             That happened with every agenda for every
19    board meeting.  Yes, let's do this.  No, let's not do
20    that.  Put this in the pre-reading materials
21    presented.
22             MR. SLOMAN:  If you could go to the top,
23         Jorge.  Okay.  We are at the top.
24             (Thereupon, the document was marked as
25             Exhibit 22 for identification.)
```

```
 1    BY MR. SLOMAN:

 2        Q.   Let's go to Exhibit 22.  So this is an email

 3    that was part of the chain that somehow got split off.

 4    But you wrote at 5:58 p.m.:  "Jack, I just conferred

 5    with board office.  This is a continuation of the last

 6    email we saw.

 7             Please go up a little further, Jorge.  And

 8    Dr. Goldschmidt wrote apparently to you, or to

 9    someone: "Joe has been trying to help us, but

10    according to him, the decision must come from you."

11             Apparently, this is to President Shalala.

12    "It seems odd to me that we would not be allowed to

13    share the November financials preliminarily with the

14    board.  See below.  Please let us know."

15             And it looks like, if you go to the very top,

16    from the president to Dr. Goldschmidt:  No

17    PowerPoints.  Just summarize November results quickly.

18    They are preliminary anyhow.  The board doesn't want.

19    It's time wasted with last minute paper or

20    PowerPoints.  It has not had a chance to see.  We have

21    other issues to discuss."

22             Did I read that correctly?

23        A.   Yes.

24        Q.   And it indicated that you conferred with the

25    board office.  Who would have conferred with?
```

70

```
1         A.   Leslie Dellinger at the time, who was the
2    board secretary.
3         Q.   And was she -- did she tell you that this was
4    not --
5         A.   I mean, you know, I'm going to answer in
6    general, because I don't remember this, you know, this
7    specifically.  We tried to anticipate the board's
8    interest at the time, how -- you know, other competing
9    agenda items and the best ways to communicate
10   information.
11             So, you know, the information that would be
12   presented at the board meeting was supposed to be
13   shared a week ahead so that people had the opportunity
14   to absorb it prior to the meeting.  And then what we
15   discussed at the meeting varied based upon what was
16   competing, you know, at that time.
17             And so, you know, there were times where the
18   board's guidance was sent to us in advance.  We
19   understand financial statements.  We don't need to
20   take up the time at the meeting discussing them.
21   We're smart business people.  We understand what
22   financial statements mean, and there are other things
23   we want to discuss.
24             That's what would generally result in, all
25   right, this is on the agenda, this isn't, make brief
```

 1    comments and that's what would generally happen.

 2         Q.   Okay.  And even though this was $5 million --

 3    this was results indicating that financials were

 4    roughly five million better than planned, it seemed

 5    that this would have been something that the board

 6    would have been extremely interested in and extremely

 7    happy with.  Do I have that wrong?

 8              MR. ISICOFF:  Object as to form.

 9         A.   The board was pleased that the finances had

10    improved.  But in terms of communicating that to the

11    board, providing them the financial statements

12    communicated that.  Right?  And there were other

13    communications, formal and informal, with the board.

14              (Thereupon, the document was marked as

15              Exhibit 25 for identification.)

16    BY MR. SLOMAN:

17         Q.   Let's go to Exhibit 25.  We'll skip over a

18    couple.  This is another executive daily update from

19    Dr. Lord on December 20, 2012.  Do you see that?

20         A.   Yes.

21         Q.   And under progress it shows a meeting with

22    you and Dr. Lord.  At the bottom where it says "UMTB,

23    again, that's University of Miami tissue bank, call

24    with Joe Natoli.  Prep for AM meeting.  Discussion of

25    compliance and general counsel recommendations and

72

```
 1   options for operational improvements."
 2            Did I read that correctly?
 3        A.   Yes.
 4        Q.   Do you remember meeting with Dr. Lord
 5   about -- or, I'm sorry -- having a call with Dr. Lord
 6   about those topics?
 7        A.   You know, I don't remember a specific call,
 8   but we had a compliance issue at the tissue bank that
 9   we would have discussed.  So I'm sure we had
10   discussion of it, I just don't remember a specific
11   call on this day.
12        Q.   At this time, do you recall a petition that
13   was being circulated at the University of Miami School
14   of Medicine?
15        A.   Yes.
16        Q.   Did you have any involvement with that?  And
17   what I mean, did you have any involvement, other than
18   being aware of it, were you asked to do anything about
19   it?
20        A.   No.
21        Q.   What's your recollection as to what was going
22   on?
23        A.   The faculty was unhappy with the environment
24   at the medical school and the leadership of Jack Lord
25   and Pascal Goldschmidt.
```

```
 1        Q.    Was it any more specific than that, if you
 2   recall?
 3        A.    That was -- that was it.  That was it in a
 4   nutshell.
 5        Q.    And were you aware at this time that there
 6   was an assessment of something called the IML that was
 7   being undertaken by an external review group?
 8        A.    I was -- yes.
 9        Q.    And what do you remember about that?
10        A.    Really --
11             MR. ISICOFF:  Object as to form.  Go ahead,
12        Joe.
13        A.    I recall hearing about that as part of the
14   rumors about what was taking place at the medical
15   school around that time.  And, specifically, that
16   there was a thought that there was this evaluation of
17   the IML and that if Alan Livingstone would call off
18   the petition drive, I have no idea whether Alan --
19   what his role was in the petition drive.  But,
20   supposedly, if he would call it off, then the
21   evaluation of the IML would cease as well.
22        Q.    Okay.  And other than that, were you asked to
23   look into that particular threat, for lack of a better
24   word?
25        A.    Not that I recall.
```

```
 1          Q.   Were you asked to make any credibility

 2     determination about the threat of -- this alleged --

 3     this alleged threat communicated -- that was

 4     communicated to Dr. Livingstone?

 5          A.   Was I -- say that again.

 6          Q.   Were you asked to make any type of

 7     credibility determination?  In other words, were you

 8     asked to look into it in any way?

 9          A.   I was not.

10          Q.   Do you recall who allegedly received the

11     alleged threat?

12          A.   Alan Livingstone.

13          Q.   Were you aware of how Alan Livingstone

14     learned of this alleged threat?

15          A.   I heard, and this was rumor, I heard that,

16     Charlie Nemeroff, who was the chair of psychiatry, was

17     sent to Alan.

18          Q.   Did you know Dr. Nemeroff?

19          A.   Yes.

20          Q.   What was your opinion of Dr. Nemeroff?

21               MR. ISICOFF:  Object as to form.

22          A.   I don't know that I had -- I mean, he was the

23     chair of psychiatry.  I don't know that I have an

24     opinion of him specifically.  He had come to the

25     university from Emory, I believe, and was sort of a
```

```
 1    highly esteemed, but had had some challenges in the

 2    past as well.

 3        Q.   What do you recall about those challenges in

 4    the past?

 5        A.   I think Senator Grassley had used him as an

 6    example of someone who had -- may have had conflict of

 7    interests.

 8        Q.   And were you involved in his hiring at all?

 9        A.   As the conduit to the board.  You know, when

10    we would hire senior executives, it would go to a

11    board committee and I would facilitate the materials

12    for the board to consider.

13        Q.   And were you asked to take a position on

14    whether to hire Dr. Nemeroff or not?

15        A.   I don't remember being asked specifically for

16    my opinion.

17        Q.   Did you have an opinion as to whether or not

18    he should have been hired by the University of Miami

19    at that time?

20        A.   I don't recall.

21        Q.   Did you ever talk to Dr. Nemeroff about this

22    alleged threat that was made concerning the petition

23    and that was communicated by him to Alan Livingstone?

24        A.   No.

25        Q.   Did you ever review an email from Jennifer
```

```
 1    McCafferty-Fernandez to Pascal Goldschmidt and Dr.

 2    Lord concerning a summary of TMG's preliminary

 3    assessment?

