**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 13-22500-Civ-Altonaga/McAliley

JONATHAN LORD, M.D.,

      Plaintiff/Relator,

vs.

UNIVERSITY OF MIAMI,

      Defendant.

_____/

**PLAINTIFF JONATHAN LORD, M.D.'S RESPONSE IN**
**OPPOSITION TO DEFENDANT'S MOTION FOR FINAL SUMMARY JUDGMENT**

## INTRODUCTION

This dispute began nearly nine years ago when Plaintiff Jonathan Lord, M.D. ("Dr. Lord") filed a *qui tam* action against the University of Miami ("University"), alleging federal and state False Claims Act ("FCA") violations. (*See* ECF No. 1.) Most of those claims were settled when the federal government and Florida intervened. (*See* ECF No. 93.). Now just one claim remains: Dr. Lord alleges the University violated the anti-retaliation provision of the FCA by firing him from his position as a high-ranking operations and compliance officer because of his efforts to investigate billing practices that defrauded the federal government. *See* 31 U.S.C. § 3730(h).

The University moved to dismiss Dr. Lord's claims arguing that Dr. Lord did not allege he engaged in any protected activity and that such activity was not the but-for cause of his termination. Before soundly rejecting the University's arguments, the Court first analyzed the 2009 and 2010 amendments to the FCA and concluded that "[u]nder the current version of section 3730(h), the relevant question for determining whether [Dr. Lord] has alleged protected conduct is whether his allegations raise at least a reasonable inference that [he] (1) engaged in lawful acts in furtherance of a [FCA] suit when such a suit was a distinct possibility ***or*** (2) attempted to stop a violation of the Act based on an objectively reasonable belief that violations had occurred." *Lord v. Univ. of Miami*, 2021 WL 5327788, at *8 (S.D. Fla. Nov. 16, 2021) (citations omitted) (emphasis added).

Applying those tests to the Third Amended Complaint, the Court found that Dr. Lord had "ample reason to believe that the University had defrauded the government" and "clear[ly] . . . acted based on his objectively reasonable belief." *Id.* at *9. It also found that the allegations "pass the test" to show his actions were in furtherance of a FCA suit while such a suit was a "distinct possibility." *Id.* Finally, it concluded "the many facts alleged by Plaintiff plausibly suggest that Plaintiff's firing was retaliatory" and, ultimately, were "a question for resolution ***at trial***." *Id.* at *15 (emphasis added).

Discovery has further developed and crystalized the evidence. We now know that the Immuno-Monitoring Laboratory ("IML") actually received the anonymous whistleblower complaint ("OIG letter") alleging billing fraud by the Department of Surgery and naming, among others, Dr. Alan Livingstone, on September 10, 2012. (*See* Plaintiff's Counterstatement of Material Facts (ECF No. 145 ("PCMF")) at ¶¶ 77-78.) The OIG letter was eventually shared with the University's medical compliance office eleven days later on September 21 and faxed to the government on October 2. (*Id.* ¶¶ 77, 79.) By October 2, key University officials, including

1

President Donna Shalala, were aware of allegations of billing fraud implicating one of its health system's most profitable departments. (*Id.*)

On October 8, the Transplant Management Group ("TMG") was formally engaged to review, *inter alia*, the IML billing fraud allegations. (*Id.* ¶ 79.) Dr. Livingstone, the chairman of the Department of Surgery, believed that the TMG assessment was an attempt to take away the IML from his department. (*Id.* ¶ 81.) As a result, Dr. Livingstone tried to derail the assessment before it began. (*Id.* ¶ 82.)

Shortly after TMG had completed its on campus review in late November, President Shalala became aware that Dr. Livingstone accused Dean Goldschmidt and Dr. Lord of using the TMG assessment to extort Dr. Livingstone into withdrawing a petition that was critical of the Dean and Dr. Lord. (*Id.* ¶ 85.) Although President Shalala did not believe these allegations and Dean Goldschmidt told her these allegations were "pure invention and lies from Livingstone," President Shalala continued to support Dr. Livingstone. (*Id*. ¶¶ 85, 87.)

On December 14, Dr. Lord briefed President Shalala in a one-on-one meeting. (*Id.* ¶ 88.) He "went through the preliminary findings of the TMG Group" and provided her an "initial assessment that [the University] had about a $10 million potential exposure" due to IML billing issues. (*Id.*) Even though the TMG's preliminary assessment had not been disseminated,  Dr. McCafferty updated him on the preliminary information. (*Id*. ¶ 35.)

On December 18, Dean Goldschmidt and Dr. Lord received TMG's preliminary assessment and authorized Dr. McCafferty to further engage TMG. (*Id.* ¶ 89.) On December 19, President Shalala reviewed TMG's preliminary assessment which stated, *in pertinent part*, that the IML requires the most follow up and identified significant "gray areas" pertaining to financials, testing protocols and unsigned orders. (*Id*. ¶ 90.)

On or before December 20, Dr. McCafferty documented that Dr. Livingstone accused her of being the source for the "unfounded" "IML concerns," he "plans to discuss his concerns with the president" and she perceived this as "a direct attempt on [Dr. Livingstone's] part to intimidate me and to influence the outcome of the MTI, IML and OPO assessment." (*Id.* ¶ 91.)

On December 21, Dr. Livingstone met President Shalala at 9:00 am. and again complained about the TMG assessment telling her it was a witch hunt and that it was being used as a weapon. (*Id*. ¶ 92.) President Shalala then explicitly told him that her office was going to take over a review of the transplant labs, and that he could rest assured no one would ever use this audit to threaten

him again. (*Id.*) Hours later, President Shalala ordered the TMG assessment and all data relative to the assessment transferred to Internal Audit. (*Id.* ¶ 93.) That same day, she ordered Dean Goldschmidt to fire Dr. Lord which he carried out on December 31, 2012. (*Id*. ¶¶ 94, 97, 105.)

Until December 21, the evidence shows that Dr. Lord was well regarded and lauded for leading a cultural and financial turnaround of the University's health system, earning a substantial raise and promotion *after* leading the University through substantial layoffs approved by the Board of Trustees and President Shalala. (*Id*. ¶¶ 72, 73.) So why did President Shalala fire Dr. Lord on December 21, 2012? The newly discovered evidence shows it was because of his protected activity, *e.g.,* the actions he took to investigate and report Medicare fraud involving a high revenue-generating faculty member, Dr. Livingstone, who had direct access to President Shalala and exerted all of his influence to derail the TMG assessment, avoid criminal and civil liability for overbilling Medicare, and preserve a valuable revenue stream for the Department of Surgery.

