**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 13-22500-CIV-ALTONAGA/McALILEY**

JONATHAN LORD, M.D.,

      *Plaintiff*,

v.

UNIVERSITY OF MIAMI,

      *Defendant*.

_____/

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN**
**OPPOSITION TO DEFENDANT'S STATEMENT OF MATERIAL FACTS**

## **TABLE OF EXHIBITS**

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 1 | Transcript of the Deposition of Jonathan Lord on February 18, 2015 in *Fayad v. University of Miami et al.*, Case No. 13-04086, 11th Judicial Circuit, Miami-Dade County, Florida ("Fayad Depo") |
| 2 | Transcript of the Deposition of Jonathan Lord taken on January 18, 2016 in his Divorce Case ("Lord Divorce Depo") |
| 3 | United States' Notice of Seal Breach and Second Motion to Partially Lift Seal, *United States of America, ex rel. Jonathan Lord, M.D. v. University of Miami*, Case No. 13-22500-Civ-Altonaga ("Government's Motion to Partially Lift Seal") |
| 4 | Sealed Order, *United States of America, ex rel. Jonathan Lord, M.D. v. University of Miami*, Case No. 13-22500-Civ-Altonaga, ("Order Partially Lifting Seal") |
| 5 | The University's Responses and Objections to Plaintiff's First Set of Requests for Admission ("University's Original Admission No. __") |
| 6 | The University's Amended Responses and Objections to Plaintiff's First Set of Requests for Admission ("University's Amended Admission No. __") |
| 7 | The University's Second Amended Responses and Objections to Plaintiff's First Set of Requests for Admission ("University's 2nd Admission No. __") |
| 8 | UM/LORD - 045584 – 5 "Memo for the record- follow up to Nemeroff threat" produced by the University on May 16, 2022 |
| 9 | Transcript of the Deposition of Gaetano Ciancio, M.D. ("Ciancio Depo.") with referenced exhibits |
| 10 | Declaration of Dr. Lord dated June 21, 2022 |
| 11 | Transcript of the Deposition of Thomas LeBlanc ("LeBlanc Depo.") with referenced exhibits |

| 12 | Select Exhibits Referenced from Goldschmidt Depo. |
|----|---------------------------------------------------|
| 13 | Select Exhibits Referenced in Lord Depo.[1] |
| 14 | Select Exhibits Referenced from Shalala Depo. |
| 15 | Select Exhibits Referenced from Livingstone Depo. |
| 16 | Select Exhibits Referenced from McCafferty Depo. |

---

[1] Plaintiff does not duplicate the exhibits to his deposition already filed by the University (*see* D.E. 140-1) and is filing solely the exhibits not included in D.E. 140-1.

Plaintiff, Jonathan Lord, M.D., hereby files his Statement of Material Facts opposing Defendant's Statement of Material Facts (ECF 140), and states:

1. Undisputed.

2. Undisputed.

3. Undisputed.

4. Undisputed.

5. Disputed.

   a. Disputed. Second half of first sentence should read: "The University of Miami Board of Trustees approved his appointment as the University Vice President for Medical Administration, effective June 1, 2012." (Goldschmidt Depo. 59:11-61:23 (Ex. 12 at Ex. 4.)

   b. Disputed. Next to last sentence. While Dr. Lord understood that he did not have tenure, he was unaware of an annual reappointment process. He also did not believe it was a routine activity at the medical center. Ultimately, the process of non-reappointment is  a judgment of either the provost or the president. (Lord Depo. 97:14-20, 168:17-24.)

   c. Disputed. Last sentence. Since taking on the role of COO, he also took on the responsibility of Chief Compliance Officer ("CCO") for the Medical Center and oversight over new functions for Patient Experience, Marketing and Strategy. (Goldschmidt Depo. 59:11-61:23; Ex. 12 at Ex. 4).)

6. Undisputed.

7. Disputed. Dr. Lord reported to Dean Goldschmidt ("Goldschmidt") and Goldschmidt reported to President Shalala ("Shalala"). (Lord Depo. 33:3-8, 153:3-9, 199:3-7; Ex. 12 at Ex. 54; Ex. 10 ¶ 3.)

8. Undisputed.

9. Undisputed.

10. Disputed.

    a. Dr. Lord agrees there were discussions about morale but not "low morale."

    b. Undisputed that Dr. Lord had regular conversations and weekly meetings with Shalala and others about the layoffs.

11. Undisputed.

12.   Disputed. There is no evidence that Dr. Keitz and Dr. Lord discussed the need for the layoff process to be "*as communicative, transparent, thoughtful, compassionate and organized as possible*." (Lord Depo. 44:6-45:18; Ex. 7.)

