UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 13-22500-CIV-ALTONAGA/McAliley

JONATHAN LORD, M.D.,

      Plaintiff,

v.

UNIVERSITY OF MIAMI,

      Defendant.

_____/

## ORDER

    **THIS CAUSE** is before the Court on Defendant University of Miami's Omnibus Motion

to Strike Plaintiff's Expert Damages Report Under [Federal Rule of Civil Procedure] 37(c) and

Motion to Exclude Plaintiff's Two Proffered Expert Witnesses Under [Federal Rule of Evidence]

702 and *Daubert* [ECF No. 141], filed on May 31, 2022.  Plaintiff, Jonathan Lord, M.D., filed a

Response [ECF No. 150], and Defendant filed a Reply [ECF No. 155].  The Court has carefully

considered the parties' written submissions, the record, and applicable law.  After thorough review,

Defendant's Motions are denied.

## I.  BACKGROUND

    Plaintiff claims that Defendant terminated his employment in multiple executive roles and

a professorship in retaliation for his attempts to uncover Defendant's violations of the False Claims

Act.  At issue here is whether Plaintiff may introduce at trial the testimony and rely on the reports[1]

of two damages experts he has retained.

---

[1] "[E]xpert reports are generally inadmissible as evidence at trial."  *Arch Specialty Ins. Co. v. BP Inv. Partners, LLC*, No. 6:18-cv-1149, 2020 WL 5848317, at *5 n.6 (M.D. Fla. Oct. 1, 2020) (alteration added; citation omitted).

Defendant officially relieved Plaintiff of his duties as Chief Operating Officer of the University of Miami's Miller School of Medicine, or Medical School, on January 31, 2013. (*See* Pl.'s Statement of Material Facts, Ex. 13, Lord Dep. Exs. [ECF No. 146-13] 5).[2] Plaintiff's faculty appointment as a clinical professor in the Medical School's Department of Pathology was set to end in July of that year. (*See id.*). In early 2013, Plaintiff elected to forego his right to an advisory faculty vote on his reappointment as a professor because, as he testified, the University's then-Provost, Tom LeBlanc, told Plaintiff that the University lacked funding to renew his appointment and, in any event, had already decided against renewal. (*See* Pl.'s Statement of Material Facts, Ex. 11, LeBlanc Dep. Tr. [ECF No. 146-11] 88, 103; Def.'s Statement of Material Facts, Ex. A, Lord Dep. Tr. [ECF No. 140-1] 171). Plaintiff told LeBlanc at the time that "[i]t [wa]s not [his] intent to resign" his professorship. (LeBlanc Dep. Tr. 103 (alterations added)).

Plaintiff filed this *qui tam* lawsuit in July 2013. About two years after Plaintiff filed suit, his then-wife, Alice Meagher, filed for divorce. (*See* Def.'s Statement of Undisputed Material Facts in Support of Mot. for Final Summ. J. [ECF No. 140] ¶ 59). In the divorce case, Plaintiff signed several sworn statements and testified that he retired from the University in 2013. (*See, e.g.*, Def.'s SMF ¶ 65; Lord Dep. Tr. 493). Plaintiff has testified in this case that Meagher "knew every circumstance that went on" during his time with the University, including the fact that he "was fired[.]" (Lord Dep. Tr. 176 (alteration added)).

The divorce case ultimately settled. (*See id.* 242). Under the settlement, Meagher would not receive alimony but was entitled to an equitable distribution of assets and 50 percent of any recovery by Plaintiff in this case. (*See id.* 242–43). The state court presiding over the divorce

---

[2] In citing the record, the Court relies on the pagination generated by the Case Management/Electronic Case Files system, which appears as a header on all filings.

proceeding approved the settlement after a colloquy, during which Meagher told the court that she was agreeing to the settlement based on the sworn statements Plaintiff had given about his employment and finances. (*See* Def.'s SMF ¶ 67).

Meanwhile, in this case, the federal government intervened and partially settled the case with Defendant.[3]  Plaintiff then filed a Third Amended Complaint (TAC) [ECF No. 101], suing Defendant on his own behalf for retaliation in violation of 31 U.S.C. section 3730(h). (*See* TAC ¶¶ 110–15).  Among its prayers for relief, the TAC seeks "compensation for all special damages available by law, including damages for emotional distress and public humiliation, litigation costs, and reasonable attorneys' fees[.]" (*Id.* 29 (alteration added)).  With only the retaliation claim pending, the Court entered a Scheduling Order [ECF No. 111] on September 3, 2021.  The Scheduling Order set a May 16, 2022 deadline for the completion of discovery but allowed "[t]he parties by agreement, and/or Magistrate Judge Torres" to extend the deadline unless the extension would affect other Scheduling Order deadlines. (Scheduling Order 1 n.1 (alteration added)).  The Scheduling Order also set an April 18, 2022 deadline for the exchange of expert witness reports and a May 2, 2022 deadline for the exchange of rebuttal expert reports. (*See id.* 1).

Plaintiff served his Federal Rule of Civil Procedure 26(a)(1) Initial Disclosures [ECF No. 141-1] shortly thereafter.  Those Disclosures stated that Plaintiff had not "finalized" his damages calculations, but that he would disclose expert testimony making those calculations "at the appropriate time pursuant to the Court's Scheduling Order." (Initial Disclosures 10).  The Disclosures also informed Defendant that Plaintiff would make "available for inspection and copying his tax returns from 2010 through the present." (*Id.* 10).

---

[3] Much of this nine-year-old case's procedural history is more fully set out in the Court's November 16, 2021 Order [ECF No. 122] denying Defendant's Motion to Dismiss [ECF No. 114].  *See Lord v. Univ. of Miami*, No. 13-22500, 2021 WL 5327788, at *5 (S.D. Fla. Nov. 16, 2021).

