**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 13-22500-CIV-ALTONAGA/McAliley**

**JONATHAN LORD, M.D.**,

      Plaintiff,

v.

**UNIVERSITY OF MIAMI**,

      Defendant.

_____/

**<u>ORDER</u>**

**THIS CAUSE** is before the Court on Defendant University of Miami's Motion for Final Summary Judgment [ECF No. 139], filed on May 31, 2022. Plaintiff Jonathan Lord, M.D., filed a Response [ECF No. 145], to which Defendant filed a Reply [ECF No. 153]. After thorough review of the parties' written submissions, the record, and applicable law, the Motion is denied.

**I.   BACKGROUND**

**A.   Plaintiff's Early Tenure as Chief Operating Officer**

In 2012, Plaintiff began work as the University of Miami's Chief Operating Officer (COO) of the University's Health System — better known as "UHealth" — and University Vice President for Medical Administration. (*See* Def.'s Statement of Undisputed Material Facts [ECF No. 140] ¶ 5 [hereinafter Def.'s SMF]; Pl.'s Statement of Material Facts [ECF No. 146] ¶ 5 [hereinafter Pl.'s SMF]). Plaintiff also served as the Chief Compliance Officer (CCO) of the University's Medical Center. (*See* Pl.'s SMF, Ex. 12, Goldschmidt Dep. Exs. [ECF No. 146-12] 3–4).[1]

---

[1] In citing the record, the Court uses the pagination generated by the electronic CM/ECF database, which appears in the header of all court filings.

In these roles, Plaintiff reported to the dean of the University's Medical School, Dr. Pascal Goldschmidt, who in turn reported to the University's then-president, Donna Shalala. (*See* Def.'s SMF, Ex. A, Lord Dep. Tr. [ECF No. 140-1] 35). Plaintiff also held an appointment as a faculty member in the University's Department of Pathology. (*See* Def.'s SMF ¶ 5; Goldschmidt Dep. Exs. 4).

Goldschmidt made the decision to hire Plaintiff. (*See* Pl.'s SMF ¶ 72). Goldschmidt chose Plaintiff in large part because of the financial difficulties the Medical School was confronting. (*See* Def.'s SMF, Ex. L, Goldschmidt Dep. Tr. [ECF No. 140-12] 43). At least initially, Plaintiff exceeded expectations. (*See id.* 59). He led efforts to analyze the University's financial position and participated in decisions to lay off more than a thousand University employees in a matter of months. (*See* Lord Dep. Tr. 36–37). The layoffs reduced the University's payroll by $50 million. (*See id.* 37). Following the layoffs, Plaintiff attended regular meetings with Shalala and other leaders to discuss University management, including employee morale. (*See id.* 38). Plaintiff and Goldschmidt had such a good working relationship that Plaintiff described them as "joined at the hip." (*Id.* 69).

University leadership was pleased with these developments. Goldschmidt credited Plaintiff with having led a "transformational" period at the Medical School and at UHealth and offered Plaintiff a significant raise and promotion in the process. (Goldschmidt Dep. Exs. 4–5; *see also* Goldschmidt Dep. Tr. 224–225). Plaintiff accepted the offer. (*See* Lord Dep. Tr. 32). Shalala and the University's Board of Trustees supported Plaintiff's promotion. (*See* Goldschmidt Dep. Tr. 59–60).

As the Medical Center's CCO, Plaintiff was tasked early on with reviewing the University's compliance programs. (*See* Lord Dep. Tr. 33–34). To that end, he hired Dr. Jennifer

McCafferty as the head of the Compliance Department.  (*See id.* 34).  McCafferty reported directly to Plaintiff.  (*See id.* 35).

Around that time, the Board of Trustees' Audit Committee met quarterly to discuss compliance-related topics.  (*See id.* 37–39).  Plaintiff sometimes participated in these meetings, and Goldschmidt always attended.  (*See id.* 38–39).  Plaintiff also instituted a practice of exchanging "daily executive updates" with Goldschmidt and his and Goldschmidt's direct reports. (*Id.* 77).  Plaintiff would sometimes copy Shalala on these updates if they "related to an important area[,]" which according to Plaintiff might include "[c]ompliance-related issues."  (*Id.* 77–78) (alterations added)).

### B.   Problems at the Immuno-Monitoring Laboratory (IML)

In July 2012, the University appointed Dr. Gaetano Ciancio to serve as the director of the Miami Transplant Institute, a joint program between Jackson Memorial Hospital and the University.  (*See* Def.'s SMF ¶ 16).  Ciancio replaced Dr. Alan Livingstone, chair of the University's Department of Surgery and head of the University's Immuno-Monitoring Laboratory, or IML, a University laboratory that performed tests for transplant patients.  (*See* Pl.'s SMF ¶¶ 74–75).  Goldschmidt's decision to replace Livingstone was the outgrowth of a protracted conflict between the University's Department of Pathology and Department of Surgery, particularly over the IML.  (*See* Lord Dep. Tr. 63–68).  Plaintiff agreed with the change; in fact, he had previously communicated his endorsement of replacing Livingstone to Shalala.  (*See* Pl.'s SMF, Ex. 10, Lord Decl. [ECF No. 146-10] ¶ 6).

When Goldschmidt hired Ciancio, he also altered the Transplant Institute's chain of command.  Ciancio reported to Goldschmidt and Plaintiff.  (*See* Lord Dep. Tr. 309).  And Goldschmidt insisted that the director of the IML, Livingstone, report directly to Ciancio.  (*See*

*id.*).  Goldschmidt also stressed the need for the IML "to be compliant with good clinical laboratory practice and partner successfully with the Department of Pathology to ensure standardization of testing and reporting[.]"  (*Id.* 309–10 (alteration added)).  Ciancio reduced the number of tests that the IML was ordering.  (*See* Pl.'s SMF ¶ 75).

Livingstone did not like these changes or Ciancio's leadership.  Livingstone called Ciancio "stupid" and "a moron" for doing so and complained that reducing testing would cost the University money.  (Pl.'s SMF, Ex. 9, Ciancio Dep. Tr. [ECF No. 146-9] 23–24, 26).  Around the same time, Plaintiff "strongly advocated" for an independent review of the IML's activities, particularly its billing practices.  (Lord Dep. Tr. 67; *see id.* 79–80).  Plaintiff often met with Shalala to discuss topics related to the Transplant Institute, including his calls for an external review and the Institute's relationship with Jackson.  (*See* Lord Dep. Tr. 81–82; Lord Decl. ¶ 7).

In August 2012, McCafferty and another University employee named Steven Falcone decided to hire Transplant Management Group, LLC (TMG) to conduct an external review of the IML.  (*See* Def.'s SMF ¶ 19).  The next month, McCafferty received an anonymous letter addressed to the U.S. Department of Health and Human Services Office of the Inspector General (OIG) alleging that Medicare fraud was occurring "in the Transplant laboratory, Department of Surgery at the University of Miami[.]"  (Lord Dep. Tr. 322 (alteration added)).  Plaintiff was made aware of the letter (referred to here as the "OIG letter").  (*See id.* 79, 85, 87).

The OIG letter stated that the University, led by Livingstone and others, was committing Medicare fraud by billing for unnecessary services.  (*See id.* 315–26).  The letter claimed that Livingstone and the IML's medical director, Phillip Ruiz, laid off employees who did not support fraudulent billing and "ke[pt] everything well secret[.]"  (*Id.* 323 (alterations added)).  The letter called for "experts" to "review[] this [sic] billing issues and a forensic accountant to look for what

is irregular." (*Id.* (alteration added)).  McCafferty showed Plaintiff the letter, and he directed her to send the letter to the University's general counsel's office.  (*See id.* 87).

On October 2, 2012, McCafferty forwarded the OIG letter to the OIG.  (*See id.* 317).  When she did, she stated that the University "take[s] any allegation of fraud, waste or abuse seriously" and informed the OIG that the University had "expanded an already ongoing investigation of the transplant laboratory." (*Id.* (alteration added)).  In his sworn testimony, Plaintiff did not recall any follow-up communications to or from the OIG and said he did not personally reach out to the OIG again.  (*See id.* 91).  Shalala testified that she had "some understanding" of the OIG letter's allegations when McCafferty forwarded the letter to the government.  (*See* Def.'s SMF, Ex. K, Shalala Dep. Tr. [ECF No. 140-11] 94).

The OIG letter propelled TMG's investigation into high gear.  (*See* Def.'s SMF ¶ 21).  Livingstone complained to Plaintiff about his lack of input into the decision to proceed with an external review.  (*See* Lord Dep. Tr. 341).  In response, Plaintiff underscored the need for "an independent assessment of compliance related activities" and argued that "[n]o one from leadership should be involved at this time[.]" (*Id.* (alterations added)).

### C.  Reactions to Plaintiff's Employment

Not everyone was pleased with Plaintiff's management style.  Shalala testified that Plaintiff struggled to get along with and communicate effectively with key University leaders, especially the University's Chief Financial Officer Joe Natoli and then-provost Tom LeBlanc.  (*See* Shalala Dep. Tr. 27–28).  Plaintiff, in Shalala's words, "was like a bull in a [c]hina shop and was a difficult personality[.]" (*Id.* 28 (alterations added)).  As one example, although Plaintiff initially developed a "friendly" relationship with Natoli, their relationship soured by the summer of 2012.  (*Id.* 56–57).

