# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 13-22500-CIV-ALTONAGA/McALILEY

**JONATHAN LORD, M.D.,**

   **Plaintiff,**

**v.**

**UNIVERSITY OF MIAMI,**

   **Defendant.**

_____/

## DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW

Defendant, University of Miami (the "University"), pursuant to Federal Rule of Civil Procedure 50(a), moves for entry of judgment as a matter of law, or a directed verdict, on the single claim asserted against it by Plaintiff, Jonathan Lord, M.D.[1] The University respectfully submits that there exists no disputed issue of material fact as to either liability or damages and that it is entitled to judgment as a matter of law on Plaintiff's single claim of retaliation under the False Claims Act, 31 U.S.C. § 3730(h) ("FCA"), in his operative Third Amended Complaint (D.E. 101).

### MEMORANDUM OF LAW

### I.   Legal Standard for Judgment as a Matter of Law

A motion for judgment as a matter of law is governed by Rule 50(a) of the Federal Rules of Civil Procedure, which provides:

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:
>
> (A)   resolve the issue against the party; and

---

[1]   Rule 50(a) was amended in 1991 "to replace the term 'directed verdict' with 'judgment as a matter of law.'" *U.S. v. One 28 Foot Contender Motor Vessel*, 240 F. App'x 842, 843 (11th Cir. 2007) (citing Fed. R. Civ. P. 50 (1991 Amendments)).

> (B)     grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 50(a)(1). In other words, judgment as a matter of law should be granted when a plaintiff has failed to present legally sufficient evidence to prove an element of his claim. *Xtec, Inc. v. Hembree Consulting Services, Inc.*, 183 F. Supp. 3d 1245, 1252 (S.D. Fla. 2016) (Altonaga, J.) (citing *Pickett v. Tyson Fresh Meats, Inc.*, 420 F.3d 1272, 1278 (11th Cir. 2005)). In adjudicating such a motion, "the court should review all of the evidence in the record," and in doing so, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

Although the court will review the evidence in light most favorable to the non-moving party, "the non-movant must put forth more than a mere scintilla of evidence suggesting that reasonable minds could reach differing verdicts.'" *XTec*, 183 F. Supp. 3d at 1252 (citing *Campbell v. Rainbow City, Ala.*, 434 F. 3d 1306, 1312 (11th Cir. 2006) (in turn quoting *Abel v. Dubberly*, 210 F.3d 1334, 1337 (11th Cir. 2000)). Moreover, the court can disregard testimony "if 'reasonable persons could not believe' it because it 'contradicts indisputable physical facts or laws.'" *Whitehead v. Bond*, 680 F. 3d 919, 925 (7th Cir. 2012) (citing *Latino v. Kaizer*, 58 F.3d 310, 315 (7th Cir. 1995)).

## II.   The University is Entitled to Judgment as a Matter of Law on Count I of Plaintiff's Third Amended Complaint (Retaliation under the False Claims Act)

The anti-retaliation provision of the FCA provides as follows:

> Any employee . . . shall be entitled to all relief necessary to make that employee . . . whole, if that employee . . . is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment ***because of*** lawful acts done by the employee . . . in furtherance of

2

an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1) (emphasis supplied). A plaintiff must prove three elements to establish a retaliation claim: "(1) he engaged in protected conduct, (2) the defendant took adverse action against his employment, and (3) the defendant took the adverse action ***because of*** his protected conduct." *Kalch v. Raytheon Tech. Servs. Co., LLC*, No. 616CV1529ORL40KRS, 2017 WL 3394240, at *3 (M.D. Fla. Aug. 8, 2017) (emphasis supplied) (citing *Reynolds v. Winn-Dixie Raleigh Inc.*, 620 F. App'x 785, 791 (11th Cir. 2015) and *Mack v. Augusta-Richmond Cty.*, 148 F. App'x 894, 896–97 (11th Cir. 2005)). The Eleventh Circuit applies the "but-for causation standard" to FCA retaliation claims. *Nesbitt v. Candler Cty.*, 945 F. 3d 1355, 1360 (11th Cir. 2020) The but-for standard requires a plaintiff to "'show that the harm **would not have** occurred in the absence of[,] that is, **but for**' his **protected conduct**." *Nesbitt*, 945 F. 3d at 1358 (emphasis and alterations in original).

Plaintiff failed to provide a legally sufficient evidentiary basis for the Jury to find in his favor as to the first and third elements of his claim. First, the trial evidence shows that Plaintiff never engaged in statutorily-protected activity. Second, Plaintiff failed to present evidence that his alleged protected conduct was the but-for cause of the University's decision to terminate his employment. Rather, the trial evidence establishes that the University's decision to terminate Dr. Lord's employment was based on legitimate, non-retaliatory factors related to his work performance (including a Petition calling for his removal and low workplace morale caused by his "bull in a China shop" behavior). Plaintiff has presented no evidence from which the Jury can reasonably conclude that the University terminated Dr. Lord *because of* his alleged protected activity. For either of these reasons, judgment as a matter of law in favor of the University is proper. *See Christopher v. Fla.*, 449 F. 3d 1360, 1364 (11th Cir. 2006) ("JMOL is appropriate

when a plaintiff presents no legally sufficient evidentiary basis for a reasonable jury to find for him on a material element of his cause of action.").

