**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

Case No. 13-22500-Civ-Altonaga/McAliley

JONATHAN LORD, M.D.,

    Plaintiff/Relator,

vs.

UNIVERSITY OF MIAMI,

    Defendant.
_____/

**PLAINTIFF JONATHAN LORD, M.D.'S MOTION FOR JUDGMENT
AS A MATTER OF LAW AT THE CLOSE OF EVIDENCE AND
<u>INCORPORATED MEMORANDUM OF LAW</u>**

# INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 50(a)(1), Plaintiff, Jonathan Lord, M.D. ("Dr. Lord"), moves the Court for judgment as a matter of law at the close of all evidence in this case. Here, Dr. Lord claims the University of Miami (the "University") violated the anti-retaliation provision of the False Claims Act ("FCA") by firing him from his position as a high-ranking operations and compliance officer because of his efforts to report on, raise awareness of, and further investigate billing practices that defrauded the federal government. *See* 31 U.S.C. § 3730(h).

At the conclusion of all of the evidence in this case, it is clear that no reasonable, properly instructed jury could find for the University with respect to whether (i) Dr. Lord engaged in protected activity (he did), (ii) all of Dr. Lord's protected activity was part of his required job duties as Chief Compliance Officer of the University (it was not), (iii) former President Donna Shalala ("Dr. Shalala") knew about Dr. Lord's protected activity before deciding to terminate his employment (she did), (iv) Dr. Shalala terminated Dr. Lord because of his protected activity (she did), and (v) Dr. Lord is entitled to damages because he has proven a violation of the anti-retaliation provision of the FCA and the University has failed to prove its affirmative defenses. The Court should enter judgment as a matter of law in Dr. Lord's favor for the following reasons.

***First***, the evidence shows that Dr. Lord engaged in protected activity under both prongs of 31 U.S.C. § 3730(h)(1). In this case, FCA litigation became a distinct possibility at least by September 2012, when the University received the anonymous whistleblower complaint ("OIG letter") alleging billing fraud was being committed by the Department of Surgery's Immuno-Monitoring Laboratory ("IML") and specifically naming, among others, Dr. Alan Livingstone. (*See* Joint Exhibit 6.) According to Dr. Shalala, the OIG letter contained very serious allegations of Medicare fraud that "raised hair on the back of [her] neck" and were part of the TMG assessment's preliminary findings. (Trial Tr. Day 4 at 187:20-25; 189:3-10; 194:11-17; 235:5-7, 16-18.) Dr. Lord's actions from September 2012 through the date of his termination were taken with potential FCA litigation at the forefront of University leadership's minds.

Dr. Lord directed that the OIG letter be sent to the government and the University's General Counsel's Office ("GC"), approved the selection of independent third-party consultant Transplant Management Group ("TMG") to assess the IML, urged Dr. Jennifer McCafferty-Fernandez—the Chief Medical Compliance Officer—to accelerate the beginning of TMG's assessment, protected

the TMG assessment from interference from University leadership, reported preliminary findings of potential Medicare fraud and the University's potential for significant liability to University leadership outside his chain of command—the Board of Trustees and Dr. Shalala—and authorized completion of a second phase of the external review. (Plaintiff's Exs. 25, 30, 60, 81, 93, 149; Joint Ex. 7.) He took these actions operating under the objectively reasonable belief that the University had committed and was committing billing fraud, based on, among other things, multiple consistent allegations of billing fraud in the IML dating back to August 2011, the OIG letter, the TMG preliminary assessment, and Dr. Livingstone's persistent efforts to interfere with and/or shut down the TMG assessment. (Plaintiff's Exs. 7, 8, 30, 66, 72, 73, 93, 113; Joint Exs. 6, 7, 25; Trial Tr. Day 5 at 56:10-14.)

**Second**, the evidence shows that not all of Dr. Lord's protected activity was part of his required job duties as Chief Compliance Officer for UHealth. For instance, he instructed Dr. McCafferty-Fernandez to send the OIG letter to the GC office and informed Hilarie Bass, the head of the University's Audit and Compliance Committee, of potential exposures relating to the IML (Plaintiff's Ex. 60), Dr. Shalala of a possible $10 million exposure under the FCA (Plaintiff's Ex. 81), and the full Board of Trustees of potential Medicare fraud and externally mandated sanctions (Plaintiff's Ex. 149).

**Third**, the evidence shows that by the time Dr. Shalala decided to terminate Dr. Lord's employment (December 21, 2012), Dr. Shalala knew about: (1) the serious allegations of Medicare fraud committed in the IML by, among others, Dr. Livingstone in the OIG letter; (2) that there was a TMG assessment of the IML that Dr. Lord was overseeing; (3) the potential $10 million FCA liability relating to the IML's billing activities; (4) TMG's preliminary findings (and cover email) that identified multiple indicators of potential Medicare fraud (including "extraordinary revenue growth," unusually high profit margins, and extensive testing relative to peers); and (5) a detailed audit of the IML's billing activities were forthcoming. (Plaintiff's Ex. 81, 89, 93.) Dr. Goldschmidt also testified he was regularly passing along information regarding the TMG assessment to Dr. Shalala and confirmed Dr. Lord met with Dr. Shalala on December 14, 2012. And although Dr. Shalala did not specifically recall whether Dr. Lord informed her of potential exposures, she admitted she knew "the investigation was going on" and that Dr. Lord assured her that an interim report was coming. (Trial Tr. Day 4 at 160:5-7; 165:18-20; 236:6-10.)

