**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 13-22500-Civ-Altonaga/McAliley

JONATHAN LORD, M.D.,

      Plaintiff,

vs.

UNIVERSITY OF MIAMI,

      Defendant.

_____/

**PLAINTIFF JONATHAN LORD, M.D.'S RENEWED MOTION FOR JUDGMENT**
**AS A MATTER OF LAW AND/OR FOR NEW TRIAL AND**
**INCORPORATED MEMORANDUM OF LAW**

## INTRODUCTION

On October 4, 2022, following an eight-day trial, the jury returned a verdict determining that Plaintiff, Jonathan Lord, M.D. ("Dr. Lord") engaged in protected activity by reporting on, raising awareness of, and further investigating billing practices that defrauded the federal government and that then-President Donna Shalala ("Dr. Shalala") knew about his protected activity. (D.E. 235). Inexplicably, the jury determined that Dr. Shalala *did not* terminate Dr. Lord because of that protected activity and, thus, the University of Miami (the "University") did not violate the anti-retaliation provision of the False Claims Act ("FCA").[1] The jury got it wrong.

Pursuant to Fed. R. Civ. P. 50(b), the Court should enter judgment for Dr. Lord in accordance with his renewed Rule 50(a) motion (*see* D.E. 229) and new trial solely on the amount of damages.[2] No properly instructed jury could have concluded that Dr. Lord's protected activity was not *at least one* but-for cause of Dr. Shalala's abrupt decision on Friday, December 21, 2012 (the Friday preceding Christmas Eve), to take the extraordinary step of breaking the chain of command to order then-Dean Pascal Goldschmidt ("Dr. Goldschmidt") to terminate Dr. Lord's employment. (Ex. 4 at 192:7-14, 218:7-15, 22-25, 261:7-9).

Dr. Shalala admitted that she acted on Dr. Alan Livingstone's complaints regarding the Immuno-monitoring Lab ("IML") assessment conducted by independent third-party Transplant Management Group ("TMG") and a fabricated "threat" to use the IML audit against Dr. Livingstone if he did not stop the faculty petition. (*Id.* at 137:2-20, 22-138:1; Pl. Ex. 66). Among the "actions" she promised him she would take during their December 21st meeting was to transfer oversight of the IML assessment conducted by TMG from Dr. Lord and Chief Medical Compliance Officer Dr. Jennifer McCafferty-Fernandez to Internal Audit and the General Counsel's office

---

[1] Emphasis is supplied unless otherwise noted. Further, this motion is accompanied by a Notice of Filing the trial transcripts that have been completed: (1) Telephonic Charge Conference, Sept. 15, 2022 (Ex. 1); (2) Trial Day 2, Sept. 19, 2022 (Ex. 2); Trial Day 3, Sept. 20, 2022 (Ex. 3); Trial Day 4, Sept. 21, 2022 (Ex. 4); Trial Day 5, Sept. 22, 2022 (Ex. 5); Trial Day 8, Oct. 3, 2022 (Ex. 6). Citations to the transcripts are designated as "Ex. __ at Page:Line." Transcripts for proceedings held on September 27, 2022 (Dr. McCafferty-Fernandez's proffered testimony) and for day six of trial on September 23, 2022 (testimony of Dr. McCafferty-Fernandez) were received moments before filing and the transcript for day seven of trial on September 30, 2022 (testimony of Dr. McCafferty-Fernandez, Natoli, Dr. Ciancio, and Dr. LeBlanc) has not been completed. Dr. Lord will amend this motion to add relevant citations when all transcripts are available.

[2] Dr. Lord also renews his Rule 50(a) motion pertaining to back pay (and interest), mitigation, and judicial estoppel, and incorporates the analysis herein. (D.E. 229 at 15-18).

("GC's Office"). (Ex. 4 at 170:19, 178:1-6, 180:15-18, 181:16, 182:13-21, 183:9-18; Pl. Ex. 99). She also promised personnel changes, which could have meant only that she would fire Dr. Lord because she admitted she had no role in terminating any other employees. (*Id.*; Ex. 4 at 191:23-25, 192:3-9). The competent evidence in this case allows only one inference to be drawn about this coincidence: Dr. Lord and the IML assessment were inextricably linked in Dr. Shalala's mind and both actions were taken to protect Dr. Livingstone.

To be sure, Dr. Shalala was given opportunities to explain this "coincidence" and rebut this inference. She came up empty. She testified she followed through on her promises to Dr. Livingstone on December 21st because she "was doing a lot of things at the same time." (*Id.* at 183:25-184:2). Further, although she testified transferring oversight of the IML to Internal Audit had nothing to do with terminating Dr. Lord's employment (*id.* at 183:9-21), she had the foresight to announce these decisions at different times. She quickly announced that day that the IML assessment would be transferred to Internal Audit and the GC's Office, but kept top secret (*i.e.*, "[n]othing must leak") Dr. Lord's termination for another 10 days. (*Id.* at 183:2-6; Pl. Ex. 101).

Further, Dr. Shalala's testimony about why she decided to terminate Dr. Lord is limited, undermined by logic and her own inconsistent testimony, and does not provide a non-retaliatory reason for deciding to do so on December 21st. *See infra* at 10-14. The University tried to supplement her threadbare testimony through other witnesses, but none of that testimony mattered. Her testimony about what she knew and what factored into her decision is what matters. (Ex. 6 at 157:1-3; Ex. 4 at 200:20-23 (agreeing jury would have to take her word for it)). Dr. Shalala was asked when (December 21) and why she made her decision, and she did not testify about any specific conduct/performance issues. For instance, Mark Diaz's testimony has no significance— Dr. Shalala never mentioned Diaz or any concerns with the layoffs' impact on the "research enterprise." She even testified she had no basis to disagree with Dr. LeBlanc's praise of Dr. Lord regarding the "research and educational mission." (*Id.* at 199:16-200:6; Pl. Ex. 162)).

Alternatively, pursuant to Fed. R. Civ. P. 59(a), the Court should grant a new trial for several reasons. ***First***, the verdict was against the great weight of the evidence for the reasons Dr. Lord is entitled to judgment as a matter of law. ***Second***, the Court erred and affected Dr. Lord's substantial rights by excluding evidence of the University's retaliation against Dr. McCafferty-Fernandez. Specifically, Dr. McCafferty-Fernandez would have testified that the University eliminated her Chief Medical Compliance Officer position and reduced her responsibilities (at

best, a lateral move) after she cooperated with the FBI's investigation of the IML without first advising the University. She would have testified (or it could be reasonably inferred) that she did that because she grew to distrust the GC's Office due to concerns with the IML audit and because she was criticized by the GC's Office and Rudy Green (the University's Chief Compliance Officer) for doing too much as part of her compliance efforts.

*Third*, the University's counsel engaged in improper closing argument. This is plain error that denied Dr. Lord a fair trial. The University repeatedly argued that there were "15" different incidents for which Dr. Lord *could* have been fired "in the real world," without tying that evidence to the decisionmaker, Dr. Shalala, or her testimony about her claimed reasons for termination, and without any care for temporal proximity to the termination decision. *See infra* at II.d. In fact, University counsel barely mentioned Dr. Shalala's stated reasons for terminating Dr. Lord.