 4         A.   Not that I recall.

 5              (Thereupon, the document was marked as

 6              Exhibit 38 for identification.)

 7    BY MR. SLOMAN:

 8         Q.   Let me show you what's been marked as Exhibit

 9    38 and ask you if this refreshes your recollection?

10              MR. ISICOFF:  At this moment, let's take a

11         second to talk about the trajectory of today,

12         because it seems you're changing topics and

13         getting into the TMG report.

14              I'm assuming you are not going to complete

15         within the hour.  If you are, there's no need to

16         take a lunch break.

17              MR. SLOMAN:  I probably wouldn't.  I don't

18         think this -- this is not going to be a marathon.

19         So whether it's an hour or two hours, probably

20         closer to two hours, Eric.  So if you want to

21         take a break now, that's fine with me.

22              If everybody wants to do that, we can take a

23         break, come back in a half an hour and, you know,

24         be done in an hour, hour and a half, certainly no

25         more than two hours, I don't think.
```

```
1              MR. ISICOFF:  All right.  I think that's

2         probably -- Joe, did you have something you

3         wanted to add?

4              THE WITNESS:  No.  Okay.

5              MR. ISICOFF:  Would you prefer to go straight

6         through?  If you wish to go straight through, we

7         can do that.

8              THE WITNESS:  I would rather go straight

9         through.

10             MR. ISICOFF:  The only issue here is the

11        reporter.  Because I recall that -- obviously, we

12        can't run roughshod over Mary Ann.

13             (Discussion held off the record.)

14             THE VIDEOGRAPHER:  This marks the end of

15        video file number two.  The time is 12:10 p.m.

16        and we're going off the record.

17             (Thereupon, a brief recess was taken, after

18        which the following proceedings were had:)

19             THE VIDEOGRAPHER:  We're back on the video

20        record.  This is the start of video file number

21        three of the deposition of Joe Natoli.  The time

22        is 12:27 p.m.

23             MR. SLOMAN:  We're just going to put up

24        Exhibit 38.  I believe I had a question pending.

25        If you could just read it back, Mary Ann, please.
```

```
 1                  (The question referred to was read by

 2             the reporter as above recorded.)

 3    BY MR. SLOMAN:

 4        Q.   Take a moment and just read this, if you

 5    wouldn't mind, Mr. Natoli.

 6        A.   Okay.

 7        Q.   Do you remember -- and, by the way, this

 8    email had a bunch of attachments with it, but,

 9    obviously, you're not on this email chain and it was

10    sent to the president.

11             My question is did the president ever discuss

12    with you the summary of key takeaways from the first

13    phase of deliverables from TMG?

14        A.   Not that I recall.

15             (Thereupon, the document was marked as

16             Exhibit 34 for identification.)

17    BY MR. SLOMAN:

18        Q.   Let me show you what's been marked as Exhibit

19    34.  This is the day after the email I just showed you

20    in Exhibit 38.  And, again, you are not on this email,

21    but this is an email from the president to Pascal

22    Goldschmidt, at 12:14 p.m., indicating -- which

23    states:  "You need to come alone tomorrow."  And Dr.

24    Goldschmidt responds: "Will do."

25             Do you see that?
```

1          A.   Yes.

2          Q.   Do you remember attending a meeting on

3    December 21st with the president and Dr. Goldschmidt

4    and perhaps Dr. LeBlanc?

5          A.   I don't recall attending a meeting.

6          Q.   Okay.  And I'll show you some emails later to

7    perhaps refresh your recollection if you did.

8               (Thereupon, the document was marked as

9               Exhibit 26 for identification.)

10   BY MR. SLOMAN:

11         Q.   All right, showing you what's been marked as

12   Exhibit 26, which is an email which I believe you were

13   copied on.  This is dated Friday, December 21st, 2012,

14   from Aileen Ugalde, subject IML investigation.  "The

15   president has directed that effective immediately, the

16   investigation of the IML be led and managed by

17   internal audit.  Internal audit will be contacting you

18   coordinating the transfer of all data gathered

19   relative to the investigation, as well as oversight of

20   the retained outside consultant."

21              Did I read that correctly?

22         A.   Yes.

23         Q.   Do you remember receiving this email?

24         A.   Yeah.  I don't remember the email

25   specifically.  Obviously, I received it.

```
 1        Q.   All right.  Do you remember the event,
 2   itself, with regard to the investigation of the IML
 3   was now being transferred to internal audit?
 4        A.   Yes.
 5        Q.   And did you have any forewarning that this
 6   was going to happen?
 7        A.   I think the president said she was going to
 8   transfer it to internal audit.  As I mentioned
 9   earlier, the investigation of the IML was seen as a
10   part of the intrigues that were going on at the
11   medical school.  Call off the petition.  We'll kill
12   the audit of the IML.  And it was all political and
13   conflicted was how it was perceived.
14             And the president's decision was I'm pulling
15   this out of the hands of folks who have conflicts and
16   I'm giving it to internal audit, which has a direct
17   reporting relationship to the board and the audit
18   committee and, clearly, has no conflicts of interest
19   as some of the other parties that had been involved
20   had.
21        Q.   And who had conflicts of interest as far as
22   your perception?
23        A.   Well, the consulting audit of the IML was
24   being overseen by Jennifer and Jack.
25        Q.   And why --
```

1        A.   And, again, the rumor was that that

2    investigation was being used as a lever, vis-a-vis the

3    vote of lack of confidence petition that was

4    circulating on the medical school campus.

5        Q.   And you have no knowledge as to whether that

6    threat or that alleged threat was actually made, do

7    you?

8        A.   I don't know.

9        Q.   And you don't know whether that alleged

10   threat was the machination of Alan Livingstone, the

11   target of that investigation.  Correct?

12       A.   I don't know.

13       Q.   Now, correct me if I'm wrong, but did you

14   have forewarning that this was going to happen; that

15   the president had made this decision?  Did she consult

16   with you about it before this email went out?

17            MR. ISICOFF:  Object as to form.

18       A.   I believe she told me that she was going to

19   move it to internal audit.

20       Q.   Okay.  And is that all you remember?

21       A.   Yes.

22            MR. ISICOFF:  Object as to form.

23       Q.   And, again, is that all you remember about

24   her --

25       A.   Yes.  Again, basically, this was the -- the

1    existing investigation was seen as being involved in

2    conflicts and that the way to ensure objectivity and

3    independence was for the investigation to be overseen

4    by internal audit, which is how, you know, most

5    investigations, or all at the University of Miami,

6    were handled.

7            And why internal audit was set up as -- you

8    know, has an independent reporting relationship to the

9    board, unlike the rest of the university.

10           (Thereupon, the document was marked as

11           Exhibit 35 for identification.)

12   BY MR. SLOMAN:

13      Q.   Let me show you now what's been marked as

14   Exhibit 35.  This is an email, dated December 22nd,

15   2012, the day after.  And, again, this is an email, it

16   starts out at 9:45 a.m. from the president to Thomas

17   LeBlanc, and Thomas LeBlanc was the provost at the

18   time?

19      A.   Yes.

20      Q.   And at 9:45 a.m. and the president

21   communicates to Mr. -- Dr. LeBlanc, "Pascal intends to

22   have a final conversation with Jack on the 31st.

23   Nothing must leak.  Jack may want to talk to me on the

24   2nd."

25           Do you see that?

```
 1        A.   Yes.

 2        Q.   And then Dr. LeBlanc responds:  "I updated

 3   Joe after we spoke last night.  I spoke to him to have

 4   Nerissa prepare a transition plan for HR.  Also

 5   mentioned to him timeline and need to maintain

 6   confidentiality."

 7             Do you remember speaking to Thomas LeBlanc on

 8   the evening of -- it seems like the evening of

 9   December 21st?

10        A.   I don't remember the conversation.

11        Q.   But you wouldn't take issue that Dr. LeBlanc

12   spoke to you about what was about to happen to Dr.