Not deterred by the Court's prior Order or the evidence, the University moves for summary judgment (ECF No. 139 (the "Motion")) reprising almost verbatim the arguments this Court already rejected. It now also seeks summary judgment on its judicial estoppel affirmative defense arguing Dr. Lord took a different position in his divorce proceeding regarding his post-termination employment (he did not) that was "an obvious effort to cheat his former wife out of alimony" (it was not). (*Id.* at 2). The University is wrong. Its Motion should be denied for several reasons.

As an initial matter, the Motion cherry-picks evidence from a heap of unfavorable evidence and improperly requests that the Court make credibility determinations and resolve material factual disputes and inferences in its favor.[1] That should sound familiar. The Court's Order denying the University's Motion to Dismiss noted that the University's arguments were "little more than a request to ignore the bevy of other allegations that Plaintiff took protected actions and the portions of the TMG Report that are less favorable to Defendant."[2] *Lord*, 2021 WL 5327788, at *9. The

---

[1] To be clear, Dr. Lord believes he will prove to a jury that the University's termination was retaliatory because of his efforts to investigate fraudulent billing practices.

[2] Admittedly, Dr. Lord misidentified a document as the TMG report in the Third Amended Complaint; however, the actual preliminary assessment sent to and reviewed by President Shalala on December 19, documented, *inter alia*, that margins for the transplant laboratory relative to the industry were unusually high and consistent with earlier allegations about the department of surgery, identified significant "gray areas" pertaining to financials, testing protocols, and unsigned orders, and stated the IML required the most follow up. (PCMF ¶ 89.)

Court should not now accept the University's invitation to turn a blind eye to material evidence.

*Second*, the evidence shows that Dr. Lord engaged in protected activity under both prongs of 31 U.S.C. § 3730(h)(1). Dr. Lord protected the TMG assessment from interference while there was a "distinct possibility" of an FCA suit, he reported preliminary findings of Medicare fraud and the University's potential for significant liability to President Shalala and the Board of Trustees, and authorized completion of the external review. He took these actions when he had an objectively reasonable belief that the University was committing billing fraud based on, among other things, the OIG letter and the TMG preliminary assessment. (*See* PCMF at ¶¶ 83, 84, 85, 89, 90, 101.)

*Third*, the evidence shows Dr. Lord's termination was retaliatory and the University's made-for-litigation justification for his termination pretextual. It is undisputed that Dr. Livingstone wielded his influence and complained directly to President Shalala about the harm he could experience from the TMG assessment. (*Id.* ¶¶ 91-92.) In turn, President Shalala protected Dr. Livingstone, the transplant labs, and the University by turning over control of the IML assessment and all relevant data to Internal Audit, terminating Dr. Lord, and isolating compliance personnel supervised by Dr. Lord from the Internal Audit. (*Id.* ¶¶ 70, 93-94.) This prevented TMG from completing its review and confirming its preliminary findings and avoided any Medicare self-reporting obligations. Making President Shalala's motives clearer, she prevented Dean Goldschmidt and Dr. Lord from moving the IML from the surgery department to pathology, stopped the executive daily updates and all emails relative to the IML, and told Dean Goldschmidt that Dr. Livingstone "has to lead to more productivity." (*Id.* ¶¶ 98, 99, 103.)

The University, in turn, expects the Court to accept as true its theory that it coincidentally terminated a high-ranking corporate officer due to his supposed "tyrannical" management style (per Dr. Livingstone) and lack of communication with University leadership (and not for his protected activity) abruptly after he told President Shalala about TMG's preliminary findings and authorized completion of its assessment, and on the same day Dr. Livingstone complained about the assessment and President Shalala turned over the TMG assessment to Internal Audit. The Court should not do so. First, the Petition the University relies on was led by Dr. Livingstone and did not seek to remove Dr. Lord. (*Id.* ¶¶ 25, 86.) Second, contemporaneous documents do not support these post-hoc rationalizations. (*Id.* ¶ 105-06.) Dr. Lord was never counseled about these supposed issues. (*Id.* ¶ 15.) And Dr. Lord's "management style" had earned him praise, a substantial raise, and a promotion. (*Id.* ¶ 73.) This is more than enough to rebut these pretextual justifications.

**Fourth**, the University has not carried its burden regarding judicial estoppel. Dr. Lord's anticipated testimony regarding his post-termination employment status and efforts to secure executive-level healthcare positions (the same way he made it to the University) is not inconsistent with his testimony in his divorce. Moreover, the University's argument regarding Dr. Lord's "obvious" intent is supported only by the University's say so. That is not enough.

Stated plainly, Dr. Lord's FCA claim should be resolved at trial by a jury of his peers.

## ARGUMENT

### I. Summary Judgment Standards.

The University's summary judgment standards are incomplete. Notably, the non-movant's evidence "is to be believed, and all justifiable inferences" drawn in his favor because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted). If a reasonable fact finder could draw more than one inference from the facts that introduces a genuine issue of material fact, then summary judgment is inappropriate. *See Samples ex rel. Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1988). Summary judgment is highly disfavored. *U.S. ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 735 (D.C. Cir. 1998).

### II. Genuine Issues of Material Fact Preclude Summary Judgment Regarding Dr. Lord's Retaliatory Termination.

A plaintiff who sues under section 3730(h) must show that he engaged in protected conduct and his employer retaliated because of that protected conduct. *Mack v. Augusta-Richmond Cnty.*, 148 F. App'x 894, 896–97 (11th Cir. 2005). This standard involves three elements: (1) that the plaintiff engaged in protected conduct, (2) that the employer knew of plaintiff's protected conduct, and (3) that the employer took adverse action against the plaintiff because of the protected conduct. *See Farnsworth v. HCA, Inc.*, 2015 WL 5234640, at *3 (M.D. Fla. Sept. 8, 2015).

The University argues Dr. Lord cannot establish that President Shalala knew of Dr. Lord's protected conduct and took adverse action because of that conduct. The University is wrong.

#### a. President Shalala knew Dr. Lord engaged in protected activity.

The University suggests section 3730(h) does not protect Dr. Lord from retaliation because he held a compliance position. (Motion at 5-8). This is not the law. The University again conflates the notice standards for compliance officers with the standards for protected activity, relying on

cases regarding ***notice*** of protected activity.[3] In any event, the evidence shows Dr. Lord engaged in protected activity of which President Shalala was aware.