13.   Disputed. While Dr. Lord participated in some Audit Committee meetings, he was excluded from others even though he and Dr. McCafferty petitioned the secretary of the board as well as Joe Natoli to ensure that their agenda items were getting onto that committee's meetings. (Lord Depo. 38:14-39:8.)

14.   Disputed. Dr. Lord agrees that he and Mr. Natoli had a good working relationship and during the Summer of 2012, they did not have the same friendly relationship, *i.e.*, getting together with wives. (Lord Depo. 54:8-55:13.) But this change did not cause him to have any less frequent and forthcoming communications with Mr. Natoli, who does not recall ever complaining to Dr. Lord that he was either less responsive, unresponsive, or noncommunicative. (Natoli Depo. 44:17-45:9, 58:18-60:10.)

15.   Disputed. Dr. Lord had a good working relationship with the CFO (Natoli) and Provost (LeBlanc) and denies that Dean Goldschmidt ever counseled him about the need to communicate effectively. (LeBlanc Depo. 77:25-79:19, Ex. 29; Natoli Depo. 44:17-45:9, 58:18-60:10; Ex. 10 ¶¶ 4, 9.)

16.   Undisputed.

17.   Undisputed except for the last sentence: "***Lord advised President Shalala of those issues 'many times,' beginning as early as June/July of 2012***." Dr. Lord discussed with  Shalala as early as June/July of 2012, the need for an external review and the change of leadership of the Miami Transplant Institute ("MTI"), *i.e.*, replacing Dr. Livingstone with Dr. Gaetano Ciancio ("Ciancio") at different points in time. (Lord Depo. 79:5-10, 80:4-11; Ex. 10 ¶ 6.) Dr. Lord told Shalala many times about terms of the external review, the OIG letter, the actual process itself, and the collaborative engagement with Jackson. (*Id.* ¶ 7; Lord Depo. 79:5-10.)

18.   Undisputed.

19.   Disputed. TMG was selected to review the IML and MTI, but Dr. Lord did not "approve" its selection. Dr. Lord agreed with Dr. McCafferty's and Steven Falcone's decision to select TMG and he guessed that the University general counsel reviewed and approved the contract. (Lord Depo. 83:11-85:3.)

2

20. Undisputed except that the IML received the anonymous letter addressed to U.S. Department of Health and Human Services, Office of Inspector General ("OIG letter") on September 10, 2012, and neither Dr. McCafferty nor the medical compliance office received it until September 21, 2012.  (McCafferty Depo. 49:3-20; Ex. 16 at Exs. 2, 5.)

21. Undisputed.

22. Undisputed.

23. Disputed.

    a. In October and November 2012, a group called Just the Facts wrote Shalala to voice concerns about the poor morale and work environment related to the IML and LAORA. (Lord Depo. 108:23-109:2, Ex. 19.)

    b. Undisputed regarding conducting "organizational climate studies" in response to complaints that had come to Human Resources about the IML.

24. Disputed. Dr. Livingstone's opinion is irrelevant hearsay, but he understood the layoffs were approved by University leadership and had to be done (Livingstone Depo. 52:14-20, 55:18-24.)

25. Disputed. On December 6, 2012, Goldschmidt emailed Shalala about a Petition being circulated at the Miller School of Medicine. (Lord Depo. 117:4-24 (Ex. 13 at Ex. 7).) The Petition speaks for itself; however, it did not call for the "removal of Lord and Dean Goldschmidt." (Lord Depo. 115:13-116:5 (Ex. 13 at Ex. 21).)

26. Disputed. The second sentence reads that "***the Petition began as early as September 2012***" and cites Dr. Livingstone's deposition testimony; however, his testimony is based on inadmissible hearsay. (Livingstone Depo. 120:2-9)

27. Disputed.

    a. The second sentence states: ***"On or about December 9, 2012, Dr. Livingstone reported that he had received a threat from Dr. Nemeroff, in which he advised that, if Dr. Livingstone put a stop to the Petition, Dean Goldschmidt and Dr. Lord would put an end to the TMG audit."*** (Shalala Depo. 62:24-67:1 (Ex. 14 at Ex. 6); Livingstone Depo. 122:19-156 (Ex. 15 at Ex. 12) (emphasis added).) Exs. 6 & 12 are the same two emails from Dr. Livingstone dated December 9, 2012. The first one was generated at 10:21 am and the second at 10:36 am.

i. The 10:21 am email was from Dr. Livingstone to Laurence Gardner and Rafic Warwar which states, in pertinent part, that:

> Charlie Nemeroff just called and we talked for more than half an hour. … Charlie has delivered the ***Deans ultimatum*** to me—which Charlie says he doesn't believe in and that he is only serving as an intermediary—***that basically states that if I agree to cease and desist and stop the recall petition, they intend to use the recent Transplant review—specifically the IML audit—to impugn my integrity and to punish me.***

(Ex. 14 at Ex. 6; Ex. 14 at Ex. 12 (emphasis added).) The 10:21 am email does not mention Dr. Lord and Dr. Livingstone testified that he does not recall if Nemeroff mentioned Dr. Lord in reference to the Dean's ultimatum. (Livingstone Depo. 130:9-11.)

ii. The 10:36 am email was from Dr. Livingstone to Leonard Abess, cc: John Clarkson and Bernard Fogel. It states, in pertinent part, that:

> I have predicted for months that Jack and the Dean would try to use the consultants to take away the transplant labs from the Department of Surgery, to weaken Surgery and in particular control me. I am not the least surprised that the Dean – orchestrated by Jack Lord- is using Charlie Nemeroff to deliver an ultimatum to me. Surgery has done nothing wrong, and we were frankly angered by how the outside consultants were directed to try and find a compliance issue with the IML. Jennifer McCafferty explicitly told them that there were problems and she wanted them found- and she also refused to meet with Rafic and myself to get any background information on the IML.

(Ex. 14 at Ex. 6; Ex. 15 at Ex. 12.) Dr. Livingstone testified that the inclusion of Dr. Lord in this second email was part of his subjective belief that Dr. Lord had convinced Goldschmidt to issue the "ultimatum" to him. (*Id.* at 143:22-144:4.) His subjective belief lacks foundation and is irrelevant. Furthermore, the Dean's ultimatum is based on inadmissible hearsay because the source of the alleged threat—Goldschmidt—denies it took place (Goldschmidt Depo. 175:16-18) and Nemeroff, the witness who allegedly conveyed the Dean's ultimatum to Dr. Livingstone, is not listed as a witness and will not testify at trial.

b. Disputed. The third and fourth sentences lack foundation because Provost LeBlanc recalls neither investigating any of Dr. Livingstone's allegations nor Shalala asking him to do so (LeBlanc Depo. 41:14-42:1-7, 43:4-12.)

28. Disputed.

a. As set forth in paragraph 27, President Shalala's alleged basis that the TMG audit "appeared to be tainted" is based on double or triple hearsay and Provost LeBlanc recalls neither

investigating any of Dr. Livingstone's allegations nor President Shalala asking him to look into any of those allegations.

b. The University's assertion that it "was 'typical' for compliance investigations to be managed by Internal Audit" omits Dr. McCafferty's testimony that "we did not have the appropriate depth of expertise in-house to cover in an assessment of such a specialized function as the transplant laboratory… and we wanted to assure that we were doing it properly." (McCafferty Depo. 59:5-16.)

29.   Disputed. Neither Dean Goldschmidt nor Dr. McCafferty testified that "***Internal Audit engaged independent counsel (Hogan Lovells) and an independent, third-party auditor (Compliance Concepts) to conduct the review.***"  (Goldschmidt Depo. 239:23-240:9; McCafferty Depo. 132:12-133:23.) Furthermore, any and all statements contained in Ex.75 are hearsay and inadmissible.

30.   Disputed. Undisputed except for the last sentence: "***With respect to Lord, the President could use to [sic] Petition "to decide what action if any to take.***" President Shalala testified that it was "ultimately up to her to decide what was to be done with the petition, she did not qualify that statement "with respect to Lord." (Shalala Depo. 84:13-16.)

31.   Disputed.

a. There is no testimony supporting the assertion that Dr. Lord failed to prepare a memorandum summarizing his December 14, 2012, meeting with President Shalala because it was not "exceptional."

b. Undisputed that Dr. Lord had many meetings with [President] Shalala during his tenure "on a pretty regular basis" and he had many meetings with [President] Shalala in a variety of settings (Lord Depo. 56:21-24); however, Dr. Lord did not regularly meet with President Shalala to discuss compliance issues or external investigations into allegations of fraud. (*See* Ex. 10 ¶ 5.)

32.   Disputed.  All of the alleged instances in Dr. Lord's interrogatory response number 5 involved President Shalala.

33.   Undisputed.

34.   Undisputed.

35. Disputed. The University omits that prior to sharing TMG's preliminary assessment with Dean Goldschmidt and Dr. Lord on December 18, 2012, Dr. McCafferty had been keeping them updated on what the preliminary information was. (McCafferty Depo. 85:14-23.)

36. Undisputed except for the last sentence. TMG never issued an actual report because on December 21, 2012 at 4:37 pm Dr. McCafferty was directed by President Shalala that the IML investigation be conducted by "Internal Audit" and that Internal Audit would be contacting her to transfer all data gathered relative to the investigation, "as well as oversight of the retained outside consultant." (McCafferty Depo. 109:20-24 (Ex. 16 at Ex. 10).)