CASE NO. 13-22500-CIV-ALTONAGA/McAliley

Defendant deposed Plaintiff on February 24, 2022.  (*See* Mot. 7).  At that time, Plaintiff had not amended his Initial Disclosures to include a damages computation.  (*See id.*).  Plaintiff nonetheless testified about his compensation after he lost his job at the University.  After his employment was terminated, Plaintiff served on several corporate boards, and the compensation he received was typically equity, not cash.  (*See* Lord Dep. Tr. 210–11).  He testified that he "had to . . . premature[ly] sell[]" some of his equity holdings because he lost his job at the University.  (*Id.* 211 (alterations added)).  According to Plaintiff, he "lost a lot of potential" by liquidating these positions.  (*Id.*).

As scheduled, Plaintiff provided expert reports from David Duffus and Jeffrey Ketchum on April 18, 2022.  Duffus is Plaintiff's damages expert.  (*See* Resp. 2).  He is a certified public accountant and certified fraud examiner and is accredited in business valuation and certified in financial forensics.  (*See* Mot., Ex. 3, Duffus Dep. Tr. [ECF No. 141-3] 134).  Duffus opined on Plaintiff's damages.  (*See id.* 147).  Ketchum is an executive search consultant with 28 years of experience.  (*See* Mot., Ex. 4, Ketchum Dep. Tr. [ECF No. 141-4] 162).  He opined on the reasonableness of Plaintiff's efforts to obtain substantially equivalent employment after being fired by the University.  (*See id.* 173).

Duffus's report identifies three rough categories of damages: lost salary and benefits, lost value of equity assets prematurely sold by Plaintiff, and prejudgment interest.  (*See* Duffus Dep. Tr. 137, 145–46).  The report concludes that Plaintiff has suffered at least $38,529,320 in damages, including $2,469,810 in prejudgment interest.  (*See id.* 147).  In preparing his report, Duffus reviewed dozens of documents, including Plaintiff's tax returns, the filings in this case, and Plaintiff's deposition testimony in this case.  (*See id.* 149–50).  He spoke with Plaintiff "three or

four times." (*Id.* 24–25). And he conducted independent research on the projected wage growth rates in the university and hospital industries. (*See id.* 58–59, 139, 150).

Duffus applied two different methods to calculate damages stemming from Plaintiff's equity sales. The first method calculates the loss of value based on the value of shares sold as of March 31, 2022 that Plaintiff would not have sold but for his termination, minus the value of the proceeds that Plaintiff received when he sold those shares. (*See id.* 145, 162). Duffus determined the amount of proceeds that Plaintiff received for the sales based on information he obtained from Plaintiff's financial advisors and Plaintiff's brokerage account statements. (*See id.* 145). This method yielded a conclusion that Plaintiff lost $25,322,560 by prematurely selling his holdings. (*See id.* 145, 162). The second method involved comparing the value of the S&P 500 index as of March 31, 2022 and the value of the S&P 500 at the end of the year in which Plaintiff sold the relevant shares. (*See id.* 145, 163). Applying that method, Duffus alternatively concluded that Plaintiff suffered $5,502,032 in losses by selling rather than holding his equity assets. (*See id.*).

Duffus additionally reviewed literature from the forensic valuation and accounting fields to determine whether Plaintiff's equity sales produced mitigating income. (*See id.* 141–42). He concluded they did not. (*See id.* 142–43). He reasoned that the equity compensation Plaintiff received through his service on boards predated his employment at the University and thus "reflect[ed] a continuation of activity that was already underway at the time of Dr. Lord's termination[.]" (*Id.* (alterations added; footnote call number omitted)).

Defendant deposed Duffus on May 11, 2022. (*See id.* 2). There, Defendant questioned Duffus about the factual premises for his conclusion about Plaintiff's equity asset sales:

> Q.   And does your analysis take into consideration whether, at some other point between the day he actually sold the shares and today, Dr. Lord might have chosen to sell those shares for any number of reasons?

CASE NO. 13-22500-CIV-ALTONAGA/McAliley

A.   No, because his testimony is, and my discussions with him were that he did not intend to sell the shares.

(*Id.* 91).

Duffus also concluded that Plaintiff is entitled to $2,469,810 in prejudgment interest.  (*See id.* 146).  He calculated that amount using the statutory interest rates in effect in the state of Florida over the course of the damages period.  (*See id.*).  These rates range from 4.25 to 6.89 percent. (*See id.*).

Ketchum is the President of Lordstone Corporation, an executive search and strategic human resources consulting firm; and the President of Dieck Executive Search, Inc., an executive search consulting firm that concentrates on the healthcare and biotechnology industries.  (*See* Ketchum Dep. Tr. 164).  He has nearly 30 years of experience in executive search consulting.  (*See id.* 162).  Ketchum's experience includes "executive job search analysis, interviewing and assessing executive skills, performance, and compensation for the purposes of executive marketability and recruitment."  (*Id.*).  He has "conducted hundreds of reference and media checks" that, he says, enable him to evaluate how media can affect an executive-level candidate's job search.  (*Id.*).  Throughout his career, Ketchum has placed more than 200 individuals in executive positions.  (*See id.*).

Ketchum is one of 286 people in the world certified by the Association of Executive Search and Leadership Consultants (AESC) as a researcher and associate.  (*See id.*).  The AESC represents the industry — which includes more than 16,000 professionals in more than 70 countries — in relations with the U.S. government.  (*See id.* 162–63).  Ketchum is also a graduate of Cornell University's Industrial and Labor Relations School's Advanced Program in Executive Search and Leadership Consulting, an MBA-level certificate program for executive search consultants with at least 10 years of experience.  (*See id.* 163).

6

Ketchum concluded that Plaintiff used "more than reasonable efforts" to find substantially similar employment after leaving the University. (*Id.* 173). He based this contention on a variety of sources. One was Plaintiff himself, whom Ketchum interviewed three times before issuing his report. (*See id.* 169–70). Ketchum questioned Plaintiff about the criteria he used to determine whether a particular job was substantially equivalent to his previous position at the University. (*See id.*).