The two executives continued to work together, but, at least in Natoli's telling, Plaintiff began to be less forthcoming and more combative with Natoli. (*See* Def.'s SMF, Ex. O., Natoli Dep. Tr. [ECF No. 140-15] 22–24). Plaintiff, for his part, complained that Natoli was often "hyperreactive to any request or conversation that came from a board member to the point where his behavior really sometimes got in the way of everyday work." (Lord Dep. Tr. 56). Despite these feelings, Plaintiff and Natoli continued to communicate with each other frequently about work matters. (*See* Natoli Dep. Tr. 46, 59–60).

Other record evidence suggests that Plaintiff's behavior aggravated members of the University community. According to Goldschmidt, Plaintiff was sometimes "dismissive, disrespectful and disparaging" toward the faculty. (Goldschmidt Dep. Tr. 99). As one example, Plaintiff "did the L sign on his head" after walking out of a faculty meeting. (*Id.* 100). Goldschmidt discussed behaviors like these with Plaintiff between October and December of 2012, but in his testimony resisted characterizing those behaviors as bearing on Plaintiff's performance. (*See id.* 99–100, 106–09). Plaintiff denies that anyone at the University, including Goldschmidt, "ever counseled or criticized" him about the way he "communicated with anyone [or] the need to communicate more effectively[.]" (Lord Decl. ¶ 4 (alterations added)).

Livingstone took issue with Plaintiff's leadership. Livingstone testified that there was an "absolute need to cut the budget" and agreed with the administration's decision to lay off employees. (Def.'s SMF, Ex. N, Livingstone Dep. Tr. [ECF No. 140-14] 58). But he described the way the University implemented the layoffs as "brutal" and suggested that Plaintiff bore primary responsibility for the harsh treatment of laid off employees. (*Id.* 51–53, 58–59). Some faculty members who attended a December 2012 meeting with faculty chairs and Goldschmidt noted their concerns that "[m]orale [wa]s really low because of style, not content[,]" given that

"[p]eople understand what had to be done, but . . . the way in which it was done" harmed morale. (Def.'s Reply to Statement of Undisputed Material Facts [ECF No. 154] [hereinafter Def.'s Reply SMF], Ex. F, Dec. 13, 2012 Email from Goldschmidt to Katz [ECF No. 154-6] 4 (alterations added)). Driving this point home, Livingstone testified that the layoffs "literally set up a reign of terror on the campus." (Livingstone Dep. Tr. 52).

Disquiet on the campus further revealed itself in the form of several employee communications to Shalala. Between October and November of 2012, a group named "Just the Facts" wrote to Shalala to voice concerns about low employee morale within some parts of UHealth, particularly the IML. (*See* Lord Dep. Tr. 110–11, 348). At the time, human resources professionals at the University were conducting organizational climate studies in response to employee complaints about the IML. (*See* Def.'s SMF ¶ 23). Just the Facts never specifically mentioned Plaintiff in its emails to Shalala. (*See* Lord Dep. Tr. 347–48).

Goldschmidt pinned Plaintiff's management as the reason for the petition because Goldschmidt had previously earned only positive reviews from faculty at the University and other institutions. (*See* Goldschmidt Dep. Tr. 101–02). Goldschmidt blamed Plaintiff for "destroy[ing] a huge part of [his] career." (*Id.* 102 (alterations added)).

On December 6, 2012, Goldschmidt and Plaintiff forwarded an email with an attached petition to Shalala. (*See* Pl.'s SMF ¶ 25). The petition was signed by hundreds of people, including faculty members, and was addressed to the Faculty Senate. (*See* Lord Dep. Tr. 352; Shalala Dep. Tr. 42–43; Livingstone Dep. Tr. 113). The petition stated that there had been "a major shift in the mission of the school that . . . jeopardizes our educational, clinical, and research enterprises." (Lord Dep. Tr. 352 (alteration added)). In particular, the petition cited "the deterioration of the relationship with Jackson Memorial Hospital" as a threat to the Medical School and "a direct result

of the failed leadership of Pascal Goldschmidt and Jack Lord[.]" (*Id.* (alteration added)). According to the petition, the faculty had "lost confidence in the ability of these men to lead the school." (*Id.*). Shalala characterized Livingstone as one of the "leaders" of the petition (Shalala Dep. Tr. 135–36); while Livingstone suggests that he learned about the petition long after it was first drafted, although he eventually supported it (*see* Livingstone Dep. Tr. 112, 121–22).

### D.  Shalala Fires Plaintiff and Ends the TMG Investigation

Meanwhile, TMG continued to investigate the IML and in the process informally shared its findings with Plaintiff, McCafferty, and others. (*See* Lord Dep. Tr. 113–14; McCafferty Dep. Tr. 86). On December 3, 2012 (days before the petition made its way to Shalala), Plaintiff had lunch with the chair of the Board of Trustees' Audit and Compliance Committee, Hilarie Bass, "[t]o . . . make sure that the activities of the compliance program and areas of risk to the university were reported to the chair[.]" (Lord Dep. Tr. 112 (alterations added)). Among other topics, Bass and Plaintiff discussed "activities related" to the Transplant Institute and "possible exposures." (Pl.'s SMF, Ex. 13, Lord Dep. Exs. [ECF No. 146-13] 3). Plaintiff prepared a memorandum documenting the issues he discussed with Bass. (*See id.*).

A few days later, Livingstone emailed other University employees to report a conversation he had with Dr. Charles Nemeroff, Chair of the Department of Psychology. (*See* Def.'s SMF ¶ 27; Pl.'s SMF ¶ 27). Livingstone stated that Nemeroff delivered to him "the Dean['s] ultimatum": according to Livingstone, "they" offered to put a stop to TMG's audit if he withdrew the petition. (Pl.'s SMF, Ex. 14, Shalala Dep. Exs. [ECF No. 146-14] 2–3 (alteration added)). Livingstone also relayed that Nemeroff did not agree with the ultimatum and was "only serving as an intermediary[.]" (*Id.* 3 (alteration added)).

In another email, Livingstone told others:

> I have predicted for months that Jack and the Dean would try to use the consultants to take away the transplant labs from the Department of Surgery, to weaken Surgery and in particular control me.  I am not the least surprised that the Dean — orchestrated by Jack Lord — is using Charlie Nemeroff to deliver an ultimatum to me.  Surgery has done nothing wrong, and we were frankly angered by how the outside consultants were directed to try and find a compliance issue with the IML. Jennifer McCafferty explicitly told them there were problems and she wanted them found — and she also refused to meet with Rafic and myself to get any background information on the IML.

(*Id.* 2).

Livingstone likewise insisted at his deposition that he "ha[d] no doubt" that Plaintiff prompted the message from Nemeroff.  (Livingstone Dep. Tr. 134).  But Livingstone also admitted that he did not recall whether Nemeroff ever mentioned Plaintiff.  (*See id.* 131, 134; *see also id.* 123–37).  Goldschmidt called Livingstone's allegations about his motives for authorizing the TMG investigation "pure invention and lies[.]"  (Goldschmidt Dep. Tr. 176 (alteration added)).

Livingstone told Shalala about his conversation with Nemeroff.  (*See* Shalala Dep. Tr. 68). Shalala then asked LeBlanc to investigate whether Plaintiff and Goldschmidt in fact asked Nemeroff to talk to Livingstone.  (*See id.*).  LeBlanc does not recall investigating or being asked to investigate.  (*See* Pl.'s SMF, Ex. 11, LeBlanc Dep. Tr. [ECF No. 146-11] 42–43).

Two days after Livingstone's email to Shalala, Livingstone again emailed Shalala to offer his resignation as the Executive Dean of Clinical Affairs.  (*See* Pl.'s SMF, Ex. 15, Livingstone Dep. Exs. [ECF No. 146-15] 4).  Shalala responded, "Alan stay[;] we need voices that are experienced[.]"  (*Id.* (alterations added)).  Livingstone interpreted Shalala's response "as an endorsement of [his] position and the fact that she would support [him]."  (Livingstone Dep. Tr. 168 (alterations added)).  According to McCafferty, around this time, Livingstone attempted to intimidate her and influence the outcome of the TMG investigation.  (*See* Def.'s SMF, Ex. M, McCafferty Dep. Tr. [ECF No. 140-13] 107–08).

On December 14, 2012, Plaintiff met with Shalala individually on his request.  (*See* Lord Dep. Tr. 124–25).  The two discussed several topics, and Plaintiff outlined "the preliminary findings of TMG," providing Shalala with an "initial assessment that [the University] had about a $10 million potential exposure in terms of billing issues at the IML."  (*Id.* 81 (alteration added)).  Plaintiff did not draft a memorandum outlining his meeting with Shalala, as he had after his meeting with Bass, because he "viewed the meeting with Hilarie Bass as exceptional" and met with Shalala "in a variety of settings . . . on a pretty regular basis."  (*Id.* 125 (alteration added)).  Plaintiff also testified that he "might" have periodically copied Shalala on daily executive updates that addressed "the findings of TMG[.]"  (*Id.* 78 (alteration added)).  Nonetheless, Plaintiff insists that he "did not regularly meet with President Shalala to discuss compliance issues or external investigations into allegations of fraud."  (Lord Decl. ¶ 5).

The same day as Plaintiff's meeting with Shalala, Goldschmidt emailed LeBlanc to ask about the "possible consequences of th[e] petition for us" — referring to himself and Plaintiff.  (Lord Dep. Tr. 354 (alteration added)).  By the next day, 485 people had signed the petition.  (*See* Def.'s SMF ¶ 34).  Plaintiff and Goldschmidt soon exchanged emails to brainstorm about how to "quiet things down" and plan their "succession" from their roles.  (Lord Dep. Tr. 355).  Plaintiff testified that at about the time of these emails, he did not harbor any concerns about his future employment with the University.  (*See id.* 131).