**A.    Plaintiff Failed to Present a Legally Sufficient Evidentiary Basis for a Reasonable Jury to Find that he Engaged in Protected Conduct**

Section 3730(h)(1) protects "lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h)(1). In other words, protected conduct under § 3730(h)(1) "can be parsed into two clauses: the litigation clause and the opposition clause." *Arthurs v. Global TPA LLC*, 208 F. Supp. 3d 1260, 1265 (M.D. Fla. 2015). The "litigation clause" protects "conduct in furtherance of FCA litigation," and the "opposition clause" protects conduct "taken as an effort to stop the [FCA] violation." *Arthurs v. Glob. TPA LLC*, 208 F. Supp. 3d 1260, 1265–66 (M.D. Fla. 2015) (citations and internal quotations omitted). As to the former clause, FCA litigation must be a "distinct possibility." *See Brown v. Morehouse Coll.*, 829 Fed. Appx. 942, 945 (11th Cir. 2020) ("protected activity under the FCA includes those employee actions by which FCA litigation was 'a distinct possibility.'") (quoting *Childree v. UAP/GA AG Chem., Inc.*, 92 F.3d 1140, 1146 (11th Cir. 1996)). As to the latter clause, an employee must "have an objectively 'reasonable belief' of an FCA violation." *Briggs for Use and Benefit of U.S. v. QuantiTech Inc.*, No. 21-11448, 2022 WL 1308494, *2 (11th Cir., May 2, 2022); *Hickman v. Spirit of Athens, Alabama, Inc.*, 985 F. 3d 1284, 1288 (11th Cir. 2021).

**1.    Plaintiff Did Not Engage in Any Protected Conduct in Furtherance of an Action Under the FCA**

Plaintiff failed to present sufficient trial evidence to invoke the litigation clause set forth in 31 U.S.C. § 3730(h)(1), which protects an employee's "lawful acts . . . in furtherance of" a FCA lawsuit. Protected conduct under the litigation clause:

> requires a nexus with the in furtherance of prong of [a False Claims Act] action,' which 'involves determining whether [plaintiff's] actions sufficiently furthered an action filed or to be filed under the [FCA].' . . . 'Protected conduct' includes 'investigation for, initiating of, testimony for, or assistance in' an FCA suit. . . . It also encompasses internal reports of FCA violations. . . . Protected activity does not, however, include 'an employee's investigation of nothing more than his employer's non-compliance with federal or state regulations.'

*U.S. v. Novartis Pharmaceuticals Corp.*, No. 15-6547, 2020 WL 17891188, at *3 (D.N.J. Apr. 16, 2020) (citations omitted).

The trial evidence demonstrates that, on December 31, 2013, Plaintiff was terminated from his executive/administration positions at the University; over the following days, the decision was made not to renew Plaintiff's faculty position. It was not until July 12, 2013, however, that Plaintiff filed his Complaint in this action. He failed to present any evidence that filing a § 3730(h) *qui tam* action was a distinct possibility, or that he even considered it, while he was still working for the University.

### 2.      Plaintiff Did Not Engage in Any Protected Conduct to Stop One or More Violations of the FCA

Plaintiff also failed to present sufficient trial evidence to invoke the opposition clause in 31 U.S.C. § 3730(h)(1). By the explicit terms of the statute, only conduct which is taken as an "effort to stop" a violation is protected. 31 U.S.C. § 3730(h)(1). Therefore, "a person who acts to oppose an FCA violation for reasons other than protecting the federal government from potential fraud has not engaged in protected conduct. Likewise, a person who quietly refuses to participate in violative behavior with the silent hope that others will take notice is also not protected." *Arthurs v. Global TPA LLC,* 208 F. Supp. 3d 1260, 1266 (M.D. Fla. 2015). "[T]he FCA's purpose can only be accomplished by encouraging individuals protected by the statute to 'come forward with

allegations of fraud perpetrated upon the government.'" *Arthurs*, 208 F. Supp. 3d at 1266 (citing *Roberts v. Accenture, LLP*, 707 F. 3d 1011, 1018 (8th Cir. 2013)).

It is undisputed that Plaintiff never complained about the University's submission of false claims to the Federal Medicare and/or Medicaid programs. Further, Plaintiff's claim that he advised President Shalala on December 14, 2012, that - - based on the *preliminary* TMG assessment - - the University was engaged in fraud and faced a $10 million exposure - - is belied by the record evidence. As of that date, there was absolutely no finding or conclusion that fraud or liability exposure existed. To the contrary, both TMG and Dr. McCafferty-Fernandez (the point person, as the Chief Medical Compliance Officer at the University, for the TMG assessment) simply noted that further review was necessary; at that point in time, a billing audit had not even been authorized, let alone conducted, and no conclusions had been reached.[2] Plaintiff's alleged statements are not objectively reasonable and cannot support his claim.