Finally, Dr. Shalala certainly learned the extent of Dr. Lord's efforts concerning the review

2

of the IML when Dr. Livingstone communicated his unfounded concerns regarding the TMG assessment (including that he had been prevented from interfering in it) via e-mail, telephone calls, and in-person meetings with Dr. Shalala. (Plaintiff's Ex. 66, 72, 73; Joint Ex. 25.) Dr. Shalala admitted that she acted on these complaints (notifying Dr. Livingstone of forthcoming personnel changes and change in oversight of the TMG assessment) because Dr. Livingstone would "challenge" any further findings.

*Fourth*, the evidence shows Dr. Lord's termination was retaliatory and the University's made-for-litigation justification for his termination pretextual. Dr. Livingstone complained several times to Dr. Shalala regarding the "witch hunt" TMG assessment and the fabricated Nemeroff threat. Although Dr. Shalala did not believe Dr. Goldschmidt or Dr. Lord had anything to do with the Nemeroff threat, she met with Dr. Livingstone on the morning of Friday, December 21, 2012 and promised to protect Dr. Livingstone from any "audit" used to threaten him, assuring him she would be making personnel changes after the New Year and would "take over" review of the IML assessment by "elevating" it to Internal Audit, which she claimed reported to the Board of Trustees and not her. (Joint Ex. 25.) Within hours of that meeting, Dr. Shalala called Dr. Goldschmidt (who was on vacation) and ordered him to terminate Dr. Lord, and transferred review of the IML and oversight of the outside expert consultants to Internal Audit and the GC's office (which reported to Dr. Shalala).

Terminating one of the Dean's employees was not typical for Dr. Shalala. She normally stayed out of Dean Goldschmidt's hiring and firing decisions, and she admitted she did not have any role in terminating any other employee's employment at that time. (Trial Tr. Day 4 at 192:7–14.) Instructing Dean Goldschmidt to terminate Dr. Lord was, thus, a special exception to Dr. Shalala's typical practices.

Further, Dean Goldschmidt and Dr. McCafferty-Fernandez testified that Dr. Shalala's surprise decision to transfer oversight of the IML review to Internal Audit and the GC's office was either inappropriate (given Mike Moloney's receipt of the December 9 e-mail from Dr. Livingstone characterizing the review as a "witch hunt") or "highly irregular."

Making President Shalala's motives clearer, she prevented Dean Goldschmidt and Dr. Lord from moving all labs, including the IML, to pathology, stopped the executive daily updates and all emails relative to the IML, and twice told Dean Goldschmidt that Dr. Livingstone "has to lead to more productivity" (*i.e.*, revenue) in response to Dean Goldschmidt's documented concerns about

Dr. Livingstone's manipulative and destructive personality. (Plaintiff's Ex. 148; Trial Tr. Day 4 at 204:23-24.) She also urged Dr. Goldschmidt to talk Dr. Livingstone out of resigning his leadership position weeks earlier.

Finally, while Dean Goldschmidt and others praised Dr. Lord in writing before and after his termination and presumed he would assume a different role within the University, Dr. Shalala angrily/sarcastically hastened his exit from the University when he stressed the importance of completing a review of the IML to all members of the Board of Trustees by expressly referencing potential Medicare fraud and externally mandated sanctions (the same Board she "elevated" the review of the IML to by transferring control of the assessment to Internal Audit). She even admitted that her response to Dr. Lord's memorandum to the Board of Trustees highlighting his concerns with the IML ("[g]ive him his check") was serious because she did not want Dr. Lord to "hang around" and wanted a "clean break" from him as soon as possible. (Trial Tr. Day 4 at 206:11-21.)

Dr. Shalala, in turn, claimed that the timing of Dr. Shalala's decision to terminate Dr. Lord on December 21, 2012 just hours after her meeting with Dr. Livingstone and around the same time she interfered with oversight of the independent TMG assessment was a coincidence because she was "doing a lot of things at the same time." (Trial Tr. Day 4 at 183:25-184:2.) That is her only explanation for making her decision to go over Dr. Goldschmidt's head to terminate an employee he thought had "substantial qualities" and did not want to terminate on the same day she met with Dr. Livingstone. And her purported non-retaliatory motivations for terminating Dr. Lord were vague and generic (and undocumented) University talking points and buzz words, short on specific examples and lacking in temporal significance.

For instance, she claimed she decided to fire Dr. Lord due to his "management style," citing how he handled mass layoffs from April to June 2012, the petition (which related to the deteriorating relationship with Jackson Memorial Hospital that predated Dr. Lord), and purported lack of communication with University leadership.

The layoffs were approved by University leadership and the Board of Trustees, and, as Mr. Natoli testified, their impact (including how they were being received by the faculty) were immediately known to the University *prior* to giving Dr. Lord a promotion in a July 3, 2012 letter that credited Dr. Lord with leading a "fiscal and cultural turnaround." (Joint Ex. 23.) Dr. Shalala approved the promotion and reviewed and specifically approved the letter before Dean

4

Goldschmidt offered it to Dr. Lord. Dr. Shalala also admitted that the petition, which stated the University needed a new *dean* (not Dr. Lord), did not say anything about the layoffs or Dr. Lord's management style. Further, she cited a complete cut off of communication with Dr. LeBlanc and Joe Natoli, but Dr. LeBlanc testified he was not aware of any cut off in communications and Joe Natoli admitted he and Dr. Lord continued communicating (despite deterioration of their social relationship) because they could not do their jobs if they did not communicate.