Adding insult to injury, the University improperly argued that it was Dr. Lord's burden to produce the University's employee, Dr. Livingstone, and Hilarie Bass as witnesses, even though they could have been called by either party. Dr. Livingstone was even an expected witness for the University. Then, presumably because it lacked evidence to rebut testimony from Dr. Goldschmidt and Dr. McCafferty-Fernandez calling the change in oversight of the assessment to Internal Audit, which Dr. Livingstone had lobbied, improper and "highly irregular" and testimony from Dr. McCafferty-Fernandez that Mike Moloney, Dr. Goldschmidt, and Rudy Green separately expressed concerns regarding the subsequent IML billing audit and the GC's Office's involvement in changing Internal Audit's findings over a weekend in May 2013, University counsel  inflamed the passions of the jury by suggesting that Dr. McCafferty-Fernandez now considered Internal Audit and the GC's Office "evil," the "devil," an "evil monster," and an "evil demon." (Ex. 6 at 181:24-182:3, 182:14-15, 191:11-12, 20-25, 192:6-11).

University counsel also improperly offered his opinion about Dr. Lord's credibility and the justness or viability of his claim, stating that Dr. Lord fabricated his claim as an opportunity to collect substantial damages. (*Id.* at 140:21-24; 141:3-8). Further, University counsel offered misleading and irrelevant testimony and argument regarding the termination of other University employees who were not involved in protected activity knowing Dr. Shalala had no role in the termination. (*Id.* at 174:17-20; Ex. 4 at 191:23-25).

*Fourth*, the jury's verdict was based on an incorrect application of the "but for" causation standard. The jury should have been provided Dr. Lord's proposed instruction. (*See* D.E. 161 at

37-40 (citing *Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1739 (2020) (noting there can be "multiple but-for causes" and Congress "could have added 'solely'" or "primarily" to the "because of" standard); *see also United States ex rel. Barrick v. Parker-Migliorini Int'l, LLC,* 2022 WL 901609, at *3 (D. Utah Mar. 25, 2022) (denying new trial based on but-for causation instruction in FCA case acknowledging possibility of multiple but-for causes). Instead, the jury was given an inadequate but-for causation instruction that, together with the remaining defendant-friendly instruction, severely prejudiced Dr. Lord by implementing a heightened standard of proof on Dr. Lord that his protected activity was ***the*** "but for" cause of his termination. (*See* D.E. 232 at 4-5).

Finally, even if any of these errors alone do not warrant a new trial, the impact of these cumulative errors does. Accordingly, Dr. Lord is entitled to judgment or a new trial.

## MEMORANDUM OF LAW

**I.   Dr. Lord is Entitled to Judgment as a Matter of Law[3]**

**a.   No Reasonable Juror Could Find That Dr. Shalala Did Not Terminate Dr. Lord's Employment Because of His Protected Activity.**

The jury correctly determined that Dr. Lord engaged in protected activity and Dr. Shalala knew about that activity before deciding to terminate Dr. Lord's employment on December 21, 2012.[4] The jury, however, determined that Dr. Shalala did not terminate Dr. Lord's employment because of his protected activity. No reasonable jury could have reached this conclusion.

"[T]he but-for causation standard applies to claims under the antiretaliation provision of the False Claims Act[.]" *Nesbitt v. Candler Cnty.*, 945 F.3d 1355, 1359 (11th Cir. 2020). A "but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found ***a*** but-for cause." *See Bostock*, 140 S.Ct. at 1739. Moreover, as the Supreme Court explained:

> This can be a sweeping standard. Often, events have multiple but-for causes. So, for example, if a car accident occurred both because the defendant ran a red light and because the plaintiff failed to signal his turn at the intersection, we might call each a but-for cause of the collision. . . . When it comes to Title VII, . . . a defendant cannot avoid liability just by citing some *other* factor that contributed to its challenged employment decision. So long as the plaintiff's sex was one but-for cause of that decision, that is enough to trigger the law.

---

[3] The standard for a renewed Rule 50(b) is the same as the standard in an initial Rule 50(a) motion. *Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 724 (11th Cir. 2012). "[A] mere scintilla of evidence does not create a jury question"; "there must be a substantial conflict in evidence." *Carruthers v. BSA Adver., Inc.*, 357 F.3d 1213, 1215 (11th Cir. 2004).

[4] Dr. Lord incorporates herein the analysis from his Rule 50(a) motion about protected activity, his job duties, and Dr. Shalala's knowledge about his protected activity. (D.E. 229 at 7-11).

*Bostock*, 140 S.Ct. at 1739 (emphasis in original and citation omitted).[5] No properly instructed jury could reasonably conclude that Dr. Lord's protected activity was not *a* but-for cause of Dr. Shalala's extraordinary decision to interfere with Dr. Goldschmidt's personnel decisions (he did not want to terminate Dr. Lord's employment, *see* Ex. 5 at 71:6–13), hours after she met with a "target" of Dr. Lord's protected activity (Dr. Livingstone) who was panicking about an audit that would address the "serious allegations" of fraud concerning IML "billing practices." (Ex. 4 at 187:22-188:1, 190:6-8, 194:11-16, 260:1-9).

**Dr. Shalala Decided to Terminate Dr. Lord's Employment on Friday, December 21, 2012 Because of Dr. Lord's Protected Activity.** Dr. Shalala proudly admitted that she recalled Dr. Livingstone's complaints with the IML assessment and a fabricated "threat" to use the IML audit against Dr. Livingstone if he did not stop the faculty petition because she "acted on them." (*Id.* at 137:2-20, 22-138:1; Pl. Ex. 66). Contemporaneous documents, including Dr. Livingstone's memorandum, and Dr. Shalala's testimony tell us how she "acted on them."

She promised Dr. Livingstone during her December 21 meeting that she would transfer oversight of the IML assessment conducted by TMG from Dr. Lord and Dr. McCafferty-Fernandez to Internal Audit and the GC's Office. (Ex. 4 at 170:19, 178:1-6, 18-:15-18, 181:16, 182:13-21, 183:9-18; Pl. Ex. 99). And she followed through on that promise later that day. (Pl. Ex. 100). She also promised changes in "HR and other areas" were coming. (Pl. Ex. 99). She again followed through. She instructed Dr. Goldschmidt to terminate Dr. Lord that same day and had no role in firing anyone else. (*Id.*; Ex. 4 at 191:23-25, 192:3-9). The competent evidence allows only one inference regarding this "coincidence": Dr. Lord and the IML assessment were inextricably linked in Dr. Shalala's mind and she addressed both on the same day to "contain" Dr. Livingstone. (*Id.* at 202:14-203:20, 204:1-4, 23-205:3 (responding "Alan has a big job to get productivity up" and "contain him. He has to lead more productivity" to Dr. Goldschmidt's complaints about Dr. Livingstone "destroying everything I built at U.M." and "there is a decision to be made" and testifying that he "was an important senior member of the faculty" who needed to "be part of the team to increase [productivity] at the medical school")).