13   Lord?

14        A.   Yes.  I agree.

15        Q.   And do you know why at this point in time, on

16   December 21st, 2012, in the evening, do you know why

17   Dr. Lord was being terminated?

18        A.   Yes.

19        Q.   Why?

20        A.   Because the atmosphere at the medical school

21   was very poor.  There was a toxic environment.  People

22   were scared for their jobs.  People were walking on

23   pins and needles.  People worried that you can get

24   called in at any moment and told that you have no job.

25   It was really related to those issues.
```

1        Q.   Anything else?  Did you hear my question?

2        A.   Yes.  I mean, it was those -- it was -- it

3    really was, at least from my standpoint, Jack's

4    management style did not work in this environment and

5    was being, you know, was being rejected by the faculty

6    in particular at the medical school.  And that that's

7    really what led to it.

8            The fact that there had been less

9    communication over the months and my relationship with

10   him had deteriorated, notwithstanding the email

11   correspondence that we continued to have and needed to

12   have as senior executives, that was a part of the

13   consideration.

14           But it also had a lot to do with just the

15   atmosphere and the employee -- how the employees were

16   feeling at the medical school at the time.  It had

17   nothing to do -- in my opinion, it had nothing to do

18   with the IML audit.  Nothing at all to do with the IML

19   audit.

20       Q.   And that's based on what?

21       A.   That's based upon what I -- the input that I

22   had in my role at the university, the various inputs

23   that I had.

24       Q.   But other than your opinion, you don't know?

25   Nobody ever told you that one way or the other whether

```
1    it had anything to do with the investigation of the

2    IML.  Correct?

3        A.   That was never mentioned.  That was not a

4    factor in any way.  The other issues were mentioned.

5    The audit of the IML was really not, you know, it was

6    not on anybody's mind, the least of whom Donna

7    Shalala.

8        Q.   Who was responsible for documenting why the

9    president of the university decided to terminate the

10   chief operating officer for the Miller School of

11   Medicine the day or two after receiving a preliminary

12   assessment from Jennifer McCafferty-Fernandez?

13       MR. ISICOFF:  Object as to form.

14       A.   Well, Jack's boss was Pascal Goldschmidt.

15       Q.   So it was Dr. Goldschmidt's responsibility to

16   document why Dr. Lord was being terminated from his

17   position as chief operating officer, chief compliance

18   officer and every other position at the University of

19   Miami?

20       MR. ISICOFF:  Object as to form.

21       A.   No.  Pascal was Jack's boss.  Pascal had the

22   ability to hire and fire for his responsibilities.

23       Q.   My question's a little bit different.  Whose

24   responsibility was it to document the reason why the

25   president of the university was terminating Dr. Lord
```

```
 1    from all his positions at the university?
 2            MR. ISICOFF:  Object as to form.
 3        A.   I don't have an answer for whose
 4    responsibility was it to document the reason.  I don't
 5    know that there is a need, a requirement, to document
 6    the reason.  Pascal Goldschmidt, folks at the medical
 7    school worked for him.  He had hiring and firing
 8    authority.
 9        Q.   But you know that it was not his decision to
10    fire Dr. Lord.  Correct?
11        A.   There was agreement between him and his boss,
12    Donna Shalala, to fire Dr. Lord.
13        Q.   You're sure of that?
14            MR. ISICOFF:  Object as to form.
15        Argumentative.
16        Q.   Are you sure of that?
17        A.   I was not privy to every conversation the two
18    of them had, but I assume.  I assume that that's a
19    decision they both supported, but I was not in every
20    conversation that the two of them had.
21        Q.   Okay.
22            Let me show you what's -- before we move on,
23    when you had this conversation with Dr. LeBlanc on the
24    evening of December 21st, 2012, did he tell you
25    anything about the reason why Dr. Lord was being fired
```

```
 1    or are the reasons that you're stating something that

 2    you learned later?

 3            MR. ISICOFF:  Object as to form.

 4        A.   You know, as I said earlier, I don't recall

 5    that specific conversation, therefore, I don't recall

 6    the specific content of that discussion.

 7        Q.   Do you recall any specific discussions,

 8    either with the president or Dr. LeBlanc, about the

 9    reasons why Dr. Lord was about to be terminated from

10    all his positions at the University of Miami?

11            MR. ISICOFF:  Object as to form.

12        A.   You know, I don't remember a specific

13    meeting, but I'm sure there were discussions where I

14    would have expressed my opinion on that decision.

15        Q.   Okay.  So my question is do you remember --

16    let's start with President Shalala -- do you remember

17    a specific or more than one specific conversation with

18    the president where she communicated to you the

19    reasons why she was terminating Dr. Lord?

20        A.   I don't remember a specific conversation.

21        Q.   Do you remember any specific meetings or

22    conversations with Dr. LeBlanc about the reasons why

23    the president decided to terminate Dr. Lord from all

24    his positions at the University of Miami?

25            MR. ISICOFF:  Object to the form.
```

```
1        A.    I don't recall a specific meeting or a
2   specific conversation.  I'm sure there were some, but
3   I can't say, oh, yeah, I remember this meeting where
4   we all got together and had this discussion.
5        Q.    Would it be fair to say that your
6   recollection of these reasons why occurred recently as
7   you prepared for this deposition?
8             MR. ISICOFF:  Object as to form and
9             argumentative.
10        A.    No, not at all.  I mean, over the course of
11   the calendar year of 2012, my confidence in Jack's
12   ability to do what was needed on an ongoing basis
13   decline dramatically.  You know, when the layoffs were
14   done, they were done very quickly.  They were done in
15   a very heavy-handed manner.  But we needed quick
16   action.
17             And so while many people fault how the
18   execution was done, it wasn't done in a way that I
19   would have done, but it needed to be done and needed
20   to be done in a hurry.
21             My confidence in Jack's ability to manage on
22   an ongoing basis was really subsequent to that with
23   his overall management style that had really a
24   chilling effect on people at the medical school.  So I
25   formed my own opinion over the course of the calendar
```

1    year of 2012 and had concluded, you know, before

2    December that this was not going to work in the longer

3    term.

4            And the fact that he was, you know, again,

5    notwithstanding the email correspondence that we had,

6    both of us trying, you know, it doesn't take very many

7    incidences of somebody from the general counsel's

8    office calling me and saying, hey, I was in a meeting,

9    I was told not to tell you what went on in the

10   meeting, for me to wonder about what other meetings

11   are occurring where people in the meeting are being

12   told not to keep me posted and they are not taking the

13   risk of calling me.  Right?

14           I didn't call Jack as a result of that call,

15   because I didn't want to put that person in a

16   difficult position.  That person needed to continue to

17   work with him.

18       Q.   Mr. Natoli, did Jack ever fail to respond to

19   you for any request that you made of him?

20       A.   Not that I recall.

21       Q.   Did Jack deliver results that met or exceeded

22   all targets every month that he was the chief

23   operating officer?

24           MR. ISICOFF:  Object as to form.

25       A.   I -- I -- I don't have the financial

1    statements for each month of his leadership memorized,

2    so I don't know that.  The one that you showed showed

3    $6 million over budget on operating income at that

4    point in time.

5        Q.   Okay.  So, let's put it this way.  He did

6    deliver results that met or exceeded all targets

7    through November of 2012 while he was COO.  Correct?

8            MR. ISICOFF:  Object as to form.

9        A.   That was one target.  That was operating

10   income, actual versus budget, was over budget by $6

11   million on a budget that was, you know, two billion

12   dollars, something like that.

13       Q.   Sitting here today, do you recall whether he

14   missed any targets in 2012?

15       A.   I don't have, as I said previous, I don't

16   recall monthly performance.

17       Q.   So the answer --

18       A.   Of operating -- you're talking about

19   operating profit specifically.  I'm sure there were

20   other -- each one of the facilities had volume

21   metrics, payor mix metrics.  There were many, many

22   metrics, some of which were achieved and some of which

23   were not achieved and that's normal business.

24       Q.   So sitting here today, you don't recall him

25   missing any targets in 2012.  Correct?