Section 3730(h) prohibits employers from retaliating against ***any employee*** for (1) lawful acts engaged in in furtherance of a FCA suit when such a suit was a distinct possibility or (2) attempting to stop any violation(s) of the FCA based on an objectively reasonable belief that violations had occurred. *See Lord*, 2021 WL 5327788, at *8, *11 (citing 31 U.S.C. § 3730(h)(1); *Childree v. UAP/GA AG CHEM, Inc.*, 92 F.3d 1140, 1146 (11th Cir. 1996); and *United States ex rel. Grant v. United Airlines Inc.*, 912 F.3d 190, 201 (4th Cir. 2018)). Moreover, "[t]he term 'protected activity' is interpreted broadly" because it is intended to protect all employees from retaliatory conduct so citizens can prevent "widespread" fraud on the government. *See Fanslow v. Chicago Mfg. Ctr., Inc.*, 384 F.3d 469, 479 (7th Cir. 2004) (citation omitted); *see also Lord*, 2021 WL 5327788, at *6. The notice element stems from the statute's but-for causation requirement. *See Mack*, 148 F. App'x at 897; *cf. Melvin v. Fed. Express Corp.*, 814 F. App'x 506, 519 (11th Cir. 2020) (causal connection element generally requires showing the "'decision maker was aware of the protected conduct at the time of the adverse employment action'") (citations omitted).

These are jury issues. There is substantial evidence from which the Court can draw reasonable inferences in Dr. Lord's favor to support a *prima facie* claim of retaliation.

***Actions taken in furtherance of an FCA suit.*** With respect to the "distinct possibility" standard, anti-retaliation protection applies "where the filing of such an action, by either the employee or the government, was a 'distinct possibility' at the time the assistance was rendered." *Lord*, 2021 WL 5327788, at *10 (quoting *Childree*, 92 F.3d at 1146). That is, protection applies if a juror could conclude "that the employer could have feared being reported to the government for fraud or sued in a qui tam action by the employee[.]" *Id.* (quoting United *States ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1304 (11th Cir. 2010) (alteration added; citation omitted)).

Here, litigation was a distinct possibility as soon as September 10, 2012 when the University received the OIG letter that alleged Medicare billing fraud in the Department of Surgery and then shared it with the government. (*See* PCMF ¶¶ 77-79); *see Childree*, 92 F.3d at 1146. In

---

[3] The University repeats its motion to dismiss argument nearly verbatim. (*See* Motion at 5-8; ECF No. 114 at 8-11). The Court previously noted that most cases Defendant cited pertained only to whether an employer had notice of protected activity. *Lord*, 2021 WL 5327788, at *8.

fact, the University engaged TMG on October 8 to review the IML and the fraud allegations. (*See* PCMF ¶¶ 79.) Almost immediately, Dr. Livingstone began threatening or intimidating colleagues and counseling them to not cooperate with the investigation. (*Id.* ¶¶ 82-83.)

Further, on December 3, Dr. Lord briefed the chairperson of the University's Board of Trustees' Audit and Compliance Committee on TMG's initial evaluation and, as this Court observed, "[t]he prospect of litigation became all the more palpable" when Dr. Lord informed President Shalala on December 14, that there was $10 million potential liability for Medicare fraud. (*Id.* ¶¶ 84, 88); *Lord*, 2021 WL 5327788, at *10. Five days later, Dr. McCafferty's report of TMG's preliminary assessment, prepared at Dr. Lord's direction and with the assistance of University counsel, was shared with President Shalala. (PCMF ¶¶ 89-90.) And Dr. Lord authorized Dr. McCafferty to engage TMG to complete the assessment. (*See* ECF No. 140 at ¶ 35.) Finally, on January 17, 2013, Dr. Lord emailed the University's Board of Trustees about TMG's preliminary findings and the potential fraudulent billing, and insisted that TMG complete its external review without interference. (*See* PCMF ¶ 102.) This is more than enough evidence that Dr. Lord acted in furtherance of a potential FCA suit while such suit was a distinct possibility. *See United States ex rel. Paredes v. Res-Care, Inc.*, 2006 WL 8432596, at *8 (S.D. Fla. Feb. 9, 2006) (denying summary judgment because plaintiff internally reported potential fraud on the government); *U.S. ex rel. Parato v. Unadilla Health Care Ctr., Inc.*, 787 F. Supp. 2d 1329, 1344 (M.D. Ga. 2011) (denying summary judgment where CEO wrote memorandum to the Board expressing concerns regarding Medicare and Medicaid fraud and noted potential liability).

***Actions taken to stop any violation(s) of the FCA***. A plaintiff makes efforts to stop FCA violations if he is "'motivated by an objectively reasonable belief that the employer is violating, or will soon violate, the [FCA].'" *Lord*, 2021 WL 5327788, at *9 (quoting *Grant*, 912 F.3d at 201 (alteration added)). A plaintiff's belief that his employer is violating the FCA is objectively reasonable when he reasonably believed his employer was violating the FCA and took actions designed to stop violations of the FCA based on that belief. *Id.* The Court previously found that Dr. Lord "had ample reason to believe that the University had defrauded the government." *Id.*

The evidence supports this same conclusion. First, Dr. Lord's suspicions were initially stoked by the OIG letter that detailed ongoing "fraud to Medicare[.]" (*See* PCMF ¶¶ 77-78.) Then, Dr. Livingstone began trying to meddle with the TMG assessment by intimidating compliance personnel and counseling colleagues not to cooperate with TMG. (*Id.* ¶ 82.) Dr. Ciancio relayed a

fear of retaliation from, among others, Dr. Livingstone. (*Id.*) And these suspicions were supported by TMG's preliminary findings (reduced to writing by Dr. McCafferty), which noted that the margins for the transplant laboratory relative to the industry were unusually high and consistent with earlier allegations about the department of surgery, identified significant "gray areas" pertaining to financials, testing protocols, and unsigned orders, and stated the IML required the most follow up. (*Id.* ¶ 89.) As the Court previously concluded, TMG's preliminary findings "furnished Plaintiff with more than a reasonable belief that Defendant had violated the False Claims Act." *Lord*, 2021 WL 5327788, at *9.

Moreover, Dr. Lord acted based on his objectively reasonable belief. After reviewing the OIG letter, Dr. Lord advocated for an external IML review free from University interference. (*See* PCMF ¶¶ 83, 102.) Then Dr. Lord shared what TMG was finding and "possible exposures" with the chairperson of the University Board of Trustees' Audit and Compliance Committee, then TMG's preliminary findings, his estimate of potential FCA liability ($10 million), and Dr. McCafferty's report with President Shalala and the University's Board of Trustees. (*Id.* ¶¶ 84, 88, 102.) He then authorized an expanded investigation of the potential fraud. (*Id.* ¶ 89.) "These are precisely the sorts of 'efforts' that section 3730(h) protects." *Lord*, 2021 WL 5327788, at *9.