37. Undisputed except the University cites "Ex. H" but it should be "Ex. I."

38. Undisputed except for the last sentence which states that "President Shalala first learned of TMG's "first phase of deliverables" on December 19, 2012"; however, Dr. Lord testified that on "December 14, 2012, [he] had a one-on-one Shalala in which [he] went through the preliminary findings of TMG Group as well as providing her initial assessment that we had about a $10 million potential exposure in terms of billing issues at the IML." (Lord Depo. 79:5-17.)

39. Undisputed except for the last sentence: "As noted in Paragraph 36, *supra*, TMG never issued any report." Dr. Lord incorporates by reference his reason for disputing the last sentence of Paragraph 36.

40. Undisputed.

41. Undisputed.

42. Disputed.

   a. On December 21, 2012, President Shalala instructed Dean Goldschmidt to terminate Dr. Lord. (Goldschmidt Depo. 156:14-157:5.)

   b. Dr. Lord disputes the University's version of why President Shalala said she terminated Dr. Lord. (Interrog. No. 6, Ex. D.)

43. Disputed.

   a. While Dean Goldschmidt testified that he supported President Shalala's decision to fire Dr. Lord, his testimony is contradicted by his contemporaneous statements and actions. (Lord Depo.155:19-21; Goldschmidt Depo. 157:14-17, 158:6-10, 186:22-187:2.)

   b. Dean Goldschmidt's subjective belief that Dr. Lord caused the negative reaction from faculty lacks foundation and constitutes inadmissible opinion testimony.

44. Disputed.  Although Mr. Natoli testified that he supported President Shalala's decision because Lord's management style and lack of communication did not work in the university/hospital environment and that the ongoing audit "was not a factor in any way," he admitted that he did not remember a specific conversation with the president where she communicated the reasons why she was terminating Dr. Lord. (Natoli Depo. 87:15-88:4.)

45. Disputed. Although Dr. Livingstone testified that he did not ask President Shalala to shut down the TMG investigation or to terminate Dr. Lord, his testimony is contradicted by the record evidence (McCafferty Depo. 101:19-102:6, 104:14-105:7, 106:7-11; Ex. 16 at Ex. 9; Livingstone Depo. 185:1-4, 188:23-25; Ex. 9 (UM/LORD - 045584 – 5 "Memo for the record- follow up to Nemeroff threat" produced by the University on May 16, 2022.) *See* paragraph 101.

46. Disputed. While Dr. McCafferty testified she was aware of complaints about Dr. Lord, it was in the context of "there were several challenges the organization was working through. It was essentially a turnaround, so it's kind of complicated."  (McCafferty Depo. 126:3-12.)

47. Undisputed.

48. Undisputed.

49. Undisputed.

50. Undisputed.

51. Disputed. Dr. Lord disputes that he "agreed not to be reappointed and incorporates paragraph 63 below.

52. Disputed.

   a. Undisputed that on January 30, 2013, a Faculty Senate meeting was held.

   b. Disputed. Hearsay. The second and third sentences are statements attributed to President Shalala from unauthenticated notes.

53. Undisputed.

54. Undisputed.

55. Undisputed.

56. Undisputed.

57. Disputed.

   a. Disputed. Dr. Lord testified in *Fayad v. University of Miami* that he was terminated as COO and Vice President of Medical Administration by Dean Goldschmidt **but that Donna Shalala had made the decision**. (Lord Depo. 199:8-14 (emphasis added).)

    **b.** Disputed. Dr. Lord cannot find the citation to the University's claim that he allegedly ***admitted that he was aware of complaints about him – specifically about people's discomfort with change and being held accountable for their performance – and the Petition of no confidence that had been circulated about him and Dean Goldschmidt.***

58.  Undisputed.

59.  Undisputed.

60.  Undisputed.

61.  Undisputed.

62.  Disputed.

    a. The University represents that "***in his divorce case, Lord served interrogatory responses, in which he swore that he had 'been unemployed since January 2013' and had not made any affirmative attempts to become employed in the last 15 months***" citing Dr. Lord's deposition transcript at pages 207:2-23, 212:4 and Ex. 44.

     i. Dr. Lord's full response to Ex. 44, interrogatory 8 filed on October 27, 2015 in his divorce case, states: "Respondent has not made any affirmative attempts to become employed in the last 15 months. *Respondent, however, was contacted by a national search firm in or around October 2014 in regard to the chief executive officer position for the American Diabetes Association*." (Lord Depo. Ex. 44 (emphasis added).)