Additionally, Ketchum asked Plaintiff to prepare two documents that Ketchum could reference in creating his report. One of these documents was a "Pre/Post UM Employment Summary" that documented Plaintiff's board activities before and after his employment with the University and Plaintiff's attempts to seek employment. (*Id.* 190–91). The second document was titled "Key meetings, conferences and networking[;]" and it outlined Plaintiff's meetings, conferences, and networking activities between 2013 and 2022. (*Id.* 192–209 (alteration added)). This document listed more than 500 meetings and events that Plaintiff attended. (*See id.* 177).

Ketchum reviewed other documents too. Ketchum stated in his report that he searched for and read many media articles about Plaintiff and the University. (*See id.* 171–72). He also reviewed Plaintiff's deposition transcript in this case, Plaintiff's deposition transcript and interrogatory responses in his divorce case, and Plaintiff's LinkedIn message archives. (*See id.* 170–71, 177). Naturally, Ketchum observed in the divorce case documents Plaintiff's prior statements that he had retired. (*See id.* 177). But Ketchum "discounted" those statements because the other evidence showed that Plaintiff was "actively open" to finding other work after leaving the University, and because "it can be embarrassing" for senior executive-level candidates "to be unemployed[.]" (*Id.* (alteration added)).

CASE NO. 13-22500-CIV-ALTONAGA/McAliley

Separately, Ketchum interviewed three executive search consultants — John Mitchell, Larry Tyler, and Tom Giella — all of whom know Plaintiff.  (*See id.* 165, 172).  Ketchum referred to these interviews as "[r]eference conversations[.]"  (*Id.* 172).  He asked the three consultants to verify that they knew Plaintiff, how long they had known him, and the capacity in which they knew him.  (*See id.*).  He also asked whether the consultants performed media research on their candidates during a search or hiring process.  (*See id.*).  Each confirmed that he did.  (*See id.* 172–73).

Defendant deposed Ketchum on May 13, 2022.  (*See id.* 3).  Ketchum testified that he was not "aware of any engagement on behalf of the Lordstone Corporation relating to [an] executive search for a hospital[.]"  (*Id.* 25 (alteration added)).  Defendant asked Ketchum whether he cross-referenced any of the entries on Plaintiff's "Pre/Post UM Employment Summary" to verify the dates or contents of the entries.  (*See id.* 54).  Ketchum replied, "It's likely that I would have" and stated, "Certainly I see some things right there that I would have cross-referenced."  (*Id.*).  As for the "Key meetings, conferences and networking" document, Ketchum testified that he did not know how Plaintiff compiled the document and did not have access to Plaintiff's Outlook calendars or email account.  (*See id.* 58–61).

## II.  LEGAL STANDARDS

### A.  Motions to Strike Expert Reports Under Federal Rule of Civil Procedure 37(c)

Federal Rule of Civil Procedure 37(c) forbids the use of "information or [a] witness" on a motion or at trial if the party relying on that information or witness failed to provide the information or identify the witness "as required by [Federal Rule of Civil Procedure] 26(a) or (e) . . . unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1) (alterations added).   "In addition to or instead of" excluding the undisclosed witness or

8

information, a district court may order the party in violation to pay reasonable expenses, note the violation to the jury, or impose other sanctions. *Id.* In short, Rule 37(c) "gives a trial court discretion to decide how best to respond to a litigant's failure to make a required disclosure under Rule 26." *Taylor v. Mentor Worldwide LLC*, 940 F.3d 582, 593 (11th Cir. 2019) (citing Fed. R. Civ. P. 37(c)(1)).

### B.  Motions to Exclude Expert Testimony Under Federal Rule of Evidence 702

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

> (b) the testimony is based on sufficient facts or data;

> (c) the testimony is the product of reliable principles and methods; and

> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court explained that Rule 702 requires district courts to ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597. Courts must perform this "'gatekeeping'" function no matter how scientific, technical, or specialized the evidence. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting *Daubert*, 509 U.S. at 589 n.7, 597; citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999)). "This function inherently requires the trial court to conduct an exacting analysis of the foundations of expert opinions to ensure they meet the standards for admissibility under Rule 702." *Id.* (emphasis, alterations, citation, and quotation marks omitted).

The Eleventh Circuit requires district courts to conduct a three-part inquiry to determine the admissibility of expert testimony:

> (1) the expert is qualified to testify competently regarding the matters he intends to address;
>
> (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and
>
> (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*MidAmerica C2L Inc. v. Siemens Energy Inc.*, 25 F.4th 1312, 1326 (11th Cir. 2022) (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)).  The burden is on the proponent of the expert testimony to show, by a preponderance of the evidence, that the testimony satisfies each prong.  *See Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1189, 1194 (11th Cir. 2010) (citing *Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care*, 582 F.3d 1227, 1232 (11th Cir. 2009)).

That said, "*Daubert* 'is not intended to supplant the adversary system or the role of the jury.'"  *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003) (quoting *Maiz v. Virani*, 253 F.3d 641, 666 (11th Cir. 2001)).  Rather, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Id.* (alteration adopted; quoting *Daubert*, 509 U.S. at 596).

## III.  DISCUSSION

Defendant seeks to strike Duffus's report and to prevent both Duffus and Ketchum from testifying at trial.  (*See* Mot. 4–21).  Defendant makes two arguments in support of striking the Duffus report, both of which boil down to the contention that Plaintiff did not afford Defendant

fair notice of the damages theories Plaintiff would pursue. (*See id.* 4–8). The Court rejects both arguments.

As for the requests to exclude Duffus and Ketchum as trial witnesses, Defendant asserts that both experts' testimony fails the Rule 702 standard. (*See id.* 8–14, 16–21). Defendant additionally contends that Duffus's testimony is barred by the doctrine of judicial estoppel and that his opinion on prejudgment interest is foreclosed by binding Eleventh Circuit law. (*See id.* 14–16). These arguments are unavailing as well.