Four days after Plaintiff's meeting with Shalala, McCafferty emailed Plaintiff and Goldschmidt a memorandum she had prepared.  (*See* Def.'s SMF ¶ 35).  The memorandum described TMG's "initial observations" and stated that TMG would issue a final report in early 2013.  (Goldschmidt Dep. Exs. 7; *see* Lord Dep. Tr. 138–39).  Those observations included "unusually high" profit margins relative to the industry, a lack of testing and billing protocols, a

"[l]ack of cooperation" and "transparency" from IML staff, and "extensive" testing "relative to peers[.]" (McCafferty Dep. Tr. 212–13 (alterations added)).

After reviewing the memorandum, Plaintiff "authorized" McCafferty "to engage in a review/audit of bills related to the IML as recommended in the report." (Def.'s SMF, Ex. H, Lord Dec. 18, 2012 Email [ECF No. 140-8] 2). McCafferty, Goldschmidt, and Plaintiff all agreed that TMG's findings were only preliminary and further investigation was necessary. (*See* Def.'s SMF ¶¶ 36–37, 40; Pl.'s SMF ¶¶ 36–38, 89).

The next day, Plaintiff prepared a draft email to Shalala discussing TMG's findings. (*See* Def.'s SMF, Ex. J, Lord Dec. 19, 2012 Email to Goldschmidt [ECF No. 140-10] 2). He sent the draft to Goldschmidt but not to Shalala. (*See id.*). Goldschmidt adopted Plaintiff's draft and emailed Shalala with documents from TMG outlining its preliminary findings. (*See* Goldschmidt Dep. Exs. 9). Plaintiff was not copied on or mentioned in the email to Shalala. (*See id.*).

This type of communication between Shalala and Goldschmidt was not unusual. Goldschmidt talked to Shalala more than Plaintiff did; in part because Shalala recruited Goldschmidt to the University and the two had a personal and social, in addition to a professional, relationship. (*See* Def.'s SMF ¶ 41). Shalala reviewed TMG's preliminary report. (*See* Shalala Dep. Tr. 88).

Livingstone met with Shalala early on December 21, 2012. (*See* Pl.'s SMF ¶ 92; Def.'s Reply SMF ¶ 92). During that meeting, he complained to her about the ultimatum he had received from Nemeroff, expressed his opinion that the "approach to the transplant labs was a witchhunt," and accused McCafferty of weaponizing the TMG investigation against him. (Pl.'s SMF, Ex. 8, Livingstone Memo [ECF No. 146-8] 2; *see* Pl.'s SMF ¶ 92). Shalala told Livingstone that "her office was going to take over a review of the transplant labs," and therefore Livingstone "could

rest assured no one would ever use this audit to threaten [him] again." (Livingstone Memo 2 (alteration added)).[2]

At least two other significant events occurred later that day. First, Shalala instructed McCafferty to transfer the TMG assessment to the University's Internal Audit department. (*See* Pl.'s SMF ¶ 92). Second, Shalala directed Goldschmidt to terminate Plaintiff's employment. (*See* Goldschmidt Dep. Tr. 157–58). Shalala maintains that she did not tell Goldschmidt why she was firing Plaintiff because, in her words, she "didn't need to." (Shalala Dep. Tr. 41). Goldschmidt, by contrast, testified that Shalala told him she was firing Plaintiff because he was "creating a huge issue with the faculty" and was "not communicating with people on her team anymore." (Goldschmidt Dep. Tr. 52). Goldschmidt believed that Plaintiff would remain employed by the University in a "senior adviser" position. (*Id.* 183–84).

Shalala explained that she decided to fire Plaintiff because "his leadership was destructive to UHealth, and increasingly he cut off any relationship" with Natoli or LeBlanc; these circumstances were "simply untenable." (Shalala Dep. Tr. 27). Citing the petition, Shalala further attested that Plaintiff "mishandled" the layoffs and she "heard from everyone" that he "destroyed morale at the medical school." (*Id.* 33). She described her decision as a "cumulative[]" one. (*Id.* (alteration added)). Goldschmidt "did not oppose" Shalala's decision to fire Plaintiff from his role as COO, even though he "valued" Plaintiff and considered him a friend. (Goldschmidt Dep. Tr. 44–45, 159).

---

[2] Defendant has not objected to the admissibility of Livingstone's memorandum describing his December 21, 2012 meeting with Shalala. (*See* Def.'s Reply SMF ¶ 92). The Court therefore assumes without deciding that the memorandum can be reduced to an admissible form through Livingstone's testimony or under either the present-sense impression exception or the recorded recollection exception to the hearsay rule. *See* Fed. R. Evid. 803(1), (5). Likewise, the Court assumes that Shalala's statement in response to Livingstone is admissible under Federal Rule of Evidence 803(3).

The day after Shalala made the decision to fire Plaintiff, LeBlanc emailed Shalala to inform her that he had "just spoke[n] with" Livingstone.  (Goldschmidt Dep. Exs. 10 (alteration added)).  LeBlanc relayed that Livingstone was "gratified to hear that oversight of the IML investigation ha[d] moved to GC/Internal Audit and that he will be given a chance to explain his position on the matter."  (*Id.* (alteration added)).  LeBlanc also told Shalala that Livingstone did not want to "initiate any other investigation regarding threats (real or implied)" at that time.  (*Id.*).  Shalala quickly responded, "Best conclusion[.]"  (*Id.* (alteration added)).  Shalala has explained that her response to LeBlanc's email referred to Livingstone's request not to further investigate rather than to her decision to move the TMG investigation in-house.  (*See* Shalala Dep. Tr. 112–13).

About a week later, Goldschmidt still had not carried out Shalala's directive to terminate Plaintiff's employment.  (*See* Pl.'s SMF ¶ 96).  Instead, he emailed Plaintiff and Dr. Richard Cote, Chair of the Department of Pathology, to request that the three collaborate on developing "an 'elevator speech' on the key limitations of the IML as it is currently set up" that he could deliver during his upcoming meeting with Shalala.  (Goldschmidt Dep. Exs. 11).  Goldschmidt expressed that he wanted the three of them to "deliver a consistent message."  (*Id.*).

The next day, he informed Plaintiff that Shalala would terminate him as COO.  (*See* Lord Dep. Tr. 155–58).  Goldschmidt did not tell Plaintiff, and Plaintiff did not ask, why Shalala decided to fire him.  (*See id.* 158).  Goldschmidt and Plaintiff communicated in the following days about what Plaintiff's new role at the University would be and discussed the potential of Plaintiff becoming the Medical School's "Chief Strategy Officer."  (*Id.* 157).

Shalala fired or demoted at least three other Medical School employees around the new year as well.  Those employees included Dr. Sheri Keitz, who was serving as Associate Vice President for Human Resources; Lee Phillips, Chief Marketing Officer for UHealth and the

Medical School; and Nelson Weichold, a Senior Business Advisor for UHealth and the Medical

School. (*See id.* 162, 166–67; Def.'s SMF ¶¶ 48–49). Meanwhile, Plaintiff remained employed

as COO until the end of January to give Natoli time to assume his role. (*See* Lord Dep. Tr. 159).

### E. Plaintiff's Clinical Professorship

On January 1, 2013 — the day after Goldschmidt informed Plaintiff of his termination —

Goldschmidt told Plaintiff that "Donna requested to recall emails relative to the IML, and no

changes should be considered or implemented until internal and external investigations are

completed." (Goldschmidt Dep. Exs. 14). Plaintiff replied, "How did she even know about those

emails – AL? Are you sure you want to stay in this environment? Are you worried about the

integrity of the review?" (*Id.*). Goldschmidt wrote back, "Of course AL. But she has a reasonable

point[;] we should not initiate changes that imply a concern before the end of both investigations."

(*Id.* (alteration added)). Around the same time, Shalala instructed Goldschmidt to cease sending

daily executive updates. (*See* Goldschmidt Dep. Tr. 182).

Also, around January 1, Goldschmidt, Cote, and Plaintiff announced plans to move certain

laboratories from the IML into the Department of Pathology. (*See* Pl.'s SMF ¶ 99). Livingstone

predictably objected. He sent a lengthy email to Shalala and LeBlanc complaining that he was not

consulted and accusing Plaintiff and Goldschmidt of "intimidation[.]" (Shalala Dep. Exs. 30

(alteration added)). Shalala responded, "Sit tight[.]" (*Id.* (alteration added)). Separately, Shalala

ordered Goldschmidt to "[w]ait for the audit to finish" and "withdraw the memo[.]" (Goldschmidt

Dep. Tr. 253 (alterations added; quotation marks omitted)).

Goldschmidt prepared a draft announcement about Plaintiff's role transition. (*See*

Goldschmidt Dep. Exs. 15). When Shalala reviewed the draft, she insisted on deleting a paragraph

that read, "After helping us accomplish all of this, Jack will be returning to his role on the faculty

of the Department of Pathology and as an innovator of 21st Century healthcare. I look forward to his continued outstanding impact as Senior Advisor to the Dean for Healthcare Innovation and Planning." (*Id.*; *see id.* 17).

Goldschmidt emailed LeBlanc after he saw Shalala's comment to urge the team to "at least say that he's going back to his prior role" because Goldschmidt did "not want for people to think he was fired." (Goldschmidt Dep. Tr. 186 (quotation marks omitted)). At her deposition, Shalala was asked whether she demanded deletion of this paragraph because "[she] had decided [Plaintiff] was being terminated from all his positions at the university." (Shalala Dep. Tr. 121 (alterations added)). Shalala answered, "Yes." (*Id.*).