In sum, Plaintiff has presented no evidence that he acted in furtherance of a *qui tam* action or that he took any actions designed to stop or avert any violations of the FCA. There is simply no legally sufficient evidentiary basis upon which the Jury could find that Plaintiff engaged in a protected activity. As such, the University is entitled to judgment as a matter of law.

---

[2]     In fact, Dr. McCafferty-Fernandez - - who Plaintiff concedes was the University's point of contact for the TMG assessment - - testified that TMG never found fraud and that neither TMG or she ever reported to anyone that the University was engaged in fraud. (9/30/22 testimony at approximately 3:25 p.m.) Further, she admitted that TMG could not report fraud or probable fraud because TMG did not any billing data. (*Id*. at 3:45 p.m.)

**B.      Plaintiff Failed to Present a Legally Sufficient Evidentiary Basis for a Reasonable Jury to Find that His Alleged Protected Activity Was the But-For Cause of the University's Decision to Terminate His Employment**

   **1.      Plaintiff Failed to Present Evidence of the Requisite But-For Causation**

Plaintiff failed to set forth a legally sufficient evidentiary basis for the Jury to find in his favor on the third element of a retaliation claim: but-for causation. To establish causation, a plaintiff must demonstrate that the final decision-maker was aware of his protected conduct:

> To establish causation under § 3730(h)(1), the plaintiff must show that ***the final decision-maker*** who approves or implements the adverse employment action ***knew about the plaintiff's protected conduct***. . . . It is not enough for other employees, supervisors, or members of the employer's management to know about the plaintiff's protected conduct where these individuals have no decision-making authority.

*Kalch v. Raytheon Tech. Servs. Co.*, LLC, No. 616CV1529ORL40KRS, 2017 WL 3394240, at *3 (M.D. Fla. Aug. 8, 2017) (internal citation omitted; emphasis supplied). *See also Reynolds v. Winn-Dixie Raleigh Inc*., 620 F. App'x 785, 792 (11th Cir. 2015) (affirming summary judgment on FCA retaliation claim where the plaintiff "failed to establish causation because he did not present any evidence that the decision makers . . . knew that [he] had spoken . . . about potential false claims"); *Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F. 3d 1199, 1208 (11th Cir. 2001) ("[a] decision maker cannot have been motivated to retaliate by something unknown to him") (quoting *Bechtel Constr. Co. v. Sec'y of Labor*, 50 F.3d 926, 934 (11th Cir. 1995)).

It is also well-established that an employee's intervening act of misconduct severs any causal connection that might be inferred from temporal proximity between the alleged statutorily protected activity and the termination decision. *See, e.g., Henderson v. FedEx Express*, 442 F. App'x 502, 506 (11th Cir. 2011); *Hankins v. AirTran Airways, Inc*., 237 F. App'x 513, 520-21 (11th Cir. 2007). *See also Schoebel v. Am. Integrity Ins. Co. of Fla*., No. 8:14–cv–426–T–27AEP, 2015 WL 4231670, at *7 (M.D. Fla. July 10, 2015) (granting summary judgment to employer

because, notwithstanding the close temporal proximity between the plaintiff's protected conduct and her termination, she indisputably violated her employer's e-mail policy, which was a legitimate reason for the termination unrelated to her protected conduct).

Furthermore, "in a retaliation case, when an employer contemplates an adverse employment action *before* an employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation." *Buchanan v. Delta Air Lines, Inc.*, 727 F. App'x 639, 642 (11th Cir. 2018) (per curiam) (citing *Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006)). In *Buchanan*, the plaintiff claimed Delta retaliated by terminating her for filing an internal complaint of discrimination after she was placed on suspension for a policy violation. *Buchanan*, 727 F. App'x at 642. The court found that the "only causal link Buchanan cites between her internal complaint and her subsequent termination is temporal proximity. Because her internal complaint occurred *after* she was already placed on suspension and under investigation, temporal proximity alone cannot establish causation." *Id.* (emphasis supplied). In other words, "employees who are already on thin ice [cannot] insulate themselves against termination or discipline by preemptively making a discrimination complaint." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1270 (11th Cir. 2010).

Here, it is undisputed that President Shalala was the final decisionmaker with respect to Plaintiff's termination. Although Plaintiff claims to have reported concerns to others (such as Hillarie Bass or the Executive Committee of the Board of Trustees), there is absolutely no evidence that those alleged reports ever were shared with President Shalala (let alone were shared *prior to* her decision to terminate). That undisputed fact is critical:

> Brungart also argues that even if the decision maker did not have knowledge of the protected conduct, *knowledge should be*

> *"imputed" to the corporation where other corporate officials or supervisors had knowledge of it. That position is, of course, foreclosed by our Clover decision, because the defendant in that case was a corporation*. Even if the *Clover* decision did not exist, we would not be persuaded to adopt Brungart's imputed knowledge theory. *The BellSouth corporation itself did not actually make the decision to take the adverse employment action; Nelson made that decision, albeit on the corporation's behalf*. Because Nelson did not know of the protected conduct, he could not have taken that action on the corporation's behalf because of the protected conduct. This is another way of saying that *the fact the employer is a corporation does not relieve a plaintiff of the burden of showing a causal connection between the protected conduct and the decision to take the adverse employment action*.