To be sure, other University witnesses parroted the same vague and generic talking points, but when pressed to offer specific examples, they cited tales of conduct that occurred prior to Dr. Lord's promotion on July 3, 2012, and innocuous conduct Dean Goldschmidt admitted were not documented because they did not rise to a level that required documentation (as opposed to Dr. Livingstone's conduct, which did require documentation).

Moreover, all University witnesses acknowledged there was significant documentation of Dr. Lord's achievements, kudos, and accolades, but no documentation whatsoever (communications, memoranda, meeting minutes) corroborating any of their purported concerns with Dr. Lord's management style or lack of communication with University leadership.

*Fifth*, because Dr. Lord has proven his employment was terminated because of his protected activity, he is entitled to damages. Moreover, the evidence showed that the University failed to carry its burden regarding failure to mitigate. The University made no effort to establish that substantially equivalent employment was available to Dr. Lord and that his efforts to obtain those comparable positions were not reasonable. That's because Dr. Lord did network, work on boards, and serve as a finalist for two CEO positions of major organizations in 2014 and 2017. Thus, the University's strategy for its failure to mitigate affirmative defense was to put all its eggs in Dr. Lord's divorce testimony basket. But Dr. Lord's testimony (and documentary evidence) regarding his post-termination employment status and substantial efforts to secure executive-level healthcare positions (the same way he made it to the University) was not inconsistent with his testimony in his divorce proceeding, which was provided while Dr. Lord was wary of breaching the seal in this case.

## MEMORANDUM OF LAW

I. **Legal Standard**

    a. **Fed. R. Civ. P. 50(a).**

Judgment as a matter of law is appropriate on any issue "[i]f a party has been fully heard on [that issue] issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). A party may move for such judgment "at any time before the case is submitted to a jury," and the movant must "specify the judgment sought and the law and facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a)(2). The evidentiary standard for a judgment as a matter of law "is essentially the same as the one for summary judgment," with the record evidence viewed in the light most favorable to the non-movant. *Home Design Servs. v. Turner Heritage Homes, Inc.,* 101 F. Supp. 3d 1201 (N.D. Fla. 2015). The court must find that "under the governing law, there can be but one reasonable conclusion as to the verdict." *Herzog v. Castle Rock Ent'mt,* 193 F.3d 1241, 1247 (11th Cir. 1999) (quoting *Brady v. S.R. Co.,* 320 U.S. 476, 479-80 (1983)); *see also Anderson v. Liberty Lobby, Inc.,* 447 U.S. 242, 251-52 (1986). Further, the failure of the University's affirmative defenses on any single required element is sufficient grounds to grant the motion as to that defense.

    b. **31 U.S.C. § 3730(h).**

The FCA contains an anti-retaliation provision, which provides:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1). In short, the anti-retaliation section "provides an employee with a cause of action against his employer if his employer terminates his employment because the employee was attempting to stop violations of the [False Claims Act]." *Briggs ex rel. United States v. QuantiTech Inc.,* No. 21-11448, 2022 WL 1308494, at *2 (11th Cir. May 2, 2022) (alteration added; citing 31 U.S.C. § 3730(h)).

6

A plaintiff who sues under section 3730(h) must show that he "engaged in protected conduct and that [his employer] retaliated against him because of that protected conduct." *Mack v. Augusta-Richmond Cnty.*, 148 F. App'x 894, 896–97 (11th Cir. 2005) (alteration added; citation omitted). Courts read this standard as involving three elements: that (1) the plaintiff engaged in protected conduct, (2) the employer knew of plaintiff's protected conduct, and (3) the employer took adverse action against the plaintiff because of the protected conduct. *See, e.g.*, *Farnsworth v. HCA, Inc.*, No. 8:15-cv-65, 2015 WL 5234640, at *3 (M.D. Fla. Sept. 8, 2015) (citations omitted).

No reasonable juror could find against Dr. Lord on any of these elements.

## II. No Reasonable Juror Could Find That Dr. Lord Did Not Engage in Protected Activity.

Section 3730(h)(1) protects an employee's "lawful acts . . . in furtherance of" a False Claims Act lawsuit, as well as "other efforts to stop 1 or more violations" of the Act. 31 U.S.C. § 3730(h)(1) (alteration added). The Eleventh Circuit has held that the statute's "lawful acts" clause protects employee conduct in furtherance of a False Claims Act lawsuit "not only whe[n] a false claims action is actually filed," but also when such a suit "was a 'distinct possibility' at the time the assistance was rendered." *Childree v. UAP/GA CHEM, Inc.*, 92 F.3d 1140, 1146 (11th Cir. 1996) (alteration added). That is, protection applies if a juror could conclude "that the employer could have feared being reported to the government for fraud or sued in a qui tam action by the employee[.]" *Lord v. Univ. of Miami*, 571 F. Supp. 3d 1299, 1312 (S.D. Fla. 2021) (quoting *United States ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1304 (11th Cir. 2010) (alteration added; citation omitted)).

In 2009 and 2010, Congress added the "other efforts" clause to the anti-retaliation provision. *See Lord*, 571 F. Supp. 3d at 1308–10 & n.3. The "other efforts" clause broadens employer liability beyond that existing by virtue of the "distinct possibility" standard. *See* 31 U.S.C. § 3730(h)(1); *Carlson v. DynCorp Int'l LLC*, 657 F. App'x 168, 171–72 (4th Cir. 2016); D.E. 173 at 25.