Making Dr. Shalala's motives clearer is her written response to Dr. Lord "just doing his job" in a January 18, 2013 memorandum to all members of the Board of Trustees wherein he

---

[5] As discussed at II.e., the jury was not instructed that there could be multiple but-for causes of Dr. Lord's firing or that the University could not avoid liability by merely citing contributing factors.

stressed the importance of completing a review of the IML and expressly referenced Medicare fraud and externally mandated sanctions. (Jt. Ex. 149). While Dr. Goldschmidt, among others, praised Dr. Lord repeatedly in writing before and after his termination and presumed he, a double alum, would assume a new role within the University, she angrily hastened his exit. (*Id.*; Ex. 5 at 117:13–18). She even admitted that her instruction to Dr. Goldschmidt in response to Dr. Lord's memorandum— "[g]ive him his check"—confirmed she did not want Dr. Lord to "hang around" and wanted him out as soon as possible. (Ex. 4 at 206:11-21). Why would Dr. Lord's e-mail to the Board anger Dr. Shalala or inspire her to hasten his exit from the University if his protected activity had nothing to do with his termination and she "elevated" the review of the IML to Internal Audit, which reports to the Board?

Dr. Shalala was given opportunities to explain the "coincidences" that occurred on December 21st. She testified that on December 21st she told Dr. Livingstone that she would take these actions and followed through that same day because she "was doing a lot of things at the same time, that's what college presidents do." (*Id.* at 183:25-184:2). Further, although she testified that the transfer of oversight of the IML to Internal Audit had nothing to do with terminating Dr. Lord's employment *(id.* at 183:9-21), she had the foresight to announce these decisions at different times. She announced on December 21st that the IML assessment would be transferred to Internal Audit and the GC's Office, but kept top secret (*i.e.*, "[n]othing must leak") Dr. Lord's termination for another 10 days until December 31, 2012. (*Id.* at 183:2-6; Pl. Ex. 101).

Moreover, Dr. Shalala's testimony regarding her motive to transfer oversight of the IML to Internal Audit—to "protect" the IML billing audit after Dr. Livingstone reported he received the Nemeroff Threat and "created a conflict"—is nonsense. (Ex. 4 at 186:12-24). First, Dr. Shalala made these important decisions—terminating Dr. Lord and transferring oversight of the IML assessment to Internal Audit and the GC's Office—while she (and Dr. Livingstone) was concerned about being reported to or investigated by the government for fraud or sued in a *qui tam* action. Dr. Shalala admitted the anonymous OIG letter contained serious allegations of billing fraud that "raised hair on the back of [her] neck" and framed the scope of the TMG assessment, which raised "serious issues . . . about the possibility of – of billing practices." (Tr. at 187:20–25; 194:11–17 (review based on "serious allegations"); 234:12-14 (OIG letter "made it very explicit what we expected to be covered" by TMG); 235:5–7 ("billing issues . . . involved possible alleged fraud"), 235:16–18 (OIG letter "raised hair on the back of my neck"); 249:3-8 (Dr. Lord "thought there

were deep problems at the IML"); 159:22–160:3 (Dr. Shalala admitting she met with Dr. Lord on December 14 to discuss pending TMG report). Dr. McCafferty-Fernandez's "MTI Assessment update" (and the cover e-mail (Pl. Ex. 89)), which Dr. Shalala admitted reviewing, also shows that TMG's observations and topics flagged for follow-up were consistent with the allegations raised by the Department of Pathology and in the OIG letter (which Dr. Shalala knew about) and other "data points" including prior allegations of billing fraud in the IML dating back to August 2011, including OIG and DOJ interviews with Philip Ruiz. (Ex. 4 at 166:12-19 (unusually high margins), 176:13-15 (Dr. Shalala knew Department of Pathology had raised issues about the IML), 239:12-14 (Dr. Shalala testifying that Dr. Cote in pathology "had real concerns about the management and the substance of what was going on over in surgery"); Pl. Ex. 7, 8, 30, 66, 72, 73, 89 ("unusually high margin within the industry and requires additional review" and "post transplant protocols – testing is extensive relative to peers"), 93 ("extraordinary revenue growth benefiting the department of surgery"), 113; Jt. Ex. 6, 7, 25; Ex. 5 at 56:10-14).

Second, there was no Nemeroff Threat and, thus, no basis to transfer oversight of the TMG Assessment to Internal Audit and the GC's Office. (Ex. 4 at 186:25-187:3 (admitting transfer occurred only because Dr. Livingstone said he received Nemeroff Threat), 188:11-12 )). Dr. Livingstone's memorandum noted Dr. Shalala did not believe Dr. Goldschmidt or Dr. Lord made any threat and Dr. Shalala's testimony suggests she did not believe the TMG Assessment lacked integrity. (Pl. Ex. 99; Ex. 4 at 187:5-11 (transferring oversight so the "integrity of the review *continued*")). Dr. Goldschmidt called the Nemeroff Threat "pure invention and lies," noted Dr. Shalala believed it was a lie, and testified that Charlie Nemeroff swore he did not make any threat. (Ex. 5 at 50:3-51:8). And there were additional reasons not to believe Dr. Livingstone or credit his allegations. Specifically, there had been several allegations of fraud in the IML well predating the petition, the TMG assessment was planned *before* the OIG letter, and TMG, an independent third-party, was recommending additional review of IML billing practices. Further, Dr. Livingstone's other claims regarding the "problems" with the IML review, including that he did not interview or meet with TMG and that Dr. McCafferty-Fernandez was using the audit as a weapon, were readily discredited. (Ex. 4 at 138:24-139:3 (Dr. Shalala agreeing Dr. McCafferty-Fernandez was not using audit as a blunt instrument); 176:21-177:1, 8-9 (noting complaints about not being interviewed although his name was on the list of people interviewed by TMG); 177:20-25 (stating she never heard concerns that Dr. McCafferty-Fernandez used audits as a weapon)). Finally, once he got

what he wanted—oversight of the IML assessment shifted to Internal Audit—Dr. Livingstone asked that no one investigate the Nemeroff Threat, even though it is what motivated his offer to resign just weeks earlier (Pl. Ex. 72) and Dr. Shalala to express that "no one could use an investigation to threaten a member of the faculty."[6] (*Id.* at 151:9-16 (Dr. Shalala testifying Dr. Livingstone threatened to resign because he was upset about the TMG assessment and the threat); 178:1-9; 149:18-22 (Dr. Livingstone's request not to investigate the Nemeroff Threat was enough to not investigate); 245:17-24 (Dr. Shalala abided by Dr. Livingstone's wishes not to investigate the Nemeroff Threat); 182:7-19 (investigation of "real or implied" threat was unnecessary because it could have been "good intentions poorly delivered"); Pl. Ex. 102).