```
 1              MR. ISICOFF:  Object as to form.
 2        A.   I can't say that.  I can say with confidence
 3    that not everything -- not every metric that we
 4    tracked was ahead of plan.  Right?
 5        Q.   Okay.
 6              (Thereupon, the document was marked as
 7              Exhibit 27 for identification.)
 8    BY MR. SLOMAN:
 9        Q.   Let me show you now what's been marked as
10    Exhibit 27.  First is an email from you to the
11    president at 4:10 p.m.  At the bottom -- from you to
12    the president.  Okay.
13              Do you see where it says, "Once Pascal has
14    spoken with Jack and the timing and next steps are
15    clear, I'd like to grab you one more time."
16              Do you see that?
17        A.   Yes.
18        Q.   All right.  So you knew that on December
19    31st, New Year's Eve, 2012, that Pascal Goldschmidt
20    had or was about to deliver the news to Jack, to Dr.
21    Lord, that he was being terminated from all his
22    positions at the university.  Correct?
23              MR. ISICOFF:  Object as to form.
24        A.   Yes.
25        Q.   Is that correct, Mr. Natoli?
```

1          A.   Yes.

2               (Thereupon, the document was marked as

3               Exhibit 28 for identification.)

4     BY MR. SLOMAN:

5          Q.   Let me show you now what's been marked as

6     Exhibit 28.  This is a series of emails that starts

7     with you.  If you go to the bottom, starting on

8     January 16th, this is from you to Alan Livingstone.

9     Do you see that?

10         A.   Yes.

11         Q.   And the subject is "One more thing."  You

12    wrote to Dr. Livingstone at 6:04 a.m.  "One more

13    thing.  We have to bring faculty leadership together.

14    There's so much infighting and reporting of negative

15    comments, this person is out to get that person.  So

16    much wasted productivity.  We need to set the tone

17    that that won't be tolerated.  It's been a painful

18    time, still is, but it's time to get back to work and

19    use water fountain conversations and talk about

20    patient care and other ways to improve what we do.

21    Let's grab a few minutes to talk about that in the

22    days to come."

23              Did I read that correctly?

24         A.   Yes.

25         Q.   And, Dr. Livingstone responds to you at 8:57

1    that evening, "I agree.  This is very important.  Way

2    too much energy is being expended on negativity."  And

3    at 6:05, you forward this on to, on the next day, on

4    January 17th, to Dr. Goldschmidt.  Do you see that?

5        A.   Yes.

6        Q.   And Dr. Goldschmidt responds on the 17th at

7    6:19 a.m., "Joe, you and I should talk about this.

8    Thanks, Pascal. "

9             Do you recall Dr. Goldschmidt's reaction to

10    your email to Dr. Livingstone?

11            MR. ISICOFF:  Object as to form.

12        A.   I do not.  I do not.

13        Q.   Did you have a relationship with Dr.

14    Livingstone, Mr. Natoli?

15        A.   We were collegial colleagues, yes.

16        Q.   Did you have -- did you form an opinion about

17    Dr. Livingstone's collegiality with others?

18        A.   Yes.

19        Q.   And what is that, or what was that?

20        A.   He was very straightforward.  Sometimes

21    sarcastic.  I very much trusted and trust his judgment

22    on clinical matters.  When I needed advice for

23    patients who might call me, he was someone that I

24    would -- that I would reach out to.  Many people

25    really liked his style; some others did not.

1      Q.   Okay.  The ones that did not, do you have any

2   specific instances in mind?

3      A.   No.

4      Q.   Let's go up a little bit more.  Dr.

5   Goldschmidt then forwarded your email on to President

6   Shalala, do you see that, at 6:32 a.m.?  "Donna, we

7   should talk about this.  Alan is campaigning against

8   me, and yesterday at a meeting with Nimer, Lubarsky

9   and Cote, was opposing our efforts to work with Steve

10  Sonenreich," and it goes on.  Do you see that?

11     A.   Yes.

12     Q.   And you were not part of the subsequent email

13  chain, but the president then responded to Dean

14  Goldschmidt about how Dr. Livingstone had always hated

15  Sinai.  Do you see that?

16     A.   Yes.

17     Q.   He had a long, simmering feud with Dr.

18  Sonenreich at Mount Sinai.  Were you aware of that?

19     A.   Yeah.  Not Dr. Sonenreich, but, yes.

20     Q.   I'm sorry.

21     A.   He was the CEO.

22     Q.   Right, the CEO.  I'm sorry.

23          And then if you go to the top, Dr.

24  Goldschmidt writes to the president at 12:31 p.m. on

25  the 17th, "Alan is a destructive individual who has

1    raised my faculty against me.  Plenty of witnesses to

2    testify to this.  He is ruining my reputation," and

3    goes on.  He ends it by saying "Alan is destroying

4    everything I've built at UM.  There is a decision to

5    be made."

6         Were you aware of Dr. Goldschmidt's feelings

7    about Dr. Livingstone?

8         A.   Yes.

9         Q.   And did you have subsequent -- did you ever

10   have a conversation with Dr. Goldschmidt about that?

11        A.   I mean, at some point while I was at the

12   medical school Dr. Livingstone stepped down from being

13   the chair of surgery, so, yes.

14             (Thereupon, the document was marked as

15             Exhibit 29 for identification.)

16   BY MR. SLOMAN:

17        Q.   Let me show you now what's been marked as

18   Exhibit 29.  Mr. Natoli, I'm showing you what's been

19   marked -- I'm showing you what's been marked as

20   Exhibit 29.  It starts off with an email from Dr.

21   Goldschmidt to the president, copying you and

22   Christine Morris, Subject, Strategy 2013.  Do you see

23   that?

24        A.   Yes.

25        Q.   And you responded to Dr. Goldschmidt's email.

```
 1      And do you see what it says?  It says in Pascal's note
 2      "I'd be careful about saying today we've accomplished
 3      one of the most impressive turnarounds in the history
 4      of modern academic medicine.  Better to be understated
 5      throughout the note."  Do you see that?
 6           A.   Yes.
 7           Q.   Do you remember what you were talking about
 8      here?
 9           A.   I don't remember.
10                (Thereupon, the document was marked as
11                Exhibit 36 for identification.)
12      BY MR. SLOMAN:
13           Q.   All right.  Let me show you Exhibit 36, which
14      was the attachment.  Do you remember -- take a moment
15      and why don't you read this page and see if reading
16      this refreshes your recollection about the prior
17      email.
18           A.   Okay.  Do you want to go up, so I can read
19      the rest of it.
20           Q.   Sure.
21           A.   Okay.  Scroll up, please.  Scroll down.
22      Okay.  Scroll down, please.  Not that much.  Not that
23      much.  Hold on.  Go up a little bit.  A little more.
24      Okay.  Okay.  Scroll down, please.  Okay.
25           Q.   Do you remember weighing in on Dr.
```

```
1    Goldschmidt's draft of a statement that -- and I'll

2    represent to you that Exhibit 36 here that you just

3    read was not the final statement that Dr. Goldschmidt

4    emailed to the medical school faculty; this was a

5    draft.  Okay?

6          And I'd like to go back to Exhibit 29, which

7    is an email.  It starts out an email from Dr.

8    Goldschmidt to the president, you and Christine

9    Morris.  And you responded at 5:27 p.m. on January

10   21st, in Pascal's note, "I'd be careful about saying

11   today we have accomplished one of the most impressive

12   turnarounds in the history of modern academic

13   medicine."

14         Why did you take issue with Dr. Goldschmidt's

15   assessment of the financial turnaround?