***Notice of Dr. Lord's protected activity.*** Normally, that Dr. Lord investigated or reported potential fraud would satisfy any notice requirement. *Id.* at *11 (citing *Maturi v. McLaughlin Rsch. Corp.*, 413 F.3d 166, 173 (1st Cir. 2005)). However, some courts require a more demanding showing when the employee is a compliance professional based on the statute's causation element.[4] *Id.* (citing cases). Ultimately, this element is satisfied "by any action [that] a factfinder reasonably could conclude would put the employer on notice that litigation is a reasonable possibility[,]" *Eberhardt v. Integrated Design & Constr., Inc.*, 167 F.3d 861, 868 (4th Cir. 1999); or by any action that would make an employer aware of the plaintiff's efforts to stop FCA violations. *Lord*, 2021 WL 5327788, at *11. Compliance professionals may establish notice "by expressly stating an intention to bring a qui tam suit," *Eberhardt*, 167 F.3d at 868; "characterizing the employer's conduct as illegal or fraudulent[,]" *id.*; "recommending that legal counsel become

---

[4] It is unclear whether this reasoning applies in the Eleventh Circuit. But this Court previously considered an unpublished Eleventh Circuit that supported heightened notice requirements for compliance employees. *See Mack*, 148 F. App'x at 897 (citation omitted). But it does not matter. Dr. Lord did enough even if the more rigorous notice standard applies to compliance employees.

involved[,]" *id.*; "act[ing] outside his normal job responsibilities[,]" *Williams*, 389 F.3d at 1261 (citation omitted); or "alert[ing] a party outside the usual chain of command[,] *id.* (alterations added; citation omitted). "[T]alismanic words" are not necessary to satisfy this element. *Id.* Moreover, the final decision-maker must have known about the protected conduct to establish causation. *Kalch v. Raytheon Tech. Servs. Co., LLC*, No. 6:16-cv-1529, 2017 WL 3394240, at *3 (M.D. Fla. Aug. 8, 2017) (citing *Reynolds v. Winn-Dixie Raleigh, Inc.*, 620 F. App'x 785, 792 (11th Cir. 2015)). President Shalala was aware of Dr. Lord's protected activity.

The Court's prior Order explained that Dr. Lord sufficiently alleged notice based on inferences from "[t]hree sequences of events." *Lord*, 2021 WL 5327788, at *12. The Court should deny summary judgment for the same reasons.

First, Dr. Lord alleged that before he was fired he briefed President Shalala about the TMG's preliminary findings, which expressly opined that the IML's billing could "be construed as Medicare billing fraud[.]" *Id.* at *13. These allegations supported "a reasonable inference that Plaintiff expressed concern to Shalala about potential fraud[,]" which is "enough to establish notice, even for a compliance employee." *Id.* (citing *Eberhardt*, 167 F.3d at 868). The evidence confirms these allegations. Dr. Lord personally briefed President Shalala about TMG's preliminary findings, albeit before they were reduced to writing by Dr. McCafferty, and warned her that TMG's preliminary assessment would conclude fraud was committed. (PCMF ¶ 88.) He, through Dean Goldschmidt, then shared the written report with President Shalala on December 19. (*Id.* ¶ 90.)

The University again "resists this result" claiming Dr. Lord admitted that reporting fraud concerns was "regular" and "not exceptional." (Motion at 7.) The Court previously rejected this argument, finding that applying inferences in Dr. Lord's favor "compels the conclusion that Plaintiff's briefing Shalala on the TMG Report was beyond the ambit of his usual responsibilities" because Dr. Lord had not alleged that he "regularly met with Shalala to discuss compliance" or that he "frequently briefed Shalala on external investigations into allegations of fraud." *Lord*, 2021 WL 5327788, at *13. The evidence shows Dr. Lord did not regularly meet with President Shalala to discuss compliance or external investigations into fraud allegations. Although Dr. Lord had meetings with President Shalala throughout his tenure, he never discussed compliance issues with President Shalala until after the OIG letter was received in late September 2012. (PCMF ¶¶ 17, 31.) Moreover, there is no evidence that Dr. Lord regularly met with President Shalala to discuss

compliance issues or external investigations into allegations of fraud. (*Id.*) The Court should again reject the University's argument.

The University also argues that TMG's preliminary findings only showed a "mere possibility" of fraud. (Motion at 8-9). This is nonsense. Notwithstanding that the University ultimately settled Dr. Lord's FCA claims, the FCA anti-retaliation provision "manifests Congress' intent to protect employees while they are collecting information about a possible fraud, *before* they have put all the pieces of the puzzle together." *Yesudian*, 153 F.3d at 740 (citing *Neal v. Honeywell Inc.*, 33 F.3d 860, 864 (7th Cir. 1994)); *see also id.* at 740–41 ("[T]here is no requirement that to be protected, a plaintiff must have gathered all of the evidence by the time of the retaliation.") The University's case law is also decidedly inapposite.

In *Colesanti v. Becton Dickinson*, CV 18-491WES, 2019 WL 4043957, at *10 (D.R.I. July 19, 2019), the plaintiff did not allege that they ever formed an objectively reasonable belief regarding securities fraud. Moreover, "at most," the complaint alleged that the plaintiff identified a system failure of a payment management system that resulted in an "overpayment payment error" and "created the **risk** that actual fraud" might not have been detected. *Id.* (emphasis added). Even worse, the University cites *United States v. Ukomadu*, 236 F.3d 333, 337 (6th Cir. 2001), which addressed whether government agents had an objectively reasonable belief that the destruction of drugs was imminent in a Fourth Amendment context.  This case has no application here.[5]

President Shalala also had notice for several other reasons. The Court was previously persuaded by reasonable inferences that other University employees discussed Dr. Lord's investigation related activities with President Shalala. *Lord*, 2021 WL 5327788, at *13. Those remain reasonable inferences based on the evidence. For example, on December 3, 2012, Dr. Lord briefed the chairperson of the University's Board of Trustees' Audit and Compliance Committee

---

[5] The University also buries a third argument in a footnote regarding unspecified post-December 2012 protected activity. This brief argument is waived. *See, e.g.*, *Zuma Seguros, CA v. World Jet of Delaware, Inc.*, 2017 WL 4237874, at *9 (S.D. Fla. Sept. 25, 2017) (Goodman, M.J.) ("[B]urying a substantive argument in a footnote (only) is impermissible and waives the argument.") Even if this argument is considered, Dr. Lord's tenure at the University in other capacities would remain unclear until late January. (PCMF ¶ 63.) Moreover, President Shalala's sarcastic response — "give him his check and thank him for his hard work on our behalf" — to Dr. Lord's January 2013 email to the Board of Trustees insisting that an external review of billing fraud be completed (and noting the potential liability) is relevant to her state of mind regarding Dr. Lord's protected activity in December 2012. (*Id.* ¶ 102.) Thus, protected activity occurring in January should be considered.