      1. When deposed in his divorce case regarding his efforts to look for work after leaving the University in 2013, Dr. Lord testified that his work was opportunistic and he was certainly open to another opportunity but nothing presented itself. (Lord Divorce Depo. 106:5-13) A search firm contacted him about the CEO position with American Diabetes Association ("ADA") He was one of two finalists but did not get the job in part because of the University. (*Id*. at 108:25-110:1.) As Dr. Lord further explained "the issue was around seeking employment versus seeking other opportunities and work" and beginning in January of 2013, he networked with search firms, joined a variety of social sites that assist with job searches, attended conferences and during the period of 2013 through October 2014, went on three or four additional boards. (Lord Depo. 203:13-25.)

      2. According to Dr. Lord, seeking employment for a CEO role is really about networking because those jobs are done by search firm and not through an advertisement in your

local newspaper. (*Id*.) That was the way he was hired by the University and similar organizations find candidates they either know or know of and it always requires something coming from a search firm. (*Id*. at 204:15-205:4.)

    b.  Undisputed as to the last sentence of paragraph 62 that his attorney in the divorce case objected to providing certain information as protected from disclosure pursuant to 31 U.S.C. 3730.

63.  Disputed.

  a. The University represents that "[i]n his divorce case, Lord filed pleadings in which he represented that he "resigned" from the University in December 2012 and officially retired in July 2013" citing to Ex. 49 – a "Motion to Bifurcate the Temporary Relief Proceeding" – which was neither sworn to nor adopted by Dr. Lord. (Lord Depo. 238:21-240:8.)

    i.  Each of Dr. Lord's sworn interrogatory or deposition answers in his divorce case referencing resignation or retirement in July 2013 referred to his professorship. ("Transcript of Lord Divorce Depo taken January 18, 2016" 99:7-23, 105:8-22) When asked why he retired from his "professorship" in 2013 Dr. Lord's attorney asserted a privilege due to the instant case being sealed. (*Id*. at 108:4-18.)

      1. Dr. Lord's answers in his divorce case were informed by Provost LeBlanc's explanation to him in late January 2013 that there were "no departmental funds available for his continued appointment in the pathology department." (LeBlanc Depo. 85:10-86:10, Ex. 36.) As a result, Dr. Lord waived his right to a departmental vote and "resigned" or "retired" from his professorship as of July 31, 2013. Since then, and after Dr. Lord's deposition was taken in this case, discovery produced in this case revealed that President Shalala terminated Dr. Lord from all his positions at the University. (Shalala Depo. 120:12-24; LeBlanc Depo. 75:11-17; Ex. 33.)

    ii.  When asked "[p]rior to retiring as a professor, the other titles that you held that you just described, from those – from that position with those titles you were fired, is that correct? A. *I was removed from those roles, correct*.  (*Id*. at 105:16-22 (emphasis added).)

64. Disputed. Dr. Lord incorporates by reference his response to paragraph 63.

65. Undisputed.

66. Undisputed; however, regarding the last sentence, ***"[i]n response to other questions about Lord's employment, his lawyer objected and instructed Lord not to answer,"*** on May 9, 2016,

while the instant case was sealed, the Court granted the United States' Second Motion to Partially Lift Seal [ECF No. 46] and ordered the seal partially lifted to allow the United States in its discretion, to disclose Dr. Lord's Complaint and Material Disclosure Statement to Dr. Lord's ex-wife, her counsel and officers of the Court overseeing the Divorce Proceeding. [ECF No. 47]. (Exs. 3-4.)

67. Disputed. Dr. Lord's ex-wife's testimony from a prior proceeding is hearsay and inadmissible. Regarding the division of assets from Dr. Lord's divorce, the terms of which are confidential, his ex-spouse received a substantial settlement and 50% of any recovery in this case. (Ex. 10 ¶ 8.)

68. Undisputed; however, it is irrelevant and immaterial to the issues in this case.

69. Disputed. The terms of the confidential settlement agreement speak for themselves.

70. Disputed. While Dr. McCafferty remained employed at the University through May/June 2014 and was not terminated, her position as Chief Medical Compliance Officer of the Miller School of Medicine was eliminated and she was reassigned to the provost's office after she refused to sign a letter concerning the refund reflected in the July 3, 2013 email and after she spoke to the FBI related to the IML. Based on that reassignment, Dr. McCafferty decided to look for another job. (McCafferty Depo. 122:11-22, 123:1-16, 168:22-169:11, 170:4-8; Ex. 16 at Ex. 11.)