### A. Plaintiff's Claimed Special Damages and the Duffus Report

Defendant's lead argument for striking Duffus's testimony about damages stemming from Plaintiff's equity sales is that the TAC's prayer for special damages fails to comply with Federal Rule of Civil Procedure 9(g). (*See id.* 4–5). Rule 9(g) requires that items of special damages be "specifically stated" in a pleading. Fed. R. Civ. P. 9(g). "[T]he rule is designed to inform defending parties as to the nature of the damages claimed in order to avoid surprise[] and to inform the court of the substance of the complaint." *Great Am. Indem. Co. v. Brown*, 307 F.2d 306, 308 (5th Cir. 1962) (alterations added; citation omitted).

But a 1993 amendment to the Federal Rules of Civil Procedure "nullified the purpose somewhat of Rule 9(g)." *Therapeutics MD, Inc. v. Evofem Biosciences, Inc.*, No. 20-cv-82296, 2022 WL 2341965, at *2 (S.D. Fla. June 1, 2022) (citation omitted); *see also Leavitt v. Cole*, 291 F. Supp. 2d 1338, 1344 n.6 (M.D. Fla. 2003). Rule 26(a)(1) requires that parties make certain disclosures to each other "without awaiting a discovery request[.]" Fed. R. Civ. P. 26(a)(1) (alteration added). The required disclosures include "a computation of each category of damages claimed by the disclosing party[.]" *Id.* 26(a)(1)(iii) (alteration added). Accounting for Rule 26's early and considerable disclosure requirements, courts have trended toward a more lenient and

practical reading of Rule 9(g).  *See* 5A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1311 (4th ed. 2022).  Commentators have likewise noted that "[a] strict approach to the application of Rule 9(g) has little justification when special damages are sought simply as a supplement to the plaintiff's general damages, as long as the pleading has satisfied the rule's underlying notice function."  *Id.* (alteration added).

Relatedly, courts have deemed a defense of noncompliance with Rule 9(g) effectively forfeited when not raised until the later stages of a case and the plaintiff has adequately notified the defendant during discovery of any special damages that he will seek.  *See* Wright & Miller, *supra*, § 1312.  Courts have drawn this principle not from any express command in the Federal Rules, but from a reading of the Rules as an integrated whole.

As a starting point, a defendant has several procedural tools in its arsenal to remedy failures to comply with Rule 9(g) early in a case, including Rule 12(b)(6) motions for failure to state a claim, Rule 12(e) motions for a more definite statement, and Rule 12(f) motions to strike.  Other Rules, including Rule 26(a), aim to remedy any lingering uncertainties about the nature and scope of a plaintiff's claims as the case progresses.

A failure to specifically plead special damages in violation of Rule 9(g) is a Rule 12(b)(6) defense, and to be sure, Rule 12(b)(6) defenses can be raised as late as at trial.  *See* Fed. R. Civ. P. 12(h)(2)(C).  But even at trial, under Rule 15(b)(1) a court may allow amendments to the pleadings "[i]f . . . a party objects that evidence is not within the issues raised in the pleadings . . . when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits."  *Id.* 15(b)(1) (alterations added).  As Rule 15(b)(1) contemplates, belated objections to the clarity of a pleading are evaluated based not only on the pleading's bare language, but also on whether a defendant has suffered

prejudice in view of the entire record.  *See id.*  Therefore, should a defendant neglect to avail itself of the tools available to it to clarify the pleadings until late in a case — particularly when the claimed special damages "are supplemental to general damages" — a district court may treat that failure as a forfeiture of the defendant's "right to object to the introduction of special damages at trial" and consider the pleadings amended accordingly.  Wright & Miller, *supra*, § 1312.

A case that remains binding in this Circuit illustrates the point.  In *Great American Indemnity Company v. Brown*, a plaintiff in a personal injury action alleged special damages "without specifically itemizing" those damages.  307 F.2d at 307–08.  The court observed that the defendant had not moved for a more definite statement or to strike the plaintiff's request for special damages.  *See id.* at 308.  The court also noted that the parties and district court had discussed the precise special damages claimed by the plaintiff at a pretrial conference.  *See id.* at 308 n.2.  So, because the defendant "neglected or failed to [us]e the[] pre-trial procedures" available to it to clarify the pleadings, and because it "had full notice of the claim for special damages[,]" the Fifth Circuit affirmed the district court's ruling admitting evidence of special damages at trial.  *Id.* at 308 (alterations added).  District courts since *Brown* have similarly reviewed not only the pleadings but also "parties' initial disclosures and subsequently produced discovery in determining whether any actual prejudice has resulted from a lack of specificity in the complaint." *Therapeutics, MD*, 2022 WL 2341965, at *2 (collecting cases; citation omitted).[4]

---

[4] These principles, among other reasons, demonstrate why Defendant's heavy reliance on a single district court case, *Landsman v. City of Vero Beach*, No.13-cv-14375, 2015 WL 10960951 (S.D. Fla. Oct. 21, 2015), is erroneous.  *Landsman* applied the incorrect standard, reasoning that "[w]hether or not Defendants had notice of the claims for damages throughout the litigation is not the standard by which the Court must determine admissibility" and that admissibility of evidence of special damages instead "turns on whether [the plaintiff] has adequately pled special damages in her complaint." *Id.* at *3 (alterations added; citation omitted).  As already explained, strict compliance with Rule 9(g) becomes less important later in a case, especially when, as here, a defendant has learned of special damages theories during discovery and did not file a Rule 12 motion addressing special damages.  *See Brown*, 307 F.2d at 308; Wright & Miller, *supra*, §§ 1311–12.

Which brings us to this case. Defendant contends that the TAC's request for "all special damages available by law" is too generic to pass muster under Rule 9(g); and thus, Plaintiff should be precluded from relying on Duffus's report at trial. (TAC 29; *see* Mot. 5). Plaintiff could (and should) have more specifically alleged its special damages. But Defendant never filed a Rule 12 motion challenging Plaintiff's general demand for special damages. So, as just demonstrated, what matters at this point is whether Defendant has been afforded fair notice of the damages Plaintiff will seek at trial such that it can prepare a defense.