Cote later sent an email to faculty welcoming Plaintiff back to the Department of Pathology. (*See* Pl.'s SMF ¶ 101). Shalala emailed Cote and others to remind them that Plaintiff had "no backup appointment and we owe him only six months['] salary." (Goldschmidt Dep. Tr. 189 (alteration added; quotation marks omitted)). She admonished, "We need to be careful here, very careful." (*Id.* (quotation marks omitted)).

Throughout January 2013, Plaintiff discussed his faculty appointment with several officials at the University. (*See* Lord Dep. Tr. 182–87). Plaintiff had discussions with LeBlanc in particular. Plaintiff made clear to LeBlanc that "[i]t [wa]s not [his] intent to resign" his professorship. (LeBlanc Dep. Tr. 103 (alterations added)). LeBlanc told Plaintiff that the Pathology Department lacked the funds to keep him on its faculty. (*See id.* 88, 103). On this understanding, Plaintiff told LeBlanc that he was "open" to foregoing a faculty vote as part of the non-reappointment process. (*Id.* 103). In the end, Plaintiff elected to waive his right to a faculty vote (a merely advisory part of the reappointment process) because Shalala and LeBlanc, who had

the authority to make decisions on his reappointment, had already decided against renewal of the appointment. (*See* Lord Dep. Tr. 171).

On January 17, 2013, Plaintiff emailed the Board of Trustees and Shalala, copying Goldschmidt, to "share the key issues" that he believed the University and Medical School "to be facing[.]" (Goldschmidt Dep. Exs. 20 (alteration added); *see id.* 23). The email emphasized compliance risks related to the Transplant Institute:

> I would not be fulfilling my duties as Chief Compliance Officer for the Medical Center if I didn't highlight key compliance issues that are pending completion:
>
> • "Miami Transplant Institute" – acting on a whistleblower complaint to the HHS Office of Inspector General and in partnership with the Jackson Health System, review of the administrative, operational and regulatory processes of the transplant program, "IML" clinical laboratory, and "OPO" organ procurement organization,  In the face of high risk to the institutions (potential fraudulent billing of Medicare and Medicaid) and complex internal politics, the review was conducted by an independent third party (TMG Group) and is pending a detailed billing practices audit.  It is critical for the protection of the institution that this external review and audit are completed without interference from administration or others and reports shared with the board.  Appropriate corrective actions will help mitigate potential externally mandated sanctions.

(*Id.* 21).

Shalala messaged Goldschmidt individually in the same email thread, "Give him his check and thank him for his hard work on our behalf[.]"  (*Id.* 23 (alteration added)).  Goldschmidt interpreted this statement as sarcastic. (*See* Goldschmidt Dep. Tr. 216).

In the meantime, Goldschmidt expressed frustration to Shalala about Livingstone's conduct.  He emailed Shalala to complain that Livingstone was "campaigning against" him and suggested that "[s]upport from the President and Trustees is needed." (Shalala Dep. Exs. 33 (alteration added)).  Shalala replied, telling Goldschmidt among other things that "Alan has a big job to get productivity up[.]"  (*Id.* (alteration added)).  Not satisfied, Goldschmidt pleaded with Shalala that "[t]here [wa]s a decision to be made" because "Alan is a destructive individual who

has raised [the] faculty against [Goldschmidt]" and "Alan [wa]s destroying everything [Goldschmidt] ha[d] built at UM." (*Id.* (alterations added)).  Shalala quickly answered, "You appointed him[,] contain him[;] he has to lead to more productivity[.]" (*Id.* (alterations added)).

A faculty meeting took place about two weeks later, on January 30, 2013.  (Def.'s SMF ¶ 52).  According to meeting notes taken by Keitz, Shalala told the faculty in attendance that she had "made changes in leadership" because "[t]here were serious issues of leadership, issues with transparency, faculty involvement and communication." (Lord Dep. Tr. 450 (alteration added)).  Shalala fielded faculty concerns about fear of retaliation for speaking out.  (*See id.*).  One faculty member reportedly commented that "[t]he person who created all that fear is no longer here." (*Id.* 451 (alteration added)).  Plaintiff testified that the unnamed faculty member was "likely" referring to him.  (*Id.* 195–96).

Plaintiff also received a letter from LeBlanc the day of the faculty meeting.  (*See* Lord Dep. Exs. 5).  The letter informed Plaintiff that, as of January 31, he would no longer be employed as Vice President for Medical Administration and COO.  (*See id.*).  It also stated that Plaintiff agreed to waive his right to a departmental vote and, as a result, the letter served as Plaintiff's "official notice of the non-reappointment as a Clinical Professor in the Department of Pathology effective July 31, 2013." (*Id.*).

### F.  McCafferty's Demotion

Meanwhile, McCafferty remained employed by the University until 2014.  (*See* Pl.'s SMF ¶ 70).  She had no involvement in the University's internal review of the IML after Shalala ended TMG's engagement.  (*See* McCafferty Dep. Tr. 119–20).

Then, in July 2013, McCafferty received an email from a University employee informing that "Compliance Concepts, the outside independent auditing company tasked with reviewing

certain allegations of inappropriate billing at the IML, ha[d] completed its report." (Pl.'s SMF, Ex. 16, McCafferty Dep. Exs. [ECF No. 146-16] 35 (alteration added)). According to the email, "[t]he independent auditor found no support for any of the allegations" against the IML, aside from noncompliance with "extremely technical" requirements, for which the "lab w[ould] be asked to refund" less than $400,000 for a roughly five-year period. (*Id.* (alterations added)). Goldschmidt, Livingstone, LeBlanc, and Natoli were recipients of, or copied on, the email. (*See id.*). McCafferty was surprised to have been included on the email. (*See* McCafferty Dep. Tr. 121).

Later, Natoli asked McCafferty to sign off on a letter relating to the refunds that the email described. (*See id.* 122). McCafferty offered to sign the letter after speaking with the people in charge of the review about the basis for their conclusions; but in McCafferty's words, "that was not something that was shared." (*Id.* 172). So McCafferty did not sign, reasoning that she "wasn't involved in the review and . . . didn't have any information about the scope or the findings, so [she] couldn't reasonably provide an assurance to the federal government[.]" (*Id.* 123 (alterations added)).

McCafferty was later contacted by the Federal Bureau of Investigation (FBI). (*See id.* 123–24). She retained counsel and, not knowing why the FBI had reached out, agreed to meet with agents. (*See id.* 124). As it turned out, the FBI was interested in the IML, and McCafferty discussed issues related to the laboratory during her meeting with federal agents. (*See id.*). After the meeting, she informed Goldschmidt that she had spoken with the FBI. (*See id.*).

The University then eliminated her position as the head of the Compliance Department and reassigned her to work in the Provost's office. (*See id.* 124, 169–70). The University reasoned that she had "exercised poor judgment" in meeting with the FBI with personal counsel but did not provide further explanation for that assessment. (*Id.* 124–25). McCafferty has described her new

role at the Provost's office as "[a]t best, . . . a lateral move," and the scope of her responsibilities "[]as significantly diminished." (*Id.* 170 (alterations added)). McCafferty decided to look for another job and, a few months later, left the University to work at Nicklaus Children's Hospital. (*See id.* 125, 171).

### G. Plaintiff's Divorce

Plaintiff filed this *qui tam* action under seal in July 2013. The case would remain under seal for roughly eight years, during which time Plaintiff discussed the case only with his lawyers and his then-wife, Alice Meagher. (*See* Lord Dep. Tr. 173–74, 202–03; Pl.'s SMF ¶ 66). Meagher filed for divorce from Plaintiff in September 2015, while the case remained under seal. (*See* Def.'s SMF ¶ 59). She sought alimony in her initial pleadings on the ground that she had given up her successful career when she and Plaintiff began their relationship. (*See id.*).

After leaving the University, Plaintiff initially filled his time by serving on boards and consulting, among other activities. (*See* Lord Dep. Tr. 210, 214). Plaintiff sometimes told others that he had "retired[.]" (*Id.* 173 (alteration added)). He made similar statements under oath during his divorce case. Plaintiff's sworn financial affidavit in the case noted that he "retired in July 2013" and was "not currently seeking employment." (Lord Dep. Tr. 493).

He signed several other affidavits attesting to the same. (*See* Def.'s SMF ¶ 65). In October 2015, Plaintiff filed an interrogatory response that stated he had "not made any affirmative attempts to become employed in the last 15 months[,]" and also that he "was contacted by a national search firm in or around October, 2014 in regard to the chief executive officer position for the American Diabetes Association[.]" (Lord Dep. Tr. 521 (alterations added)). By contrast, he testified in this case that he began networking with search firms around the time he was terminated as COO — in January 2013 — and that obtaining employment in an upper-level role,

like a chief executive officer position, usually requires initial outreach from a search firm.  (*See id.* 205–07).

At one point in the divorce case, Plaintiff's lawyers filed a motion to bifurcate temporary relief proceedings related to Meagher's request for temporary alimony while the case progressed. (*See id.* 575).  The motion stated that Plaintiff's "last formal employment was with the University of Miami's Miller School of Medicine as a Professor of Pathology" and Plaintiff "resigned from that position in December 2012, and officially retired in July 2013."  (*Id.* 576).  Plaintiff "[g]enerally" reviewed all filings in his divorce case (*id.* 215 (alteration added)), but he does not "recall specifically looking at" the motion to bifurcate (*id.* 241).  Plaintiff never swore to (or adopted in other sworn testimony) the statement concerning his resignation in the motion to bifurcate.  (*See* Pl.'s SMF ¶ 63).