*Brungart v. BellSouth Telecomms., Inc.*, 231 F. 3d 791, 800 (11th Cir. 2000). *See also Clover v. Total Sys. Servs., Inc.*, 176 F. 3d 1346, (11th Cir. 1999) (reversing denial of former employer's motion for judgment as a matter of law on Title VII claims and noting "[B]ecause Clover failed to present sufficient evidence either that (1) Miller was aware of her protected conduct or (2) anyone other than Miller was a decision-maker, we conclude she did not present sufficient evidence to permit a jury to reasonably find the requisite causal connection between her protected activity and her termination"); *Summers v. City of Dothan, Ala.*, 444 Fed. Appx. 346, 352 (11th Cir. 2011) ("We have made clear, however, that in the context of Title VII retaliation claims 'neither a court nor a jury may impute knowledge to a decision-maker who has sworn he had no actual knowledge.'") (quoting *Brochu v. City of Riviera Beach*, 304 F.3d 1144, 1156 (11th Cir. 2002)).[3]

Relatedly, complaints made *after* the termination decision has been made cannot support causation. Obviously, one cannot retaliate against someone for something that happens *after* the adverse action has occurred. "Logic dictates that the protected conduct must precede the act of retaliation." *Tucker v. Fla. Dep't of Transportation*, 678 F. App'x 893, 896 (11th Cir. 2017) (*citing*

---

[3]      Here, for example, President Shalala testified unequivocally that she had no knowledge of Plaintiff's alleged lunch with Hillarie Bass or his purported memorandum summarizing same.

*Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) ("A decision maker cannot have been motivated to retaliate by something unknown to him.")[4]

It also bears noting that, in both the cross-examination and re-direct examination of Plaintiff, he consistently testified that his alleged complaints were part of his required job responsibilities and that he regularly made reports (as to compliance and other matters) to President Shalala and the Board of Trustees. Plaintiff even admitted, in both his testimony and in a document entered into evidence, that his alleged efforts were to "fulfill [his] role as a compliance official." (*See* 9/20/22 testimony at approximately 1:33 p.m.; *see also* Joint Ex. 16 at 3.)

Because Plaintiff was the Chief Compliance Officer, Plaintiff must do more - - as a compliance employee - - to put his employer on notice of his alleged protected activity. *See Mack v. Augusta-Richmond Cty., Ga.*, 148 Fed. Appx. 894, 897 (11th Cir. 2005) (quoting with approval decisions from the First and Fourth Circuits, which recognized the principle that compliance employees must do more than their job duties to engage in protected activity). Simply put, Plaintiff never put the decisionmaker, President Shalala, on notice of protected conduct; that further vitiates his claim.[5]

---

[4]     In this way, Plaintiff's reliance on his January 18, 2013, e-mail to the Executive Committee of the Board of Trustees, is misplaced. By that date, Plaintiff already had been advised that his employment had been terminated as to all positions. In fact, Plaintiff testified that he sent the e-mail after he had been told that he had been fired from all positions. (*See* 9/20/22 testimony at approximately 4:28 p.m.) The fact that the terminations were effective as of January 31 (as to his executive roles) and July 31 (as to his professor role) is immaterial. The Eleventh Circuit has consistently held that an adverse employment action is deemed to have occurred when the employer made the final decision. *Liu v. Univ. of Miami*, 138 F. Supp. 3d 1360, 1369 (S.D. Fla. 2015) (citing *Thomas v. CVS/Pharmacy,* 336 Fed. Appx. 913, 915 (11th Cir. 2009), in turn citing *Del. State Coll. v. Ricks,* 449 U.S. 250, 258, 261–62, *aff'd*, 693 Fed. Appx. 793 (11th Cir. 2017).

[5]     At a minimum, the Court should direct a verdict in favor of the University on Question 2 of the Verdict Form ("That all of Dr. Lord's 'protected activity' was within the scope of his required job duties as Chief Compliance Officer for the University of Miami?").

Giving Plaintiff every benefit of the doubt, the only possible instance of protected conduct occurred on December 14, 2012, during his alleged meeting with President Shalala. Given the undisputed evidence above regarding the status of the TMG assessment (and that no findings had been reached) and Plaintiff's compliance role, there is no legally sufficient evidentiary basis for the Jury to find that President Shalala knew that Plaintiff was engaged in alleged protected conduct.[6] Without her knowledge that Plaintiff engaged in lawful acts in furtherance of an action under the FCA, or to stop one or more instances of fraudulent Medicare/Medicaid billing, President Shalala could not have terminated Plaintiff's employment in retaliation. His activities simply were not the but-for causation of his termination.