Several courts of appeals have held that the "other efforts" prong protects employee actions taken when the employee is motivated by an objectively reasonable belief that his employer is violating, or will violate, the False Claims Act. *See Singletary v. Howard Univ.*, 939 F.3d 287, 295–96 (D.C. Cir. 2019); *United States ex rel. Grant v. United Airlines Inc.*, 912 F.3d 190, 201–202 (4th Cir. 2018); *United States ex rel. Uhlig v. Fluor Corp.*, 839 F.3d 628, 635 (7th Cir. 2016); *see also United States ex rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d 71, 95–98 (2d Cir.

7

2017) (holding that "other efforts" clause protects an employee's refusal to participate in fraud on the government). As the jury is set to be instructed in this case, Dr. Lord had a "reasonable" belief if a reasonable person would, under the circumstances, believe that the University was engaged in billing fraud.

No reasonable juror could find that Dr. Lord did not engage in protected activity under either prong of the anti-retaliation provision.

***Actions taken in furtherance of an FCA suit.*** With respect to the "distinct possibility" standard, litigation was a distinct possibility as soon as September 10, 2012 when the University received the OIG letter that alleged in Medicare billing fraud in the Department of Surgery. *See Childree*, 92 F.3d at 1146. In fact, Dr. Shalala admitted the OIG letter contained serious allegations of billing fraud that "raised hair on the back of [her] neck" and were part of the TMG assessment's preliminary findings. (Trial Tr. Day 4 at 187:20–25; 189:3–10; 194:11–17; 235:5–7, 16–18.) There is a flood of evidence concerning Dr. Lord's protected activity after this date.

Dr. Lord directed that the OIG letter be sent to the government and the GC's office, urged Dr. McCafferty-Fernandez to accelerate the beginning of TMG's assessment, protected the TMG assessment from external interference (including University leadership), reported preliminary findings of potential Medicare fraud and the University's potential for significant liability to University leadership outside his chain of command (Hilarie Bass on the Board of Trustees and Dr. Shalala), kept Dean Goldschmidt and other high-ranking leaders abreast of developments in the investigation through executive daily updates, and authorized completion of a second phase of the external review after reviewing TMG's preliminary findings that contained indicators of potential fraud. (Plaintiff's Ex. 25, 30, 60, 81, 93; Joint Ex. 7, 17.)

Dr. Lord then worked with Dean Goldschmidt to craft a cover e-mail to Shalala outlining TMG's key findings. And, on January 18, 2013, he emailed the full Board of Trustees and Dr. Shalala to inform them of the OIG letter, potential fraud, and the TMG audit, emphasizing the importance of completing the audit "without interference from administration" to "help mitigate potential externally mandated sanctions." (Joint Ex. 149.) These actions were all taken while the University and its leadership (including Dr. Shalala and Dr. Livingstone) feared being reported to the government for fraud or sued in a *qui tam* action. No reasonable juror could find otherwise.

***Actions taken to stop any violation(s) of the FCA***. As the statute makes plain, an employee's efforts to stop even a single violation of the False Claims Act are protected if the

8

employee had an objectively reasonable belief that such violations were occurring. *See* 31 U.S.C. § 3730(h)(1); *see also Chorches*, 865 F.3d at 97–98.

Dr. Lord formed an objectively reasonable belief that False Claims Act violations were occurring no later than when he became aware of the OIG letter. As Dr. McCafferty-Fernandez testified, the allegations in the OIG letter were consistent with other "data points"—prior allegations of billing fraud in the IML dating back to August 2011, including OIG and DOJ interviews with Philip Ruiz and other anonymous complaints and allegations of fraud from respected pathologists. (Plaintiff's Ex. 7, 8, 30, 66, 72, 73, 93, 113; Joint Ex. 6, 7, 25; Trial Tr. Day 5 at 56:10-14.) And even if the OIG letter did not furnish Dr. Lord with a reasonable belief that fraud was afoot, TMG's periodic updates and preliminary report did. Moreover, Dr. Livingstone's persistent efforts to interfere with and/or shut down the TMG assessment, which he perceived as a "threat," also support Dr. Lord's objectively reasonable belief that unusually high revenue and extensive testing were indicators of fraud.

After Dr. Lord became aware of the OIG letter, he took the actions referenced *supra* at 8 operating under the objectively reasonable belief that the University had committed, and was committing, billing fraud.

### III. No Reasonable Juror Could Find That All of Dr. Lord's Protected Activity Was Part of Dr. Lord's Required Job Duties.[1]

There is no evidentiary basis in the record from which any reasonable jury could conclude that ***all*** of Dr. Lord's protected activity was a normal requirement for UHealth's Chief Compliance Officer.

First, no manual dictated Dr. Lord's specific compliance responsibilities with any degree of precision and, thus, there is no clear baseline or benchmark by which to measure whether his specific protected activity fits into his "required" job duties as Chief Compliance Officer.

In any event, record evidence shows Dr. Lord engaged in protected activity clearly outside the scope of any potential "compliance" requirements. For instance, he instructed Dr. McCafferty-Fernandez to send the OIG letter to the GC office and went outside the usual chain of command

---

[1] Dr. Lord moves for judgment as a matter of law on this special interrogatory issue, but reiterates that compliance officers do not have to meet a heightened notice requirement. A heightened notice requirement is incompatible with the purpose of the FCA (combat fraud on the government) and its anti-retaliation provision which applies to all employees. *See* D.E. 173 at 31 & n.4.