Naïve, Dr. Shalala was not. She had substantial experience with Medicare fraud. (Ex. 4 at 215:10-20). But Dr. Shalala's experience was not required to piece together that TMG's billing audit would likely conclude there was fraud in the IML where there was a series of consistent allegations of fraud, an independent third-party's initial observations consistent with those allegations, and an unsubstantiated "threat" from Dr. Livingstone coupled with his other efforts designed to impede the assessment. So, Dr. Shalala kowtowed to Dr. Livingstone's request to have Internal Audit, the entity he had already lobbied, oversee the IML audit so he, and anyone within the IML, would not "challenge" the findings. (*Id.* at 189:8-9 (audit, "particularly the billing part," had to be "carefully done" so Dr. Livingstone would not question it); 257:6-10 (TMG report "could have been challenged" so she wanted to have a "clean report that could never be challenged"); 258:17-21 ("didn't know . . . whether anyone else was going to raise an issue"); 259:11-16 (admitting that only potential challengers of the audit's integrity were "anyone within that unit"), 260:1-9 ("Whether it was one person that was going to challenge it or ten people was irrelevant to me"), 260:14-17, 18-21 (admitting Dr. Livingstone was the only one challenging the TMG assessment's integrity); Pl. Ex. 66, 99 (lobbying Internal Audit and vouching for IML)).

This could only mean one thing - Dr. Shalala's decision to transfer the TMG assessment to Internal Audit pacified Dr. Livingstone and allowed him to "lead more productivity" - because it strains credulity to believe Dr. Livingstone did not think transferring the audit would help his cause. (Ex. 4 at 182:7-19 (Dr. Livingstone was "gratified to hear that oversight of IML investigation would be moved to GC/Internal Audit" so he could explain his position); 202:14-

---

[6] Dr. Shalala's failure to investigate a threat to punish a prominent faculty member is incompatible with her testimony about her concerns about morale, leadership style, and fear/intimidation.

203:20, 204:1-4, 23-205:3 (stating "Alan has a big job to get productivity up" and "contain him. He has to lead more productivity" and testifying he "was an important senior member of the faculty" who Dr. Goldschmidt needed to "be part of the team to increase [productivity]"). According to Dr. Goldschmidt and Dr. McCafferty-Fernandez, Dr. Shalala's decision to transfer the TMG assessment to Internal Audit was improper, disappointing, and "highly irregular," given Mike Moloney's receipt of the December 9 e-mail from Dr. Livingstone characterizing the review as a "witch hunt." (Ex. 5 at 85:2–12, 91:10–14). Dr. McCafferty-Fernandez even testified she would have resigned earlier had she known what motivated Dr. Shalala's decision.

Third, Dr. Shalala repeated that the review would be conducted by Internal Audit, free from any outside influence, who would be reporting to the Board of Trustees. (Ex. 4 at 188:18-19 (stating she did not give oversight to herself); 240:17-19 (elevating to Internal Audit and "making it more transparent and making certain that it got finished"); 241:23-242:1 (out of her hands when she transferred the audit to Internal Audit); 242:18-21 (Internal Audit would not be reporting to Dr. Shalala); 243:11-14, 17-20 ("Internal Audit had complete control over it"; no one outside of Internal Audit, including Dr. Livingstone, would have influence). This was not true. The opposite occurred. Unrebutted testimony from Dr. McCafferty-Fernandez,[7] who Dr. LeBlanc and the University admitted was a "straight shooter," showed that removing Dr. Lord and Dr. McCafferty-Fernandez from the IML review did not "elevate" the review or shield it from interference or influence by, among others, Dr. Livingstone. (*See also* Pl. Ex. 99 (noting Dr. LeBlanc told Dr. Livingstone that "of course . . . [Dr. Livingstone] and whoever else was needed would now be involved")). Specifically, Dr. McCafferty-Fernandez testified that, despite her lack of involvement with the IML audit after December 21st, Mike Moloney of Internal Audit, Dr. Goldschmidt, and Rudy Green separately asked her in May 2013 about the status of the audit. Moloney, Dr. Goldschmidt, and Green also told her that Internal Audit was supposed to report a $3-$4 million overpayment to the Board during a Friday Board meeting, but that overpayment was "resolved" over the weekend. Each of Moloney, Dr. Goldschmidt, and Green were surprised by this turn of events and, thus, expressed concerns about the integrity of the IML audit and GC's Office's involvement in changing the findings over the weekend. Removing Dr. Lord and Dr. McCafferty-Fernandez from the equation did not "protect" the audit. It protected Dr. Livingstone.

---

[7] The University chose not to call Blanca Malagon from Internal Audit to testify. (D.E. 160-4).

***Dr. Shalala's Reasons for Terminating Dr. Lord are, at Best, Convenient Excuses.*** Her claimed non-retaliatory reasons for terminating Dr. Lord—vague (and undocumented) University talking points and buzz words, short on specific examples and lacking in temporal significance—fare no better when compared to her own testimony.

For instance, Dr. Shalala claimed she fired Dr. Lord due to his style of leadership, citing low faculty morale following mass layoffs from April to June 2012, the petition (which related to the deteriorating relationship with Jackson Memorial Hospital ("Jackson") that predated Dr. Lord), and, what she referred to as the "serious issue," was lack of communication with Provost Dr. Thomas LeBlanc ("Dr. LeBlanc") and Chief Financial Officer Joseph Natoli ("Natoli") Natoli. (Ex. 4 at 103:14-20 (Dr. Shalala generally stating there were leadership issues and lack of communication with Dr. LeBlanc and Natoli; 265:12-19 (citing generally morale, relationship with Jackson, faculty disrespect, and refusal to report information to Natoli)).

***Layoffs/Morale.*** The layoffs and morale issues have no temporal or logical connection to Dr. Lord's termination. Dr. Shalala admitted that the University "had to tighten our belts" and "do some layoffs" due to financial conditions Dr. Lord did not cause. (*Id.* at 221:15-16). The layoffs were approved by University leadership and the Board and implemented from April to June 2012—three months to fire around 400 employees. (*Id.* at 116:22-117:7 (layoffs approved by leadership); 222:4-11 (400 layoffs)). Further, Dr. Shalala and Natoli admitted that the layoffs' impact (including how the faculty received them) were ***immediately*** known. (*Id.* at 117:8-118:5 (confirming she knew about dissatisfaction with how layoffs were handled in June 2012); 223:10-12 (noting morale "dropped precipitously" due to layoffs)). Yet, Dr. Shalala did not testify (and the University did not introduce documents) that University leadership complained about how the layoffs were handled ***while they were happening***. In fact, Dr. Lord received a promotion (and $150,000 raise) in a July 3, 2012 letter that credited Dr. Lord with leading a "fiscal and cultural turnaround" ***after*** the layoffs occurred. (Jt. Ex. 23; Ex. 4 at 118:6-8 (agreeing she approved Dr. Lord's raise)). Dr. Shalala approved the promotion and the wording of the July 3, 2012 letter before Dr. Goldschmidt offered it to Dr. Lord. (*Id.* at 120:11-13, 121:16-25, 122:13-15, 22-24 (admitting she approved letter and Dr. Goldschmidt would not have sent it without her approval).