16   A.    The place was still in great turmoil.

17   People -- employees were unhappy, unsettled, nervous.

18   And while the finances had improved to a modest

19   surplus, it was in my opinion not the most impressive

20   turnaround in the history of modern academic medicine

21   and that a communication to a staff in this situation

22   would be better to be understated.

23   Q.    Okay.  And you see the president's email back

24   to you, "Told him to tone it down.  Get rid of war

25   analogy and don't mention Jack or sharing."
```

```
 1              Did I read that correctly?
 2      A.    Yes.
 3      Q.    Did you agree with that?
 4      A.    You're asking me today do I agree with that?
 5      Q.    Did you agree with President Shalala that Dr.
 6  Goldschmidt should not mention Jack or Sheri in that
 7  communication to the medical school?
 8      A.    Scroll up.  Did I respond to that email?
 9      Q.    I'm unaware that you did.  My question is did
10  you agree with excising a reference to Dr. Lord?
11      A.    I don't remember what I thought how many
12  years ago, nine years ago, to her -- to that one line.
13  Yeah, I don't remember what I thought at that moment.
14      Q.    Do you know why the president wanted to
15  discuss with -- did you ever discuss with her why she
16  wanted Dr. Lord to be excised from that statement?
17      A.    Not that I recall.
18      Q.    Do you recall whether you agreed or disagreed
19  with that?
20      A.    I don't recall.
21      Q.    So you don't recall asking whether you ever
22  asked the president why are we taking Dr. Lord's name
23  out of the statement?
24              MR. ISICOFF:  Objection.  You've asked this
25        like three, four times.
```

```
 1        A.   No, I don't.

 2             MR. SLOMAN:  What's the magic number?

 3   BY MR. SLOMAN:

 4        Q.   The question is, Mr. Natoli, do you recall

 5   having any conversation with the president about why

 6   it was necessary to remove Dr. Lord's name from this

 7   statement?

 8             MR. ISICOFF:  Same objection.

 9        A.   I don't recall.

10        Q.   Let me show you -- now, after Dr. Lord was

11   removed from his position, you became the interim COO.

12   Is that correct?

13        A.   Yes.

14        Q.   Did you also serve as the university's chief

15   compliance officer?

16        A.   One of my responsibilities as the interim COO

17   was the compliance function.

18        Q.   Okay.  Did you have a role in the review, the

19   IML going forward, after the December 21st, 2012,

20   email that we just went over, and I believe is marked

21   as -- was marked as Exhibit 26?

22        A.   Yes.

23        Q.   What was your role?

24        A.   When the audit was completed and the report

25   received by internal audit and it included an estimate
```

1    of amounts that could be in question and there was a

2    recommendation that the university refund, I don't

3    remember the exact amount, I think it was about

4    $400,000, and I wound -- I at some point was a

5    recipient of that report and agreed that we would

6    refund whatever the amount was, and I signed the

7    letter that accompanied the self-reporting and the

8    refund check.

9         Q.   My question, though, is a little bit

10   different.

11        Other than being the person that signed the

12   letter refunding money to the Medicare intermediary,

13   did you have any role in the review of the IML going

14   forward, specifically, in the selection of the company

15   called Compliance Concepts?

16        A.   No.

17        Q.   Who did?

18        MR. ISICOFF:  Object as to form.

19        A.   My understanding is internal audit.

20        Q.   Was that Mike Moloney?

21        MR. ISICOFF:  Object as to form.

22        A.   I actually don't remember if it was Mike or

23   his successor.  Mike left at some point.  I don't

24   remember if he was still there at that time or not.

25        Q.   Okay.  Do you recall whether Jennifer

1   McCafferty-Fernandez was involved in the review of the

2   IML going forward after December 21, 2012?

3      A.  Title review was being managed by internal

4   audit.  You know, whether the consultants had

5   interactions with Jennifer during that review or not,

6   I don't know.

7      Q.  Okay.  Because she was still the chief

8   medical compliance officer of the university.

9   Correct?

10      A.  Yes.

11      Q.  Do you know whether she was deliberately

12   excluded from the IML investigation going forward?

13         MR. ISICOFF:  Object as to form.

14      A.  I don't know.

15      Q.  Is it possible that she was deliberately

16   excluded from the IML investigation going forward?

17         MR. ISICOFF:  Object as to form.

18      A.  I don't know.

19      Q.  Jennifer McCafferty-Fernandez testified that

20   no one from internal audit or Compliance Concepts

21   contacted her.  Do you know why no one -- if true, do

22   you know why no one from internal audit or Compliance

23   Concepts contacted her?

24         MR. ISICOFF:  Object as to form.

25      A.  I just have no knowledge of that.

```
 1              (Thereupon, the document was marked as

 2              Exhibit 30 for identification.)

 3   BY MR. SLOMAN:

 4       Q.    Let me show you what's been marked as Exhibit

 5   30, which is the -- a July 2013 email.  I believe you

 6   were a recipient of this.  And it states:  "Pascal,

 7   Joe and Tom, Compliance Concepts, the outside

 8   independent auditing company tasked with reviewing

 9   certain allegations of inappropriate billing at the

10   IML, has completed its report.  Virtually all of the

11   allegations against the IML are unfounded."

12              Do you see that?

13       A.    Yes.

14       Q.    Up until that point that you received this

15   email, had you had, as the acting chief compliance

16   officer at the university, had any involvement in this

17   review?

18              MR. ISICOFF:  Object as to form.

19       A.    Not that I recall.

20       Q.    And you previously testified that you don't

21   know how Compliance Concepts were chosen.  Correct?

22       A.    No.  I said my understanding is that they

23   were selected by internal audit.

24       Q.    Okay.

25              (Thereupon, the document was marked as
```

```
 1              Exhibit 31 for identification.)

 2    BY MR. SLOMAN:

 3         Q.   Now I'm showing you what's been marked as

 4    Exhibit 31, which is the transmittal letter to the

 5    fiscal intermediary, First Coast Service Options.  If

 6    you go to the bottom, I believe, this is your -- you

 7    signed the letter?

 8         A.   Yes.

 9         Q.   You were referring to earlier?

10         A.   Yes.

11         Q.   Before you signed this and sent an

12    accompanying check, did you ask Dr.

13    McCafferty-Fernandez to sign the letter to the fiscal

14    intermediary?

15         A.   I don't remember whether I asked her to, but

16    I remember being told that she did not want to sign

17    it, and so then as the person who was more senior, I

18    signed it.

19         Q.   Do you remember her saying to you that she

20    would sign it, but she needed to see the report first?

21    Do you remember that?

22         A.   I don't remember that.

23         Q.   Do you remember her telling -- you telling

24    her it's -- when -- let me back up a second.

25              If you don't remember her saying that she'd
```

```
 1    sign it, but she needed to see it first, I take it

 2    that you don't remember her telling you -- I'm sorry.

 3           You don't remember -- is it fair to say you

 4    don't remember interacting with Jennifer

 5    McCafferty-Fernandez at all with regard to signing

 6    this letter that you signed and is referred to as

 7    Exhibit 31?

 8       A.   I don't remember interacting with Jennifer,

 9    no.

10       Q.   Do you remember whether Jennifer

11    McCafferty-Fernandez was still the chief medical

12    compliance officer at the university at that time?

13       A.   I know that she stepped down at some point.

14    I don't remember -- while I was at the medical school.

15    I don't remember the specific timing of that.

16       Q.   By the way, did she step down or was her

17    position eliminated?