on TMG's initial evaluation, alluding to preliminary findings of fraud. (*Id.* ¶ 84.) Additionally, and perhaps the most significant evidence to emerge from discovery are the communications Dr. Livingstone had with President Shalala concerning Dr. Lord's investigation-related activities. Specifically, Dr. Livingstone himself emailed the Chairman of the University's Board of Trustees to complain about the TMG assessment, mentioning Dr. Lord's involvement, and contemporaneously documented that "the Provost and the President" had been made aware of the contents of that email through University's counsel. (*Id.* ¶ 85.) Dr. Livingstone also documented that President Shalala was "certain" that Dr. Lord was not using the TMG's preliminary findings and assessment as a threat to Dr. Livingstone, Dr. Livingstone and President Shalala discussed the IML billing issues, and that she had "discussions about the IML" with others and that "her office was going [to] take over a review of the transplant labs." (*Id.* ¶ 92.) Accordingly, these facts and reasonable inferences strongly suggest President Shalala was acutely aware of Dr. Lord's role in the TMG process. *See Yesudian*, 153 F.3d at 743 (reversing summary judgment because a juror could reasonably conclude that employees other than plaintiff made retaliator aware of plaintiff's protected conduct).

Finally, as noted above, Dr. Lord informed the Board of Trustees of TMG's preliminary findings and the written report on two occasions, first on December 3, 2012 and then on January 17, 2013, each time alluding to potential sanctions. (*Id.* ¶¶ 84, 102.) The first report was clearly before Dr. Lord was terminated and the latter came amid widespread uncertainty about Dr. Lord's employment status. (*See id.* ¶¶ 63, 96, 97, 100-01.) It was twelve days later that the University informed Dr. Lord that he would be terminated from all positions and retain no role within the University. (*See id.* ¶ 104); *see also Williams*, 389 F.3d at 1261 (holding that an employee may give his employer notice of protected activity when he "alerts a party outside the usual chain of command"). In response to the latter email to the Board of Trustees, President Shalala told Dean Goldschmidt to give Dr. Lord his check and thank him for his hard work on our behalf. (PCMF ¶ 102.) Again, these facts and reasonable inferences establish that the University's highest corporate officer and decisionmaker was directly or indirectly aware of Dr. Lord's protected activity.

> b. **Dr. Lord was terminated because he engaged in protected activity**.

>> i. Dr. Lord produced evidence to establish but-for causation.

Although the University appears to concede the close temporal proximity between the protected activity and Dr. Lord's termination is enough to establish but-for causation, the

University argues Dr. Lord cannot establish a *prima facie* but-for causation because (1) he must demonstrate the decisionmaker was aware of his protected conduct (which he has as addressed above in section II.a.) and (2) Dr. Lord was on "thin ice" at the time of the protected activity on December 14. The University is mistaken.

In retaliation cases involving some evidence of contemplated adverse action before an employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not alone suffice to show causation. *See Buchanan v. Delta Air Lines, Inc.*, 727 F. App'x 639, 642 (11th Cir. 2018) ("[T]emporal proximity alone cannot establish causation."); *see also Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006). Here, it is at minimum a genuine issue of material fact whether there was any evidence of contemplated adverse action (Dr. Lord is not aware of any) and when Dr. Lord first engaged in protected activity. As stated earlier, the University was aware of the OIG letter in September 2012 and TMG was engaged by October 8. (PCMF ¶¶ 77-80.) Dr. Lord immediately had to shield the external review from Livingstone's interference. (*Id.* ¶ 83.) Thus, December 14 is merely the latest date by which Dr. Lord engaged in protected activity directly with President Shalala.

Even assuming December 14 is the line of demarcation (which it is not), Dr. Lord's evidence of but-for causation is not just the "temporal proximity" to his protected activity. As repeated throughout, Dr. Lord attempted to shield the TMG assessment from, primarily, Dr. Livingstone. (*Id.*) Dr. Livingstone chaired one of the most profitable departments in the medical school, was an influential faculty member, and was personally implicated in the OIG whistleblower letter. (*Id.* ¶¶ 78, 81.). He threatened and intimidated colleagues with respect to TMG's assessment of the IML's billing practices, and wanted to be involved in the assessment. (*Id.* ¶¶ 82, 91.) He lobbied University employees to sign a petition criticizing Dean Goldschmidt and Dr. Lord. (*Id.* ¶ 86.) He even threatened to exert his significant influence and complain directly to President Shalala. (*Id.* ¶ 91.) And Dr. Livingstone did just that. After Dr. Lord informed the Board of Trustees of TMG's preliminary findings and President Shalala that the potential liability could exceed $10 million dollars, and authorized TMG's engagement to complete its preliminary assessment, Dr. Livingstone complained to President Shalala about the harm he (and, in turn, the University) could experience if the TMG assessment was completed and the Department of Surgery lost control of the transplant labs to pathology. (*Id.* ¶ 92.).

President Shalala protected Dr. Livingstone and the University, turning over control of the IML assessment from TMG to an internal audit department, and removing any resistance to the internal review process (*i.e.*, terminating Dr. Lord and isolating Dr. McCafferty from the internal audit before eventually eliminating her position and giving her a less prominent role). (*Id.* ¶¶ 70, 93, 94.) As a result, President Shalala terminated or isolated the two most prominent compliance employees in the University health system who were strong advocates for performing an external review of IML billing practices shortly after engaging in protected activity and with a clear financial motive—Dr. Livingstone's and the transplant lab's "productivity." (*Id.* ¶¶ 81, 103.) Accordingly, the totality of the evidence shows that President Shalala fired Dr. Lord due to his efforts to raise awareness of, report on, and further investigate FCA violations. (*Id.* ¶ 42.)

Moreover, there is no evidence that Dr. Lord was ever on "thin ice" with President Shalala. For instance, there is no evidence that there were plans to terminate him independent of the TMG findings. Dr. Goldschmidt, who could rescind Dr. Lord's employment at any time in his discretion, was "upset about losing" Dr. Lord and wanted him to at least return to his prior role. (*Id.* ¶¶ 100, 105). Yet, President Shalala, not Dean Goldschmidt, decided to fire Dr. Lord and could not explain why nothing in his personnel file reflected the stated reasons for Dr. Lord's termination. (*Id.* ¶ 105.) In fact, aside from the Petition discussed below, the University has not produced one contemporaneous document showing that anyone criticized, counseled, or reprimanded Dr. Lord or documented President Shalala's "legitimate" reasons to terminate him. (*Id.* ¶¶ 105-06.)