## PLAINTIFF'S ADDITIONAL MATERIAL FACTS

71.  This claim was filed under seal and remained sealed until November 2, 2020. [ECF No. 90].

72. One of the main reasons Goldschmidt hired Dr. Lord as COO was to address the School of Medicine's financial issues in the spring of 2012.  Goldschmidt credited Dr. Lord with one of the most impressive turnarounds in the history of modern academic medicine. (Goldschmidt Depo. 42:9-14, 218:12-19, (Ex. 12 at Ex. 65).)

73.  On July 3, 2012, to recognize that Dr. Lord drove a "fiscal and cultural turn-around and set the path for continued transformation of our medical school and health system," Dean Goldschmidt, with the support of President Shalala and the University's Board of Trustees ("BOT"), offered Dr. Lord a significant raise and a promotion which Dr. Lord accepted. (Goldschmidt Depo. 57:19-58:14, 59:15-61:18 (Ex. 12 at Ex. 2, Ex. 4).)

74.  In July 2012, Dr. Ciancio replaced Dr. Livingstone as the director of the MTI (Livingstone Depo. 11:23-12:4.)

75.  The IML performed all lab tests for transplant patients. (Ciancio Depo. 11:12-18.) The IML was under the department of surgery and Dr. Livingstone was the chairman. (*Id*. at 12:1-6.)

76.  After Dr. Ciancio reduced the amount of tests in the IML, Dr. Livingstone called him "stupid" and incompetent and it "felt like a threat or a bully." (*Id.* at 20:14-21:1, 23:18-24:6, 34:17-19.)

77.  On September 10, 2012, the IML received the OIG letter but did not send it to the medical compliance office until September 21, 2012.  (McCafferty Depo. 49:11-20; Ex. 16 at Ex. 2.)

78. The OIG letter "report[ed] a fraud, which is taking placed [sic] in the Transplant laboratory, Department of Surgery[.]" (*Id*., Ex. 2, (alterations added).) It specifically named Dr. Livingstone as one of the people committing Medicare fraud. (*Id*.)

79.  On October 2, 2012, the University faxed the OIG letter to the OIG with a cover letter promising to "take all appropriate and required actions should any of these allegations be substantiated" and, as a result, "expanded an already ongoing investigation of the transplant laboratory." The University formally engaged TMG on October 8, 2012.  (McCafferty Depo. 51:5-8, 52:11-20, 56:1-5; Ex. 16 at Exs. 2 & 5.)

80.  Shalala was "faintly" aware of the contents of the OIG letter but by October 2, 2012, she had some understanding of the allegations concerning Medicare fraud relating to billing lab tests in the department of surgery. (Shalala Depo. 93:14-24.)

11

81. Dr. Livingstone knew about the OIG letter and believed that TMG was an attempt to remove the transplant labs from the department of surgery, which was one of the most profitable departments in the medical school and the IML increased its profitability. (Livingstone Depo. 63:6-12, 143:13-21, Shalala Depo. 133:11-134:1.) Dr. Livingstone was a very influential faculty member who had direct access to Shalala. (Goldschmidt Depo. 172:15-24.)

82. On October 15, 2012, Dr. McCafferty received a call from Dr. Ciancio who said Departmental leadership had instructed faculty to not cooperate with any assessment of MTI and relayed a fear of retaliation from leadership whom she understood to mean Dr. Livingstone. (McCafferty Depo. 70:25-71:18; Ex. 16 at 2; Ciancio Depo. 24:16-25:15, Ex. 3.)

83. On October 19, 2012, Dr. Lord told Dr. Livingstone that the external review was generated by the OIG letter, would be an independent assessment of compliance-related activities, and no leadership should not be involved. (McCafferty Depo. 66:10-68:3; Ex. 16 at Ex. 6.)

84. On December 3, 2012, Dr. Lord briefed the chairperson of the BOT's Audit and Compliance Committee on what TMG was finding "and possible exposures." The underpinning of what TMG was finding was known to him, Dr. McCafferty and Dean Goldschmidt. (Lord Depo. 112:2-4, 113:2-114:23, Ex. 20.)

85. Shalala saw Dr. Livingstone's December 9, 2012, email and remembers the purported Dean's ultimatum relayed by Dr. Nemeroff to Dr. Livingstone. (Shalala Depo. 66:7-68:1, Ex. 6.) Shalala did not believe these allegations and Goldschmidt told Shalala that Dr. Livingstone's allegations were "pure invention and lies." (Goldschmidt Depo. 175:3-18; Ex. 12 at Ex. 42.)

86. "There is no question that Dr. Livingstone was one of the leaders of the petition." (Shalala Depo. 134:23-135:4.)