Defendant has certainly been given such notice here. Plaintiff offered his tax returns for Defendant's inspection at the time initial disclosures were due. (*See* Initial Disclosures 10). Defendant had full access to those documents when it deposed Plaintiff, at which point Plaintiff testified about his premature equity asset sales. (*See* Lord Dep. Tr. 210–11). Duffus's report, which Plaintiff timely produced, outlines Plaintiff's damages in detail and is consistent with Plaintiff's testimony. (*See* Duffus Dep. Tr. 145, 162–63). And Defendant acknowledges that it questioned Duffus extensively about his opinions on Plaintiff's equity sales at his deposition. (*See* Mot. 11–12). Given this record, Defendant cannot complain that it does not, at this stage, have the information it needs to prepare a trial defense to Plaintiff's special damages theory.

Defendant also argues that the Court should strike Duffus's report under Rule 37(c). (*See* Mot. 6–8). But essentially the same flaws that afflict Defendant's Rule 9(g) argument also ail this one. Plaintiff admittedly did not provide the computation of special damages required by Rule 26(a)(1)(A)(iii). So, under Rule 37(c)(1), Plaintiff can use that information at trial only if his Rule 26 violation "was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). And Plaintiff's failure to disclose his special damages calculation as early as he should have *was* harmless.

As discussed, Plaintiff offered to produce years' worth of tax returns in his Initial Disclosures and testified about damages flowing from his equity sales at his deposition. (*See* Initial Disclosures 10; Lord Dep. Tr. 210–11). Plaintiff then provided a concrete damages calculation by way of the Duffus report weeks before the end of discovery and with plenty of time for Defendant to prepare to question Duffus about those damages at his deposition. (*See* Duffus Dep. Tr. 145, 162–63). These facts demonstrate that Defendant had ample opportunity to understand and explore Plaintiff's damages theories during discovery.

Even against this record, Defendant asserts that Plaintiff's failure to provide a damages calculation in his Rule 26 Disclosures prejudiced it in four ways. (*See* Mot. 8). Three of those claims focus on *Plaintiff's* conduct — specifically, Defendant faults Plaintiff for not serving amended disclosures, failing to provide an updated calculation despite "ample opportunity" to do so, and "defeat[ing] the structure of Rule 26." (*Id.* (alteration added)). But rearticulating complaints about *Plaintiff's* Rule 26 violation is not the same thing as showing that the violation harmed *Defendant*.

Defendant's remaining prejudice claim does not commit this same mistake, but it too fails. Defendant asserts that it "had no idea of Plaintiff's damages calculations" when it deposed him. (*Id.*). As already explained, Plaintiff made his tax returns available before his deposition and testified that he sold stocks that he would not have sold if the University had not fired him. (*See* Initial Disclosures 10; Lord Dep. Tr. 210–11). Thus, even if Defendant did not have Plaintiff's precise calculations handy when it deposed him, it had at its disposal significant information illustrating Plaintiff's damages.

What's more, Defendant's own conduct during discovery suggests that it either adequately understood Plaintiff's damages theory or, at the least, had plenty of opportunities to gain a better

understanding of it.  If Defendant genuinely felt blindsided by Plaintiff's damages theory, it could have sought to depose Plaintiff another time.  It did not.

Defendant instead suggests that seeking additional discovery would have been "futile[.]" (Reply 3 (alteration added)).[5]  But this argument ignores both the language of Rule 37(c) and the purpose of the flexible discovery deadline in the Court's Scheduling Order.  (*See* Scheduling Order 1 n.1).  The "severe sanction" of excluding expert testimony is not warranted when the party allegedly harmed by a late disclosure has an opportunity to remedy any prejudice suffered by it but chooses not to.  *Zaki Kulaibee Establishment v. McFlicker*, No. 08-60296-Civ, 2011 WL 1327145, at \*4 (S.D. Fla. Apr. 5, 2011); *see also Rossi v. Darden*, No. 16-21199-Civ, 2017 WL 2129429, at \*4 (S.D. Fla. May 17, 2017) (explaining that a party "may not delay in challenging a Rule 26 violation and then seek the most extreme of sanctions in a . . . motion filed after the proper time for challenging discovery violations has expired" (alteration added)).

Put simply, a defendant cannot "l[ie] in wait, hoping that plaintiff's non-compliance would doom his ability to offer any expert testimony[,]" and then claim prejudice.  *Kondragunta v. Ace Doran Hauling & Rigging Co.*, No. 1:11-cv-01094, 2013 WL 1189493, at \*8 (N.D. Ga. Mar. 21, 2013) (alterations added).  That is what Defendant is seeking to do here.  Its attempt to circumvent Rule 37(c)(1)'s harmlessness prong, therefore, must fail.

Defendant cites an Eleventh Circuit decision, *City of Rome v. Hotels.com, L.P.*, 549 F. App'x 896 (11th Cir. 2013), to argue that striking Duffus's report is warranted here.  (*See* Mot. 8; Reply 4).  In *City of Rome*, the Eleventh Circuit upheld a district court's exclusion of damages evidence because of the plaintiffs' failure to provide a Rule 26(a) damages calculation.  *See* 549

---

[5] Defendant alludes to written discovery it could have sought if it had deposed Duffus earlier (*see* Reply 3–4), but it does not specify what, if any, written discovery it would have sought or how such discovery would have cured the purported prejudice it suffered.

F. App'x at 905.  Unlike the record in this case, the circumstances in *City of Rome* called for judicial intervention.  The lawsuit at issue in *City of Rome* remained pending in the district court for six years, and the plaintiffs never provided the missing calculation in all that time.  *See id.* Critically, moreover, the plaintiffs' "expert reports did not provide a computation of . . . damages." *Id.* (alteration added).  *City of Rome* thus offers scant support for the heavy-handed sanction of "excluding" a timely disclosed expert report that contains comprehensive damages computations.

### B. Admissibility of Duffus and Ketchum's Opinions

#### i. Duffus's Opinions are Admissible Under Rule 702 and *Daubert*.

Defendant next attacks Duffus's opinions as unreliable and therefore inadmissible under *Daubert*.  (Mot. 8–10).  Specifically, Defendant suggests that Duffus improperly relied on Plaintiff's representations without independently investigating the factual premises for his opinions because, had Duffus considered Plaintiff's statements that he had retired, Duffus would have had no reasonable choice but to conclude that any damages Plaintiff suffered were self-inflicted.  (*See id.* 10).