Plaintiff was deposed during his divorce case in January 2016.  During that deposition, he was asked, "In July 2013 you were, in fact, fired from the University of Miami?"  (Lord Dep. Tr. 570).  He replied, "No.  In July of 2013 my faculty appointment expired."  (*Id.*).  He later agreed with the questioning attorney's characterization of the end of his faculty appointment as "a voluntary act on [his] part[.]"  (*Id.* 572 (alterations added)).

Plaintiff's attorney at the deposition objected and instructed Plaintiff not to answer other questions on privilege grounds, but he did not instruct Plaintiff not to answer these questions.  (*See, e.g.*, *id.* 570, 572).  A few months later, the Court partially lifted the seal in this case to permit the United States to share some information related to the case with Meagher.  (*See* Pl.'s SMF ¶ 66; May 9, 2016 Sealed Order [ECF No. 47]).  In any event, Plaintiff insisted at his deposition in this case that Meagher "knew every circumstance that went on" during his time with the University, including the fact that he "was fired[.]"  (Lord Dep. Tr. 176 (alteration added)).

Plaintiff offered a few explanations for his divorce-litigation statements at his deposition in this case. Among them, he said that he used the phrase "retired" because he "was utterly embarrassed and humiliated by what happened" to him. (*Id.* 173). He also insisted that he used "the word retirement . . . as loosely as possible" and, noting the sealing order, "used an abundance of caution in responding to anything" to avoid violating the order. (*Id.* 175, 217 (alteration added)).

The divorce case ultimately settled on confidential terms. (*See* Lord Dep. Tr. 242; Lord Decl. ¶ 8). The settlement provided that Meagher would not receive alimony but would receive an equitable distribution of assets and 50 percent of any recovery by Plaintiff in this case. (*See* Lord Dep. Tr. 242–43; Lord Decl. ¶ 8). The state court approved the settlement after a colloquy, during which Meagher represented that she was agreeing to the settlement based on the financial affidavit Plaintiff had filed. (*See* Def.'s SMF ¶ 67).

**H. This Case**

Eventually, the federal government intervened in and partially settled this action. (*See* June 7, 2021 Order [ECF No. 97]). Plaintiff then filed a Third Amended Complaint [ECF No. 101] asserting one claim of retaliation under 31 U.S.C. section 3170(h). Defendant now seeks final summary judgment. (*See generally* Mot.). It argues, in substance, that Plaintiff cannot put forth evidence sufficient to create a genuine dispute of material fact as to any of the elements of his retaliation claim. (*See id.* 3–14). Defendant also seeks summary judgment on its affirmative defense of judicial estoppel. (*See id.* 14–19).

## II. LEGAL STANDARDS

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*,

477 U.S. 317, 327 (1986) (citations omitted).  A federal court must grant summary judgment if the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a), (c).

An issue of fact is "material" if it might affect the outcome of the case under the governing law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute of fact is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party.  *See id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient[.]"  *Anderson*, 477 U.S. at 252 (alterations added).  "A party opposing summary judgment may not rest upon the mere allegations or denials in its pleadings."  *Walker v. Darby*, 911 F.2d 1573, 1576–77 (11th Cir. 1990).

If the moving party discharges its initial burden of showing the absence of a genuine dispute of material fact, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 250 (quotation marks and footnote call number omitted).  To make that showing, the non-moving party "must cite to . . . materials in the record or show that the materials cited do not establish the absence or presence of a genuine dispute."  *Blackhawk Yachting, LLC v. Tognum Am., Inc.*, No. 12-14208-Civ, 2015 WL 11176299, at *2 (S.D. Fla. June 30, 2015) (alteration added; quotation marks omitted; citing Fed. R. Civ. P. 56(c)(1)).

If the moving party would bear the burden of proof on the relevant issue at trial, it can meet its summary judgment burden only "by presenting *affirmative* evidence showing the absence of a genuine issue of material fact — that is, facts that would entitle it to a directed verdict if not

controverted at trial." *Emery v. Talladega Coll.*, 169 F. Supp. 3d 1271, 1280–81 (N.D. Ala. 2016) (citing *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993)).  Once that showing is made, the moving party "is entitled to summary judgment unless the non-moving party, in response, comes forward with significant, probative evidence demonstrating the existence of a triable issue of fact." *Fitzpatrick*, 2 F.3d at 1115 (alterations adopted; quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc)).

Courts may consider only evidence reducible to an admissible form at trial, *see Rowell v. BellSouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005) (citation omitted), and must draw all reasonable inferences in favor of the non-movant, *see Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000) (citation omitted).  "Summary judgment may be inappropriate even where the parties agree on the basic facts [] but disagree about the inferences that should be drawn from these facts." *Whelan v. Royal Caribbean Cruises Ltd.*, No. 1:12-cv-22481, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013) (alteration added; citation omitted).  Indeed, "[i]f reasonable minds might differ on the inferences arising from undisputed facts, then the Court should deny summary judgment" and proceed to trial.  *Id.* (alteration added; citations omitted).

## III.  DISCUSSION

The False Claims Act, as one might expect, forbids making false claims for payment to the United States.  *See* 31 U.S.C. § 3729(a).  Congress enacted the False Claims Act more than 150 years ago "to 'stop the massive frauds perpetrated by large contractors during the Civil War.'" *United States ex rel. Hunt v. Cochise Consultancy, Inc.*, 887 F.3d 1081, 1085 (11th Cir. 2018) (alteration adopted; quoting *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 181 (2016)).  To promote its enforcement, the Act authorizes private citizens to file suits on the government's behalf, or *qui tam* suits.  *See* 31 U.S.C. § 3730(b)(1).  Private persons who

file such suits are known as "relators," and the Act allows them to collect a portion of any recovery won in suits they initiate.  *See id.* § 3730(d); *Bingham v. HCA, Inc.*, 783 F. App'x 868, 870 (11th Cir. 2019).

In 1986, Congress added to the Act what is today 31 U.S.C. section 3730(h), the so-called anti-retaliation provision.  *See Hickman v. Spirit of Athens, Ala., Inc.*, 985 F.3d 1284, 1288 (11th Cir. 2021) (citation omitted).  It is this provision that concerns us here.  The statute provides:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1).  In short, the anti-retaliation section "provides an employee with a cause of action against his employer if his employer terminates his employment because the employee was attempting to stop violations of the [False Claims Act]."  *Briggs ex rel. United States v. QuantiTech Inc.*, No. 21-11448, 2022 WL 1308494, at *2 (11th Cir. May 2, 2022) (alteration added; citing 31 U.S.C. § 3730(h)).

A plaintiff who sues under section 3730(h) must show that he "engaged in protected conduct and that [his employer] retaliated against him because of that protected conduct."  *Mack v. Augusta-Richmond Cnty.*, 148 F. App'x 894, 896–97 (11th Cir. 2005) (alteration added; citation omitted).  Some courts read this standard as involving three elements: that (1) the plaintiff engaged in protected conduct, (2) the employer knew of plaintiff's protected conduct, and (3) the employer took adverse action against the plaintiff because of the protected conduct.  *See, e.g., Farnsworth v. HCA, Inc.*, No. 8:15-cv-65, 2015 WL 5234640, at *3 (M.D. Fla. Sept. 8, 2015) (citations omitted).

Defendant states it is entitled to summary judgment because Plaintiff has not identified evidence sufficient to establish any of the elements of his retaliation claims at trial.  (*See* Mot. 5). Additionally, Defendant asserts that the doctrine of judicial estoppel bars Plaintiff's retaliation claim as a matter of law.  (*See id*. 14).

An extensive evidentiary record exposes these arguments as wafer-thin.  At long last, this case must proceed to trial — or resolve amicably between the parties.

## A.  Protected Activity

Defendant first contends that Plaintiff did not engage in statutorily protected activity.  (*See id*. 5–9).  Section 3730(h)(1) protects an employee's "lawful acts . . . in furtherance of" a False Claims Act lawsuit, as well as "other efforts to stop 1 or more violations" of the Act.  31 U.S.C. § 3730(h)(1) (alteration added).  The Eleventh Circuit has held that the statute's "lawful acts" clause protects employee conduct in furtherance of a False Claims Act lawsuit "not only whe[n] a false claims action is actually filed," but also when such a suit "was a 'distinct possibility' at the time the assistance was rendered."  *Childree v. UAP/GA CHEM, Inc.*, 92 F.3d 1140, 1146 (11th Cir. 1996) (alteration added).

In 2009 and 2010, Congress added the "other efforts" clause to the anti-retaliation provision.  *See Lord v. Univ. of Miami*, 571 F. Supp. 3d 1299, 1308–10 & n.3 (S.D. Fla. 2021). The two clauses are disjunctive, meaning that the "other efforts" clause broadens employer liability beyond that existing by virtue of the "distinct possibility" standard.  *See* 31 U.S.C. § 3730(h)(1); *Carlson v. DynCorp Int'l LLC*, 657 F. App'x 168, 171–72 (4th Cir. 2016); *see also United States v. Woods*, 571 U.S. 31, 45–46 (2013) ("While [the word 'or'] can sometimes introduce an appositive — a word or phrase that is synonymous with what precedes it . . . — its ordinary use is

almost always disjunctive, that is the words it connects are to 'be given separate meanings.'" (alterations added; citation omitted)).