### 2. The Trial Evidence Shows that Plaintiff Was Terminated for Legitimate Reasons: Unsatisfactory Conduct and Demeanor

The trial evidence shows that, prior to December 14, President Shalala was aware of (1) the Petition seeking Plaintiff's removal, along with the growing unrest and low morale of the faculty directed toward Plaintiff and (2) the problems regarding Plaintiff's Reign of Terror management/communication style - - the very reasons why Plaintiff's employment was terminated.

A legitimate reason for an adverse action is a reason independent from the alleged basis of retaliation. *Sheppard v. Sears Roebuck & Co.*, 391 F. Supp. 2d 1168, 1180 (S.D. Fla. 2005). Neither the plaintiff nor the court may recast the reason given by the employer for taking a particular action. *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000). "Federal courts 'do not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no

---

[6]     Plaintiff himself described the meeting as "regular" and not extraordinary, and he testified that he regularly met with President Shalala on many issues, including compliance. (9/21/22 testimony at approximately 10:50 a.m.)

matter how mistaken the firm's managers, the ADEA does not interfere. Rather our inquiry is limited to whether the employer gave an honest explanation of its behavior." *Chapman*, 229 F. 3d at 1030 (citations omitted). In other words, an employer may take action "for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984) (quoting *Jones v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321, 1324 n.16 (11th Cir. 1998)).

It is well-established that an employee's poor work performance is a legitimate, non-discriminatory reason for an adverse employment action. *See, e.g., Rio v. Runyon*, 972 F. Supp. 1446, 1460 (S.D. Fla. 1997) (noting that "unsatisfactory work performance" is a legitimate reason); *Arnold v. Burger Queen Sys., Inc.*, 509 So. 2d 958, 959 (Fla. 2d DCA 1987) (same). Further, complaints about an employee's "service and demeanor" and co-worker complaints about an employee being "difficult to work with" and having a "bad attitude" are sufficient grounds for termination. *Johnson v. Great Expressions Dental Ctrs of Fla., P.A.*, 132 So. 3d 1174, 1178–79 (Fla. 3d DCA 2014). In addition, the law is clear that "[a]n employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1363 n.3 (11th Cir. 1999).

Here, the trial evidence demonstrates that there were multiple complaints against Plaintiff. He was involved in the decision to institute the lay-offs and the execution of that decision. Employee morale was very low.[7] Further, there was unrebutted evidence presented regarding

---

[7]     During his testimony, Plaintiff himself admitted that he knew there were issues about morale. (*See* 9/20/22 testimony at approximately 4:00 p.m.)

Plaintiff's demeaning style of leadership: (1) referring to Dr. Nemeroff as "needy" and a "sycophant"; (2) ignoring instructions from Joseph Natoli regarding an offer letter and telling him that he "didn't work for him"; (3) pounding on the desk of Don Steigman (COO of Jackson Health) during a meeting with such force that items were knocked off his desk; and (4) holding up the "L" sign (signifying "loser") to refer to a group of faculty after a meeting.

The situation was so dire that, in the last half of 2012, faculty members within the University Miller School of Medicine began circulating a Petition of "No Confidence" in Plaintiff and Dean Goldschmidt, noting their "failed leadership." (Joint Ex. 9.) The Petition was signed by hundreds of faculty members and was described by numerous witnesses as "unprecedented" both at the University and in academia at large. Plaintiff and Dean Goldschmidt shared that Petition with President Shalala on December 6, 2012 - - 8 days before Plaintiff's meeting with President Shalala. (*Id.*)

In sum, there is no legally sufficient evidentiary basis for a Jury to find that Plaintiff's alleged protected activity was the but-for cause of the termination decision. Rather, the evidence requires one conclusion: his employment was terminated because of Plaintiff's destructive style of leadership. Said another way, Plaintiff was "on thin ice" and the ice finally broke.

### C.    Plaintiff has Failed to Overcome the University's Judicial Estoppel Defense.

"The equitable doctrine of judicial estoppel is intended to 'prevent the perversion of the judicial process' and 'protect [its] integrity . . . by prohibiting parties from deliberately changing positions according to the exigencies of the moment.'" *Slater v. United States Steel Corp.*, 871 F.3d 1174, 1180–81 (11th Cir. 2017) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001)). "When a party does so, the doctrine of judicial estoppel allows a court to exercise its discretion to dismiss the party's claims." *Id*. The Eleventh Circuit "employs a two-part test to guide district courts in applying judicial estoppel: whether (1) the party took an inconsistent position

under oath in a separate proceeding, and (2) these inconsistent positions were calculated to make a mockery of the judicial system." *Id*. (citations and quotations omitted). The Court should consider "both the plaintiff's actions—whether he made inconsistent statements—and his motive—whether he intended to make a mockery of the judicial system." *Id*. "A motivation to conceal may be shown by evidence of a potential financial benefit that could result from concealment." *U.S. ex rel. Long v. GSDMIdea City, L.L.C.*, 798 F.3d 265, 274 (5th Cir. 2015) (applying judicial estoppel to bar FCA claim) (citing *Love v. Tyson Foods, Inc.*, 677 F.3d 258, 262 (5th Cir. 2012)).[8]