9

to inform Hilarie Bass of the Board of Trustees of potential exposures relating to the IML in a first-time one-on-one meetings (Plaintiff's Ex. 60) and Dr. Shalala of a possible $10 million exposure under the FCA (Plaintiff's Ex. 81). He also e-mailed the full Board of Trustees of potential Medicare fraud and externally mandated sanctions (Plaintiff's Ex. 149). Because Dr. Lord went outside of his chain of command, portions of his protected activity clearly fell outside of his regular job duties. No reasonable juror could find otherwise.

### IV. No Reasonable Juror Could Find That Dr. Shalala Did Not Know Dr. Lord Engaged in Protected Activity.

The evidence establishes that Dr. Shalala was aware of Dr. Lord's protected activity. Section 3730(h) prohibits employers from retaliating against **any employee** for (1) lawful acts engaged in in furtherance of a FCA suit when such a suit was a distinct possibility or (2) attempting to stop any violation(s) of the FCA based on an objectively reasonable belief that violations had occurred. *See Lord*, 2021 WL 5327788, at *8, *11 (citing 31 U.S.C. § 3730(h)(1); *Childree*, 92 F.3d at 1146; and *United States ex rel. Grant*, 912 F.3d at 201). Moreover, "[t]he term 'protected activity' is interpreted broadly" because it is intended to protect all employees from retaliatory conduct so citizens can prevent "widespread" fraud on the government. *See Fanslow v. Chicago Mfg. Ctr., Inc.*, 384 F.3d 469, 479 (7th Cir. 2004) (citation omitted); *see also Lord*, 2021 WL 5327788, at *6. The notice element stems from the statute's but-for causation requirement. *See Mack*, 148 F. App'x at 897; *cf. Melvin v. Fed. Express Corp.*, 814 F. App'x 506, 519 (11th Cir. 2020) (causal connection element generally requires showing the "'decision maker was aware of the protected conduct at the time of the adverse employment action'") (citations omitted). Ultimately, this element is satisfied "by any action [that] a factfinder reasonably could conclude would put the employer on notice that litigation is a reasonable possibility[,]" *Eberhardt v. Integrated Design & Constr., Inc.*, 167 F.3d 861, 868 (4th Cir. 1999), or by any action that would make an employer aware of the plaintiff's efforts to stop FCA violations. *Lord*, 2021 WL 5327788, at *11.

Some ways to establish notice include, "characterizing the employer's conduct as illegal or fraudulent[,]" *id.*, "recommending that legal counsel become involved[,]" *id.*, "act[ing] outside his normal job responsibilities[,]" *Williams*, 389 F.3d at 1261 (citation omitted), or "alert[ing] a party outside the usual chain of command[,] *id.* (alterations added; citation omitted). "[T]alismanic words" are not necessary to satisfy this element. *Id.* Moreover, the final decision-maker must have known about the protected conduct to establish causation. *Kalch v. Raytheon Tech. Servs. Co.,*

10

*LLC*, No. 6:16-cv-1529, 2017 WL 3394240, at *3 (M.D. Fla. Aug. 8, 2017) (citing *Reynolds v. Winn-Dixie Raleigh, Inc.*, 620 F. App'x 785, 792 (11th Cir. 2015)). President Shalala was aware of Dr. Lord's protected activity and Dr. Lord's compliance responsibilities detract nothing from that conclusion. D.E. 173 at 32.

First, Dr. Lord went outside the chain of command on December 14, 2012 to personally brief Dr. Shalala about TMG's preliminary findings, albeit before they were reduced to writing by Dr. McCafferty-Fernandez, and warned her of $10 million potential liability for billing fraud. Dr. Goldschmidt confirmed this meeting occurred, as did Dr. Shalala although she claimed to not recall the "substance of the meeting." (Trial Tr. Day 4 at 159:22–160:3; Trial Tr. Day 5 at 60:21–61:9.) Dr. Lord, through Dean Goldschmidt, then shared the written report with Dr. Shalala on December 19. (Plaintiff's Ex. 93.) Dr. Shalala admitted to reading this report. (Trial Tr. Day 4 at 9–11.)

Dr. Shalala also had notice of Dr. Lord's protected activity through other individuals. For instance, Dr. Livingstone himself emailed the Chairman of the University's Board of Trustees to complain about the TMG assessment, mentioning Dr. Lord's involvement, and contemporaneously documented that "the Provost and the President" had been made aware of the contents of that email through University's counsel. (Joint Ex. 25; Plaintiff's Ex. 66.)

Ultimately, the evidence shows that by the time Dr. Shalala decided to terminate Dr. Lord's employment (December 21, 2012), Dr. Shalala knew about: (1) the serious allegations of Medicare fraud committed by the IML and, among others, Dr. Livingstone in the OIG letter; (2) that there was a TMG assessment of the IML that Dr. Lord was overseeing; (3) the potential $10 million FCA liability relating to the IML's billing activities; (4) TMG's preliminary findings (and cover email) that identified multiple indicators of potential Medicare fraud (including "extraordinary revenue growth," unusually high profit margins, and extensive testing relative to peers); and (5) a detailed audit of the IML's billing activities was forthcoming. (Plaintiff's Ex. 81, 89, 93.) Dr. Goldschmidt was also regularly passing along information regarding the TMG assessment to Dr. Shalala. (Trial Tr. Day 5 at 67:24–68:3.) Dr. Shalala also admitted she knew "the investigation was going on" and that Dr. Lord assured her that an interim report was coming. (Trial Tr. Day 4 at 160:5-7; 165:18-20; 236:6-10.)