***Petition/Relationship with Jackson.*** Likewise, the petition has no logical or temporal connection to Dr. Lord's termination. First, despite the University's efforts to argue otherwise, this petition was neither extraordinary nor caused by Dr. Lord. Dr. Shalala testified she had seen

10

petitions before. (*Id.* at 132:4-9). Dr. Goldschmidt also observed that the petition was like an e-mail that faculty circulated years before, and similar petitions had been circulating in other universities around the same time due to financial problems. (Pl. Ex. 63; Ex. 5 at 196:5-12). Moreover, Dr. Shalala did not respect the faculty's sacred right to petition like she testified she did. Rather, she told Dr. Goldschmidt that she needed to "take them on" with respect to faculty intending to call for a vote of no confidence respecting Dr. Goldschmidt. (Ex. 4 at 160:15-161:9 (claimed she would not "fix the petition" at Dr. Goldschmidt's request but agreed she e-mailed that "we need to take them on" in reference to faculty vote)). Moreover, on July 14, 2014, well after Dr. Lord's termination, she intervened to prevent the faculty from removing Dr. Goldschmidt based on the same issues presented in the petition. (*Id.* at 161:25-163-9; Ex. 5 185:21-25, 186:22-25 (faculty on "warpath" to remove him based on same issues)). She even admitted the faculty petition and morale issues were not the "serious issue(s)." The "serious issue" was the lack of communication with Natoli and Dr. LeBlanc, discussed below.

The fact that Dr. Livingstone was driving the petition also undermines the "extraordinary" nature of the petition. Dr. Shalala testified she did not dispute that Dr. Livingstone was behind the petition, was not surprised by his involvement because of the references to the relationship with Jackson and knew Dr. Livingstone was upset about that, and accepted Dr. Goldschmidt's statement that Dr. Livingstone was pressuring faculty to sign the petition. (*Id.* at 129:1-6 (does not dispute that Livingstone was behind petition); 130:12-20 (not surprised by Livingstone's involvement); 131:22-25 (she accepted Dr. Goldschmidt's statement that Dr. Livingstone was pressuring faculty to sign the petition); 154:19 (knew Dr. Livingstone was upset about relationship with Jackson); 277:6-9 (Dr. Goldschmidt noting Dr. Livingstone had substantially following with faculty working at Jackson)). Dr. Goldschmidt testified that the petition was related to a specific issue with Jackson—a "situation that we had with the pediatric department . . . the conditions for performing bone marrow at Jackson . . . were not compatible with safe bone marrow transplant" and, thus, "we had to move our bone marrow program transiently to another hospital . . . that created a huge reaction on the part of the faculty working at Jackson." (Ex. 5 at 45:16-46:23). Dr. Livingstone's memorandum confirmed he discussed that issue with Dr. Shalala and that, "[w]ithin 15 min. of her leaving the office," she apparently had already spoken to Dr. Goldschmidt to dispel rumors about moving pediatric bone marrow transplant to another hospital. (Pl. Ex. 99).

Dr. Shalala eventually realized why Dr. Lord's counsel was asking these questions and

angrily replied, "so what," about Dr. Livingstone's involvement with the petition. (*Id.* at 156:24-157:3). ***So what***? Whether Dr. Livingstone was driving the petition (and pressuring others to sign) is critical. Dr. Livingstone being behind the petition, pressuring faculty to sign, and fabricating the Nemeroff Threat, would be evidence of Dr. Livingstone's guilty conscience that the TMG assessment was about to corroborate the Medicare fraud allegations. Moreover, the motivations behind the petition and pressuring faculty to sign (as Dr. Goldschmidt testified and Dr. Shalala accepted), including an axe to grind with Dr. Goldschmidt and the ever-mounting pressure of the TMG assessment, would undermine Dr. Shalala's claims regarding the state of Dr. Lord's impact on faculty morale. (Ex. 5 at 43:15-22, 44:16-22). In fact, it would undermine the shock value of the number of faculty members who may have signed the petition.

Second, Dr. Goldschmidt wrote that the petition had to do with fear of changes with the nature of the relationship with Jackson (Pl. Ex. 63), which Dr. Shalala claimed was "poisoned" by Dr. Lord. (Ex. 4 at 224:9-12). However, Dr. Shalala admitted the relationship with Jackson was "not great" before Dr. Lord and that "it was going to be a very tough road to get proper payments from them" despite her close personal friendship with its CEO. (*Id.* at 221:2-9). Further, multiple witnesses confirmed that the changing nature of the University's relationship with Jackson preexisted Dr. Lord's employment. (*Id.* at 278:22-279:25 (Dr. Goldschmidt describing tensions between Jackson and University dating to 2006)). And Dr. Goldschmidt testified that Dr. Lord did not poison the relationship with Jackson. (Ex. 5 at 203:21-23).

Third, Dr. Shalala believed different parts of the petition related to Dr. Lord. She claimed the petition had to do with faculty's concerns with the substance and style of Dr. Lord's leadership, but admitted that the petition, which stated the University needed a new ***dean*** (not COO), did not say anything about the layoffs or Dr. Lord's leadership style. (*Id.* at 125:9-13 (agreeing her understanding of the petition was "her words" and not expressed in the petition)). Notably, Dr. Shalala claimed her immediate interpretation of the petition (that it was issues with Dr. Lord) was based on her receipt of complaints from faculty members, suggesting she knew of the issues referenced in the petition well before she saw the petition on December 6. (*Id.* at 225:6-14 ("I received a lot of complaints" and "I often talked to individual faculty members – I spent a lot of time down there" and they were "fearful and unhappy"); 229:7-9 (she became aware of petition on December 6); 230:2-10 (learned of the petition on December 6, but immediately claiming it was related to Dr. Lord); Pl. Ex. 36 (unsolicited October email from Dr. Peruzzi praising Dr.

Goldschmidt's and Dr. Lord's leadership amidst layoffs)).

Fourth, Dr. Shalala's decision had nothing to do with research enterprise issues. She never mentioned research budgets or issues. She even admitted she had no reason to disagree with Dr. LeBlanc's January 5, 2013 email praising Dr. Lord about "sizing the research and educational mission to the margins produced by the clinical enterprise." (*Id.* at 199:16-200:6; Pl. Ex. 162).

***Dr. Lord Did Not Cut Off Communications with Natoli and Dr. LeBlanc.*** As noted above, Dr. Shalala testified that the "serious issue" with Dr. Lord was communication with Natoli and Dr. LeBlanc (Diaz was not mentioned). (Ex. 4 at 104:8-11, 12-16 ("serious issue" was communication with Natoli and Dr. LeBlanc); 185:20-186:3 (distinguishing termination of previous COO by stating he did not have issues communicating with Natoli); 200:7-13 (communication issues with Natoli "extremely important"); 224:18-225:2 ("basically" cut off communications with Natoli). However, Dr. LeBlanc testified he was not aware of any cutoff in communications. And Natoli admitted that he and Dr. Lord had to continue communicating (despite the deterioration of their social relationship following their dispute in June 2012) because they could not do their jobs without communicating. Moreover, Dr. Shalala was aware of issues with Natoli's relationship with Dr. Lord as early as August 2012, months before Dr. Shalala terminated Dr. Lord.