18       A.   We moved her to a different job.

19       Q.   And that was after you learned that she had

20    communicated with the FBI concerning a False Claims

21    Act lawsuit that was under seal at the time?

22           MR. ISICOFF:  Object as to form.

23       A.   It was related to that matter.

24       Q.   And I'll represent to you that it was after

25    you signed this letter, dated September 25, 2013.  So
```

1    my question is isn't it true that Jennifer

2    McCafferty-Fernandez was still the chief medical

3    compliance officer at the time that you signed this

4    letter, dated September 25, 2013?

5         MR. ISICOFF:  Object as to form.

6         A.   Okay.  And, again, I'm saying I don't -- I

7    don't remember.  You guys look at the records.  If the

8    records say that she stepped down subsequently, then

9    she did.  I don't recall the specific timing of when

10   she moved to a new role.

11        Q.   Assuming she was still the chief medical

12   compliance officer at the University of Miami, can you

13   think of a reason why you would not have asked her to

14   sign the letter to the fiscal intermediary?

15        MR. ISICOFF:  Object as to form.

16        A.   If internal audit and the general counsel,

17   Cindy Augustyn, who was involved, if they came to me

18   and said, hey, Joe, here's a summary of the report,

19   Jennifer is not signing, we need to you sign it, then

20   I would have signed it.

21        Q.   Did you do any diligence before signing that

22   letter?

23        A.   Just reading.

24        Q.   Reading what?

25        A.   Reading, you know, I tried -- you know, I

1    don't know whether I read the entire report or not.  I

2    don't remember.  I don't know if I did more than read

3    this letter and be assured by the general counsel's

4    office and internal audit that this was appropriate.

5    I may have read the report.  I don't recall.

6         Q.   And, again, you had no training in medical

7    compliance up until that point.  Correct?

8              MR. ISICOFF:  Object as to form.

9         A.   Yes, that's true.

10        Q.   So would it be fair to say that you did not

11   have an appreciation for the representations that you

12   were making in that letter?

13             MR. ISICOFF:  Object as to form.

14        A.   No.  I think I understood the representations

15   that I was making.

16        Q.   How confident were you that the

17   representations that you were making in that letter

18   were accurate?

19        A.   I had a high confidence that internal audit

20   had selected a consultant that had the skills to do a

21   detailed and objective and independent audit.  And

22   this was the results of their work that satisfied

23   internal audit and the general counsel, and that we

24   were kind of erring on the high side in terms of the

25   amount that we were refunding.  Whatever we thought

1    the higher end it could be, we opted to refund.

2        Q.   Would you take issue with Dr. McCafferty

3    Fernandez' testimony to us that she told you that she

4    would not sign it until you had the opportunity to

5    speak with the individuals who were actually engaged

6    and involved in the work?

7            MR. ISICOFF:  Object as to form.

8        A.   I don't recall that conversation.

9        Q.   Would you take issue if Dr. McCafferty

10   testified to that under oath?

11           MR. ISICOFF:  Object as to form.

12       A.   I don't remember.  What can I say?  I don't

13   remember that conversation.

14       Q.   And the same question, if she told you that

15   you would need to have a high level of assurance that

16   this work is appropriate before you put your name on

17   it?

18           MR. ISICOFF:  Object as to form.

19       A.   Same answer.  I don't recall speaking with

20   Jennifer.

21       Q.   Before you signed this letter, Mr. Natoli,

22   did you ever review the preliminary assessment summary

23   findings that Dr. McCafferty-Fernandez had prepared

24   for the president and Dr. Goldschmidt and Dr. Lord,

25   dated December 19, 2012?

```
 1         A.   Not that I recall.

 2              (Thereupon, the document was marked as

 3              Exhibit 32 for identification.)

 4    BY MR. SLOMAN:

 5         Q.   Let me show you what's been marked as Exhibit

 6    32.  Were you aware that Dr. Goldschmidt had received

 7    a no confidence vote from the faculty in 2014?

 8         A.   Yes.

 9         Q.   And were you aware of President Shalala's

10    decision not to abide by the vote?

11         A.   Yes.

12         Q.   And do you recall what the faculty's reaction

13    was to President Shalala's decision not to abide by

14    the vote?

15         A.   You know, I assume the various faculty

16    members had their various opinions about it, so I

17    don't want to -- I won't generalize about what the

18    faculty's reaction was.

19              MR. SLOMAN:  Why don't we take about a five

20         minute break and then I may be wrapping up.

21              THE VIDEOGRAPHER:  We're going off the

22         record.  The time is 1:19 p.m.  Just a moment,

23         please.

24              (Thereupon, a brief recess was taken, after

25         which the following proceedings were had:)
```

```
 1            THE VIDEOGRAPHER:  We're back on the video

 2       record.  The time is 1:26 p.m.

 3            THE WITNESS:  Can you hold for just one

 4       second for me here.

 5            MR. SLOMAN:  Yep.

 6            (Discussion held off the record.)

 7  BY MR. SLOMAN:

 8       Q.   Mr. Natoli, you had mentioned that Jennifer

 9  McCafferty-Fernandez stepped down at some point in

10  time, you weren't sure when.  Why did she step down?

11       A.   So she had been contacted by FBI agents, I

12  don't actually recall whether she met with them or

13  not, but she solicited outside legal advice and did

14  not let me or the general counsel's office or anyone

15  at the university know as far as I know.  And so how

16  she handled that we thought was inappropriate and

17  that's what led to us moving her to a different role.

18       Q.   Okay.  And you also indicated that Dr.

19  Livingstone stepped down.  I don't remember whether

20  those were your words or not.  But what were the

21  circumstances surrounding him stepping down?

22       A.   You know, Dean Goldschmidt decided that he

23  wanted to make a change in the chair of surgery and

24  wanted Alan to step down and Omaida Velazquez to

25  become the chair of surgery.  And the dean made that
```

1     decision.

2          Q.   Notwithstanding that the dean made that

3     decision, do you remember the reasons why the dean

4     made that decision?

5          A.   Alan had been the chair of surgery for like

6     17 years.  His relationship with Pascal was not always

7     the best and it was a change that the dean wanted to

8     make.

9          Q.   I mean, that's a sanitized version, right? I

10    mean, not always the best, it was really bad.

11    Correct?

12              MR. ISICOFF:  Object as to form.  Joe, you

13         can answer.

14         A.   Alan had lots of people who swear by him and

15    really liked his leadership style and admired his

16    dedication to the university and work ethic and

17    ethics.  And then there were some folks who did not

18    like his management style.

19         Q.   But was he reprimanded for any specific

20    incidents that you recall?

21         A.   You know, I remember him making a wisecrack

22    to, I don't know, it was somebody who was being

23    interviewed or something, and he made a wisecrack that

24    he should not have made.  And I think he -- I think he

25    was reprimanded for that.

1     Q.   And was that the reason why he was -- why the

2     dean decided to demote him or relieve him of his chair

3     responsibilities?

4     A.   I mean, you'd have to ask Pascal that

5     question.   But I assume it was more than just that one

6     incident that I'm recalling.

7              MR. SLOMAN:   I don't have anything else.

8              MR. ISICOFF:   We're not going to have any

9         questions at this time.   We will read and sign

10        and we'll take a copy of anything that's ordered

11        in terms of the transcript and the video record.

12             THE VIDEOGRAPHER:   I will conclude the video.

13        This will conclude today's testimony given by Joe

14        Natoli consisting of three video disks.   They

15        will be retained by Mary Ann Collier Reporting,

16        and the time is 1:31 p.m. and we're going off the

17        record.

18             (Reading and signing not waived.)

19             (Deposition concluded at 1:31 p.m.)

20

21

22

23

24

25

```
 1                    CERTIFICATE OF OATH

 2

 3   STATE OF FLORIDA

 4   COUNTY OF BROWARD

 5

 6        I, the undersigned authority, certify that

 7   Joseph Natoli appeared before me via Zoom on May 6,

 8   2022, and was duly sworn.

 9        WITNESS my hand and official seal this

10   16th day of May 2022.