With respect to the Petition, the University leaves out significant details. As an initial matter, Dr. Livingstone was heavily motivated to stop the TMG assessment and was one of the leaders behind the Petition. (*Id.* ¶¶ 78, 81, 86.) Further, the Petition did not call for the "removal of Lord and Dean Goldschmidt." (*Id.* ¶ 25.) The Petition stated, in pertinent part: "We are steadfast in our commitment to our school, our university, and the welfare of our community and believe that this faculty, our students, and most importantly, our patients ***deserve a dean*** who shares this view." (*Id.* (emphasis added).) Dr. Lord believed Dean Goldschmidt was the focus of the Petition based on history at the University and activities that took place from 2013 through 2015.[6] (*Id.*)

---

[6] If the University insists that the Petition was a legitimate reason for termination of Dr. Lord (but somehow not Dean Goldschmidt), then summary judgment should also be denied because Dr. Lord may not have been terminated as quickly but for the protected activity. *See Alvarez v. Royal Atl.*

In addition, the so-called evidence that Dr. Lord's management style was "domineering," "tyrannical," and his tenure a "Reign of Terror" comes from Dr. Livingstone who also understood that the substantial employee layoffs were approved by University leadership and had to be done. (*Id.* ¶ 24.) It did not come from President Shalala. It is no surprise that Dr. Livingstone, the person trying to derail the TMG assessment, would view Dr. Lord's tenure as a "Reign of Terror." (*Id.*) He had a lot riding on the outcome of the TMG review and Dr. Lord stood in the way of Dr. Livingstone's efforts to meddle in the review. Notwithstanding that, Dr. Livingstone's biased opinion regarding Dr. Lord is irrelevant, hearsay, and lacks foundation. Alternatively, its probative value is substantially outweighed by the danger of unfair prejudice and confusion of the issues. And like the University's other post-hoc "evidence," it is unsupported by any contemporaneous documents.

Finally, the University does not cite a single analogous case. Instead it relies on cases involving clear employee misconduct (not applicable here). *See Buchanan v. Delta Air Lines, Inc.*, 727 F. App'x 639, 642 (11th Cir. 2018) ("Because her internal complaint occurred *after* she was already placed on suspension and under investigation, temporal proximity alone cannot establish causation."); *Henderson v. FedEx Express*, 442 F. App'x 502, 506–07 (11th Cir. 2011) (no evidence of knowledge of protected activity and plaintiff's "falsification of his time card" was an "intervening act of misconduct that diminished any inference of causation that may have arisen out of the temporal proximity between his September 14 interview and his termination").[7] Accordingly, Dr. Lord has established a *prima facie* case of but-for causation.

    ii.   <u>The University's made-for-litigation reasons for terminating Dr. Lord are pretextual.</u>

Without a hint of irony, the University argues "there exists not a scintilla of evidence in this case that Plaintiff was terminated because of anything related to the FCA." (Motion at 14.)

---

*Developers, Inc.*, 610 F.3d 1253, 1269 (11th Cir. 2010) (reversing summary judgment because employee was fired sooner than she would have been but for protected activity).

[7] *See also Alvarez*, 610 F.3d at 1268 (defendant not entitled to summary judgment where plaintiff knew her employer "had begun searching for a new controller weeks before" when she engaged in protected activity that expedited her termination); *Hankins v. AirTran Airways, Inc.*, 237 F. App'x 513, 520–21 (11th Cir. 2007) (causation evidence limited to temporal proximity and it was undisputed that five days after a probationary airline employee engaged in protected activity she engaged in "flagrant act of misconduct" by "yell[ing] at a co-worker for cutting her off in line and stat[ing] that she would 'kick his ass if he ever tried to cut in front of [her] again in line'").

This is so, according to the University, because there was a Petition, a "Reign of Terror" culture fostered by Dr. Lord (per Dr. Livingstone), and Dean Goldschmidt and Dr. McCafferty were not terminated. (*Id.* ¶¶ 13-14). But the University's post-hoc justification for termination is a house of cards. To credit it is to ignore a mountain of evidence of retaliatory intent.

A legitimate reason for an adverse action is a reason independent from the alleged basis of retaliation. *See Sheppard v. Sears Roebuck & Co.*, 391 F. Supp. 2d 1168 (S.D. Fla. 2005). After legitimate, non-discriminatory reasons for an employment decision have been given, a plaintiff alleging retaliation must show that the employer's stated reasons were false and that the real reason was retaliation. *See Hankins*, 237 F. App'x at 522. This may be done "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* (quoting *Carter v. City of Miami*, 870 F.2d 578, 584 (11th Cir. 1989) (citations and quotations omitted)). Pursuant to established case law, "the pretext inquiry is concerned with the employer's *perception* of the employee's performance[.]" *Hankins*, 237 F. App'x at 522 (quoting *Cooper*, 390 F.3d at 740).

To begin with, the Petition and Dr. Lord's supposed "Reign of Terror" are not reasons for termination independent of the retaliation. The source of that evidence and supposed foundation for the "legitimate" reasons for termination is Dr. Livingstone, who intimidated and threatened colleagues regarding the TMG assessment and was motivated to and ultimately did exert his influence to interfere with the TMG assessment. (PCMF ¶¶ 81, 82, 85, 87, 91, 92.) Unsurprisingly, then, "Dr. Livingstone was one of the leaders of the petition." (*Id.* ¶ 86.) He even floated an unsubstantiated and nonsensical theory (with no evidentiary support then and none now) to the Board of Trustees and President Shalala that Dr. Lord was using the TMG assessment as leverage against Dr. Livingstone. (*Id.* ¶ 85.) President Shalala did not even believe him. (*Id.*) Moreover, the University does not cite any admissible evidence that there was a "consensus on campus" regarding Dr. Lord's management style; rather, it relies exclusively on Dr. Livingstone's biased description (which is contradicted by other documentary evidence).

Moreover, as thoroughly addressed above at section II.b.i., there is substantial evidence (and permissible inferences to be drawn therefrom) establishing Dr. Lord's termination was retaliatory. This evidence is based on the same allegations the Court previously noted "plausibly tell the story that Livingstone possessed both the ability and the incentive to influence the TMG investigation, he in fact exerted this influence by attempting to persuade Shalala to scuttle the

investigation, Shalala agreed with Livingstone that the TMG investigation could harm the University, and Shalala fired Plaintiff to avoid the fallout" and presented a "question for resolution at trial." *Lord*, 2021 WL 5327788, at *14–15.