87. On December 11, 2012, Dr. Livingstone offered his resignation to Shalala as "executive Dean of clinical Affairs defective [sic] immediately." (Livingstone Depo. 162:24-163:2, Ex. 14.) Shalala responded: "Alan stay we need voices that are experienced." (*Id*. at 167:2-12, Ex. 14.) Dr. Livingstone "took that as an endorsement of my position and the fact that she would support me." (*Id*. at 167:7-18.)

88. On December 14, 2012, Dr. Lord briefed Shalala in a one-on-one meeting in which he went through TMG's preliminary findings and provided her an initial assessment "that [the University] had about a $10 million potential exposure in terms of billing issues at the IML." (Lord Depo. 79:11-17.)

89.  On December 18, 2012, Dr. McCafferty emailed an MTI assessment update memorandum to Goldschmidt and Dr. Lord documenting TMG's preliminary assessment that the IML requires the most follow up and identified significant "gray areas" pertaining to financials, testing protocols, and unsigned orders. (McCafferty Depo. 92:24-94:20.) The margins for the transplant laboratory relative to the industry were unusually high and consistent with earlier allegations about the department of surgery. (*Id*. at 91:1-25.) In her email, she advised that a final report would be prepared in early 2013. (Goldschmidt Depo. 142:11-22, 143:4-13; Ex. 12 at Ex. 29.) Goldschmidt and Dr. Lord authorized Dr. McCafferty to engage TMG to "have a deeper dive . . .  into the billing components and the testing protocols." (McCafferty Depo. 88:12-89:2.)

90.  Shalala remembers "looking through" the MTI assessment update Goldschmidt emailed to her on December 19, 2012 update who remembers "looking through the report." (Goldschmidt Depo. 143:14-146:18; Ex. 12 at Ex. 30; Shalala Depo. 87:3-6.)

91.  In her December 20, 2012 memorandum, Dr. McCafferty documented that Dr. Livingstone accused her of being the source for "the IML concerns and that they are unfounded," that he "plans to discuss his concerns with the president" and it was her "impression that this is a direct attempt . . . to intimidate me and to influence the outcome of the MTI, IML and OPO assessment." (McCafferty Depo. 101:19-102:23, 104:14-105:15, 106:7-107:21; Ex. 16 at Ex. 9.)

92. On December 21, 2012, at around 9:00 am, Dr. Livingstone met with Shalala and told her he was unaware of any irregularities with the IML, that he contacted the University's Internal Audit team to review the IML, the whole approach to the transplant labs was a witch hunt, and Dr. McCafferty was using the TMG audit as a weapon. According to Dr. Livingstone, Shalala explicitly told him that her office was going to take over a review of the transplant labs, and that no one would ever use this audit to threaten him again. (Livingstone Depo. 185:1-4, 188:23-25; Ex. 8.)

93.  On December 21, 2012, at 4:37 pm Shalala instructed Dr. McCafferty to transfer the TMG assessment to Internal Audit. (Ex. 7 at No. 14; McCafferty Depo. 109:20-24 (Ex. 16 at Ex. 10.) After transferring all data relative to the TMG investigation to Internal Audit, Dr. McCafferty, the University's Chief Medical Compliance Officer, was never contacted by anyone associated with the Compliance Concepts review. (McCafferty Depo. 120:17-25, 121:1-122:22.)

94.  On December 21, 2012, Shalala instructed Goldschmidt to terminate Dr. Lord. (Goldschmidt Depo. 156:14-157:5.)

95.  On December 22, 2012, at 4:51 pm, Provost LeBlanc emailed Shalala that he just spoke to Dr. Livingstone who was gratified to hear that oversight of the IML investigation had moved to Internal Audit so he could explain his position to which Shalala responded: "Best conclusion." (Ex. 12 at Ex. 34.)

96.  On December 30, 2012, prior to carrying out Shalala's decision to terminate Dr. Lord as COO and VP of Medical Affairs, Goldschmidt emailed Dr. Lord and Dr. Cote (chair of pathology) requesting an "elevator speech" on the key limitations of the current IML so "the three of us" could deliver a consistent message to Shalala. (Goldschmidt Depo. 167:4- 25; Ex. 12 at Ex. 38.)

97.  On December 31, 2012, Goldschmidt informed Dr. Lord that Shalala was going to terminate him as COO and VP of Medical Affairs. (Lord Depo. 153:24-155:16.) Notwithstanding Shalala's decision, Goldschmidt believed Dr. Lord would return to his role in the Department of Pathology faculty and as a senior adviser for the leadership team in healthcare innovation and planning. (*Id.* at 155:17-22; Goldschmidt Depo. 171:25-172:3, 182:24-183:5; Ex. 12 at Ex. 47.)