As an initial matter, Defendant is correct that an "expert must . . . carry out some independent analysis of the material issues in the case."  *Barrueto v. Fernandez Larios*, No. 99-0528-Civ, 2003 WL 25782075, at *7 (S.D. Fla. Sept. 18, 2003) (alteration added; citation omitted). For that reason, expert "opinions should not parrot a litigating party's testimony" if they are to be admitted as reliable.  *Rossi*, 2017 WL 2129429, at *9 (citation omitted).

But an expert's decision to agree with one party's evidence over another's, or to make assumptions based on record evidence of questionable credibility, does not amount to impermissibly blind partisanship.  This distinction is important because "it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence."

*Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190, 1193 (11th Cir. 2011) (citation and quotation marks omitted).  Instead, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (alteration added; citation omitted). Therefore, "the fact that an expert assumes a party's facts as true" is not "dispositive of the admissibility of that expert's testimony." *Equal Emp. Opportunity Comm'n v. Univ. of Miami*, No. 19-23131-Civ, 2022 WL 508000, at *3 (S.D. Fla. Feb. 18, 2022) (citations omitted). Consequently, district courts should permit expert testimony when a factual basis for the expert's assumptions exists, the testimony would assist the jury, and any perceived faults in testimony can be adequately explored through cross-examination. *See Rosenfeld*, 654 F.3d at 1193–94; *McSwain v. Word Fuel Servs. Corp.*, 546 F. Supp. 3d 1144, 1150 (S.D. Fla. 2021); *see also In re Trasylol Prods. Liab. Litig.*, No. 08-md-01928, 2010 WL 1489793, at *6 (S.D. Fla. Feb. 24, 2010) ("Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." (citation and quotation marks omitted)).

Given these well accepted principles, Defendant's objections to the reliability of Duffus's testimony are unfounded.  Duffus interviewed Plaintiff at least three times in preparing his report. (*See* Duffus Dep. Tr. 24–25).  But he did not simply take Plaintiff's word for his conclusions or repeat Plaintiff's testimony.  Duffus reviewed Plaintiff's tax returns, Plaintiff's brokerage statements, the filings in this case, and Plaintiff's deposition testimony. (*See id.* 145, 149–50).  He checked Plaintiff's version of events against the understandings of Plaintiff's financial advisors. (*See id.* 145).

He also independently researched wage trends in relevant industries and reviewed technical accounting literature before arriving at his conclusions.  (*See id.* 58–59, 139, 150).  Although

CASE NO. 13-22500-CIV-ALTONAGA/McAliley

Duffus agreed with Plaintiff's view of certain disputed facts (*see id.* 91, 141–43), that agreement is no basis for excluding Duffus's testimony because Defendant will have ample opportunity to challenge both his and Plaintiff's credibility at trial. *See McSwain*, 546 F. Supp. 3d at 1151 (concluding that expert's assumptions had a "sufficient factual basis" because the expert "based his assumptions on what [the plaintiff] told him" and other record evidence, and because his conclusions could be "attacked at trial during cross-examination" (alteration added; citation omitted)); *see also Maiz*, 253 F.3d at 666 ("A district court's gatekeeper role under *Daubert* is not intended to supplant the adversary system or the role of the jury." (citation and quotation marks omitted)).

Defendant's more particularized objections to Duffus's testimony about Plaintiff's equity asset sales fail for the same reasons. Defendant claims that Duffus's opinions on the matter are unreliable because Duffus "ignored Plaintiff's numerous representations to the divorce court[.]" (Mot. 13 (alteration added)). Again, this argument does not explain why Duffus's purported failure to consider impeachment evidence that Defendant wishes to highlight makes Duffus's opinions *inadmissible*, rather than simply less credible. An expert's opinions are not excludable as a matter of law just because he does not bow in deference to impeachment evidence of debatable persuasive force offered by an opposing party. *See Quiet Tech.*, 326 F.3d at 1345 (explaining that "the alleged flaws in [an expert]'s analysis are of a character that impugn the accuracy of his results, not the general scientific validity of his methods" and that "identification of such flaws in generally reliable scientific evidence is precisely the role of cross-examination" (alteration added; citations omitted)); *G.M. Brod & Co., Inc. v. U.S. Home Corp.*, 759 F.2d 1526, 1539 (11th Cir. 1985) (affirming portion of jury verdict despite defendant's argument that plaintiff's expert based

opinion on faulty assumptions because those "assumptions were based upon the testimony of [the plaintiff]'s admitted expert" (alteration added)).

### ii.  Duffus's Opinions Require Technical and Specialized Expertise and Would Be Helpful to a Jury.

Defendant next argues that Duffus's opinions on Plaintiff's equity asset sales are the result of straightforward arithmetic calculations that do not require special expertise and thus would not assist the jury.  (*See* Mot. 13–14).  Defendant is wrong.

Duffus concluded that Plaintiff's sales of his equity assets may be considered mitigating income from a technical perspective.  (*See* Duffus Dep. Tr. 141–43).  In so concluding, Duffus relied on his review of forensic valuation accounting literature (*see id.* 141–42), a specialized area of knowledge "beyond the understanding of the average lay person."  *United States v. Frazier*, 387 F.3d 1244, 1262 (11th Cir. 2004) (citing *United States v. Rouco*, 765 F.2d 983, 995 (11th Cir. 1985)).  Moreover, Duffus applied two alternative methods to calculate damages arising from the premature equity sales, and determining the appropriateness of those methods in the circumstances requires specialized expertise.  (*See* Duffus Dep. Tr. 145, 162–63); *see also City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 563–64 (11th Cir. 1998) (holding that a damages expert's opinion would assist the trier of fact "by calculating, compiling, and explaining" numerical evidence relevant to liability).