Several courts of appeals have held that the "other efforts" prong protects employee actions taken when the employee is motivated by an objectively reasonable belief that his employer is violating, or will violate, the False Claims Act. *See Singletary v. Howard Univ.*, 939 F.3d 287, 295–96 (D.C. Cir. 2019); *United States ex rel. Grant v. United Airlines Inc.*, 912 F.3d 190, 201–02 (4th Cir. 2018); *United States ex rel. Uhlig v. Fluor Corp.*, 839 F.3d 628, 635 (7th Cir. 2016); *see also United States ex rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d 71, 95–98 (2d Cir. 2017) (holding that "other efforts" clause protects an employee's refusal to participate in fraud on the government). So far, the Eleventh Circuit has declined — twice — to address the precise impact of the "other efforts" clause on retaliation claims. In both *Hickman v. Spirit of Athens, Alabama, Inc.*, 985 F.3d 1284, and *Briggs ex rel. United States v. QuantiTech Inc.*, 2022 WL 1308494, the Eleventh Circuit disposed of retaliation claims because they failed even under the more relaxed, "objective reasonableness" standard adopted by other courts. *See* 2022 WL 1308494, at *2; 985 F.3d at 1288–89. Still, the Eleventh Circuit has recognized that "the amendments expanded retaliation coverage to at least some set of people who make 'efforts to stop' False Claims Act violations — even if those efforts do not lead to a lawsuit or to the 'distinct possibility' of a lawsuit." *Hickman*, 985 F.3d at 1288 (citation omitted).

As in *Briggs* and *Hickman*, the effect of the "other efforts" clause turns out not to matter much here, because Plaintiff has offered evidence to support a reasonable finding of protected activity under either prong of the anti-retaliation provision. Defendant's argument that Plaintiff took no protected actions focuses on Plaintiff's December 14, 2012 conversation with Shalala — which, according to Defendant, was the only arguable instance in which Plaintiff took protected

actions.  (*See* Mot. 8).  Defendant maintains that Plaintiff's December 14 statements to Shalala do not qualify as protected activity because, at the time, TMG had shared only preliminary findings and thus Plaintiff lacked any objectively reasonable basis to believe that False Claims Act violations had occurred.  (*See id.*).

No part of this argument is persuasive.  One begins with its premise: the notion that the December 14 conversation was Plaintiff's only plausible protected activity.  The record — when viewed in the light most favorable to Plaintiff, as it must be — proves that foundational assumption false, regardless of the standard applied to it.

Consider first the "distinct possibility" standard — the more demanding of the two tests. *See Hickman*, 985 F.3d at 1288.  In this case, False Claims Act litigation became a distinct possibility at least by September 2012, when the University received the anonymous OIG letter outlining in detail the IML's allegedly fraudulent activities.  (*See* Lord Dep. Tr. 315–26).  Plaintiff took several protected actions between the day of the letter's receipt and his December 14 meeting with Shalala.  First, he continued to insist on the completion of the TMG investigation without external interference.  (*See id.* 341; *see also id.* 67, 79–80, 82).  Second, he met with Bass, a member of the Board of Trustees, to discuss the status of the investigation.  (*See* Lord Dep. Tr. 112; Lord Dep. Exs. 3).  Third, Plaintiff kept Shalala and other high-ranking leaders abreast of developments in the investigation through daily executive updates.  (*See* Lord Dep. Tr. 77–78).

After the December 14 meeting, too, Plaintiff sought to uncover questionable billing practices.  He received TMG's preliminary findings, which noted indicators of potential fraud, and he authorized McCafferty to engage TMG for a more wide-ranging investigation after he reviewed those findings.  (*See* McCafferty Dep. Tr. 212–13; Lord Dec. 18, 2012 Email [ECF No. 140-8] 2). He then worked with Goldschmidt to craft a memorandum to Shalala outlining TMG's key

CASE NO. 13-22500-CIV-ALTONAGA/McAliley

findings.  (*See* Lord Dec. 19, 2012 Email to Goldschmidt; Goldschmidt Dep. Exs. 9).  And after he was notified of his termination from his executive roles — but before the termination took effect and before he knew that his professorship would not be renewed — he emailed the Board of Trustees and Shalala to inform them of the OIG letter and TMG audit, emphasizing the importance of completing the audit "without interference from administration" to "help mitigate potential externally mandated sanctions."  (Goldschmidt Dep. Exs. 21).  Plaintiff took these steps in the shadow of potential False Claims Act litigation.

But even putting all of that aside, the evidence pertaining to Plaintiff's December 14 meeting with Shalala supports a finding that his actions during the meeting were protected. Plaintiff specifically requested the meeting with Shalala and, when there, updated her on the status of the investigation, including TMG's "initial assessment that [the University] had about a $10 million potential exposure in terms of billing issues at the IML."  (Lord Dep. Tr. 81 (alteration added); *see id.* 124–25).

Defendant argues that Plaintiff's deposition testimony does not support a finding of protected activity because the findings that Plaintiff shared with Shalala were admittedly "preliminary[,]" and thus, the record at most indicates "a 'mere possibility' of a potential violation." (Mot. 8 (alteration added; quotation marks omitted)).  Defendant offers no explanation — let alone a persuasive one — for why Plaintiff's initiative in reporting a "preliminary" finding of massive fraud by an external auditor does not amount to a "lawful act[] . . . in furtherance of" a False Claims Act suit when the possibility of the suit was concrete.  31 U.S.C. § 3730(h)(1) (alterations added).  Defendant's pitiful argument also ignores "the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving

party." *Tolan v. Cotton*, 572 U.S. 650, 660 (2014); *see also United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 741–42 (D.C. Cir. 1998).

If these observations were not sufficient to merit rejection of Defendant's contention that Plaintiff took no protected actions, application of the anti-retaliation provision's "other efforts" clause certainly would be. As the statute makes plain, an employee's efforts to stop even a single violation of the False Claims Act are protected if the employee had an objectively reasonable belief that such violations were occurring. *See* 31 U.S.C. § 3730(h)(1); *see also Chorches*, 865 F.3d at 97–98.

The record in this almost ten-year-old case contains a flood of such efforts by Plaintiff. Plaintiff formed an objectively reasonable belief that False Claims Act violations were occurring no later than when he became aware of the OIG letter. (*See* Lord Dep. Tr. 87, 315–26). And even if the OIG letter did not furnish Plaintiff with a reasonable belief that fraud was afoot, TMG's periodic updates and preliminary report did. (*See id.* 113–14; McCafferty Dep. Tr. 86). After Plaintiff became aware of the OIG letter, he directed that the letter be sent to the general counsel's office (*see* Lord Dep. Tr. 87); copied Shalala on daily executive updates discussing developments in the TMG audit (*see id.* 77–78); briefed Bass on TMG's initial assessments (*see id.* 112); personally informed Shalala of a potential $10 million liability for overbilling (*see id.* 81); assisted in the preparation of a memorandum outlining TMG's preliminary findings (*see* Lord Dec. 19, 2012 Email to Goldschmidt; Goldschmidt Dep. Exs. 9); insisted that TMG complete its review without external interference (*see* Lord Dep. Tr. 67, 79–80, 82, 341); and wrote to inform the entire Board of Trustees about the OIG letter and TMG audit and advocate for continuance of an external investigation (*see* Goldschmidt Dep. Exs. 21).

Undoubtedly, the disputed and undisputed material facts show Plaintiff engaged in activity protected by section 3730(h)(1).

## B.  Notice

Next, Defendant insists that Plaintiff at most simply performed his job responsibilities, and an employee does not engage in protected conduct by doing his job.[3]  (*See* Mot. 6).  As an initial matter, this argument repeats a mistake that Defendant made in its Motion to Dismiss [ECF No. 114]: the principle that compliance employees must do more than others to earn section 3730(h)'s protection springs not from the statute's protected-activity element, but from its *notice* element (and by extension, its but-for causation requirement).  *See Lord*, 571 F. Supp. 3d at 1313; *see also Nesbitt v. Candler Cnty.*, 945 F.3d 1355, 1359 (11th Cir. 2020) (holding that "the but-for causation standard applies to claims under the antiretaliation provision").  As before, the distinction does not change the outcome here because Defendant's contention lacks record support even when construed as an argument about notice.

As noted, section 3730(h)(1) requires a showing of but-for causation.  *See Nesbitt*, 945 F.3d at 1359.  From that principle, courts have derived the corollary requirement that a defendant have had notice of the plaintiff's protected conduct.  *See, e.g.*, *Mack v. Augusta-Richmond Cnty.*, 148 F. App'x 894, 897 (11th Cir. 2005); *United States ex rel. Reed v. KeyPoint Gov't Sols.*, 923 F.3d 729, 766 (10th Cir. 2019).  And that makes sense.  "Common sense teaches that an employer

---

[3] Defendant initially argued that the Eleventh Circuit's supposed "manager rule" bars Plaintiff's claim.  (*See* Mot. 6).  After Defendant filed its Motion, the Eleventh Circuit decided *Patterson v. Georgia Pacific, LLC*, 38 F.4th 1336 (11th Cir. 2022), which held that the manager rule does not apply in cases brought under Title VII's opposition clause.  *See id.* at 1346–48.  Given section 3730(h)(1)'s marked resemblance to Title VII's opposition clause (*see* Pl.'s Not. of Suppl. Auth. [ECF No. 156] 1), Defendant wisely retreated from its invocation of the manager rule, focusing its argument instead on the principle that compliance employees must do more than others to raise an inference that their employers were aware of their protected conduct (*see* Reply 5 n.2).  The Court therefore does not address the manager rule.

cannot retaliate against conduct of which it was unaware." *Singletary*, 939 F.3d at 300 (citations omitted).