Although judicial estoppel is often invoked against bankruptcy debtors, the doctrine is available in any civil action. *Stabielli v. Eagle Roofing Products Florida, LLC*, No. 12-80766-CIV, 2013 WL 12101139, at *2 (S.D. Fla. Aug. 19, 2013) (collecting cases and granting summary judgment on the basis of judicial estoppel). *See also Schaffart v. ONEOK, Inc.*, 686 F.3d 461, 470 (8th Cir. 2012) (noting that employee's statements in divorce deposition could support judicial estoppel defense).

This Court has invoked the doctrine of judicial estoppel to prevent a party from asserting conflicting positions before different tribunals. *See, e.g., Drew Estate Holding Co., LLC v. Fantasia Distribution, Inc.*, 875 F. Supp. 2d 1360, 1370–71 (S.D. Fla. 2012) (Altonaga, J.) ("The policies underlying the doctrine include preventing internal inconsistency, precluding litigants from playing fast and loose with the courts, and prohibiting parties from deliberately changing

---

[8]    The Eleventh Circuit recently noted in a published decision that the inconsistent statements from the prior proceeding <u>do not</u> need to be made under oath. *Smith v. Haynes & Haynes P.C.*, 940 F.3d 635, 643 n.4 (11th Cir. 2019) ("The requirement that the prior inconsistent statement be made under oath is not inflexible or exhaustive. More important than whether statements are under oath is whether they are intended to mislead and deceive the court.") (internal citation and quotation omitted). In any event, Plaintiff made numerous statements - - sworn and unsworn - - in his divorce case that are entirely inconsistent with his position in this case.

positions according to the exigencies of the moment.") (quoting *United States v. McCaskey*, 9 F.3d 368, 378 (5th Cir. 1993)); *Ramsay v. Broward Cty. Sheriff's Office*, No. 09-60456-CIV, 2009 WL 10668269, at *2–3 (S.D. Fla. July 31, 2009) ("The Court finds that Plaintiff is barred from raising arguments of deficiencies of the District Court's decisions in the prior cases by the doctrine of judicial estoppel."), *R&R adopted,* D.E. 31 by Altonaga, J. (Aug. 18, 2009); *Ocean's 11 Bar & Grill, Inc. v. Indem. Ins. Corp. RRG*, No. 11-61577-CIV, 2012 WL 5398625, at *19 (S.D. Fla. Nov. 2, 2012) (Altonaga, J.) ("doctrine of judicial estoppel, which prevents a party from asserting a position in a legal proceeding that is contrary to a position taken previously in the same or earlier proceeding, may be invoked through statements made by an attorney and imputed to the party") (citing *Hall v. GE Plastic Pac. PTE Ltd.*, 327 F.3d 391, 396 (5th Cir. 2003), *aff'd*, 522 Fed. Appx. 696 (11th Cir. 2013)).

In affirming a district court's application of judicial estoppel, the Eleventh Circuit has stated

> In sum, the district court did not abuse its discretion when it invoked the flexible, equitable doctrine of judicial estoppel here. "'Equity eschews mechanical rules' and 'depends on flexibility.'" *Slater*, 871 F.3d at 1187 (quoting *Holmberg v. Armbrecht*, 327 U.S. 392, 396, 66 S.Ct. 582, 90 L.Ed. 743 (1946)). We affirm the district court's consideration of "all facts and circumstances in evaluating the plaintiff's intent," *id.*, as well as its exercise of its discretion in defense of the integrity of the judicial process. **Korman's current position is clearly inconsistent with her earlier one, which was fully accepted by the 1990s district court. Although that acceptance did not result in success for Korman, allowing her to proceed with her new position would still create the perception that the first court was misled.** Allowing Korman's new position would also give her an unfair advantage, granting her a second chance to litigate a timeworn claim. *See generally New Hampshire*, 532 U.S. at 750–51, 121 S.Ct. 1808. **The district court was entitled to defend itself against Korman's attempt to circumvent the time bar by asserting diametrically opposed facts. The balance of equities here favors barring Korman's present complaint in order to "protect the judiciary, as an institution, from the perversion of judicial**

> *machinery." See Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 599
> (6th Cir. 1982).

*Korman v. Iglesias*, 778 Fed. Appx. 680, 683 (11th Cir. 2019) (emphasis added). *See also Weakley v. Eagle Logistics*, 894 F.3d 1244, 1247 (11th Cir. 2018) ("Because the district court considered all the facts and circumstances of Weakley's cases in determining whether he intended to mislead the bankruptcy court . . . , it did not abuse its discretion by applying judicial estoppel and dismissing these two lawsuits that he failed to disclose in his bankruptcy proceeding"); *Henderson v. Franklin*, 782 Fed. Appx. 866, 872 (11th Cir. 2019) ("the district court did not abuse its discretion in determining based on all of the facts and circumstances of the case that Henderson intended to make a mockery of the judicial system by pressing his USSA claims in one forum while denying their existence in another").