### V. No Reasonable Juror Could Find That Dr. Shalala Did Not Terminate Dr. Lord's Employment Because of His Protected Activity.

"[T]he but-for causation standard applies to claims under the antiretaliation provision of the False Claims Act[.]" *Nesbitt v. Candler Cnty.*, 945 F.3d 1355, 1359 (11th Cir. 2020) (holding

11

that "the but-for causation standard applies to claims under the antiretaliation provision"). This standard requires that the protected action "have had 'a determinative influence on the outcome' of the employer's decision-making process." *Id.* (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009)). No juror could reasonably conclude that the University would have terminated Dr. Lord had he not engaged in protected activity but everything else stayed the same.[2]

Dr. Livingstone complained several times to Dr. Shalala beginning on or around December 9, 2012 regarding the "witch hunt" TMG assessment and the fabricated Nemeroff threat. Although Dr. Shalala did not believe Dr. Goldschmidt or Dr. Lord had anything to do with the Nemeroff threat, she met with Dr. Livingstone on the morning of Friday, December 21, 2012. At that meeting, she promised to protect Dr. Livingstone from any "audit" used to threaten him, and assured him she would be making personnel changes after the New Year and would "take over" review of the IML assessment by "elevating" it to Internal Audit, which she claimed reported solely to the Board of Trustees. (Joint Ex. 25.) Within hours of that meeting, Dr. Shalala called Dr. Goldschmidt (who was on vacation) and ordered him to terminate Dr. Lord, and transferred review of the IML and oversight of the outside expert consultants to Internal Audit and the GC's office (which reported to Dr. Shalala).

Dr. Shalala's decision to terminate Dr. Lord was extraordinary. She normally did not interfere with Dean Goldschmidt's hiring and firing decisions, and she did not have any role in terminating any other employee's employment at that time. (Trial Tr. Day 4 at 192:7–14.) And Dr. Goldschmidt did ***not*** want to terminated Dr. Lord's employment. (Trial Tr. Day 5 at 71:6–13).

Also extraordinary was Dr. Shalala's decision to "elevate" the oversight of the IML review/assessment to Internal Audit and the GC's office. Dean Goldschmidt repeatedly referred to Dr. Livingstone's alleged "Nemeroff threat" and other details told to Dr. Shalala as recounted in Dr. Livingstone's memorandum (Joint Ex. 25) as fabrications or lies and called the transfer to Internal Audit inappropriate given Mike Moloney's receipt of the December 9 e-mail from Dr.

---

[2] The jury instructions suggest that but-for causation requires the jury to conclude that protected activity was the "main reason" for termination. Dr. Lord maintains that this portion of the instruction is wrong. *See Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1739 (2020) (interpreting "because of" causation under Title VII retaliation claims and concluding a "defendant cannot avoid liability just by citing some other factor that contributed to its challenged employment decision. So long as the plaintiff's sex was one but-for cause of that decision, that is enough to trigger the law" because "[o]ften, events have multiple but-for causes" and Congress "could have added 'solely'" or "primarily" to the "because of" standard).

12

Livingstone characterizing the review as a "witch hunt." (Trial Tr. Day 5 at 85:2–12, 91:10–14.) Dr. McCafferty-Fernandez testified that Dr. Shalala's surprise decision to transfer oversight of the IML review to Internal Audit and the GC's office was "highly irregular" and would have expedited her decision to resign from the University had she known the impetus for the transfer.

Making President Shalala's motives clearer, she prevented Dean Goldschmidt and Dr. Lord from moving all labs, including the IML, to pathology, stopped the executive daily updates and all emails relative to the IML, and twice told Dean Goldschmidt that Dr. Livingstone "has to lead to more productivity" (*i.e.*, revenue) in response to Dean Goldschmidt's documented concerns about Dr. Livingstone's manipulative and destructive personality. (Plaintiff's Ex. 148; Trial Tr. Day 4 at 204:23-24.) She also urged Dr. Goldschmidt to talk Dr. Livingstone out of resigning his leadership position days earlier.

Finally, while Dean Goldschmidt and others praised Dr. Lord repeatedly in writing before and after his termination and presumed he would assume a different role within the University, Dr. Shalala angrily hastened his exit from the University when he stressed the importance of completing a review of the IML to all members of the Board of Trustees by expressly referencing potential Medicare fraud and externally mandated sanctions. (Trial Tr. Day 5 at 117:13–18.) She even admitted that her response to Dr. Lord's memorandum to the Board of Trustees highlighting his concerns with the IML ("[g]ive him his check") confirmed she did not want Dr. Lord to "hang around" and wanted a "clean break" from him as soon as possible. (Trial Tr. Day 4 at 206:11-21.) Why would Dr. Lord's e-mail to the full Board of Trustees anger Dr. Shalala or inspire her to hasten his exit from the University if she acquiesced to Dr. Livingstone's baseless accusations to "elevate" the review of the IML to Internal Audit, which reports to the Board of Trustees?

Dr. Shalala, in turn, claimed that the timing of her decision to terminate Dr. Lord on December 21, 2012 just hours after her meeting with Dr. Livingstone and around the same time she interfered with oversight of the independent TMG assessment was a coincidence because she was "doing a lot of things at the same time." (Trial Tr. Day 4 at 183:25-184:2.) That is her only explanation for making her decision to go over Dr. Goldschmidt's head to terminate an employee he thought had "substantial qualities" and did not want to terminate on the same day she met with Dr. Livingstone. Her purported non-retaliatory motivations for terminating Dr. Lord—vague and generic (and undocumented) University talking points and buzz words, short on specific examples

13

and lacking in temporal significance—fare no better when assessed against her own testimony and that of her University colleagues.