Ultimately, Dr. Shalala's testimony does not stand up to the test of time. Everything she cited as an explanation for her decision to terminate Dr. Lord on December 21st was known to her before his promotion on July 3, 2012 or several months before (and after she invited him to an exclusive event at her home in early December). For instance, she claimed that she already had "deep concerns" regarding Dr. Lord's "style of leadership" ***before*** his promotion, but admitting she reviewed and approved the content in the July 3, 2012 letter and the raise. (*Id. at 1*20:11-13, 121:16-25, 122:13-15, 22-24). She also cited faculty morale as a reason for her decision. (*Id.* at 247:13-248:6 (stating that, despite financial strides, morale was low)). However, Dr. Shalala admitted that morale was poor before Dr. Lord became COO because "everyone was feeling the pressure" (*id.* at 264:12-15), she expected morale to drop due to layoffs (*id.* at 264:21-265:1), and she knew the effects of the layoffs immediately, which was before Dr. Lord's promotion. (*Id.* at 117:8-118:5 (admitting she knew about dissatisfaction with how layoffs were handled by June 2012); 223:10-12 (morale "dropped precipitously" due to layoffs)).[8]

---

[8] She admitted changes in morale took a long time after Dr. Lord was fired. (*Id.* at 250:24-251:2).

Finally, Dr. Shalala did not fire Dr. Lord on December 6th when she first became aware of the petition, December 9th when Dr. Livingstone claimed to have received the Nemeroff Threat, December 11th when Dr. Livingstone tried to resign, December 14th when she learned certain faculty were trying to convene a vote regarding Dr. Goldschmidt (not Dr. Lord), or December 15th when she learned 485 faculty members had signed the petition. Instead, she fired him two days after she reviewed Dr. McCafferty-Fernandez's memorandum, and within hours following her meeting with Dr. Livingstone.  (*Id.* at 161:10-12 (had not decided to terminate Dr. Lord by December 14th); 169:3-7 (had not decided to terminate Dr. Lord on December 19th).

## II.  Alternatively, Dr. Lord is Entitled to a New Trial

### a.  Legal Standard.

The Court may grant a new trial for any reason for which a new trial has previously been granted. Fed. R. Civ. P. 59(a); *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940); Charles A. Wright & Arthur R. Miller, et al., 11 Fed. Prac. & Proc. Civ. § 2805 (3d ed. 2013) (any prejudicial legal error "is a good ground for a new trial"). The Court may weigh the evidence and grant a new trial if the verdict is against the great weight of the evidence. *Ard v. Sw. Forest Indus.*, 849 F.2d 517, 520 (11th Cir. 1988). That decision "is a matter confided almost entirely to the [trial court's] exercise of discretion." *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980).

### b.  The Verdict Is Contrary to the Great Weight of the Evidence

For the reasons expressed at point I.a., Dr. Lord is entitled to a new trial on causation and damages because the October 4, 2022 verdict is contrary to the great weight of the evidence, which shows that Dr. Lord's protected activity was a but-for cause of Dr. Shalala's decision to terminate his employment on December 21, 2012.

### c.  The Court Incorrectly Excluded Proffered Retaliation Evidence.

To prevail on a motion for new trial, Dr. Lord must show that he was substantially prejudiced by an erroneous evidentiary ruling. *Mendez v. Unitrin Direct Prop. & Cas. Ins. Co.*, 622 F. Supp. 2d 1233, 1238–39 (M.D. Fla. 2007) (citing *SEB S.A. v. Sunbeam Corp.*, 148 F. App'x 774, 790 (11th Cir. 2005) (denying motion requires court to "say with fair assurance" that judgment was not substantially swayed by error)). The inquiry, then, is "how much of an effect did the improperly . . . excluded evidence have on the verdict?" *Peat v. Vanguard Research, Inc.*, 378 F.3d 1154, 1162 (11th Cir. 2004). The verdict here was substantially swayed by the exclusion of retaliation evidence relating to Dr. McCafferty-Fernandez.

The University introduced testimony that (i) Dr. Shalala encouraged employees to report fraud, would fire them if they did not report fraud, and had never retaliated against anyone (Ex. 4 at 216:19-22, 23-25, 217:6-8, 9-18), (ii) the *University* takes reports of suspected fraud seriously (*id*. at 216:15-18, (iii) others, such as Dr. Sheri Keitz, were not involved in the TMG assessment but had been terminated (but not by Dr. Shalala) (Ex. 5 at 184:7-17), and (iv) Dr. Shalala transferred oversight of the assessment to Internal Audit to "elevate" and "protect" it (Ex. 4 at 186:12-24). Yet, evidence of retaliation against Dr. McCafferty-Fernandez was excluded.

Dr. McCafferty-Fernandez would have testified that the University eliminated her position and reduced her duties (at best, a lateral move) after she cooperated with the FBI's IML investigation without first advising the University. (*See* D.E. 173 at 18-19 (citing deposition testimony)). She would have testified (or from her testimony it could be reasonably inferred) that she took that action because she grew to distrust the GC's Office based on concerns with the IML billing audit and was increasingly criticized by the GC's Office and Rudy Green (the University's Chief Compliance Officer) for doing too much as part of her compliance efforts.

This evidence was also relevant to show Dr. Shalala's and leadership's motivation to avoid the consequences of a government investigation. (*See id.* at 36-37 (noting "arguably retaliatory treatment of McCafferty . . . lends further support" to theory that Dr. Shalala was motivated by fear of liability)). Improper exclusion of this testimony affected Dr. Lord's substantial rights.

### d.  The University's Closing Argument Constituted Plain Error.

Dr. Lord did not object to the University's closing argument. But this does not forfeit his ability to seek a new trial because "the interest of substantial justice is at stake." *McWhorter v. Birmingham*, 906 F.2d 674, 677 (11th Cir. 1990); *Christopher v. Fla.*, 449 F.3d 1360, 1366 (11th Cir. 2006). The standard to set aside a jury verdict on this basis is whether counsel's conduct impaired the jury's dispassionate consideration of the case. *BankAtl. v. Blythe Eastman Paine Webber, Inc.*, 955 F.2d 1467, 1474 (11th Cir. 1992). This standard is easily met here.