11

12

13

14                         Mary Ann Collier
                           _____
15                         Mary Ann Collier
                           Commission #HH 078151
16                         Expires 2/21/25

17

18   Witness I.D.:  Florida drivers license

19

20

21

22

23

24

25
```

1        <u>REPORTER'S DEPOSITION CERTIFICATE</u>

2

3            I, MARY ANN COLLIER, Court Reporter, certify

4    that I was authorized to and did stenographically

5    report the deposition of Joseph Natoli, that a review

6    of the transcript was requested, and that the

7    foregoing transcript, pages 1 through 111, is a true

8    and complete record of my stenographic notes.

9

10           I further certify that I am not a relative,

11   employee, attorney or counsel of any of the parties,

12   nor am I a relative or employee of any of the parties'

13   attorney or counsel connected with the action, nor am

14   I financially interested in the action.

15

16           Dated May 16, 2022.

17

18

19

20

21           *Mary Ann Collier*
             MARY ANN COLLIER
22

23

24

25

```
 1                    ERRATA SHEET

 2    DO NOT WRITE ON TRANSCRIPT.  ENTER CHANGES HERE.

 3    NAME:  Joseph Natoli
      RE:  Lord vs. University of Miami
 4    DATE OF DEPOSITION:  5/6/22
      Page/Line  Change                    Reason
 5    _____

 6    _____

 7    _____

 8    _____

 9    _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    _____

22
      Under penalty of perjury, I declare that I have read
23    my deposition and that it is true and correct,
      subject to any changes in form or substance entered
24    above.
      _____
25    Deponent's signature     Date      (Print Name)
```

```
 1              Mary Ann Collier & Associates, Inc.
                        2423 SE 10th Court
 2                   Pompano Beach, FL  33062
                         305-371-2443
 3

 4                                  May 16, 2022

 5      Eric Isicoff, Esq.
        Isicoff@irlaw.com
 6
                        Re:  Lord vs. University of Miami
 7
        Dear Mr. Isicoff:
 8
        With reference to the deposition of Joseph Natoli
 9      taken in connection with the above-captioned case,
        please be advised the transcript is prepared and
10      awaiting signature.

11      Please have the witness read the transcript, denoting
        any corrections by page and line number on the
12      enclosed errata sheet.  This errata sheet must be
        signed by you and a copy forwarded to Jeffrey Sloman,
13      attorney for the plaintiff.

14      If this has not been taken care of within 30 days of
        this date, it shall then be concluded that the reading
15      and signing has been waived.

16                           Yours very truly,

17                           Mary Ann Collier

18                           Mary Ann Collier & Associates

19      cc:  Jeffrey Sloman, Esq.