The University ignores this evidence and asks the Court to accept as true its made-for-litigation theory that it coincidentally terminated a high-ranking corporate officer due to his supposed "tyrannical" management style (per Dr. Livingstone) and lack of communication with University leadership just as President Shalala became aware of significant fraud concerns. The Court should not do so. The Petition did not seek to remove Dr. Lord. (*Id.* ¶ 25.) Moreover, contemporaneous documents do not support these ambiguous (at best) post-hoc reasons. (*Id.* ¶¶ 105-06.) In fact, Dr. Lord was never counseled about these supposed termination-worthy issues. (*Id.* ¶¶ 15, 106.) Even CFO Joe Natoli, with whom Dr. Lord initially had a friendly out-of-work relationship, never complained to anyone of communications issues with Dr. Lord. (*Id.* ¶ 14.) That is because it did not happen. And Dr. Lord's "management style" up to that point had earned him praise, a substantial raise, and a promotion ***after*** the unsurprisingly unpopular layoffs. (*Id.* ¶ 73.) Further, Dean Goldschmidt credited Dr. Lord for what he called the greatest financial turnaround in university healthcare and was "upset about losing" Dr. Lord. (*Id.* ¶ 72-73, 100.) This is more than enough to rebut the pretextual reasons for termination.

Last, the University argues that if President Shalala had retaliatory animus, then Dean Goldschmidt and Dr. McCafferty would have been fired too. The University again asks the Court to draw inferences in its favor, ignores facts in evidence, and relies on inapposite case law. Dean Goldschmidt was the main character in the Petition the University claims is their key to summary judgment, yet was not terminated. Applying the University's logic (*i.e.*, what happens to Dr. Lord must happen to Dean Goldschmidt), then the fact Dean Goldschmidt was not fired must mean the Petition is a pretextual reason for Dr. Lord's termination. The more likely reasons for the disparate termination treatment is that Dr. Lord (not Dean Goldschmidt) prominently fended off Dr. Livingstone's attempts to interfere with the investigation and Dr. Lord (not Dean Goldschmidt) was a compliance officer with more direct knowledge concerning the TMG preliminary findings. (*See* PCMF ¶¶ 5, 83.) Or, Dean Goldschmidt was more likely than Dr. Lord to go along with President Shalala bringing the external assessment in house. (*Id.* ¶ 102.)

With respect to Dr. McCafferty, the University forgets that retaliation comes in many forms. Dr. McCafferty, the Chief Medical Compliance Officer, was immediately stripped of all

responsibility for the IML billing assessment and isolated from the subsequent review conducted by Compliance Concepts. (*Id.* ¶ 93.) After she refused to validate the Compliance Concepts review, her position was eliminated and she was moved to a less prominent role with fewer responsibilities. (*Id.* ¶ <u>70.</u>) That is retaliation. *See* 31 U.S.C. § 3730(h)(1).

Finally, for this proposition the University relies on *Hamza v. Saks Fifth Ave., Inc.*, 2012 WL 13036200, at *6 (S.D.N.Y. Sept. 26, 2012), a case involving alleged discrimination to a Muslim employee where other Muslim employees had not been subjected to retaliation based on the same alleged protected activity.  This case has no application here.

### III. There are Genuine Issues of Material Fact Precluding Entry of Summary Judgment on the University's Judicial Estoppel Affirmative Defense.

Because the University wrongfully terminated a well-paid officer, portrayed the termination negatively in the press (harming future employment prospects), and litigated the FCA claim for years, it now faces significant liability (back pay, interest, special damages). Understandably, it does not want to pay. So it tries the next best thing, concocting a judicial estoppel argument out of misunderstood facts and asking the Court to dismiss Dr. Lord's claim. But Dr. Lord's testimony in his divorce and anticipated here is not inconsistent. Moreover, the University's "evidence" of intent is solely its assumption Dr. Lord was motivated to lie (he was not). Notably, Dr. Lord did not hide a secret marital asset. His divorce obviously involved his then spouse. She knew about his employment status, including efforts to secure executive-level employment, and eventually learned about the FCA claim. The University does not explain why it should be allowed to avoid indisputable evidence that it terminated Dr. Lord and that Dr. Lord tried, but failed, to secure executive-level employment after his termination. The University cannot circumvent its burden to prove Dr. Lord failed to mitigate his damages and avoid a trial.

a. <u>Judicial Estoppel Standards</u>.

In the Eleventh Circuit, courts generally consider two factors in applying judicial estoppel: (1) a party's allegedly inconsistent positions must have been made under oath in a prior proceeding and (2) the inconsistencies must be shown to have been calculated to make a mockery of the judicial system. *Supermedia LLC v. Mustell & Borrow, Attorneys at Law*, 2011 WL 13174647, at *3 (S.D. Fla. Jan. 31, 2011)  (quoting *Barger v. City of Cartersville,* 348 F.3d 1289, 1294 (11th Cir. 2003) (quotation omitted)). However, because this is an equitable doctrine invoked at the Court's discretion, "courts must always give due consideration to all of the circumstances of a particular case when considering the applicability of this doctrine." *Id.* (quoting *Burnes v. Pemco*

*Aeroplex, Inc.,* 291 F.3d 1282, 1286 (11th Cir. 2002)). Such considerations include whether the non-movant succeeded in the prior proceeding and any prejudice to the movant. *Supermedia LLC*, 2011 WL 13174647, at *6 (citations omitted).

The burden is on the defendant to present uncontroverted evidence entitling it to judgment. *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 (11th Cir. 1991) (*en banc*). Even if a party makes inconsistent statements, summary judgment cannot be granted if there exists a material issue of fact regarding the non-movant's "motivation and intent to manipulate the judicial system." *Ajaka v. Brooksamerica Mortg. Corp.*, 453 F.3d 1339, 1346 (11th Cir. 2006) (reversing summary judgment because intent was disputed fact). Knowledge or intent is usually a question of fact for the jury to be determined at trial. *Chanel, Inc. v. Italian Activewear of Florida, Inc.,* 931 F.2d 1472, 1476 (11th Cir. 1991) (citation omitted).

Judicial estoppel should be applied with caution because the results are harsh. *Supermedia LLC v*, 2011 WL 13174647, at *3 (quotations omitted). It should "apply only when the plaintiff's conduct is egregious enough that the situation 'demand[s] equitable intervention.'" *Slater v. United States Steel Corp.*, 871 F.3d 1174, 1187–88 (11th Cir. 2017) (quoting *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 248 (1944)).

> b. <u>The University has failed to show that the testimony in the divorce proceeding is inconsistent with Dr. Lord's anticipated testimony.</u>

The University argues that Dr. Lord's testimony in his divorce — that he was "retired" and was not actively looking for employment — is inconsistent with his anticipated testimony in this proceeding. The University misrepresents the facts. In his divorce, Dr. Lord described that he retired from his ***professorship*** to avoid violating the seal in this case. (*Id.* ¶ 63.) Moreover, Dr. Lord's answers were informed by what he knew at the time. (*Id.* ¶ 63.a.i.1.) Provost LeBlanc had explained that there were "no departmental funds available for his continued appointment in the pathology department." (*Id.*) As a result, Dr. Lord testified in his divorce case that he waived his right to a departmental vote and "resigned"/"retired" from his professorship as of July 31, 2013. (*Id.*) Dr. Lord also testified during his divorce case that he was terminated from his other positions. (*Id.* ¶ 63.a.ii.)