98.  Around January 1, 2013, Shalala ordered Goldschmidt to stop the executive daily updates and all emails relative to the IML. (Goldschmidt Depo. 179:5-181:15, Ex. 12 at Ex. 44.)

99.  On January 1, 2013, after Goldschmidt, Dr. Cote and Dr. Lord announced plans to move the IML to the pathology department, Dr. Livingstone again complained directly to Shalala and Provost LeBlanc. He references his December 21 meeting with Shalala and wrote he "was relieved to know how strongly [she] felt that this form of intimidation was unacceptable, and that the transplant lab review would be put directly under Mike Moloney [Internal Audit] and Aileen Ugalde [General Counsel]." Shalala responded to Dr. Livingstone: "Sit tight" and by separate email instructed Goldschmidt to "wait for the audit to finish. Withdraw the memo." (Shalala Depo. 113:20-116:21; Ex. 14 at Exs. 15 & 17.)

100.  On January 2, 2013, Shalala canceled Goldschmidt's draft announcement about Dr. Lord's continuing role in leadership. Goldschmidt, who was "upset about losing Jack," emailed Provost LeBlanc and asked "*can we at least say that he's coming back to his prior role? Do not want people to think he was fired*." (Goldschmidt Depo. 157:14-17, 184:4-185:3-20; Ex. 12 at Exs. 47– 49 (emphasis added).) By this time, Shalala had decided that Dr. Lord would be terminated from all his positions. (Shalala Depo. 120:12-24; LeBlanc Depo. 75:11-17, Ex. 33.)

101.  On January 3, 2013, after Dr. Cote emailed the faculty at 4:53 am that "we are very proud to have Jack as a member of our faculty and are fortunate that Jack will remain a vital member of

our department to help move our efforts forward," Shalala responded to Dr. Cote and others, that "you need to fully understand our obligations under Jack's contract. ***He has no backup appointment and we owe him only six months salary. If we pay him beyond the end of August, we trigger another payment. We need to be careful here, very careful***." (Goldschmidt Depo. 187:16-20; Ex. 12 at Ex. 49 (emphasis added).) It was around that time that Goldschmidt realized that Shalala was terminating Dr. Lord from all positions. (*Id*. 189:12-17.)

102. On January 17, 2013, Dr. Lord emailed the members of the BOT about many issues, including TMG's preliminary findings, the potential Medicare fraud, and how critical it was to complete the external review without University interference. (Goldschmidt Depo. 211:21-214:21; Ex. 12 at Ex. 63.) In response, Shalala instructed Goldschmidt to "give him his check and thank him for his hard work on our behalf." (Goldschmidt Depo. 211:23-212:1, Ex. 63, 214:25-215:7; Ex. 12 at Ex. 64.)

103. On January 17, 2013, in response to Goldschmidt's complaints about Dr. Livingstone, Shalala responded "you appointed him he has to lead more productivity." (Shalala Depo. 132:19-133:25, Ex. 29.)

104. On January 30, 2013, Dr. Lord was formally notified that as of January 31, 2013, he would no longer hold his administrative posts and effective July 31, 2013, he would not be reappointed as Clinical Professor in the Department of Pathology. (Lord Depo. 184:4-10, Ex. 37.)

105. Dr. Lord reported to Goldschmidt who could rescind Dr. Lord's employment at any time in his discretion. (Shalala Depo. 29:25-30:2, 43:18-19, 47:5-18.) Yet, Shalala, not Goldschmidt, decided to fire Dr. Lord and could not explain why his personnel file did not reflect the reasons for his termination (*Id.* at 26:16-19, 44:4-16.)

106. The University has not produced any documents evidencing that anyone from leadership ever criticized, counseled, or reprimanded Dr. Lord for any conduct, let alone the reasons associated with President Shalala's reasons for terminating him. (Ex. 10 ¶ 9.)

*Plaintiff's Statement of Material Facts in Opposition*
Case No. 13-22500-CIV-ALTONAGA

Dated: June 21, 2022

Respectfully submitted,

**STUMPHAUZER FOSLID SLOMAN
ROSS & KOLAYA, PLLC**
Two South Biscayne Boulevard, Suite 1600
Miami, FL 33131
Tel.: (305) 614-1400
Fax: (305) 614-1425

By: */s/ Jeffrey H. Sloman*

JEFFREY H. SLOMAN
Florida Bar No. 378879
jsloman@sfslaw.com
JORGE A. PEREZ SANTIAGO
Florida Bar No. 91915
jperezsantiago@sfslaw.com
electronicservice@sfslaw.com
JENNIFER M. HERNANDEZ
Florida Bar No. 1018836
jhernandez@sfslaw.com
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of June, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/ Jeffrey H. Sloman*
Jeffrey H. Sloman, Esq.

16