### iii.  The Doctrine of Judicial Estoppel Does Not Bar Duffus's Testimony.

Next, Defendant maintains that the doctrine of judicial estoppel bars Duffus's testimony because of Plaintiff's statements, made in his divorce case, that he had retired.  (*See* Mot. 14). "The equitable doctrine of judicial estoppel is intended to prevent the perversion of the judicial process and protect its integrity by prohibiting parties from deliberately changing positions according to the exigencies of the moment."  *Slater v. U.S. Steel Corp.*, 871 F.3d 1174, 1180 (11th

Cir. 2017) (alterations adopted; citations and quotation marks omitted).  The doctrine is a harsh one, *see Supermedia LLC v. Mustell & Borrow, Attorneys at Law*, No. 08-21510-Civ, 2011 WL 13174647, at *3 (S.D. Fla. Jan. 31, 2011) (citation omitted), and thus it should "apply only when the plaintiff's conduct is egregious enough that the situation demands equitable intervention[,]" *Slater*, 871 F.3d at 1187 (alteration adopted; other alteration added; citation and quotation marks omitted).

Courts in the Eleventh Circuit apply a two-part test to determine whether judicial estoppel bars a litigant from asserting a position.  First, a court must determine whether a "party took an inconsistent position under oath in a separate proceeding[.]" *Id.* at 1181 (alteration added; citation omitted).  Second, a court must assess whether "these inconsistent positions were calculated to make a mockery of the judicial system." *Id.* (quotation marks omitted; quoting *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1285 (11th Cir. 2002)).  In other words, courts must "consider[] both the plaintiff's actions — whether he made inconsistent statements — and his motive — whether he intended to make a mockery of the judicial system." *Id.* (alteration added).

Defendant does not make a persuasive showing that judicial estoppel should bar Duffus's testimony.  For starters, Plaintiff's prior statements that he retired are, for the most part, only arguably inconsistent with his position in this case: a person can retire from future work, even if he was fired from his most recent job.  Moreover, Plaintiff's departure from his professorship involved both voluntary and involuntary aspects.  (*See* LeBlanc Dep. Tr. 88, 103; Lord Dep. Tr. 170–73).

Just as critically, Plaintiff has offered several harmless explanations for his previous testimony.  He has explained that he was embarrassed to tell people that he had been fired, that he used the phrase "retirement" loosely because of the complicated nature of his job status, and that

he relied on the University's representations that the University lacked funding to renew his professorship but later learned those representations were false. (*See* Lord Dep. Tr. 173, 217–18; LeBlanc Dep. Tr. 88, 103; Pl.'s Resp. to Def.'s Mot. for Summ. J. [ECF No. 145] 20).  Other record evidence supports these more anodyne accounts.  Although Defendant insists that Plaintiff lied to the divorce court to cheat his ex-wife out of alimony (*see* Reply 6), Plaintiff has sworn under oath that his ex-wife will receive half of any recovery in this case (*see* Pl.'s Statement of Material Facts, Ex. 10, Lord Decl. [ECF No. 146-10] ¶ 8; Lord Dep. Tr. 242–43), which includes potentially up to twice the back pay that the University owes Plaintiff, *see* 31 U.S.C. § 3730(h)(2). And in any event, Plaintiff testified in this case that Meagher knew of Plaintiff's firing during the divorce.  (*See* Lord Dep. Tr. 176).

At minimum, these record facts highlight a genuine dispute of fact over whether Plaintiff "intended to make a mockery of the judicial system." *Slater*, 871 F.3d at 1181.  The existence of triable issues of fact concerning Plaintiff's intent is hardly surprising, because, generally speaking, "a party's state of mind (such as knowledge or intent) is a question of fact for the factfinder, to be determined" at trial. *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1476 (11th Cir. 1991) (citations omitted); *see also Ajaka v. Brooksamerica Mortg. Corp.*, 453 F.3d 1339, 1346 (11th Cir. 2006) (reversing grant of summary judgment on defense of judicial estoppel because "there exist[ed] a question of material fact as to whether [the plaintiff] had the motivation and intent to manipulate the judicial system under the circumstances presented" (alterations added)). There is thus no basis for preventing Plaintiff from putting on evidence crucial to his case at trial. *See Slater*, 871 F.3d at 1187 ("When a plaintiff intended no deception, judicial estoppel may not be applied.  If a court applies judicial estoppel to bar the plaintiff's claim absent such intent, it awards the civil defendant an unjustified windfall." (footnote call number omitted)).

### iv. Eleventh Circuit Law Permits Duffus's Prejudgment Interest Calculation.

Defendant also asserts that Duffus's prejudgment interest calculation should be excluded from trial because Duffus used Florida's statutory rates in calculating prejudgment interest. (*See* Mot. 14–16). According to Defendant, Duffus should have used the 52-week United States Treasury bond rate set forth in 28 U.S.C. section 1961(a). (*See* Reply 7).

The False Claims Act's anti-retaliation provision mandates an award of prejudgment interest for successful plaintiffs. *See* 31 U.S.C. § 3730(h)(2) (providing that relief "shall include . . . interest on the back pay" (alteration added)); *Eberhardt v. Integrated Design & Constr., Inc.*, 167 F.3d 861, 872 (4th Cir. 1999). "In the absence of a controlling statute, federal courts' choice of a rate at which to determine the amount of prejudgment interest to be awarded is . . . a matter for their discretion." *Indus. Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH*, 141 F.3d 1434, 1447 (11th Cir. 1998) (alteration added). Here, no federal statute requires courts to use a particular rate in calculating prejudgment interest for successful retaliation claims. The federal statute that Defendant cites prescribes a post-judgment interest rate. (*See* Reply 7 (citing 28 U.S.C. section 1961(a); other citation omitted)); 28 U.S.C. § 1961(a) ("Such interest shall be calculated *from the date of the entry of the judgment* . . . ." (alteration and emphasis added)); *Indus. Risk Insurers*, 141 F.3d at 1447 (citations omitted). Therefore, the Court retains discretion to use Florida's statutory interest rates if Plaintiff prevails.