Some courts outside the Eleventh Circuit have held that compliance employees must do more than others to establish notice. *See, e.g.*, *Reed*, 923 F.3d at 767; *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 568 (6th Cir. 2003); *United States ex rel. Williams v. Martin-Baker Aircraft Co., Ltd.*, 389 F.3d 1251, 1261 (D.C. Cir. 2004). Those courts rest their conclusion on the "core insight that employers are unlikely to have the requisite notice if the employee 'made no allegations of fraud' or the protected conduct was 'part of his job.'" *Singletary*, 939 F.3d at 305 (Katsas, J., dissenting) (citation omitted). This principle is somewhat at odds with the statutory text, however. The anti-retaliation provision expressly safeguards "[a]ny employee" from unlawful retaliation. 31 U.S.C. § 3730(h)(1) (alteration added). And here, as in other contexts, "'any' . . . means 'all.'" *Patterson*, 38 F.4th at 1347 (alteration added; collecting cases).[4]

The Eleventh Circuit has never addressed what, if any, additional hurdles a compliance employee must overcome to succeed in bringing a claim under section 3730(h), but in one unpublished case, it lent some offhand support to the notion that compliance employees are not like others for False Claims Act retaliation purposes. *See Mack*, 148 F. App'x at 897; *see also Lord*, 571 F. Supp. 3d at 1313. No matter. Even if a heightened notice standard applies, the Court must view the record in the light most favorable to Plaintiff and draw any reasonable inferences in his favor. *See Jameson v. Arrow Co.*, 75 F.3d 1528, 1531 (11th Cir. 1996); *see also Yesudian*, 153

---

[4] A heightened burden for compliance employees likewise seems to be in tension with the statute's but-for causation requirement. If an employer retaliates against a compliance employee and the but-for cause of the retaliation is the compliance professional's effort to avoid fraud on the government, then the plain text of the statute would seem to impose liability regardless of whether stopping fraud was within the employee's job description.

CASE NO. 13-22500-CIV-ALTONAGA/McAliley

F.3d at 741–43.  Doing so here reveals that Defendant — and importantly, Shalala — had notice

of Plaintiff's protected conduct.

As the Court has previously explained:

> So, what exactly must compliance employees allege to establish notice? Broadly speaking, "notice can be accomplished . . . by any action [that] a factfinder could conclude would put the employer on notice that litigation is a reasonable possibility[,]" *Eberhardt v. Integrated Design & Constr., Inc.*, 167 F.3d 861, 868 (4th Cir. 1999) (alterations added); or, post-amendments, by any action that would make an employer aware of the plaintiff's efforts to stop violations of the False Claims Act, *see* 31 U.S.C. § 3730(h)(1).

> More concretely, a compliance professional might establish notice "by expressly stating an intention to bring a *qui tam* suit," *Eberhardt*, 167 F.3d at 868; "characterizing the employer's conduct as illegal or fraudulent[,]" *id.* (alteration added); "recommending that legal counsel become involved[,]" *id.* (alteration added); "act[ing] outside his normal job responsibilities[,]" *Williams*, 389 F.3d at 1261 (alterations added; citation omitted; or "alert[ing] a party outside the usual chain of command[,]" *id.* (alterations added; citation omitted).  A compliance employee need not "incant talismanic words to satisfy the notice element," *id.* (citations omitted), but if the employee is the source of the employer's notice, he must do more than "[m]erely grumble . . . about job dissatisfaction or regulatory violations" or report mischarging the government to a supervisor, *Yesudian*, 153 F.3d at 744 (alterations added); *see Eberhardt*, 167 F.3d at 868 (citations omitted).

*Lord*, 571 F. Supp. 3d at 1313–14 (alterations in original).  Relatedly, the plaintiff must establish

that the decisionmakers responsible for the retaliation had notice of the protected conduct.  *See*

*Reynolds v. Winn-Dixie Raleigh, Inc.*, 620 F. App'x 785, 792 (11th Cir. 2015).

The record demonstrates that Shalala had ample notice of Plaintiff's protected actions, and

Plaintiff's compliance responsibilities detract nothing from this conclusion.  Highly relevant to

this analysis is the nature of Plaintiff's executive roles at the University.  No manual dictated

Plaintiff's compliance responsibilities; he was a high-ranking executive with discretion to define

his own role and set policy.  *See Williams*, 389 F.3d at 1261 (noting that an employee may establish

notice if he "acts outside his normal job responsibilities" (citations omitted)).  And without any

clear baseline for what Plaintiff's "typical" responsibilities were, the Court cannot lightly infer that any particular action he took to root out fraud was professionally unremarkable.

As a starting point, Shalala became aware of the OIG letter by early October 2012 at the latest. (*See* Shalala Dep. Tr. 94). By that time, certainly, litigation was a distinct possibility. *See United States ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1304 (11th Cir. 2010) (holding that a plaintiff's allegations were sufficient because, "if proven," they supported "a reasonable conclusion that the defendants were aware of the possibility of litigation under the False Claims Act").

Shalala also learned through the daily executive updates and her conversations with Livingstone of Plaintiff's responsibility in initiating and continuing the TMG audit. (*See* Lord Dep. Tr. 77–78; Shalala Dep. Tr. 68–69; Shalala Dep. Exs. 2–3; Livingstone Memo 2; Pl.'s SMF ¶ 92). Shalala reviewed TMG's preliminary report days before she ordered Plaintiff terminated from his executive positions. (*See* Shalala Dep. Tr. 88). Further, Plaintiff told Shalala on December 14, 2012 that the University was facing roughly $10 million in liability for overbilling in the IML. (*See* Lord Dep. Tr. 81). The Court must assume that Plaintiff is telling the truth and that Shalala heard him when he so informed her. *See Wate v. Kubler*, 839 F.3d 1012, 1018 (11th Cir. 2018) (noting that courts may "not weigh conflicting evidence or make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment" (citations omitted)). Likewise, Plaintiff copied Shalala on his January 2013 email to the Board of Trustees. (*See* Goldschmidt Dep. Exs. 20–23).

Even if Plaintiff must satisfy a heightened burden as a compliance employee, the record would easily permit a jury to conclude that Shalala knew of his protected conduct. Plaintiff advocated to Shalala for an external review of the IML both before and after receipt of the OIG

letter.  (*See* Lord Dep. Tr. 64–65, 79–82, 138–39; Goldschmidt Dep. Exs. 7); *cf. Eberhardt*, 167 F.3d at 868 (noting that an employee may put the employer on notice of protected conduct by "recommending that legal counsel become involved").  Shalala was well aware of those efforts, as well as of Plaintiff's primary role in the TMG investigation by the time Goldschmidt shared TMG's preliminary findings with her.  (*See* Lord Dep. Tr. 80–82; Shalala Dep. Tr. 68–69; Shalala Dep. Exs. 2–3; Livingstone Memo 2; Pl.'s SMF ¶ 92).  In fact, the final straw that led to Plaintiff's termination was Livingstone's accusation to Shalala that Plaintiff was using the investigation to harm him and the University.  (*See* Livingstone Memo 2; Pl.'s SMF ¶ 92; Goldschmidt Dep. Tr. 157–58).

Shalala also became aware of Plaintiff's efforts to discover fraud when Plaintiff personally requested the December 14 meeting with her, even though he reported to her only indirectly.  (*See* Lord Dep. Tr. 35, 81, 124–25).  Importantly, the meeting was not a typical one.  Plaintiff did not often request to meet with Shalala to discuss ongoing external investigations into potential fraud (*see* Lord Decl. ¶ 5); and he expressly warned Shalala of large impending liability for overbilling, both in the meeting itself and days later when he helped Goldschmidt inform her of TMG's preliminary findings (*see* Lord Dep. Tr. 81; Lord Dec. 19, 2012 Email to Goldschmidt; Goldschmidt Dep. Exs. 9).  *See Williams*, 389 F.3d at 1261 (observing that a compliance employee gives an employer notice of protected conduct when he "acts outside his normal job responsibilities or alerts a party outside the usual chain of command" (citations omitted)); *Eberhardt*, 167 F.3d at 868 (holding that a compliance employee may put employer on notice by "characterizing the employer's conduct as illegal or fraudulent").  Plaintiff similarly broke the chain of command by informing the Board of Trustees, with Shalala copied, of the OIG letter and TMG audit.  (*See* Goldschmidt Dep. Exs. 20–23).

In sum, when viewed in the light most favorable to Plaintiff, the facts show that Shalala knew of Plaintiff's protected conduct, in no small part because he went out of his way to inform her and others about it.

## C.   Causation

Defendant also argues that it is entitled to summary judgment because Shalala fired Plaintiff for legitimate, non-retaliatory reasons.  (*See* Mot. 9–13).  Defendant is mistaken.