Here, all of the elements of judicial estoppel have been satisfied. In his divorce proceedings, Plaintiff repeatedly took the position (in deposition, in sworn interrogatory answers, in affidavits and in pleadings) that he "retired" or "resigned" from the University and was no longer looking for employment. The reason for this is obvious: Plaintiff's ex-wife sought alimony and, in light of the duration of their marriage (approximately thirteen years) and his superior earning power (she did not work during the marriage while he earned millions), she would have been entitled to same. *See, e.g.*, *Valente v. Barion*, 146 So. 3d 1247, 1249 (Fla. 2d DCA 2014) ("The parties' twelve-year marriage is regarded as a moderate-term marriage. *See* § 61.08(4). In such a case, permanent alimony may be awarded, but the trial court must decide that it is appropriate 'based upon clear and convincing evidence after consideration of the factors set forth in subsection [61.08] (2).' § 61.08(8)"); *see also Walker v. Walker*, 85 So. 3d 553, 554 (Fla. 1st DCA 2012) ("In order to award permanent alimony, the trial court must make specific factual determinations with regard to actual need on the part of the former spouse seeking an alimony award."); *Addie v. Coale*,

120 So. 3d 44, 47 (Fla. 4th DCA 2013) (noting that, in "a gray area or moderate term marriage, the disparate earning power of the parties is a significant factor in determining whether permanent or temporary support is appropriate."). Plaintiff's representations before the divorce court - - which his ex-wife unequivocally relied on and which were adopted by the divorce court in the settlement agreement and final judgment - - resulted in no alimony to Plaintiff's ex-wife. Now, years later, Plaintiff claims that he was terminated from all of his positions at the University and has actively looked for comparative employment over the last ten years with no success, seeking millions in damages.

At trial, Plaintiff contended that the seal affected his sworn answers in his divorce case. Putting aside the fact that the seal would not permit Plaintiff to perjure himself, his contention is belied by the evidence and Plaintiff's own testimony. Plaintiff openly answered questions regarding his employment and characterized it however he and his lawyers saw fit in the divorce case. Those same lawyers (and Plaintiff himself) are now presenting contrary positions before this Court. That kind of gamesmanship simply is not allowed.[9]

---

[9]     Plaintiff also cannot shift the blame to his attorneys. As this Court has recognized in applying the doctrine of judicial estoppel:

> And it is of no moment that the numerous pre-trial statements concerning the effect of Franco's agent's actions were made by Indemnity's lawyer, rather than Cohen directly. *See Hall v. GE Plastic Pac. PTE Ltd.,* 327 F.3d 391, 396 (5th Cir.2003) (doctrine of judicial estoppel, which prevents a party from asserting a position in a legal proceeding that is contrary to a position taken previously in the same or earlier proceeding, may be invoked through statements made by an attorney and imputed to the party).

*Ocean's 11 Bar & Grill, Inc. v. Indem. Ins. Corp. RRG,* 11-61577-CIV, 2012 WL 5398625, at *19 (S.D. Fla. Nov. 2, 2012) (Altonaga, J.), *aff'd,* 522 Fed. Appx. 696 (11th Cir. 2013).

### D.     There is no Legally—Sufficient Evidence to Support Plaintiff's Damages Claims.

The above analysis should end the inquiry. However, in the event the Court denies the University's Motion as to liability, the Court nevertheless should enter a directed verdict on Plaintiff's various items of damages. Plaintiff claims damages for backpay, interest on same, emotional distress and reputational harm.[10]

Given Plaintiff's repeated admissions that he "retired" in July 2013 and was "not looking for work" thereafter, Plaintiff cannot now seek backpay damages. In fact, aside from two potential employers *who approached him* over the last ten years, Plaintiff has made no attempts to find employment.[11] The University is entitled to a directed verdict of Plaintiff's claim for backpay.

Without backpay damages, Plaintiff cannot seek prejudgment interest on same. Further, as more fully set forth in the University's *Daubert* Motion (D.E. 141 at 14-16), which the University incorporates by reference, Plaintiff's calculations as to prejudgment interest are not in accord with Eleventh Circuit law. *See Cote v. Shinseki*, 2009 WL 3246602, at *6 (M.D. Fla. Oct. 6, 2009) ("In the Eleventh Circuit, the "interest rate for prejudgment interest on back pay awards under Title VII depends on the IRS prime rates calculated in accordance with 28 U.S.C. § 1961") (collecting cases). Disregarding this authority, Plaintiff and his "expert," David Duffus, used Florida judgment interest rates (which Plaintiff's counsel instructed Mr. Duffus to use). For this additional reason, the University is entitled to a directed verdict on same.