For instance, she claimed she decided to fire Dr. Lord due to his "management style," citing how he handled mass layoffs from April to June 2012, the petition (which related to the deteriorating relationship with Jackson Memorial Hospital that predated Dr. Lord), and purported lack of communication with University leadership.

The layoffs were approved by University leadership and the Board of Trustees and implemented from April to June 2012. Three months to fire at least 500 employees. Joe Natoli testified that their impact (including how they were being received by the faculty) were immediately known to the University. But there are no documents (and no testimony) suggesting anyone in University leadership complained about how the layoffs were handled while they were happening. In fact, the layoffs occurred *prior* to the University giving Dr. Lord a promotion in a July 3, 2012 letter that credited Dr. Lord with leading a "fiscal and cultural turnaround." (Joint Ex. 23.) Dr. Shalala approved the promotion and specifically approved the letter before Dean Goldschmidt offered it to Dr. Lord. Dr. Shalala also admitted that the petition, which stated the University needed a new *dean* (not Dr. Lord), did not say anything about the layoffs or Dr. Lord's management style. Further, she cited a complete cut off of communication with Dr. LeBlanc and Joe Natoli, but Dr. LeBlanc testified he was not aware of any cut off in communications and Joe Natoli admitted he and Dr. Lord continued communicating (despite deterioration of their social relationship) because they could not do their jobs if they did not communicate.

Other University witnesses parroted the same vague and generic talking points. But their efforts to cite specific examples also fail to provide any semblance of a legitimate reason to terminate an employee. They each told tales of conduct that occurred prior to Dr. Lord's promotion on July 3, 2012, or otherwise innocuous conduct Dean Goldschmidt admitted were not documented because they did not rise to a level that required documentation (as opposed to Dr. Livingstone's conduct, which did require formal documentation).

Moreover, all University witnesses acknowledged there was significant documentation of Dr. Lord's achievements, kudos, and accolades, but no documentation whatsoever (communications, memoranda, meeting minutes) corroborating any of their purported concerns with Dr. Lord's management style or lack of communication with University leadership. Importantly, each witness hailed the importance of information accuracy, accurate reporting, or

documentation and audit trails in reference to other issues. However, none of them ever documented any concerns with the management style and work performance of a fellow well-compensated executive.

### VI. No Reasonable Juror Could Find That Dr. Lord is Not Entitled to Back Pay and Interest on Back Pay, or That Dr. Lord Failed to Mitigate His Damages.

Because the University wrongfully terminated a well-paid officer, portrayed the termination negatively in the press (harming future employment prospects), and litigated the FCA claim for years, it now faces significant liability (among other things, back pay and interest on the back pay) and does not want to pay. But the University does not provide sufficient evidence to allow any reasonable juror to conclude that Dr. Lord did not even try to secure executive-level employment after his termination.

The duty to mitigate damages requires Dr. Lord to be reasonably diligent in seeking substantially equivalent employment to the position he held with the University—Chief Operating Officer, Chief Compliance Officer, and Vice President of Medical Administration.[3] To prove that Dr. Lord failed to mitigate damages, the University must prove by a preponderance of the evidence that: (1) work comparable to the position Dr. Lord held with the University was available, and (2) Dr. Lord did not make reasonably diligent efforts to obtain it. If, however, the University shows that Dr. Lord did not make reasonable efforts to obtain any work, then the University does not have to prove that comparable work was available. *See Galbreath v. Hale Cnty., Alabama Comm'n*, 754 F. App'x 820, 830 (11th Cir. 2018) (district court correctly rejected argument that plaintiff failed to mitigate damages because "she did not look for other work" because "'Defendants did not show that substantially comparable work existed within the relevant area'") (quoting *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1527 (11th Cir. 1991) (defining substantially equivalent work), superseded by statute on other grounds, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071, as stated in *Munoz v. Oceanside Resorts, Inc.*, 223 F.3d 1340 (11th Cir. 2000)); *Ross v. Twenty-Four Collections, Inc.*, 681 F. Supp. 1547, 1554 (S.D. Fla. 1988) (finding an employee's lack of diligence did not reduce her back pay where any attempts to secure employment were rendered futile by the employer's actions); *Galbreath v. Hale Cnty., Alabama*

---

[3] Dr. Shalala also testified that Dr. Lord had a courtesy faculty appointment in the Department of Pathology. (Trial Tr. Day 4 at 219:7–8.)

*Comm'n*, CV 15-308-CG-N, 2017 WL 3402967, at *12 (S.D. Ala. Aug. 8, 2017) (identifying relevant factors for reasonableness of efforts).

Because Dr. Lord has proven his employment was terminated because of his protected activity, he is entitled to damages. *See* 31 U.S.C.§§ 3730(h)(1), (2). Moreover, the evidence showed that the University failed to carry its burden regarding failure to mitigate. The University made no effort to establish that substantially equivalent employment was available to Dr. Lord and that his efforts to obtain those comparable positions were not reasonable. Instead, the University's strategy for its failure to mitigate affirmative defense was to rely wholly on Dr. Lord's divorce testimony.