The University barely mentioned Dr. Shalala's own testimony concerning her reasons for terminating Dr. Lord, and did not mention the date of her decision. Instead, the University mischaracterized evidence and mislead the jury about the proper considerations to determine causation. The University repeatedly argued there were "15" different incidents for which Dr. Lord *could* have been fired "in the real world," and did not tie that, logically or temporally, to Dr. Shalala's termination decision or testimony. (Ex. 6 at 162:15-16, 163:3-7, 169:15-16 (mentioning

Diaz's research enterprise testimony as "another basis to terminate Jack Lord"); 163:18, 165:2-4
(June 2012 argument with Natoli "alone would be a basis to fire Dr. Lord"); 166:18-22, 167:3-5
(Dr. Lord's "loser sign" was "sufficient basis on which to fire Jack Lord"); 167:8-14 (email
referring to Nemeroff as a "sycophant" was "basis to terminate someone in the real world");
167:22-25 (Dr. Lord pounding the table at April 2012 meeting was basis to terminate Dr. Lord);
175:9-10 ("Any one of those 15 examples . . . , any of them alone would support the firing of Jack
Lord"); 178:4-6 ("too many incidents that built up that resulted in his termination"); 178:18-21
("he could be fired for his misconduct"); 141:8, 141:15-16, 145:9-11, 175:14-15, 178:18-21 (citing
generally "conduct," "misconduct," or "performance" as reasons for termination)). Identifying
instances when Dr. Lord *could* have been fired is irrelevant and prejudicial. What Dr. Shalala knew
and why she says she fired him is what matters. The University knows this. (Ex. 6 at 157:1-3).

     The University compounded this error by improperly arguing that it was Dr. Lord's ***burden***
to call Dr. Livingstone, a University employee, and Hilarie Bass as witnesses, even though the
University disclosed Dr. Livingstone as a potential witness and both were equally available to the
University. (Ex. 6 at 142:10-20, 143:13-16; 143:21-25; D.E. 160-4); *see United States v. Richard*,
678 F. App'x 927, 941 (11th Cir. 2017) (quoting *United States v. Chapman*, 435 F.2d 1245, 1247
(5th Cir. 1970) ("[A]ny inference from a party's failure to call a certain witness equally available
to both parties is impermissible."))[9] Then, without ***evidence*** to rebut testimony that (i) Internal
Audit had a conflict due to Dr. Livingstone's outreach to Mike Moloney of Internal Audit (Ex. 5
at 91:10-14), (ii) Dr. Shalala's decision to transfer oversight to Internal Audit based on the
Nemeroff Threat was "highly irregular" and, had Dr. McCafferty-Fernandez known, would have
caused her to resign sooner, and (iii) Moloney, Dr. Goldschmidt, and Rudy Green separately
expressed concerns regarding the subsequent IML billing audit and the GC's Office's involvement
in changing Internal Audit's findings over a weekend in May 2013, University counsel
mischaracterized the Internal Audit's and the GC's Office's involvement in the TMG assessment
and assured itself the jury would not be dispassionate by suggesting that Dr. McCafferty-
Fernandez now considered Internal Audit and the GC's Office "evil," the "devil," an "evil
monster," and an "evil demon." (Ex. 6 at 181:24-182:3, 182:14-15, 191:11-12, 20-25, 192:6-11).

     University counsel also gave his opinion about Dr. Lord's credibility and the justness or

---

[9] *See also Haliburton v. State*, 561 So. 2d 248, 250 (Fla. 1990) (no inferences from or comments
made on failure of either party to call equally available witness).

viability of his claim, starting his closing argument stating Dr. Lord, consistent with his "opportunistic" character, fabricated his claim to collect substantial damages. (*Id.* at 140:21-24; 141:3-8). This is improper and prejudicial. *See* Fla. R Regulating Fla. Bar 4-3.4(e) (prohibiting from giving personal opinions about credibility of a witness, alluding to any matter that the lawyer does not reasonably believe is relevant, or stating opinion as to the justness of a cause). Further, University counsel knowingly offered misleading and irrelevant argument regarding the termination of other University employees who were not involved in protected activity despite knowing that Dr. Shalala had nothing to do with their termination. (Ex. 6 at 174:17-20; Ex. 4 at 191:23-25). The University's improper closing argument entitles Dr. Lord to a new trial.

### e. The But-For Causation Instruction Improperly Advised the Jury.

Trial courts are given wide discretion regarding jury instructions "so long as they accurately reflect the law." *Carter v. DecisionOne Corp. Through C.T. Corp. Sys.*, 122 F.3d 997, 1005 (11th Cir. 1997) (quoting *Bateman v. Mnemonics, Inc.,* 79 F.3d 1532, 1543 (11th Cir. 1996)). Moreover, its instructions may not "mislead the jury to the prejudice of the objecting party." *Tran v. Toyota Motor Corp.*, 420 F.3d 1310, 1312, 1314 (11th Cir. 2005) (reversing for new trial "because the jury was not aware that consumer expectations was an adequate and independent basis for liability, rather than merely one factor among many in the risk-utility balance" and the instructions prevented plaintiff was "unable to argue that unmet consumer expectations were an independently sufficient basis for liability" due to the instruction and, thus, the court could not say that the jury understood the issues and were not misled); *see also United States v. AseraCare Inc*, 153 F. Supp. 3d 1372, 1384–85 (N.D. Ala. 2015) (granting new trial where FCA instructions contained "correct statements of law" but "were incomplete" and, thus, the court substantially doubted whether the jury had proper guidance), *aff'd* , 938 F.3d 1278 (11th Cir. 2019). Here, despite hearing substantial evidence that Dr. Lord was terminated because of his protected activity on December 21st. the jury found that Dr. Lord's employment was ***not*** terminated because of his protected activity. The jury got it wrong, and it is because it did not have proper guidance due to an incomplete and misleading but-for causation instruction.

Prior to the September 15, 2022 Charge Conference, Dr. Lord proposed a modified version of the but-for causation instruction in the Eleventh Circuit Pattern Instructions, Civil, 4.22 for Title VII claims (the "Pattern Instruction") because the explanation of but-for causation was wrong (defining "because of" to mean "main reason") and inadequate. (D.E. 161 at 37-40 (modifying

Pattern Instruction ). Principally, Dr. Lord proposed that the Court instruct the jury that it "need not find that the *only reason*" his employment was terminated was his protected activity and

> events often have *multiple "but-for" causes*. For example, if a car accident occurred both because the defendant ran a red light and because the plaintiff failed to signal his turn at the intersection, we might call each a "but-for" cause of the collision. Thus, you may find the University of Miami terminated Dr. Lord because of his protected activity if you determine that *Dr. Lord's management style and the faculty Petition contributed to the University of Miami's decision to terminate Dr. Lord, so long as you conclude that Dr. Lord's protected activity was one but-for cause of that decision*. . . .

(D.E. 161 at 39). The modifications to the Pattern Instruction were pulled from *Bostock*, 140 S.Ct. at 1739. There, the Supreme Court addressed the but-for causation standard as applied to Title VII retaliation claims. It noted that the but-for causation test "can be a sweeping standard" because "[o]ften, events have multiple but-for causes." *Id.* The Supreme Court explained, "if a car accident occurred *both* because the defendant ran a red light *and* because the plaintiff failed to signal his turn at the intersection, we might call each a but-for cause of the collision." *Id.* (emphasis in original) (citing *Burrage v. United States*, 571 U.S. 204, 211–212 (2014)). Thus, "the adoption of the traditional but-for causation standard means a defendant cannot avoid liability just by citing some *other* factor that contributed to" an employer's challenged decision so long as the protected activity "was one but-for cause of that decision." *Id.* (emphasis in original).