20

21

22

23

24

25
```



Begin forwarded message:

**From:** Jack Lord <jlordmd@gmail.com>
**Subject: Re: On my private email**
**Date:** June 8, 2012 at 9:15:22 PM EDT
**To:** "Natoli, Joe" <jnatoli@miami.edu>

This is ridiculous - you have had unbridled access to information, you have no sense of the enormity of management challenges - in every direction, the limited management talent, and at least the financial clean-up that has been made.   if this place doesn't find a way to generate new revenues that will be temporizing at best. Finally - everyone has been working 16 hours plus a day - you have made it perfectly clear tonite - not worth it to me -
Jack
jlordmd@gmail.com
305.299.7741 (m)

On Jun 8, 2012, at 9:07 PM, Natoli, Joe wrote:

> We should get together in the next few days and share our respective frustrations and disappointments and thoughts on how to best work together in the future.

> **From:** Natoli, Joe
> **Sent:** Friday, June 08, 2012 9:05 PM
> **To:** 'Jack Lord'
> **Subject:** RE: On my private email

> I have my own feelings of frustration and disappointment, so you are not alone.

> **From:** Jack Lord [mailto:jlordmd@gmail.com]
> **Sent:** Friday, June 08, 2012 8:56 PM
> **To:** Natoli, Joe
> **Subject:** On my private email

> Just wanted to share feelings of frustration and disappointment.

Exhibit No. 3

Really didn't appreciate either the tone or flavor of the conversation today.

Want to let you know that I don't work for you - haven't worked for someone for a long time - and don't intend to start now.  And I have managed a lot more than most people here have even gotten close to - and I won't be here for long with the attitude you showed today

J

Jack

jlordmd@gmail.com

305.299.7741 (m)

**From:** McCafferty-Cepero, Jennifer <JMcCafferty@med.miami.edu>
**Sent:** Friday, December 21, 2012 4:40 PM EST
**To:** Ugalde, Aileen M <augalde@miami.edu>
**CC:** Shalala, Donna E. <dshalala@miami.edu>; LeBlanc, Thomas J <leblanc@miami.edu>; Natoli, Joe <jnatoli@miami.edu>; Goldschmidt, Pascal J. <pgoldschmidt@miami.edu>; Lord, Jonathan <JLord@med.miami.edu>; Moloney, Michael J. <mmoloney@miami.edu>
**Subject:** RE: IML investigation

Thanks, Aileen.

Can you please clarify whether this relates to the IML only or to the larger assessment that includes the MTI and the OPO as well?

Best-
Jennifer


Jennifer McCafferty, PhD, CHC, CHPC, CHRC
Chief Medical Compliance Officer

305.243.6129 Office
305.439.9250 Cellular
jmccafferty@med.miami.edu



*The information contained in this transmission may contain privileged and confidential information, including patient information protected by federal and state privacy laws.  It is intended only for the use of the person(s) named above.  If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited.  If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.*

---

**From:** Ugalde, Aileen M [mailto:augalde@miami.edu]
**Sent:** Friday, December 21, 2012 4:37 PM
**To:** McCafferty-Cepero, Jennifer
**Cc:** Shalala, Donna E.; LeBlanc, Thomas J; Natoli, Joe; Goldschmidt, Pascal J.; Lord, Jonathan; Moloney, Michael J.
**Subject:** IML investigation

The President has directed that, effectively immediately, the investigation of the IML be led and managed by Internal Audit.  Internal Audit will be contacting you to coordinate the transfer of all data gathered relative to the investigation, as well as oversight of the retained outside consultant.

*Aileen M. Ugalde*
Vice President, General Counsel
 and Secretary to the Board
University of Miami
1320 South Dixie Highway
Penthouse Suite 1250
Coral Gables, Florida 33146
305-284-2700

**Exhibit No. 26**

Begin forwarded message:

From: "Augustyn, Cynthia Lou" <caugusty@miami.edu<mailto:caugusty@miami.edu>>
Date: July 3, 2013, 5:50:59 PM EDT
To: "Goldschmidt, Pascal (Dean - School of Medicine)" <PGoldschmidt@med.miami.edu<mailto:PGoldschmidt@med.miami.edu>>, "Natoli, Joe" <jnatoli@miami.edu<mailto:jnatoli@miami.edu>>, "LeBlanc, Thomas J" <leblanc@miami.edu<mailto:leblanc@miami.edu>>
Cc: "Ugalde, Aileen M" <augalde@miami.edu<mailto:augalde@miami.edu>>, "Livingstone, Alan" <ALivings@med.miami.edu<mailto:ALivings@med.miami.edu>>, "McCafferty-Cepero, Jennifer" <JMcCafferty@med.miami.edu<mailto:JMcCafferty@med.miami.edu>>, "Green, Rudolph H." <r.green3@miami.edu<mailto:r.green3@miami.edu>>, "Moloney, Michael J." <mmoloney@miami.edu<mailto:mmoloney@miami.edu>>, "Malagon, Blanca Aurora" <bmalagon@miami.edu<mailto:bmalagon@miami.edu>>
Subject: IML report

Pascal, Joe and Tom, Compliance Concepts, the outside independent auditing company tasked with reviewing certain allegations of inappropriate billing at the IML, has completed its report. Virtually all of the allegations against the IML are unfounded. The independent auditor found no support for any of the allegations, with the exception of non-compliance with the extremely technical requirements of the "grandfather clause", and the dissatisfaction of one nephrologist with two of the multiple tests on the standard treatment protocols. As Internal Audit had found the other non-billing allegations to be unfounded as well, this completes the review of the allegations raised about the IML.

To cover the period from 2008 through May 2013, the lab will be asked to refund $136K for the billings that did not meet the technical grandfather clause requirements, and $227K for the two tests that the one nephrologist claimed he did not use in treatment of his patients.

Please let me know if there are any questions.

Exhibit No. 30

LORD-001298



**UNIVERSITY**
**OF MIAMI**



|  |  |
|---|---|
| Sr. V. P. for Business and Finance | Phone: 305-284-6100 |
| P.O. Box 248106 | Fax: 305-284-4621 |
| Coral Gables, FL 33124-4626 | |

September 25, 2013

First Coast Service Options, Inc.
P. O. Box 44141
Jacksonville, FL 32231-4141

      Re:    University of Miami Immuno-Monitoring Laboratory
              Medicare # L8259

Dear Sir/Madam:

As part of our ongoing compliance activities, the University of Miami (UM) undertook a retrospective review of claims submitted to Medicare for services of the UM Department of Surgery's Immuno-Monitoring Laboratory (IML) performed during the period January 1, 2009 through May 31, 2013. Our review identified two specific issues that require Medicare payment refunds.

      1.   Billing for the technical component of physician pathology.

Medicare stopped allowing independent laboratories, such as the IML, to bill directly for the technical component of physician pathology services furnished to hospital patients in 1999, but it created a "Grandfather" exception that allowed certain labs to continue billing for such services, where the costs clearly were not included in the calculation of hospital patient services. During the period from January 1, 2009 through April 30, 2013, the IML relied on this Grandfather provision for certain of its billing, but our analysis concluded that the IML did not meet the requirements of the Grandfather provision for that period. During the period December 2010[1] through April 30, 2013, we identified 1,837 services consisting of the technical component of the pathology for which we billed and were reimbursed a total of $136,410.64.

      2.   Cytokines and C-reactive protein

Our analysis also included a review of testing protocols utilized by UM for its transplant patients. It is a standard practice for transplant centers to adopt testing protocols to ensure that patients receive optimal care. As a leader in transplant surgery, UM developed a number of protocols over the years, including testing protocols at the IML.

---

[1] We were unable to identify any billing for the technical component of pathology services prior to this date, due to a change in the billing system

Exhibit No. 31

First Coast Service Options, Inc.
September 25, 2013
Page 2

With one exception, all treating nephrologists felt that the testing protocols were appropriate and useful for the care of their patients.  Our review determined that one treating nephrologist did not agree regarding two specific tests (Cytokines and C-reactive protein) on the protocol.

During the period January 1, 2009[2] through April 30, 2013, we identified 10,260 instances where these tests were ordered by this physician and billed to Medicare by the IML.  These services were reimbursed a total of $219,641.42.

Based on the results of our analysis we are refunding these payments.   Therefore, we are attaching the following documents:

1.  The First Coast Medicare Part B Refund Form;

2.  A check in the amount of $356,052.06; and

3.  A CD containing two Excel files.  The file contains PHI and is password protected.  Please contact me at (305) 284-3800 for the password required to open the files.

    a.  The first file titled *FirstCoastAttachment1.xlsx* provides a list of all claims where the IML billed for the technical component of physician pathology.

    a.  The second file titled *FirstCoastAttachment2.xlsx* provides a list of all claims for the Cytokines and C-reactive protein tests which were ordered by the physician who did not agree with these tests.

I very much appreciate your time and assistance relative to this matter.  If you have any questions or require any additional information or clarification, please do not hesitate to contact me at 305.284.3800 or via email at jnatoli@miami.edu.

Sincerely,

Joe Natoli
Senior Vice President of Business and Finance &
CEO

---

[2] Although the review started January 1, 2009, the first claims submitted for one of the two tests was in December 2009.



**FIRST COAST**
SERVICE OPTIONS, INC.

WHEN EXPERIENCE COUNTS AND QUALITY MATTERS

## Florida

### Medicare Part B overpayment refund form

☒ Voluntary refund check attached          ☐ Voluntary offset requested

*(If a voluntary refund check is not attached, an overpayment letter will be issued.)*

### Shall be completed by provider/physician/supplier or other entity

*Please complete and forward to your Medicare contractor at the address listed below. This form, or a similar document containing the following information, should accompany every unsolicited/ voluntary refund or overpayment reporting so that receipt of the check is properly recorded and applied and/or that recovery of the overpayment is initiated.*

Provider/physician/supplier or other entity name  University of Miami- Immunological-Monitoring Laboratory

Address  1611 NW 10th Avenue, Miami, Fl 33136

Provider/physician/supplier NPI#  1932150752          Tax ID #  592579938

Contact person  Joe Natoli          Phone #  305-284-3800

Amount of check $  356,052.06     Check #  509097          Check date  10-1-13

Check date of deposit  [                    ]     (Completed by the Medicare contractor only)

### Required refund information For each claim, provide the following:

Patient name  Please refer to attached CDs                    HIC #

Medicare claim number (ICN)                    Claim amount refunded $

Claim service date

Reason code for claim adjustment  [        ]     (Select reason code from list below. Use one reason per claim.)

**Billing/Clerical**

01 - Corrected date of service to: [        ]

02 - Duplicate

03 - Corrected CPT code to: [        ]

04 - Not our patient(s)
05 - Modifier added/removed
06 - Billed in error

**Miscellaneous**

12 - Insufficient documentation
13 - Patient enrolled in an HMO
14 - Services not rendered
15 - Medical necessity

16 - Other -- please specify  16-Please see attached

CMS

Please attach copies of the related remittances or list all claim information involved on a separate sheet or CD.

If specific patient/HIC/claim #/claim amount data not available for all claims due to statistical sampling, please indicate methodology and formula used to determine amount and reason for overpayment on an attachment.

*NOTE: If specific patient/HIC/claim # information is not provided, no appeal rights can be afforded with respect to this refund)*

## For OIG reporting requirements

Do you have a corporate integrity agreement with OIG?      ○ Yes   ● No

Are you a participant in the OIG self-disclosure protocol?     ○ Yes   ○ No

*NOTE: Providers/physicians/suppliers, and other entities who are submitting a refund under the OIG's Self-Disclosure Protocol are not afforded appeal rights as stated in the signed agreement presented by the OIG)*

Print form          Reset form

Submit completed form to:

**First Coast Service Options Inc
P. O. Box 44141
Jacksonville, FL 32231-4141**

*Form revised 9/17/09*



THE FACE OF THIS DOCUMENT HAS A COLORED BACKGROUND – NOT A WHITE BACKGROUND

**UNIVERSITY OF MIAMI**

| MO. | DAY | YR. |
|-----|-----|-----|
| 10 | 01 | 13 |

No. 509097

08-509097

A GLOBAL UNIVERSITY
CORAL GABLES, FLORIDA 33124

Bank of America

63-568
631

\* \* \* \* \* \* THREE \* HUNDRED \* FIFTY \* SIX \* THOUSAND \* FIFTY \* TWO \* 06/100 \* DOLLARS \* \* \*

PAY TO THE ORDER OF

FIRST COAST SERVICES OPTIONS,
PO BOX 44141
JACKSONVILLE          FL 32231

| AMOUNT |
|--------|
| $\*\*\*\*356,052.06 |

M

VOUCHER CHECK

VICE PRESIDENT AND TREASURER

⑆509097⑆ ⑆063105683⑆ 20000056 28⑆

THE BACK OF THIS DOCUMENT CONTAINS AN ARTIFICIAL WATERMARK – HOLD AT AN ANGLE TO VIEW

---

UNIVERSITY OF MIAMI

**REMITTANCE ADVICE**

No. 509097

| REFERENCE | | AMOUNT | REFERENCE | AMOUNT |
|-----------|--|--------|-----------|--------|
| CC199213 | 0219472691 | 356,052.06 | | |

REFUND
UM

10 01 13

'CaneWatch is UM's fraud and compliance hotline www.canewatch.ethicspoint.com.