On May 9, 2016, the Court granted the United States' Second Motion to Partially Lift Seal (ECF No. 46) and ordered the seal partially lifted to allow the United States in its discretion, to disclose Dr. Lord's Complaint and Material Disclosure Statement to Dr. Lord's ex-wife, her

counsel, and officers of the Court overseeing the Divorce Proceeding (ECF No. 47), thereby allowing the parties to candidly discuss the FCA claim's impact on the divorce. (*Id.* ¶ 66.)

Dr. Lord's prior testimony is not inconsistent with his anticipated testimony. Since the divorce and ***after*** Dr. Lord's deposition was taken in this case, discovery revealed that President Shalala terminated Dr. Lord from all positions at the University. (*Id.* ¶ 63.a.i.1) Thus, Dr. Lord's testimony regarding his professorship will reflect his current understanding that he was terminated from that position.

He will also testify regarding his efforts to secure equivalent executive-level employment, consistent with his testimony in the divorce, but updated with information subsequent to the divorce. For instance, his testimony will be similar to his interrogatory response: "after the end of his employment with the University of Miami in July 2013, Dr. Lord was open to opportunities in the health care sector commensurate with his executive roles at the University. Because such roles are not generally widely advertised or publicly posted, Dr. Lord contacted professional recruiters and individuals in his professional network to discuss career opportunities and openings. Dr. Lord produced communications evidencing this outreach and networking." (*Id.* ¶ 62.) It is simply indisputable that Dr. Lord was engaging in the same kind of efforts that landed him his role with the University and nearly landed him two opportunities with other healthcare institutions — the ADA and then with the American College of Pathologists. (*Id.* ¶¶ 62, 63; Interrog No. 12.)

c.   The University has offered no evidence regarding Dr. Lord's intent.

"Judicial estoppel should not be applied when the inconsistent positions were the result of 'inadvertence[ ] or mistake' because judicial estoppel 'looks towards cold manipulation and not an unthinking or confused blunder.' " *Slater*, 871 F.3d at 1181 (quoting *Johnson Serv. Co. v. Transamerica Ins. Co.*, 485 F.2d 164, 175 (5th Cir. 1973)). Applying judicial estoppel without proof of intent results in "an unjustified windfall." *Slater*, 871 F.3d at 1187. And equity cannot allow the University to avoid liability "through a doctrine premised upon intentional misconduct without establishing such misconduct." *Id.* at 1188 (citation omitted).

As an initial matter, the University believes that financial incentive alone establishes intent. (Motion at 15.) It does not. Proving intent requires review of the specific circumstances of the case, not just financial incentive. *See Ajaka*, 453 F.3d at 1346 (reversing summary judgment because genuine fact dispute regarding motivation and intent to manipulate the judicial system); *In re McCutcheon*, 598 B.R. 339, 348 (Bankr. M.D. Ga. 2019) (denying summary judgment

because financial motive "is no longer dispositive" and the "inquiry is based on the specific circumstances surrounding the case") (citing *Slater*, 871 F.3d at 1185); *Vignoli v. Clifton Apartments, Inc.*, 2014 WL 6850775, at \*9–10 (S.D. Fla. Oct. 7, 2014) (evidence of failure to disclose employment, standing alone, was not enough), *report and recommendation adopted*, 2014 WL 6850778 (S.D. Fla. Dec. 3, 2014). The University has made no effort to do this. This alone warrants denial of its Motion. *See Callahan v. Emory Healthcare, Inc.,* 2019 WL 12405937, at \*11 (N.D. Ga. Dec. 20, 2019) (denying summary judgment because failure to disclose may have been an unthinking or confused error), *report and recommendation adopted*, 2020 WL 10110993 (N.D. Ga. Jan. 7, 2020).

In any event, even assuming Dr. Lord's testimony was inconsistent (it is not), there was no "cold manipulation." First, as explained above, Dr. Lord's testimony was based on what he understood about the ***professorship*** at the time of his testimony and his desire to avoid violating the seal in this FCA case. Second, while Dr. Lord's ex-wife did not receive alimony as part of a knowing and voluntary ***settlement***, it was, in large part, because she received a substantial settlement and 50% of any recovery in this case. (*See* PCMF ¶ 67.) Third, Dr. Lord's testimony (discussed above) clarified any ambiguity regarding retirement, described his efforts to secure executive-level opportunities, and revealed the existence of the FCA case, including the retaliation claim, which explained Dr. Lord's difficulties in securing alternative employment. (*Id.* ¶ 62.a.i.1.) Stated simply, Dr. Lord is not playing games and changing positions based on the exigencies of the moment.

Finally, the University does not and cannot make any claim that the supposed inconsistency in Dr. Lord's testimony would impose any unfair detriment on the University other than forcing it face the music for its retaliatory firing. This factor also weighs against applying judicial estoppel. *See Supermedia LLC*, 2011 WL 13174647, at \*6 (citing *Yerk v. People ex rel. Ethical Treatment of Animals,* 2010 U.S. Dist. LEXIS 98718 (M.D. Fla. Sept. 21, 2010) (citing lack of adverse impact on defendant as "factor which weighs against the relief sought by [the defendant]")).

Accordingly, the Court should deny summary judgment on the University's judicial estoppel affirmative defense.

## CONCLUSION

For the foregoing reasons, the University's Motion for Summary Judgment should be denied and this nine-year-old matter resolved at trial by a jury of his peers.

Dated: June 21, 2022

Respectfully Submitted,

STUMPHAUZER FOSLID SLOMAN
ROSS & KOLAYA, PLLC
Two South Biscayne Boulevard, Suite 1600
Miami, Florida 33131
Tel.: (305) 614-1400
Fax: (305) 614-1425

By: */s/ Jorge A. Pérez Santiago*
JEFFREY H. SLOMAN
Florida Bar No. 378879
jsloman@sfslaw.com
JORGE A. PÉREZ SANTIAGO
Florida Bar No. 91915
jperezsantiago@sfslaw.com
JENNIFER M. HERNANDEZ
Florida Bar No. 1018836
jhernandez@sfslaw.com
*Counsel for Plaintiff Dr. Lord*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 21, 2022, I filed the foregoing document on CM/ECF

causing a copy to be served on all counsel of record via electronic mail.

*/s/ Jorge A. Pérez Santiago*
JORGE A. PÉREZ SANTIAGO