### v. Ketchum is Qualified to Testify as an Expert.

Turning next to Ketchum, Defendant argues that Ketchum is not qualified to testify about Plaintiff's efforts to find comparable employment because Ketchum's experience in executive job placement does not extend to hospitals or universities. (*See* Mot. 16–17). Rule 702 makes plain that "experts may be qualified in various ways . . . .: expert status may be based on knowledge,

skill, experience, training, or education." *Frazier*, 387 F.3d at 1260–61 (alteration added; emphasis and quotation marks omitted).  And of course, an expert must be qualified to testify competently on the matters that he intends to address.  *See City of Tuscaloosa*, 158 F.3d at 562.

That said, "[a]n expert is not necessarily unqualified simply because her experience does not precisely match the matter at hand."  *Furmanite Am., Inc. v. T.D. Williamson, Inc.*, 506 F. Supp. 2d 1126, 1129 (M.D. Fla. 2007) (alteration added; citing *Maiz*, 253 F.3d at 665, 669); *see also City of S. Miami v. DeSantis*, No. 19-cv-22927, 2020 WL 7074644, at *8 (S.D. Fla. Dec. 3, 2020).  In fact, "an expert must satisfy a relatively low threshold, beyond which qualification becomes a credibility issue for the jury."  *J.G. v. Carnival Corp.*, No. 12-21089-Civ, 2013 WL 752697, at *3 (S.D. Fla. Feb. 27, 2013) (citations omitted).

There is little doubt that Ketchum's qualifications satisfy Rule 702's minimal threshold. Ketchum has extensive education, experience, and training in executive job placement.  (*See* Ketchum Dep. Tr. 161–64).  He is well qualified to explain to the jury why Plaintiff's alleged efforts to obtain equivalent employment were reasonable given his circumstances.

Further, Defendant's argument that Ketchum's purported lack of experience in placing candidates in university and hospital positions warrants excluding his testimony is myopic.  For one thing, the record testimony Defendant cites in support of its argument shows only that one of Ketchum's companies, Lordstone, does not have engagements in those industries.  (*See id.* 25; Mot. 17).  Ketchum's other company, Dieck, focuses specifically on the healthcare and biotechnology industries.  (*See* Ketchum Dep. Tr. 164).

For another thing, Defendant remains free to point the jury to any deficiencies it perceives in Ketchum's qualifications to testify about the matters at hand.  *See Maiz*, 253 F.3d at 665 (affirming admission of expert's testimony as "sufficiently within his expertise" because

objections to the expert's qualifications principally addressed the foundation for his testimony and the record furnished adequate foundation); *id.* at 669 (similar); *see also City of S. Miami*, 2020 WL 7074644, at *8 (noting that "an expert may testify regarding narrow sub-topics within his broader expertise — notwithstanding a lack of specific experience with the narrower area" (citation and quotation marks omitted)).

### vi. Ketchum's Opinions Are Reliable.

Defendant also argues that Ketchum's opinions are unreliable because he "unquestioningly relied on the materials and guidance provided by Plaintiff." (Mot. 18). This argument bears no relationship to the record.

Ketchum reviewed a number of documents, including Plaintiff's LinkedIn message archives, filings from Plaintiff's divorce case, and the "Pre/Post UM Employment Summary" and "Key meetings, conferences and networking" documents that he asked Plaintiff to prepare. (Ketchum Dep. Tr. 170–71, 177). Ketchum testified that he "likely" cross-referenced many of Plaintiff's entries in these documents with other documents to verify facts supporting his opinion. (*Id.* 54). Ketchum also attempted to verify certain information provided by Plaintiff in his reference conversations with Mitchell, Tyler, and Giella. (*See id.* 165, 172–73). And Defendant's contention that "Ketchum ignored evidence that did not support his opinion" when Ketchum "discounted" Plaintiff's statements that he had retired has no merit. (Reply 8; Ketchum Dep. Tr. 177). Ketchum expressly reviewed and considered Plaintiff's statements from the divorce case (Ketchum Dep. Tr. 177); he simply chose not to read into those statements what Defendant wants him to.

All in all, the record suggests that Ketchum's opinion is the result of a thoughtful investigation and analysis. If Defendant believes otherwise, it may — and surely will — attempt to make its point by cross-examining Ketchum and Plaintiff.

### vii.   Ketchum's Opinions Would Be Helpful to a Jury.

Last, Defendant insists that Ketchum's opinions invade the province of the jury by addressing the ultimate legal issue that the jury is tasked with deciding. (*See* Mot. 20–21). "An expert may offer his opinion as to facts that, if found, would support a conclusion that the legal standard at issue was satisfied, but he may not testify as to whether the legal standard has been satisfied." *Cordoves v. Miami-Dade Cnty.*, 104 F. Supp. 3d 1350, 1365 (S.D. Fla. 2015) (alteration adopted; citations omitted).

Ketchum's opinions do not instruct the jury on what result to reach. They instead address the facts pertaining to Plaintiff's efforts to find substantially equivalent employment in a niche market for highly qualified executives. Ketchum's testimony therefore does not offer only legal conclusions and "is admissible because it illuminates matters beyond the understanding of the average layperson." *Umana-Fowler v. NCL (Bahamas) Ltd.*, 49 F. Supp. 3d 1120, 1122 (S.D. Fla. 2014) (citing *Frazier*, 387 F.3d at 1262). And if Ketchum does improperly tell the jury what result to reach at trial, Defendant will have a chance to object.

## IV.   CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that Defendant University of Miami's Omnibus Motion to Strike Plaintiff's Expert Damages Report Under [Federal Rule of Civil Procedure] 37(c) and Motion to Exclude Plaintiff's Two Proffered Expert Witnesses Under [Federal Rule of Evidence] 702 and *Daubert* **[ECF No. 141]** is **DENIED**.

CASE NO. 13-22500-CIV-ALTONAGA/McAliley

**DONE AND ORDERED** in Miami, Florida, this 26th day of July, 2022.

_Cecilia M. Altonaga_

**CECILIA M. ALTONAGA**
**CHIEF UNITED STATES DISTRICT JUDGE**

cc:     counsel of record