As explained, "the but-for causation standard applies to claims under the antiretaliation provision of the False Claims Act[.]"   *Nesbitt*, 945 F.3d at 1359 (alteration added; citations omitted).  This standard requires that the protected action "have had 'a determinative influence on the outcome' of the employer's decision-making process."  *Id.* (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009)).[5]

Shalala, the decision-maker who ordered Plaintiff's firing, testified that she fired him because "his leadership was destructive to UHealth," he "mishandled" the layoffs, and she "heard from everyone" that he "destroyed morale at the medical school."  (Shalala Dep. Tr. 27, 33).  There are some reasons to believe her.  Her testimony is consistent with some of her contemporaneous statements to Goldschmidt that she fired Plaintiff because of his unwillingness to communicate with key personnel and faculty blowback.  (*See* Goldschmidt Dep. Tr. 52).  The faculty petition supports her, Goldschmidt's, and Livingstone's testimony that morale at the Medical School was

---

[5] Defendant notes that some courts have applied the well-known *McDonnell Douglas* causation framework to False Claims Act retaliation claims (*see* Mot. 4); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–06 (1973), but the Eleventh Circuit has never weighed in on whether the framework applies to such claims, *see Hale v. Moreland Altobelli Assocs., Inc.*, No. 1:14-cv-00065, 2014 WL 12235187, at *3 n.2 (N.D. Ga. Sept. 4, 2014) (collecting cases).  The Court need not resolve the question here because the result would be the same even if the *McDonnell Douglas* standard applied.

low and Plaintiff had a poor relationship with faculty.[6]  (*See id.* 99–102; Lord Dep. Tr. 352; Livingstone Dep. Tr. 52–53; 58–59; Shalala Dep. Tr. 33).  And around the same time Shalala fired numerous other employees who had nothing to do with the TMG investigation.  (*See* Lord Dep. Tr. 162, 166–67; Def.'s SMF ¶¶ 48–49).

But the record also furnishes reasons for a jury *not* to believe Shalala.  She ordered the end of the TMG investigation and fired Plaintiff on the same day that Livingstone complained to her and that she ordered the transfer of the TMG probe in-house, implying that Plaintiff and the investigation were inextricably linked in her mind.  (*See* Pl.'s SMF ¶ 92; Def.'s Reply SMF ¶ 92; Goldschmidt Dep. Tr. 157–58; Livingstone Memo 2).  Supporting that inference also, she sarcastically hastened the end of Plaintiff's time at the University when he informed the Board of Trustees of the OIG letter and the TMG investigation.  (*See* Goldschmidt Dep. Exs. 23; Goldschmidt Dep. Tr. 216).

Too, Shalala's order to recall IML-related emails suggests that she wanted to avoid exposing TMG's damaging findings.  (*See* Goldschmidt Dep. Exs. 14).  She had every reason to be worried about those findings.  Evidence shows her acute concerns with "productivity;" indeed, the University had just undergone a difficult financial period under her leadership.  (*See* Shalala Dep. Exs. 33; Lord Dep. Tr. 36–37; Goldschmidt Dep. Exs. 4–5; Goldschmidt Dep. Tr. 224–225).  From these facts, a jury can infer that she considered the potential of millions of dollars' worth of liability for fraud to the federal government a particularly unwelcome development.  The

---

[6] Plaintiff objects to certain evidence of Goldschmidt's, Livingstone's, and unidentified faculty members' opinions of Plaintiff's leadership (*see, e.g.*, Pl.'s SMF ¶¶ 24, 43, 52); but the Court expresses no view on the admissibility of such evidence because Defendant is not entitled to summary judgment even when the evidence is considered.  For the same reason, the Court expresses no view on the admissibility of objected-to aspects of Livingstone's recounting of his meeting with Nemeroff.  (*See id.* ¶¶ 27–28).

University's arguably retaliatory treatment of McCafferty after she cooperated with the FBI's investigation lends further support to that theory. (*See* McCafferty Dep. Tr. 119–25, 169–72).

Still other record evidence suggests that Shalala's reasons for firing Plaintiff were pretextual. Plaintiff's direct supervisor, Goldschmidt, valued Plaintiff and was upset when he was fired. Although Goldschmidt opined that Plaintiff's personality caused problems, he also testified that he did not consider any of Plaintiff's behaviors as bearing on his performance. (*See* Goldschmidt Dep. Tr. 44–45, 159).

After Shalala's December 21, 2012 discussion with Livingstone, she breached the chain of command to order Plaintiff's firing without asking Goldschmidt for his input, and she shut down the TMG audit the same day. (*See* Pl.'s SMF ¶ 92; Def.'s Reply SMF ¶ 92; Goldschmidt Dep. Tr. 157–58; Lord Dep. Tr. 35). Shalala never testified that she had considered firing Plaintiff before December 2021 — when the TMG investigation was nearing its conclusion. Neither she nor anyone else at the University told Plaintiff that he needed to improve his communication with others; and she and other key leaders agreed the layoffs Plaintiff implemented were necessary, even if painful. (*See* Lord Decl. ¶ 4; Goldschmidt Dep. Tr. 59–60, 224–25; Goldschmidt Dep. Exs. 4–5). In fact, those painful decisions initially led to Plaintiff's *promotion*. (*See* Goldschmidt Dep. Tr. 59–60).[7]

The question of whether Plaintiff's protected actions led to his firing, in other words, turns on Shalala's credibility. There are reasons to doubt her credibility; there are also reasons not to doubt it. But Defendant well knows that *courts* may not declare a winner of credibility contests at summary judgment. *See Wreal, LLC v. Amazon.com, Inc.*, 38 F.4th 114, 124 n.6 (11th Cir. 2022)

---

[7] For these reasons, the cases that Defendant cites to support the notion that "a plaintiff cannot establish causation where the employer contemplates or takes adverse action *before* the alleged protected activity occurs" are not relevant. (Mot. 10 (citing cases)).

("Credibility determinations . . . are inappropriate at the summary judgment stage." (alteration added; citation omitted)).  That role belongs to the jury at trial.

### D.  Judicial Estoppel

Finally, Defendant argues that judicial estoppel bars Plaintiff's claim because Plaintiff lied about his employment status to the court in his divorce case.  (*See* Mot. 14–18).  As the Court has explained elsewhere (*see* July 26, 2022 Order [ECF No. 170] 20–22), the record precludes summary judgment in Defendant's favor on its judicial estoppel defense.

"The equitable doctrine of judicial estoppel is intended to prevent the perversion of the judicial process and protect its integrity by prohibiting parties from deliberately changing positions according to the exigencies of the moment."  *Slater v. U.S. Steel Corp.*, 871 F.3d 1174, 1180 (11th Cir. 2017) (alterations adopted; citations and quotation marks omitted).  Courts may apply the doctrine in their discretion "only when the plaintiff's conduct is egregious enough that the situation 'demands equitable intervention.'"  *Id.* (alteration adopted; citation omitted).

To determine whether judicial estoppel applies, a court must first determine whether a "party took an inconsistent position under oath in a separate proceeding[.]"  *Id.* at 1181 (alteration added; citation omitted).  The court must then assess whether "these inconsistent positions were calculated to make a mockery of the judicial system."  *Id.* (quotation marks omitted; quoting *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1285 (11th Cir. 2002)).  In other words, courts must "consider[] both the plaintiff's actions — whether he made inconsistent statements — and his motive — whether he intended to make a mockery of the judicial system."  *Id.* (alteration added).

"As a general rule, a party's state of mind (such as knowledge or intent) is a question of fact for the factfinder, to be determined after trial."  *Chanel, Inc. v. Italian Activewear of Fla., Inc.*,

931 F.2d 1472, 1476 (11th Cir. 1991) (citations omitted). That general rule holds up here. Plaintiff's transition from his role as professor involved both voluntary and involuntary elements: LeBlanc told Plaintiff that the University lacked the funding to keep him as a professor, and Plaintiff decided to forego an advisory faculty vote because Shalala and LeBlanc had decided against renewing his professorship. (*See* LeBlanc Dep. Tr. 88, 103; Lord Dep. Tr. 171, 173).

With that nuance in the background, Plaintiff at his deposition offered several harmless explanations for his statements to the divorce court that he had retired. He explained he was embarrassed to tell people that he had been fired, he used the word "retirement" loosely because of the complicated nature of his job status, he used an "abundance of caution" to avoid violating the sealing order in this case, and he relied on the University's representations that the University lacked funding to renew his professorship in deciding against standing for a faculty vote. (Lord Dep. Tr. 173–75, 217–18; LeBlanc Dep. Tr. 88, 103). Plaintiff also has put forth evidence exposing weaknesses in Defendant's theory of why he lied to the divorce court — namely, cheating Meagher out of alimony.[8] Plaintiff attests under oath that Meagher will receive half of any recovery in this case (*see* Lord Decl. ¶ 8); and, if successful at trial, Plaintiff may be entitled to two times back pay, *see* 31 U.S.C. § 3730(h)(2).

On this record, therefore, Plaintiff genuinely disputes whether he "intended to make a mockery of the judicial system." *Slater*, 871 F.3d at 1181; *see also Ajaka v. Brooksamerica Mortg. Corp.*, 453 F.3d 1339, 1346 (11th Cir. 2006) (reversing grant of summary judgment on defense of judicial estoppel because "there exist[ed] a question of material fact as to whether [the plaintiff] had the motivation and intent to manipulate the judicial system under the circumstances presented"

---

[8] The Court expresses no view on the admissibility of Meagher's statements to the divorce court. (*See* Pl.'s SMF ¶ 67).

CASE NO. 13-22500-CIV-ALTONAGA/McAliley

(alterations added)).  He also disputes the extent to which his prior statements in the divorce case are inconsistent with his position in this case.

## IV.   CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that Defendant University of Miami's Motion for Final Summary Judgment **[ECF No. 139]** is **DENIED**.

**DONE AND ORDERED** in Miami, Florida, this 8th day of August, 2022.

_Cecilia M. Altonaga_

**CECILIA M. ALTONAGA**
**CHIEF UNITED STATES DISTRICT JUDGE**

cc:      counsel of record