---

[10]     The University renews its arguments in its Motion in *Limine* that Plaintiff should not be permitted to seek damages for emotional distress or reputational harm because he failed to disclose them during discovery and, instead, represented that those areas would be the subject of expert testimony, which expert testimony never was provided. (*See* D.E. 157 at 6-9.)

[11]     At a minimum, the Court should direct a verdict as to the 15-month period in 2014-2015 when Plaintiff swore in his divorce case that he was not looking for work. (*See* Exhibit D-43.)

As to emotional distress damages, Plaintiff admitted at trial that he has not sought any medical treatment and that, in his opinion as a medical doctor, such treatment was not warranted.[12] Therefore, at best, Plaintiff would be limited to garden-variety emotional distress damages, as Plaintiff admittedly did not seek any medical treatment for his alleged emotional distress. *See Fair Hous. Ctr. of the Greater Palm Beaches, Inc. v. Sonoma Bay Cmty. Homeowners Ass'n, Inc.*, No. 914CV80667ROSENBERGB, 2015 WL 5016836, at *3 (S.D. Fla. Aug. 25, 2015); *City of Hollywood v. Hogan*, 986 So. 2d 634, 648–49 (Fla. 4th DCA 2008) (citing *Reiter v. Metro. Transp. Auth. of N.Y., MTA*, 2003 WL 22271223, *9 (S.D.N.Y. Sept. 30, 2003)). In any event, Plaintiff failed to present any evidence sufficient for the Jury to award or quantify such damages. The University is entitled to a directed verdict on this issue. *See Akouri v. State of Fla. Dept. of Transp.*, 408 F.3d 1338, 1345–46 (11th Cir. 2005) (affirming district court's reversal of jury's award of emotional distress damages because plaintiff failed to introduce evidence of "any kind of harm, mental, emotional, or otherwise, arising from the discrimination").

Finally, Plaintiff failed to introduce into any evidence of reputational harm: He has admitted that the University did not publicly disparage him; there is no dispute that the University provided no comments to (and has no control over) the <u>Miami Herald</u>; the contents of the <u>Miami Herald</u> articles were not introduced into evidence (meaning that Plaintiff cannot demonstrate how those articles caused him any harm); and, perhaps most importantly, Plaintiff failed to introduce any evidence that someone in the community or a potential employer read those articles and had a

---

[12]    To the extent Plaintiff claims that the delay in this case caused by the seal caused him damage, that cannot be visited on the University. As the parties agreed in the proposed Neutral Statement (as has been repeatedly stated to jury both by the Court and Plaintiff's counsel), the seal/delay was neither the fault of Plaintiff nor the University.

negative view of Plaintiff thereafter.[13] *See DeMarco v. Publix Super Markets, Inc.*, 360 So. 2d 134, 136 (Fla. 3d DCA 1978) (rejecting claim based on "damage to [plaintiff's] reputation in that his firing imputed that he was unreliable or incompetent"), *aff'd*, 384 So. 2d 1253 (Fla. 1980).

In sum, there is absolutely no evidentiary support for any of Plaintiff's damages claims, and the Court properly should direct a verdict in favor of the University as to same.

## CONCLUSION

The University is entitled to judgment as a matter of law/directed verdict on Plaintiff's retaliation claim. The Jury simply does not have a legally sufficient evidentiary basis to find in favor of the Plaintiff in this case. Accordingly, Defendant, University of Miami, respectfully requests that the Court direct a verdict in favor of the University on the claim asserted against it by Plaintiff, Dr. Jonathan Lord, and grant such further and other relief as the Court deems appropriate.

Respectfully submitted,

**ISICOFF RAGATZ**
601 Brickell Key Drive, Suite 750
Miami, Florida 33131
Tel.: (305) 373-3232
Fax: (305) 373-3233

By: /s/ Christopher M. Yannuzzi
Eric D. Isicoff
Florida Bar No. 372201
Isicoff@irlaw.com
Teresa Ragatz
Florida Bar No. 545170
Ragatz@irlaw.com
Christopher M. Yannuzzi
Florida Bar No. 92166
Yannuzzi@irlaw.com

---

[13]   Even Plaintiff's own "expert," Jeffrey Ketchum, admitted this fact. (*See* 9/23/22 testimony at approximately 3:44 p.m. (noting there was "no evidence" that articles harmed Plaintiff's job search)).

<u>**CERTIFICATE OF SERVICE**</u>

I **HEREBY CERTIFY** that a true and correct copy of the foregoing has been served via

hand delivery and CM/ECF this 3rd day of October, 2022, upon the following:

Jeffrey H. Sloman
Jorge A. Perez Santiago
Jennifer M. Hernandez
Stumphauzer Foslid Sloman Ross & Kolaya, PLLC
Two South Biscayne Boulevard, Suite 1600
Miami, Florida 33131
Telephone: (305) 614-1400
Facsimile: (305) 614-1425
E-mail: jsloman@sfslaw.com
E-mail: jperezsantiago@sfslaw.com
E-mail: jhernandez@sfslaw.com

By: /s/ Christopher M. Yannuzzi
Christopher M. Yannuzzi