But Dr. Lord's testimony (and documentary evidence) regarding his post-termination employment status and substantial efforts to secure executive-level healthcare positions (the same way he made it to the University) establish that he certainly was open for and networked to obtain substantially equivalent positions.[4] (Plaintiff's Ex. 178.) In fact, the evidence clearly establishes that Dr. Lord networked with other professionals and executive search consultants in person and on social media, and worked on boards, and that those efforts almost worked—twice—with respect to two CEO positions of major organizations in 2014 and 2017.

Importantly, this testimony was not inconsistent with his testimony in his divorce proceeding, which was provided while Dr. Lord was wary of breaching the seal in this case. The evidence showed that there were serious concerns in the divorce case about the seal, including extensive objections from divorce counsel regarding Dr. Lord's ability to respond to the questions asked relating to the Dr. Lord's employment with the University. Moreover, even Dr. Lord's financial affidavit in the divorce case disclosed that "in October 2014, I was contacted by a national search firm in regard to the chief executive officer position for the American Diabetes Association." (Defendant's Ex. 42 ¶ 3(a).) Dr. Lord was clear, although he was not actively applying for jobs, he never stopped actively networking and was always open to work, such as the

---

[4] *See Weaver*, 922 F.2d at 1527 ("'Substantially equivalent employment' is employment that affords virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status to those available to employees holding the position from which the Title VII claimant has been discriminatorily terminated. If the former employee cannot find substantially equivalent employment, he may 'lower his sights' and accept noncomparable employment. Title VII, however, 'does not require that a person remain employed despite dissatisfaction.'") (footnote omitted).

16

potential CEO position with the American Diabetes Association.[5] The University has failed to meet its burden to show that Dr. Lord failed to mitigate his damages.

### VII. This Court should find judicial estoppel does not apply.

"The equitable doctrine of judicial estoppel is intended to prevent the perversion of the judicial process and protect its integrity by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *Slater v. U.S. Steel Corp.*, 871 F.3d 1174, 1180 (11th Cir. 2017) (alterations adopted; citations and quotation marks omitted). Courts may apply the doctrine in their discretion "only when the plaintiff's conduct is egregious enough that the situation 'demands equitable intervention.'" *Id.* (alteration adopted; citation omitted).

To determine whether judicial estoppel applies, a court must first determine whether a "party took an inconsistent position under oath in a separate proceeding[.]" *Id.* at 1181 (alteration added; citation omitted). The court must then assess whether "these inconsistent positions were calculated to make a mockery of the judicial system." *Id.* (quotation marks omitted; quoting *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1285 (11th Cir. 2002)). In other words, courts must "consider[] both the plaintiff's actions — whether he made inconsistent statements — and his motive — whether he intended to make a mockery of the judicial system." *Id.* (alteration added).

Dr. Lord's transition from his role as professor involved both voluntary and involuntary elements: Dr. LeBlanc told Dr. Lord that the University lacked the funding to keep him as a professor, and Dr. Lord decided to forego an advisory faculty vote because Dr. Shalala and Dr. LeBlanc had decided against renewing his professorship.

With that nuance in the background, Dr. Lord offered several harmless explanations for his statements to the divorce court that he had retired from his professorship. He explained he was embarrassed to tell people that he had been fired, he used the word "retirement" loosely because of the complicated nature of his job status, he used an "abundance of caution" to avoid violating the sealing order in this case (as reflected by his counsel's privilege objections at the deposition), and he relied on the University's representations that the University lacked funding to renew his professorship in deciding against standing for a faculty vote. Dr. Lord also explained that Alice Meagher knew everything about his employment with the University, including that he had been

---

[5] Dr. Lord is also entitled to judgment on the University's judicial estoppel defense. For the reasons addressed in the failure to mitigate damages section, Dr. Lord's testimony was not inconsistent.

terminated from his executive positions (which he clarified at his deposition), and his efforts to seek employment (which he also explained in his divorce deposition testimony).

Dr. Lord's prior testimony illustrates he had no intent to "make a mockery of the judicial system," in fact, any inconsistency in Dr. Lord's statements was due to his concern over violating this Court's seal order. *Slater*, 871 F.3d at 1181. Indeed, after the divorce deposition took place, the seal was partially lifted in order to allow Ms. Meagher, her divorce counsel, and the divorce court access to the Complaint in this case. This further corroborates that Dr. Lord was concerned with violating this Court's order. Dr. Lord clearly had no intent to "make a mockery of the judicial system." *Id.* Accordingly, judicial estoppel would be inappropriate, and this Court should find it is inapplicable here.

## CONCLUSION

For the foregoing reasons, Dr. Lord is entitled to judgment as a matter of law under Rule 50(a).

Dated: October 3, 2022

Respectfully Submitted,

**STUMPHAUZER FOSLID SLOMAN ROSS & KOLAYA, PLLC**
Two South Biscayne Boulevard, Suite 1600
Miami, Florida 33131
Tel.: (305) 614-1400
Fax: (305) 614-1425

By: */s/ Jennifer M. Hernandez*
JEFFREY H. SLOMAN
Florida Bar No. 378879
jsloman@sfslaw.com
JORGE A. PÉREZ SANTIAGO
Florida Bar No. 91915
jperezsantiago@sfslaw.com
JENNIFER M. HERNANDEZ
Florida Bar No. 1018836
jhernandez@sfslaw.com
*Counsel for Plaintiff Dr. Lord*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on October 3, 2022, I filed the foregoing document on CM/ECF causing a copy to be served on all counsel of record via electronic mail.

*/s/ Jennifer M. Hernandez*
JENNIFER M. HERNANDEZ

19