The Supreme Court also rejected the argument that "because of" meant the protected activity had to be the only or main reason of the adverse action, explaining that Congress "could have added 'solely' to indicate that actions taken 'because of' the confluence of multiple factors do not violate the law" or "could have written 'primarily because of' to indicate that the prohibited factor had to be the main cause of the defendant's challenged employment decision." *Id.*

At the Charge Conference, Dr. Lord first addressed the parties' competing but-for instructions by noting the "main reason" part of the Pattern Instruction ("[Y]ou must decide whether [name of plaintiff]'s protected activity was the main reason for [name of defendant]'s decision") is an incorrect statement of the law. (Ex. 1 at 49:11-50:8). The Court acknowledged Dr. Lord's objection but concluded it would use the pattern language when the University confirmed the "main reason" language was in the Pattern Instruction. (*Id.* at 50:23-24). Still concerned, Dr. Lord repeated that the instruction is "giving the wrong impression to the jury that the decision has to be – the retaliatory reason has to be the main reason." (*Id.* at 51:8-17).

Dr. Lord repeated the objection because equating "because of" to "main reason" precluded

Dr. Lord from arguing that his protected activity could be *one* of *multiple* but-for causes of Dr. Shalala's decision to terminate his employment because there cannot be more than one "main reason." Importantly, this was the operative instruction to be read to the jury through most of Dr. Lord's closing argument (D.E. 224 at 29-30 (the "Original Instruction"), including through Dr. Lord's counsel's argument addressing causation. (Ex. 6 at 114:8-120:7 (discussing causation). This severely prejudiced Dr. Lord and undermined his trial strategy.

After Dr. Lord had already addressed causation in his closing argument (and during a break), the Court, citing Dr. Lord's Rule 50(a) motion (D.E. 229 at n.2)), proposed changing the "main reason" part of the Original Instruction to "you must decide whether Dr. Lord's protected activity was the *main reason* or a *motivating factor* for the University of Miami's termination decision" (the "Revised Instruction"). (Ex. 6 at 125:5-20 (announcing proposed edits)). The Court also proposed adding a special interrogatory asking the jury to decide, if Dr. Shalala's termination decision was "because of" Dr. Lord's protected activity, to indicate whether it was the "main reason" or a "motivating factor." The Court's Revised Instruction did not address Dr. Lord's concerns reflected in his proposed instruction and the parties' counsel agreed that the Revised Instruction would have invited reversible error because the Eleventh Circuit had already rejected the "motivating factor" standard for FCA retaliation claims. *See Nesbitt*, 945 F.3d at 1357 (holding that a "but-for" causation standard, not a motivating factor standard, applies to FCA retaliation claims)); (Ex. 6 at 126:13-14). Understanding the Court's desire to address only the "main reason" part of the instruction (and not  another charge conference), Dr. Lord agreed with the University to ask the Court to delete the "main reason" line from the Original Instruction and not to add the proposed special interrogatory. (*Id.* at 126:14-22) [10].

As a result, the jury was read a limited and pro-defendant instruction that stated the "but-for" causation standard required the jury to "decide that the University would not have taken the action had Dr. Lord not engaged in the protected activity but everything else had been the same" while also suggesting Dr. Lord had to prove the University's claimed non-retaliatory reasons for termination were "so unbelievable that they were a cover-up to hide the true retaliatory reasons for the decision." (D.E. 232 (the "Final Instruction")). The jury had no guidance regarding proper

---

[10] The Court clarified the parties did not want the Court "to ask the jury whether it finds that any protected activity was the reason or motivating factor for the terminating decision" and the parties confirmed neither would raise that specific issue in a post-verdict motion. (*Id.* at 200:9-11, 15-19).

application of but-for causation and the Final Instruction gave Dr. Lord an insurmountable burden of proof. The Court should grant a new trial. *See Tran*, 420 F.3d at 1312, 1314 (reversing for new trial because jury was not instructed on proper standard of liability and error limited plaintiff's argument to jury); *AseraCare Inc*, 153 F. Supp. 3d at 1384–85 (new trial warranted because court had substantial doubt whether jury had proper guidance due to incomplete instructions).

### f.   All Errors in the Aggregate Support Granting a New Trial.

The district court is afforded "wide discretion" in granting a new trial "where a combination of factors, which could have caused the jury to reach a possible erroneous verdict, [lead] the court to conclude that a new trial [i]s necessary." *Deas v. PACCAR, Inc.*, 775 F.2d 1498, 1505 (11th Cir. 1985). Thus, even when one error might not warrant a new trial, cumulative error may. *See, e.g.*, *United States v. Baker*, 432 F.3d 1189, 1223 (11th Cir. 2005) (aggregation of non-reversible errors (*i.e.*, plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial); *Mendez v. Unitrin Direct Prop. & Cas. Ins. Co.*, 622 F. Supp. 2d 1233, 1239 (M.D. Fla. 2007) (errors in combination "produced a substantial prejudicial effect" so court could not be fairly assured jury's verdict was not substantially swayed by the combination of errors). Therefore, even if the Court were to determine that no one ground justified a new trial, the various grounds asserted here, in combination, should.

### <u>CONCLUSION</u>

For the foregoing reasons, Dr. Lord is entitled to judgment as a matter of law or, in the alternative, a new trial.

Dated: November 1, 2022                    Respectfully Submitted,

                                           **STUMPHAUZER FOSLID SLOMAN**
                                           **ROSS & KOLAYA, PLLC**
                                           Two South Biscayne Boulevard, Suite 1600
                                           Miami, Florida 33131
                                           Tel.: (305) 614-1400
                                           Fax: (305) 614-1425

                                           By: */s/ Jorge Pérez Santiago*
                                           JEFFREY H. SLOMAN
                                           Florida Bar No. 378879
                                           jsloman@sfslaw.com
                                           JORGE A. PÉREZ SANTIAGO
                                           Florida Bar No. 91915
                                           jperezsantiago@sfslaw.com
                                           JENNIFER M. HERNANDEZ
                                           Florida Bar No. 1018836
                                           jhernandez@sfslaw.com
                                           *Counsel for Plaintiff Dr. Lord*

## CERTIFICATE OF GOOD FAITH CONFERENCE

Pursuant to Local Rule 7.1(a)(3), I HEREBY CERTIFY that counsel for Dr. Lord conferred with the University's counsel, and are authorized to represent the University opposes the relief requested herein.

                                           */s/ Jorge Pérez Santiago*
                                           JORGE PÉREZ SANTIAGO

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 1, 2022, I filed the foregoing document on CM/ECF causing a copy to be served on all counsel of record via electronic mail.

                                           */s/ Jorge Pérez Santiago*
                                           JORGE PÉREZ SANTIAGO